IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI
Oxford Division

JOHN RASH,                              )
                                        )
                 *Plaintiff*,           )
                                        )
v.                                      )     Civil No. _____
                                        )
LAFAYETTE COUNTY, MISSISSIPPI,          )
                                        )
                 *Defendant*.           )
                                        )

_____

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

## PRELIMINARY STATEMENT

Plaintiff John Rash challenges and seeks preliminary relief against enforcement of Lafayette County's permitting policies in order to vindicate his First Amendment right to engage in free speech on the grounds of the historic Lafayette County Courthouse (the "County Courthouse") in the Oxford, Mississippi town square. Mr. Rash intends to engage in political and artistic expression on courthouse grounds during an arts and culture festival scheduled to be held in Oxford on August 8, 2020, consistent with the traditional role of the County Courthouse grounds (the "Courthouse Grounds") as a forum for public expression and debate. Because the actions of Lafayette County (the "County"), in adopting the permitting policies at issue and denying Mr. Rash's permit application, threaten his ability to engage in Constitutionally-protected speech, Mr. Rash respectfully seeks a preliminary injunction against the County in advance of August 8, 2020, pursuant to Fed. R. Civ. P. 65(a).

The County Courthouse stands in the center of the Oxford town square. Its grounds are open to the public, and function as a public park, with grass, benches, trees, and pedestrian pathways. A Confederate monument, located at the southern edge of the Courthouse Grounds, has been the subject of public debate and protest, both historically and in recent months, as part of the nation's and the State of Mississippi's renewed engagement with issues of race and history following the killing of George Floyd. On July 6, 2020, following peaceful protests and calls from community groups to remove the Confederate monument, the Lafayette County Board of Supervisors (the "Board") considered relocating the Confederate monument. The Board, however, ultimately voted unanimously against its relocation.

In addition to being a traditional public forum, the County has historically made the Courthouse Grounds available for public gatherings through a permitting process. However, in the last two years, the County, acting through the Board, Lafayette County Sheriff Joey East, and

Board- appointed County Administrator Lisa Carwyle, have revised and implemented County permitting policies that have the cumulative effect of unreasonably restricting speech and other First Amendment-protected activity on the Courthouse Grounds.

The County's actions include (i) requiring that permit applications be submitted 30 days in advance, a requirement that can be waived at the County's discretion (the "30-day rule"); (ii) requiring permits for all gatherings on Courthouse Grounds that involve more than four people (the "five person rule"); and (iii) most recently, enacting an as-yet not publicly disclosed policy that the Courthouse Grounds are "closed" from between thirty minutes before dusk until sunrise (the "dusk-to-dawn rule"). These and other aspects of the County's permitting policies are unreasonable restrictions on speech that cannot survive First Amendment scrutiny.

The County has also used its control over the permitting process in a pretextual and retaliatory fashion to censor Mr. Rash as a result of the content and viewpoint of his speech. After Mr. Rash applied for his permit, he was contacted, on July 16, 2020, by Lafayette County Sheriff's Department personnel who asked if the visual media he intended to display was connected with the Confederate monument. When Mr. Rash said it likely would be, the Sheriff's Department representative said he "would have to get back to him." The Board met four days later and adopted the dusk-to-dawn rule. The County Administrator then denied Mr. Rash's permit on that basis.

The County permitting policies set forth above unconstitutionally burden Plaintiff and others who seek to exercise their First Amendment rights to speak, assemble, and associate in the County—particularly as regards the Confederate monument on the Courthouse Grounds. The policies target expression, are not narrowly tailored to achieve any compelling government interest, and constitute an unconstitutional prior restraint. In addition, the policies constitute

retaliatory forum closure. The policies are therefore unconstitutional both facially and as applied to Plaintiff. By forcing Plaintiff to choose between forgoing his constitutional rights or facing the threat of sanctions or arrest, the permitting policies imposes ongoing, irreparable harm on Plaintiff and enforcement of the policies should be enjoined by this Court.

## FACTUAL BACKGROUND

### A.    Mr. Rash's PROJECT(ion) Event

John Rash is an Oxford resident who works as a documentary filmmaker, photographer, visual artist, and educator. For the past three years, Mr. Rash has organized an annual art event, PROJECT(ion), as part of the Oxford Fringe Festival (the "Fringe Festival"). This year's Fringe Festival is scheduled to take place on the weekend of August 7, 2020, and Mr. Rash's PROJECT(ion) is scheduled to take place on the evening of August 8, 2020. For the past two years, artists have produced light installations as part of PROJECT(ion). Last year, the event included projections on the County Courthouse, including projections with political themes. Rash Decl. ¶¶ 1-2. Mr. Rash understands that the city of Oxford has issued permits for Fringe Festival events to be held in locations on or around the same time—*i.e.*, after nightfall—as Mr. Rash's PROJECT(ion) event. Rash Decl. ¶ 16.

### B.    The County Courthouse

The Lafayette County Courthouse is a historic courthouse located in the center of Oxford's town square and listed on the National Register of Historic Places.[1] The courthouse and its grounds constitute an enclave of County property within the City of Oxford, with the surrounding areas of the Oxford town square being subject to city, rather than County

---

[1] *See* Nat'l Park Serv., Nat'l Register Digital Assets, *available at* https://npgallery.nps.gov/NRHP/AssetDetail/fe064bbe-5ccf-4862-aa9b-a5a595445f82.

jurisdiction. The courthouse building was constructed in 1872.[2] The Oxford town square is a center of civic life in the city and County and is surrounded by bars, restaurants and stores.

There is no gate or other barrier to public access to the Courthouse Grounds. An intermittent low, decorative fence surrounds the Courthouse Grounds, but there are breaks in the fence for prominent steps that lead onto the grounds and also a large entrance onto the grounds. The town square is often filled with people visiting attractions, and the Courthouse Grounds function as a public park, with grass, benches, trees, and pedestrian pathways. Rash Decl. ¶ 3.

