1                  **UNITED STATES DISTRICT COURT**

2               **NORTHERN DISTRICT OF MISSISSIPPI**

3

4

   **JOHN RASH,**                       )

5                           )

              **Plaintiff,**     )        **CAUSE NO. 3:20CV224**

6                         )

                 **VS.**          )

7                         )

   **LAFAYETTE COUNTY, MISSISSIPPI** )

8                         )

             **Defendant.**    )

9  ━━━━━━━━━━━━━━━━━━━━━━━━━━━

10

11

12      **MOTION HEARING - MOTION FOR PRELIMINARY INJUNCTION**
    **BEFORE UNITED STATES SENIOR DISTRICT JUDGE NEAL B. BIGGERS**

13         **WEDNESDAY, AUGUST 5, 2020; 1:30 P.M.**
               **OXFORD, MISSISSIPPI**

14

15  **FOR THE PLAINTIFF:**

16       ACLU of Mississippi
       JOSHUA FIYENN TOM, ESQ.

17       Post Office Box 2242
       Jackson, Mississippi 39225

18

       C. Jackson Williams, Attorney

19       C. JACKSON WILLIAMS, ESQ.
       Post Office Box 69

20       Taylor, Mississippi 38673

21

  **FOR THE PLAINTIFF VIA VIDEOCONFERENCE:**

22

       American Civil Liberties Union of Mississippi

23       LANDON P. THAMES, ESQ.
       Post Office Box 2242

24       East Capital Street
       Jackson, Mississippi 39225

25

```
 1        Simpson, Thacher & Bartlett
          JONATHAN K. YOUNGWOOD, ESQ.
 2        ISAAC M. RETHY, ESQ.
          425 Lexington Avenue
 3        New York, New York 10017


 4


 5   FOR THE DEFENDANT:


 6        Clayton O'Donnell, PLLC
          DAVID D. O'DONNELL, ESQ.
 7        Post Office Drawer 676
          Oxford, Mississippi  38655
 8


 9


10


11


12


13
     Proceedings recorded by official stenographic court reporter.
14   Transcript produced with computer-aided transcription.

15   _____

16
                      RITA DAVIS, FCRR, RPR, CSR #1626
17                     FEDERAL OFFICIAL COURT REPORTER
                     911 JACKSON AVENUE EAST, SUITE 369
18                      OXFORD, MISSISSIPPI  38655

19


20


21


22


23


24


25
```

1                          <u>TABLE OF CONTENTS</u>

2

3    Style and Appearances......................................1
     Table of Contents.........................................3

4

5
                              <u>DIRECT</u>        <u>CROSS</u>        <u>REDIRECT</u>
6    <u>WITNESSES FOR PLAINTIFF</u>

7    John Rash                  18            27            44

8
     Plaintiff rests..........................................46
9

10
                              <u>DIRECT</u>        <u>CROSS</u>        <u>REDIRECT</u>
11   <u>WITNESSES FOR DEFENDANT</u>

12   Lisa Carwyle               47            55
     Sheriff Joey East          73            79
13

14   Defendant rests..........................................93

15

16                              <u>EXHIBITS</u>

17   <u>EXHIBITS</u>              <u>DESCRIPTION</u>          <u>ID ONLY</u>      <u>RECEIVED</u>

18   Defendant's   Email dated 7/7/2020         36          54
     Exhibit A
19
     Plaintiff's   Email dated 7/23/2020        44
20   Exhibit 1                                  56

21   Plaintiff's   Email dated 7/26/2020        44
     Exhibit 2
22

23

24   Court Adjourned..........................................94

25   Court Reporter's Certificate.............................95

```
1  (CALL TO ORDER OF THE COURT)

2           THE COURT:  All right.  Let me see who we have

3  present here representing the parties.  Who do we have

4  representing the plaintiff?

5           MR. TOM:  Good afternoon, Your Honor.  My name is

6  Joshua Tom.  And I represent --

7           THE COURT:  I'm sorry.  You'll have to speak a little

8  more plainly.  I can't understand you.

9           MR. TOM:  Your Honor, my name is Joshua Tom; and I

10  the plaintiff, John Rash.  We also have --

11           MR. WILLIAMS:  Your Honor, I'm Jack Williams; and I

12  represent the plaintiff also.

13           THE COURT:  You don't want to sit at counsel table?

14           MR. WILLIAMS:  I'm trying to just maintain the --

15           THE COURT:  All right.  I see.  Trying to set social

16  distancing.  I understand.

17      Mr. O'Donnell --

18           MR. O'DONNELL:  Your Honor, David O'Donnell, for

19  Lafayette County.  And, at counsel table, I have Lisa Carwyle,

20  who's the county administrator.

21           THE COURT:  Very well.

22      And we have by extreme social distancing other lawyers

23  representing the plaintiff.  Who do we have there?

24           MR. YOUNGWOOD:  Good afternoon, Your Honor.  Jonathan

25  Youngwood for the plaintiff.
```

1          THE COURT:  All right.

2          MR. RETHY:  Also have Isaac Rethy with Simpson

3 Thacher also for the plaintiffs.

4          THE COURT:  Say it again, please.  You're talking a

5 little fast.

6          MR. RETHY:  This is Isaac Rethy with the law firm

7 Simpson Thacher also representing the plaintiff.

8          THE COURT:  Okay.  Thank you.

9          MR. THAMES:  Hi, Your Honor.  My name is Landon

10 Thames.  I'm an attorney for the plaintiff.  I work for the

11 ACLU of Mississippi.

12          THE COURT:  Okay.  I've read the petition, the

13 response, the memorandum of law filed, the defendants just

14 filed within the last hour or so.  Of course, I understand why

15 he's a little late, because he was not given notice when the

16 petition was first filed.

17     All right.  Is the plaintiff ready to proceed?  Do you

18 have any testimony you wish to present?

19          MR. TOM:  We plan to call Mr. Rash.

20          THE COURT:  Okay.  And, Mr. O'Donnell, you'll have a

21 witness or two?

22          MR. O'DONNELL:  Yes, sir, Your Honor.  We have

23 potentially four witnesses, depending on the evidence that

24 comes out in plaintiff's case.

25          THE COURT:  Okay.

1          All right, Counselor, who do you call?  Is there anything

2     you wish to state?  You can tell me briefly -- it might save

3     some time -- briefly what the -- what you perceive as the

4     uncontested facts that exist in this case and then present any

5     testimony you want that might be contested.  Go ahead.  And

6     take your mask off for that purpose.

7               MR. TOM:  So we're here today, Your Honor --

8               THE COURT:  And you can stand when you address the

9     Court.

10              MR. TOM:  Yes, sir.  So, Your Honor, we're here today

11    as an Oxford resident, John Rash, wants to exercise his First

12    Amendment rights to free speech and assembly in Oxford Town

13    Square.  He wants to hold an artistic and civic event as part

14    of the annual Fringe Festival.  Mr. Rash's event is called

15    "Projection," which involves projecting visual moving and still

16    images onto surfaces, including onto walls outside.

17         Mr. Rash has done the same event in years past, including

18    on the county courthouse walls last year.  Last year was also

19    permitted.  Lafayette County granted Mr. Rash to do just what

20    they're not allowing him to do this year.  And I think what

21    this case is going to come down to is -- is the nature --

22              THE COURT:  Now, wait -- wait just a minute.  You've

23    made a statement that I'd like for you to clarify.

24              MR. TOM:  Sure.

25              THE COURT:  The last statement you made that he

1 did -- was permitted to do last year what he was not permitted

2 to do this year.

3          MR. TOM:  Yes, sir.

4          THE COURT:  All right.

5          MR. TOM:  So Projection, which is Mr. Rash's art

6 event, which is part of the annual Fringe Festival held in

7 Oxford, 2019's Projection had images projected onto the county

8 courthouse walls, onto the outside of the walls at night.

9          THE COURT:  Where from?

10          MR. TOM:  They were -- the projection was from the

11 lawn onto the wall, onto the outside wall of the courthouse.

12 And the same thing that happened in August of 2019 as part of

13 Projection, Mr. Rash wants to do that this year, you know, with

14 different content.  But the format's the same, projecting

15 images from the lawn onto the county courthouse walls.

16     Now, you mentioned before about, you know, the nature of

17 this proceeding, emergency proceeding.  You know, that's, you

18 know, unfortunate.  We don't like to, you know, get into these

19 proceedings unless we need to.  You know, we're sorry to bring

20 the Court so quickly into this; you know, sorry to bring the

21 county so quickly into this.

22     You know, we first spoke with Mr. Rash on July 27th, which

23 was just over a week ago.  It was last Monday.  We filed our

24 papers as soon as we could, which was on Friday.  And actually

25 spoke with Attorney O'Donnell, also, on Friday notifying him

1 that we have filed these papers.  I sent him all of the papers

2 that we had filed, the complaint, the motion, the memorandum of

3 law.  And, since then, I've been in touch with him to make sure

4 that, you know, he was apprised of what was going on, notified

5 him about today's hearing.

6    THE COURT:  Okay.  You didn't put that information in

7 your filing, so I had no way of knowing that you'd spoken to

8 him.

9    MR. TOM:  I regret that omission, Your Honor.

10    THE COURT:  Okay.  Go ahead.

11    MR. TOM:  So, you know, we're here today because

12 Mr. Rash simply wants to hold the same event as he held last

13 year.  He wants to do the same type of artistic and civic event

14 like so many other people have done on the county courthouse

15 grounds.

16    You have national prayer days, Easter festivities.  You

17 had film festivals.  You've had protests for and against the

18 Confederate monument that stands on the grounds and many other

19 activities.  What John wants to do is use the town square for

20 speech and assembly just like everybody else has done in the

21 past on the county courthouse grounds.

22    Now, you know, we argue that the county's regulations, the

23 permitting regulations, which is called the county use --

24 apologies -- the "Facility Use Policy" is unreasonable.  It's

25 overbroad.  It's not narrowly tailored to achieve the interest,

1   even if the interests are legitimate, that the county is trying

2   to achieve.  That's laid out in our brief.

3        We also have evidence that the county denied Mr. Rash's

4   permit, changed the policy, closing the courthouse grounds from

5   dusk till dawn, because they didn't want Mr. Rash to project

6   content about the Confederate monument and about the protests

7   that have been happening in Oxford this summer.

8        And we know that because Mr. Rash applied for a permit on

9   July 14th of this year.  Two days later, on July 16th, the

10  sheriff's employee called him, asked him whether these

11  projections would have content about the Confederate monument,

12  about the protests.  John said it would be likely.

13       Four days later, on July 20th, the county, in closed

14  session -- you know, I haven't got to read the county's papers

15  yet; and those minutes were not posted on the website as of the

16  last time I checked, which was just a few days ago.  So we

17  don't know the rationale.

18       But they changed the policy governing the county --

19  governing the use of the county courthouse grounds, closing it

20  completely for any use after dark.  You know, that's tailor

21  made to prevent Mr. Rash from engaging in his event.  Because,

22  in order to see Projection, which is Mr. Rash's art event, it

23  has to be dark.

24            THE COURT:  Is there -- I noticed in the filing in

25  your memorandum and, also, I believe, in the defendant's

1  memorandum, there was reference made to an alternative location

2  that the city or the county has made available to protestors

3  such as Mr. Rash to project messages onto buildings.  Is that

4  your understanding?

5           MR. TOM:  So it's my understanding that there's been

6  a separate permit that's been granted for the Fringe Festival

7  this weekend onto the city courthouse -- city hall, which is,

8  you know, really close to the county courthouse.  However, as

9  testimony will show, that space is not an ample alternative

10  forum as opposed to the county courthouse for --

11           THE COURT:  It's not what?

12           MR. TOM:  It's not an ample alternative forum.

13           THE COURT:  Okay.  Why not?

14           MR. TOM:  The -- in order to project onto the city

15  hall, they're going to erect a white screen on the stair riser

16  leading into the city hall, which is sort of similar to

17  watching a movie.

18       Whereas, what Mr. Rash, an artist who was going to take

19  part in Projection, wants to do is to use an unusual surface,

20  not just a flat white screen, but the unusual surface in the

21  form of the walls of the county courthouse building on three

22  sides of the building.

23       It's much easier for people to see those projections in

24  the square given that there's the road that completely wraps

25  around the county courthouse.  People could even drive in their

1  cars and see it during the COVID-19 pandemic.

2        THE COURT:  Yeah.  They could drive -- that doesn't

3  sound too safe to me.  They're driving their cars around the

4  circle and looking at the projections simultaneously?

5        MR. TOM:  Well, you know, I would not recommend they

6  do that, you know.  But they could, I guess, park; or, you

7  know, when they're stopped in the traffic circle, maybe they

8  could look over.  But I agree, yes, I would not recommend they

9  drive and look.

10        THE COURT:  Okay.

11        MR. TOM:  So the argument there is that the city hall

12  is just not the same thing as the county courthouse.  For

13  purposes of the nature of the forum, which I think will be key

14  to Your Honor's decision in this case, the county courthouse is

15  a traditional public forum.

16      It stands in the center of the square surrounded by bars,

17  restaurants, businesses.  It has a small decorative fence; but

18  it's largely, you know, open to the public, anybody can go in

19  there at any time.

20      You know, after game day, people come down to the bars,

21  have a good time.  You know, they may walk from Proud Larry's

22  over to Square Books, somewhere else; and they may go through

23  the county courthouse square because it's open.  There's

24  benches there.  There's grass.  There's sidewalks in it.

