# EXHIBIT 4

Page 1

1                    JEFFREY GLYNN BUSBY

2        IN THE UNITED STATES DISTRICT COURT

3      FOR THE NORTHERN DISTRICT OF MISSISSIPPI

4                    OXFORD DIVISION

5

6   JOHN RASH,

7

             Plaintiff,
8
    v.                                CIVIL ACTION NO.:
9                                     3:20-cv-224-NBB-RP

10  LAFAYETTE COUNTY,
    MISSISSIPPI,
11
             Defendant.
12

13

14

15
           VIDEOTAPED REMOTE DEPOSITION OF
16
                JEFFREY GLYNN BUSBY
17
            Thursday, December 3, 2020
18
          9:09 a.m. Central Standard Time
19

20

21

22

23  Reported by:

24  GRETA H. DUCKETT, CCR, RPR, CRR, CVR-S, RVR-M-S

25  JOB NO. 187135

Page 2

```
 1              JEFFREY GLYNN BUSBY
 2
 3
 4
 5              December 3, 2020
 6         9:09 a.m. Central Standard Time
 7
 8         Videotaped remote deposition of
 9 JEFFREY GLYNN BUSBY, before Greta H. Duckett,
10 CCR, RPR, CRR, CVR-S, RVR-M-S.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 3

```
 1              JEFFREY GLYNN BUSBY
 2          A P P E A R A N C E S
 3
 4 FOR THE PLAINTIFF:
 5
 6         BY: Joshua Tom, Esq.
 7         ACLU OF MISSISSIPPI
 8         P.O. Box 2242
 9         Jackson, Mississippi 39225
10
11
12
13         C. Jackson Williams, Esq.
14         P.O. Box 69
15         Taylor, Mississippi  38673
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1              JEFFREY GLYNN BUSBY
 2          A P P E A R A N C E S
 3            C O N T I N U E D
 4
 5 FOR THE DEFENDANT:
 6
 7         By: David O'Donnell, Esq.
 8         CLAYTON O'DONNELL
 9         1403 Van Buren Avenue
10         Oxford, Mississippi 38655
11
12
13
14 ALSO PRESENT:
15
16         Kevin Marth, videographer
17
18
19
20
21
22
23
24
```

Page 5

```
 1              JEFFREY GLYNN BUSBY
 2              I N D E X
 3          EXAMINATION INDEX
 4
 5 JEFFREY GLYNN BUSBY
 6      BY MR. TOM                        9
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

JEFFREY GLYNN BUSBY

EXHIBIT INDEX

EXHIBIT 1 4/20/2015 Facility Use            32
          Policy; Bates Lafayette
          County DOC0000002 to
          Lafayette County DOC0000005

EXHIBIT 2 3/4/2019 Facility Use             41
          Policy; Bates  Lafayette
          County DOC0000006 to
          Lafayette County DOC0000010

EXHIBIT 3 2/26/2019 email to               41
          Supervisor, O'Donnell, and
          Hill, from Carwyle

EXHIBIT 4 Order: Amend Facility Use         56
          Policy Regarding Use of
          Courthouse Grounds

EXHIBIT 5 Order: Approve Revision of        62
          Facilities Use Policy to
          include a requirement of
          application to be made 14
          days prior to date of
          proposed use and requiring
          closure of courthouse
          grounds 30 minutes before
          dusk

EXHIBIT 6 9/1/2017 email to Frye from       71
          Lafayette County Board of
          Supervisors

JEFFREY GLYNN BUSBY

THE VIDEOGRAPHER:  Good morning, Counselors.  My name is Kevin Marth, and I'm the legal videographer today, in association with TSG Reporting, Inc.  Due to the severity of the COVID-19 virus and following the practice of social distancing, I will not be in the same room with the witness. Instead, I will record the deposition remotely.  Additionally, our court reporter today will also not be in the same room and will swear the witness remotely.

Do all parties stipulate to the validity of this video recording and the remote swearing and that it will be admissible in the courtroom as if it had been taken following Rule 30 of the Federal Rules of Civil Procedure and the state's rules where the case is pending?

MR. TOM:  This is Josh Tom

JEFFREY GLYNN BUSBY

for the plaintiff.  Yes.

MR. O'DONNELL:  David O'Donnell.  Yes.

THE VIDEOGRAPHER:  This marks the start of media number 1 of the remote video-recorded deposition of Jeff Busby in the matter of John Rash versus Lafayette County, Mississippi, in the United States District Court for the Northern District of Mississippi, Oxford Division.

The remote deposition today is being held on December 3rd, 2020, and the time on the video monitor is 9:09 a.m.  My name is Kevin Marth.  I'm the legal videographer today, in association with TSG Reporting, Inc.  Our court reporter today is Ms. Greta Duckett, also in association with TSG.

At this time, would counsel please state your appearances for

JEFFREY GLYNN BUSBY

the record.

MR. TOM:  Josh Tom, with the ACLU of Mississippi, on behalf of plaintiff, John Rash.

MR. WILLIAMS:  Jack Williams, sole practitioner, on behalf of the plaintiff, John Rash.

MR. O'DONNELL:  David O'Donnell for the defendant, Lafayette County, Mississippi.

THE VIDEOGRAPHER:  At this time, would the court reporter please swear in the witness, and we may proceed.

JEFFREY GLYNN BUSBY, the witness, having first been duly sworn to speak the truth, the whole truth and nothing but the truth, testified as follows:

EXAMINATION

BY MR. TOM:

Q.    Good morning, Mr. Busby.  My name is Josh Tom, and I'm here on behalf of plaintiff, John Rash.  As the court reporter and the videographer mentioned, this case is

Page 10

JEFFREY GLYNN BUSBY

1  against Lafayette County, Mississippi, and it's
2  before the Northern District of Mississippi out
3  of Oxford.  And so, you know, I know currently
4  you're the circuit clerk of Lafayette County,
5  so congratulations on that.  I know that that
6  was a big win for you, and your mother had
7  previously held that same position.  So
8  congratulations, even if it's quite a belated
9  congratulations, but this is the first time I'm
10 getting to meet you.
11     Today, we're going to be talking
12 about not your circuit clerk job, but about
13 when you were a member of the board of
14 supervisors.
15     Can you state your full name for
16 the record and spell it, please.
17     A.    Jeffrey Glynn Busby.
18 J-E-F-F-R-E-Y, G-L-Y-N-N, B-U-S-B-Y.
19     Q.    Now, given the virtual nature of
20 this deposition, you know, I understand that
21 attorney -- your attorney, David O'Donnell, is
22 in the same room as you just to your right.
23 I'm unable to see Mr. O'Donnell, and, you know,
24 I'm unable to see anything that's off this

Page 11

JEFFREY GLYNN BUSBY

1  camera.  And so, unlike a deposition where, you
2  know, we're in the same room, that presents
3  some, you know, difficulties, but, you know,
4  nothing we can't, you know, solve here.
5     And so do you agree that during
6  this deposition, excluding breaks, that you
7  will not communicate with Attorney O'Donnell or
8  anyone else when it's not apparent or audible
9  to me or the court reporter?
10         MR. O'DONNELL:  Josh, this is
11         David.  I'll represent to you --
12            (Inaudible; audio
13            distortion.)
14         MR. O'DONNELL:  I'll
15         represent to you that any
16         communications between Mr. Busby
17         and myself during the course of
18         the --
19            (Inaudible; audio
20            distortion.)
21         MR. O'DONNELL:  Any
22         communications between Mr. Busby
23         and myself will be noted --
24            (Inaudible; audio

Page 12

JEFFREY GLYNN BUSBY

1            distortion.)
2         MR. O'DONNELL:  Any
3         communications between Mr. Busby
4         and myself during the course of the
5         deposition will be noted on the
6         record before it occurs.  Okay?  So
7         there won't be any communications
8         or hand movements or suggestions to
9         the witness about testimony,
10         period.  But I understand the
11         logistical difficulties that you
12         have because of how we're handling
13         the deposition.  And as an element
14         of fairness to you and to
15         Mr. Williams, I will -- Mr. Busby
16         and I will note in the event that
17         we have to communicate during the
18         course of the deposition.
19         MR. TOM:  That's great.
20         Thanks, David.
20 BY MR. TOM:
21     Q.    Mr. Busby, have you been deposed in
22 any other matter before this one?
23     A.    No, sir.

Page 13

JEFFREY GLYNN BUSBY

1     Q.    So you've never been a -- or have
2  you ever been a plaintiff or defendant in a
3  lawsuit?
4     A.    No, sir.
5     Q.    Have you ever been a witness in a
6  lawsuit?
7     A.    No, sir.
8     Q.    So before we get to the substance,
9  I want to go over a couple of ground rules for
10 the deposition today so we can have a smooth
11 time together today.  Do you understand that
12 you're obligated to give complete and truthful
13 answers to my questions today?
14     A.    Yes, sir.
15     Q.    It's the same as if we were in
16 court.  Even though we're not in court, you
17 still have the same obligation to tell the
18 truth.
19     Do you understand that?
20     A.    Yes.
21     Q.    Because the court reporter is
22 taking down your testimony, you must speak up
23 and give oral answers instead of nodding or
24 shaking your head.

Page 14

JEFFREY GLYNN BUSBY

1
2    Do you understand that?
3    A.    I do.
4    Q.    If you don't understand a question,
5    let me know, and I'll try to rephrase it.  If
6    you need a break, tell me or your counsel, but
7    please do not ask for a break or confer with
8    your counsel while there is a question pending.
9    Do you understand?
10   A.    I do.
11   Q.    Let's not try to talk over each
12   other, because it makes it difficult for the
13   court reporter to take that information down.
14   Please let me finish the question, and I'll let
15   you finish your answer before I start asking
16   another question.
17   A.    Okay.
18   Q.    Are you taking any medication or
19   drugs that would impair memory or your ability
20   to understand my questions?
21   A.    No.
22   Q.    Is there any other reason you can't
23   give full, complete, and truthful answers
24   today?
25   A.    None.

Page 15

JEFFREY GLYNN BUSBY

1
2    Q.    Do you have any questions about the
3    procedures that we will follow today?
4    A.    I do not.
5    Q.    Are you familiar with this lawsuit
6    titled, Rash versus Lafayette County,
7    Mississippi?
8    A.    I know of it.  I do not -- no, sir,
9    I don't know a lot about the case.
10   Q.    And how do you know of the lawsuit?
11   A.    Well, when I -- when I was told
12   that I would be having this deposition.
13   Mr. O'Donnell contacted me.
14   Q.    I see.  Have you read any documents
15   related to this lawsuit?
16   A.    I have read the facility use policy
17   in '15 and in '19.
18   Q.    Have you read any other documents?
19   A.    I was presented -- I was given the
20   arena policy this morning, but I have not read
21   over it.  No, sir.
22   Q.    Have you read any other documents
23   besides those mentioned?
24   A.    No, sir.
25   Q.    Have you read any news coverage

Page 16

JEFFREY GLYNN BUSBY

1
2    concerning this lawsuit?
3    A.    No, sir.
4    Q.    What did you do to prepare for this
5    deposition?
6    A.    Mr. O'Donnell came to my office
7    yesterday for about, I would say, 30 to 45
8    minutes and presented me with the facility use
9    policy from '15 and the facility use policy
10   from '19.  And I basically -- we read over
11   that -- policies and discussed those.  And then
12   this morning, he -- or I'm not sure if it was
13   this morning or yesterday, he told me that
14   he -- that you had requested me read over the
15   arena facility policy, which he brought with
16   him this morning when he came to my office.
17   Q.    Now, besides Mr. O'Donnell, was
18   anyone else present at those meetings?
19   A.    No, sir.
20   Q.    Prior to the meetings you just
21   mentioned, had you done anything else to
22   prepare for this deposition?
23   A.    No, sir.
24   Q.    And besides the documents you
25   mentioned, did you review any other documents

Page 17

JEFFREY GLYNN BUSBY

1
2    to prepare for this deposition?
3    A.    No, sir.
4    Q.    Have you discussed anything related
5    to today's deposition with anyone else besides
6    Attorney O'Donnell?
7    A.    No, sir.
8    Q.    Did you do anything else to prepare
9    for today?
10   A.    No, sir.
11   Q.    What is your current position?
12   A.    I'm the circuit clerk of Lafayette
13   County.
14   Q.    And what's the month and year that
15   you began that position?
16   A.    January of this year, 2020.
17   Q.    Do you have any other employment in
18   addition to being the circuit clerk of
19   Lafayette County?
20   A.    I'm sorry.  I didn't under- -- I
21   couldn't hear you.
22   Q.    Do you have any other employment
23   besides -- do you have any other employment in
24   addition to being circuit clerk?
25   A.    I have a retail sporting goods

Page 18

JEFFREY GLYNN BUSBY

1  business that I've been in for 35 years.
2
3      Q.      And besides your sporting goods
4  business, are there any other employment -- do
5  you have any other employment besides that?
6      A.      Rental property, if you call that
7  a -- I mean, I'm not sure if that's -- we do
8  have rental property that we rent.
9      Q.      Okay.  Any other employers?
10     A.      No, sir.
11     Q.      Now, did you graduate from college?
12     A.      I have, like, six hours left.
13     Q.      Okay.  And where did you go --
14     A.      The University of Mississippi.
15     Q.      And did you graduate from high
16  school?
17     A.      Yes.
18     Q.      Where did you graduate from high
19  school?
20     A.      Oxford High School.
21     Q.      Where did you work prior to
22  becoming circuit clerk?
23     A.      University Sporting Goods and was a
24  supervisor for Lafayette County.
25     Q.      And how long were you a supervisor

Page 19

JEFFREY GLYNN BUSBY

1  for Lafayette County?
2
3      A.      Eight years.
4      Q.      So while supervisor for Lafayette
5  County, you also ran your sporting goods
6  business; is that correct?
7      A.      That's correct.
8      Q.      While a supervisor, did you have
9  any other employment?
10     A.      No, sir, besides sporting goods.
11  Now, I had University Sporting Goods.  That's
12  where I worked full-time, and then I did my
13  supervisor's job from there.
14     Q.      Understood.  Are you a lifelong
15  resident of Lafayette County?
16     A.      I am.
17     Q.      Have you ever lived outside of
18  Lafayette County?
19     A.      No, sir.
20     Q.      Do you live in Oxford?
21     A.      I do.
22     Q.      Are you a lifelong resident of
23  Oxford?
24     A.      Are you talking the city limits or
25  the county as a whole?

Page 20

JEFFREY GLYNN BUSBY

1
2      Q.      The city limits.
3      A.      The city limits.  I have lived
4  outside the city limits for a short period of
5  time.  It's in the city limits now.  But that
6  was back in the, probably, late '80s.  But for
7  the most part of my life or the majority of my
8  life, I have lived in the city limits.
9      Q.      So for the vast majority of your
10  life, you lived in the city limits of Oxford,
11  Mississippi?
12     A.      That's correct.
13     Q.      And how old are you?
14     A.      I'm 54.
15     Q.      Do you maintain, in any form --
16  whether paper, electronic, text message, or
17  otherwise -- any documents related to this
18  case?
19     A.      Related to this case?  I mean,
20  besides the facility use policies, no, sir.
21     Q.      Do you maintain any documents from
22  your prior work as a board of supervisors
23  member?
24     A.      Do I have -- I guess I don't
25  understand the question.

Page 21

JEFFREY GLYNN BUSBY

1
2      Q.      When you were a board of
3  supervisors member for those eight years, do
4  you maintain any documents as part of that
5  work?
6      A.      Yes, sir, I still have the emails.
7      Q.      Do any of the emails relate to this
8  lawsuit?
9      A.      Not besides the facility use
10  policies.
11     Q.      So you have emails about the
12  facility use policy?
13     A.      I have the facility use policy
14  emails, the documents in front of me that -- I
15  have in front of me today, not correspondence
16  with anyone about the facility use policy.
17     Q.      And is that -- you have the
18  facility use policy because Attorney O'Donnell
19  gave them to you or because you had them
20  before?
21     A.      David -- our attorney, David
22  O'Donnell, presented them to me.  But I'm
23  pretty sure that I -- when I was asked to
24  produce these, I produced them to the county
25  administrator.

