# EXHIBIT 8

1

2              IN THE UNITED STATES DISTRICT COURT

3            FOR THE NORTHERN DISTRICT OF MISSISSIPPI

4                        OXFORD DIVISION

5

6

7

8   JOHN RASH,

9          Plaintiff,
                              CASE NO.: 3:20-cv-224-NBB-RP
10  v.

11  LAFAYETTE COUNTY,
    MISSISSIPPI,
12
            Defendant.
13  _____/

14

15         REMOTE VIDEOTAPED DEPOSITION OF JOEY EAST

16                     DECEMBER 18, 2020

17

18

19

20

21  Reported by:

22  GINA WILLIAMS, RPR, CRR, CRC

23  JOB NO. 187734

24

25

## Page 2

1
2
3
4
5
6
7               DECEMBER 18, 2020
8               9:14 a.m.
9
10        Remote Videotaped Deposition of JOEY EAST in the
11 above-styled action before Gina Williams, Registered
12 Professional Reporter and Certified Realtime Reporter.
13
14
15
16
17
18              REPORTER'S NOTE:
19   QUOTATION MARKS ARE USED FOR CLARITY AND DO NOT
         NECESSARILY REFLECT A DIRECT QUOTE
20
21
22
23
24
25

## Page 3

1
2 A P P E A R A N C E S:
3
4     SIMPSON THACHER
5     Attorney for Plaintiff
6        425 Lexington Avenue
7        New York, NY 10017
8     By:  JONATHAN YOUNGWOOD, ESQUIRE
9        LILY CRON, ESQUIRE
10
11
12
13     Attorney for Plaintiff
14        P.O. Box 69
15        Taylor, MS 38673
16     By:  C. JACKSON WILLIAMS, ESQUIRE
17
18     CLAYTON O'DONNELL
19     Attorney for Defendant
20        1403 Van Buren Avenue
21        Oxford, MS 38655
22     By:  DAVID O'DONNELL, ESQUIRE
23
24
25 VIDEOGRAPHER:        JAAROME WILLIAMS

## Page 4

J. EAST

1
2     COURT REPORTER:  My name is Gina Williams with
3 TSG Reporting.  Due to the severity of COVID-19, the
4 videographer and I will not be in the same room with
5 the witness and will swear the witness remotely.
6     Do all parties stipulate to the validity of the
7 remote process, transcript, and swearing of the
8 witness?
9     MR. YOUNGWOOD:  Yes.
10     MR. O'DONNELL:  Yes.
11     VIDEOGRAPHER:  This is the start of Media 1 of
12 the video deposition of Joey East in the matter of John
13 Rash versus Lafayette County, Mississippi in the United
14 States District Court, Northern District of
15 Mississippi, Case Number 3:20-cv-224.
16     This deposition is being held remotely on
17 December 18, 2020.  The time is 9:14 a.m.  My name is
18 JaaRome Williams with TSG Reporting.
19     Would counsel please introduce themselves for the
20 record?
21     MR. YOUNGWOOD:  Yes.  Jonathan Youngwood and Lily
22 Cron for the Plaintiffs.
23     MR. O'DONNELL:  David O'Donnell on behalf of
24 Lafayette County, Mississippi.
25     MR. YOUNGWOOD:  And actually Mr. Williams should

## Page 5

J. EAST

1
2 introduce himself as well, or I can introduce him.
3     Jack Williams is also on for the Plaintiffs -- or
4 Plaintiff, I should say.
5         - - - -
6 WHEREUPON,
7         JOEY EAST
8 was called as a witness and, after having been first duly
9 sworn, was deposed and testified as follows:
10 EXAMINATION
11 BY MR. YOUNGWOOD:
12   Q   Good morning, Sheriff East.  My name is John
13 Youngwood.  I've just introduced myself on the record, and
14 I'm one of the attorneys representing the Plaintiff,
15 Mr. Rash, in this matter.
16     Could you state your current employment, please?
17   A   Currently the sheriff here in Lafayette County,
18 Mississippi.
19   Q   And you've had that position for almost a year?
20     Do I have that correct?
21   A   Yes, sir.
22   Q   You were elected last December?
23   A   Yes, sir.
24   Q   And you assumed the position in January of 2020?
25   A   Yes, sir.

Page 6

J. EAST

2 Q Okay. And prior to that time you had taken a
3 leave of absence, I believe, from your prior position?
4 A Yes, sir, that is correct.
5 Q Okay. And that was in connection with running
6 for the office of sheriff; is that right?
7 A Yes, sir.
8 Q Okay. And what was your prior position then?
9 A I was the chief of police at the Oxford Police
10 Department, Oxford, Mississippi.
11 Q And of course Oxford is within Lafayette County;
12 right?
13 A Yes, sir.
14 Q Okay. So you've been -- I'm sorry.
15 And how long had you been at the Oxford Police
16 Department before becoming chief of police?
17 A I was hired in 1991 and was there my whole
18 career, minus four, where I was with the Mississippi
19 Attorney General's Office.
20 Q When were you with the Mississippi Attorney
21 General's Office?
22 A I think I went in in '98, 1998, and I was there
23 four years.
24 Q Was that you had left the Oxford Police
25 Department, or you were on a leave, or what was --

Page 7

J. EAST

2 A No, sir.
3 At the time I was assigned to the narcotics unit
4 in our county and city, and I left to take a job with the
5 Attorney General's Office, worked as a Youth Service
6 Division Investigator with Mike Moore in his office.
7 Q Let's briefly just talk about the time between
8 '91 and when you went to the Attorney General's Office.
9 What was your position or title or rank in the
10 Oxford Police Department?
11 A I was hired on in '91 as a dispatcher, then I was
12 hired as a patrol officer and had many job tasks during that
13 time from DUI officer through I became an instructor and
14 taught some.
15 I then was assigned to the Metro Narcotics Unit
16 here in Lafayette County, was there for roughly four years
17 until I took the position with the Mississippi Attorney
18 General's Office.
19 Q And for those four years I think you gave your
20 title or your general position, but just tell me a little
21 bit more about what you did in the four years with the
22 Attorney General's Office.
23 A I was mainly assigned to Youth Services Division.
24 At that time General Moore had won the tobacco
25 settlement, and we were awaiting a brand of unit that would

Page 8

J. EAST

1 use minors and track -- we would do a grant -- make sure
2 people were following the grant properly. We would do
3 undercover work where we'd send youth in to see if they
4 could buy tobacco and/or alcohol.
5 Q And during those four years, were you working out
6 of the Oxford area, or were you working out of a different
7 area of the state?
8 A No, sir. Out of Oxford.
9 Q And you then spent about four years there, so if
10 I'm counting right, about 2002 you returned to the Oxford
11 Police Department?
12 A Yes, sir, that's correct.
13 Q Okay. What did you return as?
14 What was your job then?
15 A I came in as the commander of the drug unit. I
16 was hired by the police department to run that unit. I did
17 that, and then I was assigned a leave of imposition. I was
18 put over investigations -- all investigations with the city.
19 And from that position I became a major. Then I was
20 promoted to the deputy chief position. And then later on I
21 was awarded the chief of police position.
22 Q And what year did you become chief of police
23 then?
24 I guess six years before 2019, around 2014?

Page 9

J. EAST

2 A Yes, approximately 2012, 2013.
3 Q Okay. And let's just go briefly back before
4 1991.
5 What were you doing before 1991?
6 Were you in school?
7 A Yes, sir, I was in school at Northeast -- I mean
8 Northwest and had numerous jobs from working at a body shop
9 and working at the local dog store.
10 Q How old were you when you joined the police force
11 in 1991?
12 A I was 20 years old.
13 Q And your family has a background in law
14 enforcement as well; am I correct?
15 A Yes, sir. My father was the sheriff here in
16 Lafayette County.
17 Q He was the sheriff for 46 years.
18 Do I have that right?
19 A That's correct.
20 Q Safe to say you grew up with law enforcement in
21 Lafayette County?
22 A Yes, sir.
23 Q What led to you making the decision to run for
24 sheriff in 2019?
25 A A lot of prayer, a lot of talk with my family,

Page 10

J. EAST

1  and just felt that that was the -- that's the way the Lord
2  was leading me. So that's when I left and chose to run for
3  that. It just seemed like it was a natural fit.
4      Q    Okay. I apologize for not knowing this because
5  it's certainly public record.
6           How long is your term?
7           How long until you have to run again?
8      A    Four years.
9      Q    So you'll run again in '23?
10     A    2024.
11          No, 20 --
12          Yeah, 2024.
13     Q    I'm sorry. My question may not have been as
14 precise as it could have been.
15          Your term began in 2020. If you're elected to a
16 second term, it will begin in 2024; is that right?
17     A    2025.
18     Q    Okay. I see.
19     A    Four-year term.
20     Q    Okay. And there are no term limits. You can run
21 again. You can keep running; is that right?
22     A    Yes, sir.
23     Q    Okay. Let's talk a little bit about just the
24 structure and the jurisdiction of the Oxford Police

Page 11

J. EAST

1  Department. At the time that you left it last year, how
2  many officers?
3      A    When I left, we had 80 officers.
4      Q    Okay. And the jurisdiction is Oxford itself; is
5  that right?
6      A    Yes, sir.
7      Q    And approximately how many square miles or
8  whatever the best way to measure the size of Oxford is?
9      A    When I became chief, we were right at 16 square
10 miles. We annexed, in my time as chief, to where they
11 currently are 26 square miles, approximately.
12     Q    And the county, are there -- strike that.
13          As sheriff, what is your jurisdiction?
14          What is your geographic jurisdiction?
15     A    Sheriff's Department is approximately -- we cover
16 670 square miles. 40 of that is water, approximately.
17     Q    And are there --
18          Within those 670, do you exclude, for example,
19 the 26 square miles that are part of the City of Oxford?
20     A    Although we have jurisdiction, we try to allow
21 the City of Oxford to perform their own duties. We assist
22 them if they need us.
23          Same with University of Mississippi. It's inside
24 the county, but we allow them to take care of their own

Page 12

J. EAST

1  area.
2      Q    Okay. So you have jurisdiction, but you try to
3  defer where possible to the local police force?
4      A    Yes, sir.
5      Q    Are there --
6           You mentioned City of Oxford. You mentioned
7  University of Mississippi.
8           Are there other areas within the County of
9  Lafayette that have local police forces that you try to
10 defer to?
11     A    Yes, sir, the community of Abbeville. They're
12 incorporated. They have their own police chief and a couple
13 part-time officers and so we will assist them when no one's
14 on duty, but we try to allow them to handle that area also.
15     Q    Okay. Anything else, or you've listed the three?
16     A    Yes, sir, I think those are the only ones that
17 has an officer under their control.
18     Q    And if you combine the geography covered by those
19 three, we have the 26 from the City of Oxford. What's
20 the --
21          Do you know what the square mileage is for the
22 university?
23          I assume it's smaller.
24     A    No, sir, I don't.

Page 13

J. EAST

1      Q    Or for the --
2           I'm sorry. I forget the name of the third
3  jurisdiction you mentioned.
4      A    Abbeville.
5           No, sir, I don't know the square miles of that
6  either.
7      Q    And if I asked these questions differently
8  instead of by square miles, I asked you by population, would
9  you know what the population is for the three areas,
10 Abbeville, Oxford and the university?
11     A    No, sir, not --
12          I know the City of Oxford approximately has
13 between 25 and 27,000 people.
14          The university, their numbers vary depending on
15 how many students are in town, how many are staying on
16 campus versus staying off of campus, and I do not know about
17 Abbeville, no, sir.
18     Q    And do you know the population of Lafayette
19 County?
20     A    It's approximately 30,000.
21     Q    Okay. So of the 30,000 in Lafayette County,
22 somewhere between 25 and 27 of them are in the City of
23 Oxford?
24     A    No. The entire county would be close to 50,000.

Page 14

J. EAST

1                              J. EAST
2      Q     Okay. You were doing the math for me. You were
3  taking out the City of Oxford and telling me who was in the
4  county other than the City of Oxford?
5      A     Yes, sir.
6      Q     That's what I wanted to understand, so I
7  appreciate that. Thank you. It cut through it.
8            When you're taking out doing that math in your
9  head, are you also including some estimate for Abbeville and
10 for University of Mississippi?
11           Is that where you get to the 30?
12     A     Yes, sir. They would be included in the county.
13 The 30,000 would include Abbeville.
14     Q     Okay. So if I took Abbeville out, it would be
15 whatever Abbeville is, and if I took the University of
16 Mississippi out, it would be whatever that is?
17     A     Yes. And these are approximate numbers. I don't
18 have --
19     Q     I'm sure the numbers are all, again, public
20 record.
21     A     Yes, sir.
22     Q     How many officers does the -- do you have now
23 under your management -- or under your command perhaps is a
24 better word?
25     A     Including myself, there's 44 employees as far as

Page 15

J. EAST

1                              J. EAST
2  deputy sheriffs.
3            We have four openings, so we'll have a total of
4  48 when we finish the hiring process.
5            And when you gave me the figure of 60 for the
6  City of Oxford, were you also giving me deputy sheriffs, or
7  were you giving me some other number?
8      A     No, sir.
9            I gave you the number of 80, not 60, and that was
10 just including what we call gun-toters maybe. They were
11 police officers, sworn officers. I didn't include
12 communications or anything like that.
13     Q     Okay. What I'm trying to get is comparable
14 positions for the two -- for the two law enforcement
15 services.
16           So the 80 that you gave me for Oxford, is that
17 comparable to the 44, 48 that you gave me for the county?
18     A     I don't know.
19           MR. O'DONNELL: Object to form. Go ahead.
20 BY MR. YOUNGWOOD:
21     Q     You used the word, I think, "gun-toters"?
22     A     Police officers.
23     Q     Police --
24           I'm not --
25           I'm just trying to use your words.

Page 16

J. EAST

1                              J. EAST
2      A     Yes, sir.
3      Q     Although I have some --
4            I've done --
5            I'm a lawyer. I've done some cases involving
6  police forces before. You are going to completely beat me
7  on the terminology in everything every step of the way
8  today, so...
9      A     The people I'm talking about are sworn police
10 officers.
11     Q     Okay. So the 80 sworn police officers for
12 Oxford, right?
13     A     Yes, sir, that's correct.
14     Q     And the 44 to 48 when you're fully staffed, those
15 are sworn police officers too?
16     A     That's right.
17     Q     Okay. That's what I'm trying to make sure we're
18 comparing, I'll say apples and apples.
19     A     Yes, sir.
20     Q     Okay. Let's talk for a little bit about the
21 Oxford Town Square that you know is a focus of this
22 litigation, and the county courthouse. It might be easiest
23 if we just take a look at a picture.
24           And I think if you turn to Tab, for example, 39
25 in hopefully what's in front of you.

Page 17

J. EAST

1                              J. EAST
2      A     Yes, sir.
3            MR. YOUNGWOOD: And so for the court reporter,
4  we're going to use the convention that this Tab 39 will
5  now be Exhibit 39. We'll put it into the chat.
6            (Exhibit 39 was marked for identification.)
7  BY MR. YOUNGWOOD:
8      Q     You should find there, sir -- hopefully your
9  version is the same as mine. It's a set of pictures. I
10 think it goes to 23 different pictures. On the bottom they
11 seem to be numbered.
12     A     Yes, sir.
13     Q     Okay. And this is the Oxford Town Square;
14 correct?
15     A     No. This is --
16           What I'm looking at mainly is the courthouse
17 grounds.
18     Q     Okay. Let's call it, okay, courthouse grounds.
19           What would you say the relationship is between
20 the courthouse grounds and the town square?
21     A     The courthouse sits in the middle of the downtown
22 square area.
23     Q     Okay. And just to take a look at a few of them,
24 the one that's labeled B1, the first one, that's looking, as
25 I understand it, more or less north toward the statue and

Page 18

J. EAST

1
2  the courthouse?
3      A    No, sir.  That would be the south side.
4      Q    Okay.  Is it the south side --
5           Again, maybe this is an unhelpful way to do it.
6           If I'm standing where the photographer is, am I
7  looking north or looking south?
8      A    You're looking north at the south side of the
9  courthouse, yes, sir.
10     Q    That's what I thought.  So we're looking north.
11     A    Yes.
12     Q    And the statue itself, the soldier on the top,
13 he's facing south; is that right?
14     A    That's correct.
15     Q    Okay.  And this is a reasonably fair rendition of
16 what the courthouse looks like from this angle?
17     A    Yes, sir.
18     Q    Let's turn to the third page.  You can see the
19 statue outside the gate?
20     A    Yes, sir.
21     Q    Although it's not dead south, this is an angle
22 more or less looking south, right, from behind the statue?
23     A    Yes, sir.
24     Q    Okay.  This open gate here that's sort of near
25 the statue, that gate is always open; is that correct?

Page 19

J. EAST

1
2      A    Yes, sir.  Yeah, it's an opening that is, yes, is
3  always open.
4      Q    Okay.  And it's not closed at night, for example?
5      A    No, sir.
6      Q    And the height of the gate, that's been a pretty
7  consistent height in recent years, I take it?
8      A    Yes, sir.
9      Q    Okay.  The benches that we see, do you know how
10 long those benches have been there?
11     A    No, sir.
12     Q    More than a few years or less than a few years?
13     A    There's always been benches around the
14 courthouse.  I don't know how long these have been there.
15     Q    Okay.  And by "always" you mean decades, as long
16 as you can remember?
17     A    Since I was a child, I remember one or two
18 benches being up there.
19     Q    Let's turn to the next two pages, either page 4
20 or page 5.
21          Do you see another opening here?
22     A    Yes, sir.
23     Q    Can you tell which direction this is facing, sir?
24     A    Yes, sir.  This is facing west.
25          Okay.  And these openings -- this opening is two

Page 20

J. EAST

1
2  pictures, but one opening -- this has been here for decades
3  as well; correct?
4      A    Yes, sir.
5      Q    Okay.  And it's not closed off at any point;
6  correct?
7      A    That's correct.
8      Q    Okay.  If you turn to the next page 6, this is an
9  additional bench.
10          That bench has been here, fair, for a long time;
11 correct?
12     A    I don't know how long it's been there, sir.
13     Q    Okay.  You can't remember a time where there
14 weren't benches within the courthouse grounds; correct?
15     A    There's always been benches since I was a child,
16 yes, sir.
17     Q    Okay.  Let's turn to page 17, if you could.
18          Are you able to identify the angle here, the
19 direction the photographer is facing?
20     A    The photographer is facing south, and this will
21 be the new side of the courthouse.
22     Q    And again, this is --
23          You see that opening.  That opening has been
24 there for some time?
25     A    Yes, sir.

Page 21

J. EAST

1
2      Q    And that opening is never closed off; correct?
3      A    Correct.
4      Q    These benches you see here, can you tell me one
5  way or the other how long they've been here?
6      A    I don't have a clue.  I don't know how long
7  they've been there.
8      Q    Let's go to page 20.
9          Are you able to identify the direction the
10 photographer is facing?
11     A    The photographer would be facing west.
12     Q    Okay.  And a little difficult to count just from
13 a picture, but it looks like one, two, three, four, at least
14 five benches do you see there?
15     A    Yes, sir.
16     Q    And how long, do you know, have those been there?
17          Same answer as before?
18     A    Yes, sir.
19          I don't know.
20     Q    And again, we can see an opening where there's --
21 looks like there's a truck, pickup truck.
22          Do you see that opening?
23     A    Yes, sir.
24     Q    That opening has been there for many years;
25 correct?

Page 22

J. EAST

1
2    A    Yes, sir.
3    Q    And never closed off, to your knowledge?
4    A    No, sir.
5    Q    Okay. Let's go to 22, please.
6    A    Yes, sir.
7    Q    Can you tell what direction the photographer is
8    facing?
9    A    It appears the photographer is facing north.
10   Q    Okay. So this is between the courthouse and the
11   statue perhaps?
12   A    Yes, sir. That's what I would say.
13   Q    So this is probably the opening we've looked at
14   before in the prior picture, right?
15   A    Yes.
16   Q    On a typical day in --
17        Let's move ourselves to a world without COVID.
18        Let's say a typical weekend day, do you people go
19   in and out of the courthouse grounds, sit on the benches,
20   use the ground for their enjoyment?
21   A    During business hours there, it's used by
22   employees, those that are visiting court. I've seen them
23   out there.
24        On weekends, if there's a festival or something,
25   I've seen people there.

Page 23

J. EAST

1
2        Sometimes people just go and sit there, yes, sir.
3    Q    Okay. And there's nothing wrong with that;
4    right?
5    A    Nothing wrong with sitting on a bench that I know
6    of.
7    Q    How about in the evening?
8        People, same thing, go in and out and sit on the
9    benches?
10   A    Yeah, I'm sure there is. Not as much as during
11   the daytime but, yes, sir, there's people that would sit
12   there and wait for rides, drink a cup of coffee, things like
13   that I'm sure.
14   Q    Okay. I've been to Oxford myself. I understand
15   this is in an area where there are lots of restaurants,
16   bars, things to do; right?
17   A    Yes.
18   Q    And so on a typical evening, folks might come
19   into the grounds and sit and talk to each other or whatever
20   on the benches?
21   A    I think people sit there.
22        I don't know if it's a social club place to meet.
23   I wouldn't describe it as that.
24   Q    And if I were in Oxford on an evening and I came
25   from a restaurant or whatever and I wanted to go sit on the

Page 24

J. EAST

1
2    courthouse grounds, there's nothing to stop me from doing
3    so; correct?
4    A    That's correct.
5    Q    There's no sign saying don't come in here in the
6    evening; correct?
7    A    I haven't seen any signage.
8    Q    And we've already discussed the gates are never
9    blocked off; correct?
10   A    Correct.
11   Q    In your years as chief of police for the City of
12   Oxford -- actually, strike that. Let me ask more basic
13   questions.
14        So the courthouse grounds, these are -- this is
15   county property; is that right?
16   A    Yes, sir.
17   Q    And the statue, that's county property; right?
18   A    Yes, sir.
19   Q    Okay. But it's within the City of Oxford; right?
20   A    Yes, sir.
21   Q    Okay. If a City of Oxford police officer were to
22   see an event that warranted her or his attention on the
23   courthouse grounds, could they walk onto those grounds to
24   address them, to address that event?
25   A    Yes, sir, most police officers are -- would do

Page 25

J. EAST

1
2    that if they see something happening. I would hope they
3    would do that. And then they would call one of us to come
4    and take care of the situation.
5    Q    Okay. But there was nothing inappropriate from a
6    jurisdictional ground from them crossing the line of the
7    fence because they saw something on the courthouse grounds?
8    A    They have a right to act, but they're not --
9    that's not their jurisdiction, so they don't make it a
10   common habit to go in there and arrest people or enforce
11   something.
12   Q    Maybe a better way to ask, if they saw something,
13   they wouldn't ignore it.
14        They wouldn't ignore it just because it's outside
15   their jurisdiction?
16   A    I wouldn't think so. I would think they would
17   contact us.
18   Q    Well, when you were chief of police, did you ever
19   give your officers instructions on what to do if they saw
20   something on the courthouse grounds?
21   A    Contact the Sheriff's Department.
22   Q    Are there other areas within the City of Oxford
23   that share this distinction of being county property in the
24   city?
25   A    Yes, sir. We have a chancery building that's

Page 26

J. EAST

1    inside the city.
2          We also have a new --
3          We have county schools that are inside the city.
4    We have a new agricenter that's located inside the city, a
5    justice court complex that's inside the city, all of which
6    are on county property and enforced -- rules are enforced by
7    county law enforcement.
8    Q    And would you give me similar answers in terms of
9    when you were chief of police of Oxford?
10         If one of your officers saw something on one of
11   these county properties that were within the city, you would
12   expect them to do something about that; right?
13   A    Yes, sir. I would expect them to go to that
14   situation and have them contact the sheriff's department to
15   come and handle it.
16   Q    Okay. When you were chief of police of the City
17   of Oxford, were you ever made aware of any violent events
18   taking place on the courthouse grounds?
19   A    You know, I can't recall. I don't know if they
20   ever broke up fights up there or not. I just -- right
21   offhand, I don't want to say something. I can't recall that
22   from memory.
23   Q    If I expanded the question to include the statue,
24   would your answer change?

Page 27

J. EAST

1    A    No, sir.
2          MR. O'DONNELL: Object to form.
3    BY MR. YOUNGWOOD:
4    Q    Okay. And so you're not remembering any specific
5    event of violence occurring while you were chief of police
6    on the courthouse grounds on the area surrounding the
7    statue?
8    A    Not --
9          No, sir, that I can recall.
10   Q    Okay. And how about, did you learn of anything
11   in -- how long a time did you take leave of absence to run
12   for your current office, sir?
13   A    Roughly 11 months.
14   Q    And during those 11 months, did you happen to
15   hear of any violent events in the courthouse grounds or
16   areas immediately surrounding the statue?
17   A    Not that I can recall.
18   Q    Okay. And let me broaden it.
19         I'm not sure how you're interpreting my use of
20   the word "violence."
21         Were you ever made aware of unsafe -- an unsafe
22   situation of any sort while you were chief of police at the
23   City of Oxford or during your leave of absence on the
24   courthouse grounds or the land immediately surrounding the

Page 28

J. EAST

1    statue?
2          MR. O'DONNELL: Object to form.
3          THE WITNESS: Do I answer?
4          MR. O'DONNELL: Yes.
5    A    I don't really know what you mean. I'm not clear
6    on what you're asking me.
7          I've been made aware as chief that there have
8    been demonstrations there or if there was -- they had
9    something that could -- they were worried about court
10   security or that they may have a trial or something. We
11   were always contacted to say, you know, we may need help or
12   things like that.
13         I don't know if that's answering your question or
14   not.
15   BY MR. YOUNGWOOD:
16   Q    No, no, I think it is.
17         And in any of those circumstances, did you become
18   aware that anyone got hurt, physically hurt from any of
19   those incidents?
20   A    Not --
21         I mean, I've been in court one time when we had a
22   deputy that was assaulted there and had his shoulder
23   dislocated, so I'm not --
24         It's kind of a broad question. I can't --

Page 29

J. EAST

1          Just right offhand, I can't think of --
2          I really don't know what you're asking.
3    Q    Can you tell me about the incident with the
4    deputy?
5          What was that situation?
6    A    Yes, sir. They had a trial that ended with the
7    young man being convicted. He got up and was just going to
8    leave as the judge sentenced him. One of the deputies was
9    at the back of the courthouse and tried to stop to talk to
10   him, and he assaulted the deputy there and had to be taken
11   into custody by several of us.
12   Q    This was a deputy being injured in the courthouse
13   by a criminal defendant?
14   A    Yes, sir.
15   Q    Any other incidents that you can recall in the
16   time period leading up to when you became sheriff where
17   somebody was physically injured on the courthouse grounds or
18   on the land immediately surrounding the statue?
19   A    Not that I can recall right now, no, sir.
20   Q    Okay. I take it, though, during your tenure at
21   the Oxford Police Department, there were other incidents of
22   violence elsewhere in the City of Oxford; correct?
23   A    Yes, sir.
24   Q    And that happens in a city of 27,000 people;

Page 30

J. EAST

1  right?
2      A      Yes, sir.
3          And the downtown area at one time -- I don't know
4  what it is now -- I think there was, I mean, approximately
5  30 bars in a two-block to three-block radius.  So you have a
6  lot of people that go to this -- I would refer to it as
7  entertainment center down there or downtown district.  So
8  with alcohol, young adults, you're going to have people that
9  are aggressive and fight and do those type things.
10      Q      Okay.  But those happen from time to time, and
11  they happen, I assume, throughout the whole time you not
12  just were chief of police, but worked for the Oxford Police
13  Department; right?
14      A      Yes.  Yes, sir.
15          It was progressing towards -- as I was chief, it
16  was progressively getting more violent, larger crowds.  I
17  think COVID took care of a lot of that.
18      Q      I understand.
19          And we might get to this in a little bit, but
20  back in 2017 and following an incident in 2018, there were
21  actually some changes made to the downtown district
22  ordinance to address some of the potential for violence in
23  the downtown area.
24          Am I right on that?
25

Page 31

J. EAST

1      A      Yes, sir.  We worked to establish a downtown kind
2  of protocols.  We presented the mayor and Board of Aldermen
3  with a lot of safety concerns that we had.
4          I'm assuming it's '17, '18.  I don't know the
5  exact year.
6      MR. YOUNGWOOD:  You know, I was going to do this
7      later.  Why don't we just do it now, and we'll try to
8      keep moving forward chronologically.
9          So, Mr. O'Donnell, this is going to be in the
10      material that we're only able to e-mail this morning.
11      I don't know how the sheriff has that arranged, if it's
12      in a binder or some other way.
13      MR. O'DONNELL:  I tried my best, John, to label
14      them by tab, but he has them.  So just --
15      MR. YOUNGWOOD:  Okay.  So we'll keep trying the
16      tab method then.
17      MR. O'DONNELL:  I'm not sure that's --
18      MS. CRON:  I'll also drop them into the chat.
19  BY MR. YOUNGWOOD:
20      Q      Let me direct you, Sheriff, to Tab 44.  So we'll
21  call that Exhibit 44.
22          (Exhibit 44 was marked for identification.)
23      A      Yes, sir.
24
25

Page 32

J. EAST

1  BY MR. YOUNGWOOD:
2      Q      Okay.  And I'll give you a moment.  Take whatever
3  time you need, same with anything I give you today.
4          These are minutes of the City of Oxford Board of
5  Aldermen regular meeting Tuesday, October 2 -- sorry --
6  Tuesday, October 3, 2017.
7      A      Yes, sir.
8      Q      And I see you listed as being in attendance.
9      A      Yes, sir.
10      Q      Okay.  And I assume that was typical for you to
11  attend these meetings; right?
12      A      Yes, sir, it was.
13      Q      Okay.  And if you look down to item 17 on the
14  fourth page of the document.
15      A      Yes, sir.
16      Q      And both item 17 and 18 have your names next to
17  them at the top?
18      A      Yes, sir.
19      Q      And the first one relates to amending Article 2
20  of the alcohol ordinance.
21          Do you see that?
22      A      Yes, sir.
23      Q      Do you remember what this was about, what this
24  change was about?
25

Page 33

J. EAST

1      A      No, not particularly.
2          We did this kind of regularly there for several
3  months.  I don't know exactly which one this would be.
4      Q      Okay.  Let's look at 18.  Feel free to read the
5  summary that's on the top of page 5, if that's helpful.  I'm
6  going ask if you remember this discussion at all.
7      A      Oh, wait a minute.  I think I was confused.
8      Q      What do you recall --
9          What was the reason to revisit here safety
10  recommendations for the downtown area?
11      A      Due to the increasing underage drinking, I could
12  say violence, the population that was on the area of me and
13  my staff had come up with some safety recommendations that
14  we thought would benefit the city, along with our downtown
15  area, to make it a safer place if we could get these
16  suggestions or recommendations established.
17      Q      And the recommendations that you made, they
18  concern the area and the operation of the restaurants and
19  the bars; is that right?
20      A      Along with the pedestrian traffic, parking,
21  lighting, those type of things.
22      Q      Okay.  Did you make any recommendations regarding
23  the courthouse area?
24      A      No, sir.  That wasn't in my wheelhouse.
25

Page 34

J. EAST

1

2  Q    And you didn't identify for the city meeting, the
3  Board of Alderman meeting, any safety concerns you had with
4  the courthouse area at this time; right?
5  A    No, sir, not that I can recall.  I don't think
6  I'd be talking about the courthouse.
7  Q    Do you recall, sir, an incident in April of 2018
8  when a patron fired a gun in the establishment called Lyric?
9  A    Yes, sir, I do.
10  Q    What do you remember about that, sir?
11  A    I was out that night.  I was actually working on
12  mounted patrol, and it came across our radio that shots had
13  been fired in the Lyric, and we made our way to that
14  location.
15  Q    And where is the Lyric?
16  A    Lyric is located on Van Buren Avenue directly
17  across from a local pub called the Library.
18  Q    And in the --
19      No one was killed during that incident; correct?
20  A    No, sir.
21  Q    But the bullet did strike somebody?
22      Am I correct on that?
23  A    No, sir.
24  Q    No, okay.
25  A    I don't believe so.

Page 35

J. EAST

1

2      I believe that once the person fired the gun, the
3  person that was hurt was more pushed through glass as the
4  crowd was trying to escape running.  He was kind of trampled
5  or hurt, whoever it was, and glass that was being shattered
6  cut the person or hurt the person.
7  Q    Okay.  In the wake of that incident, you returned
8  to the Board of Aldermen meetings and again proposed an
9  ordinance in the downtown district.
10      Do you remember doing that?
11  A    Yes, I was trying to get them to declare that as
12  a downtown district so that we could look for other options,
13  other security-type methods there.
14      (Exhibit 50 was marked for identification.)
15  BY MR. YOUNGWOOD:
16  Q    Let's take a look at Tab 50, which we will mark
17  as Exhibit 50, please.  These are May 15, 2018 Board of
18  Aldermen, City of Oxford Meeting Minutes.
19      When you get there, you'll see on the first page
20  that you were in attendance.  Tell me when you're set,
21  please.
22  A    Yes, I'm on the page.
23  Q    So you were in attendance at this meeting?
24  That's what the first page indicates; right?
25  A    Yes, sir.

Page 36

J. EAST

1

2  Q    And if we turn to the fourth page, item 20
3  discussed a proposed ordinance creating the downtown
4  district.
5      You're identified there, Joey East?
6  A    What page?
7  Q    Page 4, sir.
8  A    What number?
9  Q    20, bottom.
10      So it says, "Chief East presented a proposed
11  ordinance creating a downtown district.  Issues that were
12  discussed included requiring working cameras in any area in
13  any restaurant or bar where the public has access, having a
14  certain number of security personnel based on the occupancy
15  of the businesses, and requiring ID readers, scanners for
16  areas where there's an age restriction for entry."
17      What was the reason you wanted to propose this,
18  or what's the reason you did propose this ordinance?
19  A    What I found is that, being that we're a college
20  town, a lot of businesses rely on the patronage of college
21  students.  It was my belief that we were policing a lot of
22  the restaurants and bars.  I didn't feel that they were
23  checking IDs properly.  They did not have enough camera
24  systems in there.
25      Their security in my opinion were not being

Page 37

J. EAST

1

2  diligent in walking around to make sure that people were --
3  breaking fights up, not allowing underage drinking.  We
4  could go back.  We got a complaint that a female was
5  harassed or assaulted or another patron.  There was no
6  cameras working in there.
7      So we were trying to get some things established
8  that would help keep the area safer.
9  Q    And the ordinance was not passed that night,
10  correct, or I don't know if the meetings are at night.  They
11  are at night.
12      It was not passed that evening; correct?
13  A    No, sir, just said to discuss.
14  Q    Okay.  And if you can now turn to Tab 52, please,
15  which we'll mark as Exhibit 52.
16      (Exhibit 52 was marked for identification.)
17  BY MR. YOUNGWOOD:
18  Q    These are June 19, 2018 City of Oxford Board of
19  Aldermen Meeting Minutes.
20      Again, when you get to the first page, I think
21  you'll see that you were in attendance.
22      Tell me when you've found that, please.
23  A    I'm here.
24  Q    Okay.  So you were in attendance at this meeting
25  on June 19, 2018; correct?

Page 38

J. EAST

1
2     A     Yes, sir, by the notes I have.
3     Q     If you turn to the third page under number 11,
4  you're noted under number 11 under second reading and public
5  hearing for proposed ordinance creating a downtown district.
6           Do you see that?
7     A     Yes, sir.
8     Q     Okay.  And this was an opportunity for the
9  community to give reaction to the proposed ordinance;
10  correct?
11     A     Yes, sir.
12     Q     If you'd turn to the next page, 4 of 7, I may not
13  pronounce the gentleman's name correctly, but I'm looking
14  fourth paragraph or third full paragraph, John Currence,
15  C-u-r-r-e-n-c-e.
16           Do you know Mr. Currence?
17     A     I do.
18     Q     And in this it says that Mr. Currence cited First
19  Amendment concerns.
20           Do you see that?
21     A     I do.
22     Q     Do you recall what he said about his First
23  Amendment concerns about the ordinance?
24     A     I do not.
25     Q     Was there part of the ordinance that would have

Page 39

J. EAST

1
2  required permits for gatherings at certain of the venues,
3  music venues and other venues?
4     A     There was language in there that was meant to be
5  if they were having private -- if they would rent their
6  facility out, we were trying to get to where we would be
7  notified about that so that we could have enough staff on
8  hand to make sure the security needs were met.
9     Q     Okay.  And part of the information that would
10  have had to have been provided was, for example, the names
11  of the artists that might perform?
12           Do you recall that?
13     A     In the beginning, yes, sir, that was on there.
14     Q     Okay.  That was one of the original proposals for
15  the ordinance?
16     A     I believe so, yes, sir.
17     Q     Okay.  That provision was ultimately dropped, the
18  need to share the name of the artist; right?
19     A     Yes, sir.
20     Q     Okay.  Do you know why it was dropped?
21     A     No, sir, I don't.
22           I believe that some of the business owners
23  brought up some good points during these conversations, and
24  it just made us go back and revisit and put in a better
25  policy or ordinance there.

Page 40

J. EAST

1
2     Q     If we could go to 55, please.  So this is
3  July 17, 2018, City of Oxford Board of Aldermen regular
4  meeting; correct?
5     A     Hold on.  I haven't got there yet.
6     Q     Yeah, sorry.  Thank you.
7           (Exhibit 55 was marked for identification.)
8     A     Okay.  I'm getting there.
9           You said 55?
10  BY MR. YOUNGWOOD:
11     Q     55.
12     A     Yes, sir.
13     Q     So you should have in front of you Tuesday --
14           And we'll mark this 55 as Exhibit 55 to your
15  deposition.
16           Tuesday, July 17, 2018, 5 p.m., City of Oxford,
17  Board of Aldermen meeting.  And you'll see again that you're
18  in attendance, if you look at the attendees?
19     A     Yes, sir.
20     Q     This time, if we turn within the document to
21  page 4 --
22     A     Yes, sir.
23     Q     Again, this -- your name is identified under item
24  14, "Second reading, public hearing and possible vote for
25  proposed ordinance creating a downtown district."

Page 41

J. EAST

1
2           Do you see that?
3     A     Yes, sir.
4     Q     And it says, "The mayor began the public hearing
5  by showing the same PowerPoint presentation that was shown
6  at the public hearing at the Oxford Conference Center.  She
7  again stressed this ordinance was not in response to one
8  particular event, but a culmination of various events dating
9  back to 2003."
10           Do you know what was being referred to by "a
11  culmination of various events dating back to 2003"?
12     A     No, sir, not right offhand.  We had --
13           I don't know exactly what she meant right there,
14  but we've had several tragedies, and she could be talking
15  about one of them from students being -- young people being
16  killed in drunk driving incidents and other things.
17           So I can't recall right offhand.
18     Q     Okay.  And those are all events that, those
19  tragedies, that in some way this ordinance was designed to,
20  if not prevent, at least lessen the likelihood in the
21  future?
22     A     Yes, sir.  Correct.
23     Q     Okay.  But none of them were events that took
24  place or tragedies that took place on the courthouse
25  grounds; correct?

Page 42

J. EAST

1
2    A    Not that I recall, no, sir.
3    Q    Okay.  If you could turn to Tab 57, which we'll
4  mark as Exhibit 57.
5         (Exhibit 57 was marked for identification.)
6  BY MR. YOUNGWOOD:
7    Q    I guess this is a petition, if you look, signed
8  by a number of citizens.  Signatures are at the back of the
9  document.
10        Do you recall this petition coming to your
11 attention at some point during the discussion of the
12 downtown district ordinance?
13   A    Yes, sir, I do vaguely.
14   Q    So you think you've seen this before?
15        I guess it looks like the petition is signed by
16 Bradley Bishop?
17   A    It's addressed to the Board of Aldermen, but I
18 think I will say I read this.
19        I can't --
20   Q    Let me direct you to the second page of it.  The
21 pages unfortunately aren't numbered, but it's just the
22 second page.
23        You can see in the middle that Mr. Bishop writes,
24 "We should reject the false choice between public safety and
25 our ideals."

Page 43

J. EAST

1
2    Q    Do you see that?
3    A    Yes, sir.
4    Q    Would you a degree with me, sir, both public
5  safety and ideals, they can coexist; right?
6    A    I don't know what you mean by "ideals."
7    Q    Okay.  Well, First Amendment and public safety,
8  they can coexist?
9    A    Yes, sir.  Yes, sir, absolutely.
10   Q    And Mr. Bishop calls the First Amendment a
11 fundamental right.
12        You'd agree with me that the First Amendment is a
13 fundamental right.
14   A    Yes, sir.
15   Q    And all aspects of the First Amendment; correct?
16   A    Yes, sir.
17   Q    Let's go to Tab 58.  I'm going to call that
18 Exhibit 58, please.
19        (Exhibit 58 was marked for identification.)
20 BY MR. YOUNGWOOD:
21   Q    This is September 4, 2018, City of Oxford Board
22 of Aldermen regular meeting.  If you --
23        Do you recognize these to be the minutes of that
24 meeting?
25   A    Yes, sir.

Page 44

J. EAST

1
2    Q    And again looking at the attendance list, you're
3  in attendance; correct?
4    A    Yes, sir.
5    Q    Okay.  Going to page 4, item 17, this concerns
6  the same downtown business district ordinance that we've
7  been discussing; correct?
8    A    Yes, sir.
9    Q    Okay.  And at this meeting the ordinance in its
10 revised form is approved; correct?
11   A    Yes, sir.
12   Q    Okay.  And one of the changes that was made from
13 earlier in the process to the approval was, for example, the
14 elimination of any requirement that you needed to disclose
15 the name of the artist performing at a venue; correct?
16   A    Yes, sir.
17   Q    If you could turn to Tab 59, which we'll mark as
18 Exhibit 59.
19        (Exhibit 59 was marked for identification.)
20 BY MR. YOUNGWOOD:
21   Q    And this may be --
22        If you can't answer this question, I'll
23 understand.
24        But does this appear to you, sir, to be the final
25 ordinance that was approved on that evening?

Page 45

J. EAST

1
2    A    I cannot --
3        There was literally --
4        I don't know if this is the last version.  I
5  don't know if this was the final one or not.
6    Q    Let me direct you to --
7        Again, they're not numbered, unfortunately, so
8  hold on.
9        -- the seventh page of the document that we've
10 marked as Exhibit 59.  There's a section on the bottom that
11 says "Section 14-103.  That's how you'll know where I am.
12   A    Yes, sir.
13   Q    "Restrictions for establishments operating under
14 Mississippi Code Annotated 67-1-5(m)(ii)."
15        Do you see that?
16   A    Yes.
17   Q    Under 2 it says, "Additionally, all businesses
18 covered under this section shall provide notice of events
19 scheduled.  If such event is for 150 people or more, at such
20 event venues as follows."
21        "A.  At least five days before such event, the
22 proper owner of such event vent" --
23        Let me start again.  I garbled that.
24        "At least five days before such event, the
25 property owner for such event venues must give notice of

Page 46

J. EAST

1 each event."
2
3          Do you see that?
4     A    Yes.
5     Q    Do you recall that provision being in the final
6 ordinance?
7     A    No, sir.  I'm not disagreeing that that's right.
8 I just don't --
9     Q    Well, do you remember --
10         Do you remember the ordinance having a notice
11 requirement for events of over 150?
12    A    Yes, sir.
13    Q    Okay.  And do you remember it being five days?
14    A    You know, I just can't recall.
15         I'm not saying that's not right.  I just don't
16 recall the exact numbers.
17    Q    Okay.  And if you turn to the next page, you'll
18 see that it gives the chief of police or his/her designee
19 the power to waive the five days under certain requirements?
20    A    Yes, sir.
21    Q    Okay.  What was the purpose, as you understood
22 it, of the notice requirement?
23    A    So that we could have the proper security if it
24 was a large crowd.  We would know there's a difference
25 between a wedding versus a rock concert, maintain more

Page 47

J. EAST

1 personnel to do street safety, block roads, things like
2 that.
3
4     Q    Okay.  And under --
5         So an event under 150 people did not require such
6 notice; is that right?
7     A    Yes, sir, I think that's right.
8         I'd just have to read the wording itself.  If
9 this is the original copy, then yes.
10    Q    Under number 3, same page, it gives the
11 content -- required content of the notice.
12         Do you see that?
13    A    Which number?
14    Q    Number --
15         So we're on the --
16    A    You're on B?
17    Q    I'm on -- I'm on 3 -- 3 not B, but 3.
18    A    Okay.
19    Q    Do you see, "The event notice shall include at a
20 minimum"?
21         Do you see that?
22         Okay.  It asks for property owner's name and
23 contact information.  Then it asks for the specific type or
24 types of events planned, i.e. live music, disk jockey,
25 fundraiser, wedding dance, or some combination of specific

Page 48

J. EAST

1 types of events.
2
3         Do you see that?
4     A    Yes, sir.
5     Q    Why was that information sought, the information
6 sought under 3B?
7     A    Simply for planning.
8     Q    Okay.  Did you have discretion to deny the
9 establishment's ability to hold these events for greater
10 than 150 people?
11    A    The way this reads, as the chief, I would have
12 that authority.
13    Q    Okay.  Where are you looking?
14    A    I think it says, "The chief of police and his
15 designee may waive" --
16         Oh.
17    Q    That's the notice requirement.
18    A    Okay.  I don't know if I do.  I can't see that in
19 here.
20    Q    Okay.  And the purpose of the five days' notice
21 you may have said already.  That's so that you can make sure
22 you have adequate resources to safeguard the event?
23    A    Yes.
24    Q    Okay.  But it also gives you the power, in the
25 section you just pointed me to, to reduce the five-day time;

Page 49

J. EAST

1 right?
2     A    Yes.
3     Q    And it says, "Because of unusual circumstances
4 out of the control of the applicant, it was impossible to
5 have provided notice within the time limitation," do you see
6 that?
7     A    Yes.
8     Q    What sort of circumstances would warrant less
9 than five days' notice under B1?
10    A    I don't know.  I don't know.  I don't know how to
11 answer that.
12    Q    Okay.  What if, for example, the event was to be
13 of a political -- strike that.
14         What if the event was to react to other public
15 events in society and there was an urgency in holding it in
16 less than five days?
17         Would that --
18    A    That could be why they put that in.
19         I don't -- I can't speak on it.
20    Q    Do you remember ever --
21         Let me ask that again, actually.  Strike that.
22         The next one, "Nature or conduct of the event
23 would not be dangerous or harmful to the public health,
24 safety and welfare of the residents of the city and police

Page 50

```
            J. EAST
 1
 2  department."
 3          Do you see that?
 4      A   Yes, sir.
 5      Q   And so what criteria --
 6          How would you make a decision as to whether or
 7  not an application made less than five -- strike that -- a
 8  notice made less than five days would be acceptable under
 9  provision B2?
10      A   I don't know that I can give examples of that.
11      Q   Okay.  And under B3, "The police department and
12  other city services and personnel have adequate time to
13  process the notice and plan for the event."
14          Do you see that?
15      A   Yes.
16      Q   So what factors would go into determining whether
17  or not B3 was applicable to an application made less than
18  five -- sorry I keep saying that -- to a notice made less
19  than five days prior to the event?
20      A   You know, I can only assume that this means it's
21  not going to have extra resources.  Sanitation won't be
22  needed.  We won't have to block the road.  Not extra police
23  force would be needed for security, those type things.
24      Q   And so all of these 1, 2 and 3 under B, these
25  were if you were to waive less than five days' notice;
```

Page 51

```
            J. EAST
 1
 2  right?
 3      A   Yes.
 4      Q   Okay.  Under this ordinance, if somebody gave you
 5  at least five days' notice and provided the information in
 6  number 3, the event would be permitted to go forward;
 7  correct?
 8      A   That's the way I look at it.
 9      Q   Okay.  Did you ever have occasion to consider a
10  request to waive the five days' notice when you were chief
11  of police?
12      A   Not that I recall, no.
13      Q   Did you as chief of police receive notices under
14  this provision of events for more than 150 people?
15      A   No, I can't --
16          I don't recall one way or the other on it.
17          The reason that is, I don't know if we got it
18  passed versus my leaving as chief.
19      Q   Well, the Exhibit 58 that we just looked at does
20  represent on the page we looked at, which was page 4 of
21  Exhibit 58, item 17, that the ordinance passed and that
22  it would become effective January 1, 2019.
23          Now, maybe you left shortly after for your leave
24  of absence.
25          Is that possible?
```

Page 52

```
            J. EAST
 1
 2      A   Yes, sir.  I think I left in January or February.
 3      Q   I'm sorry.  For me at least your voice was
 4  muffled on that answer.
 5      A   I'm sorry.  I can't recall that I left January or
 6  the first of February.
 7      Q   Okay.  But you supported the ordinance as it was
 8  passed; right?
 9      A   Yes, sir.
10      Q   And you therefore thought that the five days'
11  notice was an adequate amount of time to do whatever the
12  police department needed to do to prepare for an event of
13  more than 150 people?
14      A   I don't know that I agree with that because this
15  was changed numerous times.  So I don't think that was my
16  choice.  I think that was more the Board of Aldermen's
17  choice.
18      Q   Well, if we go to Exhibit 58 again, item 17 --
19      A   Can I take a break quick?
20      Q   Sorry?
21      A   Can I take a break to use the restroom real
22  quick?
23      Q   We can take a break now, or I probably have two
24  or three more questions on this document, whatever you
25  prefer.
```

Page 53

```
            J. EAST
 1
 2      A   Yeah, I'd like to take a break, and I'll come
 3  back.
 4      Q   Got it.
 5          VIDEOGRAPHER:  We're going off the record.  The
 6  time is 10:17 a.m.
 7          (Recess was taken.)
 8          VIDEOGRAPHER:  This is the start of Media
 9  Number 2.  We're now back on the record.  The time is
10  10:34 a.m.
11  BY MR. YOUNGWOOD:
12      Q   Sheriff East, if you could go back to Exhibit 58,
13  please, these are the September 4, 2018 Board of Aldermen
14  Meeting Minutes.
15      A   Yes, sir.
16      Q   Okay.  And under 17, this is where the ordinance
17  is presented.  Your name is next to the heading for the
18  item.
19          Do you see that?
20      A   No, sir, I don't --
21          We're on 59?
22      Q   No, 58.  I may have misspoke.  58.
23      A   Okay.
24      Q   Do you see your name there next to Pope Mallette?
25      A   Item 17.
```

Page 54

J. EAST

1
2    Q    Item 17, yes.
3    A    Sir, yes, sir.
4    Q    Okay.  And who is Pope Mallette?
5    A    He is counsel for City of Oxford.
6    Q    Okay.  And does the fact that your names are
7  there, does that mean in part that you and Mr. Mallette
8  presented during this portion of the meeting?
9    A    Yes, sir.  I don't remember if he did most of the
10 present or if I did.
11   Q    You didn't at the meeting, for example, speak
12 against the five-day notice requirement, did you?
13   A    No, sir.
14   Q    You didn't say that you needed more than five
15 days, for example?
16   A    No, sir.  Not at this meeting, no, sir.
17   Q    Was there a meeting where you did speak against
18 the five days?
19   A    Not that I recall.
20   Q    And if we can --
21        If we could go back to Exhibit 55, please.  We
22 looked at this.  This is this July 17, 2018 set of minutes
23 for the Board of Aldermen for the City of Oxford?
24   A    Yes, sir.
25   Q    Okay.  And if you also now keep that in mind or

Page 55

J. EAST

1
2  handy, because I'm going to go back to those minutes, 55,
3  Exhibit 55, and go on to Exhibit 56.
4        And you'll recognize this, I hope, to be a draft
5  of the ordinance we've been discussing?
6    A    Page 56?
7    Q    Okay.  So keep both of those in mind.  I'm going
8  to direct you back to 55 now, page 4 of 7, item 14.
9    A    55?
10   Q    Yeah.
11   A    Which one?
12   Q    14.
13        Item 14, page 4 of 7.
14   A    Okay.
15   Q    You again are listed under item 14, which relates
16 to the ordinance.  It's just your name there.
17        Do you see that?
18   A    Yes, sir.
19   Q    And it does look like from the text that the
20 mayor also spoke.
21        Do you see that?
22        Just at the beginning it says, "The mayor began
23 the public hearing."
24        Do you see that?
25   A    Yes, sir.

Page 56

J. EAST

1
2    Q    But I want to now have you look --
3        You'll see in 56, if you turn to the fourth page
4  of it -- I'm sorry -- sixth page of 56, you'll find
5  something that again says, "Section 14-103, as in the
6  final."
7    A    56.  Which one again?
8    Q    I think it's the sixth page of the document.
9        It says in the middle of the page, "Section
10 14-103."
11   A    Yes, sir.
12   Q    And you'll see under an Item 2 here, both 2A --
13        Well, 2A, it again refers to a five-day notice
14 period.
15        Do you see that?
16   A    Yes, sir.
17   Q    Okay.  You didn't, at the July 17th meeting that
18 are covered by the minutes that are Exhibit 55, you didn't
19 speak against that five-day notice period; correct?
20   A    No, sir, that I can recall.
21   Q    Okay.  You thought five days was an adequate
22 amount of time for the notice; correct?
23   A    I think we had compromised on things.  We went
24 through several drafts of these policies.
25        So I don't know how much it's changed from the

Page 57

J. EAST

1
2  first time presented until the final copy.  There was
3  numerous copies of it.
4    Q    Well, do you recall --
5        And again, we can look at all the drafts and
6  trace the history, but do you recall at any time telling
7  anyone that five days was not enough notice?
8    A    Not that I recall.
9    Q    Okay.  So not just --
10        I'm not asking you just about at the July 17
11 meeting.
12        I'm asking you at any point in the process of
13 presenting the ordinance and discussing it at multiple
14 meetings and getting it approved, you never told anyone that
15 you thought five days wasn't enough time?
16   A    Not that I remember.
17   Q    Okay, great.  Thank you.
18        We can move on to a different topic.
19        Sir, I --
20        Well, let me not assume anything.
21        You testified before --
22        Well, you testified in this proceeding over the
23 summer.  But excluding that, you've testified before; is
24 that right?
25        I can't hear you.  You're on mute.

Page 58

J. EAST

2    A    Yes, sir, I've testified in court.
3         This is my first deposition to give.
4    Q    Okay.  So you've testified in various police
5    matters in court, I assume?
6    A    Yes, sir.
7    Q    But never either in court or in a deposition in a
8    civil case like this?
9    A    No, sir.
10   Q    Sir, if you could turn now to Tab 1.
11   A    Yes, sir.
12   Q    So this, sir, is a document produced to us by the
13   county, and this will be Exhibit 1.  It's got Bates numbers
14   _2 to _5 produced by the county.
15        (Exhibit 1 was marked for identification.)
16   BY MR. YOUNGWOOD:
17   Q    Do you know what this is?
18   A    It appears to be guidelines and procedures
19   regulated in the use of a county facility.
20   Q    Have you seen this version of this document
21   before?
22        And you can see the dates of it at the top.  It
23   says, "Effective date April 20, 2015.  Last reviewed
24   April 20, 2015."
25   A    I don't know if I've seen this one or not.

Page 59

J. EAST

2    Q    Okay.  So this one predates your time as sheriff;
3    right?
4    A    Yes, sir.  This is --
5         Yes, sir.
6    Q    And would it -- would this have been a policy you
7    would have had familiarity when you were chief?
8    A    No, sir.
9    Q    Okay.  When you were chief, were you aware --
10   were you aware that the county had a policy regarding the
11   use of county facilities?
12   A    I don't ever remember having a conversation to --
13   I don't know.  I don't recall them having a -- me
14   knowing they had something in place.
15   Q    Okay.  If you go to Exhibit 2 now, Tab 2, which
16   we'll mark as Exhibit 2.
17        (Exhibit 2 was marked for identification.)
18   BY MR. YOUNGWOOD:
19   Q    So this again says, "Facility Use Policy" on the
20   top.  It has Bates numbers _6 through _10 on the bottom of
21   the pages.
22        It says, "FAC01" underneath that.
23        Do you know what that means?
24   A    No, sir, I do not.
25   Q    Okay.  And this one says, "Effective date

Page 60

J. EAST

2    March 4, 2019."
3         Do you see that?
4    A    Yes, sir.
5    Q    And so was this the policy that was in effect
6    when you became sheriff?
7    A    I guess so.
8    Q    Well, have you seen this --
9         I'm sorry.  I spoke over you.  I apologize.
10        Please finish your answer.
11   A    I'm not sure if this is when I was there or not.
12   I'd have to read it.
13   Q    Why don't you take a moment then, please.
14   A    This appears to be it, sir.
15   Q    Okay.  So you believe this was the policy in
16   place when you assumed the sheriff's role January 2020;
17   correct?
18   A    Yes, sir.
19   Q    Okay.  And between January of 2020 and May 24 of
20   2020, did you have any occasion where you had to consult the
21   policy?
22   A    Yes, sir.
23   Q    Okay.  Tell me about that.
24        And again, I just -- I'm not trying to pick an
25   arbitrary date.

Page 61

J. EAST

2    May 24th is the day before George Floyd was
3    killed, so that's why I picked that.  I'm just asking.
4         So did you have any occasion to consult this
5    policy prior to May 24, 2020?
6    A    Yes, sir.
7         Really about that time is probably when I looked
8    at this policy.  I looked most likely when we were notified
9    how many people would have to -- considered to get a permit
10   and the items the person could be on the grounds with.
11   Q    And what caused you to review this policy?
12   A    Right after the George Floyd incident there, we
13   had more people wanting to use the facility, so I was trying
14   to familiarize myself with it.
15   Q    Okay.  That's what I'm trying to get at.
16        So it was after Mr. Floyd's death that you
17   started to review this policy?
18   A    It was right in that time frame, yes, sir.
19   Q    Okay.  But once it --
20   A    I don't know prior to that.
21   Q    I'm sorry.  I spoke over you.  I didn't hear what
22   you said.
23   A    I said I'm not sure that we had an event prior to
24   that that called me to look at it.
25   Q    So Mr. Floyd dies on the 25th of May, and in the

Page 62

J. EAST

1  
2  days that follow, nationally there are protests and other
3  events associated with his death; right?
4      A    Yes.
5      Q    And your awareness of those events causes you to
6  look at this policy.
7          Do I follow correctly?
8      A    Yes.
9      Q    Was it national events that caused you to look at
10  this or was it events specific to Mississippi?
11      A    I would say both.
12      Q    Okay.  What events in Mississippi do you have in
13  mind that played a role in you deciding to review this
14  policy?
15      A    I believe the city had some -- had a couple of
16  protests march or public speakings.
17          I was more familiar with their process, so I
18  needed to get more familiar with the county's process.
19      Q    Okay.  Do you remember what the first event was
20  that you are thinking of?
21      A    No, sir.  I don't know exactly which one it would
22  be.
23      Q    Was it an event specific to Lafayette County or
24  Oxford, or was it an event somewhere else in Mississippi?
25      A    I don't know that events in other Mississippi --

Page 63

J. EAST

1  
2      A    I can't recall that.
3      Q    Okay.  But these would have all been events, of
4  course, after Mr. Floyd died on the 25th?
5      A    That was really what, yeah, made me look into
6  this more.
7      Q    "It" being the killing of Mr. Floyd or the events
8  that related to Mr. Floyd that followed his death?
9      A    Both.
10      Q    Okay.  And when you started --
11          So I'm going to --
12          So Mr. Floyd dies on May 25.
13          How long after his death do you think you're
14  looking at this policy?
15          Days?
16          Weeks?
17      A    I can't remember.
18      Q    Okay.  So late June, early -- I'm sorry -- late
19  May, early June?
20          Does that sound like the right time frame?
21      A    I can't remember.  I don't know exactly when it
22  was.
23      Q    Well, it wasn't as late as July; right?  It was
24  before July?
25      A    I don't know the exact date that I would look at

Page 64

J. EAST

1  
2  it.
3      Q    All you know is, it was after Mr. Floyd's death;
4  correct?
5      A    Yes, sir.  It was in that time frame, yes, sir.
6      Q    Okay.  When you --
7          Did you ask somebody for the policy?
8          How did the existence of the policy come to your
9  attention after his death?
10      A    I don't recall if it's online or I had to call
11  the county clerk to get it.  I'm not sure how I came in to
12  look at it.
13      Q    Well, did you even know there was a policy?
14          I'm trying to figure out how you knew to even ask
15  to look at it.
16      A    I would have to --
17          I don't know that.  I don't know, again, if it's
18  online.  I can't recall if it's online I looked at it or if
19  I asked Ms. Lisa to send me a copy of it.
20      Q    I'm sorry.  Who are you referring to?  I didn't
21  hear the name.
22      A    Ms. Lisa Carwyle.  She is the clerk of the --
23      Q    Okay.  And then you reviewed it by yourself, or
24  you reviewed it with other people?
25      A    Reviewed it by myself.  I'm sure I read it by

Page 65

J. EAST

1  
2  myself and then --
3      Q    I'm sorry.  I didn't hear the end of your answer.
4      A    I read it by myself.
5      Q    Okay.  And what were the comments that came to
6  mind as to things you might want to suggest a change to?
7      A    I can't recall right of offhand my first thoughts
8  on it.
9      Q    Okay.  Did you at some point discuss your
10  potential changes with someone else?
11      A    I remember e-mailing Ms. Carwyle one time.
12          I thought the keeping it open until ten o'clock
13  at night, being allowed a permit, I didn't think that was
14  appropriate.
15          Also, you get to reading where people would carry
16  flags.  They were able to carry objects with them, a post or
17  pole or stick, and I remember making comments about those.
18      Q    Give me a second, sir.  I think we may have that.
19  I think I may know the e-mail you're referring to, so just
20  let me locate it.
21          Before we refer to that, if you don't mind
22  turning to Tab 4, which we'll call Exhibit 4.
23          (Exhibit 4 was marked for identification.)
24  BY MR. YOUNGWOOD:
25      Q    This is an exchange between you and Ana Martinez

Page 66

J. EAST

1    J. EAST
2    of the Oxford Eagle.
3        A    Okay.
4        Q    So let's --
5            Tell me when you're ready, and please let me know
6    if you can recognize this is an exchange between you and
7    Ms. Martinez.
8            Yes?
9        A    This is where she sent me an e-mail, yes, sir.
10       Q    Okay.  And did you know her prior to this
11   exchange?
12       A    No, sir, I don't think so.
13       Q    Okay.  On June 3 at 9:57 a.m. she writes to you,
14   "I was told" -- I'm sorry.
15           She says, "Sheriff East, I was told that you were
16   the guy to talk to in regards to the barricaded statue and
17   why no one is allowed on the courthouse grounds after 5 p.m.
18   I was wondering why that was and what the plans were.  If
19   you can answer these questions for me, that would be great.
20   I can be reached at this e-mail or phone," and she gives her
21   phone number.
22           You respond, "I'm sorry about not being able to
23   take your call.  I can talk now if you're free."
24           Do you see that?
25           It's dead middle of the page at 10:55 you write

Page 67

J. EAST

1    J. EAST
2    her that.
3        A    Oh, yes, sir.
4        Q    Okay.  Did you connect with her on that day?
5        A    I can't remember.
6            I talked to her --
7            I've talked to her.  I don't remember if I talked
8    to her that day or not.
9        Q    Okay.  Do you see that she references in her
10   e-mails a barricade of the statue?
11           Do you understand that to be the confederate
12   statue that is to the south of the courthouse in the
13   pictures that we looked at earlier?
14       A    Yes, sir.
15       Q    There's --
16           There are other statues in the Oxford area;
17   right?
18       A    Yes, sir.  The university has one.
19       Q    The university also has a confederate statue;
20   right?
21       A    Yes, sir.
22       Q    But you understood this exchange to be about --
23           Let's just, so there's no record confusion, if
24   you'd turn perhaps to tab 37.
25       A    Okay.

Page 68

J. EAST

1    J. EAST
2        Q    Tab 37, which we'll mark Exhibit 37, that's the
3    statue that you believe her to be referencing; right?
4        A    Yes, sir.
5        Q    Back to Exhibit 4, Tab 4, do you know what she's
6    referring to when she refers to the statue being barricaded?
7        A    Yes, sir.  I had the statue barricaded.  And at
8    times during their short brief period at the courthouse, I
9    would walk the courthouse grounds off after court had done
10   its business.
11       Q    Okay.  I don't know that I have a picture of the
12   barricade or the courthouse grounds being blocked off.
13           Could you, perhaps starting with the statue,
14   describe what do you mean by barricading the statue?
15           How do you --
16           How do you barricade it?  It's sort of in the
17   middle of the square.
18       A    The concrete that's around it, we placed kind of
19   plastic barricades around it and cones and would use caution
20   tape to string across the entrance.
21       Q    Okay.  And what was the reason that you --
22           When did you barricade the statue?
23           This is dated --
24           Mr. Floyd died on May 25th.  The e-mail is dated
25   June 3.

Page 69

J. EAST

1    J. EAST
2            I assume it was sometime between May 25 and
3    June 3?
4        A    I don't know the exact date.
5        Q    Why did you barricade it?
6        A    We had a threat that we felt was viable to the
7    courthouse and the grounds that we felt that people were
8    going to damage the historic property up there.
9        Q    So you were worried about physical damage to the
10   statue or to the courthouse or to the grounds of the
11   courthouse?
12       A    That's correct, the courthouse property.
13       Q    Where did that threat come from?
14       A    I was notified -- I don't know if it was by the
15   Oxford Police Department or by the -- what agency.
16           I feel like it was the police department, and
17   they had monitored some talk on social media.  This was
18   right after the university's confederate monument had been
19   vandalized, and there was an arrest.
20           We had got information that there were people
21   that were going to come and vandalize the courthouse.
22       Q    And was the decision to barricade, is that --
23   that's your decision, or is there some other official who
24   made that decision?
25       A    No, sir.  That would have been my decision.

Page 70

J. EAST

1
2    Q    Okay.  Did you also station deputies around the
3  monument or at the courthouse?
4    A    And during that week or whatever the time frame
5  was, I would have deputies to monitor that some -- for the
6  courthouse to stay out.
7    Q    And you said you also did something to block off
8  the courthouse as well?
9    A    Caution tape so no one could --
10        It was a reminder that the courthouse was closed
11  and no people coming on the grounds during that time.
12    Q    Okay.  So like a plastic-type tape that we're all
13  familiar with, something like that?
14    A    Yes, sir.
15    Q    And where did you put that?
16        Between the spaces in the fence that we looked at
17  earlier in that set of exhibits?
18    A    Yes, sir.
19    Q    And did you put it at each of the openings?
20    A    Yes, sir.
21    Q    And do you remember what date you first put that
22  tape out?
23    A    No, sir.
24    Q    Okay.  For how long after you first -- strike
25  that.

Page 71

J. EAST

1
2        The barricades around the monument and the tape
3  at the openings to the courthouse, those were done at the
4  same time?
5    A    The best I remember, yes, sir.
6    Q    Okay.  And after Mr. Floyd's death; correct?
7    A    Yes, sir.  It would have been after Mr. Floyd's
8  death, yes, sir.
9    Q    Okay.  Does seeing this e-mail exchange in any
10  way allow you to better place when you first started looking
11  at the Facility Use Policy?
12        Would it have been right around the time of these
13  e-mails with Ms. Martinez?
14        Earlier?
15        Later?
16    A    No, sir, I don't recall the date.
17    Q    Again, you've referenced an e-mail, and I'm going
18  to show you that in a bit.  Maybe that will help too.
19        She asks you then some questions on the top of
20  the e-mail?
21    A    Yes.
22    Q    Did you --
23        I don't have an e-mail where you respond to them.
24        Do you believe that you responded to them by
25  phone, or did you never respond to them?

Page 72

J. EAST

1
2    A    I advised her that we could talk.
3        I think we kind of missed each other back and
4  forth, and we did --
5        The best I remember, we did have a conversation.
6  I'm not sure if it was over this or not.
7    Q    Okay.  Let me go through the questions and see if
8  you can recall any answers you ultimately gave to her.
9        She says, "Why is the statue being barricaded?"
10        Did you give her an answer to that question?
11    A    If I talked to her and if she asked me this, I'm
12  sure I did.  I just don't remember.  I just can't recall
13  whether or not we talked about this incident or not.
14    Q    Okay.  And she says, "Is it a result of the
15  vandalism of the statue on campus?"
16        Do you see that?
17    A    Yes, sir.
18    Q    And it seems to me from your prior answer that
19  that was part of the reason for barricading the statue; is
20  that right?
21    A    No.
22    Q    No?  Okay.
23        What was the reason for barricading the statue?
24    A    We had threats against the county property up
25  there.

Page 73

J. EAST

1
2        Just because someone vandalized the university
3  did not make me make my decision.
4    Q    Do you have any written record of these threats?
5    A    Not with me.
6    Q    But if we asked you, you might be able to look
7  and find them?
8    A    I would have to go and check.
9    Q    Okay.
10    A    The police department would have all that.
11    Q    I'm not asking you to do homework during the
12  deposition.  We'll follow up with it if it makes sense to do
13  so.
14    A    That would be good.
15    Q    You were asked, "What does the barricade
16  accomplish?"
17        Your answer is, it was to protect the statue?
18    A    I don't know that I answered that question.
19    Q    Well, what is the answer?
20    A    Yes, it would be to protect the courthouse
21  grounds.  That was the purpose.
22        Limited manpower.  Limited resources.  That was a
23  way to help provide security against those threats that were
24  made.
25    Q    Then you're asked, "Why can't anyone be on the

Page 74

J. EAST

1  J. EAST
2  courthouse grounds after 5 p.m.?"
3        Did you answer that question?
4    A   I don't recall whether I did or not.
5    Q   Well, what is the answer?
6        What answer would you have given at the time?
7    A   My answer would be strictly manpower.  The
8  courthouse is closed at that time.  We had a viable threat.
9  So there was no -- we felt it was best for us, with our
10 resources, if we just kind of -- we shut it.
11   Q   How long did you keep the tape up at the
12 entrances to the courthouse, the gated entrances?
13   A   I can't recall the exact number.  It was several
14 days, two, three days.
15   Q   Okay.  Why did you then take the tape down?
16   A   Because then we --
17       We took the tape down because it was causing --
18 kind of noticeable, so we took that down.  It had enough
19 time pass, and then we would place officers up there.
20   Q   You placed officers up there how many hours of
21 the day?
22   A   It was mainly in the afternoon when the
23 businesses were closed they were asked to give extra patrol.
24 Some would park there.  Some would stay inside the building
25 to just make sure we had a good presence so that maybe it

Page 75

J. EAST

1  J. EAST
2  would cause people who wanted to do damage to the courthouse
3  and the lawn or statue, whatever, it would discourage them
4  from that.
5    Q   Okay.  Are they --
6        It's now December 18.  So do you still have
7  officers performing those duties at the courthouse?
8    A   No, sir.  That was a very short time that we did
9  that.
10   Q   So I could have asked it --
11       I should have asked it that way.
12       How long did you keep the officers doing that?
13   A   I don't have the exact number.
14   Q   Okay.  But days, weeks?
15   A   Several days, yes, sir.
16   Q   Several days, not weeks, okay.
17       If you'd just go to the second page of this
18 Exhibit 4, like e-mail chains tend to do, they go off, and
19 there end up being multiple versions.
20       There's an e-mail from her that says, "She sent a
21 few."
22       Do you know what that means?
23   A   No.  I'm assuming that --
24       Well, I called her back.  I guess I tried to talk
25 to her because it says, "I'm sorry about not being able to

Page 76

J. EAST

1  J. EAST
2  take your call.  I can talk now."
3        Oh, that was from me.
4        I don't know what that meant.
5    Q   I don't know what it means either.
6        If you could turn to the next tab, Exhibit 5,
7  please.
8        (Exhibit 5 was marked for identification.)
9  BY MR. YOUNGWOOD:
10   Q   And take a look at this e-mail from Ms. -- you
11 pronounce it Carwyle?
12       I hope I'm pronouncing it right.
13   A   Yes, sir.
14   Q   To you on June 9, 10:40 a.m.  It's Bates number
15 _241 to _242, and the second page appears to be a permit
16 application.
17       Take a moment to look at it.  I'm going to ask
18 you about your involvement in that.
19   A   Okay.
20   Q   So permit applications would come to your
21 attention; is that correct?
22   A   Yes, sir.
23   Q   And this --
24       This is before the Facility Use Policy ends up
25 being amended.

Page 77

J. EAST

1  J. EAST
2        And in fact, if you look in the attachment line,
3  although we don't seem to have all the attachments produced
4  to us, you'll see that one attachment is the George Johnson
5  7/19/20 facility permit, and the second one says Lafayette
6  County Facility Use Policy 3/4/19, which matches the date on
7  Exhibit 2 that you looked at.
8        Do you see that?
9    A   Yes, sir.
10   Q   So Ms. Carwyle sends you this, permit
11 applications.
12       What are your considerations in deciding whether
13 or not to grant it at this time?
14   A   I don't have the authority to grant or deny the
15 permit.
16   Q   Okay.
17   A   I look at --
18       Myself or a staff member would reach out to
19 whoever applied for a permit to find out who would be in
20 attendance, that type of stuff, if they felt like they
21 needed extra security, those type things.
22   Q   And so your understanding is, it's Ms. Carwyle
23 who has the authority to deny it or not?
24   A   That's correct.
25   Q   Okay.  And when you're looking at it, what input

Page 78

J. EAST

1
2 are you trying to give?
3     A     Basically can we provide a safe environment for
4 that.
5     Q     Okay.  And how long does it take you to provide
6 that assessment when you get a permit request?
7     A     Depends on a lot of variables.
8           Am I able to contact that person or my staff when
9 they're available to us, you know.  We try to do it within a
10 couple of days of her giving it to us.
11    Q     So generally you can do it within a couple days,
12 meaning two days, three days?
13    A     Yes, sir.
14          Just all that will depend on our ability to call
15 that person and their availability to accept the call.  It
16 could be that day, or it could be three days.
17    Q     So is it the case, sir, that every time somebody
18 applies for a permit, you personally or someone under your
19 command will make a contact with the permit applicant?
20    A     I'm not going to say it's every time, but we try
21 to do that if we feel we need to.
22    Q     So what sort of things in a permit would cause
23 you to believe you needed to reach out and get more
24 information?
25    A     I don't understand why they're using it.  This

Page 79

J. EAST

1
2 says a vigil -- vigil.  So we would reach out to ask what
3 that -- what that meant, how many people would be there,
4 whether they needed extra protection, was it safe, those
5 type things.
6     Q     If you turn to page -- I'm sorry -- tab 6, which
7 we'll mark as Exhibit 6.
8           (Exhibit 6 was marked for identification.)
9 BY MR. YOUNGWOOD:
10    Q     This appears to be a granted version of the same
11 permit?
12    A     Yes, sir.
13    Q     Somebody's written ten people on it.
14          Do you know where that number comes from?
15    A     No, I don't.  I can only assume that, when
16 contacted, George Johnson said that he would have no more
17 than ten people there to attend this.
18    Q     Okay.  And the start time, if I read correctly,
19 it's says 9 p.m.?  Is that how you read it, 9p?
20    A     Yes, sir, that's what I would think.
21    Q     Okay.  So this was going to be a one-hour
22 nighttime vigil for 10 people at 9 p.m. on July 19, 2020?
23    A     That's the way I read it, yes, sir.
24    Q     And you had no objection to this permit being
25 issued; correct?

Page 80

J. EAST

1
2     A     On the security, that we were able to provide a
3 safe environment.
4     Q     I'm sorry.  Say that again, please, sir.  It got
5 a little garbled.
6     A     Security purpose, I felt that that we could
7 provide a safe environment.  We had no other activities
8 going on that we knew of at the time.
9     Q     Was it the nature of the event as well, a vigil,
10 that gave you comfort as well?
11    A     No, it didn't give me comfort or discomfort.
12 Just I think they could provide a safe environment.
13    Q     But you did think that you could provide a safe
14 environment for this event at 9 p.m. at night?
15    A     Yes.
16    Q     Or you wouldn't have -- you would have objected
17 to the grant of the permit; right?
18    A     I would have stated otherwise that we didn't feel
19 that we could provide enough security, yes, sir.
20    Q     Okay.  If you turn to the --
21          Actually, turn to Tab 22, please, which we'll
22 mark as Exhibit 22, Bates number _296 to _302.
23          (Exhibit 22 was marked for identification.)
24 BY MR. YOUNGWOOD:
25    Q     You had mentioned that there was a point where

Page 81

J. EAST

1
2 you looked at the policy and, among other things, you -- you
3 looked at something regarding poles and other things.
4           I'm trying to ask you, is this the exchange --
5 and there are other e-mails related to this -- where you
6 think you did that?
7     A     We're on 22?
8     Q     22, yeah.
9           And there's a document attached to it that has
10 some comments that I'm going to ask you appear to be from
11 you, but you'll have to tell me that.
12          Do you have this in front of you?
13    A     I'm on 22, yes, sir.
14    Q     Okay.  So you write to Mr. Mills and Mr. Wilburn,
15 "Here is the use policy and permit for the courthouse.  As I
16 read it, they are allowed to carry flags on some type of
17 pole, but not any type of sign that's attached to a stick or
18 pole.  Read over if you'd like.  I also made some notes so I
19 can try to get changed by the BOS and attorney."
20          BOS is Board of Supervisors; correct?
21    A     Yes, sir.
22    Q     So the attachment, there are a few comments in
23 the margin where it says "JE1."
24          I assume "JE" is you?
25    A     Yes, sir.

Page 82

J. EAST

1
2    Q    Okay.  And when you testified maybe 15 minutes
3  ago that you thought there was a time that you first looked
4  at the policy, is this when you first looked at the policy,
5  or do you think you looked at it earlier?
6        And I don't mean to trick you in any way, sir.
7  I'm going to show you a Board of Supervisors approval of
8  changes in the policy that actually predate this e-mail
9  exchange.
10    A    Yes, sir.
11    Q    So was it on June 30 that you're first looking at
12  the policy, or do you think you looked at it earlier?
13    A    I can't recall.  Definitely I looked at it on
14  this particular day, but I would assume I looked at it
15  earlier also.
16    Q    Okay.  We'll come back to 22.  Let's move back,
17  because I'm trying to do this chronologically, to 7.
18        So Tab 7, which we'll mark as Exhibit 7.
19        (Exhibit 7 was marked for identification.)
20  BY MR. YOUNGWOOD:
21    Q    Once you have that in front of me, if you could
22  confirm for me, sir, that you recognize this as an order
23  from the Board of Supervisors amending the Facility Use
24  Policy regarding the use of the courthouse grounds.
25        Is that what you recognize it to be?

Page 83

J. EAST

1
2    A    Yes.  This is where they amended the Facility Use
3  Policy.
4    Q    Okay.  Do you believe you had reviewed the
5  Facility Use Policy prior to this meeting on the 5th -- 15th
6  of June, 2020?
7    A    I don't know the exact date.
8    Q    Okay.  Did you attend this meeting?
9    A    I don't know.
10        I'm confident I did, but I'm not positive.
11    Q    Okay.  Had you discussed the Facility Use Policy
12  with any of the supervisors prior to the meeting?
13    A    I don't recall.
14    Q    One of the changes put through by this amendment
15  is that if five or more people -- it says, "Five or more
16  people gathering require a permit for use."
17        Do you see that?
18    A    Yes.
19    Q    And that had not been the requirement previously?
20    A    Correct.
21    Q    Did you have any input into that addition to the
22  policy?
23    A    I don't --
24        I don't know that my input.  I spoke to the
25  county attorney about this.

Page 84

J. EAST

1
2    Q    What was that conversation?
3        MR. YOUNGWOOD:  Mr. O'Donnell, I don't want to
4  solicit something that you're going to instruct him not
5  to answer.  I'm not trying to --
6        MR. O'DONNELL:  I appreciate that, John.  That
7  would be attorney-client communication.
8        If you ask specifically what was said, yes, I
9  would instruct the witness not to answer that question.
10  BY MR. YOUNGWOOD:
11    Q    Okay.  Let me try the subject matter, which I may
12  have already --
13        Without telling me the exact back-and-forth,
14  Sheriff, you discussed the change to require a permit
15  application for more than a five-member group with the
16  county attorney?
17    A    Correct.
18    Q    And there's another change in here that requires
19  that applications be submitted at least 30 days in advance.
20        Is that another subject you discussed with the
21  county attorney?
22    A    I can't recall.  I don't remember.
23    Q    Okay.  Did you discuss either the five-person
24  requirement or the 30-day advanced request requirement with
25  anyone else prior to this meeting?

Page 85

J. EAST

1
2    A    I don't recall.
3    Q    Okay.  Without telling me what the county
4  attorney said to you, did you support the insertion into the
5  policy of the requirement that any gathering of more than
6  five people requires a permit?
7    A    I don't know that I supported it or not.
8        I would have liked to have clarity is more that I
9  talked to the county attorney about.
10    Q    I don't want -- I don't want you to tell me what
11  you talked to the county attorney about.
12        I'm asking what your view was, not what he said
13  to you or you said to him.
14    A    Well, then I don't know how to answer that.
15    Q    I'm asking, sir, actually like what's in your
16  head, not what advice you sought or --
17        Let me ask, as of --
18        Let me try to do it this way:  As of June 15,
19  2020, when this was adopted, did you believe it was
20  important for the rule to be adopted to require the permit
21  for five or more people?
22    A    I felt like we needed clarity in there because I
23  think the original said the one person standing had have a
24  permit.
25    Q    And I don't know about today.  Again, I know it's

J. EAST

1    winter, and there's COVID.

3            But any typical point in time at 11:23 in the
4    afternoon, if you walked onto the county courthouse grounds,
5    wouldn't you see -- it would not be surprising to see five
6    people together on those grounds; correct?
7        A    I don't know.
8        Q    It wouldn't be unheard of that there would be
9    five people together on the courthouse grounds?
10       A    I mean, when there's court, there's business
11   there.  So, you know, we had an election there.  I'm not
12   surprised if five people would be there.
13       Q    Okay.  So in your view, what was the purpose of
14   the insertion of the five people gathering requirement?
15       A    Again, that goes back to I think the original
16   permitting process.  If someone was to be there to protest,
17   to gather, to have a demonstration, one person had to have a
18   permit.
19       Q    Okay.  Well, do you think it's necessary, sir, to
20   have a permitting process if six people want to gather on
21   the courthouse grounds for purposes of a protest?
22       A    I think it's important that the county has a
23   permitting process.  What that looks like is really up to
24   that government.
25            I think they need a process, otherwise we have no

J. EAST

1    way to know what's going on there.
2        Q    Okay.  What if six people want to gather for
3    lunch?  Do they need a permit?
4        A    I don't know.  That's really up to the policy
5    here.
6        Q    Well, you are consulted when the applications
7    come in.
8            In your view, would six people gathering for
9    lunch require approval under the policy?
10       A    Apparently, if they were going to do an organized
11   lunch meeting, they would need a policy.
12       Q    A permit you mean?
13       A    I would think so, yes.
14       Q    Does that make sense to you, sir?
15       A    I try to not make sense out of rules and
16   regulations the government put in place years ago.
17       Q    Okay.
18       A    I follow them.
19       Q    Well, this isn't years ago.  This was the summer
20   when you were sheriff.
21       A    Yes, sir.
22       Q    So do you think it makes sense to require a
23   permit if five or more people want to gather on the
24   courthouse grounds?

J. EAST

2        A    Apparently the Board of Supervisors thought that.
3        Q    I'm asking your view.
4        A    If it's an organized meeting to do something,
5    according to the rules, I think they have to have a permit.
6        Q    I'm asking, sir, not how you read the rules now.
7            I'm asking if you agree with the rules.
8            Do you think that's a sensible policy to require
9    a permit if five or more people want to gather on the
10   courthouse grounds?
11       A    My personal opinion I think I don't have on this.
12   I just follow the rules in place.
13       Q    Do you think five or more people gathering on the
14   courthouse grounds poses a safety risk to the County of
15   Lafayette?
16       A    I think that it could, yes.
17       Q    So how would you assess whether a request for
18   five people to gather on the courthouse grounds poses a
19   safety risk?
20            How would you assess an individual application?
21       A    Again, we would call them, find out how many
22   people would be there, those type things, and go forward.
23            We usually --
24            Is it a circus?  Are they going to be juggling
25   cannon balls that will fall off and hit somebody walking by.

J. EAST

2            There are things we'd have to find out.
3        Q    What criteria would you use to assess the
4    information you were given?
5        A    We would just -- to find out, with the
6    information they gave us, is it going to be a safety risk?
7    Would it be a hazard to a pedestrian?  If they're juggling
8    cannon balls, are they going to draw a crowd that we'd have
9    to have people spread out in the street?
10           It's just a variety of things.  I don't know that
11   I can --
12       Q    Would a prayer vigil pose less of a safety risk
13   than a political protest?
14       A    I don't know.
15       Q    Do you have any criteria on which you would make
16   the determination on whether a prayer vigil would pose less
17   of a safety risk than a political protest?
18       A    No, sir.
19       Q    And does the --
20           Would --
21           If somebody said they were going to do a
22   political protest, would you ask them what the subject
23   matter of that protest was?
24           THE WITNESS:  Can we take a break just a second?
25           MR. YOUNGWOOD:  Yes.

Page 90

```
            J. EAST
 1
 2          Should we go off the record and take a 10-minute
 3  break?
 4          I don't know what the sheriff needs.
 5          VIDEOGRAPHER:  Mr. Youngwood, are we going off
 6  the record?
 7          MR. YOUNGWOOD:  I don't know what we're doing.  I
 8  think there's a question pending too.  We can't hear
 9  you.
10          David, I don't know if you're trying to talk to
11  all of us, but we can't hear you.
12          Is the video still running?
13          VIDEOGRAPHER:  Yes, sir.
14          MR. YOUNGWOOD:  Let it run.  Let the record
15  reflect the witness and counsel have left the room with
16  a question pending.
17          MR. O'DONNELL:  Hello?
18          MR. YOUNGWOOD:  There's an echo, but we can hear
19  you.
20          MR. O'DONNELL:  Yeah, I've been in the conference
21  room.  He went to use the restroom.
22          MR. YOUNGWOOD:  Let's go off the record until the
23  witness comes back.  Should we come back in five
24  minutes, ten minutes?
25          What do you think?
```

Page 91

```
            J. EAST
 1
 2          MR. O'DONNELL:  He's coming back now.
 3          MR. YOUNGWOOD:  Okay.
 4          VIDEOGRAPHER:  Mr. Youngwood, you've got about
 5  another 15 minutes, then I'm going to have to change
 6  the tape.
 7          MR. YOUNGWOOD:  That's fine.  We'll take a break
 8  then.
 9          VIDEOGRAPHER:  Okay.  We're going off the
10  record --
11          MR. YOUNGWOOD:  No, no.  I think the witness is
12  back.  Is the witness back?
13          Okay.  Sheriff, I think when we took the break
14  there was a question I think pending that you hadn't
15  answered.
16          Maybe I'll ask the court reporter to read it back
17  because I won't get it exactly the same.
18          (Last question was read back.)
19  BY MR. YOUNGWOOD:
20      Q    That's the question.
21      A    That's a question for me?  I thought she was --
22          Can you read it --
23      Q    She can read it again.
24      A    We're content neutral.  I'm sure that most of the
25  time it's on the application what that would be.
```

Page 92

```
            J. EAST
 1
 2      Q    Okay.  So your read is that the application would
 3  allow them to tell you what the subject matter of the
 4  protest would be?
 5      A    Most of them that I've read, they usually write
 6  something over there what it's about.
 7      Q    Okay.  And in fact, the form itself says,
 8  "Explanation of Use," correct?
 9      A    Yes, sir.
10      Q    So if I wanted to protest in favor of keeping the
11  confederate statue, I'd write in "Explanation of Use:
12  Protest to support confederate statue" or something like
13  that?
14      A    I'm assuming, yes, sir.
15      Q    Okay.  And you said, sir, you're content neutral,
16  but how about the --
17          How do you determine if it's a protest?
18      A    I don't know that we do.
19          What we're looking at is security measures.  So
20  whatever they're protesting, whatever they want the permit
21  for doesn't get involved.
22          We're looking at security purposes only, get with
23  other agencies to see how we can handle that situation.
24      Q    And for example, sir, if I wanted to have a
25  gathering to welcome spring, you know, on March 21, do you
```

Page 93

```
            J. EAST
 1
 2  see that as less of a security risk than if I wanted to have
 3  a gathering to support the continued placement of the
 4  confederate statue in the town square?
 5      A    Sir, what we would do is call you to find out how
 6  many people would be there, how many you foresee, do you see
 7  people stopping, coming in.  Is there going to be traffic
 8  issues?
 9          It's all going to be based around security and
10  what your needs are in having an event and what our needs
11  are to meet that.
12      Q    Okay.  And in doing that you use your discretion
13  to make the judgment regarding security; correct?
14      A    Well, my discretion, our discretion, our personal
15  -- I mean professional opinions of what that is, what risk
16  it could be, if any, what type of security needs you might
17  need to be there.
18      Q    And where in the policy can I find a reference to
19  your need to assess security in deciding whether or not --
20  or in giving input to the county in deciding whether or not
21  to grant my permit?
22      A    I don't know.  I don't have that in front of me.
23      Q    Well, it's Tab 2, Exhibit 2, unless you're aware
24  of a later version of this policy.
25      A    Quickly glancing, I would think it would be there
```

Page 94

J. EAST

1  in "Denial of Usage."
2      Q    All right.  Just so we're all looking --
3           You're looking at the bottom of page 2?
4      A    If it would pose health or safety risk.
5      Q    Okay.  But as I understand it, your input is
6  focused on whether or not your police force can -- can --
7  has enough personnel to be there for the event, which is in
8  part dependent on what else your police force is doing that
9  day; right?
10     A    On page 3 also at the bottom of security, quickly
11 glancing, it says, "Sheriff shall determine whether and to
12 what extent additional sheriff deputies are reasonably
13 necessary for the event or traffic control and public
14 safety."
15     Q    Okay.  That doesn't say that you can deny it for
16 those reasons; right?
17     A    I don't deny it, sir.  I spoke earlier that I
18 just give a reference of public safety.  I don't deny or
19 approve.
20     Q    Okay.  So --
21     A    I do not deny or approve.
22     Q    Okay.  But you are asked for your input; correct?
23     A    On public safety, yes, sir.
24     Q    Okay.  And under this section you just pointed

Page 95

J. EAST

1  to, "The user shall provide at its own expense any security
2  that the user desires in addition to security normally
3  provided by the county."
4      Q    So that says that if I apply for a permit, and I
5  think I need more security, I can pay for it and do it;
6  right?
7      A    Repeat it again.  I'm sorry.
8      Q    The first sentence says that if I --
9           Let's pretend me, I'm the permit applicant.
10     A    Sure.
11     Q    If I want to have security in addition to
12 whatever you provide, I can do that.  I can pay for it;
13 right?
14     A    Yes.  It says, "Provide your own security."
15     Q    Yes.
16     A    The next sentence empowers you to determine
17 whether and to what extent additional sheriff department
18 deputies is reasonably necessary for the event for traffic
19 control and public safety; correct?
20     A    Yes.
21     Q    And then it says you base your decision on the
22 size, location, duration and date of the event; right?
23     A    That's what it says.
24     Q    And then you say if additional law enforcement

Page 96

J. EAST

1  protection for the event is deemed necessary by the sheriff,
2  you have to inform me, the permit applicant; right?
3      A    That's what it says.
4      Q    And then it says you can bill me in advance;
5  correct?
6      A    That's what it says.
7      Q    So nothing in this paragraph, other than my
8  refusal to pay for the additional costs, empowers anyone to
9  deny my permit; right?
10     A    Yes.
11     Q    Yes, I'm correct?
12     A    It doesn't say anything about denying the permit,
13 yes.
14     Q    Okay.  And it also gives timing for payment and
15 talks about a deposit at the time of the permit; right?
16     A    Yes, sir.
17     Q    Okay.  Have you, since you've been sheriff,
18 recommended the denial of a permit for safety reasons?
19     A    I did not recommend denial.
20          I was not able to provide proper security and
21 public safety on one event.
22     Q    What was that?
23     A    Don't know the exact name of it, but it was an
24 event, a pro-confederate monument had applied for a permit,

Page 97

J. EAST

1  and Ms. Carwyle denied that because we were not able to
2  provide ample security at the event.
3      Q    Let's go back to tab 7 and ask a few questions,
4  and I think the videographer is going to need to change the
5  tape.
6           I want to ask you about the 30-day notice period.
7           Did you have view on the inclusion of the 30-day
8  notice period in the amendments made on the 15th of June,
9  2020?
10     A    I don't recall.
11     Q    Did you, as of June 15, 2020, believe that 30-day
12 notice was required?
13     A    That no 30 days were required?
14     Q    Did you believe that it was sound policy to
15 require applications to be made 30 days in advance?
16     A    I think it is sound policy, but 30 days is a long
17 time.
18     Q    30 days is generally not necessary; correct?
19     A    It's a long time.
20     Q    Okay.  And the policy is subsequently amended to
21 reduce the 30 days to 14 days.
22          Do you recall that?
23     A    Yes, sir.
24     Q    We can quickly --

Page 98

```
1                    J. EAST
2           If you'd turn to Tab 29, which we'll mark as
3   Exhibit 29.
4           (Exhibit 29 was marked for identification.)
5   BY MR. YOUNGWOOD:
6       Q    Do you recognize this order to include a
7   requirement of application to be made 14 days prior to the
8   date of proposed use and requiring closure of courthouse
9   grounds 30 minutes before dusk approved by the Board of
10  Supervisors on the 20th day of July, 2020?
11      A    Yes.
12      Q    And we'll mark this as --
13           This is marked as Exhibit 29.
14           Were you at this meeting, sir?
15      A    I don't recall, sir.
16      Q    Okay.  We're going to come back to the dusk
17  portion of it after we change the tape.
18           Do you see now the notice is required or the
19  application is required to be made 14 days prior to the date
20  of proposed use?
21      A    Yes, sir.  14 days, yes, sir.
22      Q    That's also a long time; right?
23      A    I think that's about appropriate.
24      Q    Well, you earlier testified that you could --
25           Assuming that the person returned your phone call
```

Page 99

```
1                    J. EAST
2   if you had a question, you could make your recommendation at
3   least within two to three days; right?
4       A    I could look at security measures, yes, sir.
5       Q    Okay.  You wouldn't need more than two to three
6   days; right?
7       A    To find out about security?
8            I'm not following what you're asking.
9       Q    To make your security determination, you wouldn't
10  need more than two to three days to consider a permit;
11  correct?
12      A    If I have 14 days' notice, I can see whatever
13  else is out there.
14           If everybody has two or three days, then I'm not
15  able to juggle multiple events at one time.  I won't have
16  processing to let me know what's going on.
17      Q    Okay.  Do you understand this 14-day period
18  advance notice to be waiveable by you?
19      A    No, sir.
20      Q    You don't think you have any discretion to waive
21  it?
22      A    No, sir, because I don't have discretion to
23  approve it.
24      Q    Well, if you go back to Tab 7, Exhibit 7, which
25  is the June 15 amendment --
```

Page 100

```
1                    J. EAST
2       A    Yes, sir.
3       Q    -- you'll see on the bottom where it discusses --
4   not the bottom, but before the names, middle of the page --
5   where it discusses the 30-day period.
6            It says, "The Board of Supervisors and/or the
7   sheriff shall determine whether to waive the 30-day period."
8            Do you see that?
9       A    Yes, sir.
10      Q    But in Tab 29, Exhibit 29, there's no provision
11  for waiver of the period, is there?
12      A    I don't see it in there, no, sir.
13      Q    Okay.  Do you know why the provision to shorten
14  the period was eliminated when the application time
15  requirement was reduced from 30 to 14 days?
16      A    No, sir.
17           MR. YOUNGWOOD:  Okay.  If we have to change the
18  tape, we can -- we can do that and go off the record
19  right now.
20           VIDEOGRAPHER:  We're going off the record.  The
21  time is 11:46 a.m.
22           (Recess was taken.)
23           VIDEOGRAPHER:  This is the start of Media
24  Number 3.  We're now back on the record.  The time is
25  11:57 a.m.
```

Page 101

```
1                    J. EAST
2   BY MR. YOUNGWOOD:
3       Q    Okay.  Sheriff, I want to take a step back into
4   some of the testimony very quickly.
5            When you were police chief, did you have anything
6   to do with installing cameras in the square?
7       A    Explain.
8            What do you mean?
9       Q    I'll ask it --
10           Are there security cameras in the square that the
11  City of Oxford has access to?
12      A    Yes, sir, there are.
13      Q    Do you know when those were put up?
14      A    No, sir, I don't.
15           That was more the emergency manager,
16  Mr. Allgood's specialty.
17      Q    Were they put up while you were chief?
18      A    Some were, yes, sir.
19           I don't recall if they were there before I became
20  chief or after.
21      Q    Do you know how many cameras there are?
22      A    No, sir.
23      Q    Does the county have access to those cameras if
24  it needs it?
25      A    Not live.  If something was to take place, we can
```

Page 102

J. EAST

1  go and request to see if they have a camera angle of it,
2  that type stuff, but we can't view it live.
3  Q    Okay.  And then while you were chief, am I
4  correct that there was a practice of having mounted officers
5  patrol the square?
6  A    Yes, sir.
7       That originally started under Chief Martin.
8  Q    Okay.  When was that?
9  A    A couple years before I became chief.  I don't
10 know the exact.
11 Q    Okay.  And while you were chief, how many mounted
12 officers would there be?
13      What would their schedule be?
14 A    I don't --
15      I don't know the exact number, and it would vary
16 depending on events that were going on in town, whether
17 there was an Ole Miss basketball game, football game,
18 double-decker, those type things.  It would all vary.
19      MR. YOUNGWOOD:  Okay.  Lily, did we end up doing
20 anything with the press release that would go with
21 Tab 9?
22      Is there a way -- has that been distributed to
23 Mr. O'Donnell, or no?
24      MS. CRON:  I can drop it into the chat right now.
25

Page 103

J. EAST

1      MR. YOUNGWOOD:  Yeah, but I don't know if that
2  means the sheriff can see it.  I don't mean to make
3  this complicated.
4      MR. O'DONNELL:  John, do you want to send that by
5  e-mail?
6      MR. YOUNGWOOD:  Yeah.  It's two pages.  Maybe we
7  can do that and just print it out quickly.
8      MS. CRON:  Let me do that right now.
9      MR. YOUNGWOOD:  That will take just a minute.
10     Did you just drop it --
11     Lily, can you just flip it to me too?  I know you
12 sent it earlier, but I don't have it.
13     (Discussion was held off the record.)
14     (Exhibit 9 was marked for identification.)
15 BY MR. YOUNGWOOD:
16 Q    Before we look at what you were just handed, I
17 want to have you look at Tab 9, which we'll mark as
18 Exhibit 9.  It's a one-page document Bates number _1354.
19 It's a June 15th e-mail from Ms. Carwyle to you and others.
20     Do you have that in front of you, Tab 9,
21 Exhibit 9?
22 A    Yes, sir.
23 Q    Okay.  So you received this e-mail, correct, on
24 June 15, 2020?
25

Page 104

J. EAST

1  A    Yes, sir.
2  Q    Okay.  And unfortunately the version that was
3  produced to us didn't have an attachment, but we have now
4  had printed out to you what we'll mark as Exhibit 9A, which
5  is from --
6      MR. YOUNGWOOD:  It's from the Facebook page,
7  Lily?
8      Lily, is this from the Facebook page?
9      MS. CRON:  Sorry.  Yeah, it's from Lafayette
10 County public Facebook page.
11     (Exhibit 9A was marked for identification.)
12 BY MR. YOUNGWOOD:
13 Q    This is the final version of the press release.
14 I can't give you the version that was attached because I
15 don't have it.
16     Do you remember commenting on this press release
17 before it was issued?
18 A    No, sir.
19 Q    Okay.  And I want you to see there's a post on
20 the Facebook page from Ms. Minton.
21     Do you see that?
22     And she writes, "So glad to see supervisors
23 protecting our county during this time."
24     Do you see that?
25

Page 105

J. EAST

1  A    No, sir.
2      MR. O'DONNELL:  He's not following your question,
3  John.
4  BY MR. YOUNGWOOD:
5  Q    Yeah.  I'm asking you to look at Tab 9A, which
6  should be the printout Mr. O'Donnell gave to you.
7  A    Okay.
8  Q    So let me go slower.
9      Do you recognize this as the press release that
10 was issued after the Board of Supervisors voted to amend the
11 Facility Use Policy on the grounds for the 15th of June?
12 A    Yes, sir.
13 Q    Okay.  And you can see that somebody affixed to
14 the Facebook posting of Ms. Minton a comment.
15     Do you have that in front of you?
16 A    No, sir.
17     MR. O'DONNELL:  It should be -- let me see if I
18 can help.
19     MR. YOUNGWOOD:  It's probably on the second page,
20 probably on the page with less writing.
21     MR. O'DONNELL:  For some reason, John, it did not
22 print off.  Let me take another stab at it.
23     MR. YOUNGWOOD:  Okay.  Sorry.
24     THE WITNESS:  I'm ready.
25

Page 106

J. EAST

1
2  BY MR. YOUNGWOOD:
3      Q    You should have the second page of 9A, a Facebook
4  posting from Ms. Minton reacting to this change in the
5  policy, and you have that in front of you?
6      A    Yes.
7      Q    She writes, "So glad to see supervisors
8  protecting our county during this time."
9           Do you see that?
10     A    Yes.
11     Q    Did you have an understanding what she meant by
12 "this time"?
13     A    No.
14          (Exhibit 10 was marked for identification.)
15     Q    Let's move on to Tab 10, which we'll mark as
16 Exhibit 10.  It has Bates numbers _249 to _253.  This is --
17          Tell me when you're there, sir.
18     A    Okay.
19     Q    This is a June 17th e-mail from Ms. Carwyle to
20 you attaching a permit, correct, permit application?
21     A    Yes.
22     Q    And this is from, if you look at the second page,
23 somebody named Timothy Warren; correct?
24     A    Yes.
25     Q    Okay.  And I guess he affixes his driver's

Page 107

J. EAST

1
2  license to it.
3           That was one of the requirements?
4      A    I guess so.
5      Q    Okay.  And this was forwarded to you for your
6  input; correct?
7      A    Yes.
8      Q    And if you look at the application, he's
9  proposing a gathering two days after the permit application,
10 right?
11          He applies on the 17th, and he wants the event to
12 take place on the 19th; correct?
13     A    Say that again.
14     Q    The date of the proposed event is the 19th;
15 correct?
16     A    Yes, sir.
17     Q    And it's sent to you for consideration on the
18 17th; correct?
19     A    Yes, sir.
20     Q    Okay.  And did you give input as to whether or
21 not, from a safety perspective, it was okay to grant this
22 permit?
23     A    Yes, sir.  We saw no other conflicting things
24 going on, and we felt like we could provide appropriate
25 security.

Page 108

J. EAST

1
2      Q    Okay.  And the event was to take place from
3  6 p.m. to 8 p.m.; correct?
4      A    Yes.
5           No.
6           6 p.m. to 8 p.m., yes.
7      Q    Okay.  And the number of people was 30-plus;
8  correct?
9      A    Correct.
10     Q    Okay.  If you turn to page _253, it's the
11 grant -- it's the copy of the permit as approved.
12          You see the signature on the bottom of it?
13     A    Yes.
14     Q    Okay.  And it says, "Granted," correct?
15     A    Yes.
16     Q    There's an annotation that says, "Limit to less
17 than 50."
18          Do you see that?
19     A    Yes.  Yes.  Yes.  Yes.
20     Q    And then the date 6/7/20 (sic), which I take it
21 means it was actually approved the very same day it was
22 received; correct?
23     A    I don't know.
24     Q    Okay.  You don't know if that says 6/17/20, or
25 you don't know what the date means there?

Page 109

J. EAST

1
2      A    It is 6/17/20.
3           I don't know if that was the day it was approved
4  or not.  I don't know if she wrote that more than two days
5  later, if she wrote that down right or not.
6      Q    It says --
7           Do you recognize this as Ms. Carwyle's signature
8  and handwriting?
9      A    I can't recognize the handwriting right off the
10 bat.
11     Q    And it says, "Per Sheriff East" under the date.
12          Do you see that?
13     A    Yes, sir.
14     Q    Do you understand what the meaning of that was?
15     A    No, sir.
16     Q    Do you think that means that you agreed that this
17 permit should be issued?
18     A    No, sir.
19     Q    Although you had no objection to the permit being
20 issued; correct?
21     A    We could meet the security needs.
22     Q    Okay.  And you could meet those needs even though
23 the event was to take place from 6 p.m. to 8 p.m.; correct?
24     A    Yes, sir.
25     Q    Okay.  Do you know what this was an event for?

Page 110

J. EAST

1
2    A    I believe it was pro statue.
3    Q    Where does it say that on the application form?
4    A    It doesn't.
5    Q    How do you know it was pro statue?
6    A    "Statue."
7    Q    It says "statue" under "Explanation of Use,"
8    correct?
9    A    Right.
10   Q    How do you know it was pro statue?
11   A    Since that time I've spoke with Mr. Warren.
12   Q    At the time that you saw no safety concerns or
13   security concerns, did you know that it was pro statue?
14   A    Mr. Warren was contacted, which he advised us it
15   was.
16   Q    Who contacted him?
17   A    I don't remember if Chief Mills did or I did
18   myself.
19   Q    Notwithstanding it being a 60-person -- sorry,
20   strike that -- an up to 50-person event and pro statue, you
21   saw no security concerns; correct?
22   A    We had concerns.  We felt like we could control
23   it with personnel.  There were no other things going on in
24   the field.
25   Q    Let's go to the next tab.  This is going to be

Page 111

J. EAST

1
2    Exhibit 11.  So it's Bates numbers _261 to _266.
3              (Exhibit 11 was marked for identification.)
4    BY MR. YOUNGWOOD:
5    Q    If we could turn to the last page of the exhibit
6    first, you'll see this is an application as well or perhaps
7    the same -- a different version of the same document for
8    Mr. Warren for the 6/19 event.
9              Do you see that?
10   A    Yes, sir.
11   Q    This one, as opposed to the version we just
12   looked at, has a date written in on the top, 6/17/20.
13             Do you see that?
14   A    Yes, sir.
15   Q    Do you know who wrote that date in on the top?
16   A    No, I don't.
17   Q    And again, unlike the prior one, next to the
18   signature of Ms. Carwyle it does have the date 6/17/20, but
19   it does not have that notation "Per Sheriff East."
20             Do you know why one version has that and one
21   doesn't?
22   A    No, sir.
23   Q    Okay.  If you go back a page to page _265.
24   A    My pages aren't numbered.
25   Q    Bottom, very small print.

Page 112

J. EAST

1
2    A    Oh, yeah, yeah, yeah.  I gotcha.
3    Q    Okay.  This is an e-mail that Ms. Carwyle sends
4    to you and others on the 18th at 3:31 p.m., and she writes,
5    "Various people have asked by public records request for a
6    copy of the permit for Friday night.  I've sent it to them.
7    I want everyone to know that I marked the permit that less
8    than 50 people were allowed since they did not also submit a
9    million dollar liability insurance policy.  Tim Warren has
10   since called and has tried to get a policy in case more than
11   50 show up.  I know there's a lot of talk on social media
12   about it, and I wanted to give you all a heads up."
13             Do you see that?
14   A    Yes, sir.
15   Q    And then she writes, "Joey, I think we should
16   probably revisit a couple of issues about the policy
17   tomorrow after the end of our budget sessions."
18             Do you see that?
19   A    Yes, sir.
20   Q    Did you speak with her the next day at the end of
21   your budget sessions?
22   A    I don't --
23        I don't recall.
24   Q    Okay.  Do you know what issues she wanted to
25   raise regarding the policy?

Page 113

J. EAST

1
2    A    No, sir.
3    Q    Did she want to discuss whether there should be
4    changes in the policy?
5    A    I don't recall.
6    Q    Let's go to the next numbered tab, Tab 12, which
7    will be marked as Exhibit 12.
8              (Exhibit 12 was marked for identification.)
9    BY MR. YOUNGWOOD:
10   Q    Actually, I'm sorry, let's --
11        Yes, let's go to Exhibit 12.
12        What I suggest, sir, is if you actually --
13        At least the way it's in my binder, the first
14   page comes second.  I'm looking at a gmail message from a
15   Chad McLarty sent on June 18, 2020.
16             Do you see that?
17   A    Yes, sir.
18   Q    And your e-mail address is listed there, although
19   it appears perhaps to be the Oxford e-mail address.
20   A    Yeah, that's not my e-mail address.
21   Q    Did it used to be your e-mail address?
22   A    Yes, sir, when I was the chief of police.
23   Q    Do they forward e-mails still sent to that
24   address?
25   A    No, sir.

Page 114

J. EAST

1
2    Q    Okay.  Well, have you ever seen this e-mail
3 before?
4    A    I can't recall.
5    Q    Okay.  On the bottom the author writes, "Please
6 consider taking the 30-day evaluation period your rules
7 state happen for this one."
8         "So please consider taking your 30-day evaluation
9 period."
10        Do you see that?
11   A    Yes.
12   Q    The Warren permit application was approved the
13 very day it was submitted; correct?
14   A    That's what the paperwork shows.
15   Q    There was no reason to wait longer than within
16 the span of a day to give it approval; right?
17   A    I don't know that, but that's what it shows.
18   Q    Well, you didn't --
19        You didn't tell the county supervisor that you
20 needed more time to consider it; correct?
21   A    No.  We were able to have the appropriate
22 security, we felt.
23   Q    Okay.  I'm going to ask you to turn to Tab 14.
24 These are a collection, it looks like, of social media posts
25 concerning Mr. Warren.

Page 115

J. EAST

1
2        Tell me when you get there.
3    A    Yes, sir.
4        (Exhibit 14 was marked for identification.)
5 BY MR. YOUNGWOOD:
6    Q    Okay.  If you go to the third page, there's a
7 reference to you.  It says, "Tim Warren, we can ask Joey
8 East," middle --
9    A    What page?
10   Q    They don't have page numbers, unfortunately.
11        It's the third page of the document that we've --
12 that's Tab 14 and we've marked as Exhibit 14.
13   A    I see that.
14   Q    Okay.  Did you know Mr. Warren?
15   A    Yes, sir, I do.
16   Q    In what context do you know him?
17   A    He's a resident of Lafayette County, and I know
18 him previously through just years of growing up together.
19   Q    Did you go to school together?
20        Are you around the same age?
21   A    I don't know how old he is.  I just knew him when
22 I was younger.  In my teenage years I knew of him and his
23 younger brother.  I think he's older than me.  I'm not
24 exactly sure.  No, we didn't go to school together.  I was
25 at Oxford, and he was Lafayette.

Page 116

J. EAST

1
2    Q    And today do you still have contact with him?
3    A    No, sir.
4    Q    No, okay.
5        So you don't have a professional or social or
6 other relationship with him?
7    A    No, sir.
8    Q    You just --
9        You just know him because you both grew up in the
10 same geographic area together?
11   A    Correct.
12        If I seen him in the store, I'd speak to him.
13   Q    So this reference to you is not in any way a
14 personal reference or indication that you're in touch with
15 him?
16   A    No, sir.
17   Q    You said at some point I think subsequent to his
18 permit application you did speak with him.
19        Did I understand you correctly?
20   A    Yes, I spoke to him --
21        Yes, I did speak with him during this.
22   Q    At what point did you speak to him during that?
23   A    I remember --
24        I don't know specifics.
25        I remember speaking with him when it started.  He

Page 117

J. EAST

1
2 contacted me saying that it was growing larger than he
3 expected.  He expected very few people, and it grew larger.
4        And then I went to his residence to talk to him
5 about the things that are here with this African-American
6 male that was under a mousetrap, and I went to his residence
7 to speak with him about that.
8    Q    Okay.  And so --
9        Let me just try to do that a little more slowly
10 for me, sir.  You packed a lot into that answer.
11        Let me just start, when do you think you spoke
12 with him?
13        It sounds like there was a telephone call and
14 then later a meeting at his home.
15        Do I have that right?
16   A    Correct.
17   Q    So when, approximately, was the phone call?
18   A    Sometime in the process before his applying and
19 before the event was to take place.
20        I don't know the exact time, place, or day it
21 was.
22   Q    Okay.  So if it was before he was applying, that
23 would mean it's before June 17; right?
24   A    No, sir, it would not have been before that.  I
25 had not had contact with him until he applied for a permit.

Page 118

J. EAST

1
2    Q    But it was before the event, which was June 19?
3    A    Correct.
4    Q    Okay.  So sometime before June 19, but presumably
5  after the permit, so probably the 17th or 18th or early in
6  the day on the 19th?
7    A    It would have been before the 19th.
8    Q    Would it have been after the permit was approved?
9    A    Yes.
10   Q    So it's the 18th --
11        Probably the 18th, right?
12        There's only one day between the 17th and the
13 19th.
14   A    We can only assume.
15   Q    Okay.  And he calls you or you call him?
16   A    I don't recall how that went.
17   Q    Tell me what you remember of the phone call.
18   A    I remember having a conversation about how large
19 this was getting and how other people that he didn't know
20 were getting involved in it.
21   Q    "This" being his event planned for the 19th?
22   A    Yes.
23   Q    Okay.  And you were asked --
24        He was calling you to say how big and important
25 it was, or you were calling him to say, I need to know,

Page 119

J. EAST

1  because I'm the sheriff, how big this is getting.
2        I'm trying to understand why this subject is
3  coming up.
4    A    I can't remember.
5        I feel like he called me -- I mean, I'm not
6  positive -- because the event was getting more people that
7  he had no idea who were coming.  I remember him calling and
8  saying it was getting kind of out of control, like he was
9  going to get insurance and that type stuff.  It was growing.
10   Q    Then the meeting at his home, was that before or
11 after the event?
12   A    The event never happened, so it would have to be
13 before the event.
14   Q    Okay.  So the thing he gets approved for, for the
15 19th, never takes place?
16   A    Correct.
17   Q    And why didn't it take place?
18   A    Because he decided to pull his permit.
19   Q    Okay.  Do you know why he decided that?
20   A    No, sir, I can't --
21        I don't know why he decided to.
22   Q    Okay.  And then how long after that phone call do
23 you go to his home?
24   A    I don't know if it was that day or when it was.

Page 120

J. EAST

1
2    Q    Okay.  And what was the purpose of your visit?
3    A    To talk to him about his permit, to talk to him
4  about this picture that you have here in Exhibit, I guess
5  it's 14, where the African-American male is under a
6  mousetrap.
7    Q    Yep.
8    A    I went to talk to him about that and discuss
9  this -- his -- this gathering that he was getting and what I
10 had been hearing.  I had been contacted by the FBI about
11 this post, and I went to talk to him about that.  At that
12 time, when we got through, he decided he wanted to pull his
13 permit.
14   Q    Okay.  Anything else about that meeting that you
15 recall?
16   A    No, sir.
17   Q    Okay.  Let's move on.  Tab 14 (sic), which we'll
18 mark as Exhibit 15.
19        (Exhibit 15 was marked for identification.)
20 BY MR. YOUNGWOOD:
21   Q    Do you remember the application from Mr. Johnson
22 for a permit for 6/20 -- for June 27?
23   A    Yes, sir.
24   Q    Okay.  And what do you remember about that
25 permit?

Page 121

J. EAST

1
2    A    I believe this one was denied.
3    Q    Okay.  So he's asking for it for the 27th.
4        Did you have any contact with him or anyone under
5  your command have contact with him before the denial?
6    A    Yes, sir.  I don't know if --
7        I'm assuming --
8        I don't know who it was, if it was me or Chief
9  Mills.
10   Q    Okay.  And what was the nature of that
11 conversation?
12   A    You know, what event would take place, how many
13 people would be there, that type of...
14   Q    Okay.  If you look -- let's go to Tab 16.  We'll
15 mark it as Exhibit 16, Bates number _274 to _276.
16        (Exhibit 16 was marked for identification.)
17 BY MR. YOUNGWOOD:
18   Q    Tell me when you're there, sir.
19   A    I'm here.
20   Q    Look on the bottom.  There's an e-mail from you
21 to Ms. Carwyle and Mr. O'Donnell.
22   A    Okay.
23   Q    "Lisa, I've looked over the permit request from
24 George Johnson for this Saturday, June 27."
25        So that's four days in the future, right, the

Page 122

```
J. EAST
1
2    time you write this.
3         Does reviewing this e-mail refresh your
4    recollection as to why you recommended the permit be denied?
5         A    Yes, sir.
6         Q    And what were your reasons?
7         A    We had been working with them.  They had an event
8    that was taking place at the same time, and our resources
9    had been dedicated to them.
10        Q    Okay.  So you already had an event that night,
11   and your resources would be spread too thin if you granted
12   this.
13            That was the basic reason?
14        A    Yes.
15        Q    Okay.  And if you'd turn to Tab 17, there's a
16   second application for Mr. Johnson, and we'll mark this as
17   Exhibit 17.
18            (Exhibit 17 was marked for identification.)
19   BY MR. YOUNGWOOD:
20        Q    This one is granted; correct?
21        A    Yes.
22        Q    So why was --
23            The "Explanation of Use" is "Mississippi Stands."
24            Do you see that?
25        A    Yes, sir.
```

Page 123

```
J. EAST
1
2         Q    What is "Mississippi Stands"?
3         A    I don't know.
4         Q    Did you or anyone under your command reach out to
5    Mr. Johnson to understand the nature of this event?
6         A    Yes.  This was a political protest, if I remember
7    correctly, pro flag, pro monument.
8         Q    And flag, I just want to --
9            Is the flag the old flag, state flag of
10   Mississippi, or was it a different flag that we're talking
11   about?
12        A    No, it would have been --
13            That's correct.  It would have been the state
14   flag of Mississippi.
15        Q    The state flag as of summer of 2020?
16        A    Yes, sir, before it changed.
17        Q    Yeah.  My understanding is your flag is or will
18   be changing; right?
19        A    It's already changed, yes, sir.
20        Q    Okay.  So this is the old one.
21            And you didn't see for this any safety concerns
22   that prevented you from allowing this to take place?
23        A    No, sir.  This was the only event scheduled for
24   that day.  We talked to the city officers.  They would be on
25   hand to assist us, along with the university, if needed.
```

Page 124

```
J. EAST
1
2         Q    So I think I've heard this in a few of your
3    answers.
4            Is it relevant to your determination as to
5    whether or not you can safely cover an event whether or not
6    other events have first come to your attention or earlier
7    come to your attention?
8         A    There can be multiple events.  You have to take
9    into consideration what the events are, how volatile they
10   can be, whether there would be counter-protesters there.
11            There's just a variety of things we take into
12   account when doing these.
13        Q    Okay.  But if I apply before someone else
14   applies, does that increase my chances of getting the permit
15   for the same date, same event, same time sort of thing?
16        A    Yes, sir.  It could, yes, sir.  But that's why we
17   work conjointly with the city and university because they
18   may have a permit before you actually have a permit if you
19   apply with the county, and we have dedicated our resources
20   to them.
21        Q    Okay.  And so actually these are a little out of
22   order, but if you look at page 18 -- sorry, not page 18 --
23   Tab 18.
24            (Exhibit 18 was marked for identification.)
25
```

Page 125

```
J. EAST
1
2    BY MR. YOUNGWOOD:
3         Q    This is the denial of the June 27 permit.
4            In Ms. Carwyle's e-mail she talks about limited
5    manpower.
6            Do you see that?
7         A    Yes.
8         Q    Okay.  And so in denying his June 27 permit,
9    limited manpower was a factor in your decision?
10        A    Yes.
11        Q    Okay.  Let's go on to Tab 19, which will be
12   Exhibit 19.
13            (Exhibit 19 was marked for identification.)
14   BY MR. YOUNGWOOD:
15        Q    So I think, sir, this is where you start to look
16   into the question of the flags.
17            And so you write Ms. Carwyle an e-mail at
18   10:03 a.m. on June 25th saying that your office has spoken
19   with Mr. Johnson about his request for a permit on July 4,
20   2020 from 12:30 to 5:30.  You talk about how he expects 100
21   to 150 people and the subject matter of it.
22            Ms. Carwyle writes back, "I was thinking the
23   Facility Use Permit prohibited flags (or sticks), I'll
24   check."
25            And you say, "It prohibits sticks, but I'm not
```

Page 126

J. EAST

1
2    sure about flags."
3          Do you see that?
4      A    Yes.
5      Q    So what is the concern about flags or sticks?
6          What is your concern here?
7      A    Concern that someone has a large stick and is
8    able to hit someone with it.
9      Q    Okay. So the stick that's holding up -- that I'm
10   waving the flag, you could take the flag off or maybe not
11   the flag off and hit somebody with the stick; right?
12     A    Correct.
13         And if I remember reading the policy, signs could
14   not be on -- they had to be held, but flags could be on some
15   type of pole.
16         It wasn't clear, if I remember correctly.
17     Q    And so, again, policy doesn't permit me from
18   walking with a sign that says whatever I've chosen for it to
19   say?
20     A    Correct.
21     Q    If I put it on a stick, it could become a weapon?
22         That's your concern?
23     A    Correct.
24     Q    So let's go now to Tab 22, Exhibit 22, which
25   we've looked at before, and I actually want to go through

Page 127

J. EAST

1
2    your comments.
3          Actually, I'm sorry. Let's take these in order.
4          Briefly let's look at Tab 21, which we'll mark as
5    Exhibit 21.
6          (Exhibit 21 was marked for identification.)
7    BY MR. YOUNGWOOD:
8      Q    Tell me when you're ready, sir, on Tab 21.
9      A    Yes, sir. I'm ready.
10     Q    If you look at the second page, Ms. Carwyle on
11   June 25th writes you and Mr. O'Donnell an e-mail, "Can we
12   meet next week to work on some revisions of the Facility Use
13   Policy for the July 6th board meeting? I'm free Tuesday all
14   day or Thursday morning."
15         Do you see that?
16     A    Yes, sir.
17     Q    You respond on the first page, "I'm open
18   whenever."
19         And then there's further discussion about a time
20   and a place -- maybe not a place, just a time and a day.
21   And it looks like you're agreeing to meet at 10:00 a.m. on
22   June 30.
23         Do you see that?
24     A    Yes, sir.
25     Q    Did that meeting take place?

Page 128

J. EAST

1
2      A    Yes, sir.
3          MR. YOUNGWOOD: Okay. So, Mr. O'Donnell, I don't
4      want to inadvertently --
5          Are you going to claim privilege over the
6      discussion of that meeting?
7          MR. O'DONNELL: Yes.
8    BY MR. YOUNGWOOD:
9      Q    Can you tell me the subject of the meeting?
10     A    To talk about the Facility Use Policy.
11     Q    Again, if Mr. O'Donnell will permit, can you tell
12   me which aspects, without telling me what the substance was,
13   which aspects of the policy were discussed?
14         MR. YOUNGWOOD: Is that acceptable,
15     Mr. O'Donnell?
16         MR. O'DONNELL: That would be fine since there is
17     a follow-up e-mail from the sheriff on that.
18     A    The best of my memory, it's going to be involving
19   time, curfew time, a certain time, not to allow it to be
20   later. Also the pole, flags, that type -- those I think
21   were two.
22         I'm not sure what else was in there.
23   BY MR. YOUNGWOOD:
24     Q    Okay. So we'll look just momentarily at Exhibit
25   22.

Page 129

J. EAST

1
2          I actually just want to bring you back briefly to
3    the Tab 6, which was Exhibit 6. It's the approval of
4    Mr. Johnson's Anthony Hervey vigil.
5      A    Yes, sir.
6      Q    Did that --
7          Did that vigil take place?
8      A    Yes, sir.
9      Q    And do you know who Mr. Hervey --
10         Mr. Hervey is dead; is that right?
11     A    Sorry, excuse me.
12         Yes, sir.
13     Q    Do you know who he was?
14     A    Yes, sir.
15         Yes, sir, I do.
16     Q    Who is Mr. Hervey?
17     A    He was a local resident here in Oxford.
18     Q    And he had some association with confederate
19   causes; is that fair to say?
20     A    Yes, sir.
21         THE WITNESS: Can I take a break?
22         MR. YOUNGWOOD: Yeah, absolutely. Do you want to
23     take five minutes? Do you want to take longer now?
24     What do you want?
25         THE WITNESS: Why don't we do --

Page 130

J. EAST

1
2     MR. YOUNGWOOD:  That's fine, okay.
3     VIDEOGRAPHER:  We're going off the record.  The
4  time is 12:43 p.m.
5     (Recess was taken.)
6     VIDEOGRAPHER:  This is the start of Media
7  Number 4.  We're now back on the record.  The time is
8  12:48 p.m.
9     MR. YOUNGWOOD:  Could I ask, actually, that the
10  last question and answer be read back to me?  I just
11  want to make sure I know where we were.
12     (Last question and answer were read back.)
13  BY MR. YOUNGWOOD:
14     Q     And what was that association, sir?
15     A     What I know about Mr. Johnson, he's just pro
16  confederate statues, flags, that type.
17     Q     I actually was --
18     A     Hervey, I'm sorry.
19     Q     Yeah.
20     A     He was, I guess, pro -- I don't really know.
21     Mr. Hervey was a unique person, but he was
22  supportive of the flag and the statue, the best I recall.
23     Q     Okay.  He died from some accident; am I correct?
24     A     Yes, sir.  He was in a car accident.
25     Q     Okay.  And when was that accident?

Page 131

J. EAST

1
2     When did he pass away?
3     A     I don't remember.  I just --
4     I don't remember the date it was.
5     Q     Was it 2020?
6     A     No, sir.  No, sir.
7     Q     It was some time ago?
8     A     Yes, sir.  It was '18 or '17.  It was several
9  years ago.  I don't know exactly.
10     Q     So do you know what the occasion was that gave
11  rise to having a vigil for him on June 8 -- I'm sorry,
12  that's the wrong date -- on July 19, 2020?
13     A     I don't know if this was the anniversary of his
14  death or this is his anniversary of his birth.  I don't
15  know.
16     Q     This vigil did take place at 9 p.m. on July 19?
17     A     Yes, sir.
18     Q     Do you know how many people attended?
19     A     No, sir.  It was no more than 10.  I can't recall
20  the exact number.
21     Q     Okay.  Any safety issues or violence of any sort
22  arise out of that vigil?
23     A     There was no violence.  There were safety
24  concerns.  It's dark.  Some of them were wearing dark
25  clothing.  Pedestrians did -- people go and did try to

Page 132

J. EAST

1
2  converse with them.  There was no issues, but it was very
3  dark there and people stopping, looking.
4     In my opinion, it causes a hazard right there
5  around that time.  Traffic goes through right there in the
6  middle of that.
7     Q     Okay.  So let's return now to Exhibit 22, Tab 22.
8  So you originally make some --
9     It looks like your original e-mail here is
10  June 27 to Mr. Mills and Mr. Wilburn.
11     Do you see that?
12     A     I do.
13     Q     All right.
14     A     Yes, sir.  Okay, yeah, yeah, yeah.
15     Q     And who were they?
16     A     Scott Mills is the chief deputy, and Alan Wilburn
17  is the major of the sheriff department.
18     Q     So they're both under your command?
19     A     Yes, sir.
20     Q     Why are you sending them comments on the Facility
21  Use Policy?
22     A     I want them to be familiar with it, pending other
23  events, that they know that you can have -- carrying a
24  flagpole is not illegal per the permit.
25     Q     And you write, "I also made some notes so I can

Page 133

J. EAST

1
2  try to get changed by the Board of Supervisors and
3  attorney."
4     Do you see that?
5     A     Yes, sir.
6     Q     And then you forward this chain to Ms. Carwyle on
7  June 30 at 12 p.m.; correct?
8     A     Yes, sir.
9     Q     And so that seems to be after the meeting that
10  you had with her on June 30 at 10:00 a.m.; right?
11     A     Yes, sir.
12     Q     Okay.  I want to walk through --
13     And is this, to your knowledge, sir, the first
14  time you gave direct comments to Ms. Carwyle or to anyone on
15  potential changes to the Facility Use Policy as it relates
16  to the courthouse?
17     A     No, sir.  We had talked to previous --
18     Under the old version you could give the permit
19  out like we just talked about until ten o'clock at night.  I
20  made previous comments that I felt like that needed to be
21  maybe five o'clock.  There was no sense in having people
22  there after that.
23     We even talked about gating -- you know, we
24  brought up gating the courthouse off to keep people from
25  coming on the grounds, those type things.

Page 134

J. EAST

1
2    Q    Okay.  Those were comments that maybe took place
3  earlier -- earlier in June after Mr. Floyd's death?
4    A    I would think before that.  I don't know the
5  exact dates.
6    Q    Okay.  Well, your earlier testimony was you
7  hadn't looked at changes in the policy until Mr. Floyd's
8  death.
9        MR. O'DONNELL:  You're talking over each other at
10   this point.
11 BY MR. YOUNGWOOD:
12   Q    Sir, your earlier testimony was, you hadn't
13 looked at any change in the policy until after Mr. Floyd's
14 death.
15   A    No, I said I didn't remember.  I said it was in
16 around that time.  I never gave a specific time or day.
17   Q    Okay.  You don't have any e-mails or written
18 records showing any proposed changes that you wish to
19 suggest earlier than this document we're looking at right
20 now, which is Exhibit 22; correct?
21   A    I have nothing in front of me, no, sir.
22   Q    Well, can you recall anything that you have that
23 isn't in front of you?
24   A    I can recall conversations with him, yes, sir,
25 and with the attorney, yes, sir.  I don't know the time.  I

Page 135

J. EAST

1 don't know the exact dates that you would like.
2    Q    Okay.  Let's look at these.
3        Your first comment is to -- on page 2 of 5 under
4 "Use of facilities and grounds equal access."
5        You write, "Safety risk."
6        Can you tell me what you intended to convey by
7 writing "safety risk" in the margin?
8    A    Give me a second.
9    Q    Of course.
10   A    No, sir, I don't --
11       I don't know what that's about.  I don't know if
12 it's for that particular paragraph.
13   Q    Well, the sentence itself at the end that you've
14 attached the comment to does say, "Poses health or safety
15 risk."
16       Do you see that?
17   A    Yes, sir.
18   Q    But I guess you're just repeating the word
19 "safety risk."
20       You don't --
21   A    No, I don't.
22   Q    Let me let you finish.  Please go ahead.
23   A    Oh, I'm sorry.  I don't recall what that's for,
24 sir.
25

Page 136

J. EAST

1
2    Q    Okay.  Let's go to the next one.
3        You write, "Need to address this line.  It should
4 be no later than 5 p.m. unless special request to and
5 approved by BOS."
6        Do you see that?
7    A    Yes, sir.
8    Q    What did you mean by that?
9    A    I meant that I don't think it should be an open
10 policy that the courthouse would be open until ten o'clock.
11 I think that it should be shut down at five.  That's when
12 business hours are open.  And if they want to use it, that
13 needs to go in front of the Board of Supervisors for
14 approval.  It should be something special is what I was
15 meaning.
16   Q    Well, even without opposing an additional time
17 restriction, all applications do have to be approved by the
18 county supervisor; correct?
19   A    No, it's approved by Ms. Carwyle, from my
20 understanding.
21   Q    Okay.  I'm sorry.  I misspoke.
22       County administrator, correct?
23   A    Yes.
24   Q    Okay.  And the one permit that we saw denied --
25       And I think you testified very early in your

Page 137

J. EAST

1
2 testimony the only time one was denied, which was
3 Mr. Johnson's request for the June 27, Ms. Carwyle did
4 indicate that she would share the proposed denial with the
5 supervisors before denying it; right?
6    A    I don't understand I'm following what you're --
7    Q    Let's take a look back at Tab 16, Exhibit 16.
8    A    Yes, sir.
9    Q    So this is --
10       We looked at this earlier.
11       This is part of the discussion that leads to the
12 denial of Mr. Johnson's request for a permit on June 27.
13       And you see in the middle Ms. Carwyle writes in
14 an e-mail to you and Mr. O'Donnell, "Do you see any issue
15 with denying this?  If not, I'll send to supervisors with
16 that recommendation and let George know."
17       Do you see that?
18   A    Yes, sir.
19   Q    So prior to denying, she's going to share that
20 recommendation with the supervisors; right?
21   A    That's what she says, yes, sir.
22   Q    Okay.  And so in fact she deems it to be a
23 recommendation, not a decision; right?
24   A    It says, "Recommendation."
25       I don't know what she -- what her intent was.

Page 138

J. EAST

```
1                    J. EAST
2      Q     Okay.  So this would suggest that before denying
3  a permit, she feels the need to get approval from the
4  supervisors; correct?
5      A     No, sir, I don't --
6            I don't know that or --
7            As far as I know, she may just be advising them
8  so they would have to know that she denied a permit.
9            I don't know what she meant by that.
10     Q     Okay.  Well, is it clear to you from reading this
11 that she's going to tell them that before she actually
12 denies the permit?
13     A     I don't know.  I don't see it that way.
14           I just see that it sends the supervisors the
15 recommendation and lets George know at the same time.
16           I don't know what comes first or second.  I don't
17 know how to answer that for you.
18     Q     Let's go still on Exhibit 22 then, sir.
19           When you write, "Unless special request to and
20 approved by the BOS," what did you mean by that?
21     A     What I'm meaning is that the policy changes to
22 you can't have anything up there after a certain hour,
23 five o'clock.
24           They can always --
25           I'm still used to the county government, but I'm
```

Page 139

J. EAST

```
1  under the impression you can always appeal that process.  So
2  that's why I put that in there.
3            In the city, where I was more familiar, the Board
4  of Aldermen always had kind of the last say.  They were kind
5  of the appeal process that you could go before.
6            That's what I was meaning is, even though it says
7  five o'clock, nothing's there -- they do have a way to get
8  that approved somewhere else.  It just won't be open to
9  every citizen to come up there and have something past five.
10     Q     Okay.  And why did you pick 5 p.m.?
11     A     Because business hours stopped at five.
12     Q     Okay.  Go to the next page 4.
13           This is your comment on flags.  You say, "Never
14 mentions flags, so therefore I believe they can carry a
15 flag, state, American, but maybe not a flag with a message
16 on it."
17           Do you see that?
18     A     Yes, sir.
19     Q     So was it your reading of the policy --
20     A     I mean, under the policy I could carry a piece of
21 cardboard or a poster board with a message on it, can't I?
22     A     Yes, sir.
23           The way I remember it, you couldn't carry it on a
24 pole.
```

Page 140

J. EAST

```
1                    J. EAST
2      Q     So a flag can be on a pole, but not some other
3  message?
4      A     That's the way I was interpreting.  So you could
5  have a flag, the American flag, but you couldn't have a flag
6  that says, "I love chicken", because that's a sign.
7      Q     Could I --
8            Could I today have the old Mississippi flag?
9      A     The way it was written here, you could have
10 flags, any flag, yes, sir.
11     Q     Any flag, including the confederate flag itself
12 perhaps?
13     A     Any flag, yes, sir.
14     Q     Okay.  And I'm sorry.  That wouldn't include a
15 flag that says, "I love chicken" or wouldn't?
16     A     That's what I'm saying.  I needed clarification
17 there.
18     Q     Did you get that clarification?
19     A     Yes, sir.  You can't have --
20           I think it was changed.  If it had a message on
21 it, it was considered a banner, and it had to be carried.
22     Q     Okay.  Although you'd agree with me, sir, that
23 flags are messages, aren't they?
24     A     I think some people would interpret it that way,
25 yes, sir.
```

Page 141

J. EAST

```
1                    J. EAST
2      Q     So, again to be specific, a confederate flag
3  would be allowed or not allowed?
4      A     Under this it would be allowed, yes.
5      Q     Okay.  And the old Mississippi flag today, that
6  would be allowed?
7      A     Under that policy, yes.
8      Q     How about --
9            I'm sure you've seen them, sir, the flags that
10 are blue -- with the "Blue Lives Matter" type flags that are
11 American flags, but tinted blue.
12           Would that be allowed?
13     A     Yes, sir, I would think so.
14     Q     So how does one interpret what type of flag is
15 allowed and what isn't?
16     A     That's kind of the reason for the statement.
17     Q     So you think, as written, the policy is vague and
18 difficult to interpret?
19     A     It was for me, yes, sir.
20     Q     Did you have further discussions with Ms. -- with
21 anyone regarding the comments that are in Exhibit 22 prior
22 to the Board of Supervisors meeting that takes place on
23 July 20 where changes are made?
24     A     I can't recall the exact timing.
25           I talked to Ms. Carwyle and to my attorney,
```

Page 142

J. EAST

1      J. EAST
2 Mr. O'Donnell, previously on different occasions about this.
3      Q      And can you remember any of those specific
4 conversations following in Exhibit 22 that you sent on
5 June 30?
6      A      No, sir.
7      Q      Let's move on to Tab 24, which we'll mark as
8 Exhibit 24, please.
9      (Exhibit 24 was marked for identification.)
10 BY MR. YOUNGWOOD:
11      Q      So this has Bates number _311 through _313. This
12 is an application, you'll see on the third page, from a
13 Ms. Jackson made on July 1st for an event on either the 5th
14 or the 8th.
15      A      Yes, sir.
16      Q      And this is ultimately granted.
17      Do you see that?
18      A      Yes, sir.
19      Q      And the explanation is, "Love your neighbor in
20 prayer."
21      Do you see that?
22      A      Yes, sir.
23      Q      Do you know what that is?
24      Do you know what that's a reference to?
25      A      It was a group of people holding signs up saying

Page 143

J. EAST

1      J. EAST
2 they love your neighbor, and if you want them to stop, they
3 would pray with you and pray for our country and our county
4 and have prayer with you.
5      Q      Okay. And you wrote on the top of the first
6 e-mail, "I do not see any security threats or reasons the
7 permit should not be allowed on either date. I have spoken
8 with Chief McCutchen. The city does not have any permits
9 issued that will take extra resources from us."
10      Do you see that?
11      A      Yes, sir.
12      Q      And so you write that at 2:47 p.m.?
13      A      Yes, sir.
14      Q      And you had been sent the application at
15 10:43 a.m. that morning; correct?
16      A      Yes, sir.
17      Q      So you were able to give your sign-off on a --
18 from a safety perspective within -- between 10:43 and
19 2:47 that day?
20      A      Yes, sir.
21      Q      Let's go to --
22      Let's go actually very quickly to Tab 40, which
23 we'll mark as Exhibit 40. It's a photograph.
24      (Exhibit 40 was marked for identification.)
25

Page 144

J. EAST

1      J. EAST
2 BY MR. YOUNGWOOD:
3      Q      Are you there, sir?
4      A      Yes, I'm here.
5      Q      This is a picture in front of the courthouse, I
6 think looking -- the photographer is looking north; is that
7 right?
8      A      Yes, that would be correct.
9      Q      Okay. And that's the statue in front of the
10 courthouse; correct?
11      A      Yes, sir, appears to be.
12      Q      Okay. Was this a permitted activity?
13      A      Not that I know of, no, sir.
14      Q      Did it require a permit?
15      A      I don't know. This looks like this was not on
16 county grounds. This looks like they were projecting from
17 somewhere other than on county property.
18      Q      So if I project onto county grounds, does that
19 require a permit if I'm not standing on county grounds?
20      A      Great question. I don't know.
21      Q      Okay. Do you remember this incident -- I don't
22 want to call it an incident -- this event?
23      A      Yes, sir.
24      Q      It occurred around June 20th; is that right?
25      A      If you say so. I don't -- I don't know the date.

Page 145

J. EAST

1      J. EAST
2      Q      It occurred last summer.
3      Is that fair to say?
4      A      Is this --
5      Q      Summer of 2020.
6      A      2019. I'm sorry.
7      Q      Sorry?
8      A      When you said "last summer," I take it --
9      Q      I know. It's always -- yeah, I got it. It's
10 almost 2021, so who knows.
11      This occurred in the summer of 2020.
12      Does that sound right?
13      A      Yes, sir.
14      Q      You were sheriff when it occurred?
15      A      Yes, sir.
16      Q      Okay. And was there any violence associated with
17 it?
18      A      Not that I know of.
19      Q      Okay. Was it disrupted?
20      Was it allowed to continue?
21      Do you remember anything about it?
22      A      No, sir, I don't know.
23      Q      Did your department get involved in it at all?
24 Did the county sheriff's department get involved?
25      A      No, sir, not that I know of.

Page 146

J. EAST

1
2    Q    Okay.  But you heard no reports of violence;
3 correct?
4    A    No, sir, no violence that I can --
5         (Exhibit 41 was marked for identification.)
6 BY MR. YOUNGWOOD:
7    Q    I want to refer you to Tab 41, and you can
8 actually -- which we'll mark as Exhibit 41, Tab 42, which
9 we'll mark as Exhibit 42, and Tab 43, which we'll mark as
10 Exhibit 43.
11        (Exhibit 42 was marked for identification.)
12        (Exhibit 43 was marked for identification.)
13 BY MR. YOUNGWOOD:
14   Q    I'll represent to you, sir, these are all images
15 from the summer of 2019 where the courthouse walls were used
16 to display films at night.
17   A    Yes, sir.
18   Q    Have you --
19        Do you recognize these as such?
20   A    This is the first time I'm seeing this.
21   MR. O'DONNELL:  Object to form.
22 BY MR. YOUNGWOOD:
23   Q    Are you aware that the courthouse walls have
24 previously been used to display films or videos?
25   A    I was informed of that, yes, sir.

Page 147

J. EAST

1
2    Q    Do you know on how many occasions that's happened
3 in the past?
4    A    No, sir.
5    Q    Okay.  And when were you informed that the
6 courthouse walls had been used to display films?
7    A    I don't know the exact timing.  I knew that the
8 Oxford Visit --
9         I don't know.
10        Oxford Film Fest, Visit Oxford may have done
11 something.  I don't know what the exact wording was, but I
12 think it had something to do with Oxford and the film fest
13 at the time.  I was --
14        I was off during that so I don't really remember
15 a lot about it.
16   Q    Okay.  Are you aware of any violence that arose
17 out of past occasions when videos or films were displayed on
18 the outside walls of the county courthouse?
19   A    Not that I can recall or know of, no, sir.
20   Q    Okay.  Or if not violence, any safety concerns
21 that came up during the time that films or videos were shown
22 on the outside walls of the county courthouse in the past?
23   A    I was not in this process to know.  By looking at
24 it, I would have concern of it being there, if I was asked.
25   Q    And I'm not asking if you have concerns.

Page 148

J. EAST

1
2         I'm asking if there were actually actual safety
3 incidents, violence, people getting hurt or property getting
4 destroyed during the display of video or films in the past
5 on the outer walls of the Oxford square or county
6 courthouse?
7    A    I don't know of any, sir.
8    Q    Let's go back to Exhibit -- not back to, but look
9 at Tab 25, which we'll mark as Exhibit 25.
10        (Exhibit 25 was marked for identification.)
11 BY MR. YOUNGWOOD:
12   Q    So these -- this is a document Bates number _11
13 through _13 dated July 6, 2020, 5 p.m., Lafayette County
14 Board of Supervisors.
15        Do you see that?
16   A    Yes, sir.
17   Q    And you'll see that on a few occasions your name
18 is listed under the agenda?
19   A    Yes, sir.
20   Q    Were you at this meeting?
21   A    I don't know.  I'd have to -- I'd have to hear
22 the next question to remember if I was or not.
23   Q    Well, there's --
24        Let's take a look on the last pages of the
25 document, page 13, there's some handwriting.

Page 149

J. EAST

1
2         Do you recognize the handwriting?
3    A    I do not recognize the handwriting.
4    Q    Okay.  The top concerns the confederate statue.
5         Do you see that?
6    A    Yes, sir.
7    Q    Do you recall being there for a discussion of
8 whether or not to move the statue from its current location?
9    A    Yes, sir.
10   Q    Okay.  So you think then you were at the meeting
11 because you remember that discussion?
12   A    Yes, sir.
13   Q    Okay.  I want to ask you about the bottom,
14 though.  You'll see it says, "Facility use permit change."
15        Do you see that?
16   A    Yes, sir.
17   Q    Were you there for that discussion?
18   A    Yes, sir.
19   Q    Okay.  And tell me what you recall about that
20 discussion.
21   A    I don't --
22        I remember --
23        I don't really recall what all we did talk about.
24        I think this is a --
25        We talked about --

Page 150

J. EAST

1
2      I'm trying to read her note to refresh my memory.
3      We had met safety with OPD, UPD, and the
4  sheriff's department advised that we were trying to work
5  together to have a better facility policy amongst all of us
6  so that we could check to make sure we're not overloading
7  each other.
8      Q     Okay.  And I'm sorry, OPD means Oxford Police
9  Department; right?
10     A     Correct.
11     Q     What's VPD, if that's a V.?
12     I don't know if that's a V or a U.
13     A     U, University Police Department.
14     Q     Got it, so that's the University of Mississippi.
15     And then do you know what the last reference is
16  there?
17     A     Lafayette County Sheriff's Office.
18     Q     So your -- your now current office, your prior
19  office OPD and then the University Police Department,
20  University of Mississippi.
21     So what was the discussion that's referenced
22  here, "Safety, OPD, UPD, LSO"?
23     A     I'm not exactly sure.
24     We had met with the three entities, OPD, UPD
25  officials, and attorneys had met to try to -- prior to this

Page 151

J. EAST

1  to try to work to where our policies were the same or close
2  as they could be to each other so that like the sticks or
3  the different things of that, and talked about how we could
4  use our sources to support each other and not divide.
5
6      Q     Okay.  And during your tenure as sheriff, could
7  you recall the subject of the Facility Use Policy --
8      Well, strike that because it --
9      Strike that question.
10     What else do you recall about the safety
11  discussion at that meeting?
12     A     Just what I mentioned.
13     Q     Okay.  We'll come back to the after-dark.
14     I want to go to --
15     I can't read it all.  Maybe you can read it
16  better, but it talks about the stick and flags.  I assume
17  this is the discussion you and I have already had about,
18  when do you get to have a stick?
19     A     Yes, sir, I would assume that's what it is.
20     Q     What do you recall about that discussion, if
21  anything, at that meeting?
22     A     You know, I don't recall a lot of it.  I just
23  remember on different occasions talking about, you know, the
24  sticks, that we need to kind of clean that language up in
25  there.

Page 152

J. EAST

1
2      Different times I had made reference to a curfew
3  or to stop having the permit so late.  These are one of the
4  things we discussed with the city.  The 30 days, it seemed
5  to be a little excessive, maybe dropping that down.
6      And then again, just safety, about how to network
7  with the other departments so that we're not issuing
8  multiple permits at the same time that will dissolve our
9  resources.
10     Q     And then there's the reference to after-dark.
11  What was the discussion there?
12     A     That was again things that I had marked in the
13  past.  I would assume it was going to be what I talked
14  about, the five o'clock -- the five o'clock -- not leaving
15  it open until ten.
16     Q     Was there any rationale given for not leaving it
17  open after five o'clock?
18     A     For me, sir, it is because my resources go down
19  even more at night.  It's not an area of --
20     The courthouse is right in the middle of town, so
21  all my resources would be further out in the county, and we
22  can't --
23     It's hard for us to put enough manpower there to
24  watch that facility.  That's why I'm trying to ask them,
25  once business hours are over, to close the facility down.

Page 153

J. EAST

1
2      Q     So let me ask you about that a little bit.
3      After business hours and after dark are different
4  things; right?
5      A     They can be, yes, sir.
6      Q     In the summer they certainly are; right?
7      A     Correct.
8      Q     But maybe this time of year they align a little
9  more?
10     A     Yes, sir.  Yes, sir.
11     Q     So was it after dark or after business hours that
12  concerned you?
13     A     I put "after business hours."  I think it was
14  changed later to say -- I don't know -- sundown or dark or
15  dusk.  I don't know exactly what the language is.
16     Q     Okay.  You can't, without looking at the policy,
17  even tell me what the policy is, right, in terms of whether
18  it's after dark?
19     A     I don't know the exact wording of it.
20     It's not at five o'clock.  I know that.  There's
21  the different verbiage.
22     Q     Okay.  There are lights near the courthouse?
23     A     The courthouse has light -- globe lights, very
24  low-lit more I would call it cosmetic look than for
25  lighting.

Page 154

J. EAST

1
2    Q    The county could add lights to the courthouse if
3  the darkness is a concern; right?
4    A    They could.
5    Q    And we've already talked about there are cameras
6  in the area, which helps with safety issues, doesn't it?
7    A    I don't know --
8        It definitely helps with solving crime after
9  something is committed.  I don't know that it so much helps
10 with the safety.
11   Q    Well, you would know better than me, but doesn't
12 having visible cameras itself have a deterrent effect on
13 crime?
14   A    You would think so, but it's my experience that
15 it hasn't really slowed it down when I was the chief of
16 police.
17   Q    How about the patrols that are mounted patrols
18 that the Oxford Police Department has in this area?
19        Doesn't that serve as a safety protection?
20   A    Yes, sir.  That does help, yes, sir, to deter
21 crime.
22   Q    So the Facility Use Policy is discussed, but no
23 action is taken at this meeting, correct, regarding it?
24   A    No, sir, I don't think so.
25   Q    Okay.  And why, if you remember there being

Page 155

J. EAST

1
2  discussion on it, wasn't action taken at this meeting on it?
3    A    I don't know.
4    Q    Okay.  The words -- or the letters "exec" are
5  written next to it.  Is that some indication that this was
6  an executive session of some sort?
7    A    That's what I would say, yes, sir.
8    Q    Is that your recollection that it was in
9  executive session?
10   A    Yes, sir.
11   Q    Okay.  And what does that mean, that the public
12 is asked to leave?
13   A    Yes, sir.
14   Q    Why?
15        Do you know why the public wasn't permitted to
16 listen to a discussion of changes of the policy of the use
17 of public land?
18   A    I don't know what that --
19        I'd have to defer that to someone else.
20        I know the city would have executive sessions a
21 lot of times when we talked about security measures and
22 things like that.  So I don't know if that applies to the
23 county or not, but...
24   Q    Okay.  So that was July 6.  We flip to the next
25 tab, which is 26.

Page 156

J. EAST

1
2        (Exhibit 26 was marked for identification.)
3  BY MR. YOUNGWOOD:
4    Q    Tell me when you're there.  It's Bates number
5  _322321.
6    A    Yes, sir.
7    Q    It's a little bit out of order the way it's in
8  here.  Let's just call it Exhibit 26.
9        What I want to start with, actually, is the
10 second page.  This is an application filled out by J.F. Rash
11 dated 7/14/2020.
12        Do you see that?
13   A    I see his name.
14   Q    Okay.  And do you see this his organization --
15   A    I see it.  I gotcha.  I'm with you.
16   Q    Okay.  And you see his organization is called
17 "Projection"?
18   A    Yes.  Yes.
19   Q    Okay.  And he fills this out, according to the
20 document at least, on the 14th of July, 2020?
21   A    Yes, sir.
22   Q    Okay.  And he's seeking an event on the evening
23 of Saturday, August 8, 2020; right?
24   A    August 8, 2020, yes, sir.
25   Q    Okay.  And the start time is going to be 8 p.m.;

Page 157

J. EAST

1
2  right?
3    A    Yes, sir.
4    Q    And we can always -- we can check, sir, but
5  8 p.m. in August, that's probably not dark, is it?
6    A    I can't remember.  It would be close.
7    Q    Okay.  11 p.m. is dark, though, right, if
8  anyone's attending.
9    A    Yes, sir.
10   Q    His "Explanation of Use:  Artist installations
11 with light and projections" -- and I'm having trouble
12 reading the next word -- "and courthouse objects."
13        I'm sorry.
14        -- "onto screens and courthouse objects."
15        That's what it says.
16        Do you see that?
17   A    Yes, sir.
18   Q    It says, "30 people in attendance," right?
19   A    Yes, sir.
20   Q    And we've certainly, at least on the number,
21 we've seen applications for permits approved with more than
22 30 people in attendance; right?
23   A    I'm sorry.  I was reading.
24   Q    Yeah.  Some of the other permits that we've seen
25 approved in the weeks and months preceding this had more

Page 158

J. EAST

1  than 30 people in attendance; right?
2
3      A    Yes, sir.  Some did, yes, sir.
4      Q    Okay.  This is --
5           Now look to the first page.
6           It's sent to you by Ms. Carwyle.
7           "I received this yesterday.  I believe it's part
8  of the Fringe Festival.  They said they had done this
9  previously in the breezeway by Highpoint Coffee, but they
10 wanted it more visible and where people could spread out
11 more due to COVID.  It's a projection show."
12          Do you see that?
13     A    Yes, sir.
14     Q    And you wrote back, "I will check on this to see
15 what exactly they want to do," right?
16     A    Okay.  Yes, sir.
17     Q    Did you know who Mr. Rash was before receiving
18 this permit?
19     A    No, sir.
20     Q    Did you know what Projection was before receiving
21 this permit?
22     A    No, sir.
23     Q    I had shown you pictures of other video being
24 shown on the courthouse wall, Exhibits 41, 42 and 43 maybe
25 15, 20 minutes ago.

Page 159

J. EAST

1      At the time that you received this application,
2  were you aware that the courthouse walls had previously been
3  used at night to display film and video?
4      A    No, sir.
5      Q    So you only learned --
6           When did you learn that the courthouse walls had
7  previously been used to display film and video?
8      A    I don't know exactly.
9           I think Ms. Carwyle, in a conversation, had told
10 me they had used that before.
11     Q    Did she tell you that in the course of the
12 consideration of Mr. Rash's permit?
13     A    I don't think it was in consideration.
14          They just said that something was -- they did
15 last year.  I don't know if meaning Mr. Rash or they meant
16 someone else.
17     Q    So while you were considering your input on
18 Mr. Rash's permit, you were made aware that the space had
19 previously been used for displaying film and video, the
20 courthouse walls?
21     A    I was made aware sometime in there.  I don't know
22 exactly when it was, sir.
23     Q    Well, Mr. Rash's permit was eventually denied.
24          Was it before or after his permit was denied that

Page 160

J. EAST

1  you were made aware that the courthouse walls had been used
2  for film and video at night in the past?
3      A    I don't recall.
4      Q    You wrote, "I will check on this to see what
5  exactly they want to do."
6           Between her e-mail and his application, what did
7  you not know that you needed to know?
8      A    Exactly what they were going to do.
9      Q    Well, what --
10          You end up asking Scott Mills to make the phone
11 call, but what information did you want Mr. Mills to obtain?
12     A    What would be happening, what are we doing, how
13 would people be viewing, how large would it be, things like
14 that.
15     Q    And what --
16          If you go to the third page, this is your e-mail
17 to Mr. Mills.  Other than --
18     Q    You write to him, "Will you call and find out
19 exactly what this is for and all the information so I can
20 forward to BOS?"
21          Do you see that?
22     A    Yes, sir.
23     Q    And what did you mean by "exactly what this is
24 for and all the information"?

Page 161

J. EAST

1      A    The way I take it, at the time I'm just -- I was
2  ignorant to what they were doing.  I had no idea, had not
3  heard about this.  So we were just trying to get
4  information.
5      Q    Did you do more or less inquiry into this
6  projection than you did into the confederate -- the
7  pro-confederate events that Mr. Johnson sought and obtained
8  approval for?
9      A    I would say it's the same.  I'm more familiar
10 with Mr. Johnson and his -- what he is because we've seen
11 him around before.
12          I was ignorant to this.  I had no idea what this
13 would be for or about.
14     Q    Did you have somebody call Mr. Johnson before
15 granting or denying each of his permits?
16     A    Yes.
17     Q    So Mr. Rash's application is made on the 14th.
18 Ms. Carwyle forwards it to you on the morning of the 15th.
19 You respond to her on page 1 of Exhibit 26 within five
20 minutes on the morning of the 15th.
21          Do you see that?
22     A    Yes, sir.
23     Q    But if we look at page 3, you don't forward it to
24 Mr. Mills to make the inquiry until about 26 hours later on

Page 162

J. EAST

1   the morning of the 16th.
2
3           Do you see that?
4       A   Yes, sir.
5       Q   Why did you wait a day to make that inquiry?
6       A   I can't tell you.  I don't know.
7       Q   Okay.  You'll agree with me we've seen other --
8   we've seen other permits granted with your input within 24
9   hours from application; right?
10      A   Yes, sir.
11      Q   Okay.  And did Mr. Mills ever tell you what the
12  substance was of his conversation with Mr. Rash?
13      A   It was going to be an artist doing local art
14  projection up there, the best I remember, and that the way
15  people were going to be view it would that they would be view
16  it by driving by, or there may be -- I don't want to be held
17  to this, but I think he said there may have been two open
18  parking spaces directly across from the east side of the
19  courthouse on city property where people could pull in and
20  watch it.
21      Q   Okay.  Did he tell you what questions he asked
22  Mr. Rash?
23      A   Just what I explained.
24      Q   Did he tell you that he asked Mr. Rash, really
25  what I want to know, is there anything that is going to talk

Page 163

J. EAST

1   about the monument or things that have been going on in
2   Oxford lately?
3
4       A   No, sir, I don't recall that.
5           I recall him telling me that he did have a
6   conversation with him to see if the event would cause
7   counter-protest or upset people so that we could prepare.
8           I don't recall him giving me exact verbiage.
9       Q   Okay.  So you think -- I'm sorry.
10          Is it Deputy Mills?  I want to make sure I have
11  his title correct.
12      A   It's Chief Mills.
13      Q   Chief Mills.
14          So Chief Mills did ask him whether or not the
15  display would in some way concern the monument?
16      A   I don't know that, sir.  I wasn't present at
17  that.
18      Q   He did ask him about what the content of the
19  display would be?
20      A   I don't know that either.  I wasn't there.  He
21  just --
22          What he advised me, you know, whether or not it
23  would arouse people, people were going to be over there
24  being upset so that we could find out if we needed more
25  security, those type things.

Page 164

J. EAST

1
2       Q   Okay.  But I'm trying to -- sorry.  I don't mean
3   to over -- speak over you.
4           Chief Mills --
5           Is it your testimony, sir, that Chief Mills asked
6   Mr. Rash, is there anything in it that's going to bother
7   people, or Chief Mills asked Mr. Rash what the content was
8   of what he was going to display?
9       A   My direct testimony is, I was not there.  I don't
10  know exactly what Mr. Mills asked him.
11      Q   Then let me change it.
12          What did Mr. Mills tell you?
13          That you can tell me.
14      A   That it was an art show, that he would be showing
15  things about art.  He may even explained to me maybe when I
16  first heard that they had this type of event last year and
17  that people were going to be driving by and viewing it and
18  would be access in the parking lot to pull in and view it.
19      Q   Did he in any way describe to you what he
20  understood to be the nature of the film that would be
21  displayed?
22      A   I don't know what that means, "the nature".
23      Q   There are all sorts of art.
24          I mean, did you have a sense of what the films
25  would be about?

Page 165

J. EAST

1
2       A   No.
3       Q   Mr. Mills didn't tell you anything about what the
4   films would be about?
5       A   Art, pictures.
6           No, sir, he didn't go into specific --
7           I still don't know anything about it.  I don't
8   know.
9       Q   Well, you don't know because it wasn't displayed.
10  Right, sir?
11      A   Well, I don't know if he did another event or
12  not.  I don't know if he had --
13          So I don't know.
14      Q   Okay.
15      A   The city was having several events that night too
16  around town.
17      Q   Okay.  Upon --
18          And when did Mr. Mills and you have this
19  conversation where he described what Mr. Rash said?
20      A   It would be after I sent the e-mail.  I don't
21  know if it was the 16th, 17th, 18th.  I don't know the date.
22      Q   Okay.  You'd certainly agree with me that an
23  application on the 14th of July was sufficiently in advance
24  of the 8th of August for you to make any safety
25  determination you had to make concerning the application;

Page 166

J. EAST

1    right?

2        A    Repeat that again so I can hear you.

3        Q    Yes.

4        He applied on July 14 for an event on August 8.

5    That gave you sufficient time to make a safety

6    determination?

7        A    Yes, that was --

8        Yes, sir, I would agree with that.

9        Q    So what did you do to make your safety

10   determination?

11       A    Talked to him about it.

12       If you ask me what my safety concerns would be.

13       Q    I'll ask you that in a second.  I'm asking what

14   process you went through to make a determination regarding

15   safety.

16       A    What Mr. Mills advised me about where the

17   projector would be, those type things.

18       I actually went to the courthouse, walked off

19   from the building to the street to where people -- to see if

20   there was enough room for people to stand and view it, and

21   then took all that into consideration.

22       Q    Okay.  And did you take into consideration that

23   similar events had been held on the courthouse walls in the

24   past without incident?

Page 167

J. EAST

1

2        A    Yes, sir.

3        Q    Okay.  And did you determine that it would be

4    safe for this event to take place?

5        A    I don't know that --

6        I did have concern with the people driving.  I

7    thought it would be unsafe the way they were --

8        It was brought to me by Chief Mills is that

9    people would be driving by because of COVID.  They could

10   view it that way.  They would be walking also, which is

11   dangerous around the square, and that they could -- the

12   parking.

13       I didn't think that was appropriate to be driving

14   and watching video on the courthouse lawn.

15       Q    Okay.  And so the driving concern arose out of

16   COVID?

17       A    Ms. Carwyle, that's the reason they were having

18   it there.  I think that we read earlier is the reason he

19   wanted to have it over there is because of COVID.

20       Q    Okay.  Again, films, videos have been shown on

21   the courthouse wall in years long before COVID; right?

22       A    I was told that, yes.

23       Q    Okay.  And without incident, even though there

24   was --

25       Well, without incident that you know of; right?

Page 168

J. EAST

1

2        A    I think, yes, sir, I'd agree with that.  I don't

3    think there was -- that I know of, there was not an

4    incident.

5        Q    The concerns you just raised about the driving,

6    did you share those concerns with anyone?

7        A    Ms. Carwyle and Mr. O'Donnell.

8        Q    When was that?

9        A    I didn't keep notes.  I'm sorry.  I don't know.

10       Q    Before or after the permit was denied?

11       A    It would have been --

12       I don't think the permit was denied based on

13   that.

14       Q    I didn't ask that.

15       I'm asking, just to try to get a time, before or

16   after it was denied?

17       A    I'm assuming it was before.

18       Q    In the conversation with you said Ms. Carwyle and

19   Mr. O'Donnell, is that one conversation or separate

20   conversations?

21       A    I don't remember, sir.

22       Q    Okay.  If you'd turn to Tab 27, this will be

23   Exhibit 27.

24       (Exhibit 27 was marked for identification.)

25

Page 169

J. EAST

1

2    BY MR. YOUNGWOOD:

3        Q    This is the denial of Mr. Rash's permit; correct?

4        A    Yes.

5        Q    Okay.  Do you know when Mr. Rash was informed

6    that his permit had been denied?

7        A    No.

8        Q    Okay.  Let's go to Tab 29, which is Exhibit 29.

9    We've looked at it before.

10       This is a meeting of the --

11       This is the order approving further changes to

12   the policy regarding facility use dated July 20.

13       Were you at the meeting in which these changes

14   were made?

15       A    I don't recall.  I don't know.

16       Q    Well, we looked at the notes from the July 6

17   meeting.  We don't seem to have notes from this meeting.

18   Was this --

19       Do you remember being at more than one meeting of

20   the Board of Supervisors where the potential changes to the

21   policy were discussed?

22       A    I remember discussing it since the last time.

23       I'm assuming I was here.  I just don't remember

24   whether I was or not.  I just don't recall it.

25       Q    We've already discussed the 14-day aspect of

Page 170

J. EAST

1
2  this?
3       Let's go to the 30 minutes before dusk.
4       A     Okay.
5       Q     That's different than the 5 p.m. you put in your
6  comments in the notes we looked at that were Exhibit 22;
7  right?
8             That says "dusk," not 5 p.m.?
9       A     Yes, sir.
10      Q     Okay.  Did you play a role in choosing the word
11  "dusk"?
12      A     No, sir.
13      Q     When is dusk today?
14      A     I would say approximately 4:15, maybe, 4:15,
15  4:30.
16      Q     So dusk is something that takes place before
17  sunset?
18      A     That's the way I would think it was, yes, sir.
19      Q     Okay.  And so according to my phone, your sun
20  will set in Oxford today at 4:52.  So you're saying about 30
21  minutes, 35 minutes, something like that before sunset;
22  right?
23      A     Yes, sir.
24      Q     I couldn't hear what you just said.  It was the
25  video connection.

Page 171

J. EAST

1
2       A     Yes, sir.
3       Q     Okay.  And this policy says 30 minutes before
4  dusk; right?
5       A     Yes, sir.
6       Q     So if dusk is 4:15, then on December 18, 2020,
7  you can't have an event that passes 3:45 p.m.; right?
8       A     The way you're looking at it and the way I was
9  answering was meant 4:15 would be the last time you could
10  have -- get the permit.  That would be when you need to
11  leave right now.
12      Q     Okay.  So you're then interpreting dusk to be
13  effectively sunset?
14      A     Yes, sir.  This says 30 minutes before dusk.  I
15  was just thinking before dark, 30 minutes before that.
16      Q     Well, let me ask you, sir --
17             And I'm sorry to perhaps split hairs, but I want
18  to understand how you interpret the policy.
19             Is dusk sunset or something else?
20             Is it --
21             I mean, sunset, which we can all look up in the
22  newspaper or on our phones, is a set time every day in every
23  geographic location.
24             Does dusk mean sunset to you?
25      A     Yes, that's what I was taking it as.

Page 172

J. EAST

1
2       Q     Okay.  But you'd agree with me when the sun sets
3  it's not dark out yet?
4       A     Right.
5       Q     So it doesn't mean when it's dark.  It means when
6  the sun sets; right?
7       A     It means before dark.
8       Q     Well, this says 30 minutes before -- strike that.
9             Does dusk mean before dark?
10      A     Counsel, I've answered it, so I'd refer back to
11  what they meant by it.
12             The way I take it, it's before dark.  It's right
13  before dark.
14      Q     You'd agree with me that "dusk" is a word subject
15  to interpretation?
16      A     Apparently so because we both have different
17  versions.
18      Q     Okay.  Well, 5 p.m. would not be subject to
19  interpretation; right?
20      A     Correct.
21      Q     Okay.  Dusk -- dusk is; right?
22      A     To me it's 30 minutes before.  I mean, it's right
23  at dusk to dark.
24      Q     I'm sorry.  Dusk is 30 minutes before --
25             The policy says 30 minutes before dusk.  I'm

Page 173

J. EAST

1
2  asking when actually when dusk is.
3       A     I do not know.
4       Q     Okay.  You'd agree with me whenever it is, it's
5  different on December 18, a different time than it is on,
6  we'll just say when Mr. Rash wanted to have his event?
7       A     Yes, sir, I would agree with that.
8             MR. YOUNGWOOD:  I have a document, sir, that
9       might refresh your recollection that you actually were
10      at this meeting.  I don't know if maybe Mr. O'Donnell,
11      this one page, could print it out if Ms. Cron sends it
12      to you.
13             Can we do that?
14             MR. O'DONNELL:  Did you just send it?
15             MR. YOUNGWOOD:  I don't know if she's sent it
16      yet.
17             Lily, could you send it, please?
18             MS. CRON:  Yes, I can do it right now.
19             THE WITNESS:  Okay.
20             MR. YOUNGWOOD:  Okay.  Why don't we mark this as
21      29A.
22             (Exhibit 29A was marked for identification.)
23  BY MR. YOUNGWOOD:
24      Q     So this is a document that says the "Minutes of
25  the Lafayette County Board of Supervisors July 20, 2020,

Page 174

J. EAST

1  J. EAST
2  9 a.m.," and you are listed as being in attendance.
3       Do you see that?
4   A   Yes, sir.
5   Q   Does that in any way refresh your recollection as
6  to the discussions that you heard at that meeting concerning
7  the courthouse grounds?
8   A   No, sir.
9   Q   What else was discussed at this meeting?
10   A   I don't know.
11   Q   Do you believe anything was discussed other than
12  the courthouse policy?
13   A   I don't recall, sir.
14   Q   Okay.  Was this meeting called specifically to
15  change the policy regarding courthouse grounds?
16   A   I don't recall.  I don't remember that.
17   Q   Was it possible it was called specifically to
18  change the policy before action was taken on Mr. Rash's
19  application?
20   A   I just --
21      I don't know.
22   Q   That's possible?
23   A   I said I don't know if it's possible or not.  I
24  don't know why it was called.
25   Q   The meeting was the 20th.  Mr. Rash's application

Page 175

J. EAST

1  J. EAST
2  was the 14th.
3       Do you know why action had not yet been taken on
4  Mr. Rash's application prior to the meeting?
5       Seven days had already -- or six days had already
6  passed.
7   A   No, sir.
8   Q   You'll agree we haven't seen, at least in our
9  discussion here today, any application that took as long as
10  six days to act upon; correct?
11   A   No, sir.  You haven't shown any others, no.
12      (Exhibit 30 was marked for identification.)
13  BY MR. YOUNGWOOD:
14   Q   If you turn to the next Tab 30, this is an e-mail
15  to Mr. Rash copying you, and she writes, "Good morning,
16  Mr. Rash.  Please see the attached permit.  I denied the
17  permit due to a change in the county's permit policy.  No
18  permits will be issued after dusk due to the security
19  issues.  Thanks."
20      Do you see that?
21   A   Yes, sir.
22   Q   Are you aware of any conversations that took
23  place with Mr. Rash to see if there were ways to make
24  accommodations, be it change in time or specific location on
25  the courthouse to allow his event to proceed on the 8th?

Page 176

J. EAST

1  J. EAST
2   A   No, sir.
3   Q   Okay.  And at times you do enter into
4  conversation with applicants to see if there are
5  modifications that can be made to allow their events to go
6  forward; correct?
7   A   We have.
8   Q   But that was not done with Mr. Rash; right?
9   A   Well, we've talked to people, not to accommodate
10  that, but to have less people there is the only thing I
11  remember, than 50.
12   Q   Okay.  And you'll recall in Exhibit 22 your
13  comments to the policy that you circulated on the 30th of
14  June, one of your comments was in connection with the
15  five o'clock time restriction that that should be unless
16  special request to and approved the Board of Supervisors.
17      Remember you made that suggestion?
18   A   I made the suggestion that they move it to
19  five o'clock and, for instance, would have an appeal
20  process, is what I was --
21   Q   And that suggestion was not included in the order
22  changing the policy that the Board of Supervisors adopted on
23  July 20; right?
24   A   There was no wording to say that, no, sir.
25   Q   Has there been an amended redrafted version of

Page 177

J. EAST

1  J. EAST
2  Exhibit 2, which is the March 4, 2019 version of the policy
3  that we looked at earlier today?
4   A   I don't know.
5   Q   Okay.  So there is no document later dated than
6  this document that would add into it the changes that were
7  made by the Board of Supervisors on either July 20 or
8  June 15, two changes we've looked at that took place in June
9  and July of this year?
10   A   I got lost in your question.
11   Q   Okay.  We have Exhibit 2, which is the March 4,
12  2019 version of the policy; right?
13      We've looked at that; correct?
14   A   Yes, sir.  I've looked at a lot of stuff.  I'm
15  kind of -- I'm just lost.
16   Q   Let's go slower.  If you could flip to Tab 2.
17   A   Yes, sir.
18   Q   Exhibit 2.  This is the policy you and I looked
19  at for a bit earlier today; right?
20   A   Yes.
21   Q   And then we looked at the amendment that was made
22  at Tab 7 on June 15; correct?
23   A   Yes, sir.
24   Q   And then we just looked at --
25      We're still looking at the amendment made on

Page 178

J. EAST

1
2  June 29; correct?
3      A    Yes, sir.
4      Q    I'm sorry.  That was a definite misspeak.
5          That was Exhibit 29, which is the amendment made
6  on July 20; correct?
7      A    They amended it on the 15th of June, and what was
8  the next one?
9      Q    20th of July, correct?
10     A    Yes, sir.
11     Q    So what I'm asking is, is there a rewritten
12 version of the policy in one document that contains the
13 amendments from the 15th of June and the 20th of July?
14     A    I don't know, sir.  I don't know if it's been
15 done.  Ms. Carwyle or --
16         I haven't done it, so, no, I don't know.
17     Q    Okay.  And no one's sent it to you; right?
18     A    I don't recall it being sent to me.
19     Q    Okay.  Is there any reason you can think of that,
20 even if the policy contained a darkness restriction, that
21 there wouldn't be circumstances in which it would still be
22 safe to have an event on the courthouse grounds after dark?
23     A    Repeat that, please.
24     Q    Yes.
25         Can you envision circumstances in which it would

Page 179

J. EAST

1
2  be safe to have more than five people -- strike that.
3          Can you envision circumstances in which it would
4  be safe to have five or more people gather on the courthouse
5  grounds after dark?
6      A    Could I --
7          Could I envision that?
8      Q    Yes.
9      A    Sure.
10     Q    And there would certainly be nights when no other
11 events are taking place and you'd have sufficient resources
12 to do whatever you would need to do to safeguard the safety
13 of that event?
14     A    If we're speaking hypothetically, I'm sure that
15 there would be a time when that would be possible.
16     Q    Okay.  Did you -- strike that.
17         Were there other events that were using your
18 resources on the 8th of August of this year that would have
19 made it impossible for you to safeguard an event taking
20 place at 8 p.m. on the courthouse grounds?
21     A    I don't recall of another event in here.
22     Q    Do you know why it took --
23         Well, back to Exhibit 30, Tab 30.
24         Do you know why it took until July 30 -- I'm
25 sorry -- why it took until July 23rd for Ms. Carwyle to

Page 180

J. EAST

1
2  inform Mr. Rash that his permit had been denied?
3      A    No, sir.
4      Q    There is a reference then on the same document to
5  an e-mail four days later, Monday July 27, and she writes,
6  "In response to your question on Friday, the courthouse
7  grounds, including the statue area, are closed for any
8  gathering after dark regardless of permit requirements, so
9  you would not be allowed to be on the grounds from 30
10 minutes prior to dusk to sunrise.  Thanks."
11         Do you see that?
12     A    Yes.
13     Q    Okay.  Did Ms. Carwyle share with you the nature
14 of the conversation she had with Mr. Rash on, it would
15 appear from this exchange, Friday the 24th of July?
16     A    I don't recall, sir.
17     Q    Okay.  Did you discuss with her in any way the
18 information she gave Mr. Rash on the morning of the 27th in
19 this e-mail chain?
20     A    I don't recall.
21         (Exhibit 31 was marked for identification.)
22 BY MR. YOUNGWOOD:
23     Q    Okay.  Let's go on to 31.  This is a document
24 beginning Bates number _346, _344.
25         She writes you, Ms. Carwyle, an e-mail.  "This

Page 181

J. EAST

1
2  was turned in this afternoon.  I guess it's exactly 14 days
3  prior to 8/27.  She had" -- I think there's a typo.
4          I think, "She had said she wanted it at seven for
5  an hour and a half.  I Googled when dusk would be, and my
6  computer said 7:54 p.m.  I called and told her she'd have to
7  be done by 7:30.  So she asked me to change the time."
8          Do you see that?
9      A    Yes, sir.
10     Q    First, you don't know if Ms. Carwyle Googled
11 "dusk" or Googled "sunset," right?
12         You don't know quite what she looked at to get
13 7:54?
14     A    No, sir.
15     Q    And when she indicates that there was a change in
16 the time, is this, sir, an instance of a circumstance where
17 the county worked with the applicant to see if the program
18 could be adjusted to allow it to take place?
19     A    Yes, sir.
20         It seems that Ms. Carwyle was trying to assist
21 her so that she wouldn't be in violation.
22     Q    Okay.  Did --
23         And it says --
24         You say at the top, "After checking with other
25 entities, we have the resources to provide them with a safe

Page 182

J. EAST

1    J. EAST
2    environment and see no safety issues."
3         Do you see that?
4    A    Yes, sir.
5    Q    Okay.  And what is it that you learned about this
6    event between 5 p.m. on August 13 and 2:05 p.m. the next day
7    that made you comfortable that it could be safe?
8    A    You know, I can't recall talking to this --
9         We have no red flags that there would be any
10   issue with this.
11   Q    Okay.  Was one of the things that gave you
12   comfort there were no red flags is that the "Explanation of
13   Use" was "Worship and prayer"?
14   A    No, sir, I don't recall exactly what it was.
15   Q    Okay.  Let's go to the next Tab 32, which will be
16   Exhibit 32.
17        (Exhibit 32 was marked for identification.)
18        VIDEOGRAPHER:  Excuse me, Mr. Youngwood.  We've
19   got a couple more minutes, and I'm going to have to
20   change the media.
21        MR. YOUNGWOOD:  We'll do this and maybe the next
22   one, and then we'll take a little break.
23        VIDEOGRAPHER:  Yes, sir.
24   BY MR. YOUNGWOOD:
25   Q    Sheriff East, there's an e-mail between you and

Page 183

J. EAST

1    J. EAST
2    Ms. Carwyle August 21.
3         "Lisa, when you have the time, will you let me
4    know if the event was approved for the rest of the month for
5    the courthouse lawn."
6         Do you recall what exactly you're asking her?
7    A    There was --
8         If I remember correctly, there was no permit, but
9    there was talk that someone wanted to -- I think this is it
10   -- wanted to use the courthouse lawn like on weekends, but I
11   don't know if that ever went through.
12   Q    Okay.  And if you could turn to the next Tab 33,
13   which will be Exhibit 33, Bates number _348.
14        (Exhibit 33 was marked for identification.)
15   BY MR. YOUNGWOOD:
16   Q    Ms. Carwyle sends -- strike that.
17        You're not on this e-mail.
18        Are you in this e-mail group "Supervisor," or
19   would that be the Board of Supervisors and probably doesn't
20   include you?
21   A    Doesn't include me.
22   Q    Then I don't have a question on it.
23        Let me ask you one or two questions, then we'll
24   change the tape.
25        During your time as sheriff, did you ever arrest

Page 184

J. EAST

1    J. EAST
2    or cite someone -- strike that.
3         During the time you've been sheriff, to your
4    knowledge, has your office ever arrested or cited someone
5    for being on courthouse grounds?
6    A    No, sir, that I can recall.
7    Q    Okay.  Whether you were sheriff or not, were you
8    aware of anyone being arrested or cited for being on
9    courthouse grounds?
10   A    No, sir, not that I know of.
11   Q    And have you ever arrested or cited someone for
12   violating the five-person rule that's articulated in the
13   Facility Use Policy as amended this year?
14   A    No, sir.
15   Q    Have you officers ever told somebody to leave
16   the courthouse grounds because they were there after dusk?
17   A    No, sir, not that I can recall right now.
18   Q    Have they ever told anyone to break up a group
19   because there was more than five people without a permit on
20   the courthouse grounds?
21   A    Yes, sir, I believe so.
22   Q    Okay.  When was that?
23   A    There have been several occasions where we had
24   spontaneous people would show up either for or against the
25   statue and have more people, and we would direct them that

Page 185

J. EAST

1    J. EAST
2    they couldn't have more than four, but they were welcome to
3    walk around on the sidewalks.
4    Q    Okay.  This was during the day?
5    A    Yes, sir.
6    Q    That was --
7    A    When was the most recent incident, or these all
8    in the summer, or are they more recent?
9    A    They were sporadic, and it was several times.  I
10   don't know exactly when it was.
11   Q    Okay.
12   A    It kind of all runs together.
13        MR. YOUNGWOOD:  I think we have to change the
14   tape, so we should go off the record.
15        VIDEOGRAPHER:  We're going off the record.  The
16   time is 2:06 p.m.
17        (Recess was taken.)
18        VIDEOGRAPHER:  This is the start of Media
19   Number 5.  We're now back on the record.  The time is
20   2:17 p.m.
21   BY MR. YOUNGWOOD:
22        (Exhibit 35 was marked for identification.)
23   BY MR. YOUNGWOOD:
24   Q    Sheriff, if you could turn to Tab 35, please.
25   A    Yes, sir.

Page 186

J. EAST

1
2      Q       We'll mark this as Exhibit 35, Bates number _364
3   to _370.  This is a letter you wrote the mayor of Oxford, am
4   I correct, in --
5              It doesn't actually have a date on it.
6              It looks like in late August or early September;
7   is that right?
8      A       Yes, sir.
9      Q       Right?
10     A       Yes, sir.
11     Q       And you wrote it following some events that took
12  place on August 28; right?
13     A       Yes, sir.
14     Q       And so what was it that gave rise to your writing
15  this letter?
16     A       We had an incident --
17             We had Ole Miss Football players on Friday,
18  August the 28th.  I guess they protested practice and were
19  marching to the square and occupied the streets and then the
20  courthouse lawn and on the statue itself.
21     Q       And what was your concern?
22     A       The concern was, first, they had no permit.  We
23  were not notified in proper time.  I did not have the
24  manpower.  It could very easily have escalated.
25             What prompted me to write the mayor is that,

Page 187

J. EAST

1
2   actually, I was notified probably about 8 -- approximately
3   8:30, 8:40, and when it was overwith we learned through
4   talking to other people that the mayor had been contacted
5   and was on scene approximately an hour before we knew about
6   it, and I was letting her know that if this was to happen
7   again that her chief of police, along with myself, were to
8   know that we're having some type of event so we can be
9   better prepared for that.
10     Q       Okay.  She responds to you on the second page,
11  September 8, and she says, "Your information is not simply
12  correct," among the other things she says.
13             Do you see that?
14     A       Yes, sir.
15     Q       Did you and she ever discuss this and figure out
16  what she thought was wrong and where you differed?
17     A       No, sir, we did not.
18     Q       You wrote another letter.  Again, I can't tell
19  the date.  It doesn't have one, but it would seem to be
20  around the same time shortly after the 28th of August, and
21  this one you write to the university.
22             Do I see that correct?
23     A       Yes, sir.
24     Q       Okay.  And in it you send them a bill for the
25  services of your officers?

Page 188

J. EAST

1
2      A       Yes, sir.
3      Q       And that was actually paid, wasn't it?  The Ole
4   Miss Athletics foundation paid you $1,509.72?
5      A       Yes, sir.
6      Q       Are there other occasions in which an order -- I
7   understand this is after the fact.
8              Are there occasions in which you proposed to
9   event organizers that if they were going to pay for
10  additional security events that might pose a safety hazard,
11  it could nevertheless go forward?
12     A       No, sir.
13     Q       Okay.  And you remember that under --
14             I'm directing you back to Exhibit 2, please,
15  which is Tab 2.
16     A       Yes, sir.  Yes, sir.
17     Q       Exhibit 2, Tab 2, page 3.
18     A       Yes, sir.
19     Q       There's the paragraph on the bottom that says,
20  "Security"?
21     A       Yes, sir.
22     Q       We discussed this earlier.  This sets forth
23  provisions under which an applicant could pay to secure
24  necessary security; correct?
25     A       Yes, sir.

Page 189

J. EAST

1
2      Q       Have you ever invoked this paragraph?
3      A       No, sir.
4      Q       It remains unchanged.  This is still part of the
5   policy today; is that right?
6      A       Yes, sir, I believe that's correct.
7      Q       Okay.  Let's go on now, sir, and this is back to
8   the exhibits that may be loose in front of you.  They're
9   some of the ones that were sent to Mr. O'Donnell this
10  morning because we got them produced later.
11             MR. YOUNGWOOD:  Mr. O'Donnell, I'll tell you, we
12     have sent you two additional images.  I don't know if
13     it's possible to print them either in black and white
14     or color.  We can also share a screen when we get to
15     them.  But those probably will be the last two things
16     we send you.
17             MR. O'DONNELL:  Yeah, let me retrieve those.
18             MR. YOUNGWOOD:  Thank you so much.  Let's wait
19     for Mr. O'Donnell to come back.
20             THE WITNESS:  Hello?
21             MR. YOUNGWOOD:  You ready?
22             THE WITNESS:  Yes, sir.
23  BY MR. YOUNGWOOD:
24     Q       Let's take a look, before we get to what Mr.
25  O'Donnell printed out, go to Tab 60, please.

Page 190

```
1                    J. EAST
2         (Exhibit 60 was marked for identification.)
3   BY MR. YOUNGWOOD:
4     Q    This is -- which we'll mark as Exhibit 60.
5         It's a two-page document.  It's an exchange
6   between you and Chief McCutchen; is that right?
7     A    No, sir.
8         I don't think 6 --
9         Is that what you told me?
10    Q    No.  I may not have spoken clearly.  Tab 60, 6-0,
11  one of the loose things that were given to you probably this
12  morning.
13        Okay.  You ready?
14    A    No, sir.  I'm not there yet.
15    Q    And I'll tell you, you may want to locate 61 as
16  well, which I think is an attachment to that exchange or
17  goes with that exchange.
18    A    Yes, sir.
19    Q    Okay.
20    A    Yes, sir.
21    Q    Okay.  So 60, it should be a series of e-mails
22  from October and November of 2020?
23    A    Yes, sir.
24    Q    Okay.  So if you turn to the second page, it's an
25  e-mail from you to Chief McCutchen?
```

Page 191

```
1                    J. EAST
2     A    Yes, sir.
3     Q    And you write him, "Would it be possible for your
4   agency to supply us with data about the downtown area?  As
5   you know, we're preparing a case in Federal Court, and this
6   information could possibly be useful."
7         Do you see that?
8     A    Yes, sir.
9     Q    And the case you're referring to is this case; is
10  that right?
11    A    Yes, sir, it is.
12    Q    Okay.  And you ask him for a collection of
13  information about the downtown area safety concerns, the
14  downtown area, et cetera; correct?
15    A    Yes, sir.
16    Q    Okay.  And you go back and forth with him, and
17  you have to remind him that you need the information again,
18  and you thank him for doing the work that he's doing.
19        That's on the first page; right?
20    A    Yes, sir.
21    Q    Now if you could go to 61, which will be marked
22  as Exhibit 61.
23    A    Yes, sir.
24        (Exhibit 61 was marked for identification.)
25
```

Page 192

```
1                    J. EAST
2   BY MR. YOUNGWOOD:
3     Q    Is this the data you requested?
4     A    Yes.  This is what he sent us, yes, sir.
5     Q    Just starting with number 5, he says, "They don't
6   have the video, but the city's EMA director may have it."
7         Did you ever obtain any of those videos?
8     A    No, sir.
9     Q    Okay.  And take your time to reread 3 and 4.
10  Well, let's actually just look at 4.
11        "What are your current safety concerns for the
12  downtown area?"
13        Do you see any references here to the courthouse
14  area?
15    A    No, sir.
16    Q    And then number 3 he gets you some information
17  regarding the downtown area at times of the home football
18  game.
19        Do you see that?
20    A    Yes, sir, I do.
21    Q    Now, how many home football games are there a
22  year?
23    A    Seven.
24    Q    So 7 out of 365 days there will be a home
25  football game; right?
```

Page 193

```
1                    J. EAST
2     A    Yes, sir.
3     Q    So any concerns associated with the home football
4   game wouldn't apply on most of the days of the year; right?
5     A    No, sir, that's not exactly true.
6     Q    Well, go ahead and explain.
7     A    The downtown area is unique, so it's hard to tell
8   when it's going to have a lot of activity, but it's a lot
9   more than seven times a year.  There's baseball season.
10  There's basketball season.  The home football game, the
11  crowds pick up Thursday, Friday, even into Sunday that they
12  have to prepare for.
13        It's just kind of sporadic.  And we saw before I
14  left it was growing more and more just on a regular basis.
15    Q    But you would agree with me it's not every night
16  of the year that the downtown area is affected by athletic
17  events at the university?
18    A    Yes, sir.
19    Q    Yes, you agree with me?
20    A    I agree that there's not an event every night of
21  the year, yes, sir.
22    Q    I don't know if the university is on break yet,
23  but it probably is close to break.
24        There's certainly no events when the university
25  is on break of large-scale athletics; right?
```

Page 194

J. EAST

1
2    A    Right.  If the university is on break, there's no
3  athletics usually going on.
4    Q    So during much of the summer the university is on
5  break, for example?
6    A    There's still baseball and stuff like that, yes,
7  sir.
8    Q    And then this data that he gave you, referring to
9  arrests in the downtown area, that's under number 1; right?
10    A    Yes, sir.
11    Q    Okay.  And wrecks and vehicle accidents in the
12  last five years, he gives you that under number 2; right?
13    A    Yes, sir.
14    Q    But there's no indication here as to whether or
15  not these accidents take place in the roads through the town
16  square or somewhere else downtown; correct?
17    A    There's no reference to where exactly those motor
18  accidents happen.
19    Q    Is there any other data that you've been provided
20  by Chief McCutchen in connection with this request that you
21  made?
22    A    No, sir.
23    Q    Or any other data that you've been provided by
24  him that was requested in connection with this case?
25    A    No, sir.

Page 195

J. EAST

1
2    Q    And I shouldn't have limited it to the chief.
3         From the department, from the Oxford Police
4  Department itself, no other data you've received?
5    A    No, sir.
6    Q    Are you waiting for other data?
7    A    No, sir.
8    Q    Okay.  Let's go back.
9         And just so I understand, I think you testified
10  to this already, but a concern that you at some point had
11  regarding Mr. Rash's application to display films and videos
12  on August 8 related to drivers being distracted by the
13  images?
14         Is that what I understood?
15    A    Yes, sir, that would be one of them.
16    Q    Okay.  When we go to Tab 6, which is Exhibit 6,
17  we looked at this before.  It's the application and permit
18  approval for Mr. Johnson's Anthony Hervey vigil at 9 p.m. on
19  July 19.
20         Do you see that?
21    A    I'm getting there.  Hold on just a second.
22    Q    Yep.
23    A    Yes, sir.
24    Q    Did you, when you granted -- strike that.
25         When you were consulted about granting this

Page 196

J. EAST

1
2  petition -- sorry -- this permit request, did you express
3  any concerns about traffic being distracted by the vigil?
4    A    I can't recall if I did or not.
5    Q    Okay.  I want you to now look at the two
6  documents that were just printed, which are tabs -- or
7  number 64 and 65.  They're two pictures.
8    A    Yes, sir.
9         (Exhibit 64 was marked for identification.)
10         (Exhibit 65 was marked for identification.)
11  BY MR. YOUNGWOOD:
12    Q    I will represent to you that these are said to
13  have been taken during that vigil.
14         Did you witness that vigil in any way?
15    A    Not there --
16         Yes, sir.  At times, yes, sir.
17    Q    You did see it.
18         So these images that 64, which is a person
19  dressed in black holding a confederate flag standing at the
20  base of the statue, and 65, which is again at the base of
21  the statue, the same individual in a black gown surrounded
22  by individuals dressed by -- as confederate soldiers holding
23  what appear to be guns -- rifles, I should say -- did you
24  see images like this when you observed the vigil?
25    A    Not in this detail, no, sir.  These were from

Page 197

J. EAST

1
2  that night, I believe.
3    Q    Okay.
4         Sir, 65, 64 -- and we can show you other pictures
5  if it's useful.  I thought two was enough.
6         Did you see these as being distracting to
7  motorists passing by?
8    A    Yes, sir, I see it --
9         I think it is distracting.
10    Q    Okay.
11    A    I think I mentioned earlier how pedestrians were
12  walking to them and talking to them.  Those were a concern.
13    Q    Were there any accidents that night?
14    A    No, sir.  Not that I know of, no, sir.
15    Q    And I mean in the square area.  I don't mean in
16  all of Lafayette County.
17    A    I gotcha.  I can't --
18         I don't know.
19    Q    Did you try to break up the event because you
20  thought it was a safety hazard as it was being performed?
21    A    No, sir.
22    Q    Okay.  And although pedestrians went up to them,
23  I assume at least some of them with some animosity; right?
24    A    I don't know.
25         I had a deputy go there to stand by, and I don't

Page 198

J. EAST

1  know if people were upset or if they had discussions. I
2  just don't know.
3
4      Q    Okay.  But whenever that was, no violence erupted
5  from it; right?
6      A    Yes, sir.
7      Q    Yes, sir, you agree with me?
8      A    Yes, sir, there was no violence.
9      Q    Okay.  And no one was in some other way hurt by
10  it -- well, at least physically hurt by it?
11     A    That's correct.
12     Q    And no property was damaged; right?
13     A    No, sir.
14         MR. YOUNGWOOD:  Okay.  Lily, Jack, unless you
15     want to talk to me or have something else, I think
16     we're done.
17         Let me just make sure my co-counsel doesn't have
18     something.
19         THE WITNESS:  Yes, sir.
20         MS. CRON:  I think that we're good.
21         MR. WILLIAMS:  I don't have anything else to add.
22         MR. YOUNGWOOD:  Sheriff, I don't know if
23     Mr. O'Donnell has questions for you, but if not, I
24     thank you for your time.  I know you have a very busy,
25     important job, and I appreciate you giving us your time

Page 199

J. EAST

1
2  today and whatever time you spent with Mr. O'Donnell to
3  prepare for this.  I know it's not something that is,
4  in your view, the best use of your time, so I thank you
5  for that.
6         THE WITNESS:  Yes, sir, thank you.
7         MR. O'DONNELL:  John, I have no questions.
8         MR. YOUNGWOOD:  Thank you.  Have a nice weekend,
9     everybody.  Be well.  We can go off the record.
10         VIDEOGRAPHER:  This is the end of the deposition.
11     The time is 2:36 p.m.
12         MR. YOUNGWOOD:  Just regular service is perfect.
13     I appreciate that.
14         MR. O'DONNELL:  Written transcript for me.
15         (Whereupon, the deposition was concluded at
16     2:36 p.m.)
17     _____
18              JOEY EAST
19  Subscribed and sworn to before me this
20  ___ day of _____, 2020.

Page 200

C E R T I F I C A T E

2
3      I, Gina Williams, Registered Professional
4  Reporter, certify that I was authorized to and did
5  stenographically report the foregoing deposition; and that
6  the transcript is a true record of the testimony given by
7  the witness; that the witness did not waive reading and
8  signing.
9
10     I further certify that I am not a relative,
11  employee, attorney, or counsel of any of the parties, nor am
12  I a relative or employee of any of the parties' attorney or
13  counsel connected with the action, nor am I financially
14  interested in this action.
15     IN WITNESS WHEREOF, I have hereunto set my hand
16  this 2nd day of January, 2021.
17
18  _____
19       Gina Williams, RPR, CRR, CRC
20
21
22
23
24
25

Page 201

J. EAST
I N D E X

JOEY EAST

EXAMINATION BY MR. YOUNGWOOD                          5
- - - -
E X H I B I T S

EXHIBIT NO.:                                         PAGE
Exhibit 39  Photographs                               17
Exhibit 44  Minutes of City of Oxford Board of        31
            Aldermen Regular Meeting dated
            October 3, 2017
Exhibit 50  Minutes of City of Oxford Board of        35
            Aldermen Regular Meeting dated May
            15,2018
Exhibit 52  Minutes of City of Oxford Board of        37
            Aldermen Regular Meeting dated June
            19, 2018
Exhibit 55  Minutes of City of Oxford Board of        40
            Aldermen Regular Meeting dated July
            17, 2018
Exhibit 57  Petition                                  42
Exhibit 58  Minutes of City of Oxford Board of        43
            Aldermen Regular Meeting dated
            September 4, 2018
Exhibit 59  Ordinance Amending Chapter 14             44
Exhibit 1   Facility Use Policy FAC-01 dated          58
            April 20, 2015, Bates Lafayette
            County Doc000002 through _05
Exhibit 2   Facility Use Policy FAC-01 dated          59
            March 4, 2019, Bates Lafayette County
            Doc000006 through _10

Page 202

J. EAST

E X H I B I T S

EXHIBIT NO.:                                                          PAGE

Exhibit 4    E-mail Chain dated June 3, 2020,                          65
             Bates Lafayette County Doc001635 and
             _36

Exhibit 5    E-mail dated June 9, 2020 and                            76
             Facility Use Application and Permit
             dated June 8, 2020, Bates Lafayette
             County Doc000241 and _42

Exhibit 6    Facility Use Application and Permit                      79
             dated June 8, 2020, Bates Lafayette
             County Doc000022

Exhibit 22   E-mail dated June 30, 2020 and                          80
             Facility Use Policy FAC-01 dated
             March 4, 2019, Bates Lafayette County
             Doc000296 through _302

Exhibit 7    Order: Amend Facility Use Policy                         82
             Regarding Use of Courthouse Grounds
             dated June 15, 2020, Bates Lafayette
             County Doc000052

Exhibit 29   Order: Approve Revision of Facilities                    98
             Use Policy to Include a Requirement
             of Application to be Made 14 Days
             Prior to Date of Proposed Use and
             Requiring Closure of Courthouse
             Grounds 30 Minutes Before Dusk dated
             July 20, 2020, Bates Lafayette County
             Doc000001

Exhibit 9    E-mail dated June 15, 2020, Bates                        103
             Lafayette County Doc001354

Exhibit 9A   Lafayette County Facebook Page                          104

Exhibit 10   E-mail dated June 17, 2020 and                          106
             Attachments, Bates Lafayette County
             Doc000249 through _253

Exhibit 11   E-mail Chain dated June 2020 and                        111
             Attachments, Bates Lafayette County
             Doc000261 through _266

Page 203

J. EAST

E X H I B I T S

EXHIBIT NO.:                                                          PAGE

Exhibit 12   E-mail dated June 18, 2020, Bates                        113
             Lafayette County Doc000504 and _05

Exhibit 14   Copy of Texts, Bates Lafayette County                   115
             Doc001615 through _1617

Exhibit 15   Facility Use Application and Permit                      120
             dated June 22, 2020 and Letter dated
             June 24, 2020, Bates Lafayette County
             Doc000025 and _26

Exhibit 16   E-mail Chain dated June 23, 2020 and                    121
             Facility Use Application and Permit
             dated June 22, 2020, Bates Lafayette
             County Doc000274 through _276

Exhibit 17   Facility Use Application and Permit                      122
             dated June 22, 2020, Bates Lafayette
             County Doc000027

Exhibit 18   E-mail Chain dated June 2020, Bates                      124
             Lafayette County Doc000281

Exhibit 19   E-mail dated June 25, 2020, Bates                        125
             Lafayette County Doc000283

Exhibit 21   E-mail Chain dated June 2020, Bates                      127
             Lafayette County Doc000291 and _292

Exhibit 24   E-mail Chain dated July 2020 and                        142
             Facility Use Application and Permit
             dated July 1, 2020, Bates Lafayette
             County Doc000311 through _313

Exhibit 40   Photograph                                              143
Exhibit 41   Photograph                                              146
Exhibit 42   Photograph                                              146
Exhibit 43   Photograph                                              146

E X H I B I T S

Page 204

J. EAST

EXHIBIT NO.:                                                          PAGE

Exhibit 25   Lafayette County Board of Supervisors                   148
             dated July 6, 2020, Bates Lafayette
             County Doc000011 through _13

Exhibit 26   E-mail dated July 15, 2020 and                          156
             Facility Use Application and Permit
             dated July 14, 2020, Bates Lafayette
             County Doc000321 and _22 and E-mail
             dated July 16, 2020, Bates Rash -
             Sheriffs Department Docs - 012

Exhibit 27   Facility Use Application and Permit                      168
             dated July 14, 2020, Bates Lafayette
             County Doc000030

Exhibit 29A  Minutes of Lafayette County Board of                    173
             Supervisors dated July 20, 2020

Exhibit 30   E-mail Chain dated July 2020, Bates                     175
             Lafayette County Doc000038

Exhibit 31   E-mail Chain dated August 2020, Bates                   180
             Lafayette County Doc000341 through
             _346

Exhibit 32   E-mail dated August 21, 2020, Bates                     182
             Lafayette County Doc000347

Exhibit 33   E-mail dated August 21, 2020,                           183
             Bates Lafayette County Doc000348

Exhibit 35   Letter to Mayor Robyn Tannehill,                        185
             Letter dated September 8, 2020 and
             Attachments, Bates Lafayette County
             Doc000364 through _370

Exhibit 60   E-mail Chain dated October 9, 2020                      190
             and November 18, 2020

Exhibit 61   Data Information 1 - 5                                   191

Exhibit 64   Photograph                                              196

Exhibit 65   Photograph                                              196

Page 205

J. EAST

ERRATA SHEET FOR THE TRANSCRIPT OF:

Case Name:          Rash v. Lafayette County

Dep. Date:          December 18, 2020

Deponent:           Joey East

                    CORRECTIONS:

PAGE  LINE                    CHANGE/REASON

___ ___    _____

___ ___    _____

___ ___    _____

___ ___    _____

___ ___    _____

___ ___    _____

___ ___    _____

___ ___    _____

___ ___    _____

___ ___    _____

           _____

                         Signature of Deponent

Subscribed and sworn to before me this

___ day of _____, 20__.

My commission expires:_____

_____

Notary Public

Index: $1,509.72..28

**$**

**$1,509.72** 188:4

**0**

**012** 204:7

**05** 201:22 203:4

**1**

**1** 4:11 50:24 51:22 58:10,13,15 161:20 194:9 201:21 203:19 204:22

**10** 59:20 79:22 106:14,15,16 131:19 201:24 202:22

**10-minute** 90:2

**100** 125:20

**10017** 3:7

**103** 202:20

**104** 202:21

**106** 202:22

**10:00** 127:21 133:10

**10:03** 125:18

**10:17** 53:6

**10:34** 53:10

**10:40** 76:14

**10:43** 143:15,18

**10:55** 66:25

**11** 27:14,15 38:3,4 111:2,3 148:12 157:7 202:24

**111** 202:24

**113** 203:4

**115** 203:5

**11:23** 86:3

**11:46** 100:21

**11:57** 100:25

**12** 113:6,7,8,11 133:7

**203:**4

**120** 203:7

**121** 203:9

**122** 203:12

**124** 203:14

**125** 203:15

**127** 203:17

**12:30** 125:20

**12:43** 130:4

**12:48** 130:8

**13** 148:13,25 182:6 204:4

**1354** 103:19

**14** 40:24 55:8,12,13, 15 97:22 98:7,19,21 99:12 100:15 114:23 115:4,12 120:5,17 166:5 181:2 201:20 202:16 203:5 204:6,9

**14-103** 45:11 56:5,10

**14-day** 99:17 169:25

**1403** 3:20

**142** 203:18

**143** 203:21

**146** 203:22,23,24

**148** 204:3

**14th** 156:20 161:18 165:23 175:2

**15** 35:17 82:2 85:18 91:5 97:12 99:25 103:25 120:18,19 158:25 177:8,22 202:14,20 203:7 204:5

**15,2018** 201:12

**150** 45:19 46:11 47:5 48:10 51:14 52:13 125:21

**156** 204:5

**15th** 83:5 97:9 103:20 105:12 161:19,21 178:7,13

**16** 11:10 121:14,15, 16 137:7 203:9 204:7

**1617** 203:6

**168** 204:8

**16th** 162:2 165:21

**17** 20:17 31:5 32:14, 17 40:3,16 44:5 51:21 52:18 53:16,25 54:2,22 57:10 117:23 122:15,17,18 131:8 201:8,16 202:22 203:12

**173** 204:10

**175** 204:12

**17th** 56:17 106:19 107:11,18 118:5,12 165:21

**18** 4:17 31:5 32:17 33:5 75:6 113:15 124:22,23,24 131:8 171:6 173:5 203:4,14 204:21 205:4

**180** 204:13

**182** 204:15

**183** 204:17

**185** 204:18

**18th** 112:4 118:5,10, 11 165:21

**19** 37:18,25 79:22 118:2,4 125:11,12,13 131:12,16 195:19 201:14 203:15

**190** 204:21

**191** 204:22

**196** 204:23,24

**1991** 6:17 9:4,5,11

**1998** 6:22

**19th** 107:12,14 118:6, 7,13,21 119:16

**1st** 142:13

**2**

**2** 32:6,20 45:17 50:24

**53**:9 56:12 58:14 59:15,16,17 77:7 93:23 94:4 135:4 177:2,11,16,18 188:14,15,17 194:12 201:23

**20** 9:12 10:12 21:8 36:2,9 58:23,24 141:23 158:25 169:12 173:25 176:23 177:7 178:6 201:21 202:18 204:11 205:20

**2002** 8:11

**2003** 41:9,11

**2012** 9:2

**2013** 9:2

**2014** 8:25

**2015** 58:23,24 201:21

**2017** 30:21 32:7 201:10

**2018** 30:21 34:7 35:17 37:18,25 40:3, 16 43:21 53:13 54:22 201:14,16,19

**2019** 8:25 9:24 51:22 60:2 145:6 146:15 177:2,12 201:23 202:11

**2020** 4:17 5:24 10:16 60:16,19,20 61:5 79:22 83:6 85:19 97:10,12 98:10 103:25 113:15 123:15 125:20 131:5, 12 145:5,11 148:13 156:20,23,24 171:6 173:25 190:22 199:20 202:4,6,7,9, 10,14,18,20,22,24 203:4,7,8,9,10,12,14, 15,17,18,19 204:3,5, 6,7,9,11,12,13,15,17, 19,21 205:4

**2021** 145:10

**2024** 10:11,13,17

**2025** 10:18

**20th** 98:10 144:24

**174**:25 178:9,13

**21** 92:25 127:4,5,6,8 183:2 203:17 204:15, 17

**22** 22:5 80:21,22,23 81:7,8,13 82:16 126:24 128:25 132:7 134:20 138:18 141:21 142:4 170:6 176:12 202:10 203:7, 10,12 204:6

**23** 10:10 17:10 203:9

**23rd** 179:25

**24** 60:19 61:5 142:7, 8,9 162:8 203:8,18

**241** 76:15

**242** 76:15

**249** 106:16

**24th** 61:2 180:15

**25** 13:14,23 63:12 69:2 148:9,10 203:15 204:3

**253** 106:16 108:10 202:23

**25th** 61:25 63:4 68:24 125:18 127:11

**26** 11:12,20 12:20 155:25 156:2,8 161:20,25 203:8 204:5

**261** 111:2

**265** 111:23

**266** 111:2 202:25

**27** 13:23 120:22 121:24 125:3,8 132:10 137:3,12 168:22,23,24 180:5 204:8

**27,000** 13:14 29:25

**274** 121:15

**276** 121:15 203:11

**27th** 121:3 180:18

**28** 186:12

**28th** 186:18 187:20

**29** 98:2,3,4,13 100:10 169:8 178:2,5 202:15

**292** 203:17

**296** 80:22

**29A** 173:21,22 204:10

**2:05** 182:6

**2:06** 185:16

**2:17** 185:20

**2:36** 199:11,16

**2:47** 143:12,19

**2A** 56:12,13

---

**3**

**3** 32:7 47:10,17 50:24 51:6 66:13 68:25 69:3 94:11 100:24 161:24 188:17 192:9, 16 201:10 202:4

**3/4/19** 77:6

**30** 14:11 30:6 82:11 84:19 97:14,16,17, 19,22 98:9 100:15 127:22 133:7,10 142:5 152:4 157:18, 22 158:2 170:3,20 171:3,14,15 172:8, 22,24,25 175:12,14 179:23,24 180:9 202:10,18 204:12

**30,000** 13:21,22 14:13

**30-day** 84:24 97:7,8, 12 100:5,7 114:6,8

**30-plus** 108:7

**302** 80:22 202:12

**30th** 176:13

**31** 180:21,23 201:9 204:13

**311** 142:11

**313** 142:11 203:20

**32** 182:15,16,17

---

204:15

**322321** 156:5

**33** 183:12,13,14 204:17

**344** 180:24

**346** 180:24

**348** 183:13

**35** 170:21 185:22,24 186:2 201:11 204:18

**36** 202:5

**364** 186:2

**365** 192:24

**37** 67:24 68:2 201:13

**370** 186:3 204:20

**38655** 3:21

**38673** 3:15

**39** 16:24 17:4,5,6 201:8

**3:20-cv-224** 4:15

**3:31** 112:4

**3:45** 171:7

**3B** 48:6

---

**4**

**4** 19:19 36:7 38:12 40:21 43:21 44:5 51:20 53:13 55:8,13 60:2 65:22,23 68:5 75:18 125:19 130:7 139:13 177:2,11 192:9,10 201:19,23 202:4,11

**40** 11:17 143:22,23, 24 201:15 203:21

**41** 146:5,7,8 158:24 203:22

**42** 146:8,9,11 158:24 201:17 202:7 203:23

**425** 3:6

**43** 146:9,10,12 158:24 201:18 203:24

---

**44** 14:25 15:17 16:14 31:21,22,23 201:9,20

**46** 9:17

**48** 15:4,17 16:14

**4:15** 170:14 171:6,9

**4:30** 170:15

**4:52** 170:20

---

**5**

**5** 19:20 33:6 40:16 58:14 66:17 74:2 76:6,8 135:4 136:4 139:11 148:13 170:5, 8 172:18 182:6 185:19 192:5 201:4 202:6 204:22

**50** 35:14,16,17 108:17 112:8,11 176:11 201:11

**50,000** 13:25

**50-person** 110:20

**52** 37:14,15,16 201:13

**55** 40:2,7,9,11,14 54:21 55:2,3,8,9 56:18 201:15

**56** 55:3,6 56:3,4,7

**57** 42:3,4,5 201:17

**58** 43:17,18,19 51:19, 21 52:18 53:12,22 201:18,21

**59** 44:17,18,19 45:10 53:21 201:20,23

**5:30** 125:20

**5th** 83:5 142:13

---

**6**

**6** 20:8 59:20 79:6,7,8 108:3,6 109:23 129:3 148:13 155:24 169:16 190:8 195:16 202:8 204:3

**6-0** 190:10

---

**6/17/20** 108:24 109:2 111:12,18

**6/19** 111:8

**6/20** 120:22

**6/7/20** 108:20

**60** 15:5,9 189:25 190:2,4,10,21 204:21

**60-person** 110:19

**61** 190:15 191:21,22, 24 204:22

**64** 196:7,9,18 197:4 204:23

**65** 196:7,10,20 197:4 202:4 204:24

**67-1-5(m)(ii)** 45:14

**670** 11:17,19

**69** 3:14

**6th** 127:13

---

**7**

**7** 38:12 55:8,13 82:17, 18,19 97:4 99:24 177:22 192:24 202:13

**7/14/2020** 156:11

**7/19/20** 77:5

**76** 202:6

**79** 202:8

**7:30** 181:7

**7:54** 181:6,13

---

**8**

**8** 108:3,6 109:23 131:11 156:23,24,25 157:5 166:5 179:20 187:2,11 195:12 202:7,9 204:19

**8/27** 181:3

**80** 11:4 15:9,16 16:11 202:10

**82** 202:13

---

**8:30** 187:3

**8:40** 187:3

**8th** 142:14 165:24 175:25 179:18

---

**9**

**9** 76:14 79:19,22 80:14 102:22 103:15, 18,19,21,22 131:16 174:2 195:18 202:6, 20 204:21

**91** 7:8,11

**98** 6:22 202:15

**9:14** 4:17

**9:57** 66:13

**9A** 104:5,12 105:6 106:3 202:21

**9p** 79:19

---

**A**

**a.m** 174:2

**a.m.** 4:17 53:6,10 66:13 76:14 100:21, 25 125:18 127:21 133:10 143:15

**Abbeville** 12:12 13:5,11,18 14:9,13, 14,15

**ability** 48:9 78:14

**absence** 6:3 27:12, 24 51:24

**absolutely** 43:9 129:22

**accept** 78:15

**acceptable** 50:8 128:14

**access** 36:13 101:11,23 135:5 164:18

**accident** 130:23,24, 25

**accidents** 194:11, 15,18 197:13

**accommodate** 176:9

**accommodations** 175:24

**accomplish** 73:16

**account** 124:12

**act** 25:8 175:10

**action** 154:23 155:2 174:18 175:3

**activities** 80:7

**activity** 144:12 193:8

**actual** 148:2

**add** 154:2 177:6 198:21

**addition** 83:21 95:3, 12

**additional** 20:9 94:13 95:18,25 96:9 136:16 188:10 189:12

**Additionally** 45:17

**address** 24:24 30:23 113:18,19,20,21,24 136:3

**addressed** 42:17

**adequate** 48:22 50:12 52:11 56:21

**adjusted** 181:18

**administrator** 136:22

**adopted** 85:19,20 176:22

**adults** 30:9

**advance** 84:19 96:5 97:16 99:18 165:23

**advanced** 84:24

**advice** 85:16

**advised** 72:2 110:14 150:4 163:22 166:17

**advising** 138:7

**affected** 193:16

**affixed** 105:14

**affixes** 106:25

**African-american** 117:5 120:5

**after-dark** 151:13 152:10

**afternoon** 74:22 86:4 181:2

**age** 36:16 115:20

**agencies** 92:23

**agency** 69:15 191:4

**agenda** 148:18

**aggressive** 30:10

**agree** 43:12 52:14 88:7 140:22 162:7 165:22 166:9 168:2 172:2,14 173:4,7 175:8 193:15,19,20 198:7

**agreed** 109:16

**agreeing** 127:21

**agricenter** 26:5

**ahead** 15:19 135:23 193:6

**Alan** 132:16

**alcohol** 8:5 30:9 32:21

**Alderman** 34:3

**Aldermen** 31:3 32:6 35:8,18 37:19 40:3, 17 42:17 43:22 53:13 54:23 139:5 201:9, 11,13,15,18

**Aldermen's** 52:16

**align** 153:8

**Allgood's** 101:16

**allowed** 65:13 66:17 81:16 112:8 141:3,4, 6,12,15 143:7 145:20 180:9

**allowing** 37:3 123:22

**amend** 105:11 202:13

**amended** 76:25 83:2

97:21 176:25 178:7 184:13

**amending** 32:20 82:23 201:20

**amendment** 38:19, 23 43:7,10,12,15 83:14 99:25 177:21, 25 178:5

**amendments** 97:9 178:13

**American** 139:16 140:5 141:11

**amount** 52:11 56:22

**ample** 97:3

**Ana** 65:25

**and/or** 8:5 100:6

**angle** 18:16,21 20:18 102:2

**animosity** 197:23

**annexed** 11:11

**anniversary** 131:13, 14

**Annotated** 45:14

**annotation** 108:16

**answering** 28:14 171:9

**answers** 26:9 72:8 124:3

**Anthony** 129:4 195:18

**anyone's** 157:8

**apologize** 10:5 60:9

**Apparently** 87:11 88:2 172:16

**appeal** 139:2,6 176:19

**appears** 22:9 58:18 60:14 76:15 79:10 113:19 144:11

**apples** 16:18

**applicable** 50:17

**applicant** 49:5 78:19 95:10 96:3 181:17

188:23

**applicants** 176:4

**application** 50:7,17 76:16 84:15 88:20 91:25 92:2 98:7,19 100:14 106:20 107:8, 9 110:3 111:6 114:12 116:18 120:21 122:16 142:12 143:14 156:10 159:2 160:7 161:18 162:9 165:23,25 174:19,25 175:4,9 195:11,17 202:6,8,16 203:7,10, 12,19 204:5,8

**applications** 76:20 77:11 84:19 87:7 97:16 136:17 157:21

**applied** 77:19 96:25 117:25 166:5

**applies** 78:18 107:11 124:14 155:22

**apply** 95:5 124:13,19 193:4

**applying** 117:18,22

**approval** 44:13 82:7 87:10 114:16 129:3 136:14 138:3 161:9 195:18

**approve** 94:20,22 99:23 202:15

**approved** 44:10,25 57:14 98:9 108:11,21 109:3 114:12 118:8 119:15 136:5,17,19 138:20 139:9 157:21, 25 176:16 183:4

**approving** 169:11

**approximate** 14:17

**approximately** 9:2 11:8,12,16,17 13:13, 21 30:5 117:17 170:14 187:2,5

**April** 34:7 58:23,24 201:21

**arbitrary** 60:25

**area** 8:7,8 12:2,15 17:22 23:15 27:7

30:4,24 33:11,13,16, 19,24 34:4 36:12 37:8 67:16 116:10 152:19 154:6,18 180:7 191:4,13,14 192:12,14,17 193:7, 16 194:9 197:15

**areas** 12:9 13:10 25:22 27:17 36:16

**arise** 131:22

**arose** 147:16 167:15

**arouse** 163:23

**arranged** 31:12

**arrest** 25:10 69:19 183:25

**arrested** 184:4,8,11

**arrests** 194:9

**art** 162:13 164:14,15, 23 165:5

**Article** 32:20

**articulated** 184:12

**artist** 39:18 44:15 157:10 162:13

**artists** 39:11

**asks** 47:22,23 71:19

**aspect** 169:25

**aspects** 43:15 128:12,13

**assaulted** 28:23 29:11 37:5

**assess** 88:17,20 89:3 93:19

**assessment** 78:6

**assigned** 7:3,15,23 8:18

**assist** 11:22 12:1 123:25 181:20

**association** 129:18 130:14

**assume** 12:24 30:12 32:11 50:20 57:20 58:5 69:2 79:15 81:24 82:14 118:14 151:16,19 152:13

197:23

**assumed** 5:24 60:16

**assuming** 31:5
75:23 92:14 98:25
121:7 168:17 169:23

**athletic** 193:16

**athletics** 188:4
193:25 194:3

**attached** 81:9,17
104:15 135:15
175:16

**attaching** 106:20

**attachment** 77:2,4
81:22 104:4 190:16

**attachments** 77:3
202:23,25 204:19

**attend** 32:12 79:17
83:8

**attendance** 32:9
35:20,23 37:21,24
40:18 44:2,3 77:20
157:18,22 158:2
174:2

**attended** 131:18

**attendees** 40:18

**attending** 157:8

**attention** 24:22
42:11 64:9 76:21
124:6,7

**attorney** 3:5,13,19
6:19,20 7:5,8,17,22
81:19 83:25 84:16,21
85:4,9,11 133:3
134:25 141:25

**attorney-client** 84:7

**attorneys** 5:14
150:25

**August** 156:23,24
157:5 165:24 166:5
179:18 182:6 183:2
186:6,12,18 187:20
195:12 204:13,15,17

**author** 114:5

**authority** 48:12
77:14,23

**availability** 78:15

**Avenue** 3:6,20 34:16

**awaiting** 7:25

**awarded** 8:22

**aware** 26:18 27:22
28:8,19 59:9,10
93:23 146:23 147:16
159:3,19,22 160:2
175:22 184:8

**awareness** 62:5

---

**B**

**B1** 17:24 49:10

**B2** 50:9

**B3** 50:11,17

**back** 9:3 29:10 30:21
37:4 39:24 41:9,11
42:8 53:3,9,12 54:21
55:2,8 68:5 72:3
75:24 82:16 86:15
90:23 91:2,12,16,18
97:4 98:16 99:24
100:24 101:3 111:23
125:22 129:2 130:7,
10,12 137:7 148:8
151:13 158:14
172:10 179:23
185:19 188:14 189:7,
19 191:16 195:8

**back-and-forth**
84:13

**background** 9:13

**balls** 88:25 89:8

**banner** 140:21

**bar** 36:13

**barricade** 67:10
68:12,16,22 69:5,22
73:15

**barricaded** 66:16
68:6,7 72:9

**barricades** 68:19
71:2

**barricading** 68:14
72:19,23

**bars** 23:16 30:6
33:20 36:22

**base** 95:22 196:20

**baseball** 193:9 194:6

**based** 36:14 93:9
168:12

**basic** 24:12 122:13

**Basically** 78:3

**basis** 193:14

**basketball** 102:18
193:10

**bat** 109:10

**Bates** 58:13 59:20
76:14 80:22 103:19
106:16 111:2 121:15
142:11 148:12 156:4
180:24 183:13 186:2
201:21,23 202:4,7,9,
11,14,18,20,23,25
203:4,5,8,10,12,14,
15,17,19 204:3,6,7,9,
12,13,15,17,19

**beat** 16:6

**began** 10:16 41:4
55:22

**begin** 10:17

**beginning** 39:13
55:22 180:24

**behalf** 4:23

**belief** 36:21

**bench** 20:9,10 23:5

**benches** 19:9,10,13,
18 20:14,15 21:4,14
22:19 23:9,20

**benefit** 33:15

**big** 118:24 119:2

**bill** 96:5 187:24

**binder** 31:13 113:13

**birth** 131:14

**Bishop** 42:16,23
43:10

**bit** 7:21 10:24 16:20
30:20 71:18 153:2

156:7 177:19

**black** 189:13 196:19,
21

**block** 47:2 50:22
70:7

**blocked** 24:9 68:12

**blue** 141:10,11

**board** 31:3 32:5 34:3
35:8,17 37:18 40:3,
17 42:17 43:21 52:16
53:13 54:23 81:20
82:7,23 88:2 98:9
100:6 105:11 127:13
133:2 136:13 139:4,
22 141:22 148:14
169:20 173:25
176:16,22 177:7
183:19 201:9,11,13,
15,18 204:3,10

**body** 9:8

**BOS** 81:19,20 136:5
138:20 160:21

**bother** 164:6

**bottom** 17:10 36:9
45:10 59:20 94:4,11
100:3,4 108:12
111:25 114:5 121:20
149:13 188:19

**Box** 3:14

**Bradley** 42:16

**brand** 7:25

**break** 52:19,21,23
53:2 89:24 90:3 91:7,
13 129:21 182:22
184:18 193:22,23,25
194:2,5 197:19

**breaking** 37:3

**breezeway** 158:9

**briefly** 7:7 9:3 127:4
129:2

**bring** 129:2

**broad** 28:25

**broaden** 27:19

**broke** 26:21

**brother** 115:23

**brought** 39:23
133:24 167:8

**budget** 112:17,21

**building** 25:25 74:24
166:20

**bullet** 34:21

**Buren** 3:20 34:16

**business** 22:21
39:22 44:6 68:10
86:10 136:12 139:12
152:25 153:3,11,13

**businesses** 36:15,
20 45:17 74:23

**busy** 198:24

**buy** 8:5

---

**C**

**C-U-R-R-E-N-C-E**
38:15

**call** 15:10 17:18 25:3
31:22 43:17 64:10
65:22 66:23 76:2
78:14,15 88:21 93:5
98:25 117:13,17
118:15,17 119:23
144:22 153:24 156:8
160:12,19 161:15

**called** 5:8 34:8,17
61:24 75:24 112:10
119:6 156:16 174:14,
17,24 181:6

**calling** 118:24,25
119:8

**calls** 43:10 118:15

**camera** 36:23 102:2

**cameras** 36:12 37:6
101:6,10,21,23
154:5,12

**campus** 13:17 72:15

**cannon** 88:25 89:8

**car** 130:24

**cardboard** 139:22

**care** 11:25 25:4 30:18

**career** 6:18

**carried** 140:21

**carry** 65:15,16 81:16 139:15,21,24

**carrying** 132:23

**Carwyle** 64:22 65:11 76:11 77:10,22 97:2 103:20 106:19 111:18 112:3 121:21 125:17,22 127:10 133:6,14 136:19 137:3,13 141:25 158:6 159:10 161:19 167:17 168:7,18 178:15 179:25 180:13,25 181:10,20 183:2,16

**Carwyle's** 109:7 125:4

**case** 4:15 58:8 78:17 112:10 191:5,9 194:24 205:3

**cases** 16:5

**caused** 61:11 62:9

**causing** 74:17

**caution** 68:19 70:9

**center** 30:8 41:6

**cetera** 191:14

**Chad** 113:15

**chain** 133:6 180:19 202:4,24 203:9,14, 17,18 204:12,13,17, 21

**chains** 75:18

**chancery** 25:25

**chances** 124:14

**change** 26:25 32:25 65:6 84:14,18 91:5 97:5 98:17 100:17 106:4 134:13 149:14 164:11 174:15,18 175:17,24 181:7,15 182:20 183:24 185:13

**CHANGE/REASON** 205:7

**changed** 52:15 56:25 81:19 123:16, 19 133:2 140:20 153:14

**changing** 123:18 176:22

**Chapter** 201:20

**chat** 17:5 31:19 102:25

**check** 73:8 125:24 150:6 157:4 158:14 160:5

**checking** 36:23 181:24

**chicken** 140:6,15

**chief** 6:9,16 8:21,22, 23 11:10,11 12:13 24:11 25:18 26:10,17 27:6,23 28:8 30:13, 16 36:10 46:18 48:11,14 51:10,13,18 59:7,9 101:5,17,20 102:4,8,10,12 110:17 113:22 121:8 132:16 143:8 154:15 163:12, 13,14 164:4,5,7 167:8 187:7 190:6,25 194:20 195:2

**child** 19:17 20:15

**choice** 42:24 52:16, 17

**choosing** 170:10

**chose** 10:3

**chosen** 126:18

**chronologically** 31:9 82:17

**circulated** 176:13

**circumstance** 181:16

**circumstances** 28:18 49:4,9 178:21, 25 179:3

**circus** 88:24

**cite** 184:2

**cited** 38:18 184:4,8, 11

**citizen** 139:10

**citizens** 42:8

**city** 7:4 8:19 11:20,22 12:7,20 13:13,23 14:3,4 15:6 24:11,19, 21 25:22,24 26:2,4,5, 6,12,17 27:24 29:23, 25 32:5 33:15 34:2 35:18 37:18 40:3,16 43:21 49:25 50:12 54:5,23 62:15 101:11 123:24 124:17 139:4 143:8 152:4 155:20 162:19 165:15 201:9, 11,13,15,18

**city's** 192:6

**civil** 58:8

**claim** 128:5

**clarification** 140:16, 18

**clarity** 85:8,22

**CLAYTON** 3:18

**clean** 151:24

**clear** 28:6 126:16 138:10

**clerk** 64:11,22

**close** 13:25 151:2 152:25 157:6 193:23

**closed** 19:4 20:5 21:2 22:3 70:10 74:8, 23 180:7

**closure** 98:8 202:17

**clothing** 131:25

**club** 23:22

**clue** 21:6

**co-counsel** 198:17

**Code** 45:14

**coexist** 43:5,8

**coffee** 23:12 158:9

**collection** 114:24 191:12

**college** 36:19,20

**color** 189:14

**combination** 47:25

**combine** 12:19

**comfort** 80:10,11 182:12

**comfortable** 182:7

**command** 14:23 78:19 121:5 123:4 132:18

**commander** 8:16

**comment** 105:15 135:4,15 139:14

**commenting** 104:17

**comments** 65:5,17 81:10,22 127:2 132:20 133:14,20 134:2 141:21 170:6 176:13,14

**commission** 205:21

**committed** 154:9

**common** 25:10

**communication** 84:7

**communications** 15:12

**community** 12:12 38:9

**comparable** 15:13, 17

**comparing** 16:18

**complaint** 37:4

**completely** 16:6

**complex** 26:6

**complicated** 103:4

**compromised** 56:23

**computer** 181:6

**concern** 33:19 126:5,6,7,22 147:24 154:3 163:15 167:6, 15 186:21,22 195:10 197:12

**concerned** 153:12

**concerns** 31:4 34:3 38:19,23 44:5

**110:**12,13,21,22 123:21 131:24 147:20,25 149:4 166:13 168:5,6 191:13 192:11 193:3 196:3

**concert** 46:25

**concluded** 199:15

**concrete** 68:18

**conduct** 49:23

**cones** 68:19

**confederate** 67:11, 19 69:18 92:11,12 93:4 129:18 130:16 140:11 141:2 149:4 161:7 196:19,22

**conference** 41:6 90:20

**confident** 83:10

**confirm** 82:22

**conflicting** 107:23

**confused** 33:8

**confusion** 67:23

**conjointly** 124:17

**connect** 67:4

**connection** 6:5 170:25 176:14 194:20,24

**consideration** 107:17 124:9 159:13, 14 166:22,23

**considerations** 77:12

**considered** 61:9 140:21

**consistent** 19:7

**consult** 60:20 61:4

**consulted** 87:7 195:25

**contact** 25:17,21 26:15 47:23 78:8,19 116:2 117:25 121:4,5

**contacted** 28:12 79:16 110:14,16

117:2 120:10 187:4

**contained** 178:20

**content** 47:11 91:24
92:15 163:18 164:7

**context** 115:16

**continue** 145:20

**continued** 93:3

**control** 12:18 49:5
94:14 95:20 110:22
119:9

**convention** 17:4

**conversation** 59:12
72:5 84:2 118:18
121:11 159:10
162:12 163:6 165:19
168:18,19 176:4
180:14

**conversations**
39:23 134:24 142:4
168:20 175:22

**converse** 132:2

**convey** 135:7

**convicted** 29:8

**copies** 57:3

**copy** 47:9 57:2 64:19
108:11 112:6 203:5

**copying** 175:15

**correct** 5:20 6:4 8:13
9:14,19 16:13 17:14
18:14,25 20:3,6,7,11,
14 21:2,3,25 24:3,4,
6,9,10 29:23 34:19,
22 37:10,12,25 38:10
40:4 41:22,25 43:15
44:3,7,10,15 51:7
56:19,22 60:17 64:4
69:12 71:6 76:21
77:24 79:25 81:20
83:20 84:17 86:6
92:8 93:13 94:23
95:20 96:6,12 97:19
99:11 102:5 103:24
106:20,23 107:6,12,
15,18 108:3,8,9,14,
22 109:20,23 110:8,
21 114:13,20 116:11
117:16 118:3 119:17
122:20 123:13

126:12,20,23 130:23
133:7 134:20 136:18,
22 138:4 143:15
144:8,10 146:3
150:10 153:7 154:23
163:11 169:3 172:20
175:10 176:6 177:13,
22 178:2,6,9 186:4
187:12,22 188:24
189:6 191:14 194:16
198:11

**CORRECTIONS**
205:6

**correctly** 38:13 62:7
79:18 116:19 123:7
126:16 183:8

**cosmetic** 153:24

**costs** 96:9

**counsel** 4:19 54:5
90:15 172:10

**count** 21:12

**counter-protest**
163:7

**counter-protesters**
124:10

**counting** 8:11

**country** 143:3

**county** 4:13,24 5:17
6:11 7:4,16 9:16,21
11:13,25 12:9 13:20,
22,25 14:4,12 15:17
16:22 24:15,17 25:23
26:4,7,8,12 58:13,14,
19 59:10,11 62:23
64:11 72:24 77:6
83:25 84:16,21 85:3,
9,11 86:4,22 88:14
93:20 95:4 101:23
104:11,24 106:8
114:19 115:17
124:19 136:18,22
138:25 143:3 144:16,
17,18,19 145:24
147:18,22 148:5,13
150:17 152:21 154:2
155:23 173:25
181:17 197:16
201:22,23 202:4,7,9,
11,14,18,20,21,23,25
203:4,5,8,11,13,14,

16,17,20 204:3,4,6,9,
10,12,14,16,17,19
205:3

**county's** 62:18
175:17

**couple** 12:13 62:15
78:10,11 102:10
112:16 182:19

**court** 4:2,14 17:3
22:22 26:6 28:10,22
58:2,5,7 68:9 86:10
91:16 191:5

**courthouse** 16:22
17:16,18,20,21 18:2,
9,16 19:14 20:14,21
22:10,19 24:2,14,23
25:7,20 26:19 27:7,
16,25 29:10,13,18
33:24 34:4,6 41:24
66:17 67:12 68:8,9,
12 69:7,10,11,12,21
70:3,6,8,10 71:3
73:20 74:2,8,12 75:2,
7 81:15 82:24 86:4,9,
21 87:25 88:10,14,18
98:8 133:16,24
136:10 144:5,10
146:15,23 147:6,18,
22 148:6 152:20
153:22,23 154:2
157:12,14 158:24
159:3,7,21 160:2
162:19 166:19,24
167:14,21 174:7,12,
15 175:25 178:22
179:4,20 180:6
183:5,10 184:5,9,16,
20 186:20 192:13
202:13,17

**cover** 11:16 124:5

**covered** 12:19 45:18
56:18

**COVID** 22:17 30:18
86:2 158:11 167:9,
16,19,21

**COVID-19** 4:3

**creating** 36:3,11
38:5 40:25

**crime** 154:8,13,21

**criminal** 29:14

**criteria** 50:5 89:3,15

**Cron** 3:9 4:22 31:19
102:25 103:9 104:10
173:11,18 198:20

**crossing** 25:6

**crowd** 35:4 46:24
89:8

**crowds** 30:17 193:11

**culmination** 41:8,11

**cup** 23:12

**curfew** 128:19 152:2

**Currence** 38:14,16,
18

**current** 5:16 27:13
149:8 150:18 192:11

**custody** 29:12

**cut** 14:7 35:6

———

**D**

**damage** 69:8,9 75:2

**damaged** 198:12

**dance** 47:25

**dangerous** 49:24
167:11

**dark** 131:24 132:3
153:3,11,14,18
157:5,7 171:15
172:3,5,7,9,12,13,23
178:22 179:5 180:8

**darkness** 154:3
178:20

**data** 191:4 192:3
194:8,19,23 195:4,6
204:22

**date** 58:23 59:25
60:25 63:25 69:4
70:21 71:16 77:6
83:7 95:23 98:8,19
107:14 108:20,25
109:11 111:12,15,18
124:15 131:4,12
143:7 144:25 165:21
186:5 187:19 202:17
205:4

**dated** 68:23,24
148:13 156:11
169:12 177:5 201:9,
11,13,15,18,21,23
202:4,6,7,9,10,11,14,
18,20,22,24 203:4,7,
9,10,12,14,15,17,18,
19 204:3,5,6,7,9,11,
12,13,15,17,19,21

**dates** 58:22 134:5
135:2

**dating** 41:8,11

**David** 3:22 4:23
90:10

**day** 22:16,18 61:2
67:4,8 74:21 78:16
82:14 94:10 98:10
108:21 109:3 112:20
114:13,16 117:20
118:6,12 119:25
123:24 127:14,20
134:16 143:19 162:5
171:22 182:6 185:4
199:20 205:20

**days** 45:21,24 46:13,
19 49:17 50:8,19
54:15,18 56:21 57:7,
15 62:2 63:15 74:14
75:14,15,16 78:10,
11,12,16 84:19
97:14,16,17,19,22
98:7,19,21 99:3,6,10,
14 100:15 107:9
109:4 121:25 152:4
175:5,10 180:5 181:2
192:24 193:4 202:16

**days'** 48:20 49:10
50:25 51:5,10 52:10
99:12

**daytime** 23:11

**dead** 18:21 66:25
129:10

**death** 61:16 62:3
63:8,13 64:3,9 71:6,8
131:14 134:3,8,14

**decades** 19:15 20:2

**December** 4:17 5:22
75:6 171:6 173:5
205:4

**decided** 119:19,20, 22 120:12

**deciding** 62:13 77:12 93:19,20

**decision** 9:23 50:6 69:22,23,24,25 73:3 95:22 125:9 137:23

**declare** 35:11

**dedicated** 122:9 124:19

**deemed** 96:2

**deems** 137:22

**defendant** 3:19 29:14

**defer** 12:4,11 155:19

**definite** 178:4

**degree** 43:4

**demonstration** 86:17

**demonstrations** 28:9

**denial** 94:2 96:19,20 121:5 125:3 137:4,12 169:3

**denied** 97:2 121:2 122:4 136:24 137:2 138:8 159:24,25 168:10,12,16 169:6 175:16 180:2

**denies** 138:12

**deny** 48:8 77:14,23 94:16,18,19,22 96:10

**denying** 96:13 125:8 137:5,15,19 138:2 161:16

**Dep** 205:4

**department** 6:10,16, 25 7:10 8:12,17 11:2, 16 25:21 26:15 29:22 30:14 50:2,11 52:12 69:15,16 73:10 95:18 132:17 145:23,24 150:4,9,13,19 154:18 195:3,4 204:7

**departments** 152:7

**depend** 78:14

**dependent** 94:9

**depending** 13:15 102:17

**Depends** 78:7

**Deponent** 205:5,19

**deposed** 5:9

**deposit** 96:16

**deposition** 4:12,16 40:15 58:3,7 73:12 199:10,15

**deputies** 29:9 70:2,5 94:13 95:19

**deputy** 8:21 15:2,6 28:23 29:5,11,13 132:16 163:10 197:25

**describe** 23:23 68:14 164:19

**designed** 41:19

**designee** 46:18 48:15

**desires** 95:3

**destroyed** 148:4

**detail** 196:25

**deter** 154:20

**determination** 89:16 99:9 124:4 165:25 166:7,11,15

**determine** 92:17 94:12 95:17 100:7 167:3

**determining** 50:16

**deterrent** 154:12

**died** 63:4 68:24 130:23

**dies** 61:25 63:12

**differed** 187:16

**difference** 46:24

**differently** 13:8

**difficult** 21:12 141:18

**diligent** 37:2

**direct** 31:21 42:20 45:6 55:8 133:14 164:9 184:25

**directing** 188:14

**direction** 19:23 20:19 21:9 22:7

**directly** 34:16 162:18

**director** 192:6

**disagreeing** 46:7

**disclose** 44:14

**discomfort** 80:11

**discourage** 75:3

**discretion** 48:8 93:12,14 99:20,22

**discuss** 37:13 65:9 84:23 113:3 120:8 180:17 187:15

**discussed** 24:8 36:3,12 83:11 84:14, 20 128:13 152:4 154:22 169:21,25 174:9,11 188:22

**discusses** 100:3,5

**discussing** 44:7 55:5 57:13 169:22

**discussion** 33:7 42:11 103:14 127:19 128:6 137:11 149:7, 11,17,20 150:21 151:11,17,20 152:11 155:2,16 175:9

**discussions** 141:20 174:6 198:2

**disk** 47:24

**dislocated** 28:24

**dispatcher** 7:11

**display** 146:16,24 147:6 148:4 159:4,8 163:15,19 164:8 195:11

**displayed** 147:17 164:21 165:9

**displaying** 159:20

**disrupted** 145:19

**dissolve** 152:8

**distinction** 25:23

**distracted** 195:12 196:3

**distracting** 197:6,9

**distributed** 102:23

**district** 4:14 30:8,22 35:9,12 36:4,11 38:5 40:25 42:12 44:6

**divide** 151:5

**Division** 7:6,23

**Doc000001** 202:19

**Doc000002** 201:22

**Doc000006** 201:24

**Doc000011** 204:4

**Doc000022** 202:9

**Doc000025** 203:8

**Doc000027** 203:13

**Doc000030** 204:9

**Doc000038** 204:12

**Doc000052** 202:14

**Doc000241** 202:7

**Doc000249** 202:23

**Doc000261** 202:25

**Doc000274** 203:11

**Doc000281** 203:14

**Doc000283** 203:16

**Doc000291** 203:17

**Doc000296** 202:12

**Doc000311** 203:20

**Doc000321** 204:6

**Doc000341** 204:14

**Doc000347** 204:16

**Doc000348** 204:17

**Doc000364** 204:20

**Doc000504** 203:4

**Doc001354** 202:20

**Doc001615** 203:6

**Doc001635** 202:4

**Docs** 204:7

**document** 32:15 40:20 42:9 45:9 52:24 56:8 58:12,20 81:9 103:19 111:7 115:11 134:19 148:12,25 156:20 173:8,24 177:5,6 178:12 180:4,23 190:5

**documents** 196:6

**dog** 9:9

**dollar** 112:9

**double-decker** 102:19

**downtown** 17:21 30:4,8,22,24 31:2 33:11,15 35:9,12 36:3,11 38:5 40:25 42:12 44:6 191:4,13, 14 192:12,17 193:7, 16 194:9,16

**draft** 55:4

**drafts** 56:24 57:5

**draw** 89:8

**dressed** 196:19,22

**drink** 23:12

**drinking** 33:12 37:3

**driver's** 106:25

**drivers** 195:12

**driving** 41:16 162:16 164:17 167:6,9,13,15 168:5

**drop** 31:19 102:25 103:11

**dropped** 39:17,20

**dropping** 152:5

**drug** 8:16

**drunk** 41:16

**due** 4:3 33:12 158:11 175:17,18

**DUI** 7:13

**duly** 5:8

**duration** 95:23

**dusk** 98:9,16 153:15
170:3,8,11,13,16
171:4,6,12,14,19,24
172:9,14,21,23,24,25
173:2 175:18 180:10
181:5,11 184:16
202:18

**duties** 11:22 75:7

**duty** 12:15

**E**

**e-mail** 31:11 65:19
66:9,20 68:24 71:9,
17,20,23 75:18,20
76:10 82:8 103:6,20,
24 106:19 112:3
113:18,19,20,21
114:2 121:20 122:3
125:4,17 127:11
128:17 132:9 137:14
143:6 160:7,17
165:20 175:14 180:5,
19,25 182:25 183:17,
18 190:25 202:4,6,
10,20,22,24 203:4,9,
14,15,17,18 204:5,6,
12,13,15,17,21

**e-mailing** 65:11

**e-mails** 67:10 71:13
81:5 113:23 134:17
190:21

**Eagle** 66:2

**earlier** 44:13 67:13
70:17 71:14 82:5,12,
15 94:18 98:24
103:13 124:6 134:3,
6,12,19 137:10
167:18 177:3,19
188:22 197:11

**early** 63:18,19 118:5
136:25 186:6

**easiest** 16:22

**easily** 186:24

**east** 4:1,12 5:1,7,12

6:1 7:1 8:1 9:1 10:1
11:1 12:1 13:1 14:1
15:1 16:1 17:1 18:1
19:1 20:1 21:1 22:1
23:1 24:1 25:1 26:1
27:1 28:1 29:1 30:1
31:1 32:1 33:1 34:1
35:1 36:1,5,10 37:1
38:1 39:1 40:1 41:1
42:1 43:1 44:1 45:1
46:1 47:1 48:1 49:1
50:1 51:1 52:1 53:1,
12 54:1 55:1 56:1
57:1 58:1 59:1 60:1
61:1 62:1 63:1 64:1
65:1 66:1,15 67:1
68:1 69:1 70:1 71:1
72:1 73:1 74:1 75:1
76:1 77:1 78:1 79:1
80:1 81:1 82:1 83:1
84:1 85:1 86:1 87:1
88:1 89:1 90:1 91:1
92:1 93:1 94:1 95:1
96:1 97:1 98:1 99:1
100:1 101:1 102:1
103:1 104:1 105:1
106:1 107:1 108:1
109:1,11 110:1
111:1,19 112:1 113:1
114:1 115:1,8 116:1
117:1 118:1 119:1
120:1 121:1 122:1
123:1 124:1 125:1
126:1 127:1 128:1
129:1 130:1 131:1
132:1 133:1 134:1
135:1 136:1 137:1
138:1 139:1 140:1
141:1 142:1 143:1
144:1 145:1 146:1
147:1 148:1 149:1
150:1 151:1 152:1
153:1 154:1 155:1
156:1 157:1 158:1
159:1 160:1 161:1
162:1,18 163:1 164:1
165:1 166:1 167:1
168:1 169:1 170:1
171:1 172:1 173:1
174:1 175:1 176:1
177:1 178:1 179:1
180:1 181:1 182:1,25
183:1 184:1 185:1
186:1 187:1 188:1
189:1 190:1 191:1
192:1 193:1 194:1

195:1 196:1 197:1
198:1 199:1,18
201:1,3 202:1 203:1
204:1 205:1,5

**echo** 90:18

**effect** 60:5 154:12

**effective** 51:22 58:23
59:25

**effectively** 171:13

**elected** 5:22 10:16

**election** 86:11

**eliminated** 100:14

**elimination** 44:14

**EMA** 192:6

**emergency** 101:15

**employees** 14:25
22:22

**employment** 5:16

**empowers** 95:17
96:9

**end** 65:3 75:19
102:20 112:17,20
135:14 160:11
199:10

**ended** 29:7

**ends** 76:24

**enforce** 25:10

**enforced** 26:7

**enforcement** 9:14,
20 15:14 26:8 95:25

**enjoyment** 22:20

**enter** 176:3

**entertainment** 30:8

**entire** 13:25

**entities** 150:24
181:25

**entrance** 68:20

**entrances** 74:12

**entry** 36:16

**environment** 78:3
80:3,7,12,14 182:2

**envision** 178:25
179:3,7

**equal** 135:5

**ERRATA** 205:2

**erupted** 198:4

**escalated** 186:24

**escape** 35:4

**ESQUIRE** 3:8,9,16,
22

**establish** 31:2

**established** 33:17
37:7

**establishment** 34:8

**establishment's**
48:9

**establishments**
45:13

**estimate** 14:9

**evaluation** 114:6,8

**evening** 23:7,18,24
24:6 37:12 44:25
156:22

**event** 24:22,24 27:6
41:8 45:19,20,21,22,
24,25 46:2 47:5,19
48:22 49:13,15,23
50:13,19 51:6 52:12
61:23 62:19,23,24
80:9,14 93:10 94:8,
14 95:19,23 96:2,22,
25 107:11,14 108:2
109:23,25 110:20
111:8 117:19 118:2,
21 119:7,12,13,14
121:12 122:7,10
123:5,23 124:5,15
142:13 144:22
156:22 163:6 164:16
165:11 166:5 167:4
171:7 173:6 175:25
178:22 179:13,19,21
182:6 183:4 187:8
188:9 193:20 197:19

**events** 26:18 27:16
41:8,11,18,23 45:18
46:11 47:24 48:2,9
49:16 51:14 62:3,5,9,
10,12,25 63:3,7

99:15 102:17 124:6,
8,9 132:23 161:8
165:15 166:24 176:5
179:11,17 186:11
188:10 193:17,24

**eventually** 159:24

**exact** 31:6 46:16
63:25 69:4 74:13
75:13 83:7 84:13
96:24 102:11,16
117:20 131:20 134:5
135:2 141:24 147:7,
11 153:19 163:8

**EXAMINATION** 5:10
201:4

**examples** 50:10

**excessive** 152:5

**exchange** 65:25
66:6,11 67:22 71:9
81:4 82:9 180:15
190:5,16,17

**exclude** 11:19

**excluding** 57:23

**excuse** 129:11
182:18

**exec** 155:4

**executive** 155:6,9,20

**exhibit** 17:5,6 31:22,
23 35:14,17 37:15,16
40:7,14 42:4,5 43:18,
19 44:18,19 45:10
51:19,21 52:18 53:12
54:21 55:3 56:18
58:13,15 59:15,16,17
65:22,23 68:2,5
75:18 76:6,8 77:7
79:7,8 80:22,23
82:18,19 93:23 98:3,
4,13 99:24 100:10
103:15,19,22 104:5,
12 106:14,16 111:2,
3,5 113:7,8,11 115:4,
12 120:4,18,19
121:15,16 122:17,18
124:24 125:12,13
126:24 127:5,6
128:24 129:3 132:7
134:20 137:7 138:18
141:21 142:4,8,9
143:23,24 146:5,8,9,

Index: exhibits..geographic

10,11,12 148:8,9,10
156:2,8 161:20
168:23,24 169:8
170:6 173:22 175:12
176:12 177:2,11,18
178:5 179:23 180:21
182:16,17 183:13,14
185:22 186:2 188:14,
17 190:2,4 191:22,24
195:16 196:9,10
201:7,8,9,11,13,15,
17,18,20,21,23
202:3,4,6,8,10,13,15,
20,21,22,24 203:3,4,
5,7,9,12,14,15,17,18,
21,22,23,24 204:2,3,
5,8,10,12,13,15,17,
18,21,22,23,24

**exhibits** 70:17
158:24 189:8

**existence** 64:8

**expanded** 26:24

**expect** 26:13,14

**expected** 117:3

**expects** 125:20

**expense** 95:2

**experience** 154:14

**expires** 205:21

**explain** 101:7 193:6

**explained** 162:23
164:15

**explanation** 92:8,11
110:7 122:23 142:19
157:10 182:12

**express** 196:2

**extent** 94:13 95:18

**extra** 50:21,22 74:23
77:21 79:4 143:9

---

**F**

**FAC-01** 201:21,23
202:11

**FAC01** 59:22

**Facebook** 104:7,9,
11,21 105:15 106:3

202:21

**facilities** 59:11 135:5
202:15

**facility** 39:6 58:19
59:19 61:13 71:11
76:24 77:5,6 82:23
83:2,5,11 105:12
125:23 127:12
128:10 132:20
133:15 149:14 150:5
151:7 152:24,25
154:22 169:12
184:13 201:21,23
202:6,8,11,13 203:7,
10,12,19 204:5,8

**facing** 18:13 19:23,
24 20:19,20 21:10,11
22:8,9

**fact** 54:6 77:2 92:7
137:22 188:7

**factor** 125:9

**factors** 50:16

**fair** 18:15 20:10
129:19 145:3

**fall** 88:25

**false** 42:24

**familiar** 62:17,18
70:13 132:22 139:4
161:10

**familiarity** 59:7

**familiarize** 61:14

**family** 9:13,25

**father** 9:15

**favor** 92:10

**FBI** 120:10

**February** 52:2,6

**Federal** 191:5

**feel** 33:5 36:22 69:16
78:21 80:18 119:6

**feels** 138:3

**felt** 10:2 69:6,7 74:9
77:20 80:6 85:22
107:24 110:22
114:22 133:20

**female** 37:4

**fence** 25:7 70:16

**fest** 147:10,12

**festival** 22:24 158:8

**field** 110:24

**fight** 30:10

**fights** 26:21 37:3

**figure** 15:5 64:14
187:15

**filled** 156:10

**fills** 156:19

**film** 147:10,12 159:4,
8,20 160:3 164:20

**films** 146:16,24
147:6,17,21 148:4
164:24 165:4 167:20
195:11

**final** 44:24 45:5 46:5
56:6 57:2 104:14

**find** 17:8 56:4 73:7
77:19 88:21 89:2,5
93:5,18 99:7 160:19
163:24

**fine** 91:7 128:16
130:2

**finish** 15:4 60:10
135:23

**fired** 34:8,13 35:2

**fit** 10:4

**five-day** 48:25 54:12
56:13,19

**five-member** 84:15

**five-person** 84:23
184:12

**flag** 123:7,8,9,10,14,
15,17 126:10,11
130:22 139:16 140:2,
5,8,10,11,13,15
141:2,5,14 196:19

**flagpole** 132:24

**flags** 65:16 81:16
125:16,23 126:2,5,14
128:20 130:16
139:14,15 140:10,23

141:9,10,11 151:16
182:9,12

**flip** 103:12 155:24
177:16

**Floyd** 61:2,12,25
63:4,7,8,12 68:24

**Floyd's** 61:16 64:3
71:6,7 134:3,7,13

**focus** 16:21

**focused** 94:7

**folks** 23:18

**follow** 62:2,7 73:12
87:19 88:12

**follow-up** 128:17

**football** 102:18
186:17 192:17,21,25
193:3,10

**force** 9:10 12:4 50:23
94:7,9

**forces** 12:10 16:6

**foresee** 93:6

**forget** 13:3

**form** 15:19 27:3 28:3
44:10 92:7 110:3
146:21

**forward** 31:9 51:6
88:22 113:23 133:6
160:21 161:24 176:6
188:11

**forwarded** 107:5

**forwards** 161:19

**found** 36:19 37:22

**foundation** 188:4

**Four-year** 10:20

**fourth** 32:15 36:2
38:14 56:3

**frame** 61:18 63:20
64:5 70:4

**free** 33:5 66:23
127:13

**Friday** 112:6 180:6,
15 186:17 193:11

**Fringe** 158:8

**front** 16:25 40:13
81:12 82:21 93:22
103:21 105:16 106:5
134:21,23 136:13
144:5,9 189:8

**full** 38:14

**fully** 16:14

**fundamental** 43:11,
13

**fundraiser** 47:25

**future** 41:21 121:25

---

**G**

**game** 102:18 192:18,
25 193:4,10

**games** 192:21

**garbled** 45:23 80:5

**gate** 18:19,24,25 19:6

**gated** 74:12

**gates** 24:8

**gather** 86:17,20 87:3,
24 88:9,18 179:4

**gathering** 83:16 85:5
86:14 87:9 88:13
92:25 93:3 107:9
120:9 180:8

**gatherings** 39:2

**gating** 133:23,24

**gave** 7:19 15:5,9,16,
17 51:4 72:8 80:10
89:6 105:7 131:10
133:14 134:16 166:6
180:18 182:11
186:14 194:8

**general** 7:20,24

**General's** 6:19,21
7:5,8,18,22

**generally** 78:11
97:19

**gentleman's** 38:13

**geographic** 11:15
116:10 171:23

**geography** 12:19

**George** 61:2,12 77:4 79:16 121:24 137:16 138:15

**Gina** 4:2

**give** 25:19 26:9 32:3, 4 38:9 45:25 50:10 58:3 65:18 72:10 74:23 78:2 80:11 94:19 104:15 107:20 112:12 114:16 133:18 135:9 143:17

**giving** 15:6,7 78:10 93:20 163:8 198:25

**glad** 104:23 106:7

**glancing** 93:25 94:12

**glass** 35:3,5

**globe** 153:23

**gmail** 113:14

**good** 5:12 39:23 73:14 74:25 175:15 198:20

**Googled** 181:5,10,11

**gotcha** 112:2 156:15 197:17

**government** 86:24 87:17 138:25

**gown** 196:21

**grant** 8:2,3 77:13,14 80:17 93:21 107:21 108:11

**granted** 79:10 108:14 122:11,20 142:16 162:8 195:24

**granting** 161:16 195:25

**great** 57:17 66:19 144:20

**greater** 48:9

**grew** 9:20 116:9 117:3

**ground** 22:20 25:6

**grounds** 17:17,18,20

**geography** 20:14 22:19 23:19 24:2,14,23 25:7,20 26:19 27:7,16,25 29:18 41:25 61:10 66:17 68:9,12 69:7, 10 70:11 73:21 74:2 82:24 86:4,6,9,21 87:25 88:10,14,18 98:9 105:12 133:25 135:5 144:16,18,19 174:7,15 178:22 179:5,20 180:7,9 184:5,9,16,20 202:13,18

**group** 84:15 142:25 183:18 184:18

**growing** 115:18 117:2 119:10 193:14

**guess** 8:25 42:7,15 60:7 75:24 106:25 107:4 120:4 130:20 135:19 181:2 186:18

**guidelines** 58:18

**gun** 34:8 35:2

**gun-toters** 15:10,21

**guns** 196:23

**guy** 66:16

**H**

**habit** 25:10

**hairs** 171:17

**half** 181:5

**hand** 39:8 123:25

**handed** 103:17

**handle** 12:15 26:16 92:23

**handwriting** 109:8,9 148:25 149:2,3

**handy** 55:2

**happen** 27:15 30:11, 12 114:7 187:6 194:18

**happened** 119:13 147:2

**happening** 25:2 160:13

**harassed** 37:5

**hard** 152:23 193:7

**harmful** 49:24

**hazard** 89:7 132:4 188:10 197:20

**head** 14:9 85:16

**heading** 53:17

**heads** 112:12

**health** 49:24 94:5 135:15

**hear** 27:16 57:25 61:21 64:21 65:3 90:8,11,18 148:21 166:3 170:24

**heard** 124:2 146:2 161:4 164:16 174:6

**hearing** 38:5 40:24 41:4,6 55:23 120:10

**height** 19:6,7

**held** 4:16 103:14 126:14 162:16 166:24

**helpful** 33:6

**helps** 154:6,8,9

**Hervey** 129:4,9,10, 16 130:18,21 195:18

**Highpoint** 158:9

**hired** 6:17 7:11,12 8:17

**hiring** 15:4

**his/her** 46:18

**historic** 69:8

**history** 57:6

**hit** 88:25 126:8,11

**hold** 40:5 45:8 48:9 195:21

**holding** 49:16 126:9 142:25 196:19,22

**home** 117:14 119:11, 24 192:17,21,24

193:3,10

**homework** 73:11

**hope** 25:2 55:4 76:12

**hour** 138:22 181:5 187:5

**hours** 22:21 74:20 136:12 139:12 152:25 153:3,11,13 161:25 162:9

**hurt** 28:19 35:3,5,6 148:3 198:9,10

**hypothetically** 179:14

**I**

**i.e.** 47:24

**ID** 36:15

**idea** 119:8 161:3,13

**ideals** 42:25 43:5,6

**identification** 17:6 31:23 35:14 37:16 40:7 42:5 43:19 44:19 58:15 59:17 65:23 76:8 79:8 80:23 82:19 98:4 103:15 104:12 106:14 111:3 113:8 115:4 120:19 121:16 122:18 124:24 125:13 127:6 142:9 143:24 146:5,11,12 148:10 156:2 168:24 173:22 175:12 180:21 182:17 183:14 185:22 190:2 191:24 196:9,10

**identified** 36:5 40:23

**identify** 20:18 21:9 34:2

**IDS** 36:23

**ignorant** 161:3,13

**ignore** 25:13,14

**illegal** 132:24

**images** 146:14 189:12 195:13

193:3,10

**homework** 73:11

**immediately** 27:17, 25 29:19

**important** 85:20 86:22 118:24 198:25

**imposition** 8:18

**impossible** 49:5 179:19

**impression** 139:2

**inadvertently** 128:4

**inappropriate** 25:5

**incident** 29:4 30:21 34:7,19 35:7 61:12 72:13 144:21,22 166:25 167:23,25 168:4 185:7 186:16

**incidents** 28:20 29:16,22 41:16 148:3

**include** 14:13 15:11 26:24 47:19 98:6 140:14 183:20,21 202:16

**included** 14:12 36:12 176:21

**including** 14:9,25 15:10 140:11 180:7

**inclusion** 97:8

**incorporated** 12:13

**increase** 124:14

**increasing** 33:12

**indication** 116:14 155:5 194:14

**individual** 88:20 196:21

**individuals** 196:22

**inform** 96:3 180:2

**information** 39:9 47:23 48:5 51:5 69:20 78:24 89:4,6 160:12,20,25 161:5 180:18 187:11 191:6, 13,17 192:16 204:22

**informed** 146:25 147:5 169:5

**injured** 29:13,18

**input** 77:25 83:21,24 93:20 94:6,23 107:6, 20 159:18 162:8

**inquiry** 161:6,25 162:5

**insertion** 85:4 86:14

**inside** 11:24 26:2,4, 5,6 74:24

**installations** 157:10

**installing** 101:6

**instance** 176:19 181:16

**instruct** 84:4,9

**instructions** 25:19

**instructor** 7:13

**insurance** 112:9 119:10

**intended** 135:7

**intent** 137:25

**interpret** 140:24 141:14,18 171:18

**interpretation** 172:15,19

**interpreting** 27:20 140:4 171:12

**introduce** 4:19 5:2

**introduced** 5:13

**investigations** 8:19

**Investigator** 7:6

**invoked** 189:2

**involved** 92:21 118:20 145:23,24

**involvement** 76:18

**involving** 16:5 128:18

**issue** 137:14 182:10

**issued** 79:25 104:18 105:11 109:17,20 143:9 175:18

**issues** 36:11 93:8 112:16,24 131:21

132:2 154:6 175:19 182:2

**issuing** 152:7

**item** 32:14,17 36:2 40:23 44:5 51:21 52:18 53:18,25 54:2 55:8,13,15 56:12

**items** 61:10

---

## J

**J.F.** 156:10

**Jaarome** 3:25 4:18

**Jack** 5:3 198:14

**Jackson** 3:16 142:13

**January** 5:24 51:22 52:2,5 60:16,19

**JE** 81:24

**JE1** 81:23

**job** 7:4,12 8:15 198:25

**jobs** 9:8

**jockey** 47:24

**Joey** 4:12 5:7 36:5 112:15 116:7 199:18 201:3 205:5

**John** 4:12 5:12 31:14 38:14 84:6 103:5 105:4,22 199:7

**Johnson** 77:4 79:16 120:21 121:24 122:16 123:5 125:19 130:15 161:8,11,15

**Johnson's** 129:4 137:3,12 195:18

**joined** 9:10

**Jonathan** 3:8 4:21

**judge** 29:9

**judgment** 93:13

**juggle** 99:15

**juggling** 88:24 89:7

**July** 40:3,16 54:22 56:17 57:10 63:23,24

79:22 98:10 125:19 127:13 131:12,16 141:23 142:13 148:13 155:24 156:20 165:23 166:5 169:12,16 173:25 176:23 177:7,9 178:6,9,13 179:24,25 180:5,15 195:19 201:15 202:18 203:18,19 204:3,5,6, 7,9,11,12

**June** 37:18,25 63:18, 19 66:13 68:25 69:3 76:14 82:11 83:6 85:18 97:9,12 99:25 103:20,25 105:12 106:19 113:15 117:23 118:2,4 120:22 121:24 125:3, 8,18 127:11,22 131:11 132:10 133:7, 10 134:3 137:3,12 142:5 144:24 176:14 177:8,22 178:2,7,13 201:13 202:4,6,7,9, 10,14,20,22,24 203:4,7,8,9,10,12,14, 15,17

**jurisdiction** 10:25 11:5,14,15,21 12:3 13:4 25:9,15

**jurisdictional** 25:6

**justice** 26:6

---

## K

**keeping** 65:12 92:10

**killed** 34:19 41:16 61:3

**killing** 63:7

**kind** 28:25 31:2 33:3 35:4 68:18 72:3 74:10,18 119:19 139:5 141:16 151:24 177:15 185:12 193:13

**knew** 64:14 80:8 115:21,22 147:7 187:5

**knowing** 10:5 59:14

**knowledge** 22:3 133:13 184:4

---

## L

**label** 31:14

**labeled** 17:24

**Lafayette** 4:13,24 5:17 6:11 7:16 9:16, 21 12:10 13:19,22 62:23 77:5 88:15 104:10 115:17,25 148:13 150:17 173:25 197:16 201:21,23 202:4,7,9, 11,14,18,20,21,23,25 203:4,5,8,10,12,14, 16,17,19 204:3,6,9, 10,12,14,16,17,19 205:3

**land** 27:25 29:19 155:17

**language** 39:4 151:24 153:15

**large** 46:24 118:18 126:7 160:14

**large-scale** 193:25

**larger** 30:17 117:2,3

**late** 63:18,23 152:3 186:6

**law** 9:13,20 15:14 26:8 95:25

**lawn** 75:3 167:14 183:5,10 186:20

**lawyer** 16:5

**leading** 10:3 29:17

**leads** 137:11

**learn** 27:11 159:7

**learned** 159:6 182:5 187:3

**leave** 6:3,25 8:18 27:12,24 29:9 51:23 155:12 171:11 184:15

**leaving** 51:18 152:14,16

**led** 9:23

**left** 6:24 7:4 10:3 11:2,4 51:23 52:2,5 90:15 193:14

**lessen** 41:20

**lets** 138:15

**letter** 186:3,15 187:18 203:7 204:18, 19

**letters** 155:4

**letting** 187:6

**Lexington** 3:6

**liability** 112:9

**Library** 34:17

**license** 107:2

**light** 153:23 157:11

**lighting** 33:22 153:25

**lights** 153:22,23 154:2

**likelihood** 41:20

**Lily** 3:9 4:21 102:20 103:12 104:8,9 173:17 198:14

**Limit** 108:16

**limitation** 49:6

**limited** 73:22 125:4,9 195:2

**limits** 10:21

**Lisa** 64:19,22 121:23 183:3

**list** 44:2

**listed** 12:16 32:9 55:15 113:18 148:18 174:2

**listen** 155:16

**literally** 45:3

**litigation** 16:22

**live** 47:24 101:25 102:3

**Lives** 141:10

**local** 9:9 12:4,10 34:17 129:17 162:13

**locate** 65:20 190:15

**located** 26:5 34:16

**location** 34:14 95:23 149:8 171:23 175:24

**long** 6:15 10:7,8 19:10,14,15 20:10,12 21:5,6,16 27:12 63:13 70:24 74:11 75:12 78:5 97:17,20 98:22 119:23 167:21 175:9

**longer** 114:15 129:23

**looked** 22:13 51:19, 20 54:22 61:7,8 64:18 67:13 70:16 77:7 81:2,3 82:3,4,5, 12,13,14 111:12 121:23 126:25 134:7, 13 137:10 169:9,16 170:6 177:3,8,13,14, 18,21,24 181:12 195:17

**loose** 189:8 190:11

**Lord** 10:2

**lost** 177:10,15

**lot** 9:25 30:7,18 31:4 36:20,21 78:7 112:11 117:10 147:15 151:22 155:21 164:18 177:14 193:8

**lots** 23:15

**love** 140:6,15 142:19 143:2

**low-lit** 153:24

**LSO** 150:22

**lunch** 87:4,10,12

**Lyric** 34:8,13,15,16

---

**M**

**made** 26:18 27:22 28:8 30:22 33:18 34:13 39:24 44:12

**maintain** 46:25

**major** 8:20 132:17

**make** 8:2 16:17 25:9 33:16,23 37:2 39:8 48:21 50:6 73:3 74:25 78:19 87:15,16 89:15 93:13 99:2,9 103:3 130:11 132:8 150:6 160:11 161:25 162:5 163:10 165:24, 25 166:6,10,15 175:23 198:17

**makes** 73:12 87:23

**making** 9:23 65:17

**male** 117:6 120:5

**Mallette** 53:24 54:4,7

**man** 29:8

**management** 14:23

**manager** 101:15

**manpower** 73:22 74:7 125:5,9 152:23 186:24

**march** 60:2 62:16 92:25 177:2,11 201:23 202:11

**marching** 186:19

**margin** 81:23 135:8

**mark** 35:16 37:15 40:14 42:4 44:17 59:16 68:2 79:7 80:22 82:18 98:2,12 103:18 104:5 106:15 120:18 121:15 122:16 127:4 142:7 143:23 146:8,9 148:9 173:20 186:2 190:4

**marked** 17:6 31:23 35:14 37:16 40:7

**42:5 43:19 44:19 45:10 58:15 59:17 65:23 76:8 79:8 80:23 82:19 98:4,13 103:15 104:12 106:14 111:3 112:7 113:7,8 115:4,12 120:19 121:16 122:18 124:24 125:13 127:6 142:9 143:24 146:5,11,12 148:10 152:12 156:2 168:24 173:22 175:12 180:21 182:17 183:14 185:22 190:2 191:21, 24 196:9,10**

**Martin** 102:8

**Martinez** 65:25 66:7 71:13

**matches** 77:6

**material** 31:11

**math** 14:2,8

**matter** 4:12 5:15 84:11 89:23 92:3 125:21 141:10

**matters** 58:5

**mayor** 31:3 41:4 55:20,22 186:3,25 187:4 204:18

**Mccutchen** 143:8 190:6,25 194:20

**Mclarty** 113:15

**meaning** 78:12 109:14 136:15 138:21 139:7 159:16

**means** 50:20 59:23 75:22 76:5 103:3 108:21,25 109:16 150:8 164:22 172:5,7

**meant** 39:4 41:13 76:4 79:3 106:11 136:9 138:9 159:16 171:9 172:11

**measure** 11:9

**measures** 92:19 99:4 155:21

**media** 4:11 53:8 69:17 100:23 112:11 114:24 130:6 182:20 185:18

**meet** 23:22 93:11 109:21,22 127:12,21

**meeting** 32:6 34:2,3 35:18,23 37:19,24 40:4,17 43:22,24 44:9 53:14 54:8,11, 16,17 56:17 57:11 83:5,8,12 84:25 87:12 88:4 98:14 117:14 119:11 120:14 127:13,25 128:6,9 133:9 141:22 148:20 149:10 151:11,21 154:23 155:2 169:10,13,17, 19 173:10 174:6,9, 14,25 175:4 201:9, 11,13,15,18

**meetings** 32:12 35:8 37:10 57:14

**member** 77:18

**memory** 26:23 128:18 150:2

**mentioned** 12:7 13:4 80:25 151:12 197:11

**mentions** 139:15

**message** 113:14 139:16,22 140:3,20

**messages** 140:23

**met** 39:8 150:3,24,25

**method** 31:17

**methods** 35:13

**Metro** 7:15

**middle** 17:21 42:23 56:9 66:25 68:17 100:4 115:8 132:6 137:13 152:20

**Mike** 7:6

**mileage** 12:22

**miles** 11:8,11,12,17, 20 13:6,9

**million** 112:9

**Mills** 81:14 110:17 121:9 132:10,16 160:11,12,18 161:25 162:11 163:10,12,13, 14 164:4,5,7,10,12 165:3,18 166:17 167:8

**mind** 54:25 55:7 62:13 65:6,21

**mine** 17:9

**minimum** 47:20

**minors** 8:2

**Minton** 104:21 105:15 106:4

**minus** 6:18

**minute** 33:8 103:10

**minutes** 32:5 35:18 37:19 43:23 53:14 54:22 55:2 56:18 82:2 90:24 91:5 98:9 129:23 158:25 161:21 170:3,21 171:3,14,15 172:8, 22,24,25 173:24 180:10 182:19 201:9, 11,13,15,18 202:18 204:10

**missed** 72:3

**Mississippi** 4:13,15, 24 5:18 6:10,18,20 7:17 11:24 12:8 14:10,16 45:14 62:10,12,24,25 122:23 123:2,10,14 140:8 141:5 150:14, 20

**misspeak** 178:4

**misspoke** 53:22 136:21

**modifications** 176:5

**moment** 32:3 60:13 76:17

**momentarily** 128:24

**Monday** 180:5

**monitor** 70:5

**monitored** 69:17

**month** 183:4

**months** 27:14,15 33:4 157:25

**monument** 69:18 70:3 71:2 96:25 123:7 163:2,15

**Moore** 7:6,24

**morning** 5:12 31:11 127:14 143:15 161:19,21 162:2 175:15 180:18 189:10 190:12

**motor** 194:17

**motorists** 197:7

**mounted** 34:12 102:5,12 154:17

**mousetrap** 117:6 120:6

**move** 22:17 57:18 82:16 106:15 120:17 142:7 149:8 176:18

**moving** 31:9

**muffled** 52:4

**multiple** 57:13 75:19 99:15 124:8 152:8

**music** 39:3 47:24

**mute** 57:25

**N**

**named** 106:23

**names** 32:17 39:10 54:6 100:4

**narcotics** 7:3,15

**national** 62:9

**nationally** 62:2

**natural** 10:4

**nature** 49:23 80:9 121:10 123:5 164:20, 22 180:13

**needed** 44:14 50:22, 23 52:12 54:14 62:18 77:21 78:23 79:4 85:22 114:20 123:25

133:20 140:16 160:8 163:24

**neighbor** 142:19 143:2

**network** 152:6

**neutral** 91:24 92:15

**newspaper** 171:22

**nice** 199:8

**night** 19:4 34:11 37:9,10,11 65:13 80:14 112:6 122:10 133:19 146:16 152:19 159:4 160:3 165:15 193:15,20 197:2,13

**nights** 179:10

**nighttime** 79:22

**north** 17:25 18:7,8,10 22:9 144:6

**Northeast** 9:7

**Northern** 4:14

**Northwest** 9:8

**Notary** 205:23

**notation** 111:19

**note** 150:2

**noted** 38:4

**notes** 38:2 81:18 132:25 168:9 169:16, 17 170:6

**nothing's** 139:8

**notice** 45:18,25 46:10,22 47:6,11,19 48:17,20 49:6,10 50:8,13,18,25 51:5, 10 52:11 54:12 56:13,19,22 57:7 97:7,9,13 98:18 99:12,18

**noticeable** 74:18

**notices** 51:13

**notified** 39:7 61:8 69:14 186:23 187:2

**Notwithstanding** 110:19

**November** 190:22 204:21

**number** 4:15 15:7,9 36:8,14 38:3,4 42:8 47:10,13,14 51:6 53:9 66:21 74:13 75:13 76:14 79:14 80:22 100:24 102:16 103:19 108:7 121:15 130:7 131:20 142:11 148:12 156:4 157:20 180:24 183:13 185:19 186:2 192:5, 16 194:9,12 196:7

**numbered** 17:11 42:21 45:7 111:24 113:6

**numbers** 13:15 14:17,19 46:16 58:13 59:20 106:16 111:2 115:10

**numerous** 9:8 52:15 57:3

**NY** 3:7

**O**

**O'DONNELL** 3:18, 22 4:10,23 15:19 27:3 28:3,5 31:10,14, 18 84:3,6 90:17,20 91:2 102:24 103:5 105:3,7,18,22 121:21 127:11 128:3,7,11, 15,16 134:9 137:14 142:2 146:21 168:7, 19 173:10,14 189:9, 11,17,19,25 198:23 199:2,7,14

**Object** 15:19 27:3 28:3 146:21

**objected** 80:16

**objection** 79:24 109:19

**objects** 65:16 157:12,14

**observed** 196:24

**obtain** 160:12 192:7

**obtained** 161:8

**occasion** 51:9 60:20 61:4 131:10

**occasions** 142:2 147:2,17 148:17 151:23 184:23 188:6, 8

**occupancy** 36:14

**occupied** 186:19

**occurred** 144:24 145:2,11,14

**occurring** 27:6

**October** 32:6,7 190:22 201:10 204:21

**offhand** 26:22 29:2 41:12,17 65:7

**office** 6:6,19,21 7:5, 6,8,18,22 27:13 125:18 150:17,18,19 184:4

**officer** 7:12,13 12:18 24:21

**officers** 11:3,4 12:14 14:22 15:11,22 16:10,11,15 24:25 25:19 26:11 74:19,20 75:7,12 102:5,13 123:24 184:15 187:25

**official** 69:23

**officials** 150:25

**older** 115:23

**Ole** 102:18 186:17 188:3

**one's** 12:14 178:17

**one-hour** 79:21

**one-page** 103:19

**online** 64:10,18

**OPD** 150:3,8,19,22, 24

**open** 18:24,25 19:3 65:12 127:17 136:9, 10,12 139:9 152:15, 17 162:17

**opening** 19:2,21,25 20:2,23 21:2,20,22, 24 22:13

**openings** 15:3 19:25 70:19 71:3

**operating** 45:13

**operation** 33:19

**opinion** 36:25 88:11 132:4

**opinions** 93:15

**opportunity** 38:8

**opposed** 111:11

**opposing** 136:16

**options** 35:12

**order** 82:22 98:6 124:22 127:3 156:7 169:11 176:21 188:6 202:13,15

**ordinance** 30:23 32:21 35:9 36:3,11, 18 37:9 38:5,9,23,25 39:15,25 40:25 41:7, 19 42:12 44:6,9,25 46:6,10 51:4,21 52:7 53:16 55:5,16 57:13 201:20

**organization** 156:14,16

**organized** 87:11 88:4

**organizers** 188:9

**original** 39:14 47:9 85:23 86:15 132:9

**originally** 102:8 132:8

**outer** 148:5

**overloading** 150:6

**overwith** 187:3

**owner** 45:22,25

**owner's** 47:22

**owners** 39:22

**Oxford** 3:21 6:9,10, 11,15,24 7:10 8:7,9, 11 10:25 11:5,9,20,

22 12:7,20 13:11,13, 24 14:3,4 15:6,16 16:12,21 17:13 23:14,24 24:12,19,21 25:22 26:10,18 27:24 29:22,23 30:13 32:5 35:18 37:18 40:3,16 41:6 43:21 54:5,23 62:24 66:2 67:16 69:15 101:11 113:19 115:25 129:17 147:8, 10,12 148:5 150:8 154:18 163:3 170:20 186:3 195:3 201:9, 11,13,15,18

**P**

**p.m** 74:2

**p.m.** 40:16 66:17 79:19,22 80:14 108:3,6 109:23 112:4 130:4,8 131:16 133:7 136:4 139:11 143:12 148:13 156:25 157:5, 7 170:5,8 171:7 172:18 179:20 181:6 182:6 185:16,20 195:18 199:11,16

**P.O.** 3:14

**packed** 117:10

**pages** 19:19 42:21 59:21 103:7 111:24 148:24

**paid** 188:3,4

**paperwork** 114:14

**paragraph** 38:14 96:8 135:13 188:19 189:2

**park** 74:24

**parking** 33:21 162:18 164:18 167:12

**part** 11:20 38:25 39:9 54:7 72:19 94:9 137:11 158:7 189:4

**part-time** 12:14

**parties** 4:6

**pass** 74:19 131:2

**passed** 37:9,12 51:18,21 52:8 175:6

**passes** 171:7

**passing** 197:7

**past** 139:10 147:3,17, 22 148:4 152:13 160:3 166:25

**patrol** 7:12 34:12 74:23 102:6

**patrols** 154:17

**patron** 34:8 37:5

**patronage** 36:20

**pay** 95:6,13 96:9 188:9,23

**payment** 96:15

**pedestrian** 33:21 89:7

**pedestrians** 131:25 197:11,22

**pending** 90:8,16 91:14 132:22

**people** 8:3 13:14 16:9 22:18,25 23:2,8, 11,21 25:10 29:25 30:7,9 37:2 41:15 45:19 47:5 48:10 51:14 52:13 61:9,13 64:24 65:15 69:7,20 70:11 75:2 79:3,13, 17,22 83:15,16 85:6, 21 86:6,9,12,14,20 87:3,9,24 88:9,13,18, 22 89:9 93:6,7 108:7 112:5,8 117:3 118:19 119:7 121:13 125:21 131:18,25 132:3 133:21,24 140:24 142:25 148:3 157:18, 22 158:2,10 160:14 162:15,19 163:7,23 164:7,17 166:20,21 167:6,9 176:9,10 179:2,4 184:19,24,25 187:4 198:2

**perfect** 199:12

**perform** 11:22 39:11

**performed** 197:20

**performing** 44:15 75:7

**period** 29:17 56:14, 19 68:8 97:7,9 99:17 100:5,7,11,14 114:6, 9

**permit** 61:9 65:13 76:15,20 77:5,10,15, 19 78:6,18,19,22 79:11,24 80:17 81:15 83:16 84:14 85:6,20, 24 86:18 87:4,13,24 88:5,9 92:20 93:21 95:5,10 96:3,10,13, 16,19,25 99:10 106:20 107:9,22 108:11 109:17,19 112:6,7 114:12 116:18 117:25 118:5, 8 119:19 120:3,13, 22,25 121:23 122:4 124:14,18 125:3,8, 19,23 126:17 128:11 132:24 133:18 136:24 137:12 138:3, 8,12 143:7 144:14,19 149:14 152:3 158:18, 21 159:13,19,24,25 168:10,12 169:3,6 171:10 175:16,17 180:2,8 183:8 184:19 186:22 195:17 196:2 202:6,8 203:7,10,12, 19 204:5,8

**permits** 39:2 143:8 152:8 157:21,24 161:16 162:8 175:18

**permitted** 51:6 144:12 155:15

**permitting** 86:16,20, 23

**person** 35:2,3,6 61:10 78:8,15 85:23 86:17 98:25 130:21 196:18

**personal** 88:11 93:14 116:14

**personally** 78:18

**personnel** 36:14 47:2 50:12 94:8

110:23

**perspective** 107:21 143:18

**petition** 42:7,10,15 196:2 201:17

**phone** 66:20,21 71:25 98:25 117:17 118:17 119:23 160:11 170:19

**phones** 171:22

**photograph** 143:23 203:21,22,23,24 204:23,24

**photographer** 18:6 20:19,20 21:10,11 22:7,9 144:6

**Photographs** 201:8

**physical** 69:9

**physically** 28:19 29:18 198:10

**pick** 60:24 139:11 193:11

**picked** 61:3

**pickup** 21:21

**picture** 16:23 21:13 22:14 68:11 120:4 144:5

**pictures** 17:9,10 20:2 67:13 158:23 165:5 196:7 197:4

**piece** 139:21

**place** 23:22 26:19 33:16 41:24 59:14 60:16 71:10 74:19 87:17 88:12 101:25 107:12 108:2 109:23 117:19,20 119:16,18 121:12 122:8 123:22 127:20,25 129:7 131:16 134:2 141:22 167:4 170:16 175:23 177:8 179:11,20 181:18 186:12 194:15

**placement** 93:3

**Plaintiff** 3:5,13 5:4, 14

**Plaintiffs** 4:22 5:3

**plan** 50:13

**planned** 47:24 118:21

**planning** 48:7

**plans** 66:18

**plastic** 68:19

**plastic-type** 70:12

**play** 170:10

**played** 62:13

**players** 186:17

**point** 20:5 42:11 57:12 65:9 80:25 86:3 116:17,22 134:10 195:10

**pointed** 48:25 94:25

**points** 99:23

**pole** 65:17 81:17,18 126:15 128:20 139:25 140:2

**poles** 81:3

**police** 6:9,15,16,24 7:10 8:12,17,22,23 9:10 10:25 12:4,10, 13 15:11,22,23 16:6, 9,11,15 24:11,21,25 25:18 26:10,17 27:6, 23 29:22 30:13 46:18 48:14 49:25 50:11,22 51:11,13 52:12 58:4 69:15,16 73:10 94:7, 9 101:5 113:22 150:8,13,19 154:16, 18 187:7 195:3

**policies** 56:24 151:2

**policing** 36:21

**policy** 39:25 59:6,10, 19 60:5,15,21 61:5,8, 11,17 62:6,14 63:14 64:7,8,13 71:11 76:24 77:6 81:2,15 82:4,8,12,24 83:3,5, 11,22 85:5 87:5,10, 12 88:8 93:18,24 97:15,17,21 105:12 106:5 112:9,10,16,25 113:4 126:13,17

127:13 128:10,13
132:21 133:15 134:7,
13 136:10 138:21
139:20,21 141:7,17
150:5 151:7 153:16,
17 154:22 155:16
169:12,21 171:3,18
172:25 174:12,15,18
175:17 176:13,22
177:2,12,18 178:12,
20 184:13 189:5
201:21,23 202:11,13,
16

**political** 49:14 89:13,
17,22 123:6

**Pope** 53:24 54:4

**population** 13:9,10,
19 33:13

**portion** 54:8 98:17

**pose** 89:12,16 94:5
188:10

**poses** 88:14,18
135:15

**position** 5:19,24 6:3,
8 7:9,17,20 8:20,21,
22

**positions** 15:14

**positive** 83:10 119:7

**possibly** 191:6

**post** 65:16 104:20
120:11

**poster** 139:22

**posting** 105:15
106:4

**posts** 114:24

**potential** 30:23
65:10 133:15 169:20

**power** 46:19 48:24

**Powerpoint** 41:5

**practice** 102:5
186:18

**pray** 143:3

**prayer** 9:25 89:12,16
142:20 143:4 182:13

**preceding** 157:25

**precise** 10:15

**predate** 82:8

**predates** 59:2

**prefer** 52:25

**prepare** 52:12 163:7
193:12 199:3

**prepared** 187:9

**preparing** 191:5

**presence** 74:25

**present** 54:10
163:16

**presentation** 41:5

**presented** 31:3
36:10 53:17 54:8
57:2

**presenting** 57:13

**press** 102:21 104:14,
17 105:10

**pretend** 95:10

**pretty** 19:6

**prevent** 41:20

**prevented** 123:22

**previous** 133:17,20

**previously** 83:19
115:18 142:2 146:24
158:9 159:3,8,20

**print** 103:8 105:23
111:25 173:11
189:13

**printed** 104:5 189:25
196:6

**printout** 105:7

**prior** 6:2,3,8 22:14
50:19 61:5,20,23
66:10 72:18 83:5,12
84:25 98:7,19 111:17
137:19 141:21
150:18,25 175:4
180:10 181:3 202:17

**private** 39:5

**privilege** 128:5

**pro** 110:2,5,10,13,20
123:7 130:15,20

**pro-confederate**
96:25 161:8

**procedures** 58:18

**proceed** 175:25

**proceeding** 57:22

**process** 4:7 15:4
44:13 50:13 57:12
62:17,18 86:16,20,
23,25 117:18 139:2,6
147:23 166:15
176:20

**processing** 99:16

**produced** 58:12,14
77:3 104:4 189:10

**professional** 93:15
116:5

**program** 181:17

**progressing** 30:16

**progressively** 30:17

**prohibited** 125:23

**prohibits** 125:25

**project** 144:18

**projecting** 144:16

**projection** 156:17
158:11,20 161:7
162:14

**projections** 157:11

**projector** 166:18

**promoted** 8:21

**prompted** 186:25

**pronounce** 38:13
76:11

**pronouncing** 76:12

**proper** 45:22 46:23
96:21 186:23

**properly** 8:3 36:23

**properties** 26:12

**property** 24:15,17
25:23 26:7 45:25
47:22 69:8,12 72:24
144:17 148:3 162:19
198:12

**proposals** 39:14

**propose** 36:17,18

**proposed** 35:8 36:3,
10 38:5,9 40:25 98:8,
20 107:14 134:18
137:4 188:8 202:17

**proposing** 107:9

**protect** 73:17,20

**protecting** 104:24
106:8

**protection** 79:4 96:2
154:19

**protest** 86:16,21
89:13,17,22,23 92:4,
10,12,17 123:6

**protested** 186:18

**protesting** 92:20

**protests** 62:2,16

**protocols** 31:3

**provide** 45:18 73:23
78:3,5 80:2,7,12,13,
19 95:2,13,15 96:21
97:3 107:24 181:25

**provided** 39:10 49:6
51:5 95:4 194:19,23

**provision** 39:17 46:5
50:9 51:14 100:10,13

**provisions** 188:23

**pub** 34:17

**public** 10:6 14:19
36:13 38:4 40:24
41:4,6 42:24 43:4,7
49:15,24 55:23 62:16
94:14,19,24 95:20
96:22 104:11 112:5
155:11,15,17 205:23

**pull** 119:19 120:12
162:19 164:18

**purpose** 46:21 48:20
73:21 80:6 86:13
120:2

**purposes** 86:21
92:22

**pushed** 35:3

**put** 8:19 17:5 39:24
49:19 70:15,19,21
83:14 87:17 101:13,
17 126:21 139:3
152:23 153:13 170:5

---

**Q**

**question** 10:14
26:24 28:14,25 44:22
72:10 73:18 74:3
84:9 90:8,16 91:14,
18,20,21 99:2 105:3
125:16 130:10,12
144:20 148:22 151:9
177:10 180:6 183:22

**questions** 13:8
24:13 52:24 66:19
71:19 72:7 97:4
162:21 183:23
198:23 199:7

**quick** 52:19,22

**quickly** 93:25 94:11
97:25 101:4 103:8
143:22

---

**R**

**radio** 34:12

**radius** 30:6

**raise** 112:25

**raised** 168:5

**rank** 7:9

**Rash** 4:13 5:15
156:10 158:17
159:16 162:12,22,24
164:6,7 165:19 169:5
173:6 175:15,16,23
176:8 180:2,14,18
204:7 205:3

**Rash's** 159:13,19,24
161:18 169:3 174:18,
25 175:4 195:11

**rationale** 152:16

**reach** 77:18 78:23
79:2 123:4

**reached** 66:20

**react** 49:15

**reacting** 106:4

**reaction** 38:9

**read** 33:5 42:18 47:8 60:12 64:25 65:4 79:18,19,23 81:16,18 88:6 91:16,18,22,23 92:2,5 130:10,12 150:2 151:15 167:18

**readers** 36:15

**reading** 38:4 40:24 65:15 126:13 138:10 139:20 157:12,23

**reads** 48:11

**ready** 66:5 105:25 127:8,9 189:21 190:13

**real** 52:21

**reason** 33:10 36:17, 18 51:17 68:21 72:19,23 105:22 114:15 122:13 141:16 167:17,18 178:19

**reasons** 94:17 96:19 122:6 143:6

**recall** 26:20,22 27:10,18 29:16,20 33:9 34:5,7 38:22 39:12 41:17 42:2,10 46:5,14,16 51:12,16 52:5 54:19 56:20 57:4,6,8 59:13 63:2 64:10,18 65:7 71:16 72:8,12 74:4,13 82:13 83:13 84:22 85:2 97:11,23 98:15 101:19 112:23 113:5 114:4 118:16 120:15 130:22 131:19 134:22,24 135:24 141:24 147:19 149:7, 19,23 151:7,10,20,22 160:4 163:4,5,8 169:15,24 174:13,16 176:12 178:18 179:21 180:16,20 182:8,14 183:6 184:6,17 196:4

**receive** 51:13

**received** 103:24 108:22 158:7 159:2 195:4

**receiving** 158:17,20

**recent** 19:7 185:7,8

**recess** 53:7 100:22 130:5 185:17

**recognize** 43:23 55:4 66:6 82:22,25 98:6 105:10 109:7,9 146:19 149:2,3

**recollection** 122:4 155:8 173:9 174:5

**recommend** 96:20

**recommendation** 99:2 137:16,20,23,24 138:15

**recommendations** 33:11,14,17,18,23

**recommended** 96:19 122:4

**record** 4:20 5:13 10:6 14:20 53:5,9 67:23 73:4 90:2,6,14, 22 91:10 100:18,20, 24 103:14 130:3,7 185:14,15,19 199:9

**records** 112:5 134:18

**red** 182:9,12

**redrafted** 176:25

**reduce** 48:25 97:22

**reduced** 100:15

**refer** 30:7 65:21 146:7 172:10

**reference** 93:18 94:19 115:7 116:13, 14 142:24 150:15 152:2,10 180:4 194:17

**referenced** 71:17 150:21

**references** 67:9 192:13

**referencing** 68:3

**referred** 41:10

**referring** 64:20 65:19 68:6 191:9 194:8

**refers** 56:13 68:6

**reflect** 90:15

**refresh** 122:3 150:2 173:9 174:5

**refusal** 96:9

**regular** 32:6 40:3 43:22 193:14 199:12 201:9,11,13,15,18

**regularly** 33:3

**regulated** 58:19

**regulations** 87:17

**reject** 42:24

**related** 63:8 81:5 195:12

**relates** 32:20 55:15 133:15

**relationship** 17:19 116:6

**release** 102:21 104:14,17 105:10

**relevant** 124:4

**rely** 36:20

**remains** 189:4

**remember** 19:16,17 20:13 32:24 33:7 34:10 35:10 46:9,10, 13 49:21 54:9 57:16 59:12 62:19 63:17,21 65:11,17 67:5,7 70:21 71:5 72:5,12 84:22 104:17 110:17 116:23,25 118:17,18 119:5,8 120:21,24 123:6 126:13,16 131:3,4 134:15 139:24 142:3 144:21 145:21 147:14 148:22 149:11,22 151:23 154:25 157:6 162:14 168:21 169:19,22,23 174:16

176:11,17 183:8 188:13

**remembering** 27:5

**remind** 191:17

**reminder** 70:10

**remote** 4:7

**remotely** 4:5,16

**rendition** 18:15

**rent** 39:5

**Repeat** 95:8 166:3 178:23

**repeating** 135:19

**reporter** 4:2 17:3 91:16

**Reporting** 4:3,18

**reports** 146:2

**represent** 51:20 146:14 196:12

**representing** 5:14

**request** 51:10 78:6 84:24 88:17 102:2 112:5 121:23 125:19 136:4 137:3,12 138:19 176:16 194:20 196:2

**requested** 192:3 194:24

**require** 47:5 83:16 84:14 85:20 87:10,23 88:8 97:16 144:14,19

**required** 39:2 47:11 97:13,14 98:18,19

**requirement** 44:14 46:11,22 48:17 54:12 83:19 84:24 85:5 86:14 98:7 100:15 202:16

**requirements** 46:19 107:3 180:8

**requires** 84:18 85:6

**requiring** 36:12,15 98:8 202:17

**reread** 192:9

**residence** 117:4,6

**resident** 115:17 129:17

**residents** 49:25

**resources** 48:22 50:21 73:22 74:10 122:8,11 124:19 143:9 152:9,18,21 179:11,18 181:25

**respond** 66:22 71:23,25 127:17 161:20

**responded** 71:24

**responds** 187:10

**response** 41:7 180:6

**rest** 183:4

**restaurant** 23:25 36:13

**restaurants** 23:15 33:19 36:22

**restriction** 36:16 136:17 176:15 178:20

**Restrictions** 45:13

**restroom** 52:21 90:21

**result** 72:14

**retrieve** 189:17

**return** 8:14 132:7

**returned** 8:11 35:7 98:25

**review** 61:11,17 62:13

**reviewed** 58:23 64:23,24,25 83:4

**reviewing** 122:3

**revised** 44:10

**Revision** 202:15

**revisions** 127:12

**revisit** 33:10 39:24 112:16

**rewritten** 178:11

**rides** 23:12

**rifles** 196:23

**rise** 131:11 186:14

**risk** 88:14,19 89:6,12, 17 93:2,15 94:5 135:6,8,16,20

**road** 50:22

**roads** 47:2 194:15

**Robyn** 204:18

**rock** 46:25

**role** 60:16 62:13 170:10

**room** 4:4 90:15,21 166:21

**roughly** 7:16 27:14

**rule** 85:20 184:12

**rules** 26:7 87:16 88:5,6,7,12 114:6

**run** 8:17 9:23 10:3,8, 10,21 27:12 90:14

**running** 6:5 10:22 35:4 90:12

**runs** 185:12

**S**

**safe** 9:20 78:3 79:4 80:3,7,12,13 167:4 178:22 179:2,4 181:25 182:7

**safeguard** 48:22 179:12,19

**safely** 124:5

**safer** 33:16 37:8

**safety** 31:4 33:10,14 34:3 42:24 43:5,7 47:2 49:25 88:14,19 89:6,12,17 94:5,15, 19,24 95:20 96:19,22 107:21 110:12 123:21 131:21,23 135:6,8,15,20 143:18 147:20 148:2 150:3, 22 151:10 152:6 154:6,10,19 165:24

166:6,10,13,16 179:12 182:2 188:10 191:13 192:11 197:20

**Sanitation** 50:21

**Saturday** 121:24 156:23

**scanners** 36:15

**scene** 187:5

**schedule** 102:14

**scheduled** 45:19 123:23

**school** 9:6,7 115:19, 24

**schools** 26:4

**Scott** 132:16 160:11

**screen** 189:14

**screens** 157:14

**season** 193:9,10

**section** 45:10,11,18 48:25 56:5,9 94:25

**secure** 188:23

**security** 28:11 36:14,25 39:8 46:23 50:23 73:23 77:21 80:2,6,19 92:19,22 93:2,9,13,16,19 94:11 95:2,3,6,12,15 96:21 97:3 99:4,7,9 101:10 107:25 109:21 110:13,21 114:22 143:6 155:21 163:25 175:18 188:10,20,24

**security-type** 35:13

**seeking** 156:22

**send** 8:4 64:19 103:5 137:15 173:14,17 187:24 189:16

**sending** 132:20

**sends** 77:10 112:3 138:14 173:11 183:16

**sense** 73:12 87:15, 16,23 133:21 164:24

**sentence** 95:9,17 135:14

**sentenced** 29:9

**separate** 168:19

**September** 43:21 53:13 186:6 187:11 201:19 204:19

**series** 190:21

**serve** 154:19

**service** 7:5 199:12

**services** 7:23 15:15 50:12 187:25

**session** 155:6,9

**sessions** 112:17,21 155:20

**set** 17:9 35:20 54:22 70:17 170:20 171:22

**sets** 172:2,6 188:22

**settlement** 7:25

**seventh** 45:9

**severity** 4:3

**share** 25:23 39:18 137:4,19 168:6 180:13 189:14

**shattered** 35:5

**she'd** 181:6

**SHEET** 205:2

**sheriff** 5:12,17 6:6 9:15,17,24 11:14 29:17 31:12,21 53:12 59:2 60:6 66:15 84:14 87:21 90:4 91:13 94:12,13 95:18 96:2,18 100:7 101:3 103:3 109:11 111:19 119:2 128:17 132:17 145:14 151:6 182:25 183:25 184:3,7 185:24 198:22

**sheriff's** 11:16 25:21 26:15 60:16 145:24 150:4,17

**sheriffs** 15:2,6 204:7

**shop** 9:8

**short** 68:8 75:8

**shorten** 100:13

**shortly** 51:23 187:20

**shots** 34:12

**shoulder** 28:23

**show** 71:18 82:7 112:11 158:11 164:14 184:24 197:4

**showing** 41:5 134:18 164:14

**shown** 41:5 147:21 158:23,24 167:20 175:11

**shows** 114:14,17

**shut** 74:10 136:11

**sic** 108:20 120:17

**side** 18:3,4,8 20:21 162:18

**sidewalks** 185:3

**sign** 24:5 81:17 126:18 140:6

**sign-off** 143:17

**signage** 24:7

**signature** 108:12 109:7 111:18 205:19

**Signatures** 42:8

**signed** 42:7,15

**signs** 126:13 142:25

**similar** 26:9 166:24

**simply** 48:7 187:11

**SIMPSON** 3:4

**sir** 5:21,23,25 6:4,7, 13 7:2 8:9,13 9:7,15, 22 10:23 11:7 12:5, 12,17,25 13:6,12,18 14:5,12,21 15:8 16:2, 13,19 17:2,8,12 18:3, 9,17,20,23 19:2,5,8, 11,22,23,24 20:4,12, 16,25 21:15,18,23 22:2,4,6,12 23:2,11 24:16,18,20,25 25:25 26:14 27:2,10,13 29:7,15,20,24 30:3,

15 31:2,24 32:8,10, 13,16,19,23 33:25 34:5,7,9,10,20,23 35:25 36:7 37:13 38:2,7,11 39:13,16, 19,21 40:12,19,22 41:3,12,22 42:2,13 43:3,4,9,14,16,25 44:4,8,11,16,24 45:12 46:7,12,20 47:7 48:4 50:4 52:2,9 53:15,20 54:3,9,13, 16,24 55:18,25 56:11,16,20 57:19 58:2,6,9,10,11,12 59:4,5,8,24 60:4,14, 18,22 61:6,18 62:21 64:5 65:18 66:9,12 67:3,14,18,21 68:4,7 69:25 70:14,18,20,23 71:5,7,8,16 72:17 75:8,15 76:13,22 77:9 78:13,17 79:12, 20,23 80:4,19 81:13, 21,25 82:6,10,22 85:15 86:19 87:15,22 88:6 89:18 90:13 92:9,14,15,24 93:5 94:18,24 96:17 97:24 98:14,15,21 99:4,19, 22 100:2,9,12,16 101:12,14,18,22 102:7 103:23 104:2, 19 105:2,13,17 106:17 107:16,19,23 109:13,15,18,24 111:10,14,22 112:14, 19 113:2,12,17,22,25 115:3,15 116:3,7,16 117:10,24 119:21 120:16,23 121:6,18 122:5,25 123:16,19, 23 124:16 125:15 127:8,9,16,24 128:2 129:5,8,12,14,15,20 130:14,24 131:6,8, 17,19 132:14,19 133:5,8,11,13,17 134:12,21,24,25 135:11,18,25 136:7 137:8,18,21 138:5,18 139:19,23 140:10,13, 19,22,25 141:9,13,19 142:6,15,18,22 143:11,13,16,20 144:3,11,13,23

145:13,15,22,25
146:4,14,17,25
147:4,19 148:7,16,19
149:6,9,12,16,18
151:19 152:18 153:5,
10 154:20,24 155:7,
10,13 156:6,21,24
157:3,4,9,17,19
158:3,13,16,19,22
159:5,23 160:23
161:23 162:4,10
163:4,16 164:5
165:6,10 166:9 167:2
168:2,21 170:9,12,
18,23 171:2,5,14,16
173:7,8 174:4,8,13
175:7,11,21 176:2,24
177:14,17,23 178:3,
10,14 180:3,16
181:9,14,16,19
182:4,14,23 184:6,
10,14,17,21 185:5,25
186:8,10,13 187:14,
17,23 188:2,5,12,16,
18,21,25 189:3,6,7,
22 190:7,14,18,20,23
191:2,8,11,15,20,23
192:4,8,15,20 193:2,
5,18,21 194:7,10,13,
22,25 195:5,7,15,23
196:8,16,25 197:4,8,
14,21 198:6,7,8,13,
19 199:6

**sit** 22:19 23:2,8,11,
19,21,25

**sits** 17:21

**sitting** 23:5

**situation** 25:4 26:15
27:23 29:6 92:23

**sixth** 56:4,8

**size** 11:9 95:23

**slowed** 154:15

**slower** 105:9 177:16

**slowly** 117:9

**small** 111:25

**smaller** 12:24

**social** 23:22 69:17
112:11 114:24 116:5

**society** 49:16

**soldier** 18:12

**soldiers** 196:22

**solicit** 84:4

**solving** 154:8

**Somebody's** 79:13

**sort** 18:24 27:23 49:9
68:16 78:22 124:15
131:21 155:6

**sorts** 164:23

**sought** 48:5,6 85:16
161:8

**sound** 63:20 97:15,
17 145:12

**sounds** 117:13

**sources** 151:5

**south** 18:3,4,7,8,13,
21,22 20:20 67:12

**space** 159:19

**spaces** 70:16 162:18

**span** 114:16

**speak** 49:20 54:11,
17 56:19 112:20
116:12,18,21,22
117:7 164:3

**speaking** 116:25
179:14

**speakings** 62:16

**special** 136:4,14
138:19 176:16

**specialty** 101:16

**specific** 27:5 47:23,
25 62:10,23 134:16
141:2 142:3 165:6
175:24

**specifically** 84:8
174:14,17

**specifics** 116:24

**spent** 8:10 199:2

**split** 171:17

**spoke** 55:20 60:9
61:21 83:24 94:18
110:11 116:20
117:11

**spoken** 125:18 143:7
190:10

**spontaneous**
184:24

**sporadic** 185:9
193:13

**spread** 89:9 122:11
158:10

**spring** 92:25

**square** 11:8,10,12,
17,20 12:22 13:6,9
16:21 17:13,20,22
68:17 93:4 101:6,10
102:6 148:5 167:11
186:19 194:16
197:15

**stab** 105:23

**staff** 33:14 39:7
77:18 78:8

**staffed** 16:14

**stand** 166:21 197:25

**standing** 18:6 85:23
144:19 196:19

**Stands** 122:23 123:2

**start** 4:11 45:23 53:8
79:18 100:23 117:11
125:15 130:6 156:9,
25 185:18

**started** 61:17 63:10
71:10 102:8 116:25

**starting** 68:13 192:5

**state** 5:16 8:8 114:7
123:9,13,15 139:16

**stated** 80:18

**statement** 141:16

**States** 4:14

**station** 70:2

**statue** 17:25 18:12,
19,22,25 22:11 24:17
26:24 27:8,17 28:2
29:19 66:16 67:10,
12,19 68:3,6,7,13,14,
22 69:10 72:9,15,19,
23 73:17 75:3 92:11,
12 93:4 110:2,5,6,7,
10,13,20 130:22

**statues** 67:16 130:16

**stay** 70:6 74:24

**staying** 13:16,17

**step** 16:7 101:3

**stick** 65:17 81:17
126:7,9,11,21
151:16,18

**sticks** 125:23,25
126:5 151:3,24

**stipulate** 4:6

**stop** 24:2 29:10
143:2 152:3

**stopped** 139:12

**stopping** 93:7 132:3

**store** 9:9 116:12

**street** 47:2 89:9
166:20

**streets** 186:19

**stressed** 41:7

**strictly** 74:7

**strike** 11:13 24:12
34:21 49:14,22 50:7
70:24 110:20 151:8,9
172:8 179:2,16
183:16 184:2 195:24

**string** 68:20

**structure** 10:25

**students** 13:16
36:21 41:15

**stuff** 77:20 102:3
119:10 177:14 194:6

**subject** 84:11,20
89:22 92:3 119:3
125:21 128:9 151:7
172:14,18

**submit** 112:8

**submitted** 84:19
114:13

**Subscribed** 199:19
205:20

**subsequent** 116:17

**subsequently** 97:21

**substance** 128:12
162:12

**sufficient** 166:6
179:11

**sufficiently** 165:23

**suggest** 65:6 113:12
134:19 138:2

**suggestion** 176:17,
18,21

**suggestions** 33:17

**summary** 33:6

**summer** 57:23 87:20
123:15 145:2,5,8,11
146:15 153:6 185:8
194:4

**sun** 170:19 172:2,6

**Sunday** 193:11

**sundown** 153:14

**sunrise** 180:10

**sunset** 170:17,21
171:13,19,21,24
181:11

**supervisor** 114:19
136:18 183:18

**supervisors** 81:20
82:7,23 83:12 88:2
98:10 100:6 104:23
105:11 106:7 133:2
136:13 137:5,15,20
138:4,14 141:22
148:14 169:20
173:25 176:16,22
177:7 183:19 204:3,
11

**supply** 191:4

**support** 85:4 92:12
93:3 151:5

**supported** 52:7 85:7

**supportive** 130:22

**surprised** 86:12

**surprising** 86:5

**surrounded** 196:21

**surrounding** 27:7, 17,25 29:19

**swear** 4:5

**swearing** 4:7

**sworn** 5:9 15:11 16:9,11,15 199:19 205:20

**systems** 36:24

**T**

**tab** 16:24 17:4 31:15, 17,21 35:16 37:14 42:3 43:17 44:17 58:10 59:15 65:22 67:24 68:2,5 76:6 79:6 80:21 82:18 93:23 97:4 98:2 99:24 100:10 102:22 103:18,21 105:6 106:15 110:25 113:6 114:23 115:12 120:17 121:14 122:15 124:23 125:11 126:24 127:4, 8 129:3 132:7 137:7 142:7 143:22 146:7, 8,9 148:9 155:25 168:22 169:8 175:14 177:16,22 179:23 182:15 183:12 185:24 188:15,17 189:25 190:10 195:16

**tabs** 196:6

**takes** 119:16 141:22 170:16

**taking** 14:3,8 26:19 114:6,8 122:8 171:25 179:11,19

**talk** 7:7 9:25 10:24 16:20 23:19 29:10 66:16,23 69:17 72:2 75:24 76:2 90:10 112:11 117:4 120:3, 8,11 125:20 128:10 149:23 162:25 183:9 198:15

**talked** 67:6,7 72:11,

13 85:9,11 123:24 133:17,19,23 141:25 149:25 151:4 152:13 154:5 155:21 166:12 176:9

**talking** 16:9 34:6 41:14 123:10 134:9 151:23 182:8 187:4 197:12

**talks** 96:16 125:4 151:16

**Tannehill** 204:18

**tape** 68:20 70:9,12,22 71:2 74:11,15,17 91:6 97:6 98:17 100:18 183:24 185:14

**tasks** 7:12

**taught** 7:14

**Taylor** 3:15

**teenage** 115:22

**telephone** 117:13

**telling** 14:3 57:6 84:13 85:3 128:12 163:5

**ten** 65:12 79:13,17 90:24 133:19 136:10 152:15

**tend** 75:18

**tenure** 29:21 151:6

**term** 10:7,16,17,20, 21

**terminology** 16:7

**terms** 26:9 153:17

**testified** 5:9 57:21, 22,23 58:2,4 82:2 98:24 136:25 195:9

**testimony** 101:4 134:6,12 137:2 164:5,9

**text** 55:19

**Texts** 203:5

**THACHER** 3:4

**thin** 122:11

**thing** 23:8 119:15 124:15 176:10

**things** 23:12,16 28:13 30:10 33:22 37:7 41:16 47:2 50:23 56:23 65:6 77:21 78:22 79:5 81:2,3 88:22 89:2,10 102:19 107:23 110:23 117:5 124:11 133:25 151:4 152:4, 12 153:4 155:22 160:14 163:2,25 164:15 166:18 182:11 187:12 189:15 190:11

**thinking** 62:20 125:22 171:15

**thought** 18:10 33:15 52:10 56:21 57:15 65:12 82:3 88:2 91:21 167:7 187:16 197:5,20

**thoughts** 65:7

**threat** 69:6,13 74:8

**threats** 72:24 73:4, 23 143:6

**three-block** 30:6

**Thursday** 127:14 193:11

**Tim** 112:9 115:7

**time** 4:17 6:2 7:3,7, 13,24 11:2,11 20:10, 13,24 27:12 28:22 29:17 30:4,11,12 32:4 34:4 40:20 48:25 49:6 50:12 52:11 53:6,9 56:22 57:2,6,15 59:2 61:7, 18 63:20 64:5 65:11 70:4,11 71:4,12 74:6, 8,19 75:8 77:13 78:17,20 79:18 80:8 82:3 86:3 91:25 96:16 97:3,18,20 98:22 99:15 100:14, 21,24 104:24 106:8, 12 110:11,12 114:20 117:20 120:12 122:2, 8 124:15 127:19,20 128:19 130:4,7 131:7

132:5 133:14 134:16, 25 136:16 137:2 138:15 146:20 147:13,21 152:8 153:8 156:25 159:2 161:2 166:6 168:15 169:22 171:9,22 173:5 175:24 176:15 179:15 181:7,16 183:3,25 184:3 185:16,19 186:23 187:20 192:9 198:24, 25 199:2,4,11

**times** 52:15 68:8 152:2 155:21 176:3 185:9 192:17 193:9 196:16

**timing** 96:15 141:24 147:7

**Timothy** 106:23

**tinted** 141:11

**title** 7:9,20 163:11

**tobacco** 7:24 8:5

**today** 16:8 32:4 85:25 116:2 140:8 141:5 170:13,20 175:9 177:3,19 189:5 199:2

**told** 57:14 66:14,15 159:10 167:22 181:6 184:15,18 190:9

**tomorrow** 112:17

**top** 18:12 32:18 33:6 58:22 59:20 71:19 111:12,15 143:5 149:4 181:24

**topic** 57:18

**total** 15:3

**touch** 116:14

**town** 13:16 16:21 17:13,20 36:20 93:4 102:17 152:20 165:16 194:15

**trace** 57:6

**track** 8:2

**traffic** 33:21 93:7 94:14 95:19 132:5

196:3

**tragedies** 41:14,19, 24

**trampled** 35:4

**transcript** 4:7 199:14 205:2

**trial** 28:11 29:7

**trick** 82:6

**trouble** 157:11

**truck** 21:21

**true** 193:5

**TSG** 4:3,18

**Tuesday** 32:6,7 40:13,16 127:13

**turn** 16:24 18:18 19:19 20:8,17 36:2 37:14 38:3,12 40:20 42:3 44:17 46:17 56:3 58:10 67:24 76:6 79:6 80:20,21 98:2 108:10 111:5 114:23 122:15 168:22 175:14 183:12 185:24 190:24

**turned** 181:2

**turning** 65:22

**two-block** 30:6

**two-page** 190:5

**type** 30:10 33:22 47:23 50:23 77:20,21 79:5 81:16,17 88:22 93:16 102:3,19 119:10 121:13 126:15 128:20 130:16 133:25 141:10,14 163:25 164:16 166:18 187:8

**types** 47:24 48:2

**typical** 22:16,18 23:18 32:11 86:3

**typo** 181:3

## U

**ultimately** 39:17 72:8 142:16

**unchanged** 189:4

**underage** 33:12 37:3

**undercover** 8:4

**underneath** 59:22

**understand** 14:6 17:25 23:14 30:19 44:23 67:11 78:25 94:6 99:17 109:14 116:19 119:3 123:5 137:6 171:18 188:7 195:9

**understanding** 77:22 106:11 123:17 136:20

**understood** 46:21 67:22 164:20 195:14

**unheard** 86:8

**unhelpful** 18:5

**unique** 130:21 193:7

**unit** 7:3,15,25 8:16, 17

**United** 4:13

**university** 11:24 12:8,23 13:11,15 14:10,15 67:18,19 73:2 123:25 124:17 150:13,14,19,20 187:21 193:17,22,24 194:2,4

**university's** 69:18

**unlike** 111:17

**unsafe** 27:22 167:7

**unusual** 49:4

**UPD** 150:3,22,24

**upset** 163:7,24 198:2

**urgency** 49:16

**Usage** 94:2

**user** 95:2,3

## V

**vague** 141:17

**vaguely** 42:13

**validity** 4:6

**Van** 3:20 34:16

**vandalism** 72:15

**vandalize** 69:21

**vandalized** 69:19 73:2

**variables** 78:7

**variety** 89:10 124:11

**vary** 13:15 102:16,19

**vehicle** 194:11

**vent** 45:22

**venue** 44:15

**venues** 39:2,3 45:20, 25

**verbiage** 153:21 163:8

**version** 17:9 45:4 58:20 79:10 93:24 104:3,14,15 111:7, 11,20 133:18 176:25 177:2,12 178:12

**versions** 75:19 172:17

**versus** 4:13 13:17 46:25 51:18

**viable** 69:6 74:8

**video** 4:12 90:12 148:4 158:23 159:4, 8,20 160:3 167:14 170:25 192:6

**videos** 146:24 147:17,21 167:20 192:7 195:11

**view** 85:12 86:13 87:9 88:3 97:8 102:3 162:15 164:18 166:21 167:10 199:4

**viewing** 160:14 164:17

**vigil** 79:2,22 80:9 89:12,16 129:4,7 131:11,16,22 195:18 196:3,13,14,24

**violating** 184:12

**violation** 181:21

**violence** 27:6,21 29:23 30:23 33:13 131:21,23 145:16 146:2,4 147:16,20 148:3 198:4,8

**violent** 26:18 27:16 30:17

**visible** 154:12 158:10

**visit** 120:2 147:8,10

**visiting** 22:22

**voice** 52:3

**volatile** 124:9

**vote** 40:24

**voted** 105:11

**VPD** 150:11

## W

**wait** 23:12 33:8 114:15 162:5 189:18

**waiting** 195:6

**waive** 46:19 48:15 50:25 51:10 99:20 100:7

**waiveable** 99:18

**waiver** 100:11

**wake** 35:7

**walk** 24:23 68:9 133:12 185:3

**walked** 86:4 166:19

**walking** 37:2 88:25 126:18 167:10 197:12

**wall** 158:24 167:21

**walls** 146:15,23 147:6,18,22 148:5 159:3,7,21 160:2

166:24

**wanted** 14:6 23:25 36:17 75:2 92:10,24 93:2 112:12,24 120:12 158:10 167:19 173:6 181:4 183:9,10

**wanting** 61:13

**warrant** 49:9

**warranted** 24:22

**Warren** 106:23 110:11,14 111:8 112:9 114:12,25 115:7,14

**watch** 152:24 162:20

**watching** 167:14

**water** 11:17

**waving** 126:10

**ways** 175:23

**weapon** 126:21

**wearing** 131:24

**wedding** 46:25 47:25

**week** 70:4 127:12

**weekend** 22:18 199:8

**weekends** 22:24 183:10

**weeks** 63:16 75:14, 16 157:25

**welfare** 49:25

**west** 19:24 21:11

**wheelhouse** 33:25

**white** 189:13

**Wilburn** 81:14 132:10,16

**Williams** 3:16,25 4:2, 18,25 5:3 198:21

**winter** 86:2

**won** 7:24

**wondering** 66:18

**word** 14:24 15:21 27:21 135:19 157:12

170:10 172:14

**wording** 47:8 147:11 153:19 176:24

**words** 15:25 155:4

**work** 8:4 124:17 127:12 150:4 151:2 191:18

**worked** 7:5 30:13 31:2 181:17

**working** 8:6,7 9:8,9 34:11 36:12 37:6 122:7

**world** 22:17

**worried** 28:10 69:9

**Worship** 182:13

**wrecks** 194:11

**write** 66:25 81:14 92:5,11 122:2 125:17 132:25 135:6 136:3 138:19 143:12 160:19 186:25 187:21 191:3

**writes** 42:23 66:13 104:23 106:7 112:4, 15 114:5 125:22 127:11 137:13 175:15 180:5,25

**writing** 105:21 135:8 186:14

**written** 73:4 79:13 111:12 134:17 140:9 141:17 155:5 199:14

**wrong** 23:3,5 131:12 187:16

**wrote** 109:4,5 111:15 143:5 158:14 160:5 186:3,11 187:18

## Y

**year** 5:19 8:23 11:2 31:6 153:8 159:16 164:16 177:9 179:18 184:13 192:22 193:4, 9,16,21

**years** 6:23 7:16,19, 21 8:6,10,25 9:12,17

10:9 19:7,12 21:24
24:11 87:17,20
102:10 115:18,22
131:9 167:21 194:12

**yesterday** 158:7

**York** 3:7

**young** 29:8 30:9
41:15

**younger** 115:22,23

**Youngwood** 3:8 4:9,
21,25 5:11,13 15:20
17:3,7 27:4 28:16
31:7,16,20 32:2
35:15 37:17 40:10
42:6 43:20 44:20
53:11 58:16 59:18
65:24 76:9 79:9
80:24 82:20 84:3,10
89:25 90:5,7,14,18,
22 91:3,4,7,11,19
98:5 100:17 101:2
102:20 103:2,7,10,16
104:7,13 105:5,20,24
106:2 111:4 113:9
115:5 120:20 121:17
122:19 125:2,14
127:7 128:3,8,14,23
129:22 130:2,9,13
134:11 142:10 144:2
146:6,13,22 148:11
156:3 169:2 173:8,
15,20,23 175:13
180:22 182:18,21,24
183:15 185:13,21,23
189:11,18,21,23
190:3 192:2 196:11
198:14,22 199:8,12
201:4

**youth** 7:5,23 8:4