# EXHIBIT 10

1      JEFF MCCUTCHEN

2   IN THE UNITED STATES DISTRICT COURT

3  FOR THE NORTHERN DISTRICT OF MISSISSIPPI

4     OXFORD DIVISION

5

6 JOHN RASH,

7

    Plaintiff,

8

 v.           CIVIL ACTION NO.:

9           3:20-cv-224-NBB-RP

10 LAFAYETTE COUNTY,

 MISSISSIPPI,

11

    Defendant.

12

13

14

15

   VIDEOTAPED REMOTE DEPOSITION OF

16

     JEFF MCCUTCHEN

17

   Thursday, January 7, 2021

18

   9:07 a.m. Central Standard Time

19

20

21

22

23 Reported by:

24 GRETA H. DUCKETT, CCR, RPR, CRR, CVR-S, RVR-M-S

25 JOB NO.: 188328

Page 2

```
1                JEFF MCCUTCHEN
2
3
4
5
6
7            January 7, 2021
8        9:07 a.m. Central Standard Time
9
10          Videotaped remote deposition of
11  JEFF MCCUTCHEN, before Greta H. Duckett, CCR,
12  RPR, CRR, CVR-S, RVR-M-S.
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 3

```
1                JEFF MCCUTCHEN
2            A P P E A R A N C E S
3
4  FOR THE PLAINTIFF:
5
6          Jonathan Youngwood, Esq.
7          Lily Cron, Esq.
8          SIMPSON THACHER
9          425 Lexington Avenue
10         New York, NY 10017
11
12
13
14
15         Landon Thames, Esq.
16         ACLU OF MISSISSIPPI
17         P.O. Box 2242
18         Jackson, MS 39225
19
20
21
22
23
24
25
```

Page 4

```
1                JEFF MCCUTCHEN
2
3            A P P E A R A N C E S
4            C O N T I N U E D
5
6  FOR LAFAYETTE COUNTY, MISSISSIPPI:
7
8          Mr. David O'Donnell, Esq.
9          CLAYTON O'DONNELL
10         1403 Van Buren Avenue
11         Oxford, MS 38655
12
13
14
15  FOR THE CITY OF OXFORD AND THE WITNESS:
16
17         Pope Mallette, Esq.
18         MAYO MALLETTE
19         5 University Office Park
20         2094 Old Taylor Road
21         Oxford, MS 38655
22
23
24
25  ALSO PRESENT:
```

Page 5

```
1                JEFF MCCUTCHEN
2   Scott Hatch, videographer
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 6

1              JEFF MCCUTCHEN
2               I N D E X
3
4            EXAMINATION INDEX
5
6  JEFF MCCUTCHEN
7
8      BY MR. YOUNGWOOD          12
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 7

1              JEFF MCCUTCHEN
2               EXHIBIT INDEX
3
4  EXHIBIT 1  Article XX - Parades,        61
             Public Assemblies and
5            Special Events
6  EXHIBIT 2  4/20/2015 Facility Use       88
             Policy; Bates Lafayette
7            County DOC000002 to
             Lafayette County DOC000005
8
9  EXHIBIT 6  3/4/2019 Facility Use        90
             Policy; Bates Lafayette
10           County DOC000006 to
             Lafayette County DOC000010
11 EXHIBIT 8  Oxford Police Department,    83
             Special Event, Parade, or
12           Public Assembly Permit for
             Jennifer Samuels
13
14 EXHIBIT 9  Oxford Police Department,    82
             Special Event, Parade, or
15           Public Assembly Permit for
             Wayne Andrews Lee Ann
16           Stubbs
17 EXHIBIT 11 Order: Amend Facility Use    90
             Policy Regarding Use of
18           Courthouse Grounds; Bates
             Lafayette County DOC000052
19 EXHIBIT 13 6/18/2020 email, White       110
             Supremacy Demonstration on
20           Juneteenth; Bates
             Lafayette County Doc000502
21           to Lafayette County
             Doc000503
22
23 EXHIBIT 16 City of Oxford Event         82
             Permit Application for
24           Kesha Howell Atkinson
25

Page 8

1              JEFF MCCUTCHEN
2               EXHIBIT INDEX
3               CONTINUED
4  EXHIBIT 17 City of Oxford, Event        114
             Permit Application for
5            Anna Charlotte Lavers
6  EXHIBIT 21 6/29/2020 email string;      114
             Bates Lafayette County
7            DOC000295 to Lafayette
             County DOC000302
8  EXHIBIT 22 7/1/2020 email chain;        119
             Bates Lafayette County
9            DOC000311 to Lafayette
             County DOC000313
10
11 EXHIBIT 25 Facility Use Application     129
             and Permit, Lafayette
12           County, MIssissippi, for
             Rash
13 EXHIBIT 27 Order: Approve Revision of   98
             Facilities Use Policy to
14           Include a Requirement of
             Application to be Made 14
15           Days Prior to Date of
             Proposed Use and Requiring
16           Closure of Courthouse
             Grounds 30 Minutes Before
17           Dusk
18 EXHIBIT 28 Oxford Police Department,    76
             Special Event, Parade, or
19           Public Assembly Permit for
             Arts Council Projection
20
21 EXHIBIT 30 9/1/2020 email; Bates        131
             Sheriffs Department Docs -
22           6
23 EXHIBIT 31 Oxford Police Department,    79
             Special Event, Parade, or
24           Public Assembly Permit for
             Visit Oxford
25

Page 9

1              JEFF MCCUTCHEN
2               EXHIBIT INDEX
3               CONTINUED
4  EXHIBIT 33 Oxford Police Department,    81
             Special Event, Parade, or
5            Public Assembly Permit for
             Wayne Andrews
6  EXHIBIT 36 Email string between         40
             McCutchen from East
7
8  EXHIBIT 42 Photographs                  21
9  EXHIBIT 43 Photograph                   126
10 EXHIBIT 44 Photograph                   128
11 EXHIBIT 45 Photograph (not provided)    129
12 EXHIBIT 52 6/21/2020 email             136
13 EXHIBIT 53 Operations Plan             116
14 EXHIBIT 55 7/4/2020 Oxford Police       117
             Department Operations Plan
15 EXHIBIT 58 Video (link provided to      142
             counsel)
16
17
18
19
20
21
22
23
24

Page 10

```
 1         JEFF MCCUTCHEN
 2         THE VIDEOGRAPHER:  Good
 3  morning, Counselors.  My name is
 4  Scott Hatch.  I'm a certified legal
 5  videographer, in association with
 6  TSG Reporting, Inc.  Due to the
 7  severity of COVID-19 and following
 8  the practice of social distancing,
 9  I will not be in the room with the
10  witness.  Instead, I will record
11  this videotaped deposition
12  remotely.  The reporter, Greta
13  Duckett, also will not be in the
14  same room and will swear the
15  witness remotely.
16         Do all parties stipulate to
17  the validity of this video
18  recording and remote swearing and
19  that it will be admissible in the
20  courtroom as if it had been taken
21  following Rule 30 of the Federal
22  Rules of Civil Procedures and the
23  state's rules where this case is
24  pending?
25         MR. YOUNGWOOD:  Yes -- yes,
```

Page 11

```
 1         JEFF MCCUTCHEN
 2  for plaintiff.
 3         MR. O'DONNELL:  Yes, for the
 4  defendant.
 5         THE WITNESS:  Yes, for the
 6  witness.
 7         THE VIDEOGRAPHER.  Thank you.
 8         This is the start of media
 9  label number 1 of the
10  video-recorded deposition of Jeff
11  McCutchen in the matter John Rash
12  versus Lafayette County,
13  Mississippi, in the United States
14  District Court for the Northern
15  District of Mississippi, Oxford
16  Division, case number
17  3:20-cv-224-NBB-RP.
18         This deposition is being held
19  via videoconference, with all
20  participants appearing remotely due
21  to COVID-19 restrictions, on
22  Thursday, January 7th, 2021, at
23  approximately 9:09 a.m.
24         My name is Scott Hatch.  I'm
25  a legal video specialist from TSG
```

Page 12

```
 1              JEFF MCCUTCHEN
 2         Reporting, Inc., headquartered at
 3         228 East 45th Street, New York, New
 4         York.  The court reporter is Greta
 5         Duckett, in association with TSG
 6         Reporting.
 7              Counsel, please introduce
 8         yourselves.
 9              (Counsel stated appearances
10               for the record.)
11         THE VIDEOGRAPHER:  All
12         right.  Thank you, Counselors.
13              Will the court reporter
14         please swear in the witness?
15              (Statement by the court
16               reporter.)
17              JEFF MCCUTCHEN,
18         the witness, having first been duly
19  sworn to speak the truth, the whole truth and
20  nothing but the truth, testified as follows:
21              EXAMINATION
22  BY MR. YOUNGWOOD:
23         Q.   Chief McCutchen, I'm going to
24  address you as Chief McCutchen, unless you
25  prefer to be addressed otherwise.
```

Page 13

```
 1              JEFF MCCUTCHEN
 2         A.   No, sir.  That's fine.
 3         Q.   Okay.  Thank you.  And, Chief
 4  McCutchen, we had a moment just to chat before
 5  we went on the record and the video was turned
 6  on.  Again, you have now heard me introduce
 7  myself two times; I'll do a third.
 8         I'm John Youngwood.  I'm one of the
 9  attorneys working on this matter.  Again, I
10  recognize we're taking you away from your --
11  your duties, and I appreciate your time.  I
12  will endeavor to be as efficient as I can and
13  give you back part of your afternoon.
14         If, at any point as we're going
15  forward here, you need a break, just let us
16  know, and you can have a break.  The one thing
17  I'd ask is that we try to answer any pending
18  question before we take a break so you don't
19  just walk out in the middle of a question.
20         Have you been deposed before, sir?
21         A.   Yes, sir.
22         Q.   Okay.  In a civil-type proceeding?
23         A.   Yes, sir.
24         Q.   Okay.  How many times?
25         A.   One.
```

Page 14

JEFF MCCUTCHEN

1  JEFF MCCUTCHEN
2      Q.    What -- you don't have to tell me
3  the name of the case, but what was the general
4  nature of the proceeding?
5      A.    It was a lawsuit involving a wreck
6  with one of our officers.
7      Q.    Like, a car accident or something?
8      A.    Yes, sir.
9      Q.    And I'm going to assume you've
10 testified from time to time in court in
11 proceedings?
12     A.    Yes, sir.
13     Q.    Okay.  And those are generally
14 proceedings associated with your duties as a
15 law enforcement officer?
16     A.    Yes, sir.
17     Q.    Okay.  I know that you're currently
18 the chief of the Oxford police force, and I
19 think you've had that position either on an
20 interim or permanent basis, if I'm correct,
21 since February of 2019?
22     A.    Yes, sir.
23     Q.    Okay.  When did you become -- when
24 did the title switch from interim to full-time
25 or permanent, whatever the right way to say it

Page 15

JEFF MCCUTCHEN

1  JEFF MCCUTCHEN
2  is?
3      A.    I believe January of 2020.
4      Q.    Okay.  And prior to assuming the
5  role as interim police chief, what position did
6  you have?
7      A.    Major of operations.
8      Q.    And how long did you hold that
9  position, sir?
10     A.    From 2014 until 2019.
11     Q.    Okay.  And prior to that, what did
12 you do?
13     A.    Criminal investigator.
14     Q.    Again, for the Oxford police force?
15     A.    Yes, sir.
16     Q.    How long were you doing that?
17     A.    I believe from 2008 to 2014.
18     Q.    Okay.  And prior to that, sir?
19     A.    DUI officer with the Oxford Police
20 Department.
21     Q.    And for how long prior to 2008 did
22 you have that position?
23     A.    About six months, 2007, for about
24 six or eight months.
25     Q.    Okay.  And prior to that, sir?

Page 16

JEFF MCCUTCHEN

1  JEFF MCCUTCHEN
2      A.    Patrol officer with the Oxford
3  Police Department.
4      Q.    And how long did you hold that
5  position, or when did you start that position?
6      A.    From 2005 until 2007, sometime in
7  2007.
8      Q.    Okay.  And it was 2007 when you
9  became the DUI -- or a DUI officer?
10     A.    Yes, sir.
11     Q.    Okay.  And how about before 2005?
12     A.    In 2003, the Batesville Police
13 Department hired me as a patrol officer.
14     Q.    Okay.  So 2005 is when you started
15 with Oxford; is that right?
16     A.    Yes, sir.
17     Q.    Okay.  So, basically, 15, 16 years,
18 you've been working for the Oxford Police
19 Department?
20     A.    Yes, sir.
21     Q.    Okay.  And so fair to say you're
22 fairly familiar with the Oxford area in the
23 course of your duties?
24     A.    Yes, sir.
25     Q.    Okay.  Did you grow up in the area,

Page 17

JEFF MCCUTCHEN

1  JEFF MCCUTCHEN
2  as well?
3      A.    No, sir.  I grew up in Union
4  County.
5      Q.    Okay.  And so when did you first
6  move to the Oxford area?
7      A.    Around 2003 -- 2002, 2003.
8      Q.    Okay.  And I guess I should ask
9  you:  Prior to 2003, what were you doing?
10     A.    In 2002, I was hired by the Tippah
11 County Sheriff's Department to work in their
12 jail.
13     Q.    Okay.  And prior to that, sir?
14     A.    Odd-and-end jobs as a college
15 student.
16     Q.    Okay.  So we're now back to where
17 you're high school, college?
18     A.    Yes, sir.
19     Q.    Let me ask you this:  What year did
20 you graduate from college?
21     A.    I finished it in 2007.  I started
22 in 1999.
23     Q.    Okay.  So you had some overlap
24 between working and college?
25     A.    Yes, sir.

Page 18

JEFF MCCUTCHEN

1    Q.    Okay.  And you started, you said,
2 in Two Thousand- -- I'm sorry -- 1999, you
3 graduated from high school in '99 or
4 thereabouts?
5    A.    Yes, sir.
6    Q.    Okay.  Let's talk a little bit
7 about the Oxford police force today.  How many
8 personnel are under your command?
9    A.    Around 94.  That's total officers
10 and civilian.
11    Q.    Okay.  And how many of those 94 are
12 officers, as opposed to civilians?
13    A.    80.  80 officers.
14    Q.    Okay.  And do you have a sense of
15 what the land area is that you're in charge of
16 policing?
17    A.    Our jurisdictional property?
18    Q.    Yes.
19    A.    Yes, sir.
20    Q.    What is that?
21    A.    We cover -- really, I guess, the
22 four major boundaries would be 7 North,
23 Highway 7 North, just past Highway 30;
24 Highway 7 South just past County Road 401;

Page 19

JEFF MCCUTCHEN

1 Highway 6 eastbound just past County Road 406;
2 and then Highway 6 westbound just past -- or
3 just before Wellsgate subdivision.
4    Q.    And is that synonymous with the
5 geographic boundaries of the city of Oxford, or
6 is it in some way different than that?
7    A.    No, sir.  That's our city limits.
8    Q.    Okay.  Now, within the city, there
9 are some places that are county property; is
10 that right?
11    A.    Yes, sir.
12    Q.    And one of them -- we'll get to
13 this, obviously, a little bit later -- is the
14 county courthouse, correct?
15    A.    Yes, sir.
16    Q.    Okay.  What is your jurisdiction
17 over county property that is within the city
18 limits?
19    A.    We don't have jurisdiction over
20 county property.
21    Q.    Okay.  And what does that mean?  If
22 you were to, say, see an incident on the
23 courthouse lawn, what are the abilities of your
24 officers to assist with that?

Page 20

JEFF MCCUTCHEN

1    A.    It ultimately depends.  It depends
2 on the severity of the incident.  You know, if
3 we see a violent act, then we intervene.  If
4 it's something that we can stand by, we
5 typically call the sheriff's department and
6 give them notice.  And then -- depending on
7 where they're at and things like that.  But we
8 only step in unless it's something of exigent
9 circumstances.
10    Q.    Okay.  Other than the courthouse
11 grounds, what other county grounds are within
12 the city limits?
13    A.    You have the chancery building, you
14 also have a county property out on -- out off
15 of Highway 6 East that has multiple buildings.
16 It also has a municipal county courthouse there
17 with an arena.  We have the Lafayette County
18 School District that has just been annexed in.
19 And I'm not -- that's the ones that's coming
20 off the top of my head.
21    Q.    Okay.  If we could turn to tab 42,
22 which we'll mark as Exhibit 42.  So that,
23 hopefully, serves in the binder you were
24 provided.  I'll give you a moment to find it.

Page 21

JEFF MCCUTCHEN

1    A.    Okay.
2           (Technical discussion.)
3           (Exhibit 42 was marked for
4            identification.)
5 BY MR. YOUNGWOOD:
6    Q.    So this is tab 42 of the binder.
7 It's being marked as Exhibit 42 to your
8 deposition.  It's a series of photographs.  If
9 we just flip through them for a moment.
10          My question to you is:  Do you
11 recognize these as different photos taken in
12 and around the courthouse grounds, the
13 Lafayette County Courthouse grounds?
14    A.    Yes, sir.
15    Q.    Okay.  Are you aware, in your time
16 serving for the Oxford Police Department, of
17 any incidents of violence that have taken place
18 on the county courthouse grounds?
19    A.    Specifically, no.  Not off the top
20 of my head.
21    Q.    Okay.  And are you aware of any
22 incidents that have taken place on the
23 courthouse grounds where Oxford police officers
24 have had a need to intervene and go onto the

JEFF MCCUTCHEN

1
2  courthouse grounds?
3        A.    Yes, sir.  There have been
4  incidents where we have jointly worked with the
5  County or -- or stood by.
6        Q.    Okay.  Can you tell me what you
7  recall of those?
8        A.    You know, we've had -- we've had
9  different events, whether it was demonstrations
10 or large gatherings, that our office may have
11 actually been on site first or received radio
12 traffic.  Specifically, you know, this summer,
13 we've had incidents where our staff had to
14 either stand by or work jointly with the
15 County.  Again, a lot of it is -- was over
16 demonstrations.  We've -- we've had people had,
17 you know, things thrown at them or events such
18 as that happen where we were either standing by
19 or, again, arriving first.
20       Q.    So tell me about that, your
21 coordination between the City and the County.
22 How does that coordination come about?  How
23 does it work?
24       A.    As far as a spontaneous event or a
25 scheduled event?

JEFF MCCUTCHEN

1
2        Q.    Let's do them separately.  Why
3  don't we start with a scheduled event?
4        A.    A scheduled event, typically, I
5  would speak with the sheriff and find out the
6  logistics of what was happening on their
7  property and if they had any needs of our
8  staff.  Typically, if there's an event that is
9  happening on their property, it may impact the
10 location just -- I guess that would be east of
11 that property around our city hall.  So even if
12 we didn't necessarily intervene, we would
13 typically staff something on the other side.
14       Q.    Okay.  And maybe this is what
15 you're doing.  In terms of specific, you know,
16 planned events that involve the town square or
17 the courthouse, can you think of examples where
18 you and the County have coordinated with
19 respect to an event?
20       A.    Yes, sir.  Especially this summer.
21 We had several events, mostly of larger scale,
22 that neither our staff could manage alone or
23 their staff.  You know, probably five to seven
24 events throughout 2020 that we prepared and
25 planned jointly with.

JEFF MCCUTCHEN

1
2        Q.    And would it -- would it typically
3  be that you'd reach out to the County, Sheriff
4  East -- well, if you were having this
5  coordination, is it between you and Sheriff
6  East, or is it someone else?  Or. . .
7        A.    Typically, it would be
8  Sheriff East, myself, and then, depending on
9  the nature of the event, the size, and if it
10 was a march and where that march was going, we
11 would also speak with Chief Ray Hawkins on
12 campus.
13       Q.    I wanted to ask you that:  Like,
14 that's the third law enforcement organization
15 within the county, right, the university
16 police?
17       A.    Yes, sir.
18       Q.    Okay.  An event that takes place in
19 the town square or on the courthouse grounds,
20 is that a coordination that involves all three
21 of your agencies, or just you and the County?
22       A.    It involved all three this year, as
23 most of them had some type of impact.  Again,
24 depending on the size and if it was a march, we
25 would most likely have to have all three

JEFF MCCUTCHEN

1
2  agencies to be able to assist with traffic and
3  crowd control.
4        Q.    Okay.  So going to the summer, can
5  you remember specific -- we're talking summer
6  of 2020; it's now a new year.  Going to the
7  summer of 2020, can you recall specific events
8  that required coordination of all three law
9  enforcement agencies?
10       A.    Yes, sir.  We had a series of
11 marches or demonstrations.  I don't have the
12 specific dates in front of me, but I know we
13 had maybe four -- four that I can remember.
14 And each one, we coordinated with all three
15 agencies.
16       Q.    Okay.  So for example, there
17 were -- there were several pro-Confederate
18 marches this summer -- summer -- this summer,
19 again, being 2020; is that right?
20       A.    One, that I can remember.
21       Q.    Okay.  There was an event, for
22 example, on July 4th weekend.
23             Do you remember that?
24       A.    Yes, sir.
25       Q.    Okay.  Is that the one you're

Page 26

JEFF MCCUTCHEN

1 thinking of, sir?
2 
3     A.    Yes, sir.
4     Q.    And so what coordination, if you
5 recall, took place in connection with that
6 event?
7     A.    I believe that was a -- a county
8 permit.  And so we had anticipated a counter-
9 voice there that day, and we were in
10 communication with some of those members.  So,
11 you know, obviously, that was an event where we
12 monitored our property as far as city hall or
13 what we call the RSVP platform, and then,
14 again, worked jointly there with the County and
15 their staff.  They -- they handled everything
16 on their property, and we managed what was
17 happening in the street and adjacent to them
18 with our buildings and sidewalks.
19     Q.    Okay.  Do you recall any violence
20 being associated with that event?
21     A.    I don't believe so.  No, sir.  I
22 don't believe any arrests were made.
23     Q.    Okay.  And how about otherwise
24 during the summer, the other events that --
25 that you've referred to that took place on or

Page 27

JEFF MCCUTCHEN

1 near the courthouse grounds and the town
2 square?  Did any -- were any of them associated
3 in the summer of 2020 with violence?
4 
5     A.    No, sir.
6     Q.    Any arrests made that you recall in
7 association with those events this past summer?
8     A.    I don't believe so.
9     Q.    Okay.  When the -- you referenced
10 that, like, it was a county permit.  So you
11 understand the County, in certain
12 circumstances, will be asked and issue permits
13 for use of the courthouse grounds?
14     A.    Yes, sir.
15     Q.    Okay.  What involvement do you have
16 in that process?
17     A.    Typically, none.  We eventually
18 coordinated with our three jurisdictions, being
19 the university, the county, and the city --
20 along with our legal counsel -- to discuss
21 making sure we keep lines of communication
22 open.  As I mentioned earlier, it typically
23 takes all three agencies to assist.  And so
24 there were discussions, if multiple permits
25 were issued on multiple days, would that take

Page 28

JEFF MCCUTCHEN

1 away resources for public safety.
2 
3     Q.    Okay.  And we'll perhaps get to a
4 few examples later.  But if the County gets a
5 permit application -- and obviously, you
6 don't -- you can't know what you don't know.  I
7 appreciate that.  If the County gets a permit
8 application, is it your experience that they'll
9 reach out to you to ascertain the ways in which
10 you -- your force can or cannot assist --
11     A.    We --
12     Q.    -- that day?
13     A.    -- we did through the summer.  That
14 was not necessarily a common practice, but that
15 was something we implemented this summer.
16     Q.    Okay.  And so how would that be?
17 Did you and Sheriff East and the head of the
18 university police force have regularly
19 scheduled meetings or calls, or was it more as
20 the permits would come in?  How would -- how
21 would you go about it?
22     A.    Typically, something like that
23 would be a phone call conversation.  If I
24 received a permit or, you know, we received a
25 phone call about a potential, we would just let

Page 29

JEFF MCCUTCHEN

1 people know to, you know, schedule their
2 calendars in case we needed more assistance.
3     Q.    Do you recall any instances in the
4 summer of 2020 where the County let you know
5 that there was to be an event on county
6 property, and you had to tell them that there
7 was already too much activity going on
8 involving your police force and you wouldn't be
9 able to assist them if they needed it?
10     A.    I don't think we've ever denied
11 them any assistance, even if we had an event.
12 You know, we may tell them that we have an
13 event scheduled, but not that we would deny
14 assistance.  We may tell them that our staff is
15 going to be taxed from this time to this time.
16     Q.    And when you say that you don't
17 think you've ever denied them assistance, you
18 would always do your best to give them
19 assistance if they needed it; is that fair to
20 say?
21             MR. O'DONNELL:  Object to
22 form.
23             You can answer if you can.
24     A.    Yes.  If we -- if we have the
25

Page 30

JEFF MCCUTCHEN

1  resources.

2      Q.    Okay.  But you can't recall any

3  instances -- let's just keep it in the summer

4  of 2020 -- where you didn't believe you had the

5  resources to provide assistance?

6              MR. O'DONNELL:  Object to

7          form.

8      A.    I'm not --

9              MR. O'DONNELL:  You can

10         answer.  Go ahead.

11     A.    I'm -- I'm not certain that we did

12  or we didn't.  But there would have been

13  instances, if we had a permit scheduled, all of

14  our resources would have been specifically

15  tasked for that one event.

16     Q.    Okay.  But what I'm asking is,

17  if -- if you can recall an instance where, for

18  example, Sheriff East contacted you and said,

19  We have a request for an event; is there

20  something about the activity of your department

21  that would prevent us from having such an

22  event, you can't recall ever telling him

23  that -- that, no, we're too busy; we wouldn't

24  be able to help?

Page 31

JEFF MCCUTCHEN

1      A.    I know we discussed an event that

2  we already had scheduled.  So we had a permit,

3  and they contacted us about a potential county

4  permit.  And I told him, for our police force,

5  we were tasked for this one event for this day.

6  And so, you know, no guarantees that we could

7  assist or help in that matter.  And our streets

8  would be blocked.  Because I believe ours was a

9  march.  So, for us, we would be completely

10  tasked for that one event.

11     Q.    What -- what event are you thinking

12  of?

13     A.    We had -- I believe the -- the name

14  of the event was LO Unity.  It was coordinated

15  by some University of Mississippi football

16  players.  That was a scheduled event that would

17  take place in front of city hall that led to a

18  march.  And so we would have that tasked

19  pre-event, during the event, and post-event.

20     Q.    Okay.  Do you remember when that

21  was, sir?

22     A.    Not specifically the day.

23     Q.    Okay.  Summer of 2020?

24     A.    Yes, sir.

Page 32

JEFF MCCUTCHEN

1      Q.    Okay.  Any other instances like

2  that that you recall from summer of 2020?

3      A.    Not that I recall.

4      Q.    Okay.  And you, sir, in your

5  testimony up to now, have somewhat called out

6  summer of 2020, I think, as -- if it's fair to

7  say, as a period of increased activity,

8  marches, and such.  Is that fair to say that it

9  was a period of increased activity?

10     A.    Yes, sir.

11     Q.    Okay.  In your time on the force,

12  can you recall a time period where there was as

13  much activity of that nature as there was in

14  the summer of 2020 in the city of Oxford?

15     A.    No, sir.

16     Q.    Okay.  Let's talk a little bit more

17  about the town square and the courthouse

18  grounds.  In your 15 years on the force,

19  what -- what types of public events are held on

20  the courthouse grounds?

21     A.    You know, specifically, until

22  recently, that's really not been a position I

23  have been in to monitor.  There's -- there's

24  been, you know, several events from Halloween

Page 33

JEFF MCCUTCHEN

1  events -- I've seen some different, you know,

2  shopping events up there.  I mean, it's been

3  kind of a wide range of events.

4      Q.    Okay.  There's been displays in

5  past summers -- am I correct -- of films, say,

6  on the courthouse walls?

7              MR. O'DONNELL:  Object to

8          form.

9      A.    That, I do not know.  I -- I have

10  never seen any.

11     Q.    Okay.  The Halloween events that

12  you referred to, those are nighttime events?

13  Daytime events?

14     A.    Nighttime.

15     Q.    Okay.  And what other types of

16  nighttime events have taken place on the

17  courthouse grounds while you've been with the

18  Oxford police force?

19     A.    The Halloween may be the only thing

20  that I recall having up there.

