IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI
Oxford Division

| | | |
|---|---|---|
| JOHN RASH, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | Civil No. 3:20-cv-00224-NBB-RP |
| v. | ) | |
| | ) | |
| LAFAYETTE COUNTY, MISSISSIPPI, | ) | |
| | ) | **ORAL ARGUMENT REQUESTED** |
| *Defendant*. | ) | |
| | ) | |

<u>**MEMORANDUM OF LAW IN SUPPORT OF**</u>
<u>**PLAINTIFF JOHN RASH'S MOTION FOR PARTIAL SUMMARY JUDGMENT**</u>

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................ 1

UNDISPUTED MATERIAL FACTS ................................................................................. 5

    I.     THE COURTHOUSE GROUNDS ........................................................... 5

    II.    THE FACILITY USE POLICY ................................................................ 8

    III.   DEFENDANT'S VIOLATION OF PLAINTIFF'S CONSTITUTIONAL
          RIGHTS ..................................................................................................... 13

SUMMARY JUDGMENT STANDARD ........................................................................... 14

ARGUMENT AND AUTHORITIES ................................................................................. 15

    I.     THE COURTHOUSE GROUNDS ARE A TRADITIONAL PUBLIC
          FORUM ...................................................................................................... 15

    II.    THE CLOSURE ORDER IS NOT NARROWLY TAILORED TO
          ADVANCE A SIGNIFICANT GOVERNMENT INTEREST ........................... 17

    III.   THE COUNTY'S ONE- OR FIVE-PERSON PERMIT THRESHOLD
          VIOLATES THE FIRST AMENDMENT ......................................................... 22

CONCLUSION .................................................................................................................. 25

i

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Adderley v. Florida,*
    385 U.S. 39 (1966) ................................................................................................ 20

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) .............................................................................................. 15

*Ass'n of Community Organizations for Reform Now v. City of Frontenac,*
    714 F. 2d 813 (8th Cir. 1983) ............................................................................... 21

*Brown v. City of Grand Junction,*
    136 F. Supp. 3d 1276 (D. Col. 2015) .................................................................. 21

*Browne v. City of Grand Junction,*
    136 F. Supp. 3d 1276 (D. Colo. 2015) ................................................................ 22

*Celotex Corp. v. Catrett,*
    477 U. S. 317 (1986) ............................................................................................ 14

*Chiu v. Plano Indep. School Dist.,*
    260 F.3d 330 (5th Cir. 2001) ............................................................................... 15

*City of Cincinnati v. Discovery Network, Inc.,*
    507 U.S. 410 (1993) .............................................................................................. 22

*Collins v. Jordan,*
    110 F.3d 1363 (9th Cir. 1996) ............................................................................. 22

*Community for Creative Non-Violence v. Turner,*
    893 F.2d 1387 (D.C. Cir. 1990) ........................................................................... 23

*Consol. Edison Co. of New York v. Public Service Comm'n of New York,*
    447 U.S. 530 (1980) .............................................................................................. 19

*Cox v. City of Charleston,*
    416 F.3d 281 (4th Cir. 2005) ............................................................................... 24

*Douglas v. Brownell,*
    88 F.3d 1511 (8th Cir. 1996) ............................................................................... 23

*Fairchild v. Liberty Indep. School Dist.,*
    597 F.3d 747 (5th Cir. 2010) ............................................................................... 17

*Forsyth Cnty. v. Nationalist Movement,*
    505 U.S. 123 (1992) .............................................................................................. 23

*Freedom From Religion Found. v. Abbott,*
    955 F.3d 417 (5th Cir. 2020) ............................................................................... 18

*Greer v. Spock,*
    424 U.S. 828 (1976) .............................................................................................. 20

*Grossman v. City of Portland*,
  33 F.3d 1200 (9th Cir. 1994) ............................................................. 23

*Hays County Guardian v. Supple*,
  969 F.2d 111 (5th Cir. 1992) ...................................................... 17, 18

*Hodgkins ex rel Hodgkins v. Peterson*,
  355 F.3d 1048 (7th Cir. 2004) ........................................................... 21

*Knowles v. City of Waco, Tex.*,
  462 F.3d 430 (5th Cir. 2006) ......................................................... 4, 23

*Lopez v. Town of Cave Creek*,
  559 F. Supp. 2d 1030 (D. Ariz. 2008) .............................................. 20

*McCullen v. Coakley*,
  573 U.S. 464 (2014) ................................................................... 18, 25

*Mylett v. Jeane*,
  910 F.2d 296 (5th Cir. 1990) ............................................................. 18

*National Ass'n for Advancement of Colored People v. Peterman*,
  2020 WL 4738015 (M.D.N.C. Aug. 18, 2020) ................................... 15

*O'Connell v. Town of Burgaw*,
  262 F. Supp. 3d 316 (E.D.N.C. 2017) .............................................. 16

*Occupy Eugene v. U.S. Gen. Servs. Admin.*,
  43 F. Supp. 3d 1143 (D. Or. 2014) ................................................... 16

*Occupy Fresno v. County of Fresno*,
  835 F. Supp. 2d 849 (E.D. Cal. 2011) .............................................. 16

*Pinette v. Capitol Square Review and Advisory Board*,
  844 F. Supp. 1182 (S.D. Ohio 1993) ................................................ 16

*Pro-Life Cougars v. Univ. of Houston*,
  259 F. Supp. 2d 575 (S.D Tex. 2003) ............................................... 18

*Reynolds v. Middleton*,
  779 F.3d 222 (4th Cir. 2015) ............................................................. 22

*Satawa v. Macomb County Road Comm'n*,
  689 F.3d 506 (6th Cir. 2012) ............................................................. 16

*Serv. Empls. Int'l Union v. City of Houston*,
  595 F.3d 588 (5th Cir. 2010) ............................................................. 23

*Thayer v. City of Worcester*,
  144 F. Supp. 3d 218 (D. Mass. 2015) ............................................... 21

*Three Expo Events, L.L.C. v. City of Dallas*,
  182 F. Supp. 3d 614 (N.D. Tex. 2016) .............................................. 19

*U.S. v. Gilbert*,
  920 F.2d 878 (11th Cir. 1991) ........................................................... 17

*United States v. Grace*,
461 U.S. 171 (1983) ................................................................................................ 18

*United States v. Nat'l Treasury Emps.' Union*,
513 U.S. 454 (1995) ................................................................................................ 19

*United States v. Playboy Entm't Group*,
529 U.S. 803 (2000) ................................................................................................ 18

*Warren v. Fairfax County*,
196 F.3d 186 (4th Cir. 1999) .................................................................................. 16

*Watters v. Otter*,
955 F. Supp. 2d 1178 (D. Idaho 2013) .................................................................. 16

*Wisconsin Action Coalition v. City of Kenosha*,
767 F.2d 1248 (7th Cir. 1985) ................................................................................ 21

**Federal Rules**

Fed. R. Civ. P. 56 ..................................................................................................... 14

Plaintiff John Rash moves for partial summary judgment on the following issues: (i) the Lafayette County Courthouse Grounds ("Courthouse Grounds") are a traditional public forum; (ii) the County ordinance closing the Courthouse Grounds, without exception, as of thirty minutes before dusk violates the First Amendment; and (iii) the County ordinance requiring permits for gatherings of more than a handful of people on Courthouse Grounds violates the First Amendment. In support of this motion, Plaintiff will show as follows:

## INTRODUCTION

After the killing of George Floyd on May 25, 2020, protests and demonstrations took place in Oxford, Mississippi, as they did around the nation. The protests in Oxford were peaceful and did not involve violence or property destruction. Many of the protests took place on the Courthouse Grounds, both because of their prominent location in the center of Oxford's town square and because they are the site of controversial Confederate monument erected during the Jim Crow era. Demands to relocate the Confederate monument to a less high-profile location increased, and the Lafayette County Board of Supervisors (the "Board") was forced to hold a public hearing and take a vote on whether to do so. On July 6, 2020, the Board unanimously voted against relocating the statue.

