1          JEFFREY GLYNN BUSBY

2      IN THE UNITED STATES DISTRICT COURT

3    FOR THE NORTHERN DISTRICT OF MISSISSIPPI

4             OXFORD DIVISION

5

6  JOHN RASH,

7

            Plaintiff,

8
v.                              CIVIL ACTION NO.:
9                               3:20-cv-224-NBB-RP

10 LAFAYETTE COUNTY,
   MISSISSIPPI,
11
            Defendant.
12

13

14

15      VIDEOTAPED REMOTE DEPOSITION OF

16         JEFFREY GLYNN BUSBY

17      Thursday, December 3, 2020

18    9:09 a.m. Central Standard Time

19

20

21

22

23 Reported by:

24 GRETA H. DUCKETT, CCR, RPR, CRR, CVR-S, RVR-M-S

25 JOB NO. 187135

DEFENDANT'S
EXHIBIT
B

```
 1              JEFFREY GLYNN BUSBY
 2          the record.
 3              MR. TOM:  Josh Tom, with the
 4          ACLU of Mississippi, on behalf of
 5          plaintiff, John Rash.
 6              MR. WILLIAMS:  Jack Williams,
 7          sole practitioner, on behalf of the
 8          plaintiff, John Rash.
 9              MR. O'DONNELL:  David
10          O'Donnell for the defendant,
11          Lafayette County, Mississippi.
12              THE VIDEOGRAPHER:  At this
13          time, would the court reporter
14          please swear in the witness, and we
15          may proceed.
16          JEFFREY GLYNN BUSBY,
17      the witness, having first been duly
18  sworn to speak the truth, the whole truth and
19  nothing but the truth, testified as follows:
20              EXAMINATION
21  BY MR. TOM:
22      Q.    Good morning, Mr. Busby.  My name
23  is Josh Tom, and I'm here on behalf of
24  plaintiff, John Rash.  As the court reporter
25  and the videographer mentioned, this case is
```

```
1                JEFFREY GLYNN BUSBY
2   against Lafayette County, Mississippi, and it's
3   before the Northern District of Mississippi out
4   of Oxford.  And so, you know, I know currently
5   you're the circuit clerk of Lafayette County,
6   so congratulations on that.  I know that that
7   was a big win for you, and your mother had
8   previously held that same position.  So
9   congratulations, even if it's quite a belated
10  congratulations, but this is the first time I'm
11  getting to meet you.
12        Today, we're going to be talking
13  about not your circuit clerk job, but about
14  when you were a member of the board of
15  supervisors.
16        Can you state your full name for
17  the record and spell it, please.
18        A.     Jeffrey Glynn Busby.
19  J-E-F-F-R-E-Y, G-L-Y-N-N, B-U-S-B-Y.
20        Q.     Now, given the virtual nature of
21  this deposition, you know, I understand that
22  attorney -- your attorney, David O'Donnell, is
23  in the same room as you just to your right.
24  I'm unable to see Mr. O'Donnell, and, you know,
25  I'm unable to see anything that's off this
```

1                    JEFFREY GLYNN BUSBY

2  to prepare for this deposition?

3       A.    No, sir.

4       Q.    Have you discussed anything related

5  to today's deposition with anyone else besides

6  Attorney O'Donnell?

7       A.    No, sir.

8       Q.    Did you do anything else to prepare

9  for today?

10      A.    No, sir.

11      Q.    What is your current position?

12      A.    I'm the circuit clerk of Lafayette

13 County.

14      Q.    And what's the month and year that

15 you began that position?

16      A.    January of this year, 2020.

17      Q.    Do you have any other employment in

18 addition to being the circuit clerk of

19 Lafayette County?

20      A.    I'm sorry.  I didn't under- -- I

21 couldn't hear you.

22      Q.    Do you have any other employment

23 besides -- do you have any other employment in

24 addition to being circuit clerk?

