Page 1

1                    LISA CARWYLE

2        IN THE UNITED STATES DISTRICT COURT

3     FOR THE NORTHERN DISTRICT OF MISSISSIPPI

4                  OXFORD DIVISION

5

6   JOHN RASH,

7

            Plaintiff,

8

v.                            CIVIL ACTION NO.:

9                             3:20-cv-224-NBB-RP

10  LAFAYETTE COUNTY,
    MISSISSIPPI,

11

            Defendant.

12

13

14

15

            VIDEOTAPED REMOTE DEPOSITION OF

16

                   LISA CARWYLE

17

         Thursday, December 17, 2020

18

         9:06 a.m. Central Standard Time

19

20

21

22

23  Reported by:

24  GRETA H. DUCKETT, CCR, RPR, CRR, CVR-S, RVR-M-S

25  JOB NO. 187733

**DEFENDANT'S EXHIBIT**
**D**

```
 1              LISA CARWYLE

 2              Counsel, would you now

 3         identify yourselves for this

 4         proceeding?

 5              MR. TOM:  Joshua Tom, with

 6         the ACLU of Mississippi, on behalf

 7         of plaintiff, John Rash.

 8              MR. O'DONNELL:  David

 9         O'Donnell, on behalf of Lafayette

10         County, Mississippi.

11              THE VIDEOGRAPHER:  Thank you

12         very much.  The court reporter may

13         now swear in the witness.

14              LISA CARWYLE,

15       the witness, having first been duly

16  sworn to speak the truth, the whole truth and

17  nothing but the truth, testified as follows:

18              EXAMINATION

19  BY MR. TOM:

20      Q.    Good morning, Ms. Carwyle.  Nice to

21  see you again.

22      A.    Good morning.

23      Q.    My name is Josh Tom, and, as you

24  know, I represent plaintiff, John Rash, in this

25  action against Lafayette County, and I'm going
```

```
1                    LISA CARWYLE
2  to be taking your deposition today.
3        Please state your full name for the
4  record and spell it.
5        A.    Lisa -- L-I-S-A -- Carwyle --
6  C-A-R-W-Y-L-E.
7        Q.    Can we agree that, given the
8  virtual nature of this deposition and the
9  inability to see what is off camera, that
10 you'll not communicate with anyone during the
11 deposition, excluding breaks, that is not
12 apparent and audible to me and the court
13 reporter?
14       A.    Yes.
15       Q.    Have you been deposed in any other
16 matter?
17       A.    No.
18       Q.    So this is your first deposition?
19       A.    It is.
20       Q.    Now, before we get into the
21 questions, I want to go over some ground rules,
22 just so we can have a smooth and understandable
23 deposition for us and for the court reporter.
24       Do you understand that you're
25 obligated to give complete and truthful answers
```

```
 1                    LISA CARWYLE

 2  BY MR. TOM:

 3       Q.     Okay.  Now, did you do anything

 4  else to prepare for this deposition besides

 5  your meeting with Mr. O'Donnell yesterday?

 6       A.     No.

 7       Q.     Have you discussed anything related

 8  to today's deposition with anyone else?

 9       A.     No.

10       Q.     Did you speak with any Lafayette

11  County board of supervisors about today's

12  deposition?

13       A.     No.

14       Q.     Did you speak with Sheriff Joey

15  East about today's deposition?

16       A.     No.

17       Q.     Did you do anything else to prepare

18  for today?

19       A.     No.

20       Q.     What's your current position?

21       A.     I'm the county administrator.

22       Q.     And what's the month and year you

23  began as county administrator?

24       A.     January 2016.

25       Q.     As county administrator, have
```

1              LISA CARWYLE

2      Q.      How do people use the square at

3  night?

4      A.      They --

5              MR. O'DONNELL:  Object to

6          form.  Go ahead.

7      A.      Go ahead.  I mean, they go there to

8  eat and go to bars.  I mean, we don't -- we

9  don't have a distinction between restaurant and

10  bars here, but. . .

11      Q.      On Ole Miss football game days, is

12  it true that the square is very busy with lots

13  of people at day and night?

14      A.      Yes.

15      Q.      Is it true that there are many

16  events held on the courthouse grounds?

17      A.      Define "many."

18      Q.      How many events have been held on

19  the courthouse grounds per month since you've

20  been the county administrator?

21      A.      I would say, average, since I've

22  been the county administrator, maybe one.

23      Q.      How many events per year since

24  you've been county administrator have been held

25  on the courthouse grounds?

```
 1                    LISA CARWYLE
 2      A.      I don't have those exact numbers.
 3      Q.      Can you estimate?
 4      A.      I would estimate 10 to 12.
 5      Q.      How many events were held on the
 6 courthouse grounds per year when you were city
 7 clerk?
 8      A.      I couldn't answer that.
 9      Q.      Would you say that it's more or
10 less than when you were county administrator or
11 the city --
12      A.      I mean, I -- if I had to say, I
13 would say less, but I was not -- I mean, I did
14 work on the square.  It doesn't mean I was
15 walking out, looking to see who was on
16 the courthouse -- you know, how often somebody
17 was on the courthouse grounds.
18      Q.      Now, there was a curfew imposed in
19 July of 2020, correct, on the --
20      A.      Correct.
21      Q.      -- courthouse grounds?
22       Now, before the curfew was imposed
23 in July of 2020, events were held at night on
24 the courthouse grounds, correct?
25      A.      There were some, yes.
```

1                    LISA CARWYLE

2        Q.      How many events per year since

3   you've been county administrator have been held

4   on the courthouse grounds at night?

5        A.      Again, I don't have those exact

6   numbers.  To estimate, I would say, per year,

7   since I've been county administrator, maybe two

8   or possibly three.

9        Q.      Would you describe the square as

10  the heart of Oxford?

11       A.      Yes.

12       Q.      And what do you mean by that?

13       A.      I mean, it's the -- pretty much

14  like the center of the town, I guess.

15       Q.      And by "the center of the town,"

16  what does that mean?

17       A.      Well, it's where a lot of activity

18  takes place, because a lot of your governmental

19  functions are on the square.  And then, like I

20  mentioned earlier, restaurants and shopping.

21       Q.      So is it fair to say that the

22  square is the center of Oxford's business,

23  social, and civic life?

24       A.      The center of Oxford's business,

25  social, and civic life?  Probably, yes.

```
1                    LISA CARWYLE
2  So are the county courthouse grounds part of
3  the square?
4       A.     Well, I don't -- explain what you
5  mean when you say "part of the square."  It's
6  owned by different entities, so. . .
7       Q.     But beyond who owns it, like, when
8  you -- when someone goes to the square to
9  engage in all of the business and civic life,
10  would they also potentially -- strike that.
11       The courthouse grounds are not
12  separated from the square, are they?
13       A.     Well, there's a fence around them.
14       Q.     But there's also permanent openings
15  from -- onto the courthouse grounds, correct?
16       A.     There's an -- yes.  There's
17  openings in the fence for the -- to access
18  the --
19       Q.     And those -- and those -- and those
20  openings have no gates or enclosures, do they?
21       A.     Currently, they do not.  We have, a
22  few months ago, gotten some quotes to possibly
23  put some gates up, but that would have to go
24  through archives and history in Jackson.
25       Q.     If somebody were walking through
```

1                    LISA CARWYLE

2  the square, they could freely walk onto and

3  through the courthouse grounds, correct?

4       A.     Right now, yes, they could.   During

5  the day.

6       Q.     What happens at night?

7       A.     Well, according to our policy,

8  they're not permitted to be there at night.

9       Q.     And so the -- you're talking about

10  the curfew would prevent people from walking

11  onto the courthouse grounds at night?

12      A.     Right.

13      Q.     But there's no gates or barriers

14  that are put up at night onto the courthouse

15  grounds?

16      A.     They've not been put up yet, no.

17      Q.     And does the County intend to put

18  up gates or barriers around the courthouse?

19      A.     It has been discussed.  That's why

20  we got quotes.

