1              UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF MISSISSIPPI

3

4
   JOHN RASH,                        )
5                                    )
              Plaintiff,             )        CAUSE NO. 3:20CV224
6                                    )
                 VS.                 )
7                                    )
   LAFAYETTE COUNTY, MISSISSIPPI )
8                                    )
              Defendant.             )
9  _____

10

11
       MOTION HEARING - MOTION FOR PRELIMINARY INJUNCTION
12   BEFORE UNITED STATES SENIOR DISTRICT JUDGE NEAL B. BIGGERS
              WEDNESDAY, AUGUST 5, 2020; 1:30 P.M.
13                    OXFORD, MISSISSIPPI

14

15  FOR THE PLAINTIFF:

16       ACLU of Mississippi
         JOSHUA FIYENN TOM, ESQ.
17       Post Office Box 2242
         Jackson, Mississippi 39225
18
         C. Jackson Williams, Attorney
19       C. JACKSON WILLIAMS, ESQ.
         Post Office Box 69
20       Taylor, Mississippi 38673

21
   FOR THE PLAINTIFF VIA VIDEOCONFERENCE:
22
         American Civil Liberties Union of Mississippi
23       LANDON P. THAMES, ESQ.
         Post Office Box 2242
24       East Capital Street
         Jackson, Mississippi 39225
25



RASH -- DIRECT                                          18

1  about a Confederate monument and protests over that monument

2  than the monument itself and the grounds where the monument

3  stand, particularly when history and the design of those

4  grounds make it a traditional public forum.

5           THE COURT:  Okay.  Now -- thank you -- do you have

6  testimony you would like to present?

7           MR. TOM:  Sure.  John.  I'd like to call Mr. John

8  Rash.

9           THE COURT:  All right.  You may come around and be

10  sworn.

11     (OATH ADMINISTERED BY THE COURTROOM DEPUTY)

12           THE COURTROOM DEPUTY:  State your name for the

13  record, please.

14           THE WITNESS:  My name is John Rash.

15           THE COURT:  All right.  You may proceed.

16              JOHN RASH, PLAINTIFF, SWORN

17                 DIRECT EXAMINATION

18  BY MR. TOM:

19  Q.   Now, Mr. Rash, where do you live?

20           THE COURT:  Counsel, come right over here at this

21  podium, please.

22           MR. TOM:  Would you like me to put on my mask, Your

23  Honor?

24           THE COURT:  No.  I can understand you better without

25  it.  I may have to get Mr. Rash to -- we'll see if I can

1   understand him.

2          MR. TOM:  Okay.

3   BY MR. TOM:

4   Q.    Mr. Rash, where do you live?

5   A.    I live in Lafayette County, which is the county where

6   Oxford is.  So I live in Oxford.

7   Q.    And how long have you lived in Lafayette County?

8   A.    Since the summer of 2017.

9   Q.    And how often do you visit the Oxford Town Square?

10  A.    I visit the Oxford Town Square at least four times a week.

11  It's on my drive to work, so I pass through there more than I

12  would like to sometimes because of traffic, but definitely

13  three or four times a week at a minimum.

14  Q.    And that's three or four times a week for the entire time

15  that you've lived in Lafayette County?

16  A.    That's right.

17  Q.    And have you ever -- or tell me about your event last

18  year -- or let me -- strike that.  Have you ever held an event

19  at the Lafayette County Courthouse?

20  A.    Sure.  So I have a visual art event that I curate every

21  year as part of the Fringe Festival called "Projection."  And,

22  although we've done that event for 2 years previous to this

23  year, last year it did include the courthouse grounds.  And we

24  had, I believe, three artists who were stationed at the

25  courthouse grounds projecting onto three different walls on the

1  courthouse architectural surfaces of the courthouse itself

2  during that event last August.

3  Q.    And were there any security issues or disorder -- strike

4  that.  Were there any security issues?

5  A.    None that I was aware of.  In my observation, it was a

6  joyous event.  People were both intentionally coming to see our

7  projections; but, also, we had people who were just on the

8  square to have dinner or be out for the weekend who were

9  interested and surprised by what we were doing who stopped by

10  to look at the work of our artists that night.  But no security

11  issues that I was aware of.

12  Q.    And when exactly was this event last year?

13  A.    It was a parallel time to this year, so mid -- mid-August.

14  I don't know the exact date; but should have been, I believe,

15  the second Saturday in August of last year.

16  Q.    And what time was the event?

17  A.    It was at night.

18  Q.    From approximately what time to what time?

19  A.    I believe dusk is around 8:00 p.m. this time of year, so

20  we were projecting from 8 to 10:30ish at night and then took

21  another 20 minutes or so to break down and clear out of the

22  courthouse area when we were finished.

23  Q.    And why is it necessary to apply this year for a permit

24  for projection at night?

25  A.    This event is impossible to pull off if it's light outside

1   because what we're trying to do is, again, sort of create a

2   surprising environment by using light as our artistic medium.

3   So the artist might be a digital artist, photographers,

4   filmmakers; but it's not a traditional cinematic experience.

5   We're using the surfaces of the building and objects around the

6   courthouse square to project upon with light which wouldn't be

7   visible if the sun was out.

8   Q.   Now, is there an ample alternative forum other than the

9   county courthouse grounds for you to hold "Projection," your

10  art event, this weekend?

11  A.   Not that I'm aware of.  Not only because the prominent

12  location of the courthouse being in the center of that

13  roundabout and visible from all of the bars and restaurants --

14  so this being a three-dimensional artistic installation, by

15  stationing artists on every corner of the courthouse, it

16  becomes visible from almost any position on the square, as well

17  as the potential of allowing artists to comment on recent

18  events in Oxford which happened on the courthouse square.  So,

19  for both of those reasons, I don't see any location that would

20  be the same as using the courthouse square for this event.

21  Q.   And can you explain what you mean by the recent events

22  that have happened on the square?

23  A.   Sure.  So, for the past 2 months, there have been protests

24  on the monument base itself and on the courthouse grounds

25  against and for the Confederate statue.  And, as anyone who

1  goes to the square frequently might have witnessed this summer,

2  the artists that I have been working with are also very

3  interested in commenting on --

4          MR. O'DONNELL:  Object to hearsay and speculation.

5          THE COURT:  Overruled, for this nonjury issue.

6  Proceed.

7          THE WITNESS:  Okay.  So the artists that I've been

8  working with are interested in commenting on contemporary

9  issues.  And, whether that's directly or indirectly, any work

10 that's projected in that space that has to deal with racial

11 issues or the Confederate statues or even the death of George

12 Floyd could be seen as comments on those events that have

13 happened this summer both locally and nationally.  And the

14 courthouse is the most appropriate place for that forum versus

15 any other space that I could imagine in Oxford.

