Page 1

1

2                IN THE UNITED STATES DISTRICT COURT

3              FOR THE NORTHERN DISTRICT OF MISSISSIPPI

4                          OXFORD DIVISION

5

6

7

8    JOHN RASH,

9            Plaintiff,
                                   CASE NO.: 3:20-cv-224-NBB-RP
10   v.

11   LAFAYETTE COUNTY,
     MISSISSIPPI,
12
             Defendant.
13   _____/

14

15          REMOTE VIDEOTAPED DEPOSITION OF JOEY EAST

16                     DECEMBER 18, 2020

17

18

19

20

21   Reported by:

22   GINA WILLIAMS, RPR, CRR, CRC

23   JOB NO. 187734

24

25

```
1                            J. EAST
2         introduce himself as well, or I can introduce him.
3              Jack Williams is also on for the Plaintiffs -- or
4         Plaintiff, I should say.
5                         - - - -
6    WHEREUPON,
7                            JOEY EAST
8    was called as a witness and, after having been first duly
9    sworn, was deposed and testified as follows:
10   EXAMINATION
11   BY MR. YOUNGWOOD:
12        Q    Good morning, Sheriff East.  My name is John
13   Youngwood.  I've just introduced myself on the record, and
14   I'm one of the attorneys representing the Plaintiff,
15   Mr. Rash, in this matter.
16              Could you state your current employment, please?
17        A    Currently the sheriff here in Lafayette County,
18   Mississippi.
19        Q    And you've had that position for almost a year?
20             Do I have that correct?
21        A    Yes, sir.
22        Q    You were elected last December?
23        A    Yes, sir.
24        Q    And you assumed the position in January of 2020?
25        A    Yes, sir.
```

1                               J. EAST

2         Q      Okay.  And prior to that time you had taken a

3    leave of absence, I believe, from your prior position?

4         A      Yes, sir, that is correct.

5         Q      Okay.  And that was in connection with running

6    for the office of sheriff; is that right?

7         A      Yes, sir.

8         Q      Okay.  And what was your prior position then?

9         A      I was the chief of police at the Oxford Police

10   Department, Oxford, Mississippi.

11        Q      And of course Oxford is within Lafayette County;

12   right?

13        A      Yes, sir.

14        Q      Okay.  So you've been -- I'm sorry.

15               And how long had you been at the Oxford Police

16   Department before becoming chief of police?

17        A      I was hired in 1991 and was there my whole

18   career, minus four, where I was with the Mississippi

19   Attorney General's Office.

20        Q      When were you with the Mississippi Attorney

21   General's Office?

22        A      I think I went in in '98, 1998, and I was there

23   four years.

24        Q      Was that you had left the Oxford Police

25   Department, or you were on a leave, or what was --

```
1                         J. EAST
2      A     No, sir.
3            At the time I was assigned to the narcotics unit
4  in our county and city, and I left to take a job with the
5  Attorney General's Office, worked as a Youth Service
6  Division Investigator with Mike Moore in his office.
7      Q     Let's briefly just talk about the time between
8  '91 and when you went to the Attorney General's Office.
9            What was your position or title or rank in the
10 Oxford Police Department?
11     A     I was hired on in '91 as a dispatcher, then I was
12 hired as a patrol officer and had many job tasks during that
13 time from DUI officer through I became an instructor and
14 taught some.
15           I then was assigned to the Metro Narcotics Unit
16 here in Lafayette County, was there for roughly four years
17 until I took the position with the Mississippi Attorney
18 General's Office.
19     Q     And for those four years I think you gave your
20 title or your general position, but just tell me a little
21 bit more about what you did in the four years with the
22 Attorney General's Office.
23     A     I was mainly assigned to Youth Services Division.
24           At that time General Moore had won the tobacco
25 settlement, and we were awaiting a brand of unit that would
```

1                              J. EAST

2    use minors and track -- we would do a grant -- make sure

3    people were following the grant properly.  We would do

4    undercover work where we'd send youth in to see if they

5    could buy tobacco and/or alcohol.

6         Q    And during those four years, were you working out

7    of the Oxford area, or were you working out of a different

8    area of the state?

9         A    No, sir.  Out of Oxford.

10        Q    And you then spent about four years there, so if

11   I'm counting right, about 2002 you returned to the Oxford

12   Police Department?

13        A    Yes, sir, that's correct.

14        Q    Okay.  What did you return as?

15             What was your job then?

16        A    I came in as the commander of the drug unit.  I

17   was hired by the police department to run that unit.  I did

18   that, and then I was assigned a leave of imposition.  I was

19   put over investigations -- all investigations with the city.

20   And from that position I became a major.  Then I was

21   promoted to the deputy chief position.  And then later on I

22   was awarded the chief of police position.

23        Q    And what year did you become chief of police

24   then?

