1                 JEFF MCCUTCHEN

2      IN THE UNITED STATES DISTRICT COURT

3   FOR THE NORTHERN DISTRICT OF MISSISSIPPI

4           OXFORD DIVISION

5

6  JOHN RASH,

7

          Plaintiff,

8

  v.                      CIVIL ACTION NO.:

9                        3:20-cv-224-NBB-RP

10  LAFAYETTE COUNTY,
    MISSISSIPPI,

11

          Defendant.

12

13

14

15

      VIDEOTAPED REMOTE DEPOSITION OF

16

           JEFF MCCUTCHEN

17

       Thursday, January 7, 2021

18

      9:07 a.m. Central Standard Time

19

20

21

22

23  Reported by:

24  GRETA H. DUCKETT, CCR, RPR, CRR, CVR-S, RVR-M-S

25  JOB NO.: 188328

DEFENDANT'S EXHIBIT
J

Page 12

1          JEFF MCCUTCHEN

2          Reporting, Inc., headquartered at

3          228 East 45th Street, New York, New

4          York.  The court reporter is Greta

5          Duckett, in association with TSG

6          Reporting.

7               Counsel, please introduce

8          yourselves.

9               (Counsel stated appearances

10               for the record.)

11          THE VIDEOGRAPHER:  All

12          right.  Thank you, Counselors.

13          Will the court reporter

14          please swear in the witness?

15               (Statement by the court

16               reporter.)

17          JEFF MCCUTCHEN,

18     the witness, having first been duly

19  sworn to speak the truth, the whole truth and

20  nothing but the truth, testified as follows:

21               EXAMINATION

22  BY MR. YOUNGWOOD:

23     Q.    Chief McCutchen, I'm going to

24  address you as Chief McCutchen, unless you

25  prefer to be addressed otherwise.

```
 1                    JEFF MCCUTCHEN

 2        Q.    What -- you don't have to tell me

 3   the name of the case, but what was the general

 4   nature of the proceeding?

 5        A.    It was a lawsuit involving a wreck

 6   with one of our officers.

 7        Q.    Like, a car accident or something?

 8        A.    Yes, sir.

 9        Q.    And I'm going to assume you've

10   testified from time to time in court in

11   proceedings?

12        A.    Yes, sir.

13        Q.    Okay.  And those are generally

14   proceedings associated with your duties as a

15   law enforcement officer?

16        A.    Yes, sir.

17        Q.    Okay.  I know that you're currently

18   the chief of the Oxford police force, and I

19   think you've had that position either on an

20   interim or permanent basis, if I'm correct,

21   since February of 2019?

22        A.    Yes, sir.

23        Q.    Okay.  When did you become -- when

24   did the title switch from interim to full-time

25   or permanent, whatever the right way to say it
```

```
 1                      JEFF MCCUTCHEN
 2   is?
 3          A.    I believe January of 2020.
 4          Q.    Okay.  And prior to assuming the
 5   role as interim police chief, what position did
 6   you have?
 7          A.    Major of operations.
 8          Q.    And how long did you hold that
 9   position, sir?
10          A.    From 2014 until 2019.
11          Q.    Okay.  And prior to that, what did
12   you do?
13          A.    Criminal investigator.
14          Q.    Again, for the Oxford police force?
15          A.    Yes, sir.
16          Q.    How long were you doing that?
17          A.    I believe from 2008 to 2014.
18          Q.    Okay.  And prior to that, sir?
19          A.    DUI officer with the Oxford Police
20   Department.
21          Q.    And for how long prior to 2008 did
22   you have that position?
23          A.    About six months, 2007, for about
24   six or eight months.
25          Q.    Okay.  And prior to that, sir?
```

```
 1                    JEFF MCCUTCHEN

 2        A.    Patrol officer with the Oxford

 3   Police Department.

 4        Q.    And how long did you hold that

 5   position, or when did you start that position?

 6        A.    From 2005 until 2007, sometime in

 7   2007.

 8        Q.    Okay.  And it was 2007 when you

 9   became the DUI -- or a DUI officer?

10        A.    Yes, sir.

11        Q.    Okay.  And how about before 2005?

12        A.    In 2003, the Batesville Police

13   Department hired me as a patrol officer.

14        Q.    Okay.  So 2005 is when you started

15   with Oxford; is that right?

16        A.    Yes, sir.

17        Q.    Okay.  So, basically, 15, 16 years,

18   you've been working for the Oxford Police

19   Department?

20        A.    Yes, sir.

21        Q.    Okay.  And so fair to say you're

22   fairly familiar with the Oxford area in the

23   course of your duties?

24        A.    Yes, sir.

25        Q.    Okay.  Did you grow up in the area,
```

```
 1                    JEFF MCCUTCHEN
 2        Q.    Okay.  And you started, you said,
 3   in Two Thousand- -- I'm sorry -- 1999, you
 4   graduated from high school in '99 or
 5   thereabouts?
 6        A.    Yes, sir.
 7        Q.    Okay.  Let's talk a little bit
 8   about the Oxford police force today.  How many
 9   personnel are under your command?
10        A.    Around 94.  That's total officers
11   and civilian.
12        Q.    Okay.  And how many of those 94 are
13   officers, as opposed to civilians?
14        A.    80.  80 officers.
15        Q.    Okay.  And do you have a sense of
16   what the land area is that you're in charge of
17   policing?
18        A.    Our jurisdictional property?
19        Q.    Yes.
20        A.    Yes, sir.
21        Q.    What is that?
22        A.    We cover -- really, I guess, the
23   four major boundaries would be 7 North,
24   Highway 7 North, just past Highway 30;
25   Highway 7 South just past County Road 401;
```

```
 1                    JEFF MCCUTCHEN

 2   Highway 6 eastbound just past County Road 406;

 3   and then Highway 6 westbound just past -- or

 4   just before Wellsgate subdivision.

 5         Q.     And is that synonymous with the

 6   geographic boundaries of the city of Oxford, or

 7   is it in some way different than that?

 8         A.     No, sir.  That's our city limits.

 9         Q.     Okay.  Now, within the city, there

10   are some places that are county property; is

11   that right?

12         A.     Yes, sir.

13         Q.     And one of them -- we'll get to

14   this, obviously, a little bit later -- is the

15   county courthouse, correct?

16         A.     Yes, sir.

17         Q.     Okay.  What is your jurisdiction

18   over county property that is within the city

19   limits?

20         A.     We don't have jurisdiction over

21   county property.

22         Q.     Okay.  And what does that mean?  If

23   you were to, say, see an incident on the

24   courthouse lawn, what are the abilities of your

25   officers to assist with that?
```

