**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION**

**JOHN RASH**                                                                                    **PLAINTIFF**

**VS.**                                      **CIVIL ACTION NO.:  3:20-CV-224-NBB-RP**

**LAFAYETTE COUNTY, MISSISSIPPI**                                             **DEFENDANT**

---

**MEMORANDUM OF AUTHORITIES IN SUPPORT OF DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT**

---

COMES NOW, Lafayette County, Mississippi, the Defendant in the above-styled and numbered cause, by and through counsel, and files its Memorandum of Authorities in Support of its Motion for Summary Judgment, and would state as follows:

### I.   Introduction

Lafayette County is entitled to summary judgment as to all issues in this First Amendment case because the reasonable "time. place, manner" restrictions delineated in the County's Facility Use Policy are clearly content neutral on their face and as applied, and are otherwise narrowly drawn in furtherance of compelling governmental interests. These restrictions, including the imposition of an evening curfew limited to the Circuit Courthouse grounds, are supported by the substantial public safety interests at stake in limiting late-night access. In addition, the plaintiff has not shown that his interest in First Amendment expression has been infringed given the availability of other alternative forums. Aside from the substantive

aspects of the plaintiff's claims, the motion should be granted because the plaintiff lacks standing to pursue the facial challenges outlined in the Amended Complaint.

## II. Fact Summary

An itemization of the material facts, stated in a light most favorable to the plaintiff, is stated below.

The Lafayette County Circuit Courthouse ("Courthouse"),constructed and opened in 1872, is located in the center of the City of Oxford Courthouse Square. In 1977, the Courthouse was included in the National Register of Historic Places. Since its opening to the present, the Courthouse has housed various county government functions, including the circuit courts, circuit clerk, drug court, election commission, and judges' offices[1]. The grounds surrounding the Courthouse are configured in an octagon shape and are bordered and defined on all sides by an iron fence, a retaining wall and curb, and a perimeter sidewalk on the outside of the fence which connects to cross walks on each side of the Courthouse. Three heavily travelled main roadways (Lamar, Jackson and Van Buren Avenues) intersect at the Square and the combined traffic is routed in a single direction around the Courthouse. The one-way road which encircles the Courthouse, together with the retaining wall, curb and fencing, separate the Courthouse from the retail shops, restaurants, bars, other businesses, and parking areas which form the "Oxford Town Square," (Photos, Exhibit A). The confined Courthouse grounds contain several benches, small grassy areas interlineated with bricked sidewalks, and large trees, but the function and size of the Courthouse and its grounds do not offer a "park-like" setting. A confederate monument, erected in 1907, stands in front of the south gate of the courthouse grounds and sits within the sidewalks

---

[1] Prior to 1993, the Courthouse also housed the offices of the Board of Supervisors and the chancery and youth courts. These functions were moved to another facility known as the "Chancery Building" which is not located on the Oxford Square.

and public passageway to and from the south gate access to the Courthouse. The "Square" functions as the cultural, economic and social center of the Lafayette County-Oxford community. The Courthouse and its contiguous grounds fall within the exclusive jurisdiction of the Lafayette County Sheriffs Department and the Lafayette County Board of Supervisors, the county's governing body.

Prior to 2015, the Lafayette County Board of Supervisors (the "Board") had not enacted a written policy governing the use of County-owned facilities, including the Courthouse and its grounds. (Busby, p. 25-35, Exhibit B). The uses of the County's facilities were reserved for government functions and were otherwise controlled by the County Administrator. Regarding the Courthouse grounds, in particular, their use was generally restricted to individuals who had court and related business within the Courthouse. The County Administrator would occasionally grant requests for use of the grounds by citizens for such functions as the "Maker's Market" (a market for arts and crafts sales) and Memorial Day services at the location of the World War I and II Memorials located at the north side of the Courthouse. In addition, when the City of Oxford would hold the annual "Double Decker Arts Festival" each spring, the City would close off all vehicular traffic to and within the Square for the two day event and the County would allow ancillary use of the Courthouse grounds in aid of the special event.

**The 2015 Facility Use Policy**

Spurred by increasing and competing demands for the use of the County's facilities and growing concerns over the safety and damage risks to the historic Courthouse and grounds (the building does not have a fire suppression system), the Lafayette County Administrator (the County's Executive Officer), under the authority granted by the Board of Supervisors, adopted a

"Facility Use Policy" in April 2015 which governed "the use of public areas of buildings or facilities owned, leased or otherwise occupied exclusively by Lafayette County government that are used for the conduct of county operational business." (Busby, p. 38; 2015 Policy, Exhibit C). Making clear that the "primary use of the County facilities is for the conduct of county government business," the policy allowed for the use of "public areas (defined to include "the grounds and lobbies of County buildings, the Board Room, and Chancery and Circuit Courtrooms") only by certain groups, namely: (1) nonprofit citizen groups that are located in or doing business in Lafayette County, (2) state/local political parties, and (3) individuals from any political group, or similar gathering of individuals, who are meeting for the purposes of engaging in political discussion." (2015 Policy, p. 1). The policy applied "to all groups and individuals that have requested use of County facilities and grounds," and that "no group or individual shall be excluded from equal access to County facilities or grounds because of considerations of sex, race, religious or political persuasions or views; however, use may be denied or terminated if there is a violation of the rules set forth in this policy and/or if the use poses health or safety risks." (2015 Policy, "Equal Access").

**Limited Use and Permitting**

In addition to limiting use to certain groups (non-profit, political parties and political groups engaging in political discussion) for certain purposes, such uses were limited to Monday through Friday between the hours of 8:00 AM and 10:00 PM and that "use on weekends or after 10:00 PM is limited and must primarily be events coordinated and staffed by County employees and/or officials." (2015 Policy, p. 2). The 2015 policy also required that any use of the facilities would be by permit authorized by the County Administrator which was required to be applied for at least one week in advance of the proposed use. (2015 policy, p. 3). Users were also prohibited

4

from (1) "affixing" "signs, emblems, banners pennants, etc." to "any building surface, steps, walls…" and (2) engaging in solicitations while using the public property, except on behalf of a charity with prior written approval. (Policy, p. 2). Users were also required to indemnify and hold the County harmless for any liability or damage arising from the use and provide evidence of liability insurance in the amount of $1,000,000 if the use involved 50 or more individuals. (2015 Policy, p. 2; Carwyle, p. 32-37, Exhibit D).

### 2019 Facility Policy Amendments

In February 2019, following a period of consultation among the County, City of Oxford and University of Mississippi law enforcement agencies, the Lafayette County Board of Supervisors amended the Facility Use Policy on March 4, 2019. (Carwyle, p. 41-45; 2019 Policy, Exhibit E). The entities agreed to conform their demonstration/public gathering permitting policies in an effort to promote consistency and communication in managing events which typically simultaneously involved their respective jurisdictions (for example, a march from the University campus, which is less than a mile from the Square, along City streets, almost invariably ends at the Oxford Square in the vicinity of the Courthouse). Accordingly, consistent with the City's policies, the County extended the permit application deadline from 14 days to 30 days, provided a security review of each permit by the Sheriff who was to "determine whether and to what extent additional" Sheriff Department personnel was reasonably necessary for the event for traffic control and public safety,[2] prohibited the use of wood, metal, pipes, lumber over a certain dimension for use in displaying a sign or poster, prohibited the use of glass bottles,

---

[2] The Policy required the Sheriff to "base this decision on the size, location, duration, time and date of the event" and that the user would be informed of the decision and total cost. Significantly, the Sheriff's determination of "additional" security, if any, was in supplementation of the user supplied security and the security "normally provided" by the County."

bricks, stones and other potential weaponry, open flames, and prohibited masks and other efforts to conceal identity. (2019 policy, p. 3).

