**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION**

**JOHN RASH**                                                                             **PLAINTIFF**

**VS.**                                            **CIVIL ACTION NO.: 3:20-CV-224-NBB-RP**

**LAFAYETTE COUNTY, MISSISSIPPI**                                   **DEFENDANT**

---

**MEMORANDUM OF AUTHORITIES IN SUPPORT OF RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

---

COMES NOW, Lafayette County, Mississippi, the Defendant in the above-styled and numbered cause, by and through counsel, and files its Memorandum of Authorities in Support of its Response to Plaintiff's Motion for Summary Judgment, and would state as follows:

### I. Introduction

In order to avoid unnecessary duplication, the defendant incorporates the sections of its Motion for Summary Judgment, referenced exhibits, and supporting Memorandum of Authorities which address the three issues raised in the present motion: (1) whether the Circuit Courthouse grounds are a traditional or designated public forum, (2) whether the "dusk to dawn" restriction on the use of the Courthouse grounds is narrowly tailored to serve a significant governmental interest, and (3) whether the Facility Use Policy's permit requirement constitutes an unconstitutional prior restraint. The following is added to address selected additional points raised in Plaintiff's Motion for Partial Summary Judgment.

## II. Courthouse is not a "Traditional Public Forum"

Rash contends that the Courthouse grounds constitute a "Traditional Public Forum" by virtue of its physical characteristics and the kinds of uses which the County has permitted since the adoption of the Facility Use Policy in 2015. This contention ignores the essential character of the Circuit Courthouse grounds as a place of court business and is contrary to the overwhelming, and virtually unanimous, weight of authority which has rejected similar claims. Typically, the Supreme Court and other federal courts which have considered whether public property at issue constitutes a "traditional public forum" have applied a historical-categorical approach in resolving the issue. See Verlo v. Martinez, 262 F. Supp. 3d 1113, 1144 – 45 (D. Colo. 2017) (vast weight of Supreme Court authority approaches traditional public forum question by asking whether public space fits within a pre-existing category declared by Supreme Court); see also Perry Educ. Ass'n .v. Perry Local Educators Ass'n, 460 U.S. 37, 45 (1983) (traditional public fora are typically confined to areas such as public streets and parks that, since "time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. ); Hodge v. Talkin, 799 F.3d 1145 (D.C. Cir. 2015).

In our case, the summary judgment record shows that since its opening in 1872 to the present, the Circuit Courthouse has housed various county government functions, including the circuit courts, circuit clerk, drug court, election commission, and judges' offices. The grounds surrounding the Courthouse are configured in an octagon shape and are bordered and defined on all sides by an iron fence, a retaining wall and curb, and a perimeter sidewalk on the outside of the fence which connects to cross walks on each side of the Courthouse. Three heavily travelled main roadways (Lamar, Jackson and Van Buren Avenues) intersect at the Square and the combined traffic is routed in a single direction around the Courthouse. The one-way road which

encircles the Courthouse, together with the retaining wall, curb and fencing, separate the Courthouse from the retail shops, restaurants, bars, other businesses, and parking areas which form the "Oxford Town Square," (Defendant's MSJ, Exhibit A). The confined Courthouse grounds contain several benches, small grassy areas interlineated with bricked sidewalks, and large trees, but the function and size of the Courthouse and its grounds do not offer a "park-like" setting. Further, the roads, sidewalks, fencing and retaining walls which encircle the Courthouse grounds serve to physically and visually separate the grounds from the other areas of the Square. Rash's argument that the Courthouse grounds should be viewed as a "park-like" setting that is functionally integrated into other areas of the Square ignores the obvious and overwhelming characteristics of its physical design. See Grace.

