# EXHIBIT 10

1                    LISA CARWYLE

2        IN THE UNITED STATES DISTRICT COURT

3      FOR THE NORTHERN DISTRICT OF MISSISSIPPI

4                   OXFORD DIVISION

5

6   JOHN RASH,

7

            Plaintiff,
8
    v.                          CIVIL ACTION NO.:
9                               3:20-cv-224-NBB-RP

10  LAFAYETTE COUNTY,
    MISSISSIPPI,
11
            Defendant.
12

13

14

15
            VIDEOTAPED REMOTE DEPOSITION OF
16
                   LISA CARWYLE
17
            Thursday, December 17, 2020
18
            9:06 a.m. Central Standard Time
19

20

21

22

23  Reported by:

24  GRETA H. DUCKETT, CCR, RPR, CRR, CVR-S, RVR-M-S

25  JOB NO. 187733

Page 2

```
 1                  LISA CARWYLE
 2
 3
 4
 5
 6              December 17, 2020
 7         9:06 a.m. Central Standard Time
 8
 9          Videotaped remote deposition of
10   LISA CARWYLE, before Greta H. Duckett, CCR,
11   RPR, CRR, CVR-S, RVR-M-S.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1                  LISA CARWYLE
 2           A P P E A R A N C E S
 3
 4   FOR THE PLAINTIFF:
 5
 6           By: Joshua Tom, Esq.
 7           ACLU OF MISSISSIPPI
 8           P.O. Box 2242
 9           Jackson, Mississippi 39225
10
11
12
13   FOR THE DEFENDANT:
14
15           By: David O'Donnell, Esq.
16           CLAYTON O'DONNELL
17           1403 Van Buren Avenue
18           Oxford, Mississippi 38655
19
20
21
22   ALSO PRESENT:
23
24           Bill Thomas, videographer
25
```

Page 4

```
 1                  LISA CARWYLE
 2              I N D E X
 3          EXAMINATION INDEX
 4
 5   LISA CARWYLE
 6
 7        BY MR. TOM                    10
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1                  LISA CARWYLE
 2              EXHIBIT INDEX
 3
 4   EXHIBIT 1  Facility Use Policy,         31
             effective date 4/20/2015;
 5           Bates Lafayette County
             DOC000002 to Lafayette
 6           County DOC000005
 7   EXHIBIT 2  Facility Use Policy,         41
             effective date 3/4/2019;
 8           Bates Lafayette County
             DOC000006 to Lafayette
 9           County DOC000010
10   EXHIBIT 3  2/26/2019 email to Frye,     49
             Supervisor, from Carwyle
11
     EXHIBIT 4  3/13/2019 email to Carwyle   55
12           from YAC Operations; Bates
             Lafayette County DOC000119
13           to Lafayette County
             DOC000121
14
     EXHIBIT 5  2/21/2019 email to           57
15           Supervisor, David
             O'Donnell, Baretta Mosley,
16           from Carwyle; Bates
             Lafayette County DOC000091
17           to Lafayette County
             DOC000094
18
     EXHIBIT 6  12/12/2019 email to Jenn     62
19           Petermann from Carwyle;
             Bates Lafayette County
20           DOC000196 to Lafayette
             County DOC000197
21
     EXHIBIT 7  Order: Amend Facility Use    76
22           Policy Regarding Use of
             Courthouse Grounds
23
     EXHIBIT 8  Photograph                   87
24
25
```

Page 6

LISA CARWYLE
EXHIBIT INDEX, CONTINUED

EXHIBIT 9  6/23/2020 email to          89
           O'Donnell and East from
           Carwyle; Bates Lafayette
           County DOC000274 to
           Lafayette County DOC000281

EXHIBIT 10 6/17/2020 email to East    91
           from Carwyle; Bates
           Lafayette County DOC000249
           to Lafayette County
           DOC000270

EXHIBIT 11 6/29/2020 email to Carwyle 103
           and East from O'Donnell;
           Bates Lafayette County
           DOC000291 to Lafayette
           County DOC000292

EXHIBIT 12 6/30/2020 email to Carwyle 104
           from East; Bates Lafayette
           County DOC000296 to
           Lafayette County DOC000302

EXHIBIT 13 7/1/2020 email to East,    108
           O'Donnell, and Supervisor,
           from Carwyle; Bates
           Lafayette County DOC000305
           to Lafayette County
           DOC000307

EXHIBIT 14 7/1/2020 email to Carwyle  110
           from East; Bates Lafayette
           County DOC000311 to
           Lafayette County DOC000317

EXHIBIT 15 7/16/2020 email to East,   115
           O'Donnell, and Supervisor,
           from Carwyle; Bates
           Lafayette County DOC000324
           to Lafayette County
           DOC000329

Page 7

LISA CARWYLE
EXHIBIT INDEX, CONTINUED

EXHIBIT 16 Order:  Approve Revision of  120
           Facilities Use Policy to
           Include a Requirement of
           Application to be Made 14
           Days Prior to Date of
           Proposed Use and Requiring
           Closure of Courthouse
           Grounds 30 Minutes Before
           Dusk; Bates Lafayette
           County DOC000001

EXHIBIT 17 7/27/2020 email to           135
           Supervisor, East, and
           O'Donnell from Carwyle;
           Bates Lafayette County
           DOC000330 to Lafayette
           County DOC000331

EXHIBIT 18 9/4/2020 email to Harris     137
           from Carwyle; Bates
           Lafayette County DOC000041
           to Lafayette County
           DOC000045

Page 8

1      LISA CARWYLE
2      THE VIDEOGRAPHER:  Good
3  morning.  My name is William
4  Thomas.  I am a certified legal
5  videographer, in association with
6  TSG Reporting.
7      Due to the severity of the
8  COVID-19 outbreak and following the
9  practice of social distancing, I
10 will not be in the same room with
11 the witness.  Instead, I will
12 record this videotaped deposition
13 remotely.  The reporter, Greta
14 Duckett, also will not be in the
15 same room and will swear the
16 witness remotely.
17     Do all parties stipulate to
18 the validity of this video
19 recording and remote swearing, and
20 that it will be admissible in the
21 courtroom as if it had been taken
22 following Rule 30 of the Federal
23 Rules of Civil Procedures and the
24 state's rules where this case is
25 pending?

Page 9

1      LISA CARWYLE
2      MR. TOM:  Josh Tom on behalf
3  of plaintiffs.  So stipulated.
4      MR. O'DONNELL:  And David
5  O'Donnell.  No objection per se,
6  but reserving objections on an
7  evidentiary basis later.
8      THE VIDEOGRAPHER:  All right.
9  Thank you very much.
10     So this is the start of media
11 number 1 of the video-recorded
12 deposition of Lisa Carwyle, taken
13 in the matter of John Rash versus
14 Lafayette County, Mississippi.
15 This is in the United States
16 District Court, Northern District
17 of Mississippi, Oxford Division,
18 Number 3:20-CV-224-NBB-RP.
19     This is taking place on Zoom.
20 The time is 9:08 Central time on
21 December 17th, 2020.
22     My name is William Thomas.
23 I'm the videographer.  The court
24 reporter is Greta Duckett.  Both of
25 us are with TSG Reporting.

Page 10

LISA CARWYLE

1
2           Counsel, would you now
3     identify yourselves for this
4     proceeding?
5           MR. TOM:  Joshua Tom, with
6     the ACLU of Mississippi, on behalf
7     of plaintiff, John Rash.
8           MR. O'DONNELL:  David
9     O'Donnell, on behalf of Lafayette
10    County, Mississippi.
11          THE VIDEOGRAPHER:  Thank you
12    very much.  The court reporter may
13    now swear in the witness.
14          LISA CARWYLE,
15    the witness, having first been duly
16 sworn to speak the truth, the whole truth and
17 nothing but the truth, testified as follows:
18          EXAMINATION
19 BY MR. TOM:
20    Q.     Good morning, Ms. Carwyle.  Nice to
21 see you again.
22    A.     Good morning.
23    Q.     My name is Josh Tom, and, as you
24 know, I represent plaintiff, John Rash, in this
25 action against Lafayette County, and I'm going

Page 11

LISA CARWYLE

1 to be taking your deposition today.
2
3           Please state your full name for the
4 record and spell it.
5    A.     Lisa -- L-I-S-A -- Carwyle --
6 C-A-R-W-Y-L-E.
7    Q.     Can we agree that, given the
8 virtual nature of this deposition and the
9 inability to see what is off camera, that
10 you'll not communicate with anyone during the
11 deposition, excluding breaks, that is not
12 apparent and audible to me and the court
13 reporter?
14    A.     Yes.
15    Q.     Have you been deposed in any other
16 matter?
17    A.     No.
18    Q.     So this is your first deposition?
19    A.     It is.
20    Q.     Now, before we get into the
21 questions, I want to go over some ground rules,
22 just so we can have a smooth and understandable
23 deposition for us and for the court reporter.
24       Do you understand that you're
25 obligated to give complete and truthful answers

Page 12

LISA CARWYLE

1 to my questions today?
2    A.     Yes.
3    Q.     Do you understand that this is the
4 same as if you were in court, and even though
5 we're not in court, you still have the
6 obligation to tell the truth?
7    A.     Yes.
8    Q.     Because the court reporter is
9 taking down your testimony, you must speak up
10 and give oral answers instead of nodding or
11 shaking your head.
12       Do you understand that?
13    A.     Yes.
14    Q.     If you don't understand a question,
15 will you let me know, and I'll rephrase it?
16    A.     Yes.
17    Q.     If you need a break, tell me or
18 your counsel, but please do not ask for a break
19 or confer with your counsel while there is a
20 question pending.
21    A.     Okay.
22    Q.     It's best if we not talk over each
23 other, because it's difficult for the court
24 reporter to understand and take down that

Page 13

LISA CARWYLE

1 information.  So please let me finish the
2 question, and I'll let you finish the answer
3 before I ask another question.  Okay?
4    A.     Okay.
5    Q.     Are you taking any medication or
6 drugs that would impair your memory or ability
7 to understand my questions today?
8    A.     No.
9    Q.     Is there any other reason you can't
10 give full, complete, and truthful answers
11 today?
12    A.     No.
13    Q.     Is there any question that you have
14 about the procedures that we'll follow today?
15    A.     No.
16    Q.     What did you do to prepare for this
17 deposition?
18    A.     I met -- I'm sorry.  I'm trying to
19 adjust my volume for a minute.  I met with
20 Mr. O'Donnell and went over the documents that
21 we submitted.
22    Q.     And was anyone else at that meeting
23 besides you and Mr. O'Donnell?
24    A.     No.

Page 14

LISA CARWYLE

1
2    Q.    And when did you meet with
3  Mr. O'Donnell?
4              MR. O'DONNELL:  Did you turn
5        it up?
6              THE WITNESS:  Yeah.  I got
7        it.  I'm sorry.  My volume was --
8    A.    Yesterday.
9              MR. O'DONNELL:  Josh, can you
10       hear us?
11             MR. TOM:  Yes.
12             THE WITNESS:  Okay.
13             MR. TOM:  I can hear you.
14 BY MR. TOM:
15   Q.    And you mentioned documents.  Which
16 documents did you review?
17             MR. O'DONNELL:  Well, I would
18       object to that on the basis of
19       work-product privilege, so I
20       instruct the witness not to answer
21       that question.  If you want to ask
22       her specifically about which
23       document she reviewed that
24       refreshed her memory, that's fine.
25       But outside of that, I object.

Page 15

LISA CARWYLE

1
2  BY MR. TOM:
3    Q.    Okay.  Now, did you do anything
4  else to prepare for this deposition besides
5  your meeting with Mr. O'Donnell yesterday?
6    A.    No.
7    Q.    Have you discussed anything related
8  to today's deposition with anyone else?
9    A.    No.
10   Q.    Did you speak with any Lafayette
11 County board of supervisors about today's
12 deposition?
13   A.    No.
14   Q.    Did you speak with Sheriff Joey
15 East about today's deposition?
16   A.    No.
17   Q.    Did you do anything else to prepare
18 for today?
19   A.    No.
20   Q.    What's your current position?
21   A.    I'm the county administrator.
22   Q.    And what's the month and year you
23 began as county administrator?
24   A.    January 2016.
25   Q.    As county administrator, have

Page 16

LISA CARWYLE

1
2  you -- have you or do you hold any other
3  employment?
4    A.    No.
5    Q.    Now, let's briefly go over your
6  educational background.  Did you graduate from
7  college?
8    A.    I did.
9    Q.    And where did you graduate?
10   A.    From Ole Miss.
11   Q.    Where did you graduate from high
12 school?
13   A.    Lafayette High School in this
14 county.
15   Q.    Do you have any other degrees or
16 certifications?
17   A.    I have a master's degree in
18 accountancy from Ole Miss.
19   Q.    Where did you work prior to
20 becoming county administrator?
21   A.    I was the city clerk for the City
22 of Oxford.
23   Q.    And what were the dates that you
24 held your position as city clerk?
25   A.    From March of 2003 to January of

Page 17

LISA CARWYLE

1
2  2016.
3    Q.    While you were city clerk, did you
4  have other employment at the same time?
5    A.    No.
6    Q.    What was your employment directly
7  before city clerk?
8    A.    I was the accountant for the City
9  of Oxford Electric Department.
10   Q.    And how long did you hold that
11 position?
12   A.    It was from September of 1995 to
13 March of 2003.
14   Q.    What was your position before the
15 position as accountant?
16   A.    I was in college.  I did -- I mean,
17 I had part-time jobs, but -- I graduated
18 college in May of '95 and started in September
19 of '95.
20   Q.    I see.  Are you a lifelong resident
21 of Lafayette County?
22   A.    I am.
23   Q.    Have you ever lived outside of
24 Lafayette County?
25   A.    I have not.

Page 18

LISA CARWYLE

```
 1                    LISA CARWYLE
 2     Q.    Do you live in Oxford?
 3     A.    I do not.
 4     Q.    How far do you live from Oxford?
 5     A.    A mile.  I don't know the --
 6     Q.    And how long have you lived in that
 7  location?
 8     A.    Since 1998.
 9     Q.    Throughout this deposition, we're
10  going to be talking about Oxford's courthouse
11  square with the Lafayette County Courthouse in
12  its center.  I'm going to refer to this area as
13  "the square" and this courthouse as "the county
14  courthouse" or "the courthouse."
15       Do you understand that?
16     A.    I do.
17     Q.    Do you go to the square?
18     A.    I do.
19     Q.    How often?
20     A.    I mean, I drive through it every
21  day.  When you say "go to," I don't know if you
22  mean get out and walk around or -- but, I mean,
23  I work a block from the square.  So. . .
24     Q.    So in addition to driving through
25  it every day, how often do you get out and walk
```

Page 19

LISA CARWYLE

```
 1  in the square?
 2     A.    I'd say three to four times a week.
 3     Q.    How long have you been walking in
 4     the square?
 5     A.    I mean, my whole life.  Three to
 6  four times a week, probably, since -- during my
 7  professional career.  Because I've always
 8  worked on the square.
 9     Q.    So when you say your "professional
10  career," that's since 1995?
11     A.    Yes.
12     Q.    What do people do when they go to
13  the square?
14     A.    Mainly, shop and eat.
15     Q.    And do they do that at night as
16  well?
17     A.    They eat at night.  Most of the
18  shops are closed at night.
19     Q.    Is it fair to say that the square
20  is where people go to socialize and enjoy the
21  city, including at night?
22     A.    Yes.
23     Q.    How is the square used at night?
24     A.    I don't know what you mean.
```

Page 20

LISA CARWYLE

```
 1                    LISA CARWYLE
 2     Q.    How do people use the square at
 3  night?
 4     A.    They --
 5           MR. O'DONNELL:  Object to
 6           form.  Go ahead.
 7     A.    Go ahead.  I mean, they go there to
 8  eat and go to bars.  I mean, we don't -- we
 9  don't have a distinction between restaurant and
10  bars here, but. . .
11     Q.    On Ole Miss football game days, is
12  it true that the square is very busy with lots
13  of people at day and night?
14     A.    Yes.
15     Q.    Is it true that there are many
16  events held on the courthouse grounds?
17     A.    Define "many."
18     Q.    How many events have been held on
19  the courthouse grounds per month since you've
20  been the county administrator?
21     A.    I would say, average, since I've
22  been the county administrator, maybe one.
23     Q.    How many events per year since
24  you've been county administrator have been held
25  on the courthouse grounds?
```

Page 21

LISA CARWYLE

```
 1                    LISA CARWYLE
 2     A.    I don't have those exact numbers.
 3     Q.    Can you estimate?
 4     A.    I would estimate 10 to 12.
 5     Q.    How many events were held on the
 6  courthouse grounds per year when you were city
 7  clerk?
 8     A.    I couldn't answer that.
 9     Q.    Would you say that it's more or
10  less than when you were county administrator or
11  the city --
12     A.    I mean, I -- if I had to say, I
13  would say less, but I was not -- I mean, I did
14  work on the square.  It doesn't mean I was
15  walking out, looking to see who was on
16  the courthouse -- you know, how often somebody
17  was on the courthouse grounds.
18     Q.    Now, there was a curfew imposed in
19  July of 2020, correct, on the --
20     A.    Correct.
21     Q.    -- courthouse grounds?
22       Now, before the curfew was imposed
23  in July of 2020, events were held at night on
24  the courthouse grounds, correct?
25     A.    There were some, yes.
```

Page 22

LISA CARWYLE

1
2      Q.      How many events per year since
3  you've been county administrator have been held
4  on the courthouse grounds at night?
5      A.      Again, I don't have those exact
6  numbers.  To estimate, I would say, per year,
7  since I've been county administrator, maybe two
8  or possibly three.
9      Q.      Would you describe the square as
10 the heart of Oxford?
11     A.      Yes.
12     Q.      And what do you mean by that?
13     A.      I mean, it's the -- pretty much
14 like the center of the town, I guess.
15     Q.      And by "the center of the town,"
16 what does that mean?
17     A.      Well, it's where a lot of activity
18 takes place, because a lot of your governmental
19 functions are on the square.  And then, like I
20 mentioned earlier, restaurants and shopping.
21     Q.      So is it fair to say that the
22 square is the center of Oxford's business,
23 social, and civic life?
24     A.      The center of Oxford's business,
25 social, and civic life?  Probably, yes.

Page 23

LISA CARWYLE

1
2      Q.      How long has the square been the
3  heart of Oxford?
4      A.      I don't know.
5      Q.      Can you estimate?
6      A.      Well, I'm 47.  I didn't -- I didn't
7  spend much of my youth up here.  So I don't
8  know.  I mean, since -- during my professional
9  career, yes, it's -- I would say that.
10     Q.      For at least the past 25 years
11 is -- is what you're saying?
12     A.      Yes.
13     Q.      And the county courthouse lies at
14 the center of the square, correct?
15     A.      Right.
16     Q.      And the county courthouse grounds
17 are part of the square?
18     A.      Well, the courthouse is in the
19 center, and the grounds are around the
20 courthouse.
21     Q.      Are the county courthouse grounds
22 part of the square?
23     A.      Yes.  It's in the center of the
24 square.
25     Q.      But this is a separate question.

Page 24

LISA CARWYLE

1
2  So are the county courthouse grounds part of
3  the square?
4      A.      Well, I don't -- explain what you
5  mean when you say "part of the square."  It's
6  owned by different entities, so. . .
7      Q.      But beyond who owns it, like, when
8  you -- when someone goes to the square to
9  engage in all of the business and civic life,
10 would they also potentially -- strike that.
11     The courthouse grounds are not
12 separated from the square, are they?
13     A.      Well, there's a fence around them.
14     Q.      But there's also permanent openings
15 from -- onto the courthouse grounds, correct?
16     A.      There's an -- yes.  There's
17 openings in the fence for the -- to access
18 the --
19     Q.      And those -- and those -- and those
20 openings have no gates or enclosures, do they?
21     A.      Currently, they do not.  We have, a
22 few months ago, gotten some quotes to possibly
23 put some gates up, but that would have to go
24 through archives and history in Jackson.
25     Q.      If somebody were walking through

Page 25

LISA CARWYLE

1
2  the square, they could freely walk onto and
3  through the courthouse grounds, correct?
4      A.      Right now, yes, they could.  During
5  the day.
6      Q.      What happens at night?
7      A.      Well, according to our policy,
8  they're not permitted to be there at night.
9      Q.      And so the -- you're talking about
10 the curfew would prevent people from walking
11 onto the courthouse grounds at night?
12     A.      Right.
13     Q.      But there's no gates or barriers
14 that are put up at night onto the courthouse
15 grounds?
16     A.      They've not been put up yet, no.
17     Q.      And does the County intend to put
18 up gates or barriers around the courthouse?
19     A.      It has been discussed.  That's why
20 we got quotes.
21     Q.      Are the courthouse grounds used for
22 assembly, protests, and other expressive
23 activity?
24     A.      They -- yes.  They're used for
25 protests, you know, through the permitting

LISA CARWYLE

1
2    process.
3        Q.    And before the July 2020 curfew was
4    implemented, were some of these protests at
5    night?
6        A.    Yes.
7        Q.    How long has the county courthouse
8    grounds been used for assembly, protests, and
9    other expressive activity?
10       A.    I can't -- couldn't tell you prior
11   to January of 2016.
12       Q.    So is your answer that "at least as
13   early as January 2016"?
14       A.    Yes.
15       Q.    And being a lifelong resident of
16   Lafayette County and having driven by the
17   square for, you know, all of your professional
18   life, have you seen assembly, protests, or
19   expressive activity on the county courthouse
20   grounds before January 2016?
21       A.    Very few, but yes, I have.
22       Q.    And when did you see that?
23       A.    I couldn't -- I couldn't tell you a
24   date.
25       Q.    Can you estimate?

LISA CARWYLE

1
2        A.    No.  All I can say is I know there
3    was a guy that -- I now know his name is
4    Anthony Hervey -- who used to sit there in a
5    Confederate uniform and black flag.  But I
6    couldn't tell you -- I don't know when that
7    started or -- I probably saw him there twice,
8    you know.  I don't know how often he was there
9    or anything.
10       Q.    And you said his name was Anthony
11   Hervey or Harvey?
12       A.    I thought it was Hervey.  It might
13   be Harvey.  I'm not sure.
14       Q.    We'll just call him Hervey.  So
15   Anthony Hervey, where would he sit -- you said
16   he had -- he had a Confederate uniform or a
17   Confederate flag or both?
18       A.    Sometimes both.  I can't say he had
19   both every time I saw him, but. . .
20       Q.    Where would he sit?
21       A.    Beside the Confederate statue.
22       Q.    And how many times did you see him
23   there?
24       A.    Probably two.
25       Q.    And was this at day or night?

LISA CARWYLE

1
2        A.    Day.
3        Q.    And this -- and this was before
4    2016?
5        A.    Yes.
6        Q.    Do you have an estimate of when?
7        A.    I do not.
8        Q.    So besides Anthony Hervey, are
9    there any other protests or assemblies or
10   expressive activity that you've seen on the
11   county courthouse grounds before 2016?
12       A.    Assemblies, I've seen -- I guess
13   you call it assembly, like, when the Maker's
14   Market would come.
15       Q.    What's the Maker's Market?
16       A.    It's like -- it's promoted by the
17   local arts group here for local artists to sell
18   some of their product.
19       Q.    And when would the Maker's Market
20   happen?
21       A.    Prior to '16 -- that's where you
22   started asking me this question -- or after
23   '16?
24       Q.    When did the Maker's Market first
25   start?

