# EXHIBIT 27

JEFFREY GLYNN BUSBY

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF MISSISSIPPI

OXFORD DIVISION

JOHN RASH,

Plaintiff,

v. CIVIL ACTION NO.: 3:20-cv-224-NBB-RP

LAFAYETTE COUNTY, MISSISSIPPI,

Defendant.

VIDEOTAPED REMOTE DEPOSITION OF

JEFFREY GLYNN BUSBY

Thursday, December 3, 2020

9:09 a.m. Central Standard Time

Reported by:

GRETA H. DUCKETT, CCR, RPR, CRR, CVR-S, RVR-M-S

JOB NO. 187135

JEFFREY GLYNN BUSBY

December 3, 2020

9:09 a.m. Central Standard Time

Videotaped remote deposition of JEFFREY GLYNN BUSBY, before Greta H. Duckett, CCR, RPR, CRR, CVR-S, RVR-M-S.

JEFFREY GLYNN BUSBY

A P P E A R A N C E S

FOR THE PLAINTIFF:

BY: Joshua Tom, Esq.
ACLU OF MISSISSIPPI
P.O. Box 2242
Jackson, Mississippi 39225

C. Jackson Williams, Esq.
P.O. Box 69
Taylor, Mississippi 38673

JEFFREY GLYNN BUSBY

A P P E A R A N C E S

C O N T I N U E D

FOR THE DEFENDANT:

By: David O'Donnell, Esq.
CLAYTON O'DONNELL
1403 Van Buren Avenue
Oxford, Mississippi 38655

ALSO PRESENT:

Kevin Marth, videographer

JEFFREY GLYNN BUSBY

I N D E X

EXAMINATION INDEX

JEFFREY GLYNN BUSBY
BY MR. TOM 9

JEFFREY GLYNN BUSBY

EXHIBIT INDEX

EXHIBIT 1 4/20/2015 Facility Use Policy; Bates Lafayette County DOC0000002 to Lafayette County DOC0000005 32

EXHIBIT 2 3/4/2019 Facility Use Policy; Bates Lafayette County DOC0000006 to Lafayette County DOC0000010 41

EXHIBIT 3 2/26/2019 email to Supervisor, O'Donnell, and Hill, from Carwyle 41

EXHIBIT 4 Order: Amend Facility Use Policy Regarding Use of Courthouse Grounds 56

EXHIBIT 5 Order: Approve Revision of Facilities Use Policy to include a requirement of application to be made 14 days prior to date of proposed use and requiring closure of courthouse grounds 30 minutes before dusk 62

EXHIBIT 6 9/1/2017 email to Frye from Lafayette County Board of Supervisors 71

JEFFREY GLYNN BUSBY

THE VIDEOGRAPHER: Good morning, Counselors. My name is Kevin Marth, and I'm the legal videographer today, in association with TSG Reporting, Inc. Due to the severity of the COVID-19 virus and following the practice of social distancing, I will not be in the same room with the witness. Instead, I will record the deposition remotely. Additionally, our court reporter today will also not be in the same room and will swear the witness remotely.

Do all parties stipulate to the validity of this video recording and the remote swearing and that it will be admissible in the courtroom as if it had been taken following Rule 30 of the Federal Rules of Civil Procedure and the state's rules where the case is pending?

MR. TOM: This is Josh Tom

JEFFREY GLYNN BUSBY

for the plaintiff. Yes.

MR. O'DONNELL: David O'Donnell. Yes.

THE VIDEOGRAPHER: This marks the start of media number 1 of the remote video-recorded deposition of Jeff Busby in the matter of John Rash versus Lafayette County, Mississippi, in the United States District Court for the Northern District of Mississippi, Oxford Division.

The remote deposition today is being held on December 3rd, 2020, and the time on the video monitor is 9:09 a.m. My name is Kevin Marth. I'm the legal videographer today, in association with TSG Reporting, Inc. Our court reporter today is Ms. Greta Duckett, also in association with TSG.

At this time, would counsel please state your appearances for

JEFFREY GLYNN BUSBY

the record.

MR. TOM: Josh Tom, with the ACLU of Mississippi, on behalf of plaintiff, John Rash.

MR. WILLIAMS: Jack Williams, sole practitioner, on behalf of the plaintiff, John Rash.

MR. O'DONNELL: David O'Donnell for the defendant, Lafayette County, Mississippi.

THE VIDEOGRAPHER: At this time, would the court reporter please swear in the witness, and we may proceed.

JEFFREY GLYNN BUSBY,

the witness, having first been duly sworn to speak the truth, the whole truth and nothing but the truth, testified as follows:

EXAMINATION

BY MR. TOM:

Q. Good morning, Mr. Busby. My name is Josh Tom, and I'm here on behalf of plaintiff, John Rash. As the court reporter and the videographer mentioned, this case is

against Lafayette County, Mississippi, and it's before the Northern District of Mississippi out of Oxford. And so, you know, I know currently you're the circuit clerk of Lafayette County, so congratulations on that. I know that that was a big win for you, and your mother had previously held that same position. So congratulations, even if it's quite a belated congratulations, but this is the first time I'm getting to meet you.

Today, we're going to be talking about not your circuit clerk job, but about when you were a member of the board of supervisors.

Can you state your full name for the record and spell it, please.

A. Jeffrey Glynn Busby.
J-E-F-F-R-E-Y, G-L-Y-N-N, B-U-S-B-Y.

Q. Now, given the virtual nature of this deposition, you know, I understand that attorney -- your attorney, David O'Donnell, is in the same room as you just to your right. I'm unable to see Mr. O'Donnell, and, you know, I'm unable to see anything that's off this

camera. And so, unlike a deposition where, you know, we're in the same room, that presents some, you know, difficulties, but, you know, nothing we can't, you know, solve here.

And so do you agree that during this deposition, excluding breaks, that you will not communicate with Attorney O'Donnell or anyone else when it's not apparent or audible to me or the court reporter?

MR. O'DONNELL: Josh, this is David. I'll represent to you --

(Inaudible; audio distortion.)

MR. O'DONNELL: I'll represent to you that any communications between Mr. Busby and myself during the course of the --

(Inaudible; audio distortion.)

MR. O'DONNELL: Any communications between Mr. Busby and myself will be noted --

(Inaudible; audio

distortion.)

MR. O'DONNELL: Any communications between Mr. Busby and myself during the course of the deposition will be noted on the record before it occurs. Okay? So there won't be any communications or hand movements or suggestions to the witness about testimony, period. But I understand the logistical difficulties that you have because of how we're handling the deposition. And as an element of fairness to you and to Mr. Williams, I will -- Mr. Busby and I will note in the event that we have to communicate during the course of the deposition.

MR. TOM: That's great. Thanks, David.

BY MR. TOM:

Q. Mr. Busby, have you been deposed in any other matter before this one?

A. No, sir.

Q. So you've never been a -- or have you ever been a plaintiff or defendant in a lawsuit?

A. No, sir.

Q. Have you ever been a witness in a lawsuit?

A. No, sir.

Q. So before we get to the substance, I want to go over a couple of ground rules for the deposition today so we can have a smooth time together today. Do you understand that you're obligated to give complete and truthful answers to my questions today?

A. Yes, sir.

Q. It's the same as if we were in court. Even though we're not in court, you still have the same obligation to tell the truth.

Do you understand that?

A. Yes.

Q. Because the court reporter is taking down your testimony, you must speak up and give oral answers instead of nodding or shaking your head.

Do you understand that?
A. I do.
Q. If you don't understand a question, let me know, and I'll try to rephrase it. If you need a break, tell me or your counsel, but please do not ask for a break or confer with your counsel while there is a question pending.
Do you understand?
A. I do.
Q. Let's not try to talk over each other, because it makes it difficult for the court reporter to take that information down. Please let me finish the question, and I'll let you finish your answer before I start asking another question.
A. Okay.
Q. Are you taking any medication or drugs that would impair memory or your ability to understand my questions?
A. No.
Q. Is there any other reason you can't give full, complete, and truthful answers today?
A. None.

Q. Do you have any questions about the procedures that we will follow today?
A. I do not.
Q. Are you familiar with this lawsuit titled, Rash versus Lafayette County, Mississippi?
A. I know of it. I do not -- no, sir, I don't know a lot about the case.
Q. And how do you know of the lawsuit?
A. Well, when I -- when I was told that I would be having this deposition. Mr. O'Donnell contacted me.
Q. I see. Have you read any documents related to this lawsuit?
A. I have read the facility use policy in '15 and in '19.
Q. Have you read any other documents?
A. I was presented -- I was given the arena policy this morning, but I have not read over it. No, sir.
Q. Have you read any other documents besides those mentioned?
A. No, sir.
Q. Have you read any news coverage

concerning this lawsuit?
A. No, sir.
Q. What did you do to prepare for this deposition?
A. Mr. O'Donnell came to my office yesterday for about, I would say, 30 to 45 minutes and presented me with the facility use policy from '15 and the facility use policy from '19. And I basically -- we read over that -- policies and discussed those. And then this morning, he -- or I'm not sure if it was this morning or yesterday, he told me that he -- that you had requested me read over the arena facility policy, which he brought with him this morning when he came to my office.
Q. Now, besides Mr. O'Donnell, was anyone else present at those meetings?
A. No, sir.
Q. Prior to the meetings you just mentioned, had you done anything else to prepare for this deposition?
A. No, sir.
Q. And besides the documents you mentioned, did you review any other documents

to prepare for this deposition?
A. No, sir.
Q. Have you discussed anything related to today's deposition with anyone else besides Attorney O'Donnell?
A. No, sir.
Q. Did you do anything else to prepare for today?
A. No, sir.
Q. What is your current position?
A. I'm the circuit clerk of Lafayette County.
Q. And what's the month and year that you began that position?
A. January of this year, 2020.
Q. Do you have any other employment in addition to being the circuit clerk of Lafayette County?
A. I'm sorry. I didn't under- -- I couldn't hear you.
Q. Do you have any other employment besides -- do you have any other employment in addition to being circuit clerk?
A. I have a retail sporting goods

business that I've been in for 35 years.

Q. And besides your sporting goods business, are there any other employment -- do you have any other employment besides that?

A. Rental property, if you call that a -- I mean, I'm not sure if that's -- we do have rental property that we rent.

Q. Okay. Any other employers?

A. No, sir.

Q. Now, did you graduate from college?

A. I have, like, six hours left.

Q. Okay. And where did you go --

A. The University of Mississippi.

Q. And did you graduate from high school?

A. Yes.

Q. Where did you graduate from high school?

A. Oxford High School.

Q. Where did you work prior to becoming circuit clerk?

A. University Sporting Goods and was a supervisor for Lafayette County.

Q. And how long were you a supervisor

for Lafayette County?

A. Eight years.

Q. So while supervisor for Lafayette County, you also ran your sporting goods business; is that correct?

A. That's correct.

Q. While a supervisor, did you have any other employment?

A. No, sir, besides sporting goods. Now, I had University Sporting Goods. That's where I worked full-time, and then I did my supervisor's job from there.

Q. Understood. Are you a lifelong resident of Lafayette County?

A. I am.

Q. Have you ever lived outside of Lafayette County?

A. No, sir.

Q. Do you live in Oxford?

A. I do.

Q. Are you a lifelong resident of Oxford?

A. Are you talking the city limits or the county as a whole?

Q. The city limits.

A. The city limits. I have lived outside the city limits for a short period of time. It's in the city limits now. But that was back in the, probably, late '80s. But for the most part of my life or the majority of my life, I have lived in the city limits.

Q. So for the vast majority of your life, you lived in the city limits of Oxford, Mississippi?

A. That's correct.

Q. And how old are you?

A. I'm 54.

Q. Do you maintain, in any form -- whether paper, electronic, text message, or otherwise -- any documents related to this case?

A. Related to this case? I mean, besides the facility use policies, no, sir.

Q. Do you maintain any documents from your prior work as a board of supervisors member?

A. Do I have -- I guess I don't understand the question.

Q. When you were a board of supervisors member for those eight years, do you maintain any documents as part of that work?

A. Yes, sir, I still have the emails.

Q. Do any of the emails relate to this lawsuit?

A. Not besides the facility use policies.

Q. So you have emails about the facility use policy?

A. I have the facility use policy emails, the documents in front of me that -- I have in front of me today, not correspondence with anyone about the facility use policy.

Q. And is that -- you have the facility use policy because Attorney O'Donnell gave them to you or because you had them before?

A. David -- our attorney, David O'Donnell, presented them to me. But I'm pretty sure that I -- when I was asked to produce these, I produced them to the county administrator.

Q. I see. And when were you asked to produce those?

A. One day last week.

Q. And this was in relation to this lawsuit?

A. That's correct. Well, I assumed it was -- I guess, I assumed that it was -- now -- was because of this lawsuit. Just any -- I was asked to produce anything that had to do with the statue or facility use policies, I think, is what the question was.

Q. I see. And the county administrator, Lisa Carwyle, asked you to do that?

A. Yes. It was either he -- she or David O'Donnell. I'm not sure which one of the two. They both may have been on the email to me.

Q. I see. Do you have any documents or communications about public safety issues on the Lafayette County Courthouse grounds?

A. Besides the document in front of me, no.

Q. Do you have any documents or

communications about protests, political speech, or other expressive activity on the Lafayette County Courthouse grounds?

A. Not that I -- no, sir, not that I'm aware of.

Q. In the documents that you did have about the facility use policy and the monument, you turned those over to the county?

A. That's correct.

Q. Now, in your work as supervisor -- or scratch that.

Throughout this deposition, we'll be talking about Oxford's courthouse square and the Lafayette County Courthouse, which is in the center of Oxford's courthouse square. I'm going to refer, as locals do, to this area as "the square" or "the county courthouse." You understand that "the square" is Oxford's courthouse square, right?

