# EXHIBIT 39

1                        Larry Gillespie

2          IN THE UNITED STATES DISTRICT COURT

3            NORTHERN DISTRICT OF MISSISSIPPI

4                       Oxford Division

5

6    * * * * * * * * * * * * * * * *

7    JOHN RASH,

8             Plaintiff,
                                      3:20-cv-224-NBB-RP
9    v.

10   LAFAYETTE COUNTY, MISSISSIPPI,

11            Defendant.

12   * * * * * * * * * * * * * * * *

13

14

15        VIDEOTAPED VIDEO CONFERENCE DEPOSITION OF

16                     LARRY GILLESPIE

17                 Location of witness:

18           Law offices of Clayton O'Donnell

19

20                    Oxford, MS  38655

21              Wednesday, December 23, 2020

22

23

24   Reported by:  DEBRA AMOS ISBELL, CCR,RDR,CRR

25   Job No: 188022

Page 2

```
 1              Larry Gillespie
 2
 3
 4
 5
 6
              December 23, 2020
 7
                9:04 a.m.
 8
 9
10
11
12
13   Videotaped Video Conference Deposition
14   of LARRY GILLESPIE, with the witness
15   located at the law offices of
16   Clayton O'Donnell, PLLC, 1300 Access Road,
17   Suite 200, Oxford, Mississippi, before
18   Debra Amos Isbell, a Registered Professional
19   Reporter, Registered Diplomate Reporter,
20   Certified Realtime Reporter, and
21   Mississippi Certified Court Reporter.
22
23
24
```

Page 3

```
 1              Larry Gillespie
 2            A P P E A R A N C E S
 3
          (ALL APPEARANCES BY VIDEO CONFERENCE)
 4
 5   SIMPSON THACHER & BARTLETT
 6   Attorney for the Plaintiff
 7   425 Lexington Avenue
 8   New York, NY  10017
 9
10        BY:  ISAAC RETHY, ESQUIRE
11
12
13   C. JACKSON WILLIAMS, ESQUIRE
14   Attorney for the Plaintiff
15   P.O. Box 69
16   Taylor, MS  38673
17
18        BY:  C. JACKSON WILLIAMS, ESQUIRE
19
20
21
22
23
24
```

Page 4

```
 1              Larry Gillespie
     APPEARANCES (Continued)
 2
 3
     CLAYTON O'DONNELL
 4
     Attorneys for the Defendant
 5
     1300 Access Road, Suite 200
 6
     Oxford, MS  38655
 7
 8
          BY:  DAVID O'DONNELL, ESQUIRE
 9
10
11
12
13
     Court Reporter:
14
          DEBRA AMOS ISBELL, CCR,RDR,CRR
15
16
17
     Videographer:
18
          WILLIAM THOMAS
19
20
21
22
23
24
25
```

Page 5

```
 1              Larry Gillespie
 2         THE VIDEOGRAPHER:  Good morning.  My name is
 3   William Thomas.  I'm a certified legal videographer in
 4   association with TSG Reporting.
 5         Due to the severity of the COVID-19 and
 6   following the practice of social distancing, I will
 7   not be in the same room with the witness.  Instead I
 8   will record this videotaped deposition remotely.  The
 9   reporter, Debbie Isbell, is also not in the same room
10   with the witness and will swear him in remotely.
11         Do all parties stipulate to the validity of
12   this video recording and remote swearing in and that
13   it will be admissible in the courtroom as if it had
14   been taken following Rule 30 of the Federal Rules of
15   Civil Procedure and the state's rules where this case
16   is pending?
17         MR. RETHY:  Plaintiff agrees.
18         MR. O'DONNELL:  Defendant agrees subject to
19   our evidentiary objections.
20         THE VIDEOGRAPHER:  All right.  Thank you.
21         So this is the start of media labeled number
22   1 of the video recorded deposition of Larry Gillespie
23   taken in the matter of John Rash versus Lafayette
24   County, Mississippi.  This is in the United States
25   District Court, Northern District of Mississippi,
```

Page 6

Larry Gillespie

1 Larry Gillespie
2 Oxford Division, case number 3:20-cv-224-NBB-RP.
3         We're on record at 9:04 on December 23rd,
4 2020.
5         Counsel, would you now identify yourselves
6 for this proceeding.
7         MR. RETHY:  Isaac Rethy from Simpson
8 Thatcher & Bartlett for Plaintiff John Rash.
9         MR. WILLIAMS:  Jack Williams for Plaintiff
10 John Rash.
11         MR. O'DONNELL:  David O'Donnell on behalf of
12 Lafayette County.
13         THE VIDEOGRAPHER:  All right.  The court
14 reporter may now swear in the witness.
15         COURT REPORTER:  Mr. Gillespie, would you
16 raise your right hand, please.
17                 LARRY GILLESPIE
18         was sworn and testified as follows:
19         THE WITNESS:  I do.
20                   EXAMINATION
21 BY MR. RETHY:
22    Q.    Good morning Mr. Gillespie.
23    A.    Good morning.
24    Q.    Could you state your name and address for
25 the record?

Page 7

Larry Gillespie

1 Larry Gillespie
2    A.    Larry Gillespie, 516-A County Road 210,
3 Abbeville, Mississippi.
4    Q.    And you are a member of the Board of
5 Supervisors of Lafayette County; is that correct?
6    A.    That is correct.
7    Q.    And for which district?
8    A.    District 2.
9    Q.    And how long have you held that position?
10    A.    January of 2020.
11    Q.    And have you ever held -- sorry --
12    A.    This is my first term.  I started January
13 2020.
14    Q.    Have you ever held a public office before?
15    A.    No.
16    Q.    Have you ever been deposed before in a court
17 proceeding?
18    A.    No, sir.
19    Q.    Have you ever given testimony in court?
20    A.    No, sir.
21    Q.    So today I'm going to ask you some questions
22 and go through some documents.  You have a binder of
23 documents with you; is that correct?
24    A.    Yes, sir; that's correct.
25    Q.    And does that binder have 45 tabs?

Page 8

Larry Gillespie

1 Larry Gillespie
2    A.    That is correct, 45.
3    Q.    Okay.  Great.
4         For how long have you resided in Lafayette
5 County?
6    A.    My entire life, 47 years.
7    Q.    And are you familiar with the City of
8 Oxford?
9    A.    Yes, sir.
10    Q.    And are you familiar with the Oxford town
11 square?
12    A.    Yes, sir.
13    Q.    And the Oxford County Courthouse?
14    A.    Yes, sir.
15    Q.    Do you understand what this case is about?
16    A.    What I know about the case is that it's
17 about first amendment rights.
18    Q.    And do you have any more specific
19 understanding of what the case is about?
20    A.    It was a denial of a permit.
21    Q.    Are you acquainted with the plaintiff in the
22 case, John Rash?
23    A.    No, sir.
24    Q.    Are you familiar with the nature of the
25 event John Rash applied for a permit for?

Page 9

Larry Gillespie

1 Larry Gillespie
2    A.    No, sir.
3    Q.    Are you familiar with the Oxford Fringe
4 Festival?
5    A.    I'm not particularly -- no, sir, I'm not,
6 with that festival.  It does not ring a bell to me.
7    Q.    If you could turn in your binder to tab 3.
8    A.    Okay.
9         MR. RETHY:  This will be Exhibit 1.  I'm
10 adding to this the chat.
11         Sorry.  Ignore what I dropped into the chat.
12 It came out of the wrong folder.  The one I have added
13 now is from the right folder.  Apologies.
14         (EXHIBIT 1, TAB 3, FACILITY USE POLICY,
15          3/4/2019 - DOC000006-010, WAS MARKED FOR
16          IDENTIFICATION.)
17    Q.    So this is a document entitled Facility Use
18 Policy; correct?
19    A.    Yes.  That's what it appears to be, yes,
20 sir.
21    Q.    Are you familiar with this document?
22    A.    I am not familiar with this document, no,
23 sir.
24    Q.    Do you have a general understanding of what
25 this document is?

Page 10

Larry Gillespie

1    A.    A general understanding in the fact that it
2  would be the policy to permit use of our facilities.
3    Q.    What's your understanding of which
4  facilities are covered by this policy?
5    A.    Would you like me to read it to understand
6  it or do you just want --
7    Q.    No.  If you don't have -- I'm just wondering
8  if you have a pre-existing understanding of what it
9  covers.  If you don't, that's fine.
10   A.    I really do not, no, sir.
11   Q.    So if you could turn to tab 42.
12   A.    Okay.  Hold on a second.  Okay.
13   Q.    This will be Exhibit 2, which I'm adding to
14  the chat.
15         (EXHIBIT 2, TAB 42, COMPOSITE EXHIBIT OF
16          PHOTOGRAPHS B-1 - B-23, WAS MARKED FOR
17          IDENTIFICATION.)
18   Q.    And do you see this is a series of
19  photographs; correct?
20   A.    Yes, sir.
21   Q.    So on the first page titled B-1 do you
22  recognize the location that's portrayed in the
23  photograph?
24   A.    Yes, sir, I do.

Page 11

Larry Gillespie

1    Q.    What is that?
2    A.    That is Lafayette County Courthouse.
3    Q.    And if you'll turn to page 3, so B-3.
4    A.    Yes, sir.
5    Q.    Is it fair to say that's a picture of part
6  of the grounds of the courthouse?
7    A.    That would be correct.
8    Q.    And if you'll turn to page 4, is it fair to
9  say that this is another picture of the grounds of the
10  courthouse showing an entry point to the grounds?
11   A.    That is correct.
12   Q.    And the courthouse grounds aren't closed
13  off; right?  There's no gates that can be locked to
14  prevent people from coming in; right?
15   A.    That is correct.
16   Q.    If you'll turn to tab 10.
17   A.    Okay.
18   Q.    This will be Exhibit 3.
19         (EXHIBIT 3, TAB 10, ORDER:  AMEND FACILITY
20          USE POLICY REGARDING USE OF COURTHOUSE
21          GROUNDS, 6/15/2020 - DOC000052, WAS MARKED
22          FOR IDENTIFICATION.)
23   Q.    So are you familiar with this document?
24   A.    Yes, sir.

Page 12

Larry Gillespie

1    Q.    And this is a document that's titled
2  Order:  Amend Facility Use Policy Regarding Use of
3  Courthouse Grounds; correct?
4    A.    Correct.
5    Q.    And this states that this is -- the first
6  sentence begins by stating:  "Motion was made by Larry
7  Gillespie."  Correct?
8    A.    Yes, sir, that is correct.
9    Q.    Do you recall the reason why you made this
10  motion?
11   A.    Yes, I do.
12   Q.    And what is that reason?
13   A.    The reason we were -- I made this motion was
14  because we were in discussion of public safety around
15  the courthouse, and we were concerned of pedestrian
16  traffic in and out of the courthouse and people being
17  impeded from the sidewalks and they were having to use
18  the streets, and also that they were impeding County
19  Courthouse business.
20   Q.    And this states in part that four people or
21  less can use the County Courthouse grounds without a
22  permit; correct?
23   A.    Yes, sir; that's correct.
24   Q.    But five or more people would require a

Page 13

Larry Gillespie

1  permit?
2    A.    That is correct.
3    Q.    So if you go back to the last exhibit we
4  looked at with the various pictures --
5    A.    Yes, sir.
6    Q.    -- and turn back to the third page of that
7  exhibit.
8    A.    Yes, sir.
9    Q.    Do you see there's some benches on the
10  courthouse grounds?
11   A.    Yes, sir; that is correct.
12   Q.    So if five people were sitting on those
13  benches and talking, would this policy require them to
14  have applied for a permit beforehand?
15   A.    Beforehand -- I want to understand your
16  question.  Do you mean before we made this policy?
17   Q.    No.  Under the policy, if a group of five
18  people happened to be sitting on these benches and
19  talking but they had not applied for a permit, would
20  they be in violation of the policy?
21   A.    They would be, in my opinion -- that's what
22  you're asking; correct?
23   Q.    Your understanding, yes.
24   A.    My understanding, yes, sir.

Page 14

Larry Gillespie

2  Q.    Your understanding is that they would be in
3  violation of the policy?
4      A.    Under certain circumstances, yes, sir.
5      Q.    And what circumstances would those be?
6      A.    Under the circumstances pretty much that
7  they were not there conducting County business, more
8  or less.
9      Q.    Sorry.  Could you repeat that?
10     A.    I said that they were not there to conduct
11 any County business, more or less.
12     Q.    Are there any signs on the County Courthouse
13 grounds stating that five or more people basically
14 can't be present on the County Courthouse grounds
15 without a permit?
16     A.    To my knowledge, there are not.  But I'm not
17 100 percent certain on that.  To my knowledge, there
18 are not.
19     Q.    Do members of the public ever use these
20 benches?
21     A.    Yes.
22     Q.    And to your knowledge, have they ever
23 been -- have members of the public ever been cited or
24 ticketed or arrested for violating the policy, you
25 know, based on sitting on these benches without a

Page 15

Larry Gillespie

2  permit?
3      A.    I do not have that information.  I don't
4  have any knowledge of that, no.
5      Q.    So if you'll go back to the document that we
6  were just discussing, the amendment to the Facility
7  Use Policy.  (Ex.3)
8      A.    That would be which tab?  10?
9      Q.    Yes.
10     A.    Okay.  Yes, sir.
11     Q.    Did you make the decision that the
12 permitting requirement should be set at five people?
13     A.    Did I personally make this decision?
14     Q.    Correct.
15     A.    This decision was a discussion among the
16 Board of Supervisors, the County attorney, and the
17 Sheriff.
18     Q.    And what was the rationale for setting the
19 permitting requirement at five people?
20     A.    Again, it was back to pedestrian traffic,
21 impeding pedestrian traffic and County business.
22     Q.    So this also states that a permit
23 application must be submitted at least 30 days prior
24 to the date of the premise use for five or more
25 people; correct?

Page 16

Larry Gillespie

2      A.    That is correct.  I do not think that
3  changed -- it is correct.  I don't think it changed
4  from the previous policy.
5      Q.    And do you have an understanding of why 30
6  days is required?
7      A.    Yes.  It's my understanding that it was so
8  that all the associated departments, especially --
9  most importantly the Sheriff's Department and law
10 enforcement, could make sure that they could handle
11 whatever situation came up.
12     Q.    And do you see that below it says:
13          "The Board of Supervisors
14          and/or the Sheriff shall
15          determine whether to waive the
16          30-day period"?
17     A.    Yes, sir, I do see that.
18     Q.    And has the Board of Supervisors ever waived
19 the 30-day period?
20     A.    The Board of Supervisors representative has
21 but the official board has not.
22     Q.    And who's the representative?
23     A.    Lisa Carwyle.
24     Q.    Are you familiar with any specific instances
25 in which that advance notice period was waived by Lisa

Page 17

Larry Gillespie

2  Carwyle?
3      A.    I know that -- I don't know specifically
4  know, I can't name one.  But I know that there have
5  been some.
6      Q.    Do you have any sense of what factors Lisa
7  Carwyle considers when determining whether or not to
8  waive this requirement?
9      A.    It's my understanding that herself and the
10 Sheriff discuss that and they make a determination.
11     Q.    We're going to look at now tab 12.
12     A.    Yes, sir.
13     Q.    This will be Exhibit 4.  And this is two
14 separate files, so I'm putting both into the chat.
15     A.    Okay.
16     Q.    Sorry.  I apologize.  I feel like maybe the
17 tabs were put together wrong, and I think that --
18     MR. O'DONNELL:  Do you want to refer to them
19 by Bates number, Isaac?
20     MR. RETHY:  Yeah.
21     Q.    So look at your tab 11.  Is that a document
22 with Bates 1354.
23     A.    001354?
24     Q.    Yeah.
25     A.    Yes, sir.

