EXHIBIT 41

1

2                    IN THE UNITED STATES DISTRICT COURT

3                 FOR THE NORTHERN DISTRICT OF MISSISSIPPI

4                            OXFORD DIVISION

5

6

7

8    JOHN RASH,

9              Plaintiff,
                                    CASE NO.: 3:20-cv-224-NBB-RP
10   v.

11   LAFAYETTE COUNTY,
     MISSISSIPPI,
12
               Defendant.
13   _____/

14

15        REMOTE VIDEOTAPED DEPOSITION OF DAVID RIKARD

16                       DECEMBER 15, 2020

17

18

19

20

21   Reported by:

22   GINA WILLIAMS, RPR, CRR, CRC

23   JOB NO. 187732

24

25

## Page 2

```
1
2
3
4
5
6
7                     DECEMBER 15, 2020
8                        9:23 a.m.
9
10        Remote Videotaped Deposition of DAVID RIKARD in
11   the above-styled action before Gina Williams, Registered
12   Professional Reporter and Certified Realtime Reporter.
13
14
15
16
17
18                     REPORTER'S NOTE:
19     QUOTATION MARKS ARE USED FOR CLARITY AND DO NOT
                  NECESSARILY REFLECT A DIRECT QUOTE
20
21
22
23
24
25
```

## Page 3

```
1
2    A P P E A R A N C E S:
3
4         SIMPSON THACHER & BARTLETT
5         Attorney for Plaintiff
6             425 Lexington Avenue
7             New York, New York 10017
8         By:  ISAAC RETHY, ESQUIRE
9
10
11        ACLU OF MISSISSIPPI
12        Attorney for Plaintiff
13            P.O. Box 2242
14            Jackson, Mississippi 39225
15        By:  LANDON THAMES, ESQUIRE
16
17        CLAYTON O'DONNELL
18        Attorney for Defendant
19            1403 Van Buren Avenue
20            Oxford, Mississippi 38655
21        By:  DAVID O'DONNELL, ESQUIRE
22
23
24   VIDEOGRAPHER:          JAAROME WILLIAMS
25
```

## Page 4

```
1                     D. RIKARD
2        COURT REPORTER:  My name is Gina Williams with
3    TSG Reporting.  Due to the severity of COVID-19, the
4    videographer and I will not be in the same room with
5    the witness and will swear the witness remotely.
6        Do all parties stipulate to the validity of the
7    remote process, transcript, and swearing of the
8    witness?
9        MR. THAMES:  Yes.
10       MR. O'DONNELL:  Yes.
11       MR. RETHY:  Yes.
12                       - - - -
13       VIDEOGRAPHER:  This is the start of Media 1 of
14   the video deposition of David Rikard in the matter of
15   John Rash versus Lafayette County, Mississippi in the
16   United States District Court, Northern District of
17   Mississippi, Case Number 3:20-cv-224.
18       This deposition is being held remotely on
19   December 15, 2020 at 9:23 a.m.
20       My name is JaaRome Williams with TSG Reporting
21       Will counsel please introduce yourself for the
22   record.
23       MR. RETHY:  Isaac Rethy, Simpson, Thacher and
24   Bartlett for Plaintiff John Rash.
25       MR. THAMES:  Landon Thames for the ACLU of
```

## Page 5

```
1                     D. RIKARD
2    Mississippi for Plaintiff John Rash.
3        MR. O'DONNELL:  David O'Donnell for Lafayette
4    County, Mississippi.
5                       - - - -
6    WHEREUPON,
7                     DAVID RIKARD
8    was called as a witness and, after having been first duly
9    sworn, was deposed and testified as follows:
10                     EXAMINATION
11   BY MR. RETHY:
12       Q    Good morning.  My name is Isaac Rethy.  I'm going
13   to be the primary attorney asking questions today.
14       Can you hear me clearly?
15       A    It's a --
16       I can hear you clearly.  It's just a little hard
17   to hear you.
18       Q    Okay.  Is this better?
19       A    Yes, sir.
20       Q    Okay, great.  So if I fade out or anything,
21   please let me know.
22       A    Okay.
23       Q    So could you state your full name for the record?
24       A    David Rikard.
25       Q    And you understand you've sworn under oath to
```

Page 6

D. RIKARD

1  
2  tell the truth today; right?
3      A    Correct.
4      Q    And you intend to keep that oath; correct?
5      A    Yes, sir.
6      Q    And are you taking any medication or do you have
7  any condition that might impact your ability to testify
8  truthfully and accurately?
9      A    No, sir.
10     Q    And is there any other reason why your memory
11 might be impaired today?
12     A    None.
13     Q    So I'm going to ask a series of questions.  In
14 order to have a clear record of your answers, please wait
15 for the question to end before responding, so minimize
16 speaking over each other.
17          Make sense?
18     A    Yes.
19     Q    And in addition, because this is transcribed, you
20 need to respond audibly.  So head nods and shakes aren't
21 going to show up on the transcript so please, you know,
22 answer yes or no rather than with gestures.
23     A    Okay.
24     Q    And you know, because this is being conducted
25 over Zoom, it's always possible that we have a technical

Page 7

D. RIKARD

1  
2  issue or a connection issue or something of the sort.
3          So, you know, if it seems like there's a
4  technical issue that's preventing you from understanding
5  what I'm saying, please let me know.  I'll do the same if I
6  can't hear you for whatever technical reason.
7      A    Okay.
8      Q    And if there's anything I ask that you don't
9  understand, let me know, and I'll rephrase the question.
10 Otherwise, I'll assume you understand the question.
11          Is that fair?
12     A    Fair enough.
13     Q    And we're going to take short breaks at certain
14 points, maybe five-minute breaks every hour, hour and a
15 half, and I'm not sure --
16          I'm in a different time zone than you, but we may
17 also take a lunch break.
18          But in addition to that, if at any time you want
19 a break, just let me know, and we'll accommodate that.
20     A    Okay.
21     Q    One thing with breaks is that if there's a
22 question pending, you should just answer the question before
23 we take a break.
24          Does that make sense?
25     A    Yes, sir.

Page 8

D. RIKARD

1  
2      Q    And so your attorney might at certain points
3  object to questions that I ask, but unless he specifically
4  tells you not to answer, you should answer the question even
5  though your attorney may have objected to it.
6          Does that make sense?
7      A    I'm sorry.  Say that again.
8      Q    So your attorney might interpose objections.
9  Like I might ask a question, and he might say "objection" or
10 "object to form" or something like that, but him making
11 those objections doesn't mean that you don't have to answer
12 the question.  You still have to answer the question, unless
13 your attorney specifically tells you not to answer the
14 question.
15     A    Okay.
16     Q    I think it will be clear.  If your attorney
17 doesn't want you to answer a question, I'm sure he'll, you
18 know, make that clear, but just otherwise, you know, just
19 before you answer, give him a second to make an objection if
20 he wants to, but then answer the questions.
21     A    Okay.
22     Q    Have you ever been deposed before?
23     A    No, sir.
24     Q    Have you ever given any sort of sworn testimony
25 before?

Page 9

D. RIKARD

1  
2      A    Yes.
3      Q    Could you describe what that was?
4      A    I don't remember the exact --
5          It was during my sister's divorce.  I don't
6  remember exactly what the cause was for, but it was during
7  her divorce.
8      Q    Okay.  Where are you currently employed?
9      A    I work for Insurance Claims Specialists in
10 Lafayette County.
11     Q    And you're a member of the county board of
12 supervisors; is that right?
13     A    That's correct.
14     Q    And how long have you been on the board?
15     A    I'm starting my second term, first year into
16 that, so five years.
17     Q    So what year did you join?
18     A    I was I elected in 2015, and I was sworn in and
19 took office in 2016 originally.
20     Q    So we're going to look at a number of documents
21 today, and since it's over Zoom, the way that I'm going to
22 show you documents is by putting them into chat in the Zoom.
23          I'm going to introduce an exhibit, and in part
24 just to make sure that this way of doing things will work
25 and that you can access the exhibit and so forth.

D. RIKARD

1
2      This will be Exhibit 1, and let me know if you're
3  able to access this document.
4      A      I don't know how long it should take, but I
5  haven't received anything.
6          MR. RETHY:  So Landon, have you received it?
7          MR. THAMES:  Yes, I have it.
8          (Exhibit 1 was marked for identification.)
9  BY MR. RETHY:
10     Q      So do you see -- do you see the chat window or on
11 the bottom the chat icon?
12     A      Yes, I've got chat pulled up.
13         Sorry.  It looks like I'm going to have to
14 download it and save it to the computer.
15     Q      You should be able to click on the PDF icon that
16 appears in the chat, and it will open up.
17     A      Okay.
18     Q      Do you have the document now?
19     A      I do.
20     Q      What's the title of this document?
21     A      "Facility Use Policy."
22     Q      Are you familiar with this document?
23     A      Not this one in particular, no.
24         MR. RETHY:  So I'm going to mark another exhibit.
25 This will be Exhibit 2.

D. RIKARD

1
2      Let me know when you have this one open.
3          MR. O'DONNELL:  Isaac, it's not pulling up.
4      Is this the 2019 policy?
5          MR. RETHY:  Yeah.
6          MR. O'DONNELL:  Okay.  I can just, I'll just
7  show --
8          If we can just identify it by Bates number, we
9  can --
10         How about we do that?  Refer to it by Bates
11 number.  I'll show him the actual document.  And to the
12 extent that you're not using a Bates number, I'll be
13 going to the chat.  For some reason his computer --
14         We're using both computers.  His computer we're
15 using to pull the document up, and it's not
16 cooperating.
17         MR. RETHY:  So could I e-mail the documents?
18         MR. O'DONNELL:  Yeah, you can e-mail me, and I'll
19 print them off, and then we can do it that way.
20         How about that?
21         MR. RETHY:  Okay.  So I will send you --
22         So I just sent you a link that has all of the
23 potential exhibits.
24         MR. O'DONNELL:  Okay, Isaac, I'll go get it,
25 thanks.

D. RIKARD

1
2          MR. RETHY:  So I guess let's go off the record
3  for a few minutes just to deal with this technical
4  issue.
5          VIDEOGRAPHER:  Going off the record.  The time is
6  9:36 a.m.
7          (Recess was taken.)
8          (Exhibit 2 was marked for identification.)
9          VIDEOGRAPHER:  We're now back on the record.  The
10 time is 9:54 a.m.
11 BY MR. RETHY:
12     Q      Okay.  So I marked a document as Exhibit 2.  This
13 is a document that's Bates-stamped Lafayette County 000006.
14         Do you have that document?
15     A      Lafayette County DOC00006?
16     Q      Yeah.
17     A      I do.
18         Facility Use Policy?
19     Q      Yes.
20         Are you familiar with this document?
21     A      Yes.
22     Q      So what's your understanding of this document?
23     A      Just basically tells the public what they can and
24 cannot do on the county grounds, and when they cannot
25 be there, and what they can and cannot have while they're

D. RIKARD

1
2  there, and what process they need to go through in order to
3  secure a permit to be there.
4      Q      So this document says its effective date is
5  March 4, 2019; is that right?
6      A      Correct.
7      Q      And so this document was amended as of March 4,
8  2019; correct?
9      A      I don't know the answer to that.  I don't
10 remember the day that we amended it.
11     Q      Do you recall in February or March of 2019 the
12 policy being amended?
13     A      I really don't remember the day we amended it.
14     Q      Do you remember it being amended at all in 2019?
15     A      Yes.
16     Q      And what's your recollection of why it was
17 amended?
18     A      It was amended due to the concern for public
19 safety at the request of or in conversations with our law
20 enforcement then actually to reduce the time for people to
21 be able to secure a permit and be able to use the facilities
22 for whatever need that they wanted.
23     Q      Did you say to reduce the time?
24     A      Yeah.  It went from 30 days to 14 days.  The
25 permit -- to obtain the permit went from 30 days to 14 days.

Page 14

D. RIKARD

1
2    Q    Could you turn to the page that's stamped "9" on
3  this document?
4    A    Okay.
5    Q    Do you see there's a section that says
6  "Application for Use"?
7    A    Yes.
8    Q    And then you see the second bullet says,
9  "Application should be submitted to the county administrator
10  at least 30 days in advance of the day they need it"?
11    A    Mm-hmm.
12    Q    So does that change your testimony about, you
13  know, what this policy required in terms of advanced notice
14  for permit applications?
15    A    My recollection is from the --
16          I think we discussed it in July.  That was the
17  changes made in July.
18    Q    July of which year?
19    A    '20 -- 2020.
20    Q    But as of this policy, the 30-day requirement was
21  in place; correct?
22    A    I don't know.
23    Q    So if you go back to --
24          Go back to Exhibit 1.  So this is the one that
25  starts with the stamp number 2.

Page 15

D. RIKARD

1
2    A    Yes, sir.
3    Q    And this is the Facility Use Policy dated
4  April 20, 2015?
5    A    Correct.
6    Q    If you look at the third page of this document,
7  it's stamped 4, and then you can see there's a similar
8  application for usage section; right?
9    A    Correct.
10    Q    Do you see in this one, the second bullet says,
11  "Application should be submitted to the county administrator
12  at least one week in advance of the day needed," right?
13    A    I see that, yes.
14    Q    So doesn't that suggest that the policy was
15  changed in 2019 to go from one week advanced notice to 30
16  days advanced notice?
17    A    That's suggests and I would agree with it, yes.
18    Q    Do you recall why that change was made in 2019?
19    A    No.
20    Q    You said, no, no recollection of that?
21    A    No.
22    Q    And then you mentioned there being a subsequent
23  change from 30 days to 14 days; right?
24    A    I'm sorry?
25    Q    You mentioned that later there was a change in

Page 16

D. RIKARD

1
2  that advanced notice requirement from 30 days to 14 days; is
3  that correct?
4    A    Correct.  Correct.
5    Q    And do you recall why that change was made?
6    A    That change was made to -- just to make it easy
7  on the applicant.  We felt that 14 days, in conversations
8  with our sheriff, would be enough time for him to evaluate
9  and for Ms. Carwyle to be able to review it.
10    Q    Does the board of supervisors approve or deny
11  individual permit applications?
12    A    No, we do not.
13    Q    Does the board of supervisors ever consider
14  individual permit applications?
15    A    No, we do not.
16    Q    So the board of supervisors, you never --
17          You don't recall ever having discussed the
18  particular permit application in a board of supervisors
19  meeting?
20    A    Any particular?
21    Q    Anyone.
22    A    No.
23    Q    So who has the responsibility for approving or
24  denying particular permit applications?
25    A    Our county administrator, Lisa Carwyle.

Page 17

D. RIKARD

1
2    Q    And do you have an understanding of the factors
3  or reasons that she considers whether to permit or deny a
4  permit application?
5    A    I think that's a better question for Ms. Carwyle.
6    Q    So you have no understanding of what she
7  considers?
8    A    No, not in detail.  No, I do not.
9    Q    Is it a matter of her discretion?
10    A    I wouldn't say discretion.
11          I would say whatever --
12          If they qualify for whatever the requests are or
13  based on our ordinance or policy language that she
14  wouldn't -- it's not really at her discretion.
15          She does have the yes-or-no or the authorization.
16  But as far as someone, you know, plays by the rules and by
17  the guidelines, I don't see any reason why they would be
18  denied.
19          (Exhibit 3 was marked for identification.)
20  BY MR. RETHY:
21    Q    Let's look at what I'll mark as Exhibit 3, and
22  this is Tab 3.  It's a document number starting at _0052.
23  It goes from 47 to 364.
24          MR. O'DONNELL:  What's the Bates number on that
25  again, Isaac?

Page 18

D. RIKARD

1    D. RIKARD
2        MR. RETHY:  _52.
3        MR. O'DONNELL:  _52.  Lafayette County _52.
4    Isaac, did you reference a Tab number?
5        MR. RETHY:  It's 3.
6        MR. O'DONNELL:  Tab 3.  Let me go back and check
7    your e-mail again and make sure I printed that one off.
8    Hang on.
9        THE WITNESS:  Okay, I have it.
10   BY MR. RETHY:
11       Q    This is a document that says -- that's titled
12   "Order:  Amend Facility Use Policy Regarding Use of
13   Courthouse Grounds," correct?
14       A    Correct.
15       Q    And when it refers to "courthouse grounds,"
16   what's your understanding of what that refers to?
17       A    The courthouse itself, the surrounding area, and
18   the confederate monument.
19       Q    And --
20       A    And the surrounding area would be the grass and
21   trees.
22       Q    And when you say "courthouse" itself, which
23   courthouse is that?
24       A    Lafayette County Courthouse.
25       Q    Are you familiar with this document?

Page 19

D. RIKARD

1    D. RIKARD
2        A    This looks like a portion of our minutes.
3        Q    It reflects a motion that the supervisors voted
4    on, including yourself; correct?
5        A    Correct.
6        Q    And do you recall voting on this motion?
7        A    I do, yes.
8        Q    And this states in part that four people or less
9    do not require a permit, but five or more people gathering
10   require a permit; is that fair?
11       A    Correct.
12       Q    And what's your understanding of what "five or
13   more people gathering" means?
14       A    I couldn't hear you.
15       Q    What's your understanding of what "five or more
16   people gathering" means?
17       A    Five or more people that not in any type of
18   motion as far as walking.  They are --
19            They're still.
20       Q    You said, "They're still"?
21       A    Correct, yeah.  Like at some type of protest that
22   they are -- they're no longer walking.  They are congregated
23   in a certain area attempting to display their message.
24       Q    So there's park benches on the courthouse
25   grounds; right?