In 1906 and 1907, the United Daughters of the Confederacy and the United Confederate Veterans erected two Confederate monuments in the County—one on the University of Mississippi campus, and the other at the southern edge of the Courthouse Grounds.[3] The County Courthouse monument bears the inscription, "In memory of the patriotism of the Confederate soldiers of Lafayette County, Mississippi. They gave their lives in a just and holy cause."[4]

The County Courthouse has long been a site of protests, rallies and other community activities. For example, in recent years, these activities have included National Day of Prayer events and Easter celebrations.[5] These activities have also included events associated with the Oxford Film Festival, in which films have been exhibited within the Courthouse Grounds, as well as Mr. Rash's PROJECT(ion) event, held as part of the Fringe Festival. Rash Decl. ¶ 17.

---

[2] *See* http://www.courthouses.co/us-states/m/mississippi/lafayette-county/

[3] Andy Belt, THE OXFORD EAGLE, *The Oxford Confederate Statutes – The history and creation of two Lafayette County monuments* (Sept. 25, 2017), *available at* https://www.oxfordeagle.com/2017/09/25/statues-history-creation-two-lafayette-county-monuments/.

[4] *See* The American Legion, *Lafayette County Confederate Monument*, https://www.legion.org/memorials/244206/lafayette-county-confederate-monument.

[5] *See* Alyssa Schnugg, THE OXFORD EAGLE, *National Day of Prayer vigil to be held in Oxford this week* (May 1, 2018), *available at* https://www.oxfordeagle.com/2018/05/01/national-day-prayer-vigil-begins-wednesday-oxford/; LaReeca Rucker, THE OXFORD EAGLE, *Spring time on the Square* (Mar. 20, 2016), *available at* https://www.oxfordeagle.com/2016/03/20/spring-time-on-the-square/.

### C.  **The Confederate Monument Protests**

The Confederate monument on the Courthouse Grounds has attracted significant attention in recent years, with renewed focus being given both nationally and in Mississippi to the historical and political significance of such monuments.[6]  In February 2019, pro-Confederate groups and counter-protesters held rallies at the monument.[7]  More recently, after the killing of George Floyd, the Confederate monument became a focus of renewed political and expressive activity.  Every Friday and Saturday for at least three weeks in July 2020, there have been protests at the Confederate monument.  In addition, across the street from the monument, there have been protests nearly every day in June and July 2020.  These events included a march led by University of Mississippi football players that drew hundreds of marchers. There have also been protests at the nearby Lafayette County Chancery Courthouse focused on taking down or relocating the Confederate monument.  These protests have been peaceful.  *See* Rash Decl. ¶ 4.

Protesters advocating to keep the Confederate monument have also assembled in Oxford and on the Courthouse Grounds in recent weeks.  On Saturday July 4, 2020, a group supporting the Confederate monument held a permitted event on the Courthouse Grounds.  At this event, they displayed a confederate flag in front of the County Courthouse, above speakers standing on the stairs leading into the building.  They also stood under the Confederate monument with flags and signs.  *See* Rash Decl. ¶ 6.

---

[6] *See, e.g.*, Karen L. Cox, THE WASHINGTON POST, *The whole point of Confederate monuments is to celebrate white supremacy* (Aug. 16, 2017), *available at* https://www.washingtonpost.com/news/posteverything/wp/2017/08/16/the-whole-point-of-confederate-monuments-is-to-celebrate-white-supremacy.

[7] *See* Grace Marion, THE DAILY MISSISSIPPIAN, *Oxford community members react to Confederate protests and counterprotests* (Feb. 23, 2019), *available at* https://thedmarchives.com/oxford-community-members-react-to-confederate-protests-and-counterprotests/.

On June 22, 2020, the Board of Supervisors met to hear from the community regarding relocating the Confederate monument.[8]  On July 6, 2020, the Board voted unanimously against doing so.[9]  Board members expressed exasperation with the issue, with Supervisor Chad McLarty noting that "[t]his will be the third time in eight years" that the Board had been forced to consider the monument.[10]  Supervisor Larry Gillespie stated he did not believe that protesters were seeking "racial reconciliation"; that inaction against "violence and distraction" caused by protesters in other cities "was inexcusable"; and that "public safety will always come first for me."[11]  Board President Mike Roberts said that protesters had failed to exhibit "common sense," and expressed support for law enforcement, lamenting that "our community and our county [has been] drug into a national movement behind police brutality."[12]

### D.     The Lafayette County Permitting Process

On April 20, 2015, the County enacted a "Facility Use Policy" governing "use of public areas of buildings or facilities owned, leased or otherwise occupied exclusively by Lafayette County Government that are used for the conduct of County operational business."  Mot. Ex. 1 at 1 (the "2015 Policy").  The 2015 Policy stated that it applied to "public area[s]," which were defined to include "the grounds and lobbies of County buildings."  *Id.* at 2.  The 2015 Policy

---

[8] *See* Taylor Vance, DAILY JOURNAL, *Lafayette supervisors hear from residents over Confederate monuments near courthouse* (June 22, 2020), *available at* https://www.djournal.com/news/local/lafayette-supervisors-hear-from-residents-over-confederate-monument-near-courthouse/article_5246ad51-09d6-5858-882f-68dbee9448c7.html.

[9] For the avoidance of doubt, that decision is beyond the scope of—and not challenged in—this lawsuit.

[10] Alyssa Schnugg, *Lafayette County Supervisors Vote to Keep Confederate Statue* (July 6, 2020), https://hottytoddy.com/2020/07/06/lafayette-county-supervisors-vote-to-keep-confederate-statue/.

[11] Ana Martinez, THE OXFORD EAGLE, *Lafayette County Supervisors vote no on moving Confederate statute* (July 6, 2020), *available at* https://www.oxfordeagle.com/2020/07/06/lafayette-county-supervisors-vote-no-on-moving-confederate-statue/.

[12] *Id.*

provided that "applications should be submitted to the County Administrator at least one (1) week in advance of the day needed." *Id.* at 3. It also provided that "Permission to use the building shall be granted for events which are scheduled to begin and end between 8:00 a.m. and 10:00 p.m. Monday - Friday. Use on weekends or after 10:00 p.m. is limited and must primarily be events coordinated and staffed by County employees and/or officials." It is unclear whether this aspect of the 2015 Policy was intended to apply to outdoor, publicly-accessible areas such as the Courthouse Grounds.