25        So not only is the setup of the county courthouse the

1  archetypal traditional public forum, but its very use in

2  practice have also been.  I mentioned all the events that have

3  happened there, the protests about the Confederate monument,

4  both for and against; Easter; national prayer day; etc.

5          THE COURT:  Have they done that with or without

6  permits?

7          MR. TOM:  The -- you know, that may be better

8  directed at the county.  But, to my knowledge, according to the

9  county's policy, if you have five or more people on the county

10 courthouse grounds for an event, you have to get a permit.

11         THE COURT:  Yeah.  That's what you state.  That's

12 what they state also, five or more.  But I just was asking for

13 clarification.  You said national prayer day for example.

14         MR. TOM:  Yes.

15         THE COURT:  Whether that was a group of people who

16 made a demonstration or a protest or pro or con on some issue.

17         MR. TOM:  You know, some of this -- you know, I just

18 want to make myself perfectly clear.  You know, this is -- as

19 part of a traditional public forum, it can be used for any

20 number of reasons, for speech, assembly, protests, civic

21 engagement, artistic events.  And, so, as just part -- one of

22 these reasons is protest.  There's many other reasons that you

23 can use a traditional public forum as well.

24         THE COURT:  And they do it without a permit?

25         MR. TOM:  We would have to -- I don't know whether

1    these --

2            THE COURT:  Well, a traditional public forum has

3    certain definitions that --

4            MR. TOM:  Yes.  So, you know, I think, in an ideal

5    world, people wouldn't have to ask the government's permission

6    before they could gather and before they could speak.  However,

7    the government does have certain interests for traditional

8    public forums such as parks like the Lafayette County

9    Courthouse grounds, sidewalks, roads.  Those include security

10   concerns, traffic concerns, competing-use concerns.

11        The county's Facility Use Policy requires a permit --

12   requires permission from the government for groups of five or

13   more.  That's quite a small number to start implicating those

14   legitimate concerns.  And, when you look at other courts, the

15   number that actually most courts find is valid is much larger

16   than five.

17        You also have the point about the 30-day advance notice

18   requirement.  That's also the same type of restriction as the

19   five-person limit.  You have to ask the government's permission

20   before you can assemble --

21           THE COURT:  Well, is that relevant in this case?

22           MR. TOM:  It is.

23           THE COURT:  Why?

24           MR. TOM:  Because these regulations, the permitting

25   regulations that govern use of the county courthouse grounds,

1    they all act as prior restraints on speech for people that want

2    to use the county courthouse.

3              THE COURT:  Okay.  Did they -- let's stick to what

4    reasons the county gave to deny this request.

5              MR. TOM:  Sure.  So, you know, having, again, not

6    gotten to read the briefs yet, but according to the emails from

7    the county administrator, Ms. Carwyle, it was, quote, security

8    issues.  Obviously, legitimate concerns are security and public

9    safety.

10         However, restrictions on speech, no matter -- even if the

11   governmental interest is legitimate, restrictions on speech in

12   traditional public forums still have to be narrowly tailored to

13   achieve that interest.

14         Here, a 30-day notice requirement, by groups of five,

15   closing the courthouse grounds for any use after dark, none of

16   those are narrowly tailored to security interests.  And we only

17   have to look at the protests this summer in Oxford.  There's

18   been weekly, if not daily, protests throughout the city,

19   including on the courthouse grounds.  They've all been

20   peaceful.

21         You've also had events on the county courthouse grounds at

22   night, including one on July 4th.  There was a group that

23   supported the -- I guess, now, old version of the Mississippi

24   state flag that had the Confederate battle emblem in it.  And

25   they held an event -- a permitted event on the weekend.

1        And then there was also a recent event on or around

2   July 25th for the same cause at night right by the monument.

3   And there was -- based on photos that I have, there was, you

4   know, 8 to 12 people there, above the five-person limit.

5        Again, there's no indication of security issues.  You also

6   have the fact that surrounding the county courthouse it's city

7   of Oxford property.  And the city has granted a permit, as

8   we've just discussed, for city hall at night this weekend.  And

9   it's unclear to me why there are security interests in the

10  center of the square but nowhere surrounding it.  And as

11  anybody that --

12          THE COURT:  Let me get this clear.

13          MR. TOM:  Go ahead.

14          THE COURT:  You said in July there was a nighttime

15  permit for supporters of the flag?

16          MR. TOM:  I don't know if it was permitted; but there

17  was an event held in July for supporters of the flag, yes.  It

18  was people -- they, you know, had the full Confederate battle

19  emblem.  They were dressed in Confederate uniforms.

20          THE COURT:  At night.

21          MR. TOM:  At night, yes.

22          THE COURT:  And they were -- they were permitted or

23  not?

24          MR. TOM:  I don't -- I have to imagine they were

25  given that it was five or more, but that would be better

1 directed at the county.

2          THE COURT:  Well, I'd like to know.  That makes a

3 difference to me.  You brought it up, whether the county issued

4 a permit for them or not.  That's very interesting.  I didn't

5 know about that.  And you don't either, do you?

6          MR. TOM:  I don't, unfortunately not.

7          THE COURT:  Okay.  Go ahead.

8          MR. TOM:  So the -- we're talking about back to

9 security concerns.  So all the protests this summer have been

10 peaceful.  The city of Oxford seems to think that being on the

11 square at night is safe, and they grant permits for the Fringe

12 Festival this weekend.

13     You also have just the fact that this is the business of

14 the night-life district.  You have Oxford police, Lafayette

15 sheriffs regularly on the square given the number of people

16 there and, you know, the type of activity, drinking, etc., that

17 goes on there.

18     Oxford, to my understanding, has recently implemented

19 security cameras all over the square and other places.  And,

20 so, you know, any security interests or belied by all of those

21 points.  That being said, the city does have a legitimate

22 interest in security; but they just can't say security and then

23 do an overbroad restriction on activity that's protected by the

24 First Amendment.

25     Under the law, they have to narrowly tailor any

1   restrictions to achieve the security interest.  And it's

2   unclear to me how a blanket closure of a traditional public

3   forum at the center of the square is necessary to achieve

4   public security.

5       This type of ban would prevent a candlelight vigil, an

6   Easter prayer after dark.  When I was growing up, I used to go

7   to church at night during Easter.  It would prevent an all

8   night sit-in.  It would prevent a nighttime march.  And the

9   list goes on.  This is just too broad of a brush in the name of

10  security.

11      So I think there's three points that I want to leave you

12  with.  This is a traditional public forum by its design and by

13  its use.  The security interests, even if legitimate -- the

14  right restrictions are not narrowly tailored to achieve those

15  security interests and history just this summer has shown that

16  the security interest may be elusive.

17      And, finally, the alternative forum of anywhere but the

18  county courthouse -- there's just no alternative forum.

19  Another -- a last point I'll make on the alternative forum,

20  some of the art work that Mr. Rash and his artists wanted to

21  project onto the county courthouse grounds likely had to do

22  with the Confederate monument that stands on the grounds and,

23  also, the protests that have occurred this summer over that

24  monument.

25      I'll argue that there's no alternative forum for speech

1   about a Confederate monument and protests over that monument

2   than the monument itself and the grounds where the monument

3   stand, particularly when history and the design of those

4   grounds make it a traditional public forum.

5             THE COURT:  Okay.  Now -- thank you -- do you have

6   testimony you would like to present?

7             MR. TOM:  Sure.  John.  I'd like to call Mr. John

8   Rash.

9             THE COURT:  All right.  You may come around and be

10  sworn.

11      (OATH ADMINISTERED BY THE COURTROOM DEPUTY)

12            THE COURTROOM DEPUTY:  State your name for the

13  record, please.

14            THE WITNESS:  My name is John Rash.

15            THE COURT:  All right.  You may proceed.

16                  JOHN RASH, PLAINTIFF, SWORN

17                  <u>DIRECT EXAMINATION</u>

18  BY MR. TOM:

19  Q.   Now, Mr. Rash, where do you live?

20            THE COURT:  Counsel, come right over here at this

21  podium, please.

22            MR. TOM:  Would you like me to put on my mask, Your

23  Honor?

24            THE COURT:  No.  I can understand you better without

25  it.  I may have to get Mr. Rash to -- we'll see if I can

1    understand him.

2              MR. TOM:   Okay.

3    BY MR. TOM:

4    Q.    Mr. Rash, where do you live?

5    A.    I live in Lafayette County, which is the county where

6    Oxford is.  So I live in Oxford.

7    Q.    And how long have you lived in Lafayette County?

8    A.    Since the summer of 2017.

9    Q.    And how often do you visit the Oxford Town Square?

10   A.    I visit the Oxford Town Square at least four times a week.

11   It's on my drive to work, so I pass through there more than I

12   would like to sometimes because of traffic, but definitely

13   three or four times a week at a minimum.

14   Q.    And that's three or four times a week for the entire time

15   that you've lived in Lafayette County?

16   A.    That's right.

17   Q.    And have you ever -- or tell me about your event last

18   year -- or let me -- strike that.  Have you ever held an event

19   at the Lafayette County Courthouse?

20   A.    Sure.  So I have a visual art event that I curate every

21   year as part of the Fringe Festival called "Projection."  And,

22   although we've done that event for 2 years previous to this

23   year, last year it did include the courthouse grounds.  And we

24   had, I believe, three artists who were stationed at the

25   courthouse grounds projecting onto three different walls on the

1   courthouse architectural surfaces of the courthouse itself

2   during that event last August.

3   Q.    And were there any security issues or disorder -- strike

4   that.  Were there any security issues?

5   A.    None that I was aware of.  In my observation, it was a

6   joyous event.  People were both intentionally coming to see our

7   projections; but, also, we had people who were just on the

8   square to have dinner or be out for the weekend who were

9   interested and surprised by what we were doing who stopped by

10  to look at the work of our artists that night.  But no security

11  issues that I was aware of.

12  Q.    And when exactly was this event last year?

13  A.    It was a parallel time to this year, so mid -- mid-August.

14  I don't know the exact date; but should have been, I believe,

15  the second Saturday in August of last year.

16  Q.    And what time was the event?

17  A.    It was at night.

18  Q.    From approximately what time to what time?

19  A.    I believe dusk is around 8:00 p.m. this time of year, so

20  we were projecting from 8 to 10:30ish at night and then took

21  another 20 minutes or so to break down and clear out of the

22  courthouse area when we were finished.

23  Q.    And why is it necessary to apply this year for a permit

24  for projection at night?

25  A.    This event is impossible to pull off if it's light outside

1  because what we're trying to do is, again, sort of create a

2  surprising environment by using light as our artistic medium.

3  So the artist might be a digital artist, photographers,

4  filmmakers; but it's not a traditional cinematic experience.

5  We're using the surfaces of the building and objects around the

6  courthouse square to project upon with light which wouldn't be

7  visible if the sun was out.

8  Q.    Now, is there an ample alternative forum other than the

9  county courthouse grounds for you to hold "Projection," your

10  art event, this weekend?

11  A.    Not that I'm aware of.  Not only because the prominent

12  location of the courthouse being in the center of that

13  roundabout and visible from all of the bars and restaurants --

14  so this being a three-dimensional artistic installation, by

15  stationing artists on every corner of the courthouse, it

16  becomes visible from almost any position on the square, as well

17  as the potential of allowing artists to comment on recent

18  events in Oxford which happened on the courthouse square.  So,

19  for both of those reasons, I don't see any location that would

20  be the same as using the courthouse square for this event.

21  Q.    And can you explain what you mean by the recent events

22  that have happened on the square?

23  A.    Sure.  So, for the past 2 months, there have been protests

24  on the monument base itself and on the courthouse grounds

25  against and for the Confederate statue.  And, as anyone who

 1  goes to the square frequently might have witnessed this summer,

 2  the artists that I have been working with are also very

 3  interested in commenting on --

 4           MR. O'DONNELL:  Object to hearsay and speculation.

 5           THE COURT:  Overruled, for this nonjury issue.

 6  Proceed.

 7           THE WITNESS:  Okay.  So the artists that I've been

 8  working with are interested in commenting on contemporary

 9  issues.  And, whether that's directly or indirectly, any work

10  that's projected in that space that has to deal with racial

11  issues or the Confederate statues or even the death of George

12  Floyd could be seen as comments on those events that have

13  happened this summer both locally and nationally.  And the

14  courthouse is the most appropriate place for that forum versus

15  any other space that I could imagine in Oxford.

16  BY MR. TOM:

17  Q.    And why is that?

18  A.    Because it's a governmental space, and the Confederate

19  statue stands there.  And that's where those protests have

20  happened, so it becomes a contribution to that conversation.

21  It becomes part of the narrative that has been built by those

22  who came before us who were protesting earlier in the summer.

23  Q.    And, when you say "it becomes a contribution to the

24  conversation," what is it?

25  A.    Any artistic piece that attempts to make a comment,

1   whether for or against, the Confederate statue or to protests

2   that have happened as a result of people wanting to remove the

3   statue in Oxford.

4   Q.    So the Confederate statue adds to the art that's being

5   projected onto it?

6   A.    That's correct.  It -- it -- I think whether -- whether

7   directly or indirectly, any -- any art that is projected in

8   that space is going to be seen in juxtaposition to that statue.

9   And that juxtaposition is going to, again, contribute to the

10  conversation about the statue that has been so loud in this

11  town for the past few months.

12  Q.    Now, given that, we were talking earlier about the permit

13  to shine projections onto the city courthouse really close to

14  the county courthouse.  Why is that -- let me re -- strike

15  that.  Is that an ample alternative, the city courthouse?