Page 22

JEFFREY GLYNN BUSBY

2　　Q.　　I see.  And when were you asked to
3　produce those?
4　　A.　　One day last week.
5　　Q.　　And this was in relation to this
6　lawsuit?
7　　A.　　That's correct.  Well, I assumed it
8　was -- I guess, I assumed that it was -- now --
9　was because of this lawsuit.  Just any -- I was
10　asked to produce anything that had to do with
11　the statue or facility use policies, I think,
12　is what the question was.
13　　Q.　　I see.  And the county
14　administrator, Lisa Carwyle, asked you to do
15　that?
16　　A.　　Yes.  It was either he -- she or
17　David O'Donnell.  I'm not sure which one of the
18　two.  They both may have been on the email to
19　me.
20　　Q.　　I see.  Do you have any documents
21　or communications about public safety issues on
22　the Lafayette County Courthouse grounds?
23　　A.　　Besides the document in front of
24　me, no.
25　　Q.　　Do you have any documents or

Page 23

JEFFREY GLYNN BUSBY

2　communications about protests, political
3　speech, or other expressive activity on the
4　Lafayette County Courthouse grounds?
5　　A.　　Not that I -- no, sir, not that I'm
6　aware of.
7　　Q.　　In the documents that you did have
8　about the facility use policy and the monument,
9　you turned those over to the county?
10　　A.　　That's correct.
11　　Q.　　Now, in your work as supervisor --
12　or scratch that.
13　　Throughout this deposition, we'll
14　be talking about Oxford's courthouse square and
15　the Lafayette County Courthouse, which is in
16　the center of Oxford's courthouse square.  I'm
17　going to refer, as locals do, to this area as
18　"the square" or "the county courthouse."  You
19　understand that "the square" is Oxford's
20　courthouse square, right?
21　　A.　　That's correct.
22　　Q.　　And you understand that "the county
23　courthouse" is the Lafayette County Courthouse,
24　correct?
25　　A.　　Correct.

Page 24

JEFFREY GLYNN BUSBY

2　　Q.　　When I speak about "the county
3　courthouse grounds," you understand that I'm
4　referring to the grounds surrounding the
5　courthouse building; I'm not talking about
6　space inside the courthouse?
7　　Do you understand that?
8　　A.　　I do.
9　　Q.　　The square is the center of
10　Oxford's business, social, and city life,
11　correct?
12　　A.　　Yes, sir.
13　　Q.　　How long has the square acted as
14　the center of Oxford's business, social, and
15　city life?
16　　A.　　All of my life, that I -- that I'm
17　aware of.  I can't think of it -- I've always
18　considered it to be the center of Oxford.
19　　Q.　　The county courthouse lies at the
20　center of the square, correct?
21　　A.　　That's correct.
22　　Q.　　The county courthouse grounds,
23　except for small barriers, like decorative
24　fencing -- let me rephrase.
25　　The county courthouse grounds,

Page 25

JEFFREY GLYNN BUSBY

2　except for small barriers, like decorative
3　fencing, is open to and part of the square,
4　correct?
5　　A.　　Part of the square -- part of the
6　courthouse grounds, yes.  I don't know if the
7　streets and stuff are owned by the city or the
8　county.  I don't guess I understand the
9　question.  But the grounds inside the fenced-in
10　area that you're talking about has always been
11　considered courthouse -- Lafayette County's
12　property.
13　　Q.　　Okay.  Separate from who owns the
14　courthouse or who owns the streets, you know,
15　that's not what my question is.  The question
16　is, is that the grounds of the county
17　courthouse are part of the square; is that
18　correct?
19　　A.　　That's correct.
20　　Q.　　The county courthouse grounds has
21　sidewalks, grassy areas, and benches, right?
22　　A.　　That's correct.
23　　Q.　　The county courthouse grounds
24　function as a small public park, correct?
25　　A.　　I would disagree with calling it a

Page 26

JEFFREY GLYNN BUSBY

1 park. No, sir.
2 Q. How would you describe it?
3 A. I would -- it's a small area that
4 surrounds the courthouse that people walk
5 through going from one side of the square to
6 another side of the square.
7 Now, if you're asking me if they --
8 anyone ever stops and sits on the benches, yes,
9 they do. But do I look outside and see people
10 kicking footballs or throwing Frisbees? No,
11 sir, the lawn is not big enough for that.
12 Q. The county courthouse grounds are
13 used for assembly, political speech, protest,
14 and other expressive activity, correct?
15 A. I -- political speeches? I've
16 never heard a political speech. Now, I've --
17 when you have Veterans Day, they have assembled
18 for Veterans Day. Commencements, they have.
19 But for political speeches, no, sir, I can't
20 say that I remember one having that on the
21 grounds of the courthouse.
22 Q. The county courthouse grounds are
23 used for assembly, protest, and other
24 expressive activity, correct?
25

Page 27

JEFFREY GLYNN BUSBY

1
2 A. I'm trying to think. I'm not
3 trying to -- there has been -- are you
4 considering inside the fence or on the
5 monument? Because there have been people that
6 have sat or stood at the monument, but I -- I
7 guess there's been a few that had a speech or
8 so, but very few in the -- in the years that
9 I've been associated with it.
10 Q. Okay. So just for definitional
11 purposes, the monument is on county property,
12 correct?
13 A. I think they've established that.
14 Yes, sir.
15 Q. The monument is part of the county
16 courthouse grounds, correct?
17 A. According to the county, yes.
18 Q. So for -- when we talk about the
19 county courthouse grounds today, that includes
20 the grassy areas and also the land surrounding
21 the monument.
22 Do you understand that?
23 A. Okay.
24 Q. So when I say "county courthouse
25 grounds," you know, you tried to separate -- or

Page 28

JEFFREY GLYNN BUSBY

1
2 you did separate the monument from the grassy
3 areas.
4 A. Yes.
5 Q. When I talk about the county
6 courthouse grounds, I'm talking about the
7 grassy areas and the area of the monument.
8 Do you understand?
9 A. Okay.
10 Q. The county courthouse grounds are
11 used for assembly, protest, and other
12 expressive activity, correct?
13 A. I would say yes.
14 Q. How long has the county courthouse
15 grounds been used for assembly, protest, and
16 other expressive activity?
17 A. When you say "protest," are you --
18 is that -- or I guess my question is, is that
19 one or more? Or if it's an individual, is that
20 counted as a protest?
21 Q. Yes.
22 A. Okay. I would say probably six
23 years, and that's a guess.
24 Q. So the county courthouse grounds --
25 have you ever -- scratch that.

Page 29

JEFFREY GLYNN BUSBY

1
2 Have you ever seen an assembly, a
3 speech, or a protest on the county courthouse
4 grounds before six years ago?
5 A. I -- not that I can recall, but I
6 don't know. I'm not going to say one way or
7 the other, because I -- I simply don't know.
8 Q. So today we'll be discussing the
9 Lafayette County Board of Supervisors. When I
10 refer to "the board" or "board of supervisors,"
11 you understand I'm referring to the Lafayette
12 County Board of Supervisors, correct?
13 A. That's correct.
14 Q. How does the board communicate when
15 doing county business?
16 A. We have a meeting on the first and
17 third Monday of each month. The -- when I was
18 a supervisor, we had the first meeting at 5:00;
19 and the -- on the third Monday of the month, we
20 would have it at 8:00 in the morning, unless
21 there was a special-called meeting.
22 Q. And the board's work is reflected
23 in board agendas and minutes, correct?
24 A. That's correct.
25 Q. In what other records is the

Page 30

JEFFREY GLYNN BUSBY

1
2 board's work documented?
3     A.    I'm sorry?
4     Q.    In what other records is the
5 board's work documented?
6     A.    I would say -- I mean, I think you
7 can subscribe by email and -- or look online to
8 get the board minutes and the agenda and stuff
9 through a website, the Lafayette County
10 website.
11    Q.    Besides agendas and minutes, are
12 there any other records that show the work of
13 the board?
14    A.    Not that I'm aware of.
15    Q.    Does the board communicate via
16 email with each other?
17    A.    No, not discussing business,
18 because that's the sunshine law.  And it -- we
19 are not allowed to conduct business that way or
20 by text or anything that we do not discuss in
21 the -- we do not discuss the agenda over emails
22 or texts.
23    Q.    Do members of the board communicate
24 with the public via email?
25    A.    I'm sure one-on-one.  I'm sure that

Page 31

JEFFREY GLYNN BUSBY

1
2 we've -- our constituents, if they email us, we
3 try to answer them, yes.
4     Q.    And do board members communicate
5 with the public via text message?
6     A.    I couldn't answer that question.  I
7 don't know if other members do or not.  If
8 someone asked me about a situation on a text,
9 then I would probably -- I would probably
10 respond, depending on, I guess, what it
11 concerned.
12    Q.    Do you -- scratch that.
13    Did you communicate with the public
14 via text message while a board member?
15    A.    Can you be more specific?  On what
16 issue?  On this issue?
17    Q.    On county business.
18    A.    Yes, on county business.
19    Q.    Did you communicate with the public
20 via text or email about the monument on the
21 county courthouse grounds?
22    A.    I do not ever remember doing that,
23 no, sir.  Quite honestly, I don't remember
24 getting any.  I'm not saying I never got any,
25 but that was not a big contingency when I was

Page 32

JEFFREY GLYNN BUSBY

1
2 on the board, as much as it was road ditches or
3 roads or different things like that.
4     Q.    Sure.  Sure.  Are there any other
5 documents or communications that reflect the
6 board's work that we have not discussed?
7     A.    No, sir, that I'm aware of.
8         MR. TOM:  Now, this question
9         is for the court reporter.
10         (Technical discussion.)
11         (Exhibit 1 was marked for
12           identification.)
13 BY MR. TOM:
14    Q.    I just put Exhibit 1 into the chat.
15 And this is the April 20th, 2015, Facility Use
16 Policy.  The Bates number at the bottom of the
17 first page of this document is
18 Lafayette County DOC000002.
19    A.    Okay.  I have that.
20    Q.    Okay.  Go ahead and take a look at
21 that document, Mr. Busby.
22    A.    Okay.  What specifically do you
23 want me to look at?  I have read it.
24    Q.    Okay.  So what is this document?
25 What is Exhibit 1?

Page 33

JEFFREY GLYNN BUSBY

1
2     A.    This is the facility use policy
3 that we put in -- I think it -- well, it says
4 it went into effect in April of 2015 for the
5 use of our facilities.
6     Q.    And the board adopted this policy,
7 correct?
8     A.    That's correct.
9     Q.    And you were president of the board
10 when this policy was adopted, right?
11    A.    That's correct.
12    Q.    How was use of county property
13 regulated before this 2015 policy was adopted?
14    A.    I don't think they had a policy.  I
15 would assume they went through the county
16 administrator, but I do not know.  That was the
17 reasoning to come up with the policy, because
18 we started getting requests for facility use.
19    Q.    When did you first become a board
20 of supervisors member?
21    A.    2012.
22    Q.    So from 2012 until April 20th,
23 2015, when this policy was implemented, how did
24 the county regulate use of county property?
25    A.    I assume it went through the county

JEFFREY GLYNN BUSBY

1    JEFFREY GLYNN BUSBY
2 administrator.
3    Q.    Before this 2015 policy was
4 adopted, what role did the board have in
5 regulating use of county property?
6    A.    We had none that I'm aware of.
7 Again, I think any -- any request was made
8 through the county administrator.
9    Q.    What was the process to get
10 permission to use county property before the
11 board adopted this 2015 policy?
12    A.    I assume they contacted the county
13 administrator.
14    Q.    Besides the county administrator --
15         (Simultaneous speakers.)
16    A.    They did not contact me.
17    Q.    I see. Who were the decisionmakers
18 in granting use of the county courthouse
19 grounds before this 2015 policy was adopted?
20    A.    The county administrator.
21    Q.    Was there anyone else besides the
22 county administrator involved in that process?
23    A.    Not that I'm aware of.
24    Q.    Do you know what the criteria used
25 were to determine whether someone could use the

1    JEFFREY GLYNN BUSBY
2 county courthouse grounds --
3    A.    I do not.
4    Q.    -- before this policy was
5 implemented?
6    A.    I do not.
7    Q.    Why did the county adopt this
8 facility use policy in 2015?
9    A.    We started having more and more --
10 our county administrator, I'm assuming -- and
11 I'm sorry; I just don't remember every
12 detail -- but said we had a lot more requests
13 to use the building -- use the grounds. There
14 was problems when people would use the grounds.
15 Sprinkler systems were getting damaged. We
16 were having people in the courtroom and
17 monitors were getting damaged. So we felt, at
18 that time, we needed to put together a facility
19 use policy. And from that point, again, I
20 assume that he got with our attorney, which was
21 David O'Donnell at that time, and we came up
22 with the facility use policy that we adopted in
23 2015.
24    Q.    Who was the county administrator at
25 this time?

1    JEFFREY GLYNN BUSBY
2    A.    That was Joseph Johnson.
3    Q.    So the impetus behind adopting this
4 facility use policy in 2015 was county
5 administrator Joseph Johnson?
6    A.    Yes, sir. I think he brought it to
7 our attention that we -- he felt like that we
8 needed to have a facility use policy because of
9 the requests that he was getting for use of the
10 facilities at that time.
11    Q.    Was there anyone else that brought
12 up the idea of adopting a facility use policy?
13    A.    Not that I'm aware of. Again, if
14 there was, I do not remember.
15    Q.    So besides the concerns that you
16 just mentioned about broken sprinklers and, you
17 know, monitors in the courthouse, what concerns
18 was this 2015 policy designed to address?
19    A.    I think that was the majority of
20 our concerns at that time. It was just the use
21 of a historical building and the wear and tear
22 and different things that were going on inside
23 the facility. I don't think there was any
24 problems, if that's what you're asking me. I
25 wasn't aware of any, and I can't remember any

1    JEFFREY GLYNN BUSBY
2 problems outside -- and I don't want to say
3 "destruction," because I don't think they meant
4 to harm the facilities. But it happened during
5 the times of use, and it was just starting to
6 get used more and more.
7    Q.    Was the main concern use inside of
8 the county courthouse?
9    A.    No. I can't say just inside,
10 because -- I think there was a group -- Makers
11 Mark was one of the -- they were kind of a
12 group that used the facility a couple of times
13 a month to display crafts and arts. And it
14 was -- they were -- they were on the lawn, and
15 I know that's where some problems occurred;
16 again, with not -- not problems among
17 themselves, but problems with the use of the
18 facilities.
19    Q.    So is it fair to say that this
20 policy in 2015 was adopted not because there
21 were any problems, but just to get a better
22 process in place for people to be able to use
23 the county courthouse grounds?
24    A.    Yes, sir. I would say that's a
25 fair assessment.

JEFFREY GLYNN BUSBY

1
2      Q.      Okay.  Was this policy designed to
3  address public safety concerns?
4      A.      I think we did address some public
5  safety -- the security.  I don't -- it was not
6  a top priority at that time, no, sir.
7      Q.      Were there public safety concerns,
8  when this 2015 policy was addressed, regarding
9  the county courthouse grounds?
10     A.      Well, there's always concerns.
11 You've got a historical building here, and
12 there's no sprinkler system in this building.
13 There's -- you know, there -- so the damage to
14 the building or any electrical problems, fires,
15 or anything, this building would go up fairly
16 quickly.
17         You're probably -- in some portions
18 of this courthouse, especially on the -- I
19 guess the east and the west ends, you're less
20 than 25 feet, probably, from the road.  So,
21 yes, there were some concerns of safety among
22 people crossing streets and going in and out
23 when you would have large gatherings on the --
24 i.e., as Makers Mark would have a -- something
25 on the lawn, you would have pretty big crowds.