21     Q.    Okay.  Feel free to look through

22  the pictures that are marked as Exhibit 42, if

23  helpful.  But you would agree with me, sir,

24  that there's a low fence surrounding much of

Page 34

JEFF MCCUTCHEN

1          the courthouse grounds?
2     A.    Yes, sir.
3     Q.    And there are multiple breaks in
4  that fence as you walk around the building;
5  fair to say?
6     A.    Yes, sir.
7     Q.    And those -- those openings,
8  there's no gate that closes them, correct?
9     A.    Correct.
10     Q.    And those openings are generally
11  left open, correct, at night and at all times
12  of day?
13     A.    Yes, sir.
14     Q.    Okay.  There are no signs posted on
15  the courthouse that indicate a restriction of
16  access to the courthouse grounds at nighttime,
17  correct?
18     A.    None that I see.  I'm not -- I'm
19  not aware of any.
20     Q.    Okay.  Have you -- strike that.
21          In the town square, am I correct
22  that the City of Oxford has various security
23  cameras?
24     A.    Yes, sir.

Page 35

JEFF MCCUTCHEN

1     Q.    Can you tell me about those,
2  please?
3     A.    Specifically located around city
4  hall, we have some pointing -- which would be
5  west -- and then I believe south.  I don't know
6  that we have a full range of every angle.
7     Q.    Okay.  And, in part, these cameras
8  focus on the courthouse?
9     A.    Potentially one, but not -- I
10  wouldn't say focus.  You get some -- some
11  angles.
12     Q.    Okay.  In terms of lighting,
13  describe the lighting in the square and in the
14  courthouse area for me, the nighttime lighting.
15     A.    On a normal night -- you know, it's
16  a little different during the holiday season --
17  but, typically, there's, you know, regular
18  streetlights that stream around the outside of
19  the square -- or the inside of the square.
20     Q.    Okay.  And then I'll give you a few
21  examples.  If you turn to the third page of
22  these photos, there's a -- what looks to me to
23  be a streetlight within the courthouse grounds.
24     A.    The globed multi --

Page 36

JEFF MCCUTCHEN

1     Q.    Yeah.  It's page B-3, says on the
2  bottom.
3     A.    Yes, sir.
4     Q.    Are those on -- illuminated at
5  night?
6     A.    I'm not certain if they are all the
7  time.  I --
8     Q.    Okay.
9     A.    It's not something I've paid a lot
10  of attention to.
11     Q.    And then there seems to be a light
12  kind of on the bottom of the globes that
13  appears to be pointed at the courthouse.  Are
14  those illuminated -- do you know -- at night?
15     A.    Specifically, I don't know, sir.
16     Q.    The square itself is surrounded by
17  retail and restaurants; is that largely
18  correct?
19     A.    Yes, sir.
20     Q.    And at least up until certain hours
21  of the night, I take it, that those storefronts
22  and restaurants would be illuminated as well?
23     A.    Yes, sir.
24     Q.    Okay.  Have you observed --

Page 37

JEFF MCCUTCHEN

1  separate from protests or other marches or
2  activity like that, have you observed how
3  citizens use the courthouse grounds in your
4  time on the Oxford police force?
5     A.    Are we speaking specifically after
6  hours?
7     Q.    Well, let's start during the day,
8  and then we'll go to the evening, perhaps.  And
9  perhaps it changes during the week and the
10  weekend.  I understand that too.
11     A.    Yes, sir.  I would say, during the
12  daytime, it's typically used as business for
13  those coming and going, or court sessions.
14     Q.    There are multiple benches within
15  the grounds?  It --
16     A.    Yes, sir.
17     Q.    -- depicted some of them.
18          And people might congregate on
19  those benches?
20     A.    Yes, sir.
21     Q.    Okay.  They might have a cup of
22  coffee or a meal, like a sandwich or something,
23  perhaps, on the --
24     A.    Yes, sir.

Page 38

JEFF MCCUTCHEN

1
2    Q.    Okay.  And how about in the
3  evening?  We've discussed that there's no
4  closing of the gates.  Do people go onto the
5  courthouse grounds in the evening?
6    A.    From time to time, yes, sir.
7    Q.    Okay.  Your officers have never
8  prevented somebody from going onto the
9  courthouse grounds in the evening, have they?
10   A.    No, sir.
11   Q.    You're not aware of any arrests,
12 for example, made because somebody walked onto
13 the courthouse grounds after -- after dusk?
14   A.    No, sir.
15   Q.    You don't see it as a safety hazard
16 that somebody would be on the courthouse
17 grounds after dusk, do you?
18        MR. O'DONNELL:  Object to
19        form.
20   A.    That's something that I would not
21 be aware of as far as safety concerns or
22 information that the County may have.
23   Q.    Okay.  But from what you've
24 observed -- and I recognize the difference in
25 the jurisdiction.  But from what you've

Page 39

JEFF MCCUTCHEN

1
2  observed, you've never seen safety incidents
3  arise out of people being on the courthouse
4  grounds after dusk?
5    A.    It --
6        MR. O'DONNELL:  Object to
7        form.
8    A.    It would depend.  Again, depending
9  on the size of the gathering.  It would not be
10 uncommon for us to put a phone call in to the
11 sheriff's department to notify them or stand by
12 until a deputy arrives.
13   Q.    Okay.  Can you think of any
14 incidents where you did such a thing on the --
15 with respect to the courthouse grounds?
16   A.    Yeah.  Specifically this summer,
17 with different gatherings or disruptions on
18 their property, we would contact them or stand
19 by or at least moderate until we could get
20 some -- a deputy on scene.
21   Q.    Okay.  Are you aware of any of
22 those incidents resulting in arrests?
23   A.    Not with our -- with our officers.
24   Q.    Well, are you aware of the County
25 sheriff's department arresting anyone for being

Page 40

JEFF MCCUTCHEN

1
2  on the courthouse grounds after dark this past
3  summer of 2020?
4    A.    I don't have any knowledge of that,
5  no, sir.
6    Q.    Okay.  Let's take a look, sir, at
7  tab 36, which we'll mark as Exhibit 36.
8        (Exhibit 36 was marked for
9        identification.)
10 BY MR. YOUNGWOOD:
11   Q.    I'll give you a moment -- I'm going
12 to first ask you about the email chain.  And
13 then it's separated by -- hopefully, in your
14 binder, by a blue piece of paper, and there's a
15 document attached.  I'm going to start with the
16 email chain, and then we'll get to the
17 document.
18   A.    Okay.
19   Q.    So, Chief, if I go to the
20 second page of the email dated October 9, this
21 is an email from Sheriff East to you.  And he
22 refers in the second sentence to a case in
23 federal court.
24        Do you see that?
25   A.    Yes, sir.

Page 41

JEFF MCCUTCHEN

1
2    Q.    Okay.  So I probably should have
3  done this earlier.  Do you have any
4  understanding of what this litigation is about?
5  You're not a party to it, but do you have an
6  understanding of what it's about?
7    A.    Yes, sir.  Some general knowledge.
8    Q.    Okay.  What's -- I'm not -- it's
9  not a test, but just what is that general
10 knowledge?
11   A.    About a permit or an event that was
12 to be projected onto the building or monument
13 there on their grounds.
14   Q.    Okay.  So we'll -- we'll get to
15 that event.  And the plaintiff in the case,
16 Mr. Rash, do you know who he is?
17   A.    I don't.
18   Q.    Okay.  You don't think -- I mean,
19 obviously, you may have encountered him and not
20 know it.  But, to your knowledge, you've never
21 interacted with Mr. Rash?
22   A.    Not to my knowledge.
23   Q.    Okay.  And I take it, before you
24 learned of this lawsuit, you'd never heard of
25 him?

Page 42

JEFF MCCUTCHEN

1            JEFF MCCUTCHEN
2     A.    No, sir.
3     Q.    Okay.  And when did you first learn
4  of this lawsuit?
5     A.    Probably around the time of this
6  email.
7     Q.    Okay.  So the chief sends you this.
8  Did you have any phone conversation or
9  discussion that isn't referenced in this chain
10 regarding the request?
11    A.    I believe this was the first
12 conversation that I had in reference to any of
13 this.
14    Q.    Okay.  And did you then speak with
15 him or get more information than what's in the
16 email about the case?  Because the email
17 doesn't say as much as you just said you
18 understood about the case.
19    A.    From what I remember, I received
20 the email, and then obviously responded that we
21 would work on it.  I then tasked Deputy Chief
22 Sheridan Maiden to run the report, which I
23 think he eventually assigned it to one of our
24 records clerks.  So the general -- the
25 conversation that I had with the -- with the

Page 43

JEFF MCCUTCHEN

1            JEFF MCCUTCHEN
2  sheriff was we would get it; we would compile
3  it, and then get it back to him.
4     Q.    Okay.  There's a reference on the
5  first page to Ms. Val.  Who is that?
6     A.    She is our records clerk.
7     Q.    Okay.  So that's who you're
8  referring to.  And then there's a reference
9  higher up to Ms. Cathy.  Who's that?
10    A.    That would be a staff member at the
11 sheriff's department.
12    Q.    Okay.  So you asked Ms. Val -- and
13 I'm sorry.  What's Ms. Val's full name?
14    A.    Valerie Booth.
15    Q.    Okay.  So I'm going to call her,
16 for this, Ms. Booth.  You -- you tasked
17 Ms. Booth with gathering the data; is that fair
18 to say?
19    A.    Yes, sir.
20    Q.    Okay.  And then what's -- other
21 than asking her to do it, did you have anything
22 to do with gathering the data?
23    A.    No, sir.  The deputy chief and I
24 discussed making sure we gave some accurate
25 information as far as how many officers are

Page 44

JEFF MCCUTCHEN

1            JEFF MCCUTCHEN
2  routinely working that area.  The rest of it, I
3  believe, was either archived data in our CAD
4  system or videos that would have been -- would
5  have been pulled by the City.
6     Q.    Okay.  So I have this piece of
7  paper that's the last page of this exhibit in
8  this tab 36.  I'm going to want to walk through
9  that with you in a moment.  But other than this
10 piece of paper, did you provide anything to the
11 County or to Sheriff East in connection with
12 this lawsuit?
13    A.    I believe all we provided was the
14 documents of the data.
15    Q.    So I'm trying to understand that.
16 By "documents of the data," do you mean this
17 piece of paper, or do you mean backup to this
18 piece of paper?
19    A.    Is there -- I have page 1 and
20 page 2.  Do you have something else?
21    Q.    I have in this tab a two-page
22 email, right, which is what we've just been
23 looking at.
24    A.    Right.
25    Q.    Just the -- and separated by a

Page 45

JEFF MCCUTCHEN

1            JEFF MCCUTCHEN
2  page -- I have a one-page document that looks
3  like this (indicating).
4            Is it not -- I was wondering if you
5  were looking at the --
6            (Simultaneous speakers.)
7     A.    Yes.
8     Q.    It's five numbered items.
9     A.    Yes, sir.
10    Q.    Okay.  So that -- that's all I -- I
11 don't have two pages of data; I just have this
12 one page.  Is that what you mean?
13    A.    Yes, sir.
14    Q.    Okay.  Other than this page, which
15 we will get to, is there anything else that
16 you, to your recollection -- you or the city
17 police department -- have provided to the
18 County that you understand to be in connection
19 with this litigation?
20    A.    The only other thing that I could
21 think of would have -- could have potentially
22 been a document file.  And I -- this could be
23 it.  Again, Ms. Valerie shared that with them.
24 But there could have been an Excel sheet on --
25 because I know that in the email, we replied

Page 46

JEFF MCCUTCHEN

1 that it's a whole lot of data. So I'm not --
2
3     Q.    That's -- yeah. Yeah.
4     A.    I'm not sure if this was the data
5 that they were referring to or if they shared a
6 file to him.
7     Q.    Okay. And who -- who would have
8 actually sent this one page that we have? You
9 or someone else?
10     A.    It would have either been Deputy
11 Chief Maiden or Ms. Valerie Booth.
12     Q.    And who do you think they would
13 have sent it to?
14     A.    I believe it was to Ms. Cathy.
15     Q.    Okay. And if there was something
16 else they sent, like a data file, some zip
17 file, something, it would have been from one of
18 those two individuals, you think, likely to
19 Ms. Cathy?
20     A.    Yes, sir.
21     Q.    Okay. Did you review this sheet
22 before it went?
23     A.    Not specifically this sheet. The
24 deputy chief and I discussed it. But I -- this
25 is the first time I can remember looking at it.

Page 47

JEFF MCCUTCHEN

1
2     Q.    Okay. One of the things you
3 indicated in your answer four or five minutes
4 ago was a discussion of how many individuals
5 are assigned to, I think you said, patrol the
6 downtown area. Do you remember -- you --
7         Do I understand that correctly? It
8 doesn't matter if you said it before. Do I
9 understand that that was one of the things you
10 understood you were being asked for?
11     A.    Yes, sir. That was one of their
12 questions.
13     Q.    Okay. And is that information that
14 you gave?
15     A.    Yes, sir. That appears to be
16 question 3.
17     Q.    Okay. What I don't see in
18 question 3 is, for example, specific -- well,
19 it talks about the football games. But this --
20 I'm not meaning to say it was or wasn't
21 provided. This is the response to that
22 question; nothing else?
23     A.    Yes, sir.
24     Q.    Okay. The data under number 1, All
25 data pertaining to arrests in the downtown area

Page 48

JEFF MCCUTCHEN

1 for the last five years, do you know where this
2 information came from?
3     A.    That would have come from our
4 computer system.
5     Q.    Okay. And what does "downtown
6 area" mean?
7     A.    For us, that's a geographical area
8 consisting of the boundaries outside of what we
9 call the square, which would connect University
10 Avenue and South Lamar, Ninth Street and
11 Jackson Avenue, North Lamar and Jefferson, and
12 then East Jackson and maybe 13th Street.
13     Q.    So an area meaningfully larger than
14 the square itself?
15     A.    Yes, sir. There are some outside
16 parameters that we cover.
17     Q.    Any -- I mean, we can look at a map
18 and do the math, perhaps. But any sense of
19 what percentage of what you define to be the
20 downtown area is the square itself?
21     A.    I mean, that's the majority.
22     Q.    Okay. And the courthouse, of
23 course, is only a portion of the square?
24     A.    Yes, sir.
25

Page 49

JEFF MCCUTCHEN

1
2     Q.    Okay. Of these arrests that you
3 list, were any made on the courthouse grounds
4 or on the grounds that constitute the
5 Confederate statue outside the courthouse?
6     A.    No, sir.
7     Q.    Okay. Do you have a -- do you have
8 a further breakdown of the nature of these
9 arrests?
10     A.    No, sir.
11     Q.    Okay. Do you know if any of these
12 arrests related to permitted activities?
13     A.    Not to my knowledge.
14     Q.    Do you know what percentage of
15 these arrests took place after dark?
16     A.    I would assume the majority of
17 them.
18     Q.    Okay. And is that -- and why do
19 you assume that?
20     A.    That's typically where we have the
21 majority of our violence, is after dark. We
22 have larger crowds after dark. We have a --
23 everyone condenses in a tighter circle of the
24 square. And, again, we have more police
25 presence up there to monitor that.

JEFF MCCUTCHEN

2    Q.    And where is that tighter area of
3  the square that they condense?
4    A.    10th Street.  10th Street, Jackson
5  Avenue, 10th and Van Buren, and then Van Buren
6  just to the city hall side.  Again, that's
7  probably -- it's close to 13th Street.  So,
8  really, just the inner circle of the square and
9  a couple hundred feet to each side of the
10 square.
11   Q.    Okay.  And is that because that's
12 where the bars and restaurants are congregated?
13   A.    Yes, sir.  But it's also some of
14 the larger parking areas and the garage and
15 places like that.
16   Q.    Okay.  So it's -- it's -- to just
17 use a shorthand, it's the night life that
18 somewhat brings people in to congregate, and
19 sometimes trouble erupts?
20   A.    Yes, sir.
21   Q.    Number 2 is -- is concerning motor
22 vehicle and pedestrian wrecks.  I'm
23 sorry.  Strike that.  I just want to go back to
24 number 1 for a minute.
25        Do you know how the year 2020

JEFF MCCUTCHEN

2  ended?  This says 35 as of November 23.  Do you
3  know what happened the last five weeks of the
4  year?
5    A.    No, sir, I don't.
6    Q.    Okay.  But is it likely that the
7  number stayed relatively low through the end of
8  2020?
9    A.    Yes, sir.
10        MR. O'DONNELL:  Object to
11        form.
12 BY MR. YOUNGWOOD:
13   Q.    And what do you attribute -- it
14 seems that 2020 is markedly lower than each of
15 the prior four years that you list.  What do
16 you attribute that to?
17   A.    Mostly COVID restrictions, the
18 attendance and the ability to bring people in,
19 our ball game attendance, things -- things like
20 that.
21   Q.    Okay.  So less social activity,
22 less arrests, effectively?
23   A.    Potentially, yes, sir.
24   Q.    Yeah.  What -- it does look like
25 there are fewer arrests in 2018, '19, than

JEFF MCCUTCHEN

2  there had been in '17 and '16.  Do you have any
3  sense of what that trend can be attributed to?
4    A.    No, sir.  I mean, that could be a
5  lot of factors, depending on what the student
6  population was like, what the athletic teams
7  were like, and, again, what our ball game
8  weekends weather-wise was like during baseball
9  season.
10   Q.    Okay.  And are those the types of
11 things that tend to drive increases in arrests,
12 these -- I think you've listed a lot of
13 college-related activities and social events
14 associated with young people congregating.
15   A.    It -- it really depends.  We do
16 have, you know, quite a few large events
17 throughout the year.  And, again, it just
18 depends on what our crowds look like, what our
19 population looked like.  And it does generate a
20 lot from the college, but we have a large adult
21 gathering as well.
22   Q.    Okay.  And I think I asked you this
23 in a different way, but to be clear:  Any of
24 these arrests that are listed under number 1,
25 to your knowledge, associated with marches of

JEFF MCCUTCHEN

2  any sort?
3    A.    I don't believe so.
4    Q.    Okay.  Or other types of political
5  activity?
6    A.    Not to my knowledge.
7    Q.    How about artistic presentations?
8    A.    No, sir.
9    Q.    Okay.  And how about -- I think,
10 again, you've said this generally, but I'm
11 going to ask for the downtown permitted
12 activity.
13   A.    I don't believe so.  Again, my
14 knowledge base would be greater in '19 and '20.
15   Q.    Okay.  Well, but focusing there,
16 you can't recall any associated with
17 permitted -- permitted activity in '19 or '20?
18   A.    No, sir.
19   Q.    Okay.  Now we'll go to 2.  The
20 motor vehicle and pedestrian incidents, where
21 does this data come from?
22   A.    Again, that would come from our
23 generated computer system.
24   Q.    Okay.  And this doesn't seem to be
25 limited to the downtown area, or -- is it,

                    JEFF MCCUTCHEN
1   in some way?
2       A.    I believe so, yes, sir.  We
3   typically average, for the city, well over a
4   thousand crashes a year.  So I would assume
5   this is specifically for those roads in
6   conjunction with the downtown area.
7       Q.    Okay.  So you typically average
8   more than a thousand, but the highest number
9   here for any given year is 58, right?
10      A.    Yes.
11      Q.    And not holding you to the
12  thousand, but that would suggest that -- let's
13  just take 2017 -- that the number -- the
14  percentage of crashes taking place in the
15  downtown area were five or six percent of the
16  total city crashes?
17      A.    Yes, sir.  Without looking at the
18  data, yes, sir.
19      Q.    Okay.
20      A.    It's lower.
21      Q.    And I guess I'm curious.  The
22  nature of the crash that's going to take place
23  in the downtown area, I assume cars are going
24  at a slower speed in the downtown area than

                    JEFF MCCUTCHEN
1   they might be in other parts of the city.
2       A.    There -- they should be.
3       Q.    All right.  Fair point.
4             Again, we seem to have a trend
5   downward where there are, you know, 58 and 43
6   in '17 and '16, and then you're in the 20s for
7   the other three years.  Can you attribute that
8   to anything?
9       A.    I think it's the same as question
10  one with the crowd size.
11      Q.    Okay.  Let's go to number 3.  So
12  you were asked about patrols in the downtown
13  area.  And it -- who -- now, this response,
14  which isn't from data, did you play a role in
15  answering these questions?
16      A.    Yes, sir.  The deputy chief and I
17  discussed these.
18      Q.    Okay.  And then you had -- you gave
19  that information to Ms. Booth, and she compiled
20  it?  Is that what happened?
21      A.    That was probably something that
22  the deputy chief sat down with her with.
23      Q.    Okay.  So help me walk through
24  these.  A, there's a downtown shift that covers

                    JEFF MCCUTCHEN
1   the square area.  That's the same -- well, what
2   do we mean here by "square area"?  What's --
3       A.    That would be the area we described
4   earlier from University and North Lamar, things
5   like that.
6       Q.    Okay.  So it's saying "square," but
7   square is also sort of synonymous with what
8   you've described as the downtown area?
9       A.    Yes, sir.
10      Q.    Okay.  And it says, It's staffed by
11  seven patrol officers who work 10-hour shifts,
12  five days a week.
13            Does that mean, at any point in
14  time, there are seven officers, or does it vary
15  by time of day?
16      A.    It can vary.  So it would depend on
17  the time of the year; it would depend on the
18  events that we have taking place.  A routine
19  shift for them would look like a Wednesday
20  through Saturday.  And, again, before COVID and
21  before some of the time restrictions, it was
22  more of a 4:00 p.m. to 2:00 a.m. shift work.
23      Q.    I see.  So on a typical -- and is a
24  Saturday different than a Wednesday?

                    JEFF MCCUTCHEN
1       A.    No, sir.  They -- they would --
2   they normally would work a 4:00-to-2:00.
3       Q.    And 4:00 is p.m. to 2:00 a.m.?
4       A.    Yes, sir.
5       Q.    Okay.  And so any given afternoon
6   into the evening, there should be seven of your
7   officers walking around the downtown area?
8       A.    In a perfect world, if we're fully
9   staffed.  We've been as low as two, we've been
10  as high as eight, I believe, that have been
11  stationed down there.
12      Q.    Okay.
13      A.    Generally speaking, we probably
14  have four to six on average.
15      Q.    Okay.  And then from 2:00 a.m. to
16  4:00 p.m., not patrolled, or something lesser?
17      A.    It is generally patrolled by the
18  patrol division.  So they will make routine
19  drives through or respond to calls of service.
20      Q.    Okay.  Help me on that.  What does
21  that mean, "the patrol division"?  Is that like
22  a more general division that has responsibility
23  throughout the city, rather than a specific
24  area?

JEFF MCCUTCHEN

1
2       A.      Yes, sir.  Patrol handles what you
3   would consider any typical radio call or beat
4   assignment.  The downtown district was created
5   a few years ago because of the disturbances and
6   need for additional security down there for
7   specific times.
8       Q.      Okay.  The second one here, it
9   says, B, the downtown shift hours of deployment
10  is sometimes affected by events and the time of
11  the events --
12                  (Court reporter
13                  clarification.)
14  BY MR. YOUNGWOOD:
15      Q.      The downtown shift hours of
16  deployment is sometimes affected by the events
17  and time of the events in and around the
18  square.
19              What does that mean?
20      A.      It would depend on if there's an
21  event, if it's Double Decker, if it's an
22  11:00 a.m. kickoff or 2:30 kickoff.  It's
23  graduation weekend.  Again, if it's a permitted
24  event that we would need some extra officers,
25  they -- they kind of work on a sliding scale,

JEFF MCCUTCHEN

1
2   depending on the needs.
3       Q.      Okay.  And maybe that's partially
4   covered by C as well.  Going to D, it says, We
5   have had as many as 25 additional officers
6   assigned to the downtown shift and as few as
7   five.
8               That's dependent on the factors or
9   at least partially dependent on the factors you
10  just listed?
11      A.      Yes, sir.
12      Q.      Would it -- could it also be
13  dependent on whether or not there's a permitted
14  event in the downtown area?
15      A.      Yes, sir.
16      Q.      Going to four, there's a list of
17  safety concerns.  Did you play a role in
18  assembling these?
19      A.      Yes, sir.
20      Q.      I don't see anything specific in
21  this list -- but I'm going to ask you if I'm
22  missing it -- that relates to the courthouse
23  grounds.
24      A.      No, sir.
25      Q.      There's nothing here that

JEFF MCCUTCHEN

1
2   specifically refers to that, right?
3       A.      I don't believe so.
4       Q.      Okay.  And nothing here that
5   specifically refers to the statue, correct?
6       A.      Correct.
7       Q.      There's a reference to three
8   shootings in D.  What were those three
9   shootings?
10      A.      I know -- I believe all three of
11  them were in restaurant or bar establishments.
12      Q.      Okay.  That -- that are around the
13  courthouse -- around the square?
14      A.      Yes, sir.  Within the downtown
15  district.
16      Q.      Yeah.  And then there's this
17  request for video.  You say that you don't have
18  video, but the City's EMA --
19              And I apologize.  What does "EMA"
20  mean?
21      A.      Emergency management.
22      Q.      Okay.
23              -- may have some on the system.
24              Do you know if any video was
25  provided?

JEFF MCCUTCHEN

1
2       A.      I don't know.
3       Q.      Okay.  What role do you play in the
4   City of Oxford issuing permits?
5       A.      The permit is filed with the city
6   clerk, and then typically forwarded to one of
7   our code enforcement officers, who then will
8   send it in an email or bring it by the office.
9   At that point, we begin to gather information
10  and talk to the coordinators.
11      Q.      Let's go to tab 1, Chief, if you
12  don't mind.
13                  (Exhibit 1 was marked for
14                  identification.)
15              MR. YOUNGWOOD:  Okay.
16              MR. O'DONNELL:  John, just on
17          that housekeeping matter, your tab
18          36, is that --
19              MR. YOUNGWOOD:  That's
20          Exhibit 36.  Yes, if I didn't --
21              MR. O'DONNELL:  Okay.  That's
22          a test.  Okay.
23              MR. YOUNGWOOD:  Thank
24          you.  Thank you very much.
25  ///

                    JEFF MCCUTCHEN
1
2   BY MR. YOUNGWOOD:
3       Q.    Okay.  So these appear to be the --
4   the guidelines for issuing -- the ordinance for
5   issuing permits in the city.  Is this something
6   that you're familiar with?
7       A.    Yes, sir.
8       Q.    Okay.  And did you play any role in
9   drafting this or creating it?
10      A.    Not the original, no, sir.
11      Q.    Okay.  Have you played a role in
12  changes to it in the years that you've been
13  chief?
14      A.    Yes, sir.  We made a modification
15  to the length of how far out you can -- you can
16  apply for a permit, as far as a timing
17  standpoint.  I think we reduced that from 30
18  days to 14.  And then we changed some language
19  on the type of instruments that you can carry
20  while demonstrating.
21      Q.    Okay.  And when was the change made
22  from 30 to 15?
23      A.    It was in --
24      Q.    I thought -- maybe you said -- I
25  meant -- sorry.  Did you say 15 or 14?

1                   JEFF MCCUTCHEN
2       A.    I believe it was 14.
3       Q.    Okay.  30 to 14, then?
4       A.    That would have been in 2020.  That
5   would have been this summer.
6       Q.    Do you remember when in the summer?
7       A.    No, sir.  Not specifically.
8       Q.    Was that in any way done in
9   conjunction with the County changing their
10  policy to 14?
11      A.    Yes, sir.  I believe those
12  conversations we had jointly.
13      Q.    Were you part of those
14  conversations?
15      A.    I was a part of the initial
16  conversation when we met with the university
17  and the County.
18      Q.    Okay.  So it was a three-way
19  conversation, then?
20      A.    Yes, sir.  It was -- it was a
21  conversation that we had generalizing, trying
22  to keep information flowing to coordinate our
23  agencies.
24      Q.    When in the summer, as best you can
25  recall, did that take place?