Around this same time, the County took several steps to limit political expression on the Courthouse Grounds. First, the Board voted to require groups of five or more to obtain a permit for use of the Courthouse Grounds. Then, the Board issued another order requiring "closure of Courthouse grounds, including the confederate statue area, thirty minutes before dusk." Finally, just last month, the Board, in purporting to codify these restrictions, issued a revised permitting policy requiring permits for even a single person to use the Courthouse Grounds, except for the area immediately surrounding the Confederate memorial, for which permits are not required "for

1

groups of four or less." As Plaintiff will demonstrate, the undisputed facts and the governing law establish that these restrictions on public expression violate the First Amendment.

Plaintiff John Rash is an Oxford resident who works as a documentary filmmaker, photographer, visual artist, and educator. For the past three years, Mr. Rash has organized an annual art event, PROJECT(ion), as part of the Oxford Fringe Festival (the "Fringe Festival"). PROJECT(ion) is a temporary visual art installation created by projecting images onto indoor and outdoor surfaces, such as walls, after dark. Before 2020, the event was held, in part, on the Courthouse Grounds, as authorized by permits issued by the County. Past events included projections onto the walls of the County Courthouse. On July 14, 2020, Plaintiff applied for a permit for his annual PROJECT(ion) event. Six days later, the County issued its order closing the Courthouse Grounds thirty minutes before dusk. Based on this newly-enacted policy, the County denied Plaintiff's permit application. Plaintiff then brought this suit and moved for a preliminary injunction, but on August 6, 2020 this Court denied the motion. *See* ECF No. 26 (the "PI Ruling"). Through his continued prosecution of this action, Plaintiff seeks both to hold the County accountable for its past deprivation of his First Amendment rights, and to vindicate his ongoing interests in holding artistic events, and participating in political and other speech and expressive conduct, on the Courthouse Grounds.

Plaintiff's motion for partial summary judgment focuses on three issues. These issues are not the only issues presented by this case. However, these issues are central to the relief Plaintiff seeks, and can be readily resolved at summary judgment based on the undisputed factual record.

**First, the Courthouse Grounds are a traditional public forum.** The Courthouse Grounds' status as a traditional public forum is summed up in this Court's PI Ruling:

> The Lafayette County Courthouse, built in 1872, stands in the center
> of the Oxford town square and is listed on the National Register of

> Historic Places. Its grounds are open to the public and function as a public park with grass, benches, trees, and pedestrian pathways. The courthouse grounds have long been a site of protests, rallies, and other community activities. Use of the grounds was largely unregulated until 2015 when the County established a permitting process for public gatherings and other uses.

PI Ruling at 2. Under well-established law, a public space with these characteristics is clearly a traditional public forum. And, the facts developed in discovery confirm the Court's preliminary analysis of the Courthouse Grounds. Thus, summary judgment on the status of the Courthouse Grounds as a traditional public forum is appropriate.

**Second, the order closing the Courthouse Grounds thirty minutes before dusk (the "Closure Order") is an unreasonable time, place, and manner restriction that violates the First Amendment.** In its PI Ruling, this Court concluded that the Closure Order was justified based on Sheriff Joey East's testimony that (i) use of the Courthouse Grounds during evening hours posed an undue strain on law enforcement resources, because sheriff's deputies "are likely spread throughout the County at any given time" and (ii) that "organized use of the courthouse grounds" posed a "real and ongoing pedestrian and traffic safety issue." PI Ruling at 6–7. The evidence developed in discovery, however, demonstrates that the Closure Order is not narrowly tailored to serve a significant government interest. The County fails to substantiate any specific safety concerns beyond those that might exist in any public space. Instead, the discovery record demonstrates that any traffic or public safety concerns that exist on the Courthouse Grounds exist to a greater extent in the surrounding areas of the Oxford town square under City jurisdiction; that the town square is heavily and effectively policed by the City of Oxford; and that there have been no actual traffic or public safety incidents on or around the Courthouse Grounds that the County can point to as specific justification for the Closure Order.

Similarly lacking in any evidentiary support are the County's claims that closure is necessary because County law enforcement is spread throughout the County and thus responses to calls for law enforcement assistance would be delayed. To the extent the Closure Order seeks to prevent organized events on Courthouse Grounds starting thirty minutes before dusk, events that are subject to a permitting process—such as Plaintiff's PROJECT(ion) event—necessarily involve advance notice to the sheriff, thus allowing the sheriff to deploy its resources in advance. And, to the extent the Closure Order seeks to prohibit even a single person from being present on Courthouse Grounds for any reason or purpose it also fails: not only is "thirty minutes before dusk" a vague, variable time period that County officials have been unable to define, but the Courthouse Grounds remain open after dusk; no signage informs the public of any closure; and the County has not publicized the closure—members of the public have no way of knowing the Courthouse Grounds are closed without delving into County Board materials or applying for a permit themselves. Moreover, there is no evidence that the dispersal of sheriff's deputies throughout the County changes significantly at dusk so as to justify the Closure Order. Summary judgment should therefore be granted holding the Closure Order unconstitutional.

**Third, the requirement that small groups of people obtain permits to engage in political speech on Courthouse Grounds is an impermissible prior restraint.** The Court did not reach this issue in its PI Ruling because Plaintiff's PROJECT(ion) permit was denied based solely on the Closure Order. But under Fifth Circuit precedent, "ordinances requiring a permit for demonstrations by a handful of people are not narrowly tailored to serve a significant government interest." *Knowles v. City of Waco, Tex.*, 462 F.3d 430, 436 (5th Cir. 2006). Nothing in the record could lead a reasonable juror to determine that an exception to this well-established legal rule is

warranted. This permitting requirement clearly violates the First Amendment, and Plaintiff is entitled to summary judgment on this issue as well.

## UNDISPUTED MATERIAL FACTS

### I. THE COURTHOUSE GROUNDS

1. The Lafayette County Courthouse is a historic courthouse located in the center of Oxford's town square, which is a center of civic life in the city and County and is surrounded by bars, restaurants and stores. The Courthouse Grounds are an open, public space featuring grass, benches, trees, and pedestrian pathways. Ex. 49 (PI Hearing Tr., Carwyle Cross-Examination) at 66:11-16.[1] There is no gate or other barrier to public access to the Courthouse Grounds. An intermittent low, decorative fence surrounds the Courthouse Grounds, but there are five breaks for prominent steps that lead onto the grounds and also a large entrance at the front of the grounds. Exs. 14-19 (photographs of Courthouse Grounds); 8 (East Tr.) at 18:24-19:5[2]; 10 (McCutchen Tr.) at 94:8-13.[3] The town square is often filled with people well into the night visiting attractions, stores, restaurants, and bars, and the Courthouse Grounds are an open, public space featuring grass, benches, trees, and pedestrian pathways. Ex. 4 (Busby Tr.) at 24:9-18; 26:4-7; 80:23-81:6.[4]

---

[1] "Q. Now, would you describe the county courthouse grounds as similar -- or as a park, a small park? A. Possibly, yes. Q. And, in practice, is the county courthouse grounds used as a park by people visiting the square? A. Yes."