25      A.    I have a retail sporting goods

```
1                  JEFFREY GLYNN BUSBY
2    business that I've been in for 35 years.
3         Q.     And besides your sporting goods
4    business, are there any other employment -- do
5    you have any other employment besides that?
6         A.     Rental property, if you call that
7    a -- I mean, I'm not sure if that's -- we do
8    have rental property that we rent.
9         Q.     Okay.  Any other employers?
10        A.     No, sir.
11        Q.     Now, did you graduate from college?
12        A.     I have, like, six hours left.
13        Q.     Okay.  And where did you go --
14        A.     The University of Mississippi.
15        Q.     And did you graduate from high
16   school?
17        A.     Yes.
18        Q.     Where did you graduate from high
19   school?
20        A.     Oxford High School.
21        Q.     Where did you work prior to
22   becoming circuit clerk?
23        A.     University Sporting Goods and was a
24   supervisor for Lafayette County.
25        Q.     And how long were you a supervisor
```

```
1                    JEFFREY GLYNN BUSBY
2   for Lafayette County?
3        A.      Eight years.
4        Q.      So while supervisor for Lafayette
5   County, you also ran your sporting goods
6   business; is that correct?
7        A.      That's correct.
8        Q.      While a supervisor, did you have
9   any other employment?
10       A.      No, sir, besides sporting goods.
11  Now, I had University Sporting Goods.  That's
12  where I worked full-time, and then I did my
13  supervisor's job from there.
14       Q.      Understood.  Are you a lifelong
15  resident of Lafayette County?
16       A.      I am.
17       Q.      Have you ever lived outside of
18  Lafayette County?
19       A.      No, sir.
20       Q.      Do you live in Oxford?
21       A.      I do.
22       Q.      Are you a lifelong resident of
23  Oxford?
24       A.      Are you talking the city limits or
25  the county as a whole?
```

1              JEFFREY GLYNN BUSBY

2    except for small barriers, like decorative

3    fencing, is open to and part of the square,

4    correct?

5         A.      Part of the square -- part of the

6    courthouse grounds, yes.  I don't know if the

7    streets and stuff are owned by the city or the

8    county.  I don't guess I understand the

9    question.  But the grounds inside the fenced-in

10   area that you're talking about has always been

11   considered courthouse -- Lafayette County's

12   property.

13        Q.      Okay.  Separate from who owns the

14   courthouse or who owns the streets, you know,

15   that's not what my question is.  The question

16   is, is that the grounds of the county

17   courthouse are part of the square; is that

18   correct?

19        A.      That's correct.

20        Q.      The county courthouse grounds has

21   sidewalks, grassy areas, and benches, right?

22        A.      That's correct.

23        Q.      The county courthouse grounds

24   function as a small public park, correct?

25        A.      I would disagree with calling it a

1          JEFFREY GLYNN BUSBY

2   park.  No, sir.

3          Q.     How would you describe it?

4          A.     I would -- it's a small area that

5   surrounds the courthouse that people walk

6   through going from one side of the square to

7   another side of the square.

8          Now, if you're asking me if they --

9   anyone ever stops and sits on the benches, yes,

10  they do.  But do I look outside and see people

11  kicking footballs or throwing Frisbees?  No,

12  sir, the lawn is not big enough for that.

13         Q.     The county courthouse grounds are

14  used for assembly, political speech, protest,

15  and other expressive activity, correct?

16         A.     I -- political speeches?  I've

17  never heard a political speech.  Now, I've --

18  when you have Veterans Day, they have assembled

19  for Veterans Day.  Commencements, they have.

20  But for political speeches, no, sir, I can't

21  say that I remember one having that on the

22  grounds of the courthouse.

23         Q.     The county courthouse grounds are

24  used for assembly, protest, and other

25  expressive activity, correct?

1          JEFFREY GLYNN BUSBY

2      A.      I'm trying to think.   I'm not

3    trying to -- there has been -- are you

4    considering inside the fence or on the

5    monument?   Because there have been people that

6    have sat or stood at the monument, but I -- I

7    guess there's been a few that had a speech or

8    so, but very few in the -- in the years that

9    I've been associated with it.

10     Q.      Okay.  So just for definitional

11   purposes, the monument is on county property,

12   correct?

13     A.      I think they've established that.

14   Yes, sir.

15     Q.      The monument is part of the county

16   courthouse grounds, correct?

17     A.      According to the county, yes.

18     Q.      So for -- when we talk about the

19   county courthouse grounds today, that includes

20   the grassy areas and also the land surrounding

21   the monument.