21      Q.     Are the courthouse grounds used for

22  assembly, protests, and other expressive

23  activity?

24      A.     They -- yes.  They're used for

25  protests, you know, through the permitting

```
1                    LISA CARWYLE
2    process.
3         Q.      And before the July 2020 curfew was
4    implemented, were some of these protests at
5    night?
6         A.      Yes.
7         Q.      How long has the county courthouse
8    grounds been used for assembly, protests, and
9    other expressive activity?
10        A.      I can't -- couldn't tell you prior
11   to January of 2016.
12        Q.      So is your answer that "at least as
13   early as January 2016"?
14        A.      Yes.
15        Q.      And being a lifelong resident of
16   Lafayette County and having driven by the
17   square for, you know, all of your professional
18   life, have you seen assembly, protests, or
19   expressive activity on the county courthouse
20   grounds before January 2016?
21        A.      Very few, but yes, I have.
22        Q.      And when did you see that?
23        A.      I couldn't -- I couldn't tell you a
24   date.
25        Q.      Can you estimate?
```

```
 1                    LISA CARWYLE
 2       A.     No.  All I can say is I know there
 3  was a guy that -- I now know his name is
 4  Anthony Hervey -- who used to sit there in a
 5  Confederate uniform and black flag.  But I
 6  couldn't tell you -- I don't know when that
 7  started or -- I probably saw him there twice,
 8  you know.  I don't know how often he was there
 9  or anything.
10       Q.     And you said his name was Anthony
11  Hervey or Harvey?
12       A.     I thought it was Hervey.  It might
13  be Harvey.  I'm not sure.
14       Q.     We'll just call him Hervey.  So
15  Anthony Hervey, where would he sit -- you said
16  he had -- he had a Confederate uniform or a
17  Confederate flag or both?
18       A.     Sometimes both.  I can't say he had
19  both every time I saw him, but. . .
20       Q.     Where would he sit?
21       A.     Beside the Confederate statue.
22       Q.     And how many times did you see him
23  there?
24       A.     Probably two.
25       Q.     And was this at day or night?
```

1                          LISA CARWYLE

2          A.      Day.

3          Q.      And this -- and this was before

4    2016?

5          A.      Yes.

6          Q.      Do you have an estimate of when?

7          A.      I do not.

8          Q.      So besides Anthony Hervey, are

9    there any other protests or assemblies or

10   expressive activity that you've seen on the

11   county courthouse grounds before 2016?

12         A.      Assemblies, I've seen -- I guess

13   you call it assembly, like, when the Maker's

14   Market would come.

15         Q.      What's the Maker's Market?

16         A.      It's like -- it's promoted by the

17   local arts group here for local artists to sell

18   some of their product.

19         Q.      And when would the Maker's Market

20   happen?

21         A.      Prior to '16 -- that's where you

22   started asking me this question -- or after

23   '16?

24         Q.      When did the Maker's Market first

25   start?

```
 1                      LISA CARWYLE
 2        A.      I don't know when it first started.
 3   When I came here in January of '16, they were
 4   setting up on the courthouse lawn.
 5        Q.      And how long did it -- did it last
 6   after January 2016?
 7        A.      Probably two to three years.
 8        Q.      Do they still have the Maker's
 9   Market on the courthouse square?
10        A.      No.
11        Q.      Before January 2016, did you see
12   the Maker's Market?
13        A.      Yes.
14        Q.      And for how many years did you see
15   it before 2016?
16        A.      I don't know.
17        Q.      Was it five years?
18        A.      I don't think so.
19        Q.      Less than five years?
20        A.      I think it would be less than five
21   years, but it's not something I kept track of
22   at that point.
23        Q.      So was the Maker's Market -- how
24   many times per year did that happen?
25        A.      I think, like, eight to nine times.
```

1                     LISA CARWYLE

2        Q.      Each year?

3        A.      Right.

4        Q.      Okay.  And so you said it went

5   from, you know -- is it -- is it correct that

6   it went from, to your knowledge, around 2010 to

7   2019?

8        A.      I do not know when it started.

9        Q.      And was the Maker's Market a

10  daytime event or a nighttime event or both?

11       A.      Daytime.

12       Q.      Would it go into the evening?

13       A.      No.

14       Q.      And so it would always happen, to

15  your knowledge, for -- the Maker's Market that

16  we're talking about now is the one that

17  happened on the courthouse grounds, correct?

18       A.      Right.

19       Q.      Do they still hold it, but in a

20  different location?

21       A.      I'm not sure.

22       Q.      So besides, you know, Anthony

23  Hervey and the Maker's Market, what other

24  assemblies or protests or expressive activity

25  has happened on the courthouse grounds before

```
1              LISA CARWYLE

2          can we go off record and

3          troubleshoot that?

4              MR. TOM:  Sure.

5              THE VIDEOGRAPHER:  We're

6          going off record.  The time is

7          9:35.

8              (Recess from 9:35 a.m. to

9              10:02 a.m.)

10             THE VIDEOGRAPHER:  Back on

11         record at 10:02.

12 BY MR. TOM:

13     Q.    Hi, Ms. Carwyle.  And so you have

14 access to the ShareFile?

15     A.    I do.

16     Q.    And can you open the document that

17 begins with the number 1?

18     A.    I have it open.

19     Q.    Do you recognize this document?

20     A.    Yes.

21     Q.    And what is it?

22     A.    It is the facility use policy

23 adopted in April of 2015.

24     Q.    Now, when you became the county

25 administrator in January of 2016, what was your
```

1                    LISA CARWYLE

2   process for determining permits under this

3   policy?

4        A.      People -- you know, I'd get a

5   permit submission to me --

6          You said what was my process?  I'm

7   sorry.

8        Q.      Yes.

9        A.      And I would check to see, you know,

10  if we had any -- if there was any conflicts

11  with that day or time.  And then approve or

12  deny based on that.

13       Q.      Was the process before you became

14  administrator different?

15       A.      I would not know.

16       Q.      What criteria were used to

17  determine whether to grant or deny a permit?

18       A.      I would base it on whether they

19  followed the policy guidelines.

20       Q.      And who else was involved in

21  administering the permit policy besides you?

22       A.      Nobody.

23       Q.      Was the sheriff involved?

24       A.      In 2016, not really.  We had a

25  different sheriff then, and just, you know -- I

```
 1                    LISA CARWYLE
 2   would talk to them -- I don't remember it
 3   happening very often.  Early on, you know, if
 4   there was something that we thought would
 5   require additional security or something they
 6   needed to be made aware of.
 7        Q.    So you would contact the sheriff to
 8   give that person a heads-up?
 9        A.    Yes.
10        Q.    Did the sheriff have a role in
11   whether to grant or deny a permit at this time?
12        A.    I don't think it ever happened
13   where they had -- had a role in it early on,
14   no.
15        Q.    Was the board of supervisors
16   involved in the permitting process at this
17   time?
18        A.    No.
19        Q.    So is it fair to say that you were
20   the sole person that processed these permits,
21   but you would also pass them by the sheriff
22   sometimes?
23        A.    Yes.  The sheriff or his staff.
24        Q.    And was there any -- anyone else
25   involved in the permitting process at this
```

```
 1                    LISA CARWYLE
 2    time?
 3        A.      No.
 4        Q.      So you had the final say of whether
 5    to grant a permit or not?
 6        A.      Right.
 7        Q.      Now, when you look at Exhibit 1,
 8    you know, on the first page, it's Bates
 9    number 2?
10        A.      Right.
11        Q.      So throughout this deposition, you
12    know, if you look down at these Bates numbers,
13    they say Lafayette County DOC, and then there's
14    a series of numbers.  And whenever I refer to
15    the Bates number, I'll just say Bates number,
16    and then the number at the end.
17         Do you understand that?
18        A.      I do understand that.
19        Q.      Okay.  Where it says Bates
20    number 2, provision 6 prevents profit-making
21    groups or for profit-making purposes on county
22    facilities, correct?
23        A.      Right.
24        Q.      And if you look at number 9 --
25    not -- apologies.  If you look on Bates 4,
```

1                    LISA CARWYLE

2   where it says applications for usage, there's a

3   one-week advance notice requirement, right?