16 BY MR. TOM:

17 Q.    And why is that?

18 A.    Because it's a governmental space, and the Confederate

19 statue stands there.  And that's where those protests have

20 happened, so it becomes a contribution to that conversation.

21 It becomes part of the narrative that has been built by those

22 who came before us who were protesting earlier in the summer.

23 Q.    And, when you say "it becomes a contribution to the

24 conversation," what is it?

25 A.    Any artistic piece that attempts to make a comment,

1  whether for or against, the Confederate statue or to protests

2  that have happened as a result of people wanting to remove the

3  statue in Oxford.

4  Q.    So the Confederate statue adds to the art that's being

5  projected onto it?

6  A.    That's correct.  It -- it -- I think whether -- whether

7  directly or indirectly, any -- any art that is projected in

8  that space is going to be seen in juxtaposition to that statue.

9  And that juxtaposition is going to, again, contribute to the

10  conversation about the statue that has been so loud in this

11  town for the past few months.

12  Q.    Now, given that, we were talking earlier about the permit

13  to shine projections onto the city courthouse really close to

14  the county courthouse.  Why is that -- let me re -- strike

15  that.  Is that an ample alternative, the city courthouse?

16  A.    It's not for various reasons.  In terms of what we try to

17  achieve artistically and aesthetically, there just isn't an

18  architectural surface there for us to project upon; so we have

19  to bring our own screen, which changes the nature of what we're

20  doing visually completely to more of a cinematic experience.

21       It's more expected.  It's a flat rectangle versus a more

22  unusual surface.  So, instead of transforming part of the

23  square and creating an experience that a passerby might enjoy

24  in seeing their town in an unexpected and interesting way, it

25  just becomes similar to watching a movie at home.

RASH -- DIRECT                                   24

1          And then there's also the issue that it's less visible.

2    You have to almost come around the corner if you're driving

3    around the square intentionally into that parking area that's

4    in front of city hall to see the riser that the permit exists

5    for where we would erect the screen versus driving around the

6    square, which is a large roundabout and potentially seeing one

7    of the projections on the wall and getting interested in

8    stopping to view it.  So it gives us a lot less chance of

9    having accidental viewers if it's at the space that has been

10   permitted by the city.

11   Q.   Now, you mentioned you've been a resident of Lafayette

12   County for several years now.  Since the death of George Floyd,

13   which happened in May of 2020, have you heard of any violence

14   at the protests that have occurred in Lafayette County?

15   A.   I have not heard of any violence.  And, because my job is

16   that of a documentarian, I have been out at almost all of those

17   protests with my camera observing and documenting and have not

18   witnessed any violence from either side.

19   Q.   Have you witnessed or heard of any security issues at

20   these protests since the death of George Floyd this summer?

21   A.   None at all.  No security issues that I've witnessed at

22   all.

23   Q.   And how many protests have you been to since the death of

24   George Floyd?

25   A.   I would have to estimate at least --

1  Q.    Let me scratch that.

2  A.    Sure.

3  Q.    How many protests have you been to since the death of

4  George Floyd in Lafayette County?

5  A.    Ten or more.

6  Q.    How many protests have you been to since the death of

7  George Floyd on the county courthouse grounds?

8  A.    At least half of those, so five or more.

9  Q.    How many of the protests that you're attended in Lafayette

10  County since the death of George Floyd have been at night?

11  A.    None of the protests that I've attended to date have been

12  at night.

13  Q.    Now, so, let's talk about the square.  How would you

14  describe the square as it relates to Oxford?

15  A.    It's the cultural hub of the city.  It's the place

16  where -- it's a destination that people come to, to be together

17  with friends, to enjoy the restaurants.  If you're coming to

18  Oxford, it's the must see location in town that you will

19  definitely want to visit.

20        And, if you live in Oxford, you're going to end up there

21  at least a couple times a month intentionally or not because

22  that's where things are happening.  It's the entertainment hub

23  and the business district.

24  Q.    And where does the county courthouse lie in relation to

25  the square?

RASH -- DIRECT                                                    26

1  A.    It's -- the county courthouse is in the dead center of the

2  square.  So it would be impossible to visit the square and not

3  see the courthouse, if not also walk through the courthouse

4  grounds.

5  Q.    Now, is the county courthouse grounds open to the public?

6  A.    My understanding is that it's always been open anytime,

7  day or night.  There are park benches there.  There's a very

8  large lawn on all sides of the courthouse where people gather

9  all hours of the day or night.

10 Q.    And, so, how would you describe the county courthouse

11 grounds?

12 A.    The courthouse grounds -- so there are some parking

13 spaces, and then there's a sidewalk.  And then there is --

14 there is a wrought iron fence that separates the sidewalk from

15 the grass that has bricks in it both for stairs and for

16 wheelchair access.

17       And then within that fence is a large grass area with I

18 don't know how many park benches that are available for people

19 to sit under the trees.  And, at night, there are some

20 floodlights that are there that make it visible and accessible

21 for people to visit at night.  So, in a lot of ways, it

22 functions as a small park in the center of the square.

23            MR. TOM:  I have no further questions, Your Honor.

24            THE COURT:  All right.  Thank you.

25       The defendant may cross-examine.

RASH -- CROSS 27

1          MR. O'DONNELL:  May I proceed, Your Honor?

2          THE COURT:  You may.

3                    CROSS-EXAMINATION

4  BY MR. O'DONNELL:

5  Q.   Mr. Rash, you indicated during the initial questioning

6  that you had participated in the Fringe Festival on prior

7  years, correct?

8  A.   That's correct.

9  Q.   And the Fringe Festival -- I think it's important to talk

10  about what that is.  That's actually organized by the arts

11  council and Visit Oxford; is it not?

12  A.   It is.

13  Q.   Okay.  And your role in the Fringe Festival is to, as you

14  said, curate a particular event within the Fringe Festival?

15  A.   So I'm given the opportunity to bring my event with other

16  artists.  So the Fringe Festival is a collection of artists and

17  curators that happen to hold their events on the same night.