25             I guess six years before 2019, around 2014?

```
 1                            J. EAST
 2    Department.  At the time that you left it last year, how
 3    many officers?
 4         A      When I left, we had 80 officers.
 5         Q      Okay.  And the jurisdiction is Oxford itself; is
 6    that right?
 7         A      Yes, sir.
 8         Q      And approximately how many square miles or
 9    whatever the best way to measure the size of Oxford is?
10         A      When I became chief, we were right at 16 square
11    miles.  We annexed, in my time as chief, to where they
12    currently are 26 square miles, approximately.
13         Q      And the county, are there -- strike that.
14                As sheriff, what is your jurisdiction?
15                What is your geographic jurisdiction?
16         A      Sheriff's Department is approximately -- we cover
17    670 square miles.  40 of that is water, approximately.
18         Q      And are there --
19                Within those 670, do you exclude, for example,
20    the 26 square miles that are part of the City of Oxford?
21         A      Although we have jurisdiction, we try to allow
22    the City of Oxford to perform their own duties.  We assist
23    them if they need us.
24                Same with University of Mississippi.  It's inside
25    the county, but we allow them to take care of their own
```

```
 1                         J. EAST
 2        Q     Okay.  You were doing the math for me.  You were
 3   taking out the City of Oxford and telling me who was in the
 4   county other than the City of Oxford?
 5        A     Yes, sir.
 6        Q     That's what I wanted to understand, so I
 7   appreciate that.  Thank you.  It cut through it.
 8              When you're taking out doing that math in your
 9   head, are you also including some estimate for Abbeville and
10   for University of Mississippi?
11              Is that where you get to the 30?
12        A     Yes, sir.  They would be included in the county.
13   The 30,000 would include Abbeville.
14        Q     Okay.  So if I took Abbeville out, it would be
15   whatever Abbeville is, and if I took the University of
16   Mississippi out, it would be whatever that is?
17        A     Yes.  And these are approximate numbers.  I don't
18   have --
19        Q     I'm sure the numbers are all, again, public
20   record.
21        A     Yes, sir.
22        Q     How many officers does the -- do you have now
23   under your management -- or under your command perhaps is a
24   better word?
25        A     Including myself, there's 44 employees as far as
```

```
 1                           J. EAST
 2        A     Yes, sir.
 3        Q     Although I have some --
 4              I've done --
 5              I'm a lawyer.  I've done some cases involving
 6    police forces before.  You are going to completely beat me
 7    on the terminology in everything every step of the way
 8    today, so...
 9        A     The people I'm talking about are sworn police
10    officers.
11        Q     Okay.  So the 80 sworn police officers for
12    Oxford, right?
13        A     Yes, sir, that's correct.
14        Q     And the 44 to 48 when you're fully staffed, those
15    are sworn police officers too?
16        A     That's right.
17        Q     Okay.  That's what I'm trying to make sure we're
18    comparing, I'll say apples and apples.
19        A     Yes, sir.
20        Q     Okay.  Let's talk for a little bit about the
21    Oxford Town Square that you know is a focus of this
22    litigation, and the county courthouse.  It might be easiest
23    if we just take a look at a picture.
24              And I think if you turn to Tab, for example, 39
25    in hopefully what's in front of you.
```

```
1                                    J. EAST
2      courthouse grounds, there's nothing to stop me from doing
3      so; correct?
4           A      That's correct.
5           Q      There's no sign saying don't come in here in the
6      evening; correct?
7           A      I haven't seen any signage.
8           Q      And we've already discussed the gates are never
9      blocked off; correct?
10          A      Correct.
11          Q      In your years as chief of police for the City of
12     Oxford -- actually, strike that.  Let me ask more basic
13     questions.
14                 So the courthouse grounds, these are -- this is
15     county property; is that right?
16          A      Yes, sir.
17          Q      And the statue, that's county property; right?
18          A      Yes, sir.
19          Q      Okay.  But it's within the City of Oxford; right?
20          A      Yes, sir.
21          Q      Okay.  If a City of Oxford police officer were to
22     see an event that warranted her or his attention on the
23     courthouse grounds, could they walk onto those grounds to
24     address them, to address that event?
25          A      Yes, sir, most police officers are -- would do
```

1                          J. EAST

2    that if they see something happening.  I would hope they

3    would do that.  And then they would call one of us to come

4    and take care of the situation.

5         Q    Okay.  But there was nothing inappropriate from a

6    jurisdictional ground from them crossing the line of the

7    fence because they saw something on the courthouse grounds?

8         A    They have a right to act, but they're not --

9    that's not their jurisdiction, so they don't make it a

10   common habit to go in there and arrest people or enforce

11   something.

12        Q    Maybe a better way to ask, if they saw something,

13   they wouldn't ignore it.

14             They wouldn't ignore it just because it's outside

15   their jurisdiction?

16        A    I wouldn't think so.  I would think they would

17   contact us.

18        Q    Well, when you were chief of police, did you ever

19   give your officers instructions on what to do if they saw

20   something on the courthouse grounds?

21        A    Contact the Sheriff's Department.

22        Q    Are there other areas within the City of Oxford

23   that share this distinction of being county property in the

24   city?

25        A    Yes, sir.  We have a chancery building that's

```
 1                               J. EAST

 2              Just right offhand, I can't think of --

 3              I really don't know what you're asking.

 4      Q      Can you tell me about the incident with the

 5   deputy?

 6              What was that situation?

 7      A      Yes, sir.  They had a trial that ended with the

 8   young man being convicted.  He got up and was just going to

 9   leave as the judge sentenced him.  One of the deputies was

10   at the back of the courthouse and tried to stop to talk to

11   him, and he assaulted the deputy there and had to be taken

12   into custody by several of us.

13      Q      This was a deputy being injured in the courthouse

14   by a criminal defendant?

15      A      Yes, sir.

16      Q      Any other incidents that you can recall in the

17   time period leading up to when you became sheriff where

18   somebody was physically injured on the courthouse grounds or

19   on the land immediately surrounding the statue?

20      A      Not that I can recall right now, no, sir.

21      Q      Okay.  I take it, though, during your tenure at

22   the Oxford Police Department, there were other incidents of

23   violence elsewhere in the City of Oxford; correct?

24      A      Yes, sir.

25      Q      And that happens in a city of 27,000 people;
```

1                            J. EAST

2   right?