1                    JEFF MCCUTCHEN

2        A.    It ultimately depends.  It depends

3   on the severity of the incident.  You know, if

4   we see a violent act, then we intervene.  If

5   it's something that we can stand by, we

6   typically call the sheriff's department and

7   give them notice.  And then -- depending on

8   where they're at and things like that.  But we

9   only step in unless it's something of exigent

10  circumstances.

11       Q.    Okay.  Other than the courthouse

12  grounds, what other county grounds are within

13  the city limits?

14       A.    You have the chancery building, you

15  also have a county property out on -- out off

16  of Highway 6 East that has multiple buildings.

17  It also has a municipal county courthouse there

18  with an arena.  We have the Lafayette County

19  School District that has just been annexed in.

20  And I'm not -- that's the ones that's coming

21  off the top of my head.

22       Q.    Okay.  If we could turn to tab 42,

23  which we'll mark as Exhibit 42.  So that,

24  hopefully, serves in the binder you were

25  provided.  I'll give you a moment to find it.

```
 1                    JEFF MCCUTCHEN

 2        A.      Okay.

 3                        (Technical discussion.)

 4                        (Exhibit 42 was marked for

 5                         identification.)

 6   BY MR. YOUNGWOOD:

 7        Q.      So this is tab 42 of the binder.

 8   It's being marked as Exhibit 42 to your

 9   deposition.  It's a series of photographs.  If

10   we just flip through them for a moment.

11                My question to you is:  Do you

12   recognize these as different photos taken in

13   and around the courthouse grounds, the

14   Lafayette County Courthouse grounds?

15        A.      Yes, sir.

16        Q.      Okay.  Are you aware, in your time

17   serving for the Oxford Police Department, of

18   any incidents of violence that have taken place

19   on the county courthouse grounds?

20        A.      Specifically, no.  Not off the top

21   of my head.

22        Q.      Okay.  And are you aware of any

23   incidents that have taken place on the

24   courthouse grounds where Oxford police officers

25   have had a need to intervene and go onto the
```

```
1                    JEFF MCCUTCHEN
2   courthouse grounds?
3        A.    Yes, sir.  There have been
4   incidents where we have jointly worked with the
5   County or -- or stood by.
6        Q.    Okay.  Can you tell me what you
7   recall of those?
8        A.    You know, we've had -- we've had
9   different events, whether it was demonstrations
10  or large gatherings, that our office may have
11  actually been on site first or received radio
12  traffic.  Specifically, you know, this summer,
13  we've had incidents where our staff had to
14  either stand by or work jointly with the
15  County.  Again, a lot of it is -- was over
16  demonstrations.  We've -- we've had people had,
17  you know, things thrown at them or events such
18  as that happen where we were either standing by
19  or, again, arriving first.
20       Q.    So tell me about that, your
21  coordination between the City and the County.
22  How does that coordination come about?  How
23  does it work?
24       A.    As far as a spontaneous event or a
25  scheduled event?
```

1                    JEFF MCCUTCHEN

2        Q.     Let's do them separately.  Why

3    don't we start with a scheduled event?