In July 2019, Wayne Andrews, on behalf of the Yoknapatawpha Arts Council ("Council"), sought permission to use the Courthouse grounds during the evening of August 10, 2019 as part of a community arts festival produced by the Council and set to take place at various locations in the downtown area. Andrews advised that they wanted "to include it as part of the Project(ion) event which projects art onto buildings in the downtown area. We are planning on showing classic cartoons on one side and art on the other." (July 11, 2019 email, Exhibit F). Carwyle asked Andrews to complete a permit request but the completed form was never submitted and the permit was not issued.

The plaintiff, John Rash ("Rash"), is a self-described "curator" and "documentarian" and participated in the August 2019 art projection festival produced by the Council. According to Rash, he assisted several artists who designed "light installations" which "included projections on the Lafayette County Courthouse" during the 2019 event. (Rash Affidavit, Exhibit G; Rash, Preliminary Injunction Hearing, p. 18-19, Exhibit H). There is no evidence that Carwyle was aware of the unpermitted use of the Courthouse grounds by the Council, and the nature of the projections staged by Rash.

**June 2020 Facility Policy Amendment**

Sheriff Joey East, the former City of Oxford Chief of Police, was elected as Sheriff of Lafayette County in November 2019 and started his first term in office in January 2020. Under Mississippi law, the Sheriff has exclusive jurisdiction and responsibility over County

6

courthouses and grounds and related security[3]. East therefore reviewed the County's facility use policies and soon approached the Board of Supervisors regarding his suggestions for amending the 2019 policy. Starting in the spring, East proposed shortening the advance permit time period from 30 days to 14 days and modifying the closure time for the use of the Courthouse grounds, in particular, from 10:00 pm to 5:00 pm. (East, p. 59-60,133-34, Exhibit I). According to East, based on his experience as the Chief of Police, and common sense, he believed the after business hours use of the grounds posed an undue pedestrian and traffic safety risk given the poor lighting conditions, heavy pedestrian and traffic patterns around the courthouse, and the reduced manpower during the evening shifts. (East, p. 152). Jeff McKutchean, the current Chief of the Oxford Police Department, concurred with East's assessment of the night-time pedestrian and vehicular safety risks around the Square. (McKutchean, p. 39-54, 104, Exhibit J). According to East, the attached video of the night-time scenes around the Square typically reflects what he confronted as Chief of Police and as the current Sheriff and illustrates the source of his concerns which lead to his curfew recommendation. (Video, Exhibit L; East Affidavit, Exhibit K).

On June 15, 2020, the Board amended the policy to allow "4 people or less to use the historic Courthouse outside grounds, including the area around the confederate statue, without a permit" and confirmed that a permit was to be submitted at least 30 days prior to the date of the proposed use for "5 or more people, unless unusual circumstances make it impossible to make application prior to the 30 day period." (June 2019 Order, Exhibit M). Lisa Carwyle, the County Administrator, issued a press release, which was also posted on Lafayette County's Face Book Page, giving notice of the change in policy and the right to seek a waiver of the 30 day period if

---

[3] Under Miss. Code Ann.19-25-69, the Sheriff has charge of the Courthouse and its grounds. The Mississippi Attorney General has issued official opinions declaring the courthouses as "sensitive places" deserving of heightened regulation. Lance, 2013 Miss. AG LEXIS 111.

"unusual circumstances make it impossible to apply prior to that 30 day deadline." (Press Release, Exhibit N).

Although the policy does not address the use of the Courthouse's perimeter sidewalks and passageways around the confederate monument, the Board's relaxing of the permit requirement to "five or more individuals" was based on the finding that four or less individuals could physically gather in directly in front of the monument without blocking the pedestrian passageways around the monument. (Carwyle Affidavit, Exhibit O). Use of the Courthouse's perimeter sidewalks remained unregulated and available for use by demonstrators and other users, provided that such use did not interfere or impede other pedestrian traffic. Protests in this area took place almost daily from June through October 2020. (Carwyle Affidavit).

### July 2020 Facility Policy Amendment

After the June amendment, the Board continued to consider other revisions to the Facility Use Policy, including East's earlier suggestion for an evening closure for all uses. During an executive session at its July 6 meeting, the Board discussed general safety issues, whether to shorten the advance notice period from 30 days to 14 days, whether the use of flags should also be subject to the restriction on stick and pole dimensions and whether a prohibition of all uses of the Courthouse grounds "after dark" should be instituted. (Meeting Notes, Exhibit P). Because the County Administrator was on vacation at the time, the Board recessed the meeting to July 20, 2020 at which time it would further consider additional amendments. At the conclusion of the July 20 meeting, the Board again amended the facility use policy by closing the Courthouse grounds for all uses from "dusk to dawn." (July 20, 2020 Board Order, Exhibit Q) . Based on East's belief that 14 days was sufficient time to evaluate and plan for events of varying

8

sizes, the July 2020 amendment also shortened the advance application requirement to 14 days and eliminated all use fees.

### Rash July 14, 2020 Permit Application

In the late Spring/early Summer of 2020, the Council announced on its web site the production of "The Art-ER Limits" (also known as the "Fringe Festival") to take place on August 7 thru 9, 2020. (Council Notice, Exhibit R). The event comprised a number of art and theater related productions at various locations in Oxford. According to the announcement, event organizers also planned a "Projection Art Showcase – PROJECT(ion)" to take place on the Oxford Square on August 8 starting at 9:00 pm. The Council, however, decided not to submit a permit request for the use of the Courthouse grounds. Rash, who was "curating" one of the planned projection art shows for artists who indicated a desire to participate, submitted a permit application to Carwyle on July 14, 2020, seeking to use the "east side" and other areas of the Courthouse to project a visual art display as part of the PROJECT(ion) event.(Rash Permit, Exhibit S). Essentially, the PROJECT(ion) display event, which Rash planned for August 8 starting at 8:00 pm and concluding at 10:00 pm, was to include an area adjacent to the Oxford City Hall (the former Skipwith area) so that Rash's proposed use of the East side of the Courthouse would supplement the same projection art display at City Hall. According to Rash, he wanted "the opportunity to use the Courthouse area this year due to COVID so that it can be viewed by cars driving by or people parked in the adjacent spaces around the Square.) (Rash email to Carwyle dated July 7, 2020; Exhibit T).