In support of his position, Rash principally relies on NAACP v. Peterman, 2020 U.S. Dist. LEXIS 146796 (M.D. N.C. 2020) for the proposition that a Courthouse grounds constitutes a traditional public forum for purposes of First Amendment analysis. In Peterman, the district court considered whether a sheriff's "total ban" on the use of certain areas around a Courthouse constituted a reasonable time, place, and manner restriction consistent with Ward v. Rock Against Racism, 491 U.S. 781 (1989). Significantly, the court preliminarily noted that it was "undisputed" for purposes of the motion under consideration that certain areas around the Courthouse subject to the ban (including the "courthouse steps, sidewalks surrounding it, including the paved reserve space between the sidewalk and the monument, and the lawns at the courthouse coroners") were a "traditional public forum." Peterman,p. *17. Peterman therefore offers no support for the plaintiff's argument. To the same effect is O'Connell v. Town of Burgaw, 262 F. Supp. 3d 316 (E.D. N.C. 2017) where the court likewise assumed, without

3

analysis, that the County Courthouse Square and its surrounding public streets and sidewalks were traditional public fora.

Finally, Rash alleges that the actual "uses" allowed on the Courthouse grounds further supports a finding that the grounds serve as a traditional public forum. But the few uses to which Rash refers have occurred only since 2018 and only after the County instituted the Facility Use Policy. Thus, they are not the type of historical and longstanding "First Amendment speech" uses which would serve to transform a public space into a traditional public forum.

### The Lafayette County Courthouse is not a Designated Unlimited Public Forum

Rash alternatively argues that the Defendant has created or "designated" the Courthouse grounds as an unlimited "designated public forum" by adopting the Facility Use Policy in 2015. As pointed out in its brief in support of the Defendant's Motion for Summary Judgment, the Defendant acknowledges that a government entity may create an unlimited designated public forum if the government property has not traditionally been regarded as a public forum "but is intentionally opened up for that purpose." Pleasant Grove City v. Summun, 555 U.S. 460, 470 (2009). The government does not create a designated public forum by inaction or by permitting limited discourse but only by intentionally opening a nontraditional forum for public discourse. See Cornelius v. NAACP Legal Defense fund, Inc., 473 U.S. 788, 802 (1985). "Public discourse" in this context means "indiscriminate use". Hazelwood School Dist. v. Kuhlmeyer, 484 U.S. 260, 267 (1988). The government must make the property at issue "generally available" or "generally open" to all discourse.

4

On the other hand, a designated public forum is not created when the government allows selective access for individual speakers or for limited purposes rather than general access for a class of speakers. See Arkansas Educational Television Commission v. Forbes, 523 U.S. 666, 677 (1998). Thus, the government does not create an unlimited designated public forum akin to a traditional public forum "when it does no more than reserve eligibility for access to the forum to a particular class of speakers, whose members must then, as individuals, obtain permission." Forbes, Id at 679. In resolving this issue, the Supreme Court has looked to the policy and practice of the government to ascertain whether it intended to designate a place not traditionally open to assembly and debate as either an unlimited or "limited" public forum. The court also examines the nature of the property and its compatibility with the expressive activity to discern the government's intent. See Forbes, Id at 679; see also Walker, 135 S. Ct. at 2250. Significantly, just as the government may intentionally "designate" its property as either an unlimited or limited public forum, it may, by the same token, withdraw that designation at its discretion. Perry, 460 U.S. at 46; see also Wells v. City & County of Denver, 257 F.3d 1132, 1145 (10th Cir. 2001) (designated public fora differ from traditional public fora in that a state is not required to indefinitely retain the open character of the facility); United States v. Gilbert, 130 F.3d 1458, 1461 (11th Cir. 1997) (a government is not required to retain indefinitely the open character of a facility; government properly exercised its right, indeed, in this case, its duty, to safeguard the courthouse by imposing further restrictions in removing the public form designation); Satanic Temple v. City of Belle Plaine, 2020 U.S. Dist. LEXIS 136321 (D. Minn. 2020) (city's decision to rescind policy which opened a city park as a limited public forum did not violate plaintiff's First Amendment rights).