LISA CARWYLE

1
2        A.    I don't know when it first started.
3    When I came here in January of '16, they were
4    setting up on the courthouse lawn.
5        Q.    And how long did it -- did it last
6    after January 2016?
7        A.    Probably two to three years.
8        Q.    Do they still have the Maker's
9    Market on the courthouse square?
10       A.    No.
11       Q.    Before January 2016, did you see
12   the Maker's Market?
13       A.    Yes.
14       Q.    And for how many years did you see
15   it before 2016?
16       A.    I don't know.
17       Q.    Was it five years?
18       A.    I don't think so.
19       Q.    Less than five years?
20       A.    I think it would be less than five
21   years, but it's not something I kept track of
22   at that point.
23       Q.    So was the Maker's Market -- how
24   many times per year did that happen?
25       A.    I think, like, eight to nine times.

LISA CARWYLE

1
2     Q.     Each year?
3     A.     Right.
4     Q.     Okay.  And so you said it went
5  from, you know -- is it -- is it correct that
6  it went from, to your knowledge, around 2010 to
7  2019?
8     A.     I do not know when it started.
9     Q.     And was the Maker's Market a
10 daytime event or a nighttime event or both?
11    A.     Daytime.
12    Q.     Would it go into the evening?
13    A.     No.
14    Q.     And so it would always happen, to
15 your knowledge, for -- the Maker's Market that
16 we're talking about now is the one that
17 happened on the courthouse grounds, correct?
18    A.     Right.
19    Q.     Do they still hold it, but in a
20 different location?
21    A.     I'm not sure.
22    Q.     So besides, you know, Anthony
23 Hervey and the Maker's Market, what other
24 assemblies or protests or expressive activity
25 has happened on the courthouse grounds before

LISA CARWYLE

1
2  2016?
3     A.     I do not know.
4            MR. TOM:  I'm going to show
5        you, Ms. Carwyle, Exhibit 1.  And
6        I'm going to put it in the chat
7        here.
8            (Exhibit 1 was marked for
9            identification.)
10 BY MR. TOM:
11    Q.     Once you have it, take a moment to
12 review it.
13           THE VIDEOGRAPHER:  Is it
14       showing up for you?
15           THE WITNESS:  No.  In the
16       chat?  No.
17           THE VIDEOGRAPHER:  Could we
18       go off --
19           MR. O'DONNELL:  I don't have
20       it either.
21           THE VIDEOGRAPHER:  --
22       record and --
23           THE WITNESS:  I'm sorry.
24       What?
25           THE VIDEOGRAPHER:  Mr. Tom,

LISA CARWYLE

1
2        can we go off record and
3        troubleshoot that?
4            MR. TOM:  Sure.
5            THE VIDEOGRAPHER:  We're
6        going off record.  The time is
7        9:35.
8            (Recess from 9:35 a.m. to
9            10:02 a.m.)
10           THE VIDEOGRAPHER:  Back on
11       record at 10:02.
12 BY MR. TOM:
13    Q.     Hi, Ms. Carwyle.  And so you have
14 access to the ShareFile?
15    A.     I do.
16    Q.     And can you open the document that
17 begins with the number 1?
18    A.     I have it open.
19    Q.     Do you recognize this document?
20    A.     Yes.
21    Q.     And what is it?
22    A.     It is the facility use policy
23 adopted in April of 2015.
24    Q.     Now, when you became the county
25 administrator in January of 2016, what was your

LISA CARWYLE

1
2  process for determining permits under this
3  policy?
4     A.     People -- you know, I'd get a
5  permit submission to me --
6        You said what was my process?  I'm
7  sorry.
8     Q.     Yes.
9     A.     And I would check to see, you know,
10 if we had any -- if there was any conflicts
11 with that day or time.  And then approve or
12 deny based on that.
13    Q.     Was the process before you became
14 administrator different?
15    A.     I would not know.
16    Q.     What criteria were used to
17 determine whether to grant or deny a permit?
18    A.     I would base it on whether they
19 followed the policy guidelines.
20    Q.     And who else was involved in
21 administering the permit policy besides you?
22    A.     Nobody.
23    Q.     Was the sheriff involved?
24    A.     In 2016, not really.  We had a
25 different sheriff then, and just, you know -- I

Page 34

LISA CARWYLE

1
2 would talk to them -- I don't remember it
3 happening very often. Early on, you know, if
4 there was something that we thought would
5 require additional security or something they
6 needed to be made aware of.
7      Q.     So you would contact the sheriff to
8 give that person a heads-up?
9      A.     Yes.
10     Q.     Did the sheriff have a role in
11 whether to grant or deny a permit at this time?
12     A.     I don't think it ever happened
13 where they had -- had a role in it early on,
14 no.
15     Q.     Was the board of supervisors
16 involved in the permitting process at this
17 time?
18     A.     No.
19     Q.     So is it fair to say that you were
20 the sole person that processed these permits,
21 but you would also pass them by the sheriff
22 sometimes?
23     A.     Yes. The sheriff or his staff.
24     Q.     And was there any -- anyone else
25 involved in the permitting process at this

Page 35

LISA CARWYLE

1
2 time?
3      A.     No.
4      Q.     So you had the final say of whether
5 to grant a permit or not?
6      A.     Right.
7      Q.     Now, when you look at Exhibit 1,
8 you know, on the first page, it's Bates
9 number 2?
10     A.     Right.
11     Q.     So throughout this deposition, you
12 know, if you look down at these Bates numbers,
13 they say Lafayette County DOC, and then there's
14 a series of numbers. And whenever I refer to
15 the Bates number, I'll just say Bates number,
16 and then the number at the end.
17     Do you understand that?
18     A.     I do understand that.
19     Q.     Okay. Where it says Bates
20 number 2, provision 6 prevents profit-making
21 groups or for profit-making purposes on county
22 facilities, correct?
23     A.     Right.
24     Q.     And if you look at number 9 --
25 not -- apologies. If you look on Bates 4,

Page 36

LISA CARWYLE

1
2 where it says applications for usage, there's a
3 one-week advance notice requirement, right?
4      A.     Right.
5      Q.     And when this 2015 policy was in
6 effect, did you ever need more than one week to
7 process a permit application?
8      A.     I don't remember.
9      Q.     On average, how many days would it
10 take you to process a permit when this policy
11 was in effect?
12     A.     I'm not sure I can answer that,
13 because sometimes it took probably longer,
14 based on just what -- you know, what my other
15 duties were going on at that time. And I
16 just -- I don't know how long it took me to
17 process it or to answer them.
18     Q.     Were there times where it took you
19 longer than a week to process a permit?
20     A.     Probably.
21     Q.     And how many times was that?
22     A.     I don't know.
23     Q.     So if someone applied for a permit
24 with less than one week's notice, could that
25 one-week notice provision be waived?

Page 37

LISA CARWYLE

1
2      A.     Yes. It could be waived.
3      Q.     And who decided whether to waive it
4 or not?
5      A.     I would have.
6      Q.     What criteria would you use to
7 determine --
8      A.     I don't remember it coming up when
9 this was in play. I know, later on, you know,
10 in 2019 and '20, that I did. But I don't
11 remember it being discussed to waive or not
12 waive or me, you know, talking with the sheriff
13 in those days when this was in -- in effect.
14     Q.     So when this was in effect, did you
15 waive the one-week notice requirement ever?
16     A.     I don't remember waiving it, but I
17 don't know. I don't remember.
18     Q.     Was it in your discretion to waive
19 the one-week notice requirement when the 2015
20 policy was in effect?
21     A.     Yes. It would have been in my
22 discretion, I guess, but, again, I don't know
23 that I even thought about it like that, because
24 I don't remember it coming up at that time.
25     Q.     What concerns was this 2015 policy

LISA CARWYLE

1    designed to address?

2        A.    I wasn't here when it was designed.

3        Q.    When you were implementing this

4    policy, what concerns was it designed to

5    address?

6            MR. O'DONNELL:  Object to

7            form.  You can answer if you can.

8        A.    Well, I don't understand the

9    question.

10       Q.    Did the 2015 address public safety

11   concerns?

12       A.    Did the 2015 policy address public

13   safety concerns?

14       Q.    Yes.

15       A.    I guess some -- somewhat, yes.

16   Like, it says you can't bring drugs on the

17   property; you can't bring alcohol on the

18   property.

19       Q.    Any other public safety concerns?

20       A.    I'm trying to look and see.  Let

21   me -- hang on one second.  I mean, it talks

22   about security being required, making sure they

23   had parking.  So, I mean, I do think it

24   addressed some public safety concerns, yes.

LISA CARWYLE

1        Q.    So when this policy was in effect,

2    you mentioned that sometimes you'd contact the

3    sheriff.  Why would you contact the sheriff?

4        A.    If I thought there was an issue

5    with -- that would need additional security, I

6    would contact the sheriff.

7        Q.    And is there an example of that?

8        A.    I know in -- I think it was

9    February of '19, we had a group request use

10   that we had heard might, you know, bring a

11   large number.  And I know I contacted the

12   sheriff at that point.

13       Q.    Were there any other times you

14   contacted the sheriff when this policy was in

15   effect?

16       A.    I don't remember.

17       Q.    And the event in February of 2019,

18   do you remember what that group was?

19       A.    I think that was the George Johnson

20   permit.

21       Q.    And was that permit granted?

22       A.    It was.

23       Q.    So when this policy was in effect,

24   do you remember any other times that you

LISA CARWYLE

1    contacted the sheriff, besides February 2019?

2        A.    I don't -- I know they were

3    contacted, maybe, when there were people there

4    who didn't have a permit.  I remember that, you

5    know, but I don't know -- I don't remember a

6    specific permit that I received that I

7    contacted the sheriff.

8        Q.    What do you mean -- or what events

9    or group of people were there without a permit

10   when you had to call the sheriff?

11       A.    Well, I wouldn't call the sheriff,

12   but they would maybe call me because somebody

13   saw people up there asking if they had a

14   permit.  And so the sheriff would call me to

15   see if they had a permit, you know, those type

16   of things.

17       Q.    And do you remember some examples

18   of what kind of event that was?

19       A.    I don't remember specifically.  I

20   do not.

21       Q.    So if you go to the share drive

22   again, will you open the document beginning

23   with number 2?

24           MR. O'DONNELL:  Josh, just as

LISA CARWYLE

1        a housekeeping matter, are you --

2        when you refer to these items as

3        document 1, document 2, are you

4        wanting to attach these to the

5        deposition?

6            MR. TOM:  Yeah.  That's a

7        good call.  Sorry about that.

8            So for the document number 1,

9        the March 2015 policy, I'd like to

10       introduce that as Exhibit 1.  And

11       then for document 2, I'd like to

12       introduce that as Exhibit 2.

13           (Exhibit 2 was marked for

14           identification.)

15   BY MR. TOM:

16       Q.    Take a look at Exhibit 2,

17   Ms. Carwyle, and take some time to review it.

18       A.    Okay.

19       Q.    Do you recognize this document?

20       A.    Yes.  I believe it is a draft of

21   the March 2019 facility use policy.

22       Q.    So this is -- this is not the

23   final?

24       A.    I believe the final was in -- was

LISA CARWYLE

1
2  document number 112.
3       Q.      The Bates number 112?
4       A.      Right.
5       Q.      Do you remember if there were any
6  differences between the draft and the final?
7       A.      Just a couple.  Not very many.
8       Q.      What were the differences?
9       A.      Line number 6.  If you're looking
10  at the document 6 on your screen, line number 6
11  added a number 2.  It was -- that said, For
12  private social functions, such as weddings,
13  birthdays, and anniversary parties is
14  prohibited.
15       Q.      Were there any other differences
16  between the draft and the final?
17       A.      And then on -- on what you're
18  looking at, number 9, document 9.  Under
19  applications for usage, there was also a use
20  fee applied:  An hourly rate of $50 per hour
21  must accompany the application.  An additional
22  deposit may be required in the event the
23  sheriff of Lafayette County determines that the
24  event possesses unusual security and
25  traffic-control measures.

LISA CARWYLE

1
2       Q.      Were there any other differences
3  between this draft and the final?
4       A.      No.
5       Q.      So speaking about the final policy
6  passed or adopted on March 4th, 2019, that
7  policy extends the notice period from one week
8  to 30 days, right?
9       A.      Right.
10       Q.      And it also -- the final policy
11  adopted on March 4th, 2019, also gives the
12  sheriff a role in assessing security concerns?
13       A.      Right.
14       Q.      Why was the policy amended in March
15  2019?
16       A.      To address some security issues, to
17  include language where sticks, et cetera, could
18  not be carried when -- when somebody was
19  approved for a permit.  I'm trying to think
20  what else.  Due to the -- the -- us needing to
21  make sure the sheriff is responsible for
22  security on the courthouse grounds and trying
23  to make sure that that could be done and done
24  effectively, we added that language.
25       Q.      Which language?

LISA CARWYLE

1
2       A.      The language I just mentioned to
3  you.
4       Q.      So all of the -- all of the new
5  language, or just some of it?
6       A.      Well, the majority of it was due to
7  the threat of security and safety concerns.
8       Q.      What was the rest?  Why was the
9  rest changed?
10       A.      Well, I don't -- I couldn't tell
11  you the reasons for all of it.  I mean,
12  permission to use Lafayette County facilities
13  does not constitute an endorsement by Lafayette
14  County or Lafayette County Board of
15  Supervisors.
16       I don't know if that was done for
17  security or safety reasons, but it doesn't
18  quite seem like it to me.  But that was a
19  change.
20       Q.      So who concluded this policy should
21  be amended?
22       A.      I think probably everybody that had
23  been involved in the policy.  Definitely, the
24  sheriff.  I remember, at the time, that we were
25  approached by the current chief of police from

LISA CARWYLE

1
2  the City of Oxford to make some changes.  So
3  one, that ours -- we implemented some items
4  that the city had in theirs that I believe were
5  needed.  And a lot of that recommendation came
6  from the chief of police for the city.
7       Q.      Who was the chief of police at the
8  time?
9       A.      Joey East.
10       Q.      So the policy was amended in 2019
11  because Joey East approached the County
12  expressing security concerns about the county
13  courthouse grounds?
14       A.      That was one of the reasons.  It
15  was also in response to the event in February
16  of '19 where -- I was -- I did not attend the
17  event, so I can't tell you for sure.  But I
18  know George Johnson had a permit.  There was a
19  threat, and I believe they came kind of, like,
20  the opposition to his group.  And there was a
21  lot of concern with law enforcement --
22  sheriff's department, City of Oxford police,
23  federal agencies -- about keeping the square
24  safe during that event.
25       Q.      And who's George Johnson?

LISA CARWYLE

1
2      A.      He's the guy that filled out the
3  permit for the February '19 event.
4      Q.      And what kind of event did he have?
5  What was his event?
6      A.      He is pro-Confederate statue.
7  That's about all I know.
8      Q.      Do you remember how many people
9  were at this event?
10     A.      I do not know.  I was not there.
11     Q.      So you mentioned that Sheriff -- or
12  at the time, Chief of Police East had some
13  security concerns about the county courthouse
14  grounds.  There was also some concerns after
15  Mr. Johnson's pro-Confederate event.  Are there
16  any other reasons that the March 2019 policy
17  was enacted?
18     A.      I don't remember any more reasons
19  right now.
20     Q.      Why was the application period
21  extended from seven to 30 days?
22     A.      To make sure that the law
23  enforcement community had enough time to
24  prepare for an event like that.
25     Q.      Were there any other reasons?

LISA CARWYLE

1
2      A.      I don't remember other reasons.
3      Q.      Why was the security section
4  revised to include review by the sheriff?
5      A.      To make sure he was aware of any
6  event that would be happening.
7      Q.      Were there any other reasons that
8  review by the sheriff was --
9      A.      I'm sorry.  I didn't hear --
10     Q.      -- put into the policy?
11     A.      Say that again.  I couldn't --
12     Q.      Were there any other reasons that
13  review by the sheriff were -- put into the
14  policy?
15     A.      The sheriff reviewing the policy --
16  I mean, the permits would be for security and
17  safety issues.
18     Q.      So is it fair to say that now, in
19  the 2019 policy, the sheriff has an official
20  role in the permit process?
21     A.      I'm the one that denies or
22  approves, but I do run it by him to make sure.
23  He is the one that checks to see if there are
24  other permits pulled, like, with the City, to
25  see if there's conflicting events going on at

LISA CARWYLE

1
2  the same time.  And he lets me know whether he
3  feels confident in being able to police it, if
4  needed.
5      Q.      Did your process for granting or
6  denying permits change after this -- the March
7  2019 amendment?
8      A.      Yes.
9      Q.      How did it change?
10     A.      I would send it to the sheriff to
11  make sure he had enough people available and
12  there were no conflicting events for the same
13  permit requested date.
14     Q.      Were there any other changes to
15  your process?
16     A.      No.  I don't think so.
17     Q.      Did the board get a role in the
18  permit process?
19     A.      No.
20     Q.      Did anyone besides the sheriff get
21  a role in the permit process?
22     A.      No.
23     Q.      For the March 2019 policy
24  amendment, were there concerns specifically
25  regarding the county courthouse grounds?

LISA CARWYLE

1
2      A.      Yes.
3      Q.      What were those concerns?
4      A.      They're the same concerns I
5  mentioned before:  Safety and security for the
6  people who attend the event, the public, who
7  was there for a different reason, and the
8  facilities themselves.
9      Q.      And when you say for "the
10  facilities themselves," what do you mean?
11     A.      I mean the historic courthouse
12  building, whether something -- you know, for
13  traffic, people who are driving around the
14  courthouse, to all the buildings on the square.
15     Q.      Will you open the document that
16  begins with number 4?
17              MR. TOM:  I'd like to
18          introduce this as Exhibit 3.
19              (Exhibit 3 was marked for
20              identification.)
21  BY MR. TOM:
22     Q.      Do you recognize this document?
23     A.      It's an email to Kevin Frye and
24  David O'Donnell.
25     Q.      Now, in this email, you're talking

LISA CARWYLE

1
2  to the board of supervisors about the March
3  2019 permit policy amendment, correct?
4     A.    Yes.
5     Q.    And if you look on the first page
6  of Exhibit 3, at the top of the email in the
7  "to" section, it says, To: Kevin Frye;
8  Supervisor.
9     Who is "Supervisor"?
10    A.    That's the "supervisor" group of
11  the five supervisors.
12    Q.    So on page 1 of Exhibit 3, you tell
13  Kevin Frye that -- or what are you -- what are
14  you telling Kevin Frye in this email on
15  Tuesday, February 26th, 2019, at 10:23 a.m.?
16    A.    Well, it says:  Yeah, your first
17  three comments are on language that was already
18  in the policy, and Maker's Market was allowed
19  use before I ever came.  So I kept letting them
20  in, even though it did not comply with the
21  language.
22    Q.    So the 2015 policy already
23  prevented Maker's Market on county property,
24  right?
25    A.    I believe it did, which there's

LISA CARWYLE

1
2  probably a little wiggle room there.  But it
3  said for -- not to be used for profit-making --
4  I don't have the language in front of me, but
5  profit-making purposes.
6     Q.    So if we go back to Exhibit 1,
7  which is the 2015 policy, provision 6 of
8  Exhibit 1 says, The use of any county facility
9  that falls under this policy by profit-making
10  groups or for profit-making purposes is
11  prohibited --
12    A.    Right.
13    Q.    -- is that right?
14    A.    That's what I was referring to.
15  Uh-huh.
16    Q.    And would Maker's Market be
17  prohibited under that language under the 2015
18  policy?
19    A.    You know, they are kind of a
20  starving artist group.  It was a cultural-type
21  event that had been going on.  So I did not, at
22  first, when I came on, see that -- I mean, it's
23  not a commercial profit-making venture.  So --
24  but as we looked at revising the policy, I felt
25  like we needed to be clear on where they -- a

LISA CARWYLE

1
2  group like that would fall.
3     Q.    So did Maker's Market sell things?
4     A.    They did.  It was, like, handmade,
5  craft-type items, art.
6     Q.    So at Maker's Market, did people
7  set up booths and sell art and other goods?
8     A.    They did.
9     Q.    And so were they selling those for
10  profit?
11    A.    Yes.  I would assume so, yes.
12    Q.    So explain to me how Maker's Market
13  did not violate the 2015 policy.
14    A.    Well, like I said, I mean, that was
15  a question that I had.  I mean, they're not
16  considered, really, what I consider a
17  commercial profit group, but -- because they
18  are part of the art community.  But eventually
19  decided, yes, they did violate the policy, and
20  I told them they could no longer set up on the
21  courthouse grounds.
22    Q.    So, eventually, you said they did
23  violate the 2015 policy?
24          MR. O'DONNELL:  Object to
25      form.  You can answer.

LISA CARWYLE

1
2     A.    I'd have to look back exactly at
3  what point.  I mean, if it was -- I don't know
4  if I told them that after the 2019 policy was
5  adopted or -- I think it was all right within
6  the same time frame.
7     Q.    So let's go back to Exhibit 3, in
8  your email to Kevin Frye.  Aren't you saying
9  here that the Maker's Market did not comply
10  with the language from the 2015 policy?
11    A.    Yes.  I am saying that right there.
12  But that was also a week before we adopted the
13  new one is what I'm saying.  As we were looking
14  harder at the policy and what needed to be
15  changed, I realized they didn't really fall
16  within the current policy.
17    Q.    Was it in your discretion to make
18  exceptions to the permit policy?
19    A.    Yes.
20    Q.    What criteria did you use to
21  determine whether to make an exception or not?
22    A.    I don't remember ever really making
23  exceptions.  Later on, more recently, we did,
24  obviously, on the timeline requirement.  But --
25  and on this, I mean, when I started in 2016,

LISA CARWYLE

1    the Maker's Market had been setting up.  So I
2    really didn't even think that -- I didn't
3    realize I was making an exception, I guess,
4    when I continued to approve their permits,
5    because they had been doing it for years before
6    I came.
7         Q.    And when you were talking about the
8    timeline requirement, what are you talking
9    about?
10        A.    I'm talking about later in 2020,
11   where I know there were times when the policy
12   said you had to have 30 days, that we would
13   allow people to do it in less than that.
14        Q.    And that was within your discretion
15   whether to make an exception to the notice
16   requirement?
17        A.    Yes.  As long as Joey, the sheriff,
18   was good with any security needs that he would
19   have to get into place by that time.
20        Q.    So it was within your discretion,
21   in consultation with the sheriff, whether to
22   waive the notice requirement?
23        A.    Yes.
24        Q.    Was there anybody else involved in

LISA CARWYLE

1    the decision of whether to waive the notice
2    requirement?
3         A.    No.
4         Q.    Now, before the March 2019
5    amendment, did you allow for -- any other
6    for-profit groups to use county property?
7         A.    I don't believe so.
8         Q.    Before the March 2019 amendment,
9    did you allow any other exceptions to the
10   permit policy?
11        A.    I also don't believe so.  I don't
12   think so.
13        Q.    So will you open the document that
14   begins with number 5, which I'd like to
15   introduce as Exhibit 4?
16              (Exhibit 4 was marked for
17               identification.)
18        A.    Okay.
19        Q.    Do you recognize this document?
20        A.    I do.
21        Q.    What is it?
22        A.    An email exchange with
23   Yoknapatawpha Arts Council.
24        Q.    Who is Yokna- -- who is that?