A. That's correct.

Q. And you understand that "the county courthouse" is the Lafayette County Courthouse, correct?

A. Correct.

Q. When I speak about "the county courthouse grounds," you understand that I'm referring to the grounds surrounding the courthouse building; I'm not talking about space inside the courthouse?

Do you understand that?

A. I do.

Q. The square is the center of Oxford's business, social, and city life, correct?

A. Yes, sir.

Q. How long has the square acted as the center of Oxford's business, social, and city life?

A. All of my life, that I -- that I'm aware of. I can't think of it -- I've always considered it to be the center of Oxford.

Q. The county courthouse lies at the center of the square, correct?

A. That's correct.

Q. The county courthouse grounds, except for small barriers, like decorative fencing -- let me rephrase.

The county courthouse grounds,

except for small barriers, like decorative fencing, is open to and part of the square, correct?

A. Part of the square -- part of the courthouse grounds, yes. I don't know if the streets and stuff are owned by the city or the county. I don't guess I understand the question. But the grounds inside the fenced-in area that you're talking about has always been considered courthouse -- Lafayette County's property.

Q. Okay. Separate from who owns the courthouse or who owns the streets, you know, that's not what my question is. The question is, is that the grounds of the county courthouse are part of the square; is that correct?

A. That's correct.

Q. The county courthouse grounds has sidewalks, grassy areas, and benches, right?

A. That's correct.

Q. The county courthouse grounds function as a small public park, correct?

A. I would disagree with calling it a

park. No, sir.

Q. How would you describe it?

A. I would -- it's a small area that surrounds the courthouse that people walk through going from one side of the square to another side of the square.

Now, if you're asking me if they -- anyone ever stops and sits on the benches, yes, they do. But do I look outside and see people kicking footballs or throwing Frisbees? No, sir, the lawn is not big enough for that.

Q. The county courthouse grounds are used for assembly, political speech, protest, and other expressive activity, correct?

A. I -- political speeches? I've never heard a political speech. Now, I've -- when you have Veterans Day, they have assembled for Veterans Day. Commencements, they have. But for political speeches, no, sir, I can't say that I remember one having that on the grounds of the courthouse.

Q. The county courthouse grounds are used for assembly, protest, and other expressive activity, correct?

A. I'm trying to think. I'm not trying to -- there has been -- are you considering inside the fence or on the monument? Because there have been people that have sat or stood at the monument, but I -- I guess there's been a few that had a speech or so, but very few in the -- in the years that I've been associated with it.

Q. Okay. So just for definitional purposes, the monument is on county property, correct?

A. I think they've established that. Yes, sir.

Q. The monument is part of the county courthouse grounds, correct?

A. According to the county, yes.

Q. So for -- when we talk about the county courthouse grounds today, that includes the grassy areas and also the land surrounding the monument.

Do you understand that?

A. Okay.

Q. So when I say "county courthouse grounds," you know, you tried to separate -- or

you did separate the monument from the grassy areas.

A. Yes.

Q. When I talk about the county courthouse grounds, I'm talking about the grassy areas and the area of the monument.

Do you understand?

A. Okay.

Q. The county courthouse grounds are used for assembly, protest, and other expressive activity, correct?

A. I would say yes.

Q. How long has the county courthouse grounds been used for assembly, protest, and other expressive activity?

A. When you say "protest," are you -- is that -- or I guess my question is, is that one or more? Or if it's an individual, is that counted as a protest?

Q. Yes.

A. Okay. I would say probably six years, and that's a guess.

Q. So the county courthouse grounds -- have you ever -- scratch that.

Have you ever seen an assembly, a speech, or a protest on the county courthouse grounds before six years ago?

A. I -- not that I can recall, but I don't know. I'm not going to say one way or the other, because I -- I simply don't know.

Q. So today we'll be discussing the Lafayette County Board of Supervisors. When I refer to "the board" or "board of supervisors," you understand I'm referring to the Lafayette County Board of Supervisors, correct?

A. That's correct.

Q. How does the board communicate when doing county business?

A. We have a meeting on the first and third Monday of each month. The -- when I was a supervisor, we had the first meeting at 5:00; and the -- on the third Monday of the month, we would have it at 8:00 in the morning, unless there was a special-called meeting.

Q. And the board's work is reflected in board agendas and minutes, correct?

A. That's correct.

Q. In what other records is the

board's work documented?
A. I'm sorry?
Q. In what other records is the board's work documented?
A. I would say -- I mean, I think you can subscribe by email and -- or look online to get the board minutes and the agenda and stuff through a website, the Lafayette County website.
Q. Besides agendas and minutes, are there any other records that show the work of the board?
A. Not that I'm aware of.
Q. Does the board communicate via email with each other?
A. No, not discussing business, because that's the sunshine law. And it -- we are not allowed to conduct business that way or by text or anything that we do not discuss in the -- we do not discuss the agenda over emails or texts.
Q. Do members of the board communicate with the public via email?
A. I'm sure one-on-one. I'm sure that

we've -- our constituents, if they email us, we try to answer them, yes.
Q. And do board members communicate with the public via text message?
A. I couldn't answer that question. I don't know if other members do or not. If someone asked me about a situation on a text, then I would probably -- I would probably respond, depending on, I guess, what it concerned.
Q. Do you -- scratch that.
Did you communicate with the public via text message while a board member?
A. Can you be more specific? On what issue? On this issue?
Q. On county business.
A. Yes, on county business.
Q. Did you communicate with the public via text or email about the monument on the county courthouse grounds?
A. I do not ever remember doing that, no, sir. Quite honestly, I don't remember getting any. I'm not saying I never got any, but that was not a big contingency when I was

on the board, as much as it was road ditches or roads or different things like that.
Q. Sure. Sure. Are there any other documents or communications that reflect the board's work that we have not discussed?
A. No, sir, that I'm aware of.
MR. TOM: Now, this question is for the court reporter.
(Technical discussion.)
(Exhibit 1 was marked for identification.)
BY MR. TOM:
Q. I just put Exhibit 1 into the chat. And this is the April 20th, 2015, Facility Use Policy. The Bates number at the bottom of the first page of this document is Lafayette County DOC000002.
A. Okay. I have that.
Q. Okay. Go ahead and take a look at that document, Mr. Busby.
A. Okay. What specifically do you want me to look at? I have read it.
Q. Okay. So what is this document? What is Exhibit 1?

A. This is the facility use policy that we put in -- I think it -- well, it says it went into effect in April of 2015 for the use of our facilities.
Q. And the board adopted this policy, correct?
A. That's correct.
Q. And you were president of the board when this policy was adopted, right?
A. That's correct.
Q. How was use of county property regulated before this 2015 policy was adopted?
A. I don't think they had a policy. I would assume they went through the county administrator, but I do not know. That was the reasoning to come up with the policy, because we started getting requests for facility use.
Q. When did you first become a board of supervisors member?
A. 2012.
Q. So from 2012 until April 20th, 2015, when this policy was implemented, how did the county regulate use of county property?
A. I assume it went through the county

administrator.
Q. Before this 2015 policy was adopted, what role did the board have in regulating use of county property?
A. We had none that I'm aware of. Again, I think any -- any request was made through the county administrator.
Q. What was the process to get permission to use county property before the board adopted this 2015 policy?
A. I assume they contacted the county administrator.
Q. Besides the county administrator --
(Simultaneous speakers.)
A. They did not contact me.
Q. I see. Who were the decisionmakers in granting use of the county courthouse grounds before this 2015 policy was adopted?
A. The county administrator.
Q. Was there anyone else besides the county administrator involved in that process?
A. Not that I'm aware of.
Q. Do you know what the criteria used were to determine whether someone could use the

county courthouse grounds --
A. I do not.
Q. -- before this policy was implemented?
A. I do not.
Q. Why did the county adopt this facility use policy in 2015?
A. We started having more and more -- our county administrator, I'm assuming -- and I'm sorry; I just don't remember every detail -- but said we had a lot more requests to use the building -- use the grounds. There was problems when people would use the grounds. Sprinkler systems were getting damaged. We were having people in the courtroom and monitors were getting damaged. So we felt, at that time, we needed to put together a facility use policy. And from that point, again, I assume that he got with our attorney, which was David O'Donnell at that time, and we came up with the facility use policy that we adopted in 2015.
Q. Who was the county administrator at this time?

A. That was Joseph Johnson.
Q. So the impetus behind adopting this facility use policy in 2015 was county administrator Joseph Johnson?
A. Yes, sir. I think he brought it to our attention that we -- he felt like that we needed to have a facility use policy because of the requests that he was getting for use of the facilities at that time.
Q. Was there anyone else that brought up the idea of adopting a facility use policy?
A. Not that I'm aware of. Again, if there was, I do not remember.
Q. So besides the concerns that you just mentioned about broken sprinklers and, you know, monitors in the courthouse, what concerns was this 2015 policy designed to address?
A. I think that was the majority of our concerns at that time. It was just the use of a historical building and the wear and tear and different things that were going on inside the facility. I don't think there was any problems, if that's what you're asking me. I wasn't aware of any, and I can't remember any

problems outside -- and I don't want to say "destruction," because I don't think they meant to harm the facilities. But it happened during the times of use, and it was just starting to get used more and more.
Q. Was the main concern use inside of the county courthouse?
A. No. I can't say just inside, because -- I think there was a group -- Makers Mark was one of the -- they were kind of a group that used the facility a couple of times a month to display crafts and arts. And it was -- they were -- they were on the lawn, and I know that's where some problems occurred; again, with not -- not problems among themselves, but problems with the use of the facilities.
Q. So is it fair to say that this policy in 2015 was adopted not because there were any problems, but just to get a better process in place for people to be able to use the county courthouse grounds?
A. Yes, sir. I would say that's a fair assessment.

Q. Okay. Was this policy designed to address public safety concerns?

A. I think we did address some public safety -- the security. I don't -- it was not a top priority at that time, no, sir.

Q. Were there public safety concerns, when this 2015 policy was addressed, regarding the county courthouse grounds?

A. Well, there's always concerns. You've got a historical building here, and there's no sprinkler system in this building. There's -- you know, there -- so the damage to the building or any electrical problems, fires, or anything, this building would go up fairly quickly.

You're probably -- in some portions of this courthouse, especially on the -- I guess the east and the west ends, you're less than 25 feet, probably, from the road. So, yes, there were some concerns of safety among people crossing streets and going in and out when you would have large gatherings on the -- i.e., as Makers Mark would have a -- something on the lawn, you would have pretty big crowds.

So safety in that standpoint was a concern, yes, sir.

Q. So besides, you know, potential fire and potential pedestrian traffic concerns, what other public safety concerns were there?

A. None at that time, that I'm aware of.

Q. What is the process for obtaining a permit under this 2015 policy?

A. They would contact the county administrator's office, and he had a form that they would fill out at that time. And I think it -- I think, at that time, it was a seven-day -- you had to do it seven days prior to the event.

Q. So if you look on page 3 of Exhibit 1, under "applications for usage," it says, Application should be submitted to the county administrator at least one week in advance.

A. Yes, sir.

Q. That's what you're referring to?

A. Yes, sir.

Q. So the county administrator runs

the process for granting permits under this 2015 policy?

A. That's correct.

Q. What is the role of the board for permits under this 2015 policy?

A. We adopted the policy, but outside that, we played no part in it.

Q. What is the role of the sheriff for permits under this facility use policy?

A. I'm sorry. I didn't hear you. I couldn't hear you.

Q. What is the role of the sheriff for permits under this 2015 policy?

A. I don't know that he played a role in that, but I -- I'm not -- that would be a question, I guess, for Joseph Johnson. I -- but from my recollection, I don't know that he played a part -- a part in that at all.

Q. Besides the county administrator, who else had a role for permits under the 2015 policy?

A. No one that I'm aware of.

Q. So I want to introduce Exhibit 2.

///

(Exhibit 2 was marked for identification.)

BY MR. TOM:

Q. Mr. Busby, this is the March 4th, 2019, facility use policy. And the Bates number is Lafayette County Doc 6 on the first page.

A. Yes, sir.

Q. I also want to introduce Exhibit 3.

(Exhibit 3 was marked for identification.)

BY MR. TOM:

Q. Now, we received this document from your former colleague, Kevin Frye. You don't have this document in -- in --

A. I don't. How do I download it?

Q. -- in hard copy?

If you go to the chat button --

A. Uh-huh.

Q. -- just open the chat, and you can double-click the document.

(Technical discussion.)

BY MR. TOM:

Q. Exhibit 3 is an email from Lisa

Carwyle to the supervisors, David O'Donnell, and John Hill, regarding the March 4th, 2019, policy.

A. Okay.

Q. Do you have it open?

A. Yes. I'm going -- I printed it off.

(Technical discussion.)

A. Okay.

Q. So let's go to Exhibit 2.

A. Okay.

Q. At the bottom, that's Bates-numbered Lafayette County Doc 6.

Do you see that?

A. I do.

Q. Do you understand this document?

A. Yes, sir.

Q. What is it?

A. It's the facility use policy that we adopted on March 4, 2019.

Q. And "we" is the board, correct?

A. We as the board, yes.

Q. Now, go to Exhibit 3.

A. Okay.

Q. This is an email from Lisa Carwyle to Supervisor, David O'Donnell, and John Hill, regarding facility use policy. And then it attaches the same policy, the March 4th, 2019, policy, but this appears to be a draft of it.

Do you see that?