Page 18

Larry Gillespie

```
 1                  Larry Gillespie
 2      Q.    And then is there a document behind that
 3  document that is --
 4      A.    No, sir.
 5      Q.    You said no?
 6      A.    There is not, no, sir.
 7            MR. O'DONNELL:  It's just a single page.
 8            MR. RETHY:  Great.
 9      Q.    So if you look at 12, does that have --
10  there's an email that starts at 1111; is that right?
11      A.    Correct.
12      Q.    And it goes on to 1112.  It sort of looks
13  like it's put together backwards.
14      A.    That is correct.
15      Q.    And then is there a further document behind
16  that same tab?
17      A.    No, sir, there is not.
18      Q.    A further page?  Is there a tab 12-A?
19            Sorry.  The joys of remote depositions.
20      A.    No, sir, there's not.
21            MR. O'DONNELL:  Isaac, what we have is --
22  there's a blue sheet, and then there's a press release
23  all in tab 12.
24            THE WITNESS:  I'm sorry.  I'm sorry.  I
25  thought the blue sheet was a different tab.
```

Page 19

Larry Gillespie

```
 1                  Larry Gillespie
 2  BY MR. RETHY:
 3      Q.    Yeah, that's what I'm looking for.  What I'm
 4  really trying to introduce here -- and it seems like
 5  we messed up the binder in this respect -- is 11,
 6  which is the sort of cover email relating to the press
 7  release, and then the press release that's behind the
 8  blue sheet, if that makes sense.
 9      A.    Yes, sir.
10            MR. RETHY:  So I'm going to just add 11 to
11  the chat.
12            COURT REPORTER:  Excuse me.  So do you want
13  11 to be Exhibit 4 and 12 to be Exhibit 5 is?
14            MR. RETHY:  Let's disregard 12.  What I want
15  the exhibit to be is 11 and 12-A.  So if that could be
16  one exhibit or if it needs to be two, that's also
17  fine.  But 11 and 12-A.
18            (EXHIBIT 4, TABS 11 AND 12A - EMAIL FROM
19            LISA CARWYLE, 6/15/2020, AND FACEBOOK POST,
20            PRESS RELEASE ON REVISION OF CURRENT
21            FACILITY USE POLICY - DOC001354, WAS MARKED
22            FOR IDENTIFICATION.)
23            MR. O'DONNELL:  The gist of the exhibit is
24  going to be the press release?
25            MR. RETHY:  Correct.
```

Page 20

Larry Gillespie

```
 1                  Larry Gillespie
 2            MR. O'DONNELL:  And the one email.  Okay.  I
 3  gotcha.
 4  BY MR. RETHY:
 5      Q.    So this email from Lisa Carwyle, it goes to
 6  an email address that says "supervisor."  Right?
 7      A.    Yes, sir, that's correct.
 8      Q.    Do you receive emails that go to that
 9  address?
10      A.    Yes, sir.
11      Q.    Do you recall receiving this email?
12      A.    I do not recall this specific email, but I'm
13  sure I received it.
14      Q.    Now, if you could look at the press release.
15      A.    Okay.
16      Q.    So are you familiar with this press release?
17      A.    No, sir, I'm not familiar with it.  I'm sure
18  I have seen it, but I do not remember the exact
19  wording, no, sir.
20      Q.    You see in the middle -- you see the second
21  paragraph here says:
22            "The new policy states a permit
23            is not required for gatherings
24            of four or less people on the
25            grounds."
```

Page 21

Larry Gillespie

```
 1                  Larry Gillespie
 2            Correct?
 3      A.    Correct.
 4      Q.    And then the next paragraph states:
 5            "The previous policy states all
 6            gatherings are required to have
 7            a permit"?
 8      A.    Okay.  Run that by me again, please.
 9      Q.    Do you see in the next paragraph there's a
10  single line that says:
11            "The previous policy states all
12            gatherings are required to have
13            a permit"?
14      A.    Yes, sir, I see that statement.
15      Q.    Is that correct?
16      A.    It's correct that it says that.  I'm not 100
17  percent sure, correct, that that's what the policy
18  says.  The policy is the 2019 policy we looked at
19  before?
20      Q.    Correct.
21      A.    Okay.  I can tell you that's what it says in
22  this line item here, but I'm not 100 percent sure that
23  that's what the policy says.
24      Q.    Fair enough.  Is it your understanding that
25  prior to this June 15th amendment, that a single
```

Page 22

Larry Gillespie

1 person was required to get a permit to be on the
2 courthouse grounds?
3 A. I'm thinking. I'm not aware of that at the
4 time.
5 Q. This policy was put in place as an amendment
6 to the policy that we've been discussing on June 15th,
7 correct, this year?
8 A. I'm assuming that is correct, June 15th.
9 That would be the date of the court order; is that
10 correct?
11 Q. Yeah.
12 A. June 15th, yes. I was just making sure the
13 date was correct. I didn't have it at on the top of
14 my head.
15 Q. So was this put in place in response to
16 protests around the courthouse or around the
17 Confederate statue?
18 A. This policy was put in place for increased
19 activity around the courthouse.
20 Q. And that increased activity was related to
21 protests -- protest activity that increased after the
22 killing of George Floyd; is that correct?
23 A. Yes.
24 Q. So if we could now turn to tab 12, the true
25

Page 23

Larry Gillespie

1 tab 12 or whatever, the email.
2 A. Yes, sir.
3 MR. RETHY: I'll put this in the chat.
4 Will this be 5 or 6?
5 COURT REPORTER: This will be five.
6 (EXHIBIT 5, TAB 12, DISCLAIMER WITH EMAIL
7 FROM APRIL HUGHES, 6/15/2020 -
8 DOC001111-1112, WAS MARKED FOR
9 IDENTIFICATION.)
10 Q. So this is an email that's sent to a variety
11 of people, and the people look like they're the
12 current members of the Board of Supervisors, right,
13 the recipients of this email plus the Sheriff?
14 A. That looks correct, yes, sir.
15 Q. Do you know the author of this email?
16 A. Apparently it looks like it's April Hughes.
17 And I do not know Ms. Hughes.
18 Q. And it's signed -- it's slightly confusing.
19 It's signed Lindsey Hughes. Do you know a Lindsey
20 Hughes?
21 A. I do not.
22 Q. Do you remember receiving this email?
23 A. I do not remember this email, receiving this
24 email. I'm sure I did, but I do not remember it.
25

Page 24

Larry Gillespie

1 Q. Do you have a general sense of how many
2 emails you receive from members of the public relating
3 to the Board of Supervisors' business or to the public
4 business?
5 MR. O'DONNELL: Object to the form. But go
6 ahead.
7 A. I really do not. It's substantial, but I do
8 not remember a number.
9 Q. Would you say you get more than 10 a day?
10 A. Okay. Let's go back and ask the question
11 again in a way -- are you citing a specific time
12 period or just in general?
13 Q. So let's say during -- let's take the month
14 of June 2020.
15 A. I would say we received more than 10 a day.
16 Q. Do you have a general practice in terms of
17 reading these emails or not reading them?
18 A. I generally read every email I get.
19 Q. Do you generally respond or not respond?
20 A. I generally -- during this time period I
21 generally did not respond.
22 Q. And under what circumstances would you
23 respond?
24 A. The only circumstances usually that I
25

Page 25

Larry Gillespie

1 responded during this time period, if it was someone
2 that was a family friend or knew them personally.
3 Q. So if you look at the third paragraph of
4 this email, we see a sentence that states:
5 "I am disappointed in the
6 actions of our Sheriff this
7 past week by barricading public
8 property so that people could
9 not peacefully protest there.
10 I haven't seen him do that when
11 it was white men with
12 Confederate flags standing
13 there."
14 Q. Do you have an understanding of what the
15 author is referring to in this statement?
16 A. I'm trying to think of the time frame. I do
17 remember the Sheriff barricading the statue. I'm not
18 exactly sure when that time frame was. It was in the
19 general time of May, June, July.
20 Q. Did the Sheriff consult with the Board of
21 Supervisors before barricading the statue?
22 A. I do not recall the Sheriff consulting with
23 me.
24 Q. Did you personally observe the barricades?
25

Larry Gillespie

1
2    A.    Yes, I did see the barricades.
3    Q.    And what did the barricades consist of?
4    A.    To my recollection, it was just a portable
5  barricade, plastic barricade, that was around that
6  would generally block off a street.
7    Q.    Do you agree with the author's statement
8  that the Sheriff hadn't done this when it was white
9  men with Confederate flags standing there?
10   A.    Rephrase your question a little bit, I
11 guess.  Am I agreeing with the person saying that
12 that's the only reason he did it?
13   Q.    Do you agree that the Sheriff had not
14 barricaded the statue previously in response to
15 protest activity by pro-Confederate --
16   A.    I will say this:  That is --
17         MR. O'DONNELL:  I was going to say let him
18 finish his question.
19         THE WITNESS:  Okay.  I'm sorry.
20         Go ahead.  I'm sorry.  I should let you
21 finish your question.  Go ahead.
22   Q.    I had finished.
23   A.    Okay.  I'm sorry.  I'm very sorry.
24         My statement on that would be that, in my
25 recollection, that is the only time that I have seen

Larry Gillespie

1
2  the statue barricaded.
3    Q.    And do you understand why the statue was
4  barricaded during that time period?
5    A.    It was on the recommendation of the Sheriff.
6    Q.    Do you have a sense of why the Sheriff
7  decided to do that?
8    A.    I really don't, no, sir.
9    Q.    If you'll look at tab 15.  It will be
10 Exhibit 6, I believe.
11   A.    Yes, sir.  It appears to be a text message?
12   Q.    Yes.
13         (EXHIBIT 6, TAB 15, TEXT MESSAGE, 6/17 -
14          DOC001007, WAS MARKED FOR IDENTIFICATION.)
15 BY MR. RETHY:
16   Q.    Are you familiar with this text message?
17   A.    I did not remember it if it was sent to me,
18 but I have read it now.
19   Q.    Are you on -- have you ever received texts
20 from like sort of a text message chain that includes
21 the other members of the Board of Supervisors?
22   A.    Yes.
23   Q.    And under what circumstances would you
24 receive or send those sorts of text messages?
25   A.    More or less a notification of something

Larry Gillespie

1
2  from the County administrator or possibly our
3  attorney.
4    Q.    Do you recall sending or receiving text
5  messages regarding protests around the County
6  Courthouse?
7    A.    I do not recall that, no, sir.
8    Q.    So if you look at this text message, you see
9  that there's sort of a post within the text message
10 from someone named Sunny Young Baker.  Do you know who
11 that is?
12   A.    I do not.
13   Q.    This states that:  "... the City police are
14 not allowed to be near the statue."  Do you see that?
15   A.    I do see that, yes, sir.
16   Q.    Do you have an understanding of whether or
17 not that's correct?
18   A.    I understand that the Lafayette County
19 Sheriff's Department has jurisdiction over County
20 property, including where the statue is.
21   Q.    Do you have an understanding of whether that
22 jurisdiction is exclusive?
23   A.    It's my understanding that it is exclusive.
24   Q.    So is it your understanding that if the City
25 police observed a crime taking place on the County

Larry Gillespie

1
2  Courthouse grounds, they would have no jurisdiction to
3  intervene?
4    A.    It's my understanding that they would notify
5  the Lafayette County Sheriff's Department.
6    Q.    But they would have to stand back even if a
7  violent crime was underway?
8    A.    I'm not sure exactly -- I mean I'm sure --
9  I'm not sure, to be honest with you.  All I know is
10 that is the jurisdiction of the Lafayette County
11 Sheriff's Department.
12         I could opinionate on it.
13   Q.    Okay.  So what is your opinion?
14   A.    My opinion is any law enforcement officer
15 anywhere in the world that stands by and lets a
16 violent crime happen is not doing their job.
17   Q.    Take a look at tab 4.
18   A.    Yes, sir.  Permit application?
19   Q.    Correct.
20         (EXHIBIT 7, TAB 4, FACILITY USE APPLICATION
21          AND PERMIT BY JESSIE HONEYCUTT, 6/3/2019,
22          WAS MARKED FOR IDENTIFICATION.)
23   Q.    Do you know the applicant here, Jessie
24 Honeycutt?
25   A.    I do not.

Larry Gillespie

1  Q.    And if you look at the line that says
2  Explanation of Use, it says:  "Memorial service for
3  Anthony Hurvey."  Correct?
4      A.    It is what the line says, yes, sir.
5      Q.    Do you have an understanding of who that is?
6      A.    Anthony Harvey?
7      Q.    Hurvey.
8      A.    Hurvey?  It's my recollection Mr. Harvey --
9  yes, I have a general knowledge of who he was.
10     Q.    What is that general knowledge?
11     A.    He was an African-American who would be at
12  the monument at certain times.  I'm not exactly sure
13  what he was protesting for 100 percent.  But I think
14  he was actually killed in a car wreck on Highway 6.
15     Q.    If you'll look at tab 5.
16     A.    Okay.
17          (EXHIBIT 8, TAB 5, EMAIL FROM WAYNE ANDREWS,
18           7/11/2019, FORWARDED BY LISA CARWYLE -
19           DOC000040, WAS MARKED FOR IDENTIFICATION.)
20     Q.    Are you familiar with someone named Wayne
21  Andrews?
22     A.    I am.
23     Q.    Who is Mr. Andrews?
24     A.    Mr. Andrews is the director of the Arts --

Larry Gillespie

1  Yoknapatawpha Arts Council I think is what he is.
2      Q.    Do you know Mr. Andrews personally?
3      A.    Yes, I do.  Through business.
4      Q.    And you see in this email he sends to Lisa
5  Carwyle he asks if the courthouse lawn is available on
6  Saturday, August 10th, in the evening.  And this is in
7  2019.  Do you see that?
8      A.    I do see that.
9      Q.    It says:
10          "We would like to include
11          it" -- referring to the
12          courthouse lawn -- "as part of
13          the projection event which
14          protects art onto buildings in
15          the downtown area."
16          Do you see that?
17     A.    I do see that, yes, sir.
18     Q.    Are you familiar with that event, projection
19  event?
20     A.    I am not.
21     Q.    Are you familiar with any events during
22  which art is projected onto buildings in the downtown
23  area?
24     A.    No, sir, I am not.

Larry Gillespie

1      Q.    If you could look at tab 9.
2      A.    Okay.
3          (EXHIBIT 9, TAB 9, EMAIL FROM JANICE
4           ANTONOW, 6/11/2020 - DOC000709-710,
5           WAS MARKED FOR IDENTIFICATION.)
6      Q.    Now, this is an email that you would have
7  received along with the other members of the Board of
8  Supervisors; is that right?
9      A.    That is correct.
10     Q.    Do you recall this email?
11     A.    I do recall this certain email, yes, sir.
12     Q.    Did you respond to this email?
13     A.    No, sir, I did not.
14     Q.    Do you know the sender of the email?
15     A.    I do know the sender, yes, sir.
16     Q.    And who is the sender?
17     A.    Janice Antonow.
18     Q.    And what's your understanding -- or I guess
19  how do you know this person and what do you know about
20  them?
21     A.    I actually work for the City of Oxford, and
22  she's a Board of Aldermen.
23     Q.    She's what?
24     A.    She's a Board of Aldermen.

Larry Gillespie

1      Q.    Do you ever recall discussing this email
2  with anyone?
3      A.    The only discussion about this email was:
4  Did you get an email from Ms. Antonow?
5      Q.    And who was that discussion with?
6      A.    I think it was Mr. Rikard and Mr. McLarty.
7      Q.    Is there anything in particular about this
8  email that causes you to have a recollection of this
9  and not, for instance, the other email we looked at a
10  few minutes ago?
11     A.    Yes, sir.  The only reason is because of the
12  sender and that she just happens to be on the Board of
13  Aldermen and I happen to work for the City.  That's
14  the reason I remember.
15     Q.    So if you look at the third paragraph of
16  this email, it states:
17          "Besides being offensive to
18          many citizens, the statue in
19          its present location will
20          always serve as a magnet for
21          protests, pro and con, and will
22          continue to strain our
23          resources that could be better
24          used for more positive events."