Page 20

D. RIKARD

1    D. RIKARD
2        A    Correct.
3        Q    So if there's a group of five people sitting
4    on -- sitting on one or two of those benches, would they
5    need a permit?
6        A    No, they would not.
7        Q    Why is that?
8        A    The reason being is that they're not trying to
9    portray any type of -- there's no agenda there other than to
10   just be there and enjoy the day or conversation.
11       Q    So five or more people need a permit when they're
12   engaging in some sort of political type of conduct, but they
13   don't need a permit when they're not?
14       A    I wouldn't say, per se, that it's political.  It
15   could be basically for any reason.  But, I mean, we can't
16   control people that just stop by and, you know, that are
17   walking through the grove -- or I'm sorry -- walking through
18   the courthouse and just sit down and have a conversation and
19   eat their ice cream from YaYa's.  It's totally different
20   than someone who is going to be there for a substantial
21   amount of time.
22       Q    This order doesn't itself say anything about the
23   amount of time -- any kind of like time-based trigger for
24   requiring a permit; right?
25            It just speaks in terms of being more or less

Page 21

D. RIKARD

1    than five people?
2        A    That's correct.
3        Q    And so who --
4            Who has the authority to make the decision as to
5    whether, you know, a group of people are gathering on the
6    courthouse grounds is a group that needs a permit or a group
7    that doesn't need a permit?
8        A    Well, I wouldn't say that anybody who doesn't
9    need a permit or needs a permit.  It's basically who --
10           I really don't know how to answer your question
11   because, again, we can't control if five college students
12   are walking across the courthouse square and sit down just
13   to enjoy an ice cream, or a family, for that matter, you
14   know.  And if they're there for 15 minutes or 30 minutes, to
15   me it's not really comparing apples-to-apples or
16   oranges-to-oranges.
17           Our law enforcement is not stationed there, so
18   they can't, you know --
19           I guess over five that would actually stop would
20   be against the ordinance, but we do not have law enforcement
21   there stationed there 24/7 to regulate the ordinance.
22       Q    So this order says towards the end, it references
23   a 30-day period for making the application, and then it
24   says, "The board of supervisors and/or the sheriff shall

Page 22

D. RIKARD

1
2 determine whether to waive the 30-day period."
3        Do you see that?
4    A    Yes.
5    Q    So has the board of supervisors ever considered
6 whether to waive a 30-day application period?
7    A    Not to my recollection.
8    Q    Are there --
9        Do you have an understanding of what factors the
10 board of supervisors would consider if asked to waive this
11 30-day period?
12   A    I can't speak to that because I don't know if
13 they've ever been requested to waive it.
14   Q    Do you know whether the sheriff has ever been
15 asked to waive any advanced notice period for a permit
16 application?
17   A    Do I know?
18       No, I do not.
19   Q    Do you know whether the county administrator has
20 the authority to waive the 30-day period?
21   A    No.
22   Q    And no, you don't know or, no, she does not?
23   A    No, she does not.
24       MR. RETHY:  So let's go to Tab 4, and this is
25    document _001.  This will be Exhibit 4.

Page 23

D. RIKARD

1
2        (Exhibit 4 was marked for identification.)
3    A    Okay.
4 BY MR. RETHY:
5    Q    And this is a document with a somewhat lengthy
6 title, but the first line of the title is "Order:  Approve
7 Revision of Facilities Use Policy," correct?
8    A    Yeah, Order:  Approve Revision of Facilities Use
9 Policy to Include A."
10       That's the first line.
11   Q    And this is another order that reflects a motion
12 that was carried by the board of supervisors; correct?
13   A    Correct.
14   Q    And it states that this motion was made by you?
15   A    That's correct.
16   Q    And the substance of the motion is to revise the
17 Facilities Use Policy to include a requirement that
18 application be made at least 14 days prior to the date of
19 proposed use and required closure of courthouse grounds,
20 including the confederate statue area, 30 minutes before
21 dusk; correct?
22   A    That's correct.
23   Q    So what's your understanding of what dusk is?
24   A    The time of day between daylight and dark.
25   Q    Is it the same as sunset?

Page 24

D. RIKARD

1
2    A    I wouldn't say so.
3    Q    If someone wanted to know, like today when is 30
4 days -- when is 30 minutes before dusk, how would they
5 figure that out?
6    A    I don't know.  I don't know the answer to that
7 question.  I guess we'd have to look at the definition of
8 dusk, and I don't know what the definition of dusk is right
9 offhand.
10   Q    Was it your choice to include the concept of dusk
11 in this order?
12   A    No.  I think it was mutual.
13   Q    Mutual among who?
14   A    The board of supervisors.
15   Q    So today, given the time of year, sunset in
16 Oxford is at 4:50 p.m.  And so does that mean that at or --
17       Given that we don't really know what dusk is, but
18 it's also 30 minutes before dusk, does that mean that
19 probably by 4:50 p.m. the courthouse grounds are closed per
20 this order?
21   A    I don't know the official time.
22       I don't know that dusk has an official time, so I
23 can't speak to that.
24   Q    If you don't know what dusk is, how does this
25 order get enforced?

Page 25

D. RIKARD

1
2    A    You need to vacate the property before dark.
3    Q    So given the time of year, that means potentially
4 as early as around 5 p.m. or 5:30 p.m.; is that right?
5    A    Dark.
6    Q    Which is around 5:00, 5:30 this time of year?
7    A    It depends based on the weather or clouds or
8 sunshine, but approximately 5 p.m., but it could be before
9 or after.
10   Q    So anyone who's on the courthouse grounds after
11 approximately 5 p.m. is in violation of this order; correct?
12   A    No.
13       Anyone after dusk or dark would be in violation.
14 There's no time set.
15   Q    So that varies day by day depending on --
16 depending on the time of year and depending on weather
17 conditions and so forth.
18       Is that what you're trying to say?
19   A    Correct.
20   Q    Are you aware of this order ever having been
21 enforced?
22   A    Yes.  That's why I'm giving this deposition.
23   Q    So other than the permit denial with respect to
24 John Rash, are you aware of this order ever having been
25 enforced?

Page 26

D. RIKARD

2 A    The order is enforced on a daily basis to my
3 knowledge.
4 Q    To your knowledge, has anyone ever been cited or
5 arrested as a result of this order?
6 A    No.
7 Q    So when you say it's enforced, could you describe
8 what you mean?
9 A    No.  You'd have to ask the sheriff how he
10 enforces it.
11 Q    This says it requires closure of the courthouse
12 grounds.
13     What's your understanding of what "closure"
14 means?
15 A    You're not allowed to be on the grounds.
16 Q    So are there any dates or barricades that prevent
17 people from accessing the grounds?
18 A    No.
19 Q    Are there any signs that inform people that
20 they're not allowed to be on the grounds?
21 A    There's no signs that I'm aware of.
22     We're still in the --
23     The county administrator, I believe, is
24 actually -- those are ordered and kind of waiting on them to
25 arrive and be installed.

Page 27

D. RIKARD

2 Q    So is it your understanding that if someone was
3 sitting on one of the benches on the courthouse grounds
4 after dark, say around 7 p.m. this time of year, that
5 they're in violation of county ordinance?
6 A    Correct.
7 Q    Are you aware if the sheriff ever had to ask
8 someone to leave the courthouse grounds after dusk?
9 A    I'm not aware, no.
10 Q    So what was the --
11     What was the reason for issuing this order,
12 closing the courthouse grounds 30 minutes before dusk?
13 A    The reasoning was due to the concern just across
14 the country, the growing tension and seeing how some cities
15 were being vandalized, rioted, and just as a concern for
16 county property and our citizens.
17 Q    To your knowledge, has there been any rioting or
18 vandalism in Oxford this year?
19 A    No, thanks to our --
20     Thanks to our law enforcement, no, sir.
21 Q    When you say thanks to law enforcement, are you
22 thinking of any specific instance where you believe law
23 enforcement prevented rioting or vandalism?
24 A    I think their presence has deterred a lot.
25     I'm sorry.  I want to rephrase that.

Page 28

D. RIKARD

2     I think their presence has probably deterred
3 some, yes.
4 Q    What individuals or groups have been deterred
5 from rioting or vandalism by the presence of law
6 enforcement?
7 A    I don't know any particular group.
8 Q    So the issuance of this order I guess was in
9 response to protests or associated civil disturbance of the
10 type that occurred this past summer?
11 A    Can you repeat the question, please?
12 Q    You agree that this order was issued in response
13 to the protests or forms of civil disturbance that occurred
14 in various cities in the summer of 2020?
15     MR. O'DONNELL: Object to form.  You can answer.
16 A    Yes.
17 BY MR. RETHY:
18 Q    Was this a proposal that you --
19     Was this order the result of a proposal that you
20 developed personally?
21 A    Can you repeat the question, please?
22 Q    Basically was this -- was it your idea?
23     You made the motion that reflects that this was
24 your initiative or this was your idea?
25 A    No.

Page 29

D. RIKARD

2 Q    Whose initiative was it?
3 A    It was collaborative.
4 Q    Among who?
5 A    The board of supervisors and discussions with our
6 law enforcement.
7 Q    And when did those discussions begin?
8 A    I believe the original discussions began around
9 March of 2020.
10 Q    What was the nature of those discussions?
11 A    Our sheriff began voicing concern about being
12 able to protect the county property.
13 Q    And where did those discussions take place?
14 A    Mostly in executive session -- or in executive
15 session.
16 Q    These were oral discussions not involving written
17 communications?
18 A    Correct.
19 Q    Did the nature of those discussions change going
20 into the summer as a result of the increased protest
21 activity?
22 A    I wouldn't say they changed.  I would say they --
23 the sheriff just became --
24     I think the conversation was the same.  The
25 sheriff continued to show his growing concern.

D. RIKARD

1
2    MR. RETHY:  Turn to Tab 6.  Let me -- this is
3    document 20, _0020.  This will be Exhibit 5.
4        (Exhibit 5 was marked for identification.)
5    A    What is the document?
6  BY MR. RETHY:
7    Q    It's _0020, and it's hard to see the document
8  number because there's handwriting that is kind of right on
9  top of it.
10       MR. O'DONNELL:  Isaac, is this the Facilities
11   Application Permit?  It looks like it's Jessie
12   Honeycutt?
13       MR. RETHY:  Yeah.
14       MR. O'DONNELL:  Okay.  It's just a single page?
15       MR. RETHY:  Correct.
16       MR. O'DONNELL:  Okay.
17  BY MR. RETHY:
18   Q    Are you familiar with this document?
19   A    The document, yes.  This particular one, no.
20        I'm familiar with the application, but not Jessie
21  Honeycutt's application.
22   Q    Do you know who Jessie Honeycutt is?
23   A    No, I do not.
24   Q    And it says in the middle of the form, there's a
25  line for explanation of use, and it says "Memorial service

D. RIKARD

1
2  for Anthony Hervey."
3        Do you see that?
4    A    I do, yes.
5    Q    Do you know who that is?
6    A    I know --
7         I knew Mr. Anthony Hervey, yes, not personally,
8  but I know who he was, yes.
9         He wouldn't know who I was.
10   Q    And what is your understanding of who Mr. Hervey
11  was?
12   A    The only thing I know about Mr. Hervey is that he
13  would stand around the statue in confederate clothing and,
14  being an African-American man, that drew a lot of attention.
15   Q    Is it fair to state that this application would
16  be for a pro confederate event?
17   A    I don't know what Mr. Honeycutt's intentions were
18  besides a memorial service or Anthony Hervey.  I don't go to
19  these events so...
20   Q    Let's look at Tab 7, document number 22.
21   A    Okay.
22       MR. RETHY:  This will be Exhibit 6.
23       (Exhibit 6 was marked for identification.)
24  BY MR. RETHY:
25   Q    Are you familiar with this document?

D. RIKARD

1
2    A    Same answer:  I know the document, but I don't
3  know the application -- or this particular application.  I
4  haven't seen it until -- until today.
5    Q    Do you know who George Johnson is?
6    A    Yes, I do know who George Johnson is.
7         Again, I want to make note, not personally, not a
8  fan of George Johnson.
9    Q    So what's your understanding of who Mr. Johnson
10  is?
11   A    Mr. Johnson is a --
12        The only thing I know about Mr. Johnson is he's
13  in support of keeping the confederate monument where it is,
14  and that's basically from interviews that I've seen on TV.
15        I've never had a conversation with Mr. Johnson by
16  phone or text.  I've never had any contact with Mr. Johnson.
17   Q    So this event is scheduled for July 19, 2020;
18  correct?
19   A    Correct.
20   Q    And start time 9 p.m., correct?
21   A    Correct.
22   Q    And this permit is listed as having been granted;
23  correct?
24   A    I don't see anything here that it was granted,
25  and I don't know that it was granted.

D. RIKARD

1
2    Q    Do you see the bottom of the page where it says,
3  "Permit," and it says "Granted" and "Denied"?
4    A    Oh, okay.  I do see that, yes.  It does say,
5  "Granted."
6    Q    It's granted?
7    A    Correct.
8    Q    So do you recall this event having taken place?
9    A    No, I do not.
10   Q    Do you recall any discussions around this event?
11   A    No.  Not personally with me, no.
12   Q    So this event would have been one day before the
13  policy was changed to close the courthouse grounds 30
14  minutes before dusk; correct?
15   A    I'm sorry.  Can you repeat the question?
16   Q    So this event would have been one day before the
17  order closing the courthouse grounds 30 minutes before dusk;
18  correct?
19   A    I don't remember the exact date it went into
20  effect.
21   Q    If you look at Exhibit 4, the document stamped 1,
22  that's the order with the 30-minutes-before-dusk closure,
23  and that's dated July 20.
24       MR. O'DONNELL:  Is that document 1, Isaac?
25       MR. RETHY:  Yes, stamped _001, yes.

Page 34

                            D. RIKARD

1
2          MR. O'DONNELL:  Gotcha, all right.
3     A     This says it's the 20th day of July, 2020.  It
4  would have gone into effect immediately.
5  BY MR. RETHY:
6     Q     Right.  So this event was scheduled to be held
7  July 19, which is one day before that?
8     A     Okay.  I agree, yes.
9     Q     Do you recall any discussions of any sort about
10 this event?
11    A     I'm sorry?
12    Q     Do you recall any discussions of any sort
13 regarding this event, the George Johnson event?
14    A     No, I do not.
15          MR. RETHY:  Let's go to Tab 14.
16          MR. O'DONNELL:  What's the Bates number?
17          MR. RETHY:  _261 to _265.
18          (Exhibit 7 was marked for identification.)
19    A     I have those documents.
20 BY MR. RETHY:
21    Q     Okay.  So could you turn to the document that's
22 stamped _265?
23    A     Okay.
24    Q     Do you see this is an e-mail from June 8, (sic)
25 2020 from Lisa Carwyle?

Page 35

                            D. RIKARD

1
2     A     June 18, yes, sir.
3     Q     And this reference is a permit application --
4  sorry, stepping back.
5          So this e-mail is sent to Joey East, David
6  O'Donnell, and then supervisor.
7          Would you have received this e-mail?
8     A     Yes.
9     Q     So the supervisor is like a group list that all
10 of the members of the board of supervisors are members of?
11    A     To my knowledge, yes.
12    Q     Do you recall this e-mail?
13    A     No.  I'm not saying that in any way I didn't
14 receive it.  I just don't recall.  I mean, we get a lot of
15 e-mails, so...
16    Q     This references someone named Tim Warren.
17          Do you know who that is?
18    A     I do not.
19    Q     Now, if you could turn up to the page that's
20 stamped _262.
21    A     Okay.
22    Q     And do you see this looks like some sort of
23 poster at the top --
24          This is some sort of social media post or
25 something of that nature, which has Jessie Honey, and it's

Page 36

                            D. RIKARD

1
2  sort of cut off at the top; right?
3     A     Yes.  Well, it says, "Jetty Honey."  I don't know
4  about the rest.
5          I can't confirm the rest of what you said, but it
6  does say "Jessie Honey," and the "y" is halfway cut off,
7  correct.
8     Q     Right.  And so this references like assembly on
9  June 19 for this year.
10         Do you recall there being an assembly on or
11 around the courthouse grounds on June 19 of this year?
12    A     No, I do not.
13    Q     Do you recall any pro confederate events having
14 taken place on or around the courthouse grounds in 2020?
15    A     Yes.
16    Q     And do you recall the dates of any of those?
17    A     No, sir.
18    Q     Do you recall whether they were in January or in
19 the summer?
20    A     I would say that after us passing this, there
21 were becoming increasingly more protests.  That was one of
22 the concerns is the protests and foot traffic and
23 pedestrians around the square.
24         MR. RETHY:  Go to Tab 19.  This is number _1438.
25         THE WITNESS:  Okay.

Page 37

                            D. RIKARD

1
2          (Exhibit 8 was marked for identification.)
3  BY MR. RETHY:
4     Q     So you see this is an e-mail that the header is
5  "Tomorrow is a PR Disaster for Oxford"?
6     A     Yes.
7     Q     Do you see that you received this e-mail?
8     A     Correct.
9     Q     Do you recall receiving this e-mail?
10    A     No, sir.
11    Q     And so this e-mail says --
12         It starts saying, "The man who was approved a
13 last-minute permit on June 15 for Juneteenth to focus on
14 emphasizing only White Lives Matter on the courthouse lawn
15 posted images such as attached (warning, it is graphic) and
16 talks about other white people about a rally."
17         Do you understand what Juneteenth is?
18    A     Yes.
19    Q     And that's --
20         And the date --
21         This says here Juneteenth, is the 19th of June;
22 correct?
23    A     I believe so.
24    Q     And so this references a last-minute permit on
25 June 15 for June 19; correct?

Page 38

D. RIKARD

2    A    It references that, yes.
3    Q    Do you have --
4         Do you have any recollection of discussions
5 regarding the permit that's being referenced here?
6    A    No.  I do know it wouldn't have been last minute.
7         This is someone's opinion of what happened.  This
8 is not factual what happened.  I think that entire statement
9 is her opinion, not that I agree or disagree with it, but
10 that entire statement is opinion, not factual.
11   Q    When you receive e-mails like this, is it your
12 practice to read them?
13   A    I read every e-mail, yes.
14   Q    And would you respond to an e-mail like this?
15   A    No, I would not.
16   Q    Why not?
17   A    Generally I try to have a conversation with the
18 person.
19        E-mails can be -- the context or just portions of
20 the e-mail can be used against us, against myself.
21   Q    Do you recall having a conversation with the
22 writer of the e-mail about this -- the subject matter of the
23 e-mail?
24   A    No.
25        The only time I respond to e-mails that were

Page 39

D. RIKARD

2 regarding the statue or some protest would be if I knew the
3 person lived in District 3, and I would try to respond to
4 them.
5         I represent District 3., so I would try to reply
6 to my constituents, but no one else.  I let the other
7 supervisors handle their own districts in their own way.
8    Q    Now, if you'll turn back to the last document we
9 looked at.
10   A    Which was?
11   Q    _261 to _265 or _66.
12   A    Okay.
13   Q    If you look at the page _264.
14   A    Yes, sir.
15   Q    So you see this is a permit application?
16   A    Correct.
17   Q    And the date of application is 6/17/20?
18   A    Correct.
19   Q    And then you see the event is 6/19/20?
20   A    Correct.
21   Q    So that means that this application was made two
22 days before the event; right?
23   A    Right.
24   Q    So that is certainly less than three days; right?
25   A    Correct.