In response to the pro-Confederate monument rally on the Courthouse Grounds in February 2019, the Board amended the Facility Use Policy. *See* Mot. Ex. 2.[13] The revised policy prohibited animals, certain signage, and certain implements or weapons. *Id.* at 5-6. It also extended the application period from one week to thirty days, and provided that the permit applicant would be required to compensate the Sheriff in advance for whatever "additional Sheriff Department deputies" the sheriff deems "reasonably necessary for the event for traffic control and public safety." *Id.* at 5.

On June 15, 2020, after protests had again erupted in the wake of George Floyd's killing, the Board adopted a further policy, applicable only to the Courthouse Grounds. This policy "amend[ed] the Facility Use Policy in order to allow four (4) people or less to use the Historic Courthouse outside grounds, including the area around the Confederate Statue, without a permit, although said individual or group may obtain a permit in order to have exclusive use of the area; five (5) or more people gathering require a permit for use." Mot. Ex. 3 at 2. The policy further provided that "[a] permit application must be submitted at least 30 days prior to the date of

---

[13] *See* Alyssa Schnugg, *Lafayette County Supervisors Change 'Facility Use Policy' After Confederate Rally* (Mar. 5, 2019), https://hottytoddy.com/2019/03/05/lafayette-county-supervisors-change-facility-use-police-after-confederate-rally/.

proposed use for five or more people, unless unusual circumstances make it impossible to make application prior to the thirty (30) day period; the Board of Supervisors and/or the Sheriff shall determine whether to waive the 30 day period." *Id.*

E. **Mr. Rash's Attempts To Obtain A Permit For His Event**

In an effort to comply with the permitting policy's 30-day requirement, Mr. Rash first sought a permit for the August 8, 2020 PROJECT(ion) event on July 7, 2020, by contacting the County Administrator's office via email. Mr. Rash did not receive a response. Rash Decl. ¶ 8.

On July 14, 2020, Mr. Rash visited the Chancery Court Building to the County Administrator's office in person to follow up regarding his permit. He was informed that the Administrator had been out of the office the week prior, and that any application submitted prior to the July 20, 2020 Board of Supervisors meeting would be considered. Rash Decl. ¶ 9.

Mr. Rash submitted his permit application that same day, requesting use of the Courthouse Grounds from 8 p.m. to 11 p.m on August 8, 2020. *See* Rash Ex. 5. On July 16, 2020, Mr. Rash was contacted by an individual who identified themselves as a representative of the Lafayette County Sheriff's Department. The caller stated: "Really what I want to know, is there anything that is going to talk about the monument or things that have been going on in Oxford lately." When Mr. Rash advised that the visual art to be displayed at the event would likely concern, among other things, the Confederate monument and, the caller responded that he would "have to get back to [Mr. Rash]" regarding the application. Rash Decl. ¶ 12.

The meeting minutes for the Board of Supervisors meetings on July 6, 2020 and July 20, 2020 have not yet been made public, and video of the July 20, 2020 meeting is unavailable. However, Mr. Rash understands that when the Board met on July 20, 2020, they changed the facility use policy as it applies to the Courthouse Grounds to prohibit all activity on the Courthouse grounds during nighttime. Rash Decl. ¶ 14. Because Mr. Rash's PROJECT(ion)

event involves projection of video onto outdoor surfaces, it cannot be held during daylight hours. Therefore, the purported new dusk-to-dawn rule adopted by the Board, if enforced, would preclude Mr. Rash from holding his event. *Id.* ¶¶ 18-19.

Mr. Rash was informed of the denial of his permit by email from the County Administrator on July 23, 2020. *See* Rash Ex. 4. The County Administrator stated: "I've denied the permit due to a change in the County's permit policy. No permits will be issued after dusk, due to security issues." *Id.* After receiving this email, Mr. Rash responded to the County Administrator, asking whether—consistent with the June 15, 2020 policy revision—he could hold the event unpermitted while ensuring that no more than 4 people would be present on the Courthouse Grounds. Rash Decl. ¶ 15. The County Administrator responded on July 27, 2020, stating that "the Courthouse grounds, including the statue area, are closed for any gathering after dark, regardless of permit requirements. So you would not be allowed to be on the grounds from thirty minutes prior to dusk to sunrise." Rash Ex. 6.

## ARGUMENT

To obtain a preliminary injunction, Plaintiff must demonstrate that he is likely to succeed on the merits of at least one of his claims; he is likely to suffer irreparable harm if preliminary injunction is not granted; the equities favor preliminary injunctive relief; and such relief serves the public interest. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Jones v. Texas Dep't of Criminal Justice*, 880 F.3d 756, 759 (5th. Cir. 2018). "In First Amendment cases, the likelihood of success on the merits will often be the determinative factor." *Higher Society of Ind. v. Tippecanoe Cnty., Ind.*, 858 F.3d 1113, 1116 (7th Cir. 2017) (internal citations omitted). Moreover, in First Amendment challenges to government speech regulations, the government bears the burden of justifying its restrictions on free speech. *See Byrum v. Landreth*, 566 F.3d 442, 446 (5th Cir. 2009).

I.  **PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS OF HIS CLAIM THAT THE COUNTY'S PERMITTING POLICIES ARE UNREASONABLE RESTRICTIONS ON SPEECH AND EXPRESSIVE CONDUCT**

   A.  **The Courthouse Grounds Are A Traditional Public Forum**

   Traditional public forums are spaces which, as a matter of historical use and or government order, have long been devoted to public discourse and discussion. *See, e.g., Chiu v. Plano Independent School Dist.*, 260 F.3d 330, 344 (5th Cir. 2001) ("Traditional public forums are places that by long tradition or by government fiat have been devoted to assembly or debate.").  These forums allow individuals and groups to air ideas, engage in debate, and exercise their full range of First Amendment rights. "This type of forum includes streets and parks which have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Id.  See also Freedom From Religion Foundation v. Abbott,* 955 F.3d 417, 426 (5th Cir. 2020).