16  A.    It's not for various reasons.  In terms of what we try to

17  achieve artistically and aesthetically, there just isn't an

18  architectural surface there for us to project upon; so we have

19  to bring our own screen, which changes the nature of what we're

20  doing visually completely to more of a cinematic experience.

21      It's more expected.  It's a flat rectangle versus a more

22  unusual surface.  So, instead of transforming part of the

23  square and creating an experience that a passerby might enjoy

24  in seeing their town in an unexpected and interesting way, it

25  just becomes similar to watching a movie at home.

1       And then there's also the issue that it's less visible.

2  You have to almost come around the corner if you're driving

3  around the square intentionally into that parking area that's

4  in front of city hall to see the riser that the permit exists

5  for where we would erect the screen versus driving around the

6  square, which is a large roundabout and potentially seeing one

7  of the projections on the wall and getting interested in

8  stopping to view it.  So it gives us a lot less chance of

9  having accidental viewers if it's at the space that has been

10 permitted by the city.

11 Q.    Now, you mentioned you've been a resident of Lafayette

12 County for several years now.  Since the death of George Floyd,

13 which happened in May of 2020, have you heard of any violence

14 at the protests that have occurred in Lafayette County?

15 A.    I have not heard of any violence.  And, because my job is

16 that of a documentarian, I have been out at almost all of those

17 protests with my camera observing and documenting and have not

18 witnessed any violence from either side.

19 Q.    Have you witnessed or heard of any security issues at

20 these protests since the death of George Floyd this summer?

21 A.    None at all.  No security issues that I've witnessed at

22 all.

23 Q.    And how many protests have you been to since the death of

24 George Floyd?

25 A.    I would have to estimate at least --

1  Q.    Let me scratch that.

2  A.    Sure.

3  Q.    How many protests have you been to since the death of

4  George Floyd in Lafayette County?

5  A.    Ten or more.

6  Q.    How many protests have you been to since the death of

7  George Floyd on the county courthouse grounds?

8  A.    At least half of those, so five or more.

9  Q.    How many of the protests that you're attended in Lafayette

10 County since the death of George Floyd have been at night?

11 A.    None of the protests that I've attended to date have been

12 at night.

13 Q.    Now, so, let's talk about the square.  How would you

14 describe the square as it relates to Oxford?

15 A.    It's the cultural hub of the city.  It's the place

16 where -- it's a destination that people come to, to be together

17 with friends, to enjoy the restaurants.  If you're coming to

18 Oxford, it's the must see location in town that you will

19 definitely want to visit.

20        And, if you live in Oxford, you're going to end up there

21 at least a couple times a month intentionally or not because

22 that's where things are happening.  It's the entertainment hub

23 and the business district.

24 Q.    And where does the county courthouse lie in relation to

25 the square?

1  A.    It's -- the county courthouse is in the dead center of the

2  square.   So it would be impossible to visit the square and not

3  see the courthouse, if not also walk through the courthouse

4  grounds.

5  Q.    Now, is the county courthouse grounds open to the public?

6  A.    My understanding is that it's always been open anytime,

7  day or night.   There are park benches there.   There's a very

8  large lawn on all sides of the courthouse where people gather

9  all hours of the day or night.

10 Q.    And, so, how would you describe the county courthouse

11 grounds?

12 A.    The courthouse grounds -- so there are some parking

13 spaces, and then there's a sidewalk.   And then there is --

14 there is a wrought iron fence that separates the sidewalk from

15 the grass that has bricks in it both for stairs and for

16 wheelchair access.

17       And then within that fence is a large grass area with I

18 don't know how many park benches that are available for people

19 to sit under the trees.   And, at night, there are some

20 floodlights that are there that make it visible and accessible

21 for people to visit at night.   So, in a lot of ways, it

22 functions as a small park in the center of the square.

23            MR. TOM:   I have no further questions, Your Honor.

24            THE COURT:   All right.   Thank you.

25       The defendant may cross-examine.

1              MR. O'DONNELL:  May I proceed, Your Honor?

2              THE COURT:  You may.

3                        CROSS-EXAMINATION

4    BY MR. O'DONNELL:

5    Q.    Mr. Rash, you indicated during the initial questioning

6    that you had participated in the Fringe Festival on prior

7    years, correct?

8    A.    That's correct.

9    Q.    And the Fringe Festival -- I think it's important to talk

10   about what that is.  That's actually organized by the arts

11   council and Visit Oxford; is it not?

12   A.    It is.

13   Q.    Okay.  And your role in the Fringe Festival is to, as you

14   said, curate a particular event within the Fringe Festival?

15   A.    So I'm given the opportunity to bring my event with other

16   artists.  So the Fringe Festival is a collection of artists and

17   curators that happen to hold their events on the same night.

18   Q.    Okay.  But my question is do you -- because I'm going to

19   get to that.  The question is, your role within the Fringe

20   Festival is to curate a particular event, right?

21   A.    That's correct.  My event would have been curated by me as

22   part of a larger event of similar artistic events on the same

23   night that falls under the Fringe umbrella.

24   Q.    Right.  And the Fringe Festival is an artistic, theatrical

25   event production which is sponsored and staged by the arts

1  council and Visit Oxford over the course of several days,

2  right?

3  A.    That's right.

4  Q.    And your part in that festival is to, as you say -- as you

5  said, curate the projection in that?

6  A.    That's correct.

7  Q.    Okay.  And, in years past, your role in curating the

8  projection event -- you said that, given that it is a

9  projection, that you need to do it at night for visibility

10  purposes, right?

11  A.    Correct.

12  Q.    You could do it during the day; but it would not be nearly

13  as visible as it would be at night, right?

14  A.    That's correct.

15  Q.    And, in years past, prior to the event of the COVID virus

16  that we've all been dealing with in the past 6 months or so,

17  your event at the courthouse -- an incidentally, you received a

18  permit from the county to stage the projection event at the

19  courthouse, right, in years past, prior to 2020?

20  A.    Last year, we were on the courthouse grounds.

21  Q.    My question is, though, you were given a permit to do

22  that, right?

23  A.    I believe that's correct.  So the last 2 years, I leaned

24  on the arts council not -- this being a new event, I leaned on

25  the arts council a lot more for their support because one of

1    their missions is to help artists get started.  So all of the

2    arrangement for the space that we used in the previous 2 years

3    was provided by the arts council.  They helped us to identify

4    the best spaces.  Because being new to Oxford and using their

5    expertise, I asked them to help with that.

6    Q.    Right.  Okay.  And, so, the Fringe Festival is designed to

7    locate throughout town for access purposes, for visibility

8    purposes, various events, right?

9    A.    That's correct.

10   Q.    And, in years past, for example, I think you did a

11   projection event not -- you did it at -- did you use the

12   breezeway at Oxford Square North?

13   A.    We did.  That's correct.  Just beside the -- Uptown

14   Coffee.

15   Q.    Right.  That's right.

16   A.    That's correct.

17   Q.    Yeah.  And that was last year?

18   A.    The previous 2 years.

19   Q.    The previous -- well, last year, right?

20   A.    Last year, we used that space in addition to the

21   courthouse.

22   Q.    Okay.  Again, the purpose being that you want to make the

23   artistic and visual displays that you're dealing with as

24   accessible to the average person on the street as possible,

25   right?

1  A.    I'm sorry.  I'm not sure I understand the -- could you

2  restate the question?

3  Q.    Sure.  The purpose of staging your productions in

4  different locations around the Oxford Square is in order to

5  enhance the accessibility of the event to the average person

6  that happens to be walking around or driving around Oxford?

7  A.    That's definitely one of the reasons.  It's -- it's really

8  about transforming the space and creating something that -- you

9  know, one of the reasons we included the courthouse last year

10  is I would love for the event to be the entire square in the

11  future.

12        But things grow little by little, year by year.  So the

13  idea is, yes, it makes it more accessible and more visible the

14  more spaces that we're able to project upon in the square.

15  Q.    Is it true that the use of the space last year at the

16  courthouse grounds -- you actually had seating arranged on the

17  grounds, right?

18  A.    I believe --

19  Q.    People could sit and watch whatever the projections were

20  at that time, right?

21  A.    That was actually the Oxford Film Festival.  So they set

22  up a screen; and, to be honest, I don't remember if they used

23  the existing seating -- because there are many park benches in

24  the lawn area -- or if they actually brought folding chairs.

25        But our event is designed where it can be viewed from --

1  it's a much larger -- the intention is it's a much larger

2  projection onto the walls of the courthouse so that it could be

3  seen from Ajax; it could be seen from Square Books without

4  necessarily having -- these aren't films that have a set

5  narrative or time line.  It's more like the type of video art

6  installation you might see in an art gallery that you could

7  choose to watch for 3 seconds, or you might choose to watch for

8  20 minutes.

9  Q.    All right.  And the -- as you indicated in years past, and

10 I think also for 2020, the arts council and Visit Oxford were

11 the ones that arranged for the space for the various events,

12 including the projection event?

13 A.    That's correct.  Because I honestly just didn't know how

14 to do that myself.  And, under their guidance, they assisted

15 with that part of it.

16 Q.    And you made contact with Lisa Carwyle, who's the county

17 administrator, regarding the desire to use the courthouse

18 grounds on August the 8th, right?

19 A.    August the 8th?  I believe it was July 7th.

20 Q.    My question, though, is you contacted Lisa Carwyle --

21 A.    Oh, I see.  About the event.  Yes.  August the 8th would

22 have been the right date.  That's right.

23 Q.    Right.  And I believe you did that -- initially, was that

24 July the 7th?

25 A.    I -- I sent her an email on July 7th; that's correct.

1  Q.    Okay.  And did you talk to Ms. Carwyle on the phone as

2  well, in addition to the email?

3  A.    Later.  So she was out of office that week.  So I did not

4  receive a response to that email.  I came into her office the

5  week following once she was -- she was out of office, so I came

6  in when she was back in office and filed with the permitting

7  person.

8  Q.    Okay.  So the answer to the question is, yes, you did

9  speak to Ms. Carwyle verbally in addition to communicating with

10  her by email?

11  A.    I actually spoke with the gentleman that works in the

12  front of her office.  I never spoke to her face-to-face.

13  Q.    Did you talk to her over the phone?

14  A.    When she called me back on -- I believe it was July

15  the 15th, we spoke on the phone.

16  Q.    Okay.  So you did talk to her verbally?

17  A.    That's correct.

18  Q.    Okay.  And isn't it true that when you made the initial

19  approach to Ms. Carwyle about the use of the courthouse

20  facility that you told her that you were going to use the east

21  side of the courthouse?

22  A.    That's not correct.  I don't remember specifying any

23  specific location.

24  Q.    And the east side of the courthouse is the side of the

25  courthouse that faces city hall, right?

1  A.    I'm not sure about the geography, but I did not specify a

2  specific facade of that building.

3  Q.    Okay.  You told her that it was your intent to use that --

4  the side of the courthouse that faced city hall as part of the

5  projection?

6             MR. TOM:  Objection, Your Honor.  Asked and answered.

7             THE COURT:  Overruled.

8             THE WITNESS:  Not to my rec -- that was never the

9  intention to use that side of the building or -- let me restate

10 that.  It was never my intention to only use that side of the

11 building.  And I would have never stated that that was our

12 intention to only use that side of the building.

13 BY MR. O'DONNELL:

14 Q.    And, when you talked to her after submitting the

15 application -- you said you initially submitted a written

16 application, and then you talked to Ms. Carwyle?

17 A.    She called me back to follow up on my written application

18 to ask a few questions about the type of set up that I would

19 need.  She was asking -- she said, in particular, she was

20 concerned about if we were going to install a screen, if we

21 would be putting stakes in the ground, if we would potentially

22 be doing any damage to the lawn.

23       It was a very brief conversation.  And she seemed

24 satisfied with my answers and said that she would be getting

25 back to me after the board of supervisors met to review all

RASH  --  CROSS

1  applications the next week.

2  Q.    And you recall telling her at the time that you spoke with

3  her after submitting the application that you -- if you were

4  not allowed to install a screen that you would simply use the

5  east side of the courthouse to project your display?

6  A.    No.

7  Q.    Do you recall talking to her about the fact that you'd

8  have a 12-foot wide screen that you'd be using -- or proposed

9  to use?

10  A.    So I did say that if we used the screen -- because that

11  would be dictated on the number of artists that we have.  So,

12  obviously, there's only a set number of surfaces that we can

13  project upon.  And how we curate the event is largely dictated

14  by the space that we're granted.

15      So having access to that lawn -- if I have ten artists

16  that want to be part of the event, I may program one on each

17  facade of the building, which would be four, and then also,

18  perhaps, install a screen.  So she did ask about the screen,

19  and I told her -- I described the screen that I have access to,

20  which is a 12-foot screen.

21  Q.    And it was your intent in using the county courthouse as

22  well as city hall that the motoring public, those who are in

23  cars driving by -- it was your intent that they would view your

24  display.  That was the design setup?

25  A.    The design setup is that you would notice it initially

1  driving through and then perhaps stop and park in one of the

2  adjacent parking spaces and view it from your car or from the

3  sidewalk.

4  Q.    Right.  So you -- again, the intent in terms of the setup

5  that you were informing Ms. Carwyle about is that passing

6  motorists would view the display in addition to those who might

7  be parked in cars or individuals walking the streets?

8  A.    That's one of the intentions.  I mean, it's -- as I stated

9  earlier, the prominence of the courthouse, the visibility of

10  the courthouse, having that space as -- available to us allows

11  for a lot more accidental eyeballs that would perhaps then stop

12  and view the exhibition.

13      So the nature of that roundabout being viewable from

14  365 degrees all around, whether that's people leaving

15  restaurants or just driving around the square, makes it a very

16  desirable location and, of course, influenced my decision to

17  ask for that space.