JEFFREY GLYNN BUSBY

1
2  So safety in that standpoint was a concern,
3  yes, sir.
4      Q.      So besides, you know, potential
5  fire and potential pedestrian traffic concerns,
6  what other public safety concerns were there?
7      A.      None at that time, that I'm aware
8  of.
9      Q.      What is the process for obtaining a
10 permit under this 2015 policy?
11     A.      They would contact the county
12 administrator's office, and he had a form that
13 they would fill out at that time.  And I think
14 it -- I think, at that time, it was a
15 seven-day -- you had to do it seven days prior
16 to the event.
17     Q.      So if you look on page 3 of
18 Exhibit 1, under "applications for usage," it
19 says, Application should be submitted to the
20 county administrator at least one week in
21 advance.
22     A.      Yes, sir.
23     Q.      That's what you're referring to?
24     A.      Yes, sir.
25     Q.      So the county administrator runs

JEFFREY GLYNN BUSBY

1
2  the process for granting permits under this
3  2015 policy?
4      A.      That's correct.
5      Q.      What is the role of the board for
6  permits under this 2015 policy?
7      A.      We adopted the policy, but outside
8  that, we played no part in it.
9      Q.      What is the role of the sheriff for
10 permits under this facility use policy?
11     A.      I'm sorry.  I didn't hear you.  I
12 couldn't hear you.
13     Q.      What is the role of the sheriff for
14 permits under this 2015 policy?
15     A.      I don't know that he played a role
16 in that, but I -- I'm not -- that would be a
17 question, I guess, for Joseph Johnson.  I --
18 but from my recollection, I don't know that he
19 played a part -- a part in that at all.
20     Q.      Besides the county administrator,
21 who else had a role for permits under the 2015
22 policy?
23     A.      No one that I'm aware of.
24     Q.      So I want to introduce Exhibit 2.
25 ///

JEFFREY GLYNN BUSBY

1
2             (Exhibit 2 was marked for
3             identification.)
4  BY MR. TOM:
5      Q.      Mr. Busby, this is the March 4th,
6  2019, facility use policy.  And the Bates
7  number is Lafayette County Doc 6 on the first
8  page.
9      A.      Yes, sir.
10     Q.      I also want to introduce Exhibit 3.
11             (Exhibit 3 was marked for
12             identification.)
13 BY MR. TOM:
14     Q.      Now, we received this document from
15 your former colleague, Kevin Frye.  You don't
16 have this document in -- in --
17     A.      I don't.  How do I download it?
18     Q.      -- in hard copy?
19         If you go to the chat button --
20     A.      Uh-huh.
21     Q.      -- just open the chat, and you can
22 double-click the document.
23             (Technical discussion.)
24 BY MR. TOM:
25     Q.      Exhibit 3 is an email from Lisa

JEFFREY GLYNN BUSBY

1             JEFFREY GLYNN BUSBY
2 Carwyle to the supervisors, David O'Donnell,
3 and John Hill, regarding the March 4th, 2019,
4 policy.
5    A.    Okay.
6    Q.    Do you have it open?
7    A.    Yes.  I'm going -- I printed it
8 off.
9           (Technical discussion.)
10   A.    Okay.
11   Q.    So let's go to Exhibit 2.
12   A.    Okay.
13   Q.    At the bottom, that's Bates-
14 numbered Lafayette County Doc 6.
15    Do you see that?
16   A.    I do.
17   Q.    Do you understand this document?
18   A.    Yes, sir.
19   Q.    What is it?
20   A.    It's the facility use policy that
21 we adopted on March 4, 2019.
22   Q.    And "we" is the board, correct?
23   A.    We as the board, yes.
24   Q.    Now, go to Exhibit 3.
25   A.    Okay.

1             JEFFREY GLYNN BUSBY
2   Q.    This is an email from Lisa Carwyle
3 to Supervisor, David O'Donnell, and John Hill,
4 regarding facility use policy.  And then it
5 attaches the same policy, the March 4th, 2019,
6 policy, but this appears to be a draft of it.
7    Do you see that?
8   A.    I do.  I have it printed out.
9   Q.    Now, this email address,
10 "Supervisor," whose -- whose email address is
11 "Supervisor"?
12   A.    I'm assuming it went to all five of
13 us, all five supervisors.
14   Q.    Okay.  So this email from Lisa
15 Carwyle is to all five supervisors and to David
16 O'Donnell, correct?
17   A.    That's correct.
18   Q.    Who's John Hill?
19   A.    He was the sheriff at that time.
20   Q.    Now, this March 4th, 2019, policy
21 was passed when you were president of the
22 board, correct?
23   A.    That's correct.
24   Q.    Now, if you go to Exhibit 3, you'll
25 see that Ms. Carwyle says that the changes to

1             JEFFREY GLYNN BUSBY
2 the policy are in red.
3   A.    Yes, sir.
4   Q.    So now go down to the policy, and
5 let's look at the red language here.
6   A.    Uh-huh.  Okay.
7   Q.    So I know that this is a draft and
8 I haven't fully compared it, so -- but just --
9 just as a -- you know, just so we know where to
10 look.  So you see how it says 30 days here in
11 red?  There's a nonrefundable fee of $25 in
12 red.
13   A.    Uh-huh.
14   Q.    There's some red under --
15   A.    Yes.  I see that.
16   Q.    There's some red under
17 "security" --
18   A.    Uh-huh.
19   Q.    -- at the bottom of page 3.
20    Do you see that?
21   A.    I see that.
22   Q.    And then there's some red under
23 "signs" at the bottom of page 4?
24   A.    I -- I see that.
25   Q.    And then there's a whole section

1             JEFFREY GLYNN BUSBY
2 called "other items" in red at the bottom of
3 page 4.
4   A.    That's correct.
5   Q.    So, you know, that is the area,
6 according to Ms. Carwyle, that was changed from
7 the 2015 policy.
8   A.    That's correct.
9   Q.    So now let's go back to the final
10 policy, which is Exhibit 2.
11   A.    Okay.
12   Q.    So under applications for usage on
13 Exhibit 2 on page 3 --
14   A.    Okay.
15   Q.    -- it says on the second bullet
16 point, Applications should be submitted to the
17 county administrator at least 30 days in
18 advance?
19   A.    That's correct.
20   Q.    Why was that change made?
21   A.    Again, I'm -- I'm trying to be as
22 correct as I can be.  I -- I'm pretty sure that
23 was after the Charlottesville incident, that
24 they had many problems there.  And it concerned
25 our law enforcement.  And, again, I'm pretty

Page 46

JEFFREY GLYNN BUSBY

1
2  sure it was the same time the City redid their
3  policy as well.
4      I know the police chief, which is
5  now our sheriff, Mr. East, had come to me a few
6  times and -- telling me that we needed to get
7  something in place from a security standpoint.
8  So I assume that's why we went from a seven-day
9  period to a 30-day period from a security
10 standpoint on what we anticipated could be
11 problems.
12     Q.    So what was Mr. East talking about
13 for security?  You said -- you said that he had
14 to get some security things in place.
15     A.    Well, it's sort of like --
16     Q.    Can you explain what --
17     A.    Well, yes.  The --
18     Q.    Can you explain that conversation?
19     A.    Well, what -- what I was -- what I
20 meant by that or mean by that is the City had
21 already adopted, I think, a policy that
22 addressed security measures, which he was the
23 police chief at that time for the City.  We had
24 an interim sheriff in -- in Mr. Hill at that
25 time.  Our -- our sheriff passed away.

Page 47

JEFFREY GLYNN BUSBY

1
2      And in -- in light of the
3  Charlottesville riots, we felt like we needed
4  more security than what we had addressed in our
5  facility policies before.  And as he looked at
6  it, as our -- our -- our teams work together,
7  and I was not a part of the -- the meetings
8  that -- I think that took place on campus.  So
9  I'm -- I'm just telling you from what my
10 recollection -- recollection was.
11     But I'm pretty sure our attorney
12 and our city police, our county police, our
13 university police, many other agencies from
14 Secret Service to the FBI, all met on campus in
15 concern of the Charlottesville riots and
16 what -- we had information that was -- that may
17 or may not happen in Oxford.
18     Q.    And these were -- why did people --
19 why did these people think that what happened
20 in Charlottesville may happen in Oxford?
21     A.    That would be something you'd need
22 to ask the sheriff.  I -- I don't know if it
23 was information they received, if it was groups
24 posting things online.  I -- I can't answer
25 those -- I can't answer that.

Page 48

JEFFREY GLYNN BUSBY

1
2      Q.    Did this -- were the security
3  concerns because of the Confederate monuments
4  on the county courthouse grounds and on
5  Ole Miss's campus?
6      A.    I assume that that was a -- played
7  a part in it at that time.
8      Q.    So you mentioned that then-Police
9  Chief East reached out to you several times
10 about security concerns, right?
11     A.    That's correct.
12     Q.    And what did he -- what did he say
13 when he reached out to you?
14     A.    That he felt like that we needed to
15 look at the City's policy and adopt -- well,
16 get -- put more in place for -- for security
17 reasons because of this is the focal point
18 of -- of the town.  And, you know, it's a small
19 area with a lot of historical buildings.  And
20 so he felt like we needed more security.  Did
21 he go into a lot of details?  No.  He just said
22 that he -- he thought we needed to re-address
23 our policy.
24     Q.    And when you say "this is the focal
25 point of the town," what -- what is "this"?

Page 49

JEFFREY GLYNN BUSBY

1
2      A.    The -- the courthouse grounds, the
3  courthouse square.
4      Q.    So to recap, tell me if this is
5  correct.  Was the March 4th, 2019, amendment to
6  the facility use policy made because of
7  security concerns and to address those security
8  concerns over the county courthouse grounds and
9  the square?
10     A.    I would think that to -- yes.  I
11 would -- I would say that was a fair
12 assessment; that we -- we put those in place
13 because of security concerns, yes.
14     Q.    Were there any other reasons
15 besides security concerns that this March 4th,
16 2019, policy was passed?
17     A.    I'm sure the increase of facility
18 uses and not for one single group, but as the
19 town has grown over the years and we had not
20 addressed this in four or five years, that
21 probably initiated it.  But I can't say that
22 would be the only reason that we changed the
23 policy.
24     Q.    So there were security concerns;
25 there's increased use that gave rise to this

                    JEFFREY GLYNN BUSBY

1                   JEFFREY GLYNN BUSBY
2  amendment in 2019; is that correct?
3       A.    That would be -- yes.  I would say
4  that was a fair assessment.
5       Q.    Are there any other reasons that
6  this March 4th, 2019, amendment was made?
7       A.    Not that I'm aware of.
8       Q.    So you remember in Exhibit 3, under
9  security, there was -- there was red -- red
10 wording, right?
11      A.    That's -- that's -- yes, sir.
12      Q.    Now, you know, let's go back to
13 the -- the final exhibit -- the final policy,
14 which is Exhibit 2.
15      A.    Okay.
16      Q.    So under security, take a second to
17 read that paragraph of security.
18      A.    Okay.
19      Q.    Why was this language under
20 security added to the 2019 policy?
21      A.    Well, you -- I guess you're
22 referring to the sheriff department's
23 involvement.  You know, they have a lot more
24 resources and a lot more information than the
25 board of supervisors could ever have.  So I'm

1                   JEFFREY GLYNN BUSBY
2  assuming, with, again, the Charlottesville
3  riots and with the concern of security on our
4  historical square, the involvement of the
5  sheriff played a bigger role at that time.
6       Q.    So when we were talking about the
7  2015 policy, you said that only the county
8  administrator had a role in the process, right?
9       A.    From my recollection.  Now, I -- I
10 can't say that he never reached out to the
11 sheriff's department or -- or someone, but I
12 would say he played -- probably, at that time,
13 90 percent of the decisions were made by him.
14 If he ever had a security issue, he may have
15 reached out to the -- to the sheriff's
16 department.  I'm just not aware of that.
17      Q.    So this 2019 policy memorializes in
18 the policy that the sheriff now has a role in
19 determining whether to grant a permit for use
20 of county property, correct?
21      A.    That's correct.
22      Q.    Now, besides the sheriff and the
23 administrator, did the board have a role after
24 the policy was amended in 2019
25 in determining --

1                   JEFFREY GLYNN BUSBY
2       A.    No.
3                   (Simultaneous speakers.)
4  BY MR. TOM:
5       Q.    -- permits?
6       A.    We never voted on who used the
7  policy or who didn't use the policy -- I mean,
8  who used the facilities or who did not use the
9  facilities.  The county administrator signed
10 off on all of that.
11      Q.    So besides the county administrator
12 and the sheriff, who else had a role in
13 determining whether to grant a permit under
14 this policy or not?
15      A.    Maybe the attorney, but I don't
16 know that he had a role in that.  That would be
17 something you'd have to ask David O'Donnell.
18 The board of supervisors did not play a role,
19 that I can remember, in any incident.
20      Q.    And by "the attorney," you're --
21 you're referring to the county attorney?
22      A.    Mr. O'Donnell.  Mr. O'Donnell.
23 Yes, sir.
24      Q.    Now, if you look at Exhibit 3,
25 there's a lot of red language underneath

1                   JEFFREY GLYNN BUSBY
2  "signs," and then the whole section "other
3  items," right?
4       A.    Yes, sir.
5       Q.    Now, if you go back to Exhibit 2,
6  which is the final 2019 policy --
7       A.    Uh-huh.
8       Q.    You know, it looks like -- I don't
9  know if verbatim, but that language appears
10 there.
11      A.    That's correct.
12      Q.    So on the final policy, Exhibit 2,
13 why were this -- why were this section added to
14 the signs and other items?
15      A.    Well, I think that goes along with
16 the security, and I'm -- I don't think
17 there's -- we spelled out what our security
18 meant in -- in the other items when it refers
19 to bricks, stones, guns, slingshots.  I mean,
20 I -- I think that we were trying to make
21 it what our security -- to the people that were
22 renting the facility or the facility use would
23 know what they could and could not bring when
24 they -- they came to use our facilities.
25      Q.    So besides these changes that we've

JEFFREY GLYNN BUSBY

1                  JEFFREY GLYNN BUSBY
2  talked about, were there any other changes made
3  to the 2019 policy?
4      A.    Not -- not that I'm aware of.  Just
5  what was in this document is what we adopted.
6  I can look back.  I think I marked application
7  of use, security use, and other items, which I
8  just think spells out our security use.  But I
9  think the overall policy guidelines, the
10 definitions, use of facility grounds, were all
11 the same.
12     Q.    Who had a role drafting these 2019
13 revisions?
14     A.    Mr. O'Donnell, and I'm sure, at --
15 at that time, they gave us the -- obviously,
16 they gave us the draft.  Mr. O'Donnell, our
17 attorney, drafted a -- drafted the first copy
18 and let us look over it.  And then -- I don't
19 remember if there was any feedback or additions
20 or a discussion about taking anything out or
21 leaving -- or putting more in at that time or
22 not.  But I would say Mr. O'Donnell was the one
23 that prepared this document for us to review.
24 And from my recollection, there was no changes
25 or -- or any problems with the -- what he

1                  JEFFREY GLYNN BUSBY
2  adopted -- or what we adopted but what he put
3  before us.
4     Q.    So if you go to Exhibit 3, which is
5  the email -- email from Lisa Carwyle on
6  February 26th, 2019 --
7     A.    Uh-huh.
8     Q.    So she sent that to Supervisor,
9  which is, as you mentioned, the five
10 supervisors, David O'Donnell, and John Hill,
11 who was John Hill, the interim sheriff,
12 correct?
13     A.    That's correct.
14     Q.    So besides these people, was
15 anybody else involved in revising this 2019
16 policy?
17     A.    Not that I'm aware of.
18     Q.    Is there -- do you agree that Lisa
19 Carwyle, the five supervisors, David O'Donnell,
20 and John Hill were the people that revised and
21 adopted this 2019 policy?
22     A.    That's correct.
23     Q.    So I'm going to show you Exhibit 4,
24 which you actually have this, Mr. Busby.
25 Exhibit 4 is the June 15th, 2020, facility use

1                  JEFFREY GLYNN BUSBY
2  policy.  I'll put it in the chat just in case
3  you don't.
4     A.    I -- I don't have that.  2020?
5            (Exhibit 4 was marked for
6             identification.)
7     A.    I -- I just have the two documents
8  of -- facility use policy of 2015 and 2019.  I
9  do not have a copy of --
10     Q.    Okay.  No problem.  If you look on
11 the -- the chat --
12     A.    (Indiscernible; audio distortion)
13 Mr. O'Donnell just gave me -- I think this was
14 the late addition with the arena.  It may be in
15 here.
16           (Technical discussion.)
17 BY MR. TOM:
18     Q.    Do you have that, Mr. Busby?
19     A.    I have it now, yes.
20     Q.    And, you know, towards the --
21 underneath the names of the five supervisors,
22 it says, After the vote, President Roberts
23 declared the motion carried -- carried, this,
24 the 5th day of June, 2020.
25     A.    Okay.