1                   JEFF MCCUTCHEN
2       A.    Maybe July or August.  I'm not
3   certain.
4       Q.    Okay.  And who attended that
5   meeting?  Was it a meeting?
6       A.    Yes, sir.
7       Q.    Who attended?
8       A.    I believe our city attorney, Pope
9   Mallette; the sheriff; their attorney, David
10  O'Donnell; and Ray Hawkins, the chief on
11  campus, and his general counsel.
12      Q.    Okay.  And so one of the things
13  discussed was 30 to 14, right?
14      A.    The premise of that meeting was to
15  discuss public safety and having multiple
16  events on one day.  Conversations outside of
17  that really spilled over within our own counsel
18  with Pope Mallette and looking at adjustments
19  to adhere to permits.
20      Q.    And do you recall what the reason
21  was to reduce the time from 30 to 14?
22      A.    Really more of a reasonableness,
23  you know, what time did we need to be able to
24  prepare and staff those events.
25      Q.    Okay.  And then you -- I think you

1                   JEFF MCCUTCHEN
2   referenced the other change you remember being
3   what you could carry, if I remember that right.
4       A.    Yes, sir.
5       Q.    So tell me what you mean by that.
6       A.    We changed some language on
7   banners, and as far as being able to carry
8   certain sticks or pieces of metal.
9       Q.    So you, like, wouldn't want
10  somebody making a poster and putting it on a
11  metal stick, because they could take the poster
12  off and the stick could be a weapon, something
13  like that?
14      A.    Yes, sir.
15      Q.    How about for flags?  Can I carry a
16  flag on a stick?
17      A.    Well, that was the discussion of
18  our banner, and from banner to flag.  And we
19  cleaned that up so that we were fair across the
20  board.
21      Q.    So I -- anything I can carry a
22  banner on, I can carry a flag on?
23      A.    No, sir.  We -- we basically made
24  it to where if you carry a flag or a banner,
25  you would have to carry it in your hand or a

Page 66

JEFF MCCUTCHEN

1    very small item.  Not -- not what we would
2    consider a flag stick.
3        Q.    Okay.  So I can't -- if I can't
4    carry a banner on a metal stick, I can't carry
5    the American flag on an American -- on a metal
6    stick?
7        A.    Yes, sir.
8        Q.    Okay.  Any other changes you
9    remember making?
10       A.    I believe that was it.
11       Q.    Okay.  How about time of day?  Any
12   restrictions in terms of the City issuing
13   permits that are tied to time of day?
14       A.    Not specifically.
15       Q.    Okay.  What do you mean by that?
16       A.    Depending on the request, depending
17   on the time of day, where that location would
18   be, if it was a public safety concern, we may
19   have issues in staffing or the ability to keep
20   a demonstration safe.
21       Q.    Okay.  So at least from the City's
22   perspective, there was no need to have an
23   absolute ban on a permitted event that takes
24   place at night?

Page 67

JEFF MCCUTCHEN

1        A.    No, sir.
2        Q.    Okay.  It would be subject to the
3    same restrictions and considerations as an
4    event that takes place during the day?
5        A.    Yes, sir.
6        Q.    Which include what?  What are the
7    factors that you consider when deciding whether
8    or not to grant a specific request for a
9    permit?
10       A.    You know, it's really -- we just
11   look at time; place; manner; what their needs
12   are, as far as a public safety standpoint; the
13   size; you know, the route.  All those are taken
14   into factors.
15       Q.    Okay.  And you don't take into
16   consideration the message that the individual
17   seeking the permit is hoping to convey,
18   correct?
19            MR. O'DONNELL:  Objection.
20   BY MR. YOUNGWOOD:
21       Q.    You -- sir --
22            MR. O'DONNELL:  You can
23            answer.
24   ///

Page 68

JEFF MCCUTCHEN

1    BY MR. YOUNGWOOD:
2        Q.    I didn't -- I don't know -- I know
3    there was an objection, but you can still
4    answer.
5        A.    No, sir.
6        Q.    And, in fact, if we look at Section
7    102-641(b), which is on the third page of
8    Exhibit 1 -- I'm sorry.  That's actually not
9    where I want you to look.  Hold on.  Actually,
10   Section (a).  Sorry.  Section (a), dead middle,
11   or almost dead middle, says, The speech content
12   of the event shall not be a factor in
13   determining the amount of police protection
14   necessary.
15       A.    Where are you at?
16       Q.    It's maybe five, six lines down.
17       A.    Gotcha.
18       Q.    Yeah.  The speech content of the
19   event shall not be a factor in determining the
20   amount of police protection necessary.
21       A.    Correct.
22       Q.    And that is your policy, correct?
23       A.    Yes, sir.
24       Q.    Okay.  There is some provisions

Page 69

JEFF MCCUTCHEN

1    here in the remainder of that paragraph about
2    payment for additional police protection.  Can
3    you tell me about that?
4        A.    That would depend on if we brought
5    in additional resources.  You know, if it
6    was -- if it was a march or if it was a 5K or
7    things like that and we had to bring in extra
8    staff, there could be -- there could be some --
9    some additional cost to that.
10       Q.    Okay.  Has that occurred?
11       A.    From time to time, yes, sir.
12       Q.    And, I guess, help me understand,
13   if you have the ability to bring in extra staff
14   and then charge people for it, what would be
15   the circumstances under which you'd have to
16   deny the permit for inability to provide
17   appropriate police protection?
18       A.    I don't know that we've ever denied
19   a permit.  Yeah.  We -- if -- you know,
20   specifically, say, a 5K and they gave us a
21   route, we would give them how many officers it
22   would take to work those intersections and then
23   what it might cost for them to operate that
24   event.

Page 70

JEFF MCCUTCHEN

2  Q.  Okay.  And -- and part of that cost
3  might be bringing officers in on overtime duty?
4  A.  Yes, sir.
5  Q.  And so then it would be a choice
6  whether or not you -- the applicant wants to
7  pay for it or not?
8  A.  Yes, sir.
9  Q.  Okay.  And I take it, then, you've
10  never denied a permit, at least in your
11  experience, that relates to a political event?
12  A.  The only time that, again, we look
13  at what our policy says and, you know, did they
14  supply us with a permit in time, that -- that's
15  the only time that I know that we have denied
16  anything.
17  Q.  And have you -- okay.  So I -- so
18  that includes not denying anything for a
19  political purpose, right?
20  A.  Correct.
21  Q.  And how about an artistic event?
22  You've not -- do you have any recollection of
23  denying a permit that relates to an artistic
24  event?
25  A.  Nothing related --

Page 71

JEFF MCCUTCHEN

2  MR. O'DONNELL:  Objection to
3  form.
4  A.  -- to content.
5  Q.  Okay.  In terms --
6  (Court reporter
7  clarification.)
8  MR. O'DONNELL:  Yeah.  There
9  was an objection to form.
10  A.  We have not denied one on content.
11  MR. O'DONNELL:  Yeah.  John,
12  we talk a little slower in
13  Mississippi than you do.  So --
14  MR. YOUNGWOOD:  We -- we
15  think a little slower in New York.
16  Or what I should say is we talk
17  without thinking.
18  MR. O'DONNELL:  No comment.
19  MR. YOUNGWOOD:  Yeah.  I
20  don't think we're the only ones in
21  the world who do that.  But. . .
22  MR. O'DONNELL:  Good point.
23  MR. YOUNGWOOD:  Yeah.  Some
24  world.
25  ///

Page 72

JEFF MCCUTCHEN

2  BY MR. YOUNGWOOD:
3  Q.  In terms of the timing and the 14
4  days, when you deny a permit -- well, strike
5  that.
6  Can you recall instances where you
7  have denied permits because they were submitted
8  less than 14 days in advance?
9  A.  Yes, sir.
10  Q.  Okay.  And how about when the rule
11  was 30?  Can you recall instances when you
12  denied permits because they were submitted less
13  than 30 days in advance?
14  A.  No, sir.
15  Q.  Okay.  And in terms of the less
16  than 14, is it -- is it that if somebody
17  submits it on the 13th day, that's an automatic
18  denial, or you have some discretion to decide
19  whether you still have enough time to make a
20  decision?
21  A.  Yes, sir.  I mean, it's a lot in do
22  we have time to plan, you know, what is
23  happening in that moment; what are our staffing
24  needs.  And, again, we typically work with
25  those individuals for a secondary date, if it's

Page 73

JEFF MCCUTCHEN

2  feasible.
3  Q.  Okay.  And in terms of denying
4  requests made less than 14 days, can you recall
5  such instances in the last year?
6  A.  Yes, sir.
7  Q.  Okay.  Tell me what you recall.
8  A.  There was a request that came in
9  the week before Halloween for a parade, like a
10  vehicle -- a vehicle parade the night of
11  Halloween, and the route that they requested,
12  which is a high-traffic area for pedestrians --
13  again, it was submitted less than 14 days.  We
14  already had resources allocated for the
15  Halloween events and pedestrian traffic, which
16  we denied that permit on the grounds of not
17  getting it in in time.
18  Q.  Okay.  And what was the reaction to
19  that denial?  Did you -- I guess it's hard to
20  work out another date if it's for Halloween.
21  A.  Again, we denied it.  We gave them
22  some options, and they chose not to participate
23  in a formalized parade.
24  Q.  Okay.  You've granted permits for
25  nighttime use, correct?

JEFF MCCUTCHEN

1
2    A.    Yes, sir.
3                MR. O'DONNELL:  Hey, John,
4          would this be a good moment to take
5          five minutes?
6                MR. YOUNGWOOD:  Absolutely.
7          That's perfect.
8                MR. O'DONNELL:  Okay.
9                THE VIDEOGRAPHER:  All
10         right.  We are going off the
11         record.  The time is 10:15 a.m.
12              (Recess from 10:15 a.m. to
13               10:23 a.m.)
14               THE VIDEOGRAPHER:  We are
15         back on the record.  The time is
16         10:23 a.m.
17   BY MR. YOUNGWOOD:
18        Q.    Chief, just a question or two more
19   on Exhibit 1.  If I look at Section 102-638(b),
20   there's the reference to the 30 days.
21        A.    Yes, sir.
22        Q.    Okay.  And you're saying that's now
23   14, if -- correct?
24        A.    Yes, sir.
25        Q.    And do you know if that change has

JEFF MCCUTCHEN

1
2    been memorialized in writing?
3         A.    I am not certain on that.  That
4    would go through the city clerk's office.
5         Q.    Okay.  So how do you know that the
6    policy has been changed to -- to 30?  I'm
7    sorry.
8         A.    That --
9         Q.    14.  14.
10        A.    That was the discussion we had in
11   an open board meeting.
12        Q.    Open board meeting of the city
13   council?
14        A.    Yes, sir.
15        Q.    Okay.  And in terms of the changes
16   that relate to the sticks or other items that
17   can be part of a permitted event, is that
18   something that's memorialized somewhere?
19        A.    Yes, sir.
20        Q.    And, again, because you're
21   recalling the discussion at the city council
22   meeting?
23        A.    Yes, sir.
24        Q.    Okay.  Other than that, are you
25   aware of a written change that's included

JEFF MCCUTCHEN

1
2    within a set of the City's ordinances?
3         A.    No, sir.
4         Q.    Okay.  I want to ask you a little
5    bit about some specific permits.  If we go to
6    tab 28, which we'll mark as Exhibit 28, please.
7              (Exhibit 28 was marked for
8                identification.)
9    BY MR. YOUNGWOOD:
10        Q.    So this is a two-page document,
11   which has, at the top, Oxford Police
12   Department, and then it has a heading, Special
13   Event, Parade, or Public Assembly Permit.  Is
14   this the form for the permit application?
15        A.    Yes, sir.
16        Q.    Okay.  It still says -- this is
17   dated in this past year, although it still says
18   Chief East on the top.  The form just hasn't
19   been updated to include your name yet?
20        A.    That's right.
21        Q.    Okay.  This is an application.
22   This version doesn't seem to be signed by you
23   or anyone else under "permit approved by."
24   Would, in the normal course, you have to sign
25   the permit for it to be approved, or could it

JEFF MCCUTCHEN

1
2    be approved without -- does your signature mean
3    approval, or might it be approved and still not
4    have your signature?
5         A.    Typically, I sign them and send
6    them back to city hall.  But there could be an
7    instance where, you know, it's a conversation,
8    or that it's -- this event could have been
9    blessed where I didn't sign it, and I took it
10   to the city council for approval.
11        Q.    Okay.  Do you remember this
12   specific event?  It's on Saturday, August 8,
13   2020, applicant is Visit Oxford.  It's an Arts
14   Council projection.
15        A.    Yes, sir.
16        Q.    It says -- and it says on the
17   bottom of the page, first page, type event,
18   Arts Council projection of artwork accompanied
19   by acoustic musician.
20              Do you see that?
21        A.    Yes, sir.
22        Q.    And the time is 5:00 to 7:30 in the
23   evening?
24        A.    Yes, sir.
25        Q.    Okay.  The location is city hall

Page 78

JEFF MCCUTCHEN

1 plaza. And what's the relationship of city
2 hall plaza to the town square?
3 
4     A.    That would be in between city hall,
5 the building, and then Square Books, Jr.
6 There's an opening there, which sometimes we
7 reference to the RSVP platform.
8     Q.    Okay. Was this event approved?
9     A.    I believe so.
10    Q.    Yeah. I believe it was, too, which
11 is why I'm asking why it --
12            (Simultaneous speakers.)
13    A.    I believe so. We -- we had a
14 series of these type of events from potentially
15 late July all the way through December. So I
16 would assume it was.
17    Q.    Okay. And this event, you don't
18 recall any -- any violence associated with it,
19 do you?
20    A.    No, sir.
21    Q.    Okay. And you said a series of
22 similar events. What do you mean by "similar"?
23    A.    Visit Oxford applied for multiple
24 days during the fall, and those events
25 typically had something to do with music or

Page 79

JEFF MCCUTCHEN

1 demo-- not demonstrations, but events that
2 were happening on that location, smaller-
3 scale-type events.
4 
5     Q.    Okay. And no violence associated
6 with any of those in 2020, that you can recall,
7 right?
8     A.    No, sir.
9     Q.    Any -- any, even short of violence,
10 security concerns associated with any of those
11 events?
12    A.    No, sir.
13    Q.    And included within those events
14 such as this one were events in the evening,
15 correct?
16    A.    Yes, sir.
17    Q.    You said there was a series. If we
18 turn to tab 31, which we'll mark as Exhibit 31.
19            (Exhibit 31 was marked for
20             identification.)
21 BY MR. YOUNGWOOD:
22    Q.    You can flip through these if you
23 want, but they all appear to be Visit Oxford
24 events and, I think, all of them occurring on
25 Friday and Saturdays.

Page 80

JEFF MCCUTCHEN

1 
2            Do you see that?
3     A.    Yes, sir.
4     Q.    And all of them for time periods
5 from 10:00 a.m. to 10:00 p.m. in the evening?
6     A.    Yes, sir.
7     Q.    And, again, these don't seem to
8 have signatures indicating approval. But to
9 your recollection, were most or all of these
10 approved?
11    A.    Yes, sir. And I believe they were
12 all introduced at the city council.
13    Q.    What do you mean by "introduced"?
14    A.    Submitted for approval.
15    Q.    So the city council can approve
16 this or -- yeah. Well, help me on that. Who
17 can approve the permits?
18    A.    I can approve the permits, but I
19 will present some to the city council to make
20 sure they are aware.
21    Q.    I see. And with the Visit Oxford
22 ones, you think you did that?
23    A.    Yes, sir.
24    Q.    Okay. And, again, these all ended
25 up being peaceful events, correct?

Page 81

JEFF MCCUTCHEN

1 
2     A.    Yes, sir.
3     Q.    And at least some of them extended
4 into the evening, correct?
5     A.    Yes, sir.
6     Q.    Okay. Let me ask you to turn to
7 tab 33, which we'll mark as Exhibit 33.
8            (Exhibit 33 was marked for
9             identification.)
10 BY MR. YOUNGWOOD:
11    Q.    This is an application from
12 somebody named Wayne Andrews. And this also
13 refers to being a projection film screening
14 event.
15            Do you see that?
16    A.    Yes, sir.
17    Q.    Do you recall whether or not this
18 event was approved?
19    A.    It was.
20    Q.    Okay. And it took place?
21    A.    Sir?
22    Q.    It took -- it did take place? It
23 was approved and the event happened?
24    A.    I believe so, yes, sir.
25    Q.    Okay. And it was an event that

JEFF MCCUTCHEN

involved projections in the evening?

A. Yes, sir.

Q. Okay. Any security or safety or violence associated with it that you recall?

A. No, sir.

Q. Okay. If you could take a look at tab 9, which we'll mark as Exhibit 9.

(Exhibit 9 was marked for identification.)

BY MR. YOUNGWOOD:

Q. And then look at tab 16, which we'll mark as Exhibit 16.

(Exhibit 16 was marked for identification.)

BY MR. YOUNGWOOD:

Q. My question is, is -- the one that's labeled 9 has the title, Special Event, Parade, or Public Assembly Permit. And then if you look at 16 --

(Court reporter clarification.)

BY MR. YOUNGWOOD:

Q. Special Event, Parade, or Public Assembly Permit. And then if you go to 16, it



JEFF MCCUTCHEN

says, Event Permit Application.

My question is: Is there a difference between the two types of applications?

A. No, sir. I believe there was two different forms with the same information but different language, whether that was on the city website or the city clerk's office versus what we had on file.

Q. I see. Okay. So same purpose, same criteria in approving or disapproving them?

A. Yes, sir.

Q. Okay. And it does look like, by the way, 9, your -- your name is on it. Maybe some of the other is people just had old versions or something?

A. Yes, sir.

(Technical discussion.)

MR. YOUNGWOOD: Okay. Let's actually add tab 8, Exhibit 8, please.

(Exhibit 8 was marked for identification.)



JEFF MCCUTCHEN

BY MR. YOUNGWOOD:

Q. If you could turn there, Chief. There's a collection of documents in here. I'd actually like to refer you to the fifth page of the document. They're not numbered as such. You'll just have to count to the fifth page.

Tell me when you're there. It says on the top City of Oxford Event Permit Application, and it has the date, December 3rd, 2019.

MR. MALLETTE: John, this is Pope. Are you talking about the one that has the date stamp December 3, 2019?

MR. YOUNGWOOD: Exactly.

MR. MALLETTE: Okay. Got it.

MR. YOUNGWOOD: I don't know if yours came through in color, but December 3 is in red on mine.

MR. MALLETTE: Okay.

BY MR. YOUNGWOOD:

Q. So this form looks a little different. And the thing I want to draw your attention to is it says, Application must be



JEFF MCCUTCHEN

submitted at least five working days prior to the event.

Do you see that?

A. Yes, sir.

Q. So how does that overlap with the 30-day-in-advance requirement and the 14-day-in-advance requirement that we discussed earlier?

A. This is an event that the organizers want to serve alcohol.

Q. Okay. And that requires a different notice period?

A. Yes, sir.

Q. But it seems to require a shorter notice period, not a longer notice period.

A. This one is going to be something that we coordinate with our code office and ABC. So they -- they have to file information about the event. And, again, we've got to loop in some other jurisdictions with that.

Q. I hear you. But wouldn't that suggest that there should be a longer requirement than if you're not serving alcohol, not a shorter requirement?

Page 86

JEFF MCCUTCHEN

1
2       A.    It's essentially set up so that it
3  gives us notice to be able to let ABC -- or
4  just go by and check them.  It could be on a
5  private property or an event that's enclosed to
6  a specific group.
7       Q.    Okay.
8            MR. MALLETTE:  Hey, Jonathan,
9            to the extent that you are
10           questioning this as if it were a
11           regular event permit, I'm going to
12           object to the form.  And I'm not
13           trying to be prickly, but this is
14           an alcohol permit, rather than
15           assembly or parade permit.  It's a
16           different permit.  It may be
17           required as a subset to a march or
18           assembly, but it's an alcohol
19           permit, not a parade or assembly
20           permit.  And I'm sorry.  I don't
21           mean to testify, but it's a --
22           MR. YOUNGWOOD:  No.  I'm not
23           trying to be clever.  I -- you've
24           actually explained it to me.  I --
25           I understand it.  Let me try to see

Page 87

JEFF MCCUTCHEN

1
2            if I can get the witness to clarify
3            it so that we have it clear.
4  BY MR. YOUNGWOOD:
5       Q.    Is this an additional application
6  one would have to make if you're going to serve
7  alcohol for an event?
8       A.    Yes, sir.
9       Q.    Okay.  So if I wanted to have an
10 event in the town square, I would still need to
11 comply with the permit procedure that we've
12 been discussing up to now that at one point
13 required 30 days and more recently requires 14
14 days; is that right?
15      A.    Yes, sir.
16      Q.    And then if I wanted to serve
17 alcohol, I'd also have to complete this form?
18      A.    Yes, sir.
19      Q.    Okay.  But the five days that's
20 contained within here, that is sufficient time
21 to process the additional requirements
22 associated with having an event have alcohol,
23 correct?
24           MR. MALLETTE:  Object to the
25           form.

Page 88

JEFF MCCUTCHEN

1
2           MR. O'DONNELL:  I'll join
3           that objection.
4       A.    Can you ask the question again,
5  sir?
6       Q.    The five days here, that's
7  sufficient time to carry out whatever approvals
8  you need to seek for an event to have alcohol?
9           MR. MALLETTE:  Object to the
10          form.
11          MR. O'DONNELL:  Same -- same
12          objection.
13      A.    Yes, sir.
14          MR. YOUNGWOOD:  Okay.  Let's
15          go to tab 2, which we'll mark as
16          Exhibit 2.
17            (Exhibit 2 was marked for
18             identification.)
19 BY MR. YOUNGWOOD:
20      Q.    So is this a document you're
21 familiar with, sir?
22      A.    No, sir.
23      Q.    Okay.  Independent of the document,
24 are you aware of the County's policy regarding
25 the use of its facilities?

Page 89

JEFF MCCUTCHEN

1
2       A.    No, sir.
3       Q.    You are consulted from time to
4  time -- we touched on this briefly at the
5  beginning -- by -- with Sher- -- or let me ask
6  this better.
7            Sheriff East, from time to time,
8  will consult with your office regarding the
9  issuance of permits for the use of county
10 facilities, correct?
11      A.    No, sir.  Not with issuing of a
12 permit.  He may notify us that they have one,
13 but not that I would make any suggestions on
14 approving or disapproving.
15      Q.    Okay.  Does he notify you or does
16 he contact somebody else?  What's the line of
17 communication?
18      A.    It's typically me.
19      Q.    Okay.  And is he notifying you that
20 he has an application, or is he notifying you
21 that he's -- that they've granted a permit and
22 they have an event?
23      A.    It could be both.  If there's a
24 permit submitted to him, he may contact us to
25 ask do we have an event that day or adequate

Page 90

JEFF MCCUTCHEN

1    staff available if the permit is granted.
2        Q.    Okay.
3        A.    And then after the event is
4    scheduled, if he needs additional assistance,
5    he would reach out.
6        Q.    Okay.  And, again, you can't recall
7    any instance where you've denied him that
8    assistance?
9        A.    No, sir.
10       Q.    So we looked at tab 2.  If you turn
11   to tab 6, which we'll mark as Exhibit 6.
12                   (Exhibit 6 was marked for
13                    identification.)
14   BY MR. YOUNGWOOD:
15       Q.    I -- I take it from your prior
16   answer, you also haven't seen this document?
17       A.    No, sir.
18       Q.    If you turn to tab 11, which we'll
19   mark as Exhibit 11.
20                   (Exhibit 11 was marked for
21                    identification.)
22   BY MR. YOUNGWOOD:
23       Q.    Have you seen this document before?
24       A.    No, sir.


Page 91

JEFF MCCUTCHEN

1        Q.    Okay.  Are you aware of the
2    specific policies that the County adopted in
3    2020 relating to the use of the courthouse
4    grounds?
5        A.    In conversation.
6        Q.    Tell me what -- who was that
7    conversation with?
8        A.    With the sheriff.
9        Q.    And when was that conversation?
10       A.    It would have been throughout the
11   summer as pertaining to this.
12       Q.    I'm sorry.  What does "pertaining
13   to this" mean?
14       A.    Well, you're asking about this
15   document, specifically speaking of allowing
16   four or more people?
17       Q.    Yeah.
18       A.    That would have been a conversation
19   we had this summer.
20       Q.    Okay.  Tell me about that
21   conversation.
22       A.    Essentially, he notified us of this
23   policy coming into play.  And that way, if our
24   officers encountered more than what the policy

Page 92

JEFF MCCUTCHEN

1    allowed, we would contact his office if we saw
2    it.
3        Q.    Okay.  Did he tell you -- let's
4    just focus on the "four people" part.  Did he
5    give you the rationale for the four people
6    limitation?
7        A.    Maybe.  I mean, we talked about
8    logistics of his office and ability to monitor
9    that area, the lack of the staff that they
10   have, and the wide range of mileage that they
11   cover as an agency.
12       Q.    Okay.  But what does that have to
13   do with four people being on the courthouse
14   grounds?
15       A.    Those conversations, sir, I'm not
16   sure of.
17       Q.    You're not recalling them clearly?
18       A.    Yes, sir.  I don't know that I was
19   involved in those conversations of how they
20   came up with the number four.
21       Q.    No.  And I appreciate you weren't
22   involved in the decision.  I'm wondering if,
23   during your conversations with Sheriff East, he
24   gave you a rationale for the decision, if he

Page 93

JEFF MCCUTCHEN

1    told you we've changed it -- we've done this
2    because?
3        A.    No.  Not that I know of.
4        Q.    Okay.  But he did -- he wanted to
5    inform you and let you know that there was now
6    this four-person restriction, right?
7        A.    Yes, sir.
8        Q.    Okay.  And do you remember when he
9    informed you of that?
10       A.    It would have been sometime during
11   the summer.
12       Q.    Okay.  So this document's dated the
13   15th of June.  Sometime presumably after the
14   15th of June?
15       A.    Yes, sir.
16       Q.    Okay.  And -- and since being
17   informed of that, have -- have you or your
18   officers noticed violations of this "no more
19   than four without a permit" policy on the
20   courthouse grounds?
21       A.    We have.
22       Q.    And on what occasions?
23       A.    Dates, I don't have in front of me.
24   But there -- there were time to -- times that

Page 94

JEFF MCCUTCHEN

1  our agency would see -- I mean, we would notify
2  them if it was even two, just to give them a
3  heads-up to make sure they knew. But there
4  were times where there were more.
5      Q.    Okay. Well, let me -- when you say
6  there were two, I mean -- we can go back to the
7  pictures if it's helpful. The courthouse
8  grounds have benches and open space, correct?
9      A.    Yes, sir.
10     Q.    And the low fence with gaps in it
11 to allow access, right?
12     A.    Yes, sir.
13     Q.    So at any given time -- let's start
14 during the day -- I mean, wouldn't there be
15 groups of two or more on the courthouse
16 grounds?
17     A.    Yes, sir. And I apologize. I was
18 specifically meaning after hours.
19     Q.    Okay. Okay. So if you saw five
20 people having lunch together on the courthouse
21 grounds during the day, would you inform
22 Sheriff East's agency about that?
23     A.    No, sir.
24     Q.    Okay. Why not?

Page 95

JEFF MCCUTCHEN

1      A.    Typically, during the daytime, his
2  staff is in and out of that area equally. He's
3  got more staff during the daytime, and they
4  were able to monitor that better than after
5  hours.
6      Q.    Okay. Why does he have more staff
7  around the courthouse during the daytime than
8  at night, if you know?
9      A.    They manage the courthouse, and so
10 there are court proceedings happening
11 throughout the day. He's got detectives that
12 are out, more personnel that are out
13 specifically during the daytime. Generally,
14 it's deputies that are working the road at
15 night is all that they have.
16     Q.    Okay. Well, how about on a
17 Saturday?
18     A.    I would assume Saturday would be
19 specifically just the deputies that are working
20 the road. So if we noticed that there were
21 multiple people up there, we would generally
22 give them a call.
23     Q.    Okay. So if you saw a group of
24 five on a Wednesday at noon, you wouldn't give

Page 96

JEFF MCCUTCHEN

1  a call. If you saw a group of five at noon on
2  Saturday, your deputies might give a call?
3      A.    Yes, sir.
4      Q.    Is that tracked in some way, giving
5  a call that a certain number of people are on
6  the courthouse grounds? Or is the call just
7  made, and there's no record?
8      A.    It's probably a phone call. And,
9  again, that may be notified from my staff to --
10 for me to call him, or it could be one of our
11 staff members contacting their on-duty
12 supervisor.
13     Q.    Okay. So -- so it's your
14 understanding that five people congregating on
15 the courthouse grounds during the day is a
16 violation of County policy?
17              MR. O'DONNELL:  Object to
18              form.
19     A.    No. That's not my understanding.
20 I know that that business -- that -- that
21 operates as a business and a courthouse. So
22 there would be more people coming and going
23 throughout the day.
24     Q.    Okay. But how about on a weekend?