[2] "Q. Okay. This open gate here that's sort of near the statue, that gate is always open; is that correct? A. Yes, sir. Yeah, it's an opening that is, yes, is always open. Q. Okay. And it's not closed at night, for example? A. No, sir."

[3] "Q…The courthouse grounds have benches and open space, correct? A. Yes, sir. Q. And the low fence with gaps in it to allow access, right? A. Yes, sir."

[4] "Q. The square is the center of Oxford's business, social, and city life, correct? A. Yes, sir. Q. How long has the square acted as the center of Oxford's business, social, and city life? A. All of my life, that I -- that I'm aware of… I've considered it to be the center of Oxford." … The Courthouse Grounds is "a small area that surrounds the courthouse that people walk through going from one side of the square to another side of the square. …" "Q. What is -- can you explain what that means, like, what the square and the county courthouse are in relation to the city of Oxford. A. Well, it's the business district. I mean, you've got – you've got the businesses all around the square, and it's restaurants that people come to eat at and shop."

2.      For more than 100 years, a Confederate monument has stood at the southern edge of the Courthouse Grounds.  It bears the inscription, "In memory of the patriotism of the Confederate soldiers of Lafayette County, Mississippi.  They gave their lives in a just and holy cause."  Exs. 20-23(photographs of monument).

3.      The Courthouse Grounds, including the area surrounding the Confederate monument, have long been a site of protests, rallies and other community activities.  For example, in recent years, these activities have included National Day of Prayer events, Christmas and Easter celebrations, nighttime Halloween events, demonstrations both in favor of and against the Confederate monument, political protests and vigils, the monthly Oxford Maker's Market, events associated with the Oxford Film Festival, in which films have been exhibited within the Courthouse Grounds, the Double Decker festival, and Plaintiff's PROJECT(ion) event.[5]

4.      After the killing of George Floyd, the Confederate monument became a focus of renewed political and expressive activity.  There were numerous protests at or near the Confederate monument over the summer months of 2020.  Ex. 7 (Carwyle Tr.) at 64:9-18.[6]

---

[5] *See, e.g.*, Exs. 7 (Carwyle Tr.) at 51:16-54:7; 24-25 (Maker's Market; Ex. 27 (Annual Service for Jesus); Exs. 8 (East Tr.) at 146:14-148:7; 28, 30-32 (2019 PROJECT(ion) event); Ex. 7 (Carwyle Tr.) at 63:20-76:6 (George Floyd protests, marches, and assemblies during summer 2020); Exs. 7 (Carwyle Tr.) at 109:13-112:6; 33, 38 (Love Your Neighbor Events); Exs. 8 (East Tr.) at 123:2-25; 34 (July 4th Mississippi Stands 2.0 pro-Confederate events); Ex. 29 (2019 Anthony Hervey memorial); Exs. 10 (McCutchen Tr.) at 125:21-126:19; 8 (East Tr.) at 129:2-131:20; 35-37 (2020 Anthony Hervey vigil); Ex. 10 (McCutchen Tr.) at 32:22-33:21 (nighttime Halloween events); Ex. 4 (Busby Tr.) at 82:12-83:23 (Veterans Day commemorations); Exs. 5 (Frye Tr.) at 56:7-57:17; 59:2-60:5; 13 (McClarty Tr.) at 34:10-37:23 (Christmas and Easter events); Ex. 5 (Frye Tr.) at 60:2-61:4 (Fourth of July parade); *id.* at 61:5-23 (puppy walk); *id.* at 61:24-63:23 (Mardi Gras parade); *id.* at 63:24-65:5 (Martin Luther King, Jr. event); *id.* at 54:11-56:6 (Fringe Festival); Ex. 13 (McLarty Tr.) at 42:4-46:9; Ex. 10 (McCutchen Tr.) at 58:20-59:2; Ex. 5 (Frye Tr.) at 51:7-52:13   (Double Decker Festival); Ex. 7 (Carwyle Tr.) at 61:11-13; 26 (Bluff City Law TV filming).

[6] "Q. So you just mentioned George Floyd.  You know, after his death in the summer of 2020, there were marches and assemblies and protests in Oxford, right?  A. Right.  Q. And these marches and assemblies and protests were about Mr. Floyd's death and about the Confederate monument in the square, right?  A. Right."

5.      There is no evidence of violence or property destruction in Lafayette County or the City of Oxford resulting from any of these protests.  Ex. 10 (McCutchen Tr.) at 26:19-27:8.[7] Moreover, none of the arrests made in the downtown area for the last five years were made on the Courthouse Grounds nor were any related to permitted events including marches, political activity and artistic presentations.  *Id.* at 49:2-10; 52:22-53:13[8]; Ex. 8 (East Tr.) at 148:2-7.[9]

6.      For several days in early June 2020, the Lafayette County Sheriff's Department set up temporary barricades around the Confederate monument and took other actions to discourage protests and gatherings in its vicinity.  Ex. 8 (East Tr.) at 68:7-20; 70:2-11; 74:11-14.[10]

7.      During June and July 2020, there was significant public debate regarding potential relocation of the Confederate monument.  On June 22, 2020, the Board of Supervisors met to hear from the community regarding relocating the Confederate monument.  Ex. 39 (Board minutes).  In addition, members of the Board of Supervisors received a significant volume of written

---

[7] "Q. Okay.  Do you recall any violence being associated with [the July 4, 2020 march]?  A. I don't believe so.  No, sir.  I don't believe any arrests were made.  Q. Okay.  And how about otherwise during the summer, the other events that --that you've referred to that took place on or near the courthouse grounds and the town square?  Did any -- were any of them associated in the summer of 2020 with violence?  A. No, sir. Q. Any arrests made that you recall in association with those events this past summer?  A. I don't believe so."

[8] "Q. Okay.  Of these arrests that you list, were any made on the courthouse grounds or on the grounds that constitute the Confederate statue outside the courthouse?  A. No, sir.  Q. Okay. Do you have a -- do you have a further breakdown of the nature of these arrests?  A. No, sir.  Q.  … Any of these arrests that are listed under number 1 to your knowledge, associated with marches of any sort?  A. I don't believe so.  Q. Okay.  Or other types of political activity?  A. Not to my knowledge.  Q. How about artistic presentations? A. No, sir.  Q. Okay.  And how about … for the downtown permitted activity.  A. I don't believe so."

[9] Sheriff East was not aware of any "actual safety incidents, violence, people getting hurt or property getting destroyed during the display of video or films in the past on the outer walls of the Oxford square or county courthouse."

[10] "I had the statue barricaded…Q. How do you barricade it? It's sort of in the middle of the square.  A. The concrete that's around it, we placed kind of plastic barricades around it and cones and would use caution tape to string across the entrance." … Q. Okay.  Did you also station deputies around the monument or at the courthouse?  A. And during that week or whatever the time frame was, I would have deputies to monitor that some -- for the courthouse to stay out. … It was several days, two, three days."

correspondence regarding relocation of the Confederate monument, both in favor of and against relocation. Exs. 11 (Roberts Tr.) at 86:23-87:3[11]; 53-54 (constituent correspondence). On July 6, 2020, the Board voted unanimously against relocation. Ex. 40 (Board minutes).