22        Do you understand that?

23     A.      Okay.

24     Q.      So when I say "county courthouse

25   grounds," you know, you tried to separate -- or

1        JEFFREY GLYNN BUSBY

2   on the board, as much as it was road ditches or

3   roads or different things like that.

4        Q.      Sure.  Sure.  Are there any other

5   documents or communications that reflect the

6   board's work that we have not discussed?

7        A.      No, sir, that I'm aware of.

8                    MR. TOM:  Now, this question

9              is for the court reporter.

10                   (Technical discussion.)

11                   (Exhibit 1 was marked for

12                     identification.)

13  BY MR. TOM:

14       Q.      I just put Exhibit 1 into the chat.

15  And this is the April 20th, 2015, Facility Use

16  Policy.  The Bates number at the bottom of the

17  first page of this document is

18  Lafayette County DOC000002.

19       A.      Okay.  I have that.

20       Q.      Okay.  Go ahead and take a look at

21  that document, Mr. Busby.

22       A.      Okay.  What specifically do you

23  want me to look at?  I have read it.

24       Q.      Okay.  So what is this document?

25  What is Exhibit 1?

1                JEFFREY GLYNN BUSBY

2        A.      This is the facility use policy

3   that we put in -- I think it -- well, it says

4   it went into effect in April of 2015 for the

5   use of our facilities.

6        Q.      And the board adopted this policy,

7   correct?

8        A.      That's correct.

9        Q.      And you were president of the board

10  when this policy was adopted, right?

11       A.      That's correct.

12       Q.      How was use of county property

13  regulated before this 2015 policy was adopted?

14       A.      I don't think they had a policy.  I

15  would assume they went through the county

16  administrator, but I do not know.  That was the

17  reasoning to come up with the policy, because

18  we started getting requests for facility use.

19       Q.      When did you first become a board

20  of supervisors member?

21       A.      2012.

22       Q.      So from 2012 until April 20th,

23  2015, when this policy was implemented, how did

24  the county regulate use of county property?

25       A.      I assume it went through the county

1          JEFFREY GLYNN BUSBY

2    administrator.

3          Q.     Before this 2015 policy was

4    adopted, what role did the board have in

5    regulating use of county property?

6          A.     We had none that I'm aware of.

7    Again, I think any -- any request was made

8    through the county administrator.

9          Q.     What was the process to get

10   permission to use county property before the

11   board adopted this 2015 policy?

12         A.     I assume they contacted the county

13   administrator.

14         Q.     Besides the county administrator --

15                (Simultaneous speakers.)

16         A.     They did not contact me.

17         Q.     I see.  Who were the decisionmakers

18   in granting use of the county courthouse

19   grounds before this 2015 policy was adopted?

20         A.     The county administrator.

21         Q.     Was there anyone else besides the

22   county administrator involved in that process?

23         A.     Not that I'm aware of.

24         Q.     Do you know what the criteria used

25   were to determine whether someone could use the

1        JEFFREY GLYNN BUSBY

2   county courthouse grounds --

3        A.    I do not.

4        Q.       -- before this policy was

5   implemented?

6        A.    I do not.

7        Q.       Why did the county adopt this

8   facility use policy in 2015?

9        A.       We started having more and more --

10  our county administrator, I'm assuming -- and

11  I'm sorry; I just don't remember every

12  detail -- but said we had a lot more requests

13  to use the building -- use the grounds.  There

14  was problems when people would use the grounds.

15  Sprinkler systems were getting damaged.  We

16  were having people in the courtroom and

17  monitors were getting damaged.  So we felt, at

18  that time, we needed to put together a facility

19  use policy.  And from that point, again, I

20  assume that he got with our attorney, which was

21  David O'Donnell at that time, and we came up

22  with the facility use policy that we adopted in

23  2015.