4       A.      Right.

5       Q.      And when this 2015 policy was in

6   effect, did you ever need more than one week to

7   process a permit application?

8       A.      I don't remember.

9       Q.      On average, how many days would it

10  take you to process a permit when this policy

11  was in effect?

12      A.      I'm not sure I can answer that,

13  because sometimes it took probably longer,

14  based on just what -- you know, what my other

15  duties were going on at that time.  And I

16  just -- I don't know how long it took me to

17  process it or to answer them.

18      Q.      Were there times where it took you

19  longer than a week to process a permit?

20      A.      Probably.

21      Q.      And how many times was that?

22      A.      I don't know.

23      Q.      So if someone applied for a permit

24  with less than one week's notice, could that

25  one-week notice provision be waived?

```
 1                    LISA CARWYLE

 2       A.     Yes.  It could be waived.

 3       Q.     And who decided whether to waive it

 4  or not?

 5       A.     I would have.

 6       Q.     What criteria would you use to

 7  determine --

 8       A.     I don't remember it coming up when

 9  this was in play.  I know, later on, you know,

10  in 2019 and '20, that I did.  But I don't

11  remember it being discussed to waive or not

12  waive or me, you know, talking with the sheriff

13  in those days when this was in -- in effect.

14       Q.     So when this was in effect, did you

15  waive the one-week notice requirement ever?

16       A.     I don't remember waiving it, but I

17  don't know.  I don't remember.

18       Q.     Was it in your discretion to waive

19  the one-week notice requirement when the 2015

20  policy was in effect?

21       A.     Yes.  It would have been in my

22  discretion, I guess, but, again, I don't know

23  that I even thought about it like that, because

24  I don't remember it coming up at that time.

25       Q.     What concerns was this 2015 policy
```

Page 38

```
 1                   LISA CARWYLE
 2  designed to address?
 3       A.     I wasn't here when it was designed.
 4       Q.     When you were implementing this
 5  policy, what concerns was it designed to
 6  address?
 7                   MR. O'DONNELL:  Object to
 8             form.  You can answer if you can.
 9       A.     Well, I don't understand the
10  question.
11       Q.     Did the 2015 address public safety
12  concerns?
13       A.     Did the 2015 policy address public
14  safety concerns?
15       Q.     Yes.
16       A.     I guess some -- somewhat, yes.
17  Like, it says you can't bring drugs on the
18  property; you can't bring alcohol on the
19  property.
20       Q.     Any other public safety concerns?
21       A.     I'm trying to look and see.  Let
22  me -- hang on one second.  I mean, it talks
23  about security being required, making sure they
24  had parking.  So, I mean, I do think it
25  addressed some public safety concerns, yes.
```

```
 1                    LISA CARWYLE

 2        Q.     Were there any other differences

 3   between this draft and the final?

 4        A.     No.

 5        Q.     So speaking about the final policy

 6   passed or adopted on March 4th, 2019, that

 7   policy extends the notice period from one week

 8   to 30 days, right?

 9        A.     Right.

10        Q.     And it also -- the final policy

11   adopted on March 4th, 2019, also gives the

12   sheriff a role in assessing security concerns?

13        A.     Right.

14        Q.     Why was the policy amended in March

15   2019?

16        A.     To address some security issues, to

17   include language where sticks, et cetera, could

18   not be carried when -- when somebody was

19   approved for a permit.  I'm trying to think

20   what else.  Due to the -- the -- us needing to

21   make sure the sheriff is responsible for

22   security on the courthouse grounds and trying

23   to make sure that that could be done and done

24   effectively, we added that language.

25        Q.     Which language?
```

1                  LISA CARWYLE

2  the City of Oxford to make some changes.  So

3  one, that ours -- we implemented some items

4  that the city had in theirs that I believe were

5  needed.  And a lot of that recommendation came

6  from the chief of police for the city.

7       Q.     Who was the chief of police at the

8  time?

9       A.     Joey East.

10       Q.     So the policy was amended in 2019

11  because Joey East approached the County

12  expressing security concerns about the county

13  courthouse grounds?

14       A.     That was one of the reasons.  It

15  was also in response to the event in February

16  of '19 where -- I was -- I did not attend the

17  event, so I can't tell you for sure.  But I

18  know George Johnson had a permit.  There was a

19  threat, and I believe they came kind of, like,

20  the opposition to his group.  And there was a

21  lot of concern with law enforcement --

22  sheriff's department, City of Oxford police,

23  federal agencies -- about keeping the square

24  safe during that event.

25       Q.     And who's George Johnson?

```
 1                    LISA CARWYLE
 2       A.      I don't remember other reasons.
 3       Q.      Why was the security section
 4  revised to include review by the sheriff?
 5       A.      To make sure he was aware of any
 6  event that would be happening.
 7       Q.      Were there any other reasons that
 8  review by the sheriff was --
 9       A.      I'm sorry.  I didn't hear --
10       Q.      -- put into the policy?
11       A.      Say that again.  I couldn't --
12       Q.      Were there any other reasons that
13  review by the sheriff were -- put into the
14  policy?
15       A.      The sheriff reviewing the policy --
16  I mean, the permits would be for security and
17  safety issues.
18       Q.      So is it fair to say that now, in
19  the 2019 policy, the sheriff has an official
20  role in the permit process?
21       A.      I'm the one that denies or
22  approves, but I do run it by him to make sure.
23  He is the one that checks to see if there are
24  other permits pulled, like, with the City, to
25  see if there's conflicting events going on at
```