18  Q.   Okay.  But my question is do you -- because I'm going to

19  get to that.  The question is, your role within the Fringe

20  Festival is to curate a particular event, right?

21  A.   That's correct.  My event would have been curated by me as

22  part of a larger event of similar artistic events on the same

23  night that falls under the Fringe umbrella.

24  Q.   Right.  And the Fringe Festival is an artistic, theatrical

25  event production which is sponsored and staged by the arts

1  council and Visit Oxford over the course of several days,

2  right?

3  A.    That's right.

4  Q.    And your part in that festival is to, as you say -- as you

5  said, curate the projection in that?

6  A.    That's correct.

7  Q.    Okay.  And, in years past, your role in curating the

8  projection event -- you said that, given that it is a

9  projection, that you need to do it at night for visibility

10 purposes, right?

11 A.    Correct.

12 Q.    You could do it during the day; but it would not be nearly

13 as visible as it would be at night, right?

14 A.    That's correct.

15 Q.    And, in years past, prior to the event of the COVID virus

16 that we've all been dealing with in the past 6 months or so,

17 your event at the courthouse -- an incidentally, you received a

18 permit from the county to stage the projection event at the

19 courthouse, right, in years past, prior to 2020?

20 A.    Last year, we were on the courthouse grounds.

21 Q.    My question is, though, you were given a permit to do

22 that, right?

23 A.    I believe that's correct.  So the last 2 years, I leaned

24 on the arts council not -- this being a new event, I leaned on

25 the arts council a lot more for their support because one of

1   their missions is to help artists get started.  So all of the

2   arrangement for the space that we used in the previous 2 years

3   was provided by the arts council.  They helped us to identify

4   the best spaces.  Because being new to Oxford and using their

5   expertise, I asked them to help with that.

6   Q.    Right.  Okay.  And, so, the Fringe Festival is designed to

7   locate throughout town for access purposes, for visibility

8   purposes, various events, right?

9   A.    That's correct.

10  Q.    And, in years past, for example, I think you did a

11  projection event not -- you did it at -- did you use the

12  breezeway at Oxford Square North?

13  A.    We did.  That's correct.  Just beside the -- Uptown

14  Coffee.

15  Q.    Right.  That's right.

16  A.    That's correct.

17  Q.    Yeah.  And that was last year?

18  A.    The previous 2 years.

19  Q.    The previous -- well, last year, right?

20  A.    Last year, we used that space in addition to the

21  courthouse.

22  Q.    Okay.  Again, the purpose being that you want to make the

23  artistic and visual displays that you're dealing with as

24  accessible to the average person on the street as possible,

25  right?

1  A.    I'm sorry.  I'm not sure I understand the -- could you

2  restate the question?

3  Q.    Sure.  The purpose of staging your productions in

4  different locations around the Oxford Square is in order to

5  enhance the accessibility of the event to the average person

6  that happens to be walking around or driving around Oxford?

7  A.    That's definitely one of the reasons.  It's -- it's really

8  about transforming the space and creating something that -- you

9  know, one of the reasons we included the courthouse last year

10 is I would love for the event to be the entire square in the

11 future.

12       But things grow little by little, year by year.  So the

13 idea is, yes, it makes it more accessible and more visible the

14 more spaces that we're able to project upon in the square.

15 Q.    Is it true that the use of the space last year at the

16 courthouse grounds -- you actually had seating arranged on the

17 grounds, right?

18 A.    I believe --

19 Q.    People could sit and watch whatever the projections were

20 at that time, right?

21 A.    That was actually the Oxford Film Festival.  So they set

22 up a screen; and, to be honest, I don't remember if they used

23 the existing seating -- because there are many park benches in

24 the lawn area -- or if they actually brought folding chairs.

25       But our event is designed where it can be viewed from --

1  it's a much larger -- the intention is it's a much larger

2  projection onto the walls of the courthouse so that it could be

3  seen from Ajax; it could be seen from Square Books without

4  necessarily having -- these aren't films that have a set

5  narrative or time line.  It's more like the type of video art

6  installation you might see in an art gallery that you could

7  choose to watch for 3 seconds, or you might choose to watch for

8  20 minutes.

9  Q.    All right.  And the -- as you indicated in years past, and

10  I think also for 2020, the arts council and Visit Oxford were

11  the ones that arranged for the space for the various events,

12  including the projection event?

13  A.    That's correct.  Because I honestly just didn't know how

14  to do that myself.  And, under their guidance, they assisted

15  with that part of it.

16  Q.    And you made contact with Lisa Carwyle, who's the county

17  administrator, regarding the desire to use the courthouse

18  grounds on August the 8th, right?

19  A.    August the 8th?  I believe it was July 7th.

20  Q.    My question, though, is you contacted Lisa Carwyle --

21  A.    Oh, I see.  About the event.  Yes.  August the 8th would

22  have been the right date.  That's right.

23  Q.    Right.  And I believe you did that -- initially, was that

24  July the 7th?

25  A.    I -- I sent her an email on July 7th; that's correct.

RASH -- CROSS                                    32

1  Q.    Okay.  And did you talk to Ms. Carwyle on the phone as

2  well, in addition to the email?

3  A.    Later.  So she was out of office that week.  So I did not

4  receive a response to that email.  I came into her office the

5  week following once she was -- she was out of office, so I came

6  in when she was back in office and filed with the permitting

7  person.

8  Q.    Okay.  So the answer to the question is, yes, you did

9  speak to Ms. Carwyle verbally in addition to communicating with

10 her by email?

11 A.    I actually spoke with the gentleman that works in the

12 front of her office.  I never spoke to her face-to-face.

13 Q.    Did you talk to her over the phone?

14 A.    When she called me back on -- I believe it was July

15 the 15th, we spoke on the phone.

16 Q.    Okay.  So you did talk to her verbally?

17 A.    That's correct.

18 Q.    Okay.  And isn't it true that when you made the initial

19 approach to Ms. Carwyle about the use of the courthouse

20 facility that you told her that you were going to use the east

21 side of the courthouse?

22 A.    That's not correct.  I don't remember specifying any

23 specific location.

24 Q.    And the east side of the courthouse is the side of the

25 courthouse that faces city hall, right?

RASH  --  CROSS                                    33

1  A.    I'm not sure about the geography, but I did not specify a

2  specific facade of that building.