3       A    Yes, sir.

4            And the downtown area at one time -- I don't know

5   what it is now -- I think there was, I mean, approximately

6   30 bars in a two-block to three-block radius.  So you have a

7   lot of people that go to this -- I would refer to it as

8   entertainment center down there or downtown district.  So

9   with alcohol, young adults, you're going to have people that

10  are aggressive and fight and do those type things.

11      Q    Okay.  But those happen from time to time, and

12  they happen, I assume, throughout the whole time you not

13  just were chief of police, but worked for the Oxford Police

14  Department; right?

15      A    Yes.  Yes, sir.

16           It was progressing towards -- as I was chief, it

17  was progressively getting more violent, larger crowds.  I

18  think COVID took care of a lot of that.

19      Q    I understand.

20           And we might get to this in a little bit, but

21  back in 2017 and following an incident in 2018, there were

22  actually some changes made to the downtown district

23  ordinance to address some of the potential for violence in

24  the downtown area.

25           Am I right on that?

```
 1                            J. EAST
 2        A     Yes, sir, I've testified in court.
 3              This is my first deposition to give.
 4        Q     Okay.  So you've testified in various police
 5   matters in court, I assume?
 6        A     Yes, sir.
 7        Q     But never either in court or in a deposition in a
 8   civil case like this?
 9        A     No, sir.
10        Q     Sir, if you could turn now to Tab 1.
11        A     Yes, sir.
12        Q     So this, sir, is a document produced to us by the
13   county, and this will be Exhibit 1.  It's got Bates numbers
14   _2 to _5 produced by the county.
15              (Exhibit 1 was marked for identification.)
16   BY MR. YOUNGWOOD:
17        Q     Do you know what this is?
18        A     It appears to be guidelines and procedures
19   regulated in the use of a county facility.
20        Q     Have you seen this version of this document
21   before?
22              And you can see the dates of it at the top.  It
23   says, "Effective date April 20, 2015.  Last reviewed
24   April 20, 2015."
25        A     I don't know if I've seen this one or not.
```

1                              J. EAST

2       Q      Okay.  So this one predates your time as sheriff;

3   right?

4       A      Yes, sir.  This is --

5              Yes, sir.

6       Q      And would it -- would this have been a policy you

7   would have had familiarity when you were chief?

8       A      No, sir.

9       Q      Okay.  When you were chief, were you aware --

10  were you aware that the county had a policy regarding the

11  use of county facilities?

12      A      I don't ever remember having a conversation to --

13             I don't know.  I don't recall them having a -- me

14  knowing they had something in place.

15      Q      Okay.  If you go to Exhibit 2 now, Tab 2, which

16  we'll mark as Exhibit 2.

17             (Exhibit 2 was marked for identification.)

18  BY MR. YOUNGWOOD:

19      Q      So this again says, "Facility Use Policy" on the

20  top.  It has Bates numbers _6 through _10 on the bottom of

21  the pages.