4        A.     A scheduled event, typically, I

5    would speak with the sheriff and find out the

6    logistics of what was happening on their

7    property and if they had any needs of our

8    staff.  Typically, if there's an event that is

9    happening on their property, it may impact the

10   location just -- I guess that would be east of

11   that property around our city hall.  So even if

12   we didn't necessarily intervene, we would

13   typically staff something on the other side.

14       Q.     Okay.  And maybe this is what

15   you're doing.  In terms of specific, you know,

16   planned events that involve the town square or

17   the courthouse, can you think of examples where

18   you and the County have coordinated with

19   respect to an event?

20       A.     Yes, sir.  Especially this summer.

21   We had several events, mostly of larger scale,

22   that neither our staff could manage alone or

23   their staff.  You know, probably five to seven

24   events throughout 2020 that we prepared and

25   planned jointly with.

```
 1                   JEFF MCCUTCHEN
 2   resources.
 3        Q.    Okay.  But you can't recall any
 4   instances -- let's just keep it in the summer
 5   of 2020 -- where you didn't believe you had the
 6   resources to provide assistance?
 7                   MR. O'DONNELL:  Object to
 8             form.
 9        A.    I'm not --
10                   MR. O'DONNELL:  You can
11             answer.  Go ahead.
12        A.     I'm -- I'm not certain that we did
13   or we didn't.  But there would have been
14   instances, if we had a permit scheduled, all of
15   our resources would have been specifically
16   tasked for that one event.
17        Q.    Okay.  But what I'm asking is,
18   if -- if you can recall an instance where, for
19   example, Sheriff East contacted you and said,
20   We have a request for an event; is there
21   something about the activity of your department
22   that would prevent us from having such an
23   event, you can't recall ever telling him
24   that -- that, no, we're too busy; we wouldn't
25   be able to help?
```

```
 1                    JEFF MCCUTCHEN

 2        A.    I know we discussed an event that

 3   we already had scheduled.  So we had a permit,

 4   and they contacted us about a potential county

 5   permit.  And I told him, for our police force,

 6   we were tasked for this one event for this day.

 7   And so, you know, no guarantees that we could

 8   assist or help in that matter.  And our streets

 9   would be blocked.  Because I believe ours was a

10   march.  So, for us, we would be completely

11   tasked for that one event.

12        Q.    What -- what event are you thinking

13   of?

14        A.    We had -- I believe the -- the name

15   of the event was LO Unity.  It was coordinated

16   by some University of Mississippi football

17   players.  That was a scheduled event that would

18   take place in front of city hall that led to a

19   march.  And so we would have that tasked

20   pre-event, during the event, and post-event.

21        Q.    Okay.  Do you remember when that

22   was, sir?

23        A.    Not specifically the day.

24        Q.    Okay.  Summer of 2020?

25        A.    Yes, sir.
```

```
1                    JEFF MCCUTCHEN
2    separate from protests or other marches or
3    activity like that, have you observed how
4    citizens use the courthouse grounds in your
5    time on the Oxford police force?
6         A.    Are we speaking specifically after
7    hours?
8         Q.    Well, let's start during the day,
9    and then we'll go to the evening, perhaps.  And
10   perhaps it changes during the week and the
11   weekend.  I understand that too.
12        A.    Yes, sir.  I would say, during the
13   daytime, it's typically used as business for
14   those coming and going, or court sessions.
15        Q.    There are multiple benches within
16   the grounds?  It --
17        A.    Yes, sir.
18        Q.    -- depicted some of them.
19              And people might congregate on
20   those benches?
21        A.    Yes, sir.
22        Q.    Okay.  They might have a cup of
23   coffee or a meal, like a sandwich or something,
24   perhaps, on the --
25        A.    Yes, sir.
```

```
1                    JEFF MCCUTCHEN

2        Q.     Okay.  And how about in the

3   evening?  We've discussed that there's no

4   closing of the gates.  Do people go onto the

5   courthouse grounds in the evening?

6        A. ·    From time to time, yes, sir.

7        Q.     Okay.  Your officers have never

8   prevented somebody from going onto the

9   courthouse grounds in the evening, have they?

10       A.     No, sir.

11       Q.     You're not aware of any arrests,

12  for example, made because somebody walked onto

13  the courthouse grounds after -- after dusk?

14       A.     No, sir.

15       Q.     You don't see it as a safety hazard

16  that somebody would be on the courthouse

17  grounds after dusk, do you?

18                    MR. O'DONNELL:  Object to

19               form.

20       A.     That's something that I would not

21  be aware of as far as safety concerns or

22  information that the County may have.

23       Q.     Okay.  But from what you've

24  observed -- and I recognize the difference in

25  the jurisdiction.  But from what you've
```