Rash was subsequently contacted by Scott Mills of the Lafayette County Sheriff's Department who asked about the nature of the proposed use in order to assess whether and to

what extent additional security measures were needed during the night-time event. Rash recalled Mills asking "Really what I want to know is there anything that is going to talk about the monument or things that have been going on in Oxford lately. I said that it was likely, because the visual art at issue involves addressing current social issues, but I couldn't be sure, as artists would be in control of their own work." (Rash Affidavit, ¶ 12).

As for the adjacent City Hall location, event organizers, with Rash's involvement, submitted a permit application to the City of Oxford on July 16, 2020 seeking permission to use the "City Hall Plaza" on August 8 from 5:00 pm to 11:30 pm to stage the PROJECT(ion) event. (Oxford Permit Application, Exhibit U). The permit was approved by the City on August 4, 2020.

On July 23, 2020, Carwyle informed Rash that the permit for use of the Courthouse was denied based on the County's Facility Use policy which prohibited any use "after dusk due to security issues." (Carwyle email to Rash, Exhibit V).

Rash responded to the permit denial by filing the present action on July 31, 2020, and seeking an immediate injunction requiring Lafayette County to grant the permit. The original Complaint asserted a purely "as applied" First Amendment challenge to the County's denial of his request to stage a night-time visual projection on the Courthouse edifice of art renderings authored by others. (Complaint, ¶2). During the August 5, 2020 hearing on the motion for preliminary injunction, Rash testified that in addition to "curating" art displays for other artists, he also attended recent protests and demonstrations in the Oxford area "as a documentarian" whereby he observed and documented the events with his camera. (Rash, Preliminary Injunction Hearing, p. 22-28). Regarding the August 8 art projection, Rash admitted that he could produce the event during the day but it would not be as visible as it would be at night. (Rash, Prelim. Inj.

Hearing, p. 28). Rash also reiterated that he designed the production for Courthouse display so that it would be viewed by motorists driving through the Square (an obvious safety risk). On August 6, 2020, this court issued its ruling denying preliminary injunctive relief, finding that, regardless of whether the Courthouse grounds were a traditional or limited public forum, the "dusk to dawn" prohibition on the use of the Courthouse grounds, was content neutral, narrowly tailored to achieve a significant governmental interest, and that ample alternative public forums were available to Rash. Heeding the court's decision, Rash moved the art projection to the adjacent City Hall Plaza where it was displayed to pedestrians and passing motorists during the same evening. From that date to the present, Rash has not sought use any of the County-owned places and facilities governed by the Facility Use Policy. (Carwyle Affidavit).

After the August 8, 2020 show concluded, Rash amended his Complaint on August 19, 2020. Rash maintained his "as applied" challenge to the "dusk to dawn" closure rule but added facial challenges to other aspects of the Facility Use Policy, namely, (1) the 5 person permit requirement is not narrowly tailored (Amended Complaint, ¶ 8), (2) the 14 day advance notice period is too long and thus potentially "chills" speech (Amended Complaint, ¶ 9), (3) the "dusk to dawn" prohibition is arbitrary and vague (Amended Complaint, ¶ 10), (4) the insurance, indemnity, amplified sound, and obligation to pay for "additional" event security costs are not narrowly drawn (Amended Complaint, ¶ 11) and (5) the Policy is generally enforced to favor particular content, that is, it is not applied in a content neutral manner. (Amended Complaint, ¶ 12).

Since August 2020 to the present, Carwyle has consistently enforced the "dusk to dawn" closure when reviewing permit applications or answering general inquiries about use, permitted

or otherwise. On several occasions, for example, Carwyle required permittees to adjust the time of use so that it would conclude "30 minutes before dusk." (Permit, Exhibit W). Determining when dusk occurs (which changes each day) for purposes of the Policy is simply a matter of referring to meteorological tables and similar internet resources.

### III. Argument

#### A. Summary of Argument

Aside from the "as applied" challenge to the "dusk to dawn" restriction on the use of the Courthouse grounds, Rash cannot demonstrate that he has standing to pursue his First Amendment claims or that such claims are otherwise ripe for judicial review. The summary judgment record, as supplemented by the preliminary injunction hearing evidence, proves that Rash cannot meet his summary judgment burden as to any "as applied" and facial challenge claims. Further, even if the Courthouse grounds can be characterized as a "public forum" within the meaning the First Amendment (which would entitle Rash to the most exacting of the available review standards), Lafayette County is entitled to impose content-neutral "time, place, manner" restrictions on the use of its Courthouse grounds, in particular, and other facilities, in general. Clearly, establishing a form of "curfew" on the use of the Courthouse grounds which prohibits any uses during the evening hours when pedestrian and traffic safety interests are at their strongest, is a content-neutral time restriction. Beyond their content neutrality, the restrictions at issue are narrowly tailored to achieve a significant government interest and leave open "ample alternative channels of communication." As this court found in its Opinion denying the motion for preliminary injunction, the time restriction at issue which resulted in the denial of plaintiff's permit application advances a significant governmental interest, and given the inclusion of the "City Hall Plaza" in the proposed PROJECT(ion) event, the plaintiff had ample

alternative means to communicate the projection display. The remaining claims are also not constitutionally viable as they also implicate the County's content-neutral and reasonable time, place manner restrictions which are narrowly drawn to advance significant governmental interests.

### B. Summary Judgment Standards

Under F.R.C.P. 56, summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A party seeking summary judgment bears the initial burden of informing the court of the basis of the motion and identifying those portions of the pleadings, depositions, answers to interrogatories and affidavits, if any, which they believe demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). QBE Ins. Corp. v. Brown & Mitchell, Inc., 591 F.3d 439, 442 (5th Cir. 2009). A fact is material only if its resolution would affect the outcome of the action…." Wiley v. State Farm Fire and Cas. Company, 585 F.3d 206, 210 (5th Cir.2009). "Factual disputes that are irrelevant or unnecessary will not be counted." Anderson v. Liberty lobby, Inc., 477 U.S. 242, 248 (1986). An issue is "genuine" if it is real and substantial, as opposed to "merely formal, pretended, or a sham." Bazan v. Hidalgo County, 246 F.3d 481, 489 (5th Cir. 2001). Thus, a genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; Boyle v. Allstate Ins. Co., 615 F.3d 350, 355 (5th Cir. 2010).  As the moving party, however, the Defendants need not negate the elements of the nonmovant's case, that is, those elements of the case upon which the nonmovant bears the burden of proof at trial. Boyle, 615 F.3d at 355; Boudreau v. Swift Transp. Co., 402 F.3d 536, 540 (5th Cir. 2005).

Once a proper motion has been made, Rash, as the nonmoving party, may not rest upon mere allegations or denials of the pleadings but must present affirmative evidence, setting forth specific facts, to show the existence of a genuine issue for trial. Celotex Corp., 477 U.S. at 322; Boyle, 615 F.3d at 355; Norwegian Bulk Transport A/S v. Int'l Marine Terminals Partnership, 520 F.3d 409, 412 (5th Cir. 2008); Smith ex rel. Estate of Smith v. United States, 391 F.3d 621, 625 (5th Cir. 2004). The nonmovant's burden is not satisfied by "some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, by speculation, by the mere existence of some alleged factual dispute, or by only a scintilla of evidence." Boudreau, 402 F.3d at 540. "Unsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." Brown v. City of Houston, 337 F.3d 539, 541 (5th Cir. 2003). Indeed, although this court may not make credibility determinations or weigh the evidence in deciding a motion under Rule 56, neither is the court required to reject "the plainly obvious." Montemayor v. City of San Antonio, 276 F.3d 687, 693 (5th Cir. 2001).