The existence of a permitting scheme with limits on "who and when" for use of the grounds, together with the character of the grounds which primarily serve as a place of court business, contradict the notion that the County has created an unlimited "designated public forum" for the general and unfettered use of the general public as a place of "public discourse." The County's Facility Use Policy, as applied to the use of the Courthouse grounds, limits the nature of the activities (nonprofit and political organizations for discussion only) and time of use (Monday through Friday and limited weekends, and no use from "dusk to dawn"), all subject to specific permission. (See Defendant's Motion for Summary Judgment, Exhibit X).

Granted, although the actual use of the grounds has been consistent with the stated policy (including art shows), there have been occasional uses which do not comport with the policy limitations (protests). Yet the Supreme Court has been clear on this point, that is, a "public forum" and its scope are not created or designated "by inaction or by permitting limited discourse, bur only by intentionally opening a non-traditional forum for public discourse." Cornelius, 473 U.S. at 811; see also Hodge, 799 F.3d at 1161-62. In Hodge, the court found that it was of "no moment that the Supreme Court police in certain situations might opt to allow demonstrators onto the plaza for a brief period, presumably in an effort to exercise enforcement authority with responsible (in viewpoint neutral) discretion and unique circumstances." Id. Thus, the policy's limitations and the permitting practice, when measured against the physical and functional characteristics of the Courthouse grounds, do not satisfy the elements necessary to establish an unlimited designated public forum.

One final note – deciding between whether the Courthouse grounds are either a "traditional" or "designated" public forum is not entirely academic and is, in fact, significant to the Defendant and its authority to manage the uses allowed on the Courthouse grounds. Whereas

6

traditional public forums may not, as a general proposition, be limited or closed for First Amendment purposes, in the case of a "designated" public forum, the government may "withdraw" the designation and thereby close the space or forum as a place of public expression. See United States v. Gilbert, 130 F. 3d 1458, 1461 (11th Cir. 1997); Wells v. City of Denver, 257 F. 3d 1132, 1145 (10th Cir, 2001). Therefore, should this court find that the Courthouse grounds serve as a designated public forum, the Defendant would be free to exercise its discretion to withdraw the designation by amending the Facility Use Policy.

### A Designated Limited Public Forum

The Defendant's Facility Use Policy clearly establishes a "limited" designated public forum within the Courthouse grounds. In Freedom From Religion Foundation, Inc. v. Abbott, 955 F.3d 417, 426 (5th Cir. 2020), the Fifth Circuit acknowledged the distinction between "limited" and "unlimited" designated public forums, observing that "limited public forums are places that the government has opened for public expression of particular kinds or by particular groups." Id.; see also Chiu v. Plano Indep. School Dist., 260 F.3d 330, 346 (5th Cir. 2001). "The government can restrict speech in a limited public forum…. as long as the restriction is (1) reasonable in light of the purpose served by the forum and (2) does not discriminate against speech on the basis of viewpoint." Abbott, 955 F. 3d at 426-27. In Chiu, the Fifth Circuit noted that distinguishing between the two types of forums, that is limited and unlimited, depends on two factors: (1) the government's intent with respect to the forum, and (2) the nature of the forum and its compatibility with the speech at issue. Chiu, 260 F. 3d at 346. In our case, the defendant's facility use policy is the expression of the defendant's "intent" with regard to the Courthouse grounds and the limited nature of the uses permitted under the policy. To reiterate, as

delineated in the defendant's motion for summary judgment, the facility use policy limits the nature of the activities (nonprofit and political organizations for discussion only) and time of use (Monday through Friday and limited weekends), all subject to specific permission. In addition, the nature of the forum (Circuit Courthouse) is clearly not compatible with "the speech at issue." Indeed, the "speech at issue" – involving a night time projection on the Courthouse walls – offers a significant distraction to passing motorists and risk to pedestrian safety and detracts from the dignity of the Courthouse. Although Rash's proposed use (art display) falls within the permitted uses of the Policy (unless after dusk and before dawn), the limited nature of the forum entitles the Defendant to apply "reasonable" restrictions which are content neutral.