LISA CARWYLE

1         A.    It's -- well, I don't know how you
2    describe them.  Local, nonprofit, you know, to
3    promote arts in the community.  YAC is short.
4    Y-A-C.
5         Q.    I'll call it YAC because I don't
6    know if can pronounce --
7         A.    Yeah.  That will be easier.
8         Q.    So in this email exchange, you say
9    that the board is currently revising the
10   facility use policy, and it may affect Maker's
11   Market, correct?
12        A.    Right.
13        Q.    And what revisions were being
14   considered that would affect Maker's Market?
15        A.    Well, I don't -- again, I don't
16   guess the language regarding profit-making
17   groups was not changed in the 2019 revision.
18   But I was made more aware of it.  And so I
19   implemented it correctly, I would say, at that
20   point.
21        Q.    So is it correct to say that even
22   though the language between the March 2015 and
23   2019 policy stayed the same with regards to
24   for-profit activities, your process for

LISA CARWYLE

1    applying that language changed?
2         A.    I guess so.  I don't -- when you
3    say "process for applying it," again, I think I
4    was just made more aware of the language as we
5    looked at the policy harder and made changes to
6    it.  It was kind of like, oh, we really
7    should -- I really shouldn't allow the Maker's
8    Market to be there, based on the policy.  So
9    then I told them they were not allowed to be
10   there.
11        Q.    So you applied the 2019 -- you
12   applied the same language in the 2015 and 2019
13   policies differently, correct?
14        A.    For the Maker's Market, I did, yes.
15        Q.    Whose -- was that solely under your
16   discretion to apply that language differently?
17        A.    Well, I did not mean to apply it
18   differently, but, yes, it was solely under my
19   discretion.
20        Q.    Will you open up number 6, please?
21              MR. TOM:  And we'll introduce
22        this as Exhibit 5.
23              (Exhibit 5 was marked for
24               identification.)

LISA CARWYLE

1
2  BY MR. TOM:
3      Q.    Do you recognize this document,
4  Ms. Carwyle?
5      A.    Hang on a second.  It's not coming
6  up for some reason.  Hang on.
7                MR. TOM:  While you take a --
8                while you pull that up -- Greta,
9                are you -- are you getting these
10               exhibits for the record?
11               COURT REPORTER:  Yes, sir.  I
12               am.
13               (Technical discussion.)
14               MR. O'DONNELL:  Josh, what is
15               document number 6?
16               MR. TOM:  Number 6, which is
17               Exhibit 5, it's an email from --
18               from Ms. Carwyle about Bluff City
19               Law.  It begins with Bates 91.
20               It's Bates 91 to 94.
21     A.    Hang on.  I just -- I kind of -- I
22  got out of it.  I'm pulling the whole thing
23  back up to see if it will help.
24     I've got that in front of me.  It's
25  still kind of searching, but I've got 91, 92,

LISA CARWYLE

1
2  93, 94.
3                MR. TOM:  Okay.  Well, you
4                know, for the record, Exhibit 5 is
5                an email from Ms. Carwyle regarding
6                Bluff City Law, Bates numbers 91 to
7                94.
8                MR. O'DONNELL:  Okay.
9  BY MR. TOM:
10     Q.    Now, so, Ms. Carwyle, do you
11  recognize this document?
12     A.    I do.
13     Q.    And do you remember what Bluff City
14  Law is?
15     A.    I do.
16     Q.    What is it?
17     A.    It was a pilot show put on by NBC.
18     Q.    Which courthouse did they want to
19  use?
20     A.    The county courthouse.
21     Q.    So that's the courthouse in the
22  square?
23     A.    Right.
24     Q.    Now, you sent this email on
25  Bates 91 to Supervisor -- which is all of the

LISA CARWYLE

1
2  supervisors -- David O'Donnell, and Baretta
3  Mosley, right?
4      A.    Right.
5      Q.    Why did you send this email to all
6  of them?
7      A.    Well, this was an unusual request.
8  Baretta was the circuit clerk at the time and
9  in -- in the county courthouse.  That's where
10 they do their operations.  And so I sent it to
11 all of them for it to be discussed.
12     Q.    This was outside of your normal
13 process for granting permits?
14     A.    That's right.
15     Q.    And who -- so who would have a role
16 in whether to grant or deny this permit?
17     A.    Well, I mean, again, it was a very
18 unusual request.  It was cause for the entire
19 courthouse to be shut down as far as business
20 going on or operations over a period of days.
21 There was liability issues, so I had -- you
22 know, definitely wanted to talk to David
23 O'Donnell with that.  It did -- this one did
24 come before the board of supervisors to
25 approve, because I considered this very

LISA CARWYLE

1
2  extraordinary.
3      Q.    The board of supervisors voted on
4  whether to grant this permit for Bluff City
5  Law?
6      A.    I believe they did.  I'd have to
7  check the minutes.  I'm not -- I feel like they
8  did, but I didn't check that prior to this
9  meeting.  From my recollection, I believe it
10 came before the board.
11     Q.    Was -- did Bluff City Law hold this
12 event at the courthouse?
13     A.    They did.
14     Q.    And so it wasn't -- it wasn't your
15 authority to approve this; it was the
16 supervisors?
17     A.    I mean, I could have probably had
18 the authority to approve it, but I didn't feel
19 comfortable in approving something like that
20 without the supervisors being aware of it.
21 Because, like I said, this was a very
22 extraordinary request.
23     Q.    Now, when the 2019 policy was in
24 effect, were there any other times that you had
25 to get the supervisors' sign-off to approve a

Page 62

LISA CARWYLE

1 permit?

2      A.    No.

3      Q.    Was -- so when the 2019 policy was
4 in effect, was this the only time you got the
5 supervisors to sign off on a permit?

6      A.    Yes.

7      Q.    Will you go to the document marked
8 number 9?

9            MR. TOM:  And I want to
10           introduce this as the next exhibit,
11           which I believe is Exhibit 6.
12           (Technical discussion.)
13           (Exhibit 6 was marked for
14           identification.)

15 BY MR. TOM:

16     Q.    So do you recognize Exhibit 6,
17 Ms. Carwyle?

18     A.    I do.

19     Q.    What is it?

20     A.    It's an email between myself and
21 Jenn Petermann.

22     Q.    And Ms. Petermann wants to use --
23 or wants to hold a fund-raiser, photos with
24 Santa event, right?

---

Page 63

LISA CARWYLE

1      A.    Right.

2      Q.    And why did you deny this permit?

3      A.    Because she requested it, I
4 believe, what, three, four days in advance, and
5 we require 30-day notice.

6      Q.    So was it under your discretion
7 whether to waive that 30-day notice
8 requirement?

9      A.    Yes.

10     Q.    So why did you not exercise that
11 discretion here?

12     A.    Because I believe that's an event
13 that she could have prepared for and told us,
14 you know, ahead of time, you know.  I try to --
15 I try to always, you know, adhere to the policy
16 requirements.  And it's -- since it says 30
17 days, I would require them to be -- to have it
18 30 days prior.

19     Q.    What criteria would you use when
20 determining whether to waive the 30-day
21 requirement?

22     A.    If it was something related to, you
23 know, somebody's First Amendment right for free
24 speech regarding, like, with the George Floyd

---

Page 64

LISA CARWYLE

1 events, people had the immediate need, desire,
2 to protest, then we -- then I would allow that.

3      Q.    Were there any other criteria that
4 you used when determining whether to waive the
5 notice requirement?

6      A.    I think that was the only -- only
7 one, the only criteria.

8      Q.    So you just mentioned George Floyd.
9 You know, after his death in the summer of
10 2020, there were marches and assembles and
11 protests in Oxford, right?

12     A.    Right.

13     Q.    And these marches and assembles
14 and protests were about Mr. Floyd's death and
15 about the Confederate monument in the square,
16 right?

17     A.    Right.

18     Q.    Do you know if these marches and
19 assembles and protests were about anything
20 else?

21     A.    I mean, there were some that
22 marched for the opposite, that were, you know,
23 pro-Confederate monument.  So the other side.

24     Q.    Were there any other reasons that

---

Page 65

LISA CARWYLE

1 these marches and assembles and protests
2 happened in the summer of 2020?

3      A.    I mean, I'm not sure.  I don't
4 always, you know, know what all the reasons
5 are, but that was the main reason that there
6 were protests, that I know of.

7      Q.    And so some of these marches and
8 assembles and protests were directed at the
9 Lafayette County Board of Supervisors, right?

10     A.    Right.

11     Q.    And these were directed at the
12 Lafayette County Board of Supervisors about the
13 Confederate statue in the square, right?

14     A.    Right.

15     Q.    How many marches, assembles, or
16 protests were directed at the board of
17 supervisors over the Confederate monument in
18 the summer of 2020?

19     A.    I don't have a number.  There were
20 many that were done without a permit.  You
21 know, if they -- if they continue moving and
22 aren't just standing and possibly blocking
23 traffic, they were not required to get a
24 permit.

Page 66

LISA CARWYLE

2      Q.      How long did the marches,
3  assemblies, and protests persist in Oxford in
4  the summer of 2020?
5      A.      I mean, months.  I don't know
6  the -- I don't really feel like it has stopped.
7      Q.      So you think that the marches,
8  assemblies, or protests are still occurring in
9  Oxford?
10     A.      I don't know that I've seen any in
11  the last couple of weeks -- or maybe two weeks
12  to a month, but I'm not always outside where
13  they're occurring.
14     Q.      So since the death of George Floyd
15  to the present, how many marches, assemblies,
16  or protests would you say there have been in
17  Oxford?
18     A.      I do not know how many.
19     Q.      Is it more than 20?
20     A.      Well, I don't -- I'm not always
21  here to see them.  You know, my office -- I
22  don't overlook that area.  I don't spend my
23  time on the weekends on the square.  But when I
24  have come through, most of the time, for
25  months, there would be somebody there marching,

Page 67

LISA CARWYLE

2  walking, with signs.
3      Q.      Who would those signs say?
4      A.      "Black Lives Matter."
5      Q.      Anything else?
6      A.      I don't know anything else.
7      Q.      Some of the signs were in favor of
8  the Confederate monument?
9      A.      At times.  The majority of the ones
10  were against, but, at times, there were some
11  that were in favor, yes.
12     Q.      Did you see any Confederate flags?
13     A.      Maybe once or twice.
14     Q.      And some of these marches,
15  assemblies, and protests since the death of
16  George Floyd took place in the square, right?
17     A.      Right.
18     Q.      And how many would you estimate
19  took place in the square?
20     A.      Well, that's the same ones I was
21  just talking about.  I would not be able to
22  estimate a number.
23     Q.      Some of the marches, assemblies,
24  and protests took place on the county
25  courthouse grounds, right?

Page 68

LISA CARWYLE

2      A.      Right.
3      Q.      And some of these marches,
4  assemblies, and protests took place on the
5  county courthouse grounds at night, right?
6      A.      I think there were a few, yes.
7      Q.      How many?
8      A.      Are you asking how many were
9  permitted or how many occurred without a
10  permit?
11     Q.      How many occurred with -- in total?
12     A.      I do not know.
13     Q.      How many occurred with a permit?
14     A.      At night?
15     Q.      Yes.
16     A.      I don't know of any we gave at
17  night, except I know, in June, I think, there
18  was a vigil for Anthony Hervey, if you want to
19  say that's an assembly, you know, for him in
20  his -- in his memory.
21     Q.      How many people were at that vigil?
22     A.      I don't know.
23     Q.      Did they apply for a permit?
24     A.      They did.
25     Q.      How many people did they put on the

Page 69

LISA CARWYLE

2  permit?
3      A.      I know -- I know it was less than
4  50, because they weren't required to get
5  liability.  I'd have to look at the permit to
6  know what they put on there.
7      Q.      And what was the feeling in
8  Lafayette County -- or strike that.
9          Did you discuss these marches,
10  assemblies, and protests with the Lafayette
11  County Board of Supervisors?
12     A.      We would discuss it with the
13  sheriff in regards to maintaining a safe
14  environment and security issues and concerns
15  regarding the traffic pattern around the
16  courthouse and how dangerous that can be
17  under -- in those lines.
18     Q.      What else did y'all discuss?
19     A.      About the assemblies and -- you
20  need -- I don't understand your question.
21     Q.      So -- well, let's back up.
22          When you said that you had
23  discussed the traffic patterns and, you know,
24  other things with the sheriff, who was present
25  at those discussions?

Page 70

LISA CARWYLE

2      A.      It would be discussed in executive
3  session at board meetings, because it had to do
4  with public safety.  And so the board of
5  supervisors would be here and the sheriff and
6  myself.
7      Q.      And was there anybody else there?
8      A.      I mean, different meetings would be
9  different ones.  Usually, the county attorney
10  would definitely be there; the chancery clerk,
11  who takes the minutes.
12      Q.      And so at these, you know,
13  executive sessions, how many times -- or
14  scratch that.
15      How many times did the board
16  discuss the marches, assemblies, and protests
17  after the death of George Floyd?
18      A.      I don't know.  I would guess -- I
19  mean, I don't -- I don't really know.  I mean,
20  probably at least five or six.
21      Q.      And how often does the board meet?
22      A.      They meet twice a month.
23      Q.      What was the feeling, you know, at
24  these meetings about the marches, assemblies,
25  and protests?

Page 71

LISA CARWYLE

2      A.      The feeling was there was concern
3  for safety for the people that attend, for
4  possible -- the other side showing up and there
5  being conflict.  There was concern about safety
6  for the general public who was on the square
7  for other reasons, who was maybe driving around
8  the square, for the traffic issues that could
9  be involved around -- with a large assembly
10  around the courthouse grounds.
11      Q.      Were all of these marches and
12  assemblies and protests taxing on the board?
13      MR. O'DONNELL:  Object to
14      form.
15      A.      I mean, they were concerned
16  about -- of course, it was taxing.  You always
17  want to keep your citizens safe.  So it was
18  concerning, because they wanted to make sure
19  they were able -- that the sheriff's department
20  was able to keep them safe.  Nobody wants some
21  type of -- you know, a what-if situation if
22  things got out of control.
23      Q.      Sure.  Do you think the board felt
24  under siege from the public with all of these
25  protests, assemblies, and protests after George

Page 72

LISA CARWYLE

2  Floyd's death?
3      MR. O'DONNELL:  Object to
4      form.
5      A.      I don't know what they thought
6  about that.
7      Q.      How did you feel?
8      A.      I felt like there was conflict in
9  the public, because you had, you know, people
10  on both sides of, like, the Confederate statue
11  issue.  And I don't like conflict, so it was,
12  you know -- I don't know how I felt, just --
13  except there was a lot of conflict going on.
14      Q.      Now, did you want these -- you
15  know, all of these marches and assemblies and
16  protests to end?
17      A.      I mean, obviously, that would make
18  my job easier, for them to end, but that was
19  not for me to decide.  Everybody has a right to
20  protest and assembly -- and assemble.
21      Q.      But your own feeling, did you want
22  them to end?
23      MR. O'DONNELL:  I didn't -- I
24      didn't catch that, Josh.  What did
25      you say?

Page 73

LISA CARWYLE

2  BY MR. TOM:
3      Q.      I said, For your own feeling, did
4  you want the marches and assemblies and
5  protests to end?
6      A.      Yes.  I wanted them to end for the
7  safety of everybody.
8      Q.      Did the board want the marches and
9  assemblies and protests to end?
10      A.      I couldn't answer what they wanted.
11      Q.      Did you talk to anyone on the board
12  about whether they wanted the marches and
13  assemblies and protests to end?
14      A.      No.
15      Q.      Did you ever talk to Sheriff East
16  about him wanting the protests and marches and
17  assemblies to end?
18      A.      No.
19      Q.      Were there any discussions at
20  county board meetings or otherwise -- or
21  scratch that.
22      Were there any discussions with the
23  board of supervisors or the sheriff about how
24  to end the marches and protests?
25      A.      I don't remem- -- remember any

LISA CARWYLE

1               LISA CARWYLE
2 discussion about how to end it.  It was, you
3 know, how to work with the groups that were
4 coming, how to keep everybody safe.
5     Q.    So tell me -- and all of these were
6 discussions at board meetings?
7     A.    Yes.
8     Q.    Did you have any discussions about
9 how to keep everyone safe outside of board
10 meetings?
11     A.    I probably did with the sheriff.
12     Q.    When were those discussions?
13     A.    I couldn't tell you a date and
14 time.
15     Q.    Were those discussions in relation
16 to granting permits?
17     A.    Yes.
18     Q.    Were those discussions -- did you
19 have those discussions with the sheriff outside
20 of the permit policy?
21     A.    Like, without -- I mean, it was
22 always in reference to permits.  I guess I
23 don't understand what you mean, "outside of the
24 permit policy."
25     Q.    The only times you talked to the

1               LISA CARWYLE
2 sheriff about safety during -- you know, after
3 the death of George Floyd, was when you were
4 talking to him about a permit; is that right?
5     A.    It was always in relation to a
6 permit, yes.  I mean, the permits were the
7 reasons we were concerned about safety, you
8 know.
9     Q.    Did you receive any complaints from
10 business owners about the marches, assemblies,
11 and protests?
12     A.    I don't -- I don't think I received
13 complaints from business owners.  I don't think
14 so.
15     Q.    Do you know if the board received
16 any complaints from business owners?
17     A.    I don't know.
18     Q.    Did you receive any complaints from
19 individuals about the marches and assemblies
20 and protests after George Floyd's death?
21     A.    Yes.  I know our office -- I did
22 not personally always take the call, but I know
23 they were just general public -- again, from
24 both sides -- that didn't want the ones that
25 were up there for the statue or the ones that

1               LISA CARWYLE
2 were against; they would call and complain.
3     Q.    How many such calls do you estimate
4 there were?
5     A.    I mean, I would guess less than 20.
6     Q.    So will you go to document -- I
7 guess it's number 10, which I'll introduce as
8 Exhibit 7.
9             (Exhibit 7 was marked for
10                 identification.)
11     A.    Okay.
12     Q.    Do you recognize this document?
13     A.    Yes.
14     Q.    What is it?
15     A.    It's an order from the board
16 minutes for June 15th of 2020.
17     Q.    And this June 15th, 2020, order
18 amends the facility use policy as it applies
19 only to the county courthouse grounds, right?
20     A.    Yes.
21     Q.    It requires a permit for any group
22 of five or more people, right?
23     A.    Right.
24     Q.    Why was that amendment made?
25     A.    Why was that?  What did you --

1               LISA CARWYLE
2     Q.    Why was this five-person amendment
3 made?
4     A.    If you have more than four people
5 around the statue, you -- you have to be in the
6 street, in a crosswalk, which is not a safe
7 environment.  So this was to clarify to people
8 and make them understand that if you had five
9 or more, you needed to get a permit.  If you
10 have less, you could also get a permit and have
11 exclusive rights to that area for that
12 permitted time.
13     Q.    So -- but the -- this policy
14 applies to the entire courthouse grounds,
15 right, and only part of that is where the
16 statue is?
17     A.    Right.
18     Q.    So what if someone wanted to hold
19 an event in another section of the courthouse
20 grounds?  Would that same size limit concern
21 exist?
22     A.    The policy -- the order was to --
23 whether it was the grounds or the statue, if
24 you had five or more, you needed a permit.
25     Q.    Why was five people selected as the

Page 78

LISA CARWYLE

1  limit?
2      A.      I think I just answered that, but I
3  can answer it again, if you'd like.
4      Q.      So it was exclusively -- you chose
5  five people -- or the County selected five
6  people as the limit exclusively because of
7  concerns of people around the Confederate
8  monument; is that right?
9      A.      For the safety of the people who
10  would be there that get the permit, for the
11  safety of pedestrians who are crossing all
12  around those crosswalks, and the traffic
13  pattern there, yes.  It's a very dangerous
14  traffic pattern.  You've got vehicles coming at
15  three different directions who often don't know
16  how to drive around the square and yield
17  correctly.
18      Q.      So the -- the county courthouse
19  grounds has four -- at least four areas where
20  people can congregate, right?  Because there's
21  four sides of the courthouse; isn't that right?
22      A.      There are four sides; that's right.
23      Q.      And people can congregate on any
24  one of those sides, right?
25

Page 79

LISA CARWYLE

1
2      A.      They could.  We only issue one
3  permit for the grounds.
4      Q.      But if you issued a permit, they
5  could decide to be on any side, right?
6      A.      Right.
7      Q.      And when you said that five people
8  would create these safety concerns around the
9  Confederate monument, would five people create
10  safety concerns on the other side of the county
11  courthouse -- other sides?
12      A.      Possibly.
13      Q.      Is that why the five people were
14  chosen, because on any side, there were the
15  same concerns?
16      A.      When you get the permit, you're --
17  you're getting it for all the area, including
18  the statue.  So you don't get the permit and
19  are told, You've got to stay on the north side.
20  So the concern is, the more people you get
21  around that statue, it's dangerous to them;
22  it's dangerous to pedestrians; it's dangerous
23  to the traffic going around the square.  So
24  that's why it was decided to do five or more
25  needed to have a permit.

Page 80

LISA CARWYLE

1
2      Q.      So if five people were on the
3  county courthouse grounds, is your testimony
4  that that creates concerns for traffic safety?
5      A.      It could.
6      Q.      And how is that?
7      A.      Well, depending on what they are
8  doing there, how many more than five, it could
9  be a distraction for traffic.
10      Q.      But this -- this policy applies for
11  five or more people.  So if a group only has
12  five people, they have to get a permit under
13  this policy, right?
14      A.      That's right.
15      Q.      And so a group of five people, what
16  a kind of traffic concerns do they pose if
17  they're using the county courthouse grounds?
18      A.      It could -- whatever they are doing
19  there could be distracting to the people
20  driving the vehicles.  The safety concern could
21  also be for themselves, based on if -- that's
22  why we need to know they are coming.  That's
23  the reason for the permit, so we can be
24  prepared -- prepared to protect them, if
25  needed.

Page 81

LISA CARWYLE

1
2      Q.      Now, was this June 15th, 2020,
3  amendment made in response to the protests
4  happening that summer?
5      A.      Yes.  I believe so.
6      Q.      Were there any other reasons that
7  this amendment was made?
8      A.      Just to make it clear so people
9  understood when they needed to have a permit
10  and when they did not, because we were
11  getting -- more people were showing up to
12  protest, to use that area, and we wanted to
13  make it clear what was needed from them, what
14  was required at what point.
15      Q.      So the June 2020 amendment says
16  that 30 days' notice is required to get a
17  permit, except in, quote, unusual
18  circumstances.  And the board of supervisors
19  and/or sheriff shall determine whether to waive
20  the 30-day period.
21      Is that right?
22      A.      That's what the order says, yes.
23      Q.      What are "unusual circumstances"?
24      A.      It's like what I mentioned before,
25  you know, people had the right, that if they

Page 82

LISA CARWYLE

1      had strong feelings about the George Floyd
2      incident, to come and protest.  We felt like we
3      needed to waive the 30-day period in those
4      circumstances.
5          Q.     What criteria are used to determine
6      unusual circumstances?
7          A.     Pretty much what was happening in
8      the country and the nation, in our city, and
9      people's need -- they felt the need to protest.
10         Q.     But for purposes of determining
11     whether to waive the 30-day period, what
12     criteria were used?
13         A.     I believe that was the only --
14     those type incidences were the only time it was
15     waived.  So that was the criteria I was using.
16         Q.     And whose decision was it whether
17     to waive the 30-day period or not?
18         A.     It was my decision, and I would
19     consult with the sheriff to make sure that he
20     could have the manpower he needed available
21     during that time, you know.  So if they asked
22     three days ahead of time, is that enough time
23     for you to get who you need here?  And so under
24     his consultation, then I would waive it or not.

Page 83

LISA CARWYLE

1          Q.     Who has the final say about whether
2      to waive the notice requirement?
3          A.     I have the final say.  If anybody
4      did not like my decision, they could always
5      appeal it to the board of supervisors for --
6      during one of their board meetings.
7          Q.     So the June 2020 order says that
8      the board of supervisors and/or the sheriff
9      shall determine whether to waive the 30-day
10     period.  But you're saying that you have the
11     authority whether to waive it.  How do you
12     explain that difference?
13         A.     Well, I work under the board of
14     supervisors.  They set policy, and I'm here to
15     do the day-to-day operations, carry through on
16     those policymaking decisions.  So based on
17     that, then I'm the one that can determine to
18     waive or not waive the 30-day.
19         Q.     Did the board delegate to you their
20     authority to waive this notice requirement?
21         A.     By Mississippi law, they do, yes.
22     I mean, they're not here on a day-to-day basis
23     to carry through with any kind of act like
24     that.