A. I do. I have it printed out.

Q. Now, this email address, "Supervisor," whose -- whose email address is "Supervisor"?

A. I'm assuming it went to all five of us, all five supervisors.

Q. Okay. So this email from Lisa Carwyle is to all five supervisors and to David O'Donnell, correct?

A. That's correct.

Q. Who's John Hill?

A. He was the sheriff at that time.

Q. Now, this March 4th, 2019, policy was passed when you were president of the board, correct?

A. That's correct.

Q. Now, if you go to Exhibit 3, you'll see that Ms. Carwyle says that the changes to

the policy are in red.

A. Yes, sir.

Q. So now go down to the policy, and let's look at the red language here.

A. Uh-huh. Okay.

Q. So I know that this is a draft and I haven't fully compared it, so -- but just -- just as a -- you know, just so we know where to look. So you see how it says 30 days here in red? There's a nonrefundable fee of $25 in red.

A. Uh-huh.

Q. There's some red under --

A. Yes. I see that.

Q. There's some red under "security" --

A. Uh-huh.

Q. -- at the bottom of page 3.

Do you see that?

A. I see that.

Q. And then there's some red under "signs" at the bottom of page 4?

A. I -- I see that.

Q. And then there's a whole section

called "other items" in red at the bottom of page 4.

A. That's correct.

Q. So, you know, that is the area, according to Ms. Carwyle, that was changed from the 2015 policy.

A. That's correct.

Q. So now let's go back to the final policy, which is Exhibit 2.

A. Okay.

Q. So under applications for usage on Exhibit 2 on page 3 --

A. Okay.

Q. -- it says on the second bullet point, Applications should be submitted to the county administrator at least 30 days in advance?

A. That's correct.

Q. Why was that change made?

A. Again, I'm -- I'm trying to be as correct as I can be. I -- I'm pretty sure that was after the Charlottesville incident, that they had many problems there. And it concerned our law enforcement. And, again, I'm pretty

sure it was the same time the City redid their policy as well.

I know the police chief, which is now our sheriff, Mr. East, had come to me a few times and -- telling me that we needed to get something in place from a security standpoint. So I assume that's why we went from a seven-day period to a 30-day period from a security standpoint on what we anticipated could be problems.

Q. So what was Mr. East talking about for security? You said -- you said that he had to get some security things in place.

A. Well, it's sort of like --

Q. Can you explain what --

A. Well, yes. The --

Q. Can you explain that conversation?

A. Well, what -- what I was -- what I meant by that or mean by that is the City had already adopted, I think, a policy that addressed security measures, which he was the police chief at that time for the City. We had an interim sheriff in -- in Mr. Hill at that time. Our -- our sheriff passed away.

And in -- in light of the Charlottesville riots, we felt like we needed more security than what we had addressed in our facility policies before. And as he looked at it, as our -- our -- our teams work together, and I was not a part of the -- the meetings that -- I think that took place on campus. So I'm -- I'm just telling you from what my recollection -- recollection was.

But I'm pretty sure our attorney and our city police, our county police, our university police, many other agencies from Secret Service to the FBI, all met on campus in concern of the Charlottesville riots and what -- we had information that was -- that may or may not happen in Oxford.

Q. And these were -- why did people -- why did these people think that what happened in Charlottesville may happen in Oxford?

A. That would be something you'd need to ask the sheriff. I -- I don't know if it was information they received, if it was groups posting things online. I -- I can't answer those -- I can't answer that.

Q. Did this -- were the security concerns because of the Confederate monuments on the county courthouse grounds and on Ole Miss's campus?

A. I assume that that was a -- played a part in it at that time.

Q. So you mentioned that then-Police Chief East reached out to you several times about security concerns, right?

A. That's correct.

Q. And what did he -- what did he say when he reached out to you?

A. That he felt like that we needed to look at the City's policy and adopt -- well, get -- put more in place for -- for security reasons because of this is the focal point of -- of the town. And, you know, it's a small area with a lot of historical buildings. And so he felt like we needed more security. Did he go into a lot of details? No. He just said that he -- he thought we needed to re-address our policy.

Q. And when you say "this is the focal point of the town," what -- what is "this"?

A. The -- the courthouse grounds, the courthouse square.

Q. So to recap, tell me if this is correct. Was the March 4th, 2019, amendment to the facility use policy made because of security concerns and to address those security concerns over the county courthouse grounds and the square?

A. I would think that to -- yes. I would -- I would say that was a fair assessment; that we -- we put those in place because of security concerns, yes.

Q. Were there any other reasons besides security concerns that this March 4th, 2019, policy was passed?

A. I'm sure the increase of facility uses and not for one single group, but as the town has grown over the years and we had not addressed this in four or five years, that probably initiated it. But I can't say that would be the only reason that we changed the policy.

Q. So there were security concerns; there's increased use that gave rise to this

amendment in 2019; is that correct?
A. That would be -- yes. I would say that was a fair assessment.
Q. Are there any other reasons that this March 4th, 2019, amendment was made?
A. Not that I'm aware of.
Q. So you remember in Exhibit 3, under security, there was -- there was red -- red wording, right?
A. That's -- that's -- yes, sir.
Q. Now, you know, let's go back to the -- the final exhibit -- the final policy, which is Exhibit 2.
A. Okay.
Q. So under security, take a second to read that paragraph of security.
A. Okay.
Q. Why was this language under security added to the 2019 policy?
A. Well, you -- I guess you're referring to the sheriff department's involvement. You know, they have a lot more resources and a lot more information than the board of supervisors could ever have. So I'm

assuming, with, again, the Charlottesville riots and with the concern of security on our historical square, the involvement of the sheriff played a bigger role at that time.
Q. So when we were talking about the 2015 policy, you said that only the county administrator had a role in the process, right?
A. From my recollection. Now, I -- I can't say that he never reached out to the sheriff's department or -- or someone, but I would say he played -- probably, at that time, 90 percent of the decisions were made by him. If he ever had a security issue, he may have reached out to the -- to the sheriff's department. I'm just not aware of that.
Q. So this 2019 policy memorializes in the policy that the sheriff now has a role in determining whether to grant a permit for use of county property, correct?
A. That's correct.
Q. Now, besides the sheriff and the administrator, did the board have a role after the policy was amended in 2019 in determining --

A. No.
(Simultaneous speakers.)
BY MR. TOM:
Q. -- permits?
A. We never voted on who used the policy or who didn't use the policy -- I mean, who used the facilities or who did not use the facilities. The county administrator signed off on all of that.
Q. So besides the county administrator and the sheriff, who else had a role in determining whether to grant a permit under this policy or not?
A. Maybe the attorney, but I don't know that he had a role in that. That would be something you'd have to ask David O'Donnell. The board of supervisors did not play a role, that I can remember, in any incident.
Q. And by "the attorney," you're -- you're referring to the county attorney?
A. Mr. O'Donnell. Mr. O'Donnell. Yes, sir.
Q. Now, if you look at Exhibit 3, there's a lot of red language underneath

"signs," and then the whole section "other items," right?
A. Yes, sir.
Q. Now, if you go back to Exhibit 2, which is the final 2019 policy --
A. Uh-huh.
Q. You know, it looks like -- I don't know if verbatim, but that language appears there.
A. That's correct.
Q. So on the final policy, Exhibit 2, why were this -- why was this section added to the signs and other items?
A. Well, I think that goes along with the security, and I'm -- I don't think there's -- we spelled out what our security meant in -- in the other items when it refers to bricks, stones, guns, slingshots. I mean, I -- I think that we were trying to make it what our security -- to the people that were renting the facility or the facility use would know what they could and could not bring when they -- they came to use our facilities.
Q. So besides these changes that we've

talked about, were there any other changes made to the 2019 policy?

A. Not -- not that I'm aware of. Just what was in this document is what we adopted. I can look back. I think I marked application of use, security use, and other items, which I just think spells out our security use. But I think the overall policy guidelines, the definitions, use of facility grounds, were all the same.

Q. Who had a role drafting these 2019 revisions?

A. Mr. O'Donnell, and I'm sure, at -- at that time, they gave us the -- obviously, they gave us the draft. Mr. O'Donnell, our attorney, drafted a -- drafted the first copy and let us look over it. And then -- I don't remember if there was any feedback or additions or a discussion about taking anything out or leaving -- or putting more in at that time or not. But I would say Mr. O'Donnell was the one that prepared this document for us to review. And from my recollection, there was no changes or -- or any problems with the -- what he

adopted -- or what we adopted but what he put before us.

Q. So if you go to Exhibit 3, which is the email -- email from Lisa Carwyle on February 26th, 2019 --

A. Uh-huh.

Q. So she sent that to Supervisor, which is, as you mentioned, the five supervisors, David O'Donnell, and John Hill, who was John Hill, the interim sheriff, correct?

A. That's correct.

Q. So besides these people, was anybody else involved in revising this 2019 policy?

A. Not that I'm aware of.

Q. Is there -- do you agree that Lisa Carwyle, the five supervisors, David O'Donnell, and John Hill were the people that revised and adopted this 2019 policy?

A. That's correct.

Q. So I'm going to show you Exhibit 4, which you actually have this, Mr. Busby. Exhibit 4 is the June 15th, 2020, facility use

policy. I'll put it in the chat just in case you don't.

A. I -- I don't have that. 2020?

(Exhibit 4 was marked for identification.)

A. I -- I just have the two documents of -- facility use policy of 2015 and 2019. I do not have a copy of --

Q. Okay. No problem. If you look on the -- the chat --

A. (Indiscernible; audio distortion) Mr. O'Donnell just gave me -- I think this was the late addition with the arena. It may be in here.

(Technical discussion.)

BY MR. TOM:

Q. Do you have that, Mr. Busby?

A. I have it now, yes.

Q. And, you know, towards the -- underneath the names of the five supervisors, it says, After the vote, President Roberts declared the motion carried -- carried, this, the 5th day of June, 2020.

A. Okay.

Q. Is that right?

A. Yes, sir.

Q. So take a second to review this -- review this document.

A. Okay.

Q. So, you know, I noted you were already circuit clerk when this was passed. You were not a supervisor at this time, but, you know, you were the president of the board for eight years. And so I want to get -- ask you questions based on that experience. Okay?

A. Okay.

Q. So this -- this order amends the facility use policy, correct?

A. That's correct.

Q. And it applies -- this document applies only to the county courthouse grounds, correct?

A. Yes, sir. That's what it looks like.

Q. And only as applicable to the county courthouse grounds, groups of five or more people are now required to get a permit.

A. Four or less. Yes. Five or more

JEFFREY GLYNN BUSBY

gathered. Yes. That's what it says.

Q. Before this June 15th, 2020, policy, was there a group size limit that triggered the facility use policy and required a permit?

A. Well, I'm sorry. Repeat that.

Q. Before this June 5th, 2020, policy was -- was adopted, was there a group size limit that triggered the facility use policy and required a permit?

A. I have no idea. I mean, I don't -- I don't know why they -- what triggered this. I have no -- I'm not even in the same building as -- as the supervisors meet in. So I have no idea what -- why they did this.

Q. But from the 2015-2019 facility use policy, you were the president of the board when those policies were adopted, correct?

A. That's correct.

Q. And under those policies, was there a group size limit that triggered the policy requiring a permit?

A. It increased -- when I -- in the 2015 to the 2019, the reason we amended it was

JEFFREY GLYNN BUSBY

because of the Charlottesville incident and because of more use to the property. What triggered this, I have no idea.

Q. Okay. Let me -- let me rephrase. So under this June 15th, 2020, policy, if a group of five or more people wants to use the county courthouse grounds, they're required to get a permit, correct?

A. According to what you've given me, yes. This is the first time I've seen this.

Q. So before this policy was adopted, was there a certain-size group that had to get a permit?

A. I think in our 2019 policy, it -- in the security part, it talked about a size group, if I'm -- if I recall. I'm not -- I thought it said 50 or more, but I may be wrong.

It just says -- I guess it just says determine -- the sheriff bases on the size and location and the time of day. Yeah. The only other one, it says the application would have to have a $1,000,000 liability insurance of 50 or more people.

So, no, I don't know that we ever

JEFFREY GLYNN BUSBY

put a number on the ones that were adopted in 20- -- we did not put a number on the ones that were adopted in 2015 and 2019.

Q. Why did you not put a number on the 2015 and 2019 policies?

A. Well, at that time, we didn't -- I guess we didn't think it was necessary. Although, in the 2019 -- in the 2019, it does give the sheriff, depending on the size and location and the number of people, discretion on how much law enforcement would be needed. But, now, as far as getting a permit for a protest, I don't know that they had to have a certain number or not certain number. They did not in the '15 and '19.

Q. So in 2015 and 2019 policies, if one person wanted to hold an event on the county courthouse grounds, would they be required to apply for a permit?

A. In the 2015 and 2019, I -- I think that was correct. I think anyone that wanted to use the facilities at that time had to have a permit to make sure there was no time conflicts. I mean, there's a lot of reasons

JEFFREY GLYNN BUSBY

that went into that.

Q. And is there a certain language in the 2015 or 2019 policy that reflects your understanding that one person was required to get a permit if they wanted to use the county courthouse grounds?

A. If you're asking me is it spelled out one person, no. I think it says any group has to have. But it does not give a number.

Q. Do you know how this -- this -- the 2015 and 2019 policies were administered for purposes of what size groups were required to get a permit?

A. I do not. I would assume anyone that walked in just applied. It didn't matter if they were one or -- or 50. But, again, our county administrator made those decisions, not the board of supervisors.

Q. So let's go back to Exhibit 4, which is the June 15, 2020, policy.

A. Okay.

Q. Now, I know, again, you're not on the board when this policy was adopted, but given your long experience on the board and in

Lafayette County, why do you think it's necessary to require a permit for use of the county courthouse grounds for groups of five people?

A. Again, you're asking me questions that I -- I don't -- I don't know what was going on during that time or what information they had to make that policy be changed. I -- I'm not going to answer a question I didn't sit in on any of the meetings on.