Larry Gillespie

1
2       So do you agree that this statue -- and
3  that's referring to the Confederate monument -- on or
4  around the courthouse grounds serves as a magnet for
5  protests?
6       A.    I would agree that -- I wouldn't necessarily
7  use those words, but it is an area of protest.
8       Q.    Do you have a view on whether the continued
9  presence of the statue puts a strain on City or County
10 resources?
11      A.    Yes.  During the time of protests, it was
12 putting a strain on our law enforcement.
13      Q.    If you'd look at tab 13.
14      A.    Yes, sir.
15            (EXHIBIT 10, TAB 13, EMAILS BETWEEN BUSTER
16            CLARK AND LARRY GILLESPIE, 6/16/2020 -
17            DOC000750, WAS MARKED FOR IDENTIFICATION.)
18      Q.    And so this is an email sent directly to
19 you; correct?
20      A.    That is correct.
21      Q.    Do you recall -- and it's not just a single
22 email.  It's an email chain; right?
23      A.    Correct.
24      Q.    Do you recall this email chain?
25      A.    I mean I do after reviewing it.  Yes, I

Larry Gillespie

1 recall it.
2       Q.    Do you know Buster Clark?
3       A.    I do.
4       Q.    And who is Mr. Clark?
5       A.    Mr. Clark is a family friend.
6       Q.    So Mr. Clark states that he opposes any
7  movement of the monument; correct?
8       A.    Yes, sir.  That's what the email says.
9       Q.    And then you respond and you say:
10            "Thank you for voicing your
11            opinion.  I intend on
12            representing the people that
13            voted me into office."
14            Correct?
15      A.    That is correct, yes, sir.
16      Q.    And what did you mean by that?
17      A.    Pretty much exactly what it says.  You know,
18 I tell him I'm representing the people who voted me
19 into office.  Which, if you look below, he explains it
20 very well:  The lifetime residents of Lafayette
21 County.
22      Q.    Who was your predecessor on the Board of
23 Supervisors?
24      A.    District 2 would have been Jeff Busby.

Larry Gillespie

1
2       Q.    What's the more prospective of the views of
3  the people who voted you into office with respect to
4  the Confederate monument?
5       A.    Could you be -- rephrase the question a
6  little bit so I make sure I understand what you're
7  asking.
8       Q.    So you said you intend on representing the
9  people that voted you into office in reference to the
10 issue of whether or not to move the Confederate
11 monument; correct?
12      A.    Yes.  I have a question.
13      Q.    Okay.
14      A.    I just want to clarify what your question
15 is, if that's okay, to make sure I understand.
16      Q.    Sure.
17      A.    Are you asking did I have a preconceived
18 notion of what I thought those constituents were
19 thinking?
20      Q.    That's broadly fair, except I'm not trying
21 to -- you know, "preconceived" --
22      A.    I'm just trying to understand the question
23 to make sure I answer correctly.
24      Q.    Well, did you have a sense at the time of
25 what your constituents -- of how best to represent

Larry Gillespie

1 your constituents on this issue?
2       A.    My feelings were on the issue that the
3  lifetime residents of Lafayette County just wanted a
4  voice in the process.  That was my consensus of what I
5  thought the people wanted.
6       Q.    So when you say "lifetime residents," are
7  you intending to try to distinction between lifetime
8  residents and people who live in Lafayette County but
9  are not lifetime residents?
10      A.    There's a distinction, yes.
11      Q.    What is that distinction?
12      A.    Just that if you were born and raised in
13 Lafayette County, that you're more or less a lifetime
14 resident.  There are people here that have lived 20
15 years, but I wouldn't necessarily consider them a
16 lifetime resident.
17      Q.    Is it your view that you primarily represent
18 the interests of lifetime residents as opposed to
19 other residents?
20      A.    No, I wouldn't say that would be 100 percent
21 correct.
22      Q.    Would it be partially correct?
23      A.    I would say in this instance it would be
24 correct, letting them have a voice.

Page 38

Larry Gillespie

2  Q.  So what did that entail, letting them have a
3  voice?
4  A.  That would be a vote -- a referendum or vote
5  on the statue, whether to remove it or not.
6  Q.  Are you referring to a vote of the Board of
7  Supervisors or some kind of broader like vote that all
8  the residents of the County would take part in?
9  A.  Yes.  A referendum which would include a
10 vote from every registered voter of Lafayette County.
11 Q.  Is that a proposal that you made?
12 A.  That is a proposal I made to individuals of
13 the County, yes.
14 Q.  Is that something the Board of Supervisors
15 ever considered?
16 A.  It was discussed.
17 Q.  When was that discussion?
18 A.  I do not recall a specific date.
19 Q.  Was it this year?
20 A.  It was in 2020, yes, sir.
21 Q.  Was it in the summer of this year?
22 A.  Yes, sir.
23 Q.  And what was the outcome of that discussion?
24 A.  The outcome -- I mean we didn't have a
25 referendum or a vote.  The discussion was more or less

Page 39

Larry Gillespie

2  that I bring it up -- my feelings, exactly what we
3  have been talking about, that I thought the people of
4  Lafayette County needed to vote on it.
5  Q.  Did others disagree on that?
6  A.  I do not recall everybody's reaction.
7  Q.  Do you recall why it was determined not to
8  go forward with that referendum?
9  A.  I do not.  My thoughts on the referendum,
10 that it needed to be a voter-initiated referendum.
11 And the people that I proposed that to did not move
12 forward with that action.
13 Q.  Do you have an understanding as to why?
14 A.  I do not.  The ball was in their court.
15 Q.  Is it your view that lifetime residents of
16 the County have different perspectives on the statue
17 than residents who are not lifetime residents?
18 A.  It's possible.  I can't proclaim what those
19 people were thinking.
20     THE WITNESS:  Excuse me, sir?
21     MR. RETHY:  Yes?
22     THE WITNESS:  Would it be okay to take a
23 bathroom break?
24     MR. RETHY:  Absolutely.  Five minutes, 10
25 minutes?  What do you prefer?

Page 40

Larry Gillespie

2      THE WITNESS:  10 would be good.
3      MR. RETHY:  Okay.  Sounds good.  We'll come
4  back at five past the hour.
5      THE VIDEOGRAPHER:  So we're going off
6  record.  The time is 9:56.
7      (A RECESS WAS TAKEN.)
8      THE VIDEOGRAPHER:  Back on record at 10:07.
9      MR. RETHY:  I'd like to turn to tab 16,
10 Exhibit 11; is that correct?
11     COURT REPORTER:  Correct.
12     (EXHIBIT 11, TAB 16, EMAIL FROM JACK
13      WILLIAMS, 6/18/2020, FORWARDED BY LISA
14      CARWYLE, WITH ATTACHMENTS - DOC000261-266,
15      WAS MARKED FOR IDENTIFICATION.)
16 Q.  So this is sort of a composite document.  It
17 starts with an email, and the number on the bottom of
18 the page is 261; correct?
19 A.  That's correct.
20 Q.  And if you'll look at page 4, so 264.
21 A.  Okay.
22 Q.  We see that this is a permit application;
23 correct?
24 A.  That is correct.
25 Q.  Do you know who Timmy Warren is?

Page 41

Larry Gillespie

2  A.  I do.
3  Q.  And who is Mr. Warren?
4  A.  He's a resident of Lafayette County.  He
5  lives in the Tula area.  I'm pretty sure that's where
6  he still lives.
7  Q.  Do you know him personally?
8  A.  I do know him personally through his
9  brother.
10 Q.  And what's the nature of your relationship
11 with Mr. Warren?
12 A.  I'm just an acquaintance through his
13 brother.
14 Q.  Do you have a sense of what Mr. Warren's
15 views are regarding the Confederate monument?
16 A.  Not until -- I do now after the issue with
17 the permit and he was going to have a demonstration.
18 I did not know -- I did not know his views prior to
19 that.
20 Q.  And so what's your understanding of his
21 views now?
22 A.  My understanding is that he would like the
23 statue to stay where it's at.
24 Q.  And so do you see that the date of this
25 permit application is June 17th?

Page 42

Larry Gillespie

1
2    A.    Yes.  I see that as the date it was applied
3 for.
4    Q.    And then do you see that the date of the
5 event is June 19th?
6    A.    That's correct, yes, sir.
7    Q.    Do you see on the bottom that the permit was
8 granted?
9    A.    I do see that, yes, sir.
10    Q.    And so the time between the application
11 being made and granted was substantially less than 30
12 days; is that correct?
13    A.    That is correct.
14    Q.    And do you have an understanding of why that
15 30-day requirement was waived in this case?
16    A.    That was a decision made by the County
17 administrator, and the Sheriff apparently was good
18 with it, my assumptions.
19    Q.    So if you'll look at the next page, 265.
20    A.    Yes, sir.
21    Q.    It's an email from Lisa Carwyle to
22 recipients, including the "supervisor" address;
23 correct?
24    A.    That is correct.
25    Q.    Do you recall receiving this email?

Page 43

Larry Gillespie

1
2    A.    Let me review it.  One moment.  (Document
3 review.)
4         I do recall receiving this email.
5    Q.    So the last sentence of the first paragraph
6 states -- sorry, backing up.
7         So this email concerns the permit
8 application we just discussed; right?
9    A.    That is correct.  Actually it is a
10 notification of public records request about the
11 permit, yes, sir.
12    Q.    And you see the last sentence of the first
13 paragraph states:
14         "I know there is a lot of talk
15         on social media about it and I
16         wanted to give y'all a heads
17         up."
18         Do you see that?
19    A.    I do see that, yes, sir.
20    Q.    Do you recall there being talk on social
21 media about this event?
22    A.    I do recall talk on social media, yes, sir.
23    Q.    And what's your recollection of that?
24    A.    My recollection of that was that the date,
25 which you notice is June 19th of the event requested,

Page 44

Larry Gillespie

1
2 is actually Juneteenth, which is a very memorable date
3 in black history.
4    Q.    And what's your understanding of the
5 significance of this event being held on Juneteenth?
6    A.    Which event?  This event?
7    Q.    Mr. Warren's event.
8    A.    Just that he was in favor of keeping the
9 statue there and it directly, I guess, would not
10 coincide with Juneteenth festivities or events.
11    Q.    Can you explain what you mean by "not
12 coincide with"?
13    A.    I guess what I mean by that is that his
14 views did not -- I mean they were just kind of
15 contradictory, I guess you would say.  The statue
16 is --
17         (BACKGROUND SNEEZE.)
18         MR. RETHY:  Sorry.  She sneezed.
19         THE WITNESS:  Bless you.
20         MR. RETHY:  Working from home.
21         MR. O'DONNELL:  That came through loud and
22 clear.
23         THE WITNESS:  Yeah, it did.  It did.  It
24 came through very loud and clear.
25    A.    I mean I hate to speculate what other people

Page 45

Larry Gillespie

1
2 think.  But Juneteenth is a very eventful thing in
3 black history, and it just didn't coincide together.
4         And I'm getting that, too, from -- we refer
5 back to the social media post or social media outlet.
6 So I'm recalling what some of those were about.
7    Q.    So do you recall discussing with other
8 members of the Board of Supervisors -- sorry.
9         Do you recall any discussions with other
10 members of the Board of Supervisors regarding this
11 event?
12    A.    I do not.
13    Q.    What about with the Sheriff?
14    A.    I did have a conversation with the Sheriff
15 about this.
16    Q.    And what's your recollection of that
17 conversation?
18    A.    My recollection of the conversation was
19 about the timing of the event being -- coinciding with
20 Juneteenth.
21    Q.    Did the event take place as planned?
22    A.    Mr. Warren's event?
23    Q.    Yes.
24    A.    It did not.
25    Q.    I'm going to turn to tab 20.

Larry Gillespie

1
2  A.    Yes, sir.
3  Q.    This will be Exhibit 12.
4        (EXHIBIT 12, TAB 20, FACILITY USE
5        APPLICATION AND PERMIT BY GEORGE O.
6        JOHNSON, 6/22/2020, WITH ATTACHED LETTER
7        FROM LISA CARWYLE, 6/24/2020 -
8        DOC000025-026, WAS MARKED FOR
9        IDENTIFICATION.)
10 Q.    So this is another permit application;
11 correct?
12 A.    That is correct.
13 Q.    And the applicant is someone named George O.
14 Johnson; correct?
15 A.    That is correct, yes, sir.
16 Q.    Do you know Mr. Johnson?
17 A.    I do not personally know Mr. Johnson, no.  I
18 know of Mr. Johnson.
19 Q.    And what's your -- what's the nature of your
20 knowledge of Mr. Johnson?
21 A.    I have seen Mr. Johnson at the courthouse
22 grounds previously on demonstrations.
23 Q.    And Mr. Johnson is in favor of the
24 Confederate monument; is that fair?
25 A.    I have not talked to Mr. Johnson about that.

Larry Gillespie

1  But judging -- my opinion from outside looking in, he
2  has been there demonstrating in favor of it; correct.
3  Q.    If you'd turn to tab 28, Exhibit 13.
4        (EXHIBIT 13, TAB 28, EMAILS BETWEEN STEVE
5        HALE AND LARRY GILLESPIE, 7/6/2020 -
6        DOC000919 WAS MARKED FOR IDENTIFICATION.)
7  Q.    So this is an email exchange between
8  yourself and someone named Steve Hale; is that
9  correct?
10 A.    That is correct.
11 Q.    And who is Mr. Hale?
12 A.    Mr. Hale is a family friend.
13 Q.    And in the email to Mr. Hale you state:
14        "I will not vote to relocate
15        the monument."
16        Can you explain your decision not to vote to
17 relocate the monument?
18 A.    Yes, sir, I can.  If you will continue on
19 through the email, it shows that I would not oppose a
20 vote by the people of Lafayette County to decide
21 whether to relocate the monument or not.
22 Q.    And then it says:
23        "I would be against using
24        Lafayette County funds to

Larry Gillespie

1
2        relocate monument."
3        Correct?
4  A.    That's correct.
5  Q.    So with that context, could you explain why
6  you voted not to relocate the monument?
7  A.    Again --
8        MR. O'DONNELL:  Object to the form.  But go
9  ahead.
10 A.    Again, I think it should be left to the
11 citizens of Lafayette County, registered voters, to
12 decide.
13 Q.    And you say you would be against using
14 Lafayette County funds to relocate it.  Can you
15 explain why?
16 A.    Lafayette County only has a finite amount of
17 funds, and I think they're better used serving the
18 citizens elsewhere.
19 Q.    But earlier you said that, because the
20 monument attracts protest activities, it can also put
21 a strain on County resources; is that correct?
22 A.    Correct.  Law enforcement.
23 Q.    And so have you calculated the relative
24 costs of keeping the monument in place versus
25 relocating it?

Larry Gillespie

1
2  A.    I have not.
3  Q.    Do you have a personal view as to whether
4  the monument should be relocated.
5  A.    I do not.  Completely neutral.
6  Q.    But it wouldn't be -- would it be possible
7  to relocate the monument without using County funds?
8  A.    Would it be possible?
9  Q.    Yes.
10 A.    I can speculate on that, but I mean I can't
11 tell you 100 percent.  But I can speculate that it
12 would be possible.
13 Q.    And how would the monument -- how could the
14 monument be relocated without using County funds?
15 A.    I would speculate donations.
16 Q.    If there was a vote to relocate the
17 monument, would you oppose allocating County funds to
18 implement the results of that vote?
19 A.    Could you define "vote"?
20 Q.    A vote by the people of Lafayette County, a
21 referendum of the sort you've been describing.
22 A.    Let me clarify.  A referendum that was
23 initiated by the County voters of Lafayette County, if
24 that vote was taken and it was passed, we would be
25 obligated to move the statue by law, from what I

Page 50

Larry Gillespie

1
2 understand. And I would look for other means of
3 funding it besides County funds.
4    Q.    And why is that the case?
5          MR. O'DONNELL: Object to the form. Go
6 ahead and answer.
7    A.    Again, the County only has a finite amount
8 of money. And I think that we just need to spend it
9 in other areas.
10    Q.    So if a referendum resulted in a vote to
11 relocate the statue, is it your position that should
12 not be implemented unless you could raise funds from
13 other means?
14    A.    I would look for other funds first. Again,
15 it's my understanding we'd be bound by law -- bound by
16 the referendum to move it. But I would look for other
17 funds before using County funds.
18    Q.    Are there other areas of County business
19 where you look for other funds rather than County
20 funds to implement County policy?
21    A.    Yes.
22    Q.    And what are those?
23    A.    Public safety, fire service.
24    Q.    Take a look at tab 31.
25    A.    Yes, sir.