Page 40

D. RIKARD

2    Q    Do you know who would have made the decision to
3 waive the 30-day requirement?
4    A    I do not.
5    Q    You testified earlier that the only -- the only
6 people with that authority are the board of supervisors and
7 the sheriff; right?
8    A    No, I don't know --
9         I don't know why this was waived.  I don't recall
10 it, so...
11   Q    Earlier I asked whether the county administrator
12 had the discretion to waive the 30-day requirement.
13        I believe you said that she did not.
14        Is that right or --
15   A    Yeah, to my knowledge she does not.
16   Q    So who does have that authority?
17   A    I believe the board of supervisors.  No one else.
18   Q    Not the sheriff?
19   A    No.
20   Q    And so the board of supervisors is the only
21 county government body with the authority to waive the
22 advanced notice requirement, but yet also you said the board
23 of supervisors has never, to your knowledge, considered any
24 particular -- any individual permit application?
25   A    I'm sorry.  Can you ask that again?

Page 41

D. RIKARD

2    Q    So you just testified that the board of
3 supervisors is the only county -- only, you know, body in
4 county government with the authority to waive the permitting
5 advanced notice requirement; correct?
6    A    To my knowledge, yes, sir.
7    Q    And that means the board of supervisors acting
8 together, right, not like individual supervisors acting on
9 his own?
10   A    I'm sorry.  You'll have to ask that again.
11   Q    In order for the board to waive this, it has to
12 be the board acting together, correct, by majority vote and
13 so forth, not --
14        Could you, yourself, without the involvement of
15 any other supervisors, waive this requirement?
16        MR. O'DONNELL:  Object to form.
17   A    No.  It has to be a majority.
18 BY MR. RETHY:
19   Q    Has the board of supervisors ever considered a
20 request to waive an advance notice requirement for a permit
21 application?
22   A    Not that I recall.
23   Q    To the extent this permit was applied for, for an
24 event two days after the application date, because the board
25 of supervisors didn't waive the requirement, this is

Page 42

D. RIKARD

1  D. RIKARD
2  contrary to county policy?
3      A   I don't understand the question.
4      Q   The board of supervisors did not waive the
5  requirement in connection with Mr. Warren's application that
6  we're looking at; correct?
7      A   I'm sorry.  I couldn't hear you.
8      Q   So look at document _264.  It's Tim Warren's
9  application?
10     A   Correct.
11     Q   And this is what we just discussed.
12         The application was two days before the event;
13  correct?
14     A   Correct.
15     Q   And do you see at bottom that it was granted;
16  correct?
17     A   Correct.
18     Q   And the board of supervisors did not approve a
19  waiver of the 30-day requirement for this application;
20  correct?
21     A   I do not recall this application or anything to
22  do with it.  I apologize.
23     Q   So this was a violation of county policy to
24  approve this, without waiving, in that the application was
25  two days before the event?

Page 43

D. RIKARD

1      MR. O'DONNELL:  Object to form.  Go ahead.
2      A   Well, the policy says that it can be waived.
3  BY MR. RETHY:
4      Q   But your testimony is that it can only be waived
5  by the board of supervisors.
6      A   To my knowledge, correct.
7      Q   And the board of supervisors did not waive it?
8      A   I didn't say that.
9         What I said was, I don't recall any -- this
10  entire permit.
11     VIDEOGRAPHER:  Excuse me.  We're going to have to
12  change the media.
13     MR. RETHY:  Let's take a five-minute break, if
14  that's okay.
15     VIDEOGRAPHER:  We're going off the record.  The
16  time is 10:59 a.m.
17     (Recess was taken.)
18     VIDEOGRAPHER:  This the start of media number 2.
19  We're now back on the record.  The time is 11:14 a.m.
20     MR. RETHY:  All right.  So I'm going to turn to
21  Tab 9A.  This is document _003.
22     THE WITNESS:  _003?
23     MR. RETHY:  _30.
24     THE WITNESS:  Okay.

Page 44

D. RIKARD

1      (Exhibit 9 was marked for identification.)
2  BY MR. RETHY:
3      Q   So I think you'll see this is another permit
4  application form; right?
5      A   I'm sorry?
6      Q   This is --
7         You can see this document is another permit
8  application form?
9      A   _003?
10     Q   _0030.
11     MR. O'DONNELL:  _30, right.
12     MR. RETHY:  Yeah.
13     THE WITNESS:  Oh, I'm sorry.  I am a little hard
14  of hearing.  I apologize.  I should have probably
15  stated that earlier.  I thought you said _03.  I
16  apologize.
17     MR. RETHY:  No problem.
18     THE WITNESS:  Okay.  I have that now.
19  BY MR. RETHY:
20     Q   Okay.  So now you see this is a permit
21  application; right?
22     A   Correct.
23     Q   Are you familiar with this document?
24     A   Again, same answer.  Familiar with the

Page 45

D. RIKARD

1  application, but not this application in particular.
2      Q   So do you see that this is from an organization
3  called Projection?
4      A   Yes.
5      Q   And the contact name is J.F. Rash?
6      A   Yes.
7      Q   Do you know what Projection is?
8      A   No.
9      Q   And if you go down to "Explanation of Use," it
10  says, "Artists installations with light and projectors onto
11  screens and courthouse objects."
12         Do you see that?
13     A   Yes.
14         I'm sorry.  I thought you were asking if I knew
15  like the entity Projections and who they were.
16         I do understand what "projection" is, yes.
17     Q   Right.  But I guess --
18         Yeah, I was talking about the specific group or,
19  you know, the --
20     A   I'm not familiar with them, no, sir.
21     Q   So do you know who John Rash is?
22     A   No.
23     Q   Do you have any recollection of projected images
24  being displayed, you know, on the courthouse walls or on

Page 46

D. RIKARD

1                    D. RIKARD
2 other buildings around the square?
3     A    Not on the courthouse.
4        I believe that City Hall has been used.  I
5 haven't witnessed it personally, but I've been told.
6     Q    So was the --
7        So you see here that the permit was denied,
8 right, at the bottom?
9     A    Correct.
10     Q    Did the board of supervisors consider this permit
11 application?
12     A    No.
13     Q    Do you have an understanding of who would have
14 made the decision to deny the permit?
15     A    Ms. Carwyle, the county administrator.
16        MR. RETHY:  Turn to Tab 38.  And this is a --
17 this is a photograph.  It's not -- it's not a document
18 with a Bates number.  This will be Exhibit 10.
19        (Exhibit 10 was marked for identification.)
20        THE WITNESS:  Exhibit B-10?
21        MR. RETHY:  No.  It's not in the package of
22 exhibits there with dash numbers.  It's a stand-alone
23 photograph.
24        THE WITNESS:  I'm sorry.  Tell me the number
25 again.

Page 47

1                    D. RIKARD
2        MR. RETHY:  Tab 38.
3        MR. O'DONNELL:  Isaac, when they printed off,
4 they didn't come across as a tab, reference to the Tab.
5        MR. RETHY:  So, I mean, is it something we can
6 get help?
7        MR. O'DONNELL:  Let me see if I can figure that
8 out.
9        Can you describe what it is?
10        MR. RETHY:  It's a photograph of an imaging
11 projected on the courthouse wall.
12        MR. O'DONNELL:  Okay.  There's two photographs.
13 One has two people shown with the projection, and the
14 other has three people.
15        MR. RETHY:  So there's three similar photographs.
16        MR. O'DONNELL:  And there's -- yeah, then there's
17 one projection on the statue itself.
18        Is that it?
19        MR. RETHY:  There's three photographs with
20 projection on the courthouse and one with projection on
21 the statue.  I'll introduce all of them since --
22        MR. O'DONNELL:  Okay.  Again, the tab reference
23 is what?
24        MR. RETHY:  This is Tab 38, 39, 40 and 41.
25        MR. O'DONNELL:  38 through 41.  I'll check that

Page 48

1                    D. RIKARD
2 again.
3        MR. RETHY:  If these are introduced -- I believe
4 we're at Exhibit 14 -- or through 13.  The next will be
5 14.
6        (Exhibit 11 was marked for identification.)
7        (Exhibit 12 was marked for identification.)
8        (Exhibit 13 was marked for identification.)
9        THE WITNESS:  Okay.  I have them.
10 BY MR. RETHY:
11     Q    All right.  So if you look at Tab 38, which is an
12 image of a projection of a scene where it looks like there's
13 sort of an overpass, and then there's some people on cars in
14 the foreground.
15     A    Okay.
16     Q    Is it correct that this is a projection on the
17 wall of the county courthouse?
18     A    I can't honestly identify if this is our
19 courthouse or not.  It's obviously a projection on a
20 building.
21     Q    And what about 39, which is a similar picture,
22 projection on the wall with some graffiti on it.
23     A    Do you know which side of the courthouse this
24 would have been on?
25     Q    I do not.

Page 49

1                    D. RIKARD
2     A    I mean, I agree it's a projection on a building.
3     Q    You have no recollection of these projections
4 having been made on the courthouse; right?
5     A    Not on our courthouse, I don't have any
6 recollection, no, sir.  I'm not aware.
7        It's not that I can't remember.  I'm just not
8 aware of any.
9     Q    If you look at the last image, it is a projection
10 on a column.  It says, "Take It Down."
11     A    Yes, sir.
12     Q    Do you see that?
13     A    I do, yes.
14     Q    Can you identify what that -- what those words
15 are being projected on?
16     A    That is a confederate monument in front of the
17 courthouse -- reflecting on a courthouse.
18     Q    Do you recall this having been projected on the
19 monument?
20     A    I did not see it, but I did hear about it.
21     Q    And how did you hear about it?
22     A    I mean, I don't recall exactly how I heard about
23 it.
24     Q    Do you recall any specific conversations about
25 this?

D. RIKARD

1
2    A    I mean, we were -- we were aware that it had
3 taken place, yes.  I was aware it had taken place, yes.
4    Q    Did you discuss this with the sheriff?
5    A    Yeah, I believe we did in executive session.
6    Q    What was the nature of that discussion?
7    A    I believe at the time it was just in general
8 conversation, you know, the courthouse and statue, and it
9 was just a general conversation about the -- about
10 everything going on at the time, the protests being
11 projected.  I know that it was a concern of the sheriff
12 because --
13         I hate to say this under testimony, but the way I
14 recollect it is that I believe it was being projected from
15 across the street, which was a concern for him about traffic
16 and the light being shown across the street.
17    Q    Did the board of supervisors take any action in
18 response to this projection?
19    A    I can't remember what action was taken.  I don't
20 remember us taking any action.
21    Q    Did the sheriff take any action?
22    A    Not that I recall.
23         MR. RETHY:  Let's go to -- go to Tab 11.
24         MR. O'DONNELL:  Which is what, Isaac?
25         MR. RETHY:  Forty-six.

D. RIKARD

1
2         MR. O'DONNELL:  Document 46.
3         THE WITNESS:  Okay.
4         MR. RETHY:  This is -- this will be Exhibit 14.
5         (Exhibit 14 was marked for identification.)
6 BY MR. RETHY:
7    Q    So this is an e-mail with the subject line "Ole
8 Miss Football March," right?
9    A    Right.  Okay.
10    Q    And the top e-mail is an e-mail that you sent;
11 correct?
12    A    Correct.
13    Q    Do you recall sending this e-mail?
14    A    I did.
15    Q    And do you recall the circumstances that are
16 being discussed in this e-mail chain?
17    A    Yes.  This was after a --
18         This was after a protest by the Ole Miss football
19 team that we were not aware of was going to happen.
20    Q    And was that --
21         Was that protest a cause for concern by the board
22 of supervisors?
23    A    The short answer is yes.  Anytime that we have a
24 large group of people that are walking up South Lamar, which
25 is one of our major -- one of our main streets in Lafayette

D. RIKARD

1
2 County, yes, it was a concern.  It doesn't matter who it is.
3    Q    In your e-mail you say, "I know this is taking a
4 toll on all of us."
5         Could you explain what you're referring to there?
6    A    Well, it was just a lot of e-mails, a lot of
7 conversation, you know.  It's -- there's nowhere to escape
8 from it.  You can't go to a high school football game.  You
9 can't go to an Ole Miss game.  I mean, the sheriff, I'm
10 sure, and the board of supervisors, this was on the
11 forefront, and it was 24/7.  It was media involved from
12 every -- even national media about it.
13         And so as far as taking a toll, it was just
14 countless e-mails, conversation.  I mean, it was just
15 basically nowhere to relax.
16         I know as far as the sheriff, it was taking a
17 toll.  Well, can't speak for him, but in conversations with
18 him, it was taking a toll on his deputies and the time they
19 were having to spend away from their families to provide law
20 enforcement for the protests.  So our community, we're not
21 used to those kind of things.
22    Q    So when you're discussing the --
23         So when you say it was taking a toll or this was
24 taking a toll, what specifically are you referring to by
25 "it" or "this," that description?

D. RIKARD

1
2         MR. O'DONNELL:  Object to form.  You can answer.
3    A    The word is "this," and the entire -- entire
4 situation, just -- actually 2020, I guess, as far as this
5 was concerned.  It was the protests and all of the stress
6 that it's not only putting on ourselves, but our families.
7         It's not this particular incident.  It's the
8 combination of everything that was going on regarding the
9 statues and the movements that were taking place.
10 BY MR. RETHY:
11    Q    If you look at the bottom of this page, the
12 e-mail from Joey East September 3, you see at the end, "I'll
13 be glad to speak with any of you about the events so that
14 you will understand what happened and how quickly things
15 escalate, why it is so important for us to continue to look
16 at safety issues and the permitting process."
17         Do you see that?
18    A    I do.
19    Q    And have you discussed with the sheriff, as he's
20 inviting you to do?
21    A    This permitting is always a work in progress.
22         I think the sheriff's concern was that we did
23 have this policy in effect.  And, you know, according to the
24 policy, the football players, athletic director, and our new
25 head football coach for the university were all in this

Page 54

D. RIKARD

1
2 march, and they were --
3         It's my understanding they were given permission
4 by the mayor to take a picture around the monument.  They
5 didn't have any authority that size of a gathering to become
6 stagnant and take pictures.
7         From what I was told the picture was to be taken,
8 and they were going to leave.  That didn't happen either.
9 So it puts our sheriff in an extremely difficult situation
10 to exemplify or enforce the ordinances, you know, in just a
11 matter of a few minutes.
12         Basically this happened without our knowledge
13 and, you know, the last thing we want to do is arrest or
14 cause any kind of conflicts with anyone.  So it would have
15 looked bad for us to be arresting our athletic director,
16 head football coach and director.
17         That's not the intent of the ordinance.  The
18 ordinance is to -- the intent is for protection of all our
19 citizens.
20         With the sheriff not knowing, what he wanted was
21 to maybe have some additional leeway with protests or
22 gatherings that were done out of emotion instead of having
23 to, like in this instance, just being able to -- you know,
24 having to make the decision in just a matter of moments
25 whether to arrest or force people off the property, whatever

Page 55

D. RIKARD

1
2 he has to do.
3     Q    So since this time have you continued to look at
4 the permitting process?
5     A    We have given leeway in the event that there is a
6 large community -- large community support to have something
7 around the courthouse, yes, that would be less than our
8 permitting process.
9         So basically if there's something that's a pretty
10 charged emotional -- regardless of what it is -- emotional
11 situation that people want to protest, then it's better, we
12 feel -- I feel -- speaking for myself -- to allow them to
13 protest instead of an emotionally charged situation like
14 that.  If you try to deter them, then it might cause an
15 adverse reaction.
16     Q    So is that reflected in any new orders or minutes
17 or other kind of formal county records?
18     A    Not that I'm aware of.
19     Q    But is it something that has been discussed with
20 the sheriff in terms of -- you know, in terms of having to
21 enforce the existing policies?
22     A    I'm sorry?
23     Q    So it's something that's been discussed with the
24 sheriff in terms of how best to enforce the existing
25 policies?

Page 56

D. RIKARD

1
2     A    In the situation I'm referring to here, a
3 spontaneous occurrence or spontaneous protest, then that has
4 been discussed that he has -- he has the leeway to allow
5 that to happen without having to enforce the policy.
6         MR. RETHY:  Okay, thanks.  So I'm going to move
7 to what will be Exhibit 15, and this is Tab 11B, a
8 document that starts with _364.
9         (Exhibit 15 was marked for identification.)
10 BY MR. RETHY:
11     Q    So you see the first --
12         So this is --
13         I guess what I'm looking at, and it may not be as
14 obvious for you, the structure, the document starts with
15 _364 and then goes up to _370.
16     A    Okay.  I have all that.
17     Q    This first page, letter from Sheriff East, is
18 this the letter that's being discussed in the e-mail chain
19 that we just looked at?
20     A    Correct.
21     Q    Then if you turn to the next page, you see this
22 is a letter from Mayor Tannehill; is that right?
23     A    Yes.
24     Q    Have you seen this letter before?
25     A    No, I have not.  I was never --

Page 57

D. RIKARD

1
2         I was not copied on the responses to the
3 sheriff's letters.
4     Q    Did you at any time discuss the mayor's responses
5 to the sheriff's letters?
6     A    No.
7     Q    If you turn to page _370.
8     A    Okay.
9     Q    You see this is a copy of a check from Ole Miss
10 Athletic Foundation to the Sheriff's Office?
11     A    Yes.
12     Q    Were you aware that the Athletic Foundation made
13 this payment to the sheriff?
14     A    No, sir, I was not.
15     Q    Do you have an understanding of the circumstances
16 under which the sheriff can charge a person or a group for
17 law enforcement services?
18     A    No.
19         MR. RETHY:  Let's go to Tab 12, Exhibit 16.
20         (Exhibit 16 was marked for identification.)
21 BY MR. RETHY:
22     Q    This is pages _55 to _56.
23     A    Okay.
24     Q    Do you see this is an e-mail from Lisa Carwyle
25 January 4, 2019?

Page 58

D. RIKARD

2    A    Yes.

3    Q    So do you have an understanding of what Oxford

4 Makers Market is?

5    A    Somewhat.

6    Q    What is your understanding?

7    A    They have previously set up in the courthouse

8 grounds, and I believe they -- I know there's a lot of, I

9 believe it's artwork and maybe some handmade items that

10 are -- that are on display.

11         I've never been to the market, so I don't know.

12    Q    Is it still set up on the courthouse grounds?

13    A    I couldn't tell you the last time that they were

14 set up on the courthouse grounds.