   The County Courthouse stands in the center of Oxford's town square.  The Courthouse Grounds, complete with sidewalks and benches, are an archetypical traditional public forum, and have hosted numerous public events, protests, and debates over the years.  The physical characteristics and central location of the Courthouse Grounds match the Supreme Court's description of a traditional public forum because it is "continually open, often uncongested, and constitutes not only a necessary conduit in the daily affairs of a locality's citizens, but also a place where people may enjoy the open air and the company of friends and neighbors in a relaxed environment." *Heffron v. International Soc. for Krishna Consciousness, Inc.*, 452 U.S. 640, 651 (1981).  Courts have recognized that courthouse grounds in town squares constitute public forums. *See Capitol Square Review and Advisory Bd. v. Pinette*, 515 U.S. 753, 758 (1995) (identifying the public square outside a state capitol as a traditional public forum);

*O'Connell v. Town of Burgaw, N. Carolina*, 262 F. Supp. 3d 316, 320 (E.D.N.C. 2017) (holding that "[t]he Pender County Courthouse Square and its surrounding public streets and sidewalks are traditional public fora.").[14]  Courts have also recognized that a public forum does not lose its status as such merely because it "abuts government property that has been dedicated to a use other than as a forum for public expression." *United States v. Grace*, 461 U.S. 171, 180 (1983).[15]

### B.    The County's Permitting Policy Is An Unreasonable Restraint On Speech That Fails Heightened Scrutiny

Because the Courthouse Grounds are a public forum, restrictions on speech in that forum are subject to heightened scrutiny.  Although the County is entitled to enact reasonable time, place, and manner regulations in a public forum, those restrictions "must be narrowly tailored to serve a compelling state interest."  *Freedom From Religion Found. v. Abbott*, 955 F.3d 417, 427 (5th Cir. 2020).  "A regulation is 'narrowly tailored' when it does not 'burden substantially more speech than is necessary to further the government's legitimate interests.'"  *Hays Cnty. Guardian*

---

[14] *See also Satawa v. Macomb County Road Comm'n*, 689 F.3d 506, 519 (6th Cir. 2012) (recognizing that walkways and grounds "quite close to the seat of government, and [...] covered by sidewalks" are clearly traditional public forums); *Deans v. Las Vegas Clark County Library District*, 220 F. Supp. 3d 1058, 1062 (D. Nev. 2016) (plaza outside county library was traditional public forum); *Watters v. Otter*, 955 F. Supp. 2d 1178, 1186 (D. Idaho 2013) (describing "the grounds surrounding the old Ada County Courthouse" as a traditional public forum); *Occupy Fresno v. County of Fresno*, 835 F. Supp. 2d 849, 855–56 (E.D. Cal. 2011) (park that surrounds the County Court was a traditional public forum).

[15] At the very least, the Courthouse Grounds constitutes a designated public forum.  In addition to traditional public forums, "[t]he state can also intentionally create designated public forums on other state property for the same widespread use as traditional public forums." *Fairchild v. Liberty Independent School Dist.*, 597 F.3d 747, 758 (5th Cir. 2010).  The Fifth Circuit recognizes designated public forums "created by government designation of a place or channel of communication for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects." *Chiu*, 260 F.3d at 345.  And "once the government has designated a particular forum as appropriate for certain types of speech or for speech on particular topics, speech for which the forum is designated is afforded protection identical to the protection provided to speakers in a traditional public forum." *Id.* at 347. Lafayette County has clearly designated the park and sidewalks outside the County Courthouse as a public forum fit for widespread use and discourse.  The County has approved permits for various protests, gatherings, and rallies over the years, and has held out the space as one for public assembly and speech. Other courts evaluating plazas and squares set aside for public speech have similarly concluded that such spaces are designated public forums. *See U.S. v. Gilbert*, 920 F.2d 878, 884 (11th Cir. 1991) (finding "no question" that an unenclosed plaza next to a federal building was a designated public forum).

*v. Supple*, 969 F.2d 111, 119 (5th Cir. 1992). This standard applies to content-neutral regulations as well as to speech restrictions that are content or viewpoint based. *See Pro-Life Cougars v. Univ. of Houston*, 259 F. Supp. 2d 575, 581 (S.D Tex. 2003) ("a content-neutral regulation of speech on a public forum must be narrowly tailored to serve a significant government interest and must leave open ample alternative channels of communication").

An "ordinance requiring a permit and a fee before authorizing public speaking, parades, or assemblies in 'the archetype of a traditional public forum,' … is a prior restraint on speech." *Forsyth Cnty., Ga. v. Nationalist Movement*, 505 U.S. 123, 130 (1992). "[T]here is a 'heavy presumption' against the validity of a prior restraint'" and to curtail risks of arbitrary application or suppression of particular viewpoints, "a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license" must contain "narrow, objective, and definite standards to guide the licensing authority." *Id.* at 130-31. *See also Service Employees International Union v. City of Houston*, 595 F.3d 588, 596 (5th Cir. 2010) (prior restraints "are disfavored and must be confined by narrow, objective, and definite standards."). For the reasons discussed below, the County's restrictions on public gatherings on the Courthouse Grounds are unreasonable restrictions on free speech, are not narrowly tailored to serve a significant government interest, and lack appropriate objective standards to cabin official discretion.

### 1. The Dawn-To-Dusk Rule

The County's recently-adopted dawn-to-dusk rule—effectively, a curfew which prohibits *any* presence on Courthouse Grounds between thirty minutes before dusk and dawn—does not pass First Amendment muster. The County cannot explain why this restriction is necessary or how it furthers any significant government interest, and vague contentions regarding public safety do not suffice. *See Occupy Eugene v. U.S. General Services Administration*, 43 F. Supp. 3d 1143, 1150-51 (D. Or. 2014) (striking down restriction on permit authorizing protest only

between 8 a.m. and 5 p.m. as "greater than necessary to further the interest of public safety"); *accord United States v. Nat'l Treasury Emps.' Union*, 513 U.S. 454, 475 (1995) ("When the Government defends a regulation on speech as a means to redress past harms or prevent anticipated harms, it must do more than simply 'posit the existence of the disease sought to be cured.' It must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way.").