18  Q.    You'd agree that a display that was intended to be viewed

19  by motorists driving around the courthouse at night presented a

20  potential traffic safety issue and a pedestrian safety issue?

21  A.    It's -- there's no way to view the display while you're

22  driving.  So it would be the same thing as a Christmas tree

23  that was lit up on the courthouse lawn.  It may catch your eye,

24  but it's not asking you to stop while you're driving or to

25  watch while you're driving.

1    Q.    But you intended that passing motorists would view your

2    display, right?

3    A.    I think there's a difference between viewing and noticing.

4              MR. O'DONNELL:  Could I get this marked as Exhibit A?

5              THE COURT:  Very well.

6         (DEFENDANT'S EXHIBIT A WAS MARKED FOR IDENTIFICATION)

7    BY MR. O'DONNELL:

8    Q.    All right.  Mr. Rash, you see that on your screen in front

9    of you?

10   A.    Uh-huh.

11   Q.    That's Exhibit A.  And that's an email dated July the 7th,

12   2020 to Ms. Carwyle, correct?

13   A.    That's correct.

14   Q.    All right.  And, in it, you're explaining to Ms. Carwyle

15   the fact that Mr. Wayne Andrews from the arts council had given

16   you her contact information for purposes of obtaining a permit,

17   right?

18   A.    That's correct.

19   Q.    Okay.  And Mr. Andrews -- who is Mr. Andrews?

20   A.    He is the executive director of the Yoknapatawpha Arts

21   Council.

22   Q.    Okay.  And, in the email, you're explaining that you want

23   to use the courthouse facility on August the 8th, the same

24   night as the Fringe Festival; that you had several artists that

25   would like to project onto screens as well as the existing

1    courthouse property.  Then you say, "We've done this one, the

2    square, several times in the past few years.  We would like the

3    opportunity to use the courthouse area this year due to COVID

4    so that it can be viewed by cars driving by."

5         Not noticing but viewed by cars driving by, right?  Those

6    are your words?

7    A.    That -- that is the language that I used in this initial

8    email.

9    Q.    Yes, sir.  "Or viewed by people parked in the adjacent

10   spaces around the square.  Please let me know about the process

11   of obtaining a permit."

12        Okay.  So you intended, by virtue of the nature of the

13   display, that passing motorists would view your display, not

14   notice, not glance; but that it would be a meaningful

15   interaction with the passing motorists.

16   A.    My intention by using the word *view* was that it would

17   catch their attention.

18   Q.    And, in addition to the permit for the use of the

19   courthouse facility, you made application -- or I should say

20   Visit Oxford, as the event organizer, made application for a

21   permit to use the city hall plaza as it's referred to.  Is that

22   your understanding?

23   A.    That is my understanding.

24   Q.    Okay.  And the -- what involvement did you have with the

25   submission and the contents of the application to the city for

1  use of the city hall plaza?

2  A.    None.

3  Q.    You left that up to the event organizers?

4  A.    That's correct.

5  Q.    Okay.

6  A.    I believe there are other events happening there during

7  the day, so it was just an extension of the existing permit.

8  Because they're using that -- there are other groups involved

9  in the Fringe Festival using that same space earlier in the

10  day.

11  Q.    But it is your understanding that on July the 16th a

12  permit was submitted to the city of Oxford for the specific

13  purpose of allowing the projection event to be held there

14  during the evening hours?

15  A.    I'm not aware of the language of that permit at all.

16  Q.    Did you talk to Wayne Andrews about that permit that was

17  submitted to the city?

18  A.    Wayne informed me that that space would be available if

19  needed.

20  Q.    And, after the permit was submitted, you in fact discussed

21  the permit with Wayne Andrews in the terms of the setup of

22  various projection screens in that space, didn't you?

23  A.    This past weekend, I went out and mapped out what would be

24  possible with that space.  Because it is so dramatically

25  different from the courthouse square that I needed to come up

1  with some sort of a contingency plan and also wanted Wayne to

2  be aware of what that plan would be.

3  Q.   Was it your understanding that the application submitted

4  to the city by Visit Oxford and the arts council was for the

5  very purpose of projecting artwork?

6  A.   I was not.

7  Q.   Okay.  What about live music, was live music provided

8  during this aspect of the projection event?

9  A.   No.  My understanding is you have to apply for a special

10 permit for amplified sound, so our event has always been silent

11 projection.

12 Q.   And, in your discussions with Wayne Andrews after the

13 application was submitted to the city of Oxford about the city

14 hall space, you just indicated that you did talk with Wayne

15 about what you would need to stage the projection event on that

16 space, right?

17 A.   I sent Wayne -- as per usual, a week before the event, I

18 sent him a list of what supplies I may need from the arts

19 council to even make the event possible in that space.

20 Q.   Okay.  In your discussions with Wayne about using that

21 space for the projection event, were you -- you were already --

22 were you already informed about the county's decision on your

23 permit?

24 A.   Yes.

25 Q.   And the viewing of the projection event as far as the city

RASH  --  CROSS

1  hall space is concerned, what was your intent about the

2  individuals or groups that you expected would participate and

3  view your display?  Who were you going after?

4  A.    It's a public art event.  So it's really open to anyone

5  who happens to pass through that space during the evening that

6  we hold the event.

7  Q.    Right.  Just like the aspect of the projection production

8  that you had hoped to stage at the county courthouse?

9  A.    That part is similar.

10  Q.    Same people would be viewing both projections, right?

11  A.    I would argue that it would be a more limited audience

12  because it's a less accessible space.

13  Q.    How is the city hall plaza less accessible to pedestrians

14  and to motor vehicles?

15  A.    It's less accessible for viewing because it's a much

16  smaller space.  It's less accessible for our artists because it

17  requires us to use one screen versus four to six projecting

18  surfaces.  It's less accessible for, as you suggested, sidewalk

19  viewership because there are obstructions from the angles that

20  it would require you -- like, you would have to look at it

21  straight on.

22        Because of Square Books and the city hall -- the space

23  that's available is the riser that's on top of the stairs that

24  actually sits back off of the sidewalk almost 10 feet.  So it's

25  just not as visible as the courthouse would be.

RASH  --  CROSS                                        41

1  Q.    Well, you also have -- in terms of city hall space, you

2  have three projection screens that you have asked to place

3  there, right?

4  A.    So --

5  Q.    Yes?

6  A.    Not screens.  Three potential projection areas.  One of

7  the questions I asked Wayne, which I haven't received an answer

8  back on, is part of my plan was to try to plan for three

9  different surfaces.  Only one of which I know at the moment is

10 okay under the permit.

11 Q.    You understood the city approved the permit last night?

12 Did you know that?

13 A.    I did not.

14 Q.    Okay.  And one of the areas that you proposed to use was

15 the area in front of the Faulkner statue?

16 A.    That was a question that I asked Wayne, if that was going

17 to be possible; but I have not planned for it as of yet because

18 I have not received the answer to that question.

19 Q.    And there would be no obstruction in the event the

20 Faulkner statue was used, right?

21 A.    There are obstructions.  It would be -- you would almost

22 have to stand on the sidewalk to see it.  You would not be able

23 to see that from across the street.

24 Q.    Right.  Well, you know, in terms of the county courthouse,

25 there are obstructions there as well, right?  Large trees,

RASH  --  CROSS

1  would you agree, are obstructions?

2  A.    So it depends on if you're talking about an individual

3  screen or the scale of the event itself.  So, as I stated

4  earlier, the thesis of this event is sort of to transform the

5  space as a whole.

6      So thinking of the Courthouse as a three-dimensional cube

7  having light projected on it from all sides increases the

8  visibility substantially versus a flat rectangle that's leaned

9  up against the stairs at the city hall.

10     So trees might obstruct one portion of the screen if

11  you're trying to view it like a movie or a TV in your living

12  room but does not obstruct the entire courthouse.

13  Q.    You mentioned that you had participated in a number of

14  events in and around Oxford relating to the Black Lives Matter

15  and also, potentially, the Confederate statue issue, right?

16  You did, right?

17  A.    Can you --

18  Q.    You participated in some of those events?

19  A.    I did.

20  Q.    And you indicated earlier that you had been on the

21  courthouse grounds with groups of people in relation to those

22  events?

23  A.    I indicated that I had filmed groups of people who were on

24  the courthouse grounds.

25  Q.    And you don't know whether or not those events had been

1   permitted, do you?

2   A.    I know for a fact that the event on July 4th was

3   permitted.

4            MR. O'DONNELL:  One moment, Your Honor.

5            THE COURT:  All right.

6            MR. O'DONNELL:  That's all I have, Your Honor.

7            THE COURTROOM DEPUTY:  Mr. O'Donnell, can I have the

8   exhibit, please?

9            THE COURT:  Do you have any redirect in line with

10  cross?

11           MR. TOM:  Very briefly, Your Honor.  I'd like to

12  enter two exhibits, Your Honor.

13           THE COURT:  You'd like to what?

14           MR. TOM:  I'd like to enter two exhibits, Your Honor.

15           THE COURT:  If they are matters that were brought up

16  on cross-examination, we'll consider that.

17           MR. TOM:  Yes, they are.

18           THE COURT:  But you must qualify them.

19           MR. TOM:  Okay.  Well, just for marking purposes,

20  then --

21           THE COURT:  I'm sorry, sir.  You're going to have to

22  take off that mask.

23           MR. TOM:  Just for marking purposes in the first

24  instance, then.

25           THE COURT:  All right.

1           MR. TOM:  So the first one I guess would be

2  Plaintiff's Exhibit 1 or Exhibit 2, however you're marking

3  them.  It's the July 23rd email from Ms. Carwyle to Mr. Rash.

4        (PLAINTIFF'S EXHIBIT NO. 1 WAS MARKED FOR IDENTIFICATION)

5           MR. TOM:  And then the next exhibit that I'll have

6  marked is the July 27th email from Ms. Carwyle to Mr. Rash.

7        (PLAINTIFF'S EXHIBIT NO. 2 WAS MARKED FOR IDENTIFICATION)

8  BY MR. TOM:

9  Q.   So Mr. Rash --

10          THE COURT:  You're asking these emails to be received

11 as an exhibit in the case?

12          MR. TOM:  We had attached these to Mr. Rash's

13 declaration, but I would ask that these emails be entered as

14 exhibits, yes.

15          MR. O'DONNELL:  We'd object because these were

16 brought out in direct initially, so -- and were introduced for

17 the first time on cross.

18          THE COURT:  I haven't heard anybody authenticate

19 these emails.

20          MR. TOM:  Okay.  Well, let's put aside the emails.  I

21 can get this done without that.

22                    REDIRECT EXAMINATION

23 BY MR. TOM:

24 Q.   So, Mr. Rash, when you were speaking with Mr. O'Donnell

25 about the, you know, potential security concerns for viewing

1  the projections on the county courthouse from cars -- do you

2  remember that discussion?

3  A.    I do.

4  Q.    So do you remember when you were emailing with Ms. Carwyle

5  on July 23rd and July 27th?  What did she say is the reason

6  that the county courthouse grounds were closed?

7  A.    Security issues was the only reason that was given.

8  Q.    And you -- she sent a follow-up email, correct?

9  A.    That's correct.

10  Q.    And what did she say in the follow-up email?  She said

11  that the grounds were closed completely for any use, correct?

12         MR. O'DONNELL:  Object to leading.

13         THE COURT:  Sustained.

14  BY MR. TOM:

15  Q.    Why were the grounds closed, according to Ms. Carwyle's

16  second email to you?

17  A.    My recollection of that email just said that for security

18  issues the grounds would be closed after dusk.

19  Q.    And that was just for -- for what purpose were they closed

20  after dusk?

21  A.    I'm not sure what purpose other than security issues.

22  Q.    Who were the grounds closed to after dusk?

23  A.    From the email that I received, she indicated that the

24  grounds would be closed for anyone after dusk.

25  Q.    Not just for your event?

1  A.     Not just for my event but for any event or for any

2  gathering.

3            MR. TOM:  No further questions, Your Honor.

4            THE COURT:  Any cross?

5            MR. O'DONNELL:  No, sir, Your Honor.

6            THE COURT:  Okay.  You may step down.

7            THE COURTROOM DEPUTY:  Mr. Tom, may I have those two

8  exhibits?

9            MR. TOM:  Yes.

10           THE COURT:  They're not exhibits.  They've not been

11 received.  They've not been offered.

12           THE COURTROOM DEPUTY:  Right.  But I still need to

13 have them to show they were a part of it.

14           THE COURT:  All right.

15     Anything else?  Any other testimony?

16           MR. TOM:  Not from our side, Your Honor.

17           THE COURT:  Okay.  Then, Mr. O'Donnell, you have

18 witnesses also?

19           MR. O'DONNELL:  Yes, sir, Your Honor.

20           THE COURT:  Okay.  We'll take a 15-minute recess and

21 start the defendant's testimony.

22 (Recess at 2:44 p.m. until 3:05 p.m.)

23           THE COURT:  All right, Mr. O'Donnell, who do you

24 call?

25           MR. O'DONNELL:  I call Ms. Carwyle to the stand, Your

 1   Honor.

 2              THE COURT:  All right.  She may come around and be

 3   sworn.

 4        (OATH ADMINISTERED BY THE COURTROOM DEPUTY)

 5              THE COURTROOM DEPUTY:  And, if you would, please,

 6   state your first and last name and spell them for the record.