1                  JEFFREY GLYNN BUSBY
2     Q.    Is that right?
3     A.    Yes, sir.
4     Q.    So take a second to review this --
5  review this document.
6     A.    Okay.
7     Q.    So, you know, I noted you were
8  already circuit clerk when this was passed.
9  You were not a supervisor at this time, but,
10 you know, you were the president of the board
11 for eight years.  And so I want to get -- ask
12 you questions based on that experience.  Okay?
13     A.    Okay.
14     Q.    So this -- this order amends the
15 facility use policy, correct?
16     A.    That's correct.
17     Q.    And it applies -- this document
18 applies only to the county courthouse grounds,
19 correct?
20     A.    Yes, sir.  That's what it looks
21 like.
22     Q.    And only as applicable to the
23 county courthouse grounds, groups of five or
24 more people are now required to get a permit.
25     A.    Four or less.  Yes.  Five or more

Page 58

JEFFREY GLYNN BUSBY

1 gathered. Yes. That's what it says.
2 Q. Before this June 15th, 2020,
3 policy, was there a group size limit that
4 triggered the facility use policy and required
5 a permit?
6 A. Well, I'm sorry. Repeat that.
7 Q. Before this June 5th, 2020, policy
8 was -- was adopted, was there a group size
9 limit that triggered the facility use policy
10 and required a permit?
11 A. I have no idea. I mean, I don't --
12 I don't know why they -- what triggered this.
13 I have no -- I'm not even in the same building
14 as -- as the supervisors meet in. So I have no
15 idea what -- why they did this.
16 Q. But from the 2015-2019 facility use
17 policy, you were the president of the board
18 when those policies were adopted, correct?
19 A. That's correct.
20 Q. And under those policies, was there
21 a group size limit that triggered the policy
22 requiring a permit?
23 A. It increased -- when I -- in the
24 2015 to the 2019, the reason we amended it was

Page 59

JEFFREY GLYNN BUSBY

1 because of the Charlottesville incident and
2 because of more use to the property. What
3 triggered this, I have no idea.
4 Q. Okay. Let me -- let me rephrase.
5 So under this June 15th, 2020, policy, if a
6 group of five or more people wants to use the
7 county courthouse grounds, they're required to
8 get a permit, correct?
9 A. According to what you've given me,
10 yes. This is the first time I've seen this.
11 Q. So before this policy was adopted,
12 was there a certain-size group that had to get
13 a permit?
14 A. I think in our 2019 policy, it --
15 in the security part, it talked about a size
16 group, if I'm -- if I recall. I'm not -- I
17 thought it said 50 or more, but I may be wrong.
18 It just says -- I guess it just
19 says determine -- the sheriff bases on the size
20 and location and the time of day. Yeah. The
21 only other one, it says the application would
22 have to have a $1,000,000 liability insurance
23 of 50 or more people.
24 So, no, I don't know that we ever

Page 60

JEFFREY GLYNN BUSBY

1 put a number on the ones that were adopted
2 in 20- -- we did not put a number on the ones
3 that were adopted in 2015 and 2019.
4 Q. Why did you not put a number on the
5 2015 and 2019 policies?
6 A. Well, at that time, we didn't -- I
7 guess we didn't think it was necessary.
8 Although, in the 2019 -- in the 2019, it does
9 give the sheriff, depending on the size and
10 location and the number of people, discretion
11 on how much law enforcement would be needed.
12 But, now, as far as getting a permit for a
13 protest, I don't know that they had to have a
14 certain number or not certain number. They did
15 not in the '15 and '19.
16 Q. So in 2015 and 2019 policies, if
17 one person wanted to hold an event on the
18 county courthouse grounds, would they be
19 required to apply for a permit?
20 A. In the 2015 and 2019, I -- I think
21 that was correct. I think anyone that wanted
22 to use the facilities at that time had to have
23 a permit to make sure there was no time
24 conflicts. I mean, there's a lot of reasons

Page 61

JEFFREY GLYNN BUSBY

1 that went into that.
2 Q. And is there a certain language in
3 the 2015 or 2019 policy that reflects your
4 understanding that one person was required to
5 get a permit if they wanted to use the county
6 courthouse grounds?
7 A. If you're asking me is it spelled
8 out one person, no. I think it says any group
9 has to have. But it does not give a number.
10 Q. Do you know how this -- this -- the
11 2015 and 2019 policies were administered for
12 purposes of what size groups were required to
13 get a permit?
14 A. I do not. I would assume anyone
15 that walked in just applied. It didn't matter
16 if they were one or -- or 50. But, again, our
17 county administrator made those decisions, not
18 the board of supervisors.
19 Q. So let's go back to Exhibit 4,
20 which is the June 15, 2020, policy.
21 A. Okay.
22 Q. Now, I know, again, you're not on
23 the board when this policy was adopted, but
24 given your long experience on the board and in

JEFFREY GLYNN BUSBY

1    Lafayette County, why do you think it's
2    necessary to require a permit for use of the
3    county courthouse grounds for groups of five
4    people?
5        A.    Again, you're asking me questions
6    that I -- I don't -- I don't know what was
7    going on during that time or what information
8    they had to make that policy be changed.  I --
9    I'm not going to answer a question I didn't sit
10   in on any of the meetings on.
11       Q.    That's fine.  You know, I'm not
12   asking for, you know, you to talk about what
13   the board did, but I'm talking about your
14   personal experience.
15       A.    Well, my personal experience, I
16   don't know what the -- what led up to even
17   making this policy change.  If I was sitting
18   there and I -- I listened to the different
19   situations, if there were situations, then my
20   opinion would go one way or the other.  But
21   I -- only thing I can answer is when I was on
22   the board and what was presented to us.
23                (Exhibit 5 was marked for
24                identification.)

JEFFREY GLYNN BUSBY

1    BY MR. TOM:
2        Q.    So I'm going to show you Exhibit 5.
3    You should also have this one, Mr. Busby.  It's
4    also a single-page document, and I'm also
5    putting it in the chat here.  It is the
6    July 20th, 2020, order that amended the
7    facility use policy.
8        A.    Okay.
9        Q.    So at the top of this document, it
10   says, Order:  Approve revision of facilities
11   use policy to include a requirement of
12   application to be made 14 days prior to date of
13   proposed use and requiring closure of
14   courthouse grounds 30 minutes before dusk.
15       Correct?
16       A.    Yes, sir.  That's what it says.
17       Q.    So take a -- have you had a chance
18   to review that document, look at it?
19       A.    No.  It's the first time I've
20   looked at it.  (Indiscernible; audio
21   distortion.)  Okay.
22       Q.    So this order closes the courthouse
23   grounds 30 minutes before dusk.
24       Do you see that?

JEFFREY GLYNN BUSBY

1        A.    I do.
2        Q.    So, in effect, this order puts a
3    curfew on the county courthouse grounds,
4    closing it at night.
5        Do you agree with that?
6        A.    That's what it says, yes, sir.
7        Q.    Before this amendment was adopted,
8    has a curfew ever been placed on the county
9    courthouse grounds?
10       A.    Not that I'm aware of, no.
11       Q.    Before this amendment was made, has
12   a curfew ever been placed on any county
13   property?
14       A.    Again, not that I can recall.
15       Q.    Was a curfew considered for the
16   April 2015 or March 2019 facility use policies?
17       A.    I just don't remember.  Not that I
18   can recall.
19       Q.    Why do you think a curfew was
20   imposed on July 20th, 2020?
21       A.    I have no idea.
22       Q.    During your years as president of
23   the board of supervisors, did you ever think a
24   curfew was necessary?

JEFFREY GLYNN BUSBY

1        A.    To be honest, I guess I never
2    thought about it.  Now, the question that is
3    propose -- being proposed to me, I don't know
4    that, after the incident in Charlottesville,
5    that it wouldn't have been a good idea.  But
6    did I ever consider that before right now?  No.
7        Q.    During your years as president of
8    the board of supervisors, did anyone ever bring
9    up the idea of a curfew to you?
10       A.    Not to me.
11       Q.    Given your lifelong experience in
12   Oxford and your experience as a board of
13   supervisors member for eight years, do you
14   think that a county courthouse -- do you think
15   that a curfew on the county courthouse grounds
16   is necessary to ensure public safety?
17       A.    I can't say it's not a bad idea.
18   I -- I never considered it when -- or when it
19   was brought to my attention when I was board
20   president.  But as this town increases in
21   population and traffic and the use of the
22   facility, you know -- again, I don't know what
23   went into their -- I don't know what all went
24   into their discussion to -- to provide this.

JEFFREY GLYNN BUSBY

1
2 So -- or put this into play. But, you know, I
3 know there has been a lot of increase in -- in
4 traffic, a lot of increase in -- in facility
5 use. So, again, I -- I can't answer for that
6 board. But I don't think it's a bad idea.
7     Q.     So beyond being a, you know, good
8 or bad idea, given your lifelong experience in
9 Oxford and your eight years as county
10 supervisor, is a curfew necessary on the county
11 courthouse grounds to ensure public safety?
12     A.     I would think, at times, it -- it
13 probably was, yes.
14     Q.     What times were those?
15     A.     Well, you've got football games
16 when you have 100,000 people in town. You
17 have -- and, again, you're -- you're -- I don't
18 know if you've ever been to Oxford, but these
19 grounds are not very large. I mean, your --
20 you step off of -- you go 25 feet east or west,
21 and you're stepping into traffic.
22     So, you know, I -- I think -- I
23 think, given the increase in traffic, increase
24 in facility use, increase for the number of
25 people that -- that visit this town, it's

JEFFREY GLYNN BUSBY

1
2 probably not a bad idea. Again, I've never
3 considered it, but, again, I just didn't think
4 of it.
5     Q.     So you would agree that the
6 increase in people visiting Oxford as a result
7 of University of Mississippi football games has
8 occurred for many years, correct?
9     A.     Oh, yeah. Absolutely.
10     Q.     And so the, you know, increase of
11 people on the square during game days has been
12 occurring for many years, correct?
13     A.     That's correct. And I've seen many
14 accidents up here, too.
15     Q.     And so in all those many years of
16 game days during Ole Miss football games, why
17 do you think a curfew was not implemented
18 before July 2020?
19     A.     I mean, I can't answer that,
20 because -- again, I don't think it's a bad
21 idea. Did I think of it? No. You know, but
22 there's a lot of things that -- that I -- when
23 you have new people and fresh ideas that come
24 in, I can't answer for what this group is --
25 is -- what they were thinking, what the

JEFFREY GLYNN BUSBY

1
2 situations were at that time. I just have no
3 idea.
4     You asked me my opinion on -- on
5 that. You know, I thought, years ago, we
6 should put speed bumps, because I watched a kid
7 get run over on a bicycle over here next to
8 First National Bank across from the courthouse.
9 So, you know, it's -- it's always been a safety
10 problem, as you alluded to; that it's not
11 something that just happened in the last year.
12     But I don't know what went into
13 them changing this policy. I'm not going to
14 answer that. I can just give you my opinion of
15 what I think.
16     Q.     How was public safety achieved
17 without a curfew on the county courthouse
18 account grounds before July 20th, 2020?
19     A.     I don't know that I -- to be honest
20 with you, I can't think of a time that our
21 facility was used at night. And I'm not saying
22 it wasn't, but I can't think of a time in my
23 eight years as president or my time for 35
24 years across the street, which I have a clear
25 view of this facility, that it was ever used at

JEFFREY GLYNN BUSBY

1
2 nighttime. And, again, it could have been. I
3 just don't remember one.
4     Q.     And are you -- when you're talking
5 about facility, are you talking about the
6 county courthouse grounds?
7     A.     The county courthouse grounds,
8 correct. Always been used in the daytime, as
9 far as I know.
10     Q.     Have you gone onto the county
11 courthouse grounds for nonwork purposes at
12 night after this curfew was imposed?
13     A.     For nonwork? No, I have not.
14     Q.     Have you walked by the county
15 courthouse grounds at night after this curfew
16 was imposed?
17     A.     Oh, sure.
18     Q.     And did you see people on the
19 county courthouse grounds at that time?
20     A.     I have no -- I mean, I don't know.
21 I don't -- I'm -- I'm not going to say there
22 wasn't people walking through, but I don't -- I
23 don't know. I can't tell you a certain time
24 and date that -- that I saw someone over here,
25 no.

Page 70

JEFFREY GLYNN BUSBY

1
2     Q.     Now, in your role as circuit clerk,
3 have you heard of anyone enforcing this curfew?
4     A.     I have not.
5     Q.     Do you know if this curfew's being
6 enforced?
7     A.     I do not.  I know when we've had --
8 in light of -- let me rephrase that.  When
9 we -- they have -- during protests or during a
10 group protesting, I think they have -- I know
11 they have -- they put some security tape on the
12 entrances, maybe one or two times.
13    Q.     And when was that?
14    A.     I cannot remember.
15    Q.     Was it this summer?
16    A.     It was warm, so I'm assuming, yes.
17    Q.     So it was warm and it was 2020.
18 And there was protesting --
19    A.     It was definitely 2020.  And it was
20 probably -- I would say summer.  It hasn't been
21 in the last month or so, no.
22    Q.     How many times has the county taken
23 up the issue of moving or contextualizing a
24 Confederate statue on the courthouse grounds?
25    A.     Well, I know when I was on the

Page 71

JEFFREY GLYNN BUSBY

1
2 board, we put a group together right after the
3 university contextualized theirs.  And we
4 discussed contextualizing our monument at that
5 time.
6     Q.     That was in the fall of 2017,
7 right?
8     A.     If you say so.  I don't -- I don't
9 remember the timeline, but I do remember
10 putting a group together and -- for the
11 contextualization of this statue.
12    Q.     Okay.  I'll show you Exhibit 6,
13 just to refresh your -- refresh your memory.
14            (Exhibit 6 was marked for
15              identification.)
16 BY MR. TOM:
17    Q.     Now, Exhibit 6 is -- I just put it
18 in the chat.
19    A.     Yes.  I'm -- I'm pulling it up.
20 Yes.
21    Q.     Okay.  Let me know once you have
22 that.
23            (Technical discussion.)
24    A.     Is this in the -- is this in the
25 report that you gave to Mr. O'Donnell?

Page 72

JEFFREY GLYNN BUSBY

1
2     Q.     No.
3     A.     It's not?
4     Q.     No.
5     A.     Okay.  Let me print it off.  Okay.
6     Q.     Now, sir, this document is an email
7 from Lafayette County Board of Supervisors to
8 Kevin Frye dated September 1st, 2017, correct?
9     A.     Yes.  It's our agenda, it looks
10 like.
11    Q.     Yeah.  So this is the county board
12 of supervisors' agenda for September 5th, 2017,
13 right?
14    A.     Uh-huh.
15    Q.     And you were on the board at this
16 time, right?
17    A.     That's correct.
18    Q.     So look on page 2, number 6, it
19 says, Discussion regarding status of
20 Confederate memorial statue and related
21 options.
22    A.     That's -- I see that.
23    Q.     Now, is this what we were talking
24 about before when you were talking about
25 contextualizing the statue?