Page 97

JEFF MCCUTCHEN

1  Five people standing there having a picnic on
2  the lawn on a weekend. Is that a -- your
3  understanding, a violation of County policy?
4      A.    I don't know that they deem it as a
5  violation, and that's why we directly report it
6  to them.
7      Q.    Okay. And are you aware of them
8  taking any actions with respect to the people
9  gathering in response to any of the calls that
10 your office has made to them?
11     A.    I don't know of anything
12 specifically that they've done. I do know that
13 we have notified them of multiple people there,
14 and their office handles that. Whether that's
15 removal or giving them additional options, I
16 wouldn't know.
17     Q.    Okay. And do you have safety
18 concerns associated with more than four people
19 gathering on the courthouse grounds?
20     A.    It all depends:  time of day,
21 what's going on, traffic patterns. Again,
22 that's -- we'll try to manage the street and
23 everything adjacent to that, and we give them
24 the call on how they determine safety on their

Page 98

JEFF MCCUTCHEN

1  grounds.
2      Q.    So -- so it's possible for five
3  people to gather on the courthouse grounds and
4  for it to be perfectly safe?
5      A.    It's possible.
6      Q.    Okay.  And it's possible for five
7  people to gather on the courthouse grounds
8  after dark and it be perfectly safe, correct?
9      A.    It's possible.
10              MR. O'DONNELL:  Object to
11              form.
12  BY MR. YOUNGWOOD:
13      Q.    And in both circumstances, day or
14  night, it depends on all the other
15  circumstances, correct?
16      A.    Yes, sir.
17              MR. YOUNGWOOD:  Okay.  Go to
18              27, please.
19  BY MR. YOUNGWOOD:
20      Q.    Have you seen -- which we'll mark
21  as Exhibit 27.  Tab 27 is Exhibit 27.  Have you
22  ever seen this document before?
23              (Exhibit 27 was marked for
24              identification.)

Page 99

JEFF MCCUTCHEN

1      A.    No, sir.
2      Q.    Okay.  Were you aware -- well, you
3  testified earlier that the -- you became aware
4  that the approval time period for the permit
5  associating -- associated with the use of the
6  courthouse grounds changed from 30 days to 14,
7  right?
8      A.    Yes, sir.
9      Q.    Were -- well, let me actually -- I
10  don't mean to have led you in that way.
11              When you became aware of the change
12  in 30 to 14, what policy did you think was
13  changing?
14      A.    I would assume it was very similar
15  to the same policy that we had, as far as
16  accepting a permit.
17      Q.    Did you -- and did you understand
18  it to be a countywide policy or only a policy
19  limited to the courthouse grounds and the
20  statue?
21      A.    I didn't get any -- it didn't get
22  into any specifics on that.
23      Q.    Okay.  Did you, in your
24  conversations with Sheriff East last summer,

Page 100

JEFF MCCUTCHEN

1  gain any understanding as to why these various
2  policy changes were being applied to the
3  courthouse grounds, as opposed to all county
4  property?
5      A.    Yes, sir.  Mostly around the
6  ability to provide security there.  Again, I'm
7  not sure how many deputies they run, but it's
8  600-and-some-odd square miles, and I'm assuming
9  six to eight deputies.  So response time and
10  the ability to monitor that is definitely
11  different for them than for us.
12      Q.    What is different about the
13  courthouse for them, as opposed to any other
14  small plot of land within the county?
15      A.    I'm not sure, unless it's you
16  know, that being centrally located in the city
17  and coming through the city limits, slowing
18  them down as far as a response time versus a
19  piece of property in the county with open road.
20      Q.    But there are -- you testified
21  earlier, there are other -- there's other
22  parcels of county property within the city,
23  right?
24      A.    Yes, sir.

Page 101

JEFF MCCUTCHEN

1      Q.    Would the rationale be any
2  different for them in terms of the sheriff's
3  office's access to them than it would be for
4  the courthouse grounds?
5      A.    I'm not certain.
6      Q.    And your conversations with -- with
7  Sheriff East concerning changes in policies to
8  the courthouse grounds and the area approximate
9  to the statue touch on any of the political
10  movements that were exhibited this summer of
11  2020?
12      A.    No, sir.  Again, I think they were
13  following a very similar policy that we were.
14  We were trying to, you know, give our citizens,
15  you know -- not different standards,
16  essentially.
17      Q.    By "not different standards," you
18  mean that the City and the County wanted to
19  have the same standard?
20      A.    From a timing standpoint as to when
21  to get your permit in.
22      Q.    Okay.  But in terms of the focus of
23  the County's changes in policy on the
24  courthouse, did the subject, for example, of

JEFF MCCUTCHEN

1
2  Black Lives Matter come up?
3      A.   No, sir.
4      Q.   Or the Confederate marches or
5  events?  Did they -- did that come up in your
6  conversations with Sheriff East?
7      A.   About why they changed their --
8  their timing?
9      Q.   Yes.
10     A.   No, sir.
11     Q.   Okay.  Or there's a -- there's a --
12  I understand, a group of citizens who would
13  like to take down the Confederate statue,
14  correct, or move it?  Take it down or move it,
15  right?
16     A.   Yes, sir.
17     Q.   Did that come up in connection with
18  any of the conversations that you had with
19  Sheriff East regarding changes to the
20  courthouse grounds policy?
21     A.   No, sir.
22     Q.   Okay.  Did you also become aware,
23  over the summer, from Sheriff East or
24  otherwise, that the County had made a change to
25  its courthouse grounds policy so as to prohibit

JEFF MCCUTCHEN

1
2  the issuance of any permits for time periods
3  starting 30 minutes before dusk?
4      A.   I think once they enacted that in
5  their county, then we were notified.
6      Q.   Were you -- by Sheriff East?
7      A.   Yes, sir.
8      Q.   So you were notified by
9  Sheriff East?
10     A.   Once they changed this policy, yes,
11  sir.
12     Q.   Okay.  And you were not consulted
13  on whether or not the policy should change in
14  that manner, I assume?
15     A.   I don't believe so.
16     Q.   Okay.  Did Sheriff East tell you
17  the rationale for changing the policy so as to
18  preclude the use of the courthouse grounds
19  starting 30 minutes before dusk?
20     A.   Yes, sir.  Again, you know, back to
21  the safety -- the public safety, being able to
22  provide security to that from a staffing need
23  and in a response-time need.
24     Q.   Did he provide any instances to you
25  in which he was unable to provide security

JEFF MCCUTCHEN

1
2  relating to the courthouse grounds after --
3  starting 30 minutes before dusk?
4      A.   Are you asking did he provide me
5  any data?
6      Q.   Any -- any overall data or -- or
7  reference to a specific incident.
8      A.   We've had several incidents -- and
9  I don't have any dates in front of me -- where
10  our staff responded or intercepted disturbances
11  there.  And if it's in -- after normal working
12  hours, I mean, you could potentially look at a
13  15- to 40-minute window before they could
14  respond.  So I know we've had those
15  conversations.
16     Q.   Okay.  And you can't remember a
17  specific incident?
18     A.   No, sir.  Those would be things --
19  you know, potentially look back on in our
20  system.  But it has happened from time to time.
21     Q.   But you've had incidents elsewhere
22  in the city at night from time to time, right?
23     A.   Yes, sir.
24     Q.   Okay.  In fact, most of your
25  incidents take place elsewhere in the city at

JEFF MCCUTCHEN

1
2  night, right?
3              MR. O'DONNELL:  Object to
4          form.
5      A.   When you -- when you're saying
6  "most incidents," what are you referencing to?
7      Q.   Well, in the downtown area, most of
8  them take place at night, right?  I think you
9  said that before.
10             MR. O'DONNELL:  Same
11         objection.
12     A.   Yes, sir.
13     Q.   When is dusk?
14     A.   30 minutes before sunset.
15     Q.   So dusk is 30 minutes before
16  sunset?
17     A.   That's my understanding.
18     Q.   Okay.  So 30 minutes before dusk
19  would be an hour before sunset, then?
20     A.   I guess so.
21     Q.   Okay.  And by definition, sunset
22  would change based on the day of the year,
23  right?
24     A.   Yes, sir.
25     Q.   Is it the time of day -- let's not

Page 106

JEFF MCCUTCHEN

1  talk about the courthouse for a second.  Let's
2  talk about incidents related to people
3  gathering, you know, near and around bars and
4  restaurants -- okay -- which you've discussed
5  take place in the downtown area.
6        Is it the time of day that
7  increases the likelihood of an incident
8  regarding -- requiring police involvement, or
9  is it the amount of light in the sky?
10       A.    You know, I think it's a -- it's a
11  lot of factors.  It's -- it's the time of the
12  day; it's where it's located at; it's how large
13  the gathering is.  I think it's many factors.
14       Q.    Okay.  How about whether or not
15  it's a sunny day or a cloudy day?  Cloudy days
16  are darker than sunny days.
17       A.    You know, sometimes rain lowers our
18  crowd, but, again, I think it goes back to all
19  those factors.
20       Q.    Okay.  At least in big cities where
21  I live, you know, summer heat can increase
22  incidents.  Is that -- so is heat, temperature,
23  something that plays a role in whether or not
24  an incident is likely to take place?

Page 107

JEFF MCCUTCHEN

1
2       A.    It can.
3       Q.    Okay.  It's not just the setting of
4  the sun; fair to say?
5       A.    Yes, sir.
6       Q.    Okay.  Was there any discussion
7  with Sheriff East when you were informed that
8  the City had -- sorry.  Strike that.  Was there
9  any discussion with Sheriff East when you were
10  informed that the County had adopted a 30-
11  minutes-before-dusk policy with respect to the
12  courthouse grounds of a desire to see the City
13  institute a similar policy for areas of the
14  city?
15       A.    Not that I'm aware of.
16       Q.    So there was a desire to make the
17  14 days correspond, but not a desire to make
18  the time-of-day aspect of the policy
19  correspond?
20       A.    I don't know that we discussed
21  that.
22       Q.    Okay.  How about the four-person
23  requirement that's in the County policy with
24  respect to the courthouse grounds?  Any -- any
25  effort to impose a four-person gathering

Page 108

JEFF MCCUTCHEN

1  limitation elsewhere within the city?
2       A.    We had some general discussions
3  with our attorney.  And, again, it depended
4  on --
5       Q.    I don't -- I don't -- I don't -- if
6  it's a direct conversation with Mr. Mallette or
7  another attorney, I don't need you to tell me
8  that.  So if that's the only way to answer the
9  question, perhaps I'll ask you to stop.  But I
10  would like to get the information, but I don't
11  want to violate your --
12       MR. MALLETTE:  John --
13  BY MR. YOUNGWOOD:
14       Q.    -- with your attorney.
15       MR. MALLETTE:  Counselor,
16       this is Pope Mallette.  I don't
17       object to you asking him how our
18       policy is formed, as long as he's
19       not quoting --
20       MR. YOUNGWOOD:  Yes.
21  BY MR. YOUNGWOOD:
22       Q.    So maybe if you -- if you're able
23  to answer what you know about the policy, as
24  opposed to what you were told, which I know is

Page 109

JEFF MCCUTCHEN

1  a -- sounds a little artificial, but I don't
2  want to violate your relationship with your
3  attorney.
4       A.    And -- and you're asking about the
5  County policy, correct?
6       Q.    Yeah.  Well, I'm -- you've kind of
7  told me that -- that one of the things going on
8  is the County was changing their policy from 30
9  to 14, so maybe the city changes it from 30 to
10  14.  You told me about the poles and sticks at
11  the rallies or events -- I don't mean that
12  they're just rallies -- and -- and that you
13  wanted to have similar policies on these
14  things.  I just asked you about the after dusk,
15  which it sounds like there's no such policy in
16  the city, correct?
17       A.    Correct.
18       Q.    And there's no policy in the city
19  that puts special attention on gatherings of
20  more than four people, right?
21       A.    Correct.
22       Q.    And so now my question is:  With
23  respect to the gatherings of more people, do
24  you know why the City doesn't have limitations

Page 110

JEFF MCCUTCHEN

1
2  on gatherings of more than four people?
3       A.    I don't know specifically on why
4  we -- we don't have a number on that.  Again,
5  our staffing is different than that of the
6  County, and our ability to respond to those
7  areas are a little bit different.
8       Q.    Okay.  Let me start going through a
9  few documents and ask you some specific
10  questions on -- on those.  But we'll try and
11  move quickly.  Go to tab 13, which we'll mark
12  as Exhibit 13.
13                 (Exhibit 13 was marked for
14                  identification.)
15  BY MR. YOUNGWOOD:
16       Q.    This is an email from somebody
17  named Anne Barrett, and I believe you're one of
18  the recipients of the email, if you look on the
19  email addresses.
20       A.    Yes, sir.
21       Q.    Okay.  Do you remember this email
22  and the attachment that I think comes from a
23  social media post by somebody named Tim Warren?
24       A.    Yes, sir.
25       Q.    What do you remember about this?

Page 111

JEFF MCCUTCHEN

1
2       A.    I just remember seeing it in an
3  email.
4       Q.    That --
5       A.    Yeah.  It would have been an email
6  we received this summer.
7       Q.    Okay.  And do you know who
8  Mr. Warren is?
9       A.    I believe, maybe just through
10  some -- some Facebook searches, I gathered what
11  was on his profile.
12       Q.    Okay.  Other than that, you've not,
13  to your knowledge, encountered him?
14       A.    I don't believe so.
15       Q.    Okay.  And I think this is -- to
16  your knowledge, the City of Oxford did not
17  grant the permit to Mr. Warren, did it?
18       A.    I don't believe we had one
19  submitted to us.
20       Q.    Okay.  And, in fact, from the
21  email, you can see it's relating to a permit
22  that pertains to the -- to an event on the
23  courthouse lawn.
24             Do you see that?
25       A.    Yes, sir.

Page 112

JEFF MCCUTCHEN

1
2       Q.    Did you have any involvement in
3  granting that permit?
4       A.    No, sir.
5       Q.    Okay.  Did you have any involvement
6  in policing the event that he held on the
7  courthouse lawn?
8                 (Simultaneous speakers.)
9                 MR. O'DONNELL:  Object to the
10             form.
11                 (Court reporter
12                  clarification.)
13                 THE WITNESS:  I think, David,
14             I cut you off.
15       A.    I believe we -- we had additional
16  security that day just for the city.  But it
17  would have been for this event, but
18  specifically for any counterdemonstrators.
19       Q.    Okay.  And notwithstanding the
20  nature of Mr. Warren's message, you were able
21  to maintain safety and order that day, correct?
22       A.    Yes, sir.
23       Q.    There were multiple events, am I
24  correct, held within the city of Oxford on
25  Juneteenth this year?

Page 113

JEFF MCCUTCHEN

1
2       A.    We had -- we had a couple.  I
3  believe we had a march and a scavenger hunt.
4  And that was over, you know, the weekend, maybe
5  a Friday and a Saturday.
6       Q.    Okay.  And you were able to have
7  these events simultaneously -- or I understand
8  some of them may have straddled days -- again,
9  maintaining safety and order in the community,
10  correct?
11       A.    Yes.
12                 (Court reporter
13                  clarification.)
14  BY MR. YOUNGWOOD:
15       Q.    And by Juneteenth, we're referring
16  to June 19th; is that right, sir?
17       A.    Yes, sir.
18       Q.    In fact, if you look at tab 16,
19  which we'll mark as Exhibit 16.
20             This is a permit which does seem to
21  be signed and approved relating to some -- an
22  event that's going to be called Oxford
23  Juneteenth; is that right?
24       A.    Yes, sir.
25       Q.    And it has three dates for it,

Page 114

```
1                JEFF MCCUTCHEN
2  June 19, 20, 21, but one of them includes June
3  19th itself, correct?
4       A.    Yes, sir.
5       Q.    And then if you turn to tab 17,
6  which we'll mark as Exhibit 17.
7                (Exhibit 17 was marked for
8                    identification.)
9  BY MR. YOUNGWOOD:
10      Q.    This says -- this is for June 19th,
11 Students Stronger -- sorry.  I misspoke.
12 Stronger Together Student Organization March,
13 June 19th, start time, 5:00 p.m., end
14 7:00 p.m., correct?
15      A.    Yes, sir.
16      Q.    Do you know if that took place?
17 The document itself is -- doesn't seem to be
18 marked as approved.
19      A.    I do not believe that event took
20 place.  I believe the organizers of Juneteenth
21 correlated with this group to do -- to do the
22 march together.
23      Q.    Okay.  I want to see if I can help
24 you place better the meeting that you described
25 where you met with Sheriff East and the head of
```

Page 115

```
1                JEFF MCCUTCHEN
2  the university's security force.  If you turn
3  to tab 21, which we'll mark as Exhibit 21.
4                (Exhibit 21 was marked for
5                    identification.)
6  BY MR. YOUNGWOOD:
7       Q.    You're not on this, sir.  I'm not
8  going to ask you if you've seen it before or
9  anything.  If you look at the top, though,
10 Sheriff East writes that he has a meeting at
11 9:30 with the two chiefs about security for the
12 weekend.
13      Could -- would -- is that possibly
14 when you had your discussions that related to
15 the -- you know, what you could put a banner on
16 and timing of applications?
17      A.    It's possible, yes, sir.
18      Q.    Okay.  But you're not -- this
19 doesn't tell you that it was or wasn't?
20      A.    I'm not sure, because this could
21 have been a meeting leading up to the July 4th
22 event.  So it could have been just a security
23 meeting.
24      Q.    Okay.  It's not uncommon, I guess,
25 for you to meet with Sheriff East or your
```

Page 116

```
1                JEFF MCCUTCHEN
2  counterpart at the university?
3       A.    No, sir.
4       Q.    Let's take a look at tab 53, which
5  we'll mark as Exhibit 53.
6                (Exhibit 53 was marked for
7                    identification.)
8  BY MR. YOUNGWOOD:
9       Q.    And take a look at this.  This was
10 produced to us.  And tell me what this is,
11 please.
12      A.    This would have been an operational
13 plan with our department for an event that we
14 had this summer.
15      Q.    Okay.  So this just relates to one
16 event?  This is not, like, a general statement
17 of policy?
18      A.    No, sir.  This was specifically for
19 one event.
20      Q.    Okay.  And would you create such a
21 plan for all events or only large events?  Or
22 how did that work?
23      A.    Typically, for large events or
24 events that might use additional jurisdictions
25 or resources.
```

Page 117

```
1                JEFF MCCUTCHEN
2       Q.    Okay.  And would you create these
3  plans in conjunction with the sheriff's
4  department or with the university security
5  force?
6       A.    We would if we were relying on
7  their resources or putting them in what we call
8  a stack or in a group with our officers.
9       Q.    If you could turn to 55, please,
10 which we'll mark as Exhibit 55.
11                (Exhibit 55 was marked for
12                    identification.)
13 BY MR. YOUNGWOOD:
14      Q.    This a similar type of plan?  This
15 one's for the 4th of July last year.
16      A.    Yes, sir.
17      Q.    Okay.  I want to direct your
18 attention to the second paragraph of the first
19 page, where it says, Lafayette County Sheriff's
20 Office is primarily responsible for operations
21 during the event.  However, if needed, the
22 Oxford Police Department will assist when
23 requested.
24      Do you see that?
25      A.    Yes, sir.
```

Page 118

JEFF MCCUTCHEN

1  Q.   And this is an example of your
2  office and the Lafayette County Sheriff's
3  Office coordinating on safety and security for
4  the courthouse grounds, correct?
5     A.   Yes, sir.
6     Q.   And the protest here was a
7  Confederate protesters -- set of protesters,
8  right?
9     A.   I don't know what they deemed it as
10 far as what they permitted for.
11    Q.   It says on the top, on July 4th,
12 2020, at 1230 hours, Confederate 901 protesters
13 will be conducting a stagnant protest on the
14 courthouse grounds.
15       Do you see that?
16    A.   Yes, sir, I do.
17    Q.   And what does that mean,
18 Confederate 901?
19    A.   That was a group.  That was a title
20 they used on Facebook.  And so one of the
21 organizers we were familiar with, that's where
22 we would have coined that terminology.
23    Q.   Okay.  And I think you've also
24 testified that your concern that day was as
25

Page 119

JEFF MCCUTCHEN

1  much with the Confederate protesters as with
2  any counterprotesters that might appear, right?
3     A.   Yes, sir.
4     Q.   Okay.  And through the coordination
5  between your office and the Lafayette County
6  Sheriff's Office, you were able to maintain
7  safety and order during this event, correct?
8     A.   Yes, sir.
9     Q.   I want to refer you to tab 22,
10 which we'll mark as Exhibit 22.
11       (Exhibit 22 was marked for
12       identification.)
13 BY MR. YOUNGWOOD:
14    Q.   You're not on this.  I'm not
15 suggesting that you have seen this document
16 before.  But it concerns an application for
17 July 5th.  You can see the application.  It's
18 something on the courthouse grounds, something
19 called Love Your Neighbor and Prayer.
20       The reason I'm showing it to you
21 is, on the top, Sheriff East says, I have
22 spoken with Chief McCutchen, and the City does
23 not have any permits issued that will take
24 extra resources from us.
25

Page 120

JEFF MCCUTCHEN

1        Was it sometimes -- we've talked
2  about assistance you provided the County.
3  Would the County provide you with assistance as
4  well?
5     A.   Yes, sir.
6     Q.   And so while you're two separate
7  police forces, is it fair to say that you tried
8  to, where you could, share resources to
9  maintain safety and order within the city of
10 Oxford?
11    A.   Yes, sir.
12    Q.   Would you sometimes assist them
13 outside of the city and in the county,
14 generally?
15    A.   Yes, sir.
16    Q.   Okay.  What would give rise to
17 that?
18    A.   It could be a traffic crash, it
19 could be a crime scene or a search.  Just
20 depending on the need.
21    Q.   Okay.  And how about with a planned
22 permitted event?  Would you be available to
23 assist them if there were permitted events
24 outside of the city but in the county,
25

Page 121

JEFF MCCUTCHEN

1  generally?
2     A.   Yes, sir.
3     Q.   Well, let me -- does that happen?
4  I mean, are most of the permitted events within
5  the city boundaries, even if, perhaps, on
6  county grounds within the city boundaries?
7     A.   Yes, sir.
8     Q.   Or are they --
9     A.   Most of them -- most of them are.
10    Q.   Okay.  And how about the
11 relationship with the university?  Does the
12 university police force assist you from time to
13 time?
14    A.   Yes, sir.
15    Q.   Do they assist the County from time
16 to time?
17    A.   Yes, sir.
18    Q.   And then going the other way, do
19 you assist the university from time to time?
20    A.   Yes, sir.
21    Q.   Okay.  And have you observed that
22 the County assists the university from time to
23 time?
24    A.   Yes, sir.
25

Page 122

JEFF MCCUTCHEN

1
2    Q.    Okay.  Do you know what the size is
3  of the university police force?
4    A.    I believe it's around 32, 33.
5    Q.    And is that total employees, or is
6  that law enforcement officers only?
7    A.    I believe that's officers only.
8    Q.    Okay.  And Sheriff East has
9  testified to this.  I don't, unfortunately,
10  have it right in front of me.  Do you know
11  approximately how many officers he has?
12    A.    Maybe 40.  I'm not certain.
13    Q.    Okay.  So not holding you to these
14  numbers, but you have roughly 80 officers; you
15  said the university has roughly 32, 33; and he
16  maybe has 40.  So all together, more than 150
17  officers within the county boundaries?
18    A.    Probably so, yes, sir.
19    Q.    And then is there another police
20  force within the county boundaries?
21    A.    Not -- not local jurisdictions.
22    Q.    State, you mean?
23    A.    Yes, sir.
24    Q.    Okay.  And tell me about that.  How
25  does the -- and I don't want to get the words

Page 123

JEFF MCCUTCHEN

1  wrong.  The state police force or -- is that
2  the right terminology?  Or is it -- is it a
3  marshal's office or what is it?
4    A.    We have a Mississippi Bureau of
5  Narcotics, so a drug enforcement arm of the
6  State has an office here in Oxford.
7    Q.    Any -- any other state law
8  enforcement officers?
9    A.    I don't believe any -- any more
10  State officers are located here.
11    Q.    Okay.  And by "here," you mean
12  Oxford, or by "here," you mean Lafayette
13  County?
14    A.    Oxford and the county.
15    Q.    How many, then, in that one state
16  office you just referred to, the narcotics
17  office?
18    A.    I don't know.
19    Q.    Okay.  Like --
20        (Simultaneous speakers.)
21    A.    Maybe a handful of five or six,
22  max.
23    Q.    You said five or six, max?
24    A.    Yes, sir, I believe.

Page 124

JEFF MCCUTCHEN

1
2    Q.    And how about federal?  Are there
3  federal law enforcement officers located within
4  the county?
5    A.    Yes, sir.  I know we have an FBI
6  office, a marshal's office, I believe an ATF
7  office.  Most of the branches of the federal
8  government have some sort of representation
9  here.
10    Q.    Okay.  Let's just start with the
11  State.  What's your level of interaction in
12  coordination with the State narcotics office?
13    A.    Typically, only with narcotics
14  investigations or any large-scale violent crime
15  that may pertain back to narcotics.  But not
16  really a day-to-day operation.
17    Q.    So they probably would not be
18  available, for example, if you needed help with
19  a permitted event?
20    A.    Right.  We -- we've never called on
21  them.
22    Q.    And federal, same thing?  You
23  wouldn't be seeking the assistance of federal
24  officers with a permitted event within the
25  city?

Page 125

JEFF MCCUTCHEN

1
2    A.    Typically, no.
3    Q.    Okay.  Any occasions where you
4  would?
5    A.    As -- as the year and the summer
6  went along, we tried to partner with as many
7  people as we could for intel gathering.  But
8  when it comes to safety and security, it was
9  handled all at the local level.
10    Q.    What do you mean by "intel
11  gathering"?
12    A.    If -- so if we received a permit,
13  we would try to loop in our federal partners.
14  That way, if they had any information, any
15  additional background or former investigative
16  knowledge of the participants or organizers,
17  that would help us understand what we were
18  dealing with.
19    Q.    Okay.  Hold on one -- one second,
20  please.  Sorry.
21        Anthony Hervey.  Do you know that
22  name?
23    A.    Yes, sir.
24    Q.    Okay.  And do you recall that there
25  was a vigil for Mr. Hervey this summer on the

Page 126

JEFF MCCUTCHEN

1                JEFF MCCUTCHEN
2 courthouse grounds?
3      A.     Yes, sir. I believe so.
4      Q.     What do you recall about that?
5      A.     We had so many. I want to say it
6 was around Memorial Day, maybe, that there was
7 a gathering, either on the courthouse or they
8 walked to the courthouse. And I could
9 completely have my days wrong on that.
10      Q.     Okay. Do you remember any safety
11 incidents associated with that event?
12      A.     Safety incidents, I would not say.
13 But I know, if I'm referencing that right day,
14 then we would have obviously had our downtown
15 units monitoring that area.
16      Q.     Okay. And -- and you were able to
17 maintain safety and order during that -- that
18 vigil?
19      A.     Yes, sir.
20      Q.     Okay. If you could turn to tab 43,
21 which we'll mark as Exhibit 43.
22             (Exhibit 43 was marked for
23                identification.)
24 BY MR. YOUNGWOOD:
25      Q.     Do you remember -- this is a

Page 127

1                JEFF MCCUTCHEN
2 picture, sir, of the statue with a projection
3 on it saying, Take it down.
4      Do you remember when this occurred,
5 this summer?
6      A.     I've actually never seen that
7 photo, but I do believe I understand what
8 you're referencing to.
9      Q.     Okay. Did you witness the event
10 yourself?
11      A.     No, sir.
12      Q.     Okay. You were informed of the
13 event?
14      A.     If that -- if this is the one where
15 someone was parked and then shined the
16 projection across the road, then yes, sir.
17      Q.     How did you learn of it?
18      A.     I was contacted by one of our staff
19 members.
20      Q.     Okay. Was any police action taken
21 with respect to it?
22      A.     As far as enforcement, no, sir. We
23 did not make any arrests or citations issued.
24      Q.     Okay. Any -- any violence erupt
25 from this event that's depicted in this

Page 128

1                JEFF MCCUTCHEN
2 picture?
3      A.     No, sir.
4      Q.     Okay. Or car collisions or
5 anything like that in the area surrounding the
6 statue?
7      A.     Not that I'm aware of.
8      Q.     Okay. Or any other harm to public
9 safety take place associated with this event?
10      A.     I do believe we asked the
11 individual not to shine it across that direct
12 roadway into drivers' eyes.
13      Q.     Okay. And did they then cease
14 their behavior, or did they keep it up?
15      A.     They moved on.
16      Q.     Okay. Do you know how long it was
17 up for?
18      A.     No, sir.
19      Q.     Okay. But during the time it was
20 up and perhaps projecting across the road, as
21 you say, you're not aware of any car accidents
22 or any other events that harmed public safety
23 because of it?
24      A.     No, sir.
25      Q.     Okay. If you could turn to tab 44,

Page 129

1                JEFF MCCUTCHEN
2 which we'll mark as Exhibit 44.
3             (Exhibit 44 was marked for
4                identification.)
5 BY MR. YOUNGWOOD:
6      Q.     And you can also look at tab 45,
7 which we'll mark as Exhibit 45.
8             (Exhibit 45 was marked for
9                identification.)
10 BY MR. YOUNGWOOD:
11      Q.     These are projections from a prior
12 summer, I'll represent to you, sir, on the
13 courthouse walls. Were you aware of films
14 being shown on the courthouse walls in prior
15 years?
16      A.     No, sir.
17      Q.     Okay. Then I won't ask any more
18 questions about those.
19      Sir, I'll represent to you that --
20 actually, I'll just show it to you. Tab 25,
21 which we'll mark as Exhibit 25.
22             (Exhibit 25 was marked for
23                identification.)
24 BY MR. YOUNGWOOD:
25      Q.     This is a permit application made

Page 130

JEFF MCCUTCHEN

1  to the County, not to the City, by Mr. Rash,
2  who's the plaintiff in the case, for an event
3  on August 8th, which, you'll see from the
4  document, was denied.
5      Were you in any way consulted
6  regarding this application?
7      A.    I don't believe so.
8      Q.    Okay.  Did anyone -- I think your
9  answer will be no.  No one asked you if you
10 could provide assistance to safeguard this --
11 the safety of the community if this event were
12 to take place, correct?
13     A.    Not to my knowledge, no, sir.
14     Q.    Do you know any reason why, if you
15 had been asked to provide assistance the night
16 of the 8th of August, that your -- your office
17 couldn't have provided such assistance?
18     A.    Only if we had other events
19 scheduled and stacked.
20     Q.    Okay.  And do you recall August 8th
21 of this year -- of last year -- sorry --
22 being -- your resources being taxed in a way
23 that you couldn't provide assistance?
24     A.    I couldn't answer without going

Page 131

JEFF MCCUTCHEN

1  back and looking at our calendar.
2      Q.    Okay.  What would I want to look at
3  to figure that out?  You say "our calendar."
4  Can you be more specific?
5      A.    You know, to be able to go back and
6  look at any notes that we made, any permits
7  that would have been filed, anything like that.
8      Q.    Okay.  Let's go to tab 30, which
9  we'll mark as Exhibit 30.
10         (Exhibit 30 was marked for
11          identification.)
12 BY MR. YOUNGWOOD:
13     Q.    So this is an email that
14 Sheriff East sends to you, Chief McCutchen, on
15 September 1st of 2020.  Do you remember
16 receiving this -- this email from the sheriff?
17     A.    Yes, sir.
18     Q.    Okay.  And then he's attached to it
19 a letter he wrote to the mayor of the City of
20 Oxford.  Do you see that behind the blue piece
21 of paper?
22     A.    Yes, sir.
23     Q.    Okay.  Do you recall this letter?
24     A.    Yes, sir.