## II.    THE FACILITY USE POLICY

8.    On April 20, 2015, more than 140 years after the Courthouse was built more than 100 years after the installation of the Confederate monument, the County enacted a "Facility Use Policy" that created a permitting process applicable to use of the Courthouse Grounds. Ex. __ (2015 policy). Prior to the enactment of this policy, there were no permitting requirements applicable to the Courthouse Grounds. Ex. 4 (Busby Tr.) at 33:12-14.[12]

9.    The Facility Use Policy provides in part that "[p]ermission to use the building shall be granted for events which are scheduled to begin and end between 8:00 a.m. and 10:00 p.m. Monday - Friday. Use on weekends or after 10:00 p.m. is limited and must primarily be events coordinated and staffed by County employees and/or officials." Ex. 1 (2015 policy). There is no evidence that this portion of the Policy applies to the Courthouse Grounds, as opposed to interior spaces in County buildings that are also subject to the policy. To the contrary, the undisputed facts demonstrate that the public uses the Courthouse Grounds on weekends and that the County issues permits for use of the County Courthouse Grounds for events to be held on weekends. Exs. 24, 33, 34, 35 (weekend permits).

10.    In March 2019, the Board amended the Facility Use Policy for the first time since it was enacted. Ex. 2 (2019 revised policy). These amendments are not relevant to this motion.

---

[11] "Q. … you do engage in correspondence with your constituents from time to time on this subject; is that right? A. I think I've gotten a ton of email from them."

[12] "Q. How was use of county property regulated before this 2015 policy was adopted? A. I don't think they had a policy."

11.     On June 15, 2020, the Board issued an order "amend[ing] the Facility Use Policy in order to allow four (4) people or less to use the Historic Courthouse outside grounds, including the area around the Confederate Statue, without a permit, although said individual or group may obtain a permit in order to have exclusive use of the area; five (5) or more people gathering require a permit for use." Ex. 3 (June 15, 2020 Order).

12.     There is no evidence that the policy requiring a permit for gatherings of five or more people on the Courthouse Grounds has ever been enforced against persons present on the Courthouse Grounds not engaged in political speech or expression. Exs. 8 (East Tr.) at 184:11-14[13]; 9 (Gillespie. Tr.) at 14:22-15:4.[14]

13.     On July 20, 2020, the Board further amended the Facility Use Policy to "require closure of Courthouse grounds, including the confederate statue area, thirty minutes before dusk." This Order does not define "dusk." Ex. 51 (July 20, 2020 Order). There is no common understanding among County officials as to what "dusk" means, except that it relates to the time of sunset, which varies seasonally.[15] The timing of sunset in Oxford, Mississippi varies from as early as 4:47 p.m. in early December to as late as 8:14 p.m. in late June.[16]

---

[13] "Q. And have you ever arrested or cited someone for violating the five-person rule that's articulated in the Facility Use Policy as amended this year? A. No, sir."

[14] "Q. And to your knowledge, have they ever been -- have members of the public ever been cited or ticketed or arrest for violating the policy, you know, based on sitting on these benches without a permit? A. I do not have that information. I don't have any knowledge of that, no."

[15] County officials presented divergent understandings of "dusk" in their testimony, stating that (i) dusk was the same as sunset (Ex. __ (East Tr.) at 171:12-14 ("Q. Okay. So you're then interpreting dusk to be effectively sunset? A. Yes, sir.")); (ii) 30 minutes before sunset (Ex. 10 (McCutchen Tr.) at 105:13-14 ("Q. When is dusk? A. 30 minutes before sunset.")); (iii) complete darkness (Ex. 11 Roberts Tr. 117:6-7 ("My interpretation, dusk is complete darkness.")); and (iv) variable daily (Ex. 6 (Rikard Tr. 24:22; 25:7-8 ("I don't know that dusk has an official time … it depends based on the weather or clouds or sunshine.")).

[16] *See* TIMEANDDATE.COM, https://www.timeanddate.com/sun/usa/oxford?month=12&year=2020 (noting sunset at 4:47 p.m. on December 1, 2020 in Oxford, Mississippi); *id.* https://www.timeanddate.com/sun/usa/oxford?month=7&year=2020 (noting sunset at 8:14 p.m. on July 1, 2020 in Oxford, Mississippi).

14.     Despite the policy providing for "closure" of the Courthouse Grounds, there is no signage stating that the Courthouse Grounds are closed 30 minutes before dusk; beyond posting Board minutes online, the County has never made a public announcement or statement about the closure; and no gates, fences, or other barriers physically close or obstruct entrance to the Courthouse Grounds during these times.  Exs. 18 (photograph); 8 (East Tr.) at 24:5-7[17]; 10 (McCutchen Tr.) at 34:15-20[18]; 11 (Roberts Tr.) at 21:25-22:4[19]; 9 (Gillespie Tr.) at 56:3-8.[20]

15.     Since the effective date of the Closure Order, there is no evidence that the order has been enforced against an individual or individuals present on Courthouse grounds during the period of closure.  Exs. 8 (East Tr.) at 184:3-17[21]; 9 (Gillespie Tr.) at 57:14-19.[22]  Instead, the order has only been enforced against persons seeking to engage in political or artistic expression, including Plaintiff.  Exs. 41, 45-46 (permit denials based on Closure Order)

16.     The County contends that the Closure Order was enacted for public safety and traffic safety purposes, but there is no evidence of any arrests, citations, traffic violations, or traffic accidents on the Courthouse Grounds, or otherwise related to any use of the Courthouse Grounds, during the times of day described by the Closure Order.  The County failed to produce any such

---

[17] "Q. There's no sign saying don't come in here in the evening; correct?  A. I haven't seen any signage."

[18] "Q. Okay.  There are no signs posted on the courthouse that indicate a restriction of access to the courthouse grounds at nighttime, correct?  A. none that I see.  I'm not – I'm not aware of any."

[19] "Q. And there are no signs that suggest limited access to the grounds, correct?  A. Not that I -- not that I'm aware of."

[20] "Q. And there's also no signs posted that inform members of the public that they're prohibited from accessing the courthouse grounds at certain points in time?  A. At this time, no, sir.  To my knowledge, there are none at this time."

[21] "Q. …During the time you've been sheriff, to your knowledge, has your office ever arrested or cited someone for being on courthouse grounds?  A. No, sir, that I can recall.  Q Okay.  Whether you were sheriff or not, were you aware of anyone being arrested or cited for being on courthouse grounds?  A. No, sir, not that I know of."…"Q. Have your officers ever told somebody to leave the courthouse grounds because they were there after dusk?  A. No, sir, not that I can recall right now."

[22] "Q. Are you aware of this policy ever having been enforced? … A. I'm not aware."

records in discovery, and the records produced by the City of Oxford do not substantiate the County's asserted public safety and traffic safety concerns. Exs. 42-43 (Oxford police records); 10 (McCutchen Tr.) at 39:24-40:5; 49:2-13; 59:16-60:6;[23] (East Tr.) at 184:3-10.[24]

17.     Indeed, the County's response to Plaintiff's interrogatory requesting that the County "identify and describe any relevant public safety and/or traffic safety incidents or issues predating the enactment of the [Closure] Order" stated only that the Closure Order was enacted in reliance on the advice of Sheriff East, who "advised that the evening use of the Circuit Courthouse grounds posed an undue pedestrian and traffic safety issue given the confines of the Courthouse Square and the centrality of its location in a busy commercial area." Ex. 52 (interrogatory responses). The County did not identify any specific public safety or traffic safety incidents.