24       Q.       Who was the county administrator at

25  this time?

```
1                    JEFFREY GLYNN BUSBY
2         A.      That was Joseph Johnson.
3         Q.      So the impetus behind adopting this
4    facility use policy in 2015 was county
5    administrator Joseph Johnson?
6         A.      Yes, sir.  I think he brought it to
7    our attention that we -- he felt like that we
8    needed to have a facility use policy because of
9    the requests that he was getting for use of the
10   facilities at that time.
11        Q.      Was there anyone else that brought
12   up the idea of adopting a facility use policy?
13        A.      Not that I'm aware of.  Again, if
14   there was, I do not remember.
15        Q.      So besides the concerns that you
16   just mentioned about broken sprinklers and, you
17   know, monitors in the courthouse, what concerns
18   was this 2015 policy designed to address?
19        A.      I think that was the majority of
20   our concerns at that time.  It was just the use
21   of a historical building and the wear and tear
22   and different things that were going on inside
23   the facility.  I don't think there was any
24   problems, if that's what you're asking me.  I
25   wasn't aware of any, and I can't remember any
```

```
 1              JEFFREY GLYNN BUSBY
 2   problems outside -- and I don't want to say
 3   "destruction," because I don't think they meant
 4   to harm the facilities.  But it happened during
 5   the times of use, and it was just starting to
 6   get used more and more.
 7        Q.    Was the main concern use inside of
 8   the county courthouse?
 9        A.    No.  I can't say just inside,
10   because -- I think there was a group -- Makers
11   Mark was one of the -- they were kind of a
12   group that used the facility a couple of times
13   a month to display crafts and arts.  And it
14   was -- they were -- they were on the lawn, and
15   I know that's where some problems occurred;
16   again, with not -- not problems among
17   themselves, but problems with the use of the
18   facilities.
19        Q.    So is it fair to say that this
20   policy in 2015 was adopted not because there
21   were any problems, but just to get a better
22   process in place for people to be able to use
23   the county courthouse grounds?
24        A.    Yes, sir.  I would say that's a
25   fair assessment.
```

Page 38

```
1              JEFFREY GLYNN BUSBY
2       Q.    Okay.  Was this policy designed to
3  address public safety concerns?
4       A.    I think we did address some public
5  safety -- the security.  I don't -- it was not
6  a top priority at that time, no, sir.
7       Q.    Were there public safety concerns,
8  when this 2015 policy was addressed, regarding
9  the county courthouse grounds?
10      A.    Well, there's always concerns.
11 You've got a historical building here, and
12 there's no sprinkler system in this building.
13 There's -- you know, there -- so the damage to
14 the building or any electrical problems, fires,
15 or anything, this building would go up fairly
16 quickly.
17      You're probably -- in some portions
18 of this courthouse, especially on the -- I
19 guess the east and the west ends, you're less
20 than 25 feet, probably, from the road.  So,
21 yes, there were some concerns of safety among
22 people crossing streets and going in and out
23 when you would have large gatherings on the --
24 i.e., as Makers Mark would have a -- something
25 on the lawn, you would have pretty big crowds.
```

1                    JEFFREY GLYNN BUSBY

2    So safety in that standpoint was a concern,

3    yes, sir.

4         Q.      So besides, you know, potential

5    fire and potential pedestrian traffic concerns,

6    what other public safety concerns were there?

7         A.      None at that time, that I'm aware

8    of.

9         Q.      What is the process for obtaining a

10   permit under this 2015 policy?

11        A.      They would contact the county

12   administrator's office, and he had a form that

13   they would fill out at that time.  And I think

14   it -- I think, at that time, it was a

15   seven-day -- you had to do it seven days prior

16   to the event.

17        Q.      So if you look on page 3 of

18   Exhibit 1, under "applications for usage," it

19   says, Application should be submitted to the

20   county administrator at least one week in

21   advance.

22        A.      Yes, sir.

23        Q.      That's what you're referring to?

24        A.      Yes, sir.

25        Q.      So the county administrator runs

```
1                    JEFFREY GLYNN BUSBY
2    the process for granting permits under this
3    2015 policy?
4        A.      That's correct.
5        Q.      What is the role of the board for
6    permits under this 2015 policy?
7        A.      We adopted the policy, but outside
8    that, we played no part in it.
9        Q.      What is the role of the sheriff for
10   permits under this facility use policy?
11       A.      I'm sorry.  I didn't hear you.  I
12   couldn't hear you.
13       Q.      What is the role of the sheriff for
14   permits under this 2015 policy?
15       A.      I don't know that he played a role
16   in that, but I -- I'm not -- that would be a
17   question, I guess, for Joseph Johnson.  I --
18   but from my recollection, I don't know that he
19   played a part -- a part in that at all.
20       Q.      Besides the county administrator,
21   who else had a role for permits under the 2015
22   policy?
23       A.      No one that I'm aware of.
24       Q.      So I want to introduce Exhibit 2.
25   ///
```