Page 48

```
 1                    LISA CARWYLE
 2   the same time.  And he lets me know whether he
 3   feels confident in being able to police it, if
 4   needed.
 5        Q.    Did your process for granting or
 6   denying permits change after this -- the March
 7   2019 amendment?
 8        A.    Yes.
 9        Q.    How did it change?
10        A.    I would send it to the sheriff to
11   make sure he had enough people available and
12   there were no conflicting events for the same
13   permit requested date.
14        Q.    Were there any other changes to
15   your process?
16        A.    No.  I don't think so.
17        Q.    Did the board get a role in the
18   permit process?
19        A.    No.
20        Q.    Did anyone besides the sheriff get
21   a role in the permit process?
22        A.    No.
23        Q.    For the March 2019 policy
24   amendment, were there concerns specifically
25   regarding the county courthouse grounds?
```

```
 1                    LISA CARWYLE
 2      A.      Yes.
 3      Q.      What were those concerns?
 4      A.      They're the same concerns I
 5 mentioned before:  Safety and security for the
 6 people who attend the event, the public, who
 7 was there for a different reason, and the
 8 facilities themselves.
 9      Q.      And when you say for "the
10 facilities themselves," what do you mean?
11      A.      I mean the historic courthouse
12 building, whether something -- you know, for
13 traffic, people who are driving around the
14 courthouse, to all the buildings on the square.
15      Q.      Will you open the document that
16 begins with number 4?
17                    MR. TOM:  I'd like to
18              introduce this as Exhibit 3.
19                    (Exhibit 3 was marked for
20                    identification.)
21 BY MR. TOM:
22      Q.      Do you recognize this document?
23      A.      It's an email to Kevin Frye and
24 David O'Donnell.
25      Q.      Now, in this email, you're talking
```

```
 1                    LISA CARWYLE
 2   group like that would fall.
 3        Q.     So did Maker's Market sell things?
 4        A.     They did.  It was, like, handmade,
 5   craft-type items, art.
 6        Q.     So at Maker's Market, did people
 7   set up booths and sell art and other goods?
 8        A.     They did.
 9        Q.     And so were they selling those for
10   profit?
11        A.     Yes.  I would assume so, yes.
12        Q.     So explain to me how Maker's Market
13   did not violate the 2015 policy.
14        A.     Well, like I said, I mean, that was
15   a question that I had.  I mean, they're not
16   considered, really, what I consider a
17   commercial profit group, but -- because they
18   are part of the art community.  But eventually
19   decided, yes, they did violate the policy, and
20   I told them they could no longer set up on the
21   courthouse grounds.
22        Q.     So, eventually, you said they did
23   violate the 2015 policy?
24                    MR. O'DONNELL:  Object to
25             form.  You can answer.
```

```
 1                    LISA CARWYLE
 2       A.     Right.
 3       Q.     And why did you deny this permit?
 4       A.     Because she requested it, I
 5  believe, what, three, four days in advance, and
 6  we require 30-day notice.
 7       Q.     So was it under your discretion
 8  whether to waive that 30-day notice
 9  requirement?
10       A.     Yes.
11       Q.     So why did you not exercise that
12  discretion here?
13       A.     Because I believe that's an event
14  that she could have prepared for and told us,
15  you know, ahead of time, you know.  I try to --
16  I try to always, you know, adhere to the policy
17  requirements.  And it's -- since it says 30
18  days, I would require them to be -- to have it
19  30 days prior.
20       Q.     What criteria would you use when
21  determining whether to waive the 30-day
22  requirement?
23       A.     If it was something related to, you
24  know, somebody's First Amendment right for free
25  speech regarding, like, with the George Floyd
```

```
 1                    LISA CARWYLE
 2   events, people had the immediate need, desire,
 3   to protest, then we -- then I would allow that.
 4        Q.     Were there any other criteria that
 5   you used when determining whether to waive the
 6   notice requirement?
 7        A.     I think that was the only -- only
 8   one, the only criteria.
 9        Q.     So you just mentioned George Floyd.
10   You know, after his death in the summer of
11   2020, there were marches and assemblies and
12   protests in Oxford, right?
13        A.     Right.
14        Q.     And these marches and assemblies
15   and protests were about Mr. Floyd's death and
16   about the Confederate monument in the square,
17   right?
18        A.     Right.
19        Q.     Do you know if these marches and
20   assemblies and protests were about anything
21   else?
22        A.     I mean, there were some that
23   marched for the opposite, that were, you know,
24   pro-Confederate monument.  So the other side.
25        Q.     Were there any other reasons that
```

```
 1                    LISA CARWYLE
 2   these marches and assembles and protests
 3   happened in the summer of 2020?
 4        A.    I mean, I'm not sure.  I don't
 5   always, you know, know what all the reasons
 6   are, but that was the main reason that there
 7   were protests, that I know of.
 8        Q.    And so some of these marches and
 9   assemblies and protests were directed at the
10   Lafayette County Board of Supervisors, right?
11        A.    Right.
12        Q.    And these were directed at the
13   Lafayette County Board of Supervisors about the
14   Confederate statue in the square, right?
15        A.    Right.
16        Q.    How many marches, assemblies, or
17   protests were directed at the board of
18   supervisors over the Confederate monument in
19   the summer of 2020?
20        A.    I don't have a number.  There were
21   many that were done without a permit.  You
22   know, if they -- if they continue moving and
23   aren't just standing and possibly blocking
24   traffic, they were not required to get a
25   permit.
```

Page 68

```
 1                    LISA CARWYLE
 2        A.     Right.
 3        Q.     And some of these marches,
 4   assemblies, and protests took place on the
 5   county courthouse grounds at night, right?
 6        A.     I think there were a few, yes.
 7        Q.     How many?
 8        A.     Are you asking how many were
 9   permitted or how many occurred without a
10   permit?
11        Q.     How many occurred with -- in total?
12        A.     I do not know.
13        Q.     How many occurred with a permit?
14        A.     At night?
15        Q.     Yes.
16        A.     I don't know of any we gave at
17   night, except I know, in June, I think, there
18   was a vigil for Anthony Hervey, if you want to
19   say that's an assembly, you know, for him in
20   his -- in his memory.
21        Q.     How many people were at that vigil?
22        A.     I don't know.
23        Q.     Did they apply for a permit?
24        A.     They did.
25        Q.     How many people did they put on the
```

```
 1                    LISA CARWYLE

 2  were against; they would call and complain.

 3        Q.     How many such calls do you estimate

 4  there were?

 5        A.     I mean, I would guess less than 20.

 6        Q.     So will you go to document -- I

 7  guess it's number 10, which I'll introduce as

 8  Exhibit 7.

 9                    (Exhibit 7 was marked for

10                     identification.)

11        A.     Okay.

12        Q.     Do you recognize this document?

13        A.     Yes.

14        Q.     What is it?

15        A.     It's an order from the board

16  minutes for June 15th of 2020.

17        Q.     And this June 15th, 2020, order

18  amends the facility use policy as it applies

19  only to the county courthouse grounds, right?

20        A.     Yes.

21        Q.     It requires a permit for any group

22  of five or more people, right?

23        A.     Right.

24        Q.     Why was that amendment made?

25        A.     Why was that?  What did you --
```

```
 1                    LISA CARWYLE
 2        Q.      Why was this five-person amendment
 3   made?
 4        A.      If you have more than four people
 5   around the statue, you -- you have to be in the
 6   street, in a crosswalk, which is not a safe
 7   environment.  So this was to clarify to people
 8   and make them understand that if you had five
 9   or more, you needed to get a permit.  If you
10   have less, you could also get a permit and have
11   exclusive rights to that area for that
12   permitted time.
13        Q.      So -- but the -- this policy
14   applies to the entire courthouse grounds,
15   right, and only part of that is where the
16   statue is?
17        A.      Right.
18        Q.      So what if someone wanted to hold
19   an event in another section of the courthouse
20   grounds?  Would that same size limit concern
21   exist?
22        A.      The policy -- the order was to --
23   whether it was the grounds or the statue, if
24   you had five or more, you needed a permit.
25        Q.      Why was five people selected as the
```

Page 78

```
 1                    LISA CARWYLE
 2   limit?
 3        A.     I think I just answered that, but I
 4   can answer it again, if you'd like.
 5        Q.     So it was exclusively -- you chose
 6   five people -- or the County selected five
 7   people as the limit exclusively because of
 8   concerns of people around the Confederate
 9   monument; is that right?
10        A.     For the safety of the people who
11   would be there that get the permit, for the
12   safety of pedestrians who are crossing all
13   around those crosswalks, and the traffic
14   pattern there, yes.  It's a very dangerous
15   traffic pattern.  You've got vehicles coming at
16   three different directions who often don't know
17   how to drive around the square and yield
18   correctly.
19        Q.     So the -- the county courthouse
20   grounds has four -- at least four areas where
21   people can congregate, right?  Because there's
22   four sides of the courthouse; isn't that right?
23        A.     There are four sides; that's right.
24        Q.     And people can congregate on any
25   one of those sides, right?
```

Page 79

```
 1                    LISA CARWYLE
 2        A.      They could.  We only issue one
 3   permit for the grounds.
 4        Q.      But if you issued a permit, they
 5   could decide to be on any side, right?
 6        A.      Right.
 7        Q.      And when you said that five people
 8   would create these safety concerns around the
 9   Confederate monument, would five people create
10   safety concerns on the other side of the county
11   courthouse -- other sides?
12        A.      Possibly.
13        Q.      Is that why the five people were
14   chosen, because on any side, there were the
15   same concerns?
16        A.      When you get the permit, you're --
17   you're getting it for all the area, including
18   the statue.  So you don't get the permit and
19   are told, You've got to stay on the north side.
20   So the concern is, the more people you get
21   around that statue, it's dangerous to them;
22   it's dangerous to pedestrians; it's dangerous
23   to the traffic going around the square.  So
24   that's why it was decided to do five or more
25   needed to have a permit.
```

Page 80

```
1                      LISA CARWYLE
2         Q.      So if five people were on the
3    county courthouse grounds, is your testimony
4    that that creates concerns for traffic safety?
5         A.      It could.
6         Q.      And how is that?
7         A.      Well, depending on what they are
8    doing there, how many more than five, it could
9    be a distraction for traffic.
10        Q.      But this -- this policy applies for
11   five or more people.  So if a group only has
12   five people, they have to get a permit under
13   this policy, right?
14        A.      That's right.
15        Q.      And so a group of five people, what
16   a kind of traffic concerns do they pose if
17   they're using the county courthouse grounds?
18        A.      It could -- whatever they are doing
19   there could be distracting to the people
20   driving the vehicles.  The safety concern could
21   also be for themselves, based on if -- that's
22   why we need to know they are coming.  That's
23   the reason for the permit, so we can be
24   prepared -- prepared to protect them, if
25   needed.
```

1                    LISA CARWYLE

2       Q.      Now, was this June 15th, 2020,

3   amendment made in response to the protests

4   happening that summer?