3  Q.    Okay.  You told her that it was your intent to use that --

4  the side of the courthouse that faced city hall as part of the

5  projection?

6              MR. TOM:  Objection, Your Honor.  Asked and answered.

7              THE COURT:  Overruled.

8              THE WITNESS:  Not to my rec -- that was never the

9  intention to use that side of the building or -- let me restate

10  that.  It was never my intention to only use that side of the

11  building.  And I would have never stated that that was our

12  intention to only use that side of the building.

13  BY MR. O'DONNELL:

14  Q.    And, when you talked to her after submitting the

15  application -- you said you initially submitted a written

16  application, and then you talked to Ms. Carwyle?

17  A.    She called me back to follow up on my written application

18  to ask a few questions about the type of set up that I would

19  need.  She was asking -- she said, in particular, she was

20  concerned about if we were going to install a screen, if we

21  would be putting stakes in the ground, if we would potentially

22  be doing any damage to the lawn.

23        It was a very brief conversation.  And she seemed

24  satisfied with my answers and said that she would be getting

25  back to me after the board of supervisors met to review all

RASH  --  CROSS                                    34

1  applications the next week.

2  Q.    And you recall telling her at the time that you spoke with

3  her after submitting the application that you -- if you were

4  not allowed to install a screen that you would simply use the

5  east side of the courthouse to project your display?

6  A.    No.

7  Q.    Do you recall talking to her about the fact that you'd

8  have a 12-foot wide screen that you'd be using -- or proposed

9  to use?

10 A.    So I did say that if we used the screen -- because that

11 would be dictated on the number of artists that we have.  So,

12 obviously, there's only a set number of surfaces that we can

13 project upon.  And how we curate the event is largely dictated

14 by the space that we're granted.

15       So having access to that lawn -- if I have ten artists

16 that want to be part of the event, I may program one on each

17 facade of the building, which would be four, and then also,

18 perhaps, install a screen.  So she did ask about the screen,

19 and I told her -- I described the screen that I have access to,

20 which is a 12-foot screen.

21 Q.    And it was your intent in using the county courthouse as

22 well as city hall that the motoring public, those who are in

23 cars driving by -- it was your intent that they would view your

24 display.  That was the design setup?

25 A.    The design setup is that you would notice it initially

1  driving through and then perhaps stop and park in one of the

2  adjacent parking spaces and view it from your car or from the

3  sidewalk.

4  Q.    Right.  So you -- again, the intent in terms of the setup

5  that you were informing Ms. Carwyle about is that passing

6  motorists would view the display in addition to those who might

7  be parked in cars or individuals walking the streets?

8  A.    That's one of the intentions.  I mean, it's -- as I stated

9  earlier, the prominence of the courthouse, the visibility of

10  the courthouse, having that space as -- available to us allows

11  for a lot more accidental eyeballs that would perhaps then stop

12  and view the exhibition.

13      So the nature of that roundabout being viewable from

14  365 degrees all around, whether that's people leaving

15  restaurants or just driving around the square, makes it a very

16  desirable location and, of course, influenced my decision to

17  ask for that space.

18  Q.    You'd agree that a display that was intended to be viewed

19  by motorists driving around the courthouse at night presented a

20  potential traffic safety issue and a pedestrian safety issue?

21  A.    It's -- there's no way to view the display while you're

22  driving.  So it would be the same thing as a Christmas tree

23  that was lit up on the courthouse lawn.  It may catch your eye,

24  but it's not asking you to stop while you're driving or to

25  watch while you're driving.

RASH  --  CROSS                                                        36

1  Q.    But you intended that passing motorists would view your

2  display, right?

3  A.    I think there's a difference between viewing and noticing.

4          MR. O'DONNELL:  Could I get this marked as Exhibit A?

5          THE COURT:  Very well.

6      (DEFENDANT'S EXHIBIT A WAS MARKED FOR IDENTIFICATION)

7  BY MR. O'DONNELL:

8  Q.    All right.  Mr. Rash, you see that on your screen in front

9  of you?

10  A.    Uh-huh.

11  Q.    That's Exhibit A.  And that's an email dated July the 7th,

12  2020 to Ms. Carwyle, correct?

13  A.    That's correct.

14  Q.    All right.  And, in it, you're explaining to Ms. Carwyle

15  the fact that Mr. Wayne Andrews from the arts council had given

16  you her contact information for purposes of obtaining a permit,

17  right?

18  A.    That's correct.

19  Q.    Okay.  And Mr. Andrews -- who is Mr. Andrews?

20  A.    He is the executive director of the Yoknapatawpha Arts

21  Council.

22  Q.    Okay.  And, in the email, you're explaining that you want

23  to use the courthouse facility on August the 8th, the same

24  night as the Fringe Festival; that you had several artists that

25  would like to project onto screens as well as the existing

RASH -- CROSS                                                37

1  courthouse property.  Then you say, "We've done this one, the

2  square, several times in the past few years.  We would like the

3  opportunity to use the courthouse area this year due to COVID

4  so that it can be viewed by cars driving by."

5       Not noticing but viewed by cars driving by, right?  Those

6  are your words?

7  A.    That -- that is the language that I used in this initial

8  email.

9  Q.    Yes, sir.  "Or viewed by people parked in the adjacent

10 spaces around the square.  Please let me know about the process

11 of obtaining a permit."

12      Okay.  So you intended, by virtue of the nature of the

13 display, that passing motorists would view your display, not

14 notice, not glance; but that it would be a meaningful

15 interaction with the passing motorists.

16 A.    My intention by using the word *view* was that it would

17 catch their attention.

18 Q.    And, in addition to the permit for the use of the

19 courthouse facility, you made application -- or I should say

20 Visit Oxford, as the event organizer, made application for a

21 permit to use the city hall plaza as it's referred to.  Is that

22 your understanding?

23 A.    That is my understanding.

24 Q.    Okay.  And the -- what involvement did you have with the

25 submission and the contents of the application to the city for

RASH  --  CROSS                                      38

1  use of the city hall plaza?

2  A.    None.

3  Q.    You left that up to the event organizers?

4  A.    That's correct.

5  Q.    Okay.

6  A.    I believe there are other events happening there during

7  the day, so it was just an extension of the existing permit.

8  Because they're using that -- there are other groups involved

9  in the Fringe Festival using that same space earlier in the

10 day.