22             It says, "FAC01" underneath that.

23             Do you know what that means?

24      A      No, sir, I do not.

25      Q      Okay.  And this one says, "Effective date

Page 60

```
 1                              J. EAST
 2    March 4, 2019."
 3                   Do you see that?
 4         A      Yes, sir.
 5         Q      And so was this the policy that was in effect
 6    when you became sheriff?
 7         A      I guess so.
 8         Q      Well, have you seen this --
 9                   I'm sorry.  I spoke over you.  I apologize.
10                   Please finish your answer.
11         A      I'm not sure if this is when I was there or not.
12    I'd have to read it.
13         Q      Why don't you take a moment then, please.
14         A      This appears to be it, sir.
15         Q      Okay.  So you believe this was the policy in
16    place when you assumed the sheriff's role January 2020;
17    correct?
18         A      Yes, sir.
19         Q      Okay.  And between January of 2020 and May 24 of
20    2020, did you have any occasion where you had to consult the
21    policy?
22         A      Yes, sir.
23         Q      Okay.  Tell me about that.
24                   And again, I just -- I'm not trying to pick an
25    arbitrary date.
```

```
1                              J. EAST
2    take your call.  I can talk now."
3                   Oh, that was from me.
4                   I don't know what that meant.
5         Q    I don't know what it means either.
6                   If you could turn to the next tab, Exhibit 5,
7    please.
8                   (Exhibit 5 was marked for identification.)
9    BY MR. YOUNGWOOD:
10        Q    And take a look at this e-mail from Ms. -- you
11   pronounce it Carwyle?
12                  I hope I'm pronouncing it right.
13        A    Yes, sir.
14        Q    To you on June 9, 10:40 a.m.  It's Bates number
15   _241 to _242, and the second page appears to be a permit
16   application.
17                  Take a moment to look at it.  I'm going to ask
18   you about your involvement in that.
19        A    Okay.
20        Q    So permit applications would come to your
21   attention; is that correct?
22        A    Yes, sir.
23        Q    And this --
24                  This is before the Facility Use Policy ends up
25   being amended.
```

```
 1                          J. EAST
 2              And in fact, if you look in the attachment line,
 3     although we don't seem to have all the attachments produced
 4     to us, you'll see that one attachment is the George Johnson
 5     7/19/20 facility permit, and the second one says Lafayette
 6     County Facility Use Policy 3/4/19, which matches the date on
 7     Exhibit 2 that you looked at.
 8              Do you see that?
 9     A     Yes, sir.
10     Q     So Ms. Carwyle sends you this, permit
11     applications.
12              What are your considerations in deciding whether
13     or not to grant it at this time?
14     A     I don't have the authority to grant or deny the
15     permit.
16     Q     Okay.
17     A     I look at --
18              Myself or a staff member would reach out to
19     whoever applied for a permit to find out who would be in
20     attendance, that type of stuff, if they felt like they
21     needed extra security, those type things.
22     Q     And so your understanding is, it's Ms. Carwyle
23     who has the authority to deny it or not?
24     A     That's correct.
25     Q     Okay.  And when you're looking at it, what input
```

```
1                        J. EAST
2    are you trying to give?
3         A      Basically can we provide a safe environment for
4    that.
5         Q      Okay.  And how long does it take you to provide
6    that assessment when you get a permit request?
7         A      Depends on a lot of variables.
8                Am I able to contact that person or my staff when
9    they're available to us, you know.  We try to do it within a
10   couple of days of her giving it to us.
11        Q      So generally you can do it within a couple days,
12   meaning two days, three days?
13        A      Yes, sir.
14               Just all that will depend on our ability to call
15   that person and their availability to accept the call.  It
16   could be that day, or it could be three days.
17        Q      So is it the case, sir, that every time somebody
18   applies for a permit, you personally or someone under your
19   command will make a contact with the permit applicant?
20        A      I'm not going to say it's every time, but we try
21   to do that if we feel we need to.
22        Q      So what sort of things in a permit would cause
23   you to believe you needed to reach out and get more
24   information?
25        A      I don't understand why they're using it.  This
```

1                              J. EAST

2       A       Yes.  This is where they amended the Facility Use

3   Policy.

4       Q       Okay.  Do you believe you had reviewed the

5   Facility Use Policy prior to this meeting on the 5th -- 15th

6   of June, 2020?

7       A       I don't know the exact date.

8       Q       Okay.  Did you attend this meeting?

9       A       I don't know.

10              I'm confident I did, but I'm not positive.

11      Q       Okay.  Had you discussed the Facility Use Policy

12  with any of the supervisors prior to the meeting?

13      A       I don't recall.

14      Q       One of the changes put through by this amendment

15  is that if five or more people -- it says, "Five or more

16  people gathering require a permit for use."

17              Do you see that?

18      A       Yes.

19      Q       And that had not been the requirement previously?

20      A       Correct.

21      Q       Did you have any input into that addition to the

22  policy?

23      A       I don't --

24              I don't know that my input.  I spoke to the

25  county attorney about this.

J. EAST

1

2   winter, and there's COVID.

3           But any typical point in time at 11:23 in the

4   afternoon, if you walked onto the county courthouse grounds,

5   wouldn't you see -- it would not be surprising to see five

6   people together on those grounds; correct?

7      A    I don't know.

8      Q    It wouldn't be unheard of that there would be

9   five people together on the courthouse grounds?

10      A    I mean, when there's court, there's business

11   there.  So, you know, we had an election there.  I'm not

12   surprised if five people would be there.

13      Q    Okay.  So in your view, what was the purpose of

14   the insertion of the five people gathering requirement?

15      A    Again, that goes back to I think the original

16   permitting process.  If someone was to be there to protest,

17   to gather, to have a demonstration, one person had to have a

18   permit.

19      Q    Okay.  Well, do you think it's necessary, sir, to

20   have a permitting process if six people want to gather on

21   the courthouse grounds for purposes of a protest?

22      A    I think it's important that the county has a

23   permitting process.  What that looks like is really up to

24   that government.

25           I think they need a process, otherwise we have no

```
1                            J. EAST
2    way to know what's going on there.
3         Q    Okay.  What if six people want to gather for
4    lunch?  Do they need a permit?
5         A    I don't know.  That's really up to the policy
6    here.
7         Q    Well, you are consulted when the applications
8    come in.
9              In your view, would six people gathering for
10   lunch require approval under the policy?
11        A    Apparently, if they were going to do an organized
12   lunch meeting, they would need a policy.
13        Q    A permit you mean?
14        A    I would think so, yes.
15        Q    Does that make sense to you, sir?
16        A    I try to not make sense out of rules and
17   regulations the government put in place years ago.
18        Q    Okay.
19        A    I follow them.
20        Q    Well, this isn't years ago.  This was the summer
21   when you were sheriff.
22        A    Yes, sir.
23        Q    So do you think it makes sense to require a
24   permit if five or more people want to gather on the
25   courthouse grounds?
```

J. EAST

1

2      Q     Okay.  So your read is that the application would

3   allow them to tell you what the subject matter of the

4   protest would be?