Page 39

```
 1                    JEFF MCCUTCHEN
 2    observed, you've never seen safety incidents
 3    arise out of people being on the courthouse
 4    grounds after dusk?
 5         A.    It --
 6                    MR. O'DONNELL:  Object to
 7              form.
 8         A.    It would depend.  Again, depending
 9    on the size of the gathering.  It would not be
10    uncommon for us to put a phone call in to the
11    sheriff's department to notify them or stand by
12    until a deputy arrives.
13         Q.    Okay.  Can you think of any
14    incidents where you did such a thing on the --
15    with respect to the courthouse grounds?
16         A.    Yeah.  Specifically this summer,
17    with different gatherings or disruptions on
18    their property, we would contact them or stand
19    by or at least moderate until we could get
20    some -- a deputy on scene.
21         Q.    Okay.  Are you aware of any of
22    those incidents resulting in arrests?
23         A.    Not with our -- with our officers.
24         Q.    Well, are you aware of the County
25    sheriff's department arresting anyone for being
```

1                    JEFF MCCUTCHEN

2    routinely working that area.  The rest of it, I

3    believe, was either archived data in our CAD

4    system or videos that would have been -- would

5    have been pulled by the City.

6         Q.    Okay.  So I have this piece of

7    paper that's the last page of this exhibit in

8    this tab 36.  I'm going to want to walk through

9    that with you in a moment.  But other than this

10   piece of paper, did you provide anything to the

11   County or to Sheriff East in connection with

12   this lawsuit?

13        A.    I believe all we provided was the

14   documents of the data.

15        Q.    So I'm trying to understand that.

16   By "documents of the data," do you mean this

17   piece of paper, or do you mean backup to this

18   piece of paper?

19        A.    Is there -- I have page 1 and

20   page 2.  Do you have something else?

21        Q.    I have in this tab a two-page

22   email, right, which is what we've just been

23   looking at.

24        A.    Right.

25        Q.    Just the -- and separated by a

Page 45

```
 1                    JEFF MCCUTCHEN

 2   page -- I have a one-page document that looks

 3   like this (indicating).

 4                Is it not -- I was wondering if you

 5   were looking at the --

 6                    (Simultaneous speakers.)

 7        A.    Yes.

 8        Q.    It's five numbered items.

 9        A.    Yes, sir.

10        Q.    Okay.  So that -- that's all I -- I

11   don't have two pages of data; I just have this

12   one page.  Is that what you mean?

13        A.    Yes, sir.

14        Q.    Okay.  Other than this page, which

15   we will get to, is there anything else that

16   you, to your recollection -- you or the city

17   police department -- have provided to the

18   County that you understand to be in connection

19   with this litigation?

20        A.    The only other thing that I could

21   think of would have -- could have potentially

22   been a document file.  And I -- this could be

23   it.  Again, Ms. Valerie shared that with them.

24   But there could have been an Excel sheet on --

25   because I know that in the email, we replied
```

Page 46

```
 1                    JEFF MCCUTCHEN
 2   that it's a whole lot of data.  So I'm not --
 3        Q.    That's -- yeah.  Yeah.
 4        A.    I'm not sure if this was the data
 5   that they were referring to or if they shared a
 6   file to him.
 7        Q.    Okay.  And who -- who would have
 8   actually sent this one page that we have?  You
 9   or someone else?
10        A.    It would have either been Deputy
11   Chief Maiden or Ms. Valerie Booth.
12        Q.    And who do you think they would
13   have sent it to?
14        A.    I believe it was to Ms. Cathy.
15        Q.    Okay.  And if there was something
16   else they sent, like a data file, some zip
17   file, something, it would have been from one of
18   those two individuals, you think, likely to
19   Ms. Cathy?
20        A.    Yes, sir.
21        Q.    Okay.  Did you review this sheet
22   before it went?
23        A.    Not specifically this sheet.  The
24   deputy chief and I discussed it.  But I -- this
25   is the first time I can remember looking at it.
```

```
 1                    JEFF MCCUTCHEN
 2       Q.    Okay.  One of the things you
 3  indicated in your answer four or five minutes
 4  ago was a discussion of how many individuals
 5  are assigned to, I think you said, patrol the
 6  downtown area.  Do you remember you -- you --
 7             Do I understand that correctly?  It
 8  doesn't matter if you said it before.  Do I
 9  understand that that was one of the things you
10  understood you were being asked for?
11       A.    Yes, sir.  That was one of their
12  questions.
13       Q.    Okay.  And is that information that
14  you gave?
15       A.    Yes, sir.  That appears to be
16  question 3.
17       Q.    Okay.  What I don't see in
18  question 3 is, for example, specific -- well,
19  it talks about the football games.  But this --
20  I'm not meaning to say it was or wasn't
21  provided.  This is the response to that
22  question; nothing else?
23       A.    Yes, sir.
24       Q.    Okay.  The data under number 1, All
25  data pertaining to arrests in the downtown area
```

```
1                    JEFF MCCUTCHEN
2    for the last five years, do you know where this
3    information came from?
4         A.    That would have come from our
5    computer system.
6         Q.    Okay.  And what does "downtown
7    area" mean?
8         A.    For us, that's a geographical area
9    consisting of the boundaries outside of what we
10   call the square, which would connect University
11   Avenue and South Lamar, Ninth Street and
12   Jackson Avenue, North Lamar and Jefferson, and
13   then East Jackson and maybe 13th Street.
14        Q.    So an area meaningfully larger than
15   the square itself?
16        A.    Yes, sir.  There are some outside
17   parameters that we cover.
18        Q.    Any -- I mean, we can look at a map
19   and do the math, perhaps.  But any sense of
20   what percentage of what you define to be the
21   downtown area is the square itself?
22        A.    I mean, that's the majority.
23        Q.    Okay.  And the courthouse, of
24   course, is only a portion of the square?
25        A.    Yes, sir.
```