Summary judgment is mandated if Rash fails to make a showing sufficient to establish the existence of an element essential to his case on which he bears the burden of proof at trial. Nebraska v. Wyoming, 507 U.S. 584, 590 (1993); Celotex Corp., 477 U.S. at 322; Patrick v. Ridge, 394 F.3d 311, 315 (5th Cir. 2004). "Where the nonmoving party fails to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, no genuine issue of material fact can exist." Apache Corp. v. W & T Offshore, Inc., 66 F.3d 789, 793 (5th Cir. 2010). "In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp., 477

U.S. at 322 – 23. A genuine dispute of material fact means that evidence is such that a reasonable jury could return a verdict for the nonmoving party. Royal v. CCC R Tres Arboles, LLC, 736 F.3d 396, 400 (5th Cir. 2013). If the evidence presented by the nonmovant "is merely colorable, or is not sufficiently probative, summary judgment is appropriate." Cutting Underwater Techs. USA, Inc. v. ENI U.S. operating Company, 671 F.3d 512, 516 (5th Cir. 2012). In ruling on the present motion, the court may consider the evidence presented at a preliminary injunction hearing. JSLG, Inc. v. City of Waco, 2011 U.S. Dist. LEXIS 164422 (W.D. Tex. 2011), aff'd, 504 Fed. App'x 312 (5th Cir.2012).

The plaintiff bears the burden of proof as to the substantive elements of his First Amendment claims as well as meeting the elements of Section 1983's remedial requirements.

## C. Standing and Ripeness

As an initial matter, because Rash does not simply contest how the facility use policy was applied to him but also attempts to advance "facial" challenges to the Facility Use Policy, there is a real question as to whether he has standing within the meaning of Article III. It is Rash's burden to demonstrate that the claims articulated in the Amended Complaint fall within the court's subject matter jurisdiction. See Massachusetts v. EPA, 549 U.S. 497, 516 (2007); see also Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992) (observing that "the core component of standing is an essential and unchanging part of the case or controversy requirement of Article III"). One element of the "irreducible constitutional minimum of standing" is that the plaintiff must have suffered an "injury in fact." Lujan, 504 U.S. at 560. An injury in fact is "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical" Id. unless the plaintiff has suffered such an injury he

is without standing to invoke the jurisdiction of a federal court. See Sierra Club v. Morton, 405 U.S. 727, 735 (1972).

The Supreme Court has recognized that, under certain circumstances, a provision regulating speech may be challenged as overly broad even by one whose own First Amendment rights are not violated. See Sec. of Md. v. Joseph H Munson Co., 467 U.S. 947, 956 (1984). The rationale for this limited rule is a "judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." Id. at 956. Yet a federal court allows litigation to proceed under this variant of "third-party standing" with "hesitation" and "only as a last resort." New York v. Ferber, 458 U.S. 747, 769 (1982). Indeed, even this limited form of standing to undertake overbreadth challenges requires a plaintiff to have suffered an injury in fact as a result of the challenged aspect of the regulation. See Joseph H. Munson Co., 467 U.S. at 958. In Mississippi State Democratic Party v. Barbour, 529 F.3d 538 (5th Cir. 2008), the Fifth Circuit emphasized that in order to prove standing to raise a First Amendment facial challenge, "a plaintiff must produce evidence of an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by [the challenged regulation]. Specifically, the plaintiff must demonstrate a serious interest in acting contrary to [a regulation on speech]." Id. at 545.

Ripeness is a related doctrine that is developed under Article III's case or controversy requirement. Ripeness requires that, to fall within the federal jurisdiction defined by Article III, the harm asserted by the plaintiff must have "matured sufficiently to warrant judicial intervention." Warth v. Seldin, 422 U.S. 490, 499 (1975). "A court should dismiss a case for lack of ripeness when the case is abstract or hypothetical." Monk v. Huston, 340 F.3d 279, 282 (5th Cir. 2003). Both ripeness and standing require the plaintiff to have suffered an injury or to be

faced with an imminent injury in order to present a justiciable controversy. See Barbour, 529 F.3d at 545.

In the present case, Rash's standing to challenge the "dusk to dawn" prohibition is dubious, at best, even though the prohibition was applied in denying his request for a permit. Of particular note on this point is the reality that Rash was merely functioning as a "curator" of the art projection event, not as artist or author of the content of the projection whose ideas or expressions were to be put on display. Moreover, even Rash was uncertain as to the content of the display when inquiry was made prior to the permit decision[4]. Further, Rash clearly does not have standing to pursue the "facial" challenges as articulated in the Amended Complaint, including (1) the 5 person permit requirement, (2) the 14 day advance notice requirement, and (3) the insurance, indemnity, amplified sound and additional security cost requirements because these provisions were not only not "applied" to Rash, there is nothing in the summary judgment record or pleadings which would evince a "serious interest" in acting in ways which would implicate these provisions in a concrete, not hypothetical, manner. See Bloedorn v. Grube, 631 F.3d 1218 1228 (11th Cir. 2011) (in determining whether a First Amendment injury is imminent for standing purposes, the law requires only that the anticipated injury occur within some fixed period of time in the future; immediacy, in this context, means reasonably fixed and specific in time and not too far off; a plaintiff must show that he has an unambiguous intention at a reasonably foreseeable time to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute or rule, and that there is a credible threat of prosecution). Accordingly, the claims raised in the Amended Complaint should be dismissed for lack of standing and ripeness.

---

4 When asked to produce the art projection displays during discovery, Rash responded that he was not in possession of these materials.

### D.     First Amendment – Identifying the Forum

Assuming Rash establishes his standing to pursue his First Amendment claims and that they are otherwise "ripe for review" by this court, Rash bears the burden to establish a genuine issue of material fact as to each of the elements of his First Amendment claims. As a general proposition, the First Amendment does not guarantee access to property just because it is owned by the government. See Cornelius v. NAACP Legal Defense and Educ.Fund, Inc., 473 U.S. 788, 803 (1985). Rather, the nature and extent of the constitutional protections accorded to speech essentially depends on the forum in which it is spoken. Fairchild v. Liberty Indep. School Dist., 597 F.3d 747, 757 (5th Cir. 2010). The Supreme Court has broadly identified four distinct categories of government property for First Amendment purposes: (1) traditional public fora, (2) designated unlimited public fora, (3) designated limited public fora" and (4) non-public fora. See Walker v. Sons of Confederate Veterans, Inc., 135 S.Ct. 2239 (2015); see also Keister v. Bell, 461 F. Supp. 3rd 1152, 1166 (N.D. Ala. 2020). Identifying which is at issue is determinative because the degree of scrutiny under which the government's regulation is evaluated is largely governed by the kind of forum the government is attempting to regulate. For both traditional and designated unlimited public fora, a time, place, manner restriction can be placed only if it is content neutral, narrowly tailored to achieve a significant government interest, and leaves open ample alternative channels of communication. See Moore v. Brown, 868 F.3d 398, 403 – 04 (5th Cir. 2017). In contrast, any restrictions made on expressive activity in a limited public forum only must be reasonable and viewpoint neutral.