### III.  The "Dusk to Dawn" Closure Restriction

If the court finds that the Courthouse grounds have been designated as a "limited" public forum, then the Defendant need only show that any restrictions on permitted uses are both reasonable and viewpoint neutral. Abbott, 955 F.3d at 426-27. The "dusk to dawn" restriction which prohibits all uses (political speech and otherwise) from dusk to dawn is clearly reasonable and viewpoint neutral as a matter of material, undisputed, fact.

Assuming the Lafayette County Courthouse grounds are either a traditional or an unlimited "designated" public forum, the Defendant's "dusk to dawn" restriction constitutes a reasonable "time, place, manner" restrictions which is content neutral.  Indeed, Rash does not take issue with the restriction's "viewpoint neutrality." (Plaintiff's Supporting Memorandum, p. 17-18). Instead, Rash contends (contrary to the court's preliminary injunction ruling) that the restriction is not "narrowly tailored" to advance a significant governmental interest, and that any articulated "interests" (traffic and pedestrian safety) are "too speculative." (Plaintiff's Supporting

8

Memorandum, p. 17-18).[1] In making his case, Rash does not accurately and completely state the intermediate scrutiny test which applies to content neutral restrictions in traditional and designated unlimited public forums.

As this court held in denying the plaintiff's Motion for Preliminary Injunction, a content neutral regulation of time, place, and manner of expression in a public forum is permitted when it is narrowly tailored to serve a significant government interest and leave open ample alternative channels of communication. See Moore, 868 F.3d at 403- 04; see also Packingham v. North Carolina, 137 S. Ct. 1730, 1736 (2017). A content neutral restriction does not undergo "strict scrutiny." Rather, such restrictions are evaluated under "intermediate scrutiny" which the Fifth Circuit has emphasized "does not require that the least restrictive means be used." Moore, 868 F.3d at 404. Ward v. Rock Against Racism, 491 U.S. 781, 798 (1989). "As long as the restriction promotes a substantial governmental interest that would be achieved less effectively without the restriction, it is sufficiently narrowly tailored." Serv. Employees International Union v. City of Houston, 595 F.3d 588, 596 (5th Cir. 2010). An ordinance is narrowly tailored if there is a "reasonable fit" between the stated governmental interest and the ordinance provision at issue. Cincinnati v. Discovery Network, 507 U.S. 410, 416 (1993).

### Significant Governmental Interest

As pointed out in the Defendant's Brief in support of its Motion for Summary Judgment, the courts which have considered similar time restrictions, that is, curfews which effectively

---

[1] Although he does not argue "vagueness" as a separate basis of attack on the "dusk to dawn" restriction, Rash makes brief mention that the use of "dusk" could be considered vague because Board members, who have not had a role in the administration of the policy, had different understandings of when "dusk" occurred. However, the term is clear on its face and is consistently applied by Lisa Carwyle, the County Administrator, who was delegated the task of processing permit applications and the general enforcement of the Facility Use Policy. See Carwyle Supplemental Affidavit, Exhibit A hereto.

close even "traditional" public forums like parks, for night time use have consistently ruled that a government's interest in safety and the coordination of uses of extremely limited space are substantial as a matter of law. See Moore, 868 F.3d at 404; see also Lauder, Inc. v. City of Houston, 751 F. Supp.2d 920, 930 (S.D. Tex. 2010) (evidence amply supports a finding that the city's interest in public safety and aesthetics are substantial). "Public safety is not only a substantial government interest, but a compelling one at the heart of government's function." Houston Chronicle Publishing Co. v. City of League City, 488 F.3d 613, 622 (5th Cir. 2007). Indeed, Lafayette County is not required to present detailed evidence of a real and substantial governmental interest based on past experience but rather it may "advance its interest by arguments based on appeals to common sense and logic." Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta, 219 F.3d 1301, 1318 (11th Cir. 2000); see also Clark v. Community for Creative Nonviolence, 468 U.S. 288, 296 (1984); Beasley, 2012 U.S. Dist. LEXIS 198622 (N.D. Ga. 2012) (even if "generic," city's interests in maintenance, noise reduction, safety, and crime reduction, are significant governmental interests when justifying park closure provisions).