Page 84

LISA CARWYLE

1          Q.     Now, when this June 2020 policy was
2      in effect, did the board ever get involved in
3      whether to waive the notice requirement?
4          A.     No.
5          Q.     So after this June 2020 policy
6      amendment was made, did the process for
7      administering permits change at all?
8          A.     Not really.  I don't know that
9      they -- the process changed.  I mean, I was --
10     obviously, we were getting more of them.  I
11     was, you know, more aware of the timeliness of
12     it, you know, to get with the sheriff.  And
13     people were bringing permits and requesting to
14     be approved within three days.  So I -- I spent
15     more of my time with them, probably, than I did
16     in the past.
17         Q.     But the process stayed the same?
18         A.     I can't think of a -- of a change
19     right now, no.
20         Q.     Did any of the decision makers
21     change?
22         A.     No.
23         Q.     Did the sheriff's role change?
24         A.     No.  I mean, again, back starting

Page 85

LISA CARWYLE

1      more in March of '19 is when the sheriff more
2      routinely was brought in to be aware of what
3      permits were coming up.
4          Q.     So when you were implementing the
5      June 2020 version of the policy, is it fair to
6      say that you ran the permit process in
7      consultation with the sheriff, who would opine
8      on security and public-safety issues?
9          A.     Right.  And if there was any other
10     conflicting -- if the City had any conflicting
11     permits at the same time, which goes hand in
12     hand with the safety and security issues.
13         Q.     Were -- were there any other parts
14     of the process besides that?
15         A.     No.
16         Q.     So even though the June 2020
17     amendment explicitly gives the board of
18     supervisors a role in determining whether to
19     waive the 30-day notice period, you're saying
20     that, in practice, they didn't actually do
21     anything with the permit process after --
22         A.     No.  That was -- that was for me to
23     do.
24         Q.     Why was this language giving the

Page 86

LISA CARWYLE

1    board of supervisors and/or the sheriff the
2    authority to waive the 30-day period put into
3    this order?
4         A.    I don't know.
5         Q.    Was it at the -- did one of the
6    supervisors suggest it, or did the sheriff
7    suggest it?
8         A.    I don't remember.  I don't remember
9    if it was just that they knew that that
10   really -- that meant that I would, you know, be
11   implementing the policy for them.  I'm not
12   sure.
13        Q.    So after this -- this June '20
14   amendment was made, did you discuss with the
15   board how the permitting policy would change?
16   I mean, strike that.
17        After the June 2020 order was
18   implemented, did you discuss with the board how
19   the permitting process would change?
20        A.    Well, I don't think so, because I
21   don't really think we changed anything in the
22   process.  I still checked with the sheriff,
23   like I had been before.
24        Q.    So was it -- was it your discretion
25

Page 87

LISA CARWYLE

1    after the June 2020 order was implemented in
2    how to process permits under the new policy?
3         A.    Yes.
4         Q.    Would you go to the document that
5    begins with number 11?
6              MR. TOM:  And we'll introduce
7         this as the next exhibit.
8              (Exhibit 8 was marked for
9              identification.)
10   BY MR. TOM:
11        Q.    Do you recognize what this document
12   is?
13        A.    I do.
14        Q.    What is it?
15        A.    It's a picture of the Confederate
16   statue in front of the courthouse.
17        Q.    And it has the -- are these -- are
18   these words "Take It Down," are they normally
19   on the statue?
20        A.    No.
21        Q.    So it looks like -- did you -- did
22   you hear about these words being projected onto
23   the Confederate statue in the summer of 2020?
24        A.    I did hear about it.
25

Page 88

LISA CARWYLE

1         Q.    Did you see this projection?
2         A.    No.
3         Q.    What were your thoughts about this
4    projection?
5         A.    I really didn't have any.
6         Q.    Did you hear any criticism about
7    this?
8         A.    I don't -- I might have -- I'm
9    trying to remember if I saw it, like, on
10   Facebook somewhere or people talking about it
11   or -- I don't really remember where I heard
12   about it, but I knew it occurred at one time.
13        Q.    Did you hear any criticism about
14   the projection?
15        A.    I'm sure there was probably some
16   critical comments and then some in favor also.
17        Q.    Did you speak with the board of
18   supervisors about this projection?
19        A.    Did I speak with the board of
20   supervisors?  No.
21        Q.    Did you speak with the sheriff or
22   anyone in the sheriff's department about this
23   projection?
24        A.    I don't remember talking to any of

Page 89

LISA CARWYLE

1    them about it.
2         Q.    Would you open up document
3    number 12, which will be our next exhibit?
4              (Exhibit 9 was marked for
5              identification.)
6    BY MR. TOM:
7         Q.    Do you recognize these documents?
8         A.    I do.
9         Q.    What are they?
10        A.    It's an email exchange between
11   myself and David O'Donnell and Joey East about
12   George Johnson's permit request.
13        Q.    And this exhibit has Bates number
14   range 274 to 281.  So on Bates number 274, you
15   say, I'll send to supervisors with that
16   recommendation and let George know.
17        Do you see that?
18        A.    Right.
19        Q.    Why did you send a recommendation
20   to the supervisors?
21        A.    Well, usual -- sometimes,
22   especially during this heated time of the
23   summer, I would let them know of a permit that
24   I was denying or granting so they would be
25

Page 90

LISA CARWYLE

1 aware of it, because somebody might call them
2 complaining or -- or they might hear about
3 people being on the -- on the courthouse lawn.
4 So I would let them know that it was happening
5 or not happening.
6     Q.    And what was their role after you
7 let them know about the permit?
8     A.    They didn't have a role.  They
9 just -- I wanted to make sure they were aware.
10 You know, supervisors don't like hearing about
11 stuff from the public, upset.  They'd rather
12 know ahead of time, so. . .
13     Q.    Why do you use the word
14 "recommendation"?
15     A.    That was just the term I used, but
16 it wasn't for their approval.  It was so they
17 were aware, because if George or any people in
18 his group were upset they were denied, I wanted
19 them to know before they got phone calls about
20 it.
21     Q.    I see.  So the supervisors still
22 had no role in the permit process; is that
23 right?
24     A.    Right.  They didn't have a role in

Page 91

LISA CARWYLE

1 approving or denying.  They might be aware that
2 there was a permit after the fact, but. . .
3     Q.    Now, go to -- let's see -- the last
4 page of this exhibit, and that has Bates
5 number 281.
6     A.    Okay.
7     Q.    So Brent Larson says -- Brent
8 Larson is a supervisor, right?
9     A.    Right.
10     Q.    And he says, Excellent job to all.
11 Thanks for the information.  Brent.
12     Do you have any idea why he said
13 that?
14     A.    Do I have any idea why he said
15 that?  He was thanking us for the information,
16 and he said, "excellent job," thanking us for
17 our work.
18     Q.    Will you go to the document that
19 begins with number 13?
20     MR. TOM:  I'll introduce this
21         as the next exhibit.
22         (Exhibit 10 was marked for
23             identification.)
24 ///

Page 92

LISA CARWYLE

1 BY MR. TOM:
2     Q.    And this document has Bates range
3 249 to 270.
4     A.    Right.
5     Q.    Do you recognize this document?
6     A.    I do.
7     Q.    What is it?
8     A.    It's a permit application for --
9 well, hang on -- an email back and forth, I
10 guess, with Joey and I for a Tim Warren to have
11 a permit.
12     Q.    Who's Tim Warren?
13     A.    A Lafayette County citizen.
14     Q.    And so look at -- compare these
15 three pages.  It's Bates numbers 250, 253, and
16 264, which are the actual permit application.
17     A.    Okay.
18     Q.    Let's look at -- let's look at
19 Bates 250.
20     A.    Uh-huh.
21     Q.    So you see at the top, where it
22 says date, just above Timmy Warren?
23     A.    Uh-huh.
24     Q.    This is blank, right?  Is that

Page 93

LISA CARWYLE

1 right?
2     A.    Yes.
3     Q.    And underneath the bottom line
4 under permit, where it says granted, denied,
5 and county administrator, that's all blank,
6 right?
7     A.    Right.
8     Q.    And so whose handwriting is this in
9 the rest of the document?
10     A.    I'm sorry.  We're on 250?
11     Q.    Yes.
12     A.    I guess it's whoever filled out the
13 permit.
14     Q.    So this is not your handwriting?
15     A.    No.
16     Q.    Okay.  So let's go to Exhibit Two-
17 fifty-- Bates number 253.  This is also the
18 same permit from Timmy Warren.  But now, if you
19 look at the bottom, it says, Permit has been
20 granted; there's someone's signature, and then
21 it says, 6/17/20, per Sheriff East.
22     Do you see that?
23     A.    Right.
24     Q.    Whose signature is this?

LISA CARWYLE

1
2   A.      That's my signature.
3   Q.      And who wrote the date and "per
4   Sheriff East"?
5   A.      I did.
6   Q.      What does that -- what does this
7   mean, "per Sheriff East"?
8   A.      It means I had checked with him to
9   make sure that he could handle -- he thought he
10  could handle, for safety and security purposes,
11  this group coming on the 19th.
12  Q.      And what does the date, 6/17/20,
13  signify?
14  A.      I think that was the day I wrote
15  it, I assume.
16  Q.      Go to the page that's Bates number
17  264.  So now look at the top of this one.  It
18  says, Date, 6/17/20.
19      Do you see that?
20  A.      Yes.
21  Q.      And then at the bottom, it also
22  says 6/17/20, but there's no "per
23  Sheriff East."
24      Do you see that?
25  A.      Yeah.

LISA CARWYLE

1
2   Q.      So why is this -- why are all of
3   these three documents different?
4   A.      I do not know.
5   Q.      Who -- who filled in 6/17/20 at the
6   top?
7   A.      I don't -- I don't know.  I don't
8   remember it being different, so I couldn't tell
9   you.
10  Q.      Go back to Bates 253.  Bates 253
11  has already been approved by you, granted, your
12  signature, per Sheriff East, 6/17/20 at the
13  bottom.  But at the top, there's no date.
14  A.      Okay.
15  Q.      If you go to 264, it's also been
16  approved, but there is a date --
17  A.      Okay.
18  Q.      -- at the top.
19      Who wrote the date?
20  A.      I do not know.
21  Q.      What does this date signify at the
22  top --
23  A.      It's --
24  Q.      -- 6/17/20?
25  A.      It's usually when the person came

LISA CARWYLE

1
2   in and filled it out.  I might have put it
3   there because they brought it that day, but
4   I -- I don't remember.
5   Q.      So this person applied for a permit
6   on 6/17/20, and the event to be held was on
7   6/19/20, right?
8   A.      I believe so.
9   Q.      So whose decision was it to waive
10  the 30-day notice requirement here?
11  A.      That would be my decision, based on
12  consulting with Sheriff East, like I said
13  before, that he could handle the event for
14  safety and security issues.
15  Q.      Why did you waive the 30-day notice
16  requirement here?
17  A.      Because the same reason I waived
18  them for any other permitted -- during that
19  time, was because of the George Floyd issue.
20  There was a lot of public outcry, need to
21  protest and assemble.  And so we allowed it.
22  Q.      So is it -- is it -- just to
23  clarify, if the permit was for a protest about
24  George Floyd, you would waive the notice
25  requirement?

LISA CARWYLE

1
2   A.      No.
3   Q.      So tell me -- tell me exactly why
4   you would --
5       (Simultaneous speakers.)
6   A.      In reaction to George -- the George
7   Floyd issue, we had a lot of people coming out,
8   you know, that spilled over into "take the
9   statue down," and we did not feel like it was
10  good practice to deny them that; that that
11  sometimes maybe would cause more issues to be
12  told you could not.  So we waived the 30 -- I
13  waived the 30-day notice so they could.
14      But in response to that, when
15  you've got people who are protesting for it to
16  be taken down, that, then, ensues the other
17  side to feel like they have the First Amendment
18  right to come and protest to leave it.  So this
19  was not -- I mean, he did -- the way I
20  understood it, he was not here in support of
21  the statue being taken down.  He was organizing
22  in support of it staying.
23  Q.      So what criteria were you using to
24  determine whether to waive the notice
25  requirement?

Page 98

LISA CARWYLE

2  A.    I think I just answered that.

3  Q.    So if it -- if it had to do with a
protest, whether for or against the statue, or
a protest about George Floyd, you would waive
it, but, otherwise, you would not.  Is that
what you're saying?

8       MR. O'DONNELL:  Object to
9  form.

10 A.    I believe all of them that -- yes,
that were waived during that time had to do
with one or the other.

13 Q.    One or the other what?

14 A.    For or against the statue or George
Floyd.

16 Q.    Were there any other events that
you waived the notice requirement that were not
about the statue or about George Floyd?

19 A.    I do not believe so.

20 Q.    So all of the permits that you
waived were for events that had to do with the
statue or George Floyd?

23 A.    From my recollection, yes; that is
right.

25 Q.    But that was solely under your

Page 99

LISA CARWYLE

2  discretion to do that in consultation with
Sheriff East?

4  A.    Yes.

5  Q.    So go to, in this same exhibit,
Bates number 265.  And this is an email from
you to supervisors -- or it just says
Supervisor, Joey East, and David O'Donnell,
dated June 18, 2020, at 3:31 p.m.

10 So in the second paragraph, you
say, Joey and I think we should probably --
scratch that.

13 Joey and I think we probably should
revisit a couple of issues about the policy
tomorrow after -- at the end of our budget
sessions.

17 Right?

18 A.    Right.

19 Q.    What issues were those?

20 A.    The issues that I think I talked
about above as far as that -- well, hang on.
Let me read them.

23 Oh.  I think just the concern of
the safety issues, the security issues,
surrounding this number of people coming and

Page 100

LISA CARWYLE

2  whether -- I don't know, other than that.  I
mean, I know it was all about safety and
security.  Joey was very concerned about
opposing groups trying to show up at the same
time and there being conflict.

7  Q.    What decisions were made regarding
those issues?

9  A.    Well, eventually, it -- the
decision was made to, A, put a curfew on the
use of the grounds, because it was harder --
much harder for them to police that and
guarantee a secure environment when it's dark
outside.  That's the main thing I remember.

15 Q.    Were there other things?

16 A.    I can't think of any right now.

17 Q.    And so when you say that you should
revisit a couple of issues at the -- a couple
of issues tomorrow, did you discuss, on that
date, the curfew?

21 A.    I can't tell you for sure that we
did, but I know it was discussed a number of
times before they voted in July.  So probably.

24       THE VIDEOGRAPHER:  So,
25 Mr. Tom, excuse me.  Within the

Page 101

LISA CARWYLE

2  next 10 minutes, I'll need to
change media.

4        MR. TOM:  Okay.  We can go
ahead and do that now.

6        And, Greta, can you remind me
what exhibit we're on?

8        MR. O'DONNELL:  Me too.  I'm
keeping track of that.

10       THE VIDEOGRAPHER:  So we'll
go off record first.  We're going
off the record.  The time is 11:34.

13       (Recess from 11:34 a.m. to
14        11:43 a.m.)

15       THE VIDEOGRAPHER:  We're back
on record.  The time is 11:43.

17 BY MR. TOM:

18 Q.    So, Ms. Carwyle, let's go back to
Exhibit 10 and look at the page that has Bates
number 269 on it.  Do you see that?

21 A.    Well, is that the order to amend
the facility use on June 15th?

23 Q.    No.  It's -- should be an email
from you to Jack Williams.

25 A.    I'm sorry.  You said Exhibit 10,

LISA CARWYLE

1           LISA CARWYLE
2  but I'm looking at document numbers.  So is it
3  document number 12?
4              MR. O'DONNELL:  13.
5  BY MR. TOM:
6      Q.    It's -- it's the -- it's the
7  document that begins with 13.
8      A.    Okay.  Sorry.
9      Q.    Yeah.  It's confusing.  So 13 is
10 Exhibit 10, and then on that document, we want
11 to look at the page that says 269.  And this is
12 an email from you to Jack Williams, right?
13     A.    Yes.
14     Q.    And so at the top here, you say,
15 FYI, this permit has been canceled.
16        What does that -- what did you mean
17 there?
18     A.    That Tim Warren that had requested
19 the permit canceled the event.
20     Q.    I see.  Do you have any idea why?
21     A.    Hearsay is that he was kind of
22 being threatened, and -- and it just -- I guess
23 he was kind of worried about it being a
24 conflict, and so he -- he said he wasn't going
25 to do it.

LISA CARWYLE

1           LISA CARWYLE
2      Q.    And who told you that?
3      A.    I believe Joey East told me that.
4      Q.    So will you go to document that
5  begins with number 14, which we'll introduce as
6  Exhibit 11?
7              (Exhibit 11 was marked for
8                identification.)
9  BY MR. TOM:
10     Q.    Do you recognize this document?
11     A.    Yes.
12     Q.    What is it?
13     A.    An email to David O'Donnell and
14 Joey East -- well, or from David; the last one
15 is -- about us meeting.
16     Q.    Okay.  And so go to the second page
17 of this document, which has Bates number 292 at
18 the bottom.
19     A.    Uh-huh.
20     Q.    And you say to David O'Donnell and
21 Joey East, Can we meet next week to work on
22 some revisions to the facility use policy for
23 the July 6th board meeting?
24        What revisions?
25     A.    I don't remember specifically what

LISA CARWYLE

1           LISA CARWYLE
2  all was on my mind at the time, but, again, the
3  revisions that eventually came, we were
4  concerned about the security, the safety of the
5  people who were requesting the use.  And so
6  I -- again, that's what ultimately became -- we
7  changed the policy in July, I think, 21st or
8  20th, to implement the "no use after dark" and
9  the "14-day" change.
10     Q.    Who suggested making those
11 revisions?
12     A.    Joey definitely suggested making
13 the revisions for safety and security concerns
14 he had for people having permits at night.
15     Q.    Were there any revisions that y'all
16 discussed at this meeting that were not
17 adopted?
18     A.    I don't remember.
19     Q.    So will you go to the document that
20 begins with 15, which will be Exhibit 12?
21              (Exhibit 12 was marked for
22                identification.)
23     A.    Okay.
24     Q.    So do you recognize this document?
25     A.    I do.

LISA CARWYLE

1           LISA CARWYLE
2      Q.    What -- what is it?
3      A.    It's an email from Joey East about
4  the permit application policy.
5      Q.    Now let's go to page 3 of this
6  exhibit, with the Bates number 298.
7      A.    Okay.
8      Q.    So you see these little comment
9  bubbles?
10     A.    I do.
11     Q.    And they -- they -- the first one
12 says JE1 and the second one says JE2.  Does
13 that indicate that these are Joey East's
14 comments?
15     A.    Yes.
16     Q.    So if you look at the comment JE2,
17 Mr. Joey East comments on the word "limited" in
18 the policy.  And he says -- or let's go back.
19        So the policy says, Use on weekends
20 or after 10:00 p.m. is limited and must be
21 primarily events coordinated and staffed by
22 county employees and/or officials.
23        So Joey East comments on that
24 sentence and says, It should be no later than
25 5:00 p.m. unless special request to and

LISA CARWYLE

1
2  approved by BOS.
3      Do you see that?
4      A.    I do.
5      Q.    And BOS is board of supervisors?
6      A.    Right.
7      Q.    Okay.  What does -- what does this
8  comment mean?
9      A.    He's commenting that we need to
10 address the time frame that it's allowed,
11 again, going back to him being concerned with
12 events after dark.  He said it should be no
13 later than 5:00 p.m.  He -- and then he's
14 saying, unless -- he was suggesting that, if
15 possible, we should change the policy to put in
16 there that, you know, if somebody had a special
17 request to use it after dark, that it should go
18 directly to the board of supervisors.
19     Q.    And did the board want a bigger
20 role in the permitting process?
21     A.    I don't believe so.  No.
22     Q.    Was this authority given to the
23 board in the final policy?
24     A.    No.
25     Q.    Why was it not?

LISA CARWYLE

1
2      A.    I do not know.  I guess they didn't
3  want it in there.  I don't remember it being
4  discussed with the board to -- for it -- their
5  approval to be included or not included.
6      Q.    Did this become part of your
7  practice to get approval from the board for
8  events on weekends?
9      A.    Has it become part of our practice?
10     Q.    Yes.
11     A.    No.
12     Q.    So, as of today, does the board
13 have any role in granting or denying permits
14 for use of county property?
15     A.    No.  Unless, like I said before, if
16 somebody did not like my granting or denying,
17 they could appeal it to the board of
18 supervisors.
19     Q.    And is that appeal provision
20 somewhere in the policy?
21     A.    It's not stated in the policy, but
22 that's just state law regarding any decision
23 made.  It's always available to be appealed to
24 the board of supervisors.
25     Q.    Do you have any idea why

LISA CARWYLE

1
2  Sheriff East wanted the board of supervisors to
3  have the authority whether to grant special
4  weekend use?
5      A.    I do not.
6      Q.    Did you think it was necessary for
7  the board of supervisors to have authority to
8  grant permits for weekend use?
9      A.    I don't think it's necessary, no.
10     Q.    So go to tab -- or document that
11 begins with number 16, which will be
12 Exhibit 13.
13             (Exhibit 13 was marked for
14              identification.)
15             (Court reporter
16              clarification.)
17 BY MR. TOM:
18     Q.    Do you recognize this document,
19 Ms. Carwyle?
20     A.    I do.
21     Q.    What is it?
22     A.    It's an email to Joey East, David,
23 and the supervisors about a permit application.
24     Q.    And what was this permit
25 application for?