Q. That's fine. You know, I'm not asking for, you know, you to talk about what the board did, but I'm talking about your personal experience.

A. Well, my personal experience, I don't know what the -- what led up to even making this policy change. If I was sitting there and I -- I listened to the different situations, if there were situations, then my opinion would go one way or the other. But I -- only thing I can answer is when I was on the board and what was presented to us.

(Exhibit 5 was marked for identification.)

BY MR. TOM:

Q. So I'm going to show you Exhibit 5. You should also have this one, Mr. Busby. It's also a single-page document, and I'm also putting it in the chat here. It is the July 20th, 2020, order that amended the facility use policy.

A. Okay.

Q. So at the top of this document, it says, Order: Approve revision of facilities use policy to include a requirement of application to be made 14 days prior to date of proposed use and requiring closure of courthouse grounds 30 minutes before dusk.

Correct?

A. Yes, sir. That's what it says.

Q. So take a -- have you had a chance to review that document, look at it?

A. No. It's the first time I've looked at it. (Indiscernible; audio distortion.) Okay.

Q. So this order closes the courthouse grounds 30 minutes before dusk.

Do you see that?

A. I do.

Q. So, in effect, this order puts a curfew on the county courthouse grounds, closing it at night.

Do you agree with that?

A. That's what it says, yes, sir.

Q. Before this amendment was adopted, has a curfew ever been placed on the county courthouse grounds?

A. Not that I'm aware of, no.

Q. Before this amendment was made, has a curfew ever been placed on any county property?

A. Again, not that I can recall.

Q. Was a curfew considered for the April 2015 or March 2019 facility use policies?

A. I just don't remember. Not that I can recall.

Q. Why do you think a curfew was imposed on July 20th, 2020?

A. I have no idea.

Q. During your years as president of the board of supervisors, did you ever think a curfew was necessary?

A. To be honest, I guess I never thought about it. Now, the question that is propose -- being proposed to me, I don't know that, after the incident in Charlottesville, that it wouldn't have been a good idea. But did I ever consider that before right now? No.

Q. During your years as president of the board of supervisors, did anyone ever bring up the idea of a curfew to you?

A. Not to me.

Q. Given your lifelong experience in Oxford and your experience as a board of supervisors member for eight years, do you think that a county courthouse -- do you think that a curfew on the county courthouse grounds is necessary to ensure public safety?

A. I can't say it's not a bad idea. I -- I never considered it when -- or when it was brought to my attention when I was board president. But as this town increases in population and traffic and the use of the facility, you know -- again, I don't know what went into their -- I don't know what all went into their discussion to -- to provide this.

So -- or put this into play. But, you know, I know there has been a lot of increase in -- in traffic, a lot of increase in -- in facility use. So, again, I -- I can't answer for that board. But I don't think it's a bad idea.

Q. So beyond being a, you know, good or bad idea, given your lifelong experience in Oxford and your eight years as county supervisor, is a curfew necessary on the county courthouse grounds to ensure public safety?

A. I would think, at times, it -- it probably was, yes.

Q. What times were those?

A. Well, you've got football games when you have 100,000 people in town. You have -- and, again, you're -- you're -- I don't know if you've ever been to Oxford, but these grounds are not very large. I mean, your -- you step off of -- you go 25 feet east or west, and you're stepping into traffic.

So, you know, I -- I think -- I think, given the increase in traffic, increase in facility use, increase for the number of people that -- that visit this town, it's

probably not a bad idea. Again, I've never considered it, but, again, I just didn't think of it.

Q. So you would agree that the increase in people visiting Oxford as a result of University of Mississippi football games has occurred for many years, correct?

A. Oh, yeah. Absolutely.

Q. And so the, you know, increase of people on the square during game days has been occurring for many years, correct?

A. That's correct. And I've seen many accidents up here, too.

Q. And so in all those many years of game days during Ole Miss football games, why do you think a curfew was not implemented before July 2020?

A. I mean, I can't answer that, because -- again, I don't think it's a bad idea. Did I think of it? No. You know, but there's a lot of things that -- that I -- when you have new people and fresh ideas that come in, I can't answer for what this group is -- is -- what they were thinking, what the

situations were at that time. I just have no idea.

You asked me my opinion on -- on that. You know, I thought, years ago, we should put speed bumps, because I watched a kid get run over on a bicycle over here next to First National Bank across from the courthouse. So, you know, it's -- it's always been a safety problem, as you alluded to; that it's not something that just happened in the last year.

But I don't know what went into them changing this policy. I'm not going to answer that. I can just give you my opinion of what I think.

Q. How was public safety achieved without a curfew on the county courthouse account grounds before July 20th, 2020?

A. I don't know that I -- to be honest with you, I can't think of a time that our facility was used at night. And I'm not saying it wasn't, but I can't think of a time in my eight years as president or my time for 35 years across the street, which I have a clear view of this facility, that it was ever used at

nighttime. And, again, it could have been. I just don't remember one.

Q. And are you -- when you're talking about facility, are you talking about the county courthouse grounds?

A. The county courthouse grounds, correct. Always been used in the daytime, as far as I know.

Q. Have you gone onto the county courthouse grounds for nonwork purposes at night after this curfew was imposed?

A. For nonwork? No, I have not.

Q. Have you walked by the county courthouse grounds at night after this curfew was imposed?

A. Oh, sure.

Q. And did you see people on the county courthouse grounds at that time?

A. I have no -- I mean, I don't know. I don't -- I'm -- I'm not going to say there wasn't people walking through, but I don't -- I don't know. I can't tell you a certain time and date that -- that I saw someone over here, no.

Q. Now, in your role as circuit clerk, have you heard of anyone enforcing this curfew?
A. I have not.
Q. Do you know if this curfew's being enforced?
A. I do not. I know when we've had -- in light of -- let me rephrase that. When we -- they have -- during protests or during a group protesting, I think they have -- I know they have -- they put some security tape on the entrances, maybe one or two times.
Q. And when was that?
A. I cannot remember.
Q. Was it this summer?
A. It was warm, so I'm assuming, yes.
Q. So it was warm and it was 2020. And there was protesting --
A. It was definitely 2020. And it was probably -- I would say summer. It hasn't been in the last month or so, no.
Q. How many times has the county taken up the issue of moving or contextualizing a Confederate statue on the courthouse grounds?
A. Well, I know when I was on the

board, we put a group together right after the university contextualized theirs. And we discussed contextualizing our monument at that time.
Q. That was in the fall of 2017, right?
A. If you say so. I don't -- I don't remember the timeline, but I do remember putting a group together and -- for the contextualization of this statue.
Q. Okay. I'll show you Exhibit 6, just to refresh your -- refresh your memory.
(Exhibit 6 was marked for identification.)
BY MR. TOM:
Q. Now, Exhibit 6 is -- I just put it in the chat.
A. Yes. I'm -- I'm pulling it up. Yes.
Q. Okay. Let me know once you have that.
(Technical discussion.)
A. Is this in the -- is this in the report that you gave to Mr. O'Donnell?

Q. No.
A. It's not?
Q. No.
A. Okay. Let me print it off. Okay.
Q. Now, sir, this document is an email from Lafayette County Board of Supervisors to Kevin Frye dated September 1st, 2017, correct?
A. Yes. It's our agenda, it looks like.
Q. Yeah. So this is the county board of supervisors' agenda for September 5th, 2017, right?
A. Uh-huh.
Q. And you were on the board at this time, right?
A. That's correct.
Q. So look on page 2, number 6, it says, Discussion regarding status of Confederate memorial statue and related options.
A. That's -- I see that.
Q. Now, is this what we were talking about before when you were talking about contextualizing the statue?

A. I assume so. Again, I don't know -- I can't remember the timeline. I just remember putting the group together. We had that incident, and then we also had another -- it was another time that we instructed our attorney, David O'Donnell, county attorney, to look into, if we did decide to move it, what were our options and where could we move it, according to statutes and law.
Q. Okay. So --
A. But I'm not sure which one of the -- I'm not sure which one of the two it is --
Q. I see.
A. -- at this point.
Q. So when you were on the board of supervisors, you considered contextualizing the statue, and then you considered moving it when you asked Attorney O'Donnell about your options, correct?
A. Well, no. We never got to the point that we had decided to move it. We never -- we never brought that to a vote. Never talked about that. We -- we wanted to

know, because there was conflicting things of if we could move it, if we couldn't move it, where we could move it. And so we instructed him to -- just in the whole process, to find out what -- what we could and could not do.

Q. I see. So is it -- is it fair to say that the board considered contextualizing the monument, and it also worked with attorney O'Donnell with options if you were to decide to move it?

A. It's fair to say that we -- we all discussed contextualizing the monument. As far as moving the monument, there was never a discussion per se that we were going to move it. It was to find out what our options were, if we ever got to that point.

Q. I see. Okay. So when you were on the board, you considered contextualizing the monument, and you considered your options --

A. Correct.

Q. -- for moving it?

A. Correct.

Q. Now, were there any other times that the board, when you were on the board,

considered contextualizing or moving the monument, besides those two?

A. Not that I'm aware of, but I'm not going to swear to that.

Q. Now, which happened first, the contextualization or the exploration of options of moving it?

A. I'm not real sure. It was all around the same time, I -- I think.

Q. So why did the board consider contextualizing the monument?

A. I want to say maybe someone came to one of our board -- board meetings and asked us to consider that. I can't tell you the name of the group, but I know someone -- I'm pretty sure someone did come to the board at that time. We told them that we would look into it, and that's when we formed the board and started that process.

Q. And tell me about the process.

A. We got -- I cannot tell you all the names of them, of the individuals that were on there. I know that Dr. Sensy (phonetic) was on it; I know Mr. Parrage (phonetic) was on it.

To be honest, I know it was six or seven, I think, was on it -- on the board, on the group. But I -- I do not remember the names of the individuals that were on it at that time. But they met several different times discussing the options. And then we never did -- at that point, the university -- did not seem to satisfy what the university had done at that point, and so we never -- we never went forward.

Q. Did the board vote on whether to contextualize the monument or not?

A. Not that I recall, but, again, I can't remember. I know we voted to put a group together, but I don't know if we -- I know -- I'm not sure if we ever voted on contextualizing the monument.

Q. Now, when the -- when you were on the board, you said that y'all considered options for moving it.

Do you remember that?

A. I do remember having David O'Donnell to find out what our legal options would be if we ever went down that -- that

path, yes.

Q. But the board -- did the board ever take that up officially during a meeting?

A. I think it was brought up in executive session when we asked David O'Donnell to get an AG's opinion or -- or find out or let us know. But I can't swear to that.

Q. And once -- did David -- did David give you options?

A. He did tell us where -- where the -- the statue could be relocated and what we could or could not do with the statue at that time.

Q. And what did y'all do with that information?

A. We didn't do anything with it, because, again, we never -- it never -- we were just asking him to do it in case or if we ever decided to go down that -- that -- that path, which we never did.

Q. Now, this summer, the board voted unanimous -- unanimously to keep the Confederate monument in place, correct?

A. That's correct. Correct.

JEFFREY GLYNN BUSBY

Q. So besides what we've already talked about, has the board ever considered contextualizing or moving the monument besides those three times?

A. Again, not that I'm aware of, but, I'm -- again, I can't swear to that. And I certainly can't swear to what they've done in 2020.

Q. When you were on the board, are there any other times that the board considered contextualizing or moving the monument or exploring options for moving the monument?

A. Again, not that I can recall. I'm not going to swear to that.

Q. Now, this summer -- it happened on June 20th, 2020 -- someone projected at night the words, quote, take it down, onto the county courthouse Confederate monument.

Did you see that?

A. I think I saw it on social media. I did not see it live, no.

Q. Now, did you hear any complaints about that?

A. I never heard anything one way or

JEFFREY GLYNN BUSBY

the other, to be honest.

Q. Did you talk to any current board of supervisors members about that projection?

A. No, sir.

Q. Do you know what the Oxford Fringe Festival is?

A. Oxford what?

Q. Fringe Festival.

A. No, sir, I don't.

Q. Do you remember, in the summer of 2019, images of people being deported from the border were projected onto the county courthouse walls?

A. No, sir, I don't. On our courthouse?

Q. The Lafayette County Courthouse walls.

A. No, sir, I don't.

MR. TOM: Can we take a -- maybe a 10-minute break? I'm probably almost done, but I want to speak with Jack first. And then we can ask any additional questions and wrap up.

JEFFREY GLYNN BUSBY

MR. O'DONNELL: That'll be fine, Josh.

(Technical discussion.)

THE VIDEOGRAPHER: This marks the end of media number 1. We're going off the record at 10:49 a.m.

(Recess from 10:49 a.m. to 11:09 a.m.)

THE VIDEOGRAPHER: This marks the start of media number 2. We are back on the record at 11:10.

BY MR. TOM:

Q. So, Jeff, just a few more questions before we wrap up here.

A. Okay.

Q. Mr. -- Mr. Busby, I mean.

So, before, we were talking about how, you know, the county courthouse and the square were sort of, you know, the center of Oxford.

A. Yes.

Q. What is -- can you explain what that means, like, what the square and the county courthouse are in relation to the city

JEFFREY GLYNN BUSBY

of Oxford?

A. Well, it's the business district. I mean, you've got -- you've got the businesses all around the square, and it's restaurants that people come to eat at and shop. And it's -- you know, this is always known as -- as the circuit court and where you -- where the trials take place and -- it's kind of what I mean by the central district.

Q. So is it -- is it fair to say that, you know, the square and the county courthouse that sits in the center of the square is the heart of the social and civic life of Oxford?

A. I would -- I would say so, yes.

Q. And if somebody were to want to have an assembly or, you know, engage in, you know, expressive activity, would they do it in the square?