Page 51

Larry Gillespie

1
2    (EXHIBIT 14, TAB 31,  EMAILS BETWEEN JOEY
3    EAST AND LISA CARWYLE, 7/15/2020, WITH
4    ATTACHED FACILITY USE APPLICATION AND
5    PERMIT BY STEPHANIE M. SELF - DOC000323,
6    327, 319, WAS MARKED FOR IDENTIFICATION.)
7    Q.    So this is an email between -- I'm sorry.
8 This document, do you see the number at the bottom is
9 323 on the first page?
10    A.    Yes, sir.
11    Q.    So this is an email that you're not on, so I
12 don't expect you to recall this email. But there's a
13 discussion between Lisa Carwyle and Sheriff East;
14 correct?
15    A.    Yes, sir, it appears that way.
16    Q.    And in Ms. Carwyle's email she states:
17          "Did y'all discuss at the board
18          meeting that Monday to change
19          the requirement on the number
20          of days to issue a permit?"
21          Do you see that?
22    A.    I do, yes, sir, I see that.
23    Q.    And then Sheriff East responds:
24          "We did discuss for a longer
25          about -- amount -- of time to

Page 52

Larry Gillespie

1
2          approve permits that would
3          involve security and safety
4          needs."
5          Do you see that?
6    A.    I do, yes, sir.
7    Q.    Do you recall that discussion?
8          MR. O'DONNELL: Object to the form. Go
9 ahead.
10    A.    Do I recall the discussion of --
11    Q.    The discussion of the board meeting that's
12 being referenced here.
13    A.    We did discuss policy. I'm not sure -- if I
14 remember correctly, Ms. Carwyle was not at that
15 meeting. So that would explain why she's asking this
16 question.
17    Q.    So do you recall discussing the policy with
18 the Sheriff at a board meeting around this time?
19    A.    Yes.
20    Q.    Do you recall discussing changing the policy
21 to reflect -- to require a longer amount of time to
22 approve certain permits?
23    A.    I recall discussing with the Sheriff what
24 time he needed --
25          MR. O'DONNELL: I have to go off camera. We

Page 53

Larry Gillespie

1
2 can keep going. I'm going to step out of the room for
3 just a second.
4          THE WITNESS: Okay.
5    A.    I remember discussing with the Sheriff how
6 long it would take him to do his due diligence on
7 permits.
8    Q.    And do you recall his response on that
9 topic?
10    A.    I really do not, no.
11    Q.    Look at tab 32 now.
12    A.    Okay.
13    Q.    Sorry. Not quite yet -- or actually, yeah,
14 32. Sorry.
15    A.    Okay.
16          (EXHIBIT 15, TAB 32, ORDER:  APPROVE
17          REVISION OF FACILITIES USE POLICY TO
18          INCLUDE A REQUIREMENT OF APPLICATION TO BE
19          MADE 14 DAYS PRIOR TO DATE OF PROPOSED USE
20          AND REQUIRING CLOSURE OF COURTHOUSE GROUNDS
21          30 MINUTES BEFORE DUSK, 7/20/2020 -
22          DOC000001, WAS MARKED FOR IDENTIFICATION.)
23          THE WITNESS: David is stepping back in the
24 room. I just want to update him where we're at.
25          We're on tab 32, David.

Larry Gillespie

1
2    MR. O'DONNELL: Appreciate it, Larry.
3    THE WITNESS: Yes, sir.
4    Q.    So this is the document -- the number on the
5 bottom is 001; correct?
6    A.    That is correct.
7    Q.    Are you familiar with this document?
8    A.    Let me review it very quickly. (Document
9 review.)
10    I am familiar with this document.
11    Q.    This is an order reflecting a revision of
12 the Facilities Use Policy; correct?
13    A.    That is correct.
14    Q.    And the substance of the revision is to
15 change the time for the application to 14 days and
16 require closure of courthouse grounds, including the
17 Confederate statue area, 30 minutes before dusk;
18 correct?
19    A.    That is correct.
20    Q.    What's your understanding of -- sorry.
21    And you voted for this; correct?
22    A.    That is correct.
23    Q.    And what's your understanding of why this
24 policy change was enacted?
25    A.    This policy change was enacted primarily for

Larry Gillespie

1
2 public safety.
3    Q.    And can you specify what public safety
4 concerns?
5    A.    The discussion was that the grounds needed
6 to be closed primarily at the closing of business
7 hours because the Lafayette County Sheriff's
8 Department -- at this time this is when they had the
9 least amount of deputies and they were stretched thin
10 at night and were not able to keep someone there to
11 monitor the courthouse grounds.
12    Q.    Was this a policy change implemented in
13 response to increased protest activity around the
14 Confederate statue?
15    A.    No. Actually this policy had been pushed by
16 the Sheriff since he took office.
17    Q.    So this says -- this policy requires closure
18 of the courthouse grounds. What's your understanding
19 of what "closure of the courthouse grounds" means?
20    A.    That there would be no public access.
21    Q.    And we looked earlier at some pictures of
22 the courthouse grounds; right?
23    A.    Yes, sir.
24    Q.    And there's not actual gates, are there,
25 blockades that restrict access; is that correct?

Larry Gillespie

1
2    A.    At this time there are not, no, sir.
3    Q.    And there's also no signs posted that inform
4 members of the public that they're prohibited from
5 accessing the courthouse grounds at certain points in
6 time?
7    A.    At this time, no, sir. To my knowledge,
8 there are none at this time.
9    Q.    What's your understanding of what "dusk"
10 means?
11    A.    Dusk is actually when the sun starts going
12 below the horizon. I think that is correct.
13    Q.    And that changes depending on the time of
14 year; correct?
15    A.    That is correct.
16    Q.    What's your understanding of what dusk is
17 today?
18    MR. O'DONNELL: Object to the form.
19    A.    Can you clarify exactly what you're asking?
20 Are you asking me what time dusk is today?
21    Q.    That's correct. What time is dusk today in
22 Oxford, Mississippi?
23    A.    I would guess 4:45 to 5. When you start
24 losing light is what I would guess, but I'm not 100
25 percent on that.

Larry Gillespie

1
2    Q.    And so 30 minutes before dusk would mean
3 4:15 to 4:30?
4    A.    Yes. If my assumptions are correct, that
5 would be correct.
6    Q.    Do you believe that members of the public
7 understand that they're prohibited from being on the
8 courthouse grounds today as of 4:15 or 4:30 in the
9 afternoon?
10    A.    I'm not sure about that. It just depends on
11 how aware they are of County business, I guess.
12 Because at this point in time I'm not sure that there
13 are signs up.
14    Q.    Are you aware of this policy ever having
15 been enforced?
16    A.    The policy of asking people to leave at
17 dusk? Is that what you're asking?
18    Q.    Correct. 30 minutes before dusk.
19    A.    I'm not aware.
20    Q.    Would it surprise you to learn that
21 occasionally there are people on the courthouse
22 grounds at times of day that are prohibited under this
23 policy?
24    A.    I would not be surprised.
25    Q.    And so do you know why 30 minutes before

Page 58

Larry Gillespie

1 dusk was the point in time that was chosen?

2 A.    To my recollection, it was because there was

3 still light.

4 Q.    And what's your understanding of courthouse

5 business hours?

6 A.    My understanding is courthouse business

7 hours end at 5 on a regular basis.

8 Q.    So this policy, during this time of year,

9 closes the courthouse grounds while the courthouse is

10 still open?

11 A.    I'm assuming that would be correct, what

12 you're saying.  But -- go ahead.

13 Q.    But it would never be actually enforced in

14 that way?

15 MR. O'DONNELL:  Object to the form.  You can

16 answer.

17 A.    I would not think anybody doing courthouse

18 business would be denied access.

19 Q.    So the courthouse grounds are in the center

20 of the Oxford town square; correct?

21 A.    That is correct.

22 Q.    And is it fair to say that on certain

23 nights, weekends, say when there's football games or

24 other events, that there is a lot of night-life

Page 59

Larry Gillespie

1 activity in the town square?

2 A.    That would be fair to say.

3 Q.    What's your -- so who's responsible for

4 public safety with respect to night life on the town

5 square?

6 A.    On public and City-owned property, Oxford

7 Police Department.  On Lafayette County property,

8 Lafayette County Sheriff's Department.

9 Q.    If you would turn to tab 30.

10 A.    Okay.

11 (EXHIBIT 16, TAB 30, FACILITY USE

12 APPLICATION AND PERMIT BY J.F. RASH,

13 7/14/2020 - DOC000030, WAS MARKED FOR

14 IDENTIFICATION.)

15 Q.    This is a document that the number at the

16 bottom ends in 30; correct?

17 A.    Yes, sir; that's correct.

18 Q.    And are you familiar with this permit

19 application?

20 A.    I am not necessarily familiar with it.  I

21 know it was turned in.

22 Q.    And sir, could you explain what you mean by

23 that, you know it was turned in?

24 A.    I mean like if you would ask me what

Page 60

Larry Gillespie

1 Mr. Rash's address is, I would not be familiar with

2 that.  But I am familiar that it was turned in and

3 requested and denied.

4 Q.    So did you discuss this particular permit

5 application with anyone?

6 A.    I do not recall discussing this, no.

7 Q.    Was this permit application ever discussed

8 at a Board of Supervisors meeting?

9 A.    Really the only time I remember this being

10 discussed is when we were in the litigation part.

11 Q.    Do you have an understanding of why the

12 permit -- this permit was denied?

13 A.    I really do not know.  It was on the

14 recommendation of the Sheriff.

15 Q.    If you would turn to tab 34.

16 A.    Yes, sir.

17 (EXHIBIT 17, TABS 34 AND 34A, EMAIL FROM

18 JOEY EAST, 9/3/2020, WITH RESPONSES BY

19 BRENT LARSON AND DAVID RIKARD -

20 DOC000046-047, AND LETTERS FROM SHERIFF

21 JOEY EAST WITH ATTACHMENTS - DOC000366-370,

22 WAS MARKED FOR IDENTIFICATION.)

23 Q.    So this is a document that ends in 46,

24 correct, the first page?

Page 61

Larry Gillespie

1 A.    Yes, sir, yes, sir, that's correct.

2 Q.    And do you recall -- this is an email

3 exchange among the Board of Supervisors members,

4 including yourself and the Sheriff and a few others;

5 is that fair?

6 A.    Yes.  I see in the -- it was sent to me and

7 a few others.  I would have to review it to make sure

8 I understand exactly what it was about.

9 Q.    Okay.  If you'd take a second to review

10 that.

11 A.    Okay.  (Document review.)

12 Yes, sir, I remember this.

13 Q.    So do you recall the event that's being

14 discussed in this email chain?

15 A.    Yes.  If I recall correctly, it was the

16 march by the Ole Miss football players.

17 Q.    And in the bottom email the Sheriff states

18 that:

19 "I would imagine that each of

20 you have had your share of

21 phone calls concerning those

22 events and have your own

23 concerns about what took place

24 on the courthouse grounds."

Page 62

Larry Gillespie

2       So did you have any phone calls about that
3  march?
4       A.   If I recall, I had, I would say, three to
5  five maybe, just someone asking what was going on.
6       Q.   And were those just phone calls with
7  constituents or acquaintances?
8       A.   Yes, just acquaintances and constituents.
9  To be honest with you, I can't remember exactly who
10 they were.  But I think I do remember having a few
11 phone calls about it.
12      Q.   And did you have any concerns about the
13 march or what took place on the courthouse grounds on
14 that date?
15      A.   Yes, sir, I did.
16      Q.   And could you explain those concerns?
17      A.   My concerns were public safety.  That's
18 exactly why we have a permitting process.  It was an
19 unauthorized march.  They had pedestrian and vehicular
20 traffic blocked.  I think it was very overwhelming for
21 the Oxford Police Department and the Lafayette County
22 Sheriff's Department trying to get it under control.
23      Q.   The top email is from Mr. Rikard.
24      A.   Yes, sir.
25      Q.   It states:

Page 63

Larry Gillespie

2       "I know this is taking a toll
3        on all of us."
4       Do you have an understanding of what he
5  meant in saying that?
6       A.   Yes.  It just had been a very stressful
7  summer.
8       Q.   Could you explain why?
9       A.   Just all the overwhelming activity around --
10 concerning the statue and all the things happening.
11      Q.   So I think that this should be a document
12 with a slip sheet, a blue sheet, and then there should
13 be something after it; is that correct?
14      A.   I do see a blue sheet, and I'm looking
15 behind it.  Yes, sir.  There seems to be several pages
16 behind it.
17      Q.   And the first one of those is on the
18 Sheriffs letterhead.  It's a document that's stamped
19 ending 364?
20      A.   That is correct.
21      Q.   Just take a minute to review this letter.
22      A.   Okay.  (Document review.)
23           Okay.  I have reviewed the first document.
24      Q.   So have any of the protests, in the wake of
25 the killing of George Floyd in the Oxford,

Page 64

Larry Gillespie

2  Mississippi, area, been violent?
3       A.   Not to my knowledge.
4       Q.   And has there been any property destruction
5  or looting associated with those protests in Oxford,
6  Mississippi?
7       A.   Not to my knowledge.
8       Q.   If you'll look at the next page, this is a
9  letter from the mayor of Oxford to the Sheriff.
10      A.   Okay.
11      Q.   Are you acquainted with the mayor of Oxford?
12      A.   I do know Ms. Tannehill, yes.
13      Q.   Did you say earlier that you currently work
14 for the City?
15      A.   I do, that is correct.
16      Q.   What's your position?
17      A.   I'm a firefighter.
18      Q.   Do you see this letter -- have you ever seen
19 this letter before?
20      A.   I do not recall ever seeing this letter, no,
21 sir.
22      Q.   And you see that in the first paragraph of
23 this letter Mayor Tannehill tells Sheriff East:  "Your
24 information is simply not correct"?
25      A.   I do see that, yes, sir.

Page 65

Larry Gillespie

2       Q.   Do you understand what she's referring to
3  there?
4       A.   I do not, no, sir.
5       Q.   Are you aware of there being any
6  disagreements or differences of opinion between the
7  City and County on how to handle protests?
8       A.   I'm sure -- I mean I can't specify, but I'm
9  sure there's agreements and disagreements in all
10 matters of business with the City and County.
11      Q.   Do you have any understanding of any
12 specific disagreements related to how they handle
13 protests between the City and the County?
14      A.   I do not recall any, no, sir, except
15 maybe -- probably this.  But I'm not sure what she's
16 referring to as incorrect information.
17      Q.   Are you aware of there being any
18 disagreements or differences of opinion among City and
19 County lawmakers regarding the Confederate statue or
20 relocation of the Confederate statue?
21      A.   I have not spoken directly with them about
22 it.  It seems like some of them probably -- I think
23 wanted it moved.  I'm not sure.  I'm speculating
24 because I have not spoken with them directly.  And we
25 did not move it.  So I would say that would be a

Larry Gillespie

1 disagreement.

2 Q. When you say "some of them," could you

3 identify any specific people you're referring to?

4 MR. O'DONNELL: Object to the form. Go

5 ahead.

6 A. It's my understanding they had a vote on

7 some issues with it, and they weren't all in

8 agreement. That's the reason I said "some."

9 Q. Do you recall there being any disagreements

10 between the City and the County regarding jurisdiction

11 over the Confederate statue?

12 A. I do.

13 Q. And what's your understanding of that issue?

14 A. Of the disagreement or the outcome?

15 Q. The disagreement first.

16 A. The City questioned whether the County

17 actually owned the property.

18 Q. And what was the outcome?

19 A. The outcome was that there were some

20 investigations done, and there was no concrete

21 evidence to say that the County did not own the

22 property.

23 Q. Could you take a look at the next letter in

24 this packet?

25

Larry Gillespie

1 A. Yes. Give me a minute to review it, please.

2 Q. Sure.

3 A. (Document review.)

4 (HORN BLOWING.)

5 MR. O'DONNELL: Okay. Somebody needs to

6 close their window.

7 MR. RETHY: My windows are closed. It's

8 part of living in New York.

9 A. Okay. I have reviewed the document.

10 Q. Before reviewing it just now, have you ever

11 seen this document?

12 A. Yes. If I recall, I think the Sheriff

13 emailed this to me before.

14 Q. And did you review or comment on the

15 document?

16 A. I reviewed it, but I do not recall

17 commenting on it.

18 Q. And do you understand why the Sheriff sent

19 it to you?

20 A. Yes. He was wanting to inform us of what he

21 was doing with neighboring governments.

22 Q. This is a letter to some University

23 officials; correct?

24 A. That is correct.

25

Larry Gillespie

1 Q. And in the second to last paragraph on the

2 second page of this letter, the Sheriff states:

3 "The Lafayette County Sheriff's

4 Department is requesting that

5 the cost for all dedicated

6 personnel hours for both

7 on-duty and off-duty (overtime)

8 personnel be paid by the

9 University of Mississippi."

10 Do you see that?

11 A. I do see that, yes, sir.

12 Q. Are you familiar with -- or are you aware of

13 any other occasions in which the Sheriff has asked for

14 payment for law enforcement services from members of

15 the public?