15    Q    Are you aware of any changes in the permitting

16 policy that would impact whether they could set up on the

17 courthouse grounds?

18    A    No.

19         MR. RETHY:  Let's go to 13.

20         (Exhibit 17 was marked for identification.)

21 BY MR. RETHY:

22    Q    Tab 13, which is document _178 to _179.

23    A    Okay.

24    Q    Exhibit 16 (sic).

25    A    I have _178, _179.

Page 59

D. RIKARD

2    Q    So if you see, this is an e-mail from Lisa

3 Carwyle September 9, 2019?

4    A    Okay.

5    Q    And do you see it looks like three e-mails down

6 she states, "I apologize that I'm not able to approve your

7 permit request.  Facilities Use Policy states the use of any

8 county facility that falls under this policy by

9 profit-making groups or for profit-making purposes and for

10 private social functions such as wedding, birthdays and

11 anniversary parties is prohibited."

12         Do you see that?

13    A    I do.

14    Q    And is it your understanding that that was a

15 revision to the policy that was implemented in 2019?

16    A    I don't recall.

17         MR. RETHY:  Let's do a new document.  This will

18 be Exhibit 17 (sic).  It's Tab 30, and this one is

19 FRYE0058 to _59.

20         (Exhibit 18 was marked for identification.)

21    A    _0058 to _59?

22    Q    Yes.  But it starts with the stamp "FRYE" rather

23 than with the county stamp.

24    A    You'll have to give me just a second.

25         Okay.

Page 60

D. RIKARD

2    Q    Do you see that this is an e-mail from Lisa

3 Carwyle dated February 26, 2019?

4    A    Yes, sir.

5    Q    Do you see that it's sent to --

6         The "To" line is Kevin Frye and supervisor.  So

7 this is an e-mail that you would have received via that

8 address?

9    A    Correct.

10    Q    And do you recall this e-mail exchange?

11    A    No, sir.

12    Q    So if you look at the top e-mail, Lisa Carwyle

13 says, "Yeah, your first three comments are on language that

14 was already in the policy and Makers Marker" -- presumably

15 meaning "Market" -- was allowed use before I ever came, so I

16 just kept letting them, even though it did not comply with

17 the language."

18    A    Okay.

19    Q    Do you understand what that means?

20    A    No.

21         Well, I mean, I'm not Ms. Carwyle.  I didn't

22 write the sentence.

23         My understanding is that she allowed them to

24 continue to use the courthouse even though, based on the

25 language, they shouldn't have been able to.

Page 61

D. RIKARD

2    Q    And is that --

3         Is that something that she has the authority to

4 do?

5    A    Well, she has the authority to deny permits, so

6 yes.

7    Q    She has the authority to grant permits even where

8 the permit doesn't comply with the ordinance?

9    A    Well, I think based on the statement you can see

10 that we weren't aware of it.

11    Q    When you say "we," you mean board of supervisors?

12    A    Correct.

13    Q    And are you implying that she didn't have the

14 authority?

15    A    No.

16         I'm just saying that we weren't aware that it was

17 going on.

18    Q    So does the county administrator have the

19 authority to grant permit applications where the application

20 doesn't comply with county policy?

21    A    I'm not --

22         I don't know the answer to that.

23    Q    So you said that --

24         You said that we didn't know that this was going

25 on.

Page 62

D. RIKARD

1
2    What did you mean by that?
3    A    We didn't know that they were being allowed to
4    use the -- or I didn't know that they were being allowed to
5    use it against policy language.
6    Q    And was --
7         Did you do anything to --
8         When you learned that, did you do anything in
9    response to that?
10   A    No.
11        I don't recall.  I don't recall this situation.
12        I think you have to understand, I mean,
13   leading --
14        This is all really preceding the situation with
15   the protests and marches and so you'd have to ask
16   Ms. Carwyle, but I'm sure there was probably some lenience
17   prior to all this going on.
18        MR. RETHY:  So I probably have an hour, hour and
19        a half more of questions, and so I don't know what
20        people, David, on your side want to do in terms of
21        taking breaks or breaking for lunch or not breaking for
22        lunch.  Let me know what do you think.
23        This is an okay time for a break, but I don't
24        know whether we need a full lunch break.  I'm
25        completely open to what you prefer.

Page 63

D. RIKARD

1
2         MR. O'DONNELL:  Yeah, Isaac, in a situation like
3    this we prefer to roll through lunch, but we can take a
4    five-minute break at your convenience, whatever.  But
5    yeah, since you've only got an hour, hour and a half to
6    go, and David's got some business to attend to today,
7    so he'd prefer to keep going.
8         MR. RETHY:  All right.  Let's -- let's take,
9    let's say, ten minutes now.
10        MR. O'DONNELL:  Okay, that's fine.
11        VIDEOGRAPHER:  We're going off the record.  The
12   time is 11:58 p.m. -- a.m.
13        (Recess was taken.)
14        VIDEOGRAPHER:  This is the start of media
15   number 3.  We're now back on the record.  The time is
16   12:29 p.m.
17   BY MR. RETHY:
18   Q    Are you familiar with something called the
19   Double-Decker Festival?
20   A    Yes.
21   Q    What is that?
22   A    Annual festival that the City of Oxford has.
23   Q    And that takes place in the square where the
24   courthouse is?
25   A    It does.

Page 64

D. RIKARD

1
2    Q    Does that take place in part on courthouse
3    grounds?
4    A    No, sir.
5         The event is --
6         Several streets are blocked off.  I believe it's
7    Van Buren and Jackson.  It's around the square and down
8    those streets.
9         It's a lot of arts and crafts and night music,
10   but it's -- generally there's nothing as far as anything
11   being set up at all on the courthouse grounds itself.
12   Q    Is this square ever crowded in the evenings?
13   A    Sure.
14   Q    When might that be?
15   A    We have seen an extra amount -- or amount of
16   growth to about 50,000 people in our county.  We're one of
17   the fastest-growing counties in the state numerous years.
18        The square and the makeup of the square, the
19   construction of the square, the design of the square has
20   never changed, so you can imagine the influx of people.
21        You know, generally lunchtime, afternoons, and
22   especially ballgame weekends -- or not even ballgame
23   weekends, but our baseball team --
24        When say "our," I mean the university.
25        But the baseball team is really good, and we

Page 65

D. RIKARD

1
2    bring in one of the largest crowds for baseball in the
3    country.
4         So any given weekend when there is any type of
5    athletics or a graduation just, I mean, it's a very busy,
6    busy place.
7    Q    That extends into the evening or night; right?
8    A    Correct.
9    Q    And are you familiar with there being a dedicated
10   detail of City of Oxford police that patrols the square?
11   A    Yes.
12   Q    And what's your understanding of that detail?
13   A    Well, I'm 44, so I don't go to the bars anymore,
14   but passing through I know that, I believe it's Jackson
15   Avenue, I know they have -- I believe they call it the
16   mounted patrol with the horses and the law enforcement.
17        And then --
18        This is just my assumption, but there's also a
19   tent that's set up in the event that somebody needs
20   immediate help, and I have seen the policemen out there
21   playing Cornhole that's set up in front of that tent
22   intentionally to -- I'm assuming, again, intentionally to
23   keep a good rapport with the students and people that are
24   out at night just to make sure that they're there to help
25   and able to -- people feel comfortable being around them and

Page 66

D. RIKARD

1  ask for help.
2      Q    And do you think in general that the Oxford
3  police are capable of patrolling the square?
4      A    I do.
5      Q    And do you have an understanding of there being
6  any video cameras, video surveillance of the square or the
7  courthouse grounds?
8      A    Yes.
9      Q    What's that understanding?
10     A    I just know, I mean, through law enforcement that
11 there are.  I don't know where the actual location of the
12 cameras are, but I know there are cameras on the square, and
13 that was due to -- my understanding, it was due to --
14          I mean, after a ballgame weekend, again, it's a
15 very small area.  I mean, we'll bring 50,000 additional
16 people into the city, and so the streets are extremely
17 crowded.  And so just to make sure that for the safety of
18 the people that are patronizing the bars that everyone is
19 safe.
20     Q    Are you aware of any cameras that are installed
21 by the county or county property or feed to the Sheriff's
22 Department?
23     A    We discussed it.  I don't know that --
24          I can't remember if we purchased those.  I know

Page 67

D. RIKARD

1  it was, we were trying to --
2          The last thing that I remember was --
3          You know, we only own the courthouse and the
4  statue, and so therefore we would have had to place the
5  cameras on personal property to be able to video the
6  courthouse and the grounds.
7          We would have had to get permission from, you
8  know, an owner -- property owner to be able to install it.
9  And they may be installed.  I'm not sure.
10     Q    Do you personally have access to surveillance
11 video footage from the square?
12     A    No.
13     Q    Do you communicate with other supervisors by text
14 message?
15     A    In general communication, yes.
16     Q    And do you have like a group text among the --
17 among the five supervisors?
18     A    Not that like, per se, Ms. Carwyle had that said
19 "Supervisors" or something like that, no, sir, we don't.
20          It's not a thread that is used.  It's not like
21 saved on my phone, if that's the question.
22          If I wanted to text everyone, I would have to go
23 and enter each name into the text thread to send a message.
24     Q    Right, but that's something you've done before?

Page 68

D. RIKARD

1      A    Yeah, I have.
2      Q    And what sort of communications do you engage in
3  with the other supervisors in group text?
4      A    Well, I mean hunting or possibly the death of
5  someone, people who are sick, you know.  It's important for
6  us, especially with the people that are well-known in the
7  community, you know, if something happens to them, we need
8  to send our condolences or, you know, prayers for them if
9  they're sick.
10          So we do try to keep each other informed in
11 circumstances like that.
12     Q    What about topics like the ones we've been
13 discussing here like the permitting process or protests or
14 anything of that nature?
15     A    No, sir.
16     Q    Why not?
17     A    Sunshine Law prohibits us from making any
18 discussion -- or not making any discussion, but making any
19 policy or decisions without a public forum or in the
20 executive session.
21          MR. RETHY:  So I'm going to turn to Tabs 32, 33
22     and 34, and these are all pictures.  They're pictures
23     of the statue.
24          MR. O'DONNELL:  These are marked on the bottom.

Page 69

D. RIKARD

1      A    Some of them have exhibit numbers.
2  BY MR. RETHY:
3      Q    It's not among those.
4      A    Okay.  Can you describe which picture you want me
5  to take a look at?
6      Q    Just a second.
7          32 is an image of the base of the statue.
8      A    Okay.  Does it have a drawing in the picture to
9  the left of it where it says "Erected 1907"?
10     Q    Is there like a drawing of a truck or something
11 of that nature?
12     A    Yes.
13     Q    That's right.
14     A    All right.
15     Q    And then 33 is just a picture of the whole
16 statue.
17     A    Okay.
18     Q    And 34 is the statue at night and some people
19 carrying apparently the football goal post.
20     A    That would be Florida.  They were number one in
21 the country at the time and tore the goalpost down.  The
22 funny --
23          Well, the thing about this was, that was an
24 afternoon game -- or actually, it may have been an 11:30

Page 70

D. RIKARD

1    game, and they're still partying and taking it at night.
2    Q    Right.
3         So this kind of --
4         So in this photo with the goalposts, so under
5    current policy that would be a violation; is that right?
6    A    Well, in this exact circumstance, this is the
7    leeway that the sheriff would have because this is something
8    that doesn't happen on a daily occurrence, and we don't beat
9    the number one team in the country very often.
10        So this would be something that was a very
11   spontaneous large crowd that he would have the leeway to
12   determine how to best proceed. Exhibits 18 (sic) 19, 20.
13            (Exhibit 19 was marked for identification.)
14            (Exhibit 20 was marked for identification.)
15            (Exhibit 21 was marked for identification.)
16   BY MR. RETHY:
17   Q    Got it.  So look at Tab 32, the base of the
18   statue.  So this is --
19        You're familiar with the statue generally; right?
20   A    Right.
21   Q    And you're familiar with this inscription that's
22   reflected in this picture?
23   A    Most definitely, yes, sir.
24   Q    And so it says, "In memory of the patriotism of
25

Page 71

D. RIKARD

1    the confederate soldiers in Lafayette County, Mississippi.
2    They gave their lives in a just and holy cause."
3         What is your understanding of the meaning of
4    "They gave their lives in a just and holy cause"?
5    A    My understanding is, this was put up by the
6    Daughters of the Confederacy, I believe, and that was
7    their -- that was their opinion at the time.
8         I don't know if I have the right to do this, but
9    I think it's very pertinent to this conversation.
10        If you notice in that picture --
11        And actually, the other is a better example, the
12   picture where it shows the entire monument.  There are --
13   there are -- those are considered cannonballs at the corner
14   or the base of the monument, and I know -- you'll see that
15   was stolen.
16        So it just kind of adds value to our Sheriff's
17   Departments can't be everywhere at all time.  That marble
18   cannonball is extremely expensive, and it's been stolen I
19   believe on more than one occasion, which actually, like I
20   said, it's missing in this picture.  So there's a lot of
21   value there of how much our Sheriff's Department can
22   regulate a situation that's right in the city, you know, the
23   center of our city.
24   Q    Do you recall any efforts made at any point in
25

Page 72

D. RIKARD

1    time to contextualize the statue?
2    A    Yes.
3    Q    What's your recollection of that?
4    A    A committee was put together at the request of
5    some community, I believe, and we -- board of supervisors
6    were in favor of it and still in favor of it.  It's to --
7         It's in remembrance of the -- some of the men
8    that -- men we know of that were lynched in Lafayette
9    County.
10        MR. RETHY:  Could you turn to -- turn to Tab 29.
11   So this is FRYE50 to _51.
12            (Exhibit 22 was marked for identification.)
13        THE WITNESS:  Have we looked at those before
14   already?  Sorry, I'm trying to put them back in the
15   same order.  I've got a bunch of the FRYE
16   documentation.
17        MR. RETHY:  I think I've gotten sloppy stating on
18   the record the exhibit numbers, but I believe this is
19   Exhibit 22.
20        MR. O'DONNELL:  Tab 22?
21        MR. RETHY:  This is Exhibit 22, Tab 29.
22        MR. O'DONNELL:  I've got it.
23        Okay, the FRYE documents, which tab were they in?
24        MR. RETHY:  29.
25

Page 73

D. RIKARD

1         MR. O'DONNELL:  29, okay.  Let me take a look.
2         THE WITNESS:  Tab 50 and 51.
3    BY MR. RETHY:
4    Q    This is an e-mail from Lisa Carwyle dated
5    November 1, 2017?
6    A    Correct.
7    Q    And the subject is "Wording for
8    Contextualization."
9         And it was sent to the supervisors e-mail, which
10   means that as a supervisor you would have received a copy?
11   A    Right.
12   Q    Do you recall this e-mail?
13   A    I do.
14   Q    And what were the circumstances in 2017
15   surrounding this contextualization draft or this attempt at
16   contextualization?
17   A    Can you ask me that question again, please?
18   Q    I'll go ahead a different way.
19        What was the study group referenced in the
20   e-mail?
21   A    It was a group of --
22        I don't remember who actually was on this, but it
23   was I believe some historians, some very well-respected
24   people from the community that were requested to serve, and
25

Page 74

D. RIKARD

1
2  by serving, to get together and come up with some language
3  to place on the plaque.
4      Q    You said to place on what?
5           Sorry. I couldn't hear the last word.
6      A    On the plaque, contextualization plaque.
7      Q    Was the plaque ever put in place?
8      A    No.
9           We met with the committee at our last board
10 meeting. And I actually have a Zoom meeting with them set
11 up for Friday at 10:00.
12          We're still working on it, but we are in the very
13 final stages and hope to do it at our next board meeting,
14 which will be -- I'm sorry -- third Monday of this month.
15 That's what we're hoping to be able to do.
16     Q    So this is --
17          Has this been a continuous process since 2017, or
18 did it kind of stop at some point and then restart more
19 recently?
20     A    It kind of stalled, yes.
21     Q    And when did it stall?
22     A    I don't recall when it stalled.
23     Q    Do you recall why it stalled?
24     A    I don't recall why it stalled.
25          I do know that this year they wanted to come back

Page 75

D. RIKARD

1
2  earlier in the year, but due to COVID they decided to
3  postpone it.
4      Q    If you turn to the second page of this document.
5      A    Okay.
6      Q    The proposed wording.
7      A    Yes.
8      Q    Do you recall reading this proposed wording?
9      A    I do.
10     Q    And did you support this or not?
11     A    Yes. I voted for it. I voted in favor.
12     Q    Of this language?
13     A    I don't remember this language being changed. It
14 may have been, but if this is the language that was brought
15 to the board, I did vote in favor of it, yes.
16     Q    And what was the --
17          Do you remember what the -- what the vote was?
18     A    4-1, I believe.
19     Q    4-1 in favor or against?
20     A    In favor of it.
21     Q    And do you recall which member of the board voted
22 against?
23     A    Yeah, this is '17.
24          I believe Mr. McLarty had an issue with some of
25 the wording. I can't remember the exact word, but it was

Page 76

D. RIKARD

1
2  "presumed" or something along those lines that -- or
3  "alleged." That was the word. It was "alleged."
4          Mr. McLarty didn't agree with the "alleged" being
5  in there. And with that, I believe it had to be resubmitted
6  to the Archives in History, which was part of the delay
7  because they had to approve anything that goes on the
8  courthouse grounds. It is a historical -- the entire
9  grounds are a historical area.
10         But once that was changed and okayed, then
11 Mr. McLarty was okay with it as well.
12     Q    So is the wording reflected in this document
13 going to be on the plaque that is going to be considered at
14 the next board of supervisors meeting?
15     A    I'm not sure. That's what the meeting is for on
16 Friday.
17     Q    And you mentioned something about an objection to
18 the use of the word "alleged"?
19     A    Yes, but that was Mr. McLarty. That's just my
20 recollection. It would be better for him to answer that
21 question.
22     Q    And I think that you -- sorry, strike that.
23          MR. RETHY: Let's go to Tab 24, which is _1583 to
24     _1584.
25          (Exhibit 23 was marked for identification.)