Blanket prohibitions on access to traditional public forums after dark, justified on generic public safety grounds, are not narrowly tailored and cannot withstand First Amendment scrutiny. Courts have recognized that "a wide range of First Amendment activities" traditionally occur after dark, "including political events, death penalty protests, late night sessions of the [legislature], and neighborhood association meetings or nighttime events." *Hodgkins ex rel Hodgkins v. Peterson*, 355 F.3d 1048, 1058 (7th Cir. 2004). "A number of religions mark particular days or events with late-night services, prayers, or other activities," and "[l]ate-night or all-night marches, rallies, and sleep-ins are often held to protest government action or inaction." *Id.* Thus, ordinances that prohibit access to traditional public forums after dark reach "some of the purest and most protected forms of speech and expression," *id.*, and are unconstitutional absent a specific and compelling justification.

No such justification exists here. To the contrary, any claimed public safety rationale for the dawn-to-dusk rule's blanket prohibition on speech after dark is undermined by the fact that the Courthouse Grounds are an enclave of County property at the heart of the City of Oxford's central business district. The City has granted a permit for the Fringe Festival that allows events to take place in the surrounding areas and that is not subject to a similar dusk-to-dawn restriction. *See* Rash Decl. ¶ 16. The contention that public safety concerns necessitate a complete

prohibition on First Amendment-protected activities specifically on Courthouse Grounds, but not in the immediate vicinity, cannot bear even a modicum of scrutiny. This is particularly true where the County's prior policy under which it granted permits for events after dark (such as the permit issued to the Fringe Festival for use of the Courthouse Grounds in 2019 (*see* Rash Decl. ¶ 2)) is an obvious, less burdensome alternative, and the existence of such alternatives is "a relevant consideration in determining whether the fit between ends and means is reasonable." *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 417 n.13 (1993).

The County's policy change also fails because it leaves no adequate alternative venues for Mr. Rash's PROJECT(ion) event. In addition to requirements of narrow tailoring, restrictions on speech "must leave open ample alternative channels of communication" for speakers to express their messages. *Justice For All v. Faulkner*, 410 F.3d 760, 769 (5th Cir. 2005). But an alternative forum "is not sufficient if it forecloses a speaker's ability to reach one audience even if it allows the speaker to reach other groups." *Sarre v. City of New Orleans*, 420 Fed. Appx. 371, 376 (5th Cir. 2011). A speaker's audience can also be fairly specific. For example, in *Sarre*, the Fifth Circuit advised that on remand, the district court should "determine whether there exist alternative fora at which Appellants can reasonably expect to sell prints of their original artwork to the tourists who visit New Orleans." *Id.* at 377.

Here, the County's change in policy eliminates Mr. Rash's ability to reach his audience, the attendees at Oxford's 2020 Fringe Festival. Use of the venue earlier in the day is not a suitable alternative, as Mr. Rash's light projections require that it be dark in order to be visible; thus, "the late hour of the activity" is both "dictated by necessity" and "closely linked with the purpose and message of the activity." *Hodgkins*, 355 F.3d at 1062. For the past two years, artists have used light projections after dark as part of PROJECT(ion) without County

14

restrictions and without adverse public safety consequences. Rash Decl. ¶¶ 1–2. The County's new dawn-to-dusk rule eliminates the only suitable forum for Mr. Rash to convey his message to his target audience, and thus fails to leave open adequate alternative channels of communications. *See Hodgkins*, 355 F.3d at 1063 (striking down curfew ordinance that forced citizens to "surrender [their] right to participate in late-night activities whose context and message are tied to the late hour and the public forum").

### 2. The Five Person Rule

The permitting policy applicable to the Courthouse Grounds is also independently unconstitutional because "ordinances requiring a permit for demonstrations by a handful of people are not narrowly tailored to serve a significant government interest." *Knowles v. City of Waco, Tex.*, 462 F.3d 430, 436 (5th Cir. 2006). The court in *Knowles* struck down an ordinance requiring a permit for gatherings of two people, and the court cited with approval cases from other circuits striking down ordinances requiring permits for gatherings of ten or six people. *See Douglas v. Brownell*, 88 F.3d 1511, 1524 (8th Cir. 1996) (noting concern about "application of the permit requirement to groups of ten or more persons"); *Grossman v. City of Portland*, 33 F.3d 1200, 1202–06 (9th Cir. 1994) (expressing disbelief that "six to eight people carrying signs in a public park constituted enough of a threat to the safety and convenience of park users … to justify the restrictions imposed on their speech here").

Like the permit requirement at issue in *Knowles*, the County's imposition of a permit requirement for gatherings of more than four people on Courthouse Grounds is not narrowly tailored and cannot survive heightened scrutiny. *Cox v. City of Charleston, SC* is instructive. 416 F.3d 281 (4th Cir. 2005). There, the Fourth Circuit considered a permitting ordinance that "[was] not limited to large groups," but also "applie[d] to gatherings of only a few people." *Id.* at 285. The city argued that this was justified because "[s]afety issues remain whether the parade

or protest is large or small"—"[s]ome small but particularly inflammatory protests may be a greater security concern than even much larger ones," and "'[s]mall towns with limited resources' need advance warning of even small protests to adequately police the events." *Id.* The court rejected these arguments, noting that the city "fail[ed] to explain how a small demonstration that may become inflammatory would tax its police force any differently than, for example, a street fight between two individuals, so as to justify requiring advance warning of all small demonstrations." *Id.* The court concluded that "[w]hile it may be true that the permit requirement succeeds in mitigating" safety risks, "it does so at too high a cost." *Id.* So too here.

### 3. The Permit Approval Process

The County's vague, discretionary, and ambiguous permit approval process also fails to meet the high standards that are required before a prior restraint on speech in a traditional public forum will be found to pass constitutional muster.