 7              THE WITNESS:  It's Lisa Carwyle, and that's

 8   C-a-r-w-y-l-e.

 9              THE COURT:  Okay.

10              MR. O'DONNELL:  May I proceed, Your Honor?

11              THE COURT:  Yes.

12               LISA CARWYLE, DEFENDANT'S WITNESS, SWORN

13                        DIRECT EXAMINATION

14   BY MR. O'DONNELL:

15   Q.   All right.  Ms. Carwyle, will you tell us where you are

16   employed currently?

17   A.   I'm employed with Lafayette County.

18   Q.   And what's your position with the county?

19   A.   I'm county administrator.

20   Q.   And how long have you held that position?

21   A.   Since January 2016.

22   Q.   Okay.  And can you briefly describe the nature of your

23   duties as the county administrator?

24   A.   I assist the board of supervisors.  I do the agenda for

25   all the meetings.  I'm also the manager of the county in a way

1   and do a lot of the accounting work associated with it.  I have

2   a Masters of Accountancy.

3   Q.    And, in your role as county administrator, do you have any

4   function or role in the administration and implementation of

5   the county's Facility Use Policies?

6   A.    I do.  Those are submitted -- the permit requests are

7   submitted to my office, and I review those and approve or deny

8   based on the policy.

9   Q.    Okay.  And, prior to 2015, what is your understanding

10  about whether the county had a Facility Use Policy in place?

11  A.    I don't believe they did prior to 2015.

12  Q.    Okay.  And is it your understanding that in 2015 the

13  county adopted a Facility Use Policy?

14  A.    Yes.

15  Q.    And what is the policy intended to cover, which

16  facilities?

17  A.    All county facilities, grounds, courtrooms.

18  Q.    Does it cover other buildings as well besides the center

19  courthouse?

20  A.    Oh, yes.  The chancery building.  Mainly, the requests we

21  would get is the chancery building and courthouse and the

22  grounds, including the statue.

23  Q.    Okay.  Under the 2015 policy, what is your understanding

24  about whether the county required a permit or not?

25  A.    They required a permit for use between -- to be granted

1  for use between 8:00 a.m. and 10:00 p.m. during the week and

2  limited access on the weekends, mainly for county business,

3  county employees.

4  Q.    And was that policy amended in 2019?

5  A.    It was.

6  Q.    Okay.  And do you recall what the nature of the amendment

7  was in 2019?

8  A.    The biggest changes were we went from a seven-day

9  requirement period for the permit to be applied for to 30 days,

10  and we added a $50-an-hour-rental fee.

11  Q.    Okay.  In terms of who is required to obtain a permit,

12  what was your understanding about the 2019 policy?

13  A.    Political groups, nonprofit groups, groups engaging

14  together to gather.  I'm trying to remember what else was

15  listed as required.  But there were certain groups that were --

16  that was not allowed to receive a permit.  You know, we don't

17  allow for-profit organizations to gather and solicit.

18  Q.    And, in the year 2020, was the Facility Use Policy that

19  applied to the center courthouse -- was it amended?

20  A.    It was.  I think it was around the middle of June they

21  made some changes to make it clear that groups of four or less

22  were not required to get a permit; but, if they did obtain a

23  permit, then that space was exclusively theirs.  And the hourly

24  rate was taken out.

25        And then, in practice, it was -- the 30 days was not

 1    required.  If -- due to the nature of the environment and what

 2    was going on in the country, we approved permits with a few-day

 3    turnaround.

 4    Q.    And, in July of 2020, was the Facility Use Policy that

 5    pertained to the center courthouse -- was it amended again?

 6    A.    It was.

 7    Q.    And what was the nature of the amendment at that time?

 8    A.    That change went to a 14-day requirement for the permit to

 9    be filed prior to the date they wished to use the facility and

10    stated that there would not be any use of the courthouse

11    grounds 30 minutes prior to dusk.

12    Q.    Okay.  Now, with regard to that most recent amendment, the

13    July 2020 amendment, in terms of the curfew, the dusk to dawn

14    curfew for the courthouse grounds, what is your recollection

15    about the discussions that led up to that amendment?

16    A.    Sheriff East began speaking with the board as -- you know,

17    early to mid-June about his concerns for security and safety

18    around the courthouse, tensions with groups, and his ability to

19    keep everybody safe.  And he requested that the board have this

20    curfew.

21          And, also, he even mentioned putting up gates.  He'd like

22    to lock it up at five o'clock p.m.  You know, it just made it

23    easier for them to keep everything secure and the safety of the

24    citizens and the people that were participating and using the

25    permits.

1  Q.    All right.  With respect specifically, though, to the

2  policy that was amended in July 2020, what was the date of the

3  amendment?

4  A.    It was July 20th of 2020.

5  Q.    July 20th?  Okay.  And were you present during the

6  discussions that led to that particular amendment?

7  A.    I was on that day.  On July the 6th, which was the board

8  meeting previous, I was out of town.  And, when I got back into

9  town, I specifically asked the sheriff and a couple of

10  supervisors -- because I knew there was going to be discussion

11  at that board meeting about possibly amending the policy.

12       I asked if it was amended because we were getting

13  requests.  And they said that they discussed it.  They did not

14  actually make a motion, but they did have discussion about

15  making those changes and expected it to be at the next one.

16  Q.    Okay.  And the changes you're talking about, again, are

17  the imposition of the dusk-to-dawn curfew?

18  A.    That's right.

19  Q.    And, so, in the July 20th meeting, what's your

20  recollection about the discussions that -- on that day that led

21  to the --

22  A.    Led to -- Sheriff East came to them.  There had been

23  meetings between different entities, the university, the city,

24  and the county about security issues, safety, the tension.  And

25  he asked -- requested -- he said, the city was doing some

1  similar changes as far as 14 days on their permits; and he

2  asked for that change and the dusk-to-dawn change.

3  Q.   At that point, then, the board voted to adopt that

4  amendment?

5  A.   Right.

6  Q.   I want to ask you about the permit application that

7  Mr. Rash submitted to the county.

8  A.   Uh-huh.

9  Q.   What was the first indication that you can recall in terms

10  of Mr. Rash's desire to obtain a permit for the August 8th

11  Fringe Festival?

12  A.   His permit application was turned in at my office -- I

13  think it was July 14th that he filled it out.  I did call and

14  speak with him about the permit to get an idea of equipment he

15  would need.  We've had problems in the past with some damage to

16  the sprinkler systems.

17       And he indicated to me that he would like to put up a

18  12-foot wide screen; but, if that did not work, he could use

19  the side of the courthouse.  I was under the impression -- I

20  remember being told it would be the east side of the

21  courthouse.

22  Q.   Okay.  So Mr. Rash's first desire or proposed use was to

23  actually install a screen --

24  A.   Uh-huh.

25  Q.   -- on the east side of the courthouse?

1  A.    Right.

2  Q.    Okay.  And your recollection is that you raised concerns

3  about staking and anything that might damage underground

4  utilities.  And what was his response?

5  A.    He said if he could not use the screen, he could use the

6  side of the building.

7  Q.    By that conversation, did you take that he had a

8  preference at that time about how the projection would be

9  viewed?

10  A.    I did not.

11  Q.    In terms of whether it be a screen or not?  Did he have a

12  preference?

13  A.    No.

14  Q.    Okay.  Did he not indicate to you that his first choice

15  was to use a screen?

16  A.    Yes.  I mean, that's -- when I asked what equipment he

17  would bring, he said a screen, yes.

18  Q.    On July the 7th, he sent you an email regarding the events

19  on August the 8th.  Did you receive that email?

20  A.    I believe I did.  I was gone out on vacation that entire

21  week, and I might have kind of missed it; but I did get the

22  email, yeah.

23  Q.    Okay.

24          MR. O'DONNELL:  May I approach?

25          THE COURT:  All right.

1  BY MR. O'DONNELL:

2  Q.    All right.  Ms. Carwyle, I'm showing you what we've at

3  this point at least marked for identification as Exhibit A.  Do

4  you recognize that?

5  A.    Yes.

6  Q.    What is the -- what is Exhibit A?

7  A.    It's an email to me from Mr. John Rash on July 7th.

8  Q.    Okay.

9  A.    Asking about the permit process, I believe.

10  Q.    Okay.  And you, in fact, received that?

11  A.    Yes.

12  Q.    Okay.

13        MR. O'DONNELL:  Your Honor, at this time, we'd move

14  to enter into evidence Exhibit A.

15        THE COURT:  All right.  It'll be received as an

16  exhibit.

17        (DEFENDANT'S EXHIBIT A WAS RECEIVED INTO EVIDENCE)

18  BY MR. O'DONNELL:

19  Q.    Did you discuss with Mr. Rash, in response to this email,

20  his desire to display at the courthouse and how that might

21  affect traffic safety issues?  Any recollection about that?

22  A.    I did not speak with him after the email.  The email came

23  and then the permit, and then I spoke with him.  And, I mean, I

24  do remember having some conversation about where his equipment

25  would be because I was worried about traffic issues.

1 Q.    Okay.  What was your understanding about where the

2 equipment would be placed?

3 A.    That the projector and the screen would be both on the

4 courthouse lawn.  I was not sure if the projector would be

5 needed, like, across the street or something but -- you know.

6 Q.    Okay.  What about in reference to the east side of the

7 courthouse?

8 A.    That's the recollection I have, is that it would be on the

9 east side.

10 Q.    Okay.  And, in terms of the situation on Mr. Rash's

11 permit, what went into the decision to deny the permit?

12 A.    It was denied based on the policy change that nobody would

13 be allowed to use the courthouse grounds from dusk to dawn.

14 Q.    Was there any basis for the denial concerning the 14-day

15 permit -- events permit requirement?

16 A.    No.

17        MR. O'DONNELL:  That's all I have, Your Honor.

18        THE COURT:  All right.

19     Plaintiff wish to cross-examine?

20        MR. TOM:  Yes, Your Honor.

21        THE COURT:  Okay.  You may proceed.

22                    CROSS-EXAMINATION

23 BY MR. TOM:

24 Q.    Good afternoon, Ms. Carwyle.

25 A.    Hey.

1  Q.    My name is Josh Tom.  I represent Mr. Rash.  In your email

2  to Mr. Rash on July 23rd -- do you remember that email?

3  A.    Uh-huh.

4  Q.    And you mentioned what as being the reasons that the

5  grounds were closed after dusk?

6  A.    For security and safety issues.

7        MR. RASH:  I'm going to give this one another go

8  here, Your Honor, and try to get these entered again.

9        THE COURT:  Okay.

10       MR. TOM:  I'll mark this as Exhibit 1 for -- just for

11  marking purposes now.

12       THE COURT:  Very well.

13  (PLAINTIFF'S EXHIBIT NO. 1 WAS MARKED FOR IDENTIFICATION AGAIN)

14       MR. O'DONNELL:  Which one is that?

15       MR. TOM:  It's the July 23rd one.

16       MR. O'DONNELL:  Okay.

17  BY MR. TOM:

18  Q.    Do you recognize this document, Ms. Carwyle?

19  A.    I do.

20  Q.    And what is it?

21  A.    It's an email from me to Mr. Rash.

22  Q.    And, so, this is your email, right?

23  A.    Yes.

24  Q.    And it was sent on Thursday, July 23rd, 2020?

25  A.    Right.

1  Q.    And the subject matter's "permit denial"?

2  A.    Uh-huh.

3  Q.    And is that permit the one that Mr. Rash was going to

4  apply for to hold "Projection" on August 8th?

5  A.    Yes.

6  Q.    And, so, if you look at the second sentence, it says --

7  apologies -- the third sentence, it says, "No permits will be

8  issued after dusk due to security issues."  Is that correct?

9  A.    That's right.

10 Q.    And, so, it just said "security issues," not safety

11 issues.  Isn't that right?

12 A.    Right.  Well, the board speaks through their minutes; and

13 the board changed the policy.  And, so, I'm not the one that

14 does the minutes for the board; but I believe the board minutes

15 state security and safety issues.

16 Q.    I see.  And what's your understanding of the security and

17 safety issues that caused the board to change its Facility Use

18 Policy on July 20th?

19 A.    Sheriff East could probably speak to it better.  But, from

20 hearing his discussions over the last couple of months, it's

21 been a concern of the sheriff's department to be able to --

22 he's got limited staff, and he is to cover the entire county.

23       And, of course, the county courthouse is the only grounds

24 in the middle of the county that's his responsibility, the

25 grounds there.  And he had issues, problems, concern with the

1  security and safety of events going on at night because it was

2  harder to make sure everybody remained safe and secure with

3  tensions -- there was a lot of, you know, different issues

4  going on at the time.

5         That's why I was continually in conversation with him.  It

6  was something he was dealing with daily, and his staff.  And he

7  had requested to the board several times and had discussions

8  several times about those problems.

9  Q.    And where do you live?

10 A.    I live in Lafayette County, 8 County Road 217.

11 Q.    And how long have you lived there?

12 A.    I have lived there for 23 years.

13 Q.    And how far away is that from Oxford?

14 A.    Three miles.

15 Q.    And since the -- are you familiar with the killing of

16 George Floyd in Minnesota?

17 A.    I am.

18 Q.    And are a lot of the protests and other events that have

19 been happening in Oxford since his killing -- is that the -- is

20 that the reason why the sheriff decided to -- was that the

21 reason for the sheriff's security concerns, those protests

22 about -- after the killing of George Floyd?

23 A.    Some of them, yes.

24 Q.    What else -- what other reasons --

25 A.    Some of it had to do with protests of the Confederate

 1  statue.

 2  Q.    I see.  And, so, you have the protest over the killing of

 3  George Floyd and the protests for and against the Confederate

 4  statue.  What else did the sheriff state as part of the

 5  security issues and safety concerns?