Page 73

JEFFREY GLYNN BUSBY

1
2     A.     I assume so.  Again, I don't
3 know -- I can't remember the timeline.  I just
4 remember putting the group together.  We had
5 that incident, and then we also had another --
6 it was another time that we instructed our
7 attorney, David O'Donnell, county attorney, to
8 look into, if we did decide to move it, what
9 were our options and where could we move it,
10 according to statutes and law.
11    Q.     Okay.  So --
12    A.     But I'm not sure which one of
13 the -- I'm not sure which one of the two it
14 is --
15    Q.     I see.
16    A.     -- at this point.
17    Q.     So when you were on the board of
18 supervisors, you considered contextualizing the
19 statue, and then you considered moving it when
20 you asked Attorney O'Donnell about your
21 options, correct?
22    A.     Well, no.  We never got to the
23 point that we had decided to move it.  We
24 never -- we never brought that to a vote.
25 Never talked about that.  We -- we wanted to

JEFFREY GLYNN BUSBY

1  know, because there was conflicting things of
2  if we could move it, if we couldn't move it,
3  where we could move it.  And so we instructed
4  him to -- just in the whole process, to find
5  out what -- what we could and could not do.
6      Q.     I see.  So is it -- is it fair to
7  say that the board considered contextualizing
8  the monument, and it also worked with attorney
9  O'Donnell with options if you were to decide to
10 move it?
11     A.     It's fair to say that we -- we all
12 discussed contextualizing the monument.  As far
13 as moving the monument, there was never a
14 discussion per se that we were going to move
15 it.  It was to find out what our options were,
16 if we ever got to that point.
17     Q.     I see.  Okay.  So when you were on
18 the board, you considered contextualizing the
19 monument, and you considered your options --
20     A.     Correct.
21     Q.     -- for moving it?
22     A.     Correct.
23     Q.     Now, were there any other times
24 that the board, when you were on the board,

JEFFREY GLYNN BUSBY

1  considered contextualizing or moving the
2  monument, besides those two?
3      A.     Not that I'm aware of, but I'm not
4  going to swear to that.
5      Q.     Now, which happened first, the
6  contextualization or the exploration of options
7  of moving it?
8      A.     I'm not real sure.  It was all
9  around the same time, I -- I think.
10     Q.     So why did the board consider
11 contextualizing the monument?
12     A.     I want to say maybe someone came to
13 one of our board -- board meetings and asked us
14 to consider that.  I can't tell you the name of
15 the group, but I know someone -- I'm pretty
16 sure someone did come to the board at that
17 time.  We told them that we would look into it,
18 and that's when we formed the board and started
19 that process.
20     Q.     And tell me about the process.
21     A.     We got -- I cannot tell you all the
22 names of them, of the individuals that were on
23 there.  I know that Dr. Sensy (phonetic) was on
24 it; I know Mr. Parrage (phonetic) was on it.

JEFFREY GLYNN BUSBY

1  To be honest, I know it was six or seven, I
2  think, was on it -- on the board, on the group.
3  But I -- I do not remember the names of the
4  individuals that were on it at that time.  But
5  they met several different times discussing the
6  options.  And then we never did -- at that
7  point, the university -- did not seem to
8  satisfy what the university had done at that
9  point, and so we never -- we never went
10 forward.
11     Q.     Did the board vote on whether to
12 contextualize the monument or not?
13     A.     Not that I recall, but, again, I
14 can't remember.  I know we voted to put a group
15 together, but I don't know if we -- I know --
16 I'm not sure if we ever voted on
17 contextualizing the monument.
18     Q.     Now, when the -- when you were on
19 the board, you said that y'all considered
20 options for moving it.
21        Do you remember that?
22     A.     I do remember having David
23 O'Donnell to find out what our legal options
24 would be if we ever went down that -- that

JEFFREY GLYNN BUSBY

1  path, yes.
2      Q.     But the board -- did the board ever
3  take that up officially during a meeting?
4      A.     I think it was brought up in
5  executive session when we asked David O'Donnell
6  to get an AG's opinion or -- or find out or let
7  us know.  But I can't swear to that.
8      Q.     And once -- did David -- did David
9  give you options?
10     A.     He did tell us where -- where
11 the -- the statue could be relocated and what
12 we could or could not do with the statue at
13 that time.
14     Q.     And what did y'all do with that
15 information?
16     A.     We didn't do anything with it,
17 because, again, we never -- it never -- we were
18 just asking him to do it in case or if we ever
19 decided to go down that -- that path,
20 which we never did.
21     Q.     Now, this summer, the board voted
22 unanimous -- unanimously to keep the
23 Confederate monument in place, correct?
24     A.     That's correct.  Correct.

JEFFREY GLYNN BUSBY

1
2     Q.     So besides what we've already
3  talked about, has the board ever considered
4  contextualizing or moving the monument besides
5  those three times?
6     A.     Again, not that I'm aware of, but,
7  I'm -- again, I can't swear to that.  And I
8  certainly can't swear to what they've done in
9  2020.
10     Q.     When you were on the board, are
11  there any other times that the board considered
12  contextualizing or moving the monument or
13  exploring options for moving the monument?
14     A.     Again, not that I can recall.  I'm
15  not going to swear to that.
16     Q.     Now, this summer -- it happened on
17  June 20th, 2020 -- someone projected at night
18  the words, quote, take it down, onto the county
19  courthouse Confederate monument.
20         Did you see that?
21     A.     I think I saw it on social media.
22  I did not see it live, no.
23     Q.     Now, did you hear any complaints
24  about that?
25     A.     I never heard anything one way or

JEFFREY GLYNN BUSBY

1
2  the other, to be honest.
3     Q.     Did you talk to any current board
4  of supervisors members about that projection?
5     A.     No, sir.
6     Q.     Do you know what the Oxford Fringe
7  Festival is?
8     A.     Oxford what?
9     Q.     Fringe Festival.
10     A.     No, sir, I don't.
11     Q.     Do you remember, in the summer of
12  2019, images of people being deported from the
13  border were projected onto the county
14  courthouse walls?
15     A.     No, sir, I don't.  On our
16  courthouse?
17     Q.     The Lafayette County Courthouse
18  walls.
19     A.     No, sir, I don't.
20         MR. TOM:  Can we take a --
21         maybe a 10-minute break?  I'm
22         probably almost done, but I want to
23         speak with Jack first.  And then we
24         can ask any additional questions
25         and wrap up.

JEFFREY GLYNN BUSBY

1
2         MR. O'DONNELL:  That'll be
3         fine, Josh.
4         (Technical discussion.)
5         THE VIDEOGRAPHER:  This marks
6         the end of media number 1.  We're
7         going to go off the record at 10:49 a.m.
8         (Recess from 10:49 a.m. to
9         11:09 a.m.)
10         THE VIDEOGRAPHER:  This marks
11         the start of media number 2.  We
12         are back on the record at 11:10.
13  BY MR. TOM:
14     Q.     So, Jeff, just a few more questions
15  before we wrap up here.
16     A.     Okay.
17     Q.     Mr. -- Mr. Busby, I mean.
18         So, before, we were talking about
19  how, you know, the county courthouse and the
20  square were sort of, you know, the center of
21  Oxford.
22     A.     Yes.
23     Q.     What is -- can you explain what
24  that means, like, what the square and the
25  county courthouse are in relation to the city

JEFFREY GLYNN BUSBY

1
2  of Oxford?
3     A.     Well, it's the business district.
4  I mean, you've got -- you've got the businesses
5  all around the square, and it's restaurants
6  that people come to eat at and shop.  And
7  it's -- you know, this is always known as -- as
8  the circuit court and where you -- where the
9  trials take place and -- it's kind of what I
10  mean by the central district.
11     Q.     So is it -- is it fair to say that,
12  you know, the square and the county courthouse
13  that sits in the center of the square is the
14  heart of the social and civic life of Oxford?
15     A.     I would -- I would say so, yes.
16     Q.     And if somebody were to want to
17  have an assembly or, you know, engage in, you
18  know, expressive activity, would they do it in
19  the square?
20     A.     I would say the square would be one
21  of the -- the university would probably be one.
22  But I would say that the square would be
23  included, yes.
24     Q.     And would the county courthouse
25  grounds be -- now, within -- within the square,

Page 82

JEFFREY GLYNN BUSBY

1 the county courthouse grounds are -- okay.
2 Strike that.
3
4      We've talked about how the square
5 is the heart of Oxford, right?  Is that right?
6      A.      I consider it that, yes.
7      Q.      Now, would you say that the county
8 courthouse grounds are the heart of the square?
9      A.      No.  Do I think the --
10 courthouse grounds make the square?  No.  I
11 think these businesses make the square.
12      Q.      So what happens on -- we may -- we
13 talked before about the Veterans Day
14 commemorations.  What happens on Veterans Day
15 during those commemorations?
16      A.      You would have the office -- you'd
17 have representative from the board of
18 supervisors that kind of gave the welcoming,
19 along with the mayor.  And then you would --
20 you would get a report from the -- usually,
21 from the marshal's service, the highway patrol,
22 the city police, the university police, the
23 county sheriff's department.  I may have left
24 out a few.  Wildlife, fisheries.  And they
25 would tell if they had lost any men during

Page 83

JEFFREY GLYNN BUSBY

1
2 service or anything to that -- to that nature.
3 You usually had a guest speaker that would
4 probably speak for about 15 minutes.
5      Q.      And how many people are there?
6      A.      Oh, 30.  I don't know.  30, 40.
7      Q.      What time does this take place?
8      A.      Usually, in the mornings around
9 10:00.
10      Q.      And, spatially, where is it
11 located?
12      A.      On the north side of the square.
13      Q.      Is it out -- is it -- is it --
14 where is it located in relation to the county
15 courthouse grounds?
16      A.      It's on the county courthouse --
17 it's kind of in the grassy area on the -- on
18 the north side of the square.  North -- I guess
19 you'd say the northeast side of the square.
20      Q.      So it's on the northeast side of
21 the square, but on the county courthouse
22 grounds?
23      A.      Yes.
24      Q.      Now, before, we talked about how
25 the March 2019 amendment to the facility use

Page 84

JEFFREY GLYNN BUSBY

1
2 policy changed the permit period from seven
3 days to 30 days.
4      Do you remember that?
5      A.      Yes.
6      Q.      And so we talked about the reason
7 that the 2019 amendments were made were for
8 security reasons and because of increased use
9 of county property, right?
10      A.      Correct.
11      Q.      So how does the 30-day advance
12 notice requirement advance those interests?
13      A.      I -- I'm sorry.  I couldn't
14 understand you.
15      Q.      How does the 30-day permit
16 requirement advance those interests?
17      A.      I guess -- I guess I'm
18 understanding you correctly.  It would --
19 again, I would think, if it was a -- a group
20 that -- that -- that may be -- I don't know
21 that it always takes 30 days to make a
22 decision, number one.  Sometimes, I'm sure it
23 could be made in -- in less than 30 days.  We
24 just ask for a 30-day window of opportunity.
25      Now, it can -- sometimes, I'm

Page 85

JEFFREY GLYNN BUSBY

1
2 sure -- I don't know, because I'm not the
3 county administrator -- would probably issue
4 the permit before the 30 days was up.  But if
5 there was security or -- or issues that the
6 sheriff's department needed to look into or the
7 FBI needed to look into, I'm sure that -- that
8 time would vary -- vary.  So I don't -- I don't
9 know that it always took 30 days.
10      Q.      And who has the discretion to -- or
11 is there discretion about whether to adhere to
12 the 30-day requirement or not?
13      A.      That would be a question for the
14 county administrator.  I -- I don't know.  I've
15 never had that issue brought to the -- when I
16 was on the board, it never was brought to our
17 board's attention, no.
18      Q.      Now, besides this order that
19 imposed the curfew on the county courthouse
20 grounds that we reviewed before --
21      A.      But -- but sir, as I was thinking
22 about that and I re-read -- it's always -- it
23 hasn't been a curfew, but it's always been
24 until 10:00 p.m. for facility use.  It's always
25 been in our contract.  I think it says from

Page 86

JEFFREY GLYNN BUSBY

1
2    8:00 to 10:00. I was looking on it earlier.
3    In a prior -- maybe the 20- -- was it 2019? Or
4    2015, I mean.
5        Q.    So if we go to Exhibit 2, which is
6    the March 2019 policy --
7        A.    Uh-huh.
8        Q.    -- and under -- on page 2, under
9    scope of and restrictions on use.
10       A.    Eight to 10. Uh-huh.
11       Q.    It says, Permission to use the
12   building shall be granted for events which are
13   scheduled to begin and end between 8:00 and
14   10:00 p.m., right?
15       A.    That's what it was prior, yes.
16       Q.    And it says, Permission to use the
17   building.
18        What does that mean?
19       A.    Well, you have -- you have
20   different groups that will meet inside the
21   courthouse. And whether it be the -- one of
22   the political parties or having these kids --
23   moot court or -- or -- or different
24   organizations will request permission to use
25   the facility.

Page 87

JEFFREY GLYNN BUSBY

1
2        Q.    And so this 8:00 to 10:00 a.m.
3    [sic] limit only applies to the building,
4    right?
5        A.    I would assume that's -- I would
6    assume that would be correct.
7        Q.    And so the curfew that was passed
8    on July 20th applies to, quote, closure of
9    courthouse grounds, including the Confederate
10   statue area.
11       A.    Okay.
12       Q.    Is that right?
13       A.    I'm assuming that's what that says.
14   Now, I don't know. If you'd show me the
15   document, I would -- again, that was --
16       Q.    It's --
17       A.    -- after me.
18       Q.    -- it's -- it's Exhibit Number --
19   Exhibit Number 5.
20            (Technical discussion.)
21       A.    It says, Approved facility -- no.
22   This doesn't say -- yeah, it does. 30 minutes
23   before dusk. Uh-huh.
24       Q.    So is it correct that the March
25   2019 policy, when it's use of the building on

Page 88

JEFFREY GLYNN BUSBY

1
2    the county courthouse grounds from 8:00 a.m. to
3    10:00 p.m., and then the July 20th, 2020, order
4    closes the county courthouse grounds, including
5    the Confederate statue area 30 minutes before
6    dusk, right?
7        A.    Yes.
8        Q.    So the two time requirements
9    between the March 2019 policy and this July '20
10   policy are actually different, aren't they?
11       A.    Yes, because one of them closes
12   at -- at dusk.
13       Q.    And they also are different because
14   they apply to different areas, right?
15       A.    According to this -- this -- this
16   document that you've produced for me, yes.
17   Again, I -- I don't know what they -- their
18   discussion was. I'm just reading what's in
19   front of me.
20       Q.    Now, to your knowledge, has the --
21   has the county ever announced this curfew that
22   was imposed on July 20th, 2020?
23       A.    I would assume we adopted it. It
24   was in the paper. But that's an assumption.
25       Q.    Besides me showing you the order

Page 89

JEFFREY GLYNN BUSBY

1
2    today, you'd never heard of it before?
3        A.    Of the 2020?
4        Q.    Yes.
5        A.    No. I've never -- I've never seen
6    that before today.
7        Q.    But not the -- not the document.
8    Had you ever heard of the curfew before today?
9        A.    I can't say that I've heard -- that
10   I knew there was a curfew.
11       Q.    And we talked about the meeting for
12   security reasons in 2019, where, you know, a
13   lot of those different agencies and people met.
14        Do you remember that?
15       A.    I remember telling you that I was
16   not present, but there was a meeting on the
17   university, yes.
18       Q.    Do you remember what that event was
19   called?
20       A.    I do not.
21       Q.    Do you remember who called that
22   event?
23       A.    I do not.
24       Q.    But that event was called in order
25   to discuss security issues in Oxford, correct?

Page 90

1        JEFFREY GLYNN BUSBY
2    A.    After the Charlottesville incident,
3  my recollection, yes, that's what it was called
4  to talk about, security measures.
5            MR. TOM:  Okay.  Well, that's
6            all I have, I believe.  You know,
7            I'll -- if -- if Jack wants to ask
8            any questions, I believe he has an
9            opportunity to.  And, also,
10           obviously, David, you know, if you
11           have any follow-up.
12           MR. WILLIAMS:  This is Jack.
13           I have no follow-up.
14           MR. O'DONNELL:  That's good,
15           Jack.  I have -- I have no further
16           questions -- other questions.
17           We're done.
18           MR. TOM:  All right.
19           Mr. Busby, thanks for taking your
20           morning to chat with us here.
21           THE WITNESS:  Yes, sir.
22           Thank you.
23           THE VIDEOGRAPHER:  This
24           concludes the deposition.  We are
25           going off the record at 11:24 a.m.