Page 132

JEFF MCCUTCHEN

1      Q.    And do you recall the event that
2  led to it?
3      A.    Yes, sir.
4      Q.    And what -- what do you -- let's
5  start with the event.  What do you recall about
6  the event that led to it?
7      A.    This was a march that originated on
8  campus, then came to the city limits, and then
9  to the county courthouse.  And then they
10 eventually moved over to the city hall plaza
11 before exiting the square and heading back to
12 campus.
13     Q.    Okay.  And what, if any,
14 involvement did you have in that event?
15     A.    We had to secure intersections and
16 staff the area around the courthouse and
17 eventually help navigate the student athletes
18 back to campus.
19     Q.    If you look at the second paragraph
20 of Sheriff East's letter to the mayor, he says,
21 It is very concerning the City of Oxford's
22 mayor would not notify anyone with the Oxford
23 Police Department, much less anyone at the
24 Lafayette County Sheriff's Department, that

Page 133

JEFF MCCUTCHEN

1  approximately 120 emotionally charged grown men
2  would be marching and protesting upon City of
3  Oxford streets and on the Lafayette County
4  Courthouse grounds.
5      Do you see that?
6      A.    Yes, sir.
7      Q.    Had your office learned of the
8  march in advance?
9      A.    Not -- not really in advance.  I
10 got a phone call from the chief of police on
11 campus telling me that they were about to start
12 marching.  So within a matter of seconds or
13 minutes before the actual event took place.
14     Q.    Okay.  Did you discuss this event
15 with Sheriff East, or did you just receive this
16 letter afterwards?
17     A.    We discussed it.  I mean, we were
18 on the site together that day.
19     Q.    Okay.  And -- and do you know what
20 gave rise to him then writing this letter?
21     A.    I can only assume from frustration
22 of the event spontaneously happening and no one
23 giving any law enforcement a heads-up.
24     Q.    Okay.  He writes to you on the

Page 134

JEFF MCCUTCHEN

1          JEFF MCCUTCHEN
2    first page of Exhibit 30, Thought you might
3    need a copy for your files.
4          Do you know what he meant by that?
5          A.   Yes, sir.  We generated a police
6    report, and so we attached that, I'm assuming,
7    or I kept it in an email.
8          Q.   Okay.  If you go to now past his
9    first letter, there's a letter dated
10   September 8th from the mayor back to him, where
11   she writes, I'm in receipt of your letter
12   regarding the football team's march without a
13   permit on Friday, August 8, 2020.  Your
14   information is simply not correct.
15         Do you know -- and I know you're
16   not her.  But do you know what she meant by the
17   information not being correct?
18         A.   There was a lot of speculation as
19   to her knowledge of that event or her duration
20   prior to the event kicking off.  And so I
21   believe her statement there is that the facts
22   were not all the way out when the original
23   letter was written.
24         Q.   And so the thing she may be
25   saying -- again, I know you're not her -- is,

Page 135

JEFF MCCUTCHEN

1    You're assuming I knew about stuff in advance
2    that I didn't know about?
3          A.   I would assume so.
4          Q.   Okay.  Did you ever have a
5    conversation with her about the event?
6          A.   Afterwards, yes, sir.
7          Q.   What was that conversation?
8          A.   Trying to get a timeline of what
9    she knew, where she was, you know, how did we
10   get to this moment without any conversations.
11         MR. YOUNGWOOD:  Okay.  Why
12             don't we take a break?  We've been
13             going about an hour.  Why don't --
14             why don't we make it -- if you
15             don't mind, why don't we make it 15
16             minutes?  Maybe Landon and Lily,
17             the three of us, could talk, and
18             we're -- we're actually close to
19             the end.  And I just want to make
20             sure Landon or Lily have -- have
21             some stuff they want me to cover
22             that I make sure I cover.
23         So I think we'll get you
24             freed up before -- well, I don't

Page 136

JEFF MCCUTCHEN

1          know what time you normally eat
2          lunch, but before your afternoon.
3          So we'll take 15 minutes, come back
4          at 12:45 -- sorry -- 11:45.
5          THE VIDEOGRAPHER:
6    Okay.  We're going off the record.
7    The time is 11:31 a.m.
8          (Recess from 11:31 a.m. to
9             11:47 a.m.)
10         THE VIDEOGRAPHER:  We are
11   back on the record.  The time is
12   11:47 a.m.
13         MR. YOUNGWOOD:  Okay.  Keith,
14   I really don't have too much
15   longer.  So we certainly won't need
16   another break.
17   BY MR. YOUNGWOOD:
18         Q.   If you could turn to tab 52, which
19   we'll mark as Exhibit 52.
20         (Exhibit 52 was marked for
21             identification.)
22   BY MR. YOUNGWOOD:
23         Q.   This is an email from Alex Moffett
24   to you and to others.  Who is Mr. Moffett?


Page 137

JEFF MCCUTCHEN

1          A.   He would have been our sergeant who
2    managed the downtown district.
3          Q.   Okay.  And the top of the email,
4    which is dated June 21, he writes, We had a
5    small crowd on the square tonight.  It was much
6    smaller than the two previous evenings.
7          So he's writing this the morning,
8    it looks like, of the 21st, and when he says
9    "tonight," he must be referring to the 20th.
10   Is that how you read it when you got the email?
11         A.   Yes, sir.
12         Q.   Okay.  And then he says, Much
13   smaller than the previous two evenings.
14         The previous immediate evening
15   would have been June 19th, which would have
16   been Juneteenth, correct?
17         A.   Yes, sir.
18         Q.   Okay.  He says, There were no
19   issues from the Juneteenth march from the
20   activity center to city hall, and there was a
21   good turnout.
22         Do you see that as a reference to
23   what happened on the 20th or on the 19th?
24         A.   That probably would have been -- I

Page 138

JEFF MCCUTCHEN

1   believe the scavenger hunt was on the 19th, and
2   the march was on the 20th.
3       Q.    Okay.  And can you help me -- and
4   really, for the record, sir, when it says
5   "activity center to city hall," what was that
6   describing?
7       A.    The activity center was the
8   location on Molly Barr Road and Price Street.
9   The activity center is located there.  That was
10  the start location for the march, and the march
11  came to city hall and then back to the activity
12  center.
13      Q.    And how does that relate, for the
14  record, to the square -- town square?
15      A.    It would have went directly through
16  the town square.
17      Q.    And how would it relate to the
18  courthouse, then, the county courthouse?
19      A.    The county -- it would have went
20  around the county courthouse.
21      Q.    Okay.  So it -- like around the
22  sidewalk immediately outside the county
23  courthouse or -- or --
24      A.    No.  Just --

Page 139

JEFF MCCUTCHEN

1       (Simultaneous speakers.)
2       A.    Because the county courthouse is in
3   the center of the square, it would have just
4   naturally been in the proximity of it.
5       Q.    Okay.  So it would have -- it would
6   have circled the county courthouse, but perhaps
7   with a road between the marchers and the
8   courthouse; is that right?
9       A.    Yes, sir.
10      Q.    Okay.  And he says, Everyone stayed
11  on the sidewalks and out of the street, and
12  there was not anyone attempting to interfere
13  with the march.
14          Right?
15      A.    Yes, sir.
16      Q.    Did this event have coordination at
17  all, to your knowledge, with the county
18  sheriff's office?
19      A.    Probably only just to know about
20  that it was happening.
21      Q.    Okay.  And this is certainly an
22  example of an event that could take -- that
23  took place at night in the town square without
24  any violence or disturbance to the peace,

Page 140

JEFF MCCUTCHEN

1   correct?
2       A.    I believe it was in the evening.  I
3   don't know that it was after dark.
4       Q.    Okay.  But evening in -- in late
5   June would -- could be 8:00, 9:00 p.m. without
6   it being after dark, right?
7       A.    Yes, sir.
8       Q.    Okay.  And there was no violence or
9   other threats to public safety associated with
10  it, right?
11      A.    That's correct.
12      Q.    Okay.  Have you ever had
13  conversations with -- with Sheriff East about
14  even greater coordination between your force
15  and his force with respect to keeping the peace
16  within the county and the city?
17      A.    Such as?
18      Q.    I don't know.  Any -- I mean -- let
19  me ask it differently.
20          What is your level of coordination?
21  Is it -- is it a good level of coordination?
22  Something that's challenged and needs more
23  work?  Or how would you classify it?
24      A.    I think it's good.  He, obviously,

Page 141

JEFF MCCUTCHEN

1   has been the sheriff this first year, so it's
2   taken some -- some time to iron out some of
3   those details.  But I think it's good and it's
4   getting better.
5       Q.    And you -- I mean, you used to work
6   for him when he was -- had your position,
7   right?
8       A.    Yes, sir.
9       Q.    Okay.  So you've known each other a
10  long time?
11      A.    Yes, sir.
12      Q.    And you have a good working
13  relationship, I take it?
14      A.    Yes, sir.
15      Q.    No problems with communicating?  If
16  you need something, you can talk to him about
17  it; if he needs something, he can talk to you
18  about it?
19      A.    Yes, sir.
20      Q.    Okay.  I'm going to just show
21  you --
22          MR. YOUNGWOOD:  And let me
23          actually ask the videographer:  Is
24          there a way to capture both the

Page 142

JEFF MCCUTCHEN

1   JEFF MCCUTCHEN
2 witness and some picture we're
3 going to put up of the town square?
4   THE VIDEOGRAPHER:  Yeah.  If
5 we do a screen share --
6   MR. YOUNGWOOD:  Yes.  So --
7   THE VIDEOGRAPHER:  -- I can
8 do a picture-in-picture on that.
9   MR. YOUNGWOOD:  Yeah.  Lily
10 will do that.
11   So on -- this is not -- we
12 will give everyone the link to it.
13 It's a short video of the town
14 square, and I'm really going to
15 just use it for the record to see
16 if the chief can help us orient it
17 to the extent the Court will want
18 to know that.  Why don't we mark it
19 as -- just to make sure I don't use
20 a number that's been used, I'll say
21 it's Exhibit 58, which would be the
22 next numbered exhibit, if the
23 binder went that far.
24  (Exhibit 58 was marked for
25   identification.)

Page 143

JEFF MCCUTCHEN

1   JEFF MCCUTCHEN
2 BY MR. YOUNGWOOD:
3  Q. And what I'd like to do, Chief,
4 if -- can you see the screen?  Can you see what
5 I'm looking at?  It's a picture of the
6 courthouse.
7  A. Yes, sir.
8  Q. Okay.  And what I'm going to do is
9 have it go forward, and I'm going to ask Lily
10 to stop it just for orientation and ask you to
11 just help us, for the record, identify what
12 we're looking at.  So when I do that, for the
13 record, I'll mark the time piece on the -- on
14 the video.
15  Before we start, can you tell us
16 what this is a picture of?
17  A. This would be North Lamar, and
18 you're facing the north side of the county
19 courthouse.
20  Q. Okay.  And you can see that this is
21 taken during the holiday season.  There are
22 wreaths up.  Is this a fair rendition of what
23 the courthouse might look like from that
24 position during the holiday season?
25  A. Yes, sir.

Page 144

JEFF MCCUTCHEN

1   JEFF MCCUTCHEN
2  Q. Okay.  And the streamers, the
3 lights that we see coming from the top of the
4 courthouse to the buildings, those are put up
5 all year or just part of the year?
6  A. Just during the holidays.
7  Q. Okay.  How about, though, the
8 streetlights?  Would those be on after dark,
9 typically?
10  A. Yes, sir.
11   MR. YOUNGWOOD:  Okay.  And
12  let's start the video, and I'll --
13  I'll tell you when to stop it.
14   (Video played.)
15   MR. YOUNGWOOD:  So let's
16  pause it.  Can we -- Lily, can we
17  pause it?  Okay.
18 BY MR. YOUNGWOOD:
19  Q. So which direction have we turned?
20  A. You are now about to go south.
21  Q. Okay.  And this is at 23 seconds of
22 the video.  And, again, I recognize the
23 Christmas lights are up and they're not at all
24 times of the year.  But, otherwise, this is a
25 fair rendition of what it would look like to

Page 145

JEFF MCCUTCHEN

1   JEFF MCCUTCHEN
2 start going south from this direction?
3  A. Yes, sir.
4  Q. Okay.  Looking at the retail that's
5 along the road we're facing, what road is that?
6  A. You're now entering the courthouse
7 circle.
8  Q. Okay.  And the lights that are
9 coming from those doors at night, are those
10 typically on in the evening?
11  A. Yes, sir.
12   MR. YOUNGWOOD:  Okay.  Let's
13  go forward, Lily.
14   (Video played.)
15   MR. YOUNGWOOD:  Okay.  And
16  let's pause again, please.
17 BY MR. YOUNGWOOD:
18  Q. Okay.  If I could now -- so we've
19 gone -- we're looking east; am I correct,
20 still?
21  A. You're looking south.
22  Q. I'm looking south.  Okay.  So the
23 courthouse is to the east of us, and there are
24 stores to the south of us and the west of us,
25 correct?

Page 146

JEFF MCCUTCHEN

1
2    A.    Yes, sir.
3    Q.    Okay.  The lights -- and you
4  remember I showed you a picture of these during
5  the day.  It's part of the reason I wanted to
6  look at the video.  The lights that are toward
7  the left of the screen, the bulb lights, those
8  are typically on at night; is that right?
9    A.    They -- they are here.  Again, I've
10 just never paid attention.  I'm sorry.
11            MR. YOUNGWOOD:  Okay.  And
12            just for the record, I've stopped
13            the tape at 32 seconds.  Let's move
14            forward.
15            (Video played.)
16            MR. YOUNGWOOD:  Okay.  Let's
17            pause it again as it -- as it
18            circles around.
19 BY MR. YOUNGWOOD:
20   Q.    We can't see the courthouse now,
21 but we're on the southernmost portion of the
22 square; is that right?  Or headed toward the
23 southernmost portion?
24   A.    Yes, sir.
25   Q.    Okay.  And the street that goes

Page 147

JEFF MCCUTCHEN

1
2  south away from the courthouse, what -- what
3  street is that?
4    A.    That is South Lamar.
5    Q.    Okay.  So it's North Lamar north of
6  the courthouse and South Lamar south of the
7  courthouse?
8    A.    Yes, sir.
9    Q.    The courthouse divides the north
10 and south?
11   A.    Yes, sir.
12   Q.    Okay.  Again, we're looking at
13 retail on the southernmost portion.  And this
14 is -- I'm sorry -- for the record, at 42
15 seconds.
16            Again, this -- this retail and the
17 lights there, on a typical evening, those
18 lights would be on; is that -- is that right?
19   A.    Yes, sir.
20   Q.    And --
21            MR. O'DONNELL:  Let -- let
22            me -- excuse me, John.  I want to
23            make an objection.  I think the
24            video has an aspect to it that
25            enhances the lighting features in

Page 148

JEFF MCCUTCHEN

1
2            the video.  So I think, therefore,
3            it's unduly suggestive of what the
4            actual conditions are.  So. . .
5            MR. YOUNGWOOD:  Fair enough.
6            I think I'm -- I understand the
7            objection.
8            MR. O'DONNELL:  Okay.
9  BY MR. YOUNGWOOD:
10   Q.    But the lights themselves would
11 typically be on?  Whether a different camera
12 aperture would change the -- the visual or not,
13 the lights would be on; is that fair to say?
14   A.    Yes, sir.
15   Q.    Okay.  There are some lights toward
16 the top of the buildings that we're looking at.
17 And if I can read it correctly here at 42
18 seconds, we're looking at a retail
19 establishment called the Village Tailor or
20 Trailer.  I'm not sure.  I'm sure you know what
21 it must say.
22   A.    Yes, sir.
23   Q.    What does it say?
24   A.    Village Tailor.
25   Q.    Tailor.  What is the Village

Page 149

JEFF MCCUTCHEN

1
2  Tailor?
3    A.    It is a -- like, a boutique, ladies
4  shop.
5    Q.    It's not a tailor; it's a clothing
6  store?  Okay.
7    A.    Yes, sir.
8    Q.    There's some lights on the top of
9  this building, kind of -- and, again, I
10 recognize the objection that pictures can be
11 taken different ways.  But those lights on the
12 top, are those -- I don't mean the string of
13 lights, which I take it must -- may be holiday
14 lights.  I mean the kind of spotlights.  Are
15 those lights that are typically on on the
16 buildings in the evenings?
17   A.    Yes, sir.
18   Q.    Okay.  Let's -- and these -- and
19 I'm sorry.  There are also streetlights on the
20 street themselves, both on South Lamar and on
21 the cross-street.  Those would also, I assume,
22 be typically on in the evening?
23   A.    Yes, sir.
24   Q.    And what is the street that
25 we're -- we're headed down here?  Is that just

Page 150

JEFF MCCUTCHEN

```
 1              JEFF MCCUTCHEN
 2  called Courthouse Square, or is there some
 3  other name for this street?
 4      A.   Yes, sir.  But if you were to go
 5  east, then you would be on Van Buren.
 6      Q.   Okay.  So I think we'll get there
 7  in a second.
 8              MR. YOUNGWOOD:  Let's --
 9          let's proceed, Lily.
10          (Video played.)
11              MR. YOUNGWOOD:  Okay.  Let's
12          pause.
13  BY MR. O'DONNELL:
14      Q.   So is that Van Buren is the street
15  now that we're facing, almost dead-screen,
16  at -- at 47 seconds?
17      A.   Yes, sir.
18      Q.   Okay.  And we're now facing another
19  set of retail, which looks to be a clothing
20  store.  And lights coming through the windows,
21  those would be on on a typical evening, I take
22  it?
23      A.   Yes, sir.
24              MR. YOUNGWOOD:  Okay.  We can
25          keep going.
```

Page 151

JEFF MCCUTCHEN

```
 1              JEFF MCCUTCHEN
 2          (Video played.)
 3              MR. YOUNGWOOD:  Okay.  We're
 4          turning the corner.  We can pause
 5          for a second.
 6  BY MR. YOUNGWOOD:
 7      Q.   We're now looking north; is that
 8  right?
 9      A.   Yes, sir.
10      Q.   And coming around the courthouse
11  and now to the -- we're looking north to the
12  left side of the screen to the west, to the --
13  to the position of the camera would be the
14  courthouse, even though we can't see it; is
15  that right?
16      A.   Yes, sir.
17      Q.   Okay.  And those lights, the bulb
18  lights, are now on the other side.  Again,
19  these are stationed in different places around
20  the courthouse grounds.  Those are on on a
21  typical evening, correct?
22      A.   Yes, sir.
23              MR. YOUNGWOOD:  Okay.  And
24          this is at 59 seconds of the video.
25          Please keep going.
```

Page 152

JEFF MCCUTCHEN

```
 1              JEFF MCCUTCHEN
 2          (Video played.)
 3              MR. YOUNGWOOD:  Okay.  And
 4          let's pause one more time, please.
 5  BY MR. YOUNGWOOD:
 6      Q.   We're now turning to the west; is
 7  that correct?
 8      A.   Yes, sir.
 9      Q.   Okay.  And coming around the
10  courthouse.  And, again, there's a streetlight
11  toward right of center on the screen.  We're at
12  one minute and five seconds.  Is that a
13  streetlight that's typically on in the
14  evenings?
15      A.   Yes, sir.
16      Q.   And there's another streetlight on
17  the other side of, I guess, what must be
18  South -- I'm sorry -- yeah, South Lamar --
19  North Lamar.  North Lamar.  That streetlight is
20  also typically on, correct?
21      A.   Yes, sir.
22      Q.   We talked about cameras at one
23  point.  Where in the square would the cameras
24  be located?
25      A.   You've -- you've got a couple.  So
```

Page 153

JEFF MCCUTCHEN

```
 1              JEFF MCCUTCHEN
 2  in the orientation where we are, to the right
 3  at city hall, you would -- you would have a
 4  camera.  At one time, directly in front of us
 5  on the Thompson House was a camera.  I don't
 6  know that it is still there, just due to some
 7  construction.  There's cameras -- there are
 8  cameras, if you follow to the left -- if you
 9  went back west on Jackson Avenue, you have
10  multiple cameras there.  And then on Van Buren.
11      Q.   So let me -- at the risk of going
12  slightly backwards, I'd like to -- you said
13  Thompson House.  Where -- where in the square
14  would that be?  I'd like to roll back the video
15  a little and see if -- did we pass it by
16  already?
17      A.   No.  You -- you are looking right
18  at it.  It is -- it is the big, white,
19  multi-layered building to the left of the
20  screen.
21      Q.   Okay.  And that camera, we're now
22  at a minute-seven on the tape and looking at a
23  big, white building.  Where on the building
24  would that be?
25      A.   I believe -- I believe they're -- I
```

JEFF MCCUTCHEN

1 believe there is one -- so if you take this
2 whole structure and follow it all the way to
3 the far end on the left, there should be one
4 situated on the far end of that building, I
5 believe.
6
7      Q.    And which way would it be pointing?
8      A.    More than likely, it will catch
9 what is immediately below it or it will be
10 pointing to the right, down Jackson Avenue.
11            MR. MALLETTE:  West.
12     A.    West.
13     Q.    West.  Away from the courthouse?
14     A.    Yes, sir.
15     Q.    Okay.  Let me ask this way:  Are
16 there -- are there cameras that would capture
17 the courthouse?
18     A.    Yes, sir.  I believe, if you -- if
19 you back up and you gather city hall again,
20 just to the right --
21     Q.    Okay.
22     A.    -- there are positions -- two
23 cameras positioned there.
24            MR. YOUNGWOOD:  Okay.  Lily,
25       why don't you see if you can find

JEFF MCCUTCHEN

1
2      that?
3            MS. CRON:  Do I go further
4      back?
5            THE WITNESS:  Yeah.  Keep
6      coming back.  Keep coming.  Okay.
7      A.    So just to the --
8      Q.    I think if you go forward, we'll
9 get there.
10     A.    Okay.  That's fine.
11            (Video played.)
12 BY MR. YOUNGWOOD:
13     Q.    Yeah.  Let's stop there.  Okay.  So
14 this is at 51 seconds, and we are looking east.
15     A.    Okay.  If you see the two Christmas
16 trees --
17     Q.    Yep.
18     A.    Right?  So the second one, which
19 would be not -- not the one closest to the edge
20 of your screen.  But if you would track your
21 eyes just to the right, you can see a light
22 pole with an overhanging bulb.  About halfway
23 down is two cameras.  And one, I believe, will
24 capture city hall, and the other one is what
25 would -- is described as a point-tilt-zoom, a

JEFF MCCUTCHEN

1
2 PTZ.  So it moves and rotates.  And it will
3 capture some of the county courthouse.
4      Q.    So it would capture the county
5 courthouse looking to the west?
6      A.    Yes, sir.
7      Q.    It points west.  The courthouse is
8 to the west, and it -- and it goes back and
9 forth, and at times, in its sweep, will capture
10 the western side of the courthouse?
11     A.    Yes, sir.
12     Q.    Okay.  Any other cameras in the
13 square that you believe capture the courthouse?
14     A.    I'm not certain if there are any on
15 Van Buren towards the east.  I do know that
16 there was one at the South Lamar/Courthouse
17 Square Loop intersection.  But I do believe
18 that construction has knocked that one out, and
19 I don't believe that is back up.
20     Q.    Okay.  And who has charge over
21 these cameras, jurisdiction over them?
22     A.    The City of Oxford.
23     Q.    Okay.  So you -- you don't play a
24 role in whether or not more cameras are put up
25 or fewer cameras are put up?

JEFF MCCUTCHEN

1
2      A.    No, sir.  That typically goes
3 through the emergency management coordinator,
4 Jimmy Allgood.
5      Q.    Okay.  You don't know, for example,
6 how much it would cost to put up another
7 camera?
8      A.    I don't, no, sir.
9      Q.    Okay.  What are they used for?
10     A.    We use them, typically, to monitor
11 locations that -- that we can't staff.  Those
12 cameras are also -- are not recorded but
13 displayed in our dispatch room.  So if we have
14 disturbances or events that -- that kick off,
15 we can get a quick view of that.
16     Q.    Okay.  And if you received a
17 request for footage from the sheriff's office,
18 you would -- well, maybe it's not in your
19 jurisdiction to share it, but -- but is it your
20 understanding that the City would share it?
21     A.    Yes, sir.
22     Q.    Okay.  Let's -- let's -- this was
23 at 51 seconds.  I think you've essentially
24 identified a pole that's between the red
25 building that is city hall and a small red

JEFF MCCUTCHEN

1
2  building that borders a white building.
3       A.    Yes, sir.
4       Q.    What's the name of the small red
5  building?
6       A.    The bottom floor is Square Books,
7  Jr., and then the top floor, at one time, was a
8  legal office.
9       Q.    Okay.  And the white building, what
10 is that known as?
11      A.    It's a department store, Neilson's.
12            MR. YOUNGWOOD:  Okay.  Let's
13            continue, please.  And we're
14            progressing now through one minute
15            of the video.  There's going to be
16            a second loop.
17            (Video played.)
18            MR. YOUNGWOOD:  So let's just
19            pause again.
20 BY MR. YOUNGWOOD:
21      Q.    This -- this is looking at the
22 courthouse at one minute, 11 seconds, looking
23 south; is that correct?
24      A.    Yes, sir.
25            MR. YOUNGWOOD:  Okay.  Let's

JEFF MCCUTCHEN

1
2  continue.
3            (Video played.)
4            MR. YOUNGWOOD:  If you could
5            try to pause, Lily, where we can
6            see one of the light posts and the
7            light shining on the courthouse.
8            MS. CRON:  Is that good or
9            further?
10           MR. YOUNGWOOD:  No.  Go back.
11           I'd like to try to get one of the
12           strobe lights that I think point at
13           the courthouse.
14                 There you go.  Stop.  So
15           we're at --
16           MS. CRON:  Further?
17           (Technical discussion.)
18           (Video played.)
19           MR. YOUNGWOOD:  There you go.
20           Stop.
21 BY MR. YOUNGWOOD:
22      Q.    So at 1:18, we're on the west side
23 of the courthouse; is that right?
24      A.    Yes, sir.
25      Q.    Coming from the north.  And I -- I

JEFF MCCUTCHEN

1
2  appreciate you can only testify as you see and
3  remember.  But can you see the strobe light
4  underneath the bulb lights pointing at the
5  courthouse?
6       A.    Yes, sir.
7       Q.    And is it -- does that help you
8  recall, sir, whether or not those lights are on
9  at night to illuminate the courthouse?
10      A.    I mean, it appears they are there.
11 It's just something I've never paid attention
12 to.
13      Q.    Okay.
14            MR. YOUNGWOOD:  Okay.  Let's
15            continue.
16            (Video played.)
17            MR. YOUNGWOOD:  If you could
18            pause, Lily, when we get to the
19            statue, which will be momentarily.
20 BY MR. YOUNGWOOD:
21      Q.    Okay.  So -- so we're now on the
22 south side of the courthouse, correct?
23      A.    Yes, sir.
24      Q.    And the courthouse is -- is to the
25 north of the statue, right?