18.     Levels of pedestrian and vehicular traffic in the Oxford town square after dark are a function of the square being a center for local nightlife, and fluctuate in accordance with weekends, holidays, and special events. Ex. 9 (Gillespie Tr.) at 58:20-59:3.[25] The Oxford police department maintains a significant presence in the Oxford town square, including a dedicated patrol unit, to maintain order in the area. Ex. 8 (East Tr.) at 102:4-19[26]; Ex. 10 (McCutchen Tr.)

---

[23] "[A]re you aware of the County sheriff's department arresting anyone for being on the courthouse grounds after dark this past summer of 2020? A. I don't have any knowledge of that, no sir. … Q. Okay. Of these arrests that you list, were any made on the courthouse grounds or on the grounds that constitute the Confederate statue outside the courthouse? A. No, sir. Q. Okay, Do you know if any of these arrests related to permitted activities? A. Not to my knowledge.… [T]here's a list of safety concerns. Did you play a role in assembling these? A. Yes, sir. Q. I don't see anything specific in this list … that relates to the courthouse grounds. A. No, sir. Q. There's nothing here that specifically refers to that, right? A. I don't believe so. Q. Okay. And nothing here that specifically refers to the statute, correct? A. Correct."

[24] "During the time you've been sheriff, to your knowledge, has your office ever arrested or cited someone for being on courthouse grounds? A. No, sir, that I can recall. Q. Okay. Whether you were sheriff or not, were you aware of anyone being arrested or cited for being on courthouse grounds? A. No, sir …"

[25] "Q. And is it fair to say that on certain nights, weekends, say when there's football games or other events, that there is a lot of night-life activity in the town square? A. That would be fair to say."

[26] "Q. Okay. And then while you were chief, am I correct that there was a practice of having mounted officers patrol the square? A. Yes, sir. . . . I don't know the exact number, and it would vary depending on

11

at 56:19-57:20[27]; Ex. 5 (Frye Tr.) at 70:4-8.[28]  In the event of a crime or other exigent circumstance

on the Courthouse Grounds, the Oxford police department would respond or assist the Sheriff's

Department, as appropriate.  Exs. 10 (McCutchen Tr.) at 39:9-12; 57:18-20[29]; 49 (PI Hearing Tr.,

East Cross-Examination) at 88: 6-12.[30]

19.     The County did not produce any specific evidence substantiating the claim that the

Sheriff's Department is unable to timely respond to calls for law enforcement assistance on the

Courthouse Grounds as of thirty minutes before dusk.  In addition, the Board controls the Sheriff

Department's budget, and there is no evidence that the Sheriff's Department's budget is

insufficient, or that the Sheriff has ever sought or been denied additional funding for matters related

to the Courthouse Grounds.  Exs. 11 (Roberts Tr.) at 18:12-22[31]; 12 (Larson Tr.) at 66:25-67:4.[32]

---

the events that were going on in town, whether there was an Ole Miss basketball game, football game, double-decker, those type things.  It would all vary."

[27] "A routine shift for them would look like a Wednesday through Saturday…4:00 p.m. to 2:00 a.m. shift work…Generally speaking, we probably have four to six [officers on patrol] on average" and "as many as 25 additional officers assigned to the downtown shift" for events around the square. "Q. Okay. And then from 2:00 a.m. to 4:00 p.m., not patrolled, or something lesser? A. It is generally patrolled by the patrol division. So they will make routine drives through or respond to calls of service."

[28] "We have for a number of years had a horse patrol.  So on particularly crowded nights, there are at least four officers on horseback.  There's a dedicated square detail with officers who are on foot on the square."

[29] "A...It would not be uncommon for us to put a phone call in to the sheriff's department to notify them or stand by until a deputy arrives. … It is generally patrolled by the patrol division.  So they will make routine drives through or respond to calls of service."

[30] "Q. And, if an Oxford police officer saw violence or security issues happening on the county courthouse grounds, could they go there and investigate? A. Sure.  I'm sure they would.  I'm sure they would try to go up there if they saw something that was -- shouldn't be happening.  I'm sure that they would try to do that and notify us.  I would hope they would."

[31] "Q. Okay.  What role does the board of supervisors have in the sheriff's department budget?  A. We -- we approve it or not approve it, based on, you know, tax revenues we receive as a county whole, as most departments are, that -- that they present to the board.  Between the county administrator and ourselves and our controllers, we -- we go through budget -- budget items just like we do any other department."

[32] "Q. And has the sheriff ever asked for additional funding to deal with issues related to the county courthouse grounds?  A. Not that I'm aware of."

20.     On January 4, 2021, the County adopted a revised version of the Facility Use Policy, which, the County contends, integrates the amendments enacted in June and July 2020 into the Facility Use Policy. Ex. 50 (2021 revised policy); 13 (McLarty Tr.) at 64:9-20.[33]  This new version of the policy authorizes permits to be granted until 10:00 p.m., for County facilities and grounds other than the Courthouse Grounds, but provides that "[u]se of the County Courthouse exterior grounds is prohibited between 30 minutes before dusk thru and until dawn." Ex. 50 at 2. It also provides, as to the Courthouse Grounds, that "[p]ermits are required for all uses except no permit is required for use of the area immediately surrounding the confederate memorial for groups of four or less." *Id.* at 2.  As of the date of this filing, the revised policy has not been posted on the County's website, and the publicly-posted Facility Use Policy available to the public remains the original 2015 version of the policy.[34]

## III.     DEFENDANT'S VIOLATION OF PLAINTIFF'S CONSTITUTIONAL RIGHTS

21.     Plaintiff John Rash is an Oxford resident who works as a documentary filmmaker, photographer, visual artist, and educator.  For the past three years, Plaintiff has organized an annual art event, PROJECT(ion), as part of the Oxford Fringe Festival. Ex. 47 (Rash Decl.) ¶ 2.

22.     In 2018 and 2019, artists have produced light installations as part of PROJECT(ion).  In 2019, the event included projections on the County Courthouse, including projections with political themes.  Because PROJECT(ion) involves projection of video onto outdoor surfaces, it cannot be held during daylight hours. Ex. 55 (Second Rash Decl.) ¶¶ 2-3.

---

[33] "Mr. O'Donnell: … [T]he facility use policy that's dated – reflecting July 20,2020, revisions, this document was finally presented to the board in its January 4, 2021 meeting, at which time it was reviewed and approved, the purpose of which was to combine all the changes that the board had made during 2020 into one document …."

[34] *See* https://lafayettems.com/wp-content/uploads/2020/02/Facility-Use-Policy.pdf (as of Feb. 2, 2021).

23. In past years, the County issued permits to the Fringe Festival organizers that authorized Plaintiff to hold the PROJECT(ion) event after dark. Ex. 28 (County permit). The city of Oxford also issued permits for Fringe Festival events to be held on or around the same time. Ex. 44 (City permit). There is no evidence of any public safety or traffic safety incidents associated with these events.

24. Plaintiff first sought a permit for the 2020 PROJECT(ion) event on July 7, 2020. On July 14, 2020, Plaintiff visited the County Administrator's office in person and submitted a permit application for use of the Courthouse Grounds from 8 p.m. to 11 p.m. on August 8, 2020. On July 16, 2020, Plaintiff was contacted by Chief Deputy Scott Mills, who questioned him regarding the anticipated content of the artistic displays. On July 23, 2020, the County denied Plaintiff's permit application based on the newly-enacted Closure Order. Exs. 47 (Rash Decl.) ¶ 14; 45-46 (permit and emails).