Page 46

```
1                 JEFFREY GLYNN BUSBY
2   sure it was the same time the City redid their
3   policy as well.
4        I know the police chief, which is
5   now our sheriff, Mr. East, had come to me a few
6   times and -- telling me that we needed to get
7   something in place from a security standpoint.
8   So I assume that's why we went from a seven-day
9   period to a 30-day period from a security
10  standpoint on what we anticipated could be
11  problems.
12       Q.    So what was Mr. East talking about
13  for security?  You said -- you said that he had
14  to get some security things in place.
15       A.    Well, it's sort of like --
16       Q.    Can you explain what --
17       A.    Well, yes.  The --
18       Q.    Can you explain that conversation?
19       A.    Well, what -- what I was -- what I
20  meant by that or mean by that is the City had
21  already adopted, I think, a policy that
22  addressed security measures, which he was the
23  police chief at that time for the City.  We had
24  an interim sheriff in -- in Mr. Hill at that
25  time.  Our -- our sheriff passed away.
```

```
 1              JEFFREY GLYNN BUSBY
 2         And in -- in light of the
 3   Charlottesville riots, we felt like we needed
 4   more security than what we had addressed in our
 5   facility policies before.  And as he looked at
 6   it, as our -- our -- our teams work together,
 7   and I was not a part of the -- the meetings
 8   that -- I think that took place on campus.  So
 9   I'm -- I'm just telling you from what my
10   recollection -- recollection was.
11         But I'm pretty sure our attorney
12   and our city police, our county police, our
13   university police, many other agencies from
14   Secret Service to the FBI, all met on campus in
15   concern of the Charlottesville riots and
16   what -- we had information that was -- that may
17   or may not happen in Oxford.
18         Q.      And these were -- why did people --
19   why did these people think that what happened
20   in Charlottesville may happen in Oxford?
21         A.      That would be something you'd need
22   to ask the sheriff.  I -- I don't know if it
23   was information they received, if it was groups
24   posting things online.  I -- I can't answer
25   those -- I can't answer that.
```

```
 1                    JEFFREY GLYNN BUSBY
 2       Q.      Did this -- were the security
 3  concerns because of the Confederate monuments
 4  on the county courthouse grounds and on
 5  Ole Miss's campus?
 6       A.      I assume that that was a -- played
 7  a part in it at that time.
 8       Q.      So you mentioned that then-Police
 9  Chief East reached out to you several times
10  about security concerns, right?
11       A.      That's correct.
12       Q.      And what did he -- what did he say
13  when he reached out to you?
14       A.      That he felt like that we needed to
15  look at the City's policy and adopt -- well,
16  get -- put more in place for -- for security
17  reasons because of this is the focal point
18  of -- of the town.  And, you know, it's a small
19  area with a lot of historical buildings.  And
20  so he felt like we needed more security.  Did
21  he go into a lot of details?  No.  He just said
22  that he -- he thought we needed to re-address
23  our policy.
24       Q.      And when you say "this is the focal
25  point of the town," what -- what is "this"?
```

1                    JEFFREY GLYNN BUSBY

2   assuming, with, again, the Charlottesville

3   riots and with the concern of security on our

4   historical square, the involvement of the

5   sheriff played a bigger role at that time.

6          Q.     So when we were talking about the

7   2015 policy, you said that only the county

8   administrator had a role in the process, right?

9          A.     From my recollection.  Now, I -- I

10  can't say that he never reached out to the

11  sheriff's department or -- or someone, but I

12  would say he played -- probably, at that time,

13  90 percent of the decisions were made by him.

14  If he ever had a security issue, he may have

15  reached out to the -- to the sheriff's

16  department.  I'm just not aware of that.