5       A.      Yes.  I believe so.

6       Q.      Were there any other reasons that

7   this amendment was made?

8       A.      Just to make it clear so people

9   understood when they needed to have a permit

10  and when they did not, because we were

11  getting -- more people were showing up to

12  protest, to use that area, and we wanted to

13  make it clear what was needed from them, what

14  was required at what point.

15      Q.      So the June 2020 amendment says

16  that 30 days' notice is required to get a

17  permit, except in, quote, unusual

18  circumstances.  And the board of supervisors

19  and/or sheriff shall determine whether to waive

20  the 30-day period.

21         Is that right?

22      A.      That's what the order says, yes.

23      Q.      What are "unusual circumstances"?

24      A.      It's like what I mentioned before,

25  you know, people had the right, that if they

```
 1                    LISA CARWYLE
 2  had strong feelings about the George Floyd
 3  incident, to come and protest.  We felt like we
 4  needed to waive the 30-day period in those
 5  circumstances.
 6       Q.    What criteria are used to determine
 7  unusual circumstances?
 8       A.    Pretty much what was happening in
 9  the country and the nation, in our city, and
10  people's need -- they felt the need to protest.
11       Q.    But for purposes of determining
12  whether to waive the 30-day period, what
13  criteria were used?
14       A.    I believe that was the only --
15  those type incidences were the only time it was
16  waived.  So that was the criteria I was using.
17       Q.    And whose decision was it whether
18  to waive the 30-day period or not?
19       A.    It was my decision, and I would
20  consult with the sheriff to make sure that he
21  could have the manpower he needed available
22  during that time, you know.  So if they asked
23  three days ahead of time, is that enough time
24  for you to get who you need here?  And so under
25  his consultation, then I would waive it or not.
```

1                        LISA CARWYLE

2        Q.      Who has the final say about whether

3    to waive the notice requirement?

4        A.      I have the final say.  If anybody

5    did not like my decision, they could always

6    appeal it to the board of supervisors for --

7    during one of their board meetings.

8        Q.      So the June 2020 order says that

9    the board of supervisors and/or the sheriff

10   shall determine whether to waive the 30-day

11   period.  But you're saying that you have the

12   authority whether to waive it.  How do you

13   explain that difference?

14       A.      Well, I work under the board of

15   supervisors.  They set policy, and I'm here to

16   do the day-to-day operations, carry through on

17   those policymaking decisions.  So based on

18   that, then I'm the one that can determine to

19   waive or not waive the 30-day.

20       Q.      Did the board delegate to you their

21   authority to waive this notice requirement?

22       A.      By Mississippi law, they do, yes.

23   I mean, they're not here on a day-to-day basis

24   to carry through with any kind of act like

25   that.

Page 84

1                    LISA CARWYLE

2        Q.       Now, when this June 2020 policy was

3   in effect, did the board ever get involved in

4   whether to waive the notice requirement?

5        A.       No.

6        Q.       So after this June 2020 policy

7   amendment was made, did the process for

8   administering permits change at all?

9        A.       Not really.  I don't know that

10  they -- the process changed.  I mean, I was --

11  obviously, we were getting more of them.  I

12  was, you know, more aware of the timeliness of

13  it, you know, to get with the sheriff.  And

14  people were bringing permits and requesting to

15  be approved within three days.  So I -- I spent

16  more of my time with them, probably, than I did

17  in the past.

18       Q.       But the process stayed the same?

19       A.       I can't think of a -- of a change

20  right now, no.

21       Q.       Did any of the decision makers

22  change?

23       A.       No.

24       Q.       Did the sheriff's role change?

25       A.       No.  I mean, again, back starting

```
 1                  LISA CARWYLE

 2   them about it.

 3        Q.     Would you open up document

 4   number 12, which will be our next exhibit?

 5                    (Exhibit 9 was marked for

 6                     identification.)

 7   BY MR. TOM:

 8        Q.     Do you recognize these documents?

 9        A.     I do.

10        Q.     What are they?

11        A.     It's an email exchange between

12   myself and David O'Donnell and Joey East about

13   George Johnson's permit request.

14        Q.     And this exhibit has Bates number

15   range 274 to 281.  So on Bates number 274, you

16   say, I'll send to supervisors with that

17   recommendation and let George know.

18         Do you see that?

19        A.     Right.

20        Q.     Why did you send a recommendation

21   to the supervisors?

22        A.     Well, usual -- sometimes,

23   especially during this heated time of the

24   summer, I would let them know of a permit that

25   I was denying or granting so they would be
```

1                          LISA CARWYLE

2    aware of it, because somebody might call them

3    complaining or -- or they might hear about

4    people being on the -- on the courthouse lawn.

5    So I would let them know that it was happening

6    or not happening.

7          Q.      And what was their role after you

8    let them know about the permit?

9          A.      They didn't have a role.  They

10   just -- I wanted to make sure they were aware.

11   You know, supervisors don't like hearing about

12   stuff from the public, upset.  They'd rather

13   know ahead of time, so. . .

14         Q.      Why do you use the word

15   "recommendation"?

16         A.      That was just the term I used, but

17   it wasn't for their approval.  It was so they

18   were aware, because if George or any people in

19   his group were upset they were denied, I wanted

20   them to know before they got phone calls about

21   it.

22         Q.      I see.  So the supervisors still

23   had no role in the permit process; is that

24   right?

25         A.      Right.  They didn't have a role in

```
 1                    LISA CARWYLE

 2   discretion to do that in consultation with

 3   Sheriff East?

 4        A.     Yes.

 5        Q.     So go to, in this same exhibit,

 6   Bates number 265.  And this is an email from

 7   you to supervisors -- or it just says

 8   Supervisor, Joey East, and David O'Donnell,

 9   dated June 18, 2020, at 3:31 p.m.

10        So in the second paragraph, you

11   say, Joey and I think we should probably --

12   scratch that.

13        Joey and I think we probably should

14   revisit a couple of issues about the policy

15   tomorrow after -- at the end of our budget

16   sessions.

17        Right?

18        A.     Right.

19        Q.     What issues were those?

20        A.     The issues that I think I talked

21   about above as far as that -- well, hang on.

22   Let me read them.

23        Oh.  I think just the concern of

24   the safety issues, the security issues,

25   surrounding this number of people coming and
```

```
 1                    LISA CARWYLE
 2    whether -- I don't know, other than that.  I
 3    mean, I know it was all about safety and
 4    security.  Joey was very concerned about
 5    opposing groups trying to show up at the same
 6    time and there being conflict.
 7         Q.     What decisions were made regarding
 8    those issues?
 9         A.     Well, eventually, it -- the
10    decision was made to, A, put a curfew on the
11    use of the grounds, because it was harder --
12    much harder for them to police that and
13    guarantee a secure environment when it's dark
14    outside.  That's the main thing I remember.
15         Q.     Were there other things?
16         A.     I can't think of any right now.
17         Q.     And so when you say that you should
18    revisit a couple of issues at the -- a couple
19    of issues tomorrow, did you discuss, on that
20    date, the curfew?
21         A.     I can't tell you for sure that we
22    did, but I know it was discussed a number of
23    times before they voted in July.  So probably.
24                    THE VIDEOGRAPHER:  So,
25              Mr. Tom, excuse me.  Within the
```

1                    LISA CARWYLE

2   all was on my mind at the time, but, again, the

3   revisions that eventually came, we were

4   concerned about the security, the safety of the

5   people who were requesting the use.  And so

6   I -- again, that's what ultimately became -- we

7   changed the policy in July, I think, 21st or

8   20th, to implement the "no use after dark" and

9   the "14-day" change.