11 Q.    But it is your understanding that on July the 16th a

12 permit was submitted to the city of Oxford for the specific

13 purpose of allowing the projection event to be held there

14 during the evening hours?

15 A.    I'm not aware of the language of that permit at all.

16 Q.    Did you talk to Wayne Andrews about that permit that was

17 submitted to the city?

18 A.    Wayne informed me that that space would be available if

19 needed.

20 Q.    And, after the permit was submitted, you in fact discussed

21 the permit with Wayne Andrews in the terms of the setup of

22 various projection screens in that space, didn't you?

23 A.    This past weekend, I went out and mapped out what would be

24 possible with that space.  Because it is so dramatically

25 different from the courthouse square that I needed to come up

RASH  --  CROSS                                        39

1  with some sort of a contingency plan and also wanted Wayne to

2  be aware of what that plan would be.

3  Q.    Was it your understanding that the application submitted

4  to the city by Visit Oxford and the arts council was for the

5  very purpose of projecting artwork?

6  A.    I was not.

7  Q.    Okay.  What about live music, was live music provided

8  during this aspect of the projection event?

9  A.    No.  My understanding is you have to apply for a special

10  permit for amplified sound, so our event has always been silent

11  projection.

12  Q.    And, in your discussions with Wayne Andrews after the

13  application was submitted to the city of Oxford about the city

14  hall space, you just indicated that you did talk with Wayne

15  about what you would need to stage the projection event on that

16  space, right?

17  A.    I sent Wayne -- as per usual, a week before the event, I

18  sent him a list of what supplies I may need from the arts

19  council to even make the event possible in that space.

20  Q.    Okay.  In your discussions with Wayne about using that

21  space for the projection event, were you -- you were already --

22  were you already informed about the county's decision on your

23  permit?

24  A.    Yes.

25  Q.    And the viewing of the projection event as far as the city

1  hall space is concerned, what was your intent about the

2  individuals or groups that you expected would participate and

3  view your display?  Who were you going after?

4  A.    It's a public art event.  So it's really open to anyone

5  who happens to pass through that space during the evening that

6  we hold the event.

7  Q.    Right.  Just like the aspect of the projection production

8  that you had hoped to stage at the county courthouse?

9  A.    That part is similar.

10  Q.    Same people would be viewing both projections, right?

11  A.    I would argue that it would be a more limited audience

12  because it's a less accessible space.

13  Q.    How is the city hall plaza less accessible to pedestrians

14  and to motor vehicles?

15  A.    It's less accessible for viewing because it's a much

16  smaller space.  It's less accessible for our artists because it

17  requires us to use one screen versus four to six projecting

18  surfaces.  It's less accessible for, as you suggested, sidewalk

19  viewership because there are obstructions from the angles that

20  it would require you -- like, you would have to look at it

21  straight on.

22      Because of Square Books and the city hall -- the space

23  that's available is the riser that's on top of the stairs that

24  actually sits back off of the sidewalk almost 10 feet.  So it's

25  just not as visible as the courthouse would be.

RASH -- CROSS 41

1  Q.    Well, you also have -- in terms of city hall space, you

2  have three projection screens that you have asked to place

3  there, right?

4  A.    So --

5  Q.    Yes?

6  A.    Not screens.  Three potential projection areas.  One of

7  the questions I asked Wayne, which I haven't received an answer

8  back on, is part of my plan was to try to plan for three

9  different surfaces.  Only one of which I know at the moment is

10 okay under the permit.

11 Q.    You understood the city approved the permit last night?

12 Did you know that?

13 A.    I did not.

14 Q.    Okay.  And one of the areas that you proposed to use was

15 the area in front of the Faulkner statue?

16 A.    That was a question that I asked Wayne, if that was going

17 to be possible; but I have not planned for it as of yet because

18 I have not received the answer to that question.

19 Q.    And there would be no obstruction in the event the

20 Faulkner statue was used, right?

21 A.    There are obstructions.  It would be -- you would almost

22 have to stand on the sidewalk to see it.  You would not be able

23 to see that from across the street.

24 Q.    Right.  Well, you know, in terms of the county courthouse,

25 there are obstructions there as well, right?  Large trees,

RASH  --  CROSS                                    42

1  would you agree, are obstructions?

2  A.   So it depends on if you're talking about an individual

3  screen or the scale of the event itself.  So, as I stated

4  earlier, the thesis of this event is sort of to transform the

5  space as a whole.

6       So thinking of the Courthouse as a three-dimensional cube

7  having light projected on it from all sides increases the

8  visibility substantially versus a flat rectangle that's leaned

9  up against the stairs at the city hall.

10      So trees might obstruct one portion of the screen if

11  you're trying to view it like a movie or a TV in your living

12  room but does not obstruct the entire courthouse.

13 Q.   You mentioned that you had participated in a number of

14 events in and around Oxford relating to the Black Lives Matter

15 and also, potentially, the Confederate statue issue, right?

16 You did, right?

17 A.   Can you --

18 Q.   You participated in some of those events?

19 A.   I did.

20 Q.   And you indicated earlier that you had been on the

21 courthouse grounds with groups of people in relation to those

22 events?

23 A.   I indicated that I had filmed groups of people who were on

24 the courthouse grounds.

25 Q.   And you don't know whether or not those events had been

1 permitted, do you?

2 A.   I know for a fact that the event on July 4th was

3 permitted.

4            MR. O'DONNELL:  One moment, Your Honor.

5            THE COURT:  All right.

6            MR. O'DONNELL:  That's all I have, Your Honor.

7            THE COURTROOM DEPUTY:  Mr. O'Donnell, can I have the

8 exhibit, please?

9            THE COURT:  Do you have any redirect in line with

10 cross?

11            MR. TOM:  Very briefly, Your Honor.  I'd like to

12 enter two exhibits, Your Honor.

13            THE COURT:  You'd like to what?

14            MR. TOM:  I'd like to enter two exhibits, Your Honor.

15            THE COURT:  If they are matters that were brought up

16 on cross-examination, we'll consider that.

17            MR. TOM:  Yes, they are.

18            THE COURT:  But you must qualify them.

19            MR. TOM:  Okay.  Well, just for marking purposes,

20 then --

21            THE COURT:  I'm sorry, sir.  You're going to have to

22 take off that mask.

23            MR. TOM:  Just for marking purposes in the first

24 instance, then.