5      A     Most of them that I've read, they usually write

6   something over there what it's about.

7      Q     Okay.  And in fact, the form itself says,

8   "Explanation of Use," correct?

9      A     Yes, sir.

10      Q     So if I wanted to protest in favor of keeping the

11   confederate statue, I'd write in "Explanation of Use:

12   Protest to support confederate statue" or something like

13   that?

14      A     I'm assuming, yes, sir.

15      Q     Okay.  And you said, sir, you're content neutral,

16   but how about the --

17            How do you determine if it's a protest?

18      A     I don't know that we do.

19            What we're looking at is security measures.  So

20   whatever they're protesting, whatever they want the permit

21   for doesn't get involved.

22            We're looking at security purposes only, get with

23   other agencies to see how we can handle that situation.

24      Q     And for example, sir, if I wanted to have a

25   gathering to welcome spring, you know, on March 21, do you

1                              J. EAST

2    see that as less of a security risk than if I wanted to have

3    a gathering to support the continued placement of the

4    confederate statue in the town square?

5        A    Sir, what we would do is call you to find out how

6    many people would be there, how many you foresee, do you see

7    people stopping, coming in.  Is there going to be traffic

8    issues?

9             It's all going to be based around security and

10   what your needs are in having an event and what our needs

11   are to meet that.

12       Q    Okay.  And in doing that you use your discretion

13   to make the judgment regarding security; correct?

14       A    Well, my discretion, our discretion, our personal

15   -- I mean professional opinions of what that is, what risk

16   it could be, if any, what type of security needs you might

17   need to be there.

18       Q    And where in the policy can I find a reference to

19   your need to assess security in deciding whether or not --

20   or in giving input to the county in deciding whether or not

21   to grant my permit?

22       A    I don't know.  I don't have that in front of me.

23       Q    Well, it's Tab 2, Exhibit 2, unless you're aware

24   of a later version of this policy.

25       A    Quickly glancing, I would think it would be there

J. EAST

1

2    in "Denial of Usage."

3        Q       All right.  Just so we're all looking --

4                You're looking at the bottom of page 2?

5        A       If it would pose health or safety risk.

6        Q       Okay.  But as I understand it, your input is

7    focused on whether or not your police force can -- can --

8    has enough personnel to be there for the event, which is in

9    part dependent on what else your police force is doing that

10   day; right?

11       A       On page 3 also at the bottom of security, quickly

12   glancing, it says, "Sheriff shall determine whether and to

13   what extent additional sheriff deputies are reasonably

14   necessary for the event or traffic control and public

15   safety."

16       Q       Okay.  That doesn't say that you can deny it for

17   those reasons; right?

18       A       I don't deny it, sir.  I spoke earlier that I

19   just give a reference of public safety.  I don't deny or

20   approve.

21       Q       Okay.  So --

22       A       I do not deny or approve.

23       Q       Okay.  But you are asked for your input; correct?

24       A       On public safety, yes, sir.

25       Q       Okay.  And under this section you just pointed

Page 95

1                               J. EAST

2    to, "The user shall provide at its own expense any security

3    that the user desires in addition to security normally

4    provided by the county."

5              So that says that if I apply for a permit, and I

6    think I need more security, I can pay for it and do it;

7    right?

8        A     Repeat it again.  I'm sorry.

9        Q     The first sentence says that if I --

10             Let's pretend me, I'm the permit applicant.

11       A     Sure.

12       Q     If I want to have security in addition to

13   whatever you provide, I can do that.  I can pay for it;

14   right?

15       A     Yes.  It says, "Provide your own security."

16       Q     Yes.

17             The next sentence empowers you to determine

18   whether and to what extent additional sheriff department

19   deputies is reasonably necessary for the event for traffic

20   control and public safety; correct?

21       A     Yes.

22       Q     And then it says you base your decision on the

23   size, location, duration and date of the event; right?

24       A     That's what it says.

25       Q     And then you say if additional law enforcement

```
1                            J. EAST
2    protection for the event is deemed necessary by the sheriff,
3    you have to inform me, the permit applicant; right?
4         A     That's what it says.
5         Q     And then it says you can bill me in advance;
6    correct?
7         A     That's what it says.
8         Q     So nothing in this paragraph, other than my
9    refusal to pay for the additional costs, empowers anyone to
10   deny my permit; right?
11        A     Yes.
12        Q     Yes, I'm correct?
13        A     It doesn't say anything about denying the permit,
14   yes.
15        Q     Okay.  And it also gives timing for payment and
16   talks about a deposit at the time of the permit; right?
17        A     Yes, sir.
18        Q     Okay.  Have you, since you've been sheriff,
19   recommended the denial of a permit for safety reasons?
20        A     I did not recommend denial.
21              I was not able to provide proper security and
22   public safety on one event.
23        Q     What was that?
24        A     Don't know the exact name of it, but it was an
25   event, a pro-confederate monument had applied for a permit,
```

1                        J. EAST

2    and Ms. Carwyle denied that because we were not able to

3    provide ample security at the time.

4         Q     Let's go back to tab 7 and ask a few questions,

5    and I think the videographer is going to need to change the

6    tape.

7               I want to ask you about the 30-day notice period.

8               Did you have view on the inclusion of the 30-day

9    notice period in the amendments made on the 15th of June,

10   2020?