1                    JEFF MCCUTCHEN

2          Q.     Okay.  Of these arrests that you

3    list, were any made on the courthouse grounds

4    or on the grounds that constitute the

5    Confederate statue outside the courthouse?

6          A.     No, sir.

7          Q.     Okay.  Do you have a -- do you have

8    a further breakdown of the nature of these

9    arrests?

10         A.     No, sir.

11         Q.     Okay.  Do you know if any of these

12   arrests related to permitted activities?

13         A.     Not to my knowledge.

14         Q.     Do you know what percentage of

15   these arrests took place after dark?

16         A.     I would assume the majority of

17   them.

18         Q.     Okay.  And is that -- and why do

19   you assume that?

20         A.     That's typically where we have the

21   majority of our violence, is after dark.  We

22   have larger crowds after dark.  We have a --

23   everyone condenses in a tighter circle of the

24   square.  And, again, we have more police

25   presence up there to monitor that.

1                    JEFF MCCUTCHEN

2        Q.    And where is that tighter area of

3   the square that they condense?

4        A.    10th Street.  10th Street, Jackson

5   Avenue, 10th and Van Buren, and then Van Buren

6   just to the city hall side.  Again, that's

7   probably -- it's close to 13th Street.  So,

8   really, just the inner circle of the square and

9   a couple hundred feet to each side of the

10  square.

11       Q.    Okay.  And is that because that's

12  where the bars and restaurants are congregated?

13       A.    Yes, sir.  But it's also some of

14  the larger parking areas and the garage and

15  places like that.

16       Q.    Okay.  So it's -- it's -- to just

17  use a shorthand, it's the night life that

18  somewhat brings people in to congregate, and

19  sometimes trouble erupts?

20       A.    Yes, sir.

21       Q.    Number 2 is -- is concerning motor

22  vehicle and pedestrian wrecks.  I'm

23  sorry.  Strike that.  I just want to go back to

24  number 1 for a minute.

25             Do you know how the year 2020

1                          JEFF MCCUTCHEN

2     in some way?

3          A.     I believe so, yes, sir.  We

4     typically average, for the city, well over a

5     thousand crashes a year.  So I would assume

6     this is specifically for those roads in

7     conjunction with the downtown area.

8          Q.     Okay.  So you typically average

9     more than a thousand, but the highest number

10    here for any given year is 58, right?

11         A.     Yes.

12         Q.     And not holding you to the

13    thousand, but that would suggest that -- let's

14    just take 2017 -- that the number -- the

15    percentage of crashes taking place in the

16    downtown area were five or six percent of the

17    total city crashes?

18         A.     Yes, sir.  Without looking at the

19    data, yes, sir.

20         Q.     Okay.

21         A.     It's lower.

22         Q.     And I guess I'm curious.  The

23    nature of the crash that's going to take place

24    in the downtown area, I assume cars are going

25    at a slower speed in the downtown area than

1                    JEFF MCCUTCHEN

2   BY MR. YOUNGWOOD:

3        Q.    Okay.  So these appear to be the --

4   the guidelines for issuing -- the ordinance for

5   issuing permits in the city.  Is this something

6   that you're familiar with?

7        A.    Yes, sir.

8        Q.    Okay.  And did you play any role in

9   drafting this or creating it?

10       A.    Not the original, no, sir.

11       Q.    Okay.  Have you played a role in

12  changes to it in the years that you've been

13  chief?

14       A.    Yes, sir.  We made a modification

15  to the length of how far out you can -- you can

16  apply for a permit, as far as a timing

17  standpoint.  I think we reduced that from 30

18  days to 14.  And then we changed some language

19  on the type of instruments that you can carry

20  while demonstrating.