### 1. Courthouse is not a "Traditional Public Forum"

The plaintiff asserts that the Lafayette County Courthouse grounds are a "traditional public forum" relying on a distorted and contrived characterization of the grounds as a "park-

like" setting. However, the Supreme Court has restricted traditional public forum status to its "historical confines." Perry Educ. Ass'n .v. Perry Local Educators Ass'n, 460 U.S. 37, 45 (1983). These "historic confines" include public areas such as public streets and parks that, since "time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." Perry, 460 US at 45. A time, place, and manner restriction can be placed on a traditional public forum only if it is content neutral, narrowly tailored to achieve a significant government interest, and leaves open ample alternative channels of communication. Id.

Yet the "park and courthouse" analogy advanced by the plaintiff parallel those made, and rejected, in Hodge v. Talkin, 799 F.3d 1145 (D.C. Cir. 2015) where the court considered whether the United States Supreme Court plaza was a traditional public forum by virtue of its "park-like" features. Noting that the Supreme Court in United States v. Grace, 461 U.S. 171 (1983) held that the sidewalks which bordered the outer edge of the Supreme Court plaza grounds constituted a "traditional" public forum, the Hodge court answered the related question of whether the Court's plaza grounds – the elevated marble terrace running from the sidewalk to the staircase that ascends to the Court's main doors, were also properly characterized as a traditional public forum. Finding that the Supreme Court plaza was a "nonpublic" forum, the Hodge court placed emphasis on the physical configuration of the plaza and its functional integration into the Supreme Court facility itself. Hodge, 799 F.3d at 1158-59 ("the plaza's features convey in many distinctive ways that a person has entered some special type of enclave"). The court went on to observe that its conclusion was consistent with the treatment of courthouses in general that the areas "surrounding a courthouse traditionally have not been considered a forum for demonstrations and protests." Id. This proposition has been affirmed by virtually every court

which has considered the issue. See United States v. Barnes, 2020 U.S. Dist. LEXIS 152854 (D.C.D.C. 2020); Verlo v. City and County of Denver, 741 Fed. Appx. 534, 544 (10th Cir. 2018) (traditionally, courthouse grounds have not been considered traditional public fora; this category is typically reserved for (1) parks, (2) streets and (3) sidewalks). See also Huminski v. Corsones, 396 F.3d 53 (2d Cir. 2005); Sammartano v. First Judicial District Court, 303 F.3d 959 (9th Cir. 2002); United States v. Gilbert, 130 F.3d 1458 (11th Cir. 1997); Comfort v. McLaughlin, 473 F. Supp.2d 1026, 1028 (D.C. Cal. 2006) (rejecting argument that Courthouse grounds were public forum because shared "many characteristics with public park;" courthouses are not areas that traditionally have been made available for public assembly and debate nor is primary purpose to provide platform for members of public to espouse abuse). In our case, the Lafayette County Courthouse is clearly not a traditional public forum.

### 2. The Lafayette County Courthouse is not a designated public forum

The plaintiff suggests, alternatively, that the Lafayette County Courthouse grounds are an unlimited "designated public forum." Generally, a government entity may create an unlimited designated public forum if the government property has not traditionally been regarded as a public forum "but is intentionally opened up for that purpose." Pleasant Grove City v. Summun, 555 U.S. 460, 470 (2009). The government does not create a designated public forum by inaction or by permitting limited discourse but only by intentionally opening a nontraditional forum for public discourse. See Cornelius v. NAACP legal Defense fund, Inc., 473 U.S. 788, 802 (1985). "Public discourse" in this context means "indiscriminate use". Hazelwood School Dist. v. Kuhlmeyer, 484 U.S. 260, 267 (1988). The government must make the property at issue "generally available" or "generally open" to all discourse. On the other hand, a designated public forum is not created when the government allows selective access for individual speakers

or for limited purposes rather than general access for a class of speakers. <u>See Arkansas Educational Television Commission v. Forbes</u>, 523 U.S. 666, 677 (1998). Thus, the government does not create an unlimited designated public forum akin to a traditional public forum "when it does no more than reserve eligibility for access to the forum to a particular class of speakers, whose members must then, as individuals, obtain permission." <u>Forbes, Id</u> at 679. In resolving this issue, the Supreme Court has looked to the policy and practice of the government to ascertain whether it intended to designate a place not traditionally open to assembly and debate as either an unlimited or "limited" public forum. The court also examines the nature of the property and its compatibility with the expressive activity to discern the government's intent. <u>See Forbes, Id</u> at 679; <u>see also Walker</u>, 135 S. Ct. at 2250. Significantly, just as the government may intentionally "designate" its property as either an unlimited or limited public forum, it may, by the same token, withdraw that designation at its discretion. <u>Perry</u>, 460 U.S. at 46; <u>see also Wells v. City & County of Denver</u>, 257 F.3d 1132, 1145 (10th Cir. 2001) (designated public fora differ from traditional public fora in that a state is not required to indefinitely retain the open character of the facility); <u>United States v. Gilbert</u>, 130 F.3d 1458, 1461 (11th Cir. 1997) (a government is not required to retain indefinitely the open character of a facility; government properly exercised its right, indeed, in this case, its duty, to safeguard the courthouse by imposing further restrictions in removing the public form designation); <u>Satanic Temple v. City of Belle Plaine</u>, 2020 U.S. Dist. LEXIS 136321 (D. Minn. 2020) (city's decision to rescind policy which opened a city park as a limited public forum did not violate plaintiff's First Amendment rights).

The existence of a permitting scheme with limits on "who and when" for use of the grounds, together with the character of the grounds which primarily serve as a place of court business, contradict the notion that the County has created an unlimited "designated public

forum" for the general and unfettered use of the general public as a place of "public discourse." The County's Facility Use Policy, as applied to the use of the Courthouse grounds, limits the nature of the activities (nonprofit and political organizations for discussion only) and time of use (Monday through Friday and limited weekends, and no use from "dusk to dawn"), all subject to specific permission. Granted, although the actual use of the grounds has been consistent with the stated policy (including art shows), there have been occasional uses which do not comport with the policy limitations (protests). Yet the Supreme Court has been clear on this point, that is, a "public forum" and its scope are not created or designated "by inaction or by permitting limited discourse, bur only by intentionally opening a non-traditional forum for public discourse." Cornelius, 473 U.S. at 811; see also Hodge, 799 F.3d at 1161-62.  In Hodge, the court found that it was of "no moment that the Supreme Court police in certain situations might opt to allow demonstrators onto the plaza for a brief period, presumably in an effort to exercise enforcement authority with responsible (in viewpoint neutral) discretion and unique circumstances." Id. Thus, the policy's limitations and the permitting practice, when measured against the physical and functional characteristics of the Courthouse grounds, do not satisfy the elements necessary to establish an unlimited designated public forum.