The proof before the court during the preliminary injunction hearing and as supplemented by the additional evidence submitted in support of the Defendant's Motion for Summary Judgment (and incorporated herein by reerence) established a significant and even "compelling" governmental interests which were served by the closure. As the court found, in consultation with Sheriff East, the Lafayette County Board of Supervisors determined that the interest of pedestrian and traffic safety substantiated the need to impose a nighttime prohibition on the use of the grounds. These interests are clearly suggested under the circumstances and environment of the Courthouse which stands at the center of a very busy town Square. Also, the area is poorly lit

10

and typically serves as a "pass-through" for pedestrians walking to the area shops, restaurants and bars. Significantly, the area is frequented by students enrolled at the University of Mississippi who are drawn by the bars and restaurants located in and around the town Square. Further, recent experiences with individuals desiring to demonstrate in front of the confederate statue demonstrated a real and ongoing pedestrian and traffic safety issue which posed a strain on the Sheriffs Department during the daylight hours when these demonstrations occurred. Allowing the use of the Courthouse grounds during the late evening hours posed an unnecessary and unreasonable risk to pedestrian traffic safety and added strain on limited law enforcement resources. As to Rash's proposed use, in particular, a night time projection onto the Courthouse walls intended to be viewed by passing motorists falls well within the County's significant interests in pedestrian and traffic safety[2]. Common sense and logic compels this conclusion.

### Narrow Tailoring and Ample Alternative Means of Expression

The County's "dusk to dawn" closure of the Courthouse grounds also satisfies the requirement that as "time, place and manner" restriction, it must be narrowly tailored to serve a significant governmental interest and leave ample means of alternative places for expression. Of course, so long as the policy is content neutral, the restriction "need not be the least restrictive or least intrusive means of doing so." Ward v. Rock Against Racism, 491 U.S. 781, 798 (1989). There must be a "reasonable" fit between the significant interest at issue and the restriction which is imposed to serve that interest. Ward, 491 U.S. at 800. Further, the restriction must

---

[2] Rash asserts that he was granted a permit by the County in July 2019 for an evening use of the Courthouse grounds in order to project an art display on the Courthouse walls. This is incorrect. According to Carwyle, Wayne Andrews inquired abut the use of the grounds at night to show "cartoons and art" but did not submit a permit application and a permit was not issued. (Carwyle Supplemental Affidavit, Exhibit A hereto).

"leave open an alternative channel of communication" but not necessarily the alternative the plaintiff desires. Id.

Rash cites Occupy Eugene v. U.S., 43 F. Supp. 3d 1143 (D. Or. 2014) and Lopez v. Town of Cave Creek, 559 F. Supp. 2d 1030 (D. Ariz. 2008) in support of his contention that the "dusk to dawn" restriction is not narrowly tailored. Yet these cases are not factually analogous. In Occupy Eugene, the plaintiff challenged a GSA regulation which limited the use of a park area (a traditional public forum) to the hours of 8:00 AM to 5:00 PM, Monday through Friday. Occupy Eugene, at 1147. Further, in ruling in the plaintiff's favor, the court made clear that its ruling was "limited to the facts on this limited record" while expressing discomfort that the GSA was limiting use in the traditional forum to "normal business hours." Id. at 1152. The court observed that the GSA did not, in any event, advance any rational explanation for the business hours limitation, but indicated that "one could make a strong argument that a 7:00 am to 10:00 pm limitation would be narrowly tailored to support GSA's legitimate interests. Id. at 1151.

Lopez is also not helpful to the plaintiff's cause. In Lopez, the court noted that although traffic safety is a significant government interest, the defendant did not provide any evidence that traffic safety was endangered by the day time solicitation prohibited by the challenged ordinance nor was that concern even mentioned when the anti-solicitation ordinance was adopted. Lopez, 559 F. Supp. 2d at 1034. In our case, the record clearly establishes that pedestrian and traffic safety concerns motivated the Defendant's decision to impose the "dusk to dawn" restriction. Common sense and logic also informs the conclusion that the restriction has a reasonable fit to these asserted interests, unlike Occupy Eugene and Lopez.