LISA CARWYLE

1
2      A.    It was from a Deanna Jackson --
3  Jackson wanting to do, like, a prayer -- "Love
4  Your Neighbor" prayer on the courthouse lawn.
5      Q.    Do you remember what that event
6  was?
7      A.    Do I remember what it was?
8      Q.    Uh-huh.  What is -- what is Love
9  Your --
10     A.    I believe it's what I just --
11     Q.    What is --
12     A.    I'm sorry.
13     Q.    What is Love Your Neighbor and
14 Prayer?  Like, what happened at that event?
15     A.    I think they just wanted every- --
16 I'm not a hundred percent sure how it happened.
17 She mentioned, you know, people driving by and
18 maybe, I think, pulling over in a crosswalk for
19 them to pray for them and with them.
20     Q.    This -- did this have to do with
21 the monument or with George Floyd?
22     A.    It was in response to the conflict
23 of the protests that were going on, you know,
24 both sides, like I said, protesting and that
25 conflict.  In response to that, she wanted a

LISA CARWYLE

1
2  "let's all come together and pray."
3          Q.      And so this permit application was
4  made on July 1st, and she wanted either
5  July 5th or July 8th, both of which are less
6  than 30 days, right?
7          A.      Right.
8          Q.      So why did you send this permit
9  to -- or strike that.
10         You sent this permit to the
11 supervisors just as a heads-up, as you
12 mentioned before, with other permits?
13         A.      Right.  So they would be aware.
14 Uh-huh.
15         Q.      So open document that begins with
16 17, which we'll introduce as Exhibit 14.
17                 (Exhibit 14 was marked for
18                 identification.)
19 BY MR. TOM:
20         Q.      Do you recognize this document?
21         A.      Yes.  It's an email from Joey East
22 saying that there were no security threats or
23 reasons to not allow the permit.
24         Q.      And it had to do with the same
25 event as we discussed before, the Love Your

LISA CARWYLE

1
2  Neighbor and Prayer event, right?
3          A.      Right.
4          Q.      So if you look on page 5 of the
5  document, which is Bates number 315, you know,
6  you tell Deanna Jackson that July 5th was
7  approved, right?
8          A.      Right.
9          Q.      And so she applied on July 4th and
10 got approved for an event that was held on
11 July 5th?
12         A.      No.  She did not apply on July 4th.
13         Q.      No, July 1st.  I -- let me
14 rephrase.  She applied for this permit on
15 July 1st for an event on July 5th and was
16 approved, right?
17         A.      Right.
18         Q.      Why did you waive the 30-day notice
19 requirement here?
20         A.      It falls under the same criteria
21 of -- of people wanting to use their First
22 Amendment right to come out and, you know, in
23 response to protesting and everything that was
24 going on.  I just answered this before.  But
25 their desire to bring people together, love

LISA CARWYLE

1
2  your neighbor, and pray.  That's why I approved
3  it.  Just like the same reason I approved
4  people who came out to protest in support of
5  George Floyd, in support of the statue, or
6  against the statue.
7          Q.      Okay.  So does this -- does this
8  expand the reasons why you would grant a
9  permit?  Because before, you said that it was
10 for or against the statue or if it was George
11 Floyd, you would consider waiving the notice
12 requirement.
13         A.      Well, it doesn't just have to be
14 George Floyd.
15         Q.      Okay.  Explain it to me.
16         A.      Did somebody -- I thought somebody
17 else said something.
18         You know, it -- because there might
19 be another instance -- incident come up similar
20 in the future.  I mean, it's just, like I said,
21 we do not want to stand in the way of anybody's
22 right to demonstrate, to protest, for free
23 speech.
24         Q.      Okay.  So is it -- because, you
25 know, before we -- we -- I thought we had

LISA CARWYLE

1
2  nailed it down that you would, you know,
3  consider waiving the notice requirement if it
4  was for or against the statue or if it was
5  about George Floyd.
6          A.      Well, obviously, I'm not just only
7  concerned with George Floyd's death or people
8  aren't only concerned with that.  There would
9  be other times -- hopefully, it doesn't ever
10 happen again in the future, but if it did, then
11 yes.  I wouldn't just say it was only because
12 of him.
13         Q.      So what -- what are the criteria
14 that you'd use if it's not just George Floyd
15 and if it's not just the monument for
16 determining whether to waive the notice
17 requirement?
18         A.      I guess I don't have a good word
19 for it, but, it's, you know, depending on the
20 environment of what's going on in our culture
21 of their need to do that, if it's
22 time-sensitive to them.
23         Q.      And what do you mean by
24 "environment"?
25         A.      What the -- what am I trying to

LISA CARWYLE

1  say?  The mood of what -- everybody's emotions
2  of what -- and reaction to some event, like
3  George Floyd's death.
4       Q.      And how do you determine the mood?
5       A.      I do not know.
6       Q.      So do you use any criteria when
7  determining the mood?
8       A.      I mean, I guess it's based on what
9  we see here in the -- in the public, in the
10 media, and the people who are calling and
11 asking to do this.  That -- you know, I can
12 tell what the mood is when people are out
13 there, you know, wanting to protest.
14      Q.      So what else do you use besides the
15 mood to determine whether the notice
16 requirement should be waived?
17      A.      I feel like I've -- I've said it
18 500 times.  I'm trying to think of a way to say
19 it differently.
20      We do not want to prohibit people
21 from expressing themselves, from free speech
22 when there is a need, a desire, to protest in
23 response to some type of event like that.  That
24 was the criteria I used.  I cannot sit here and

LISA CARWYLE

1  foresee every possible scenario to tell you how
2  that would be analyzed or not.  I can tell you
3  what I did.
4       Q.      And did you come up with those
5  criteria yourself?
6       A.      I mean, some of it was in
7  consultation with our county attorney.
8       Q.      Did you discuss with anybody else
9  to come up with the criteria of whether to
10 waive the notice requirement?
11      A.      No, not criteria.  Again, we
12 wouldn't waive it if the sheriff could not
13 provide security for the event.  If he didn't
14 have enough manpower, didn't have enough days
15 to get that together, then I would not have
16 approved it.
17      Q.      So will you go to document that
18 begins with 18?
19          MR. TOM:  We'll do that as
20      Exhibit 15.
21          (Exhibit 15 was marked for
22           identification.)
23 BY MR. TOM:
24      Q.      Do you recognize this document?

LISA CARWYLE

1       A.      I do.
2       Q.      And what is it?
3       A.      Well, I haven't scrolled all the
4  way through it, but, first, I sent it -- it's
5  an email to Joey East and David O'Donnell and
6  the supervisors asking if they changed anything
7  as far as the number of days to issue a permit
8  at a meeting I was not present at.
9       Q.      So Exhibit 15, this involves a
10 permit for Take It Down Oxford for a peaceful
11 gathering to attend a BOS meeting, right?
12      A.      Right.
13      Q.      And it was submitted on July 14th,
14 2020, and for the meeting on -- for the event
15 to be held on July 20th, 2020, right?
16      A.      Uh-huh.  Right.
17      Q.      And this -- this permit was
18 granted, right?
19      A.      Yes.
20      Q.      Why did you decide to waive the
21 notice requirement here?
22      A.      Because there was a lot of --
23 again, this was related to the Confederate
24 statue and wanting to take it down.  So --

LISA CARWYLE

1  well, wait a minute.  This was in response to,
2  I guess, their vote to not take it down, and
3  they wanted to protest because of that.  So
4  I -- so I allowed it.
5       Q.      Go to the first page of this
6  exhibit, which has Bates number 324.  And
7  there's two emails on this page.  At the bottom
8  email, it's an email from you to Joey East and
9  David O'Donnell.  And you say, Did y'all
10 discuss at the board meeting last Monday to
11 change the requirement on the number of days to
12 issue a permit?
13      And then at the top, you say, I
14 don't know if y'all decided to change the
15 number of days required to issue a permit, but
16 I received this Tuesday right before 5:00.
17      Why did you say that?
18      A.      Because I didn't know if they had
19 made any changes to the number of days that was
20 required to issue a permit, and I was checking.
21      Q.      Why would that matter?
22      A.      Well, I wanted to know, because I
23 administer the policy, if there was a change to
24 the permit.  It obviously did not matter in

                    LISA CARWYLE
1
2  this case, but I just -- I -- those are some
3  things I'd like to know.
4      Q.    But -- so you -- you have already
5  said that you had the discretion to waive the
6  requirement or not, irregardless of what the
7  policy said, right?
8      A.    That's right.
9      Q.    So why would it matter whether they
10 changed it or not if you had that discretion?
11     A.    Well, as I implement the policy, I
12 would like to know if changes are -- were made
13 to it.
14     Q.    If a change had been made to it,
15 how would that have affected this permit?
16     A.    Well, considering they did it
17 seven -- six days in advance and it was
18 approved, then it wouldn't have changed it.
19 But I would need -- still need to know any
20 changes to our policy.
21     Q.    Were you looking for an excuse to
22 deny this permit?
23     A.    I was not, because I approved the
24 permit.
25     Q.    Well, I'm just getting to this

                    LISA CARWYLE
1
2  language about -- you know, you were inquiring
3  about whether they changed the notice
4  requirement or not and why -- why you would ask
5  that.
6      A.    I would ask that because, as county
7  administrator, I need to know of any changes to
8  the facility use policy or any other policy
9  that the board sets.
10     Q.    So remember when -- let's go back
11 to Exhibit 13, which is the document that has
12 Bates numbers 311 to 317.
13     A.    Can you tell me what document
14 number that is?
15     Q.    It begins with 17.
16     A.    Okay.
17     Q.    So this -- this permit was about
18 the Love Your Neighbor and Prayer event that
19 was applied for on July 1st for an event that
20 was held on July 5th, and it was approved. And
21 then document number 18, which is Exhibit 15,
22 was -- was applied for on July 14th for an
23 event on July 20th.
24     And so why was it that you were
25 asking about whether the notice requirement was

                    LISA CARWYLE
1
2  changed for the Take It Down board of
3  supervisors gathering but not for the Love Your
4  Neighbor event?
5      A.    Because on July 1st, I was here
6  working. July -- let me look at my
7  calendar -- 6th through the 10th, I was on
8  vacation, and I missed the board of supervisor
9  meeting on July 6th. So when I come back to
10 work, I want to know did they change anything
11 in that meeting. Love Your Neighbor was
12 applied, and that email was sent prior to me
13 being on vacation and prior to that meeting.
14     Q.    I see. So will you go to document
15 number 19, which we'll introduce as Exhibit 16?
16           (Exhibit 16 was marked for
17              identification.)
18 BY MR. TOM:
19     Q.    Do you recognize this one?
20     A.    I do.
21     Q.    What is it?
22     A.    It's a board order revising the
23 facility use policy on July 20th, 2020.
24     Q.    And this order reduces the
25 advance-notice requirement to 14 days from 30,

                    LISA CARWYLE
1
2  and also imposed a curfew on the county
3  courthouse grounds, right?
4      A.    Right.
5      Q.    Why were these changes made?
6      A.    The curfew was made based on
7  Sheriff East's recommendation and concern about
8  safety issues of events happening up there
9  after dark. I believe the 14 days was we were
10 concerned that 30 days was too many, and so
11 we -- they changed -- voted to change it to 14.
12     Q.    30 days was too many for -- why was
13 30 days too many?
14     A.    I think they believed it was too
15 many for the applicant to have to comply with,
16 so they changed it to 14 days.
17     Q.    Who thought that?
18     A.    I couldn't tell you specifically
19 who thought that. I know the sheriff thought
20 he could, you know, deal with a 14-day time
21 frame, and so it was changed.
22     Q.    So are the courthouse grounds
23 dangerous at night?
24     A.    I believe it -- I believe it is
25 more dangerous to have an event there at night.

LISA CARWYLE

1              LISA CARWYLE
2     Q.    Why is that?
3     A.    It's not lit well at all.  It's
4  very poorly lit.  It's more like ornamental
5  lighting.  And, of course, when it's dark, for
6  the people driving around the square, it's more
7  dangerous for them because their line of vision
8  is not as well as it would be during the day.
9  And so it's dangerous for people who are using
10 that area and possibly spilling out into the
11 street.  It's also more dangerous, if you were
12 to have some type of conflicting groups there,
13 for the sheriff's department to be able to
14 handle a situation like that.
15    Q.    And are there specific incidents
16 that happened?  Let me rephrase that.
17     Are there specific incidents about
18 those safety concerns on the courthouse
19 grounds?
20    A.    I mean, obviously, there's, you
21 know, security/safety concerns around the whole
22 square.  But I know -- I think a candlelight
23 vigil was done, I think, in June, and I think
24 Sheriff East -- it brought it to his attention
25 more that a circumstance like that could

1              LISA CARWYLE
2  escalate into a bigger issue, problems.
3     Q.    Do you have a -- do you have any
4  idea why that was?
5     A.    Do I have any idea why he felt like
6  that?
7     Q.    Uh-uh.
8     A.    I think -- I believe he told me
9  this.  I don't -- that there were some -- the
10 candlelight vigil were people there in
11 support -- I guess you would say in support of
12 the statue, because they were there for that
13 Anthony Hervey that had passed away.  And I
14 think maybe people coming by and yelling at
15 them and, you know, some conflict.  Maybe
16 people came up to them.  I don't know.  But he
17 was concerned about security issues when it was
18 dark.
19    Q.    So before this amendment was
20 adopted in July of 2020, has a curfew ever been
21 placed on the county courthouse grounds, to
22 your knowledge?
23    A.    I don't know of a curfew formally
24 being placed, but it had been discussed for a
25 while prior to this being adopted.

1              LISA CARWYLE
2     Q.    When was it first discussed?
3     A.    I couldn't tell you an exact date.
4  But definitely for at least a couple of months
5  before that, before it was adopted.  And then,
6  really, the big difference was having a new
7  sheriff who, I think, looked at things probably
8  a little bit differently, was more -- just
9  wanted to be more proactive to keep something
10 bad from happening, than just reacting to and
11 making changes after there was some event.
12    Q.    So the first time you've ever heard
13 of a curfew being discussed was when Joey East
14 became the sheriff?
15    A.    Yes.
16    Q.    And when did he become sheriff?
17    A.    First of January of 2020.
18    Q.    Had you ever heard of a curfew
19 being discussed by anyone before that?
20    A.    I don't remember any.
21    Q.    Has a curfew ever been placed on
22 any county property before July 2020?
23    A.    I -- I don't know.
24    Q.    Was a curfew considered when the
25 facility use policy was amended on March 4th,

1              LISA CARWYLE
2  2019?
3     A.    I can't say that it was, but I
4  definitely can't say that it wasn't.  I
5  don't -- you know, I just don't have a good
6  timeline of exactly when all that was
7  discussed.
8     Q.    You said, though, that the first
9  time you'd ever heard of any curfew was when
10 Joey East became sheriff in January of 2020,
11 right?
12    A.    That's my recollection, yes.
13    Q.    So did the County consider other
14 options besides a curfew?
15          MR. O'DONNELL:  Object to
16     form.
17    A.    I mean, I guess this goes in line
18 with the curfew, but when we talked about, at
19 the time, maybe we should put gates up, you
20 know, when it's closed.  Obviously, the main
21 purpose of the courthouse is for the courthouse
22 itself to function as county government.  And
23 so we had talked about when that closed, you
24 know, at 5:00, to possibly put gates up.  But
25 that goes in line with the curfew.

Page 126

LISA CARWYLE

1
2      Q.      Did the County try any other
3  options besides the curfew in order to achieve
4  its public safety goals?
5      A.      I mean, obviously -- and that --
6  that'd probably be a better question for the
7  sheriff.  I mean, he's always trying to look at
8  options and -- and ways to make it safer.
9      Q.      So, to your knowledge, did the
10  County do anything to ensure public safety on
11  the county courthouse grounds, besides
12  implementing the curfew and discussing putting
13  up gates?
14     A.      Well, when -- I guess when you say
15  "did we do anything," I mean, obviously, like,
16  through this whole process, that was one of the
17  reasons we made sure we included Sheriff East
18  in the -- in the process, because we -- for the
19  safety.  That's something else we did to ensure
20  the public safety, is to make sure he was aware
21  of the events and could handle them.
22     Q.      Did the board consider other
23  options besides a curfew and putting up gates
24  around the county courthouse grounds in order
25  to ensure public safety?

Page 127

LISA CARWYLE

1
2      A.      I don't know.  I don't remember.
3  I'm feeling like I'm forgetting something, but
4  I don't remember.
5      Q.      Did you consider any other options,
6  besides a curfew and putting up gates, in order
7  to ensure public safety at the county
8  courthouse grounds?
9      A.      Did I consider?  Is that what you
10  said?
11     Q.      Yeah.
12     A.      I don't remember.
13     Q.      Is a curfew necessary to ensure
14  public safety on the county courthouse grounds?
15     A.      I think the curfew will definitely
16  help ensure public safety on the courthouse
17  grounds after dark.
18     Q.      Is it necessary to ensure public
19  safety?
20     A.      I believe it is.
21     Q.      Why do you say that?
22     A.      Based on the information that I've
23  heard Sheriff East discuss, I believe so.
24     Q.      So we discussed before how the
25  square is active at night, including, you know,

Page 128

LISA CARWYLE

1
2  use of the courthouse grounds, you know, for at
3  least several years before you became the
4  county administrator, right?
5                  MR. O'DONNELL:  Object to
6          form.
7      A.  Yeah.  I'm --
8                  MR. O'DONNELL:  She
9          doesn't --
10     A.      What's your question?
11     Q.      People used the square at night for
12  many years, right?
13     A.      Yes.  They've used parts of the
14  square at night for many years.
15     Q.      Including the county courthouse
16  grounds, right?
17     A.      I rarely see people at night on the
18  courthouse grounds.
19     Q.      But regardless of what you've seen,
20  the people -- you know, not just because, you
21  know, you've seen it, but is it your
22  understanding that people use the square,
23  including the courthouse grounds, at night, and
24  that's happened for many years?
25     A.      I mean, yes, they do.  But if you

Page 129

LISA CARWYLE

1
2  were to ride around the square at night, you're
3  going to see, you know, a lot more people using
4  the square outside of the courthouse grounds
5  than you will ever see on the courthouse
6  grounds.
7      Q.      During that -- during all of these
8  times -- strike that.
9       Is the curfew being enforced?
10     A.      It is.
11     Q.      Who enforces it?
12     A.      I mean, I've enforced it with
13  people requesting permits for that time.
14     Q.      Who else enforces it?
15     A.      That's how I know it's being
16  enforced, is, like I said, I mean, we've had
17  other permit requests that would maybe spill
18  over into nighttime that I have had to tell
19  them they could -- the permit would be granted
20  if they adjusted their time frame.
21      We are -- I've actually got the
22  director of building services looking at
23  getting some signs made.  And like I think I
24  already mentioned, I'm not sure about the
25  gates, but we're getting some -- got some

Page 130

LISA CARWYLE

1  quotes and going to discuss whether we want to
2  gate it, whether archives and history would
3  approve that.
4      Q.     Have you granted any permits, after
5  this July amendment was made, for events at
6  night?
7      A.     I have not.
8      Q.     So if somebody were to be --
9  scratch that.
10     If someone is just walking at night
11  on the courthouse grounds, would that violate
12  the curfew?
13     A.     It would.
14     Q.     And who is -- who is -- is anyone
15  enforcing that, if someone were to just walk on
16  it?  Is somebody enforcing that?
17     A.     I don't know.  I mean, the
18  sheriff's department is who would need to
19  enforce that.  Of course, we have -- which is
20  one of the issues with safety and security.  We
21  don't have a huge staff at night, and they are
22  responsible for patrolling the whole 600 square
23  miles of Lafayette County.  So I don't -- I
24  can't answer that question.  I don't know if

Page 131

LISA CARWYLE

1  they are or they're not.
2      Q.     Do you know if a sheriff's deputy
3  is stationed at night on the county courthouse
4  grounds?
5      A.     I'm pretty sure they are not.
6      Q.     Does the City of Oxford enforce the
7  curfew at night on the county courthouse
8  grounds?
9      A.     No.  That's not in their
10  jurisdiction.
11     Q.     So besides the -- enforcing the
12  curfew when someone applies for a permit, is
13  the curfew being enforced besides that?
14     A.     That is a question for
15  Sheriff East.  I don't get to tell the sheriff
16  what to do.
17     Q.     Have you gone onto the county
18  courthouse grounds for nonwork purposes at
19  night after the curfew was imposed?
20     A.     Have I?
21     Q.     Yes.
22     A.     No.
23     Q.     Have you seen anyone on the county
24  courthouse grounds at night since the curfew

Page 132

LISA CARWYLE

1  was imposed?
2      A.     I don't believe so.  I'm not up
3  here at night very often.
4      Q.     How has the County made the curfew
5  known to the public?
6      A.     Well, like I said, we are working
7  on getting some signs made now.  But other than
8  that, it would be just how it was reported
9  after the meeting, you know, in the policies on
10  our website and stuff.
11     Q.     So this order dated July 20th,
12  2020, imposing the curfew was posted on the
13  website?
14     A.     Well, the order is part of the
15  minutes that are linked to our website.
16     Q.     So besides putting this order,
17  along with the minutes, on the Lafayette County
18  website, how else was the curfew made known to
19  the public?
20     A.     I'm not sure.  I would have to
21  double-check that.  I'm not sure.
22     Q.     To your knowledge, do you know of
23  any other ways that the curfew has been made
24  known to the public?

Page 133

LISA CARWYLE

1      A.     I don't know.  I know -- I remember
2  a -- we did a press release, I think, after the
3  one in June, to make sure everybody understood
4  the permitting process.  I just can't remember
5  right now if we did the same thing in July.
6      Q.     And you did say that the curfew is
7  not posted currently anywhere on the courthouse
8  grounds?
9      A.     It's not.
10     Q.     Did y'all post a curfew -- or does
11  Lafayette County have any social media pages?
12     A.     Yes.
13     Q.     What social media pages?
14     A.     We have Facebook.
15     Q.     Did you post -- did Lafayette
16  County post the curfew on the -- on its
17  Facebook page?
18     A.     That's what I was saying I do not
19  remember.  If we had done a press release,
20  that's where it would have gone, but I don't
21  remember.
22     Q.     The only way that you enforce the
23  curfew is through the permit process, correct?
24     A.     That's the way I enforce it, yes.

Page 134

LISA CARWYLE

1
2    Q.    Are you aware of any other way that
3  the curfew is enforced?
4    A.    I do not know.
5    Q.    Now, besides the substantive
6  changes about the notice requirement and the
7  curfew, was the process -- was your process for
8  administering permits changed after the July
9  2020 amendment?
10   A.    No.
11   Q.    Was the curfew implemented in
12 response to the protests and marches and
13 assemblies occurring in Oxford in the summer of
14 2020?
15   A.    Ask me that again.
16   Q.    Was the curfew implemented in
17 response to the protests, assemblies, and
18 marches occurring in Oxford in the summer of
19 2020?
20   A.    It was related to that, because
21 those caused security and safety concerns with
22 Sheriff East.
23   Q.    When you say it was related to
24 that, what does that mean?
25   A.    Well, I guess the way you stated it

Page 135

LISA CARWYLE

1  makes it sound like we possibly did it because
2  of the protests, but it was done because of the
3  safety concerns related to the protests.  I'm
4  just trying --
5
6    Q.    Were --
7    A.    -- to clarify.
8    Q.    Were there safety concerns
9  unrelated to the protests?
10   A.    Yes.  There would be safety
11 concerns for people using the courthouse lawn
12 for anything after dark.
13   Q.    Did the board impose the curfew in
14 an effort to end the protests on the county
15 courthouse grounds?
16   A.    No.
17   Q.    So will you open up document
18 number -- that begins with 20?
19          MR. TOM:  And we'll introduce
20       this as Exhibit 17.
21          (Exhibit 17 was marked for
22          identification.)
23 BY MR. TOM:
24   Q.    Do you recognize that document?
25   A.    I do.

Page 136

LISA CARWYLE

1
2    Q.    What is it?
3    A.    It's an email about a permit
4  request that I have received.
5    Q.    And so this has to do with a
6  different Love Your Neighbor event from Deanna
7  Jackson.  That's right, isn't it?
8    A.    Right.
9    Q.    And so in the -- in the email on
10 the first page of this document, you say to
11 supervisors, Joey East, and David O'Donnell, I
12 received this Friday, so she is within the 14
13 days.  Let me know if you see any reason for
14 denial.
15     Why are you asking these people if
16 they see any reason for denial?
17   A.    That's really for Joey.
18   Q.    So is it your practice, when you're
19 asking Joey a question, to send emails to the
20 supervisors and -- and David O'Donnell?
21   A.    I copied them so they would be
22 aware that it was going on.
23   Q.    Have you ever asked the supervisors
24 whether they had any reasons to deny a permit?
25   A.    No.

Page 137

LISA CARWYLE

1
2    Q.    So will you go to document 21,
3  which we'll introduce as Exhibit 18?
4          (Exhibit 18 was marked for
5          identification.)
6  BY MR. TOM:
7    Q.    Do you recognize this document?
8    A.    I do.
9    Q.    And what is it?
10   A.    This looks like it's a permit
11 application for this Arami -- I don't know how
12 you say -- Harris.
13   Q.    And so if you look on the first
14 page of this document, you say that -- no.
15 Scratch that.
16     Go to the fourth page of this
17 document, which is -- has at the bottom, it's
18 numbered Bates -- let's see -- Bates 44.
19   A.    Okay.
20   Q.    And towards the center, you say,
21 Arami called yesterday and asked if she could
22 extend the time from 11:00 to 12:30 to 11:00 to
23 2:00.  What are your thoughts?  There isn't
24 much warning between now and Monday.
25     And Joey said, I do not like

LISA CARWYLE

1
2 changing at the last minute.
3      And you say, I don't either.  I'll
4 tell her 11:00 to 12:30 is what she was
5 approved for, and it will have to remain at
6 that.
7      Why did you not like changing the
8 time frame at the -- why did you not like to
9 change the time frame?
10     A.     Because we want the sheriff's
11 department to be prepared for what they need
12 and for the time frame needed, and that was
13 last-minute change.
14     Q.     Is it within your discretion to
15 grant a time extension?
16     A.     Yes.
17     Q.     And what criteria do you use when
18 determining whether to grant a time extension?
19     A.     How much time prior that they
20 requested.  I mean, at some point, you do need
21 people to make a plan and stick to it, because
22 we're planning according to their plan.
23     Q.     And how much time is -- is that
24 that you would allow revision versus you
25 wouldn't?