A. I would say the square would be one of the -- the university would probably be one. But I would say that the square would be included, yes.

Q. And would the county courthouse grounds be -- now, within -- within the square,

the county courthouse grounds are -- okay. Strike that.

We've talked about how the square is the heart of Oxford, right? Is that right?

A. I consider it that, yes.

Q. Now, would you say that the county courthouse grounds are the heart of the square?

A. No. Do I think the -- the courthouse grounds make the square? No. I think these businesses make the square.

Q. So what happens on -- we may -- we talked before about the Veterans Day commemorations. What happens on Veterans Day during those commemorations?

A. You would have the office -- you'd have representative from the board of supervisors that kind of gave the welcoming, along with the mayor. And then you would -- you would get a report from the -- usually, from the marshal's service, the highway patrol, the city police, the university police, the county sheriff's department. I may have left out a few. Wildlife, fisheries. And they would tell if they had lost any men during

service or anything to that -- to that nature. You usually had a guest speaker that would probably speak for about 15 minutes.

Q. And how many people are there?

A. Oh, 30. I don't know. 30, 40.

Q. What time does this take place?

A. Usually, in the mornings around 10:00.

Q. And, spatially, where is it located?

A. On the north side of the square.

Q. Is it out -- is it -- is it -- where is it located in relation to the county courthouse grounds?

A. It's on the county courthouse -- it's kind of in the grassy area on the -- on the north side of the square. North -- I guess you'd say the northeast side of the square.

Q. So it's on the northeast side of the square, but on the county courthouse grounds?

A. Yes.

Q. Now, before, we talked about how the March 2019 amendment to the facility use

policy changed the permit period from seven days to 30 days.

Do you remember that?

A. Yes.

Q. And so we talked about the reason that the 2019 amendments were made were for security reasons and because of increased use of county property, right?

A. Correct.

Q. So how does the 30-day advance notice requirement advance those interests?

A. I -- I'm sorry. I couldn't understand you.

Q. How does the 30-day permit requirement advance those interests?

A. I guess -- I guess I'm understanding you correctly. It would -- again, I would think, if it was a -- a group that -- that -- that may be -- I don't know that it always takes 30 days to make a decision, number one. Sometimes, I'm sure it could be made in -- in less than 30 days. We just ask for a 30-day window of opportunity.

Now, it can -- sometimes, I'm

sure -- I don't know, because I'm not the county administrator -- would probably issue the permit before the 30 days was up. But if there was security or -- or issues that the sheriff's department needed to look into or the FBI needed to look into, I'm sure that -- that time would vary -- vary. So I don't -- I don't know that it always took 30 days.

Q. And who has the discretion to -- or is there discretion about whether to adhere to the 30-day requirement or not?

A. That would be a question for the county administrator. I -- I don't know. I've never had that issue brought to the -- when I was on the board, it never was brought to our board's attention, no.

Q. Now, besides this order that imposed the curfew on the county courthouse grounds that we reviewed before --

A. But -- but sir, as I was thinking about that and I re-read -- it's always -- it hasn't been a curfew, but it's always been until 10:00 p.m. for facility use. It's always been in our contract. I think it says from

8:00 to 10:00. I was looking on it earlier. In a prior -- maybe the 20- -- was it 2019? Or 2015, I mean.
Q. So if we go to Exhibit 2, which is the March 2019 policy --
A. Uh-huh.
Q. -- and under -- on page 2, under scope of and restrictions on use.
A. Eight to 10. Uh-huh.
Q. It says, Permission to use the building shall be granted for events which are scheduled to begin and end between 8:00 and 10:00 p.m., right?
A. That's what it was prior, yes.
Q. And it says, Permission to use the building.
What does that mean?
A. Well, you have -- you have different groups that will meet inside the courthouse. And whether it be the -- one of the political parties or having these kids -- moot court or -- or -- or different organizations will request permission to use the facility.

Q. And so this 8:00 to 10:00 a.m. [sic] limit only applies to the building, right?
A. I would assume that's -- I would assume that would be correct.
Q. And so the curfew that was passed on July 20th applies to, quote, closure of courthouse grounds, including the Confederate statue area.
A. Okay.
Q. Is that right?
A. I'm assuming that's what that says. Now, I don't know. If you'd show me the document, I would -- again, that was --
Q. It's --
A. -- after me.
Q. -- it's -- it's Exhibit Number -- Exhibit Number 5.
(Technical discussion.)
A. It says, Approved facility -- no. This doesn't say -- yeah, it does. 30 minutes before dusk. Uh-huh.
Q. So is it correct that the March 2019 policy, when it's use of the building on

the county courthouse grounds from 8:00 a.m. to 10:00 p.m., and then the July 20th, 2020, order closes the county courthouse grounds, including the Confederate statue area 30 minutes before dusk, right?
A. Yes.
Q. So the two time requirements between the March 2019 policy and this July '20 policy are actually different, aren't they?
A. Yes, because one of them closes at -- at dusk.
Q. And they also are different because they apply to different areas, right?
A. According to this -- this -- this document that you've produced for me, yes. Again, I -- I don't know what they -- their discussion was. I'm just reading what's in front of me.
Q. Now, to your knowledge, has the -- has the county ever announced this curfew that was imposed on July 20th, 2020?
A. I would assume we adopted it. It was in the paper. But that's an assumption.
Q. Besides me showing you the order

today, you'd never heard of it before?
A. Of the 2020?
Q. Yes.
A. No. I've never -- I've never seen that before today.
Q. But not the -- not the document. Had you ever heard of the curfew before today?
A. I can't say that I've heard -- that I knew there was a curfew.
Q. And we talked about the meeting for security reasons in 2019, where, you know, a lot of those different agencies and people met.
Do you remember that?
A. I remember telling you that I was not present, but there was a meeting on the university, yes.
Q. Do you remember what that event was called?
A. I do not.
Q. Do you remember who called that event?
A. I do not.
Q. But that event was called in order to discuss security issues in Oxford, correct?

JEFFREY GLYNN BUSBY

A. After the Charlottesville incident, my recollection, yes, that's what it was called to talk about, security measures.

MR. TOM: Okay. Well, that's all I have, I believe. You know, I'll -- if -- if Jack wants to ask any questions, I believe he has an opportunity to. And, also, obviously, David, you know, if you have any follow-up.

MR. WILLIAMS: This is Jack. I have no follow-up.

MR. O'DONNELL: That's good, Jack. I have -- I have no further questions -- other questions. We're done.

MR. TOM: All right. Mr. Busby, thanks for taking your morning to chat with us here.

THE WITNESS: Yes, sir. Thank you.

THE VIDEOGRAPHER: This concludes the deposition. We are going off the record at 11:24 a.m.

JEFFREY GLYNN BUSBY

(The remote deposition of JEFFREY GLYNN BUSBY concluded at 11:24 a.m. Central Standard Time)

______________________________

Jeffrey Glynn Busby

SUBSCRIBED AND SWORN BEFORE ME

THIS ____ DAY OF __________, 2020.

____________________

JEFFREY GLYNN BUSBY

REPORTER'S CERTIFICATE

I, Greta H. Duckett, Certified Court Reporter, Registered Professional Reporter, and Certified Realtime Reporter, hereby certify that on Thursday, December 3, 2020, I reported the remote deposition of JEFFREY GLYNN BUSBY, who was first duly sworn or affirmed to speak the truth in the matter of the foregoing cause, and that the pages herein contain a true and accurate transcription of the examination of said witness by counsel for the parties set out herein.

I further certify that I am neither of kin nor of counsel to any of the parties to said cause, nor in any manner interested in the results thereof.

This 14th day of December, 2020.

Greta Duckett
______________________________

GRETA H. DUCKETT, RPR, CRR, CVR-S, RVR-M-S
ACCR-12, GCCR-2891, MCCR-1945, TNLCR-671

ERRATA SHEET

Case Name:

Deposition Date:

Deponent:

| Pg. | No. | Now Reads | Should Read | Reason |
|---|---|---|---|---|
| ___ | ___ | __________ | __________ | ____________________ |
| ___ | ___ | __________ | __________ | ____________________ |
| ___ | ___ | __________ | __________ | ____________________ |
| ___ | ___ | __________ | __________ | ____________________ |
| ___ | ___ | __________ | __________ | ____________________ |
| ___ | ___ | __________ | __________ | ____________________ |
| ___ | ___ | __________ | __________ | ____________________ |
| ___ | ___ | __________ | __________ | ____________________ |
| ___ | ___ | __________ | __________ | ____________________ |
| ___ | ___ | __________ | __________ | ____________________ |
| ___ | ___ | __________ | __________ | ____________________ |
| ___ | ___ | __________ | __________ | ____________________ |
| ___ | ___ | __________ | __________ | ____________________ |
| ___ | ___ | __________ | __________ | ____________________ |

_____________________

Signature of Deponent

SUBSCRIBED AND SWORN BEFORE ME

THIS ____ DAY OF __________, 2020.

____________________

(Notary Public) MY COMMISSION EXPIRES:__________

**$**

**$1,000,000** 59:23

**$25** 44:11

**1**

**1** 8:6 32:11,14,25 39:18 80:6

**10** 86:10

**10-minute** 79:21

**100,000** 66:16

**10:00** 83:9 85:24 86:2,14 87:2 88:3

**10:49** 80:7,8

**11:09** 80:9

**11:10** 80:12

**11:24** 90:25

**14** 63:13

**15** 15:17 16:9 60:16 61:21 83:4

**15th** 55:25 58:3 59:6

**19** 15:17 16:10 60:16

**1st** 72:8

**2**

**2** 40:24 41:2 42:11 45:10,13 50:14 53:5, 12 72:18 80:11 86:5, 8

**20** 88:9

**20-** 60:3 86:3

**2012** 33:21,22

**2015** 32:15 33:4,13, 23 34:3,11,19 35:8, 23 36:4,18 37:20 38:8 39:10 40:3,6,14, 21 45:7 51:7 56:8 58:25 60:4,6,17,21 61:4,12 64:17 86:4

**2015-2019** 58:17

**2017** 71:6 72:8,12

**2019** 41:6 42:3,21 43:5,20 49:5,16 50:2, 6,20 51:17,24 53:6 54:3,12 55:6,15,21 56:8 58:25 59:15 60:4,6,9,17,21 61:4, 12 64:17 79:12 83:25 84:7 86:3,6 87:25 88:9 89:12

**2020** 8:16 17:16 55:25 56:4,24 58:3,8 59:6 61:21 63:7 64:21 67:18 68:18 70:17,19 78:9,17 88:3,22 89:3

**20th** 32:15 33:22 63:7 64:21 68:18 78:17 87:8 88:3,22

**25** 38:20 66:20

**26th** 55:6

**3**

**3** 39:17 41:10,11,25 42:24 43:24 44:19 45:13 50:8 52:24 55:4

**30** 7:21 16:7 44:10 45:17 63:15,24 83:6 84:3,21,23 85:4,9 87:22 88:5

**30-day** 46:9 84:11, 15,24 85:12

**35** 18:2 68:23

**3rd** 8:15

**4**

**4** 42:21 44:23 45:3 55:23,25 56:5 61:20

**40** 83:6

**45** 16:7

**4th** 41:5 42:3 43:5,20 49:5,15 50:6

**5**

**5** 62:24 63:3 87:19

**50** 59:18,24 61:17

**54** 20:14

**5:00** 29:18

**5th** 56:24 58:8 72:12

**6**

**6** 41:7 42:14 71:12,14, 17 72:18

**8**

**80s** 20:6

**8:00** 29:20 86:2,13 87:2 88:2

**9**

**90** 51:13

**9:09** 8:17

**A**

**a.m.** 8:17 80:7,8,9 87:2 88:2 90:25

**ability** 14:19

**Absolutely** 67:9

**accidents** 67:14

**account** 68:18

**achieved** 68:16

**ACLU** 9:4

**acted** 24:13

**activity** 23:3 26:15, 25 28:12,16 81:18

**added** 50:20 53:13

**addition** 17:18,24 56:14

**additional** 79:24

**Additionally** 7:12

**additions** 54:19

**address** 36:18 38:3, 4 43:9,10 49:7

**addressed** 38:8 46:22 47:4 49:20

**adhere** 85:11

**administered** 61:12

**administrator** 21:25 22:14 33:16 34:2,8, 13,14,20,22 35:10,24 36:5 39:20,25 40:20 45:17 51:8,23 52:9, 11 61:18 85:3,14