16 A. I personally am not aware.

17 Q. Do you have an understanding of when -- of

18 the reasons why the Sheriff might ask for payment?

19 A. I would be speculating. But I mean, again,

20 he has a finite budget, so I'm assuming he's just

21 trying to cover his costs.

22 Q. Do you know whether the Sheriff requests

23 that a member of the public pay for law enforcement

24 services, whether the member of the public to whom the

25

Larry Gillespie

1 request is directed is legally obligated to pay?

2 A. No, sir, I do not.

3 Q. Turn to tab 26.

4 A. Okay.

5 (EXHIBIT 18, TAB 26, EMAILS BETWEEN

6 ANA LAUREN MARTINEZ AND LARRY GILLESPIE,

7 7/2/2020 - DOC000944, WAS MARKED

8 FOR IDENTIFICATION.)

9 Q. Do you see that this is a single-page

10 document with the Bates number that ends in 944; is

11 that correct?

12 A. Yes, sir, that is correct.

13 Q. And this is an email chain between yourself

14 and someone named Ana Martinez; is that correct?

15 A. That's correct.

16 Q. So do you recall this email exchange?

17 A. Vaguely.

18 Q. And you write:

19 "Thank you for how you reported

20 our responses on the statue."

21 Do you have any recollection of what you

22 were referring to there?

23 A. I really do not. Just judging by the date,

24 possibly the form we had. I'm not sure. I do not

25

Page 70

Larry Gillespie

1   really.
2   Q.   If you could turn to tab 40.
3   A.   Okay.
4        (EXHIBIT 19, TAB 40, FACEBOOK POSTING,
5        "A REBEL NIGHT TO REMEMBER," WAS MARKED
6        FOR IDENTIFICATION.)
7   Q.   So this is a picture, and it looks like it's
8   taken from a Facebook page; is that fair?
9   A.   It is a picture, correct. I'm not sure
10  where it came from.
11  Q.   Do you have a sense of what the picture is
12  depicting?
13  A.   Lafayette County Courthouse.
14  Q.   And just to make sure we're looking at the
15  same thing, it's got a caption that says "Forever Ole
16  Miss, A Rebel Night to Remember"?
17  A.   No, that is not the picture I'm looking at.
18       I'm sorry. I'm on the wrong tab. I'm
19  sorry. I'm sorry.
20       Okay. Now I'm on the same page with you.
21  I'm sorry.
22       Yes. Now I see that it does look it's some
23  sort of social media page, yes.
24  Q.   And do you have a sense of what the

Page 71

Larry Gillespie

1   photograph is depicting?
2   A.   It looks like they have a goalpost.
3   Q.   Do you remember -- and they have the
4   goalpost right around the statue; is that correct?
5   A.   That is correct.
6   Q.   And do you remember this having taken place?
7   A.   I do remember when a goalpost was brought
8   through the square of Oxford. I'm not sure if this is
9   the exact one.
10  Q.   So this is after dark; correct? Or it
11  appears to be after dark?
12  A.   That is correct.
13  Q.   So would the gathering that's being depicted
14  here be a violation of the current policies?
15       MR. O'DONNELL: Object to the form. Lack of
16  foundation.
17  A.   The current policy as it states now?
18  Q.   Correct.
19  A.   Yes, it looks to be in violation.
20  Q.   Who enforces the current policy?
21  A.   Your question being on the ground who
22  enforces it?
23  Q.   Correct.
24  A.   Lafayette County Sheriff's Department.

Page 72

Larry Gillespie

1   Q.   And does the Sheriff's Department have
2   discretion how it enforces the policy?
3   A.   As in who -- try to get a little more
4   specific. Whether he interprets it different
5   or whether -- could you be a little more specific?
6   Q.   Does the Sheriff have the authority to
7   decide to enforce or not to enforce the policy in
8   different instances?
9   A.   A simple answer, yes.
10  Q.   Are you aware of instances where the Sheriff
11  has determined not to enforce the policy?
12  A.   I am not aware.
13  Q.   And are you aware of any factors or criteria
14  the Sheriff would consider in determining whether or
15  not to enforce the policy or is it just his
16  case-by-case judgment?
17  A.   Okay. Let's hold up just a second because I
18  think I'm getting a little confused about what you
19  have asked. Because when I interpret what you're
20  saying, I'm thinking, okay, does the Sheriff have --
21  let's just say -- I'm giving a situation -- he has a
22  crowd there. Does he have the discretion to say I'm
23  going to arrest these people for breaking the policy
24  or not? Is that what you are asking?

Page 73

Larry Gillespie

1   Q.   That's one aspect, yes.
2   A.   In that aspect, yes, he does have
3   discretion.
4   Q.   And beyond arresting, he has the discretion
5   to let a gathering continue versus ordering a
6   gathering to disburse; would that also be correct?
7   A.   No. I would say the Sheriff would abide by
8   the policy regardless of who is there. He has the
9   discretion on how to enforce the policy on the
10  outcome, more or less.
11  Q.   And explain what you mean by "the outcome."
12  A.   That would be what the situation would turn
13  to, whether he arrests somebody or doesn't arrest them
14  and they just move along.
15  Q.   If you would, turn back to tab 10, which is
16  something we've previously looked at. (Ex.3)
17  A.   Okay.
18  Q.   So this is the June 15th, 2020 revision to
19  the Facility Use Policy; correct?
20  A.   Yes, sir.
21  Q.   And I believe earlier you testified that one
22  reason for the five-person -- the rule that five or
23  more people require a permit was to minimize impacts
24  on courthouse business; is that fair? I'm sure I

Larry Gillespie

1
2 didn't characterize it necessarily perfectly.
3     A.     Yes, sir.  Not to impede pedestrian traffic
4 or impede courthouse business.
5     Q.     So would that rationale apply over the
6 weekend?
7     A.     Yes.
8     Q.     Even though the courthouse is closed?
9     A.     Yes.  There's still pedestrian traffic on
10 the sidewalks.
11     Q.     On the sidewalks on the County Courthouse
12 grounds?
13     A.     Surrounding the County Courthouse grounds.
14     Q.     But there is no -- but during the weekends
15 there's no courthouse business to be impeded; correct?
16     A.     On a normal basis, I would say no.
17     Q.     And a gathering within the -- a gathering on
18 the County Courthouse grounds wouldn't impede
19 pedestrian traffic; is that fair?
20     A.     It depends on where they're gathering.
21     Q.     Could you explain that in any more detail,
22 like which areas would lead to different outcomes in
23 that regard?
24     A.     Yes.  The actual statue sits outside what
25 you would call the fencing of the courthouse grounds,

Larry Gillespie

1
2 and there is a public sidewalk that interjects with
3 that that people use outside the courthouse grounds.
4     Q.     So let's look back at tab 42, which is the
5 series of pictures of the courthouse grounds.  (Ex.2)
6     A.     Yes, sir.
7     Q.     So looking at the first one, can you
8 identify the sidewalk you're referring to in this
9 first picture?  You may not be able to see it, but let
10 me know if you can.
11     A.     Yes, sir.  There should be a sidewalk on the
12 corner there where the blue sign is coming around the
13 outside of the fence.
14     Q.     So if you look at the second page, is this
15 the sidewalk you're referring to?  (Indicating.)
16     A.     Yes, it looks to be so.
17     Q.     Does this particular sidewalk just sort of
18 go around the courthouse area?  Or does it lead
19 anywhere else?
20     A.     I think it goes -- it goes around the
21 courthouse area and leads to crosswalks all around the
22 courthouse that go to other businesses inside the
23 City.
24     Q.     And so your testimony is that the reason for
25 requiring a permit for a gathering of five or more

Larry Gillespie

1
2 people on the weekend when there's no courthouse
3 business going on is to ensure that access to this
4 sidewalk isn't impeded?
5     A.     Yes.
6     Q.     And the policy isn't limited to just the
7 area around the Confederate statue; it also includes,
8 say, if you turn to the third page, a gathering of
9 people, five people, sitting on the benches that are
10 pictured?
11     A.     Yes.  That would be part of the courthouse
12 grounds.
13     Q.     And so you need to apply for a permit to sit
14 on those -- to have five people sit on those benches
15 during the weekend in order to make sure that the
16 sidewalk around the courthouse is clear?
17         MR. O'DONNELL:  Object to the form.  Go
18 ahead.
19     A.     It's my understanding for an organized
20 protest, you would.
21     Q.     But not for just a social gathering of five
22 people?
23         MR. O'DONNELL:  Object to the form of that.
24     A.     As to my knowledge, I would say that is not
25 how it's applied.

Larry Gillespie

1
2     Q.     Could you explain that?
3     A.     It would not be considered an organized
4 demonstration.
5     Q.     So the five-person rule is, in practice,
6 enforced with respect to organized demonstrations, not
7 other gatherings?
8     A.     Define "gatherings."
9     Q.     Like the social gathering of five people
10 sitting on the benches that I used as an example just
11 then.
12     A.     Okay.  Ask me the question again so I make
13 sure I remember exactly what you asked.
14     Q.     So in practice, the five-person rule applies
15 to -- or is it enforced with respect to organized
16 demonstrations and not to, say, like the five-person
17 social gathering that I gave in this example?
18     A.     In my opinion, it would be enforced on
19 organized demonstrations.
20     Q.     And how do you determine whether something
21 is an organized demonstration or not?
22     A.     I'm not sure how to answer that question.  I
23 don't know.
24     Q.     So who would make that determination?  Would
25 it be the Sheriff?

Page 78

Larry Gillespie

1
2    A.    Yes.
3          MR. RETHY:  Let's take a 10-minute break.  I
4  may be close to done here.
5          MR. O'DONNELL:  All right.  10 minutes.
6          THE VIDEOGRAPHER:  We're going off record.
7  The time is 11:16.
8          (A RECESS WAS TAKEN.)
9          THE VIDEOGRAPHER:  Back on record at 11:30.
10         MR. RETHY:  So with all that, I have no
11  further questions.  Thank you for your time this
12  morning.
13         THE WITNESS:  I appreciate it.  Thank you.
14         MR. O'DONNELL:  And I have no questions
15  either, Isaac.
16         MR. RETHY:  Okay.  Great.  Have a happy
17  holidays, everyone.
18         THE VIDEOGRAPHER:  So we are going off the
19  record.  The time is 11:31.
20         COURT REPORTER:  David, would you like a
21  copy of this deposition?
22         MR. O'DONNELL:  I would, yes.
23         COURT REPORTER:  Thank you.  Read and sign?
24         MR. O'DONNELL:  We'll read and sign, yes.
25         COURT REPORTER:  Thank you.

Page 79

Larry Gillespie

1
2        MR. RETHY:  Thanks.
3        MR. O'DONNELL:  Thank y'all.  Have a good
4  holiday.
5        (A DISCUSSION WAS HELD OFF THE RECORD.)
6        (THE DEPOSITION OF LARRY GILLESPIE
7         WAS CONCLUDED AT 11:31 A.M.)
8
9
10    _____                        11:31:47
           LARRY GILLESPIE
11
12  Subscribed and sworn to before me
13  this _____ day of _____ 2020.
14
      ---------------------------------
16
17
18
19
20
21
22
23
24

Page 80

Larry Gillespie

1
2        CERTIFICATE OF CHANGE
3  RASH v. LAFAYETTE COUNTY, MS  3:20-cv-224-NBB-RP
4        I, LARRY GILLESPIE, the witness, have read
5  the testimony contained herein and hereby request the
6  following changes be made:
7  PAGE   LINE            CHANGE           TO
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20  Subscribed and sworn to before me this _____ day of
    _____ 20___.
21
    My Commission Expires:
22
23                      _____
                        LARRY GILLESPIE
24
25                      _____
                        NOTARY PUBLIC

Page 81

Larry Gillespie
C E R T I F I C A T E

1
2
3        I do hereby certify that the foregoing
4  proceedings were taken down by me and transcribed
5  using computer-aided transcription and that the
6  foregoing is a true and correct transcript of said
7  proceedings.
8
9        I further certify that I am neither of
10 counsel nor of kin to any of the parties, nor am I in
11 anywise interested in the result of said cause.
12
13       I further certify that I have earned the
14 certifications awarded by the National Court Reporters
15 Association of RPR,RMR,RDR,CRR,CRC,RSA and am duly
16 licensed by the Alabama, Illinois, Louisiana, and
17 Mississippi Boards of Court Reporting as a Certified
18 Court Reporter.
19
20  _____
21  DEBRA AMOS ISBELL, CCR,RDR,CRR
    ALABAMA - ACCR #21 (expires 9/30/21)
22  ILLINOIS - CSR #084.004798 (expires 5/31/21)
    LOUISIANA - CCR #2014003 (expires 12/31/21)
23  MISSISSIPPI - CSR #1809 (expires 4/10/21)
    NCRA (expires 12/31/2021)
24
25

Page 82

```
1              Larry Gillespie
2                I N D E X
3  DEPOSITION OF LARRY GILLESPIE, 12/23/2020
4
5            EXAMINATION INDEX
6    BY MR. RETHY . . . . . . . . . . . . . .    6
7
8
9
10           EXHIBIT INDEX
11  EXHIBIT
12  Exhibit 1   Tab 3, Facility Use Policy, 3/4/2019    9
13             - DOC000006-010
14  Exhibit 2   Tab 42, composite exhibit of          10
15             photographs B-1 - B-23
16  Exhibit 3   Tab 10, Order:  Amend Facility Use    11
17             Policy Regarding Use of Courthouse
18             Grounds, 6/15/2020 - DOC000052
19  Exhibit 4   Tabs 11 and 12a - Email from Lisa     19
20             Carwyle, 6/15/2020, and Facebook post
21             - Press Release on Revision of Current
22             Facility Use Policy - DOC001354
23  Exhibit 5   Tab 12, Disclaimer with email from    23
24             April Hughes, 6/15/2020
25             - DOC001111-1112
```

Page 83

```
1              Larry Gillespie
2  Exhibit 6   Tab 15, text message, 6/17            27
3             - DOC001007
4  Exhibit 7   Tab 4, Facility Use Application and   29
5             Permit by Jessie Honeycutt, 6/3/2019
6  Exhibit 8   Tab 5, email from Wayne Andrews,      30
7             11/17/2019, forwarded by Lisa Carwyle
8             - DOC000040
9  Exhibit 9   Tab 9, email from Janice Antonow,     32
10            6/11/2020 - DOC000709-710
11  Exhibit 10  Tab 13, emails between Buster Clark   34
12            and Larry Gillespie, 6/16/2020
13            - DOC000750
14  Exhibit 11  Tab 16, email from Jack Williams,     40
15            6/18/2020, forwarded by Lisa Carwyle,
16            with attachments - DOC000261-266
17  Exhibit 12  Tab 20, Facility Use Application and  46
18            Permit by George O. Johnson,
19            6/22/2020, with attached letter from
20            Lisa Carwyle, 6/24/2020
21            - DOC000025-026
22  Exhibit 13  Tab 28, emails between Steve Hale and 47
23            Larry Gillespie, 7/6/2020 - DOC000919
24
25
```

Page 84

```
1              Larry Gillespie
2  Exhibit 14  Tab 31,  emails between Joey East and 51
3             Lisa Carwyle, 7/15/2020, with
4             attached Facility Use Application and
5             Permit by Stephanie M. Self
6             - DOC000323, 327, 319
7  Exhibit 15  Tab 32,  Order:  Approve Revision of  53
8             Facilities Use Policy to Include a
9             Requirement of Application to be Made
10            14 Days Prior to Date of Proposed Use
11            and Requiring Closure of Courthouse
12            Grounds 30 Minutes Before Dusk,
13            7/20/2020 - DOC000001
14  Exhibit 16  Tab 30,  Facility Use Application and 59
15            Permit by J.F. Rash, 7/14/2020
16            - DOC000030
17  Exhibit 17  Tabs 34 and 34a,  email from Joey     60
18            East, 9/3/2020, with responses by
19            Brent Larson and David Rikard
20            - DOC000046-047, and letters from
21            Sheriff Joey East with attachments
22            - DOC000366-370
23  Exhibit 18  Tab 26,  emails between Ana Lauren    69
24            Martinez and Larry Gillespie, 7/2/2020
25            - DOC000944
```

Page 85

```
1              Larry Gillespie
2  Exhibit 19  Tab 40,  Facebook Posting, "A Rebel   70
3             Night to Remember"
```