Page 77

D. RIKARD

1
2          MR. RETHY: This is Exhibit 23.
3          MR. O'DONNELL: Is that Tab 24?
4          MR. RETHY: Yeah.
5      A    Okay.
6  BY MR. RETHY:
7      Q    Do you recall --
8          This document has two unrelated e-mails, one of
9  them to each page.
10         Do you recall either of these e-mails?
11     A    No.
12     Q    So they're referencing a vote about the statue
13 removal.
14         Do you recall that vote?
15     A    I do.
16     Q    And that was a vote about whether to remove or
17 relocate the confederate statue; right?
18     A    Correct.
19     Q    And the board of supervisors voted not to remove
20 it; correct?
21     A    Correct.
22     Q    Including yourself?
23     A    Correct.
24     Q    Could you explain the reasoning behind that vote?
25     A    Based on state law, it has to stay on the

Page 78

D. RIKARD

1    entity's property that it belongs to, which means it has to
2    stay on Lafayette County property. And we just didn't see
3    any suitable place at the time for it to be moved, or I
4    didn't see any suitable place.
5        Q    What would you have considered to be a suitable
6    place?
7        A    I don't know what's a suitable place, but in
8    front of another building isn't the place for it, another
9    government-owned building, and that's pretty much all that
10   we own at this point.
11       MR. RETHY: Lets' go to Tab 21. This is _1459 to
12   _61.
13       (Exhibit 24 was marked for identification.)
14       THE WITNESS: _59 through _61?
15       MR. RETHY: _1459 through _61, yeah.
16       THE WITNESS: Okay.
17   BY MR. RETHY:
18       Q    This is an e-mail and attachment, and it appears
19   that it was produced sort of in reverse order so that the
20   attachment is page 1, and then the second page of the e-mail
21   is page 2., and the front page of the e-mail is page 3.
22           Looking at the --
23           Looking at page 3, which is the front page of the
24   e-mail, do you see that this is an e-mail from Eunice Benton

Page 79

D. RIKARD

1    to yourself and copied the other supervisors; correct?
2        A    Correct.
3        Q    Do you recall this e-mail?
4        A    No, sir.
5        Q    Are you familiar with who Eunice Benton is?
6        A    No. I do --
7            This other document, _1583, Kim Kelley-Rhinewalt,
8    I knew or know of her, and I did have a town hall meeting
9    with some of her associates. I just want to clarify that.
10           But I don't know Ms. Eunice Benton or Steve
11   Scott. I haven't met with them or know them.
12       Q    If you look at the attachments --
13           So this is _1459, an attachment titled "Take It
14   Down Oxford."
15       A    Okay.
16       Q    You see there's number 3 -- skip it.
17           Number 4 states, "The monument brings white
18   supremacists, many from outside our community, to see the
19   square as their space rather than our community's space."
20           Do you agree with that statement?
21       A    I would agree that there have been some white
22   supremacists --
23           Well, I don't know that they're white
24   supremacists. They were confederate advocates that have

Page 80

D. RIKARD

1    come from outside our community to the square.
2            And I don't know if "protest" is the right word,
3    but the gentleman we mentioned earlier --
4            I can't even think of his name now.
5        Q    George Johnson?
6        A    George Johnson, yes, he's been to the square
7    several times, and he does not live in Lafayette County.
8            I don't know if he's a white supremacist or not.
9    I don't have conversations with him. I can tell you he
10   does -- does have confederate flags and those type of
11   things.
12       MR. RETHY: Let's look at Tab 25.
13       (Exhibit 25 was marked for identification.)
14   BY MR. RETHY:
15       Q    This is _1587 to _1588.
16       A    Let me make sure I have that. Give me a second.
17       Q    This is an e-mail exchange between you and Eunice
18   Benton; correct?
19       A    Yes.
20       Q    Do you recall this conversation?
21       A    I know this is my e-mail. Reading it, I remember
22   it, but as far as this being on the top forefront of my
23   memory, no.
24       Q    One of the things you say in your e-mail is, "The

Page 81

D. RIKARD

1    IHL has taken years to come up with a suitable place and
2    rendering."
3            Could you explain what that refers to?
4        A    Yeah. IHL is the governing body over the
5    colleges in the state, and there's also a confederate
6    monument on the -- in or around the circle at the university
7    and, like with the board of supervisors, it was requested to
8    be taken down.
9            I mean, it's that same amount of time that I can
10   think of, at least probably three or four years, that it
11   wasn't moved for whatever reason, and it was only recently
12   located I think a few months back -- three or four months
13   back to a confederate cemetery on the university grounds
14   that they deemed was more suitable than the circle.
15           It's also a very costly task. So it's not just
16   something that, you know, is having a wrecker pull up, pick
17   it up and move it. We would have to amend our budget if we
18   were going to do it.
19           I don't know how the IHL came up with their
20   funds.
21           For our board it would take a -- it would be a
22   pretty extenuating circumstance or process.
23       Q    Now let's turn to Tab 27. This is _1623 through
24   _1634, and this is a printout of text messages, if that

Page 82

```
                    D. RIKARD
1
2   makes it easier.
3       A    I wanted to --
4            When you asked me earlier about this -- or the
5   conversation or e-mail with the sheriff that said this is
6   taking a toll on us, this is the "this."
7            If you --
8            I mean, if you see that, that e-mail says,
9   "Completely appalled.  What a group of white boys you are."
10           I mean, that's --
11           For a person like me, and I can pretty much speak
12  for the board, that's not in any shape, form or fashion the
13  type of people that we are.  So that is --
14           And the sheriff catches a lot of the grief too.
15  So that's the "this" that I was referring to in that e-mail.
16           So I apologize.  What did you want me to --
17      Q    It's Tab 27, _1623 to _1634, and it's a
18  compilation of text messages.
19           (Exhibit 26 was marked for identification.)
20      A    Okay, I have 1623 and 1624.
21  BY MR. RETHY:
22      Q    _1623 to _1634?
23      A    Oh, 34, okay.
24      Q    Do you recognize these as text messages sent and
25  received by you?
```

Page 83

```
                    D. RIKARD
1
2       A    Yes.
3       Q    So if you turn to _1633, who is Mr. McGregor?
4       A    He is --
5            He owns a welding company.  He was on the
6   Lafayette County School Board.  He was not reelected in this
7   last election.
8       Q    He sent you this text, and you reacted with a
9   thumbs up and "Thanks for the text," right?
10      A    Right.
11      Q    Do you agree with his characterization of that
12  you were standing up to the statue removal mob?
13      A    Again, we weren't --
14           The intention was not to stand up to anyone.  We
15  didn't have anywhere to place the monument.
16      Q    So you don't agree with this characterization of
17  the situation?
18      A    I don't agree with his assessment there.  Bill
19  McGregor is not a friend of mine.
20      Q    Looking at _1631.
21      A    Okay.
22      Q    Who is Cristen Hemmins?
23      A    She is the chair of the Democratic Party in
24  Lafayette County.
25           And she says, "Does Johnny Morgan have a lot of
```

Page 84

```
                    D. RIKARD
1
2   influence over the board?  Be honest."
3            Who is Johnny Morgan?
4       A    Johnny Morgan is a local business owner.  He
5   spoke when we had, I believe it was the June 6th meeting.
6   We allowed a limited forum to allow people from each side to
7   speak about removing or leaving the statue where it is.
8   Johnny Morgan spoke in favor of leaving the statue where it
9   is.
10      Q    You say you consider Johnny a friend in response
11  to that; is that correct?
12      A    Yes, I do.
13      Q    And you say you've known him through Brad Camp
14  for a long time.
15           Who is Brad Camp?
16      A    Brad Camp, a friend of mine.  He works for Johnny
17  Morgan.
18      Q    Do you share Mr. Morgan's views regarding removal
19  of the statue?
20      A    Just to clarify, he is not in favor of
21  relocating.
22           And I think I made myself clear my point of
23  relocating.  I can answer again if you want me to.  I mean,
24  I don't --
25           I'm indifferent to where the statue is but,
```

Page 85

```
                    D. RIKARD
1
2   again, it's a very costly process as well to have it moved
3   as well as having -- the main thing is having a place to put
4   it.
5       Q    If you'd turn to --
6            Sorry.  I didn't mean to cut you off.
7            Turn to _1526.
8            Do you recognize the person in this photograph?
9       A    I have no idea who this person is.
10           In the photograph?
11           I'm sorry.  In the photograph or sent the
12  photograph?
13      Q    The person in the photograph.
14      A    What number we on?
15      Q    _1626.
16      A    Oh.
17      Q    Same package of texts.
18      A    I apologize.
19           Yes, that's the gentleman we just mentioned,
20  George Johnson.
21      Q    So you wouldn't agree that he's your new best
22  buddy, I assume?
23      A    No, sir.  We're not new buddies, old buddies or
24  buddies.
25           I don't share the same views Mr. Johnson does.
```

D. RIKARD

1
2      MR. RETHY:  I guess that's enough with that one.
3  I'm pretty close to being done, I think.
4      Could we go off the record for five minutes?  I
5  just need to sort of collect my thoughts as to whether
6  there's anything else.
7      MR. O'DONNELL:  Okay, that's fine.
8      VIDEOGRAPHER:  We're going off the record.  The
9  time is 1:22 p.m.
10      (Recess was taken.)
11      VIDEOGRAPHER:  We're back on the record.  The
12  time is 1:33 p.m.
13      MR. RETHY:  All right.  I've got one last
14  document, and then be done.  This is Tab 22, _1535.
15      (Exhibit 27 was marked for identification.)
16  BY MR. RETHY:
17      Q    This is an e-mail to you from Ana Martinez;
18  correct?
19      A    Right.
20      Q    Do you recall this e-mail?
21      A    Ms. Martinez, she sent me several e-mails.
22           This one in particular, no.  I didn't respond to
23  any of her e-mails.
24      Q    So she says, "Calling to ask you a question
25  regards to the barricaded statue."

D. RIKARD

1
2      Q    Do you know what she's referring to there?
3      A    Yes.
4      Q    What is she referring to?
5      A    The sheriff placed barricades around the statue.
6      Q    When did that happen?
7      A    I don't know the exact date it was actually --
8      MR. RETHY:  Seems like the video might have
9  frozen.
10      VIDEOGRAPHER:  Yeah, it looks froze to me.  Want
11  to go off the record?
12      MR. RETHY:  I suppose so.
13      VIDEOGRAPHER:  Going off the record.  The time is
14  1:35 p.m.
15      (Recess was taken.)
16      VIDEOGRAPHER:  We're back on the record.  The
17  time is 1:44 p.m.
18  BY MR. RETHY:
19      Q    Okay.  So before we broke off due to a technical
20  issue, we were talking about this e-mail from Ana Martinez
21  and barricades around the statue, and I was attempting to
22  learn more about approximately when those barricades were
23  put up and the reason for that being done.
24      A    I really don't -- I don't know the --
25           I think they were put up on several occasions,

D. RIKARD

1
2  but I don't know.  That was strictly the sheriff's call.
3      Q    Do you know the rationale for it?
4      A    No, sir.
5      Q    And are there barricades there currently?
6      A    No, sir, and haven't been.
7      Q    So were the barricades put up and then removed
8  relative -- such that they were up for a relatively short
9  period of time each time they were put up?
10      A    Again, the sheriff would know.  I don't --
11           I don't know the week that they were put up or
12  even the dates or how many times.
13           Again, that was something that he would do at his
14  discretion for whatever he deemed necessary.  I'm not sure.
15      Q    The e-mail continues, "I also wanted to ask why
16  you guys weren't allowing anyone on the courthouse grounds
17  after 5 p.m."
18           Do you know what that refers to?
19      A    I'm going to look at a calendar real quick.
20           So June 3rd would have been after our first board
21  meeting.
22           I can't remember when the -- when I went -- when
23  the curfew went into effect for 5:00.
24           We had a curfew way before my tenure at 10 p.m.,
25  but as far as for this exact question, I'm sorry, I don't

D. RIKARD

1
2  know.
3      Q    So you mentioned a 10 p.m. curfew.
4           Is that a curfew specifically related to the
5  courthouse grounds or more general curfew?
6      A    No, the courthouse grounds.
7      Q    And do you know whether in fact there was a
8  5 p.m. curfew on the courthouse grounds as of June 3, 2020?
9      A    No.
10      Q    No, you don't recall or, no, there wasn't?
11      A    No, I don't recall.
12      Q    So who is --
13           Does the sheriff have the authority to -- to
14  unilaterally impose a curfew?
15      A    That's -- I don't know about the policy on that.
16      Q    Did the board of supervisors vote to impose a
17  5 p.m. curfew?
18      A    I don't recall that, no.
19      Q    Do you recall there being a 5 p.m. curfew in
20  effect on the courthouse grounds at any time in 2020 prior
21  to the enactment of the July 20 policy with the
22  30-minutes-before-dusk provision?
23      A    No.
24      Q    Barricades --
25           Do you recall what the barricades looked like?

Page 90

D. RIKARD

2    A    Orange cones.

3    Q    Was there law enforcement present at the

4 barricade?

5    A    You'll have to ask the sheriff that.

6    Q    Is it the board's present intention to continue

7 the 30-minutes-before-dusk closure policy indefinitely?

8    A    Yes.  At this time, yes.

9         MR. RETHY:  I don't believe I have any further

10 questions.  Thank you for your time.

11         MR. O'DONNELL:  I have no questions.

12         VIDEOGRAPHER:  This the end of the deposition.

13 The time is 1:50 p.m.

14         MR. O'DONNELL:  This is David O'Donnell.  I'll

15 need a written transcript, please.

16         MR. RETHY:  For Plaintiff, if we could get the

17 rough transcript when that's available, and then just

18 ordinary delivery of the final.

19         (Whereupon, the deposition was concluded at

20     1:50 p.m.)

21                    _____

22                    DAVID RIKARD

23 Subscribed and sworn to before me this

24 ___ day of _____, 2020.

25

Page 91

2    C E R T I F I C A T E

4         I, Gina Williams, Registered Professional

5 Reporter, certify that I was authorized to and did

6 stenographically report the foregoing deposition; and that

7 the transcript is a true record of the testimony given by

8 the witness; that the witness did not waive reading and

9 signing.

10         I further certify that I am not a relative,

11 employee, attorney, or counsel of any of the parties, nor am

12 I a relative or employee of any of the parties' attorney or

13 counsel connected with the action, nor am I financially

14 interested in this action.

15         IN WITNESS WHEREOF, I have hereunto set my hand

16 this 28th day of December, 2020.

17

18                    _____

19                    Gina Williams, RPR, CRR, CRC

20

21

22

23

24

25

Page 92

D. RIKARD

I N D E X

3 DAVID RIKARD

4    EXAMINATION BY MR. RETHY                          5

5                    - - - -

6    E X H I B I T S

7 EXHIBIT NO.:

8    Exhibit 1   Facility Use Policy dated April 20,    10
                 2015 Bates Lafayette County DOC000002
9                through _05

10   Exhibit 2   Facility Use Policy dated March 4,     12
                 2019, Bates Lafayette County
11               DOC000006 through _10

12   Exhibit 3   Order: Amend Facility Use Policy       17
                 Regarding Use of Courthouse Grounds,
13               Bates Lafayette County DOC000052

14   Exhibit 4   Order: Approve Revision of Facilities  23
                 Use Policy to Include a Requirement
15               of Application to be Made 14 Days
                 Prior to Date of Proposed Use and
16               Requiring Closure of Courthouse
                 Grounds 30 Minutes Before Dusk, Bates
17               Lafayette County DOC000020

18   Exhibit 5   Facility Use Applicant and Permit,     30
                 Bates Lafayette County DOC000001

19

20   Exhibit 6   Facility Use Application and Permit,   31
                 Bates Lafayette County DOC000022

21   Exhibit 7   E-mail Chain dated June of 2020,       34
                 Bates Lafayette County DOC000261
22               through _265

23   Exhibit 8   E-mail dated June 18, 2020 Titled      37
                 "Tomorrow is a PR Disaster for
24               Oxford" Bates Lafayette County
                 Doc001438

25              E X H I B I T S

Page 93

D. RIKARD

2 EXHIBIT NO.:

3    Exhibit 9   Facility Use Application and Permit,   44
                 Bates Lafayette County DOC000030

4

5    Exhibit 10  Photograph                             46

     Exhibit 11  Photograph                             48

6

     Exhibit 12  Photograph                             48

7

     Exhibit 13  Photograph                             48

8

9    Exhibit 14  E-mail Chain dated September 3, 2020,  51
                 Bates Lafayette County DOC000046 and
10               _47

11   Exhibit 15  Letter to Mayor Robyn Tannehill,       56
                 Bates Lafayette County DOC000364
12               through _370

13   Exhibit 16  E-mail Chain dated October 12, 2018    57
                 and January 4, 2019, Bates Lafayette
14               County DOC000055 and _56

15   Exhibit 17  E-mail Chain dated August and          58
                 September of 2019, Bates Lafayette
16               County DOC000178 and _179

17   Exhibit 18  E-mail Chain dated February 26, 2019,  59
                 Bates FRYE0058 and _59

18   Exhibit 19  Photograph                             70

19   Exhibit 20  Photograph                             70

20   Exhibit 21  Photograph                             70

21   Exhibit 22  E-mail dated November 1, 2017, Bates   72
                 FRYE0050 and _51

22

23   Exhibit 23  E-mails dated July 6, 2020, Lafayette  76
                 County Doc001583 and _84

24

25              E X H I B I T S

Page 94

```
1                    D. RIKARD
2   EXHIBIT NO.:
3      Exhibit 24  E-mail dated June 22, 2020 and        78
                   Attachment Titled "Take It Down
4                  Oxford" Bates Lafayette County
                   Doc001459 through _1461
5
       Exhibit 25  E-mail Chain dated July 6, 2020,      80
6                  Bates Lafayette County Doc001587 and
                   _88
7
       Exhibit 26  Copy of Text Message dated July 6,    82
8                  Bates Lafayette County Doc001623
                   through _34
9
       Exhibit 27  E-mail dated June 3, 2020, Bates      86
10                 Lafayette County Doc001535
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 95