*First*, the requirement that applicants obtain a permit 30 days before a planned event is unconstitutionally burdensome. Courts have repeatedly held that 30 day notice requirements for protests or public gatherings, even when content-neutral, violate the First Amendment. *See, e.g.*, *Sullivan v. City of August*, 511 F.3d 16, 38–40 (1st Cir. 2007) (holding that First Amendment rights "require the City in time sensitive situations to accommodate proposed parades and marches much more quickly than within thirty days"); *Am.-Arab Anti-Discrimination Comm. v. City of Dearborn*, 418 F.3d 600, 606 (6th Cir. 2005) (finding it "indisputable that the thirty-day notice period is over expansive").[16] "Because notice provisions have the tendency to stifle our

---

[16] By contrast, the Fifth Circuit has upheld a notice requirement where the requirement was (i) only seven days; and (ii) applicable to a university campus. *See Sonnier v. Crain*, 613 F.3d 436, 441–42 (5th Cir. 2010). That requirement is far more lenient, and far more attuned to its specific circumstances, than the 30-day period at issue here.

most paradigmatic examples of First Amendment activity, courts must take special care when reviewing the government's justification for its infringement." *Am.-Arab Anti-Discrimination Comm.,* 418 F.3d at 605.

Here, the Board of Supervisors offered no justification when they announced the new 30-day rule. If the 30-day rule was enacted in furtherance of some unspecified security or safety concern, it is overbroad and not sufficiently tailored to that interest. *See id.* at 606 ("[I]t is difficult to characterize the thirty-day notice provision as a necessity" for achieving the city's stated interest in ensuring public safety.). And, if the "reason for such an expansive notice period is the fact that the [Board] only meets twice a month,"[17] that is wholly inadequate; "[s]uch a substantial inhibition on speech cannot be justified by the [government's] failure to respond to requests in a more timely fashion." *Id.*; *see also Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 163 (1969) (Harlan, J., concurring) (Applications "must be handled on an expedited basis so that rights of political expression will not be lost in a maze of cumbersome and slow-moving procedures.").[18]

The permitting policy states that "the Board of Supervisors and/or the Sheriff shall determine whether to waive the 30 day period" when "unusual circumstances make it impossible to make application prior to the thirty (30) day period." Mot. Ex. 3. However, this discretionary waiver provision does not save the thirty-day requirement. *See Am.-Arab Anti-Discrimination*

---

[17] The Board of Supervisors holds regular meetings twice a month. Lafayette County, *Board of Supervisors' Meeting Policy and Procedures*, https://lafayettems.com/how-do-i/request-use-of-a-county-facility/ (last visited July 30, 2020) (noting that the Board of Supervisors meets "commencing at 5:00 p.m. on the first Monday and as recessed starting at 8:00 a.m. on the third Monday of each month").

[18] Indeed, the County's website states that permit applications "will be processed in three to five business days." *See* Lafayette County, Request Use of a County Facility, https://lafayettems.com/how-do-i/request-use-of-a-county-facility/ (last visited July 30, 2020). This further undercuts any contention that the 30-day requirement is necessary as an administrative matter.

*Comm.*, 418 F.3d at 607 (waiver provision inadequate where "no provision in the Ordinance, past practice, or narrowing construction that specifies standards by which it makes its waiver decisions"); *World Wide Street Preachers' Fellowship v. City of Grand Rapids*, No. 1:07-CV-57, 2007 WL 1462130, at *6 (W.D. Mich. May 16, 2007) ("[U]ncircumscribed authority to waive technical compliance with the rules is insufficient to rescue the notice period from unconstitutionality."). And, while this exception might make the 30-day rule less restrictive in some cases, the lack of clear guidelines about when exception will be granted (or refused) presents a serious risk of unconstitutional censorship. "Unusual circumstances" is far too vague to meaningfully channel government discretion; as the Fifth Circuit has explained, "the doctrine forbidding unbridled discretion disallows a presumption that the government will act in good faith and adhere to standards absent from the ordinance's face." *Freedom From Religion Foundation*, 955 F.3d at 429 n.2. The policy's exception that officials might waive the 30-day rule for undefined "unusual circumstances" vests the County with unfettered discretion to selectively enforce the rule based on whether County officials approve of the content or viewpoint.

**Second**, the County's permitting policy is silent on who exactly decides whether or not to grant a permit application. The policies explain that determinations regarding safety and security are to be made by the Sheriff, while the permit form itself identifies the County Administrator as the official approving or denying permit applications. *See* Mot. Ex. 2. But in Mr. Rash's case, the County Administrator advised him that his application would not be decided until the Board of Supervisors met five days later. Rash Decl. ¶ 9. And a representative from the Lafayette County Sheriff's Department called Mr. Rash about his permit application, and after learning that Mr. Rash's light projections might concern the Confederate monument, said he would have

to "get back to [him]." *Id.* ¶ 12. Without knowledge of who the actual decision maker is, a permit applicant cannot receive the "fair notice" that the First Amendment requires. *Service Employees International Union*, 595 F.3d at 596–97.

Importantly, the fact that County officials questioned Mr. Rash regarding the content of his speech before ultimately denying his permit is itself compelling circumstantial evidence that the County's permitting process is insufficiently objective, inadequately defined, and grants officials far too much discretion. *See, e.g.*, *Lady J. Lingerie, Inc. v. City of Jacksonville*, 176 F.3d 1358, 1361 (11th Cir. 1999) (requiring "precise and objective criteria"). Even if the relevant decision-makers ultimately did not deny Mr. Rash's permit based on the content of his speech, the fact that this formed part of their internal deliberative process creates an improper suggestion of content- or viewpoint-based discrimination, which itself has a chilling effect on Mr. Rash's—and others'—speech. As explained above, because of the interests at stake, there can be no "presumption that the government will act in good faith" when exercising discretion in this area of the law. *Freedom From Religion Foundation*, 955 F.3d at 429 n.2. *See also J&B Entertainment v. City of Jackson, Miss.*, No. Civ.A. 3:06-CV-144WS, 2006 WL 1118130, at *9 (S.D. Miss. April 7, 2006) ("A scheme establishing a prior restraint, such as a licensing requirement, on protected speech which places unbridled discretion in the decision maker by failing to impose either objective standards for a decision or adequate procedural safeguards creates an impermissible risk of suppression of that protected right with every application.").