 6  A.    Well, his ability -- the number of staff he had, his

 7  ability to respond.  Because, normally, you know, your deputies

 8  are not patrolling inside the city limits; they're outside.  So

 9  that span of time it would take when something was occurring on

10  the courthouse grounds posed a problem for him, which then

11  poses a security and safety issue for your people who are

12  participating in those events and your citizens who are driving

13  to a restaurant or walking around the square or whatever.

14  Q.    And do you know of any violence that has occurred since

15  the killing of George Floyd during these protests in Lafayette

16  County?

17  A.    I do not know of any violence, no.

18  Q.    And do you know of any disorder that's happened as a

19  result of these protests after the killing of George Floyd in

20  Lafayette County?

21  A.    There has been some tension at times, I mean, with

22  different groups meeting up.  You know, in each other's face

23  and having issues with them, the protestors, walking in the

24  crosswalk and causing problems with the street.

25  Q.    And, so, what is -- what is -- besides tension, was there

1  anything above tension that's happened during these protests

2  after the killing of George Floyd?

3  A.    I mean, I spend a lot of time in my office and not -- I've

4  not been to any of the protests, so I do not know.

5  Q.    But you haven't heard of anything beyond tension in

6  Lafayette County after the killing of George Floyd during these

7  protests, right?

8  A.    No.

9  Q.    And do you know of anybody that has been arrested during

10 these protests after the killing of George Floyd?

11 A.    I don't believe so; but, again, I don't get to see those

12 records or know.

13 Q.    And you stated earlier that the permitting process in

14 order to use county facilities -- you receive those permits,

15 right?

16 A.    Right.

17 Q.    How many permits have been applied for to use the county

18 courthouse grounds since the killing of George Floyd?

19 Estimate.

20 A.    Ten, twelve maybe.

21 Q.    And how many of those permits had to do with either the

22 Confederate statue or the killing of George Floyd?

23 A.    Most of them.

24 Q.    Is that five or six or how many of the ten?

25 A.    So people for or against the statue and --

1  Q.    Uh-huh.

2  A.    I mean, I would say, out of ten, seven.

3  Q.    And was there any security issues at any of those events?

4  A.    You would need to ask the people in charge of security for

5  that.

6  Q.    Have you heard of any security issues at any of those

7  events that you granted a permit for, for the county courthouse

8  grounds after the killing of George Floyd?

9  A.    I have heard that there are some issues that's caused

10  stress on the law enforcement and in the city and in the county

11  to police it.

12  Q.    Uh-huh.  And, since the killing of George Floyd, how many

13  permits have you received to use the county courthouse grounds

14  that you've denied?

15  A.    I'm trying to think back.  I think maybe there was one

16  because there was already a permit issued for that day because

17  we don't allow two at the same time.

18  Q.    Uh-huh.

19  A.    There's been others that's been denied at a different time

20  frame.  But, if you're talking about just from the killing of

21  George -- you know, George Floyd --

22  Q.    Uh-huh.  Okay.  And, so, Attorney O'Donnell was speaking

23  to Mr. Rash earlier about how projections onto the courthouse

24  grounds may distract drivers.  Do you remember that?

25  A.    Uh-huh.

1 Q.    And, so, how does closing courthouse grounds entirely from

2 dusk till dawn deal with the issue of drivers being distracted

3 by projections on the courthouse walls?

4 A.    I guess I don't understand your question because it was

5 closed so that they can maintain a secure environment, keep the

6 citizens safe, keep anybody who may be using the courthouse

7 lawn safe.  So they -- you know, that's why it was closed.  It

8 wasn't closed to prevent projection.

9 Q.    Now, are any of the events that you've given a permit to

10 since the killing of George Floyd for the county courthouse

11 grounds been at night?

12 A.    Yes.

13 Q.    And are you aware of any security issues that resulted

14 during those events at night?

15 A.    I am not.

16 Q.    And did you grant, on or around July 25th of this year, a

17 permit for the group called the Delta Flaggers to use the

18 county courthouse grounds for a candlelight vigil?

19 A.    Not the Delta Flaggers; but there was a candlelight vigil,

20 yes.

21 Q.    When was the candlelight vigil?

22 A.    I -- I think it was on -- I thought it was on July 18th.

23 Q.    July 18th?

24 A.    Uh-huh.

25 Q.    And do you remember what the candlelight vigil was about?

1  A.    It was -- it's a group called the 901 (phonetic) group

2  that come and honor --

3          THE COURT:  I think I'm going require you to take

4  that mask off.

5          THE WITNESS:  Sorry.

6          THE COURT:  I've tried to understand you, but it's

7  very difficult.

8          THE WITNESS:  I'm sorry.  It was a group to honor

9  Anthony her vie, somebody who passed away a few years ago.

10  BY MR. TOM:

11  Q.    I see.  And that event was at night, right?

12  A.    It was.

13  Q.    And are you aware of any security issues or safety issues

14  that happened during that event?

15  A.    I'm not directly.  Like I said, it would be best to ask

16  the sheriff who handles the security and safety issues.  If I

17  remember correctly -- and I could be getting some events

18  confused.  He said there was a group against their beliefs that

19  came; and, you know, he maybe had to ask some to leave.  I

20  believe that was for that night, but it could have been a

21  different time.

22  Q.    I see.  During your time as county administrator, how many

23  permits have you granted for use of the county courthouse

24  grounds do you estimate?

25  A.    Probably 40.

CARWYLE -- CROSS

1   Q.    And have those permits included protests?

2   A.    Yes.

3   Q.    Have those permits included art events?

4   A.    Yes.

5   Q.    Have those permits included events for Easter?

6   A.    Yes.

7   Q.    Have they included events for the national prayer day?

8   A.    Yes.

9   Q.    What other events have those permits included on the

10  county courthouse grounds?

11  A.    When I first started they were allowing some more -- like,

12  wedding-type events were happening on the lawn.  Those were

13  ceased with the new policy in March of '19.  So those were, you

14  know, permitted earlier.

15        The Makers Market used to use -- they would have art

16  events where they would sell art the first Saturday of every

17  month.  Those were also no longer allowed with the March '19

18  revision of the policy.

19  Q.    So would you say that anybody -- that the nature of the

20  county courthouse grounds as used by the public is used for as

21  many reasons as people -- strike that.  How would you describe

22  the Oxford Town Square?

23  A.    A thriving commercial area for city of Oxford tourism.

24  Q.    And is it a busy area?

25  A.    Yes.

1  Q.    And are people there during the day?

2  A.    Yes.

3  Q.    Walking around?

4  A.    Right.

5  Q.    Driving?

6  A.    Yes.

7  Q.    And what about at night, are people there?

8  A.    Yes.

9  Q.    And is it busy at night?

10  A.    Yes.

11  Q.    And is the county courthouse open to the square?

12  A.    Is it open to the square?

13  Q.    Like, if I were visiting a bar on the square at night,

14  could I just go and walk into the county courthouse grounds?

15  A.    Oh, the grounds, yes.  Right now you can.

16  Q.    So the county courthouse grounds are open to the square,

17  including at night; isn't that right?

18  A.    Yes.

19  Q.    And, so, what if somebody went to -- are you familiar with

20  this restaurant called City Grocery?

21  A.    Yes.

22  Q.    And it's on the square, right?

23  A.    Right.

24  Q.    What if somebody went to City Grocery with, say, a group

25  of five people, right, and then they left and they were having

1   dinner, so it's night -- what happens if they were to go walk

2   into the open county courthouse grounds and sit on the bench

3   next to the Confederate monument, say?  Would they be in

4   violation of the Facility Use Policy?

5   A.    It says there shall be no use of the courthouse grounds

6   from dusk until dawn, so.

7   Q.    So that -- so that would mean that those friends, after

8   dinner, couldn't go sit on the bench in the county courthouse

9   grounds.  Is that what you're saying?

10  A.    That would be in violation of the policy.

11  Q.    Now, would you describe the county courthouse grounds as

12  similar -- or as a park, a small park?

13  A.    Possibly, yes.

14  Q.    And, in practice, is the county courthouse grounds used as

15  a park by people visiting the square?

16  A.    Yes.

17  Q.    So were there any other interests for closing the county

18  courthouse grounds from dusk to dawn besides the security and

19  safety issues that we've already talked about?

20  A.    I don't think so, no.

21  Q.    Why before the -- so you mentioned to Mr. O'Donnell before

22  that there was a 30-day notice requirement.  But then, on

23  July 20th, it got changed to 14; is that correct?

24  A.    Uh-huh.

25  Q.    What's your understanding of why 30 days' notice is

CARWYLE -- CROSS

1   required?  What's the government's -- what's Lafayette County's

2   interest to require 30 days' advance notice to require a permit

3   to use county facilities?

4   A.  To make sure we're prepared for anything we would need to

5   provide.

6   Q.  And, in your experience, how long does it take to process

7   a permit application to use Lafayette County facilities?

8   A.  A week to two weeks.

9   Q.  What's the difference -- why does one permit take one week

10   versus one permit takes two weeks?

11   A.  I'm just giving generalities based on my job

12   responsibilities and other things that I have to take care of,

13   which is a lot.

14   Q.  And, so, are you the only person that processes and

15   decides whether to grant a permit or not?

16   A.  I check with the sheriff, and he will check with the city

17   to see if they have permits.  Because we need to be aware of

18   what else will be happening in the same space on the same day.

19   So I have to get it to him.  Again, he's busy.  He has to check

20   with the city.  They have to check their records.  So it just

21   takes some time.

22   Q.  What's the sheriff's role in determining whether to grant

23   a permit to use the Lafayette County facilities?

24   A.  He -- I -- he is one of the people that I check with

25   before I grant permission for the permit.  And he just makes

1  sure he will have the resources available for whatever type

2  permit it is, whatever is needed as far as additional security.

3  Q.    Does he have any other -- does he have any other input in

4  whether a permit should be granted or denied than security

5  issues?

6  A.    No.

7  Q.    What's the board of supervisor's role in deciding whether

8  to grant or deny a permit to use Lafayette County facilities?

9  A.    They're not part of the initial process. They are an

10  appeal process. If I were to issue a denial, then somebody

11  could appeal it to the board of supervisors.

12  Q.    I see. So is this correct, you, as the county

13  administrator, handle the process for permitting to use

14  Lafayette County facilities; and you consult with the sheriff

15  on security issues. And, should a permit be denied, the board

16  comes in as -- to take a second look. Is that correct?

17  A.    Only if it's appealed to the board.

18  Q.    Okay. But -- so was everything else I said correct? Let

19  me restate it. You handle the permitting process for the use

20  of Lafayette County facilities, right?

21  A.    Right.

22  Q.    And the sheriff's role is to speak about potential

23  security issues for those permits, right?

24  A.    Right.

25  Q.    And then the board becomes involved if someone appeals

1  denial of a permit; is that right?

2  A.    Right.

3  Q.    Are there any other roles that the sheriff has besides

4  what we've just talked about?

5  A.    Just what I stated, right.

6  Q.    Are there any roles for use of Lafayette County facilities

7  besides appeals that the board handles?

8  A.    No.

9  Q.    So, when Mr. Rash applied for a permit, are you familiar

10  with the conversation he had with somebody from the sheriff's

11  department?

12  A.    Yes.

13  Q.    And what's your understanding of that conversation?

14  A.    I know Deputy Chief Scott Mills called to just see what --

15  the nature of what he was going to be doing, how many people,

16  that type thing; so they could know how to plan for it.

17  Q.    And, so, are you aware that the sheriff's employee who

18  spoke with Mr. Rash about his permit said that he would have

19  to -- strike that.  You said to Mr. Rash in one of your emails

20  that the board of supervisors meets on July 20th; and that his

21  permit would be decided then, correct?

22  A.    No, I did not.

23        THE COURT:  Do you have further questions?

24        MR. TOM:  Just a few more, Your Honor.

25  BY MR. TOM:

1  Q.   What's the purpose of requiring groups of five or more to

2  get a permit for use of Lafayette County courthouse grounds?

3  A.   I don't really know all the rationale behind that.  That

4  was in conversation with our attorney and the board of

5  supervisors; it was decided to say five or more.  We needed to

6  define it in some way because, you know, there's issues if

7  there's one or two; so the sheriff would have clear direction

8  on how to enforce if somebody needs a permit or does not have a

9  permit.

10 Q.   Now, there -- now, the permit process for use of the

11 county facilities, including the county courthouse, applies to

12 everyone, right?

13 A.   The permitting process?  Yes.

14 Q.   So Mr. Rash is just one of the people that has gone

15 through the permitting process, right?

16 A.   Yes.

17 Q.   So this 30-day advance notice requirement applies to

18 everyone who wants to use the grounds, right?

19 A.   It's 14 days.

20 Q.   The 14 days now?

21 A.   Right.

22 Q.   The advance notice requirement applies to everyone who

23 wants to use the county courthouse grounds, right?

24 A.   There have been times during this last couple of months

25 where I think I stated that earlier they allowed a shorter

1    notice due to the environment and the need to respond.

2    Q.    And whose discretion is that?

3    A.    Sheriff East.

4    Q.    So Sheriff East has the discretion of whether to make --

5    waive the 14-day notice requirement?

6    A.    Right.

7    Q.    And under what basis does he use to decide whether to

8    waive the advance notice requirement?

9    A.    I believe he uses the fact of what's going on in the

10   community and, you know, the need to allow people for their

11   need to protest.  And whether he allows it or not is based on

12   his ability to respond to that, to have people there if needed,

13   how staffed he is for that time.