Page 91

1        JEFFREY GLYNN BUSBY
2        (The remote deposition of
3        JEFFREY GLYNN BUSBY
4        concluded at 11:24 a.m.
5        Central Standard Time)
6
7
8
9
10
11
12  _____
            Jeffrey Glynn Busby
13
14
15
16  SUBSCRIBED AND SWORN BEFORE ME
17  THIS ____ DAY OF _____, 2020.
18
19
20  _____
21
22
23
24

Page 92

1        JEFFREY GLYNN BUSBY
2        REPORTER'S CERTIFICATE
3        I, Greta H. Duckett, Certified Court
4  Reporter, Registered Professional Reporter, and
5  Certified Realtime Reporter, hereby certify
6  that on Thursday, December 3, 2020, I reported
7  the remote deposition of JEFFREY GLYNN BUSBY,
8  who was first duly sworn or affirmed to speak
9  the truth in the matter of the foregoing cause,
10  and that the pages herein contain a true and
11  accurate transcription of the examination of
12  said witness by counsel for the parties set out
13  herein.
14        I further certify that I am neither of
15  kin nor of counsel to any of the parties to
16  said cause, nor in any manner interested in the
17  results thereof.
18        This 14th day of December, 2020.
19
20  *Greta Duckett*
21  _____
    GRETA H. DUCKETT, RPR, CRR, CVR-S, RVR-M-S
22  ACCR-12, GCCR-2891, MCCR-1945, TNLCR-671
23
24

Page 93

1        ERRATA SHEET
2  Case Name:
3  Deposition Date:
4  Deponent:
5  Pg.  No. Now Reads      Should Read  Reason
6  ___  ___ _____     _____   _____
7  ___  ___ _____     _____   _____
8  ___  ___ _____     _____   _____
9  ___  ___ _____     _____   _____
10  ___  ___ _____     _____   _____
11  ___  ___ _____     _____   _____
12  ___  ___ _____     _____   _____
13  ___  ___ _____     _____   _____
14  ___  ___ _____     _____   _____
15  ___  ___ _____     _____   _____
16  ___  ___ _____     _____   _____
17  ___  ___ _____     _____   _____
18  ___  ___ _____     _____   _____
19  ___  ___ _____     _____   _____
20
        _____
21             Signature of Deponent
22  SUBSCRIBED AND SWORN BEFORE ME
23  THIS ____ DAY OF _____, 2020.
24  _____
25  (Notary Public)   MY COMMISSION EXPIRES:_____

## $

**$1,000,000** 59:23

**$25** 44:11

## 1

**1** 8:6 32:11,14,25 39:18 80:6

**10** 86:10

**10-minute** 79:21

**100,000** 66:16

**10:00** 83:9 85:24 86:2,14 87:2 88:3

**10:49** 80:7,8

**11:09** 80:9

**11:10** 80:12

**11:24** 90:25

**14** 63:13

**15** 15:17 16:9 60:16 61:21 83:4

**15th** 55:25 58:3 59:6

**19** 15:17 16:10 60:16

**1st** 72:8

## 2

**2** 40:24 41:2 42:11 45:10,13 50:14 53:5, 12 72:18 80:11 86:5, 8

**20** 88:9

**20-** 60:3 86:3

**2012** 33:21,22

**2015** 32:15 33:4,13, 23 34:3,11,19 35:8, 23 36:4,18 37:20 38:8 39:10 40:3,6,14, 21 45:7 51:7 56:8 58:25 60:4,6,17,21 61:4,12 64:17 86:4

**2015-2019** 58:17

**2017** 71:6 72:8,12

**2019** 41:6 42:3,21 43:5,20 49:5,16 50:2, 6,20 51:17,24 53:6 54:3,12 55:6,15,21 56:8 58:25 59:15 60:4,6,9,17,21 61:4, 12 64:17 79:12 83:25 84:7 86:3,6 87:25 88:9 89:12

**2020** 8:16 17:16 55:25 56:4,24 58:3,8 59:6 61:21 63:7 64:21 67:18 68:18 70:17,19 78:9,17 88:3,22 89:3

**20th** 32:15 33:22 63:7 64:21 68:18 78:17 87:8 88:3,22

**25** 38:20 66:20

**26th** 55:6

## 3

**3** 39:17 41:10,11,25 42:24 43:24 44:19 45:13 50:8 52:24 55:4

**30** 7:21 16:7 44:10 45:17 63:15,24 83:6 84:3,21,23 85:4,9 87:22 88:5

**30-day** 46:9 84:11, 15,24 85:12

**35** 18:2 68:23

**3rd** 8:15

## 4

**4** 42:21 44:23 45:3 55:23,25 56:5 61:20

**40** 83:6

**45** 16:7

**4th** 41:5 42:3 43:5,20 49:5,15 50:6

## 5

**5** 62:24 63:3 87:19

**50** 59:18,24 61:17

**54** 20:14

**5:00** 29:18

**5th** 56:24 58:8 72:12

## 6

**6** 41:7 42:14 71:12,14, 17 72:18

## 8

**80s** 20:6

**8:00** 29:20 86:2,13 87:2 88:2

## 9

**90** 51:13

**9:09** 8:17

## A

**a.m.** 8:17 80:7,8,9 87:2 88:2 90:25

**ability** 14:19

**Absolutely** 67:9

**accidents** 67:14

**account** 68:18

**achieved** 68:16

**ACLU** 9:4

**acted** 24:13

**activity** 23:3 26:15, 25 28:12,16 81:18

**added** 50:20 53:13

**addition** 17:18,24 56:14

**additional** 79:24

**Additionally** 7:12

**additions** 54:19

**address** 36:18 38:3, 4 43:9,10 49:7

**addressed** 38:8 46:22 47:4 49:20

**adhere** 85:11

**administered** 61:12

**administrator** 21:25 22:14 33:16 34:2,8, 13,14,20,22 35:10,24 36:5 39:20,25 40:20 45:17 51:8,23 52:9, 11 61:18 85:3,14

**administrator's** 39:12

**admissible** 7:19

**adopt** 35:7 48:15

**adopted** 33:6,10,13 34:4,11,19 35:22 37:20 40:7 42:21 46:21 54:5 55:2,21 58:9,19 59:12 60:2,4 61:24 64:8 88:23

**adopting** 36:3,12

**advance** 39:21 45:18 84:11,12,16

**AG's** 77:7

**agencies** 47:13 89:13

**agenda** 30:8,21 72:9, 12

**agendas** 29:23 30:11

**agree** 11:6 55:18 64:6 67:5

**ahead** 32:20

**allowed** 30:19

**alluded** 68:10

**amended** 51:24 58:25 63:7

**amendment** 49:5 50:2,6 64:8,12 83:25

**amendments** 84:7

**amends** 57:14

**announced** 88:21

**answers** 13:14,24 14:23

**anticipated** 46:10

**apparent** 11:9

**appearances** 8:25

**appears** 43:6 53:9

**applicable** 57:22

**application** 39:19 54:6 59:22 63:13

**applications** 39:18 45:12,16

**applied** 61:16

**applies** 57:17,18 87:3,8

**apply** 60:20 88:14

**Approve** 63:11

**Approved** 87:21

**April** 32:15 33:4,22 64:17

**area** 23:17 25:10 26:4 28:7 45:5 48:19 83:17 87:10 88:5

**areas** 25:21 27:20 28:3,7 88:14

**arena** 15:20 16:15 56:14

**arts** 37:13

**assembled** 26:18

**assembly** 26:14,24 28:11,15 29:2 81:17

**assessment** 37:25 49:12 50:4

**association** 7:5 8:19,22

**assume** 33:15,25 34:12 35:20 46:8 48:6 61:15 73:2 87:5, 6 88:23

**assumed** 22:7,8

**assuming** 35:10 43:12 51:2 70:16 87:13

**assumption** 88:24

**attaches** 43:5

**attention** 36:7 65:20 85:17

**attorney** 10:22 11:8 17:6 21:18,21 35:20 47:11 52:15,20,21 54:17 73:7,20 74:9

**audible** 11:9

**audio** 11:13,20,25 56:12 63:21

**aware** 23:6 24:17 30:14 32:7 34:6,23 36:13,25 39:7 40:23 50:7 51:16 54:4 55:17 64:11 75:4 78:6

---

**B**

**B-U-S-B-Y** 10:19

**back** 20:6 45:9 50:12 53:5 54:6 61:20 80:12

**bad** 65:18 66:6,8 67:2,20

**Bank** 68:8

**barriers** 24:23 25:2

**based** 57:12

**bases** 59:20

**basically** 16:10

**Bates** 32:16 41:6

**Bates-** 42:13

**began** 17:15

**begin** 86:13

**behalf** 9:4,7,23

**belated** 10:9

**benches** 25:21 26:9

**bicycle** 68:7

**big** 10:7 26:12 31:25 38:25

**bigger** 51:5

**board** 10:14 20:22 21:2 29:9,10,12,14, 23 30:8,13,15,23 31:4,14 32:2 33:6,9, 19 34:4,11 40:5 42:22,23 43:22 50:25 51:23 52:18 57:10 58:18 61:19,24,25 62:14,23 64:24 65:9, 13,20 66:6 71:2 72:7, 11,15 73:17 74:8,19, 25 75:11,14,17,19 76:3,12,20 77:3,22 78:3,10,11 79:3 82:17 85:16

**board's** 29:22 30:2,5 32:6 85:17

**border** 79:13

**bottom** 32:16 42:13 44:19,23 45:22

**break** 14:6,7 79:21

**breaks** 11:7

**bricks** 53:19

**bring** 53:23 65:9

**broken** 36:16

**brought** 16:15 36:6, 11 65:20 73:24 77:5 85:15,16

**building** 24:5 35:13 36:21 38:11,12,14,15 58:14 86:12,17 87:3, 25

**buildings** 48:19

**bullet** 45:15

**bumps** 68:6

**Busby** 7:1 8:1,8 9:1, 16,22 10:1,18 11:1, 17,23 12:1,4,16,23 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1, 21 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1,5 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1,

24 56:1,18 57:1 58:1 59:1 60:1 61:1 62:1 63:1,4 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1,17 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1,19

**business** 18:2,4 19:6 24:10,14 29:15 30:17,19 31:17,18 81:3

**businesses** 81:4 82:11

**button** 41:19

---

**C**

**call** 18:6

**called** 45:2 89:19,21, 24 90:3

**calling** 25:25

**camera** 11:2

**campus** 47:8,14 48:5

**carried** 56:23

**Carwyle** 22:14 42:2 43:2,15,25 45:6 55:5, 19

**case** 7:24 9:25 15:9 20:18,19 56:2 77:19

**center** 23:16 24:9,14, 18,20 80:20 81:13

**central** 81:10

**certain-size** 59:13

**chance** 63:18

**change** 45:20 62:18

**changed** 45:6 49:22 62:9 84:2

**changing** 68:13

**Charlottesville** 45:23 47:3,15,20 51:2 59:2 65:5 90:2

**chat** 32:14 41:19,21

56:2,11 63:6 71:18 90:20

**chief** 46:4,23 48:9

**circuit** 10:5,13 17:12, 18,24 18:22 57:8 70:2 81:8

**city** 19:24 20:2,3,4,5, 8,10 24:10,15 25:7 46:2,20,23 47:12 80:25 82:22

**City's** 48:15

**civic** 81:14

**Civil** 7:22

**clear** 68:24

**clerk** 10:5,13 17:12, 18,24 18:22 57:8 70:2

**closes** 63:23 88:4,11

**closing** 64:5

**closure** 63:14 87:8

**colleague** 41:15

**college** 18:11

**commemorations** 82:14,15

**Commencements** 26:19

**communicate** 11:8 12:18 29:14 30:15,23 31:4,13,19

**communications** 11:17,23 12:4,8 22:21 23:2 32:5

**compared** 44:8

**complaints** 78:23

**complete** 13:13 14:23

**concern** 37:7 39:2 47:15 51:3

**concerned** 31:11 45:24

**concerns** 36:15,17, 20 38:3,7,10,21 39:5, 6 48:3,10 49:7,8,13, 15,24

56:2,11 63:6 71:18 90:20

**concludes** 90:24

**conduct** 30:19

**Confederate** 48:3 70:24 72:20 77:24 78:19 87:9 88:5

**confer** 14:7

**conflicting** 74:2

**conflicts** 60:25

**congratulations** 10:6,9,10

**considered** 24:18 25:11 64:16 65:19 67:3 73:18,19 74:8, 19,20 75:2 76:20 78:3,11

**constituents** 31:2

**contact** 34:16 39:11

**contacted** 15:13 34:12

**contextualization** 71:11 75:7

**contextualize** 76:13

**contextualized** 71:3

**contextualizing** 70:23 71:4 72:25 73:18 74:8,13,19 75:2,12 76:18 78:4, 12

**contingency** 31:25

**contract** 85:25

**conversation** 46:18

**copy** 41:18 54:17 56:9

**correct** 19:6,7 20:12 22:7 23:10,21,24,25 24:11,20,21 25:4,18, 19,22,24 26:15,25 27:12,16 28:12 29:12,13,23,24 33:7, 8,11 40:4 42:22 43:16,17,22,23 45:4, 8,19,22 48:11 49:5 50:2 51:20,21 53:11 55:12,13,22 57:15, 16,19 58:19,20 59:9 60:22 63:16 67:8,12,

Index: correctly..exhibit

13 69:8 72:8,17
73:21 74:21,23
77:24,25 84:10 87:6,
24 89:25

**correctly** 84:18

**correspondence**
21:15

**counsel** 8:24 14:6,8

**Counselors** 7:3

**counted** 28:20

**county** 8:9 9:11 10:2,
5 15:6 17:13,19
18:24 19:2,5,15,18,
25 21:24 22:13,22
23:4,9,15,18,22,23
24:2,19,22,25 25:8,
16,20,23 26:13,23
27:11,15,17,19,24
28:5,10,14,24 29:3,9,
12,15 30:9 31:17,18,
21 32:18 33:12,15,
24,25 34:5,8,10,12,
14,18,20,22 35:2,7,
10,24 36:4 37:8,23
38:9 39:11,20,25
40:20 41:7 42:14
45:17 47:12 48:4
49:8 51:7,20 52:9,11,
21 57:18,23 59:8
60:19 61:6,18 62:2,4
64:4,9,13 65:15,16
66:9,10 68:17 69:6,7,
10,14,19 70:22 72:7,
11 73:7 78:18 79:13,
17 80:19,25 81:12,24
82:2,7,23 83:14,16,
21 84:9 85:3,14,19
88:2,4,21

**County's** 25:11

**couple** 13:10 37:12

**court** 7:13 8:11,20
9:13,24 11:10 13:17,
22 14:13 32:9 81:8
86:23

**courthouse** 22:22
23:4,14,15,16,18,20,
23 24:3:5,6,19,22,25
25:6,11,14,17,20,23
26:5,13,22,23 27:16,
19,24 28:6,10,14,24
29:3 31:21 34:18

35:2 36:17 37:8,23
38:9,18 48:4 49:2,3,8
57:18,23 59:8 60:19
61:7 62:4 63:15,23
64:4,10 65:15,16
66:11 68:8,17 69:6,7,
11,15,19 70:24 78:19
79:14,16,17 80:19,25
81:12,24 82:2,8,10
83:15,16,21 85:19
86:21 87:9 88:2,4