JEFF MCCUTCHEN

1
2       A.    Yes, sir.
3       Q.    And the statue itself is facing
4  south, looking at South Lamar; is that right?
5       A.    Yes, sir.
6             MR. YOUNGWOOD:  And for the
7             record, we're at one minute and 30
8             seconds on the video.
9  BY MR. YOUNGWOOD:
10      Q.    The space between the courthouse
11 grounds and the statue, whose jurisdiction is
12 that?
13      A.    The space between the courthouse
14 and the statue?
15      Q.    Yeah.
16      A.    Is the County's.
17      Q.    Okay.  There's no -- there's no
18 City ground between the two, the -- if we were
19 to draw a map, the kind of what you consider to
20 be the County grounds kind of juts out like a
21 peninsula from the -- from the courthouse and
22 captures the statue?  Is that how you view it?
23      A.    Since I have been an officer in
24 Oxford, that has always been a jurisdiction of
25 the County.

Page 162

JEFF MCCUTCHEN

Q. Okay. So the City's jurisdiction, though, is the street; is that right?

A. Yes, sir.

Q. And I won't make you watch the video again. But all the retail and surrounding roads, that's City jurisdiction, right?

A. Yes, sir.

MR. YOUNGWOOD: Okay. Let's keep going, Lily.

(Video played.)

MR. YOUNGWOOD: Okay. I think that -- that's the video. We can close it.

Thank you for enduring that with me, Chief.

I think that's it, sir. I have no further questions at this time. I don't know if your counsel or Mr. O'Donnell may have a question for you.

MR. O'DONNELL: I do not, John. No questions.

MR. MALLETTE: And this is

Page 163

JEFF MCCUTCHEN

Pope Mallette. I have no questions.

MR. YOUNGWOOD: Okay. Chief, thank you for your time. Again, I recognize how busy you are and how important your work is, and I regret that we had to take your morning from you. So be well.

THE VIDEOGRAPHER: Counselors, before we close the deposition, Mr. Young, just clarifying video orders, would you like a copy of the video?

(Discussion with counsel, videographer, and court reporter.)

THE VIDEOGRAPHER: This ends the deposition. We are going off the record at 12:15 p.m.

(The deposition of JEFF MCCUTCHEN concluded at 12:15 p.m.)

* * * * * * * * *

Page 164

JEFF MCCUTCHEN

REPORTER'S CERTIFICATE

I, Greta H. Duckett, Certified Court Reporter, Registered Professional Reporter, and Certified Realtime Reporter, hereby certify that on Thursday, January 7, 2021, I reported the remote deposition of JEFF MCCUTCHEN, who was first duly sworn or affirmed to speak the truth in the matter of the foregoing cause, and that the pages herein contain a true and accurate transcription of the examination of said witness by counsel for the parties set out herein.

I further certify that I am neither of kin nor of counsel to any of the parties to said cause, nor in any manner interested in the results thereof.

This 20th day of January, 2021.

*Greta Duckett*

GRETA H. DUCKETT, RPR, CRR, CVR-S, RVR-M-S
ACCR-12, GCCR-2891, MCCR-1945, TNLCR-671

.

Page 165

ERRATA SHEET

Case Name:

Deposition Date:

Deponent:

Pg. No. Now Reads        Should Read    Reason

___ ___ _____    _____    _____
___ ___ _____    _____    _____
___ ___ _____    _____    _____
___ ___ _____    _____    _____
___ ___ _____    _____    _____
___ ___ _____    _____    _____
___ ___ _____    _____    _____
___ ___ _____    _____    _____
___ ___ _____    _____    _____
___ ___ _____    _____    _____

_____
Signature of Deponent

SUBSCRIBED AND SWORN BEFORE ME
THIS _____ DAY OF _____, 2020.
_____
(Notary Public)    MY COMMISSION EXPIRES:_____

**(**

**(a)** 68:11

**1**

**1** 11:9 44:19 47:24
50:24 52:24 61:11,13
68:9 74:19

**10-hour** 56:12

**102-638(b)** 74:19

**102-641(b)** 68:8

**10:00** 80:5

**10:15** 74:11,12

**10:23** 74:13,16

**10th** 50:4,5

**11** 90:19,20,21
158:22

**11:00** 58:22

**11:31** 136:8,9

**11:45** 136:5

**11:47** 136:10,13

**120** 133:2

**1230** 118:13

**12:15** 163:20,23

**12:45** 136:5

**13** 110:11,12,13

**13th** 48:13 50:7 72:17

**14** 62:18,25 63:2,3,10
64:13,21 72:3,8,16
73:4,13 74:23 75:9
87:13 99:7,13 107:17
109:10,11

**14-day-in-advance**
85:8

**15** 16:17 32:19 62:22,
25 135:16 136:4

**15-** 104:13

**150** 122:16

**15th** 93:14,15

**16** 16:17 52:2 55:7
82:12,13,14,20,25
113:18,19

**17** 52:2 55:7 114:5,6,
7

**19** 51:25 53:14,17
114:2

**1999** 17:22 18:3

**19th** 113:16 114:3,10,
13 137:16,24 138:2

**1:18** 159:22

**1st** 131:16

**2**

**2** 44:20 50:21 53:19
88:15,16,17 90:11

**20** 53:14,17 114:2

**2002** 17:7,10

**2003** 16:12 17:7,9

**2005** 16:6,11,14

**2007** 15:23 16:6,7,8
17:21

**2008** 15:17,21

**2014** 15:10,17

**2017** 54:14

**2018** 51:25

**2019** 14:21 15:10
84:11,15

**2020** 15:3 23:24 25:6,
7,19 27:4 29:5 30:5
31:24 32:3,7,15 40:3
50:25 51:8,14 63:4
77:13 79:6 91:4
101:12 118:13
131:16 134:13

**2021** 11:22

**20s** 55:7

**20th** 137:10,24 138:3

**21** 114:2 115:3,4
137:5

**21st** 137:9

**22** 119:10,11,12

**228** 12:3

**23** 51:2 144:21

**25** 59:5 129:20,21,22

**27** 98:19,22,24

**28** 76:6,7

**2:00** 56:23 57:4,16

**2:30** 58:22

**3**

**3** 47:16,18 55:12
84:15,20

**30** 10:21 18:24 62:17,
22 63:3 64:13,21
72:11,13 74:20 75:6
87:13 99:7,13 103:3,
19 104:3 105:14,15,
18 109:9,10 131:9,
10,11 134:2 161:7

**30-** 107:10

**30-day-in-advance**
85:7

**31** 79:18,19

**32** 122:4,15 146:13

**33** 81:7,8 122:4,15

**35** 51:2

**36** 40:7,8 44:8 61:18,
20

**3:20-cv-224-nbb-rp**
11:17

**3rd** 84:10

**4**

**40** 122:12,16

**40-minute** 104:13

**401** 18:25

**406** 19:2

**42** 20:22,23 21:4,7,8
33:23 147:14 148:17

**43** 55:6 126:20,21,22

**44** 128:25 129:2,3

**45** 129:6,7,8

**45th** 12:3

**47** 150:16

**4:00** 56:23 57:4,17

**4:00-to-2:00** 57:3

**4th** 25:22 115:21
117:15 118:12

**5**

**51** 155:14 157:23

**52** 136:19,20,21

**53** 116:4,5,6

**55** 117:9,10,11

**58** 54:10 55:6 142:21,
24

**59** 151:24

**5:00** 77:22 114:13

**5K** 69:7,21

**5th** 119:18

**6**

**6** 19:2,3 20:16 90:12,
13

**600-and-some-odd**
100:9

**7**

**7** 18:23,24,25

**7:00** 114:14

**7:30** 77:22

**7th** 11:22

**8**

**8** 77:12 83:22,24
134:13

**80** 18:14 122:14

**8:00** 140:6

**8th** 130:4,17,21
134:10

**9**

**9** 40:20 82:8,9,18
83:16

**901** 118:13,19

**94** 18:10,12

**99** 18:4

**9:00** 140:6

**9:09** 11:23

**9:30** 115:11

**A**

**a.m.** 11:23 56:23
57:4,16 58:22 74:11,
12,13,16 80:5 136:8,
9,10,13

**ABC** 85:19 86:3

**abilities** 19:24

**ability** 51:18 66:20
69:14 92:9 100:7,11
110:6

**absolute** 66:24

**Absolutely** 74:6

**accepting** 99:17

**access** 34:17 94:12
101:4

**accident** 14:7

**accidents** 128:21

**accompanied** 77:18

**accurate** 43:24

**acoustic** 77:19

**act** 20:4

**action** 127:20

**actions** 97:9

**activities** 49:12
52:13

**activity** 29:8 30:21
32:8,10,14 37:3
51:21 53:5,12,17
137:21 138:6,8,10,12

**actual** 133:14 148:4

**add** 83:22

**additional** 58:6 59:5 69:3,6,10 87:5,21 90:5 97:16 112:15 116:24 125:15

**address** 12:24

**addressed** 12:25

**addresses** 110:19

**adequate** 89:25

**adhere** 64:19

**adjacent** 26:17 97:24

**adjustments** 64:18

**admissible** 10:19

**adopted** 91:3 107:10

**adult** 52:20

**advance** 72:8,13 133:9,10 135:2

**affected** 58:10,16

**afternoon** 13:13 57:6 136:3

**agencies** 24:21 25:2, 9,15 27:23 63:23

**agency** 92:12 94:2, 23

**agree** 33:24

**ahead** 30:11

**alcohol** 85:11,24 86:14,18 87:7,17,22 88:8

**Alex** 136:24

**Allgood** 157:4

**allocated** 73:14

**allowed** 92:2

**allowing** 91:16

**American** 66:6

**amount** 68:14,21 106:10

**Andrews** 81:12

**angle** 35:7

**angles** 35:12

**Anne** 110:17

**annexed** 20:19

**answering** 55:16

**Anthony** 125:21

**anticipated** 26:8

**aperture** 148:12

**apologize** 60:19 94:18

**appearances** 12:9

**appearing** 11:20

**appears** 36:14 47:15 160:10

**applicant** 70:6 77:13

**application** 28:5,8 76:14,21 81:11 83:2 84:10,25 87:5 89:20 119:17,18 129:25 130:7

**applications** 83:5 115:16

**applied** 78:23 100:3

**apply** 62:16

**approval** 77:3,10 80:8,14 99:5

**approvals** 88:7

**approve** 80:15,17,18

**approved** 76:23,25 77:2,3 78:8 80:10 81:18,23 113:21 114:18

**approving** 83:12 89:14

**approximate** 101:9

**approximately** 11:23 122:11 133:2

**archived** 44:3

**area** 16:22,25 17:6 18:16 35:15 44:2 47:6,25 48:7,8,14,21 50:2 53:25 54:7,16, 24,25 55:14 56:2,3,4, 9 57:8,25 59:14

**areas** 50:14 107:13 110:7

**arena** 20:18

**arise** 39:3

**arm** 123:6

**arresting** 39:25

**arrests** 26:22 27:6 38:11 39:22 47:25 49:2,9,12,15 51:22, 25 52:11,24 127:23

**arrives** 39:12

**arriving** 22:19

**artificial** 109:2

**artistic** 53:7 70:21,23

**Arts** 77:13,18

**artwork** 77:18

**ascertain** 28:9

**aspect** 107:18 147:24

**assembling** 59:18

**assembly** 76:13 82:19,25 86:15,18,19

**assigned** 42:23 47:5 59:6

**assignment** 58:4

**assist** 19:25 25:2 27:23 28:10 29:10 31:8 117:22 120:13, 24 121:13,16,20

**assistance** 29:3,12, 15,18,20 30:6 90:5,9 120:3,4 124:23 130:11,16,18,24

**assists** 121:23

**associating** 99:6

**association** 10:5 12:5 27:7

**assume** 14:9 49:16, 19 54:5,24 78:16 95:19 99:15 103:14

133:22 135:4 149:21

**assuming** 15:4 100:9 134:6 135:2

**ATF** 124:6

**athletes** 132:18

**athletic** 52:6

**attached** 40:15 131:19 134:6

**attachment** 110:22

**attempting** 139:13

**attendance** 51:18,19

**attended** 64:4,7

**attention** 36:11 84:25 109:20 117:18 146:10 160:11

**attorney** 64:8,9 108:4,8,15 109:4

**attorneys** 13:9

**attribute** 51:13,16 55:8

**attributed** 52:3

**August** 64:2 77:12 130:4,17,21 134:13

**automatic** 72:17

**Avenue** 48:11,12 50:5 153:9 154:10

**average** 54:4,8 57:15

**aware** 21:16,22 34:20 38:11,21 39:21,24 75:25 80:20 88:24 91:2 97:8 99:3, 4,12 102:22 107:15 128:7,21 129:13

---

**B**

**B-3** 36:2

**back** 13:13 17:16 43:3 50:23 74:15 77:6 94:7 103:20 104:19 106:19 124:15 131:2,6 132:12,19 134:10 136:4,12 138:12 153:9,14 154:19

155:4,6 156:8,19 159:10

**background** 125:15

**backup** 44:17

**backwards** 153:12

**ball** 51:19 52:7

**ban** 66:24

**banner** 65:18,22,24 66:5 115:15

**banners** 65:7

**bar** 60:11

**Barr** 138:9

**Barrett** 110:17

**bars** 50:12 106:4

**base** 53:14

**baseball** 52:8

**based** 105:22

**basically** 16:17 65:23

**basis** 14:20

**Batesville** 16:12

**beat** 58:3

**begin** 61:9

**beginning** 89:5

**behavior** 128:14

**benches** 37:15,20 94:9

**big** 106:21 153:18,23

**binder** 20:24 21:7 40:14 142:23

**bit** 18:7 19:14 32:17 76:5 110:7

**Black** 102:2

**blessed** 77:9

**blocked** 31:9

**blue** 40:14 131:21

**board** 65:20 75:11,12

**Books** 78:5 158:6

**Booth** 43:14,16,17

46:11 55:20

**borders** 158:2

**bottom** 36:3,13
77:17 158:6

**boundaries** 18:23
19:6 48:9 121:6,7
122:17,20

**boutique** 149:3

**branches** 124:7

**break** 13:15,16,18
135:13 136:17

**breakdown** 49:8

**breaks** 34:4

**briefly** 89:4

**bring** 51:18 61:8
69:8,14

**bringing** 70:3

**brings** 50:18

**brought** 69:5

**building** 20:14 34:5
41:12 78:5 149:9
153:19,23 154:5
157:25 158:2,5,9

**buildings** 20:16
26:18 144:4 148:16
149:16

**bulb** 146:7 151:17
155:22 160:4

**Bureau** 123:5

**Buren** 50:5 150:5,14
153:10 156:15

**business** 37:13
96:21,22

**busy** 30:24 163:6

**C**

**CAD** 44:3

**calendar** 131:2,4

**calendars** 29:3

**call** 20:6 26:13 28:23,
25 39:10 43:15 48:10
58:3 95:23 96:2,3,6,

7,9,11 97:25 117:7
133:11

**called** 32:6 113:22
119:20 124:20
148:19 150:2

**calls** 28:19 57:20
97:10

**camera** 148:11
151:13 153:4,5,21
157:7

**cameras** 34:24 35:8
152:22,23 153:7,8,10
154:16,23 155:23
156:12,21,24,25
157:12

**campus** 24:12 64:11
132:9,13,19 133:12

**capture** 141:25
154:16 155:24 156:3,
4,9,13

**captures** 161:22

**car** 14:7 128:4,21

**carry** 62:19 65:3,7,
15,21,22,24,25 66:5
88:7

**cars** 54:24

**case** 10:23 11:16
14:3 29:3 40:22
41:15 42:16,18 130:3

**catch** 154:8

**Cathy** 43:9 46:14,19

**cease** 128:13

**center** 137:21 138:6,
8,10,13 139:4 152:11

**centrally** 100:17

**certified** 10:4

**chain** 40:12,16 42:9

**challenged** 140:23

**chancery** 20:14

**change** 62:21 65:2
74:25 75:25 99:12
102:24 103:13
105:22 148:12

**changed** 62:18 65:6

75:6 93:2 99:7 102:7
103:10

**changing** 63:9 99:14
103:17 109:9

**charge** 18:16 69:15
156:20

**charged** 133:2

**chat** 13:4

**check** 86:4

**chief** 12:23,24 13:3
14:18 15:5 24:11
40:19 42:7,21 43:23
46:11,24 55:17,23
61:11 62:13 64:10
74:18 76:18 84:3
119:23 131:15
133:11 142:16 143:3
162:17 163:4

**chiefs** 115:11

**choice** 70:5

**chose** 73:22

**Christmas** 144:23
155:15

**circle** 49:23 50:8
145:7

**circled** 139:7

**circles** 146:18

**circumstances**
20:10 27:12 69:16
98:14,16

**citations** 127:23

**cities** 106:21

**citizens** 37:4 101:15
102:12

**city** 19:6,8,9,18 20:13
22:21 23:11 26:12
27:19 31:18 32:15
34:23 35:4 44:5
45:16 50:6 54:4,17
55:2 57:24 61:4,5
62:5 64:8 66:13 75:4,
12,21 77:6,10,25
78:2,4 80:12,15,19
83:9 84:9 100:17,18,
23 101:19 104:22,25
107:8,12,14 108:2
109:10,17,19,25

111:16 112:16,24
119:23 120:10,14,25
121:6,7 124:25 130:2
131:20 132:9,11,22
133:3 137:21 138:6,
12 140:17 153:3
154:19 155:24
156:22 157:20,25
161:18 162:7

**City's** 60:18 66:22
76:2 162:2

**Civil** 10:22

**civil-type** 13:22

**civilian** 18:11

**civilians** 18:13

**clarification** 58:13
71:7 82:22 112:12
113:13

**clarify** 87:2

**clarifying** 163:13

**classify** 140:24

**cleaned** 65:19

**clear** 52:23 87:3

**clerk** 43:6 61:6

**clerk's** 75:4 83:9

**clerks** 42:24

**clever** 86:23

**close** 50:7 135:19
162:15 163:11

**closes** 34:9

**closest** 155:19

**closing** 38:4

**clothing** 149:5
150:19

**cloudy** 106:16

**code** 61:7 85:18

**coffee** 37:23

**coined** 118:23

**collection** 84:4

**college** 17:14,17,20,
24 52:20

**college-related**
52:13

**collisions** 128:4

**color** 84:19

**command** 18:9

**comment** 71:18

**common** 28:14

**communicating**
141:16

**communication**
26:10 27:21 89:17

**community** 113:9
130:12

**compile** 43:2

**compiled** 55:20

**complete** 87:17

**completely** 31:10
126:9

**comply** 87:11

**computer** 48:5 53:23

**concern** 66:19
118:25

**concerns** 38:21
59:17 79:10 97:19
119:17

**concluded** 163:22

**condense** 50:3

**condenses** 49:23

**conditions** 148:4

**conducting** 118:14

**Confederate** 49:5
102:4,13 118:8,13,19
119:2

**congregate** 37:19
50:18

**congregated** 50:12

**congregating** 52:14
96:15

**conjunction** 54:7
63:9 117:3

**connect** 48:10

**connection** 26:5
44:11 45:18 102:17

**consideration** 67:17

**considerations**
67:4

**consisting** 48:9

**constitute** 49:4

**construction** 153:7
156:18

**consult** 89:8

**consulted** 89:3
103:12 130:6

**contact** 39:18 89:16,
24 92:2

**contacted** 30:19
31:4 127:18

**contacting** 96:12

**contained** 87:20

**content** 68:12,19
71:4,10

**continue** 158:13
159:2 160:15

**control** 25:3

**conversation** 28:23
42:8,12,25 63:16,19,
21 77:7 91:6,8,10,19,
22 108:7 135:6,8

**conversations**
63:12,14 64:16
92:16,20,24 99:25
101:7 102:6,18
104:15 135:11
140:14

**convey** 67:18

**coordinate** 63:22
85:18

**coordinated** 23:18
25:14 27:18 31:15

**coordinating** 118:4

**coordination** 22:21,
22 24:5,20 25:8 26:4
119:5 124:12 139:17
140:15,21,22

**coordinator** 157:3

**coordinators** 61:10

**copy** 134:3 163:14

**corner** 151:4

**correct** 14:20 19:15
33:6 34:9,10,12,18,
22 36:19 60:5,6
67:19 68:22,23 70:20
73:25 74:23 79:15
80:25 81:4 87:23
89:10 94:9 98:9,16
102:14 109:6,17,18,
22 112:21,24 113:10
114:3,14 118:5 119:8
130:13 134:14,17
137:17 140:2,12
145:19,25 151:21
152:7,20 158:23
160:22

**correctly** 47:7
148:17

**correlated** 114:21

**correspond** 107:17,
19

**cost** 69:10,24 70:2
157:6

**council** 75:13,21
77:10,14,18 80:12,
15,19

**counsel** 12:7,9 27:20
64:11,17 162:20
163:15

**Counselor** 108:16

**Counselors** 10:3
12:12 163:11

**count** 84:7

**counter-** 26:8

**counterdemonstrat**
**ors** 112:18

**counterpart** 116:2

**counterprotesters**
119:3

**county** 11:12 17:4,11
18:25 19:2,10,15,18,
21 20:12,15,17,18
21:14,19 22:5,15,21
23:18 24:3,15,21
26:7,14 27:10,11,19

28:4,7 29:5,6 31:4
38:22 39:24 44:11
45:18 63:9,17 89:9
91:3 96:17 97:4
100:4,15,20,23
101:19 102:24 103:5
107:10,23 109:6,9
110:6 117:19 118:3
119:6 120:3,4,14,25
121:7,16,23 122:17,
20 123:14,15 124:4
130:2 132:10,25
133:4 138:19,20,21,
23 139:3,7,18 140:17
143:18 156:3,4
161:20,25

**County's** 88:24
101:24 161:16

**countywide** 99:19

**couple** 50:9 113:2
152:25

**court** 11:14 12:4,13,
15 14:10 37:14 40:23
58:12 71:6 82:21
95:11 112:11 113:12
142:17 163:16

**courthouse** 19:15,
24 20:11,17 21:13,
14,19,24 22:2 23:17
24:19 27:2,13 32:18,
21 33:7,18 34:2,16,
17 35:9,15,24 36:14
37:4 38:5,9,13,16
39:3,15 40:2 48:23
49:3,5 59:22 60:13
91:4 92:14 93:21
94:8,16,21 95:8,10
96:7,16,22 97:20
98:4,8 99:7,20 100:4,
14 101:5,9,25
102:20,25 103:18
104:2 106:2 107:12,
24 111:23 112:7
118:5,15 119:19
126:2,7,8 129:13,14
132:10,17 133:5
138:19,21,24 139:3,
7,9 143:6,19,23
144:4 145:6,23
146:20 147:2,6,7,9
150:2 151:10,14,20
152:10 154:13,17
156:3,5,7,10,13

158:22 159:7,13,23
160:5,9,22,24
161:10,13,21

**courtroom** 10:20

**cover** 18:22 48:17
92:12 135:22,23

**covered** 59:4

**covers** 55:25

**COVID** 51:17 56:21

**COVID-19** 10:7
11:21

**crash** 54:23 120:19

**crashes** 54:5,15,17

**create** 116:20 117:2

**created** 58:4

**creating** 62:9

**crime** 120:20 124:14

**Criminal** 15:13

**criteria** 83:12

**CRON** 155:3 159:8,
16

**cross-street** 149:21

**crowd** 25:3 55:11
106:19 137:6

**crowds** 49:22 52:18

**cup** 37:22

**curious** 54:22

**cut** 112:14

---

**D**

**dark** 40:2 49:15,21,
22 98:9 140:4,7
144:8

**darker** 106:17

**data** 43:17,22 44:3,
14,16 45:11 46:2,4,
16 47:24,25 53:21
54:19 55:15 104:5,6

**date** 72:25 73:20
84:10,14

**dated** 40:20 76:17

93:13 134:9 137:5

**dates** 25:12 93:24
104:9 113:25

**David** 64:9 112:13

**day** 26:9 28:12 31:6,
23 34:13 37:8 56:16
64:16 66:12,14,18
67:5 72:17 89:25
94:15,22 95:12
96:16,24 97:21 98:14
105:22,25 106:7,13,
16 112:16,18 118:25
126:6,13 133:19
146:5

**day-to-day** 124:16

**days** 27:25 56:13
62:18 72:4,8,13 73:4,
13 74:20 78:24 85:2
87:13,14,19 88:6
99:7 106:16,17
107:17 113:8 126:9

**daytime** 33:14 37:13
95:2,4,8,14

**dead** 68:11,12

**dead-screen** 150:15

**dealing** 125:18

**December** 78:15
84:10,15,20

**decide** 72:18

**deciding** 67:8

**decision** 72:20
92:23,25

**Decker** 58:21

**deem** 97:5

**deemed** 118:10

**defendant** 11:4

**define** 48:20

**definition** 105:21

**demo-** 79:2

**demonstrating**
62:20

**demonstration**
66:21

**demonstrations** 22:9,16 25:11 79:2

**denial** 72:18 73:19

**denied** 29:11,18 69:19 70:10,15 71:10 72:7,12 73:16,21 90:8 130:5

**deny** 29:14 69:17 72:4

**denying** 70:18,23 73:3

**department** 15:20 16:3,13,19 17:11 20:6 21:17 30:21 39:11,25 43:11 45:17 76:12 116:13 117:4, 22 132:24,25 158:11

**depend** 39:8 56:17, 18 58:20 69:5

**depended** 108:4

**dependent** 59:8,9,13

**depending** 20:7 24:8,24 39:8 52:5 59:2 66:17 120:21

**depends** 20:2 52:15, 18 97:21 98:15

**depicted** 37:18 127:25

**deployment** 58:9,16

**deposed** 13:20

**deposition** 10:11 11:10,18 21:9 163:12,19,21

**deputies** 95:15,20 96:3 100:8,10

**deputy** 39:12,20 42:21 43:23 46:10,24 55:17,23

**describe** 35:14

**describing** 138:7

**desire** 107:12,16,17

**details** 141:4

**detectives** 95:12

**determine** 97:25

**determining** 68:14, 20

**difference** 38:24 83:4

**differently** 140:20

**direct** 108:7 117:17 128:11

**direction** 144:19 145:2

**directly** 97:6 138:16 153:4

**disapproving** 83:12 89:14

**discretion** 72:18

**discuss** 27:20 64:15 133:15

**discussed** 31:2 38:3 43:24 46:24 55:18 64:13 85:8 106:5 107:20 133:18

**discussing** 87:12

**discussion** 21:3 42:9 47:4 65:17 75:10,21 83:20 107:6,9 159:17 163:15

**discussions** 27:24 108:3 115:14

**dispatch** 157:13

**displayed** 157:13

**displays** 33:5

**disruptions** 39:17

**distancing** 10:8

**district** 11:14,15 20:19 58:4 60:15 137:3

**disturbance** 139:25

**disturbances** 58:5 104:10 157:14

**divides** 147:9

**division** 11:16 57:19, 22,23

**document** 40:15,17 45:2,22 76:10 84:6

**document's** 93:13

**documents** 44:14, 16 84:4 110:9

**doors** 145:9

**Double** 58:21

**downtown** 47:6,25 48:6,21 53:11,25 54:7,16,24,25 55:13, 25 56:9 57:8 58:4,9, 15 59:6,14 60:14 105:7 106:6 126:14 137:3