25. Plaintiff filed this lawsuit on July 31, 2020 and sought a preliminary injunction so as to be able to hold PROJECT(ion) as planned on August 8, 2020. On August 6, 2020, this Court denied Plaintiff's motion.

26. Plaintiff continues to reside in Oxford, Mississippi and intends to organize and participate in gatherings and events, including events such as PROJECT(ion) that by their nature must be held after dark, on Courthouse Grounds. Ex. 55 (Second Rash Decl.) ¶¶ 1-4. Because of this, Plaintiff continues to be injured by the County's unconstitutional policies concerning use of the Courthouse Grounds.

## SUMMARY JUDGMENT STANDARD

Summary judgment should be granted if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). The party moving for summary judgment bears the

initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record in the case which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. Then, to avoid summary judgment, the non-moving party must come forward with sufficient evidence to sustain a jury verdict in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 251 (1986).

## ARGUMENT AND AUTHORITIES

### I. THE COURTHOUSE GROUNDS ARE A TRADITIONAL PUBLIC FORUM

Traditional public forums are spaces which, as a matter of historical use and or government order, have long been devoted to public discourse and discussion. "This type of forum includes streets and parks which have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Chiu v. Plano Indep. School Dist.*, 260 F.3d 330, 344 (5th Cir. 2001). Courthouse grounds in town squares that have been used for public events, gatherings, and political protests, as well as similar plazas, squares, and other government properties, have been repeatedly held to constitute traditional public forums. For instance, *National Ass'n for Advancement of Colored People v. Peterman*, 2020 WL 4738015 (M.D.N.C. Aug. 18, 2020), another case involving First Amendment claims challenging restrictions imposed during summer 2020 protest activity, involved a space substantially similar to the Courthouse Grounds:

> The Historic Alamance County Courthouse … sits in the middle of a square, on a relatively small piece of land. There are small open spaces on each corner with what appear to be grass and trees, which the Court will refer to as the courthouse grounds. … Outside of the northern entrance to the courthouse is a large Confederate monument. . . . Demonstrations and protests have historically been held on the courthouse steps and in the spaces immediately outside and around the courthouse. The courthouse steps and grounds and the sidewalks immediately surrounding the courthouse are a traditional public forum.

*Id.* at *2-*3. Similarly, in *Pinette v. Capitol Square Review and Advisory Board*, 844 F. Supp. 1182 (S.D. Ohio 1993), *aff'd*, 515 U.S. 753 (1995), the district concluded that where the grounds of a government building had been held open and used for expressive activities, those grounds constituted a traditional public forum:

> The evidence before this Court clearly establishes that the Capitol Square has been held open and used as a public forum for a considerable number of years. The Statehouse grounds have been made available for speeches or displays by gay, lesbian and bisexual groups, United Way of Franklin County, the Knights of the Ku Klux Klan, and commercial entities including participants in the Central Ohio Art Festival. During the December holiday season, the Capitol square has also been used to display a menorah erected by a private organization. Thus, the Court finds that the Capitol Square is a traditional public forum.

*Id.*. at 1185. Numerous other decisions are in accord.[35]

Here, the undisputed facts demonstrate that the Courthouse Grounds are a traditional public forum. As this Court previously found, "[i]ts grounds are open to the public and function as a public park with grass, benches, trees, and pedestrian pathways," and "have long been a site of protests, rallies, and other community activities." PI Ruling at 2. The evidentiary record overwhelmingly confirms this Court's preliminary finding. *See supra*, Undisputed Material Facts ("UF") ¶¶ 1–3. Summary judgment should therefore be granted for Plaintiff on the Courthouse Grounds' status as a traditional public forum.

---

[35] *See, e.g.*, *O'Connell v. Town of Burgaw*, 262 F. Supp. 3d 316, 320 (E.D.N.C. 2017) ("The Pender County Courthouse Square and its surrounding public streets and sidewalks are traditional public fora."); *Occupy Eugene v. U.S. Gen. Servs. Admin.*, 43 F. Supp. 3d 1143 (D. Or. 2014) ("Considering the long history of both protests and other gatherings at the federal plaza, as evinced by the record, the Plaza undoubtedly qualifies as [a traditional public] forum."); *Watters v. Otter*, 955 F. Supp. 2d 1178, 1186 (D. Idaho 2013) (describing "the grounds surrounding the old Ada County Courthouse" as a traditional public forum); *Satawa v. Macomb County Road Comm'n*, 689 F.3d 506, 519 (6th Cir. 2012) (walkways and grounds "quite close to the seat of government, and [...] covered by sidewalks" are clearly traditional public forums); *Occupy Fresno v. County of Fresno*, 835 F. Supp. 2d 849, 855–56 (E.D. Cal. 2011) (park that surrounds the County Court was a traditional public forum); *Warren v. Fairfax County*, 196 F.3d 186 (4th Cir. 1999) ("[L]arge grassy mall" in front of the Fairfax Government Center Complex was a traditional public forum).

At a minimum, the Courthouse Grounds constitutes a designated public forum. In addition to traditional public forums, "[t]he state can also intentionally create designated public forums on other state property for the same widespread use as traditional public forums." *Fairchild v. Liberty Indep. School Dist.*, 597 F.3d 747, 758 (5th Cir. 2010). The Fifth Circuit recognizes designated public forums "created by government designation of a place or channel of communication for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects." *Chiu*, 260 F.3d at 345; *see also Hays County Guardian v. Supple*, 969 F.2d 111, 117 (5th Cir. 1992) (area can be a designated public forum even if the government does not permit unrestricted expressive activity there). "[O]nce the government has designated a particular forum as appropriate for certain types of speech or for speech on particular topics, speech for which the forum is designated is afforded protection identical to the protection provided to speakers in a traditional public forum." *Chiu*, 260 F.3d at 347. Here, it is undisputed that the County has designated the Courthouse Grounds as a public forum for political and artistic expression by approving permits for protests, gatherings, rallies, and other public events over the years. UF ¶¶ 1–3. Courts evaluating similar plazas and squares set aside for public speech have similarly concluded that such spaces are, at a minimum, designated public forums subject to the same First Amendment protections as traditional public forums. *See U.S. v. Gilbert*, 920 F.2d 878, 884 (11th Cir. 1991) (finding "no question" that an unenclosed plaza next to a federal building was a designated public forum).