17         Q.     So this 2019 policy memorializes in

18  the policy that the sheriff now has a role in

19  determining whether to grant a permit for use

20  of county property, correct?

21         A.     That's correct.

22         Q.     Now, besides the sheriff and the

23  administrator, did the board have a role after

24  the policy was amended in 2019

25  in determining --

```
 1                JEFFREY GLYNN BUSBY
 2       A.    No.
 3                   (Simultaneous speakers.)
 4  BY MR. TOM:
 5       Q.    -- permits?
 6       A.    We never voted on who used the
 7  policy or who didn't use the policy -- I mean,
 8  who used the facilities or who did not use the
 9  facilities.  The county administrator signed
10  off on all of that.
11       Q.    So besides the county administrator
12  and the sheriff, who else had a role in
13  determining whether to grant a permit under
14  this policy or not?
15       A.    Maybe the attorney, but I don't
16  know that he had a role in that.  That would be
17  something you'd have to ask David O'Donnell.
18  The board of supervisors did not play a role,
19  that I can remember, in any incident.
20       Q.    And by "the attorney," you're --
21  you're referring to the county attorney?
22       A.    Mr. O'Donnell.  Mr. O'Donnell.
23  Yes, sir.
24       Q.    Now, if you look at Exhibit 3,
25  there's a lot of red language underneath
```

```
 1                    JEFFREY GLYNN BUSBY
 2    "signs," and then the whole section "other
 3    items," right?
 4         A.      Yes, sir.
 5         Q.      Now, if you go back to Exhibit 2,
 6    which is the final 2019 policy --
 7         A.      Uh-huh.
 8         Q.      You know, it looks like -- I don't
 9    know if verbatim, but that language appears
10    there.
11         A.      That's correct.
12         Q.      So on the final policy, Exhibit 2,
13    why were this -- why was this section added to
14    the signs and other items?
15         A.      Well, I think that goes along with
16    the security, and I'm -- I don't think
17    there's -- we spelled out what our security
18    meant in -- in the other items when it refers
19    to bricks, stones, guns, slingshots.  I mean,
20    I -- I think that we were trying to make
21    it what our security -- to the people that were
22    renting the facility or the facility use would
23    know what they could and could not bring when
24    they -- they came to use our facilities.
25         Q.      So besides these changes that we've
```

1         JEFFREY GLYNN BUSBY

2  situations were at that time.  I just have no

3  idea.

4       You asked me my opinion on -- on

5  that.  You know, I thought, years ago, we

6  should put speed bumps, because I watched a kid

7  get run over on a bicycle over here next to

8  First National Bank across from the courthouse.

9  So, you know, it's -- it's always been a safety

10  problem, as you alluded to; that it's not

11  something that just happened in the last year.

12       But I don't know what went into

13  them changing this policy.  I'm not going to

14  answer that.  I can just give you my opinion of

15  what I think.

16       Q.    How was public safety achieved

17  without a curfew on the county courthouse

18  account grounds before July 20th, 2020?

19       A.    I don't know that I -- to be honest

20  with you, I can't think of a time that our

21  facility was used at night.  And I'm not saying

22  it wasn't, but I can't think of a time in my

23  eight years as president or my time for 35

24  years across the street, which I have a clear

25  view of this facility, that it was ever used at

1           JEFFREY GLYNN BUSBY

2   nighttime.  And, again, it could have been.  I

3   just don't remember one.

4        Q.    And are you -- when you're talking

5   about facility, are you talking about the

6   county courthouse grounds?

7        A.    The county courthouse grounds,

8   correct.  Always been used in the daytime, as

9   far as I know.

10       Q.    Have you gone onto the county

11  courthouse grounds for nonwork purposes at

12  night after this curfew was imposed?

13       A.    For nonwork?  No, I have not.

14       Q.    Have you walked by the county

15  courthouse grounds at night after this curfew

16  was imposed?

17       A.    Oh, sure.

18       Q.    And did you see people on the

19  county courthouse grounds at that time?

20       A.    I have no -- I mean, I don't know.

21  I don't -- I'm -- I'm not going to say there

22  wasn't people walking through, but I don't -- I

23  don't know.  I can't tell you a certain time

24  and date that -- that I saw someone over here,

25  no.