10       Q.    Who suggested making those

11  revisions?

12       A.    Joey definitely suggested making

13  the revisions for safety and security concerns

14  he had for people having permits at night.

15       Q.    Were there any revisions that y'all

16  discussed at this meeting that were not

17  adopted?

18       A.    I don't remember.

19       Q.    So will you go to the document that

20  begins with 15, which will be Exhibit 12?

21                    (Exhibit 12 was marked for

22                    identification.)

23       A.    Okay.

24       Q.    So do you recognize this document?

25       A.    I do.

1                    LISA CARWYLE

2       Q.      What -- what is it?

3       A.      It's an email from Joey East about

4   the permit application policy.

5       Q.      Now let's go to page 3 of this

6   exhibit, with the Bates number 298.

7       A.      Okay.

8       Q.      So you see these little comment

9   bubbles?

10      A.      I do.

11      Q.      And they -- they -- the first one

12  says JE1 and the second one says JE2.  Does

13  that indicate that these are Joey East's

14  comments?

15      A.      Yes.

16      Q.      So if you look at the comment JE2,

17  Mr. Joey East comments on the word "limited" in

18  the policy.  And he says -- or let's go back.

19       So the policy says, Use on weekends

20  or after 10:00 p.m. is limited and must be

21  primarily events coordinated and staffed by

22  county employees and/or officials.

23       So Joey East comments on that

24  sentence and says, It should be no later than

25  5:00 p.m. unless special request to and

Page 106

1                     LISA CARWYLE

2    approved by BOS.

3          Do you see that?

4        A.      I do.

5        Q.      And BOS is board of supervisors?

6        A.      Right.

7        Q.      Okay.  What does -- what does this

8    comment mean?

9        A.      He's commenting that we need to

10   address the time frame that it's allowed,

11   again, going back to him being concerned with

12   events after dark.  He said it should be no

13   later than 5:00 p.m.  He -- and then he's

14   saying, unless -- he was suggesting that, if

15   possible, we should change the policy to put in

16   there that, you know, if somebody had a special

17   request to use it after dark, that it should go

18   directly to the board of supervisors.

19       Q.      And did the board want a bigger

20   role in the permitting process?

21       A.      I don't believe so.  No.

22       Q.      Was this authority given to the

23   board in the final policy?

24       A.      No.

25       Q.      Why was it not?

Page 107

```
 1                    LISA CARWYLE
 2        A.     I do not know.  I guess they didn't
 3   want it in there.  I don't remember it being
 4   discussed with the board to -- for it -- their
 5   approval to be included or not included.
 6        Q.     Did this become part of your
 7   practice to get approval from the board for
 8   events on weekends?
 9        A.     Has it become part of our practice?
10        Q.     Yes.
11        A.     No.
12        Q.     So, as of today, does the board
13   have any role in granting or denying permits
14   for use of county property?
15        A.     No.  Unless, like I said before, if
16   somebody did not like my granting or denying,
17   they could appeal it to the board of
18   supervisors.
19        Q.     And is that appeal provision
20   somewhere in the policy?
21        A.     It's not stated in the policy, but
22   that's just state law regarding any decision
23   made.  It's always available to be appealed to
24   the board of supervisors.
25        Q.     Do you have any idea why
```

Page 108

1                    LISA CARWYLE

2    Sheriff East wanted the board of supervisors to

3    have the authority whether to grant special

4    weekend use?

5         A.      I do not.

6         Q.      Did you think it was necessary for

7    the board of supervisors to have authority to

8    grant permits for weekend use?

9         A.      I don't think it's necessary, no.

10        Q.      So go to tab -- or document that

11   begins with number 16, which will be

12   Exhibit 13.

13                         (Exhibit 13 was marked for

14                          identification.)

15                         (Court reporter

16                          clarification.)

17   BY MR. TOM:

18        Q.      Do you recognize this document,

19   Ms. Carwyle?

20        A.      I do.

21        Q.      What is it?

22        A.      It's an email to Joey East, David,

23   and the supervisors about a permit application.

24        Q.      And what was this permit

25   application for?

```
 1                    LISA CARWYLE
 2   nailed it down that you would, you know,
 3   consider waiving the notice requirement if it
 4   was for or against the statue or if it was
 5   about George Floyd.
 6        A.     Well, obviously, I'm not just only
 7   concerned with George Floyd's death or people
 8   aren't only concerned with that.  There would
 9   be other times -- hopefully, it doesn't ever
10   happen again in the future, but if it did, then
11   yes.  I wouldn't just say it was only because
12   of him.
13        Q.     So what -- what are the criteria
14   that you'd use if it's not just George Floyd
15   and if it's not just the monument for
16   determining whether to waive the notice
17   requirement?
18        A.     I guess I don't have a good word
19   for it, but, it's, you know, depending on the
20   environment of what's going on in our culture
21   of their need to do that, if it's
22   time-sensitive to them.
23        Q.     And what do you mean by
24   "environment"?
25        A.     What the -- what am I trying to
```

```
1                    LISA CARWYLE
2    say?  The mood of what -- everybody's emotions
3    of what -- and reaction to some event, like
4    George Floyd's death.
5         Q.     And how do you determine the mood?
6         A.     I do not know.
7         Q.     So do you use any criteria when
8    determining the mood?
9         A.     I mean, I guess it's based on what
10   we see here in the -- in the public, in the
11   media, and the people who are calling and
12   asking to do this.  That -- you know, I can
13   tell what the mood is when people are out
14   there, you know, wanting to protest.
15        Q.     So what else do you use besides the
16   mood to determine whether the notice
17   requirement should be waived?
18        A.     I feel like I've -- I've said it
19   500 times.  I'm trying to think of a way to say
20   it differently.
21         We do not want to prohibit people
22   from expressing themselves, from free speech
23   when there is a need, a desire, to protest in
24   response to some type of event like that.  That
25   was the criteria I used.  I cannot sit here and
```

1                    LISA CARWYLE

2  foresee every possible scenario to tell you how

3  that would be analyzed or not.  I can tell you

4  what I did.

5       Q.     And did you come up with those

6  criteria yourself?

7       A.     I mean, some of it was in

8  consultation with our county attorney.

9       Q.     Did you discuss with anybody else

10  to come up with the criteria of whether to

11  waive the notice requirement?

12       A.     No, not criteria.  Again, we

13  wouldn't waive it if the sheriff could not

14  provide security for the event.  If he didn't

15  have enough manpower, didn't have enough days

16  to get that together, then I would not have

17  approved it.

18       Q.     So will you go to document that

19  begins with 18?

20                    MR. TOM:  We'll do that as

21            Exhibit 15.

22                    (Exhibit 15 was marked for

23                     identification.)