25            THE COURT:  All right.

1  Honor.

2          THE COURT:  All right.  She may come around and be

3  sworn.

4      (OATH ADMINISTERED BY THE COURTROOM DEPUTY)

5          THE COURTROOM DEPUTY:  And, if you would, please,

6  state your first and last name and spell them for the record.

7          THE WITNESS:  It's Lisa Carwyle, and that's

8  C-a-r-w-y-l-e.

9          THE COURT:  Okay.

10         MR. O'DONNELL:  May I proceed, Your Honor?

11         THE COURT:  Yes.

12         LISA CARWYLE, DEFENDANT'S WITNESS, SWORN

13                    DIRECT EXAMINATION

14  BY MR. O'DONNELL:

15  Q.   All right.  Ms. Carwyle, will you tell us where you are

16  employed currently?

17  A.   I'm employed with Lafayette County.

18  Q.   And what's your position with the county?

19  A.   I'm county administrator.

20  Q.   And how long have you held that position?

21  A.   Since January 2016.

22  Q.   Okay.  And can you briefly describe the nature of your

23  duties as the county administrator?

24  A.   I assist the board of supervisors.  I do the agenda for

25  all the meetings.  I'm also the manager of the county in a way

1  and do a lot of the accounting work associated with it.  I have

2  a Masters of Accountancy.

3  Q.   And, in your role as county administrator, do you have any

4  function or role in the administration and implementation of

5  the county's Facility Use Policies?

6  A.   I do.  Those are submitted -- the permit requests are

7  submitted to my office, and I review those and approve or deny

8  based on the policy.

9  Q.   Okay.  And, prior to 2015, what is your understanding

10  about whether the county had a Facility Use Policy in place?

11  A.   I don't believe they did prior to 2015.

12  Q.   Okay.  And is it your understanding that in 2015 the

13  county adopted a Facility Use Policy?

14  A.   Yes.

15  Q.   And what is the policy intended to cover, which

16  facilities?

17  A.   All county facilities, grounds, courtrooms.

18  Q.   Does it cover other buildings as well besides the center

19  courthouse?

20  A.   Oh, yes.  The chancery building.  Mainly, the requests we

21  would get is the chancery building and courthouse and the

22  grounds, including the statue.

23  Q.   Okay.  Under the 2015 policy, what is your understanding

24  about whether the county required a permit or not?

25  A.   They required a permit for use between -- to be granted

CARWYLE -- DIRECT                                    49

1  for use between 8:00 a.m. and 10:00 p.m. during the week and

2  limited access on the weekends, mainly for county business,

3  county employees.

4  Q.    And was that policy amended in 2019?

5  A.    It was.

6  Q.    Okay.  And do you recall what the nature of the amendment

7  was in 2019?

8  A.    The biggest changes were we went from a seven-day

9  requirement period for the permit to be applied for to 30 days,

10 and we added a $50-an-hour-rental fee.

11 Q.    Okay.  In terms of who is required to obtain a permit,

12 what was your understanding about the 2019 policy?

13 A.    Political groups, nonprofit groups, groups engaging

14 together to gather.  I'm trying to remember what else was

15 listed as required.  But there were certain groups that were --

16 that was not allowed to receive a permit.  You know, we don't

17 allow for-profit organizations to gather and solicit.

18 Q.    And, in the year 2020, was the Facility Use Policy that

19 applied to the center courthouse -- was it amended?

20 A.    It was.  I think it was around the middle of June they

21 made some changes to make it clear that groups of four or less

22 were not required to get a permit; but, if they did obtain a

23 permit, then that space was exclusively theirs.  And the hourly

24 rate was taken out.

25        And then, in practice, it was -- the 30 days was not

CARWYLE -- DIRECT                                    50

1  required.  If -- due to the nature of the environment and what

2  was going on in the country, we approved permits with a few-day

3  turnaround.

4  Q.    And, in July of 2020, was the Facility Use Policy that

5  pertained to the center courthouse -- was it amended again?

6  A.    It was.

7  Q.    And what was the nature of the amendment at that time?

8  A.    That change went to a 14-day requirement for the permit to

9  be filed prior to the date they wished to use the facility and

10  stated that there would not be any use of the courthouse

11  grounds 30 minutes prior to dusk.

12  Q.    Okay.  Now, with regard to that most recent amendment, the

13  July 2020 amendment, in terms of the curfew, the dusk to dawn

14  curfew for the courthouse grounds, what is your recollection

15  about the discussions that led up to that amendment?

16  A.    Sheriff East began speaking with the board as -- you know,

17  early to mid-June about his concerns for security and safety

18  around the courthouse, tensions with groups, and his ability to

19  keep everybody safe.  And he requested that the board have this

20  curfew.

21        And, also, he even mentioned putting up gates.  He'd like

22  to lock it up at five o'clock p.m.  You know, it just made it

23  easier for them to keep everything secure and the safety of the

24  citizens and the people that were participating and using the

25  permits.

1  Q.    All right.  With respect specifically, though, to the

2  policy that was amended in July 2020, what was the date of the

3  amendment?

4  A.    It was July 20th of 2020.

5  Q.    July 20th?  Okay.  And were you present during the

6  discussions that led to that particular amendment?

7  A.    I was on that day.  On July the 6th, which was the board

8  meeting previous, I was out of town.  And, when I got back into

9  town, I specifically asked the sheriff and a couple of

10 supervisors -- because I knew there was going to be discussion

11 at that board meeting about possibly amending the policy.

12       I asked if it was amended because we were getting

13 requests.  And they said that they discussed it.  They did not

14 actually make a motion, but they did have discussion about

15 making those changes and expected it to be at the next one.

16 Q.    Okay.  And the changes you're talking about, again, are

17 the imposition of the dusk-to-dawn curfew?

18 A.    That's right.

19 Q.    And, so, in the July 20th meeting, what's your

20 recollection about the discussions that -- on that day that led

21 to the --

22 A.    Led to -- Sheriff East came to them.  There had been

23 meetings between different entities, the university, the city,

24 and the county about security issues, safety, the tension.  And

25 he asked -- requested -- he said, the city was doing some

CARWYLE -- DIRECT                                    52

1   similar changes as far as 14 days on their permits; and he

2   asked for that change and the dusk-to-dawn change.

3   Q.    At that point, then, the board voted to adopt that

4   amendment?