11        A     I don't recall.

12        Q     Did you, as of June 15, 2020, believe that 30-day

13   notice was required?

14        A     That no 30 days were required?

15        Q     Did you believe that it was sound policy to

16   require applications to be made 30 days in advance?

17        A     I think it is sound policy, but 30 days is a long

18   time.

19        Q     30 days is generally not necessary; correct?

20        A     It's a long time.

21        Q     Okay.  And the policy is subsequently amended to

22   reduce the 30 days to 14 days.

23               Do you recall that?

24        A     Yes, sir.

25        Q     We can quickly --

Page 98

1                          J. EAST

2              If you'd turn to Tab 29, which we'll mark as

3    Exhibit 29.

4              (Exhibit 29 was marked for identification.)

5    BY MR. YOUNGWOOD:

6         Q    Do you recognize this order to include a

7    requirement of application to be made 14 days prior to the

8    date of proposed use and requiring closure of courthouse

9    grounds 30 minutes before dusk approved by the Board of

10   Supervisors on the 20th day of July, 2020?

11        A    Yes.

12        Q    And we'll mark this as --

13             This is marked as Exhibit 29.

14             Were you at this meeting, sir?

15        A    I don't recall, sir.

16        Q    Okay.  We're going to come back to the dusk

17   portion of it after we change the tape.

18             Do you see now the notice is required or the

19   application is required to be made 14 days prior to the date

20   of proposed use?

21        A    Yes, sir.  14 days, yes, sir.

22        Q    That's also a long time; right?

23        A    I think that's about appropriate.

24        Q    Well, you earlier testified that you could --

25             Assuming that the person returned your phone call

```
 1                          J. EAST
 2   if you had a question, you could make your recommendation at
 3   least within two to three days; right?
 4        A     I could look at security measures, yes, sir.
 5        Q     Okay.  You wouldn't need more than two to three
 6   days; right?
 7        A     To find out about security?
 8              I'm not following what you're asking.
 9        Q     To make your security determination, you wouldn't
10   need more than two to three days to consider a permit;
11   correct?
12        A     If I have 14 days' notice, I can see whatever
13   else is out there.
14              If everybody has two or three days, then I'm not
15   able to juggle multiple events at one time.  I won't have
16   processing to let me know what's going on.
17        Q     Okay.  Do you understand this 14-day period
18   advance notice to be waiveable by you?
19        A     No, sir.
20        Q     You don't think you have any discretion to waive
21   it?
22        A     No, sir, because I don't have discretion to
23   approve it.
24        Q     Well, if you go back to Tab 7, Exhibit 7, which
25   is the June 15 amendment --
```

J. EAST

1

2    try to get changed by the Board of Supervisors and

3    attorney."

4            Do you see that?

5    A    Yes, sir.

6    Q    And then you forward this chain to Ms. Carwyle on

7    June 30 at 12 p.m.; correct?

8    A    Yes, sir.

9    Q    And so that seems to be after the meeting that

10   you had with her on June 30 at 10:00 a.m.; right?

11   A    Yes, sir.

12   Q    Okay.  I want to walk through --

13           And is this, to your knowledge, sir, the first

14   time you gave direct comments to Ms. Carwyle or to anyone on

15   potential changes to the Facility Use Policy as it relates

16   to the courthouse?

17   A    No, sir.  We had talked to previous --

18           Under the old version you could give the permit

19   out like we just talked about until ten o'clock at night.  I

20   made previous comments that I felt like that needed to be

21   maybe five o'clock.  There was no sense in having people

22   there after that.

23           And we even talked about gating -- you know, we

24   brought up gating the courthouse off to keep people from

25   coming on the grounds, those type things.

1                                    J. EAST

2        Q      Okay.  Those were comments that maybe took place

3    earlier -- earlier in June after Mr. Floyd's death?

4        A      I would think before that.  I don't know the

5    exact dates.

6        Q      Okay.  Well, your earlier testimony was you

7    hadn't looked at changes in the policy until Mr. Floyd's

8    death.

9             MR. O'DONNELL:  You're talking over each other at

10           this point.

11   BY MR. YOUNGWOOD:

12       Q      Sir, your earlier testimony was, you hadn't

13   looked at any change in the policy until after Mr. Floyd's

14   death.

15       A      No, I said I didn't remember.  I said it was in

16   around that time.  I never gave a specific time or day.

17       Q      Okay.  You don't have any e-mails or written

18   records showing any proposed changes that you wish to

19   suggest earlier than this document we're looking at right

20   now, which is Exhibit 22; correct?

21       A      I have nothing in front of me, no, sir.

22       Q      Well, can you recall anything that you have that

23   isn't in front of you?