21       Q.    Okay.  And when was the change made

22  from 30 to 15?

23       A.    It was in --

24       Q.    I thought -- maybe you said -- I

25  meant -- sorry.  Did you say 15 or 14?

```
 1                    JEFF MCCUTCHEN

 2       A.    I believe it was 14.

 3       Q.    Okay.  30 to 14, then?

 4       A.    That would have been in 2020.  That

 5  would have been this summer.

 6       Q.    Do you remember when in the summer?

 7       A.    No, sir.  Not specifically.

 8       Q.    Was that in any way done in

 9  conjunction with the County changing their

10  policy to 14?

11       A.    Yes, sir.  I believe those

12  conversations we had jointly.

13       Q.    Were you part of those

14  conversations?

15       A.    I was a part of the initial

16  conversation when we met with the university

17  and the County.

18       Q.    Okay.  So it was a three-way

19  conversation, then?

20       A.    Yes, sir.  It was -- it was a

21  conversation that we had generalizing, trying

22  to keep information flowing to coordinate our

23  agencies.

24       Q.    When in the summer, as best you can

25  recall, did that take place?
```

1                    JEFF MCCUTCHEN

2          A.     Typically, during the daytime, his

3    staff is in and out of that area equally.  He's

4    got more staff during the daytime, and they

5    were able to monitor that better than after

6    hours.

7          Q.     Okay.  Why does he have more staff

8    around the courthouse during the daytime than

9    at night, if you know?

10         A.     They manage the courthouse, and so

11   there are court proceedings happening

12   throughout the day.  He's got detectives that

13   are out, more personnel that are out

14   specifically during the daytime.  Generally,

15   it's deputies that are working the road at

16   night is all that they have.

17         Q.     Okay.  Well, how about on a

18   Saturday?

19         A.     I would assume Saturday would be

20   specifically just the deputies that are working

21   the road.  So if we noticed that there were

22   multiple people up there, we would generally

23   give them a call.

24         Q.     Okay.  So if you saw a group of

25   five on a Wednesday at noon, you wouldn't give

1              JEFF MCCUTCHEN

2    a call.  If you saw a group of five at noon on

3    Saturday, your deputies might give a call?

4         A.    Yes, sir.

5         Q.    Is that tracked in some way, giving

6    a call that a certain number of people are on

7    the courthouse grounds?  Or is the call just

8    made, and there's no record?

9         A.    It's probably a phone call.  And,

10   again, that may be notified from my staff to --

11   for me to call him, or it could be one of our

12   staff members contacting their on-duty

13   supervisor.

14        Q.    Okay.  So -- so it's your

15   understanding that five people congregating on

16   the courthouse grounds during the day is a

17   violation of County policy?

18                  MR. O'DONNELL:  Object to

19              form.

20        A.    No.  That's not my understanding.

21   I know that that business -- that -- that

22   operates as a business and a courthouse.  So

23   there would be more people coming and going

24   throughout the day.

25        Q.    Okay.  But how about on a weekend?

1           JEFF MCCUTCHEN

2  Five people standing there having a picnic on

3  the lawn on a weekend.  Is that a -- your

4  understanding, a violation of County policy?

5       A.    I don't know that they deem it as a

6  violation, and that's why we directly report it

7  to them.

8       Q.    Okay.  And are you aware of them

9  taking any actions with respect to the people

10  gathering in response to any of the calls that

11  your office has made to them?

12       A.    I don't know of anything

13  specifically that they've done.  I do know that

14  we have notified them of multiple people there,

15  and their office handles that.  Whether that's

16  removal or giving them additional options, I

17  wouldn't know.

18       Q.    Okay.  And do you have safety

19  concerns associated with more than four people

20  gathering on the courthouse grounds?

21       A.    It all depends:  time of day,

22  what's going on, traffic patterns.  Again,

23  that's -- we'll try to manage the street and

24  everything adjacent to that, and we give them

25  the call on how they determine safety on their

1          JEFF MCCUTCHEN

2  gain any understanding as to why these various

3  policy changes were being applied to the

4  courthouse grounds, as opposed to all county

5  property?

6       A.   Yes, sir.  Mostly around the

7  ability to provide security there.  Again, I'm

8  not sure how many deputies they run, but it's

9  600-and-some-odd square miles, and I'm assuming

10 six to eight deputies.  So response time and

11 the ability to monitor that is definitely

12 different for them than for us.

13      Q.   What is different about the

14 courthouse for them, as opposed to any other

15 small plot of land within the county?

16      A.   I'm not sure, unless it's, you

17 know, that being centrally located in the city

18 and coming through the city limits, slowing

19 them down as far as a response time versus a

20 piece of property in the county with open road.

21      Q.   But there are -- you testified

22 earlier, there are other -- there's other

23 parcels of county property within the city,

24 right?