### 3. Time, Place, Manner Restrictions in Traditional and Designated Unlimited Public Forums – Dusk to Dawn" Closure

Even if we assume that the Lafayette County Courthouse grounds are either a traditional or an unlimited "designated" public forum, the County is entitled to impose reasonable "time, place, manner" restrictions which are content neutral. As the Fifth Circuit has held, content neutral regulations of time, place, and manner of expression in a public forum are permitted when they are narrowly tailored to serve a significant government interest and leave open ample alternative channels of communication. See Moore, 868 F.3d at 403- 04; see also Packingham v.

North Carolina, 137 S.Ct. 1730, 1736 (2017). Thus, a content neutral restriction does not undergo "strict scrutiny." Rather, such restrictions are evaluated under "intermediate scrutiny" which the Fifth Circuit has emphasized "does not require that the least restrictive means be used." Moore, 868 F.3d at 404. "As long as the restriction promotes a substantial governmental interest that would be achieved less effectively without the restriction, it is sufficiently narrowly tailored." Serv. Employees International Union v. City of Houston, 595 F.3d 588, 596 (5th Cir. 2010). Rules that incidentally burdens speech are evaluated in terms of their general effect. See Baby Dolls Topless Saloons, Inc. v. City of Dallas, 295 F.3d 471, 485 (5th Cir. 2002). By the same token, if a substantial portion of the burden on speech does not advance the goals of the rule, the rule is not narrowly tailored. See Knowles v. City of Waco, 462 F.3d 430, 434 (5th Cir. 2006).

### 4. **Content Neutrality**

As this court found in its order denying the plaintiff's Motion for Preliminary Injunction, the County's facility use policy, to the extent it imposes an evening curfew, is clearly a content – neutral regulation of time, place, and manner. Other courts considering similar "curfew" policies applied to traditional and designated unlimited public forums have consistently held that such restrictions are inherently content neutral. See Dowd v. City of Los Angeles, 2013 U.S. Dist. LEXIS 111435 (C.D. Calif. 2013) (ordinance which required all activity in city parks to cease at "sunset until 9:00 AM" was content neutral); Occupy Sacramento v. City of Sacramento, 878 F. Supp.2d 1110, 1118 (E.D. Calif. 2012) (city ordinance which closed park from 11:00 PM to 5:00 AM was content neutral); Beasley v. City of Atlanta, 2012 U.S. Dist. LEXIS 198622 (N.D. Ga. 2012) (city ordinance which closed all parks from 11:00 PM to 6:00 AM was content neutral). Clearly, there is no genuine issue of material fact that the "dusk to dawn" closure restriction is

"content neutral" both as applied and on its face. See Reed v. Town of Gilbert, 576 U.S. 155, 166 (2015). As the record establishes, neither is there any credible evidence that the implementation of the "dusk to dawn" use restriction was intended as "retaliation" against Rash, as the proof shows that the discussions which lead to the restriction, adopted on July 20, 2020, occurred months prior to Rash's submission of his permit request. Neither is their any proof that Carwyle, the county official administering the policy and making the decision to deny the permit, was aware of any content or "message" within the proposed projection.

### 5. Significant Governmental Interest

Again, assuming the Courthouse grounds constitute either a traditional or designated unlimited public forum, the time restriction at issue is subject to intermediate scrutiny. First, the courts which have considered similar time restrictions, that is, curfews pertaining to the availability of even "traditional" public forums like parks, have consistently ruled that a government's interest in safety and the coordination of uses of extremely limited space are substantial as a matter of law. See Moore, 868 F.3d at 404; see also Lauder, Inc. v. City of Houston, 751 F. Supp.2d 920, 930 (S.D. Tex. 2010) (evidence amply supports a finding that the city's interest in public safety and aesthetics are substantial). "Public safety is not only a substantial government interest, but a compelling one at the heart of government's function." Houston Chronicle Publishing Co. v. City of League City, 488 F.3d 613, 622 (5th Cir. 2007). Indeed, Lafayette County is not required to present detailed evidence of a real and substantial governmental interest based on past experience but rather it may at "advance its interest by arguments based on appeals to common sense and logic." Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta, 219 F.3d 1301, 1318 (11th Cir. 2000); see also Clark v. Community for Creative Nonviolence, 468 U.S. 288, 296 (1984); Beasley, 2012 U.S. Dist.

LEXIS 198622 (N.D. Ga. 2012) (even if "generic," city's interests in maintenance, noise reduction, safety, and crime reduction, are significant governmental interests when justifying park closure provisions).

The proof before the court during the preliminary injunction hearing and as supplemented by the additional evidence submitted herein established a significant and even "compelling" governmental interests which were served by the closure. As the court found, in consultation with Sheriff East, the Lafayette County Board of Supervisors determined that the interest of pedestrian and traffic safety substantiated the need to impose a nighttime prohibition on the use of the grounds. These interests are clearly suggested under the circumstances and environment of the Courthouse which stands at the center of a very busy town Square. Also, the area is poorly lit and typically serves as a "pass-through" for pedestrians walking to the area shops, restaurants and bars. Significantly, the area is frequented by students enrolled at the University of Mississippi who are drawn by the bars and restaurants located in and around the town Square. Further, recent experiences with individuals desiring to demonstrate in front of the confederate statue demonstrated a real and ongoing pedestrian and traffic safety issue which posed a strain on the Sheriffs Department during the daylight hours when these demonstrations occurred. Allowing organized use of the Courthouse grounds during the late evening hours posed in unnecessary and unreasonable risk to pedestrian traffic safety.

### 6. Narrow Tailoring and Ample Alternative Means of Expression

The County's "dusk to dawn" closure of the Courthouse grounds also satisfies the requirement that a s "time, place and manner" restriction, it must be narrowly tailored to serve a significant governmental interest and leave ample means of alternative places for expression. Of

course, so long as the policy is content neutral, the restriction "need not be the least restrictive or least intrusive means of doing so." Ward v. Rock Against Racism, 491 U.S. 781, 798 (1989). There must be a "reasonable" fit between the significant interest at issue and the restriction which is imposed to serve that interest. Ward, 491 U.S. at 800. Further, the restriction must "leave open an alternative channel of communication" but not necessarily the alternative the plaintiff desires. Id.;

The record unequivocally establishes that the plaintiff had, and has, ample alternatives to the proposed use. In any event, the guarantees of the First Amendment have never meant "that people who want to propagandize protest or views have a constitutional right to do so whenever and however and wherever they please." Greer v. Spock, 424 U.S. 828, 836 (1976). The touchstone is whether the alternative spaces allow the speaker to reach a similar audience. See Heffron v. International Society for Krishna Consciousness, Inc., 452 U.S. 640, 655 (1981). For example, in Grisham v. city of Fort Worth, 2015 WL 3901612 (N.D. Tex. 2915), the government required speakers with a message that they wished to share with participants in a Festival to do so at a location immediately across the street from the Festival's footprint. The court found that the speakers could effectively convey their views to participants in the Festival from the other side of the road. Because the plaintiff in our case arranged to produce his video display at the City Hall Plaza which is within feet of the East side of the Lafayette County Courthouse (the area of the proposed use), the plaintiff clearly enjoyed ample alternative means to display the art projection. In denying Plaintiff's Motion for Preliminary Injunction, this court found that the County's institution of the "dusk to dawn" prohibition reasonably advanced identified significant governmental interests and did not effectively foreclose "ample alternative means to communicate his message to a similar, if not identical, audience." As the court observed, Rash

had arranged to produce his art installation at City Hall "which is within mere feet of the East side of the County Courthouse which, in fact, served as ample alternative means to communicate his message."