Finally, the record unequivocally establishes that the plaintiff had, and has, ample alternatives to the proposed use. In any event, the guarantees of the First Amendment have never

meant "that people who want to propagandize protest or views have a constitutional right to do so whenever and however and wherever they please." Greer v. Spock, 424 U.S. 828, 836 (1976). The touchstone is whether the alternative spaces allow the speaker to reach a similar audience. See Heffron v. International Society for Krishna Consciousness, Inc., 452 U.S. 640, 655 (1981). For example, in Grisham v. City of Fort Worth, 2015 WL 3901612 (N.D. Tex. 2915), the government required speakers with a message that they wished to share with participants in a Festival to do so at a location immediately across the street from the Festival's footprint. The court found that the speakers could effectively convey their views to participants in the Festival from the other side of the road. Because the plaintiff in our case arranged to produce his video display at the City Hall Plaza which is within feet of the East side of the Lafayette County Courthouse (the area of the proposed use), the plaintiff clearly enjoyed ample alternative means to display the art projection. In denying Plaintiff's Motion for Preliminary Injunction, this court found that the County's institution of the "dusk to dawn" prohibition reasonably advanced identified significant governmental interests and did not effectively foreclose "ample alternative means to communicate his message to a similar, if not identical, audience." As the court observed, Rash had arranged to produce his art installation at City Hall "which is within mere feet of the East side of the County Courthouse which, in fact, served as ample alternative means to communicate his message."

## IV. The Facial Challenge to the Permit Requirement

It is Rash's position that the Facility Use Policy's permitting requirement which, in part, requires all users of the Courthouse grounds (one person within the Courthouse grounds proper and groups of five or more individuals congregating around the confederate memorial) to first

13

obtain a permit constitutes an unconstitutional prior restraint. Because these aspects of the County's permit requirements were not "applied" to Rash when his application for a permit was denied in July 2020, he presents a "facial" challenge to the policy. The "facial" validity of an ordinance is a question of law. See Village of Hoffman Estates, Inc. v. Flipside Hoffman Estates, Inc., 455 U.S. 489, 494 (1982); see also Center for Individual Freedom v. Carmouche, 449 F.3d 655, 662 (5th Cir. 2006).

The Fifth Circuit in Sonnier v. Crain, 613 F.3d 436, 443 (5th Cir. 2010) noted that "a facial challenge is of course the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the act would be valid." (Citing U.S. v. Salerno, 481 U.S. 739, 745 (1987). A facial challenge will fail when the statute has a "plainly engine legitimate sweep." Crain, 6131 F.3d at 443. "Facial challenges are best when infrequent. Although passing on the validity of a law wholesale may be efficient in the abstract, any gain is often offset by losing the lessons taught by the particular, to which common law method normally looks." Sabri v. United States, 541 U.S. 600, 608 – 09 (2004).

As discussed in its Brief in Support of its Motion for Summary Judgment, it is the County's position that Rash does not have standing to raise a facial challenge to policies and practices which were not applied in denying Rash a permit. It is the plaintiff's burden to establish that he has the requisite standing to challenge the Defendant's permit requirement. Lujon v. Defenders of Wildlife, 504 U.S. 555, 561 (1992). Rash must establish that he has suffered an "injury in fact." Elk Grove Unified Sch. Dist. V. Newdow, 542 U.S. 1, 11 (2004). A plaintiff must establish that he has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged official conduct and the injury or threat of injury must be both real and immediate, not conjectural or hypothetical. Los Angeles v. Lyons, 461 U.S. 95, 101 (1983).