LISA CARWYLE

1
2     A.     It would be based on the sheriff's
3 response to me.
4     Q.     And so it was -- it's -- whether to
5 allow a time extension is just within the
6 discretion of you and the sheriff?
7     A.     I mean, it's within my discretion,
8 but I would consult with the sheriff before I
9 allowed it.
10     Q.     Have you allowed other changes to
11 any permit application, to your knowledge?
12     A.     I don't remember.
13     Q.     So how many times has the County
14 taken up the issue of moving or contextualizing
15 the Confederate statue on the courthouse
16 grounds?
17     A.     I don't know how many times.
18     Q.     The board considered
19 contextualizing the statue in 2017, right?
20     A.     Right.
21     Q.     And the board decided not to
22 contextualize it, right?
23     A.     No.  I don't know that they decided
24 not to contextualize it.
25     Q.     What did the board decide in 2017?

LISA CARWYLE

1
2     A.     From my memory, there was a
3 committee appointed who worked on some
4 contextualization language.
5     Q.     What did the board decide regarding
6 that language?
7     A.     I don't believe it ever came back
8 up.  I don't think anybody ever placed it back
9 on the agenda, so there was no decision made.
10    Q.     Why did it never come back up on
11 the agenda?
12    A.     I don't know.
13    Q.     Did you talk to any of the
14 supervisors about the contextualization
15 language?
16    A.     I don't remember from 2017 whether
17 I talked to any of them or not.
18    Q.     Do you remember David Rikard's
19 views on contextualization of the Confederate
20 monument in 2017?
21    A.     No.
22    Q.     Do you remember Chad McLarty's
23 views on contextualization in 2017?
24    A.     I do not remember their views, no.
25    Q.     Same question for Mike Roberts.

LISA CARWYLE

1
2     A.     I don't remember any of their views
3 on contextualization, any of the supervisors.
4     Q.     Do you remember Joey East's views
5 on the contextualization?
6     A.     Well, Joey East was chief of police
7 in 2017, so I don't believe -- if he had views,
8 they wouldn't have been talked about with the
9 County.
10    Q.     Did you talk with Joey East in a
11 personal manner about his views on
12 contextualization?
13    A.     No.
14    Q.     And the board voted unanimously
15 this summer, July 6th, 2020, to keep the
16 Confederate monument in place, correct?
17    A.     Right.
18    Q.     And did you talk with any of the
19 supervisors about their decision to keep the
20 Confederate monument in place?
21    A.     I don't remember any specific
22 conversation.  I was not at that meeting.  That
23 was when I was on vacation.
24    Q.     Outside of the meeting, did you
25 have any conversations with any of the

Page 142

1              LISA CARWYLE
2 supervisors about whether to move the statue?
3      A.    I don't remember any specific
4 conversations to say I did or I didn't.
5      Q.    Did you have any conversations with
6 Sheriff East about whether to move the statue
7 this summer?
8      A.    I don't believe so.
9              MR. TOM:  Can we take a
10             five-minute break?  I'm almost
11             done.  Just let me review some
12             stuff, and we'll -- we'll pop back
13             on.  And I'll either end it or ask
14             a few more questions.
15             THE VIDEOGRAPHER:  Going off
16             record -- going off record.  The
17             time is 12:41.
18             (Recess from 12:41 p.m. to
19                12:46 p.m.)
20             THE VIDEOGRAPHER:  Back on
21             record at 12:46.
22             MR. TOM:  Ms. Carwyle, thanks
23             for taking the time to speak with
24             me today.  No further questions.
25             THE WITNESS:  Thank you.

Page 143

1              LISA CARWYLE
2              MR. O'DONNELL:  I have no
3 questions.
4              THE VIDEOGRAPHER:  We're
5 going off record.  The time is
6 12:47.
7              (The deposition of LISA
8              CARWYLE concluded at
9              12:47 p.m. Central Standard
10             Time.)
11    *    *    *    *    *    *    *    *    *
12
13
14 _____
15    Lisa Carwyle
16
17
18 SUBSCRIBED AND SWORN BEFORE ME
19 THIS ____ DAY OF _____, 2020.
20
21
22 _____
23
24

Page 144

1              LISA CARWYLE
2         REPORTER'S CERTIFICATE
3      I, Greta H. Duckett, Certified Court
4 Reporter, Registered Professional Reporter, and
5 Certified Realtime Reporter, hereby certify
6 that on Thursday, December 17, 2020, I reported
7 the remote deposition of LISA CARWYLE, who was
8 first duly sworn or affirmed to speak the truth
9 in the matter of the foregoing cause, and that
10 the pages herein contain a true and accurate
11 transcription of the examination of said
12 witness by counsel for the parties set out
13 herein.
14      I further certify that I am neither of
15 kin nor of counsel to any of the parties to
16 said cause, nor in any manner interested in the
17 results thereof.
18      This 31st day of December, 2020.
19
20     *Greta Duckett*
21 _____
22 GRETA H. DUCKETT, RPR, CRR, CVR-S, RVR-M-S
   ACCR-12, GCCR-2891, MCCR-1945, TNLCR-671
23
24

Page 145

1              ERRATA SHEET
2 Case Name:
3 Deposition Date:
4 Deponent:
5 Pg.  No. Now Reads    Should Read  Reason
6 ___  ___ _____    _____    _____
7 ___  ___ _____    _____    _____
8 ___  ___ _____    _____    _____
9 ___  ___ _____    _____    _____
10 ___  ___ _____    _____    _____
11 ___  ___ _____    _____    _____
12 ___  ___ _____    _____    _____
13 ___  ___ _____    _____    _____
14 ___  ___ _____    _____    _____
15 ___  ___ _____    _____    _____
16 ___  ___ _____    _____    _____
17 ___  ___ _____    _____    _____
18 ___  ___ _____    _____    _____
19 ___  ___ _____    _____    _____
20
21                    _____
                       Signature of Deponent
22 SUBSCRIBED AND SWORN BEFORE ME
23 THIS ____ DAY OF _____, 20___.
24 _____
25 (Notary Public)   MY COMMISSION EXPIRES:_____

**$**

**$50** 42:20

**1**

**1** 9:11 31:5,8 32:17 35:7 41:4,9,11 50:12 51:6,8

**10** 21:4 76:7 91:23 101:2,19,25 102:10

**10:00** 105:20

**10:02** 32:9,11

**10:23** 50:15

**10th** 120:7

**11** 87:6 103:6,7

**112** 42:2,3

**11:00** 137:22 138:4

**11:34** 101:12,13

**11:43** 101:14,16

**12** 21:4 89:4 102:3 104:20,21

**12:30** 137:22 138:4

**12:41** 142:17,18

**12:46** 142:19,21

**12:47** 143:6,9

**13** 91:20 102:4,7,9 108:12,13 119:11

**14** 103:5 110:16,17 120:25 121:9,11,16 136:12

**14-day** 104:9 121:20

**14th** 116:14 119:22

**15** 104:20 115:21,22 116:10 119:21

**15th** 76:16,17 81:2 101:22

**16** 28:21,23 29:3 108:11 120:15,16

**17** 110:16 119:15 135:20,21

**17th** 9:21

**18** 99:9 115:19 119:21 137:3,4

**19** 39:10 45:16 46:3 85:2 120:15

**1995** 17:12 19:11

**1998** 18:8

**19th** 94:11

**1st** 110:4 111:13,15 119:19 120:5

**2**

**2** 35:9,20 40:24 41:4, 12,13,14,17 42:11

**20** 37:10 66:19 76:5 86:14 135:18

**2003** 16:25 17:13

**2010** 30:6

**2015** 32:23 36:5 37:19,25 38:11,13 41:10 50:22 51:7,17 52:13,23 53:10 56:23 57:13

**2016** 15:24 17:2 26:11,13,20 28:4,11 29:6,11,15 31:2 32:25 33:24 53:25

**2017** 139:19,25 140:16,20,23 141:7

**2019** 30:7 37:10 39:18 40:2 41:22 43:6,11,15 45:10 46:16 47:19 48:7,23 50:3,15 53:4 55:5,9 56:18,24 57:12,13 61:23 62:4 125:2

**2020** 9:21 21:19,23 26:3 54:11 64:11 65:3,19 66:4 76:16, 17 81:2,15 83:8 84:2, 6 85:6,17 86:18 87:2, 24 99:9 116:15,16 120:23 123:20 124:17,22 125:10 132:13 134:9,14,19 141:15 143:19

**17th** 9:21

**20th** 104:8 116:16 119:23 120:23 132:12

**21** 137:2

**21st** 104:7

**249** 92:4

**25** 23:10

**250** 92:16,20 93:11

**253** 92:16 93:18 95:10

**264** 92:17 94:17 95:15

**265** 99:6

**269** 101:20 102:11

**26th** 50:15

**270** 92:4

**274** 89:15

**281** 89:15 91:6

**292** 103:17

**298** 105:6

**2:00** 137:23

**3**

**3** 49:18,19 50:6,12 53:7 105:5

**30** 8:22 43:8 46:21 54:13 63:17,19 81:16 97:12 110:6 120:25 121:10,12,13

**30-day** 63:6,8,21 81:20 82:4,12,18 83:10,19 85:20 86:3 96:10,15 97:13 111:18

**311** 119:12

**315** 111:5

**317** 119:12

**324** 117:7

**3:20-CV-224-NBB-RP** 9:18

**3:31** 99:9

**4**

**4** 35:25 49:16 55:16, 17

**44** 137:18

**47** 23:6

**4th** 43:6,11 111:9,12 124:25

**5**

**5** 55:15 57:23,24 58:17 59:4 111:4

**50** 69:4

**500** 114:19

**5:00** 105:25 106:13 117:17 125:24

**5th** 110:5 111:6,11,15 119:20

**6**

**6** 35:20 42:9,10 51:7 57:21 58:15,16 62:12,14,17

**6/17/20** 93:22 94:12, 18,22 95:5,12,24 96:6

**6/19/20** 96:7

**600** 130:23

**6th** 103:23 120:7,9 141:15

**7**

**7** 76:8,9

**8**

**8** 87:9

**8th** 110:5

**9**

**9** 35:24 42:18 62:9

**89:5**

**91** 58:19,20,25 59:6, 25

**92** 58:25

**93** 59:2

**94** 58:20 59:2,7

**95** 17:18,19

**9:08** 9:20

**9:35** 32:7,8

**A**

**a.m.** 32:8,9 50:15 101:13,14

**ability** 13:7

**access** 24:17 32:14

**accompany** 42:21

**accountancy** 16:18

**accountant** 17:8,15

**achieve** 126:3

**ACLU** 10:6

**act** 83:24

**action** 10:25

**active** 127:25

**activities** 56:25

**activity** 22:17 25:23 26:9,19 28:10 30:24

**actual** 92:17

**added** 42:11 43:24

**addition** 18:24

**additional** 34:5 39:6 42:21

**address** 38:2,6,11, 13 43:16 106:10

**addressed** 38:25

**adhere** 63:16

**adjust** 13:20

**adjusted** 129:20

**administer** 117:24

**administering** 33:21
84:8 134:8

**administrator**
15:21,23,25 16:20
20:20,22,24 21:10
22:3,7 32:25 33:14
93:6 119:7 128:4

**admissible** 8:20

**adopted** 32:23 43:6,
11 53:5,12 104:17
123:20,25 124:5

**advance** 36:3 63:5
118:17

**advance-notice**
120:25

**affect** 56:11,15

**affected** 118:15

**agencies** 45:23

**agenda** 140:9,11

**agree** 11:7

**ahead** 20:6,7 63:15
82:23 90:13 101:5

**alcohol** 38:18

**allowed** 50:18 57:10
96:21 106:10 117:5
139:9,10

**amend** 101:21

**amended** 43:14
44:21 45:10 124:25

**amendment** 48:7,24
50:3 55:6,9 63:24
76:24 77:2 81:3,7,15
84:7 85:18 86:15
97:17 111:22 123:19
130:6 134:9

**amends** 76:18

**analyzed** 115:3

**and/or** 81:19 83:9
86:2 105:22

**anniversary** 42:13

**answers** 11:25 12:11
13:11

**Anthony** 27:4,10,15
28:8 30:22 68:18

**123:13**

**anybody's** 112:21

**apologies** 35:25

**apparent** 11:12

**appeal** 83:6 107:17,
19

**appealed** 107:23

**applicant** 121:15

**application** 36:7
42:21 46:20 92:9,17
105:4 108:23,25
110:3 137:11 139:11

**applications** 36:2
42:19

**applied** 36:23 42:20
57:12,13 96:5 111:9,
14 119:19,22 120:12

**applies** 76:18 77:14
80:10 131:13

**apply** 57:17,18 68:23
111:12

**applying** 57:2,4

**appointed** 140:3

**approached** 44:25
45:11

**approval** 90:17
107:5,7

**approve** 33:11 54:5
60:25 61:15,18,25
130:4

**approved** 43:19
84:15 95:11,16 106:2
111:7,10,16 112:2,3
115:17 118:18,23
119:20 138:5

**approves** 47:22

**approving** 61:19
91:2

**April** 32:23

**Arami** 137:11,21

**archives** 24:24 130:3

**area** 18:12 66:22
77:11 79:17 81:12
122:10

**areas** 78:20

**art** 52:5,7,18

**artist** 51:20

**artists** 28:17

**arts** 28:17 55:24 56:4

**assemble** 72:20
96:21

**assembles** 65:2

**assemblies** 28:9,12
30:24 64:11,14,20
65:9,16 66:3,8,15
67:15,23 68:4 69:10,
19 70:16,24 71:12,25
72:15 73:4,9,13,17
75:10,19 134:13,17

**assembly** 25:22
26:8,18 28:13 68:19
71:9 72:20

**assessing** 43:12

**association** 8:5

**assume** 52:11 94:15

**attach** 41:5

**attend** 45:16 49:6
71:3 116:12

**attention** 122:24

**attorney** 70:9 115:8

**audible** 11:12

**authority** 61:15,18
83:12,21 86:3 106:22
108:3,7

**average** 20:21 36:9

**aware** 34:6 47:5
56:19 57:5 61:20
84:12 85:3 90:2,10,
18 91:2 110:13
126:20 134:2 136:22

**B**

**back** 32:10 51:6 53:2,
7 58:23 69:21 84:25
92:10 95:10 101:15,
18 105:18 106:11
119:10 120:9 140:7,
8,10 142:12,20

**background** 16:6

**bad** 124:10

**Baretta** 60:2,8

**barriers** 25:13,18

**bars** 20:8,10

**base** 33:18

**based** 33:12 36:14
57:9 80:21 83:17
96:11 114:9 121:6
127:22 139:2

**basis** 9:7 14:18 83:23

**Bates** 35:8,12,15,19,
25 42:3 58:19,20
59:6,25 89:14,15
91:5 92:3,16,20
93:18 94:16 95:10
99:6 101:19 103:17
105:6 111:5 117:7
119:12 137:18

**began** 15:23

**beginning** 40:23

**begins** 32:17 49:16
55:15 58:19 87:6
91:20 102:7 103:5
104:20 108:11
110:15 115:19
119:15 135:18

**behalf** 9:2 10:6,9

**believed** 121:14

**big** 124:6

**bigger** 106:19 123:2

**birthdays** 42:13

**bit** 124:8

**black** 27:5 67:4

**blank** 92:25 93:6

**block** 18:23

**blocking** 65:23

**Bluff** 58:18 59:6,13
61:4,11

**board** 15:11 34:15
44:14 48:17 50:2
56:10 60:24 61:3,10
65:10,13,17 69:11
70:3,4,15,21 71:12,

23 73:8,11,20,23
74:6,9 75:15 76:15
81:18 83:6,7,9,14,20
84:3 85:18 86:2,16,
19 88:18,20 103:23
106:5,18,19,23
107:4,7,12,17,24
108:2,7 117:11 119:9
120:2,8,22 126:22
135:13 139:18,21,25
140:5 141:14

**booths** 52:7

**BOS** 106:2,5 116:12

**bottom** 93:4,20
94:21 95:13 103:18
117:8 137:17

**break** 12:18,19
142:10

**breaks** 11:11

**Brent** 91:8,12

**briefly** 16:5

**bring** 38:17,18 39:11
111:25

**bringing** 84:14

**brought** 85:3 96:3
122:24

**bubbles** 105:9

**budget** 99:15

**building** 49:12
129:22

**buildings** 49:14

**business** 22:22,24
24:9 60:19 75:10,13,
16

**busy** 20:12

**C**

**C-A-R-W-Y-L-E** 11:6

**calendar** 120:7

**call** 27:14 28:13
40:11,12,13,15 41:8
56:6 75:22 76:2 90:2

**called** 137:21

**calling** 114:11

**calls** 76:3 90:20

**camera** 11:9

**canceled** 102:15,19

**candlelight** 122:22 123:10

**career** 19:8,11 23:9

**carried** 43:18

**carry** 83:16,24

**Carwyle** 8:1 9:1,12 10:1,14,20 11:1,5 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1,5 32:1,13 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1,18 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1,4,18 59:1,5,10 60:1 61:1 62:1,18 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1,18 102:1 103:1 104:1 105:1 106:1 107:1 108:1,19 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1 132:1 133:1 134:1 135:1 136:1 137:1 138:1 139:1 140:1 141:1 142:1,22 143:1,8,14

**case** 8:24 118:2

**catch** 72:24

**caused** 134:21

**center** 18:12 22:14, 15,22,24 23:14,19,23 137:20

**Central** 9:20 143:9

**certifications** 16:16

**certified** 8:4

**cetera** 43:17

**Chad** 140:22

**chancery** 70:10

**change** 44:19 48:6,9 84:8,19,22,24 86:16, 20 101:3 104:9 106:15 117:12,15,24 118:14 120:10 121:11 138:9,13

**changed** 44:9 53:15 56:18 57:2 84:10 86:22 104:7 116:7 118:10,18 119:3 120:2 121:11,16,21 134:8

**changing** 138:2,7

**chat** 31:6,16

**check** 33:9 61:7,8

**checked** 86:23 94:8

**checking** 117:21

**checks** 47:23

**chief** 44:25 45:6,7 46:12 141:6

**chose** 78:5

**chosen** 79:14

**circuit** 60:8

**circumstance** 122:25

**circumstances** 81:18,23 82:5,7

**citizen** 92:14

**citizens** 71:17

**city** 16:21,24 17:3,7,8 19:22 21:6,11 45:2,4, 6,22 47:24 58:18

**concerns** 37:25 38:5,12,14,20,25 43:12 44:7 45:12 46:13,14 48:24 49:3, 4 69:14 78:8 79:8,10, 15 80:4,16 104:13 122:18,21 134:21 135:4,8,11

**concluded** 44:20 143:8

**Confederate** 27:5, 16,17,21 64:16 65:14,18 67:8,12 72:10 78:8 79:9 87:16,24 116:24 139:15 140:19 141:16,20

**confer** 12:20

**confident** 48:3

**conflict** 71:5 72:8,11, 13 100:6 102:24 109:22,25 123:15

**conflicting** 47:25 48:12 85:11 122:12

**conflicts** 33:10

**confusing** 102:9

**congregate** 78:21, 24

**considered** 52:16 56:15 60:25 124:24 139:18

**constitute** 44:13

**consult** 82:20 139:8

**consultation** 54:22 82:25 85:8 99:2 115:8

**consulting** 96:12

**contact** 34:7 39:3,4,7

**contacted** 39:12,15 40:2,4,8

**contextualization** 140:4,14,19,23 141:3,5,12

**contextualize** 139:22,24

**contextualizing**

**59:6,13 61:4,11 82:9 85:11 131:7

**civic** 22:23,25 24:9

**Civil** 8:23

**clarification** 108:16

**clarify** 77:7 96:23 135:7

**clear** 51:25 81:8,13

**clerk** 16:21,24 17:3,7 21:7 60:8 70:10

**closed** 19:19 125:20, 23

**college** 16:7 17:16, 18

**comfortable** 61:19

**comment** 105:8,16 106:8

**commenting** 106:9

**comments** 50:17 88:17 105:14,17,23

**commercial** 51:23 52:17

**committee** 140:3

**communicate** 11:10

**community** 46:23 52:18 56:4

**compare** 92:15

**complain** 76:2

**complaining** 90:3

**complaints** 75:9,13, 16,18

**complete** 11:25 13:11

**comply** 50:20 53:9 121:15

**concern** 45:21 71:2, 5 77:20 79:20 80:20 99:23 121:7

**concerned** 71:15 75:7 100:4 104:4 106:11 113:7,8 121:10 123:17

**139:14,19

**continue** 65:22

**continued** 54:5

**control** 71:22

**conversation** 141:22

**conversations** 141:25 142:4,5

**coordinated** 105:21

**copied** 136:21

**correct** 21:19,20,24 23:14 24:15 25:3 30:5,17 35:22 50:3 56:12,22 57:14 133:24 141:16

**correctly** 56:20 78:18

**Council** 55:24

**counsel** 10:2 12:19, 20

**country** 82:9

**county** 9:14 10:10,25 15:11,21,23,25 16:14,20 17:21,24 18:11,13 20:20,22,24 21:10 22:3,7 23:13, 16,21 24:2 25:17 26:7,16,19 28:11 32:24 35:13,21 42:23 44:12,14 45:11,12 46:13 48:25 50:23 51:8 55:7 59:20 60:9 65:10,13 67:24 68:5 69:8,11 70:9 73:20 76:19 78:6,19 79:10 80:3,17 92:14 93:6 105:22 107:14 115:8 119:6 121:2 123:21 124:22 125:13,22 126:2,10,11,24 127:7,14 128:4,15 130:24 131:4,8,18,24 132:5,18 133:12,17 135:14 139:13 141:9

**couple** 42:7 66:11 99:14 100:18 124:4

**court** 9:16,23 10:12 11:12,23 12:5,6,9,24

58:11 108:15

**courthouse** 18:10, 11,13,14 20:16,19,25 21:6,16,17,21,24 22:4 23:13,16,18,20, 21 24:2,11,15 25:3, 11,14,18,21 26:7,19 28:11 29:4,9 30:17, 25 43:22 45:13 46:13 48:25 49:11,14 52:21 59:18,20,21 60:9,19 61:12 67:25 68:5 69:16 71:10 76:19 77:14,19 78:19,22 79:11 80:3,17 87:17 90:4 109:4 121:3,22 122:18 123:21 125:21 126:11,24 127:8,14,16 128:2, 15,18,23 129:4,5 130:12 131:4,8,19,25 133:8 135:11,15 139:15

**courtroom** 8:21

**COVID-19** 8:8

**craft-type** 52:5

**create** 79:8,9

**creates** 80:4

**criteria** 33:16 37:6 53:20 63:20 64:4,8 82:6,13,16 97:23 111:20 113:13 114:7, 25 115:6,10,12 138:17

**critical** 88:17

**criticism** 88:7,14

**crossing** 78:12

**crosswalk** 77:6 109:18

**crosswalks** 78:13

**cultural-type** 51:20

**culture** 113:20

**curfew** 21:18,22 25:10 26:3 100:10,20 121:2,6 123:20,23 124:13,18,21,24 125:9,14,18,25 126:3,12,23 127:6,

13,15 129:9 130:13 131:8,13,14,20,25 132:5,13,19,24 133:7,11,17,24 134:3,7,11,16 135:13