**administrator's** 39:12

**admissible** 7:19

**adopt** 35:7 48:15

**adopted** 33:6,10,13 34:4,11,19 35:22 37:20 40:7 42:21 46:21 54:5 55:2,21 58:9,19 59:12 60:2,4 61:24 64:8 88:23

**adopting** 36:3,12

**advance** 39:21 45:18 84:11,12,16

**AG's** 77:7

**agencies** 47:13 89:13

**agenda** 30:8,21 72:9, 12

**agendas** 29:23 30:11

**agree** 11:6 55:18 64:6 67:5

**ahead** 32:20

**allowed** 30:19

**alluded** 68:10

**amended** 51:24 58:25 63:7

**amendment** 49:5 50:2,6 64:8,12 83:25

**amendments** 84:7

**amends** 57:14

**announced** 88:21

**answers** 13:14,24 14:23

**anticipated** 46:10

**apparent** 11:9

**appearances** 8:25

**appears** 43:6 53:9

**applicable** 57:22

**application** 39:19 54:6 59:22 63:13

**applications** 39:18 45:12,16

**applied** 61:16

**applies** 57:17,18 87:3,8

**apply** 60:20 88:14

**Approve** 63:11

**Approved** 87:21

**April** 32:15 33:4,22 64:17

**area** 23:17 25:10 26:4 28:7 45:5 48:19 83:17 87:10 88:5

**areas** 25:21 27:20 28:3,7 88:14

**arena** 15:20 16:15 56:14

**arts** 37:13

**assembled** 26:18

**assembly** 26:14,24 28:11,15 29:2 81:17

**assessment** 37:25 49:12 50:4

**association** 7:5 8:19,22

**assume** 33:15,25 34:12 35:20 46:8 48:6 61:15 73:2 87:5, 6 88:23

**assumed** 22:7,8

**assuming** 35:10 43:12 51:2 70:16 87:13

**assumption** 88:24

**attaches** 43:5

**attention** 36:7 65:20 85:17

**attorney** 10:22 11:8 17:6 21:18,21 35:20 47:11 52:15,20,21 54:17 73:7,20 74:9

**audible** 11:9

**audio** 11:13,20,25 56:12 63:21

**aware** 23:6 24:17 30:14 32:7 34:6,23 36:13,25 39:7 40:23 50:7 51:16 54:4 55:17 64:11 75:4 78:6

**B**

**B-U-S-B-Y** 10:19

**back** 20:6 45:9 50:12 53:5 54:6 61:20 80:12

**bad** 65:18 66:6,8 67:2,20

**Bank** 68:8

**barriers** 24:23 25:2

**based** 57:12

**bases** 59:20

**basically** 16:10

**Bates** 32:16 41:6

**Bates-** 42:13

**began** 17:15

**begin** 86:13

**behalf** 9:4,7,23

**belated** 10:9

**benches** 25:21 26:9

**bicycle** 68:7

**big** 10:7 26:12 31:25 38:25

**bigger** 51:5

**board** 10:14 20:22 21:2 29:9,10,12,14, 23 30:8,13,15,23 31:4,14 32:2 33:6,9, 19 34:4,11 40:5 42:22,23 43:22 50:25 51:23 52:18 57:10 58:18 61:19,24,25 62:14,23 64:24 65:9, 13,20 66:6 71:2 72:7, 11,15 73:17 74:8,19, 25 75:11,14,17,19 76:3,12,20 77:3,22 78:3,10,11 79:3 82:17 85:16

**board's** 29:22 30:2,5 32:6 85:17

**border** 79:13

**bottom** 32:16 42:13 44:19,23 45:2

**break** 14:6,7 79:21

**breaks** 11:7

**bricks** 53:19

**bring** 53:23 65:9

**broken** 36:16

**brought** 16:15 36:6, 11 65:20 73:24 77:5 85:15,16

**building** 24:5 35:13 36:21 38:11,12,14,15 58:14 86:12,17 87:3, 25

**buildings** 48:19

**bullet** 45:15

**bumps** 68:6

**Busby** 7:1 8:1,8 9:1, 16,22 10:1,18 11:1, 17,23 12:1,4,16,23 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1, 21 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1,5 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1,

24 56:1,18 57:1 58:1 59:1 60:1 61:1 62:1 63:1,4 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1,17 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1,19

**business** 18:2,4 19:6 24:10,14 29:15 30:17,19 31:17,18 81:3

**businesses** 81:4 82:11

**button** 41:19

**C**

**call** 18:6

**called** 45:2 89:19,21, 24 90:3

**calling** 25:25

**camera** 11:2

**campus** 47:8,14 48:5

**carried** 56:23

**Carwyle** 22:14 42:2 43:2,15,25 45:6 55:5, 19

**case** 7:24 9:25 15:9 20:18,19 56:2 77:19

**center** 23:16 24:9,14, 18,20 80:20 81:13

**central** 81:10

**certain-size** 59:13

**chance** 63:18

**change** 45:20 62:18

**changed** 45:6 49:22 62:9 84:2

**changing** 68:13

**Charlottesville** 45:23 47:3,15,20 51:2 59:2 65:5 90:2

**chat** 32:14 41:19,21

56:2,11 63:6 71:18 90:20

**chief** 46:4,23 48:9

**circuit** 10:5,13 17:12, 18,24 18:22 57:8 70:2 81:8

**city** 19:24 20:2,3,4,5, 8,10 24:10,15 25:7 46:2,20,23 47:12 80:25 82:22

**City's** 48:15

**civic** 81:14

**Civil** 7:22

**clear** 68:24

**clerk** 10:5,13 17:12, 18,24 18:22 57:8 70:2

**closes** 63:23 88:4,11

**closing** 64:5

**closure** 63:14 87:8

**colleague** 41:15

**college** 18:11

**commemorations** 82:14,15

**Commencements** 26:19

**communicate** 11:8 12:18 29:14 30:15,23 31:4,13,19

**communications** 11:17,23 12:4,8 22:21 23:2 32:5

**compared** 44:8

**complaints** 78:23

**complete** 13:13 14:23

**concern** 37:7 39:2 47:15 51:3

**concerned** 31:11 45:24

**concerns** 36:15,17, 20 38:3,7,10,21 39:5, 6 48:3,10 49:7,8,13, 15,24

**concludes** 90:24

**conduct** 30:19

**Confederate** 48:3 70:24 72:20 77:24 78:19 87:9 88:5

**confer** 14:7

**conflicting** 74:2

**conflicts** 60:25

**congratulations** 10:6,9,10

**considered** 24:18 25:11 64:16 65:19 67:3 73:18,19 74:8, 19,20 75:2 76:20 78:3,11

**constituents** 31:2

**contact** 34:16 39:11

**contacted** 15:13 34:12

**contextualization** 71:11 75:7

**contextualize** 76:13

**contextualized** 71:3

**contextualizing** 70:23 71:4 72:25 73:18 74:8,13,19 75:2,12 76:18 78:4, 12

**contingency** 31:25

**contract** 85:25

**conversation** 46:18

**copy** 41:18 54:17 56:9

**correct** 19:6,7 20:12 22:7 23:10,21,24,25 24:11,20,21 25:4,18, 19,22,24 26:15,25 27:12,16 28:12 29:12,13,23,24 33:7, 8,11 40:4 42:22 43:16,17,22,23 45:4, 8,19,22 48:11 49:5 50:2 51:20,21 53:11 55:12,13,22 57:15, 16,19 58:19,20 59:9 60:22 63:16 67:8,12,

13 69:8 72:8,17 73:21 74:21,23 77:24,25 84:10 87:6, 24 89:25

**correctly** 84:18

**correspondence** 21:15

**counsel** 8:24 14:6,8

**Counselors** 7:3

**counted** 28:20

**county** 8:9 9:11 10:2, 5 15:6 17:13,19 18:24 19:2,5,15,18, 25 21:24 22:13,22 23:4,9,15,18,22,23 24:2,19,22,25 25:8, 16,20,23 26:13,23 27:11,15,17,19,24 28:5,10,14,24 29:3,9, 12,15 30:9 31:17,18, 21 32:18 33:12,15, 24,25 34:5,8,10,12, 14,18,20,22 35:2,7, 10,24 36:4 37:8,23 38:9 39:11,20,25 40:20 41:7 42:14 45:17 47:12 48:4 49:8 51:7,20 52:9,11, 21 57:18,23 59:8 60:19 61:6,18 62:2,4 64:4,9,13 65:15,16 66:9,10 68:17 69:6,7, 10,14,19 70:22 72:7, 11 73:7 78:18 79:13, 17 80:19,25 81:12,24 82:2,7,23 83:14,16, 21 84:9 85:3,14,19 88:2,4,21

**County's** 25:11

**couple** 13:10 37:12

**court** 7:13 8:11,20 9:13,24 11:10 13:17, 22 14:13 32:9 81:8 86:23

**courthouse** 22:22 23:4,14,15,16,18,20, 23 24:3,5,6,19,22,25 25:6,11,14,17,20,23 26:5,13,22,23 27:16, 19,24 28:6,10,14,24 29:3 31:21 34:18 35:2 36:17 37:8,23 38:9,18 48:4 49:2,3,8 57:18,23 59:8 60:19 61:7 62:4 63:15,23 64:4,10 65:15,16 66:11 68:8,17 69:6,7, 11,15,19 70:24 78:19 79:14,16,17 80:19,25 81:12,24 82:2,8,10 83:15,16,21 85:19 86:21 87:9 88:2,4

**courtroom** 7:20 35:16

**coverage** 15:25

**COVID-19** 7:7

**crafts** 37:13

**criteria** 34:24

**crossing** 38:22

**crowds** 38:25

**curfew** 64:4,9,13,16, 20,25 65:10,16 66:10 67:17 68:17 69:12,15 70:3 85:19,23 87:7 88:21 89:8,10

**curfew's** 70:5

**current** 17:11 79:3

## D

**damage** 38:13

**damaged** 35:15,17

**date** 63:13 69:24

**dated** 72:8

**David** 8:3 9:9 10:22 11:12 12:21 21:21 22:17 35:21 42:2 43:3,15 52:17 55:10, 19 73:7 76:23 77:6,9 90:10

**day** 22:4 26:18,19 56:24 59:21 82:13,14

**days** 39:15 44:10 45:17 63:13 67:11,16 84:3,21,23 85:4,9

**daytime** 69:8

**December** 8:15

**decide** 73:8 74:10

**decided** 73:23 77:20

**decision** 84:22

**decisionmakers** 34:17

**decisions** 51:13 61:18

**declared** 56:23

**decorative** 24:23 25:2

**defendant** 9:10 13:3

**definitional** 27:10

**definitions** 54:10

**department** 51:11, 16 82:23 85:6

**department's** 50:22

**depending** 31:10 60:10

**deported** 79:12

**deposed** 12:23

**deposition** 7:12 8:7, 14 10:21 11:2,7 12:6, 14,19 13:11 15:12 16:5,22 17:2,5 23:13 90:24

**describe** 26:3

**designed** 36:18 38:2

**destruction** 37:3

**detail** 35:12

**details** 48:21

**determine** 34:25 59:20

**determining** 51:19, 25 52:13

**difficult** 14:12

**difficulties** 11:4 12:12

**disagree** 25:25

**discretion** 60:11 85:10,11

**discuss** 30:20,21 89:25

**discussed** 16:11 17:4 32:6 71:4 74:13

**discussing** 29:8 30:17 76:6

**discussion** 32:10 41:23 42:9 54:20 56:16 65:25 71:23 72:19 74:15 80:4 87:20 88:18

**display** 37:13

**distancing** 7:9

**distortion** 11:14,21 12:2 56:12 63:22

**district** 8:11,12 10:3 81:3,10

**ditches** 32:2

**Division** 8:13

**Doc** 41:7 42:14

**DOC000002** 32:18

**document** 22:23 32:17,21,24 41:14, 16,22 42:17 54:5,23 57:5,17 63:5,10,19 72:6 87:15 88:16 89:7

**documented** 30:2,5

**documents** 15:14, 18,22 16:24,25 20:17,21 21:4,14 22:20,25 23:7 32:5 56:7

**double-click** 41:22

**download** 41:17

**draft** 43:6 44:7 54:16

**drafted** 54:17

**drafting** 54:12

**drugs** 14:19

**Duckett** 8:22

**Due** 7:6

**duly** 9:17

**dusk** 63:15,24 87:23

88:6,12

## E

**earlier** 86:2

**east** 38:19 46:5,12 48:9 66:20

**eat** 81:6

**effect** 33:4 64:3

**electrical** 38:14

**electronic** 20:16

**element** 12:14

**email** 22:18 30:7,16, 24 31:2,20 41:25 43:2,9,10,14 55:5 72:6

**emails** 21:6,7,11,14 30:21

**employers** 18:9

**employment** 17:17, 22,23 18:4,5 19:9

**end** 80:6 86:13

**ends** 38:19

**enforced** 70:6

**enforcement** 45:25 60:12

**enforcing** 70:3

**engage** 81:17

**ensure** 65:17 66:11

**entrances** 70:12

**established** 27:13

**event** 12:17 39:16 60:18 89:18,22,24

**events** 86:12

**EXAMINATION** 9:20

**excluding** 11:7

**executive** 77:6

**exhibit** 32:11,14,25 39:18 40:24 41:2,10, 11,25 42:11,24 43:24 45:10,13 50:8,13,14 52:24 53:5,12 55:4,

23,25 56:5 61:20 62:24 63:3 71:12,14, 17 86:5 87:18,19

**experience** 57:12 61:25 62:15,16 65:12,13 66:8

**explain** 46:16,18 80:23

**exploration** 75:7

**exploring** 78:13

**expressive** 23:3 26:15,25 28:12,16 81:18

F

**facilities** 33:5 36:10 37:4,18 52:8,9 53:24 60:23 63:11

**facility** 15:16 16:8,9, 15 20:20 21:9,12,13, 16,18 22:11 23:8 32:15 33:2,18 35:8, 18,22 36:4,8,12,23 37:12 40:10 41:6 42:20 43:4 47:5 49:6, 17 53:22 54:10 55:25 56:8 57:15 58:5,10, 17 63:8 64:17 65:23 66:4,24 68:21,25 69:5 83:25 85:24 86:25 87:21