**#**

**#084.004798** 81:22
**#1809** 81:23
**#2014003** 81:22
**#21** 81:21

**0**

**001** 54:5
**001354** 17:23

**1**

**1** 5:22 9:9,14
**10** 11:17,20 15:8 24:10,16 34:15 39:24 40:2 73:16 78:5
**10-minute** 78:3
**100** 14:17 21:16,22 30:14 37:21 49:11 56:24
**10:07** 40:8
**10th** 31:7
**11** 17:21 19:5,10,13, 15,17,18 40:10,12
**1111** 18:10
**1112** 18:12
**11:16** 78:7
**11:30** 78:9
**11:31** 78:19 79:7
**11:31:47** 79:10
**12** 17:11 18:9,23 19:13,14 22:25 23:2, 7 46:3,4
**12-A** 18:18 19:15,17
**12/31/2021** 81:23
**12/31/21** 81:22
**12A** 19:18
**13** 34:13,15 47:4,5
**1354** 17:22

**14** 51:2 53:19 54:15
**15** 27:9,13 53:16
**15th** 21:25 22:7,9,13 73:19
**16** 40:9,12 59:12
**17** 60:18
**17th** 41:25
**18** 69:6
**19** 70:5
**19th** 42:5 43:25

**2**

**2** 7:8 10:14,16 35:25
**20** 37:15 45:25 46:4 80:20
**2019** 21:18 31:8
**2020** 6:4 7:10,13 24:15 38:20 73:19 79:13
**210** 7:2
**23rd** 6:3
**26** 69:4,6
**261** 40:18
**264** 40:20
**265** 42:19
**28** 47:4,5

**3**

**3** 9:7,14 11:4,19,20
**3/4/2019** 9:15
**30** 5:14 15:23 16:5 42:11 53:21 54:17 57:2,18,25 59:10,12, 17
**30-day** 16:16,19 42:15
**31** 50:24 51:2
**319** 51:6
**32** 53:11,14,16,25

**323** 51:9
**327** 51:6
**34** 60:16,18
**34A** 60:18
**364** 63:19
**3:20-cv-224-nbb-rp** 6:2 80:3

**4**

**4** 11:9 17:13 19:13,18 29:17,20 40:20
**4/10/21** 81:23
**40** 70:3,5
**42** 10:12,16 75:4
**45** 7:25 8:2
**46** 60:24
**47** 8:6
**4:15** 57:3,8
**4:30** 57:3,8
**4:45** 56:23

**5**

**5** 19:13 23:5,7 30:16, 18 56:23 58:8
**5/31/21** 81:22
**516-A** 7:2

**6**

**6** 23:5 27:10,13 30:15
**6/11/2020** 32:5
**6/15/2020** 11:22 19:19 23:8
**6/16/2020** 34:16
**6/17** 27:13
**6/18/2020** 40:13
**6/22/2020** 46:6
**6/24/2020** 46:7
**6/3/2019** 29:21

**7**

**7** 29:20
**7/11/2019** 30:19
**7/14/2020** 59:14
**7/15/2020** 51:3
**7/2/2020** 69:8
**7/20/2020** 53:21
**7/6/2020** 47:6

**8**

**8** 30:18

**9**

**9** 32:2,4
**9/3/2020** 60:19
**9/30/21** 81:21
**944** 69:11
**9:04** 6:3
**9:56** 40:6

**A**

**A.M.** 79:7
**Abbeville** 7:3
**abide** 73:8
**Absolutely** 39:24
**access** 55:20,25 58:19 76:3
**accessing** 56:5
**ACCR** 81:21
**acquaintance** 41:12
**acquaintances** 62:7,8
**acquainted** 8:21 64:11
**action** 39:12
**actions** 25:7

**activities** 48:20
**activity** 22:20,21,22 26:15 55:13 59:2 63:9
**actual** 55:24 74:24
**add** 19:10
**added** 9:12
**adding** 9:10 10:14
**address** 6:24 20:6,9 42:22 60:2
**administrator** 28:2 42:17
**admissible** 5:13
**advance** 16:25
**African-american** 30:12
**afternoon** 57:9
**agree** 26:7,13 34:2,6
**agreeing** 26:11
**agreement** 66:9
**agreements** 65:9
**agrees** 5:17,18
**ahead** 24:7 26:20,21 48:9 50:6 52:9 58:13 66:6 76:18
**Alabama** 81:16,21
**Aldermen** 32:23,25 33:14
**allocating** 49:17
**allowed** 28:14
**Amend** 11:20 12:3
**amendment** 8:17 15:6 21:25 22:6
**AMOS** 81:21
**amount** 48:16 50:7 51:25 52:21 55:9
**Ana** 69:7,15
**and/or** 16:14
**Andrews** 30:18,22, 24,25 31:3

**Anthony** 30:4,7

**Antonow** 32:5,18 33:5

**anywise** 81:11

**Apologies** 9:13

**apologize** 17:16

**apparently** 23:17 42:17

**appears** 9:19 27:11 51:15 71:12

**applicant** 29:23 46:13

**application** 15:23 29:18,20 40:22 41:25 42:10 43:8 46:5,10 51:4 53:18 54:15 59:13,20 60:6,8

**applied** 8:25 13:15, 20 42:2 76:25

**applies** 77:14

**apply** 74:5 76:13

**approve** 52:2,22 53:16

**April** 23:8,17

**area** 31:16,24 34:7 41:5 54:17 64:2 75:18,21 76:7

**areas** 50:9,18 74:22

**arrest** 72:24 73:14

**arrested** 14:24

**arresting** 73:5

**arrests** 73:14

**art** 31:15,23

**Arts** 30:25 31:2

**asks** 31:6

**aspect** 73:2,3

**association** 5:4 81:15

**assuming** 22:9 58:12 68:21

**assumptions** 42:18 57:4

**ATTACHED** 46:6 51:4

**ATTACHMENTS** 40:14 60:22

**attorney** 15:16 28:3

**attracts** 48:20

**August** 31:7

**author** 23:16 25:16

**author's** 26:7

**authority** 72:7

**awarded** 81:14

**aware** 22:4 57:11,14, 19 65:5,17 68:13,17 72:11,13,14

---

**B**

**B-1** 10:17,22

**B-23** 10:17

**B-3** 11:4

**back** 13:4,7 15:5,20 24:11 29:6 40:4,8 45:5 53:23 73:16 75:4 78:9

**BACKGROUND** 44:17

**backing** 43:6

**backwards** 18:13

**Baker** 28:10

**ball** 39:14

**barricade** 26:5

**barricaded** 26:14 27:2,4

**barricades** 25:25 26:2,3

**barricading** 25:8,18, 22

**Bartlett** 6:8

**based** 14:25

**basically** 14:13

**basis** 58:8 74:16

**Bates** 17:19,22 69:11

**bathroom** 39:23

**begins** 12:7

**behalf** 6:11

**bell** 9:6

**benches** 13:10,14,19 14:20,25 76:9,14 77:10

**binder** 7:22,25 9:7 19:5

**bit** 26:10 36:6

**black** 44:3 45:3

**Bless** 44:19

**block** 26:6

**blockades** 55:25

**blocked** 62:20

**BLOWING** 67:5

**blue** 18:22,25 19:8 63:12,14 75:12

**board** 7:4 15:16 16:13,18,20,21 23:13 24:4 25:21 27:21 32:8,23,25 33:13 35:23 38:6,14 45:8, 10 51:17 52:11,18 60:9 61:4

**Boards** 81:17

**born** 37:13

**bottom** 40:17 42:7 51:8 54:5 59:17 61:18

**bound** 50:15

**break** 39:23 78:3

**breaking** 72:24

**BRENT** 60:20

**bring** 39:2

**broader** 38:7

**broadly** 36:20

**brother** 41:9,13

**brought** 71:8

**budget** 68:21

**buildings** 31:15,23

**Busby** 35:25

**business** 12:20 14:7,11 15:21 24:4,5 31:4 50:18 55:6 57:11 58:6,7,19 65:10 73:25 74:4,15 76:3

**businesses** 75:22

**Buster** 34:15 35:3

---

**C**

**calculated** 48:23

**call** 74:25

**calls** 61:22 62:2,6,11

**camera** 52:25

**caption** 70:16

**car** 30:15

**Carwyle** 16:23 17:2, 7 19:19 20:5 30:19 31:6 40:14 42:21 46:7 51:3,13 52:14

**Carwyle's** 51:16

**case** 5:15 6:2 8:15, 16,19,22 42:15 50:4

**case-by-case** 72:17

**CCR** 81:22

**CCR,RDR,CRR** 81:21

**center** 58:20

**CERTIFICATE** 80:2

**certifications** 81:14

**certified** 5:3 81:17

**certify** 81:3,9,13

**chain** 27:20 34:22,24 61:15 69:14

**change** 51:18 54:15, 24,25 55:12 80:2,7

**changed** 16:3

**changing** 52:20

**characterize** 74:2

**chat** 9:10,11 10:15 17:14 19:11 23:4

**chosen** 58:2

**circumstances** 14:4,5,6 24:23,25 27:23

**cited** 14:23

**citing** 24:12

**citizens** 33:19 48:11, 18

**City** 8:7 28:13,24 32:22 33:14 34:9 64:14 65:7,10,13,18 66:11,17 75:23

**City-owned** 59:7

**Civil** 5:15

**clarify** 36:14 49:22 56:19

**Clark** 34:16 35:3,5,6, 7

**clear** 44:22,24 76:16

**close** 67:7 78:4

**closed** 11:13 55:6 67:8 74:8

**closes** 58:10

**closing** 55:6

**closure** 53:20 54:16 55:17,19

**coincide** 44:10,12 45:3

**coinciding** 45:19

**comment** 67:15

**commenting** 67:18

**Commission** 80:21

**Completely** 49:5

**composite** 10:16 40:16

**computer-aided** 81:5

**con** 33:22

**concerned** 12:16

**concerns** 43:7 55:4 61:24 62:12,16,17

**CONCLUDED** 79:7

**concrete** 66:21

**conduct** 14:10

**conducting** 14:7

**Confederate** 22:18 25:13 26:9 34:3 36:4, 10 41:15 46:24 54:17 55:14 65:19,20 66:12 76:7

**confused** 72:19

**confusing** 23:19

**consensus** 37:5

**considered** 38:15 77:3

**considers** 17:7

**consist** 26:3

**constituents** 36:18, 25 37:2 62:7,8

**consult** 25:21

**consulting** 25:23

**contained** 80:5

**context** 48:5

**continue** 33:23 47:19 73:6

**continued** 34:8

**contradictory** 44:15

**control** 62:22

**conversation** 45:14, 17,18

**copy** 78:21

**corner** 75:12

**correct** 7:5,6,23,24 8:2 9:18 10:20 11:8, 12,16 12:4,5,8,9,23, 24 13:3,12,23 15:14, 25 16:2,3 18:11,14 19:25 20:7 21:2,3,15, 16,17,20 22:8,9,11, 14,23 23:15 28:17 29:19 30:4 32:10 34:19,20,23 35:8,15,

16 36:11 37:22,23,25 40:10,11,18,19,23,24 42:6,12,13,23,24 43:9 46:11,12,14,15 47:3,10,11 48:3,4,21, 22 51:14 54:5,6,12, 13,18,19,21,22 55:25 56:12,14,15,21 57:4, 5,18 58:12,21,22 59:17,18 60:25 61:2 63:13,20 64:15,24 67:24,25 69:12,13, 15,16 70:10 71:5,6, 11,13,19,24 73:7,20 74:15 81:6

**correctly** 36:23 52:14 61:16

**cost** 68:6

**costs** 48:24 68:22

**Council** 31:2

**counsel** 6:5 81:10

**County** 5:24 6:12 7:2,5 8:5,13 11:3 12:19,22 14:7,11,12, 14 15:16,21 28:2,5, 18,19,25 29:5,10 34:9 35:22 37:4,9,14 38:8,10,13 39:4,16 41:4 42:16 47:21,25 48:11,14,16,21 49:7, 14,17,20,23 50:3,7, 17,18,19,20 55:7 57:11 59:8,9 62:21 65:7,10,13,19 66:11, 17,22 68:4 70:14 71:25 74:11,13,18 80:3

**court** 5:25 6:13,15 7:16,19 19:12 22:10 23:6 39:14 40:11 78:20,23,25 81:14, 17,18

**courthouse** 8:13 11:3,7,11,13,21 12:4, 16,17,20,22 13:11 14:12,14 22:3,17,20 28:6 29:2 31:6,13 34:4 46:21 53:20 54:16 55:11,18,19,22 56:5 57:8,21 58:5,7, 10,18,20 61:25 62:13 70:14 73:25 74:4,8,

11,13,15,18,25 75:3, 5,18,21,22 76:2,11, 16

**courtroom** 5:13

**cover** 19:6 68:22

**covered** 10:5

**covers** 10:10

**COVID-19** 5:5

**crime** 28:25 29:7,16

**criteria** 72:14

**crosswalks** 75:21

**crowd** 72:23

**CSR** 81:22,23

**current** 19:20 23:13 71:15,18,21

---

**D**

**D0c001354** 19:21

**dark** 71:11,12

**date** 15:24 22:10,14 38:18 41:24 42:2,4 43:24 44:2 53:19 62:14 69:24

**David** 6:11 53:23,25 60:20 78:20

**day** 24:10,16 57:22 79:13 80:20

**days** 15:23 16:6 42:12 51:20 53:19 54:15

**Debbie** 5:9

**DEBRA** 81:21

**December** 6:3

**decide** 47:21 48:12 72:8

**decided** 27:7

**decision** 15:11,13,15 42:16 47:17

**dedicated** 68:6

**Defendant** 5:18

**define** 49:19 77:8

**demonstrating** 47:3

**demonstration** 41:17 77:4,21

**demonstrations** 46:22 77:6,16,19

**denial** 8:20

**denied** 58:19 60:4,13

**Department** 16:9 28:19 29:5,11 55:8 59:8,9 62:21,22 68:5 71:25 72:2

**departments** 16:8

**depending** 56:13

**depends** 57:10 74:20

**depicted** 71:14

**depicting** 70:13 71:2

**deposed** 7:16

**deposition** 5:8,22 78:21 79:6

**depositions** 18:19

**deputies** 55:9

**describing** 49:21

**destruction** 64:4

**detail** 74:21

**determination** 17:10 77:24

**determine** 16:15 77:20

**determined** 39:7 72:12

**determining** 17:7 72:15

**differences** 65:6,18

**diligence** 53:6

**directed** 69:2

**directly** 34:18 44:9 65:21,24

**director** 30:25

**disagree** 39:5

**disagreement** 66:2,

15,16

**disagreements** 65:6,9,12,18 66:10

**disappointed** 25:6

**disburse** 73:7

**DISCLAIMER** 23:7

**discretion** 72:3,23 73:4,5,10

**discuss** 17:10 51:17, 24 52:13 60:5

**discussed** 38:16 43:8 60:8,11 61:15

**discussing** 15:6 22:7 33:2 45:7 52:17, 20,23 53:5 60:7

**discussion** 12:15 15:15 33:4,6 38:17, 23,25 51:13 52:7,10, 11 55:5 79:5

**discussions** 45:9

**disregard** 19:14

**distancing** 5:6

**distinction** 37:8,11, 12

**district** 5:25 7:7,8 35:25

**Division** 6:2

**DOC000001** 53:22

**DOC000006-010** 9:15

**DOC000025-026** 46:8

**DOC000030** 59:14

**DOC000040** 30:20

**DOC000046-047** 60:21

**DOC000052** 11:22

**DOC000261-266** 40:14

**DOC000323** 51:5

**DOC000366-370** 60:22

Index: DOC000709-710..grounds

**DOC000709-710** 32:5

**DOC000750** 34:17

**DOC000919** 47:7

**DOC000944** 69:8

**DOC001007** 27:14

**DOC001111-1112** 23:9

**document** 9:17,21, 22,25 11:24 12:2 15:5 17:21 18:2,3,15 40:16 43:2 51:8 54:4, 7,8,10 59:16 60:24 61:12 63:11,18,22,23 67:4,10,12,16 69:11