```
1                         ERRATA SHEET
2   Case Name:
3   Deposition Date:
4   Deponent:
5   Pg.  No. Now Reads     Should Read  Reason
6   ___  ___ _____    _____   _____
7   ___  ___ _____    _____   _____
8   ___  ___ _____    _____   _____
9   ___  ___ _____    _____   _____
10  ___  ___ _____    _____   _____
11  ___  ___ _____    _____   _____
12  ___  ___ _____    _____   _____
13  ___  ___ _____    _____   _____
14  ___  ___ _____    _____   _____
15  ___  ___ _____    _____   _____
16  ___  ___ _____    _____   _____
17  ___  ___ _____    _____   _____
18  ___  ___ _____    _____   _____
19  ___  ___ _____    _____   _____
20
21                         _____
22                         Signature of Deponent
    SUBSCRIBED AND SWORN BEFORE ME
23  THIS ____ DAY OF _____, 2020.
24  _____
25  (Notary Public)   MY COMMISSION EXPIRES:_____
```

Index: 000006..advance

**0**

**000006** 12:13

**001** 22:25 33:25

**0020** 30:3,7

**003** 43:22,23 44:10

**0030** 44:11

**0052** 17:22

**0058** 59:21

**03** 44:16

**1**

**1** 4:13 10:2,8 14:24 33:21,24 73:6 78:21

**10** 46:18,19 88:24 89:3

**10017** 3:7

**10:00** 74:11

**10:59** 43:17

**11** 48:6 50:23

**11:14** 43:20

**11:30** 69:25

**11:58** 63:12

**11B** 56:7

**12** 48:7 57:19

**12:29** 63:16

**13** 48:4,8 58:19,22

**14** 13:24,25 15:23 16:2,7 23:18 34:15 48:4,5 51:4,5

**1403** 3:19

**1438** 36:24

**1459** 78:12,16 79:14

**15** 4:19 21:15 37:13, 25 56:7,9

**1526** 85:7

**1535** 86:14

**1583** 76:23 79:8

**1584** 76:24

**1587** 80:16

**1588** 80:16

**16** 57:19,20 58:24

**1623** 81:24 82:17,20, 22

**1624** 82:20

**1626** 85:15

**1631** 83:20

**1633** 83:3

**1634** 81:25 82:17,22

**17** 58:20 59:18 75:23

**178** 58:22,25

**179** 58:22,25

**18** 35:2 59:20 70:13

**19** 32:17 34:7 36:9, 11,24 37:25 70:13,14

**1907** 69:10

**19th** 37:21

**1:22** 86:9

**1:33** 86:12

**1:35** 87:14

**1:44** 87:17

**1:50** 90:13,20

**2**

**2** 10:25 12:8,12 14:25 43:19 78:22

**20** 14:19 15:4 30:3 33:23 70:13,15 89:21

**2015** 9:18 15:4

**2016** 9:19

**2017** 73:6,15 74:17

**2019** 11:4 13:5,8,11, 14 15:15,18 57:25 59:3,15 60:3

**2020** 4:19 14:19 28:14 29:9 32:17 34:3,25 36:14 53:4 89:8,20 90:24

**20th** 34:3

**21** 70:16 78:12

**22** 31:20 72:13,20,21, 22 86:14

**2242** 3:13

**23** 76:25 77:2

**24** 76:23 77:3 78:14

**24/7** 21:22 52:11

**25** 80:13,14

**26** 60:3 82:19

**261** 34:17 39:11

**262** 35:20

**264** 39:13 42:8

**265** 34:17,22 39:11

**27** 81:24 82:17 86:15

**29** 72:11,22,25 73:2

**3**

**3** 17:19,21,22 18:5,6 39:3,5 53:12 63:15 78:22,24 79:17 89:8

**30** 13:24,25 14:10 15:15,23 16:2 21:15 23:20 24:3,4,18 27:12 33:13,17 43:24 44:12 59:18

**30-day** 14:20 21:24 22:2,6,11,20 40:3,12 42:19

**30-minutes-before-dusk** 33:22 89:22 90:7

**32** 68:22 69:8 70:18

**33** 68:22 69:16

**34** 68:23 69:19 82:23

**364** 17:23 56:8,15

**370** 56:15 57:7

**38** 46:16 47:2,24,25 48:11

**38655** 3:20

**39** 47:24 48:21

**39225** 3:14

**3:20-cv-224** 4:17

**3rd** 88:20

**4**

**4** 13:5,7 15:7 22:24,25 23:2 33:21 57:25 79:18

**4-1** 75:18,19

**40** 47:24

**41** 47:24,25

**425** 3:6

**44** 65:13

**46** 51:2

**47** 17:23

**4:50** 24:16,19

**5**

**5** 25:4,8,11 30:3,4 88:17 89:8,17,19

**50** 73:3

**50,000** 64:16 66:16

**51** 72:12 73:3

**52** 18:2,3

**55** 57:22

**56** 57:22

**59** 59:19,21 78:15

**5:00** 25:6 88:23

**5:30** 25:4,6

**6**

**6** 30:2 31:22,23

**6/17/20** 39:17

**6/19/20** 39:19

**61** 78:13,15,16

**66** 39:11

**6th** 84:5

**7**

**7** 27:4 31:20 34:18

**8**

**8** 34:24 37:2

**9**

**9** 14:2 32:20 44:2 59:3

**9:23** 4:19

**9:36** 12:6

**9:54** 12:10

**9A** 43:22

**A**

**a.m.** 4:19 12:6,10 43:17,20 63:12

**ability** 6:7

**access** 9:25 10:3 67:11

**accessing** 26:17

**accommodate** 7:19

**accurately** 6:8

**ACLU** 3:11 4:25

**acting** 41:7,8,12

**action** 50:17,19,20, 21

**activity** 29:21

**actual** 11:11 66:12

**addition** 6:19 7:18

**additional** 54:21 66:16

**address** 60:8

**adds** 71:17

**administrator** 14:9 15:11 16:25 22:19 26:23 40:11 46:15 61:18

**advance** 14:10 15:12

41:20

**advanced** 14:13 15:15,16 16:2 22:15 40:22 41:5

**adverse** 55:15

**advocates** 79:25

**African-american** 31:14

**afternoon** 69:25

**afternoons** 64:21

**agenda** 20:9

**agree** 15:17 28:12 34:8 38:9 49:2 76:4 79:21,22 83:11,16,18 85:21

**ahead** 43:2 73:19

**alleged** 76:3,4,18

**allowed** 26:15,20 60:15,23 62:3,4 84:6

**allowing** 88:16

**amend** 18:12 81:18

**amended** 13:7,10, 12,13,14,17,18

**amount** 20:21,23 64:15 81:10

**Ana** 86:17 87:20

**and/or** 21:25

**anniversary** 59:11

**Annual** 63:22

**answers** 6:14

**Anthony** 31:2,7,18

**anymore** 65:13

**Anytime** 51:23

**apologize** 42:22 44:15,17 59:6 82:16 85:18

**appalled** 82:9

**apparently** 69:20

**appears** 10:16 78:19

**apples-to-apples** 21:16

**applicant** 16:7

**application** 14:6,9 15:8,11 16:18 17:4 21:24 22:6,16 23:18 30:11,20,21 31:15 32:3 35:3 39:15,17, 21 40:24 41:21,24 42:5,9,12,19,21,24 44:5,9,22 45:2 46:11 61:19

**applications** 14:14 16:11,14,24 61:19

**applied** 41:23

**approve** 16:10 23:6, 8 42:18,24 59:6 76:7

**approved** 37:12

**approving** 16:23

**approximately** 25:8, 11 87:22

**April** 15:4

**Archives** 76:6

**area** 18:17,20 19:23 23:20 66:16 76:9

**arrest** 54:13,25

**arrested** 26:5

**arresting** 54:15

**arrive** 26:25

**Artists** 45:11

**arts** 64:9

**artwork** 58:9

**assembly** 36:8,10

**assessment** 83:18

**associates** 79:10

**assume** 7:10 85:22

**assuming** 65:22

**assumption** 65:18

**athletic** 53:24 54:15 57:10,12

**athletics** 65:5

**attached** 37:15

**attachment** 78:19, 21 79:14

**attachments** 79:13

**attempt** 73:16

**attempting** 19:23 87:21

**attend** 63:6

**attention** 31:14

**attorney** 3:5,12,18 5:13 8:2,5,8,13,16

**audibly** 6:20

**authority** 21:5 22:20 40:6,16,21 41:4 54:5 61:3,5,7,14,19 89:13

**authorization** 17:15

**Avenue** 3:6,19 65:15

**aware** 25:20,24 26:21 27:7,9 49:6,8 50:2,3 51:19 55:18 57:12 58:15 61:10,16 66:21

___

**B**

**B-10** 46:20

**back** 12:9 14:23,24 18:6 35:4 39:8 43:20 63:15 72:15 74:25 81:13,14 86:11 87:16

**bad** 54:15

**ballgame** 64:22 66:15

**barricade** 90:4

**barricaded** 86:25

**barricades** 26:16 87:5,21,22 88:5,7 89:24,25

**bars** 65:13 66:19

**Bartlett** 3:4 4:24

**base** 69:8 70:18 71:15

**baseball** 64:23,25 65:2

**based** 17:13 25:7 60:24 61:9 77:25

**basically** 12:23 20:15 21:10 28:22 32:14 52:15 54:12 55:9

**basis** 26:2

**Bates** 11:8,10,12 17:24 34:16 46:18

**Bates-stamped** 12:13

**beat** 70:9

**began** 29:8,11

**begin** 29:7

**belongs** 78:2

**benches** 19:24 20:4 27:3

**Benton** 78:25 79:6, 11 80:19

**Bill** 83:18

**birthdays** 59:10

**blocked** 64:6

**board** 9:11,14 16:10, 13,16,18 21:25 22:5, 10 23:12 24:14 29:5 35:10 40:6,17,20,22 42:4,18 43:6,8 46:10 50:17 51:21 52:10 61:11 72:6 74:9,13 75:15,21 76:14 77:19 81:8,22 82:12 83:6 84:2 88:20 89:16

**board's** 90:6

**body** 40:21 41:3 81:5

**bottom** 10:11 33:2 42:15 46:8 53:11 68:25

**Box** 3:13

**boys** 82:9

**Brad** 84:13,15,16

**break** 7:17,19,23 43:14 62:23,24 63:4

**breaking** 62:21

**breaks** 7:13,14,21 62:21

**bring** 65:2 66:16

**brings** 79:18

**broke** 87:19

**brought** 75:14

**buddies** 85:23,24

**buddy** 85:22

**budget** 81:18

**building** 48:20 49:2 78:9,10

**buildings** 46:2

**bullet** 14:8 15:10

**bunch** 72:16

**Buren** 3:19 64:7

**business** 63:6 84:4

**busy** 65:5,6

___

**C**

**calendar** 88:19

**call** 65:15 88:2

**called** 5:8 45:4 63:18

**Calling** 86:24

**cameras** 66:7,13,21 67:6

**Camp** 84:13,15,16

**cannonball** 71:19

**cannonballs** 71:14

**capable** 66:4

**carried** 23:12

**carrying** 69:20

**cars** 48:13

**Carwyle** 16:9,25 17:5 34:25 46:15 57:24 59:3 60:3,12, 21 62:16 67:19 73:5

**Case** 4:17

**catches** 82:14

**cemetery** 81:14

**center** 71:24

Index: chain..days

**chain** 51:16 56:18

**chair** 83:23

**change** 14:12 15:18, 23,25 16:5,6 29:19 43:13

**changed** 15:15 29:22 33:13 64:20 75:13 76:10

**characterization** 83:11,16

**charge** 57:16

**charged** 55:10,13

**chat** 9:22 10:10,11, 12,16 11:13

**check** 18:6 47:25 57:9

**choice** 24:10

**circle** 81:7,15

**circumstance** 70:7 81:23

**circumstances** 51:15 57:15 68:12 73:15

**cited** 26:4

**cities** 27:14 28:14

**citizens** 27:16 54:19

**city** 46:4 63:22 65:10 66:17 71:23,24

**civil** 28:9,13

**Claims** 9:9

**clarify** 79:10 84:20

**CLAYTON** 3:17

**clear** 6:14 8:16,18 84:22

**click** 10:15

**close** 33:13 86:3

**closed** 24:19

**closing** 27:12 33:17

**closure** 23:19 26:11, 13 33:22 90:7

**clothing** 31:13

**clouds** 25:7

**coach** 53:25 54:16

**collaborative** 29:3

**collect** 86:5

**college** 21:12

**colleges** 81:6

**column** 49:10

**combination** 53:8

**comfortable** 65:25

**comments** 60:13

**committee** 72:5 74:9

**communicate** 67:14

**communication** 67:16

**communications** 29:17 68:3

**community** 52:20 55:6 68:8 72:6 73:25 79:19 80:2

**community's** 79:20

**company** 83:5

**comparing** 21:16

**compilation** 82:18

**completely** 62:25 82:9

**comply** 60:16 61:8, 20

**computer** 10:14 11:13,14

**computers** 11:14

**concept** 24:10

**concern** 13:18 27:13,15 29:11,25 50:11,15 51:21 52:2 53:22

**concerned** 53:5

**concerns** 36:22

**concluded** 90:19

**condition** 6:7

**conditions** 25:17

**condolences** 68:9

**conduct** 20:12

**conducted** 6:24

**cones** 90:2

**Confederacy** 71:7

**confederate** 18:18 23:20 31:13,16 32:13 36:13 49:16 71:2 77:17 79:25 80:11 81:6,14

**confirm** 36:5

**conflicts** 54:14

**congregated** 19:22

**connection** 7:2 42:5

**considered** 22:5 40:23 41:19 71:14 76:13 78:6

**considers** 17:3,7

**constituents** 39:6

**construction** 64:19

**contact** 32:16 45:6

**context** 38:19

**contextualization** 73:9,16,17 74:6

**contextualize** 72:2

**continue** 53:15 60:24 90:6

**continued** 29:25 55:3

**continues** 88:15

**continuous** 74:17

**contrary** 42:2

**control** 20:16 21:12

**convenience** 63:4

**conversation** 20:10, 18 29:24 32:15 38:17,21 50:8 52:7, 14 71:10 80:21 82:5

**conversations** 13:19 16:7 49:24 52:17 80:10

**cooperating** 11:16

**copied** 57:2 79:2

**copy** 57:9 73:11

**corner** 71:14

**Cornhole** 65:21

**correct** 6:3,4 9:13 13:6,8 14:21 15:5,9 16:3,4 18:13,14 19:4, 5,11,21 20:2 21:3 23:7,12,13,15,21,22 25:11,19 27:6 29:18 30:15 32:18,19,20, 21,23 33:7,14,18 36:7 37:8,22,25 39:16,18,20,25 41:5, 12 42:6,10,13,14,16, 17,20 43:7 44:23 46:9 48:16 51:11,12 56:20 60:9 61:12 65:8 73:7 77:18,20, 21,23 79:2,3 80:19 84:11 86:18

**costly** 81:16 85:2

**counsel** 4:21

**counties** 64:17

**countless** 52:14

**country** 27:14 65:3 69:22 70:10

**county** 4:15 5:4 9:10, 11 12:13,15,24 14:9 15:11 16:25 18:3,24 22:19 26:23 27:5,16 29:12 40:11,21 41:3, 4 42:2,23 46:15 48:17 52:2 55:17 59:8,23 61:18,20 64:16 66:22 71:2 72:10 78:3 80:8 83:6, 24

**Court** 4:2,16

**courthouse** 18:13, 15,17,22,23,24 19:24 20:18 21:7,13 23:19 24:19 25:10 26:11 27:3,8,12 33:13,17 36:11,14 37:14 45:12,25 46:3 47:11, 20 48:17,19,23 49:4, 5,17 50:8 55:7 58:7,

12,14,17 60:24 63:24 64:2,11 66:8 67:4,7 76:8 88:16 89:5,6,8, 20

**COVID** 75:2

**COVID-19** 4:3

**crafts** 64:9

**cream** 20:19 21:14

**Cristen** 83:22

**crowd** 70:12

**crowded** 64:12 66:18

**crowds** 65:2

**curfew** 88:23,24 89:3,4,5,8,14,17,19

**current** 70:6

**cut** 36:2,6 85:6

**D**

**daily** 26:2 70:9

**dark** 23:24 25:2,5,13 27:4

**dash** 46:22

**date** 13:4 23:18 33:19 37:20 39:17 41:24 87:7

**dated** 15:3 33:23 60:3 73:5

**dates** 26:16 36:16 88:12

**Daughters** 71:7

**David** 3:21 4:14 5:3, 7,24 35:5 62:20 90:14,22

**David's** 63:6

**day** 13:10,13 14:10 15:12 20:10 23:24 25:15 33:12,16 34:3, 7 90:24

**daylight** 23:24

**days** 13:24,25 14:10 15:16,23 16:2,7 23:18 24:4 39:22,24

41:24 42:12,25

**deal** 12:3

**death** 68:5

**December** 4:19

**decided** 75:2

**decision** 21:5 40:2
46:14 54:24

**decisions** 68:20

**dedicated** 65:9

**deemed** 81:15 88:14

**Defendant** 3:18

**definition** 24:7,8

**delay** 76:6

**delivery** 90:18

**Democratic** 83:23

**denial** 25:23

**denied** 17:18 33:3
46:7

**deny** 16:10 17:3
46:14 61:5

**denying** 16:24

**Department** 66:23
71:22

**Departments** 71:18

**depending** 25:15,16

**depends** 25:7

**deposed** 5:9 8:22

**deposition** 4:14,18
25:22 90:12,19

**deputies** 52:18

**describe** 9:3 26:7
47:9 69:5

**description** 52:25

**design** 64:19

**detail** 17:8 65:10,12

**deter** 55:14

**determine** 22:2
70:13

**deterred** 27:24 28:2,
4

**developed** 28:20

**difficult** 54:9

**director** 53:24 54:15,
16

**disagree** 38:9

**Disaster** 37:5

**discretion** 17:9,10,
14 40:12 88:14

**discuss** 50:4 57:4

**discussed** 14:16
16:17 42:11 51:16
53:19 55:19,23 56:4,
18 66:24

**discussing** 52:22
68:14

**discussion** 50:6
68:19

**discussions** 29:5,7,
8,10,13,16,19 33:10
34:9,12 38:4