***Third***, the permitting process applicable to the Courthouse Grounds is constitutionally infirm because it ambiguously appears to apply the same standards to the Courthouse Grounds— a traditional public forum—as it does to limited public forums such as county building lobbies and courtrooms. Thus, the permitting policy—which purports to apply to the Courthouse

Grounds as well as to other "county facilities"—provides that "[g]roups are generally limited to one reservation per month" and that "[p]ermission to use the building shall be granted for events which are scheduled to begin and end between 8:00 a.m. and 10:00 p.m. Monday – Friday," with "[u]se on weekends or after 10:00 p.m." being "limited" and "primarily [ ] events coordinated and staffed by County employees and/or officials." Mot. Ex. 2 at 3.

These may be appropriate restrictions for a policy that governs the public's right to reserve event space within a courthouse or county building. However, to the extent it is intended to also apply to a traditional public forum such as the Courthouse Grounds—which is generally open and accessible to the public, including on nights and weekends—its purported restrictions of gatherings to "one reservation per month" and prohibition of weekend gatherings wholly fail to pass muster. Indeed, the evidence indicates that the County does not apply, or at least consistently apply, these aspects of its policy to gatherings on the Courthouse Grounds—just this past month, the County granted a permit for a Saturday protest by a pro-Confederate group on the Courthouse Grounds. Rash Decl. ¶ 6. In sum, the substantial deficiencies in the County's policy, as applied to gatherings, speech, and protest on the Courthouse Grounds, demonstrate that its enforcement must be enjoined as applied to the Courthouse Grounds.

## II. PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS OF HIS RETALIATORY CLOSURE CLAIM

A preliminary injunction should also be issued because Plaintiff is likely to succeed on the merits of his claim that the County engaged in unconstitutional retaliatory forum closure. Specifically, the County retaliated against Mr. Rash by enacting the dusk-to-dawn rule in response to his permit application, in order to provide a facially-neutral justification for the County's denial of the permit.

The First Amendment principle of viewpoint neutrality mandates that "the government [ ] not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views." *Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 96 (1972). This rule applies not only to explicit viewpoint-based regulations, but also to facially-neutral regulations that are "in reality a facade for viewpoint-based discrimination." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 811 (1985). Similarly, content-based regulations are strongly disfavored and face strict scrutiny. *See Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

Viewpoint and content-based regulations disguised as legitimate government action often arise in the form of governmental retaliation in response to disfavored protected speech. Such retaliation is unconstitutional, as the "First Amendment prohibits not only direct limits on individual speech but also adverse governmental action against an individual in retaliation for the exercise of protected speech activities." *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002).

Courts have recognized speech retaliation in a number of contexts, including retaliatory forum closure.[19] *See, e.g.*, *ACT-UP v. Walp*, 755 F. Supp. 1281, 1289–90 (M.D. Pa. 1991) (holding that the temporary closure of a public gallery at the chamber of the Pennsylvania House of Representatives "in order to deny access to a particular group" was unconstitutional); *Missouri Knights of the Ku Klux Klan v. Kansas City*, 723 F. Supp. 1347, 1352 (W.D. Mo. 1989)

---

[19] A public forum, may not be closed, permanently or temporarily, primarily because the government disfavors the viewpoint or content of particular speech. *See, e.g.*, S*tudent Gov't Ass'n v. Bd. of Trs. of the Univ. of Mass.*, 868 F.2d 473, 480 (1st Cir. 1989); *Rhames v. City of Biddeford*, 204 F. Supp. 2d 45, 51 (D. Me. 2002) ("[T]o shut down the public access channel temporarily so as to stifle discussion of a particular current controversy… or so as to stifle the particular speech of this plaintiff…would be speaker and viewpoint censorship and would violate the First Amendment under any analysis."). "Whether the exclusion is accomplished by individual censorship or elimination [or limitation] of the forum is inconsequential; the result is the same." *Missouri Knights*, 723 F. Supp. at 1352. *See also U.S. Postal Serv. v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 133 (1981) (state cannot "by its own *ipse dixit* destroy the 'public forum' status of the streets and parks ….").

(refusing to dismiss a claim that a facially-neutral resolution to eliminate a public access television channel was intended to censor the viewpoint of a certain group); *Koala v. Khosla*, 931 F.3d 887, 904 (9th Cir. 2019) (reversing dismissal of retaliatory forum closure claim).  The County's dusk-to-dawn rule is likewise an unconstitutional content and viewpoint-based regulation disguised as a facially-neutral rule amounting to a retaliatory forum closure.

To establish a First Amendment retaliation claim against a private citizen under 42 U.S.C. § 1983, a plaintiff must demonstrate that "(1) they were engaged in constitutionally protected activity, (2) the defendants' actions caused them to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity, and (3) the defendants' adverse actions were substantially motivated against the plaintiffs' exercise of constitutionally protected conduct."  *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002); *Culbertson v. Lykos*, 790 F.3d 608, 618 (5th Cir. 2015); *San Antonio Firefighters' Ass'n, Local 624 v. City of San Antonio*, 404 F. Supp. 3d 1045, 1063 (W.D. Tex. 2019).

### A. <u>Plaintiff Is Engaged In Constitutionally-Protected Activity</u>

There is no doubt that Mr. Rash was engaged in constitutionally protected activity when he sought a permit to hold a public event that would express political views implicating the ongoing political discourse regarding the Confederate monument on the Courthouse Grounds. The Supreme Court "has frequently reaffirmed that speech on public issues occupies the highest rung of the hierarchy of First Amendment values and is entitled to special protection." *Colson v. Grohman*, 174 F.3d 498, 506 (5th Cir. 1999) (*quoting Connick v. Myers*, 461 U.S. 138, 145 (1983)).  This core political speech must be protected to ensure this country's "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co. v. Sullivan*, 376 U.S. 254, 271 (1964).