14   Q.    Now, are there -- are those criteria that Sheriff East

15   uses to determine whether to waive the advance notice

16   requirement -- are they written down somewhere?

17   A.    Not -- no.

18   Q.    So he uses his own discretion of whether to waive that

19   14-day notice requirement, right?

20   A.    Uh-huh.  In consultation with our attorney, he does, yes.

21   Q.    And -- but there's no written criteria for when the

22   advance notice requirement would be waived, is there?

23   A.    No.

24   Q.    So -- (pause).

25              THE COURT:  All right, Counselor, let's move on.

1            MR. TOM:  That's all I have.

2            MR. WILLIAMS:  May I approach Counsel, Your Honor,

3    co-counsel?

4            THE COURT:  All right.

5                    (Off-the-record discussion)

6    BY MR. TOM:

7    Q.    Are Oxford police officers available to respond to

8    disturbances at the county courthouse?

9    A.    Possibly, if they're available.

10   Q.    Does the city of Oxford own all of the land surrounding

11   the county courthouse?

12   A.    They do.

13           MR. TOM:  No further questions, Your Honor.

14           THE COURT:  All right.  You may step down.  Well,

15   wait just a minute.

16       Do you have redirect?

17           MR. O'DONNELL:  I have no questions, Your Honor.

18           THE COURT:  All right.

19       You may step down.

20           THE WITNESS:  Thank you.

21           THE COURT:  Do you have any other witnesses,

22   Mr. O'Donnell?

23           MR. O'DONNELL:  We'll call Sheriff East.

24           THE COURT:  All right.  Do you know where he is?

25   Okay.

1        (OATH ADMINISTERED BY THE COURTROOM DEPUTY)

2              THE COURTROOM DEPUTY:  And will you state your first

3   and last name for the record?

4              THE WITNESS:  Joey East.  Can I take this off or

5   leave it on, Judge?

6              THE COURT:  Take it off.

7              THE WITNESS:  Thank you.

8              THE COURT:  If you want to.

9              THE WITNESS:  I'd like to.

10             JOEY EAST, DEFENDANT'S WITNESS, SWORN

11                      DIRECT EXAMINATION

12  BY MR. O'DONNELL:

13  Q.    Sheriff East, you've given us your name.  Can you tell us

14  when you first became sheriff of Lafayette County?

15  A.    January the 1st of this year.

16  Q.    And, prior to January 1st of this year, what was your

17  position?

18  A.    I was the chief of police of the Oxford Police Department.

19  Q.    And how long did you have that position?

20  A.    Six years.

21  Q.    And, when you took office as sheriff in January of this

22  year, did you ever have an occasion to speak with the board of

23  supervisors about any concerns that you had regarding the use

24  of the courthouse facilities at night?

25  A.    Yes, sir.

1   Q.    Okay.  Can you tell us what -- what prompted those

2   discussions with the board?

3   A.    Probably around March, we started having conversations

4   about it.  I didn't feel like that, based on manpower -- the

5   policy said -- let's try to change the policy.  When I was the

6   chief of police and that was part of my area, I had plenty of

7   manpower.  It was in the middle of the downtown area.  I would

8   be able to police that to a level of safety.

9         As the sheriff, my biggest concern is outside the city

10  limits; so that really left two buildings inside the city that

11  we have to watch.  My knowledge of downtown Oxford when it's

12  busy -- when COVID isn't happening and we have a lot of

13  involvement, I didn't feel like, based on those, that I

14  personally, as the sheriff, with the limited manpower I have,

15  would be able to provide a safe environment for people to be

16  there, especially after night.

17        Because we're running 670 square miles at night with

18  sometimes six or even less deputies.  Can't really focus on the

19  safety there; so I was encouraging them to look at limiting the

20  access to that, even possibly gating it at times so that it

21  would limit that and from anyone getting hurt or being there.

22  Q.    As the sheriff of Lafayette County, what's the nature of

23  your jurisdiction over the courthouse grounds?

24  A.    That's one of the areas that I'm in charge of.

25  Q.    You're in charge of the security of the facility?

1  A.    Yes, sir.

2  Q.    What involvement does the city have with regard -- the

3  city of Oxford have with regard to the security or the safety

4  of the courthouse grounds?

5  A.    None.

6  Q.    Okay.  That's your exclusive domain?

7  A.    Yes, sir.  Yes, sir.

8  Q.    All right.  So, with regard to the use of the courthouse

9  facility as an area of use by groups, what's been your

10 experience since you become sheriff with regard to potential

11 traffic and pedestrian safety issues?

12 A.    Since March, we've had -- with everything that's going on,

13 we've had some pop-up rallies or organizing or things going on.

14 And we've seen big movements, big crowds.  People would march

15 or get together.  So that causes safety issues, traffic issues.

16       Had a lot of people that are protesting out on the statue

17 or around there, getting out in the street.  I've had to go up

18 there a couple of times to get people out of the traffic area,

19 asked the police to come over there to assist me in those

20 areas.  So, other than those things there -- you know, it's a

21 gated area; but people are coming in and out across there.  So

22 it's limited to street side for those things to happen.

23 Q.    What, in your opinion, is the lighting capacity or

24 capability of the area around the courthouse?

25 A.    It's poorly lit.  It's one of the topics when I was chief

1    that I would talk to the city about.  The square itself, in my

2    opinion, is poorly lit for people driving.  Young adults are

3    constantly moving in and out of traffic, parked cars.  It's not

4    a well-lit area, and the courthouse is even less lit.

5    Q.    Did that add to your concerns about the use of the

6    courthouse during the evening hours?

7    A.    Yes, sir.  It's just not really protected well.  It's not

8    lighted real well; and we're not watching it at all, really.

9    We rely on the city, at times, to look at it for us.

10   Q.    Okay.  So you started voicing your concerns with the board

11   of supervisors, you said, in March of this year?

12   A.    Yes, sir.  I believe that's right.

13   Q.    Okay.  Did those discussions evolve at any point with

14   regard to the city or the university or the county?

15   A.    Yes, sir.  What we saw, we each had a permitting process

16   and each one was different, city, university, and county.  And,

17   through this experience over the last couple of months, we came

18   together.  Because the city would permit something, the county

19   would be looking at permitting something -- if it's a large

20   event, we have limited resources.

21         So altogether, between the city, the county, and the

22   university, we probably have 120 to 130 officers.  So, if the

23   city has something very large and they need us to be a backup

24   and to help them with issues, we can't necessarily have a

25   permit going on at the courthouse at the same time because it

 1  takes the resources away to help them.

 2       So we had conversations about that.  That's what -- we

 3  talked about the time of the stuff that was up there on the

 4  courthouse lawn.  I think the original permitting process for

 5  the county allowed until ten o'clock at night.

 6       Those are some of the things that I didn't think should

 7  just be open; it should be a limited area.  But we did meet

 8  with the city and the university, and we tried to get our

 9  permitting processes so it would kind of look the same so we

10  weren't contradicting each other.

11  Q.   So the concept of the curfew or limiting or prohibiting

12  use of the courthouse after dark, that was discussed with the

13  university and the city as well?

14  A.   Yes, sir.  That conversation absolutely came up.

15  Q.   And, you know, eventually, in July -- on July 20th of this

16  year, that the county's use facility policy was amended to

17  prohibit the use of the courthouse facility after dark?

18  A.   Yes, sir.

19  Q.   Do you have any recollection about your input in that

20  decision?

21  A.   I advised them my opinion of it.  I don't know how much

22  input I had on their decision-making, but I'd been advising

23  them of that for several weeks up to that time.  I think before

24  they actually voted on it, the two weeks before, we had a

25  conversation about it.  And it was advising them of our

1    conversation with the city and university and what we talked

2    about collectively as a group.

3    Q.    Okay.  With regard to the permit application submitted by

4    Mr. Rash to the county for using the courthouse grounds on

5    August the 8th, did you have any conversations with Chief

6    Deputy Mills about that application?

7    A.    I did.

8    Q.    Okay.  What was your conversation?

9    A.    Usually, what I do when we get a permit, I ask Deputy

10   Mills to contact the individual, whoever it is, whatever group

11   it may be, to find out what will be transpiring, what are they

12   doing, just to see if there are security needs on our part.

13        A lot of times we need to know, you know, is it going to

14   be volatile; will there be counterprotestors here; will there

15   be someone that doesn't like what you're doing, so we can

16   provide adequate security.

17   Q.    Okay.  So, in your conversation with Chief Deputy Mills,

18   did he inform you about a conversation he had, or the inquiry

19   he made, with Mr. Rash?

20   A.    He did.  He said he asked Mr. Rash; and he wanted to show

21   a film, some type of film or films or pictures, on the

22   courthouse lawn.  Scott -- Chief Deputy Mills did say they were

23   talking about would there be anything there that would be

24   maybe -- I don't know the exact words, but would upset other

25   people.  So we need to know if we need security there to make

1    sure someone didn't come over there.

2          He did advise that Mr. Rash said, to the best of my

3    memory, that there may be one thing on his film or something

4    that could be political or contradiction or people may get

5    upset about it.

6    Q.    Okay.  So your concern and interest was actually to

7    protect Mr. Rash's ability, in the event the permit was

8    approved, to display what he was displaying --

9    A.    Right.

10   Q.    -- in terms of whether or not additional security was

11   needed?

12   A.    Oh, absolutely.  Yes, sir.

13          MR. O'DONNELL:  That's all I have, Your Honor.

14          THE COURT:  All right.  Cross-examination?

15          MR. TOM:  Yes, Your Honor.

16                    CROSS-EXAMINATION

17   BY MR. TOM:

18   Q.    Good afternoon, Sheriff East.  How are you?

19   A.    Good.  How are you, sir?

20   Q.    Doing good.  My name's Josh Tom.  I represent Mr. Rash

21   over here.

22   A.    Okay.

23   Q.    I'll ask you some questions.  So how would you describe

24   the Oxford Town Square?

25   A.    Quaint.  I don't know what you're talking -- I don't know

1  what you're getting at.

2  Q.    So you've been sheriff for how long now of Lafayette

3  County?

4  A.    Seven months -- eight months now.

5  Q.    Congrats.

6  A.    Thank you.

7  Q.    And how long were you with the Oxford police?

8  A.    I was with the city -- I spent 4 years with the Attorney

9  General's Office; so that puts 25 years, 24, 25 years with the

10 city.

11 Q.    I got you.  So you know Oxford.  You probably know every

12 street in Oxford, right?

13 A.    I know how to get down them.  I don't know that I could

14 tell you which street is there.  I haven't been on the road in

15 a long time.  There's so many new streets.  Yes, sir, I'm

16 pretty familiar with Oxford.

17 Q.    So you'd agree that the square is the business, nightlife

18 hub of the city, right?

19 A.    Yes, sir, I'd agree with that.

20 Q.    A lot of people use the square day and night?

21 A.    Yes, sir.

22 Q.    And would you agree that the county courthouse grounds

23 that stand at the center of the square are also used day and

24 night by the people that are enjoying the square?

25 A.    Probably to sit around.  I've seen people sit up there and

1    eat ice cream, things like that.  I haven't seen it to be,

2    like, an entertainment area.

3    Q.    So it's sort of like people using it -- use the county

4    courthouse grounds sort of like a park; isn't that right?

5    A.    At times, if there's something going on, Double Decker.

6    But, you know, you don't see a lot of blankets or people

7    sitting out like that.  It's not really used in that area.

8    Q.    People sit on the benches on the grounds of the county

9    courthouse?

10   A.    Yes, sir.  It's used that way some, yes, sir.

11   Q.    And it's been used for people -- the county courthouse

12   grounds have been used for people to sit on the benches for

13   people to gather, for people to enjoy themselves in the square

14   both day and night for many years, right?

15   A.    That's correct, yes, sir.

16   Q.    And would you say that you were with the Oxford Police

17   Department -- did you say 25 years?

18   A.    Yes, sir.

19   Q.    And would you say that the county courthouse grounds have

20   been used in that fashion for 25 years?

21   A.    As far as I know, there's never been a measure to stop

22   people from using it, no, sir.

23   Q.    So I was speaking with Ms. Carwyle earlier about the

24   permitting process for people that wanted to use county

25   facilities.  It's called the Facility Use Policy.  Are you

1  familiar with that policy?

2  A.    Somewhat, yes, sir.  Not verbatim.

3  Q.    What's your role in the Facility Use Policy?

4  A.    Ms. Carwyle, once they fill it out, would send it to me.

5  We will then check with the city and university now to see if

6  there's anything going on.  We look to see how -- really kind

7  of see what it is, if we're going to need the -- the manpower

8  we need, if there's a security risk or not.  I'll email her

9  back to let her know there's no issues as far as security goes.

10 Q.    All right.  So your role for whether someone gets a permit

11 to use Lafayette County facilities is solely focused on

12 security?

13 A.    Yes, sir.

14 Q.    Is there any other reasons that you are involved in the

15 permitting process to use Lafayette County facilities?

16 A.    Not that I know of, no, sir.

17 Q.    And, so, before July 20th, there was a 30-day advance

18 notice requirement for someone to apply for a permit to use

19 facility property; is that right?

20 A.    Yes, sir.

21 Q.    And then, on July 20th of this year, they changed it to

22 14 days; is that right?

23 A.    Correct.

24 Q.    And is part of your role to determine whether that advance

25 notice requirement is waived or not?