**courtroom** 7:20
35:16

**coverage** 15:25

**COVID-19** 7:7

**crafts** 37:13

**criteria** 34:24

**crossing** 38:22

**crowds** 38:25

**curfew** 64:4,9,13,16,
20,25 65:10,16 66:10
67:17 68:17 69:12,15
70:3 85:19,23 87:7
88:21 89:8,10

**curfew's** 70:5

**current** 17:11 79:3

**D**

**damage** 38:13

**damaged** 35:15,17

**date** 63:13 69:24

**dated** 72:8

**David** 8:3 9:9 10:22
11:12 12:21 21:21
22:17 35:21 42:2
43:3,15 52:17 55:10,
19 73:7 76:23 77:6,9
90:10

**day** 22:4 26:18,19
56:24 59:21 82:13,14

**days** 39:15 44:10
45:17 63:13 67:11,16
84:3,21,23 85:4,9

**daytime** 69:8

**December** 8:15

**decide** 73:8 74:10

**decided** 73:23 77:20

**decision** 84:22

**decisionmakers**
34:17

**decisions** 51:13
61:18

**declared** 56:23

**decorative** 24:23
25:2

**defendant** 9:10 13:3

**definitional** 27:10

**definitions** 54:10

**department** 51:11,
16 82:23 85:6

**department's** 50:22

**depending** 31:10
60:10

**deported** 79:12

**deposed** 12:23

**deposition** 7:12 8:7,
14 10:21 11:2,7 12:6,
14,19 13:11 15:12
16:5,22 17:2,5 23:13
90:24

**describe** 26:3

**designed** 36:18 38:2

**destruction** 37:3

**detail** 35:12

**details** 48:21

**determine** 34:25
59:20

**determining** 51:19,
25 52:13

**difficult** 14:12

**difficulties** 11:4
12:12

**disagree** 25:25

**discretion** 60:11
85:10,11

**discuss** 30:20,21
89:25

**discussed** 16:11
17:4 32:6 71:4 74:13

**discussing** 29:8
30:17 76:6

**discussion** 32:10
41:23 42:9 54:20
56:16 65:25 71:23
72:19 74:15 80:4
87:20 88:18

**display** 37:13

**distancing** 7:9

**distortion** 11:14,21
12:2 56:12 63:22

**district** 8:11,12 10:3
81:3,10

**ditches** 32:2

**Division** 8:13

**Doc** 41:7 42:14

**DOC000002** 32:18

**document** 22:23
32:17,21,24 41:14,
16,22 42:17 54:5,23
57:5,17 63:5,10,19
72:6 87:15 88:16
89:7

**documented** 30:2,5

**documents** 15:14,
18,22 16:24,25
20:17,21 21:4,14
22:20,25 23:7 32:5
56:7

**double-click** 41:22

**download** 41:17

**draft** 43:6 44:7 54:16

**drafted** 54:17

**drafting** 54:12

**drugs** 14:19

**Duckett** 8:22

**Due** 7:6

**duly** 9:17

**dusk** 63:15,24 87:23

88:6,12

**E**

**earlier** 86:2

**east** 38:19 46:5,12
48:9 66:20

**eat** 81:6

**effect** 33:4 64:3

**electrical** 38:14

**electronic** 20:16

**element** 12:14

**email** 22:18 30:7,16,
24 31:2,20 41:25
43:2,9,10,14 55:5
72:6

**emails** 21:6,7,11,14
30:21

**employers** 18:9

**employment** 17:17,
22,23 18:4,5 19:9

**end** 80:6 86:13

**ends** 38:19

**enforced** 70:6

**enforcement** 45:25
60:12

**enforcing** 70:3

**engage** 81:17

**ensure** 65:17 66:11

**entrances** 70:12

**established** 27:13

**event** 12:17 39:16
60:18 89:18,22,24

**events** 86:12

**EXAMINATION** 9:20

**excluding** 11:7

**executive** 77:6

**exhibit** 32:11,14,25
39:18 40:24 41:2,10,
11,25 42:11,24 43:24
45:10,13 50:8,13,14
52:24 53:5,12 55:4,

23,25 56:5 61:20 62:24 63:3 71:12,14, 17 86:5 87:18,19

**experience** 57:12 61:25 62:15,16 65:12,13 66:8

**explain** 46:16,18 80:23

**exploration** 75:7

**exploring** 78:13

**expressive** 23:3 26:15,25 28:12,16 81:18

**F**

**facilities** 33:5 36:10 37:4,18 52:8,9 53:24 60:23 63:11

**facility** 15:16 16:8,9, 15 20:20 21:9,12,13, 16,18 22:11 23:8 32:15 33:2,18 35:8, 18,22 36:4,8,12,23 37:12 40:10 41:6 42:20 43:4 47:5 49:6, 17 53:22 54:10 55:25 56:8 57:15 58:5,10, 17 63:8 64:17 65:23 66:4,24 68:21,25 69:5 83:25 85:24 86:25 87:21

**fair** 37:19,25 49:11 50:4 74:7,12 81:11

**fairly** 38:15

**fairness** 12:15

**fall** 71:6

**familiar** 15:5

**FBI** 47:14 85:7

**February** 55:6

**Federal** 7:22

**fee** 44:11

**feedback** 54:19

**feet** 38:20 66:20

**felt** 35:17 36:7 47:3 48:14,20

**fence** 27:4

**fenced-in** 25:9

**fencing** 24:24 25:3

**Festival** 79:7,9

**fill** 39:13

**final** 45:9 50:13 53:6, 12

**find** 74:5,16 76:24 77:7

**fine** 62:12 80:3

**finish** 14:14,15

**fire** 39:5

**fires** 38:14

**fisheries** 82:24

**focal** 48:17,24

**follow** 15:3

**follow-up** 90:11,13

**football** 66:15 67:7, 16

**footballs** 26:11

**form** 20:15 39:12

**formed** 75:19

**forward** 76:11

**fresh** 67:23

**Fringe** 79:6,9

**Frisbees** 26:11

**front** 21:14,15 22:23 88:19

**Frye** 41:15 72:8

**full** 10:16 14:23

**full-time** 19:12

**fully** 44:8

**function** 25:24

**G**

**G-L-Y-N-N** 10:19

**game** 67:11,16

**games** 66:15 67:7,16

**gathered** 58:2

**gatherings** 38:23

**gave** 21:19 49:25 54:15,16 56:13 71:25 82:18

**give** 13:13,24 14:23 60:10 61:10 68:14 77:10

**Glynn** 7:1 8:1 9:1,16 10:1,18 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1

**good** 7:2 9:22 65:6 66:7 90:14

**goods** 17:25 18:3,23 19:5,10,11

**graduate** 18:11,15, 18

**grant** 51:19 52:13

**granted** 86:12

**granting** 34:18 40:2

**grassy** 25:21 27:20 28:2,7 83:17

**great** 12:20

**Greta** 8:21

**ground** 13:10

**grounds** 22:22 23:4 24:3,4,22,25 25:6,9, 16,20,23 26:13,22,23 27:16,19,25 28:6,10,

15,24 29:4 31:21 34:19 35:2,13,14 37:23 38:9 48:4 49:2, 8 54:10 57:18,23 59:8 60:19 61:7 62:4 63:15,24 64:4,10 65:16 66:11,19 68:18 69:6,7,11,15,19 70:24 81:25 82:2,8, 10 83:15,22 85:20 87:9 88:2,4

**group** 37:10,12 49:18 58:4,9,22 59:7, 13,17 61:9 67:24 70:10 71:2,10 73:4 75:16 76:3,15 84:19

**groups** 47:23 57:23 61:13 62:4 86:20

**grown** 49:19

**guess** 20:24 22:8 25:8 27:7 28:18,23 31:10 38:19 40:17 50:21 59:19 60:8 65:2 83:18 84:17

**guest** 83:3

**guidelines** 54:9

**guns** 53:19

**H**

**hand** 12:9

**handling** 12:13

**happen** 47:17,20

**happened** 37:4 47:19 68:11 75:6 78:16

**hard** 41:18

**harm** 37:4

**head** 13:25

**hear** 17:21 40:11,12 78:23

**heard** 26:17 70:3 78:25 89:2,8,9

**heart** 81:14 82:5,8

**held** 8:15 10:8

**high** 18:15,18,20

**highway** 82:21

**Hill** 42:3 43:3,18 46:24 55:10,11,20

**historical** 36:21 38:11 48:19 51:4

**hold** 60:18

**honest** 65:2 68:19 76:2 79:2

**honestly** 31:23

**hours** 18:12

**I**

**i.e.** 38:24

**idea** 36:12 58:12,16 59:4 64:22 65:6,10, 18 66:6,8 67:2,21 68:3

**ideas** 67:23

**identification** 32:12 41:3,12 56:6 62:25 71:15

**images** 79:12

**impair** 14:19

**impetus** 36:3

**implemented** 33:23 35:5 67:17

**imposed** 64:21 69:12,16 85:19 88:22

**inaudible** 11:13,20, 25

**incident** 45:23 52:19 59:2 65:5 73:5 90:2

**include** 63:12

**included** 81:23

**includes** 27:19

**including** 87:9 88:4

**increase** 49:17 66:3, 4,23,24 67:6,10

**increased** 49:25 58:24 84:8

**increases** 65:21

**indiscernible** 56:12 63:21

**individual** 28:19

**individuals** 75:23 76:5

**information** 14:13 47:16,23 50:24 62:8 77:16

**initiated** 49:21

**inside** 24:6 25:9 27:4 36:22 37:7,9 86:20

**instructed** 73:6 74:4

**insurance** 59:23

**interests** 84:12,16

**interim** 46:24 55:11

**introduce** 40:24 41:10

**involved** 34:22 55:15

**involvement** 50:23 51:4

**issue** 31:16 51:14 70:23 85:3,15

**issues** 22:21 85:5 89:25

**items** 45:2 53:3,14, 18 54:7

---

**J**

**J-E-F-F-R-E-Y** 10:19

**Jack** 9:6 79:23 90:7, 12,15

**January** 17:16

**Jeff** 8:8 80:14

**Jeffrey** 7:1 8:1 9:1,16 10:1,18 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1

**45**:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1

**job** 10:13 19:13

**John** 8:8 9:5,8,24 42:3 43:3,18 55:10, 11,20

**Johnson** 36:2,5 40:17

**Joseph** 36:2,5 40:17

**Josh** 7:25 9:3,23 11:11 80:3

**July** 63:7 64:21 67:18 68:18 87:8 88:3,9,22

**June** 55:25 56:24 58:3,8 59:6 61:21 78:17

---

**K**

**Kevin** 7:4 8:18 41:15 72:8

**kicking** 26:11

**kid** 68:6

**kids** 86:22

**kind** 37:11 81:9 82:18 83:17

**knew** 89:10

**knowledge** 88:20

---

**L**

**Lafayette** 8:9 9:11 10:2,5 15:6 17:12,19 18:24 19:2,4,15,18 22:22 23:4,15,23 25:11 29:9,11 30:9 32:18 41:7 42:14 62:2 72:7 79:17

**land** 27:20

**language** 44:5 50:19 52:25 53:9 61:3

**large** 38:23 66:19

**late** 20:6 56:14

**law** 30:18 45:25 60:12 73:10

**lawn** 26:12 37:14 38:25

**lawsuit** 13:4,7 15:5, 10,15 16:2 21:8 22:6, 9

**leaving** 54:21

**led** 62:17

**left** 18:12 82:23

**legal** 7:4 8:18 76:24

**liability** 59:23

**lies** 24:19

**life** 20:7,8,10 24:10, 15,16 81:14

**lifelong** 19:14,22 65:12 66:8

**light** 47:2 70:8

**limit** 58:4,10,22 87:3

**limits** 19:24 20:2,3,4, 5,8,10

**Lisa** 22:14 41:25 43:2,14 55:5,18

**listened** 62:19

**live** 19:20 78:22

**lived** 19:17 20:3,8,10

**locals** 23:17

**located** 83:11,14

**location** 59:21 60:11

**logistical** 12:12

**long** 18:25 24:13 28:14 61:25

**looked** 47:5 63:21

**lost** 82:25

**lot** 15:9 35:12 48:19, 21 50:23,24 52:25

**60**:25 66:3,4 67:22 89:13

---

**M**

**made** 34:7 45:20 49:6 50:6 51:13 54:2 61:18 63:13 64:12 84:7,23

**main** 37:7

**maintain** 20:15,21 21:4

**majority** 20:7,9 36:19

**make** 53:20 60:24 62:9 82:10,11 84:21

**Makers** 37:10 38:24

**makes** 14:12

**making** 62:18

**March** 41:5 42:3,21 43:5,20 49:5,15 50:6 64:17 83:25 86:6 87:24 88:9

**Mark** 37:11 38:24

**marked** 32:11 41:2, 11 54:6 56:5 62:24 71:14

**marks** 8:5 80:5,10

**marshal's** 82:21

**Marth** 7:4 8:18

**matter** 8:8 12:24 61:16

**mayor** 82:19

**means** 80:24

**meant** 37:3 46:20 53:18

**measures** 46:22 90:4

**media** 8:6 78:21 80:6,11

**medication** 14:18

**meet** 10:11 58:15 86:20

**meeting** 29:16,18,21 77:4 89:11,16

**meetings** 16:18,20 47:7 62:11 75:14

**member** 10:14 20:23 21:3 31:14 33:20 65:14

**members** 30:23 31:4,7 79:4

**memorial** 72:20

**memorializes** 51:17

**memory** 14:19 71:13

**men** 82:25

**mentioned** 9:25 15:23 16:21,25 36:16 48:8 55:9

**message** 20:16 31:5, 14

**met** 47:14 76:6 89:13

**minutes** 16:8 29:23 30:8,11 63:15,24 83:4 87:22 88:5

**Miss's** 48:5

**Mississippi** 8:10,12 9:4,11 10:2,3 15:7 18:14 20:11 67:7

**Monday** 29:17,19

**monitor** 8:17

**monitors** 35:17 36:17

**month** 17:14 29:17, 19 37:13 70:21

**monument** 23:8 27:5,6,11,15,21 28:2, 7 31:20 71:4 74:9,13, 14,20 75:3,12 76:13, 18 77:24 78:4,12,13, 19

**monuments** 48:3

**moot** 86:23

**morning** 7:3 9:22 15:20 16:12,13,16 29:20 90:20

**mornings** 83:8

Index: mother..protest

**mother** 10:7

**motion** 56:23

**move** 73:8,9,23 74:3, 4,11,15

**movements** 12:9

**moving** 70:23 73:19 74:14,22 75:2,8 76:21 78:4,12,13

**N**

**names** 56:21 75:23 76:4

**National** 68:8

**nature** 10:20 83:2

**needed** 35:18 36:8 46:6 47:3 48:14,20, 22 60:12 85:6,7

**news** 15:25

**night** 64:5 68:21 69:12,15 78:17

**nighttime** 69:2

**nodding** 13:24

**nonrefundable** 44:11

**nonwork** 69:11,13

**north** 83:12,18

**northeast** 83:19,20

**Northern** 8:11 10:3

**note** 12:17

**noted** 11:24 12:6 57:7

**notice** 84:12

**number** 8:6 32:16 41:7 60:2,3,5,11,15 61:10 66:24 72:18 80:6,11 84:22 87:18, 19

**numbered** 42:14

**O**

**O'DONNELL** 8:3,4

9:9,10 10:22,24 11:8, 11,15,22 12:3 15:13 16:6,17 17:6 21:18, 22 22:17 35:21 42:2 43:3,16 52:17,22 54:14,16,22 55:10,19 56:13 71:25 73:7,20 74:10 76:24 77:6 80:2 90:14

**obligated** 13:13

**obligation** 13:18

**obtaining** 39:9

**occurred** 37:15 67:8

**occurring** 67:12

**occurs** 12:7

**office** 16:6,16 39:12 82:16

**officially** 77:4

**Ole** 48:5 67:16

**one-on-one** 30:25

**online** 30:7 47:24

**open** 25:3 41:21 42:6

**opinion** 62:21 68:4, 14 77:7

**opportunity** 84:24 90:9

**options** 72:21 73:9, 21 74:10,16,20 75:7 76:7,21,24 77:10 78:13

**oral** 13:24

**order** 57:14 63:7,11, 23 64:3 85:18 88:3, 25 89:24

**organizations** 86:24

**owned** 25:7

**owns** 25:13,14

**Oxford** 8:12 10:4 18:20 19:20,23 20:10 24:18 47:17,20 65:13 66:9,18 67:6 79:6,8 80:21 81:2,14 82:5 89:25

**Oxford's** 23:14,16,

19 24:10,14

**P**

**p.m.** 85:24 86:14 88:3

**paper** 20:16 88:24

**paragraph** 50:17

**park** 25:24 26:2

**Parrage** 75:25

**part** 20:7 21:4 25:3,5, 17 27:15 40:8,19 47:7 48:7 59:16

**parties** 7:16 86:22

**passed** 43:21 46:25 49:16 57:8 87:7

**path** 77:2,20

**patrol** 82:21

**pedestrian** 39:5

**pending** 7:24 14:8

**people** 26:5,10 27:5 35:14,16 37:22 38:22 47:18,19 53:21 55:14,20 57:24 59:7, 24 60:11 62:5 66:16, 25 67:6,11,23 69:18, 22 79:12 81:6 83:5 89:13