**downward** 55:6

**drafting** 62:9

**draw** 84:24 161:19

**drive** 52:11

**drivers'** 128:12

**drives** 57:20

**drug** 123:6

**Duckett** 10:13 12:5

**due** 10:6 11:20 153:6

**DUI** 15:19 16:9

**duly** 12:18

**duration** 134:19

**dusk** 38:13,17 39:4 103:3,19 104:3 105:13,15,18 109:15

**duties** 13:11 14:14 16:23

**duty** 70:3

**E**

**earlier** 27:22 41:3 56:5 85:9 99:4 100:22

**east** 12:3 20:16 23:10 24:4,6,8 28:17 30:19 40:21 44:11 48:13 76:18 89:7 92:24 99:25 101:8 102:6,

19,23 103:6,9,16 107:7,9 114:25 115:10,25 119:22 122:8 131:15 133:16 140:14 145:19,23 150:5 155:14 156:15

**East's** 94:23 132:21

**eastbound** 19:2

**eat** 136:2

**edge** 155:19

**effectively** 51:22

**efficient** 13:12

**effort** 107:25

**EMA** 60:18,19

**email** 40:12,16,20,21 42:6,16,20 44:22 45:25 61:8 110:16, 18,19,21 111:3,5,21 131:14,17 134:7 136:24 137:4,11

**emergency** 60:21 157:3

**emotionally** 133:2

**employees** 122:5

**enacted** 103:4

**enclosed** 86:5

**encountered** 41:19 91:25 111:13

**end** 51:7 114:13 135:20 154:4,5

**endeavor** 13:12

**ended** 51:2 80:24

**ends** 163:18

**enduring** 162:16

**enforcement** 14:15 24:14 25:9 61:7 122:6 123:6,9 124:3 127:22 133:24

**enhances** 147:25

**entering** 145:6

**equally** 95:3

**erupt** 127:24

**erupts** 50:19

**essentially** 86:2 91:23 101:17 157:23

**establishment** 148:19

**establishments** 60:11

**evening** 37:9 38:3,5, 9 57:7 77:23 79:14 80:5 81:4 82:2 137:15 140:3,5 145:10 147:17 149:22 150:1 151:21

**evenings** 137:7,14 149:16 152:14

**event** 22:24,25 23:3, 4,8,19 24:9,18 25:21 26:6,11,20 29:6,12, 14 30:16,20,23 31:2, 6,11,12,15,17,20 41:11,15 58:21,24 59:14 66:24 67:5 68:13,20 69:25 70:11,21,24 75:17 76:13 77:8,12,17 78:8,17 81:14,18,23, 25 82:18,24 83:2 84:9 85:3,10,20 86:5, 11 87:7,10,22 88:8 89:22,25 90:4 111:22 112:6,17 113:22 114:19 115:22 116:13,16,19 117:21 119:8 120:23 124:19, 24 126:11 127:9,13, 25 128:9 130:3,12 132:2,6,7,15 133:14, 15,23 134:19,20 135:6 139:17,23

**events** 22:9,17 23:16,21,24 25:7 26:24 27:7 32:20,25 33:2,3,4,12,13,14,17 52:13,16 56:19 58:10,11,16,17 64:16,24 73:15 78:14,22,24 79:2,4, 11,13,14,24 80:25 102:5 109:12 112:23 113:7 116:21,23,24 120:24 121:5 128:22

130:19 157:14

**eventually** 27:17
42:23 132:11,18

**EXAMINATION**
12:21

**examples** 23:17 28:4
35:22

**Excel** 45:24

**excuse** 147:22

**exhibit** 20:23 21:4,8
33:23 40:7,8 44:7
61:13,20 68:9 74:19
76:6,7 79:18,19 81:7,
8 82:8,9,13,14 83:22,
24 88:16,17 90:12,
13,20,21 98:22,24
110:12,13 113:19
114:6,7 115:3,4
116:5,6 117:10,11
119:11,12 126:21,22
129:2,3,7,8,21,22
131:10,11 134:2
136:20,21 142:21,22,
24

**exhibited** 101:11

**exigent** 20:9

**exiting** 132:12

**experience** 28:8
70:11

**explained** 86:24

**extended** 81:3

**extent** 86:9 142:17

**extra** 58:24 69:8,14
119:25

**eyes** 128:12 155:21

—————————

**F**

—————————

**Facebook** 111:10
118:21

**facilities** 88:25 89:10

**facing** 143:18 145:5
150:15,18 161:3

**fact** 68:7 104:24
111:20 113:18

**factor** 68:13,20

**factors** 52:5 59:8,9
67:8,15 106:12,14,20

**facts** 134:21

**fair** 16:21 29:20 32:7,
9 34:6 43:17 55:4
65:19 107:4 120:8
143:22 144:25 148:5,
13

**fairly** 16:22

**fall** 78:24

**familiar** 16:22 62:6
88:21 118:22

**FBI** 124:5

**feasible** 73:2

**features** 147:25

**February** 14:21

**federal** 10:21 40:23
124:2,3,7,22,23
125:13

**Feel** 33:22

**feet** 50:9

**fence** 33:25 34:5
94:11

**fewer** 51:25 156:25

**figure** 131:4

**file** 45:22 46:6,16,17
83:10 85:19

**filed** 61:5 131:8

**files** 134:3

**film** 81:13

**films** 33:6 129:13

**find** 20:25 23:5
154:25

**fine** 13:2 155:10

**finished** 17:21

**flag** 65:16,18,22,24
66:3,6

**flags** 65:15

**flip** 21:10 79:22

**floor** 158:6,7

**flowing** 63:22

**focus** 35:9,11 92:5
101:23

**focusing** 53:15

**follow** 153:8 154:3

**footage** 157:17

**football** 31:16 47:19
134:12

**force** 14:18 15:14
18:8 28:10,18 29:9
31:5 32:12,19 33:19
37:5 115:2 117:5
121:13 122:3,20
123:2 140:15,16

**forces** 120:8

**form** 29:23 30:8 33:9
38:19 39:7 51:11
71:3,9 76:14,18
84:23 86:12 87:17,25
88:10 96:19 98:12
105:4 112:10

**formalized** 73:23

**formed** 108:19

**forms** 83:7

**forward** 13:15 143:9
145:13 146:14 155:8

**forwarded** 61:6

**four-person** 93:7
107:22,25

**free** 33:22

**freed** 135:25

**Friday** 79:25 113:5
134:13

**front** 25:12 31:18
93:24 104:9 122:10
153:4

**frustration** 133:22

**full** 35:7 43:13

**full-time** 14:24

**fully** 57:9

—————————

**G**

—————————

**gain** 100:2

**game** 51:19 52:7

**games** 47:19

**gaps** 94:11

**garage** 50:14

**gate** 34:9

**gates** 38:4

**gather** 61:9 98:4,8
154:19

**gathered** 111:10

**gathering** 39:9
43:17,22 52:21
97:10,20 106:4,14
107:25 125:7,11
126:7

**gatherings** 22:10
39:17 109:20,24
110:2

**gave** 43:24 47:14
55:19 69:21 73:21
92:25 133:21

**general** 14:3 41:7,9
42:24 57:23 64:11
108:3 116:16

**generalizing** 63:21

**generally** 14:13
34:11 53:10 57:14,18
95:14,22 120:15
121:2

**generate** 52:19

**generated** 53:23
134:5

**geographic** 19:6

**geographical** 48:8

**give** 13:13 20:7,25
29:19 35:21 40:11
69:22 92:6 94:3
95:23,25 96:3 97:24
101:15 120:17
142:12

**giving** 96:5 97:16
133:24

**globed** 35:25

**globes** 36:13

**good** 10:2 71:22 74:4

137:22 140:22,25
141:4,13 159:8

**Gotcha** 68:18

**government** 124:8

**graduate** 17:20

**graduated** 18:4

**graduation** 58:23

**grant** 67:9 111:17

**granted** 73:24 89:21
90:2

**granting** 112:3

**greater** 53:14 140:15

**Greta** 10:12 12:4

**grew** 17:3

**ground** 161:18

**grounds** 20:12
21:13,14,19,24 22:2
24:19 27:2,13 32:19,
21 33:18 34:2,17
35:24 37:4,16 38:5,9,
13,17 39:4,15 40:2
41:13 49:3,4 59:23
73:16 91:5 92:15
93:21 94:9,17,22
96:7,16 97:20 98:2,4,
8 99:7,20 100:4
101:5,9 102:20,25
103:18 104:2 107:12,
24 118:5,15 119:19
121:7 126:2 133:5
151:20 161:11,20

**group** 86:6 95:24
96:2 102:12 114:21
117:8 118:20

**groups** 94:16

**grow** 16:25

**grown** 133:2

**guarantees** 31:7

**guess** 17:8 18:22
23:10 54:22 69:13
73:19 105:20 115:24
152:17

**guidelines** 62:4

## H

**halfway** 155:22

**hall** 23:11 26:12 31:18 35:5 50:6 77:6, 25 78:3,4 132:11 137:21 138:6,12 153:3 154:19 155:24 157:25

**Halloween** 32:25 33:12,20 73:9,11,15, 20

**hand** 65:25

**handful** 123:22

**handled** 26:15 125:9

**handles** 58:2 97:15

**happen** 22:18 121:4

**happened** 51:3 55:21 81:23 104:20 137:24

**happening** 23:6,9 26:17 72:23 79:3 95:11 133:23 139:21

**hard** 73:19

**harm** 128:8

**harmed** 128:22

**Hatch** 10:4 11:24

**Hawkins** 24:11 64:10

**hazard** 38:15

**head** 20:21 21:21 28:17 114:25

**headed** 146:22 149:25

**heading** 76:12 132:12

**headquartered** 12:2

**heads-up** 94:4 133:24

**hear** 85:22

**heard** 13:6 41:24

**heat** 106:22,23

**held** 11:18 32:20

**helpful** 33:24 94:8

**Hervey** 125:21,25

**Hey** 74:3 86:8

**high** 17:17 18:4 57:11

**high-traffic** 73:12

**higher** 43:9

**highest** 54:9

**Highway** 18:24,25 19:2,3 20:16

**hired** 16:13 17:10

**hold** 15:8 16:4 68:10 125:19

**holding** 54:12 122:13

**holiday** 35:17 143:21,24 149:13

**holidays** 144:6

**hoping** 67:18

**hour** 105:19 135:14

**hours** 36:21 37:7 58:9,15 94:19 95:6 104:12 118:13

**House** 153:5,13

**housekeeping** 61:17

**hundred** 50:9

**hunt** 113:3 138:2

## I

**identification** 21:5 40:9 61:14 76:8 79:20 81:9 82:10,15 83:25 88:18 90:14,22 98:25 110:14 114:8 115:5 116:7 117:12 119:13 126:23 129:4, 9,23 131:12 136:22 142:25

**identified** 157:24

**identify** 143:11

**illuminate** 160:9

**illuminated** 36:5,15, 23

**immediately** 138:23 154:9

**impact** 23:9 24:23

**implemented** 28:15

**important** 163:7

**impose** 107:25

**inability** 69:17

**incident** 19:23 20:3 104:7,17 106:8,25

**incidents** 21:18,23 22:4,13 39:2,14,22 53:20 104:8,21,25 105:6 106:3,23 126:11,12

**include** 67:7 76:19

**included** 75:25 79:13

**includes** 70:18 114:2

**increase** 106:22

**increased** 32:8,10

**increases** 52:11 106:8

**Independent** 88:23

**indicating** 45:3 80:8

**individual** 67:17 128:11

**individuals** 46:18 47:4 72:25

**inform** 93:6 94:22

**information** 38:22 42:15 43:25 47:13 48:3 55:20 61:9 63:22 83:7 85:19 108:11 125:14 134:14,17

**informed** 93:10,18 107:7,10 127:12

**initial** 63:15

**inside** 35:20

**instance** 30:18 77:7 90:8

**instances** 29:4 30:4, 14 32:2 72:6,11 73:5 103:24

**institute** 107:13

**instruments** 62:19

**intel** 125:7,10

**interacted** 41:21

**interaction** 124:11

**intercepted** 104:10

**interfere** 139:13

**interim** 14:20,24 15:5

**intersection** 156:17

**intersections** 69:23 132:16

**intervene** 20:4 21:25 23:12

**introduce** 12:7 13:6

**introduced** 80:12,13

**investigations** 124:14

**investigative** 125:15

**investigator** 15:13

**involve** 23:16

**involved** 24:22 82:2 92:20,23

**involvement** 27:15 106:9 112:2,5 132:15

**involves** 24:20

**involving** 14:5 29:9

**iron** 141:3

**issuance** 89:9 103:2

**issue** 27:12

**issued** 27:25 119:24 127:23

**issues** 66:20 137:20

**issuing** 61:4 62:4,5 66:13 89:11

**item** 66:2

**items** 45:8 75:16

## J

**Jackson** 48:12,13 50:4 153:9 154:10

**jail** 17:12

**January** 11:22 15:3

**Jeff** 10:1 11:1,10 12:1,17 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1 132:1 133:1 134:1 135:1 136:1 137:1 138:1 139:1 140:1 141:1 142:1 143:1 144:1 145:1 146:1 147:1 148:1 149:1 150:1 151:1 152:1 153:1 154:1 155:1 156:1 157:1 158:1 159:1 160:1 161:1

**investigations** 124:14

**investigative** 125:15

**investigator** 15:13

162:1 163:1,21

**Jefferson** 48:12

**Jimmy** 157:4

**jobs** 17:14

**John** 11:11 13:8 61:16 71:11 74:3 84:12 108:13 147:22 162:24

**join** 88:2

**jointly** 22:4,14 23:25 26:14 63:12

**Jonathan** 86:8

**Jr** 78:5 158:7

**July** 25:22 64:2 78:15 115:21 117:15 118:12 119:18

**June** 93:14,15 113:16 114:2,10,13 137:5,16 140:6

**Juneteenth** 112:25 113:15,23 114:20 137:17,20

**jurisdiction** 19:17, 20 38:25 156:21 157:19 161:11,24 162:2,7

**jurisdictional** 18:18

**jurisdictions** 27:18 85:21 116:24 122:21

**juts** 161:20

**K**

**keeping** 140:16

**Keith** 136:14

**kick** 157:14

**kicking** 134:20

**kickoff** 58:22

**kind** 33:4 36:13 58:25 109:7 149:9,14 161:19,20

**knew** 94:4 135:2,10

**knocked** 156:18

**knowledge** 40:4 41:7,10,20,22 49:13 52:25 53:6,14 111:13,16 125:16 130:14 134:19 139:18

**L**

**label** 11:9

**labeled** 82:18

**lack** 92:10

**ladies** 149:3

**Lafayette** 11:12 20:18 21:14 117:19 118:3 119:6 123:13 132:25 133:4

**Lamar** 48:11,12 56:5 143:17 147:4,5,6 149:20 152:18,19 161:4

**Lamar/courthouse** 156:16

**land** 18:16 100:15

**Landon** 135:17,21

**language** 62:18 65:6 83:8

**large** 22:10 52:16,20 106:13 116:21,23

**large-scale** 124:14

**largely** 36:18

**larger** 23:21 48:14 49:22 50:14

**late** 78:15 140:5

**law** 14:15 24:14 25:8 122:6 123:8 124:3 133:24

**lawn** 19:24 97:3 111:23 112:7

**lawsuit** 14:5 41:24 42:4 44:12

**leading** 115:21

**learn** 42:3 127:17

**learned** 41:24 133:8

**led** 31:18 99:11 132:3,7

**left** 34:12 146:7 151:12 153:8,19 154:4

**legal** 10:4 11:25 27:20 158:8

**length** 62:15

**lesser** 57:17

**letter** 131:20,24 132:21 133:17,21 134:9,11,23

**level** 124:11 125:9 140:21,22

**life** 50:17

**light** 36:12 106:10 155:21 159:6,7 160:3

**lighting** 35:13,14,15 147:25

**lights** 144:3,23 145:8 146:3,6,7 147:17,18 148:10,13,15 149:8, 11,13,14,15 150:20 151:17,18 159:12 160:4,8

**likelihood** 106:8

**Lily** 135:17,21 142:9 143:9 144:16 145:13 150:9 154:24 159:5 160:18 162:11

**limitation** 92:7 108:2

**limitations** 109:25

**limited** 53:25 99:20

**limits** 19:8,19 20:13 100:18 132:9

**lines** 27:21 68:17

**link** 142:12

**list** 49:3 51:15 59:16, 21

**listed** 52:12,24 59:10

**litigation** 41:4 45:19

**live** 106:22

**Lives** 102:2

**LO** 31:15

**local** 122:21 125:9

**located** 35:4 100:17 106:13 123:11 124:3 138:10 152:24

**location** 23:10 66:18 77:25 79:3 138:9,11

**locations** 157:11

**logistics** 23:6 92:9

**long** 15:8,16,21 16:4 108:19 128:16 141:11

**longer** 85:16,23 136:16

**looked** 52:19 90:11

**loop** 85:20 125:13 156:17 158:16

**lot** 22:15 36:10 46:2 52:5,12,20 72:21 106:12 134:18

**Love** 119:20

**low** 33:25 51:7 57:10 94:11

**lower** 51:14 54:21

**lowers** 106:18

**lunch** 94:21 136:3

**M**

**made** 26:22 27:6 38:12 49:3 62:14,21 65:23 73:4 96:8 97:11 102:24 129:25 131:7

**Maiden** 42:22 46:11

**maintain** 112:21 119:7 120:10 126:17

**maintaining** 113:9

**major** 15:7 18:23

**majority** 48:22 49:16,21

**make** 57:19 72:19 80:19 87:6 89:13 94:4 107:16,17

127:23 135:15,16,20, 23 142:19 147:23 162:5

**making** 27:21 43:24 65:10 66:10

**Mallette** 64:9,18 84:12,17,21 86:8 87:24 88:9 108:7,13, 16,17 154:11 162:25 163:2

**manage** 23:22 95:10 97:23

**managed** 26:16 137:3

**management** 60:21 157:3

**manner** 67:12 103:14

**map** 48:18 161:19

**march** 24:10,24 31:10,19 69:7 86:17 113:3 114:12,22 132:8 133:9 134:12 137:20 138:3,11 139:14

**marchers** 139:8

**marches** 25:11,18 32:9 37:2 52:25 102:4

**marching** 133:3,13

**mark** 20:23 40:7 76:6 79:18 81:7 82:8,13 88:15 90:12,20 98:21 110:11 113:19 114:6 115:3 116:5 117:10 119:11 126:21 129:2, 7,21 131:10 136:20 142:18 143:13

**marked** 21:4,8 33:23 40:8 61:13 76:7 79:19 81:8 82:9,14 83:24 88:17 90:13,21 98:24 110:13 114:7, 18 115:4 116:6 117:11 119:12 126:22 129:3,8,22 131:11 136:21 142:24

**markedly** 51:14

**marshal's** 123:4
124:6

**math** 48:19

**matter** 11:11 13:9
31:8 47:8 61:17
102:2 133:13

**max** 123:23,24

**mayor** 131:20
132:21,23 134:10

**Mccutchen** 10:1
11:1,11 12:1,17,23,
24 13:1,4 14:1 15:1
16:1 17:1 18:1 19:1
20:1 21:1 22:1 23:1
24:1 25:1 26:1 27:1
28:1 29:1 30:1 31:1
32:1 33:1 34:1 35:1
36:1 37:1 38:1 39:1
40:1 41:1 42:1 43:1
44:1 45:1 46:1 47:1
48:1 49:1 50:1 51:1
52:1 53:1 54:1 55:1
56:1 57:1 58:1 59:1
60:1 61:1 62:1 63:1
64:1 65:1 66:1 67:1
68:1 69:1 70:1 71:1
72:1 73:1 74:1 75:1
76:1 77:1 78:1 79:1
80:1 81:1 82:1 83:1
84:1 85:1 86:1 87:1
88:1 89:1 90:1 91:1
92:1 93:1 94:1 95:1
96:1 97:1 98:1 99:1
100:1 101:1 102:1
103:1 104:1 105:1
106:1 107:1 108:1
109:1 110:1 111:1
112:1 113:1 114:1
115:1 116:1 117:1
118:1 119:1,23 120:1
121:1 122:1 123:1
124:1 125:1 126:1
127:1 128:1 129:1
130:1 131:1,15 132:1
133:1 134:1 135:1
136:1 137:1 138:1
139:1 140:1 141:1
142:1 143:1 144:1
145:1 146:1 147:1
148:1 149:1 150:1
151:1 152:1 153:1
154:1 155:1 156:1

**157:1 158:1 159:1**
160:1 161:1 162:1
163:1,22

**meal** 37:23

**meaning** 47:20
94:19

**meaningfully** 48:14

**meant** 62:25 134:4,
16

**media** 11:8 110:23

**meet** 115:25

**meeting** 64:5,14
75:11,12,22 114:24
115:10,21,23

**meetings** 28:19

**member** 43:10

**members** 26:10
96:12 127:19

**Memorial** 126:6

**memorialized** 75:2,
18

**men** 133:2

**mentioned** 27:22

**message** 67:17
112:20

**met** 63:16 114:25

**metal** 65:8,11 66:5,6

**middle** 13:19 68:11,
12

**mileage** 92:11

**miles** 100:9

**mind** 61:12 135:16

**mine** 84:20

**minute** 50:24 152:12
158:14,22 161:7

**minute-seven**
153:22

**minutes** 47:3 74:5
103:3,19 104:3
105:14,15,18 133:14
135:17 136:4

**minutes-before-
dusk** 107:11

**missing** 59:22

**Mississippi** 11:13,
15 31:16 71:13 123:5

**misspoke** 114:11

**moderate** 39:19

**modification** 62:14

**Moffett** 136:24,25

**Molly** 138:9

**moment** 13:4 20:25
21:10 40:11 44:9
72:23 74:4 135:11

**momentarily** 160:19

**monitor** 32:24 49:25
92:9 95:5 100:11
157:10

**monitored** 26:12

**monitoring** 126:15

**months** 15:23,24

**monument** 41:12

**morning** 10:3 137:8
163:9

**motor** 50:21 53:20

**move** 17:6 102:14
110:11 146:13

**moved** 128:15
132:11

**movements** 101:11

**moves** 156:2

**multi** 35:25

**multi-layered**
153:19

**multiple** 20:16
27:24,25 34:4 37:15
64:15 78:23 95:22
97:14 112:23 153:10

**municipal** 20:17

**music** 78:25

**musician** 77:19

**minutes-before-dusk**

## N

**named** 81:12 110:17,
23

**narcotics** 123:6,17
124:12,13,15

**naturally** 139:5

**nature** 14:4 24:9
32:14 49:8 54:23
112:20

**navigate** 132:18

**necessarily** 23:12
28:14

**needed** 29:3,10,20
117:21 124:18

**Neighbor** 119:20

**Neilson's** 158:11

**night** 34:12 35:16
36:6,15,22 50:17
66:25 73:10 95:9,16
98:15 104:22 105:2,8
130:16 139:24 145:9
146:8 160:9

**nighttime** 33:13,15,
17 34:17 35:15 73:25

**Ninth** 48:11

**noon** 95:25 96:2

**normal** 35:16 76:24
104:11

**north** 18:23,24 48:12
56:5 143:17,18
147:5,9 151:7,11
152:19 159:25
160:25

**Northern** 11:14

**notes** 131:7

**notice** 20:7 85:13,16
86:3

**noticed** 93:19 95:21

**notified** 91:23 96:10
97:14 103:5,8

**notify** 39:11 89:12,15
94:2 132:23

**notifying** 89:19,20

**notwithstanding**
112:19

**November** 51:2

**number** 11:9,16
47:24 50:21,24 51:7
52:24 54:9,14 55:12
92:21 96:6 110:4
142:20

**numbered** 45:8 84:6
142:22

**numbers** 122:14

## O

**O'DONNELL** 11:3
29:22 30:7,10 33:8
38:18 39:6 51:10
61:16,21 64:10
67:20,23 71:2,8,11,
18,22 74:3,8 88:2,11
96:18 98:11 105:3,10
112:9 147:21 148:8
150:13 162:21,23

**object** 29:22 30:7
33:8 38:18 39:6
51:10 86:12 87:24
88:9 96:18 98:11
105:3 108:18 112:9

**objection** 67:20 68:4
71:2,9 88:3,12
105:11 147:23 148:7
149:10

**observed** 36:25 37:3
38:24 39:2 121:22

**occasions** 93:23
125:3

**occurred** 69:11
127:4

**occurring** 79:24

**October** 40:20

**Odd-and-end** 17:14

**office** 22:10 61:8
75:4 83:9 85:18 89:8
92:2,9 97:11,15
117:20 118:3,4
119:6,7 123:4,7,17,
18 124:6,7,12 130:17

133:8 139:19 157:17 158:8

**office's** 101:4

**officer** 14:15 15:19 16:2,9,13 161:23

**officers** 14:6 18:10, 13,14 19:25 21:24 38:7 39:23 43:25 56:12,15 57:8 58:24 59:5 61:7 69:22 70:3 91:25 93:19 117:8 122:6,7,11,14,17 123:9,11 124:3,24

**on-duty** 96:12

**one's** 117:15

**one-page** 45:2

**open** 27:22 34:12 75:11,12 94:9 100:20

**opening** 78:6

**openings** 34:8,11

**operate** 69:24

**operates** 96:22

**operation** 124:16

**operational** 116:12

**operations** 15:7 117:20

**opposed** 18:13 100:4,14 108:25

**options** 73:22 97:16

**order** 112:21 113:9 119:8 120:10 126:17

**orders** 163:13

**ordinance** 62:4

**ordinances** 76:2

**organization** 24:14 114:12

**organizers** 85:11 114:20 118:22 125:16

**orient** 142:16

**orientation** 143:10 153:2

**original** 62:10 134:22

**originated** 132:8

**overhanging** 155:22

**overlap** 17:23 85:6

**overtime** 70:3

**Oxford** 11:15 14:18 15:14,19 16:2,15,18, 22 17:6 18:8 19:6 21:17,24 32:15 33:19 34:23 37:5 61:4 76:11 77:13 78:23 79:23 80:21 84:9 111:16 112:24 113:22 117:22 120:11 123:7,13,15 131:21 132:23 133:4 156:22 161:24

**Oxford's** 132:22

**P**

**p.m.** 56:23 57:4,17 80:5 114:13,14 140:6 163:20,23

**pages** 45:11

**paid** 36:10 146:10 160:11

**paper** 40:14 44:7,10, 17,18 131:22

**parade** 73:9,10,23 76:13 82:19,24 86:15,19

**paragraph** 69:2 117:18 132:20

**parameters** 48:17

**parcels** 100:23

**parked** 127:15

**parking** 50:14

**part** 13:13 35:8 63:13,15 70:2 75:17 92:5 144:5 146:5

**partially** 59:3,9

**participants** 11:20 125:16

**participate** 73:22

**parties** 10:16

**partner** 125:6

**partners** 125:13

**parts** 55:2

**party** 41:5

**pass** 153:15

**past** 18:24,25 19:2,3 27:7 33:6 40:2 76:17 134:8

**patrol** 16:2,13 47:5 56:12 57:19,22 58:2

**patrolled** 57:17,18

**patrols** 55:13

**patterns** 97:22

**pause** 144:16,17 145:16 146:17 150:12 151:4 152:4 158:19 159:5 160:18

**pay** 70:7

**payment** 69:3

**peace** 139:25 140:16

**peaceful** 80:25

**pedestrian** 50:22 53:20 73:15

**pedestrians** 73:12

**pending** 10:24 13:17

**peninsula** 161:21

**people** 22:16 29:2 37:19 38:4 39:3 50:18 51:18 52:14 69:15 83:17 91:17 92:5,6,14 94:21 95:22 96:6,15,23 97:2,9,14,19 98:4,8 106:3 109:21,24 110:2 125:7

**percent** 54:16

**percentage** 48:20 49:14 54:15

**perfect** 57:9 74:7

**perfectly** 98:5,9

**period** 32:8,10,13 85:13,16 99:5

**periods** 80:4 103:2

**permanent** 14:20,25

**permit** 26:8 27:10 28:5,7,24 30:14 31:3, 5 41:11 61:5 62:16 67:10,18 69:17,20 70:10,14,23 72:4 73:16 76:13,14,23,25 82:19,25 83:2 84:9 86:11,14,15,16,19,20 87:11 89:12,21,24 90:2 93:20 99:5,17 101:22 111:17,21 112:3 113:20 125:12 129:25 134:13