## II.     THE CLOSURE ORDER IS NOT NARROWLY TAILORED TO ADVANCE A SIGNIFICANT GOVERNMENT INTEREST

Because the Courthouse Grounds are a public forum, "the government's ability to permissibly restrict expressive conduct is very limited." *United States v. Grace*, 461 U.S. 171, 177 (1983). Such restrictions on speech are subject to heightened scrutiny, and "the Government

bears the burden of proving[ the constitutionality of its actions." *United States v. Playboy Entm't Group*, 529 U.S. 803, 816 (2000). Although the County is entitled to enact reasonable time, place, and manner regulations in a public forum, those restrictions "must be narrowly tailored to serve a compelling state interest." *Freedom From Religion Found. v. Abbott*, 955 F.3d 417, 426 (5th Cir. 2020). "A regulation is 'narrowly tailored' when it does not 'burden substantially more speech than is necessary to further the government's legitimate interests.'" *Hays Cnty. Guardian v. Supple*, 969 F.2d 111, 118 (5th Cir. 1992). *See also Pro-Life Cougars v. Univ. of Houston*, 259 F. Supp. 2d 575, 582 (S.D. Tex. 2003) (Even a "content-neutral regulation of speech on a public forum must be narrowly tailored to serve a significant government interest …"). The undisputed facts establish that the Closure Order, which prohibits *any* presence on Courthouse Grounds as of thirty minutes before dusk, is not narrowly tailored to serve a significant government interest.[36]

As an initial matter, the Court's adverse decision regarding the Closure Order at the preliminary injunction stage is not law of the case and does not prevent this Court from now granting summary judgment to Plaintiff. *See Mylett v. Jeane*, 910 F.2d 296, 299 (5th Cir. 1990) ("[F]indings of fact and conclusions of law disposing of a request for a preliminary injunction are not binding at trial on the merits."). As another court in this Circuit explained, even though a plaintiff does not "succeed[ ] on [his] preliminary injunction motion does not necessarily mean that, with further discovery and development of the evidentiary record, [he] cannot prevail on the merits." *Three Expo Events, L.L.C. v. City of Dallas*, 182 F. Supp. 3d 614, 622 (N.D. Tex. 2016).

In the PI Ruling, the Court found that the Closure Order was "narrowly tailored and promotes a valid, significant, and substantial interest of the County in protecting the public and

---

[36] Because the Closure Order "is not narrowly tailored," the Court "not consider whether the Act leaves open ample alternative channels of communication." *McCullen v. Coakley*, 573 U.S. 464, 496 n.9 (2014).

doing so by utilizing its limited law enforcement resources in the most reasonably efficient manner possible." PI Ruling at 9. In so holding, the Court relied on the following testimony:

- Sheriff East's testimony that he believed "use of the courthouse grounds should be prohibited after dark given the amount of vehicular and pedestrian traffic around the square and due to what he perceives as poor lighting conditions." *Id.* at 6.

- Sheriff East's testimony that "[b]ecause the small area covered by the courthouse and grounds is in the center of the town square, surrounded by City property, any calls requiring the need for law enforcement to the courthouse and grounds can be met with considerable delay, as the limited sheriff's deputies available are likely spread throughout Lafayette County at any given time." *Id.* at 7.

- Sheriff East's testimony that "recent experiences with individuals desiring to demonstrate on the courthouse grounds demonstrated a real and ongoing pedestrian and traffic safety issue which posed a strain on the Sheriff's Department even during daylight hours." *Id.*

Now that discovery is complete, the factual record fails to provide any support for these asserted justifications for the Closure Order. "[W]hen the Government defends a regulation on speech as a means to redress past harms or prevent anticipated harms, it must do more than simply 'posit the existence of the disease sought to be cured.' It must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *United States v. Nat'l Treasury Emps.' Union*, 513 U.S. 454, 475 (1995); *Consol. Edison Co. of New York v. Public Service Comm'n of New York*, 447 U.S. 530, 543 (1980) ("Mere speculation of harm does not constitute a compelling government interest."). Applying this standard, no reasonable juror could conclude that the Closure Order is narrowly tailored to further an important government interest.[37]

---

[37] In preliminarily upholding the validity of the Closure Order in the PI Ruling, this Court relied on *Greer v. Spock*, 424 U.S. 828, 836 (1976), and *Adderley v. Florida*, 385 U.S. 39, 48 (1966), to hold that the First Amendment does not guarantee "that people who want to propagandize protests or views have a constitutional right to do so whenever and however and wherever they please." PI Ruling at 8. *Greer* and *Adderley*, however, concerned protests on a military base and inside a jail, respectively. The Courthouse grounds are in no way analogous to a military base or jail, neither of which are traditional public forums, and both of which pose distinct security and public order concerns. After discovery it is clear that *Green* and *Adderley* do not provide the operative rule of decision in this case.

First, the evidence adduced in discovery does not substantiate that the Closure Order is necessary due to the amount of vehicular and pedestrian traffic around the square. Instead, the evidence shows that the amount of vehicular and pedestrian traffic around the square varies based on factors that have nothing to do with use of the Courthouse Grounds for First Amendment activities. Specifically, the level of activity in the Oxford town square, particularly after dark, is a function of the square being a center for local nightlife, and the level of nightlife activity fluctuates in accordance with weekends, holidays, and special events. *See* UF ¶¶ 18. This might mean that the County could be justified in denying a permit for a large protest to be held in the late evening during University of Mississippi Homecoming Week, for instance, based on public safety or traffic safety concerns. But that does not mean that prohibiting members of the public from holding a five-person vigil at 5:30 p.m. on a winter weekday is equally justifiable. To the contrary, this sort of overbroad regulation is precisely what the narrow tailoring requirement seeks to avoid. *See, e.g.*, *Occupy Eugene*, 43 F. Supp. 3d at 1150–51 (striking down restriction authorizing protest only between 8 a.m. and 5 p.m. as "greater than necessary to further the interest of public safety"); *Lopez v. Town of Cave Creek*, 559 F. Supp. 2d 1030, 1035 (D. Ariz. 2008) ("Even assuming that the Town provided sufficient support that the Ordinance advances its asserted interest in traffic safety, though, the Ordinance is still not narrowly tailored. … There are myriad of less restrictive means for the City to promote traffic safety, such as enforcement of existing traffic, parking, and loitering laws.").[38]

---

[38] *See also Hodgkins ex rel Hodgkins v. Peterson*, 355 F.3d 1048, 1058 (7th Cir. 2004) (recognizing that "a wide range of First Amendment activities" traditionally occur after dark, and that regulations imposing blanket prohibitions on such activities must have a specific and compelling justification); *Ass'n of Community Organizations for Reform Now v. City of Frontenac*, 714 F. 2d 813 (8th Cir. 1983) (striking down ordinance prohibiting door-to-door canvasing after 6 p.m. on the grounds that it was not narrowly tailored to advance the city's legitimate objectives; city could address its interest in crime prevention and avoiding undue annoyance of its citizens through less restrictive means); *Wisconsin Action Coalition v. City of Kenosha*, 767 F.2d 1248 (7th Cir. 1985) (same); *Thayer v. City of Worcester*, 144 F. Supp. 3d 218, 235

Second, the County's rationale that the Closure Order is necessary because Sheriff's Department personnel might be delayed in responding to calls for law enforcement assistance on the Courthouse Grounds is also unsupported by the evidence. The County did not produce any specific evidence of delays, or any evidence that the Department's ability to respond to calls for assistance changes materially as of thirty minutes before dusk. UF ¶ 19. Yet even if such evidence existed, it would not justify the Closure Order. The County justifies the Facility Use Policy in part on the basis that a permitting process with an advance notice requirement allows Sheriff's Department personnel to plan ahead for protests or other gatherings and allocate resources appropriately. But if a permitting requirement gives the Sheriff's Department time to plan ahead and allocate appropriate resources to a permitted event on Courthouse Grounds, then the Sheriff's Department will not be caught off guard in the far reaches of the County and unable to respond to hypothetical situations that may develop at such permitted protests. And to the extent the Closure Order seeks to prevent members of the public from accessing the Courthouse Grounds without a permit, it fails on its own terms: nothing physically obstructs access to the Courthouse Grounds during the ostensible period of closure; the County has not publicized the closure; and no signage advises that the Courthouse Grounds close thirty minutes prior to dusk—even assuming members of the public could determine what that meant. UF ¶¶ 13–14. Indeed, under prior County policy, the County granted permits for events on Courthouse Grounds after dark, including permits for Plaintiff's PROJECT(ion) event, and there is no evidence of any adverse public safety consequences. UF ¶ 23. The existence of such alternatives is "a relevant consideration in

---

(D. Mass. 2015) (striking down blanket prohibition on panhandling beginning at "one-half hour before sunset" because "the City has not cited to any evidence or provided any meaningful argument to establish that a "blanket prohibition on panhandling at night is necessary to advance public safety."); *Brown v. City of Grand Junction*, 136 F. Supp. 3d 1276 (D. Col. 2015) (same).

determining whether the fit between ends and means is reasonable." *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 417 n.13 (1993).[39] The record here establishes it is not.