24  BY MR. TOM:

25       Q.     Do you recognize this document?

Page 116

```
 1                    LISA CARWYLE
 2       A.      I do.
 3       Q.      And what is it?
 4       A.      Well, I haven't scrolled all the
 5  way through it, but, first, I sent it -- it's
 6  an email to Joey East and David O'Donnell and
 7  the supervisors asking if they changed anything
 8  as far as the number of days to issue a permit
 9  at a meeting I was not present at.
10       Q.      So Exhibit 15, this involves a
11  permit for Take It Down Oxford for a peaceful
12  gathering to attend a BOS meeting, right?
13       A.      Right.
14       Q.      And it was submitted on July 14th,
15  2020, and for the meeting on -- for the event
16  to be held on July 20th, 2020, right?
17       A.      Uh-huh.  Right.
18       Q.      And this -- this permit was
19  granted, right?
20       A.      Yes.
21       Q.      Why did you decide to waive the
22  notice requirement here?
23       A.      Because there was a lot of --
24  again, this was related to the Confederate
25  statue and wanting to take it down.  So --
```

```
1                    LISA CARWYLE
2   well, wait a minute.  This was in response to,
3   I guess, their vote to not take it down, and
4   they wanted to protest because of that.  So
5   I -- so I allowed it.
6        Q.    Go to the first page of this
7   exhibit, which has Bates number 324.  And
8   there's two emails on this page.  At the bottom
9   email, it's an email from you to Joey East and
10  David O'Donnell.  And you say, Did y'all
11  discuss at the board meeting last Monday to
12  change the requirement on the number of days to
13  issue a permit?
14        And then at the top, you say, I
15  don't know if y'all decided to change the
16  number of days required to issue a permit, but
17  I received this Tuesday right before 5:00.
18        Why did you say that?
19        A.    Because I didn't know if they had
20  made any changes to the number of days that was
21  required to issue a permit, and I was checking.
22        Q.    Why would that matter?
23        A.    Well, I wanted to know, because I
24  administer the policy, if there was a change to
25  the permit.  It obviously did not matter in
```

```
 1                    LISA CARWYLE
 2  this case, but I just -- I -- those are some
 3  things I'd like to know.
 4       Q.    But -- so you -- you have already
 5  said that you had the discretion to waive the
 6  requirement or not, irregardless of what the
 7  policy said, right?
 8       A.    That's right.
 9       Q.    So why would it matter whether they
10  changed it or not if you had that discretion?
11       A.    Well, as I implement the policy, I
12  would like to know if changes are -- were made
13  to it.
14       Q.    If a change had been made to it,
15  how would that have affected this permit?
16       A.    Well, considering they did it
17  seven -- six days in advance and it was
18  approved, then it wouldn't have changed it.
19  But I would need -- still need to know any
20  changes to our policy.
21       Q.    Were you looking for an excuse to
22  deny this permit?
23       A.    I was not, because I approved the
24  permit.
25       Q.    Well, I'm just getting to this
```

1                    LISA CARWYLE

2    language about -- you know, you were inquiring

3    about whether they changed the notice

4    requirement or not and why -- why you would ask

5    that.

6        A.     I would ask that because, as county

7    administrator, I need to know of any changes to

8    the facility use policy or any other policy

9    that the board sets.

10       Q.     So remember when -- let's go back

11   to Exhibit 13, which is the document that has

12   Bates numbers 311 to 317.

13       A.     Can you tell me what document

14   number that is?

15       Q.     It begins with 17.

16       A.     Okay.

17       Q.     So this -- this permit was about

18   the Love Your Neighbor and Prayer event that

19   was applied for on July 1st for an event that

20   was held on July 5th, and it was approved.  And

21   then document number 18, which is Exhibit 15,

22   was -- was applied for on July 14th for an

23   event on July 20th.

24           And so why was it that you were

25   asking about whether the notice requirement was

```
 1                    LISA CARWYLE

 2   changed for the Take It Down board of

 3   supervisors gathering but not for the Love Your

 4   Neighbor event?

 5       A.      Because on July 1st, I was here

 6   working.  July -- let me look at my

 7   calendar -- 6th through the 10th, I was on

 8   vacation, and I missed the board of supervisor

 9   meeting on July 6th.  So when I come back to

10   work, I want to know did they change anything

11   in that meeting.  Love Your Neighbor was

12   applied, and that email was sent prior to me

13   being on vacation and prior to that meeting.

14       Q.      I see.  So will you go to document

15   number 19, which we'll introduce as Exhibit 16?

16                       (Exhibit 16 was marked for

17                        identification.)

18   BY MR. TOM:

19       Q.      Do you recognize this one?

20       A.      I do.

21       Q.      What is it?

22       A.      It's a board order revising the

23   facility use policy on July 20th, 2020.

24       Q.      And this order reduces the

25   advance-notice requirement to 14 days from 30,
```

```
 1                     LISA CARWYLE
 2   and also imposed a curfew on the county
 3   courthouse grounds, right?
 4        A.      Right.
 5        Q.      Why were these changes made?
 6        A.      The curfew was made based on
 7   Sheriff East's recommendation and concern about
 8   safety issues of events happening up there
 9   after dark.  I believe the 14 days was we were
10   concerned that 30 days was too many, and so
11   we -- they changed -- voted to change it to 14.
12        Q.      30 days was too many for -- why was
13   30 days too many?
14        A.      I think they believed it was too
15   many for the applicant to have to comply with,
16   so they changed it to 14 days.
17        Q.      Who thought that?
18        A.      I couldn't tell you specifically
19   who thought that.  I know the sheriff thought
20   he could, you know, deal with a 14-day time
21   frame, and so it was changed.
22        Q.      So are the courthouse grounds
23   dangerous at night?
24        A.      I believe it -- I believe it is
25   more dangerous to have an event there at night.
```

```
 1                   LISA CARWYLE

 2        Q.      Why is that?

 3        A.      It's not lit well at all.  It's

 4   very poorly lit.  It's more like ornamental

 5   lighting.  And, of course, when it's dark, for

 6   the people driving around the square, it's more

 7   dangerous for them because their line of vision

 8   is not as well as it would be during the day.

 9   And so it's dangerous for people who are using

10   that area and possibly spilling out into the

11   street.  It's also more dangerous, if you were

12   to have some type of conflicting groups there,

13   for the sheriff's department to be able to

14   handle a situation like that.

15        Q.      And are there specific incidents

16   that happened?  Let me rephrase that.

17          Are there specific incidents about

18   those safety concerns on the courthouse

19   grounds?

20        A.      I mean, obviously, there's, you

21   know, security/safety concerns around the whole

22   square.  But I know -- I think a candlelight

23   vigil was done, I think, in June, and I think

24   Sheriff East -- it brought it to his attention

25   more that a circumstance like that could
```

```
 1                    LISA CARWYLE
 2   escalate into a bigger issue, problems.
 3        Q.     Do you have a -- do you have any
 4   idea why that was?
 5        A.     Do I have any idea why he felt like
 6   that?
 7        Q.     Uh-uh.
 8        A.     I think -- I believe he told me
 9   this.  I don't -- that there were some -- the
10   candlelight vigil were people there in
11   support -- I guess you would say in support of
12   the statue, because they were there for that
13   Anthony Hervey that had passed away.  And I
14   think maybe people coming by and yelling at
15   them and, you know, some conflict.  Maybe
16   people came up to them.  I don't know.  But he
17   was concerned about security issues when it was
18   dark.
19        Q.     So before this amendment was
20   adopted in July of 2020, has a curfew ever been
21   placed on the county courthouse grounds, to
22   your knowledge?
23        A.     I don't know of a curfew formally
24   being placed, but it had been discussed for a
25   while prior to this being adopted.
```

```
 1                    LISA CARWYLE
 2   2019?
 3       A.     I can't say that it was, but I
 4   definitely can't say that it wasn't.  I
 5   don't -- you know, I just don't have a good
 6   timeline of exactly when all that was
 7   discussed.
 8       Q.     You said, though, that the first
 9   time you'd ever heard of any curfew was when
10   Joey East became sheriff in January of 2020,
11   right?
12       A.     That's my recollection, yes.
13       Q.     So did the County consider other
14   options besides a curfew?
15                    MR. O'DONNELL:  Object to
16            form.
17       A.     I mean, I guess this goes in line
18   with the curfew, but when we talked about, at
19   the time, maybe we should put gates up, you
20   know, when it's closed.  Obviously, the main
21   purpose of the courthouse is for the courthouse
22   itself to function as county government.  And
23   so we had talked about when that closed, you
24   know, at 5:00, to possibly put gates up.  But
25   that goes in line with the curfew.
```

Page 127

1                    LISA CARWYLE

2        A.      I don't know.  I don't remember.

3    I'm feeling like I'm forgetting something, but

4    I don't remember.

5        Q.      Did you consider any other options,

6    besides a curfew and putting up gates, in order

7    to ensure public safety at the county

8    courthouse grounds?