5   A.    Right.

6   Q.    I want to ask you about the permit application that

7   Mr. Rash submitted to the county.

8   A.    Uh-huh.

9   Q.    What was the first indication that you can recall in terms

10  of Mr. Rash's desire to obtain a permit for the August 8th

11  Fringe Festival?

12  A.    His permit application was turned in at my office -- I

13  think it was July 14th that he filled it out.  I did call and

14  speak with him about the permit to get an idea of equipment he

15  would need.  We've had problems in the past with some damage to

16  the sprinkler systems.

17        And he indicated to me that he would like to put up a

18  12-foot wide screen; but, if that did not work, he could use

19  the side of the courthouse.  I was under the impression -- I

20  remember being told it would be the east side of the

21  courthouse.

22  Q.    Okay.  So Mr. Rash's first desire or proposed use was to

23  actually install a screen --

24  A.    Uh-huh.

25  Q.    -- on the east side of the courthouse?

1  A.    Right.

2  Q.    Okay.  And your recollection is that you raised concerns

3  about staking and anything that might damage underground

4  utilities.  And what was his response?

5  A.    He said if he could not use the screen, he could use the

6  side of the building.

7  Q.    By that conversation, did you take that he had a

8  preference at that time about how the projection would be

9  viewed?

10  A.    I did not.

11  Q.    In terms of whether it be a screen or not?  Did he have a

12  preference?

13  A.    No.

14  Q.    Okay.  Did he not indicate to you that his first choice

15  was to use a screen?

16  A.    Yes.  I mean, that's -- when I asked what equipment he

17  would bring, he said a screen, yes.

18  Q.    On July the 7th, he sent you an email regarding the events

19  on August the 8th.  Did you receive that email?

20  A.    I believe I did.  I was gone out on vacation that entire

21  week, and I might have kind of missed it; but I did get the

22  email, yeah.

23  Q.    Okay.

24         MR. O'DONNELL:  May I approach?

25         THE COURT:  All right.

1  BY MR. O'DONNELL:

2  Q.    All right.  Ms. Carwyle, I'm showing you what we've at

3  this point at least marked for identification as Exhibit A.  Do

4  you recognize that?

5  A.    Yes.

6  Q.    What is the -- what is Exhibit A?

7  A.    It's an email to me from Mr. John Rash on July 7th.

8  Q.    Okay.

9  A.    Asking about the permit process, I believe.

10  Q.    Okay.  And you, in fact, received that?

11  A.    Yes.

12  Q.    Okay.

13          MR. O'DONNELL:  Your Honor, at this time, we'd move

14  to enter into evidence Exhibit A.

15          THE COURT:  All right.  It'll be received as an

16  exhibit.

17          (DEFENDANT'S EXHIBIT A WAS RECEIVED INTO EVIDENCE)

18  BY MR. O'DONNELL:

19  Q.    Did you discuss with Mr. Rash, in response to this email,

20  his desire to display at the courthouse and how that might

21  affect traffic safety issues?  Any recollection about that?

22  A.    I did not speak with him after the email.  The email came

23  and then the permit, and then I spoke with him.  And, I mean, I

24  do remember having some conversation about where his equipment

25  would be because I was worried about traffic issues.

1 Q.    Okay.  What was your understanding about where the

2 equipment would be placed?

3 A.    That the projector and the screen would be both on the

4 courthouse lawn.  I was not sure if the projector would be

5 needed, like, across the street or something but -- you know.

6 Q.    Okay.  What about in reference to the east side of the

7 courthouse?

8 A.    That's the recollection I have, is that it would be on the

9 east side.

10 Q.    Okay.  And, in terms of the situation on Mr. Rash's

11 permit, what went into the decision to deny the permit?

12 A.    It was denied based on the policy change that nobody would

13 be allowed to use the courthouse grounds from dusk to dawn.

14 Q.    Was there any basis for the denial concerning the 14-day

15 permit -- events permit requirement?

16 A.    No.

17          MR. O'DONNELL:  That's all I have, Your Honor.

18          THE COURT:  All right.

19     Plaintiff wish to cross-examine?

20          MR. TOM:  Yes, Your Honor.

21          THE COURT:  Okay.  You may proceed.

22                    CROSS-EXAMINATION

23 BY MR. TOM:

24 Q.    Good afternoon, Ms. Carwyle.

25 A.    Hey.

1       (OATH ADMINISTERED BY THE COURTROOM DEPUTY)

2           THE COURTROOM DEPUTY:  And will you state your first

3  and last name for the record?

4           THE WITNESS:  Joey East.  Can I take this off or

5  leave it on, Judge?

6           THE COURT:  Take it off.

7           THE WITNESS:  Thank you.

8           THE COURT:  If you want to.

9           THE WITNESS:  I'd like to.

10          JOEY EAST, DEFENDANT'S WITNESS, SWORN

11                      DIRECT EXAMINATION

12  BY MR. O'DONNELL:

13  Q.   Sheriff East, you've given us your name.  Can you tell us

14  when you first became sheriff of Lafayette County?

15  A.   January the 1st of this year.

16  Q.   And, prior to January 1st of this year, what was your

17  position?

18  A.   I was the chief of police of the Oxford Police Department.

19  Q.   And how long did you have that position?

20  A.   Six years.

21  Q.   And, when you took office as sheriff in January of this

22  year, did you ever have an occasion to speak with the board of

23  supervisors about any concerns that you had regarding the use

24  of the courthouse facilities at night?

25  A.   Yes, sir.

1 Q.    Okay.  Can you tell us what -- what prompted those

2 discussions with the board?

3 A.    Probably around March, we started having conversations

4 about it.  I didn't feel like that, based on manpower -- the

5 policy said -- let's try to change the policy.  When I was the

6 chief of police and that was part of my area, I had plenty of

7 manpower.  It was in the middle of the downtown area.  I would

8 be able to police that to a level of safety.

9        As the sheriff, my biggest concern is outside the city

10 limits; so that really left two buildings inside the city that

11 we have to watch.  My knowledge of downtown Oxford when it's

12 busy -- when COVID isn't happening and we have a lot of

13 involvement, I didn't feel like, based on those, that I

14 personally, as the sheriff, with the limited manpower I have,

15 would be able to provide a safe environment for people to be

16 there, especially after night.

17        Because we're running 670 square miles at night with

18 sometimes six or even less deputies.  Can't really focus on the

19 safety there; so I was encouraging them to look at limiting the

20 access to that, even possibly gating it at times so that it

21 would limit that and from anyone getting hurt or being there.