24       A      I can recall conversations with him, yes, sir,

25   and with the attorney, yes, sir.  I don't know the time.  I

```
1                              J. EAST
2       Q     Okay.  Let's go to the next one.
3             You write, "Need to address this line.  It should
4  be no later than 5 p.m. unless special request to and
5  approved by BOS."
6             Do you see that?
7       A     Yes, sir.
8       Q     What did you mean by that?
9       A     I meant that I don't think it should be an open
10 policy that the courthouse would be open until ten o'clock.
11 I think that it should be shut down at five.  That's when
12 business hours are open.  And if they want to use it, that
13 needs to go in front of the Board of Supervisors for
14 approval.  It should be something special is what I was
15 meaning.
16      Q     Well, even without opposing an additional time
17 restriction, all applications do have to be approved by the
18 county supervisor; correct?
19      A     No, it's approved by Ms. Carwyle, from my
20 understanding.
21      Q     Okay.  I'm sorry.  I misspoke.
22            County administrator, correct?
23      A     Yes.
24      Q     Okay.  And the one permit that we saw denied --
25            And I think you testified very early in your
```

J. EAST

1

2      Q      Do you know on how many occasions that's happened

3   in the past?

4      A      No, sir.

5      Q      Okay.  And when were you informed that the

6   courthouse walls had been used to display films?

7      A      I don't know the exact timing.  I knew that the

8   Oxford Visit --

9               I don't know.

10              Oxford Film Fest, Visit Oxford may have done

11  something.  I don't know what the exact wording was, but I

12  think it had something to do with Oxford and the film fest

13  at the time.  I was --

14              I was off during that so I don't really remember

15  a lot about it.

16     Q      Okay.  Are you aware of any violence that arose

17  out of past occasions when videos or films were displayed on

18  the outside walls of the county courthouse?

19     A      Not that I can recall or know of, no, sir.

20     Q      Okay.  Or if not violence, any safety concerns

21  that came up during the time that films or videos were shown

22  on the outside walls of the county courthouse in the past?

23     A      I was not in this process to know.  By looking at

24  it, I would have concern of it being there, if I was asked.

25     Q      And I'm not asking if you have concerns.

Page 150

```
 1                         J. EAST
 2              I'm trying to read her note to refresh my memory.
 3              We had met safety with OPD, UPD, and the
 4    sheriff's department advised that we were trying to work
 5    together to have a better facility policy amongst all of us
 6    so that we could check to make sure we're not overloading
 7    each other.
 8         Q    Okay.  And I'm sorry, OPD means Oxford Police
 9    Department; right?
10         A    Correct.
11         Q    What's VPD, if that's a V.?
12              I don't know if that's a V or a U.
13         A    U, University Police Department.
14         Q    Got it, so that's the University of Mississippi.
15              And then do you know what the last reference is
16    there?
17         A    Lafayette County Sheriff's Office.
18         Q    So your -- your now current office, your prior
19    office OPD and then the University Police Department,
20    University of Mississippi.
21              So what was the discussion that's referenced
22    here, "Safety, OPD, UPD, LSO"?
23         A    I'm not exactly sure.
24              We had met with the three entities, OPD, UPD
25    officials, and attorneys had met to try to -- prior to this
```

Page 152

1                                    J. EAST

2              Different times I had made reference to a curfew

3     or to stop having the permit so late.  These are one of the

4     things we discussed with the city.  The 30 days, it seemed

5     to be a little excessive, maybe dropping that down.

6              And then again, just safety, about how to network

7     with the other departments so that we're not issuing

8     multiple permits at the same time that will dissolve our

9     resources.

10        Q     And then there's the reference to after-dark.

11    What was the discussion there?

12        A     That was again things that I had marked in the

13    past.  I would assume it was going to be what I talked

14    about, the five o'clock -- the five o'clock -- not leaving

15    it open until ten.

16        Q     Was there any rationale given for not leaving it

17    open after five o'clock?

18        A     For me, sir, it is because my resources go down

19    even more at night.  It's not an area of --

20              The courthouse is right in the middle of town, so

21    all my resources would be further out in the county, and we

22    can't --

23              It's hard for us to put enough manpower there to

24    watch that facility.  That's why I'm trying to ask them,

25    once business hours are over, to close the facility down.

```
 1                              J. EAST
 2      Q      So let me ask you about that a little bit.
 3             After business hours and after dark are different
 4   things; right?
 5      A      They can be, yes, sir.
 6      Q      In the summer they certainly are; right?
 7      A      Correct.
 8      Q      But maybe this time of year they align a little
 9   more?
10      A      Yes, sir.  Yes, sir.
11      Q      So was it after dark or after business hours that
12   concerned you?
13      A      I put "after business hours."  I think it was
14   changed later to say -- I don't know -- sundown or dark or
15   dusk.  I don't know exactly what the language is.
16      Q      Okay.  You can't, without looking at the policy,
17   even tell me what the policy is, right, in terms of whether
18   it's after dark?
19      A      I don't know the exact wording of it.
20             It's not at five o'clock.  I know that.  There's
21   the different verbiage.
22      Q      Okay.  There are lights near the courthouse?
23      A      The courthouse has light -- globe lights, very
24   low-lit more I would call it cosmetic look than for
25   lighting.
```

1                              J. EAST

2    you were made aware that the courthouse walls had been used

3    for film and video at night in the past?

4        A    I don't recall.

5        Q    You wrote, "I will check on this to see what

6    exactly they want to do."

7             Between her e-mail and his application, what did

8    you not know that you needed to know?

9        A    Exactly what they were going to do.

10       Q    Well, what --

11            You end up asking Scott Mills to make the phone

12   call, but what information did you want Mr. Mills to obtain?

13       A    What would be happening, what are we doing, how

14   would people be viewing, how large would it be, things like

15   that.