25      A.   Yes, sir.

1          JEFF MCCUTCHEN

2      Q.    Would the rationale be any

3  different for them in terms of the sheriff's

4  office's access to them than it would be for

5  the courthouse grounds?

6      A.    I'm not certain.

7      Q.    And your conversations with -- with

8  Sheriff East concerning changes in policies to

9  the courthouse grounds and the area approximate

10 to the statue touch on any of the political

11 movements that were exhibited this summer of

12 2020?

13     A.    No, sir.  Again, I think they were

14 following a very similar policy that we were.

15 We were trying to, you know, give our citizens,

16 you know -- not different standards,

17 essentially.

18     Q.    By "not different standards," you

19 mean that the City and the County wanted to

20 have the same standard?

21     A.    From a timing standpoint as to when

22 to get your permit in.

23     Q.    Okay.  But in terms of the focus of

24 the County's changes in policy on the

25 courthouse, did the subject, for example, of

```
 1                    JEFF MCCUTCHEN

 2   relating to the courthouse grounds after --

 3   starting 30 minutes before dusk?

 4        A.    Are you asking did he provide me

 5   any data?

 6        Q.    Any -- any overall data or -- or

 7   reference to a specific incident.

 8        A.    We've had several incidents -- and

 9   I don't have any dates in front of me -- where

10   our staff responded or intercepted disturbances

11   there.  And if it's in -- after normal working

12   hours, I mean, you could potentially look at a

13   15- to 40-minute window before they could

14   respond.  So I know we've had those

15   conversations.

16        Q.    Okay.  And you can't remember a

17   specific incident?

18        A.    No, sir.  Those would be things --

19   you know, potentially look back on in our

20   system.  But it has happened from time to time.

21        Q.    But you've had incidents elsewhere

22   in the city at night from time to time, right?

23        A.    Yes, sir.

24        Q.    Okay.  In fact, most of your

25   incidents take place elsewhere in the city at
```

1              JEFF MCCUTCHEN

2    night, right?

3                    MR. O'DONNELL:  Object to

4              form.

5         A.    When you -- when you're saying

6    "most incidents," what are you referencing to?

7         Q.    Well, in the downtown area, most of

8    them take place at night, right?  I think you

9    said that before.

10                   MR. O'DONNELL:  Same

11             objection.

12        A.    Yes, sir.

13        Q.    When is dusk?

14        A.    30 minutes before sunset.

15        Q.    So dusk is 30 minutes before

16   sunset?

17        A.    That's my understanding.

18        Q.    Okay.  So 30 minutes before dusk

19   would be an hour before sunset, then?

20        A.    I guess so.

21        Q.    Okay.  And by definition, sunset

22   would change based on the day of the year,

23   right?

24        A.    Yes, sir.

25        Q.    Is it the time of day -- let's not

```
 1                    JEFF MCCUTCHEN
 2   picture, sir, of the statue with a projection
 3   on it saying, Take it down.
 4            Do you remember when this occurred,
 5   this summer?
 6        A.   I've actually never seen that
 7   photo, but I do believe I understand what
 8   you're referencing to.
 9        Q.   Okay.  Did you witness the event
10   yourself?
11        A.   No, sir.
12        Q.   Okay.  You were informed of the
13   event?
14        A.   If that -- if this is the one where
15   someone was parked and then shined the
16   projection across the road, then yes, sir.
17        Q.   How did you learn of it?
18        A.   I was contacted by one of our staff
19   members.
20        Q.   Okay.  Was any police action taken
21   with respect to it?
22        A.   As far as enforcement, no, sir.  We
23   did not make any arrests or citations issued.
24        Q.   Okay.  Any -- any violence erupt
25   from this event that's depicted in this
```

1                    JEFF MCCUTCHEN

2    picture?

3         A.    No, sir.

4         Q.    Okay.  Or car collisions or

5    anything like that in the area surrounding the

6    statue?

7         A.    Not that I'm aware of.

8         Q.    Okay.  Or any other harm to public

9    safety take place associated with this event?

10        A.    I do believe we asked the

11   individual not to shine it across that direct

12   roadway into drivers' eyes.

13        Q.    Okay.  And did they then cease

14   their behavior, or did they keep it up?

15        A.    They moved on.

16        Q.    Okay.  Do you know how long it was

17   up for?

18        A.    No, sir.

19        Q.    Okay.  But during the time it was

20   up and perhaps projecting across the road, as

21   you say, you're not aware of any car accidents

22   or any other events that harmed public safety

23   because of it?