### 7. Designated Limited Public Forum

Essentially, through its Facility Use Policy and related practices, the County has created a "limited public forum" which allows the County to impose "reasonable" and viewpoint neutral restrictions on the use of the grounds and other County facilities. A "limited" public forum is established by designation when governmental entities open their property but limit its use to certain groups or dedicated it solely to the discussion of certain subjects. See Walker v. Sons of Confederate Veterans, Inc., 135 S. Ct. 2239 (2015); Chiu v. Plano Indep. School Dist., 260 F.3d 330 (5th Cir. 2001). See also Freedom from Religion Foundation, Inc. v. Abbott, 955 F.3d 417 (5th Cir. 2020). If the space is classified as a limited public forum, the government may exclude a speaker "if he is not a member of the class of speakers for whose especial benefit the forum was created." Cornelius, 473 US at 806. "Indeed, implicit in the idea that a government forum has not been opened widely and intentionally to the general public is the government's right to draw distinctions in access based on a speaker's identity." Perry, 460 U.S. at 49. Restrictions in a limited public forum only need to be "reasonable and viewpoint neutral." Id. According to the Supreme Court in Cornelius, in a limited public forum, any time, place, and manner restriction made on expressive activity need only be viewpoint neutral and reasonable, and the restriction "need not be the most reasonable or only reasonable limitation." Cornelius, 473 US at 808. "The regulation is constitutional so long as it is reasonable in light of the purposes which the forum at issue serves." Perry, 460 U.S. at 49.

The County's facility use policy, as applied to the Courthouse grounds, establishes a designated limited public forum because of the nature of the restrictions and limitations placed on "uses" within that area, limitations entirely appropriate given the "sensitive" and solemn nature of the Courthouse's operations. To reiterate, the policy in its present form restricts uses to only certain groups (nonprofit and political organizations and similar groups) who may use the identified County facilities only for certain purposes, including "political discussion." Uses were otherwise subject to permitting requirements and limited in time. With regard to the Courthouse and its grounds, in particular, uses were also prohibited from interfering with official business and operations. These restrictions do not evince the "intentional" opening of an unlimited public forum within the meaning of the First Amendment.

Accordingly, the record before the court establishes that the challenged restrictions are clearly "reasonable" in light of the forum which the restrictions serve and are content neutral.. The "dawn to dusk" closure rule "reasonably advances" the County's interest in preserving public safety.

### E.     The Facial Challenge to the Facility Use Policy

In addition to the "as applied" claims, the Amended Complaint also asserts "facial" challenges to certain aspects of the Facility Use Policy. Again, it is the County's position that Rash does not have standing to raise a facial challenge  to policies and practices which were not applied in denying Rash a permit. Beyond standing, these claims are not ripe for a judicial determination. In any event, assuming Rash satisfies the standing and ripeness threshold, Rash cannot meet the "heavy burden" in advancing a cognizable facial claim.

In order to prevail on a facial challenge, Rash must establish that "no set of circumstances exists under which the challenged law would be valid, or at least, that the challenged law does

not have any plainly legitimate sweep." <u>International Women's Day March Planning Committee v. City of San Antonio</u>, 619 F.3d 346, 355 (5th Cir. 2010); <u>see also</u> <u>United States v. Salerno</u>, 481 U.S. 739, 745 (1987). Hypothetical situations, speculation and theoretical possibilities do not suffice to establish the necessary interest in pursuing a facial challenge to a municipal ordinance. <u>See</u> <u>Magee v. City of South Padre Island</u>, 463 Fed. App'x 377, 380 (5th Cir. 2012). Facial challenges are "disfavored" and are considered to be "the most difficult challenge to mount successfully." <u>Salerno</u>, 481 US at 745; <u>Sonnier v. Crain</u>, 613 F.3d 436, 443 (5th Cir. 2010). When evaluating a facial challenge to an ordinance, the court must consider the municipality's authoritative construction of the ordinance, including its own implementation and interpretation of it." <u>Int'l Women's Day March Planning Committee</u>, 619 F.3d at 358. Furthermore, "facial vagueness challenges, in particular, are generally disfavored for several reasons, including but not limited to, the fact that facial invalidity claims often "rest on speculation." <u>Washington State Grange v. Washington State Republican Party</u>, 552 U.S. 442, 450 (2008); <u>see also</u> <u>National Endowment for the Arts v. Finley,</u> 524 U.S. 569, 580 (1998) ("facial invalidation is manifestly strong medicine that has been employed by the Court sparingly and only as a last resort"). In <u>Finley</u>, the Court emphasized that in order to prevail on a facial challenge, a plaintiff must demonstrate "a substantial risk that application of the provision will lead to the suppression of speech." <u>Id</u>. at 580.

**1. The Term "Dusk" is not "Vague"**

The plaintiff's first "facial" challenge, delineated in paragraphs 51 and 52 of the Amended Complaint, concerns the policy's use of "dusk" as defining the start of the closure. Rash asserts that the use of "dusk" is impermissibly "vague" and has been applied in ways which favor certain speech. "Dusk," of course, has a technically precise meaning and is easily

29

determined on a daily basis by reference to meteorological tables. "Dusk" connotes the precise time when there is complete darkness and is a point in time after "sunset." Thus understood, the County's underlying significant interest in promoting night-time pedestrian and traffic safety is best served by a restriction which is imposed when "complete darkness" occurs, rather than an arbitrary restriction based on the time of day (for example, 5:00 pm). Thus, as explained above, the "dusk to dawn" restriction satisfies the time, place, manner test applicable to either the traditional, designated unlimited or limited public forums. Further, there is no evidence that this restriction has been inconsistently applied in ways which would implicate the plaintiff's First Amendment rights as a matter of facial or "as applied" challenges.

### 2. The Policy's Permitting Requirements

The remainder of the plaintiff's challenges do not concern the basis of the County's denial of his permit. Rather, Rash, the self-styled documentarian and art curator, asserts that certain aspects of the permitting requirements (involving daytime uses) are prone to facial attack: (1) only groups of five or more are required to obtain a permit, (2) the 14 day advance notice requirement, and (3) the insurance, indemnity, amplified sound and requirement that users defray the cost of "additional security measures as determined by the Sheriff. Rash asserts that these provisions "unreasonably burden his Free Speech rights and, in the case of the assessment for additional security costs, impermissibly gives the Sheriff "unbridled discretion." (Amended Complaint, ¶' 53 thru 58).