Abstract injury is not enough to confer standing. Although the existence of an allegedly vague or overbroad statute can establish a sufficient injury to support standing, rash does not allege that either exists in his present motion. See Center for individual Freedom v. Carmouche, 449 F.3d 655, 660 (5th Cir. 2006). However, allegations of chilled speech or self censorship "must arise from a fear of prosecution that is not imaginary or wholly speculative." Id. If a plaintiff cannot establish injury, they have no standing in their unconstitutional challenges fail. See Freedom Path, Inc. v. IRS, 913 F.3d 503, 506 – 08 (5th Cir. 2019); Henderson v. Stalder, 287 F.3d 374, 380 (5th Cir. 2002) (plaintiffs failed to allege an injury in fact and therefore lacked standing to challenge the facial constitutionality of statute); see also Three Expo events, LLC v. City of Dallas, 907 F.3d 333 (5th Cir. 2018) (when plaintiff alleges injury derived from government's actions toward someone else, more is necessary). As the summary judgment record clearly reflects, Rash describes himself as a "curator" of art, including projection displays, and an observer and photographer of events around the Square, including demonstrations and protests. Although he claims that he "intends" to participate in demonstrations in the future, such bare-bones expressions of future intent are insufficient to establish standing to launch a facial attack on the defendant's permitting requirements. Beyond standing, these claims are not ripe for a judicial determination. Assuming Rash satisfies the standing and ripeness threshold, Rash cannot meet the "heavy burden" in advancing a cognizable facial claim.

      Pursuing his "facial" attack on the County's requirement that certain users of the Courthouse grounds first obtain a permit, Rash relies on Knowles v. City of Waco, 462 F.3d 430 (5th Cir. 2006). In Knowles, the court considered whether Waco's parade ordinance, to the extent it required a permit to engage in a parade or demonstration on city streets for as few as two individuals, was an unconstitutional prior restraint. Essential to the court's decision that the

advance permit requirement could not be constitutionally justified was the reality that the activity was to take place on "traditional" public forum areas such as streets and sidewalks. In these areas, the presence of two individuals "would not interfere meaningfully" with the government's asserted interests (traffic and pedestrian safety). Further, the court noted the ordinance's exceptions for certain users which undermined the traffic and pedestrian safety justifications for permit requirement, exceptions which are not present here.

Obviously, any advance permit requirement is a form of prior restraint, but no case has applied a per se rule of unconstitutionality to an administrative permitting scheme. Instead, in Knowles, as well as the other decisions from other circuits cited in Rash's brief on this point, (which he contends justifies the "per se" rule of unconstitutionality he advocates here), context is all important. In these decisions, the courts considered a permitting requirement for one or a few individuals in traditional public forum areas where the asserted governmental interests could not be "meaningfully" implicated or adversely affected, unlike here. In our case, an advance permit requirement is fully justified and reasonable because the Courthouse grounds are a place of business, are narrowly confined and subject to competing uses. Obviously, in the context of the Circuit Courthouse grounds, the requirement that one or more users, depending on the area within the grounds, must obtain a permit not only serves traffic and pedestrian safety interests but also the interest in maintaining an appropriate environment conducive to court operations. To allow unfettered uses or uses in greater numbers (Rash does not suggest which number would be appropriate) without permitting would be certain to interfere with the County's interests in managing the Courthouse environs while court is in session and otherwise.

16

## IV. Conclusion

Wherefore, premises considered, the Defendant respectfully requests that this Court deny the present motion. The Defendant also requests any other relief which the court may find warranted in the premises.

THIS, the 22nd day of February, 2021.

        Respectfully submitted,

        CLAYTON O'DONNELL PLLC
        1300 ACCESS ROAD, SUITE 200
        P.O. Drawer 676
        Oxford, MS 38655
        Telephone: (662) 234-0900
        Facsimile: (662) 234-3557

        /s/ David D. O'Donnell
        **DAVID D. O'DONNELL, MSB #3912**
        *Attorney for Lafayette County, Ms.,*
        *Defendant*
        dodonnell@claytonodonnell.com

## **CERTIFICATE OF SERVICE**

    I, David D. O'Donnell, hereby certify that I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record.

    This the 22nd day of February, 2021.

        */s/ David D. O'Donnell*
        **DAVID D. O'DONNELL, MSB# 3912**
        dodonnell@claytonodonnell.com