**current** 15:20 44:25 53:16

---

## D

**dangerous** 69:16 78:14 79:21,22 121:23,25 122:7,9,11

**dark** 100:13 104:8 106:12,17 121:9 122:5 123:18 127:17 135:12

**date** 26:24 48:13 74:13 92:23 94:3,12, 18 95:13,16,19,21 100:20 124:3

**dated** 99:9 132:12

**dates** 16:23

**David** 9:4 10:8 49:24 60:2,22 89:12 99:8 103:13,14,20 108:22 116:6 117:10 136:11, 20 140:18

**day** 18:21,25 20:13 25:5 27:25 28:2 33:11 94:14 96:3 122:8 143:19

**day-to-day** 83:16,23

**days** 20:11 36:9 37:13 43:8 46:21 54:13 60:20 63:5,18, 19 82:23 84:15 110:6 115:15 116:8 117:12, 16,20 118:17 120:25 121:9,10,12,13,16 136:13

**days'** 81:16

**daytime** 30:10,11

**deal** 121:20

**Deanna** 109:2 111:6 136:6

**death** 64:10,15 66:14 67:15 70:17 72:2

75:3,20 113:7 114:4

**December** 9:21

**decide** 72:19 79:5 116:21 139:25 140:5

**decided** 37:3 52:19 79:24 117:15 139:21, 23

**decision** 55:2 82:17, 19 83:5 84:21 96:9, 11 100:10 107:22 140:9 141:19

**decisions** 83:17 100:7

**Define** 20:17

**degree** 16:17

**degrees** 16:15

**delegate** 83:20

**demonstrate** 112:22

**denial** 136:14,16

**denied** 90:19 93:5

**denies** 47:21

**deny** 33:12,17 34:11 60:16 63:3 97:10 118:22 136:24

**denying** 48:6 89:25 91:2 107:13,16

**department** 17:9 45:22 71:19 88:23 122:13 130:19 138:11

**depending** 80:7 113:19

**deposed** 11:15

**deposit** 42:22

**deposition** 8:12 9:12 11:2,8,11,18,23 13:18 15:4,8,12,15 18:9 35:11 41:6 143:7

**deputy** 131:3

**describe** 22:9 56:3

**designed** 38:2,3,5

**desire** 64:2 111:25

114:23

**determine** 33:17 37:7 53:21 81:19 82:6 83:10,18 97:24 114:5,16

**determines** 42:23

**determining** 33:2 63:21 64:5 82:11 85:19 113:16 114:8 138:18

**difference** 83:13 124:6

**differences** 42:6,8, 15 43:2

**differently** 57:14,17, 19 114:20 124:8

**difficult** 12:24

**directed** 65:9,12,17

**directions** 78:16

**directly** 17:6 106:18

**director** 129:22

**discretion** 37:18,22 53:17 54:15,21 57:17,20 63:7,12 86:25 99:2 118:5,10 138:14 139:6,7

**discuss** 69:9,12,18 70:16 86:15,19 100:19 115:9 117:11 127:23 130:2

**discussed** 15:7 25:19 37:11 60:11 69:23 70:2 100:22 104:16 107:4 110:25 123:24 124:2,13,19 125:7 127:24

**discussing** 126:12

**discussion** 58:13 62:13 74:2

**discussions** 69:25 73:19,22 74:6,8,12, 15,18,19

**distancing** 8:9

**distinction** 20:9

**distracting** 80:19

**distraction** 80:9

**District** 9:16

**Division** 9:17

**DOC** 35:13

**document** 14:23 32:16,19 40:23 41:4, 9,12,20 42:2,10,18 49:15,22 55:14,20 58:3,15 59:11 62:8 76:6,12 87:5,12 89:3 91:19 92:3,6 93:10 102:2,3,7,10 103:4, 10,17 104:19,24 108:10,18 110:15,20 111:5 115:18,25 119:11,13,21 120:14 135:17,24 136:10 137:2,7,14,17

**documents** 13:21 14:15,16 89:8 95:3

**double-check** 132:22

**draft** 41:21 42:6,16 43:3

**drive** 18:20 40:22 78:17

**driven** 26:16

**driving** 18:24 49:13 71:7 80:20 109:17 122:6

**drugs** 13:7 38:17

**Duckett** 8:14 9:24

**due** 8:7 43:20 44:6

**duly** 10:15

**duties** 36:15

---

## E

**earlier** 22:20

**early** 26:13 34:3,13

**easier** 56:8 72:18

**East** 15:15 45:9,11 46:12 73:15 89:12 93:22 94:4,7,23 95:12 96:12 99:3,8 103:3,14,21 105:3,

17,23 108:2,22
110:21 116:6 117:9
122:24 124:13
125:10 126:17
127:23 131:16
134:22 136:11 141:6,
10 142:6

**East's** 105:13 121:7
141:4

**eat** 19:15,18 20:8

**educational** 16:6

**effect** 36:6,11 37:13,
14,20 39:2,16,24
61:24 62:5 84:3

**effectively** 43:24

**effort** 135:14

**Electric** 17:9

**email** 49:23,25 50:6,
14 53:8 55:23 56:9
58:17 59:5,24 60:5
62:21 89:11 92:10
99:6 101:23 102:12
103:13 105:3 108:22
110:21 116:6 117:9
120:12 136:3,9

**emails** 117:8 136:19

**emotions** 114:2

**employees** 105:22

**employment** 16:3
17:4,6

**enacted** 46:17

**enclosures** 24:20

**end** 35:16 72:16,18,
22 73:5,6,9,13,17,24
74:2 99:15 135:14
142:13

**endorsement** 44:13

**enforce** 130:20
131:7 133:23,25

**enforced** 129:9,12,
16 131:14 134:3

**enforcement** 45:21
46:23

**enforces** 129:11,14

**enforcing** 130:16,17

131:12

**engage** 24:9

**enjoy** 19:21

**ensues** 97:16

**ensure** 126:10,19,25
127:7,13,16,18

**entire** 60:18 77:14

**entities** 24:6

**environment** 69:14
77:7 100:13 113:20,
24

**escalate** 123:2

**estimate** 21:3,4 22:6
23:5 26:25 28:6
67:18,22 76:3

**evening** 30:12

**event** 30:10 39:18
40:19 42:22,24
45:15,17,24 46:3,4,5,
9,15,24 47:6 49:6
51:21 61:12 62:25
63:13 77:19 96:6,13
102:19 109:5,14
110:25 111:2,10,15
114:3,24 115:14
116:15 119:18,19,23
120:4 121:25 124:11
136:6

**events** 20:16,18,23
21:5,23 22:2 40:9
47:25 48:12 64:2
98:16,21 105:21
106:12 107:8 121:8
126:21 130:6

**eventually** 52:18,22
100:9 104:3

**every-** 109:15

**everybody's** 114:2

**evidentiary** 9:7

**exact** 21:2 22:5 124:3

**EXAMINATION**
10:18

**examples** 40:18

**excellent** 91:11,17

**exception** 53:21

54:4,16

**exceptions** 53:18,23
55:10

**exchange** 55:23
56:9 89:11

**excluding** 11:11

**exclusive** 77:11

**exclusively** 78:5,7

**excuse** 100:25
118:21

**executive** 70:2,13

**exercise** 63:11

**exhibit** 31:5,8 35:7
41:11,13,14,17
49:18,19 50:6,12
51:6,8 53:7 55:16,17
57:23,24 58:17 59:4
62:11,12,14,17 76:8,
9 87:8,9 89:4,5,14
91:5,22,23 93:17
99:5 101:7,19,25
102:10 103:6,7
104:20,21 105:6
108:12,13 110:16,17
115:21,22 116:10
117:7 119:11,21
120:15,16 135:20,21
137:3,4

**exhibits** 58:10

**exist** 77:21

**expand** 112:8

**explain** 24:4 52:12
83:13 112:15

**explicitly** 85:18

**expressing** 45:12
114:22

**expressive** 25:22
26:9,19 28:10 30:24

**extend** 137:22

**extended** 46:21

**extends** 43:7

**extension** 138:15,18
139:5

**extraordinary** 61:2,
22

**F**

**Facebook** 88:11
133:15,18

**facilities** 35:22 44:12
49:8,10

**facility** 32:22 41:22
51:8 56:11 76:18
101:22 103:22 119:8
120:23 124:25

**fact** 91:3

**fair** 19:20 22:21 34:19
47:18 85:6

**fall** 52:2 53:15

**falls** 51:9 111:20

**favor** 67:7,11 88:17

**February** 39:10,18
40:2 45:15 46:3
50:15

**federal** 8:22 45:23

**fee** 42:20

**feel** 61:7,18 66:6 72:7
97:9,17 114:18

**feeling** 69:7 70:23
71:2 72:21 73:3
127:3

**feelings** 82:2

**feels** 48:3

**felt** 51:24 71:23 72:8,
12 82:3,10 123:5

**fence** 24:13,17

**fifty-** 93:18

**filled** 46:2 93:13 95:5
96:2

**final** 35:4 41:24,25
42:6,16 43:3,5,10
83:2,4 106:23

**fine** 14:24

**finish** 13:2,3

**five-minute** 142:10

**five-person** 77:2

**flag** 27:5,17

**flags** 67:12

**Floyd** 63:25 64:9
66:14 67:16 70:17
75:3 82:2 96:19,24
97:7 98:5,15,18,22
109:21 112:5,11,14
113:5,14

**Floyd's** 64:15 72:2
75:20 113:7 114:4

**follow** 13:15

**football** 20:11

**for-profit** 55:7 56:25

**foresee** 115:2

**forgetting** 127:3

**form** 20:6 38:8 52:25
71:14 72:4 98:9
125:16 128:6

**formally** 123:23

**fourth** 137:16

**frame** 53:6 106:10
121:21 129:20 138:8,
9,12

**free** 63:24 112:22
114:22

**freely** 25:2

**Friday** 136:12

**front** 51:4 58:24
87:17

**Frye** 49:23 50:7,13,
14 53:8

**full** 11:3 13:11

**function** 125:22

**functions** 22:19
42:12

**fund-raiser** 62:24

**future** 112:20 113:10

**FYI** 102:15

**G**

**game** 20:11

**gate** 130:3

**gates** 24:20,23 25:13,18 125:19,24 126:13,23 127:6 129:25

**gathering** 116:12 120:3

**gave** 68:16

**general** 71:6 75:23

**George** 39:20 45:18, 25 63:25 64:9 66:14 67:16 70:17 71:25 75:3,20 82:2 89:13, 17 90:18 96:19,24 97:6 98:5,14,18,22 109:21 112:5,10,14 113:5,7,14 114:4

**give** 11:25 12:11 13:11 34:8

**giving** 85:25

**goals** 126:4

**good** 8:2 10:20,22 41:8 54:19 97:10 113:18 125:5

**goods** 52:7

**government** 125:22

**governmental** 22:18

**graduate** 16:6,9,11

**graduated** 17:17

**grant** 33:17 34:11 35:5 60:16 61:4 108:3,8 112:8 138:15,18

**granted** 39:22 93:5, 21 95:11 116:19 129:19 130:5

**granting** 48:5 60:13 74:16 89:25 107:13, 16

**Greta** 8:13 9:24 58:8 101:6

**ground** 11:21

**grounds** 20:16,19,25 21:6,17,21,24 22:4 23:16,19,21 24:2,11, 15 25:3,11,15,21 26:8,20 28:11 30:17,

25 43:22 45:13 46:14 48:25 52:21 67:25 68:5 71:10 76:19 77:14,20,23 78:20 79:3 80:3,17 100:11 121:3,22 122:19 123:21 126:11,24 127:8,14,17 128:2, 16,18,23 129:4,6 130:12 131:5,9,19,25 133:9 135:15 139:16

**group** 28:17 39:10, 19 40:10 45:20 50:10 51:20 52:2,17 76:21 80:11,15 90:19 94:11

**groups** 35:21 51:10 55:7 56:18 74:3 100:5 122:12

**guarantee** 100:13

**guess** 22:14 28:12 37:22 38:16 54:4 56:17 57:3 70:18 74:22 76:5,7 92:11 93:13 102:22 107:2 113:18 114:9 117:3 123:11 125:17 126:14 134:25

**guidelines** 33:19

**guy** 27:3 46:2

_____

**H**

**hand** 85:12,13

**handle** 94:9,10 96:13 122:14 126:21

**handmade** 52:4

**handwriting** 93:9,15

**hang** 38:22 58:5,6,21 92:10 99:21

**happen** 28:20 29:24 30:14 113:10

**happened** 30:17,25 34:12 65:3 109:14,16 122:16 128:24

**happening** 34:3 47:6 81:4 82:8 90:5,6 121:8 124:10

**harder** 53:14 57:6 100:11,12

**Harris** 137:12

**Harvey** 27:11,13

**head** 12:12

**heads-up** 34:8 110:11

**hear** 14:10,13 47:9 87:23,25 88:7,14 90:3

**heard** 39:11 88:12 124:12,18 125:9 127:23

**hearing** 90:11

**Hearsay** 102:21

**heart** 22:10 23:3

**heated** 89:23

**held** 16:24 20:16,18, 24 21:5,23 22:3 96:6 111:10 116:16 119:20

**Hervey** 27:4,11,12, 14,15 28:8 30:23 68:18 123:13

**high** 16:11,13

**historic** 49:11

**history** 24:24 130:3

**hold** 16:2 17:10 30:19 61:11 62:24 77:18

**hour** 42:20

**hourly** 42:20

**housekeeping** 41:2

**huge** 130:22

**hundred** 109:16

_____

**I**

**idea** 91:13,15 102:20 107:25 123:4,5

**identification** 31:9 41:15 49:20 55:18 57:25 62:15 76:10 87:10 89:6 91:24

103:8 104:22 108:14 110:18 115:23 120:17 135:22 137:5

**identify** 10:3

**impair** 13:7

**implement** 104:8 118:11

**implemented** 26:4 45:3 56:20 86:19 87:2 134:11,16

**implementing** 38:4 85:5 86:12 126:12

**impose** 135:13

**imposed** 21:18,22 121:2 131:20 132:2

**imposing** 132:13

**inability** 11:9

**incidences** 82:15

**incident** 82:3 112:19

**incidents** 122:15,17

**include** 43:17 47:4

**included** 107:5 126:17

**including** 19:22 79:17 127:25 128:15, 23

**individuals** 75:19

**information** 13:2 91:12,16 127:22

**inquiring** 119:2

**instance** 112:19

**instruct** 14:20

**intend** 25:17

**introduce** 41:11,13 49:18 55:16 57:22 62:11 76:7 87:7 91:21 103:5 110:16 120:15 135:19 137:3

**involved** 33:20,23 34:16,25 44:23 54:25 71:9 84:3

**involves** 116:10

**irregardless** 118:6

**issue** 39:5 72:11 79:2 96:19 97:7 116:8 117:13,16,21 123:2 139:14

**issued** 79:4

**issues** 43:16 47:17 60:21 69:14 71:8 85:9,13 96:14 97:11 99:14,19,20,24 100:8,18,19 121:8 123:17 130:21

**items** 41:3 45:3 52:5

_____

**J**

**Jack** 101:24 102:12

**Jackson** 24:24 109:2,3 111:6 136:7

**January** 15:24 16:25 26:11,13,20 29:3,6, 11 32:25 124:17 125:10

**JE1** 105:12

**JE2** 105:12,16

**Jenn** 62:22

**job** 72:18 91:11,17

**jobs** 17:17

**Joey** 15:14 45:9,11 54:18 89:12 92:11 99:8,11,13 100:4 103:3,14,21 104:12 105:3,13,17,23 108:22 110:21 116:6 117:9 124:13 125:10 136:11,17,19 137:25 141:4,6,10

**John** 9:13 10:7,24

**Johnson** 39:20 45:18,25

**Johnson's** 46:15 89:13

**Josh** 9:2 10:23 14:9 40:25 58:14 72:24

**Joshua** 10:5

**July** 21:19,23 26:3 100:23 103:23 104:7 110:4,5 111:6,9,11, 12,13,15 116:14,16 119:19,20,22,23 120:5,6,9,23 123:20 124:22 130:6 132:12 133:6 134:8 141:15

**June** 68:17 76:16,17 81:2,15 83:8 84:2,6 85:6,17 86:14,18 87:2 99:9 101:22 122:23 133:4

**jurisdiction** 131:11

**K**

**keeping** 45:23 101:9

**Kevin** 49:23 50:7,13, 14 53:8

**kind** 40:19 45:19 46:4 51:19 57:7 58:21,25 80:16 83:24 102:21, 23

**knew** 86:10 88:13

**knowledge** 30:6,15 123:22 126:9 132:23 139:11

**L**

**L-I-S-A** 11:5

**Lafayette** 9:14 10:9, 25 15:10 16:13 17:21,24 18:11 26:16 35:13 42:23 44:12, 13,14 65:10,13 69:8, 10 92:14 130:24 132:18 133:12,16

**language** 43:17,24, 25 44:2,5 50:17,21 51:4,17 53:10 56:17, 23 57:2,5,13,17 85:25 119:2 140:4,6, 15

**large** 39:12 71:9

**Larson** 91:8,9

**last-minute** 138:13

**law** 45:21 46:22 58:19 59:6,14 61:5, 11 83:22 107:22

**lawn** 29:4 90:4 109:4 135:11

**leave** 97:18

**legal** 8:4

**lets** 48:2

**letting** 50:19

**liability** 60:21 69:5

**lies** 23:13

**life** 19:6 22:23,25 24:9 26:18

**lifelong** 17:20 26:15

**lighting** 122:5

**limit** 77:20 78:2,7

**limited** 105:17,20

**lines** 69:17

**linked** 132:16

**Lisa** 8:1 9:1,12 10:1, 14 11:1,5 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1

116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1 132:1 133:1 134:1 135:1 136:1 137:1 138:1 139:1 140:1 141:1 142:1 143:1,7,14

**lit** 122:3,4

**live** 18:2,4

**lived** 17:23 18:6

**Lives** 67:4

**local** 28:17 56:3

**location** 18:7 30:20

**long** 17:10 18:6 19:4 23:2 26:7 29:5 36:16 54:18 66:2

**longer** 36:13,19 52:20

**looked** 51:24 57:6 124:7

**lot** 22:17,18 45:5,21 72:13 96:20 97:7 116:23 129:3

**lots** 20:12

**love** 109:3,8,13 110:25 111:25 119:18 120:3,11 136:6

**M**

**made** 34:6 56:19 57:5,6 76:24 77:3 81:3,7 84:7 86:15 100:7,10 107:23 110:4 117:20 118:12, 14 121:5,6 126:17 129:23 130:6 132:5, 8,19,24 140:9

**main** 65:6 100:14 125:20

**maintaining** 69:13

**majority** 44:6 67:9

**make** 43:21,23 45:2 46:22 47:5,22 48:11 53:17,21 54:16 71:18 72:17 77:8 81:8,13 82:20 90:10 94:9 126:8,20 133:4 138:21

**Maker's** 28:13,15,19, 24 29:8,12,23 30:9, 15,23 50:18,23 51:16 52:3,6,12 53:9 54:2 56:11,15 57:8,15

**makers** 84:21

**makes** 135:2

**making** 38:23 53:22 54:4 104:10,12 124:11

**manner** 141:11

**manpower** 82:21 115:15

**March** 16:25 17:13 41:10,22 43:6,11,14 46:16 48:6,23 50:2 55:5,9 56:23 85:2 124:25

**marched** 64:23

**marches** 64:11,14, 19 65:2,8,16 66:2,7, 15 67:14,23 68:3 69:9 70:16,24 71:11 72:15 73:4,8,12,16, 24 75:10,19 134:12, 18

**marching** 66:25

**marked** 31:8 41:14 49:19 55:17 57:24 62:8,14 76:9 87:9 89:5 91:23 103:7 104:21 108:13 110:17 115:22 120:16 135:21 137:4

**Market** 28:14,15,19, 24 29:9,12,23 30:9, 15,23 50:18,23 51:16 52:3,6,12 53:9 54:2 56:12,15 57:9,15

**master's** 16:17

**matter** 9:13 11:16 41:2 67:4 117:22,25

118:9

**Mclarty's** 140:22

**means** 94:8

**meant** 86:11

**measures** 42:25

**media** 9:10 101:3 114:11 133:12,14

**medication** 13:6

**meet** 14:2 70:21,22 103:21

**meeting** 13:23 15:5 61:9 103:15,23 104:16 116:9,12,15 117:11 120:9,11,13 132:10 141:22,24

**meetings** 70:3,8,24 73:20 74:6,10 83:7

**memory** 13:7 14:24 68:20 140:2

**mentioned** 14:15 22:20 39:3 44:2 46:11 49:5 64:9 81:24 109:17 110:12 129:24

**met** 13:19,20

**Mike** 140:25

**mile** 18:5

**miles** 130:24

**mind** 104:2

**minute** 13:20 117:2 138:2

**minutes** 61:7 70:11 76:16 101:2 132:16, 18

**missed** 120:8

**Mississippi** 9:14,17 10:6,10 83:22

**moment** 31:11

**Monday** 117:11 137:24

**month** 15:22 20:19 66:12 70:22

**months** 24:22 66:5,

25 124:4

**monument** 64:16,24 65:18 67:8 78:9 79:9 109:21 113:15 140:20 141:16,20

**mood** 114:2,5,8,13, 16

**morning** 8:3 10:20, 22

**Mosley** 60:3

**move** 142:2,6

**moving** 65:22 139:14

**N**

**nailed** 113:2

**nation** 82:9

**nature** 11:8

**NBC** 59:17

**needed** 34:6 45:5 48:4 51:25 53:14 77:9,24 79:25 80:25 81:9,13 82:4,21 138:12

**needing** 43:20

**neighbor** 109:4,13 111:2 112:2 119:18 120:4,11 136:6

**Nice** 10:20

**night** 19:16,18,19,22, 24 20:3,13 21:23 22:4 25:6,8,11,14 26:5 27:25 68:5,14, 17 104:14 121:23,25 127:25 128:11,14,17, 23 129:2 130:7,11,22 131:4,8,20,25 132:4

**nighttime** 30:10 129:18

**nodding** 12:11

**nonprofit** 56:3

**nonwork** 131:19

**normal** 60:12

**north** 79:19

**Northern** 9:16

**notice** 36:3,24,25 37:15,19 43:7 54:16, 23 55:2 63:6,8 64:6 81:16 83:3,21 84:4 85:20 96:10,15,24 97:13,24 98:17 111:18 112:11 113:3, 16 114:16 115:11 116:22 119:3,25 134:6

**number** 9:11,18 32:17 35:9,15,16,20, 24 39:12 40:24 41:9 42:2,3,9,10,11,18 49:16 55:15 57:21 58:15,16 62:9 65:20 67:22 76:7 87:6 89:4, 14,15 91:6,20 93:18 94:16 99:6,25 100:22 101:20 102:3 103:5, 17 105:6 108:11 111:5 116:8 117:7, 12,16,20 119:14,21 120:15 135:18

**numbered** 137:18

**numbers** 21:2 22:6 35:12,14 59:6 92:16 102:2 119:12

**O**

**O'DONNELL** 9:4,5 10:8,9 13:21,24 14:3, 4,9,17 15:5 20:5 31:19 38:7 40:25 49:24 52:24 58:14 59:8 60:2,23 71:13 72:3,23 89:12 98:8 99:8 101:8 102:4 103:13,20 116:6 117:10 125:15 128:5, 8 136:11,20 143:2