**fair** 37:19,25 49:11 50:4 74:7,12 81:11

**fairly** 38:15

**fairness** 12:15

**fall** 71:6

**familiar** 15:5

**FBI** 47:14 85:7

**February** 55:6

**Federal** 7:22

**fee** 44:11

**feedback** 54:19

**feet** 38:20 66:20

**felt** 35:17 36:7 47:3 48:14,20

**fence** 27:4

**fenced-in** 25:9

**fencing** 24:24 25:3

**Festival** 79:7,9

**fill** 39:13

**final** 45:9 50:13 53:6, 12

**find** 74:5,16 76:24 77:7

**fine** 62:12 80:3

**finish** 14:14,15

**fire** 39:5

**fires** 38:14

**fisheries** 82:24

**focal** 48:17,24

**follow** 15:3

**follow-up** 90:11,13

**football** 66:15 67:7, 16

**footballs** 26:11

**form** 20:15 39:12

**formed** 75:19

**forward** 76:11

**fresh** 67:23

**Fringe** 79:6,9

**Frisbees** 26:11

**front** 21:14,15 22:23 88:19

**Frye** 41:15 72:8

**full** 10:16 14:23

**full-time** 19:12

**fully** 44:8

**function** 25:24

G

**G-L-Y-N-N** 10:19

**game** 67:11,16

**games** 66:15 67:7,16

**gathered** 58:2

**gatherings** 38:23

**gave** 21:19 49:25 54:15,16 56:13 71:25 82:18

**give** 13:13,24 14:23 60:10 61:10 68:14 77:10

**Glynn** 7:1 8:1 9:1,16 10:1,18 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1

**good** 7:2 9:22 65:6 66:7 90:14

**goods** 17:25 18:3,23 19:5,10,11

**graduate** 18:11,15, 18

**grant** 51:19 52:13

**granted** 86:12

**granting** 34:18 40:2

**grassy** 25:21 27:20 28:2,7 83:17

**great** 12:20

**Greta** 8:21

**ground** 13:10

**grounds** 22:22 23:4 24:3,4,22,25 25:6,9, 16,20,23 26:13,22,23 27:16,19,25 28:6,10, 15,24 29:4 31:21 34:19 35:2,13,14 37:23 38:9 48:4 49:2, 8 54:10 57:18,23 59:8 60:19 61:7 62:4 63:15,24 64:4,10 65:16 66:11,19 68:18 69:6,7,11,15,19 70:24 81:25 82:2,8, 10 83:15,22 85:20 87:9 88:2,4

**group** 37:10,12 49:18 58:4,9,22 59:7, 13,17 61:9 67:24 70:10 71:2,10 73:4 75:16 76:3,15 84:19

**groups** 47:23 57:23 61:13 62:4 86:20

**grown** 49:19

**guess** 20:24 22:8 25:8 27:7 28:18,23 31:10 38:19 40:17 50:21 59:19 60:8 65:2 83:18 84:17

**guest** 83:3

**guidelines** 54:9

**guns** 53:19

H

**hand** 12:9

**handling** 12:13

**happen** 47:17,20

**happened** 37:4 47:19 68:11 75:6 78:16

**hard** 41:18

**harm** 37:4

**head** 13:25

**hear** 17:21 40:11,12 78:23

**heard** 26:17 70:3 78:25 89:2,8,9

**heart** 81:14 82:5,8

**held** 8:15 10:8

**high** 18:15,18,20

**highway** 82:21

**Hill** 42:3 43:3,18 46:24 55:10,11,20

**historical** 36:21 38:11 48:19 51:4

**hold** 60:18

**honest** 65:2 68:19 76:2 79:2

**honestly** 31:23

**hours** 18:12

I

**i.e.** 38:24

**idea** 36:12 58:12,16 59:4 64:22 65:6,10, 18 66:6,8 67:2,21 68:3

**ideas** 67:23

**identification** 32:12 41:3,12 56:6 62:25 71:15

**images** 79:12

**impair** 14:19

**impetus** 36:3

**implemented** 33:23 35:5 67:17

**imposed** 64:21 69:12,16 85:19 88:22

**inaudible** 11:13,20, 25

**incident** 45:23 52:19 59:2 65:5 73:5 90:2

**include** 63:12

**included** 81:23

**includes** 27:19

**including** 87:9 88:4

**increase** 49:17 66:3, 4,23,24 67:6,10

**increased** 49:25 58:24 84:8

**increases** 65:21

**indiscernible** 56:12 63:21

**individual** 28:19

**individuals** 75:23 76:5

**information** 14:13 47:16,23 50:24 62:8 77:16

**initiated** 49:21

**inside** 24:6 25:9 27:4 36:22 37:7,9 86:20

**instructed** 73:6 74:4

**insurance** 59:23

**interests** 84:12,16

**interim** 46:24 55:11

**introduce** 40:24 41:10

**involved** 34:22 55:15

**involvement** 50:23 51:4

**issue** 31:16 51:14 70:23 85:3,15

**issues** 22:21 85:5 89:25

**items** 45:2 53:3,14, 18 54:7

**J**

**J-E-F-F-R-E-Y** 10:19

**Jack** 9:6 79:23 90:7, 12,15

**January** 17:16

**Jeff** 8:8 80:14

**Jeffrey** 7:1 8:1 9:1,16 10:1,18 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1

**job** 10:13 19:13

**John** 8:8 9:5,8,24 42:3 43:3,18 55:10, 11,20

**Johnson** 36:2,5 40:17

**Joseph** 36:2,5 40:17

**Josh** 7:25 9:3,23 11:11 80:3

**July** 63:7 64:21 67:18 68:18 87:8 88:3,9,22

**June** 55:25 56:24 58:3,8 59:6 61:21 78:17

**K**

**Kevin** 7:4 8:18 41:15 72:8

**kicking** 26:11

**kid** 68:6

**kids** 86:22

**kind** 37:11 81:9 82:18 83:17

**knew** 89:10

**knowledge** 88:20

**L**

**Lafayette** 8:9 9:11 10:2,5 15:6 17:12,19 18:24 19:2,4,15,18 22:22 23:4,15,23 25:11 29:9,11 30:9 32:18 41:7 42:14 62:2 72:7 79:17

**land** 27:20

**language** 44:5 50:19 52:25 53:9 61:3

**large** 38:23 66:19

**late** 20:6 56:14

**law** 30:18 45:25 60:12 73:10

**lawn** 26:12 37:14 38:25

**lawsuit** 13:4,7 15:5, 10,15 16:2 21:8 22:6, 9

**leaving** 54:21

**led** 62:17

**left** 18:12 82:23

**legal** 7:4 8:18 76:24

**liability** 59:23

**lies** 24:19

**life** 20:7,8,10 24:10, 15,16 81:14

**lifelong** 19:14,22 65:12 66:8

**light** 47:2 70:8

**limit** 58:4,10,22 87:3

**limits** 19:24 20:2,3,4, 5,8,10

**Lisa** 22:14 41:25 43:2,14 55:5,18

**listened** 62:19

**live** 19:20 78:22

**lived** 19:17 20:3,8,10

**locals** 23:17

**located** 83:11,14

**location** 59:21 60:11

**logistical** 12:12

**long** 18:25 24:13 28:14 61:25

**looked** 47:5 63:21

**lost** 82:25

**lot** 15:9 35:12 48:19, 21 50:23,24 52:25 60:25 66:3,4 67:22 89:13

**M**

**made** 34:7 45:20 49:6 50:6 51:13 54:2 61:18 63:13 64:12 84:7,23

**main** 37:7

**maintain** 20:15,21 21:4

**majority** 20:7,9 36:19

**make** 53:20 60:24 62:9 82:10,11 84:21

**Makers** 37:10 38:24

**makes** 14:12

**making** 62:18

**March** 41:5 42:3,21 43:5,20 49:5,15 50:6 64:17 83:25 86:6 87:24 88:9

**Mark** 37:11 38:24

**marked** 32:11 41:2, 11 54:6 56:5 62:24 71:14

**marks** 8:5 80:5,10

**marshal's** 82:21

**Marth** 7:4 8:18

**matter** 8:8 12:24 61:16

**mayor** 82:19

**means** 80:24

**meant** 37:3 46:20 53:18

**measures** 46:22 90:4

**media** 8:6 78:21 80:6,11

**medication** 14:18

**meet** 10:11 58:15 86:20

**meeting** 29:16,18,21 77:4 89:11,16

**meetings** 16:18,20 47:7 62:11 75:14

**member** 10:14 20:23 21:3 31:14 33:20 65:14

**members** 30:23 31:4,7 79:4

**memorial** 72:20

**memorializes** 51:17

**memory** 14:19 71:13

**men** 82:25

**mentioned** 9:25 15:23 16:21,25 36:16 48:8 55:9

**message** 20:16 31:5, 14

**met** 47:14 76:6 89:13

**minutes** 16:8 29:23 30:8,11 63:15,24 83:4 87:22 88:5

**Miss's** 48:5

**Mississippi** 8:10,12 9:4,11 10:2,3 15:7 18:14 20:11 67:7

**Monday** 29:17,19

**monitor** 8:17

**monitors** 35:17 36:17

**month** 17:14 29:17, 19 37:13 70:21

**monument** 23:8 27:5,6,11,15,21 28:2, 7 31:20 71:4 74:9,13, 14,20 75:3,12 76:13, 18 77:24 78:4,12,13, 19

**monuments** 48:3

**moot** 86:23

**morning** 7:3 9:22 15:20 16:12,13,16 29:20 90:20

**mornings** 83:8

**mother** 10:7

**motion** 56:23

**move** 73:8,9,23 74:3, 4,11,15

**movements** 12:9

**moving** 70:23 73:19 74:14,22 75:2,8 76:21 78:4,12,13

**N**

**names** 56:21 75:23 76:4

**National** 68:8

**nature** 10:20 83:2

**needed** 35:18 36:8 46:6 47:3 48:14,20, 22 60:12 85:6,7

**news** 15:25

**night** 64:5 68:21 69:12,15 78:17

**nighttime** 69:2

**nodding** 13:24

**nonrefundable** 44:11

**nonwork** 69:11,13

**north** 83:12,18

**northeast** 83:19,20

**Northern** 8:11 10:3

**note** 12:17

**noted** 11:24 12:6 57:7

**notice** 84:12

**number** 8:6 32:16 41:7 60:2,3,5,11,15 61:10 66:24 72:18 80:6,11 84:22 87:18, 19

**numbered** 42:14

**O**

**O'DONNELL** 8:3,4

9:9,10 10:22,24 11:8, 11,15,22 12:3 15:13 16:6,17 17:6 21:18, 22 22:17 35:21 42:2 43:3,16 52:17,22 54:14,16,22 55:10,19 56:13 71:25 73:7,20 74:10 76:24 77:6 80:2 90:14

**obligated** 13:13

**obligation** 13:18

**obtaining** 39:9

**occurred** 37:15 67:8

**occurring** 67:12

**occurs** 12:7

**office** 16:6,16 39:12 82:16

**officially** 77:4

**Ole** 48:5 67:16

**one-on-one** 30:25

**online** 30:7 47:24

**open** 25:3 41:21 42:6

**opinion** 62:21 68:4, 14 77:7

**opportunity** 84:24 90:9

**options** 72:21 73:9, 21 74:10,16,20 75:7 76:7,21,24 77:10 78:13

**oral** 13:24

**order** 57:14 63:7,11, 23 64:3 85:18 88:3, 25 89:24

**organizations** 86:24

**owned** 25:7

**owns** 25:13,14

**Oxford** 8:12 10:4 18:20 19:20,23 20:10 24:18 47:17,20 65:13 66:9,18 67:6 79:6,8 80:21 81:2,14 82:5 89:25

**Oxford's** 23:14,16, 19 24:10,14

**P**

**p.m.** 85:24 86:14 88:3

**paper** 20:16 88:24

**paragraph** 50:17

**park** 25:24 26:2

**Parrage** 75:25

**part** 20:7 21:4 25:3,5, 17 27:15 40:8,19 47:7 48:7 59:16

**parties** 7:16 86:22

**passed** 43:21 46:25 49:16 57:8 87:7

**path** 77:2,20

**patrol** 82:21

**pedestrian** 39:5

**pending** 7:24 14:8

**people** 26:5,10 27:5 35:14,16 37:22 38:22 47:18,19 53:21 55:14,20 57:24 59:7, 24 60:11 62:5 66:16, 25 67:6,11,23 69:18, 22 79:12 81:6 83:5 89:13

**percent** 51:13

**period** 12:11 20:4 46:9 84:2

**permission** 34:10 86:11,16,24

**permit** 39:10 51:19 52:13 57:24 58:6,11, 23 59:9,14 60:13,20, 24 61:6,14 62:3 84:2, 15 85:4

**permits** 40:2,6,10, 14,21 52:5

**person** 60:18 61:5,9

**personal** 62:15,16

**phonetic** 75:24,25

**place** 37:22 46:7,14 47:8 48:16 49:12 77:24 81:9 83:7

**plaintiff** 8:2 9:5,8,24 13:3

**play** 52:18 66:2

**played** 40:8,15,19 48:6 51:5,12

**point** 35:19 45:16 48:17,25 73:16,23 74:17 76:8,10

**police** 46:4,23 47:12, 13 82:22

**policies** 16:11 20:20 21:10 22:11 47:5 58:19,21 60:6,17 61:12 64:17

**policy** 15:16,20 16:9, 15 21:12,13,16,18 23:8 32:16 33:2,6,10, 13,14,17,23 34:3,11, 19 35:4,8,19,22 36:4, 8,12,18 37:20 38:2,8 39:10 40:3,6,7,10,14, 22 41:6 42:4,20 43:4, 5,6,20 44:2,4 45:7,10 46:3,21 48:15,23 49:6,16,23 50:13,20 51:7,17,18,24 52:7, 14 53:6,12 54:3,9 55:16,21 56:2,8 57:15 58:4,5,8,10,18, 22 59:6,12,15 61:4, 21,24 62:9,18 63:8, 12 68:13 84:2 86:6 87:25 88:9,10