**documents** 7:22,23

**donations** 49:15

**downtown** 31:16,23

**dropped** 9:11

**due** 5:5 53:6

**duly** 81:15

**dusk** 53:21 54:17 56:9,11,16,20,21 57:2,17,18 58:2

### E

**earlier** 48:19 55:21 64:13 73:22

**earned** 81:13

**East** 51:3,13,23 60:19,22 64:23

**email** 18:10 19:6,18 20:2,5,6,11,12 23:2, 7,11,14,16,23,24,25 24:19 25:5 30:18 31:5 32:4,7,11,12,13, 15 33:2,4,5,9,10,17 34:18,22,24 35:9 40:12,17 42:21,25 43:4,7 47:8,14,20 51:7,11,12,16 60:18 61:3,15,18 62:23 69:14,17

**emailed** 67:14

**emails** 20:8 24:3,18 34:15 47:5 51:2 69:6

**enacted** 54:24,25

**end** 58:8

**ending** 63:19

**ends** 59:17 60:24 69:11

**enforce** 72:8,12,16 73:10

**enforced** 57:15 58:14 77:6,15,18

**enforcement** 16:10 29:14 34:12 48:22 68:15,24

**enforces** 71:21,23 72:3

**ensure** 76:3

**entail** 38:2

**entire** 8:6

**entitled** 9:17

**entry** 11:11

**evening** 31:7

**event** 8:25 31:14,19, 20 42:5 43:21,25 44:5,6,7 45:11,19,21, 22 61:14

**eventful** 45:2

**events** 31:22 33:25 44:10 58:25 61:23

**everybody's** 39:6

**evidence** 66:22

**evidentiary** 5:19

**Ex.2** 75:5

**Ex.3** 15:7 73:17

**exact** 20:18 71:10

**EXAMINATION** 6:20

**exchange** 47:8 61:4 69:17

**exclusive** 28:22,23

**Excuse** 19:12 39:20

**exhibit** 9:9,14 10:14,

16 11:19,20 13:4,8 17:13 19:13,15,16, 18,23 23:7 27:10,13 29:20 30:18 32:4 34:15 40:10,12 46:3, 4 47:4,5 51:2 53:16 59:12 60:18 69:6 70:5

**expect** 51:12

**expires** 80:21 81:21, 22,23

**explain** 44:11 47:17 48:5,15 52:15 59:23 62:16 63:8 73:12 74:21 77:2

**explains** 35:20

**Explanation** 30:3

### F

**Facebook** 19:19 70:5,9

**facilities** 10:3,5 53:17 54:12

**Facility** 9:14,17 11:20 12:3 15:6 19:21 29:20 46:4 51:4 59:12 73:20

**fact** 10:2

**factors** 17:6 72:14

**fair** 11:6,9 21:24 36:20 46:24 58:23 59:3 61:6 70:9 73:25 74:19

**familiar** 8:7,10,24 9:3,21,22 11:24 16:24 20:16,17 27:16 30:21 31:19,22 54:7, 10 59:19,21 60:2,3 68:13

**family** 25:3 35:6 47:13

**favor** 44:8 46:23 47:3

**Federal** 5:14

**feel** 17:16

**feelings** 37:3 39:2

**fence** 75:13

**fencing** 74:25

**festival** 9:4,6

**festivities** 44:10

**files** 17:14

**fine** 10:10 19:17

**finish** 26:18,21

**finished** 26:22

**finite** 48:16 50:7 68:21

**fire** 50:23

**firefighter** 64:17

**five-person** 73:23 77:5,14,16

**flags** 25:13 26:9

**Floyd** 22:23 63:25

**folder** 9:12,13

**football** 58:24 61:17

**foregoing** 81:3,6

**Forever** 70:16

**form** 24:6 48:8 50:5 52:8 56:18 58:16 66:5 69:25 71:16 76:17,23

**forward** 39:8,12

**FORWARDED** 30:19 40:13

**foundation** 71:17

**frame** 25:17,19

**friend** 25:3 35:6 47:13

**Fringe** 9:3

**funding** 50:3

**funds** 47:25 48:14,17 49:7,14,17 50:3,12, 14,17,19,20

### G

**games** 58:24

**gates** 11:14 55:24

**gathering** 71:14 73:6,7 74:17,20 75:25 76:8,21 77:9, 17

**gatherings** 20:23 21:6,12 77:7,8

**gave** 77:17

**general** 9:24 10:2 24:2,13,17 25:20 30:10,11

**generally** 24:19,20, 21,22 26:6

**George** 22:23 46:5, 13 63:25

**Gillespie** 5:1,22 6:1, 15,17,22 7:1,2 8:1 9:1 10:1 11:1 12:1,8 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1,16 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1,6 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1,7 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1, 6,10 80:1,4,23 81:1

**gist** 19:23

**give** 43:16 67:2

**giving** 72:22

**goalpost** 71:3,5,8

**good** 5:2 6:22,23 40:2,3 42:17 79:3

**gotcha** 20:3

**governments** 67:22

**granted** 42:8,11

**Great** 8:3 18:8 78:16

**ground** 71:22

**grounds** 11:7,10,11,

13,22 12:4,22 13:11
14:13,14 20:25 22:3
29:2 34:4 46:22
53:20 54:16 55:5,11,
18,19,22 56:5 57:8,
22 58:10,20 61:25
62:13 74:12,13,18,25
75:3,5 76:12

**group** 13:18

**guess** 26:11 32:19
44:9,13,15 56:23,24
57:11

---

**H**

**Hale** 47:6,9,12,13,14

**hand** 6:16

**handle** 16:10 65:7,12

**happen** 29:16 33:14

**happened** 13:19

**happening** 63:10

**happy** 78:16

**Harvey** 30:7,9

**hate** 44:25

**head** 22:15

**heads** 43:16

**held** 7:9,11,14 44:5
79:5

**Highway** 30:15

**history** 44:3 45:3

**hold** 10:13 72:18

**holiday** 79:4

**holidays** 78:17

**home** 44:20

**honest** 29:9 62:9

**Honeycutt** 29:21,24

**horizon** 56:12

**HORN** 67:5

**hour** 40:4

**hours** 55:7 58:6,8
68:7

**Hughes** 23:8,17,18,
20,21

**Hurvey** 30:4,8,9

---

**I**

**IDENTIFICATION**
9:16 10:18 11:23
19:22 23:10 27:14
29:22 30:20 32:6
34:17 40:15 46:9
47:7 51:6 53:22
59:15 60:23 69:9
70:7

**identify** 6:5 66:4 75:8

**Ignore** 9:11

**Illinois** 81:16,22

**imagine** 61:20

**impacts** 73:24

**impede** 74:3,4,18

**impeded** 12:18
74:15 76:4

**impeding** 12:19
15:21

**implement** 49:18
50:20

**implemented** 50:12
55:12

**importantly** 16:9

**include** 31:11 38:9
53:18

**includes** 27:20 76:7

**including** 28:20
42:22 54:16 61:5

**incorrect** 65:16

**increased** 22:19,21,
22 55:13

**Indicating** 75:15

**individuals** 38:12

**inform** 56:3 67:21

**information** 15:3
64:24 65:16

**initiated** 49:23

**inside** 75:22

**instance** 33:10 37:24

**instances** 16:24
72:9,11

**intend** 35:12 36:8

**intending** 37:8

**interested** 81:11

**interests** 37:19

**interjects** 75:2

**interpret** 72:20

**interprets** 72:5

**intervene** 29:3

**introduce** 19:4

**investigations**
66:21

**involve** 52:3

**Isaac** 6:7 17:19 18:21
78:15

**Isbell** 5:9 81:21

**issue** 36:10 37:2,3
41:16 51:20 66:14

**issues** 66:8

**item** 21:22

---

**J**

**J.F.** 59:13

**Jack** 6:9 40:12

**Janice** 32:4,18

**January** 7:10,12

**Jeff** 35:25

**Jessie** 29:21,23

**job** 29:16

**JOEY** 51:2 60:19,22

**John** 5:23 6:8,10
8:22,25

**Johnson** 46:6,14,16,
17,18,20,21,23,25

**joys** 18:19

**judging** 47:2 69:24

**judgment** 72:17

**July** 25:20

**June** 21:25 22:7,9,13
24:15 25:20 41:25
42:5 43:25 73:19

**Juneteenth** 44:2,5,
10 45:2,20

**jurisdiction** 28:19,
22 29:2,10 66:11

---

**K**

**keeping** 44:8 48:24

**killed** 30:15

**killing** 22:23 63:25

**kin** 81:10

**kind** 38:7 44:14

**knew** 25:3

**knowledge** 14:16,
17,22 15:4 30:10,11
46:20 56:7 64:3,7
76:24

---

**L**

**labeled** 5:21

**Lack** 71:16

**Lafayette** 5:23 6:12
7:5 8:4 11:3 28:18
29:5,10 35:21 37:4,9,
14 38:10 39:4 41:4
47:21,25 48:11,14,16
49:20,23 55:7 59:8,9
62:21 68:4 70:14
71:25 80:3

**Larry** 5:1,22 6:1,17
7:1,2 8:1 9:1 10:1
11:1 12:1,7 13:1 14:1
15:1 16:1 17:1 18:1
19:1 20:1 21:1 22:1
23:1 24:1 25:1 26:1
27:1 28:1 29:1 30:1
31:1 32:1 33:1 34:1,
16 35:1 36:1 37:1
38:1 39:1 40:1 41:1
42:1 43:1 44:1 45:1
46:1 47:1,6 48:1 49:1
50:1 51:1 52:1 53:1

**Lindsey** 23:20

**Lisa** 16:23,25 17:6
19:19 20:5 30:19
31:5 40:13 42:21
46:7 51:3,13

**litigation** 60:11

54:1,2 55:1 56:1 57:1
58:1 59:1 60:1 61:1
62:1 63:1 64:1 65:1
66:1 67:1 68:1 69:1,7
70:1 71:1 72:1 73:1
74:1 75:1 76:1 77:1
78:1 79:1,6,10 80:1,
4,23 81:1

**LARSON** 60:20

**LAUREN** 69:7

**law** 16:9 29:14 34:12
48:22 49:25 50:15
68:15,24

**lawmakers** 65:19

**lawn** 31:6,13

**lead** 74:22 75:18

**leads** 75:21

**learn** 57:20

**leave** 57:16

**left** 48:10

**legal** 5:3

**legally** 69:2

**lets** 29:15

**letter** 46:6 63:21
64:9,18,19,20,23
66:24 67:23 68:3

**letterhead** 63:18

**LETTERS** 60:21

**letting** 37:25 38:2

**licensed** 81:16

**life** 8:6 59:5

**lifetime** 35:21 37:4,7,
8,10,14,17,19 39:15,
17

**light** 56:24 58:4

**limited** 76:6

**live** 37:9

**lived** 37:15

**lives** 41:5,6

**living** 67:9

**location** 10:23 33:20

**locked** 11:14

**long** 7:9 8:4 53:6

**longer** 51:24 52:21

**looked** 13:5 21:18 33:10 55:21 73:17

**looting** 64:5

**losing** 56:24

**lot** 43:14 58:25

**loud** 44:21,24

**Louisiana** 81:16,22

**M**

**made** 12:7,10,14 13:17 38:11,12 42:11,16 53:19 80:6

**magnet** 33:21 34:4

**make** 15:11,13 16:10 17:10 36:6,15,23 61:8 70:15 76:15 77:12,24

**makes** 19:8

**making** 22:13

**march** 61:17 62:3,13, 19

**MARKED** 9:15 10:17 11:22 19:21 23:9 27:14 29:22 30:20 32:6 34:17 40:15 46:8 47:7 51:6 53:22 59:14 60:23 69:8 70:6

**Martinez** 69:7,15

**matter** 5:23

**matters** 65:10

**mayor** 64:9,11,23

**Mclarty** 33:7

**means** 50:2,13 55:19 56:10

**meant** 63:5

**media** 5:21 43:15,21, 22 45:5 70:24

**meeting** 51:18 52:11,15,18 60:9

**member** 7:4 68:24, 25

**members** 14:19,23 23:13 24:3 27:21 32:8 45:8,10 56:4 57:6 61:4 68:15

**memorable** 44:2

**Memorial** 30:3

**men** 25:12 26:9

**message** 27:11,13, 16,20 28:8,9

**messages** 27:24 28:5

**messed** 19:5

**middle** 20:20

**minimize** 73:24

**minute** 63:21 67:2

**minutes** 33:11 39:24,25 53:21 54:17 57:2,18,25 78:5

**Mississippi** 5:24,25 7:3 56:22 64:2,6 68:10 81:17,23

**moment** 43:2

**Monday** 51:18

**money** 50:8

**monitor** 55:11

**month** 24:14

**monument** 30:13 34:3 35:8 36:4,11 41:15 46:24 47:16, 18,22 48:2,6,20,24 49:4,7,13,14,17

**morning** 5:2 6:22,23 78:12

**motion** 12:7,11,14

**move** 36:10 39:11 49:25 50:16 65:25 73:15

**moved** 65:23

**movement** 35:8

**N**

**named** 28:10 30:21 46:13 47:9 69:15

**National** 81:14

**nature** 8:24 41:10 46:19

**NCRA** 81:23

**necessarily** 34:6 37:16 59:21 74:2

**needed** 39:4,10 52:24 55:5

**neighboring** 67:22

**neutral** 49:5

**night** 55:10 59:5 70:6,17

**night-life** 58:25

**nights** 58:24

**normal** 74:16

**Northern** 5:25

**NOTARY** 80:25

**notice** 16:25 43:25

**notification** 27:25 43:10

**notify** 29:4

**notion** 36:18

**number** 5:21 6:2 17:19 24:9 40:17 51:8,19 54:4 59:16 69:11

**O**

**O'DONNELL** 5:18 6:11 17:18 18:7,21 19:23 20:2 24:6 26:17 44:21 48:8 50:5 52:8,25 54:2

**56:18 58:16 66:5 67:6 71:16 76:17,23 78:5,14,22,24 79:3**

**Object** 24:6 48:8 50:5 52:8 56:18 58:16 66:5 71:16 76:17,23

**objections** 5:19

**obligated** 49:25 69:2

**observe** 25:25

**observed** 28:25

**occasionally** 57:21

**occasions** 68:14

**off-duty** 68:8

**offensive** 33:18

**office** 7:14 35:14,20 36:3,9 55:16

**officer** 29:14

**official** 16:21

**officials** 67:24

**Ole** 61:17 70:16

**on-duty** 68:8

**open** 58:11

**opinion** 13:22 29:13, 14 35:12 47:2 65:6, 18 77:18

**opinionate** 29:12

**oppose** 47:20 49:17

**opposed** 37:19

**opposes** 35:7

**order** 11:20 12:3 22:10 53:16 54:11 76:15

**ordering** 73:6

**organized** 76:19 77:3,6,15,19,21

**outcome** 38:23,24 66:15,19,20 73:11,12

**outcomes** 74:22

**outlet** 45:5

**overtime** 68:8

**overwhelming** 62:20 63:9

**owned** 66:18

**Oxford** 6:2 8:8,10,13 9:3 32:22 56:22 58:21 59:7 62:21 63:25 64:5,9,11 71:9

**P**

**packet** 66:25

**pages** 63:15

**paid** 68:9

**paragraph** 20:21 21:4,9 25:4 33:16 43:5,13 64:22 68:2

**part** 11:6 12:21 31:13 38:8 60:11 67:9 76:11

**partially** 37:23

**parties** 5:11 81:10

**passed** 49:24

**past** 25:8 40:4

**pay** 68:24 69:2

**payment** 68:15,19

**peacefully** 25:10

**pedestrian** 12:16 15:20,21 62:19 74:3, 9,19

**pending** 5:16

**people** 11:15 12:17, 21,25 13:13,19 14:13 15:12,19,25 20:24 23:12 25:9 35:13,19 36:3,9 37:6,9,15 39:3,11,19 44:25 47:21 49:20 57:16,21 66:4 72:24 73:24 75:3 76:2,9,14,22 77:9

**percent** 14:17 21:17, 22 30:14 37:21 49:11 56:25

**perfectly** 74:2

**period** 16:16,19,25

24:13,21 25:2 27:4

**permit** 8:20,25 10:3 12:23 13:2,15,20 14:15 15:2,22 20:22 21:7,13 22:2 29:18, 21 40:22 41:17,25 42:7 43:7,11 46:5,10 51:5,20 59:13,19 60:5,8,13 73:24 75:25 76:13