**display** 19:23 58:10

**displayed** 45:25

**District** 4:16 39:3,5

**districts** 39:7

**disturbance** 28:9,13

**divorce** 9:5,7

**DOC00006** 12:15

**document** 10:3,18,
20,22 11:11,15
12:12,13,14,20,22
13:4,7 14:3 15:6
17:22 18:11,25 22:25
23:5 30:3,5,7,18,19
31:20,25 32:2 33:21,
24 34:21 39:8 42:8
43:22 44:8,24 46:17
51:2 56:8,14 58:22
59:17 75:4 76:12
77:8 79:8 86:14

**documentation**
72:17

**documents** 9:20,22
11:17 34:19 72:24

**Double-decker**
63:19

**download** 10:14

**draft** 73:16

**drawing** 69:9,11

**drew** 31:14

**due** 4:3 13:18 27:13
66:14 75:2 87:19

**duly** 5:8

**dusk** 23:21,23 24:4,
8,10,17,18,22,24
25:13 27:8,12 33:14,
17

**E**

**e-mail** 11:17,18 18:7
34:24 35:5,7,12 37:4,
7,9,11 38:13,14,20,
22,23 51:7,10,13,16
52:3 53:12 56:18
57:24 59:2 60:2,7,10,
12 73:5,10,13,21
78:19,21,22,25 79:4
80:18,22,25 82:5,8,
15 86:17,20 87:20
88:15

**e-mails** 35:15 38:11,
19,25 52:6,14 59:5
77:8,10 86:21,23

**earlier** 40:5,11 44:16
75:2 80:4 82:4

**early** 25:4

**easier** 82:2

**East** 35:5 53:12
56:17

**easy** 16:6

**eat** 20:19

**effect** 33:20 34:4
53:23 88:23 89:20

**effective** 13:4

**efforts** 71:25

**elected** 9:18

**election** 83:7

**emotion** 54:22

**emotional** 55:10

**emotionally** 55:13

**emphasizing** 37:14

**employed** 9:8

**enactment** 89:21

**end** 6:15 21:23 53:12
90:12

**enforce** 54:10 55:21,
24 56:5

**enforced** 24:25
25:21,25 26:2,7

**enforcement** 13:20
21:18,21 27:20,21,23
28:6 29:6 52:20
57:17 65:16 66:11
90:3

**enforces** 26:10

**engage** 68:3

**engaging** 20:12

**enjoy** 20:10 21:14

**enter** 67:24

**entire** 38:8,10 43:11
53:3 71:13 76:8

**entity** 45:16

**entity's** 78:2

**Erected** 69:10

**escalate** 53:15

**escape** 52:7

**ESQUIRE** 3:8,15,21

**Eunice** 78:25 79:6,11
80:18

**evaluate** 16:8

**evening** 65:7

**evenings** 64:12

**event** 31:16 32:17
33:8,10,12,16 34:6,
10,13 39:19,22 41:24
42:12,25 55:5 64:5
65:19

**events** 31:19 36:13
53:13

**exact** 9:4 33:19 70:7
75:25 87:7 88:25

**EXAMINATION** 5:10

**exchange** 60:10
80:18

**Excuse** 43:12

**executive** 29:14 50:5
68:21

**exemplify** 54:10

**exhibit** 9:23,25 10:2,
8,24,25 12:8,12
14:24 17:19,21 22:25
23:2 30:3,4 31:22,23
33:21 34:18 37:2
44:2 46:18,19,20
48:4,6,7,8 51:4,5
56:7,9 57:19,20
58:20,24 59:18,20
69:2 70:14,15,16
72:13,19,20,22 76:25
77:2 78:14 80:14
82:19 86:15

**exhibits** 11:23 46:22
70:13

**existing** 55:21,24

**expensive** 71:19

**explain** 52:5 77:24
81:4

**explanation** 30:25
45:10

**extends** 65:7

**extent** 11:12 41:23

**extenuating** 81:23

**extra** 64:15

**extremely** 54:9
66:17 71:19

**F**

**facilities** 13:21 23:7,
8,17 30:10 59:7

**facility** 10:21 12:18
15:3 18:12 59:8

**fact** 89:7

**factors** 17:2 22:9

**factual** 38:8,10

**fade** 5:20

**fair** 7:11,12 19:10 31:15

**falls** 59:8

**familiar** 10:22 12:20 18:25 30:18,20 31:25 44:24,25 45:21 63:18 65:9 70:20,22 79:6

**families** 52:19 53:6

**family** 21:14

**fan** 32:8

**fashion** 82:12

**fastest-growing** 64:17

**favor** 72:7 75:11,15, 19,20 84:8,20

**February** 13:11 60:3

**feed** 66:22

**feel** 55:12 65:25

**felt** 16:7

**festival** 63:19,22

**figure** 24:5 47:7

**final** 74:13 90:18

**fine** 63:10 86:7

**five-minute** 7:14 43:14 63:4

**flags** 80:11

**Florida** 69:21

**focus** 37:13

**foot** 36:22

**footage** 67:12

**football** 51:8,18 52:8 53:24,25 54:16 69:20

**force** 54:25

**forefront** 52:11 80:23

**foreground** 48:14

**form** 8:10 28:15 30:24 41:16 43:2 44:5,9 53:2 82:12

**formal** 55:17

**forms** 28:13

**Forty-six** 50:25

**forum** 68:20 84:6

**Foundation** 57:10, 12

**Friday** 74:11 76:16

**friend** 83:19 84:10,16

**front** 49:16 65:21 78:9,22,24

**froze** 87:10

**frozen** 87:9

**Frye** 59:22 60:6 72:16,24

**FRYE0058** 59:19

**FRYE50** 72:12

**full** 5:23 62:24

**functions** 59:10

**funds** 81:21

**funny** 69:23

**G**

**game** 52:8,9 69:25 70:2

**gathering** 19:9,13,16 21:6 54:5

**gatherings** 54:22

**gave** 71:3,5

**general** 50:7,9 66:3 67:16 89:5

**generally** 38:17 64:10,21 70:20

**gentleman** 80:4 85:19

**George** 32:5,6,8 34:13 80:6,7 85:20

**gestures** 6:22

**Gina** 4:2

**give** 8:19 59:24 80:17

**giving** 25:22

**glad** 53:13

**goal** 69:20

**goalpost** 69:22

**goalposts** 70:5

**good** 5:12 64:25 65:23

**Gotcha** 34:2

**governing** 81:5

**government** 40:21 41:4

**government-owned** 78:10

**graduation** 65:5

**graffiti** 48:22

**grant** 61:7,19

**granted** 32:22,24,25 33:3,5,6 42:15

**graphic** 37:15

**grass** 18:20

**great** 5:20

**grief** 82:14

**grounds** 12:24 18:13,15 19:25 21:7 23:19 24:19 25:10 26:12,15,17,20 27:3, 8,12 33:13,17 36:11, 14 58:8,12,14,17 64:3,11 66:8 67:7 76:8,9 81:14 88:16 89:5,6,8,20

**group** 20:3 21:6,7 28:7 35:9 45:19 51:24 57:16 67:17 68:4 73:20,22 82:9

**groups** 28:4 59:9

**grove** 20:17

**growing** 27:14 29:25

**growth** 64:16

**guess** 12:2 21:20 24:7 28:8 45:18 53:4 56:13 86:2

**guidelines** 17:17

**guys** 88:16

**H**

**half** 7:15 62:19 63:5

**halfway** 36:6

**hall** 46:4 79:9

**handle** 39:7

**handmade** 58:9

**handwriting** 30:8

**Hang** 18:8

**happen** 51:19 54:8 56:5 70:9 87:6

**happened** 38:7,8 53:14 54:12

**hard** 5:16 30:7 44:14

**hate** 50:13

**he'll** 8:17

**head** 6:20 53:25 54:16

**header** 37:4

**hear** 5:14,16,17 7:6 19:14 42:7 49:20,21 74:5

**heard** 49:22

**hearing** 44:15

**held** 4:18 34:6

**Hemmins** 83:22

**Hervey** 31:2,7,10,12, 18

**high** 52:8

**historians** 73:24

**historical** 76:8,9

**History** 76:6

**holy** 71:3,5

**honest** 84:2

**honestly** 48:18

**Honey** 35:25 36:3,6

**Honeycutt** 30:12,22

**Honeycutt's** 30:21

31:17

**hope** 74:13

**hoping** 74:15

**horses** 65:16

**hour** 7:14 62:18 63:5

**hunting** 68:5

**I**

**ice** 20:19 21:14

**icon** 10:11,15

**idea** 28:22,24 85:9

**identification** 10:8 12:8 17:19 23:2 30:4 31:23 34:18 37:2 44:2 46:19 48:6,7,8 51:5 56:9 57:20 58:20 59:20 70:14, 15,16 72:13 76:25 78:14 80:14 82:19 86:15

**identify** 11:8 48:18 49:14

**IHL** 81:2,5,20

**image** 48:12 49:9 69:8

**images** 37:15 45:24

**imagine** 64:20

**imaging** 47:10

**immediately** 34:4

**impact** 6:7 58:16

**impaired** 6:11

**implemented** 59:15

**implying** 61:13

**important** 53:15 68:6

**impose** 89:14,16

**incident** 53:7

**include** 23:9,17 24:10

**including** 19:4 23:20 77:22

increased 29:20

increasingly 36:21

indefinitely 90:7

indifferent 84:25

individual 16:11,14 40:24 41:8

individuals 28:4

influence 84:2

influx 64:20

inform 26:19

informed 68:11

initiative 28:24 29:2

inscription 70:22

install 67:9

installations 45:11

installed 26:25 66:21 67:10

instance 27:22 54:23

Insurance 9:9

intend 6:4

intent 54:17,18

intention 83:14 90:6

intentionally 65:22

intentions 31:17

interpose 8:8

interviews 32:14

introduce 4:21 9:23 47:21

introduced 48:3

inviting 53:20

involved 52:11

involvement 41:14

involving 29:16

Isaac 3:8 4:23 5:12 11:3,24 17:25 18:4 30:10 33:24 47:3 50:24 63:2

issuance 28:8

issue 7:2,4 12:4

75:24 87:20

issued 28:12

issues 53:16

issuing 27:11

items 58:9


J

J.F. 45:6

Jaarome 3:24 4:20

Jackson 3:14 64:7 65:14

January 36:18 57:25

Jessie 30:11,20,22 35:25 36:6

Jetty 36:3

Joey 35:5 53:12

John 4:15,24 5:2 25:24 45:22

Johnny 83:25 84:3,4, 8,10,16

Johnson 32:5,6,8,9, 11,12,15,16 34:13 80:6,7 85:20,25

join 9:17

July 14:16,17,18 32:17 33:23 34:3,7 89:21

June 34:24 35:2 36:9,11 37:13,21,25 84:5 88:20 89:8

Juneteenth 37:13, 17,21


K

keeping 32:13

Kelley-rhinewalt 79:8

Kevin 60:6

Kim 79:8

kind 20:23 26:24 30:8 52:21 54:14 55:17 70:4 71:17 74:18,20

knew 31:7 39:2 45:15 79:9

knowing 54:20

knowledge 26:3,4 27:17 35:11 40:15,23 41:6 43:7 54:12


L

Lafayette 4:15 5:3 9:10 12:13,15 18:3, 24 51:25 71:2 72:9 78:3 80:8 83:6,24

Lamar 51:24

Landon 3:15 4:25 10:6

language 17:13 60:13,17,25 62:5 74:2 75:12,13,14

large 51:24 55:6 70:12

largest 65:2

last-minute 37:13, 24

law 13:19 21:18,21 27:20,21,22 28:5 29:6 52:19 57:17 65:16 66:11 68:18 77:25 90:3

lawn 37:14

leading 62:13

learn 87:22

learned 62:8

leave 27:8 54:8

leaving 84:7,8

leeway 54:21 55:5 56:4 70:8,12

left 69:10

lengthy 23:5

lenience 62:16

Lets' 78:12

letter 56:17,18,22,24

letters 57:3,5

letting 60:16

Lexington 3:6

light 45:11 50:16

limited 84:6

lines 76:2

link 11:22

Lisa 16:25 34:25 57:24 59:2 60:2,12 73:5

list 35:9

listed 32:22

live 80:8

lived 39:3

lives 37:14 71:3,5

local 84:4

located 81:13

location 66:12

long 9:14 10:4 84:14

longer 19:22

looked 39:9 54:15 56:19 72:14 89:25

lot 27:24 31:14 35:14 52:6 58:8 64:9 71:21 82:14 83:25

lunch 7:17 62:21,22, 24 63:3

lunchtime 64:21

lynched 72:9


M

made 14:17 15:18 16:5,6 23:14,18 28:23 39:21 40:2 46:14 49:4 57:12 71:25 84:22

main 51:25 85:3

major 51:25

majority 41:12,17

make 6:17 7:24 8:6, 18,19 9:24 16:6 18:7 21:5 32:7 54:24

65:24 66:18 80:17

Makers 58:4 60:14

makes 82:2

makeup 64:18

making 8:10 21:24 68:18,19

man 31:14 37:12

marble 71:18

march 13:5,7,11 29:9 51:8 54:2

marches 62:15

mark 10:24 17:21

marked 10:8 12:8,12 17:19 23:2 30:4 31:23 34:18 37:2 44:2 46:19 48:6,7,8 51:5 56:9 57:20 58:20 59:20 68:25 70:14,15,16 72:13 76:25 78:14 80:14 82:19 86:15

Marker 60:14

market 58:4,11 60:15

Martinez 86:17,21 87:20

matter 4:14 17:9 21:14 37:14 38:22 52:2 54:11,24

mayor 54:4 56:22

mayor's 57:4

Mcgregor 83:3,19

Mclarty 75:24 76:4, 11,19

meaning 60:15 71:4

means 19:13,16 25:3 26:14 39:21 41:7 60:19 73:11 78:2

media 4:13 35:24 43:13,19 52:11,12 63:14

medication 6:6

meeting 16:19 74:10,13 76:14,15 79:9 84:5 88:21

**member** 9:11 75:21

**members** 35:10

**memorial** 30:25 31:18

**memory** 6:10 70:25 80:24

**men** 72:8,9

**mentioned** 15:22,25 76:17 80:4 85:19 89:3

**message** 19:23 67:15,24

**messages** 81:25 82:18,24

**met** 74:9 79:12

**middle** 30:24

**mine** 83:19 84:16

**minimize** 6:15

**minute** 38:6

**minutes** 12:3 19:2 21:15 23:20 24:4,18 27:12 33:14,17 54:11 55:16 63:9 86:4

**missing** 71:21

**Mississippi** 3:11,14, 20 4:15,17 5:2,4 71:2

**Mm-hmm** 14:11

**mob** 83:12

**moments** 54:24

**Monday** 74:14

**month** 74:14

**months** 81:13

**monument** 18:18 32:13 49:16,19 54:4 71:13,15 79:18 81:7 83:15

**Morgan** 83:25 84:3, 4,8,17

**Morgan's** 84:18

**morning** 5:12

**motion** 19:3,6,18 23:11,14,16 28:23

**mounted** 65:16

**move** 56:6 81:18

**moved** 78:4 81:12 85:2

**movements** 53:9

**music** 64:9

**mutual** 24:12,13

---

## N

**named** 35:16

**national** 52:12

**nature** 29:10,19 35:25 50:6 68:15 69:12

**needed** 15:12

**night** 64:9 65:7,24 69:19 70:2

**nods** 6:20

**Northern** 4:16

**note** 32:7

**notice** 14:13 15:15, 16 16:2 22:15 40:22 41:5,20 71:11

**November** 73:6

**number** 4:17 9:20 11:8,11,12 14:25 17:22,24 18:4 30:8 31:20 34:16 36:24 43:19 46:18,24 63:15 69:21 70:10 79:17,18 85:14

**numbers** 46:22 69:2 72:19

**numerous** 64:17

---

## O

**O'DONNELL** 3:17, 21 4:10 5:3 11:3,6, 18,24 17:24 18:3,6 28:15 30:10,14,16 33:24 34:2,16 35:6 41:16 43:2 44:12 47:3,7,12,16,22,25 50:24 51:2 53:2 63:2,

10 68:25 72:21,23 73:2 77:3 86:7 90:11, 14

**oath** 5:25 6:4

**object** 8:3,10 28:15 41:16 43:2 53:2

**objected** 8:5

**objection** 8:9,19 76:17

**objections** 8:8,11

**objects** 45:12

**obtain** 13:25

**obvious** 56:14

**occasion** 71:20

**occasions** 87:25

**occurred** 28:10,13

**occurrence** 56:3 70:9

**offhand** 24:9

**office** 9:19 57:10

**official** 24:21,22

**okayed** 76:10

**Ole** 51:7,18 52:9 57:9

**open** 10:16 11:2 62:25

**opinion** 38:7,9,10 71:8

**oral** 29:16

**Orange** 90:2

**oranges-to-oranges** 21:17

**order** 6:14 13:2 18:12 20:22 21:23 23:6,8, 11 24:11,20,25 25:11,20,24 26:2,5 27:11 28:8,12,19 33:17,22 41:11 72:16 78:20

**ordered** 26:24

**orders** 55:16

**ordinance** 17:13 21:21,22 27:5 54:17,

18 61:8

**ordinances** 54:10

**ordinary** 90:18

**organization** 45:3

**original** 29:8

**originally** 9:19

**overpass** 48:13

**owner** 67:9 84:4

**owns** 83:5

**Oxford** 3:20 24:16 27:18 37:5 58:3 63:22 65:10 66:3 79:15

---