**B.** __Defendants' Actions Have A Chilling Effect__

The injury Mr. Rash suffered as a result of his permit's denial far exceeds the requirement that the defendant's actions caused the plaintiff "to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity." *Keenan*, 290 F.3d at 258. Mr. Rash has previously exercised his protected speech rights through his participation in the annual Fringe Festival by creating art installations in public spaces. Rash Decl. ¶ 2. The sudden implementation of the dusk-to-dawn rule will not only chill, but will silence Mr. Rash and others who wish to express their political viewpoints on this controversial topic. As the Fifth Circuit has explained, such intimidating retaliatory tactics used by the government would deter an ordinary person from continuing to express such a viewpoint. *Keenan*, 290 F.3d at 259. The dawn-to-dusk rule permanently deprives Mr. Rash of the opportunity to convey his message, which is inextricably bound to the form of the PROJECT(ion) event, the projection of images onto the County Courthouse walls.

**C.** __Defendant's Adverse Actions Were Retaliatory__

The County took adverse retaliatory action against Mr. Rash when on July 20, 2020, it revised the County's permit requirements to no longer allow events after dusk on Country Courthouse grounds and denied Mr. Rash's permit request to hold the PROJECT(ion) event. Rash Decl. ¶ 14. Direct evidence of a retaliatory motive is not necessary. *See San Antonio Firefighters' Ass'n, Local 624 v. City of San Antonio*, 404 F. Supp. 3d 1045, 1064 (W.D. Tex. 2019). Instead, retaliatory motive can be proved by adverse action "on the heels of [plaintiff's] protected speech activity." *Ulrich v. City & Cty. of San Francisco*, 308 F.3d 968, 980 (9th Cir. 2002).

Here, the dusk-to-dawn rule was adopted by the County only four days after a Sheriff's Department representative requested that Mr. Rash disclose whether the art he intended to

display would concern the Confederate monument. Three days later, Mr. Rash's permit application was denied. As the Fifth Circuit has held, "a trail of breadcrumbs, albeit circumstantial" is sufficient to establish the defendant "harbored a retaliatory motive." *Jordan v. Ector Cty.*, 516 F.3d 290, 301 (5th Cir. 2008). In light of the County's recent history of adopting escalating speech-restrictive rules for public gatherings on the Courthouse Grounds, this "close temporal proximity" between the challenged speech and the retaliatory action more than suffices. *Koala v. Khosla*, 931 F.3d 887, 905 (9th Cir. 2019).

In the alternative, another means of demonstrating retaliatory and pretextual motive is evidence that others have engaged in similar conduct without retaliation. *Jordan*, 516 F.3d at 301. While the dawn-to-dusk rule was imposed on the County Courthouse grounds, temporarily closing the public forum at the center of Oxford's Confederate monument debate, the "City of Oxford granted a permit for a location adjacent to the County Courthouse for an event after dark for this year's Oxford Fringe Festival." Rash Decl. ¶ 16.

## III.     THE OTHER REQUIREMENTS FOR PRELIMINARY INJUNCTIVE RELIEF ARE SATISFIED

Preliminary relief is necessary to prevent irreparable harm to Plaintiff. Plaintiff will be permanently deprived of the opportunity to hold his event, or else subjected to the risk of arrest or other enforcement action, if preliminary injunctive relief is not obtained in advance of August 8, 2020. And the "loss of First Amendment freedoms for even minimal periods of time constitutes irreparable injury justifying the grant of a preliminary injunction." *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. Unit B Nov. 1981).

The balance of equities and public interest also weighs in favor of Plaintiff. The permitting policies obstruct Plaintiff's exercise of his constitutional rights, causing him great harm. Meanwhile, no harm will come to Defendant if Plaintiff is allowed to engage in protected

speech.  While "[t]he State absolutely has an interest in enforcing the law," that "interest yields when the law at issue violates the Constitution." *Campaign for S. Equal. v. Bryant*, 64 F. Supp. 3d 906, 951 (S.D. Miss. 2014), *aff'd*, 791 F.3d 625 (5th Cir. 2015).  And, "injunctions protecting First Amendment freedoms are always in the public interest." *Texans for Free Enter. v. Texas Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013).

Finally, the Court should waive the bond requirement of Fed. R. Civ. P. 65(c).  A court, "may elect to require no security at all" in an appropriate case.  *Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996).  Because "this litigation is in the public interest insofar as it seeks to vindicate the public's First Amendment rights," the bond requirement should be waived. *Libertarian Party of Connecticut v. Merrill*, No. 15-CV-1851 (JCH), 2016 WL 10405920, at *8 (D. Conn. Jan. 26, 2016); *see also Gordon v. City of Houston, Tex.*, 79 F. Supp. 3d 676, 695 (S.D. Tex. 2015) (waiving bond in First Amendment case).

## **CONCLUSION**

Plaintiff's Motion for a Preliminary Injunction should be granted.


Dated: July 31, 2020                                   Respectfully submitted,

                                                       _/s/ Joshua Tom_____

SIMPSON THACHER & BARTLETT LLP          AMERICAN CIVIL LIBERTIES UNION OF
Jonathan K. Youngwood*                  MISSISSIPPI FOUNDATION, INC.
Isaac Rethy*                            Joshua Tom, MS Bar. No 105392
425 Lexington Avenue                    Landon Thames, MS Bar No. 105127
New York, NY 10017                      P.O. Box 2242
(212) 455-2000                          Jackson, MS 39225
jyoungwood@stblaw.com                   Phone: (601) 354-3408
irethy@stblaw.com                       jtom@aclu-ms.org
                                        lthames@aclu-ms.org

*pro hac vice forthcoming*

## <u>CERTIFICATE OF SERVICE</u>

I, Joshua Tom, hereby certify that on July 31, 2020, I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to all parties on file with the Court.


<u>/s/: Joshua Tom</u>
Joshua Tom