EAST -- CROSS

```
 1   A.    I guess it -- they would value my opinion if it was -- you

 2   know, I couldn't get enough people together if it's a security

 3   risk.   Other than that, I don't have a say whether or not they

 4   get that or not.

 5   Q.    So do you have any say in whether someone gets a permit

 6   quicker than 30 days or quicker than 14 days?

 7   A.    No, sir.   I wouldn't think so.   I know about that

 8   conversation, how it got moved from 30 to 14.   But, you know, I

 9   just say that it's not a security hazard; and I have enough

10   manpower to cover that.

11   Q.    I see.   So you don't have -- do you have discretion about

12   whether the 30-day advance notice requirement, now 14-day

13   advance notice requirement, is waived?

14   A.    I don't know of any that I have.

15   Q.    Okay.   So are you familiar with a group called the Delta

16   Flaggers?

17   A.    Yes, sir.

18   Q.    And do you know if they held an event on the county

19   courthouse grounds in July of this year?

20   A.    Yes.   I don't know if it was the Delta Flaggers, but I

21   know there was an event.   I don't know the exact name of the

22   group.

23   Q.    Was this event that was a candlelight vigil to honor the

24   death of a man who had passed away several years ago?

25   A.    So are we talking about the same event, or are we talking
```

1  about two events now?

2  Q.    Which events -- tell me the first event that you're

3  thinking about.

4  A.    Well, you brought up the candlelight.  I was thinking that

5  was a different event than the flaggers.  So I'm em not sure if

6  we're --

7  Q.    Oh, I see.  Okay.  So tell me about the candlelight event.

8  A.    Yes, sir.  They had one there a couple weeks ago.

9  Q.    And when was that?

10  A.    I don't know the exact date.

11  Q.    Was it at night?

12  A.    Yes, sir.

13  Q.    And how many people were there?

14  A.    I'm not the only one there.  I know the permit said

15  there'd be no more than 8 to 10.

16  Q.    Were there any security problems?

17  A.    No, sir, not that night.  I had a deputy go by and check

18  on it.  The city even walked over there.  We had issues of

19  people walking up, so we had to move some people from there;

20  but nothing major, no, sir.

21  Q.    And what's the other event that you mentioned?

22  A.    I thought you were talking about there was a -- you said

23  "flaggers."  So there were some -- the county issued a permit

24  to people being up there on one date, and they had a lot of

25  flags.  And they were pro -- pro-state, pro-monument-type

1    stuff.  So I thought that was what you were talking about.

2    Q.    I see.  And was this the event that was on July 4th?

3    A.    I'm not sure.  I'd have to look at the permitting to see

4    which one it was.  We had so many right in there.  It was kind

5    of confusing.  It seemed like every weekend we were up there

6    for a city or county event.

7    Q.    Was this event that we're calling the pro-flaggers, was

8    that in July of this year?

9    A.    Yes, sir.

10   Q.    And was that event during the night or day?

11   A.    It was during the day that I'm talking about.

12   Q.    And how many people do you estimate were there?

13   A.    I would say 30 to 40.

14   Q.    And were there any -- was anyone arrested?

15   A.    No, sir.

16   Q.    Were there any security issues at that event?

17   A.    We had a lot of security there.

18   Q.    Tell me -- so what was the purpose of the security there?

19   A.    This is a time that we felt like we needed them.  Anytime

20   you have a pro-flag or Confederate, you know, pro-statue or

21   take the statue down, that causes -- it's usually possible

22   counter-demonstrators will come, so we have security there to

23   make sure that the two sides can stay apart; and there's no

24   issues.

25   Q.    I see.  So, since the -- are you familiar with the killing

1   of George Floyd?

2   A.    Yes, sir.

3   Q.    And you understand that happened in May of 2020, right?

4   A.    Yes, sir.

5   Q.    And, since the killing of George Floyd, there's been a lot

6   of protests in Oxford; is that correct?

7   A.    Yes, sir.

8   Q.    And have any of these protests had any violence?

9   A.    No, sir, not yet, thank goodness.

10  Q.    Yeah.  Mississippi has acquitted itself well, hasn't it?

11  A.    Sir?

12  Q.    Mississippi has done well with these protests, kept them

13  all peaceful?

14  A.    Here in Oxford, we've been fortunate, yes, sir.

15  Q.    All the protests in Oxford have been peaceful after the

16  killing of George Floyd?

17  A.    Yes, sir.

18  Q.    So you've only been sheriff for a couple of months.  So

19  what's changed between -- since you became sheriff and all the

20  time before that requires the county courthouse grounds to be

21  closed from dusk till dawn?

22  A.    I don't know how they looked at it.  I wasn't here before

23  that.  But the perspective I brought in, based on manpower,

24  670 square miles -- okay?  I have 44 officers currently.  When

25  I was the chief of police, I ran 26 square miles, significantly

1   less, with 80 officers.

2        So I have a lot bigger area, more rural areas that my

3   officers are out in; and I'm not really focused on the square.

4   That I'm over that, I feel like it's important that the

5   county -- I think it's a risk for them to take.  We're not

6   there; we're not watching it.  I feel confident the city's not

7   watching it; they have their own issues.

8        So I just feel like it's best there's nothing going on up

9   there.  We have a lot of, as you said, entertainment there, a

10  lot of young adults that partake.  And some of them get more

11  than they should.  And I just think it would be best if that

12  area was closed off after a certain time of night.

13  Q.   And when you were with the Oxford Police Department, did

14  you -- or do you know of any Oxford police officer that

15  enforced the law on the county courthouse grounds?

16  A.   I know that we had several times with where we would have

17  people that were public drunk or accused of that that would run

18  or maybe go up there.  And then, you know, the officer would go

19  up there and have to deal with them.  But I don't know of any

20  particular one where they just went up there and saw somebody

21  sitting on a bench.  We didn't do anything like that, that I

22  recall.

23  Q.   But if, say -- say -- is it true that completely

24  surrounding the county courthouse grounds is owned by the city

25  of Oxford?

1  A.    The streets, yes, sir.

2  Q.    And, so, that means the Oxford Police Department has

3  jurisdiction over the area completely surrounding the county

4  courthouse?

5  A.    They have -- outside the courthouse, they do, yes, sir.

6  Q.    And, if an Oxford police officer saw violence or security

7  issues happening on the county courthouse grounds, could they

8  go there and investigate?

9  A.    Sure.  I'm sure they would.  I'm sure they would try to go

10 up there if they saw something that was -- shouldn't be

11 happening.  I'm sure that they would try to do that and notify

12 us.  I would hope they would.

13 Q.    And how often do Oxford police officers patrol the square?

14 A.    They have a downtown unit up there.

15 Q.    And, so, there's an entire unit of the Oxford Police

16 Department whose entire jurisdiction is the square?

17 A.    That's correct.  Or used to.  They did when I was there.

18 Q.    Used to.  So that was -- that was at least -- that was the

19 case 7 months ago.  Is that right?

20 A.    Yeah.  Well, I was on leave for a year when I was running

21 for sheriff; so I can't really talk -- I don't know what was

22 going on that time.  So at least a year and 8 months ago, we

23 did.

24 Q.    And how many officers are in the unit that only patrols

25 the square?

1  A.    I don't know how many's in there now, sir.

2  Q.    How many were there when you were with the Oxford Police

3  Department?

4  A.    We had it up to eight, I believe, when I was there.

5  Q.    Eight.  And is that -- for law enforcement agency, is

6  eight officers for that size area, is that well-policed or is

7  that -- is that enough police officers or could it use more or

8  is it too few?

9  A.    When there's an SEC game and it's full, we would normally

10  stack on 15.  We'd have 15 officers up there.  Seven would not

11  be enough.

12  Q.    And that's during game day, right?

13  A.    Yes, sir.  Or back to school.  You know, big events that

14  would come up, we would try to get out as many officers.  Plus,

15  we would put a mounted patrol up there also.

16  Q.    And are you familiar with Fringe Festival Oxford?  A

17  Fringe Festival?  It's an artistic festival for anyone in

18  Oxford.

19  A.    No, sir, not really.

20  Q.    Not familiar with it?  Are you familiar with the Oxford

21  Film Festival?

22  A.    Yes, sir.

23  Q.    And are you familiar that they had a projection event on

24  the county courthouse grounds last year?

25  A.    I didn't know that until here recently when I was informed

1  that they did.

2  Q.    And compared to, say, game day, how's the crowd in the

3  square during the film festival?

4  A.    I haven't really seen a bigger crowd there during the

5  square.  I'm not familiar with it.  I know when they headed

6  out, they had it at the mall or something.  I say the mall, but

7  where the university owns now, used to be the old Walmart; they

8  had some pretty good crowds there.

9  Q.    And this is for the film festival?

10  A.    When they would do their film festival, you know, there's

11  a movie theater; they showed them there.

12  Q.    How many officers would you need to properly police the

13  square during the Oxford Film Festival?

14  A.    I don't know that we'd need any more.  I haven't seen any

15  uptick in that.  In the last year and a half, I don't know.

16  Q.    But it's no more than game day, is it?

17  A.    No.  No, sir.  I wouldn't think so.

18  Q.    It's probably less?

19  A.    I would consider it -- it's considerably less.

20  Q.    And what's considerable?  I mean, how many officers would

21  you need?

22  A.    Just depends on the size of the grounds.  You normally had

23  five up there at night.  You had eight assigned to the area,

24  but you'd have five most nights up there.

25  Q.    I see.  So during -- you would estimate that during last

EAST -- CROSS

1  year's Oxford Film Festival five Oxford police officers could

2  sufficiently police that -- that area?

3  A.    I have no idea.  I didn't even know they had a film

4  festival up there last year, so I can't comment on that.

5  Q.    So do you see it as the role of law enforcement, during

6  people engaged in protests, to keep those protests safe?

7  A.    Yes.

8  Q.    And that when one group is, say, protesting to take the

9  Confederate monument that rests on the county courthouse

10  grounds, and then there's another group protesting to keep it

11  up, that the role of law enforcement is to make sure that both

12  of those groups can protest and get their points of view

13  across?

14  A.    Yes.

15  Q.    So is it the Lafayette County Sheriff's role, in your

16  view, to insure that people are able to express their right --

17  their First Amendment rights to free speech and assembly?

18  A.    Yes.

19  Q.    And, so, when these protests happened in Oxford this past

20  summer, you know, some related to George Floyd, some related to

21  the monument, both for and against, it was -- it was the

22  sheriff's role, your role, and your department's role, to make

23  sure that all of those people could speak their minds, get

24  their message across, and stay safe, right?

25  A.    My role was to protect the --

1            MR. O'DONNELL:  I'm going to object to relevance at

2   this point.

3            THE COURT:  It is somewhat distant from what I'm

4   interested in, but go ahead; and you may answer that question

5   and move on.

6            MR. TOM:  Okay.

7   BY MR. TOM:

8   Q.    You can answer that.

9   A.    Our role is to make sure that they have a safe environment

10  to express their First Amendment right, yes, sir.

11  Q.    And, in your experience, the county courthouse grounds

12  have been used for protests, right?

13  A.    They have this past summer for sure, yes, sir.

14  Q.    And, when you were with the Oxford Police Department, were

15  there ever protests on the county courthouse grounds?

16  A.    Yes, sir.  In previous years, yes, sir.

17  Q.    And, so, part of the Oxford Police Department's, to your

18  understanding, and the Lafayette County Sheriff's role are to

19  insure that people are able to safely protest on the county

20  courthouse grounds, right?

21  A.    Wherever they choose to have a permit, whether it's

22  courthouse grounds, whether it's, you know, in between city

23  hall and Neilson's over there, it's our job to make sure they

24  stay safe and have that First Amendment right to assemble and

25  protest and be safe.

1  Q.    And, clearly, they would, say, get a permit for use of the

2  courthouse grounds, right?

3  A.    If they have a permit up there, then it's my job to make

4  sure they have a safe environment to do that in.

5  Q.    Well, that's great.  You've done a great job from what I

6  understand, all peaceful.

7  A.    Thank you.

8  Q.    Yeah.

9          MR. TOM:  No further questions, Your Honor.

10         THE COURT:  Any redirect?

11         MR. O'DONNELL:  No, sir, Your Honor.

12         THE COURT:  You may step down.

13         THE WITNESS:  Thank you.

14         THE COURT:  Anything further?

15         MR. O'DONNELL:  Nothing further, Your Honor.

16         THE COURT:  Is there anything further from the

17  plaintiff?

18         MR. TOM:  Can I check with my co-counsel, Your Honor?

19         THE COURT:  Yes, you may.  (Pause).

20      You can go out that way.

21         THE WITNESS:  Yes, sir.

22         MR. TOM:  Nothing further, Your Honor.

23         THE COURT:  All right.  Thank you.

24      All right, gentlemen.  The Court's going to take the

25  matter into consideration, and we'll issue an order on it

1   within -- let's see; today's Wednesday -- within 24 hours.

2              MR. TOM:   Thank you, Your Honor.

3              THE COURT:   All right.   If there's nothing further,

4   we'll be in recess.

5                   (Proceedings concluded at 4:17 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3

4            I, Rita Davis, Federal Official Realtime Court

5    Reporter, in and for the United States District Court for the

6    Northern District of Mississippi, do hereby certify that

7    pursuant to Section 753, Title 28, United States Code that the

8    foregoing is a true and correct transcript of the

9    stenographically reported proceedings held in the

10   above-entitled matter; and that the transcript page format is

11   in conformance with the regulations of the Judicial Conference

12   of the United States.

13

14

15                    Dated this 1st day of December, 2020.

16

17

18

19                    /s/ Rita Davis _____
                       RITA DAVIS, FCRR, RPR, CSR #1626
20                     Federal Official Court Reporter

21

22

23

24

25