**percent** 51:13

**period** 12:11 20:4 46:9 84:2

**permission** 34:10 86:11,16,24

**permit** 39:10 51:19 52:13 57:24 58:6,11, 23 59:9,14 60:13,20, 24 61:6,14 62:3 84:2, 15 85:4

**permits** 40:2,6,10, 14,21 52:5

**person** 60:18 61:5,9

**personal** 62:15,16

**phonetic** 75:24,25

**place** 37:22 46:7,14 47:8 48:16 49:12

77:24 81:9 83:7

**plaintiff** 8:2 9:5,8,24 13:3

**play** 52:18 66:2

**played** 40:8,15,19 48:6 51:5,12

**point** 35:19 45:16 48:17,25 73:16,23 74:17 76:8,10

**police** 46:4,23 47:12, 13 82:22

**policies** 16:11 20:20 21:10 22:11 47:5 58:19,21 60:6,17 61:12 64:17

**policy** 15:16,20 16:9, 15 21:12,13,16,18 23:8 32:16 33:2,6,10, 13,14,17,23 34:3,11, 19 35:4,8,19,22 36:4, 8,12,18 37:20 38:2,8 39:10 40:3,6,7,10,14, 22 41:6 42:4,20 43:4, 5,6,20 44:2,4 45:7,10 46:3,21 48:15,23 49:6,16,23 50:13,20 51:7,17,18,24 52:7, 14 53:6,12 54:3,9 55:16,21 56:2,8 57:15 58:4,5,8,10,18, 22 59:6,12,15 61:4, 21,24 62:9,18 63:8, 12 68:13 84:2 86:6 87:25 88:9,10

**political** 23:2 26:14, 16,17,20 86:22

**population** 65:22

**portions** 38:17

**position** 10:8 17:11, 15

**posting** 47:24

**potential** 39:4,5

**practice** 7:8

**practitioner** 9:7

**prepare** 16:4,22 17:2,8

**prepared** 54:23

**present** 16:18 89:16

**presented** 15:19 16:8 21:22 62:23

**presents** 11:3

**president** 33:9 43:21 56:22 57:10 58:18 64:23 65:8,21 68:23

**pretty** 21:23 38:25 45:22,25 47:11 75:16

**previously** 10:8

**print** 72:5

**printed** 42:7 43:8

**prior** 16:20 18:21 20:22 39:15 63:13 86:3,15

**priority** 38:6

**problem** 56:10 68:10

**problems** 35:14 36:24 37:2,15,16,17, 21 38:14 45:24 46:11 54:25

**Procedure** 7:22

**procedures** 15:3

**proceed** 9:15

**process** 34:9,22 37:22 39:9 40:2 51:8 74:5 75:20,21

**produce** 21:24 22:3, 10

**produced** 21:24 88:16

**projected** 78:17 79:13

**projection** 79:4

**property** 18:6,8 25:12 27:11 33:12,24 34:5,10 51:20 59:3 64:14 84:9

**propose** 65:4

**proposed** 63:14 65:4

**protest** 26:14,24 28:11,15,17,20 29:3 60:14

**protesting** 70:10,18

**protests** 23:2 70:9

**provide** 65:25

**public** 22:21 25:24 30:24 31:5,13,19 38:3,4,7 39:6 65:17 66:11 68:16

**pulling** 71:19

**purposes** 27:11 61:13 69:11

**put** 32:14 33:3 35:18 48:16 49:12 55:2 56:2 60:2,3,5 66:2 68:6 70:11 71:2,17 76:15

**puts** 64:3

**putting** 54:21 63:6 71:10 73:4

---

**Q**

**question** 14:4,8,14, 16 20:25 22:12 25:9, 15 28:18 31:6 32:8 40:17 62:10 65:3 85:13

**questions** 13:14 14:20 15:2 57:12 62:6 79:24 80:14 90:8,16

**quickly** 38:16

**quote** 78:18 87:8

---

**R**

**ran** 19:5

**Rash** 8:9 9:5,8,24 15:6

**re-address** 48:22

**re-read** 85:22

**reached** 48:9,13 51:10,15

**read** 15:14,16,18,20, 22,25 16:10,14 32:23 50:17

**reading** 88:18

**real** 75:9

**reason** 14:22 49:22 58:25 84:6

**reasoning** 33:17

**reasons** 48:17 49:14 50:5 60:25 84:8 89:12

**recall** 29:5 59:17 64:15,19 76:14 78:14

**recap** 49:4

**received** 41:14 47:23

**recess** 80:8

**recollection** 40:18 47:10 51:9 54:24 90:3

**record** 7:11 9:2 10:17 12:7 80:7,12 90:25

**recording** 7:18

**records** 29:25 30:4, 12

**red** 44:2,5,11,12,14, 16,22 45:2 50:9 52:25

**redid** 46:2

**refer** 23:17 29:10

**referring** 24:4 29:11 39:23 50:22 52:21

**refers** 53:18

**reflect** 32:5

**reflected** 29:22

**reflects** 61:4

**refresh** 71:13

**regulate** 33:24

**regulated** 33:13

**regulating** 34:5

**relate** 21:7

**related** 15:15 17:4 20:17,19 72:20

**relation** 22:5 80:25 83:14

**relocated** 77:12

**remember** 26:21 31:22,23 35:11 36:14,25 50:8 52:19 54:19 64:18 69:3 70:14 71:9 73:3,4 76:4,15,22,23 79:11 84:4 89:14,15,18,21

**remote** 7:18 8:7,14

**remotely** 7:12,15

**rent** 18:8

**rental** 18:6,8

**renting** 53:22

**Repeat** 58:7

**rephrase** 14:5 24:24 59:5 70:8

**report** 71:25 82:20

**reporter** 7:13 8:21 9:13,24 11:10 13:22 14:13 32:9

**Reporting** 7:6 8:20

**represent** 11:12,16

**representative** 82:17

**request** 34:7 86:24

**requested** 16:14

**requests** 33:18 35:12 36:9

**require** 62:3

**required** 57:24 58:5, 11 59:8 60:20 61:5, 13

**requirement** 63:12 84:12,16 85:12

**requirements** 88:8

**requiring** 58:23 63:14

**resident** 19:15,22

**resources** 50:24

**respond** 31:10

**restaurants** 81:5

**restrictions** 86:9

**result** 67:6

**retail** 17:25

**review** 16:25 54:23 57:4,5 63:19

**reviewed** 85:20

**revised** 55:20

**revising** 55:15

**revision** 63:11

**revisions** 54:13

**riots** 47:3,15 51:3

**rise** 49:25

**road** 32:2 38:20

**roads** 32:3

**Roberts** 56:22

**role** 34:4 40:5,9,13, 15,21 51:5,8,18,23 52:12,16,18 54:12 70:2

**room** 7:10,14 10:23 11:3

**Rule** 7:21

**rules** 7:22,23 13:10

**run** 68:7

**runs** 39:25

---

**S**

**safety** 22:21 38:3,5, 7,21 39:2,6 65:17 66:11 68:9,16

**sat** 27:6

**satisfy** 76:9

**scheduled** 86:13

**school** 18:16,19,20

**scope** 86:9

**scratch** 23:12 28:25 31:12

**Secret** 47:14

**section** 44:25 53:2, 13

**security** 38:5 44:17

46:7,9,13,14,22 47:4 48:2,10,16,20 49:7, 13,15,24 50:9,16,17, 20 51:3,14 53:16,17, 21 54:7,8 59:16 70:11 84:8 85:5 89:12,25 90:4

**Sensy** 75:24

**separate** 25:13 27:25 28:2

**September** 72:8,12

**service** 47:14 82:21 83:2

**session** 77:6

**seven-day** 39:15 46:8

**severity** 7:7

**shaking** 13:25

**sheriff** 40:9,13 43:19 46:5,24,25 47:22 50:22 51:5,18,22 52:12 55:11 59:20 60:10

**sheriff's** 51:11,15 82:23 85:6

**shop** 81:6

**short** 20:4

**show** 30:12 55:23 63:3 71:12 87:14

**showing** 88:25

**sic** 87:3

**side** 26:6,7 83:12,18, 19,20

**sidewalks** 25:21

**signed** 52:9

**signs** 44:23 53:2,14

**simply** 29:7

**simultaneous** 34:15 52:3

**single** 49:18

**single-page** 63:5

**sir** 12:25 13:5,8,15 15:8,21,24 16:3,19,

23 17:3,7,10 18:10
19:10,19 20:20 21:6
23:5 24:12 26:2,12,
20 27:14 31:23 32:7
36:6 37:24 38:6 39:3,
22,24 41:9 42:18
44:3 50:11 52:23
53:4 57:3,20 63:17
64:7 72:6 79:5,10,15,
19 85:21 90:21

**sit** 62:10

**sits** 26:9 81:13

**sitting** 62:18

**situation** 31:8

**situations** 62:20
68:2

**size** 58:4,9,22 59:16,
20 60:10 61:13

**slingshots** 53:19

**small** 24:23 25:2,24
26:4 48:18

**smooth** 13:11

**social** 7:9 24:10,14
78:21 81:14

**sole** 9:7

**solve** 11:5

**sort** 46:15 80:20

**space** 24:6

**spatially** 83:10

**speak** 9:18 13:23
24:2 79:23 83:4

**speaker** 83:3

**speakers** 34:15 52:3

**special-called** 29:21

**specific** 31:15

**specifically** 32:22

**speech** 23:3 26:14,
17 27:7 29:3

**speeches** 26:16,20

**speed** 68:6

**spell** 10:17

**spelled** 53:17 61:8

**spells** 54:8

**sporting** 17:25 18:3,
23 19:5,10,11

**sprinkler** 35:15
38:12

**sprinklers** 36:16

**square** 23:14,16,18,
19,20 24:9,13,20
25:3,5,17 26:6,7
49:3,9 51:4 67:11
80:20,24 81:5,12,13,
19,20,22,25 82:4,8,
10,11 83:12,18,19,21

**standpoint** 39:2
46:7,10

**start** 8:6 14:15 80:11

**started** 33:18 35:9
75:19

**starting** 37:5

**state** 8:25 10:16

**state's** 7:23

**States** 8:10

**statue** 22:11 70:24
71:11 72:20,25 73:19
77:12,13 87:10 88:5

**status** 72:19

**statutes** 73:10

**step** 66:20

**stepping** 66:21

**stipulate** 7:16

**stones** 53:19

**stood** 27:6

**stops** 26:9

**street** 68:24

**streets** 25:7,14 38:22

**Strike** 82:3

**stuff** 25:7 30:8

**submitted** 39:19
45:16

**subscribe** 30:7

**substance** 13:9

**suggestions** 12:9

**summer** 70:15,20
77:22 78:16 79:11

**sunshine** 30:18

**supervisor** 18:24,25
19:4,8 23:11 29:18
43:3,10,11 55:8 57:9
66:10

**supervisor's** 19:13

**supervisors** 10:15
20:22 21:3 29:9,10,
12 33:20 42:2 43:13,
15 50:25 52:18
55:10,19 56:21 58:15
61:19 64:24 65:9,14
72:7 73:18 79:4
82:18

**supervisors'** 72:12

**surrounding** 24:4
27:20

**surrounds** 26:5

**swear** 7:15 9:14 75:5
77:8 78:7,8,15

**swearing** 7:18

**sworn** 9:18

**system** 38:12

**systems** 35:15

**T**

**takes** 84:21

**taking** 13:23 14:18
54:20 90:19

**talk** 14:11 27:18 28:5
62:13 79:3 90:4

**talked** 54:2 59:16
73:25 78:3 82:4,13
83:24 84:6 89:11

**talking** 10:12 19:24
23:14 24:5 25:10
28:6 46:12 51:6
62:14 69:4,5 72:23,
24 80:18

**tape** 70:11

**teams** 47:6

**tear** 36:21

**technical** 32:10
41:23 42:9 56:16
71:23 80:4 87:20

**telling** 46:6 47:9
89:15

**testified** 9:19

**testimony** 12:10
13:23

**text** 20:16 30:20 31:5,
8,14,20

**texts** 30:22

**That'll** 80:2

**then-police** 48:8

**thing** 62:22

**things** 32:3 36:22
46:14 47:24 67:22
74:2

**thinking** 67:25 85:21

**thought** 48:22 59:18
65:3 68:5

**throwing** 26:11

**time** 8:16,24 9:13
10:10 13:12 20:5
35:18,21,25 36:10,20
38:6 39:7,13,14
43:19 46:2,23,25
48:7 51:5,12 54:15,
21 57:9 59:11,21
60:7,23,24 62:8
63:20 68:2,20,22,23
69:19,23 71:5 72:16
73:6 75:10,18 76:5
77:14 83:7 85:8 88:8

**timeline** 71:9 73:3

**times** 37:5,12 46:6
48:9 66:12,14 70:12,
22 74:24 76:6 78:5,
11

**titled** 15:6

**today** 7:5,13 8:14,19,
21 10:12 13:11,12,14
14:24 15:3 17:9
21:15 27:19 29:8
89:2,6,8

**today's** 17:5

**told** 15:11 16:13
75:18

**Tom** 7:25 9:3,21,23
12:20,22 32:8,13
41:4,13,24 52:4
56:17 63:2 71:16
79:20 80:13 90:5,18

**top** 38:6 63:10

**town** 48:18,25 49:19
65:21 66:16,25

**traffic** 39:5 65:22
66:4,21,23

**trials** 81:9

**triggered** 58:5,10,
13,22 59:4

**truth** 9:18,19 13:19

**truthful** 13:13 14:23

**TSG** 7:6 8:20,23

**turned** 23:9

**U**

**Uh-huh** 41:20 44:6,
13,18 53:7 55:7
72:14 86:7,10 87:23

**unable** 10:24,25

**unanimous** 77:23

**unanimously** 77:23

**under-** 17:20

**underneath** 52:25
56:21

**understand** 10:21
12:11 13:12,20 14:2,
4,9,20 20:25 23:19,
22 24:3,7 25:8 27:22
28:8 29:11 42:17
84:14

**understanding** 61:5
84:18

**Understood** 19:14

**United** 8:10

**university** 18:14,23
19:11 47:13 67:7
71:3 76:8,9 81:21
82:22 89:17

**unlike** 11:2

**usage** 39:18 45:12

———————

**V**

**validity** 7:17

**vary** 85:8

**vast** 20:9

**verbatim** 53:9

**versus** 8:9 15:6

**Veterans** 26:18,19 82:13,14

**video** 7:17 8:16

**video-recorded** 8:7

**view** 68:25

**virtual** 10:20

**virus** 7:7

**visit** 66:25

**visiting** 67:6

**vote** 56:22 73:24 76:12

**voted** 52:6 76:15,17 77:22

———————

**W**

**walk** 26:5

**walked** 61:16 69:14

**walking** 69:22

**walls** 79:14,18

**wanted** 60:18,22 61:6 73:25

**warm** 70:16,17

**watched** 68:6

**wear** 36:21

**website** 30:9,10

**week** 22:4 39:20

**welcoming** 82:18

**west** 38:19 66:20

**Wildlife** 82:24

**Williams** 9:6 12:16 90:12

**win** 10:7

**window** 84:24

**wording** 50:10

**words** 78:18

**work** 18:21 20:22 21:5 23:11 29:22 30:2,5,12 32:6 47:6

**worked** 19:12 74:9

**wrap** 79:25 80:15

**wrong** 59:18

———————

**Y**

**y'all** 76:20 77:15

**year** 17:14,16 68:11

**years** 18:2 19:3 21:3 27:8 28:23 29:4 49:19,20 57:11 64:23 65:8,14 66:9 67:8,12, 15 68:5,23,24

**yesterday** 16:7,13