**permits** 27:12,24 28:20 61:4 62:5 64:19 66:14 72:7,12 73:24 76:5 87:17,18 89:9 103:2 119:24 131:7

**permitted** 49:12 53:11,17 58:23 59:13 66:24 75:17 118:11 120:23,24 121:5 124:19,24

**personnel** 18:9 95:13

**perspective** 66:23

**pertain** 124:15

**pertaining** 47:25 91:12,13

**pertains** 111:22

**phone** 28:23,25 39:10 42:8 96:9 133:11

**photo** 127:7

**photographs** 21:9

**photos** 21:12 35:23

**picnic** 97:2

**picture** 127:2 128:2 142:2 143:5,16 146:4

**picture-in-picture** 142:8

**pictures** 33:23 94:8 149:10

**piece** 40:14 44:6,10, 17,18 100:20 131:21 143:13

**pieces** 65:8

**place** 21:18,23 24:18 26:5,25 31:18 33:17 49:15 54:15,23 56:19 63:25 66:25 67:5,12 81:20,22 104:25 105:8 106:6,25 114:16,20,24 128:9 130:13 133:14 139:24

**places** 19:10 50:15 151:19

**plaintiff** 11:2 41:15 130:3

**plan** 72:22 116:13,21 117:14

**planned** 23:16,25 120:22

**plans** 117:3

**platform** 26:13 78:7

**play** 55:15 59:17 61:3 62:8 91:24 156:23

**played** 62:11 144:14 145:14 146:15 150:10 151:2 152:2 155:11 158:17 159:3, 18 160:16 162:12

**players** 31:17

**plays** 106:24

**plaza** 78:2,3 132:11

**plot** 100:15

**point** 13:14 55:4 56:14 61:9 71:22 87:12 152:23 159:12

**point-tilt-zoom** 155:25

**pointed** 36:14

**pointing** 35:5 154:7, 10 160:4

**points** 156:7

**pole** 155:22 157:24

**poles** 109:11

**police** 14:18 15:5,14, 19 16:3,12,18 18:8 21:17,24 24:16 28:18 29:9 31:5 33:19 37:5 45:17 49:24 68:14,21 69:3,18 76:11 106:9 117:22 120:8 121:13 122:3,19 123:2 127:20 132:24 133:11 134:5

**policies** 91:3 101:8 109:14

**policing** 18:17 112:6

**policy** 63:10 68:23 70:13 75:6 88:24 91:24,25 93:20 96:17 97:4 99:13,16,19 100:3 101:14,24 102:20,25 103:10,13, 17 107:11,13,18,23 108:19,24 109:6,9, 16,19 116:17

**political** 53:4 70:11, 19 101:10

**Pope** 64:8,18 84:13 108:17 163:2

**population** 52:6,19

**portion** 48:24 146:21,23 147:13

**position** 14:19 15:5, 9,22 16:5 32:23 141:7 143:24 151:13

**positioned** 154:23

**positions** 154:22

**possibly** 115:13

**post** 110:23

**post-event** 31:20

**posted** 34:15

**poster** 65:10,11

**posts** 159:6

**potential** 28:25 31:4

**potentially** 35:10 45:21 51:23 78:14 104:12,19

**practice** 10:8 28:14

**Prayer** 119:20

**pre-event** 31:20

**preclude** 103:18

**prefer** 12:25

**premise** 64:14

**prepare** 64:24

**prepared** 23:24

**presence** 49:25

**present** 80:19

**presentations** 53:7

**prevent** 30:22

**prevented** 38:8

**previous** 137:7,14, 15

**Price** 138:9

**prickly** 86:13

**primarily** 117:20

**prior** 15:4,11,18,21, 25 17:9,13 51:15 85:2 90:16 129:11,14 134:20

**private** 86:5

**pro-confederate** 25:17

**problems** 141:16

**procedure** 87:11

**Procedures** 10:22

**proceed** 150:9

**proceeding** 13:22 14:4

**proceedings** 14:11, 14 95:11

**process** 27:16 87:21

**produced** 116:10

**profile** 111:11

**progressing** 158:14

**prohibit** 102:25

**projected** 41:12

**projecting** 128:20

**projection** 77:14,18 81:13 127:2,16

**projections** 82:2 129:11

**property** 18:18 19:10,18,21 20:15 23:7,9,11 26:12,16 29:7 39:18 86:5 100:5,20,23

**protection** 68:14,21 69:3,18

**protest** 118:7,14

**protesters** 118:8,13 119:2

**protesting** 133:3

**protests** 37:2

**provide** 30:6 44:10 69:17 100:7 103:22, 24,25 104:4 120:4 130:11,16,24

**provided** 20:25 44:13 45:17 47:21 60:25 120:3 130:18

**provisions** 68:25

**proximity** 139:5

**PTZ** 156:2

**public** 28:2 32:20 64:15 66:19 67:13 76:13 82:19,24 103:21 128:8,22 140:10

**pulled** 44:5

**purpose** 70:19 83:11

**put** 39:10 115:15 142:3 144:4 156:24, 25 157:6

**puts** 109:20

**putting** 65:10 117:7

**Q**

**question** 13:18,19 21:11 47:16,18,22 55:10 74:18 82:17

83:3 88:4 108:10 109:23 162:22

**questioning** 86:10

**questions** 47:12 55:16 110:10 129:18 162:19,24 163:3

**quick** 157:15

**quickly** 110:11

**quoting** 108:20

**R**

**radio** 22:11 58:3

**rain** 106:18

**rallies** 109:12,13

**range** 33:4 35:7 92:11

**Rash** 11:11 41:16,21 130:2

**rationale** 92:6,25 101:2 103:17

**Ray** 24:11 64:10

**reach** 24:3 28:9 90:6

**reaction** 73:18

**read** 137:11 148:17

**reason** 64:20 119:21 130:15 146:5

**reasonableness** 64:22

**recall** 22:7 25:7 26:5, 19 27:6 29:4 30:3,18, 23 32:3,4,13 33:21 53:16 63:25 64:20 72:6,11 73:4,7 78:18 79:6 81:17 82:5 90:7 125:24 126:4 130:21 131:24 132:2,6 160:8

**recalling** 75:21 92:18

**receipt** 134:11

**receive** 133:16

**received** 22:11 28:24 42:19 111:6 125:12 157:16

**receiving** 131:17

**recently** 32:23 87:13

**recess** 74:12 136:9

**recipients** 110:18

**recognize** 13:10 21:12 38:24 144:22 149:10 163:6

**recollection** 45:16 70:22 80:9

**record** 10:10 12:10 13:5 74:11,15 96:8 136:7,12 138:5,15 142:15 143:11,13 146:12 147:14 161:7 163:20

**recorded** 157:12

**recording** 10:18

**records** 42:24 43:6

**red** 84:20 157:24,25 158:4

**reduce** 64:21

**reduced** 62:17

**refer** 84:5 119:10

**reference** 42:12 43:4,8 60:7 74:20 78:7 104:7 137:23

**referenced** 27:9 42:9 65:2

**referencing** 105:6 126:13 127:8

**referred** 26:25 33:13 123:17

**referring** 43:8 46:5 113:15 137:10

**refers** 40:22 60:2,5 81:13

**regret** 163:8

**regular** 35:18 86:11

**regularly** 28:18

**relate** 75:16 138:14, 18

**related** 49:12 70:25 106:3 115:14

**relates** 59:22 70:11, 23 116:15

**relating** 91:4 104:2 111:21 113:21

**relationship** 78:2 109:3 121:12 141:14

**relying** 117:6

**remainder** 69:2

**remember** 25:5,13, 20,23 31:21 42:19 46:25 47:6 63:6 65:2, 3 66:10 77:11 93:9 104:16 110:21,25 111:2 126:10,25 127:4 131:16 146:4 160:3

**remote** 10:18

**remotely** 10:12,15 11:20

**removal** 97:16

**rendition** 143:22 144:25

**replied** 45:25

**report** 42:22 97:6 134:6

**reporter** 10:12 12:4, 13,16 58:12 71:6 82:21 112:11 113:12 163:17

**Reporting** 10:6 12:2, 6

**represent** 129:12,19

**representation** 124:8

**request** 30:20 42:10 60:17 66:17 67:9 73:8 157:17

**requested** 73:11 117:23

**requests** 73:4

**require** 85:15

**required** 25:8 86:17 87:13

**requirement** 85:7,8, 24,25 107:23

**requirements** 87:21

**requires** 85:12 87:13

**requiring** 106:9

**resources** 28:2 30:2, 6,15 69:6 73:14 116:25 117:7 119:25 120:9 130:23

**respect** 23:19 39:15 97:9 107:11,24 109:24 127:21 140:16

**respond** 57:20 104:14 110:6

**responded** 42:20 104:10

**response** 47:21 55:14 97:10 100:10, 19

**response-time** 103:23

**responsibility** 57:23

**responsible** 117:20

**rest** 44:2

**restaurant** 60:11

**restaurants** 36:18, 23 50:12 106:5

**restriction** 34:16 93:7

**restrictions** 11:21 51:17 56:22 66:13 67:4

**resulting** 39:22

**retail** 36:18 145:4 147:13,16 148:18 150:19 162:6

**review** 46:21

**rise** 120:17 133:21

**risk** 153:11

**road** 18:25 19:2 95:15,21 100:20 127:16 128:20 138:9 139:8 145:5

**roads** 54:6 162:7

**roadway** 128:12

**role** 15:5 55:15 59:17 61:3 62:8,11 106:24 156:24

**roll** 153:14

**room** 10:9,14 157:13

**rotates** 156:2

**roughly** 122:14,15

**route** 67:14 69:22 73:11

**routine** 56:19 57:19

**routinely** 44:2

**RSVP** 26:13 78:7

**rule** 10:21 72:10

**rules** 10:22,23

**run** 42:22 100:8

**S**

**safe** 66:21 98:5,9

**safeguard** 130:11

**safety** 28:2 38:15,21 39:2 59:17 64:15 66:19 67:13 82:4 97:18,25 103:21 112:21 113:9 118:4 119:8 120:10 125:8 126:10,12,17 128:9, 22 130:12 140:10

**sandwich** 37:23

**sat** 55:23

**Saturday** 56:21,25 77:12 95:18,19 96:3 113:5

**Saturdays** 79:25

**scale** 23:21 58:25

**scale-type** 79:4

**scavenger** 113:3 138:2

**scene** 39:20 120:20

**schedule** 29:2

**scheduled** 22:25 23:3,4 28:19 29:14

30:14 31:3,17 90:5 130:20

**school** 17:17 18:4 20:19

**Scott** 10:4 11:24

**screen** 142:5 143:4 146:7 151:12 152:11 153:20 155:20

**screening** 81:13

**search** 120:20

**searches** 111:10

**season** 35:17 52:9 143:21,24

**secondary** 72:25

**seconds** 133:13 144:21 146:13 147:15 148:18 150:16 151:24 152:12 155:14 157:23 158:22 161:8

**Section** 68:7,11 74:19

**secure** 132:16

**security** 34:23 58:6 79:10 82:4 100:7 103:22,25 112:16 115:2,11,22 117:4 118:4 125:8

**seek** 88:8

**seeking** 67:18 124:23

**send** 61:8 77:5

**sends** 42:7 131:15

**sense** 18:15 48:19 52:3

**sentence** 40:22

**separate** 37:2 120:7

**separated** 40:13 44:25

**separately** 23:2

**September** 131:16 134:10

**sergeant** 137:2

**series** 21:9 25:10 78:14,21 79:17

**serve** 85:11 87:6,16

**serves** 20:24

**service** 57:20

**serving** 21:17 85:24

**sessions** 37:14

**set** 76:2 86:2 118:8 150:19

**setting** 107:3

**severity** 10:7 20:3

**share** 120:9 142:5 157:19,20

**shared** 45:23 46:5

**sheet** 45:24 46:21,23

**Sher-** 89:5

**Sheridan** 42:22

**sheriff** 23:5 24:3,5,8 28:17 30:19 40:21 43:2 44:11 64:9 89:7 91:9 92:24 94:23 99:25 101:8 102:6, 19,23 103:6,9,16 107:7,9 114:25 115:10,25 119:22 122:8 131:15,17 132:21 133:16 140:14 141:2

**sheriff's** 17:11 20:6 39:11,25 43:11 101:3 117:3,19 118:3 119:7 132:25 139:19 157:17

**shift** 55:25 56:20,23 58:9,15 59:6

**shifts** 56:12

**shine** 128:11

**shined** 127:15

**shining** 159:7

**shootings** 60:8,9

**shop** 149:4

**shopping** 33:3

**short** 79:9 142:13

**shorter** 85:15,25

**shorthand** 50:17

**show** 129:20 141:21

**showed** 146:4

**showing** 119:21

**shown** 129:14

**side** 23:13 50:6,9
143:18 151:12,18
152:17 156:10
159:22 160:22

**sidewalk** 138:23

**sidewalks** 26:18
139:12

**sign** 76:24 77:5,9

**signature** 77:2,4

**signatures** 80:8

**signed** 76:22 113:21

**signs** 34:15

**similar** 78:22 99:15
101:14 107:13
109:14 117:14

**simply** 134:14

**simultaneous** 45:6
78:12 112:8 123:21
139:2

**simultaneously**
113:7

**sir** 13:2,20,21,23
14:8,12,16,22 15:9,
15,18,25 16:10,16,
20,24 17:3,13,18,25
18:6,20 19:8,12,16
21:15 22:3 23:20
24:17 25:10,24 26:2,
3,21 27:5,14 31:22,
25 32:5,11,16 33:24
34:3,7,14,25 36:4,16,
20,24 37:12,17,21,25
38:6,10,14 40:5,6,25
41:7 42:2 43:19,23
45:9,13 46:20 47:11,
15,23 48:16,25 49:6,
10 50:13,20 51:5,9,
23 52:4 53:8,18 54:3,
18,19 55:17 56:10
57:2,5 58:2 59:11,15,
19,24 60:14 62:7,10,

14 63:7,11,20 64:6
65:4,14,23 66:8 67:2,
6,22 68:6,24 69:12
70:4,8 72:9,14,21
73:6 74:2,21,24
75:14,19,23 76:3,15
77:15,21,24 78:20
79:8,12,16 80:3,6,11,
23 81:2,5,16,21,24
82:3,6 83:6,14,19
85:5,14 87:8,15,18
88:5,13,21,22 89:2,
11 90:10,18,25
92:16,19 93:8,16
94:10,13,18,24 96:4
98:17 99:2,9 100:6,
25 101:13 102:3,10,
16,21 103:7,11,20
104:18,23 105:12,24
107:5 110:20,24
111:25 112:4,22
113:16,17,24 114:4,
15 115:7,17 116:3,18
117:16,25 118:6,17
119:4,9 120:6,12,16
121:3,8,15,18,21,25
122:18,23 123:25
124:5 125:23 126:3,
19 127:2,11,16,22
128:3,18,24 129:12,
16,19 130:14 131:18,
23,25 132:4 133:7
134:5 135:7 137:12,
18 138:5 139:10,16
140:8 141:9,12,15,20
143:7,25 144:10
145:3,11 146:2,24
147:8,11,19 148:14,
22 149:7,17,23
150:4,17,23 151:9,
16,22 152:8,15,21
154:14,18 156:6,11
157:2,8,21 158:3,24
159:24 160:6,8,23
161:2,5 162:4,9,18

**site** 22:11 133:19

**situated** 154:5

**size** 24:9,24 39:9
55:11 67:14 122:2

**sky** 106:10

**sliding** 58:25

**slightly** 153:12

**slower** 54:25 71:12,
15

**slowing** 100:18

**small** 66:2 100:15
137:6 157:25 158:4

**smaller** 137:7,14

**smaller-** 79:3

**social** 10:8 51:21
52:13 110:23

**sort** 53:2 56:8 124:8

**sounds** 109:2,16

**south** 18:25 35:6
48:11 144:20 145:2,
21,22,24 147:2,4,6,
10 149:20 152:18
156:16 158:22
160:22 161:4

**southernmost**
146:21,23 147:13

**space** 94:9 161:10,
13

**speak** 12:19 23:5
24:11 42:14

**speakers** 45:6 78:12
112:8 123:21 139:2

**speaking** 37:6 57:14
91:16

**special** 76:12 82:18,
24 109:20

**specialist** 11:25

**specific** 23:15 25:5,
7,12 47:18 57:24
58:7 59:20 67:9 76:5
77:12 86:6 91:3
104:7,17 110:9 131:5

**specifically** 21:20
22:12 30:15 31:23
32:22 35:4 36:16
37:6 39:16 46:23
54:6 60:2,5 63:7
66:15 69:21 91:16
94:19 95:14,20 97:13
110:3 112:18 116:18

**specifics** 99:23

**speculation** 134:18

**speech** 68:12,19

**speed** 54:25

**spilled** 64:17

**spoken** 119:23

**spontaneous** 22:24

**spontaneously**
133:23

**spotlights** 149:14

**square** 23:16 24:19
27:3 32:18 34:22
35:14,20 36:17
48:10,15,21,24 49:24
50:3,8,10 56:2,3,7,8
58:18 60:13 78:3,5
87:10 100:9 132:12
137:6 138:15,17
139:4,24 142:3,14
146:22 150:2 152:23
153:13 156:13,17
158:6

**stack** 117:8

**stacked** 130:20

**staff** 22:13 23:8,13,
22,23 26:15 29:15
43:10 64:24 69:9,14
90:2 92:10 95:3,4,7
96:10,12 104:10
127:18 132:17
157:11

**staffed** 56:11 57:10

**staffing** 66:20 72:23
103:22 110:5

**stagnant** 118:14

**stamp** 84:14

**stand** 20:5 22:14
39:11,18

**standard** 101:20

**standards** 101:16,18

**standing** 22:18 97:2

**standpoint** 62:17
67:13 101:21

**start** 11:8 16:5 23:3
37:8 40:15 94:14
110:8 114:13 124:10
132:6 133:12 138:11
143:15 144:12 145:2

**started** 16:14 17:21
18:2

**starting** 103:3,19
104:3

**state** 122:22 123:2,7,
8,11,16 124:11,12

**state's** 10:23

**stated** 12:9

**statement** 12:15
116:16 134:21

**States** 11:13

**stationed** 57:12
151:19

**statue** 49:5 60:5
99:21 101:10 102:13
127:2 128:6 160:19,
25 161:3,11,14,22

**stayed** 51:7 139:11

**step** 20:9

**stick** 65:11,12,16
66:3,5,7

**sticks** 65:8 75:16
109:11

**stipulate** 10:16

**stood** 22:5

**stop** 108:10 143:10
144:13 155:13
159:14,20

**stopped** 146:12

**store** 149:6 150:20
158:11

**storefronts** 36:22

**stores** 145:24

**straddled** 113:8

**stream** 35:19

**streamers** 144:2

**street** 12:3 26:17
48:11,13 50:4,7
97:23 138:9 139:12
146:25 147:3 149:20,
24 150:3,14 162:3

**streetlight** 35:24
152:10,13,16,19

**streetlights** 35:19
144:8 149:19

**streets** 31:8 133:4

**strike** 34:21 50:23
72:4 107:8

**string** 149:12

**strobe** 159:12 160:3

**Stronger** 114:11,12

**structure** 154:3

**student** 17:15 52:5
114:12 132:18

**Students** 114:11

**stuff** 135:2,22

**subdivision** 19:4

**subject** 67:3 101:25

**submits** 72:17

**submitted** 72:7,12
73:13 80:14 85:2
89:24 111:19

**subset** 86:17

**sufficient** 87:20 88:7

**suggest** 54:13 85:23

**suggesting** 119:16

**suggestions** 89:13

**suggestive** 148:3

**summer** 22:12 23:20
25:4,5,7,18 26:24
27:4,7 28:13,15 29:5
30:4 31:24 32:3,7,15
39:16 40:3 63:5,6,24
91:12,20 93:12 99:25
101:11 102:23
106:22 111:6 116:14
125:5,25 127:5
129:12

**summers** 33:6

**sun** 107:4

**sunny** 106:16,17

**sunset** 105:14,16,19,
21

**supervisor** 96:13

**supply** 70:14

**surrounded** 36:17

**surrounding** 33:25
128:5 162:7

**swear** 10:14 12:14

**swearing** 10:18

**sweep** 156:9

**switch** 14:24

**sworn** 12:19

**synonymous** 19:5
56:8

**system** 44:4 48:5
53:23 60:23 104:20

———————

**T**

**tab** 20:22 21:7 40:7
44:8,21 61:11,17
76:6 79:18 81:7 82:8,
12 83:22 88:15
90:11,12,19 98:22
110:11 113:18 114:5
115:3 116:4 119:10
126:20 128:25 129:6,
20 131:9 136:19

**tailor** 148:19,24,25
149:2,5

**takes** 24:18 27:23
66:24 67:5

**taking** 13:10 54:15
56:19 97:9

**talk** 18:7 32:17 61:10
71:12,16 106:2,3
135:18 141:17,18

**talked** 92:8 120:2
152:22

**talking** 25:5 84:13

**talks** 47:19

**tape** 146:13 153:22

**tasked** 30:16 31:6,
11,19 42:21 43:16

**taxed** 29:16 130:23

**team's** 134:12

**teams** 52:6

**technical** 21:3 83:20

159:17

**telling** 30:23 133:12

**temperature** 106:23

**tend** 52:11

**terminology** 118:23
123:3

**terms** 23:15 35:13
66:13 71:5 72:3,15
73:3 75:15 101:3,23

**test** 41:9 61:22

**testified** 12:20 14:10
99:4 100:21 118:25
122:9

**testify** 86:21 160:2

**testimony** 32:6

**thereabouts** 18:5

**thing** 13:16 33:20
39:14 45:20 84:24
124:22 134:24

**things** 20:8 22:17
47:2,9 51:19 52:11
56:5 64:12 69:8
104:18 109:8,15

**thinking** 26:2 31:12
71:17

**Thompson** 153:5,13

**thought** 62:24 134:2

**thousand** 54:5,9,13

**Thousand-** 18:3

**threats** 140:10

**three-way** 63:18

**thrown** 22:17

**Thursday** 11:22

**tied** 66:14

**tighter** 49:23 50:2

**Tim** 110:23

**time** 13:11 14:10
21:16 29:16 32:12,13
36:8 37:5 38:6 42:5
46:25 56:15,16,18,22
58:10,17 64:21,23
66:12,14,18 67:12
69:12 70:12,14,15

72:19,22 73:17
74:11,15 77:22 80:4
87:20 88:7 89:3,4,7
93:25 94:14 97:21
99:5 100:10,19 103:2
104:20,22 105:25
106:7,12 114:13
121:13,14,16,17,20,
23,24 128:19 136:2,
8,12 141:3,11 143:13
152:4 153:4 158:7
162:20 163:5

**time-of-day** 107:18

**timeline** 135:9

**times** 13:7,24 34:12
58:7 93:25 94:5
144:24 156:9

**timing** 62:16 72:3
101:21 102:8 115:16

**Tippah** 17:10

**title** 14:24 82:18
118:20

**today** 18:8

**told** 31:5 93:2 108:25
109:8,11

**tonight** 137:6,10

**top** 20:21 21:20
76:11,18 84:9 115:9
118:12 119:22 137:4
144:3 148:16 149:8,
12 158:7

**total** 18:10 54:17
122:5

**touch** 101:10

**touched** 89:4

**town** 23:16 24:19
27:2 32:18 34:22
78:3 87:10 138:15,17
139:24 142:3,13

**track** 155:20

**tracked** 96:5

**traffic** 22:12 25:2
73:15 97:22 120:19

**Trailer** 148:20

**trees** 155:16

**trend** 52:3 55:5

**trouble** 50:19

**truth** 12:19,20

**TSG** 10:6 11:25 12:5

**turn** 20:22 35:22
79:18 81:6 84:3
90:11,19 114:5 115:2
117:9 126:20 128:25
136:19

**turned** 13:5 144:19

**turning** 151:4 152:6

**turnout** 137:22

**two-page** 44:21
76:10

**type** 24:23 62:19
77:17 78:14 117:14

**types** 32:20 33:16
52:10 53:4 83:4

**typical** 56:24 58:3
147:17 150:21
151:21

**typically** 20:6 23:4,8,
13 24:2,7 27:17,22
28:22 35:18 37:13
49:20 54:4,8 61:6
72:24 77:5 78:25
89:18 95:2 116:23
124:13 125:2 144:9
145:10 146:8 148:11
149:15,22 152:13,20
157:2,10

———————

**U**

**ultimately** 20:2

**unable** 103:25

**uncommon** 39:10
115:24

**underneath** 160:4

**understand** 27:11
37:11 44:15 45:18
47:7,9 69:13 86:25
99:18 102:12 113:7
125:17 127:7 148:6

**understanding**
41:4,6 96:15,20 97:4

100:2 105:17 157:20

**understood** 42:18 47:10

**unduly** 148:3

**Union** 17:3

**United** 11:13

**units** 126:15

**Unity** 31:15

**university** 24:15 27:19 28:18 31:16 48:10 56:5 63:16 116:2 117:4 121:12, 13,20,23 122:3,15

**university's** 115:2

**updated** 76:19

**V**

**Val** 43:5,12

**Val's** 43:13

**Valerie** 43:14 45:23 46:11

**validity** 10:17

**Van** 50:5 150:5,14 153:10 156:15

**vary** 56:15,17

**vehicle** 50:22 53:20 73:10

**version** 76:22

**versions** 83:18

**versus** 11:12 83:9 100:19

**video** 10:17 11:25 13:5 60:17,18,24 142:13 143:14 144:12,14,22 145:14 146:6,15 147:24 148:2 150:10 151:2, 24 152:2 153:14 155:11 158:15,17 159:3,18 160:16 161:8 162:6,12,14 163:13,14

**video-recorded** 11:10

**videoconference** 11:19

**videos** 44:4

**view** 157:15 161:22

**vigil** 125:25 126:18

**Village** 148:19,24,25

**violate** 108:12 109:3

**violation** 96:17 97:4, 6

**violations** 93:19

**violence** 21:18 26:19 27:4 49:21 78:18 79:5,9 82:5 127:24 139:25 140:9

**violent** 20:4 124:14

**Visit** 77:13 78:23 79:23 80:21

**visual** 148:12

**voice** 26:9

**W**

**walk** 13:19 34:5 44:8 55:24

**walked** 38:12 126:8

**walking** 57:8

**walls** 33:7 129:13,14

**wanted** 24:13 87:9, 16 93:5 101:19 109:14 146:5

**Warren** 110:23 111:8,17

**Warren's** 112:20

**watch** 162:5

**Wayne** 81:12

**ways** 28:9 149:11

**weapon** 65:12

**weather-wise** 52:8

**website** 83:9

**Wednesday** 56:20, 25 95:25

**week** 37:10 56:13 73:9

**weekend** 25:22 37:11 58:23 96:25 97:3 113:4 115:12

**weekends** 52:8

**weeks** 51:3

**Wellsgate** 19:4

**west** 35:6 145:24 151:12 152:6 153:9 154:11,12,13 156:5, 7,8 159:22

**westbound** 19:3

**western** 156:10

**white** 153:18,23 158:2,9

**wide** 33:4 92:11

**window** 104:13

**windows** 150:20

**wondering** 45:4 92:23

**words** 122:25

**work** 17:11 22:14,23 42:21 56:12,23 57:3 58:25 69:23 72:24 73:20 116:22 140:24 141:6 163:7

**worked** 22:4 26:14

**working** 13:9 16:18 17:24 44:2 85:2 95:15,20 104:11 141:13

**world** 57:9 71:21,24

**wreaths** 143:22

**wreck** 14:5

**wrecks** 50:22

**writes** 115:10 133:25 134:11 137:5

**writing** 75:2 133:21 137:8

**written** 75:25 134:23

**wrong** 123:2 126:9

**wrote** 131:20

**Y**

**year** 17:19 24:22 25:6 50:25 51:4 52:17 54:5,10 56:18 73:5 76:17 105:22 112:25 117:15 125:5 130:22 141:2 144:5,24

**years** 16:17 32:19 48:2 51:15 55:8 58:5 62:12 129:15

**York** 12:3,4 71:15

**young** 52:14 163:12

**Youngwood** 10:25 12:22 13:8 21:6 40:10 51:12 58:14 61:15,19,23 62:2 67:21 68:2 71:14,19, 23 72:2 74:6,17 76:9 79:21 81:10 82:11, 16,23 83:21 84:2,16, 18,22 86:22 87:4 88:14,19 90:15,23 98:13,18,20 108:14, 21,22 110:15 113:14 114:9 115:6 116:8 117:13 119:14 126:24 129:5,10,24 131:13 135:12 136:14,18,23 141:23 142:6,9 143:2 144:11,15,18 145:12, 15,17 146:11,16,19 148:5,9 150:8,11,24 151:3,6,23 152:3,5 154:24 155:12 158:12,18,20,25 159:4,10,19,21 160:14,17,20 161:6,9 162:10,13 163:4

**Z**

**zip** 46:16