Third, the County's contention that First Amendment activities on or around the Courthouse Grounds put a strain on law enforcement resources is insufficient. There is no concrete evidence of any such strain. Nor is there any evidence that the Sheriff's Department's budget—which the County controls—is insufficient, or that the County has rejected requests from the Sheriff for additional funding. UF ¶ 19. The mere fact that prohibiting Lafayette County citizens from exercising First Amendment rights might lessen the Sheriff's Department's workload does not suffice to demonstrate that prohibiting the exercise of such rights is narrowly tailored and serves an important government interest. To the contrary, "[t]he generally accepted way of dealing with unlawful conduct that may be intertwined with First Amendment activity is to punish it after it occurs rather than to prevent the First Amendment activity from occurring in order to obviate the possible unlawful conduct." *Collins v. Jordan*, 110 F.3d 1363, 1371–72 (9th Cir. 1996).

In sum, the undisputed facts demonstrate that the Closure Order is not narrowly tailored to serve an important government interest. Summary judgment should be granted to Plaintiff.

## III.  THE COUNTY'S ONE- OR FIVE-PERSON PERMIT THRESHOLD VIOLATES THE FIRST AMENDMENT

An "ordinance requiring a permit and a fee before authorizing public speaking, parades, or assemblies … is a prior restraint on speech." *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 130 (1992). "[T]here is a 'heavy presumption' against the validity of a prior restraint." *Id. See also Serv. Empls. Int'l Union v. City of Houston*, 595 F.3d 588, 596 (5th Cir. 2010). The

---

[39] "[T]he burden of proving narrow tailoring requires the County to prove that it actually *tried* other methods to address the problem." *Reynolds v. Middleton*, 779 F.3d 222, 231 (4th Cir. 2015). The County may not "[take] a sledgehammer to a problem that can and should be solved with a scalpel." *Browne v. City of Grand Junction*, 136 F. Supp. 3d 1276, 1294 (D. Colo. 2015).

County's requirement that members of the public apply for a permit prior to engaging in political speech on Courthouse Grounds in groups of more than one or four constitutes a prior restraint. The PI Ruling did not pass on its validity; after discovery, it is clear this prior restraint is invalid.

The Fifth Circuit has held that "ordinances requiring a permit for demonstrations by a handful of people are not narrowly tailored to serve a significant government interest." *Knowles,* 462 F.3d at 436. The court in *Knowles* struck down an ordinance requiring a permit for gatherings of two people, and the court cited with approval cases from other circuits striking down ordinances requiring permits for gatherings of ten or six people. *See Douglas v. Brownell*, 88 F.3d 1511, 1524 (8th Cir. 1996) (noting concern about "application of the permit requirement to groups of ten or more persons"); *Grossman v. City of Portland*, 33 F.3d 1200, 1202–07 (9th Cir. 1994) (expressing disbelief that "six to eight people carrying signs in a public park constituted enough of a threat to the safety and convenience of park users … to justify the restrictions imposed on their speech here"); *Community for Creative Non-Violence v. Turner*, 893 F.2d 1387, 1392 (D.C. Cir. 1990) (permit requirement applicable to "two or more individuals speaking or otherwise proselytizing in the above-ground area of a Metro station" was not narrowly tailored, even though Washington Metro's asserted interests of protecting the safety and convenience of riders was significant).

Like the permit requirement at issue in *Knowles*, the County's imposition of a permit requirement for gatherings of more than one or four people on the Courthouse Grounds cannot survive constitutional scrutiny. *Cox v. City of Charleston*, 416 F.3d 281 (4th Cir. 2005), is instructive in this regard. There, the Fourth Circuit considered a permitting ordinance that "[was] not limited to large groups," but also "applie[d] to gatherings of only a few people." *Id.* at 285. The city argued that this was justified because "[s]afety issues remain whether the parade or protest is large or small"—"[s]ome small but particularly inflammatory protests may be a greater security

concern than even much larger ones," and "'[s]mall towns with limited resources' need advance warning of even small protests to adequately police the events." *Id.* The court rejected these arguments, noting that the city "fail[ed] to explain how a small demonstration that may become inflammatory would tax its police force any differently than, for example, a street fight between two individuals, so as to justify requiring advance warning of all small demonstrations." *Id.* The court concluded that "[w]hile it may be true that the permit requirement succeeds in mitigating" safety risks, "it does so at too high a cost." *Id.*

The Middle District of North Carolina's recent decision in *Peterman* is also instructive. There, the defendants contended that "that the need to prevent damage to the courthouse and to protect the public" justified the regulation there at issue. 2020 WL 4738015, at *6. The Court found, however, that "there [wa]s no evidence of any obstruction of the sidewalks or access to the courthouse," or any "evidence that protests have ever disrupted the ordinary functions at the courthouse." *Id.* So too here. While the County has claimed that extending the permitting requirement to small groups of people, or even a single person, there is no evidence that gatherings of such small groups of people materially impede pedestrian or traffic safety or courthouse access. As in *Peterman*, the County's proffered justification for its regulation fails the constitutional test, as the County does not and cannot "show that the proffered harms are 'real, not merely conjectural,' and that the policy 'alleviate[s] these harms in a direct and material way.'" *Id.*; *see also McCullen*, 573 U.S. at 486, 492 (striking down restrictions on protest justified as "ensuring public safety and order, promoting the free flow of traffic on streets and sidewalks, [and] protecting property rights"; public safety risks could "readily be addressed through existing local ordinances" or "generic criminal statutes"). On this factual record, the County's extension of its permitting requirement to groups of one or five persons on Courthouse Grounds cannot be justified under

existing First Amendment law, and the County's permitting requirement must therefore also be struck down as unconstitutional.

## **CONCLUSION**

For the foregoing reasons, Plaintiff's motion should be granted.

Dated:  February 2, 2021

                                                                    /s/ Joshua Tom
                                                        _____

SIMPSON THACHER & BARTLETT LLP
Jonathan K. Youngwood (*pro hac vice*)
Isaac Rethy (*pro hac vice*)
425 Lexington Avenue
New York, NY 10017
(212) 455-2000
jyoungwood@stblaw.com
irethy@stblaw.com

C. Jackson Williams, MS Bar No. 7226
P.O. Box 69
Taylor, MS 38673
Phone: (662) 701-9447
cjxn@mac.com

AMERICAN CIVIL LIBERTIES UNION OF
MISSISSIPPI FOUNDATION, INC.
Joshua Tom, MS Bar. No 105392
Landon Thames, MS Bar No. 105127
P.O. Box 2242
Jackson, MS 39225
Phone: (601) 354-3408
jtom@aclu-ms.org
lthames@aclu-ms.org