9        A.      Did I consider?  Is that what you

10   said?

11       Q.      Yeah.

12       A.      I don't remember.

13       Q.      Is a curfew necessary to ensure

14   public safety on the county courthouse grounds?

15       A.      I think the curfew will definitely

16   help ensure public safety on the courthouse

17   grounds after dark.

18       Q.      Is it necessary to ensure public

19   safety?

20       A.      I believe it is.

21       Q.      Why do you say that?

22       A.      Based on the information that I've

23   heard Sheriff East discuss, I believe so.

24       Q.      So we discussed before how the

25   square is active at night, including, you know,

```
 1                    LISA CARWYLE

 2   use of the courthouse grounds, you know, for at

 3   least several years before you became the

 4   county administrator, right?

 5                    MR. O'DONNELL:  Object to

 6           form.

 7   A.      Yeah.  I'm --

 8                    MR. O'DONNELL:  She

 9           doesn't --

10   A.      What's your question?

11   Q.      People used the square at night for

12   many years, right?

13   A.      Yes.  They've used parts of the

14   square at night for many years.

15   Q.      Including the county courthouse

16   grounds, right?

17   A.      I rarely see people at night on the

18   courthouse grounds.

19   Q.      But regardless of what you've seen,

20   the people -- you know, not just because, you

21   know, you've seen it, but is it your

22   understanding that people use the square,

23   including the courthouse grounds, at night, and

24   that's happened for many years?

25   A.      I mean, yes, they do.  But if you
```

```
1                    LISA CARWYLE
2    were to ride around the square at night, you're
3    going to see, you know, a lot more people using
4    the square outside of the courthouse grounds
5    than you will ever see on the courthouse
6    grounds.
7         Q.     During that -- during all of these
8    times -- strike that.
9          Is the curfew being enforced?
10        A.     It is.
11        Q.     Who enforces it?
12        A.     I mean, I've enforced it with
13   people requesting permits for that time.
14        Q.     Who else enforces it?
15        A.     That's how I know it's being
16   enforced, is, like I said, I mean, we've had
17   other permit requests that would maybe spill
18   over into nighttime that I have had to tell
19   them they could -- the permit would be granted
20   if they adjusted their time frame.
21          We are -- I've actually got the
22   director of building services looking at
23   getting some signs made.  And like I think I
24   already mentioned, I'm not sure about the
25   gates, but we're getting some -- got some
```

```
 1                    LISA CARWYLE
 2  quotes and going to discuss whether we want to
 3  gate it, whether archives and history would
 4  approve that.
 5       Q.     Have you granted any permits, after
 6  this July amendment was made, for events at
 7  night?
 8       A.     I have not.
 9       Q.     So if somebody were to be --
10  scratch that.
11       If someone is just walking at night
12  on the courthouse grounds, would that violate
13  the curfew?
14       A.     It would.
15       Q.     And who is -- who is -- is anyone
16  enforcing that, if someone were to just walk on
17  it?  Is somebody enforcing that?
18       A.     I don't know.  I mean, the
19  sheriff's department is who would need to
20  enforce that.  Of course, we have -- which is
21  one of the issues with safety and security.  We
22  don't have a huge staff at night, and they are
23  responsible for patrolling the whole 600 square
24  miles of Lafayette County.  So I don't -- I
25  can't answer that question.  I don't know if
```

Page 131

```
1                    LISA CARWYLE
2    they are or they're not.
3         Q.    Do you know if a sheriff's deputy
4    is stationed at night on the county courthouse
5    grounds?
6         A.    I'm pretty sure they are not.
7         Q.    Does the City of Oxford enforce the
8    curfew at night on the county courthouse
9    grounds?
10        A.    No.  That's not in their
11   jurisdiction.
12        Q.    So besides the -- enforcing the
13   curfew when someone applies for a permit, is
14   the curfew being enforced besides that?
15        A.    That is a question for
16   Sheriff East.  I don't get to tell the sheriff
17   what to do.
18        Q.    Have you gone onto the county
19   courthouse grounds for nonwork purposes at
20   night after the curfew was imposed?
21        A.    Have I?
22        Q.    Yes.
23        A.    No.
24        Q.    Have you seen anyone on the county
25   courthouse grounds at night since the curfew
```

Page 132

                          LISA CARWYLE

1

2   was imposed?

3       A.     I don't believe so.  I'm not up

4   here at night very often.

5       Q.     How has the County made the curfew

6   known to the public?

7       A.     Well, like I said, we are working

8   on getting some signs made now.  But other than

9   that, it would be just how it was reported

10  after the meeting, you know, in the policies on

11  our website and stuff.

12      Q.     So this order dated July 20th,

13  2020, imposing the curfew was posted on the

14  website?

15      A.     Well, the order is part of the

16  minutes that are linked to our website.

17      Q.     So besides putting this order,

18  along with the minutes, on the Lafayette County

19  website, how else was the curfew made known to

20  the public?

21      A.     I'm not sure.  I would have to

22  double-check that.  I'm not sure.

23      Q.     To your knowledge, do you know of

24  any other ways that the curfew has been made

25  known to the public?

Page 133

1                    LISA CARWYLE

2       A.     I don't know.  I know -- I remember

3  a -- we did a press release, I think, after the

4  one in June, to make sure everybody understood

5  the permitting process.  I just can't remember

6  right now if we did the same thing in July.

7       Q.     And you did say that the curfew is

8  not posted currently anywhere on the courthouse

9  grounds?

10      A.     It's not.

11      Q.     Did y'all post a curfew -- or does

12 Lafayette County have any social media pages?

13      A.     Yes.

14      Q.     What social media pages?

15      A.     We have Facebook.

16      Q.     Did you post -- did Lafayette

17 County post the curfew on the -- on its

18 Facebook page?

19      A.     That's what I was saying I do not

20 remember.  If we had done a press release,

21 that's where it would have gone, but I don't

22 remember.

23      Q.     The only way that you enforce the

24 curfew is through the permit process, correct?

25      A.     That's the way I enforce it, yes.

```
 1                    LISA CARWYLE
 2        Q.     Are you aware of any other way that
 3   the curfew is enforced?
 4        A.     I do not know.
 5        Q.     Now, besides the substantive
 6   changes about the notice requirement and the
 7   curfew, was the process -- was your process for
 8   administering permits changed after the July
 9   2020 amendment?
10        A.     No.
11        Q.     Was the curfew implemented in
12   response to the protests and marches and
13   assemblies occurring in Oxford in the summer of
14   2020?
15        A.     Ask me that again.
16        Q.     Was the curfew implemented in
17   response to the protests, assemblies, and
18   marches occurring in Oxford in the summer of
19   2020?
20        A.     It was related to that, because
21   those caused security and safety concerns with
22   Sheriff East.
23        Q.     When you say it was related to
24   that, what does that mean?
25        A.     Well, I guess the way you stated it
```

```
 1                    LISA CARWYLE
 2  makes it sound like we possibly did it because
 3  of the protests, but it was done because of the
 4  safety concerns related to the protests.  I'm
 5  just trying --
 6       Q.      Were --
 7       A.      -- to clarify.
 8       Q.      Were there safety concerns
 9  unrelated to the protests?
10       A.      Yes.  There would be safety
11  concerns for people using the courthouse lawn
12  for anything after dark.
13       Q.      Did the board impose the curfew in
14  an effort to end the protests on the county
15  courthouse grounds?
16       A.      No.
17       Q.      So will you open up document
18  number -- that begins with 20?
19                    MR. TOM:  And we'll introduce
20            this as Exhibit 17.
21                    (Exhibit 17 was marked for
22                    identification.)
23  BY MR. TOM:
24       Q.      Do you recognize that document?
25       A.      I do.
```