22 Q.    As the sheriff of Lafayette County, what's the nature of

23 your jurisdiction over the courthouse grounds?

24 A.    That's one of the areas that I'm in charge of.

25 Q.    You're in charge of the security of the facility?

1  A.    Yes, sir.

2  Q.    What involvement does the city have with regard -- the

3  city of Oxford have with regard to the security or the safety

4  of the courthouse grounds?

5  A.    None.

6  Q.    Okay.  That's your exclusive domain?

7  A.    Yes, sir.  Yes, sir.

8  Q.    All right.  So, with regard to the use of the courthouse

9  facility as an area of use by groups, what's been your

10  experience since you become sheriff with regard to potential

11  traffic and pedestrian safety issues?

12  A.    Since March, we've had -- with everything that's going on,

13  we've had some pop-up rallies or organizing or things going on.

14  And we've seen big movements, big crowds.  People would march

15  or get together.  So that causes safety issues, traffic issues.

16        Had a lot of people that are protesting out on the statue

17  or around there, getting out in the street.  I've had to go up

18  there a couple of times to get people out of the traffic area,

19  asked the police to come over there to assist me in those

20  areas.  So, other than those things there -- you know, it's a

21  gated area; but people are coming in and out across there.  So

22  it's limited to street side for those things to happen.

23  Q.    What, in your opinion, is the lighting capacity or

24  capability of the area around the courthouse?

25  A.    It's poorly lit.  It's one of the topics when I was chief

1  that I would talk to the city about.  The square itself, in my

2  opinion, is poorly lit for people driving.  Young adults are

3  constantly moving in and out of traffic, parked cars.  It's not

4  a well-lit area, and the courthouse is even less lit.

5  Q.    Did that add to your concerns about the use of the

6  courthouse during the evening hours?

7  A.    Yes, sir.  It's just not really protected well.  It's not

8  lighted real well; and we're not watching it at all, really.

9  We rely on the city, at times, to look at it for us.

10 Q.    Okay.  So you started voicing your concerns with the board

11 of supervisors, you said, in March of this year?

12 A.    Yes, sir.  I believe that's right.

13 Q.    Okay.  Did those discussions evolve at any point with

14 regard to the city or the university or the county?

15 A.    Yes, sir.  What we saw, we each had a permitting process

16 and each one was different, city, university, and county.  And,

17 through this experience over the last couple of months, we came

18 together.  Because the city would permit something, the county

19 would be looking at permitting something -- if it's a large

20 event, we have limited resources.

21       So altogether, between the city, the county, and the

22 university, we probably have 120 to 130 officers.  So, if the

23 city has something very large and they need us to be a backup

24 and to help them with issues, we can't necessarily have a

25 permit going on at the courthouse at the same time because it

1  takes the resources away to help them.

2      So we had conversations about that.  That's what -- we

3  talked about the time of the stuff that was up there on the

4  courthouse lawn.  I think the original permitting process for

5  the county allowed until ten o'clock at night.

6      Those are some of the things that I didn't think should

7  just be open; it should be a limited area.  But we did meet

8  with the city and the university, and we tried to get our

9  permitting processes so it would kind of look the same so we

10  weren't contradicting each other.

11  Q.    So the concept of the curfew or limiting or prohibiting

12  use of the courthouse after dark, that was discussed with the

13  university and the city as well?

14  A.    Yes, sir.  That conversation absolutely came up.

15  Q.    And, you know, eventually, in July -- on July 20th of this

16  year, that the county's use facility policy was amended to

17  prohibit the use of the courthouse facility after dark?

18  A.    Yes, sir.

19  Q.    Do you have any recollection about your input in that

20  decision?

21  A.    I advised them my opinion of it.  I don't know how much

22  input I had on their decision-making, but I'd been advising

23  them of that for several weeks up to that time.  I think before

24  they actually voted on it, the two weeks before, we had a

25  conversation about it.  And it was advising them of our

1   conversation with the city and university and what we talked

2   about collectively as a group.

3   Q.    Okay.   With regard to the permit application submitted by

4   Mr. Rash to the county for using the courthouse grounds on

5   August the 8th, did you have any conversations with Chief

6   Deputy Mills about that application?

7   A.    I did.

8   Q.    Okay.   What was your conversation?

9   A.    Usually, what I do when we get a permit, I ask Deputy

10  Mills to contact the individual, whoever it is, whatever group

11  it may be, to find out what will be transpiring, what are they

12  doing, just to see if there are security needs on our part.

13        A lot of times we need to know, you know, is it going to

14  be volatile; will there be counterprotestors here; will there

15  be someone that doesn't like what you're doing, so we can

16  provide adequate security.

17  Q.    Okay.   So, in your conversation with Chief Deputy Mills,

18  did he inform you about a conversation he had, or the inquiry

19  he made, with Mr. Rash?

20  A.    He did.   He said he asked Mr. Rash; and he wanted to show

21  a film, some type of film or films or pictures, on the

22  courthouse lawn.   Scott -- Chief Deputy Mills did say they were

23  talking about would there be anything there that would be

24  maybe -- I don't know the exact words, but would upset other

25  people.   So we need to know if we need security there to make

1 sure someone didn't come over there.

2     He did advise that Mr. Rash said, to the best of my

3 memory, that there may be one thing on his film or something

4 that could be political or contradiction or people may get

5 upset about it.

6 Q.   Okay. So your concern and interest was actually to

7 protect Mr. Rash's ability, in the event the permit was

8 approved, to display what he was displaying --

9 A.   Right.

10 Q.   -- in terms of whether or not additional security was

11 needed?

12 A.   Oh, absolutely. Yes, sir.

13     MR. O'DONNELL: That's all I have, Your Honor.

14     THE COURT: All right. Cross-examination?

15     MR. TOM: Yes, Your Honor.

16             <u>CROSS-EXAMINATION</u>

17 BY MR. TOM:

18 Q.   Good afternoon, Sheriff East. How are you?

19 A.   Good. How are you, sir?

20 Q.   Doing good. My name's Josh Tom. I represent Mr. Rash

21 over here.

22 A.   Okay.

23 Q.   I'll ask you some questions. So how would you describe

24 the Oxford Town Square?

25 A.   Quaint. I don't know what you're talking -- I don't know