16       Q    And what --

17            If you go to the third page, this is your e-mail

18   to Mr. Mills.  Other than --

19            You write to him, "Will you call and find out

20   exactly what this is for and all the information so I can

21   forward to BOS?"

22            Do you see that?

23       A    Yes, sir.

24       Q    And what did you mean by "exactly what this is

25   for and all the information"?

Page 161

1                                 J. EAST

2       A    The way I take it, at the time I'm just -- I was

3   ignorant to what they were doing.  I had no idea, had not

4   heard about this.  So we were just trying to get

5   information.

6       Q    Did you do more or less inquiry into this

7   projection than you did into the confederate -- the

8   pro-confederate events that Mr. Johnson sought and obtained

9   approval for?

10      A    I would say it's the same.  I'm more familiar

11  with Mr. Johnson and his -- what he is because we've seen

12  him around before.

13           I was ignorant to this.  I had no idea what this

14  would be for or about.

15      Q    Did you have somebody call Mr. Johnson before

16  granting or denying each of his permits?

17      A    Yes.

18      Q    So Mr. Rash's application is made on the 14th.

19  Ms. Carwyle forwards it to you on the morning of the 15th.

20  You respond to her on page 1 of Exhibit 26 within five

21  minutes on the morning of the 15th.

22           Do you see that?

23      A    Yes, sir.

24      Q    But if we look at page 3, you don't forward it to

25  Mr. Mills to make the inquiry until about 26 hours later on

                              J. EAST

1

2    the morning of the 16th.

3              Do you see that?

4    A      Yes, sir.

5    Q      Why did you wait a day to make that inquiry?

6    A      I can't tell you.  I don't know.

7    Q      Okay.  You'll agree with me we've seen other --

8    we've seen other permits granted with your input within 24

9    hours from application; right?

10   A      Yes, sir.

11   Q      Okay.  And did Mr. Mills ever tell you what the

12   substance was of his conversation with Mr. Rash?

13   A      It was going to be an artist doing local art

14   projection up there, the best I remember, and that the way

15   people were going to view it would that they would be view

16   it by driving by, or there may be -- I don't want to be held

17   to this, but I think he said there may have been two open

18   parking spaces directly across from the east side of the

19   courthouse on city property where people could pull in and

20   watch it.

21   Q      Okay.  Did he tell you what questions he asked

22   Mr. Rash?

23   A      Just what I explained.

24   Q      Did he tell you that he asked Mr. Rash, really

25   what I want to know, is there anything that is going to talk

```
1                        J. EAST
2    about the monument or things that have been going on in
3    Oxford lately?
4         A     No, sir, I don't recall that.
5               I recall him telling me that he did have a
6    conversation with him to see if the event would cause
7    counter-protest or upset people so that we could prepare.
8               I don't recall him giving me exact verbiage.
9         Q     Okay.  So you think -- I'm sorry.
10              Is it Deputy Mills?  I want to make sure I have
11   his title correct.
12        A     It's Chief Mills.
13        Q     Chief Mills.
14              So Chief Mills did ask him whether or not the
15   display would in some way concern the monument?
16        A     I don't know that, sir.  I wasn't present at
17   that.
18        Q     He did ask him about what the content of the
19   display would be?
20        A     I don't know that either.  I wasn't there.  He
21   just --
22              What he advised me, you know, whether or not it
23   would arouse people, people were going to be over there
24   being upset so that we could find out if we needed more
25   security, those type things.
```

1                            J. EAST

2     right?

3          A      Repeat that again so I can hear you.

4          Q      Yes.

5                 He applied on July 14 for an event on August 8.

6     That gave you sufficient time to make a safety

7     determination?

8          A      Yes, that was --

9                 Yes, sir, I would agree with that.

10         Q      So what did you do to make your safety

11    determination?

12         A      Talked to him about it.

13                If you ask me what my safety concerns would be.

14         Q      I'll ask you that in a second.  I'm asking what

15    process you went through to make a determination regarding

16    safety.

17         A      What Mr. Mills advised me about where the

18    projector would be, those type things.

19                I actually went to the courthouse, walked off

20    from the building to the street to where people -- to see if

21    there was enough room for people to stand and view it, and

22    then took all that into consideration.

23         Q      Okay.  And did you take into consideration that

24    similar events had been held on the courthouse walls in the

25    past without incident?

```
 1                          J. EAST
 2       A      Yes, sir.
 3       Q      Okay.  And did you determine that it would be
 4  safe for this event to take place?
 5       A      I don't know that --
 6              I did have concern with the people driving.  I
 7  thought it would be unsafe the way they were --
 8              It was brought to me by Chief Mills is that
 9  people would be driving by because of COVID.  They could
10  view it that way.  They would be walking also, which is
11  dangerous around the square, and that they could -- the
12  parking.
13              I didn't think that was appropriate to be driving
14  and watching video on the courthouse lawn.
15       Q      Okay.  And so the driving concern arose out of
16  COVID?
17       A      Ms. Carwyle, that's the reason they were having
18  it there.  I think that we read earlier is the reason he
19  wanted to have it over there is because of COVID.
20       Q      Okay.  Again, films, videos have been shown on
21  the courthouse wall in years long before COVID; right?
22       A      I was told that, yes.
23       Q      Okay.  And without incident, even though there
24  was --
25              Well, without incident that you know of; right?
```