24        A.    No, sir.

25        Q.    Okay.  If you could turn to tab 44,

1. **All data pertaining to arrest in the downtown area for the last 5 year.**
   2020 there were 35 arrest as of November 23, 2020.
   2019 there were 78 arrest
   2018 there were 72 arrest
   2017 there were 110 arrest
   2016 there were 98 arrest

2. **All wrecks involving motor vehicle and pedestrians in the last 5 years.**
   2020 there were 21 motor vehicle accidents as of November 23, 2020.
   2019 there were 21 motor vehicle accidents
   2018 there were 25 motor vehicle accidents
   2017 there were 58 motor vehicle accidents
   2016 there were 43 motor vehicle accidents

3. **How many officers are routinely assigned to patrol the downtown area and on average how many on a home football game.**
   a. There is a Downtown shift that covers the Square area, this shift is staffed by seven patrol offices who work ten hour shifts five days a week.
   b. The Downtown shift hours of deployment is sometimes affected by the events and time of the events in and around the square.
   c. As for ball games and special events, the number of additional personnel utilized to provide service to the Square varies depending on a number of factors, i.e. team standing, popularity of event and day of the week.
   d. We have had as many as twenty-five additional offices beside the Downtown shift and as few as five.

4. **What are your current safety concerns with the downtown area? (lighting, traffic, overcrowding, violence, etc. etc.)**
   a. There are lighting issues in the area of North Lamar and East Van Buren Ave. these areas have limited lighting and are a safety concern.
   b. Night time pedestrian traffic is high and pedestrians often walk out into traffic without looking or checking to see if its clear for them.
   c. High volume events and weekend (crowds, traffic, unruly customers, etc.) produces lots of activity in and around the square. Because of this, many resources have to be utilized in this area which limits resources available to the rest of the city,
   d. In the pass few years there have bee three shootings in this area.
   e. Vehicular traffic is heavy at times and sometimes require us to close off streets, additionally vehicles often stop in the middle of the road causing safety issues for both pedestrian and vehicles

5. **Would it be possible to get videos that your department have saved showing traffic conditions around the downtown area during week day nights and on weekend ball games and non-ball game weekends. If any of those videos capture the County Court house grounds that would be great to have.**

The police department does not have any video but the City's EMA Director may have some on his system.

**From:** Joey East <jeast@lafayettesheriff.net>
**Sent:** Wednesday, November 18, 2020 10:38 AM
**To:** Jeff Mccutchen <jmccutchen@oxfordpolice.net>
**Subject:** Re: data

Thank you

Sent from my iPhone

> On Nov 18, 2020, at 10:33 AM, Jeff Mccutchen <jmccutchen@oxfordpolice.net> wrote:
>
> Yes sir. Ms. Val is reaching out to Ms. Cathy now. It's quite a bit of data.
>
>> On Nov 18, 2020, at 10:19 AM, Joey East <jeast@lafayettesheriff.net> wrote:
>>
>> Chief,
>> I just wanted to check back with you to see if you were able to get the information requested below.
>>
>> Thanks
>>
>> Joey
>>
>> **From:** Jeff Mccutchen <jmccutchen@oxfordpolice.net>
>> **Sent:** Friday, October 9, 2020 4:03 PM
>> **To:** Joey East <jeast@lafayettesheriff.net>
>> **Subject:** Re: data
>>
>> I'll get with Ms. Val and get them pulled as quick as we can.
>>
>> **From:** Joey East <jeast@lafayettesheriff.net>
>> **Sent:** Friday, October 9, 2020 2:36 PM
>> **To:** Jeff Mccutchen <jmccutchen@oxfordpolice.net>
>> **Subject:** Re: data
>>
>> Next two weeks would be great but I totally understand if that not possible.
>>
>> Sent from my iPhone
>>
>>> On Oct 9, 2020, at 1:56 PM, Jeff Mccutchen <jmccutchen@oxfordpolice.net> wrote:
>>>
>>> Yes sir, we'll work on it. When do you need it by?
>>>
>>> Jeff McCutchen

1

On Oct 9, 2020, at 1:02 PM, Joey East
<jeast@lafayettesheriff.net> wrote:

Chief McCutchen,

Would it be possible for your agency to supply us
with data about the downtown area? As you know
we are preparing for a case in federal court and
this information could possibly be useful.

1. All data pertaining to arrest in the
   downtown area for the last 5 year.
2. All wrecks involving motor vehicle and
   pedestrians in the last 5 years
3. How many officers are routinely assign to
   patrol the downtown area and on average
   how many on a home football game
4. What are your current safety concerns with
   the downtown area? (lighting, traffic,
   overcrowding, violence, etc. etc.)
5. Would it be possible to get videos that your
   department have saved showing traffic
   conditions around the downtown area
   during week day nights and on weekend
   ball games and non-ball game weekends. If
   any of those videos capture the County
   Court house grounds that would be great to
   have.

Chief
I understand that Covid has slowed traffic and
businesses traffic down over the last several
months so this information I am requesting can be
based on the last several years and your knowledge
and experience of the area.

Thank you

Joey

<image001.jpg>

2