### a. The 14 day Advance Notice Requirement

In order to prevail on his facial challenge to the policies 14 day advance notice requirement, it is Rash's burden to establish that this restriction would be invalid "in all circumstances." <u>Sonnier</u>, 613 F.3d at 445; <u>see also</u> <u>Washington State Grange</u>, 128 Sup. Ct. at

1191. Obviously, there are situations in which a 14 day notice may be required, depending on the size of the crowd, competing uses and other forms and jurisdictions and the availability of law enforcement personnel who would be called upon to provide adequate security. See Keister v. Bell, 461 F.Supp. 3d 1152,1175 (N.D. Ala. 2020) (in the limited public forum context, a ten day advance notice requirement is reasonable and therefore constitutional). In addition, Rash fails to take into account the policy's waiver provision which accords the County Administrator the authority to waive the 14 day requirement whenever compliance with the 14 day period is impossible under the circumstances. The County's current policy (adopted on January 4, 2021), clarifies the circumstances of when an individual or group may qualify for the waiver, stating "the County Administrator may shorten or waive the 14 day permit application requirement for proposed uses which demonstrate an urgent need for use of the County facility, such as the desire to demonstrate or engage in speech protected by the First Amendment motivated by events or issues suggesting a need for immediate demonstration or expression, subject to reasonable time, place and manner restrictions." (January 4, 2021 Policy, Exhibit X). The availability of the waiver under these circumstances effectively neutralizes any facial challenge to the 14 day advance notice requirement.

### b. Requiring Permits for Groups Comprising 5 or More Individuals

Rash also raises a facial challenge to the Policy's requirement that groups of five or more individuals who desire to "gather" on the Courthouse grounds must obtain a permit. Of course, permit requirements are per se constitutional as reasonable and necessary for the sound management of public property which is often subject to competing demands for use, especially where such uses might interfere in the government's uses. Thus, permitting performs an essential part of the government's right to institute reasonable time, place, manner restrictions. But Rash

contends that this provision is unduly "vague" in the sense that one does not know what constitutes a "gathering" subject to permitting rules. In <u>Grayned v. City of Rockford</u>, 408 U.S. 104, 108 (1972), the Supreme Court acknowledged that it is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined. The Court emphasized, however, that when reviewing a policy against a claim that its language is impermissibly vague under the First Amendment, "we can never expect mathematical certainty from our language." Indeed, facial vagueness challenges are generally "disfavored for several reasons, including but not limited to, the fact that facial invalidity claims often rest on speculation." <u>Washington State Grange</u>, 552 US at 450. "Speculation about possible vagueness in hypothetical situations not before the court will not support a facial attack on a statute when it is surely valid in the vast majority of its intended applications." <u>Hill v. Colorado</u>, 530 U.S. 703, 733 (2000); <u>see also</u> <u>Magee v. City of South Padre Island</u>, 463 Fed. Appx. 377380 (5th Cir. 2012). Clearly, in our case, a person of ordinary intelligence would understand that the coordinated and planned use of County facilities by 5 or more individuals would fall within the ambit of the policy's permitting requirements.

### c. Assessment of Security Costs

Rash also complains that the policy impermissibly entitles the sheriff to impose a cost assessment on users of County facilities whenever it is determined that there are "additional" security needs beyond the level normally provided by the Sheriff's Department. Specifically, the policy provides that "the user shall provide, at its own expense, any security that the user desires in addition to security normally provided by the County. The sheriff shall determine whether and to what extent additional sheriff department deputies are reasonably necessary for the event for traffic control and public safety. The sheriff shall base his decision on the size, location,

duration, time and date of the event. If additional law enforcement protection for the event is deemed necessary by the sheriff, he shall so inform the user." In <u>International Women's Day of March Planning Committee,</u> 619 F.3d at 367-69, the Fifth Circuit considered a similar challenge to a city ordinance which the plaintiff claimed allowed the Chief of Police too much discretion in making decisions regarding the level of security necessary for permitted events and assessing costs. The Fifth Circuit cited with approval the case <u>Sullivan v. City of Augusta,</u> 511 F.3d 16 (1st Cir. 2007) decided by the First Circuit which upheld an ordinance that impose fees on parade organizers to cover "the costs of traffic control per city collective bargaining agreement and cleanup costs, as estimated by the police department." <u>Id</u>. Significantly, according to the Fifth Circuit, the ordinance in <u>Sullivan</u> "did not provide further guidance to the police, but the First Circuit explained that there was value in letting the police exercise their 'experienced, professional judgment' in determining the resources necessary for traffic control, since the court found it 'hard to see any purely mechanical means for determining how many officers would be needed to direct traffic at the various intersections of differing routes and neighborhoods.'" <u>Id.</u> In upholding the constitutional validity of the ordinance under review, the Fifth Circuit in <u>International Women's Day</u> held that the ordinance was sufficiently clear in limiting the police chief's discretion to assessing actual traffic control costs deemed reasonably necessary under the circumstances. The facility use policy in our case sufficiently circumscribes the Sheriff's discretion in assessing costs based on the criteria outlined in the policy and therefore does not provide the sort of "unbridled discretion" required to establish a due process violation.

### d. Insurance and Indemnity and Amplified Sound

Finally, the plaintiff presents a facial challenge to the Policy's insurance and indemnity requirements which are imposed on events involving groups of 50 or more individuals and the

33

generally applicable amplified sound prohibition. These provisions are reasonable, especially considering the "sensitive" nature of the courthouse setting and the fact that the historical Courthouse is without fire suppression systems and is thus susceptible to catastrophic damage. Further, these provisions are content neutral and serve significant governmental interests. Unlike the ordinance under consideration in <u>Houston Peace Coalition v. Houston City Council</u>, 310 F. Supp. 457, 461 (S.D. Tex. 1970), the subject Policy requirement does not give the County Administrator "unlimited discretion" to require and set the amount of insurance. Ultimately, viewing these policy requirement through the prism of the limited public forum reasonableness standard, they are clearly reasonable under the circumstances.

## IV.    Conclusion

Wherefore, premises considered, the Defendant respectfully requests that this Court grant the present motion. The Defendant also requests any other relief which the court may find warranted in the premises.

THIS, the 2nd day of February, 2021.

Respectfully submitted,

CLAYTON O'DONNELL  PLLC
1300 ACCESS ROAD, SUITE 200
P.O. Drawer 676
Oxford, MS  38655
Telephone:  (662) 234-0900
Facsimile:  (662) 234-3557


/s/ David D. O'Donnell
**DAVID D. O'DONNELL, MSB #3912**
*Attorney for Lafayette County, Ms.,*
*Defendant*
dodonnell@claytonodonnell.com

34

**CERTIFICATE OF SERVICE**

I, David D. O'Donnell, hereby certify that I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record.

This the 2nd day of February, 2021.

*/s/ David D. O'Donnell*
**DAVID D. O'DONNELL, MSB# 3912**
dodonnell@claytonodonnell.com

35