**object** 14:18,25 20:5 38:7 52:24 71:13 72:3 98:8 125:15 128:5

**objection** 9:5

**objections** 9:6

**obligated** 11:25

**obligation** 12:7

**occurred** 68:9,11,13 88:13

**occurring** 66:8,13 134:13,18

**office** 66:21 75:21

**official** 47:19

**officials** 105:22

**Ole** 16:10,18 20:11

**one-week** 36:3,25 37:15,19

**open** 32:16,18 40:23 49:15 55:14 57:21 89:3 110:15 135:17

**openings** 24:14,17, 20

**operations** 60:10,20 83:16

**opine** 85:8

**opposing** 100:5

**opposite** 64:23

**opposition** 45:20

**options** 125:14 126:3,8,23 127:5

**oral** 12:11

**order** 76:15,17 77:22 81:22 83:8 86:4,18 87:2 101:21 120:22, 24 126:3,24 127:6 132:12,15,17

**organizing** 97:21

**ornamental** 122:4

**outbreak** 8:8

**outcry** 96:20

**overlook** 66:22

**owned** 24:6

**owners** 75:10,13,16

**owns** 24:7

**Oxford** 9:17 16:22 17:9 18:2,4 22:10 23:3 45:2,22 64:12 66:3,9,17 116:11

131:7 134:13,18

**Oxford's** 18:10 22:22,24

**P**

**p.m.** 99:9 105:20,25 106:13 142:18,19 143:9

**pages** 92:16 133:12, 14

**paragraph** 99:10

**parking** 38:24

**part** 23:17,22 24:2,5 52:18 77:15 107:6,9 132:15

**part-time** 17:17

**parties** 8:17 42:13

**parts** 85:14 128:13

**pass** 34:21

**passed** 43:6 123:13

**past** 23:10 84:17

**patrolling** 130:23

**pattern** 69:15 78:14, 15

**patterns** 69:23

**peaceful** 116:11

**pedestrians** 78:12 79:22

**pending** 8:25 12:21

**people** 19:13,21 20:2,13 25:10 33:4 40:4,10,14 46:8 48:11 49:6,13 52:6 54:14 64:2 68:21,25 71:3 72:9 76:22 77:4, 7,25 78:6,7,8,10,21, 24 79:7,9,13,20 80:2, 11,12,15,19 81:8,11, 25 84:14 88:11 90:4, 18 97:7,15 99:25 104:5,14 109:17 111:21,25 112:4 113:7 114:11,13,21 122:6,9 123:10,14,16 128:11,17,20,22

129:3,13 135:11 136:15 138:21

**people's** 82:10

**percent** 109:16

**period** 43:7 46:20 60:20 81:20 82:4,12, 18 83:11 85:20 86:3

**permanent** 24:14

**permission** 44:12

**permit** 33:5,17,21 34:11 35:5 36:7,10, 19,23 39:21,22 40:5, 7,10,15,16 43:19 45:18 46:3 47:20 48:13,18,21 50:3 53:18 55:11 60:16 61:4 62:2,6 63:3 65:21,25 68:10,13,23 69:2,5 74:20,24 75:4, 6 76:21 77:9,10,24 78:11 79:3,4,16,18, 25 80:12,23 81:9,17 85:7,22 89:13,24 90:8,23 91:3 92:9,12, 17 93:5,14,19,20 96:5,23 102:15,19 105:4 108:23,24 110:3,8,10,23 111:14 112:9 116:8,11,18 117:13,16,21,25 118:15,22,24 119:17 129:17,19 131:13 133:24 136:3,24 137:10 139:11

**permits** 33:2 34:20 47:16,24 48:6 54:5 60:13 74:16,22 75:6 84:8,14 85:4,12 87:3 98:20 104:14 107:13 108:8 110:12 129:13 130:5 134:8

**permitted** 25:8 68:9 77:12 96:18

**permitting** 25:25 34:16,25 86:16,20 106:20 133:5

**persist** 66:3

**person** 34:8,20 95:25 96:5

**personal** 141:11

**personally** 75:22

**Petermann** 62:22,23

**phone** 90:20

**photos** 62:24

**picture** 87:16

**pilot** 59:17

**place** 9:19 22:18 54:20 67:16,19,24 68:4 141:16,20

**plaintiff** 10:7,24

**plaintiffs** 9:3

**plan** 138:21,22

**planning** 138:22

**play** 37:9

**point** 29:22 39:13 53:3 56:21 81:14 138:20

**police** 44:25 45:6,7, 22 46:12 48:3 100:12 141:6

**policies** 57:14 132:10

**policy** 25:7 32:22 33:3,19,21 36:5,10 37:20,25 38:5,13 39:2,15,24 41:10,22 43:5,7,10,14 44:20, 23 45:10 46:16 47:10,14,15,19 48:23 50:3,18,22 51:7,9,18, 24 52:13,19,23 53:4, 10,14,16,18 54:12 55:11 56:11,24 57:6, 9 61:23 62:4 63:16 74:20,24 76:18 77:13,22 80:10,13 83:15 84:2,6 85:6 86:12,16 87:3 99:14 103:22 104:7 105:4, 18,19 106:15,23 107:20,21 117:24 118:7,11,20 119:8 120:23 124:25

**policymaking** 83:17

**poorly** 122:4

**pop** 142:12

**pose** 80:16

**position** 15:20 16:24 17:11,14,15

**possesses** 42:24

**possibly** 22:8 24:22 65:23 79:12 122:10 125:24 135:2

**post** 133:11,16,17

**posted** 132:13 133:8

**potentially** 24:10

**practice** 8:9 85:21 97:10 107:7,9 136:18

**pray** 109:19 110:2 112:2

**prayer** 109:3,4,14 111:2 119:18

**prepare** 13:17 15:4, 17 46:24

**prepared** 63:14 80:24 138:11

**present** 66:15 69:24 116:9

**press** 133:3,20

**pretty** 22:13 82:8 131:6

**prevent** 25:10

**prevented** 50:23

**prevents** 35:20

**primarily** 105:21

**prior** 16:19 26:10 28:21 61:8 63:19 120:12,13 123:25 138:19

**private** 42:12

**privilege** 14:19

**pro-confederate** 46:6,15 64:24

**proactive** 124:9

**problems** 123:2

**procedures** 8:23 13:15

**proceeding** 10:4

**process** 26:2 33:2,6, 13 34:16,25 36:7,10, 17,19 47:20 48:5,15, 18,21 56:25 57:4 60:13 84:7,10,18 85:7,15,22 86:20,23 87:3 90:23 106:20 126:16,18 133:5,24 134:7

**processed** 34:20

**product** 28:18

**professional** 19:8, 10 23:8 26:17

**profit** 52:10,17

**profit-making** 35:20,21 51:3,5,9,10, 23 56:17

**prohibit** 114:21

**prohibited** 42:14 51:11,17

**projected** 87:23

**projection** 88:2,5, 15,19,24

**promote** 56:4

**promoted** 28:16

**pronounce** 56:7

**property** 38:18,19 50:23 55:7 107:14 124:22

**protect** 80:24

**protest** 64:3 72:20 81:12 82:3,10 96:21, 23 97:18 98:4,5 112:4,22 114:14,23 117:4

**protesting** 97:15 109:24 111:23

**protests** 25:22,25 26:4,8,18 28:9 30:24 64:12,15,20 65:2,7,9, 17 66:3,8,16 67:15, 24 68:4 69:10 70:16, 25 71:12,25 72:16 73:5,9,13,16,24 75:11,20 81:3 109:23 134:12,17 135:3,4,9,

14

**provide** 115:14

**provision** 35:20 36:25 51:7 107:19

**public** 38:11,13,20, 25 49:6 70:4 71:6,24 72:9 75:23 90:12 96:20 114:10 126:4, 10,20,25 127:7,14, 16,18 132:6,20,25

**public-safety** 85:9

**pull** 58:8

**pulled** 47:24

**pulling** 58:22 109:18

**purpose** 125:21

**purposes** 35:21 51:5,10 82:11 94:10 131:19

**put** 24:23 25:14,16,17 31:6 47:10,13 59:17 68:25 69:6 86:3 96:2 100:10 106:15 125:19,24

**putting** 126:12,23 127:6 132:17

**Q**

**question** 12:15,21 13:3,4,14 14:21 23:25 28:22 38:10 52:15 69:20 126:6 128:10 130:25 131:15 136:19 140:25

**questions** 11:21 12:2 13:8 142:14,24 143:3

**quote** 81:17

**quotes** 24:22 25:20 130:2

**R**

**ran** 85:7

**range** 89:15 92:3

**rarely** 128:17

**Rash** 9:13 10:7,24

**rate** 42:20

**reacting** 124:10

**reaction** 97:6 114:3

**read** 99:22

**realize** 54:4

**realized** 53:15

**reason** 13:10 49:7 58:6 65:6 80:23 96:17 112:3 136:13, 16

**reasons** 44:11,17 45:14 46:16,18,25 47:2,7,12 64:25 65:5 71:7 75:7 81:6 110:23 112:8 126:17 136:24

**receive** 75:9,18

**received** 40:7 75:12, 15 117:17 136:4,12

**recently** 53:23

**recess** 32:8 101:13 142:18

**recognize** 32:19 41:20 49:22 55:20 58:3 59:11 62:17 76:12 87:12 89:8 92:6 103:10 104:24 108:18 110:20 115:25 120:19 135:24 137:7

**recollection** 61:9 98:23 125:12

**recommendation** 45:5 89:17,20 90:15 121:7

**record** 8:12 11:4 31:22 32:2,6,11 58:10 59:4 101:11, 12,16 142:16,21 143:5

**recording** 8:19

**reduces** 120:24

**refer** 18:12 35:14 41:3

**reference** 74:22

**referring** 51:14

**refreshed** 14:24

**related** 15:7 63:23 116:24 134:20,23 135:4

**relation** 74:15 75:5

**release** 133:3,20

**remain** 138:5

**remem-** 73:25

**remember** 34:2 36:8 37:8,11,16,17,24 39:17,19,25 40:5,6, 18,20 42:5 44:24 46:8,18 47:2 53:22 59:13 73:25 86:9 88:10,12,25 95:8 96:4 100:14 103:25 104:18 107:3 109:5,7 119:10 124:20 127:2, 4,12 133:2,5,20,22 139:12 140:16,18,22, 24 141:2,4,21 142:3

**remind** 101:6

**remote** 8:19

**remotely** 8:13,16

**rephrase** 12:16 111:14 122:16

**reported** 132:9

**reporter** 8:13 9:24 10:12 11:13,23 12:9, 25 58:11 108:15

**Reporting** 8:6 9:25

**represent** 10:24

**request** 39:10 60:7, 18 61:22 89:13 105:25 106:17 136:4

**requested** 48:13 63:4 102:18 138:20

**requesting** 84:14 104:5 129:13

**requests** 129:17

**require** 34:5 63:6,18

**required** 38:23 42:22

65:24 69:4 81:14,16 117:16,21

**requirement** 36:3 37:15,19 53:24 54:9, 17,23 55:3 63:9,22 64:6 83:3,21 84:4 96:10,16,25 97:25 98:17 111:19 112:12 113:3,17 114:17 115:11 116:22 117:12 118:6 119:4, 25 120:25 134:6

**requirements** 63:17

**requires** 76:21

**reserving** 9:6

**resident** 17:20 26:15

**response** 45:15 81:3 97:14 109:22,25 111:23 114:24 117:2 134:12,17 139:3

**responsible** 43:21 130:23

**rest** 44:8,9 93:10

**restaurant** 20:9

**restaurants** 22:20

**review** 14:16 31:12 41:18 47:4,8,13 142:11

**reviewed** 14:23

**reviewing** 47:15

**revised** 47:4

**revising** 51:24 56:10 120:22

**revision** 56:18 138:24

**revisions** 56:14 103:22,24 104:3,11, 13,15

**revisit** 99:14 100:18

**ride** 129:2

**rights** 77:11

**Rikard's** 140:18

**Roberts** 140:25

**role** 34:10,13 43:12 47:20 48:17,21 60:15 84:24 85:19 90:7,9, 23,25 106:20 107:13

**room** 8:10,15 51:2

**routinely** 85:3

**Rule** 8:22

**rules** 8:23,24 11:21

**run** 47:22

---

**S**

**safe** 45:24 69:13 71:17,20 74:4,9 77:6

**safer** 126:8

**safety** 38:11,14,20, 25 44:7,17 47:17 49:5 70:4 71:3,5 73:7 75:2,7 78:10,12 79:8, 10 80:4,20 85:13 94:10 96:14 99:24 100:3 104:4,13 121:8 122:18 126:4,10,19, 20,25 127:7,14,16,19 130:21 134:21 135:4, 8,10

**Santa** 62:25

**scenario** 115:2

**school** 16:12,13

**scratch** 70:14 73:21 99:12 130:10 137:15

**screen** 42:10

**scrolled** 116:4

**searching** 58:25

**section** 47:3 50:7 77:19

**secure** 100:13

**security** 34:5 38:23 39:6 42:24 43:12,16, 22 44:7,17 45:12 46:13 47:3,16 49:5 54:19 69:14 85:9,13 94:10 96:14 99:24 100:4 104:4,13 110:22 115:14 123:17 130:21

134:21

**security/safety** 122:21

**selected** 77:25 78:6

**sell** 28:17 52:3,7

**selling** 52:9

**send** 48:10 60:5 89:16,20 110:8 136:19

**sentence** 105:24

**separate** 23:25

**separated** 24:12

**September** 17:12,18

**series** 35:14

**services** 129:22

**session** 70:3

**sessions** 70:13 99:16

**set** 52:7,20 83:15

**sets** 119:9

**setting** 29:4 54:2

**severity** 8:7

**shaking** 12:12

**share** 40:22

**Sharefile** 32:14

**sheriff** 15:14 33:23, 25 34:7,10,21,23 37:12 39:4,7,13,15 40:2,8,11,12,15 42:23 43:12,21 44:24 46:11 47:4,8,13,15, 19 48:10,20 54:18,22 69:13,24 70:5 73:15, 23 74:11,19 75:2 81:19 82:20 83:9 84:13 85:2,8 86:2,7, 23 88:22 93:22 94:4, 7,23 95:12 96:12 99:3 108:2 115:13 121:7,19 122:24 124:7,14,16 125:10 126:7,17 127:23 131:16 134:22 139:6, 8 142:6

**sheriff's** 45:22 71:19 84:24 88:23 122:13 130:19 131:3 138:10 139:2

**shop** 19:15

**shopping** 22:20

**shops** 19:19

**short** 56:4

**show** 31:4 59:17 100:5

**showing** 31:14 71:4 81:11

**shut** 60:19

**side** 64:24 71:4 79:5, 10,14,19 97:17

**sides** 72:10 75:24 78:22,23,25 79:11 109:24

**siege** 71:24

**sign** 62:6

**sign-off** 61:25

**signature** 93:21,25 94:2 95:12

**signify** 94:13 95:21

**signs** 67:2,3,7 129:23 132:8

**similar** 112:19

**simultaneous** 97:5

**sir** 58:11

**sit** 27:4,15,20 114:25

**situation** 71:21 122:14

**size** 77:20

**smooth** 11:22

**social** 8:9 22:23,25 42:12 133:12,14

**socialize** 19:21

**sole** 34:20

**solely** 57:16,19 98:25

**somebody's** 63:24

**someone's** 93:21

**sound** 135:2

**speak** 10:16 12:10 15:10,14 88:18,20,22 142:23

**speakers** 97:5

**speaking** 43:5

**special** 105:25 106:16 108:3

**specific** 40:7 122:15, 17 141:21 142:3

**specifically** 14:22 40:20 48:24 103:25 121:18

**speech** 63:25 112:23 114:22

**spell** 11:4

**spend** 23:7 66:22

**spent** 84:15

**spill** 129:17

**spilled** 97:8

**spilling** 122:10

**square** 18:11,13,17, 23 19:2,5,9,14,20,24 20:2,12 21:14 22:9, 19,22 23:2,14,17,22, 24 24:3,5,8,12 25:2 26:17 29:9 45:23 49:14 59:22 64:16 65:14 66:23 67:16,19 71:6,8 78:17 79:23 122:6,22 127:25 128:11,14,22 129:2,4 130:23

**staff** 34:23 130:22

**staffed** 105:21

**stand** 112:21

**Standard** 143:9

**standing** 65:23

**start** 9:10 28:25

**started** 17:18 27:7 28:22 29:2 30:8 53:25

**starting** 84:25

**starving** 51:20

**state** 11:3 107:22

**state's** 8:24

**stated** 107:21 134:25

**States** 9:15

**stationed** 131:4

**statue** 27:21 46:6 65:14 72:10 75:25 77:5,16,23 79:18,21 87:17,20,24 97:9,21 98:4,14,18,22 112:5, 6,10 113:4 116:25 123:12 139:15,19 142:2,6

**stay** 79:19

**stayed** 56:24 84:18

**staying** 97:22

**stick** 138:21

**sticks** 43:17

**stipulate** 8:17

**stipulated** 9:3

**stopped** 66:6

**street** 77:6 122:11

**strike** 24:10 69:8 86:17 110:9 129:8

**strong** 82:2

**stuff** 90:12 132:11 142:12

**submission** 33:5

**submitted** 13:22 116:14

**SUBSCRIBED** 143:18

**substantive** 134:5

**suggest** 86:7,8

**suggested** 104:10, 12

**suggesting** 106:14

**summer** 64:10 65:3, 19 66:4 81:4 87:24 89:24 134:13,18

141:15 142:7

**supervisor** 50:8,9, 10 59:25 91:9 99:8 120:8

**supervisors** 15:11 34:15 44:15 50:2,11 60:2,24 61:3,16,20 62:6 65:10,13,18 69:11 70:5 73:23 81:18 83:6,9,15 85:19 86:2,7 88:19, 21 89:16,21 90:11,22 99:7 106:5,18 107:18,24 108:2,7,23 110:11 116:7 120:3 136:11,20,23 140:14 141:3,19 142:2

**supervisors'** 61:25

**support** 97:20,22 112:4,5 123:11

**surrounding** 99:25

**swear** 8:15 10:13

**swearing** 8:19

**sworn** 10:16 143:18

---

**T**

**tab** 108:10

**takes** 22:18 70:11

**taking** 9:19 11:2 12:10 13:6 142:23

**talk** 12:23 34:2 60:22 73:11,15 140:13 141:10,18

**talked** 74:25 99:20 125:18,23 140:17 141:8

**talking** 18:10 25:9 30:16 37:12 49:25 54:8,9,11 67:21 75:4 88:11,25

**talks** 38:22

**taxing** 71:12,16

**technical** 58:13 62:13

**telling** 50:14

**term** 90:16

**testified** 10:17

**testimony** 12:10 80:3

**thanking** 91:16,17

**that'd** 126:6

**thing** 58:22 100:14 133:6

**things** 40:17 52:3 69:24 71:22 100:15 118:3 124:7

**Thomas** 8:4 9:22

**thought** 27:12 34:4 37:23 39:5 72:5 94:9 112:16,25 121:17,19

**thoughts** 88:4 137:23

**threat** 44:7 45:19

**threatened** 102:22

**threats** 110:22

**Tim** 92:11,13 102:18

**time** 9:20 17:4 27:19 32:6 33:11 34:11,17 35:2 36:15 37:24 41:18 44:24 45:8 46:12,23 48:2 53:6 54:20 60:8 62:5 63:15 66:23,24 74:14 77:12 82:15,22,23 84:16 85:12 88:13 89:23 90:13 96:19 98:11 100:6 101:12, 16 104:2 106:10 121:20 124:12 125:9, 19 129:13,20 137:22 138:8,9,12,15,18,19, 23 139:5 142:17,23 143:5,10

**time-sensitive** 113:22

**timeline** 53:24 54:9 125:6

**timeliness** 84:12

**times** 19:3,7 27:22 29:24,25 36:18,21 39:14,25 54:12 61:24 67:9,10 70:13,15

74:25 100:23 113:9 114:19 129:8 139:13, 17

**Timmy** 92:23 93:19

**today** 11:2 12:2 13:8, 12,15 15:18 107:12 142:24

**today's** 15:8,11,15

**told** 52:20 53:4 57:10 63:14 79:19 97:12 103:2,3 123:8

**Tom** 9:2 10:5,19,23 14:11,13,14 15:2 31:4,10,25 32:4,12 41:7,16 49:17,21 57:22 58:2,7,16 59:3, 9 62:10,16 73:2 87:7, 11 89:7 91:21 92:2 100:25 101:4,17 102:5 103:9 108:17 110:19 115:20,24 120:18 135:19,23 137:6 142:9,22

**tomorrow** 99:15 100:19

**top** 50:6 92:22 94:17 95:6,13,18,22 102:14 117:14

**total** 68:11

**town** 22:14,15

**track** 29:21 101:9

**traffic** 49:13 65:24 69:15,23 71:8 78:13, 15 79:23 80:4,9,16

**traffic-control** 42:25

**troubleshoot** 32:3

**true** 20:12,15

**truth** 10:16,17 12:7

**truthful** 11:25 13:11

**TSG** 8:6 9:25

**Tuesday** 50:15 117:17

**turn** 14:4

**Two-** 93:17

**type** 40:16 71:21

82:15 114:24 122:12

**U**

**Uh-huh** 51:15 92:21, 24 103:19 109:8 110:14 116:17

**Uh-uh** 123:7

**ultimately** 104:6

**unanimously** 141:14

**underneath** 93:4

**understand** 11:24 12:4,13,15,25 13:8 18:15 35:17,18 38:9 69:20 74:23 77:8

**understandable** 11:22

**understanding** 128:22

**understood** 81:9 97:20 133:4

**uniform** 27:5,16

**United** 9:15

**unrelated** 135:9

**unusual** 42:24 60:7, 18 81:17,23 82:7

**upset** 90:12,19

**usage** 36:2 42:19

**usual** 89:22

**V**

**vacation** 120:8,13 141:23

**validity** 8:18

**vehicles** 78:15 80:20

**venture** 51:23

**version** 85:6

**versus** 9:13 138:24

**video** 8:18

**video-recorded** 9:11

**views** 140:19,23,24 141:2,4,7,11

**vigil** 68:18,21 122:23 123:10

**violate** 52:13,19,23 130:12

**virtual** 11:8

**vision** 122:7

**volume** 13:20 14:7

**vote** 117:3

**voted** 61:3 100:23 121:11 141:14

**W**

**wait** 117:2

**waive** 37:3,11,12,15, 18 54:23 55:2 63:8, 21 64:5 81:19 82:4, 12,18,25 83:3,10,12, 19,21 84:4 85:20 86:3 96:9,15,24 97:24 98:5 111:18 113:16 115:11,13 116:21 118:5

**waived** 36:25 37:2 82:16 96:17 97:12,13 98:11,17,21 114:17

**waiving** 37:16 112:11 113:3

**walk** 18:22,25 25:2 130:16

**walking** 19:4 21:15 24:25 25:10 67:2 130:11

**wanted** 60:22 71:18 73:6,10,12 77:18 81:12 90:10,19 108:2 109:15,25 110:4 117:4,23 124:9

**wanting** 41:5 73:16 109:3 111:21 114:14 116:25

**warning** 137:24

**Warren** 92:11,13,23 93:19 102:18

**ways** 126:8 132:24

**website** 132:11,14, 16,19

**weddings** 42:12

**week** 19:3,7 36:6,19 43:7 53:12 103:21

**week's** 36:24

**weekend** 108:4,8

**weekends** 66:23 105:19 107:8

**weeks** 66:11

**what-if** 71:21

**wiggle** 51:2

**William** 8:3 9:22

**Williams** 101:24 102:12

**word** 90:14 105:17 113:18

**words** 87:19,23

**work** 16:19 18:23 21:14 74:3 83:14 91:18 103:21 120:10

**work-product** 14:19

**worked** 19:9 140:3

**working** 120:6 132:7

**worried** 102:23

**wrote** 94:3,14 95:19

**Y**

**y'all** 69:18 104:15 117:10,15 133:11

**Y-A-C** 56:5

**YAC** 56:4,6

**year** 15:22 20:23 21:6 22:2,6 29:24 30:2

**years** 23:10 29:7,14, 17,19,21 54:6 128:3, 12,14,24

**yelling** 123:14

**yesterday** 14:8 15:5 137:21

**yield** 78:17

**Yokna-** 55:25

**Yoknapatawpha** 55:24

**youth** 23:7

**Z**

**Zoom** 9:19