**political** 23:2 26:14, 16,17,20 86:22

**population** 65:22

**portions** 38:17

**position** 10:8 17:11, 15

**posting** 47:24

**potential** 39:4,5

**practice** 7:8

**practitioner** 9:7

**prepare** 16:4,22 17:2,8

**prepared** 54:23

**present** 16:18 89:16

**presented** 15:19 16:8 21:22 62:23

**presents** 11:3

**president** 33:9 43:21 56:22 57:10 58:18 64:23 65:8,21 68:23

**pretty** 21:23 38:25 45:22,25 47:11 75:16

**previously** 10:8

**print** 72:5

**printed** 42:7 43:8

**prior** 16:20 18:21 20:22 39:15 63:13 86:3,15

**priority** 38:6

**problem** 56:10 68:10

**problems** 35:14 36:24 37:2,15,16,17, 21 38:14 45:24 46:11 54:25

**Procedure** 7:22

**procedures** 15:3

**proceed** 9:15

**process** 34:9,22 37:22 39:9 40:2 51:8 74:5 75:20,21

**produce** 21:24 22:3, 10

**produced** 21:24 88:16

**projected** 78:17 79:13

**projection** 79:4

**property** 18:6,8 25:12 27:11 33:12,24 34:5,10 51:20 59:3 64:14 84:9

**propose** 65:4

**proposed** 63:14 65:4

**protest** 26:14,24 28:11,15,17,20 29:3 60:14

**protesting** 70:10,18

**protests** 23:2 70:9

**provide** 65:25

**public** 22:21 25:24 30:24 31:5,13,19 38:3,4,7 39:6 65:17 66:11 68:16

**pulling** 71:19

**purposes** 27:11 61:13 69:11

**put** 32:14 33:3 35:18 48:16 49:12 55:2 56:2 60:2,3,5 66:2 68:6 70:11 71:2,17 76:15

**puts** 64:3

**putting** 54:21 63:6 71:10 73:4

**Q**

**question** 14:4,8,14, 16 20:25 22:12 25:9, 15 28:18 31:6 32:8 40:17 62:10 65:3 85:13

**questions** 13:14 14:20 15:2 57:12 62:6 79:24 80:14 90:8,16

**quickly** 38:16

**quote** 78:18 87:8

**R**

**ran** 19:5

**Rash** 8:9 9:5,8,24 15:6

**re-address** 48:22

**re-read** 85:22

**reached** 48:9,13 51:10,15

**read** 15:14,16,18,20, 22,25 16:10,14 32:23 50:17

**reading** 88:18

**real** 75:9

**reason** 14:22 49:22 58:25 84:6

**reasoning** 33:17

**reasons** 48:17 49:14 50:5 60:25 84:8 89:12

**recall** 29:5 59:17 64:15,19 76:14 78:14

**recap** 49:4

**received** 41:14 47:23

**recess** 80:8

**recollection** 40:18 47:10 51:9 54:24 90:3

**record** 7:11 9:2 10:17 12:7 80:7,12 90:25

**recording** 7:18

**records** 29:25 30:4, 12

**red** 44:2,5,11,12,14, 16,22 45:2 50:9 52:25

**redid** 46:2

**refer** 23:17 29:10

**referring** 24:4 29:11 39:23 50:22 52:21

**refers** 53:18

**reflect** 32:5

**reflected** 29:22

**reflects** 61:4

**refresh** 71:13

**regulate** 33:24

**regulated** 33:13

**regulating** 34:5

**relate** 21:7

**related** 15:15 17:4 20:17,19 72:20

**relation** 22:5 80:25 83:14

**relocated** 77:12

**remember** 26:21 31:22,23 35:11 36:14,25 50:8 52:19 54:19 64:18 69:3 70:14 71:9 73:3,4 76:4,15,22,23 79:11 84:4 89:14,15,18,21

**remote** 7:18 8:7,14

**remotely** 7:12,15

**rent** 18:8

**rental** 18:6,8

**renting** 53:22

**Repeat** 58:7

**rephrase** 14:5 24:24 59:5 70:8

**report** 71:25 82:20

**reporter** 7:13 8:21 9:13,24 11:10 13:22 14:13 32:9

**Reporting** 7:6 8:20

**represent** 11:12,16

**representative** 82:17

**request** 34:7 86:24

**requested** 16:14

**requests** 33:18 35:12 36:9

**require** 62:3

**required** 57:24 58:5, 11 59:8 60:20 61:5, 13

**requirement** 63:12 84:12,16 85:12

**requirements** 88:8

**requiring** 58:23 63:14

**resident** 19:15,22

**resources** 50:24

**respond** 31:10

**restaurants** 81:5

**restrictions** 86:9

**result** 67:6

**retail** 17:25

**review** 16:25 54:23 57:4,5 63:19

**reviewed** 85:20

**revised** 55:20

**revising** 55:15

**revision** 63:11

**revisions** 54:13

**riots** 47:3,15 51:3

**rise** 49:25

**road** 32:2 38:20

**roads** 32:3

**Roberts** 56:22

**role** 34:4 40:5,9,13, 15,21 51:5,8,18,23 52:12,16,18 54:12 70:2

**room** 7:10,14 10:23 11:3

**Rule** 7:21

**rules** 7:22,23 13:10

**run** 68:7

**runs** 39:25

**S**

**safety** 22:21 38:3,5, 7,21 39:2,6 65:17 66:11 68:9,16

**sat** 27:6

**satisfy** 76:9

**scheduled** 86:13

**school** 18:16,19,20

**scope** 86:9

**scratch** 23:12 28:25 31:12

**Secret** 47:14

**section** 44:25 53:2, 13

**security** 38:5 44:17 46:7,9,13,14,22 47:4 48:2,10,16,20 49:7, 13,15,24 50:9,16,17, 20 51:3,14 53:16,17, 21 54:7,8 59:16 70:11 84:8 85:5 89:12,25 90:4

**Sensy** 75:24

**separate** 25:13 27:25 28:2

**September** 72:8,12

**service** 47:14 82:21 83:2

**session** 77:6

**seven-day** 39:15 46:8

**severity** 7:7

**shaking** 13:25

**sheriff** 40:9,13 43:19 46:5,24,25 47:22 50:22 51:5,18,22 52:12 55:11 59:20 60:10

**sheriff's** 51:11,15 82:23 85:6

**shop** 81:6

**short** 20:4

**show** 30:12 55:23 63:3 71:12 87:14

**showing** 88:25

**sic** 87:3

**side** 26:6,7 83:12,18, 19,20

**sidewalks** 25:21

**signed** 52:9

**signs** 44:23 53:2,14

**simply** 29:7

**simultaneous** 34:15 52:3

**single** 49:18

**single-page** 63:5

**sir** 12:25 13:5,8,15 15:8,21,24 16:3,19,

23 17:3,7,10 18:10 19:10,19 20:20 21:6 23:5 24:12 26:2,12, 20 27:14 31:23 32:7 36:6 37:24 38:6 39:3, 22,24 41:9 42:18 44:3 50:11 52:23 53:4 57:3,20 63:17 64:7 72:6 79:5,10,15, 19 85:21 90:21

**sit** 62:10

**sits** 26:9 81:13

**sitting** 62:18

**situation** 31:8

**situations** 62:20 68:2

**size** 58:4,9,22 59:16, 20 60:10 61:13

**slingshots** 53:19

**small** 24:23 25:2,24 26:4 48:18

**smooth** 13:11

**social** 7:9 24:10,14 78:21 81:14

**sole** 9:7

**solve** 11:5

**sort** 46:15 80:20

**space** 24:6

**spatially** 83:10

**speak** 9:18 13:23 24:2 79:23 83:4

**speaker** 83:3

**speakers** 34:15 52:3

**special-called** 29:21

**specific** 31:15

**specifically** 32:22

**speech** 23:3 26:14, 17 27:7 29:3

**speeches** 26:16,20

**speed** 68:6

**spell** 10:17

**spelled** 53:17 61:8

**spells** 54:8

**sporting** 17:25 18:3, 23 19:5,10,11

**sprinkler** 35:15 38:12

**sprinklers** 36:16

**square** 23:14,16,18, 19,20 24:9,13,20 25:3,5,17 26:6,7 49:3,9 51:4 67:11 80:20,24 81:5,12,13, 19,20,22,25 82:4,8, 10,11 83:12,18,19,21

**standpoint** 39:2 46:7,10

**start** 8:6 14:15 80:11

**started** 33:18 35:9 75:19

**starting** 37:5

**state** 8:25 10:16

**state's** 7:23

**States** 8:10

**statue** 22:11 70:24 71:11 72:20,25 73:19 77:12,13 87:10 88:5

**status** 72:19

**statutes** 73:10

**step** 66:20

**stepping** 66:21

**stipulate** 7:16

**stones** 53:19

**stood** 27:6

**stops** 26:9

**street** 68:24

**streets** 25:7,14 38:22

**Strike** 82:3

**stuff** 25:7 30:8

**submitted** 39:19 45:16

**subscribe** 30:7

**substance** 13:9

**suggestions** 12:9

**summer** 70:15,20 77:22 78:16 79:11

**sunshine** 30:18

**supervisor** 18:24,25 19:4,8 23:11 29:18 43:3,10,11 55:8 57:9 66:10

**supervisor's** 19:13

**supervisors** 10:15 20:22 21:3 29:9,10, 12 33:20 42:2 43:13, 15 50:25 52:18 55:10,19 56:21 58:15 61:19 64:24 65:9,14 72:7 73:18 79:4 82:18

**supervisors'** 72:12

**surrounding** 24:4 27:20

**surrounds** 26:5

**swear** 7:15 9:14 75:5 77:8 78:7,8,15

**swearing** 7:18

**sworn** 9:18

**system** 38:12

**systems** 35:15

**T**

**takes** 84:21

**taking** 13:23 14:18 54:20 90:19

**talk** 14:11 27:18 28:5 62:13 79:3 90:4

**talked** 54:2 59:16 73:25 78:3 82:4,13 83:24 84:6 89:11

**talking** 10:12 19:24 23:14 24:5 25:10 28:6 46:12 51:6 62:14 69:4,5 72:23, 24 80:18

**tape** 70:11

**teams** 47:6

**tear** 36:21

**technical** 32:10 41:23 42:9 56:16 71:23 80:4 87:20

**telling** 46:6 47:9 89:15

**testified** 9:19

**testimony** 12:10 13:23

**text** 20:16 30:20 31:5, 8,14,20

**texts** 30:22

**That'll** 80:2

**then-police** 48:8

**thing** 62:22

**things** 32:3 36:22 46:14 47:24 67:22 74:2

**thinking** 67:25 85:21

**thought** 48:22 59:18 65:3 68:5

**throwing** 26:11

**time** 8:16,24 9:13 10:10 13:12 20:5 35:18,21,25 36:10,20 38:6 39:7,13,14 43:19 46:2,23,25 48:7 51:5,12 54:15, 21 57:9 59:11,21 60:7,23,24 62:8 63:20 68:2,20,22,23 69:19,23 71:5 72:16 73:6 75:10,18 76:5 77:14 83:7 85:8 88:8

**timeline** 71:9 73:3

**times** 37:5,12 46:6 48:9 66:12,14 70:12, 22 74:24 76:6 78:5, 11

**titled** 15:6

**today** 7:5,13 8:14,19, 21 10:12 13:11,12,14 14:24 15:3 17:9 21:15 27:19 29:8 89:2,6,8

**today's** 17:5

**told** 15:11 16:13 75:18

**Tom** 7:25 9:3,21,23 12:20,22 32:8,13 41:4,13,24 52:4 56:17 63:2 71:16 79:20 80:13 90:5,18

**top** 38:6 63:10

**town** 48:18,25 49:19 65:21 66:16,25

**traffic** 39:5 65:22 66:4,21,23

**trials** 81:9

**triggered** 58:5,10, 13,22 59:4

**truth** 9:18,19 13:19

**truthful** 13:13 14:23

**TSG** 7:6 8:20,23

**turned** 23:9

**U**

**Uh-huh** 41:20 44:6, 13,18 53:7 55:7 72:14 86:7,10 87:23

**unable** 10:24,25

**unanimous** 77:23

**unanimously** 77:23

**under-** 17:20

**underneath** 52:25 56:21

**understand** 10:21 12:11 13:12,20 14:2, 4,9,20 20:25 23:19, 22 24:3,7 25:8 27:22 28:8 29:11 42:17 84:14

**understanding** 61:5 84:18

**Understood** 19:14

**United** 8:10

**university** 18:14,23 19:11 47:13 67:7 71:3 76:8,9 81:21 82:22 89:17

**unlike** 11:2

**usage** 39:18 45:12

V

**validity** 7:17

**vary** 85:8

**vast** 20:9

**verbatim** 53:9

**versus** 8:9 15:6

**Veterans** 26:18,19 82:13,14

**video** 7:17 8:16

**video-recorded** 8:7

**view** 68:25

**virtual** 10:20

**virus** 7:7

**visit** 66:25

**visiting** 67:6

**vote** 56:22 73:24 76:12

**voted** 52:6 76:15,17 77:22

W

**walk** 26:5

**walked** 61:16 69:14

**walking** 69:22

**walls** 79:14,18

**wanted** 60:18,22 61:6 73:25

**warm** 70:16,17

**watched** 68:6

**wear** 36:21

**website** 30:9,10

**week** 22:4 39:20

**welcoming** 82:18

**west** 38:19 66:20

**Wildlife** 82:24

**Williams** 9:6 12:16 90:12

**win** 10:7

**window** 84:24

**wording** 50:10

**words** 78:18

**work** 18:21 20:22 21:5 23:11 29:22 30:2,5,12 32:6 47:6

**worked** 19:12 74:9

**wrap** 79:25 80:15

**wrong** 59:18

Y

**y'all** 76:20 77:15

**year** 17:14,16 68:11

**years** 18:2 19:3 21:3 27:8 28:23 29:4 49:19,20 57:11 64:23 65:8,14 66:9 67:8,12, 15 68:5,23,24

**yesterday** 16:7,13