**permits** 52:2,22 53:7

**permitting** 15:12,19 62:18

**person** 22:2 26:11 32:20

**personal** 49:3

**personally** 15:13 25:3,25 31:3 41:7,8 46:17 68:17

**personnel** 68:7,9

**perspectives** 39:16

**phone** 61:22 62:2,6, 11

**photograph** 10:24 71:2

**photographs** 10:17, 20

**picture** 11:6,10 70:8, 10,12,18 75:9

**pictured** 76:10

**pictures** 13:5 55:21 75:5

**place** 22:6,16,19 28:25 45:21 48:24 61:24 62:13 71:7

**plaintiff** 5:17 6:8,9 8:21

**planned** 45:21

**plastic** 26:5

**players** 61:17

**point** 11:11 57:12 58:2

**points** 56:5

**police** 28:13,25 59:8

62:21

**policies** 71:15

**policy** 9:14,18 10:3,5 11:21 12:3 13:14,17, 18,21 14:3,24 15:7 16:4 19:21 20:22 21:5,11,17,18,23 22:6,7,19 50:20 52:13,17,20 53:17 54:12,24,25 55:12, 15,17 57:14,16,23 58:9 71:18,21 72:3,8, 12,16,24 73:9,10,20 76:6

**portable** 26:4

**portrayed** 10:23

**position** 7:9 50:11 64:16

**positive** 33:25

**possibly** 28:2 69:25

**post** 19:19 28:9 45:5

**posted** 56:3

**POSTING** 70:5

**practice** 5:6 24:17 77:5,14

**pre-existing** 10:9

**preconceived** 36:17,21

**predecessor** 35:23

**prefer** 39:25

**premise** 15:24

**presence** 34:9

**present** 14:14 33:20

**press** 18:22 19:6,7, 20,24 20:14,16

**pretty** 14:6 35:18 41:5

**prevent** 11:15

**previous** 16:4 21:5, 11

**previously** 26:14 46:22 73:17

**primarily** 37:18

54:25 55:6

**prior** 15:23 21:25 41:18 53:19

**pro** 33:22

**pro-confederate** 26:15

**Procedure** 5:15

**proceeding** 6:6 7:17

**proceedings** 81:4,7

**process** 37:5 62:18

**proclaim** 39:18

**prohibited** 56:4 57:7,22

**projected** 31:23

**projection** 31:14,19

**property** 25:9 28:20 59:7,8 64:4 66:18,23

**proposal** 38:11,12

**proposed** 39:11 53:19

**prospective** 36:2

**protects** 31:15

**protest** 22:22 25:10 26:15 34:7 48:20 55:13 76:20

**protesting** 30:14

**protests** 22:17,22 28:5 33:22 34:5,11 63:24 64:5 65:7,13

**public** 7:14 12:15 14:19,23 24:3,4 25:8 43:10 50:23 55:2,3, 20 56:4 57:6 59:5,7 62:17 68:16,24,25 75:2 80:25

**pushed** 55:15

**put** 17:17 18:13 22:6, 16,19 23:4 48:20

**puts** 34:9

**putting** 17:14 34:12

## Q

**question** 13:17 24:11 26:10,18,21 36:5,12,14,22 52:16 71:22 77:12,22

**questioned** 66:17

**questions** 7:21 78:11,14

**quickly** 54:8

## R

**raise** 6:16 50:12

**raised** 37:13

**Rash** 5:23 6:8,10 8:22,25 59:13 80:3

**Rash's** 60:2

**rationale** 15:18 74:5

**reaction** 39:6

**read** 10:6 24:19 27:18 78:23,24 80:4

**reading** 24:18

**reason** 12:10,13,14 26:12 33:12,15 66:9 73:23 75:24

**reasons** 68:19

**Rebel** 70:6,17

**recall** 12:10 20:11,12 25:23 28:4,7 32:11, 12 33:2 34:21,24 35:2 38:18 39:6,7 42:25 43:4,20,22 45:7,9 51:12 52:7,10, 17,20,23 53:8 60:7 61:3,14,16 62:4 64:20 65:14 66:10 67:13,17 69:17

**recalling** 45:6

**receive** 20:8 24:3 27:24

**received** 20:13 24:16 27:19 32:8

**receiving** 20:11 23:23,24 28:4 42:25

43:4

**RECESS** 40:7 78:8

**recipients** 23:14 42:22

**recognize** 10:23

**recollection** 26:4,25 30:9 33:9 43:23,24 45:16,18 58:3 69:22

**recommendation** 27:5 60:15

**record** 5:8 6:3,25 40:6,8 78:6,9,19 79:5

**recorded** 5:22

**recording** 5:12

**records** 43:10

**refer** 17:18 45:4

**reference** 36:9

**referenced** 52:12

**referendum** 38:4,9, 25 39:8,9,10 49:21, 22 50:10,16

**referring** 25:16 31:12 34:3 38:6 65:2, 16 66:4 69:23 75:8, 15

**reflect** 52:21

**reflecting** 54:11

**regard** 74:23

**registered** 38:10 48:11

**regular** 58:8

**related** 22:21 65:12

**relating** 19:6 24:3

**relationship** 41:10

**relative** 48:23

**release** 18:22 19:7, 20,24 20:14,16

**relocate** 47:15,18,22 48:2,6,14 49:7,16 50:11

**relocated** 49:4,14

**relocating** 48:25

**relocation** 65:20

**remember** 20:18 23:23,24,25 24:9 25:18 27:17 33:15 52:14 53:5 60:10 61:13 62:9,10 70:6, 17 71:4,7,8 77:13

**remote** 5:12 18:19

**remotely** 5:8,10

**remove** 38:5

**repeat** 14:9

**rephrase** 26:10 36:5

**reported** 69:20

**reporter** 5:9 6:14,15 19:12 23:6 40:11 78:20,23,25 81:18

**Reporters** 81:14

**Reporting** 5:4 81:17

**represent** 36:25 37:18

**representative** 16:20,22

**representing** 35:13, 19 36:8

**request** 43:10 69:2 80:5

**requested** 43:25 60:4

**requesting** 68:5

**requests** 68:23

**require** 12:25 13:14 52:21 54:16 73:24

**required** 16:6 20:23 21:6,12 22:2

**requirement** 15:12, 19 17:8 42:15 51:19 53:18

**requires** 55:17

**requiring** 53:20 75:25

**resided** 8:4

**resident** 37:15,17 41:4

**residents** 35:21 37:4,7,9,10,19,20 38:8 39:15,17

**resources** 33:24 34:10 48:21

**respect** 19:5 36:3 59:5 77:6,15

**respond** 24:20,22,24 32:13 35:10

**responded** 25:2

**responds** 51:23

**response** 22:16 26:14 53:8 55:13

**responses** 60:19 69:21

**responsible** 59:4

**restrict** 55:25

**result** 81:11

**resulted** 50:10

**results** 49:18

**Rethy** 5:17 6:7,21 9:9 17:20 18:8 19:2,10, 14,25 20:4 23:4 27:15 39:21,24 40:3, 9 44:18,20 67:8 78:3, 10,16 79:2

**review** 43:2,3 54:8,9 61:8,10,12 63:21,22 67:2,4,15

**reviewed** 63:23 67:10,17

**reviewing** 34:25 67:11

**revision** 19:20 53:17 54:11,14 73:19

**rights** 8:17

**Rikard** 33:7 60:20 62:23

**ring** 9:6

**Road** 7:2

**room** 5:7,9 53:2,24

**RPR,RMR,RDR, CRR,CRC,RSA** 81:15

**rule** 5:14 73:23 77:5, 14

**rules** 5:14,15

**Run** 21:8

---

**S**

**safety** 12:15 50:23 52:3 55:2,3 59:5 62:17

**Saturday** 31:7

**security** 52:3

**send** 27:24

**sender** 32:15,16,17 33:13

**sending** 28:4

**sends** 31:5

**sense** 17:6 19:8 24:2 27:6 36:24 41:14 70:12,25

**sentence** 12:7 25:5 43:5,12

**separate** 17:14

**series** 10:19 75:5

**serve** 33:21

**serves** 34:4

**service** 30:3 50:23

**services** 68:15,25

**serving** 48:17

**set** 15:12

**setting** 15:18

**severity** 5:5

**share** 61:21

**sheet** 18:22,25 19:8 63:12,14

**Sheriff** 15:17 16:14 17:10 23:14 25:7,18, 21,23 26:8,13 27:5,6 42:17 45:13,14 51:13,23 52:18,23

**53:5 55:16 60:15,21 61:5,18 64:9,23 67:13,19 68:3,14,19, 23 72:7,11,15,21 73:8 77:25

**Sheriff's** 16:9 28:19 29:5,11 55:7 59:9 62:22 68:4 71:25 72:2

**Sheriffs** 63:18

**showing** 11:11

**shows** 47:20

**sidewalk** 75:2,8,11, 15,17 76:4,16

**sidewalks** 12:18 74:10,11

**sign** 75:12 78:23,24

**signed** 23:19,20

**significance** 44:5

**signs** 14:12 56:3 57:13

**simple** 72:10

**simply** 64:24

**Simpson** 6:7

**single** 18:7 21:10,25 34:21

**single-page** 69:10

**sir** 7:18,20,24 8:9,12, 14,23 9:2,5,20,23 10:11,21,25 11:5,25 12:9,24 13:6,9,12,25 14:4 15:10 16:17 17:12,25 18:4,6,17, 20 19:9 20:7,10,17, 19 21:14 23:3,15 27:8,11 28:7,15 29:18 30:5 31:18,25 32:12,14,16 33:12 34:14 35:9,16 38:20, 22 39:20 42:6,9,20 43:11,19,22 46:2,15 47:19 50:25 51:10, 15,22 52:6 54:3 55:23 56:2,7 59:18, 23 60:17 61:2,13 62:15,24 63:15 64:21,25 65:4,14 68:12 69:3,13 73:21

**74:3 75:6,11

**sit** 76:13,14

**sits** 74:24

**sitting** 13:13,19 14:25 76:9 77:10

**situation** 16:11 72:22 73:13

**slightly** 23:19

**slip** 63:12

**SNEEZE** 44:17

**sneezed** 44:18

**social** 5:6 43:15,20, 22 45:5 70:24 76:21 77:9,17

**sort** 18:12 19:6 27:20 28:9 40:16 49:21 70:24 75:17

**sorts** 27:24

**Sounds** 40:3

**specific** 8:18 16:24 20:12 24:12 38:18 65:12 66:4 72:5,6

**specifically** 17:3

**speculate** 44:25 49:10,11,15

**speculating** 65:23 68:20

**spend** 50:8

**spoken** 65:21,24

**square** 8:11 58:21 59:2,6 71:9

**stamped** 63:18

**stand** 29:6

**standing** 25:13 26:9

**stands** 29:15

**start** 5:21 56:23

**started** 7:12

**starts** 18:10 40:17 56:11

**state** 6:24 47:14

**state's** 5:15

**statement** 21:14 25:16 26:7,24

**states** 5:24 12:6,21 15:22 20:22 21:4,5, 11 25:5 28:13 33:17 35:7 43:6,13 51:16 61:18 62:25 68:3 71:18

**stating** 12:7 14:13

**statue** 22:18 25:18, 22 26:14 27:2,3 28:14,20 33:19 34:2, 9 38:5 39:16 41:23 44:9,15 49:25 50:11 54:17 55:14 63:10 65:19,20 66:12 69:21 71:5 74:24 76:7

**stay** 41:23

**step** 53:2

**STEPHANIE** 51:5

**stepping** 53:23

**Steve** 47:5,9

**stipulate** 5:11

**strain** 33:23 34:9,12 48:21

**street** 26:6

**streets** 12:19

**stressful** 63:6

**stretched** 55:9

**subject** 5:18

**submitted** 15:23

**Subscribed** 79:12 80:20

**substance** 54:14

**substantial** 24:8

**substantially** 42:11

**summer** 38:21 63:7

**sun** 56:11

**Sunny** 28:10

**supervisor** 20:6 42:22

**Supervisors** 7:5 15:16 16:13,18,20

**Supervisors'** 24:4

**surprise** 57:20

**surprised** 57:24

**Surrounding** 74:13

**swear** 5:10 6:14

**swearing** 5:12

**sworn** 6:18 79:12 80:20

---

**T**

**tab** 9:7,14 10:12,16 11:17,20 15:8 17:11, 21 18:16,18,23,25 22:25 23:2,7 27:9,13 29:17,20 30:16,18 32:2,4 34:13,15 40:9, 12 45:25 46:4 47:4,5 50:24 51:2 53:11,16, 25 59:10,12 60:16 69:4,6 70:3,5,19 73:16 75:4

**tabs** 7:25 17:17 19:18 60:18

**taking** 28:25 63:2

**talk** 43:14,20,22

**talked** 46:25

**talking** 13:14,20 39:3

**Tannehill** 64:12,23

**tells** 64:23

**term** 7:12

**terms** 24:17

**testified** 6:18 73:22

**testimony** 7:19 75:24 80:5

**text** 27:11,13,16,20, 24 28:4,8,9

**texts** 27:19

**Thatcher** 6:8

**thin** 55:9

**thing** 45:2 70:16

**things** 63:10

**thinking** 22:4 36:19 39:19 72:21

**Thomas** 5:3

**thought** 18:25 36:18 37:6 39:3

**thoughts** 39:9

**ticketed** 14:24

**time** 22:5 24:12,21 25:2,17,19,20 26:25 27:4 34:11 36:24 40:6 42:10 51:25 52:18,21,24 54:15 55:8 56:2,6,7,8,13, 20,21 57:12 58:2,9 60:10 78:7,11,19

**times** 30:13 57:22

**timing** 45:19

**Timmy** 40:25

**titled** 10:22 12:2

**today** 7:21 56:17,20, 21 57:8

**toll** 63:2

**top** 22:14 62:23

**topic** 53:9

**town** 8:10 58:21 59:2,5

**traffic** 12:17 15:20,21 62:20 74:3,9,19

**transcribed** 81:4

**transcript** 81:6

**transcription** 81:5

**true** 22:25 81:6

**TSG** 5:4

**Tula** 41:5

**turn** 9:7 10:12 11:4,9, 17 13:7 22:25 40:9 45:25 47:4 59:10 60:16 69:4 70:3 73:13,16 76:8

**turned** 59:22,24 60:3

---

**U**

**unauthorized** 62:19

**understand** 8:15 10:6 13:16 27:3 28:18 36:6,15,22 50:2 57:7 61:9 65:2 67:19

**understanding** 8:19 9:24 10:2,4,9 13:24, 25 14:2 16:5,7 17:9 21:24 25:15 28:16, 21,23,24 29:4 30:6 32:19 39:13 41:20,22 42:14 44:4 50:15 54:20,23 55:18 56:9, 16 58:5,7 60:12 63:4 65:11 66:7,14 68:18 76:19

**underway** 29:7

**United** 5:24

**University** 67:23 68:10

**update** 53:24

---

**V**

**Vaguely** 69:18

**validity** 5:11

**variety** 23:11

**vehicular** 62:19

**versus** 5:23 48:24 73:6

**video** 5:12,22

**view** 34:8 37:18 39:15 49:3

**views** 36:2 41:15,18, 21 44:14

**violating** 14:24

**violation** 13:21 14:3 71:15,20

**violent** 29:7,16 64:2

**voice** 37:5,25 38:3

**voicing** 35:11

---

**vote** 38:4,6,7,10,25 39:4 47:15,17,21 49:16,18,19,20,24 50:10 66:7

**voted** 35:14,19 36:3, 9 48:6 54:21

**voter** 38:10

**voter-initiated** 39:10

**voters** 48:11 49:23

---

**W**

**waive** 16:15 17:8

**waived** 16:18,25 42:15

**wake** 63:24

**wanted** 37:4,6 43:16 65:23

**wanting** 67:21

**Warren** 40:25 41:3, 11

**Warren's** 41:14 44:7 45:22

**Wayne** 30:18,21

**week** 25:8

**weekend** 74:6 76:2, 15

**weekends** 58:24 74:14

**white** 25:12 26:8

**William** 5:3

**Williams** 6:9 40:13

**window** 67:7

**windows** 67:8

**wondering** 10:8

**wording** 20:19

**words** 34:7

**work** 32:22 33:14 64:13

**Working** 44:20

**world** 29:15

**wreck** 30:15

**write** 69:19

**wrong** 9:12 17:17
 70:19

---

**Y**

---

**y'all** 43:16 51:17 79:3

**year** 22:8 38:19,21
 56:14 58:9

**years** 8:6 37:16

**Yoknapatawpha**
 31:2

**York** 67:9

**Young** 28:10