## P

**p.m.** 24:16,19 25:4,8, 11 27:4 32:20 63:12, 16 86:9,12 87:14,17 88:17,24 89:3,8,17, 19 90:13,20

**P.O.** 3:13

**package** 46:21 85:17

**pages** 57:22

**park** 19:24

**part** 9:23 19:8 64:2 76:6

**parties** 4:6 59:11

**Party** 83:23

**partying** 70:2

**passing** 36:20 65:14

**past** 28:10

**patriotism** 70:25

**patrol** 65:16

**patrolling** 66:4

**patrols** 65:10

**patronizing** 66:19

**payment** 57:13

**PDF** 10:15

**pedestrians** 36:23

**pending** 7:22

**people** 13:20 19:8,9, 13,16,17 20:3,11,16 21:2,6 26:17,19 37:16 40:6 47:13,14 48:13 51:24 54:25 55:11 62:20 64:16,20 65:23,25 66:17,19 68:6,7 69:19 73:25 82:13 84:6

**period** 21:24 22:2,6, 11,15,20 88:9

**permission** 54:3 67:8

**permit** 13:3,21,25 14:14 16:11,14,18,24 17:3,4 19:9,10 20:5, 11,13,24 21:7,8,10 22:15 25:23 30:11 32:22 33:3 35:3 37:13,24 38:5 39:15 40:24 41:20,23 43:11 44:4,8,21 46:7,10,14 59:7 61:8,19

**permits** 61:5,7

**permitting** 41:4 53:16,21 55:4,8 58:15 68:14

**person** 38:18 39:3 57:16 82:11 85:8,9, 13

**personal** 67:6

**personally** 28:20 31:7 32:7 33:11 46:5 67:11

**pertinent** 71:10

**phone** 32:16 67:22

**photo** 70:5

**photograph** 46:17, 23 47:10 85:8,10,11, 12,13

**photographs** 47:12, 15,19

**pick** 81:17

**picture** 48:21 54:4,7 69:5,9,16 70:23 71:11,13,21

**pictures** 54:6 68:23

**place** 14:21 29:13 33:8 36:14 50:3 53:9 63:23 64:2 65:6 67:5 74:3,4,7 78:4,5,7,8,9 81:2 83:15 85:3

**Plaintiff** 3:5,12 4:24 5:2 90:16

**plaque** 74:3,6,7 76:13

**players** 53:24

**playing** 65:21

**plays** 17:16

**point** 71:25 74:18 78:11 84:22

**points** 7:14 8:2

**police** 65:10 66:4

**policemen** 65:20

**policies** 55:21,25

**policy** 10:21 11:4 12:18 13:12 14:13,20 15:3,14 17:13 18:12 23:7,9,17 33:13 42:2, 23 43:3 53:23,24 56:5 58:16 59:7,8,15 60:14 61:20 62:5 68:20 70:6 89:15,21 90:7

**political** 20:12,14

**portion** 19:2

**portions** 38:19

**portray** 20:9

**possibly** 68:5

**post** 35:24 69:20

**posted** 37:15

**poster** 35:23

**postpone** 75:3

**potential** 11:23

**potentially** 25:3

**PR** 37:5

**practice** 38:12

**prayers** 68:9

**preceding** 62:14

**prefer** 62:25 63:3,7

**presence** 27:24 28:2,5

**present** 90:3,6

**presumed** 76:2

**pretty** 55:9 78:10 81:23 82:11 86:3

**prevent** 26:16

**prevented** 27:23

**preventing** 7:4

**previously** 58:7

**primary** 5:13

**print** 11:19

**printed** 18:7 47:3

**printout** 81:25

**prior** 23:18 62:17 89:20

**private** 59:10

**pro** 31:16 36:13

**problem** 44:18

**proceed** 70:13

**process** 4:7 13:2 53:16 55:4,8 68:14 74:17 81:23 85:2

**produced** 78:20

**profit-making** 59:9

**progress** 53:21

**prohibited** 59:11

**prohibits** 68:18

**projected** 45:24 47:11 49:15,18 50:11,14

**projection** 45:4,8,17 47:13,17,20 48:12, 16,19,22 49:2,9 50:18

**projections** 45:16 49:3

**projectors** 45:11

**property** 25:2 27:16 29:12 54:25 66:22 67:6,9 78:2,3

**proposal** 28:18,19

**proposed** 23:19 75:6,8

**protect** 29:12

**protection** 54:18

**protest** 19:21 29:20 39:2 51:18,21 55:11, 13 56:3 80:3

**protests** 28:9,13 36:21,22 50:10 52:20 53:5 54:21 62:15 68:14

**provide** 52:19

**provision** 89:22

**public** 12:23 13:18 68:20

**pull** 11:15 81:17

**pulled** 10:12

**pulling** 11:3

**purchased** 66:25

**purposes** 59:9

**put** 71:6 72:5,15 74:7 85:3 87:23,25 88:7,9, 11

**puts** 54:9

**putting** 9:22 53:6

---

**Q**

**qualify** 17:12

**question** 6:15 7:9, 10,22 8:4,9,12,14,17 17:5 21:11 24:7 28:11,21 33:15 42:3 67:22 73:18 76:21 86:24 88:25

**questions** 5:13 6:13 8:3,20 62:19 90:10, 11

**quick** 88:19

**quickly** 53:14

---

**R**

**rally** 37:16

**rapport** 65:23

**Rash** 4:15,24 5:2 25:24 45:6,22

**rationale** 88:3

**reacted** 83:8

**reaction** 55:15

**read** 38:12,13

**reading** 75:8 80:22

**real** 88:19

**reason** 6:10 7:6 11:13 17:17 20:8,15 27:11 81:12 87:23

**reasoning** 27:13 77:24

**reasons** 17:3

**recall** 13:11 15:18 16:5,17 19:6 33:8,10 34:9,12 35:12,14 36:10,13,16,18 37:9 38:21 40:9 41:22 42:21 43:10 49:18, 22,24 50:22 51:13,15 59:16 60:10 62:11 71:25 73:13 74:22, 23,24 75:8,21 77:7, 10,14 79:4 80:21 86:20 89:10,11,18, 19,25

**receive** 35:14 38:11

**received** 10:5,6 35:7 37:7 60:7 73:11 82:25

**receiving** 37:9

**recently** 74:19 81:12

**recess** 12:7 43:18 63:13 86:10 87:15

**recognize** 82:24 85:8

**recollect** 50:14

**recollection** 13:16 14:15 15:20 22:7

38:4 45:24 49:3,6 72:4 76:20

**record** 4:22 5:23 6:14 12:2,5,9 43:16, 20 63:11,15 72:19 86:4,8,11 87:11,13, 16

**records** 55:17

**reduce** 13:20,23

**reelected** 83:6

**Refer** 11:10

**reference** 18:4 35:3 47:4,22

**referenced** 38:5 73:20

**references** 21:23 35:16 36:8 37:24 38:2

**referencing** 77:12

**referring** 52:5,24 56:2 82:15 87:2,4

**refers** 18:15,16 81:4 88:15

**reflected** 55:16 70:23 76:12

**reflecting** 49:17

**reflects** 19:3 23:11 28:23

**regulate** 21:22 71:23

**related** 89:4

**relative** 88:8

**relax** 52:15

**relocate** 77:17

**relocating** 84:21,23

**remember** 9:4,6 13:10,13,14 33:19 49:7 50:19,20 66:25 67:3 73:23 75:13,17, 25 80:22 88:22

**remembrance** 72:8

**remote** 4:7

**remotely** 4:5,18

**removal** 77:13 83:12 84:18

**remove** 77:16,19

**removed** 88:7

**removing** 84:7

**rendering** 81:3

**repeat** 28:11,21 33:15

**rephrase** 7:9 27:25

**reply** 39:5

**REPORTER** 4:2

**Reporting** 4:3,20

**represent** 39:5

**request** 13:19 41:20 59:7 72:5

**requested** 22:13 73:25 81:8

**requests** 17:12

**require** 19:9,10

**required** 14:13 23:19

**requirement** 14:20 16:2 23:17 40:3,12, 22 41:5,15,20,25 42:5,19

**requires** 26:11

**requiring** 20:24

**respect** 25:23

**respond** 6:20 38:14, 25 39:3 86:22

**responding** 6:15

**response** 28:9,12 50:18 62:9 84:10

**responses** 57:2,4

**responsibility** 16:23

**rest** 36:4,5

**restart** 74:18

**resubmitted** 76:5

**result** 26:5 28:19 29:20

**Rethy** 3:8 4:11,23 5:11,12 10:6,9,24

**removal** 11:5,17,21 12:2,11 17:20 18:2,5,10 22:24 23:4 28:17 30:2,6,13,15,17 31:22,24 33:25 34:5, 15,17,20 36:24 37:3 41:18 43:4,14,21,24 44:3,13,18,20 46:16, 21 47:2,5,10,15,19, 24 48:3,10 50:23,25 51:4,6 53:10 56:6,10 57:19,21 58:19,21 59:17 62:18 63:8,17 68:22 69:3 70:17 72:11,18,22,25 73:4 76:23 77:2,4,6 78:12, 16,18 80:13,15 82:21 86:2,13,16 87:8,12, 18 90:9,16

**reverse** 78:20

**review** 16:9

**revise** 23:16

**revision** 23:7,8 59:15

**Rikard** 4:1,14 5:1,7, 24 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1,22

**rioted** 27:15

**rioting** 27:17,23 28:5

**roll** 63:3

**room** 4:4

**rough** 90:17

**rules** 17:16

**S**

**safe** 66:20

**safety** 13:19 53:16 66:18

**save** 10:14

**saved** 67:22

**scene** 48:12

**scheduled** 32:17 34:6

**school** 52:8 83:6

**Scott** 79:12

**screens** 45:12

**section** 14:5 15:8

**secure** 13:3,21

**send** 11:21 67:24 68:9

**sending** 51:13

**sense** 6:17 7:24 8:6

**sentence** 60:22

**September** 53:12 59:3

**series** 6:13

**serve** 73:25

**service** 30:25 31:18

**services** 57:17

**serving** 74:2

**session** 29:14,15 50:5 68:21

**set** 25:14 58:7,12,14, 16 64:11 65:19,21 74:10

**severity** 4:3

**shakes** 6:20

**shape** 82:12

**share** 84:18 85:25

**sheriff** 16:8 21:25 22:14 26:9 27:7

**rough** 29:11,23,25 40:7,18 50:4,11,21 52:9,16 53:19 54:9,20 55:20, 24 56:17 57:13,16 70:8 82:5,14 87:5 88:10 89:13 90:5

**sheriff's** 53:22 57:3, 5,10 66:22 71:17,22 88:2

**short** 7:13 51:23 88:8

**show** 6:21 9:22 11:7, 11 29:25

**shown** 47:13 50:16

**shows** 71:13

**sic** 34:24 58:24 59:18 70:13

**sick** 68:6,10

**side** 48:23 62:20 84:6

**signs** 26:19,21

**similar** 15:7 47:15 48:21

**Simpson** 3:4 4:23

**single** 30:14

**sir** 5:19 6:5,9 7:25 8:23 15:2 27:20 35:2 36:17 37:10 39:14 41:6 45:21 49:6,11 57:14 60:4,11 64:4 67:20 68:16 70:24 79:5 85:23 88:4,6

**sister's** 9:5

**sit** 20:18 21:13

**sitting** 20:3,4 27:3

**situation** 53:4 54:9 55:11,13 56:2 62:11, 14 63:2 71:23 83:17

**size** 54:5

**skip** 79:17

**sloppy** 72:18

**small** 66:16

**social** 35:24 59:10

**soldiers** 71:2

**someone's** 38:7

**sort** 7:2 8:24 20:12 34:9,12 35:22,24 36:2 48:13 68:3 78:20 86:5

**South** 51:24

**space** 79:20

**speak** 22:12 24:23 52:17 53:13 82:11 84:7

**speaking** 6:16 55:12

**speaks** 20:25

**Specialists** 9:9

**specific** 27:22 45:19 49:24

**specifically** 8:3,13 52:24 89:4

**spend** 52:19

**spoke** 84:5,8

**spontaneous** 56:3 70:12

**square** 21:13 36:23 46:2 63:23 64:7,12, 18,19 65:10 66:4,7, 13 67:12 79:20 80:2, 7

**stages** 74:13

**stagnant** 54:6

**stall** 74:21

**stalled** 74:20,22,23, 24

**stamp** 14:25 59:22, 23

**stamped** 14:2 15:7 33:21,25 34:22 35:20

**stand** 31:13 83:14

**stand-alone** 46:22

**standing** 83:12

**start** 4:13 32:20 43:19 63:14

**starting** 9:15 17:22

**starts** 14:25 37:12 56:8,14 59:22

Index: state..video

**state** 5:23 31:15 64:17 77:25 81:6

**stated** 44:16

**statement** 38:8,10 61:9 79:21

**states** 4:16 19:8 23:14 59:6,7 79:18

**stating** 72:18

**stationed** 21:18,22

**statue** 31:13 39:2 47:17,21 50:8 67:5 68:24 69:8,17,19 70:19,20 72:2 77:12, 17 83:12 84:7,8,19, 25 86:25 87:5,21

**statues** 53:9

**statute** 23:20

**stay** 77:25 78:3

**stepping** 35:4

**Steve** 79:11

**stipulate** 4:6

**stolen** 71:16,19

**stop** 20:16 21:20 74:18

**street** 50:15,16

**streets** 51:25 64:6,8 66:17

**stress** 53:5

**strictly** 88:2

**strike** 76:22

**structure** 56:14

**students** 21:12 65:23

**study** 73:20

**subject** 38:22 51:7 73:8

**submitted** 14:9 15:11

**Subscribed** 90:23

**subsequent** 15:22

**substance** 23:16

**substantial** 20:20

**suggest** 15:14

**suggests** 15:17

**suitable** 78:4,5,6,8 81:2,15

**summer** 28:10,14 29:20 36:19

**sunset** 23:25 24:15

**sunshine** 25:8 68:18

**supervisor** 35:6,9 60:6 73:11

**supervisors** 9:12 16:10,13,16,18 19:3 21:25 22:5,10 23:12 24:14 29:5 35:10 39:7 40:6,17,20,23 41:3,7,8,15,19,25 42:4,18 43:6,8 46:10 50:17 51:22 52:10 61:11 67:14,18,20 68:4 72:6 73:10 76:14 77:19 79:2 81:8 89:16

**support** 32:13 55:6 75:10

**suppose** 87:12

**supremacist** 80:9

**supremacists** 79:19,23,25

**surrounding** 18:17, 20 73:16

**surveillance** 66:7 67:11

**swear** 4:5

**swearing** 4:7

**sworn** 5:9,25 8:24 9:18 90:23

**T**

**tab** 17:22 18:4,6 22:24 30:2 31:20 34:15 36:24 43:22 46:16 47:2,4,22,24 48:11 50:23 56:7 57:19 58:22 59:18

70:18 72:11,21,22,24 73:3 76:23 77:3 78:12 80:13 81:24 82:17 86:14

**Tabs** 68:22

**takes** 63:23

**taking** 6:6 50:20 52:3,13,16,18,23,24 53:9 62:21 70:2 82:6

**talking** 45:19 87:20

**talks** 37:16

**Tannehill** 56:22

**task** 81:16

**team** 51:19 64:23,25 70:10

**technical** 6:25 7:4,6 12:3 87:19

**tells** 8:4,13 12:23

**ten** 63:9

**tension** 27:14

**tent** 65:19,21

**tenure** 88:24

**term** 9:15

**terms** 14:13 20:25 55:20,24 62:20

**testified** 5:9 40:5 41:2

**testify** 6:7

**testimony** 8:24 14:12 43:5 50:13

**text** 32:16 67:14,17, 23,24 68:4 81:25 82:18,24 83:8,9

**texts** 85:17

**Thacher** 3:4 4:23

**Thames** 3:15 4:9,25 10:7

**thing** 7:21 31:12 32:12 54:13 67:3 69:24 85:3

**things** 9:24 52:21 53:14 80:12,25

**thinking** 27:22

**thought** 44:16 45:15

**thoughts** 86:5

**thread** 67:21,24

**thumbs** 83:9

**Tim** 35:16 42:8

**time** 7:16,18 12:5,10 13:20,23 16:8 20:21, 23 23:24 24:15,21,22 25:3,6,14,16 27:4 32:20 38:25 43:17,20 50:7,10 52:18 55:3 57:4 58:13 62:23 63:12,15 69:22 71:8, 18 72:2 78:4 81:10 84:14 86:9,12 87:13, 17 88:9 89:20 90:8, 10,13

**time-based** 20:23

**times** 80:8 88:12

**title** 10:20 23:6

**titled** 18:11 79:14

**today** 5:13 6:2,11 9:21 24:3,15 32:4 63:6

**told** 46:5 54:7

**toll** 52:4,13,17,18,23, 24 82:6

**Tomorrow** 37:5

**top** 30:9 35:23 36:2 51:10 60:12 80:23

**topics** 68:13

**tore** 69:22

**totally** 20:19

**town** 79:9

**traffic** 36:22 50:15

**transcribed** 6:19

**transcript** 4:7 6:21 90:15,17

**trees** 18:21

**trigger** 20:23

**truck** 69:11

**truth** 6:2

**truthfully** 6:8

**TSG** 4:3,20

**turn** 14:2 30:2 34:21 35:19 39:8 43:21 46:16 56:21 57:7 68:22 72:11 75:4 81:24 83:3 85:5,7

**TV** 32:14

**type** 19:17,21 20:9,12 28:10 65:4 80:11 82:13

**U**

**understand** 5:25 7:9,10 37:17 42:3 45:17 53:14 60:19 62:12

**understanding** 7:4 12:22 17:2,6 18:16 19:12,15 22:9 23:23 26:13 27:2 31:10 32:9 46:13 54:3 57:15 58:3,6 59:14 60:23 65:12 66:6,10, 14 71:4,6

**unilaterally** 89:14

**United** 4:16

**university** 53:25 64:24 81:7,14

**unrelated** 77:8

**usage** 15:8

**V**

**vacate** 25:2

**validity** 4:6

**Van** 3:19 64:7

**vandalism** 27:18,23 28:5

**vandalized** 27:15

**varies** 25:15

**versus** 4:15

**video** 4:14 66:7 67:6,

12 87:8

**views** 84:18 85:25

**violation** 25:11,13
27:5 42:23 70:6

**voicing** 29:11

**vote** 41:12 75:15,17
77:12,14,16,24 89:16

**voted** 19:3 75:11,21
77:19

**voting** 19:6

─────────────

**W**

─────────────

**wait** 6:14

**waiting** 26:24

**waive** 22:2,6,10,13,
15,20 40:3,12,21
41:4,11,15,20,25
42:4 43:8

**waived** 40:9 43:3,5

**waiver** 42:19

**waiving** 42:24

**walking** 19:18,22
20:17 21:13 51:24

**wall** 47:11 48:17,22

**walls** 45:25

**wanted** 13:22 24:3
54:20 67:23 74:25
82:3 88:15

**warning** 37:15

**Warren** 35:16

**Warren's** 42:5,8

**weather** 25:7,16

**wedding** 59:10

**week** 15:12,15 88:11

**weekend** 65:4 66:15

**weekends** 64:22,23

**welding** 83:5

**well-known** 68:7

**well-respected**
73:24

**white** 37:14,16 79:18,
22,24 80:9 82:9

**Williams** 3:24 4:2,20

**window** 10:10

**witnessed** 46:5

**word** 53:3 74:5 75:25
76:3,18 80:3

**wording** 73:8 75:6,8,
25 76:12

**words** 49:14

**work** 9:9,24 53:21

**working** 74:12

**works** 84:16

**wrecker** 81:17

**write** 60:22

**writer** 38:22

**written** 29:16 90:15

─────────────

**Y**

─────────────

**Yaya's** 20:19

**year** 9:15,17 14:18
24:15 25:3,6,16 27:4,
18 36:9,11 74:25
75:2

**years** 9:16 64:17
81:2,11

**yes-or-no** 17:15

**yet also** 40:22

**York** 3:7

─────────────

**Z**

─────────────

**zone** 7:16

**Zoom** 6:25 9:21,22
74:10