EXHIBIT 42

Page 1

1                    MIKE ROBERTS

2        IN THE UNITED STATES DISTRICT COURT

3     FOR THE NORTHERN DISTRICT OF MISSISSIPPI

4                  OXFORD DIVISION

5

6  JOHN RASH,

7
            Plaintiff,
8
   v.                          CIVIL ACTION NO.:
9                              3:20-cv-224-NBB-RP

10 LAFAYETTE COUNTY,
   MISSISSIPPI,
11
            Defendant.
12

13

14

15
            REMOTE DEPOSITION OF
16
               MIKE ROBERTS
17
         Wednesday, January 13, 2021
18
        9:23 a.m. Central Standard Time
19

20

21

22

23 Reported by:

24 GRETA H. DUCKETT, CCR, RPR, CRR, CVR-S, RVR-M-S

25 JOB NO.: 188441

```
                                          Page 2
 1                  MIKE ROBERTS
 2
 3
 4
 5              January 13, 2021
 6          9:23 a.m. Central Standard Time
 7
 8          Videotaped remote deposition of
 9   MIKE ROBERTS, before Greta H. Duckett, CCR,
10   RPR, CRR, CVR-S, RVR-M-S.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

```
                                          Page 3
 1                  MIKE ROBERTS
 2              A P P E A R A N C E S
 3
 4   FOR THE PLAINTIFF:
 5
 6          Jonathan Youngwood, Esq.
 7          Raul Duran, Esq.
 8          SIMPSON THACHER & BARTLETT
 9          425 Lexington Avenue
10          New York, New York 10017
11
12
13
14
15          Joshua Tom, Esq.
16          ACLU OF MISSISSIPPI
17          P.O. Box 2242
18          Jackson, Mississippi 39225
19
20
21
22
23
24
25
```

```
                                          Page 4
 1                  MIKE ROBERTS
 2              A P P E A R A N C E S
 3                C O N T I N U E D
 4
 5   FOR LAFAYETTE COUNTY, MISSISSIPPI:
 6
 7          David O'Donnell, Esq.
 8          CLAYTON O'DONNELL
 9          1403 Van Buren Avenue
10          Oxford, Mississippi 38655
11
12
13
14
15   ALSO PRESENT:
16          William Thomas, videographer
17
18
19
20
21
22
23
24
```

```
                                          Page 5
 1                  MIKE ROBERTS
 2                  I N D E X
 3          EXAMINATION INDEX
 4
 5   BY MR. YOUNGWOOD                    10
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 6

```
MIKE ROBERTS
EXHIBIT INDEX
```

EXHIBIT 1   4/20/2015 Facility Use          32
            Policy; Bates Lafayette
            County DOC000002 to
            Lafayette County DOC000005

EXHIBIT 2   3/4/2019 Facility Use           37
            Policy; Bates Lafayette
            County DOC000006 to
            Lafayette County DOC000010

EXHIBIT 3   3/4/2019 Facility Use           51
            Policy; Bates Lafayette
            County DOC000006 to
            Lafayette County DOC000010

EXHIBIT 12  Order: Amend Facility Use       54
            Policy Regarding Use of
            Courthouse Grounds; Bates
            Lafayette County DOC000052

EXHIBIT 14  6/17/2020 email; Bates          87
            Lafayette County Doc001262

EXHIBIT 17  Social media posts; Bates       133
            Lafayette County Doc001615
            to Lafayette County
            Doc001617

EXHIBIT 18  6/18/2020 email; Bates          132
            Lafayette County DOC000261
            to Lafayette County
            DOC000266

EXHIBIT 20  6/19/2020 email from            88
            Settle; Bates Lafayette
            County Doc000848

EXHIBIT 27  7/6/2020 Board of               80
            Supervisors agenda; Bates
            Lafayette County DOC000011
            to Lafayette County
            DOC000013

Page 7

```
MIKE ROBERTS
EXHIBIT INDEX

CONTINUED
```

EXHIBIT 28  7/27/2020 email; Bates          128
            Lafayette County DOC000038

EXHIBIT 29  7/14/2020 Rash Facility         122
            Use Application

EXHIBIT 32  Order:  Approve Revision        111
            of Facilities Use Policy
            to Include a Requirement
            of Application to be Made
            14 Days Prior to Date of
            Proposed Use and Requiring
            Closure of Courthouse
            Grounds 30 Minutes Before
            Dusk; Bates Lafayette
            County DOC000001

EXHIBIT 39  Photograph                      20
EXHIBIT 46  Photographs                     100
EXHIBIT 47  Photograph                      94
EXHIBIT 48  Photograph                      94
EXHIBIT 49  Photograph                      94
EXHIBIT 50  Photograph                      94
EXHIBIT 53  Blank Facility Use              136
            Application

Page 8

MIKE ROBERTS

THE VIDEOGRAPHER:  Good morning.  My name is William Thomas.  I'm a certified legal videographer in association with TSG Reporting.

Due to the severity of the COVID-19 and following the practice of social distancing, I will not be in the same room with the witness.  Instead, I will record this videotaped deposition remotely.  The reporter, Greta Duckett, also will not be in the same room with the witness and will swear him in remotely.

Do all parties stipulate to the validity of this video recording and remote swearing in, and that it will be admissible in the courtroom as if it had been taken following Rule 30 of the Federal Rules of Civil Procedures and the state's rules where this case is pending?

Page 9

MIKE ROBERTS

MR. YOUNGWOOD:  For plaintiff -- for plaintiff, yes.

MR. O'DONNELL:  For the defendant, of course, subject to evidentiary objections, agreed.

THE COURT REPORTER:  Thank you.

THE VIDEOGRAPHER:  All right.  Thank you very much.

We are going on record at 9:23 on January 13th, 2021.  This is the videotaped deposition of Mr. Mike Roberts, taken in the matter of John Rash versus Lafayette County, Mississippi.  This is in the United States District Court, Northern District of Mississippi, Oxford Division, Case Number 3:20-cv-224-NBB-RP.

Counsel, would you now identify yourselves for this proceeding?

MR. YOUNGWOOD:  Jonathan Youngwood, Simpson Thacher, for the

MIKE ROBERTS

1
2    plaintiff.
3              MR. O'DONNELL:  David
4         O'Donnell --
5              MR. TOM:  Joshua Tom -- oh.
6         Go ahead.
7              MR. O'DONNELL:  Go ahead,
8         Joshua.
9              MR. TOM:  Joshua Tom with the
10        ACLU of Mississippi for plaintiff.
11             MR. O'DONNELL:  And David
12        O'Donnell on behalf of Lafayette
13        County, Mississippi.
14             THE VIDEOGRAPHER:  All
15        right.  Thank you.
16             The court reporter may now
17        swear in the witness.
18             MIKE ROBERTS,
19        the witness, having first been duly
20   sworn to speak the truth, the whole truth and
21   nothing but the truth, testified as follows:
22             EXAMINATION
23   BY MR. YOUNGWOOD:
24        Q.   Mr. Roberts, good morning.  I'm
25   sorry for the preliminary waste of your time as

MIKE ROBERTS

1
2    we all tried to get everything to work.  And --
3    and I -- and I also recognize you're -- you're
4    undoubtedly a busy man, and I'm going to try to
5    keep this as efficient as -- as I can.
6              Mr. Roberts, could you state
7    your -- your current -- well, you're currently
8    the president of the board of supervisors of
9    Lafayette County, correct?
10        A.   Yes, sir.
11        Q.   Okay.  And do you have -- is that a
12   paid position?
13        A.   Same as -- statutorily, the same as
14   the rest of the supervisors.
15        Q.   Okay.  But there --
16        A.   You don't get anything extra for
17   being the -- you don't get anything extra for
18   being the president.
19        Q.   What -- what -- what is -- what is
20   the payment arrangement for the members of the
21   board, including yourself?
22        A.   Are you talking about an amount?
23        Q.   Yes.  If you know.
24        A.   45-7.  I'm -- I'm not real sure.  I
25   know that sounds terrible --

MIKE ROBERTS

1
2         Q.   I'm sorry.  Forty-
3         A.   -- but 45-7.  I think it's about
4    45-7.
5         Q.   45 -- $45,000?
6         A.   Yeah.  Roughly.  Roughly, in
7    that -- 45-7, I think, is what it is.  I just
8    don't remember off the top of my head.
9         Q.   Okay.  And do you have other
10   employment, sir?
11        A.   I do.
12        Q.   What -- what else do you do?
13        A.   I'm an insurance agent, direct
14   sales, employee benefit insurance sales agent.
15        Q.   Okay.  And how long have you been
16   doing that?
17        A.   Roughly, 18 years.
18        Q.   Okay.  Prior to that, what did you
19   do?
20        A.   Prior to insurance, I was a night
21   auditor at a hotel here in Oxford.
22        Q.   Okay.  And how many years did you
23   do that?
24        A.   You're asking me to dig deep.
25   Probably two or three.  It's been so long ago,

MIKE ROBERTS

1
2    I couldn't tell you.
3         Q.   Okay.
4         A.   Two years.
5         Q.   And -- and we won't go back,
6    perhaps, through your whole history.  But prior
7    to that, what did you do?
8         A.   I was an astounding college
9    student.
10        Q.   Okay.  Where did you go to college,
11   sir?
12        A.   University of Mississippi.
13        Q.   Okay.  And you graduated -- you
14   were graduated from there?
15        A.   Right.
16        Q.   What -- what year was that?
17        A.   '98.  '98.
18        Q.   '98.  What was your field of study?
19        A.   Business.
20        Q.   Okay.  And did you grow up in the
21   Oxford area?
22        A.   I did.
23        Q.   Okay.  So more or less lived --
24   lived in the area in the county your whole
25   life?

MIKE ROBERTS

1
2     A.    I have.
3     Q.    Other than your position on the
4  board of supervisors -- and we'll go through
5  that a little bit -- have you ever been
6  employed by government?
7     A.    I have not.
8     Q.    Have you ever -- whether it was an
9  employment or not, have you ever held any other
10 public offices?
11    A.    I have not.
12    Q.    Okay.  You were first elected to
13 the board in 2011.  Do I understand that
14 correctly?
15    A.    That's correct.  I think that was
16 my first term, yes, sir.
17    Q.    Okay.  Why did you decide to run
18 for the board?
19    A.    Lifelong interest in politics and
20 public service.
21    Q.    Okay.  And so you've subsequently
22 been reelected to the board how many times?
23    A.    I started -- this is my third term.
24    Q.    Okay.  And that was -- I'm sorry.
25 When did your third term start?

MIKE ROBERTS

1
2     A.    January of '20.
3     Q.    Okay.  And you've recently changed
4  your party registration, do I understand, from
5  Democrat to Republican?
6     A.    I did.
7     Q.    And you did that subsequent to the
8  election.  Do I have that right?
9     A.    That is correct.
10    Q.    Okay.  What was the reason for
11 that, sir?
12    A.    Just personal convictions.
13    Q.    Okay.  Had you been a lifelong
14 Democrat accurate prior to that?
15    A.    Yes, sir.
16    Q.    Okay.  When did you become
17 president?
18    A.    At the start of this term.
19    Q.    Okay.  And I'm sorry for not
20 knowing this.  Were you elected to be
21 president, or -- or does the -- do your
22 co-supervisors elect you?  In other words, did
23 you run --
24    A.    The co-supervisors.  No.  The
25 board -- the board internally decides that.

MIKE ROBERTS

1
2     Q.    Okay.  And did you -- why did you
3  determine to seek to be president?
4     A.    I don't know that I sought to be
5  it, as much as it was that, being a returning
6  supervisor, you know, leaned towards me holding
7  that position.
8     Q.    Okay.  What additional
9  responsibilities do you have as president?
10    A.    A lot of ribbon cuttings, a lot of
11 speeches, taking the minutes -- I mean, signing
12 off on the minutes, conducting the meetings,
13 you know, as -- as we have scheduled.
14    Q.    Okay.  And maybe I should go back a
15 little bit.  What do you understand your duties
16 to be as a supervisor?
17    A.    More of a public-relationships kind
18 of guy.  As a supervisor in general, just for
19 my district to represent, to -- to kind of
20 share their views and what -- what they hope
21 that this board will accomplish, but, more
22 specifically, myself and the folks that are in
23 my district.
24    Q.    What do you understand to be the
25 responsibility, then, of the board as a whole?

MIKE ROBERTS

1
2  What -- what area -- what is it responsible for
3  doing?
4     A.    Our board is, I would say,
5  countywide, outside the city limits, just to
6  make sure that their taxpayer moneys are being
7  used for the growth.  And not just
8  economically, but their own physical and mental
9  growth, you know, countywide; that they have a
10 voice in their expenditures of their tax
11 dollars.
12    Q.    Okay.  And what about with respect
13 to law enforcement?  What do you understand
14 your duties to be with respect to law
15 enforcement?
16    A.    For me personally, is -- is to
17 support them in any role and fashion that I can
18 that would, you know, correlate with the wishes
19 of my district, which, for us, that's fully
20 support them in every way we can.
21    Q.    Okay.  What role do you have in
22 setting their -- their -- and by the way, law
23 enforcement, are we referring to the sheriff's
24 office?  Is that what we're referring to?
25 When -- when you think of your --

Page 18

MIKE ROBERTS

1
2    A.    That's the way I --
3    Q.    Go ahead. Sorry. I didn't mean to
4 speak over you.
5    A.    Yes. That's the way I took it,
6 that you were saying the sheriff's department
7 is our law enforcement. We certainly would
8 support our, you know, first responders with
9 our, you know, fire department and stuff like
10 that. But law enforcement, I -- I would refer
11 to as -- as sheriff's department.
12   Q.    Okay. What role does the board of
13 supervisors have in the sheriff's department
14 budget?
15   A.    We -- we approve it or not approve
16 it, based on, you know, tax revenues we receive
17 as a county whole, as most departments are,
18 that -- that they present to the board.
19 Between the county administrator and ourselves
20 and our controllers, we -- we go through
21 budget -- budget items just like we do any
22 other department.
23   Q.    Okay. And if you thought their
24 budget was inadequate, what power would you
25 have to raise additional funds that could have

Page 19

MIKE ROBERTS

1
2 a larger budget?
3    A.    I don't know that power-wise that
4 we're to raise their budget. I think we just
5 have to look at it as it -- as it arises in
6 terms of public safety countywide.
7    Q.    Okay. Now, the county -- included
8 within the county is the city of Oxford,
9 correct?
10   A.    Yes, sir.
11   Q.    And there are some grounds within
12 the city of Oxford that are actually county
13 property as opposed to city property; is that
14 right?
15   A.    Correct.
16   Q.    And one of those grounds is the
17 county courthouse that's in the middle of the
18 Oxford city square, correct?
19   A.    Yes, sir.
20   Q.    Okay. And you understand that, in
21 part, this litigation concerns those grounds?
22   A.    Correct.
23   Q.    Okay. If we could turn, sir,
24 within this binder you've been provided, to the
25 tab marked 39.

Page 20

MIKE ROBERTS

1
2           Give me one second, sir. I'm
3 sorry. Hold on.
4              (Technical discussion.)
5              (Exhibit 39 was marked for
6               identification.)
7 BY MR. YOUNGWOOD:
8    Q.    So see you'll a collection of -- of
9 photographs at this tab 39, which we'll mark as
10 Exhibit 39. They're numbered B-1 through B-23.
11 Do you have the right document in front of you?
12   A.    I do, yes, sir.
13   Q.    Okay. And, sir, do you -- do you
14 recognize -- we can just start with the first
15 one -- this to be a picture of that county
16 courthouse that we were just discussing?
17   A.    I do.
18   Q.    Okay. What are the -- I understand
19 it's a courthouse and it's an active
20 courthouse, but in addition to that, the -- the
21 grounds of the courthouse over the years -- you
22 said you -- you've been a Lafayette County
23 resident your whole life. What are these
24 grounds used for?
25   A.    Primarily, we have the circuit

Page 21

MIKE ROBERTS

1
2 court at this time and circuit clerk's office
3 for their daily functions and -- and to hold
4 court.
5    Q.    Okay. The grounds themselves are
6 surrounded by a low-rise fence. You can see
7 that in any number of these pictures, correct?
8    A.    I can.
9    Q.    Okay. And this fence, do you know
10 how long it's been in place?
11   A.    I do not.
12   Q.    Okay. As -- as long as you can
13 remember, a fence has been --
14   A.    As long as I -- yes, sir.
15   Q.    Okay. And the openings in the
16 fence that you can see in some of these
17 pictures -- I'm looking at, for example, B-3
18 right now, kind of an opening right in front of
19 the statue -- those have been there as long as
20 you can recall, correct?
21   A.    Yes, sir.
22   Q.    Okay. And there's -- there's no
23 gate or anything that closes them off, correct?
24   A.    No, sir.
25   Q.    And there are no signs that suggest

Page 22

MIKE ROBERTS

1
2 limited access to the grounds, correct?
3     A.    Not that I -- not that I'm aware
4 of.
5     Q.    Okay.  And so no manner in which an
6 individual in the town square would -- would
7 know that there was any restriction to access
8 to these grounds, correct?
9     A.    Other than anything that might be
10 posted, but I'm not aware of anything.
11     Q.    Okay.  The square as a whole,
12 what -- what functions has it performed over
13 time?
14     A.    The entire Oxford square?
15     Q.    Yeah.
16     A.    Place of commerce and growth.  City
17 hall there, so there's some government business
18 conducted on the city's behalf.  But primarily
19 commerce and entertainment.
20     Q.    Effectively, the center of -- of
21 the town, correct?
22     A.    Yes, sir.
23     Q.    And -- and perhaps also the center
24 of the county; fair to say?
25     A.    I haven't looked at it

Page 23

MIKE ROBERTS

1
2 geographically, but I would -- I would think
3 so.
4     Q.    Well, I didn't even mean just
5 physically geographically.  I mean, it's the
6 center of commerce and business and
7 entertainment and the other things that you
8 listed?
9     A.    If you say so.  I think Oxford, as
10 a whole, is probably -- probably used pretty
11 uniformly from county line to county line.
12 Inside the city limits is -- you'll find the
13 same type of commerce and entertainment
14 countywide.
15     Q.    Okay.  It's also an area that, in
16 the past, has sometimes been used for marches,
17 correct?
18     A.    Are you talking about, like,
19 demonstrations?
20     Q.    Start with demonstrations, yeah.
21     A.    It has.
22     Q.    And even not demonstrations, but --
23 but, perhaps, for holidays, celebrations,
24 parades, that sort of thing?
25     A.    Right.

Page 24

MIKE ROBERTS

1
2     Q.    And -- strike that.
3           Are you aware -- let's just,
4 perhaps, start with the years you've been on
5 the board of supervisors -- of any safety
6 issues, any incidents of violence that have
7 been associated with the county courthouse
8 grounds?
9     A.    I'm not aware of any -- any
10 violence.  There's always concern of safety
11 when you get in -- when you get in an area as
12 confined as the square of Oxford.
13     Q.    Okay.  And that -- that safety
14 also --
15     A.    Off the top of my head, I do not
16 remember any -- I'm sorry.
17     Q.    No.  Please go ahead.  Finish --
18 finish your sentence.  I think you were going
19 to say you don't, off the top of your head,
20 remember any violence?  Is that what you were
21 going to say?
22     A.    I'm not -- off the top of my head,
23 I'm not aware of any -- any instances
24 specifically.  I just know that safety's always
25 a concern with a confined area like that.  With

Page 25

MIKE ROBERTS

1
2 the way the traffic flows around the courthouse
3 square and the square in general, it's always a
4 concern.
5     Q.    Okay.  And -- and perhaps it's also
6 a concern because some of the establishments
7 that line the square serve alcohol?
8     A.    I don't -- I don't know that that
9 changes the inherent danger or safety concerns
10 around it.
11     Q.    Okay.  So the concerns you just
12 listed, I heard you list traffic as a concern.
13     A.    One of them.
14     Q.    Okay.  What -- what other concerns
15 have you had about safety in the square?
16     A.    It's just the -- the engineering
17 aspects of it.  I don't know if you've ever
18 been to Oxford.  Just the, you know, pedestrian
19 traffic that -- that is encouraged around the
20 square.  I don't know if you've been there, but
21 the -- the visual line of sight is not really
22 conducive for pedestrian -- pedestrian
23 walkways, crossing the streets, and -- and
24 there's a lot of, you know, foot traffic,
25 window shopping or, you know, door-to-door.

Page 26

MIKE ROBERTS

1  MIKE ROBERTS
2  And when they're crossing these streets,
3  it's -- the -- the visibility is not always
4  conducive to safety.
5       Q.    Okay.  We had talked about
6  violence.  Are you aware -- and you couldn't
7  recall any.  Are you aware of any -- any
8  injuries directly related to the -- the type of
9  matters you just listed -- pedestrians walking,
10 the traffic patterns, all those things -- in
11 the time you've been supervisor?
12      A.    I haven't really thought about it
13 in a while, but off the top of my head, nothing
14 specific.  But I just haven't really -- I
15 haven't really written it down or tried to keep
16 up with it.
17      Q.    Okay.  And how about destruction of
18 property?  Can you think of incidents of
19 meaningful destruction of property associated
20 with the square in the years that you've been
21 on the board of supervisors?
22      A.    I -- you know, meaningful is
23 probably relevant, but, yeah, there's -- I
24 mean, there's been small cases of vandalism or
25 inadvertent damage to, specifically, our

Page 27

MIKE ROBERTS

1  MIKE ROBERTS
2  courthouse grounds.  I'm not sure about the
3  city, if they have documented any type of
4  vandalism or -- or conduct like that.  But I
5  know we've had some, you know, minor theft and
6  probably incidental damage to the courthouse
7  grounds over the years.  But, there again, I
8  have not documented those in --
9       Q.    Okay.
10      A.    -- something I can pull -- pull out
11 of my head real quick.
12      Q.    Okay.  You can't -- you can't,
13 sitting here right now -- and I understand you
14 haven't thought about it in a while.  But you
15 can't, sitting here right now, identify any
16 specific instances of vandalism?
17      A.    The only specific one that pops in
18 my head right now is the -- on the statue,
19 there was some cannonballs that had taken --
20 been taken off or ornamental ball -- I don't
21 know what -- what you want to call them, but I
22 know that those have been stolen in the past
23 since I've been in office.
24      Q.    Okay.  Let's go to that in a
25 second.  Other than something associated with

Page 28

MIKE ROBERTS

1  MIKE ROBERTS
2  the statue itself, can you think of any
3  instances of vandalism in the decade or so
4  you've been on the board of supervisors in
5  the -- around the courthouse or in the town
6  square?
7       A.    I don't remember any right now.
8       Q.    Okay.  Let's take a look at --
9  interesting -- Exhibit -- we'll keep the 39.
10 There's a picture -- the first page has a
11 statue.  That's really what I was looking for.
12      A.    On 39?  Okay.
13      Q.    Same -- same tab you were in, just
14 the first page.  It has B-1 on the bottom.
15      A.    Yes.
16      Q.    That's -- the statue we're
17 referring to is the statue that's on the left
18 side of this picture, right?
19      A.    Correct.
20      Q.    Between the cars, right?
21      A.    Right.
22      Q.    Okay.  And when you're referring to
23 the vandalism and the cannonballs, are those
24 the -- the round objects toward the base of the
25 statue?

Page 29

MIKE ROBERTS

1  MIKE ROBERTS
2       A.    Yes, sir.
3       Q.    And so what -- what has happened in
4  the past?
5       A.    Those have -- those have been
6  taken.
7       Q.    Okay.  Are they not affixed?  Are
8  they -- one's able to --
9       A.    They are.  They are.
10      Q.    But people are determined and find
11 a way?
12      A.    I guess so.  Yeah.  I'm not sure
13 what the resale market for it is, but yes.
14      Q.    Okay.  And when's the last time you
15 can think of that occurring?
16      A.    I hate to be broad with you, but I
17 just know it's been since I've been elected to
18 supervisor --
19      Q.    Okay.
20      A.    -- we've had to replace one.
21      Q.    You've had -- so you can think, in
22 the 10 years, you -- you can remember at least
23 one instance where you've replaced one?
24      A.    This latest, yes, sir.
25      Q.    Okay.  You can't think of any other

Page 30

MIKE ROBERTS

1  instances?

2      A.    Not during my term.  I know that
3  they've -- the only reason I know it's been
4  taken before is because they remembered the
5  price being expensive and had to -- had to
6  replace it before.  So we had a little -- I
7  don't remember where the information came from.
8  Somebody had the vendor that we had replaced
9  them before with.
10     Q.    I see.  You're -- you're
11 remembering it happened sometime in your 10
12 years, and when it happened, somebody said, oh,
13 the last time we did this, it cost whatever it
14 cost?
15     A.    Whatever it was.  But yeah.  How do
16 you go about replacing these?  Well --
17     Q.    Okay.
18     A.    We knew how to replace them because
19 we had had the vandalism that had happened
20 before.
21     Q.    Okay.  Other than what we've just
22 discussed about the cannonballs, any other
23 instances of vandalism that you can
24 specifically recall related to the courthouse,

Page 31

MIKE ROBERTS

1  the courthouse grounds, or -- or the square in
2  general?
3      A.    I just haven't thought about it.
4  I'll have -- I mean, I'm sure there is; I just
5  can't remember right now.
6      Q.    Okay.  And are there other places
7  in the county where vandalism sometimes occurs?
8      A.    I'm sure.  I haven't -- I haven't
9  conferred with the sheriff recently, but I'm
10 sure there's vandalism.
11     Q.    Okay.  And you had mentioned
12 traffic concerns.  I assume there are other
13 places in the county where you have traffic
14 concerns?
15     A.    Yes, sir.
16     Q.    Okay.  And although you couldn't
17 recall any direct violence associated with the
18 courthouse square while you've been supervisor,
19 have there -- there has, I assume, been
20 violence within the county in the 10 years
21 you've been supervisor?
22     A.    Oh, I'm -- I'm -- yes, sir.
23     Q.    Can you -- can you think of
24 specific instances there that -- that occurred,

Page 32

MIKE ROBERTS

1  now that we've broadened it to beyond the --
2             (Simultaneous speakers.)
3      A.    I don't have any details.  I know
4  we've had some -- we've had some murders.
5  We've had some -- some -- you know, I'm sure
6  domestic disputes.  I just don't remember
7  specifics.  But I -- we're -- we're not immune
8  to our share of violence or crime.
9      Q.    Okay.  But -- but you're not
10 thinking of any of those instances taking place
11 on the courthouse square, correct?
12     A.    No, sir.
13            MR. YOUNGWOOD:  Okay.  Let's
14        take a look at the first tab.
15        We'll mark this as Exhibit 1 to
16        Mr. Roberts' deposition.
17            (Exhibit 1 was marked for
18            identification.)
19 BY MR. YOUNGWOOD:
20     Q.    Do you -- you recognize this?
21 Take -- and take as much time as you need to
22 look at it.  You may not have seen it in a
23 while.  It's a -- it's a document
24 Bates-numbered doc2 to 5, and it has an

Page 33

MIKE ROBERTS

1  effective date on the top of August 20, 2015.
2         Do you know what this is?
3      A.    Titled, Facility Use Policy --
4      Q.    And do you recognize it, sir, as --
5  as the facility use policy related to the
6  county facilities as of (indiscernible) --
7      A.    I --
8             (Simultaneous speakers.)
9  BY MR. YOUNGWOOD:
10     Q.    -- of 2015?
11     A.    It appears to be.
12     Q.    Okay.
13            (Court reporter
14            clarification.)
15     A.    It appears to be, yes, sir -- yes,
16 ma'am.
17     Q.    So -- so this version is dated
18 April 2015.  Do you recall adopting this
19 policy, as a member of the board of
20 supervisors?
21     A.    Yes, sir.
22     Q.    And just to be specific, you recall
23 adopting it in April of 2015?
24     A.    I don't remember the date

Page 34

MIKE ROBERTS

1      MIKE ROBERTS
2  specifically, but I remember us adopting the
3  facility use policy.
4      Q.    Was there one prior to this policy?
5      A.    Not that I'm aware of.  I think it
6  was in general -- generalities that we had, you
7  know, used -- but nothing -- nothing
8  documented.
9      Q.    Okay.
10     A.    I think this was the year we first
11 decided to -- that we needed a facility use
12 policy.
13     Q.    Okay.  And what -- what gave rise
14 to the need for this policy?
15     A.    I think, in general, it was just
16 the increased requests to use the courthouse
17 grounds, county facilities, that we realized
18 that we needed some kind of formal guidelines
19 to go by.
20     Q.    Okay.  You mentioned the courthouse
21 grounds.  This policy, am I correct, is not
22 specific to the courthouse?
23     A.    Right.  You -- but you asked
24 what -- what facilitated the use --
25     Q.    Yep.

Page 35

MIKE ROBERTS

1      MIKE ROBERTS
2      A.    -- of this guideline, so it's --
3  it's -- this applies to the county facility as
4  a whole.  But what it -- what spurred this
5  policy, this document, was the requested use of
6  our courthouse grounds.
7      Q.    Okay.  And when -- when did you
8  observe that there had been an increase in the
9  requests to use the courthouse grounds?
10     A.    I don't remember a specific time.
11 Just in general while I was serving as
12 supervisor, that our county administrator kept
13 getting requests to use courthouse grounds.
14     Q.    And use it for what?
15     A.    Anything from weddings to meetings
16 to a -- arts and crafts shows to -- a wide
17 variety of uses.
18     Q.    Okay.  Those types of uses -- I
19 mean, at least in some respect, those have been
20 going on for -- for years as of 2015; is that
21 fair to say?
22     A.    I don't think so.  I'm not -- I'm
23 not sure that they've been going on -- I don't
24 know.  I couldn't tell you how long or not how
25 long.

Page 36

MIKE ROBERTS

1      MIKE ROBERTS
2      Q.    Okay.  And so what was the process
3  that was used to come up with this policy?
4      A.    County administrator, they adopt --
5  I think they looked at -- around at local.  But
6  there again, my knowledge is I'm not sure of
7  the actual words or -- or guidelines, but I'm
8  assuming they probably consulted with law
9  enforcement surrounding the city of Oxford or
10 university and kind of -- you know, just to see
11 what -- what other municipalities are doing.
12     Q.    Okay.  And what role did you play,
13 if any, in drafting this?
14     A.    I'm sorry?
15     Q.    What role did you play in putting
16 this together?
17     A.    None, other than reviewing it when
18 it became time for our vote.
19     Q.    Okay.  And you -- I don't think we
20 have the records of that meeting, but you --
21 you voted to approve this?
22     A.    I don't have it in front of me, but
23 yes, sir, I'm pretty confident in saying I did.
24     Q.    Okay.  And once it was in place,
25 did it work well?  Did it serve the purposes

Page 37

MIKE ROBERTS

1      MIKE ROBERTS
2  you were hoping it would serve?
3      A.    Compared to what we had previously,
4  absolutely.
5      Q.    Okay.  And -- and what do you mean
6  by that?
7      A.    I mean, we didn't have anything in
8  writing before, and now we had a facility use
9  policy that was adopted and published for the
10 public to see, something to go by.
11     Q.    Okay.  If you could turn to the
12 second tab in the binder, which we'll mark as
13 Exhibit 2 to Mr. Roberts' deposition.
14              (Exhibit 2 was marked for
15               identification.)
16 BY MR. YOUNGWOOD:
17     Q.    It has Bates number doc6 through
18 10.  You'll see here that the -- the effective
19 date on this document is now March 4th, 2019.
20     A.    I do.
21     Q.    Do -- do you recall revising the
22 policy in March of 2019 or thereabouts?
23 Perhaps the work was done earlier than March.
24     A.    Right.  I'm not sure of the date,
25 but I do remember some revisions.

Page 38

MIKE ROBERTS

2     Q.    And what do you recall giving rise
3 to the need for revisions?
4     A.    I think, you know, as any kind of
5 working document, it evolves.  And I think our
6 biggest concern was our -- our sheriff had
7 issues, concerns about safety issues, and we
8 needed to address -- address that with him in
9 support of his ability to -- to protect the
10 courthouse grounds or county facilities in
11 general.
12    Q.    So the sheriff -- and who was the
13 sheriff in -- in 2019?  Which sheriff are we
14 referring to?
15    A.    I don't remember if that was Scott
16 Mills, the chief deputy, or Buddy East.
17    Q.    Okay.
18    A.    Joey -- Joey East is the one that
19 brought the concerns to us, Sheriff East.
20    Q.    He -- he brought those to you in
21 March of 2019 or February of 2019?
22    A.    I don't remember the specific
23 times.  I know it was early in the year that
24 we -- our concerns were based off the -- the
25 law enforcement's security of the courthouse

Page 39

MIKE ROBERTS

2 grounds and facilities.
3    Q.    Okay.  But -- so you don't remember
4 if it was March or February, but you remember
5 it was in advance of the adoption of this
6 policy that's marked as Exhibit 2?
7    A.    As the -- as the one we're looking
8 at now, the effective date that you have on
9 here, March 4th?
10    Q.    Yes.
11    A.    Right.
12    Q.    Yeah.  Okay.  And you think it was
13 Sheriff East that -- in whatever position he
14 was in at the time, that brought these concerns
15 to you?
16    A.    I can't remember who was the
17 sheriff at that time that brought it.
18    Q.    Okay.  Let's -- let's not go by
19 name, then.  The sheriff at that time brought
20 concerns to the board of supervisors -- and
21 that time being early 2019 -- and those
22 concerns, in part, led to the changes that are
23 put into the policy, the copy of which you're
24 looking at right now, which is marked as
25 Exhibit 2?

Page 40

MIKE ROBERTS

2    A.    Right.
3    Q.    Okay.  And what were the concerns
4 that were brought to the board's attention in
5 early 2019?
6    A.    Just basically the security of
7 the -- of the square and the safety for the
8 public that was using it at that time; that our
9 sheriff's department wasn't equipped to patrol
10 it.  But also that -- that, you know, in
11 conjunction with our -- with the city policy,
12 facility use policy they had, that ours, we
13 thought, needed to be in more line, a uniform
14 deal, in line with theirs so that -- that
15 everybody was on the same page and could --
16 could enforce it in an efficient manner.
17 Instead of having two or three different
18 policies, that we tried to get one that was
19 kind of in line with -- with the surrounding
20 university and city also.
21    Q.    So what -- what aspects of the
22 policy were -- actually, strike that.  I'll get
23 back to that in a second.
24    What were the specific safety
25 concerns that the sheriff brought to the

Page 41

MIKE ROBERTS

2 board's attention in early 2019?
3    A.    Just off the top of my head, I
4 don't remember all of them.  But, basically, we
5 needed a -- you know, to address the
6 permitting -- permitting process, the amount of
7 people that -- that could be there, when, who's
8 going to pay for it if there's extra law
9 enforcement that has to be brought in or -- or
10 guide traffic.  Just a variety of --
11    At the end of the day, I mean, you
12 know, we're conducting business there at the
13 courthouse on the grounds, and so it's
14 pretty -- pretty imperative that we protect
15 that integrity to do that.
16    Q.    Did the sheriff raise any specific
17 incidents that gave rise to safety concerns?
18    A.    I -- I don't recall specific -- you
19 know, any specifics.  I just haven't -- I
20 haven't really thought about that.
21    Q.    You mentioned that the results were
22 desired to bring your policy and the city
23 policy in line with each other.  Do you
24 remember which aspects of the two policies that
25 you sought to bring in alignment in March of

MIKE ROBERTS

1
2  2019?
3      A.    Mainly the permitting time --
4  timeline.
5      Q.    So the number of days required to
6  get a permit, or the number of days in advance
7  a permit had to be sought?  Is that what you're
8  referring to?
9      A.    Right.  That was one of the primary
10 changes.
11     Q.    Okay.  And what do you recall that
12 change being?
13     A.    I know we -- we went from -- I
14 think, it was a seven-day, a 30-day.  And then
15 later, you know, after the sheriff had figured
16 out that he didn't need the whole 30 days, that
17 we moved it back to 14 and left some leeway
18 there to -- you know, circumstances arise that
19 somebody needed to, you know, use it at a time-
20 sensitive deal, that -- that we had that
21 ability as well.
22     Q.    Okay.  We'll get to the 14 in a
23 bit.  I think that's a change that actually
24 took place in 2020, not 2019.
25     A.    Correct.

MIKE ROBERTS

1
2      Q.    Do you recall, specifically to
3  2019, what the changes were that related to try
4  to bring the city and county policies in
5  alignment with one another?
6      A.    The 30-day permitting.  And I think
7  we may have adopted some, you know, no sticks,
8  no anything that might be used as a weapon
9  needed to be, you know, cleaned up a little bit
10 in the language.  And --
11     Q.    Okay.  So let me just separate
12 those two.  One is the 30 days, that you need
13 to apply 30 days out, right?  That's one of the
14 changes you think was implemented in 2019?
15     A.    I believe so.  I believe so.
16     Q.    And then you referred to -- to
17 sticks.  By that, I think you mean, like, a
18 flagpole or -- or something like that that
19 might be used to hold a banner or flag but
20 could obviously -- well, could obviously, as
21 the whole nation has learned, be used as a
22 weapon?
23     A.    Right.  To the best of my
24 remembrance, that's -- we were trying to
25 prevent any type of article or -- that might be

MIKE ROBERTS

1
2  used as a weapon.
3      Q.    Okay.  There's a -- there's a
4  section on page 3 of the document, which is 3
5  of 4, about security and a discussion of costs.
6  I'll let you just look at that to refresh
7  yourself.
8          Do you remember any discussion
9  about costs and spreading the cost of the
10 requesters of the permit associated with this
11 change in policy?
12     A.    I'm sure we've had discussion.  I
13 do -- I do remember having some.  Specifics, I
14 don't.  But I know we did talk about it at some
15 point.  I can't remember who -- who brought it
16 up or whatever.  But I know that, at some
17 point, I'm sure we had discussions about what
18 it was costing.
19     Q.    Okay.  Based on the policy in place
20 as of March 4th, 2019, what were the criteria
21 that the county would use to determine whether
22 or not to grant a permit for -- we'll -- we'll
23 keep it to the courthouse grounds, use of the
24 courthouse grounds.
25     A.    I'm not sure what the criteria was.

MIKE ROBERTS

1
2  Basically, that was, you know, a county
3  administrator function.  I just -- I don't -- I
4  don't remember what guidelines they used back
5  then to decide.
6      Q.    Okay.  Well, who -- who did you
7  understand was empowered to make the
8  determination as to whether or not to grant a
9  permit under the March 4, 2019, version of the
10 policy?
11     A.    As far as -- as far as I'm
12 concerned, still to this day, it's the county
13 administrator that made those calls.
14     Q.    So not the sheriff?
15     A.    I would -- no, sir.  I would
16 certainly think his input, hopefully, would
17 have been valued.  But at the end of the day,
18 the county administrator would be the one that
19 would have that call.
20     Q.    Okay.  And -- and what role, then,
21 would the board -- you and the other four
22 supervisors -- play in considering permits?
23     A.    Considering them would only come
24 before us if somebody appealed, maybe, on
25 perhaps of a denial, you know, they would come

MIKE ROBERTS

1 appeal that decision to us. But I don't
2 remember that ever happening.
3     Q.    Okay. So let me -- so other than
4 if there was an appeal, you don't understand
5 that the board had any responsibility for
6 granting permits?
7     A.    No. We -- we didn't -- we don't --
8 weren't involved in the process of granting or
9 denying permits.
10     Q.    Okay. And you -- you think that
11 there is a process by which, if a permit was
12 denied, an applicant had the right to appeal to
13 the board?
14     A.    That's my understanding.
15     Q.    Okay. What's your understanding
16 based on?
17     A.    Just conversations over the course
18 of being in this office, that if, you know, a
19 permit was denied, we have our policies and
20 procedures set up, just like we do in a
21 building -- you know, building grounds
22 or development. If somebody disagrees with a
23 planning commission decision, they always have
24 the right to appeal to us.

MIKE ROBERTS

1     Q.    Okay. You say based on
2 conversations. Conversations with who?
3     A.    I'm just sure in general over the
4 course -- I couldn't remember specific names,
5 but I know that -- I'm sure, over the course of
6 two terms and starting a third one, when we
7 started adopting these, that -- that the people
8 have a right to speak. At the end of the day,
9 they elect me. So if they're not happy with
10 our committee --
11     A.    Uh-oh.
12     Q.    I'm okay.
13     A.    Yeah.
14     Q.    That's the benefit of remote.
15 And --
16     A.    Yes. I just -- I believe they have
17 the right to appeal to us. They -- they had
18 the opportunity to vote for us or vote against
19 us, so I think they have the right to -- to
20 appeal a decision.
21     Q.    Okay. And how -- how would an
22 individual whose permit was denied know they
23 had a right to appeal to you?
24     A.    It should be in our public policy

MIKE ROBERTS

1 use document.
2     Q.    Okay.
3     A.    Or in the permitting process.
4     Q.    Okay. You're not aware of it being
5 described in this document that we've been
6 looking at, Exhibit 2, correct?
7     A.    I'd have to go -- it's been a while
8 since I've looked through it, so I'd have to go
9 back and look through it.
10     Q.    Okay. Why don't you just take a
11 moment, sir? It's a four-page document. If
12 I'm miss -- I don't see it in here, but -- if
13 it's in here, I -- if we just take two or three
14 minutes or whatever you need. If you think
15 it's in here, let me know.
16     A.    I'd have to take a little more
17 time, but I don't see it just scanning through
18 it.
19     Q.    Okay. And, look, it -- it says
20 what it says. I'm not --
21     A.    Right. That's right. That's
22 right.
23     Q.    I'm not trying to make this a test
24 or anything, but -- let me ask a different

MIKE ROBERTS

1 question, then.
2     Other than this policy, is there
3 any means by which you think a citizen who
4 sought a permit and was denied would know that
5 they had a right to appeal to the full board?
6     A.    I'm -- I would think, upon denial,
7 conversation with county administrator, you
8 know, they would be afforded that option or --
9 or let know, you know, about that option. And
10 I haven't even seen an actual permit form.
11 Maybe it's on that. I'm not -- I'm not aware.
12 I've never seen the actual permit request form.
13 But I would think that -- and hope that, upon a
14 denial of a permit, that -- that the applicant
15 was informed at that time.
16     Q.    Okay. And the policy itself --
17     MR. YOUNGWOOD: Sorry.
18     Somebody else speaking? No. Just
19     an echo.
20 BY MR. YOUNGWOOD:
21     Q.    The policy itself, how are the
22 people who live within the county -- how would
23 one know that this is the policy?
24     A.    It's published on our web page.

MIKE ROBERTS

1
2      Q.     Okay.   Has this policy -- we're
3  going to go and look at -- at changes that were
4  made last year in a little bit.
5           (Technical discussion.)
6           MR. YOUNGWOOD:  We can go off
7           the record and maybe take a
8           five-minute break and let
9           Mr. Roberts get a charger and not
10          have a -- not have him --
11          THE VIDEOGRAPHER:  Okay.  So
12          we are -- we're going off record.
13          The time is 10:08.
14          (Recess from 10:08 a.m. to
15          10:22 a.m.)
16          THE VIDEOGRAPHER:  Back on
17          record.  The time is 10:22.
18  BY MR. YOUNGWOOD:
19      Q.     Mr. Roberts, we've obtained the
20  binder that is more catered toward your
21  examination, and we'll use that going forward.
22  And what I'd actually like you to do is turn to
23  tab 3 in it.
24      A.     3?
25      Q.     Tab 3, yeah.  I think you will see

MIKE ROBERTS

1  that this is the exact -- and we're going to
2  mark this as Exhibit 3.
3
4           (Exhibit 3 was marked for
5           identification.)
6  BY MR. YOUNGWOOD:
7      Q.     This is the same document that we
8  were looking at before the break that had also
9  been marked as Exhibit 2.  But since we'll be
10  looking at this binder, we'll use this version,
11  which is tab 3.  And it's marked as Exhibit 3,
12  and it -- it, like the prior one, has Bates
13  numbers on the bottom, doc6 through 10.
14          We are going to look at further
15  changes that the board of supervisors adopted
16  with respect to the policy during the summer of
17  2020 in a bit.  But I want to ask you:  The
18  full policy, as -- as it appears in Exhibit 3,
19  has that been updated?  Is there a current full
20  version of the policy?
21      A.     Yes, sir.
22      Q.     And when was that?  When did that
23  take place?
24      A.     I don't remember the date.  But
25  we -- we got all the updates posted, and I put

MIKE ROBERTS

1  on our website to reflect all the changes we
2  made.  It's -- I'm trying to think when we --
3  when we adopted it.
4      Q.     Okay.  How long --
5      A.     It -- it --
6      Q.     Go ahead.  Sorry.
7      A.     Sorry?
8      Q.     Go ahead.  I cut you off.  Please
9  go ahead.
10      A.     No.  I'm sorry.  I'm just saying I
11  don't remember a specific date, but I do -- I
12  do know that we have -- we have included all
13  the changes or updates we've had.  And we got
14  one document posted for public, you
15  know, viewing.
16      Q.     Okay.  And posted would be on your
17  website?
18      A.     Yes, sir.
19      Q.     Okay.  And you don't remember when
20  that went up?
21      A.     I don't remember that date.  It was
22  at our board meeting, regular -- regular board
23  meeting we had.  I just don't remember a
24  specific date.

MIKE ROBERTS

1
2      Q.     Was it -- I'm -- I'm going to show
3  you some minutes from various board meetings or
4  minutes or other documents related to board
5  meetings in a second.  Was it after you had
6  made all the changes at a further subsequent
7  board meeting, or was it done in conjunction
8  with some of the changes that were made during
9  the summer of 2020?
10      A.     To my knowledge, I think we -- we
11  needed one document to reflect all the changes
12  that we made to -- you know, just to be clear
13  with everybody.  Just to have --
14      Q.     Right.
15      A.     -- everything that we -- we had
16  made adjustments on in one document.
17      Q.     Okay.  Let's go now, if we could,
18  sir, to tab 12.
19      A.     12.
20      Q.     So this should be a one-page
21  document with Bates number doc52.  It has on
22  the top, Order: Amended Facility Use Policy
23  Regarding the Use of Courthouse Grounds.
24          Do you -- is that what you're
25  looking at?  Okay.  Great.

MIKE ROBERTS

1
2    A.    Yes, sir.
3    Q.    This -- this is marked, then, as
4 Exhibit 12.
5              (Exhibit 12 was marked for
6              identification.)
7 BY MR. YOUNGWOOD:
8    Q.    Do you -- you recognize this
9 document?
10   A.    Yes, sir.
11   Q.    What do you recognize it to be?
12   A.    Just as I read it, just an agenda
13 item to amend the facility use policy regarding
14 the courthouse grounds.
15   Q.    Okay.  And --
16   A.    Specifically, into the four or
17 five.
18   Q.    Okay.  You voted in favor of this
19 amendment, correct?
20   A.    I did.
21   Q.    Okay.  And you -- you were -- you
22 were the president as of the time of this
23 amendment, correct?
24   A.    Yes, sir.
25   Q.    Okay.  And I -- I may have been

MIKE ROBERTS

1
2 confused by your prior testimony.  You became
3 president in 2020, correct?
4    A.    That's right.  When this first new
5 term started.
6    Q.    Right.  Okay.  Whose idea was it to
7 make the amendments that are reflected in this
8 document?
9    A.    We -- we made the change based off
10 the recommendation of the sheriff, is what --
11 what I remember bringing it up.  I'm not -- I
12 don't remember if anybody else had any input,
13 but I know the sheriff -- we basically based it
14 off the sheriff's recommendation.
15   Q.    Okay.  And his recommendation came
16 in the wake of protests and other events that
17 took place in Oxford and around the country
18 following the death of George Floyd; is that
19 right?
20   A.    I'm not -- I'm not sure what his
21 recommendation -- other than his law
22 enforcement experience to us.  I don't remember
23 him mentioning anything specific.
24   Q.    Okay.  What was his recommendation?
25   A.    He -- we were trying to -- to, you

MIKE ROBERTS

1
2 know, not limit folks from being there, but,
3 more importantly, protect the safety of the
4 pedestrians that were using crosswalks and the
5 business of the courthouse square.  And -- so
6 his recommendation was, you know, five or more
7 start causing safety concerns with folks who
8 are trying to get in and out of the courthouse
9 to conduct business.  Or just for their safety,
10 as well, with the way the square flows traffic-
11 wise, could lead to potential, you know,
12 hazard.
13   Q.    Okay.  And in making this
14 recommendation, he did not cite any specific
15 prior safety incidents involving the courthouse
16 square, correct?
17   A.    I don't remember any -- any
18 specifics, other than him just basing it off
19 of -- of what -- his knowledge and years in
20 dealing with the square and traffic and people.
21   Q.    Okay.  Why was it brought to the
22 board on the 15th of June?
23   A.    I don't know why it came on the
24 15th, but his recommendation to us,
25 conversations that -- over the course of time,

MIKE ROBERTS

1
2 just -- just genuine concern for the -- the
3 well-being of the pedestrian traffic.
4    Q.    Okay.  How long --
5    A.    Whether it was -- whether it was
6 there for, you know, sight-seeing or shopping
7 or whether it was there to conduct business
8 inside the courthouse or -- or register to vote
9 or whatever it was, you know, just for the --
10 for the safety of all of them.
11   Q.    Okay.  And by -- this is your
12 signature on the bottom of the page; is that
13 right?
14   A.    Yes, sir.
15   Q.    Okay.  How often does the board of
16 supervisors meet?
17   A.    We meet twice a month, first Monday
18 and third Monday of the month.
19   Q.    Okay.  So this -- this would have
20 been, presumably, the second Monday in June?
21   A.    Correct.
22   Q.    Third Monday in June.  Third
23 Monday --
24   A.    Third Monday in June.  I don't have
25 a calendar in front of me, but it's -- it's not

Page 58

MIKE ROBERTS

1 a special-called meeting, it doesn't appear by
2 this document. So it would be our second
3 meeting of the month.
4 Q. Right. Okay. And had the subject
5 of -- of changing the policy come up previously
6 in 2020, previous to this meeting?
7 A. Right. There'd been conversations
8 going on for a while about updating and
9 changing, based off of his recommendations.
10 Q. Okay. And if I had minutes of
11 those prior meetings, I'd see a reflection that
12 there was discussion of policy changes made --
13 that appeared prior to this date in June of --
14 let me start that question again.
15 If I reviewed your minutes of your
16 meetings earlier in 2020, I assume I would
17 therefore see a reflection of a discussion
18 regarding the policy?
19 A. I'm not aware -- I don't know that
20 you would or not. A lot of it's in casual
21 conversation with him day to day. I'm not
22 sure -- without the minutes in front of me, I'm
23 not sure that anything in the minutes would
24 address that.
25

Page 59

MIKE ROBERTS

1 Q. Okay. And you had, I think,
2 indicated one of your duties as president was
3 signing off on the minutes?
4 A. It is.
5 Q. Okay. Let's go through the changes
6 that are effectuated in this document. So
7 let's go to the second change first. One of
8 the changes is this requirement of 30 days.
9 I'm looking in the middle of the first
10 paragraph: A permit application must be
11 submitted at least 30 days prior to the date of
12 the proposed use for five or more people,
13 unless unusual circumstances makes it
14 impossible to make application prior to 30 --
15 to the 30-day period.
16 Do you see that?
17 A. I do.
18 Q. And then it says, The board of
19 supervisors and/or the -- and/or the sheriff
20 shall determine whether to waive the 30-day
21 period.
22 Do you see that?
23 A. I do.
24 Q. So what -- what was -- you had
25

Page 60

MIKE ROBERTS

1 testified earlier that you thought the 30 days
2 was -- was imposed back in 2019. Does this
3 change your recollection on that topic in terms
4 of the timing?
5 A. Not without going back and looking
6 at it. I'm not sure if I was speaking to your
7 question about '15 to '19 or '19 to '20. I'm
8 just -- based on what I can remember of the
9 changes in the permit process, the dates
10 specifically, I'd have to -- I'd have to go
11 back and read some. I just -- the overall end
12 game was the -- you know, not to get ahead of
13 your question, but just the overall deal is
14 from the initial time in '15 when we started
15 the policy; to '19, we made changes; to '20, we
16 made changes. I'm just -- my -- I remember
17 that, eventually, we got back down to seven --
18 I mean, 14 days.
19 Q. Okay. Well, let's talk about what
20 was in place here as the 15th -- on the 15th of
21 June, 2020. This -- this addition of the
22 30-day requirement, did it replace a different
23 time period, or is this the first time that
24 there was a time period applicable to permit
25

Page 61

MIKE ROBERTS

1 applications?
2 A. I don't remember the specifics of
3 it. I know the 30-day was brought to us by the
4 sheriff at that time, and I don't remember if
5 it was previous that we had 30 days. The
6 initial 30-day number came up because we were
7 trying to coincide with the city's facility use
8 policy, and the sheriff recommended that we be
9 on the same page as the city.
10 Now, time-wise -- I apologize. I
11 just don't remember if that was the changes in
12 '15 -- or '19 or '20. I just remember that
13 was the reasoning for it.
14 Q. Okay. And so the reason, as you
15 understood it, was simply to be consistent with
16 the city time period?
17 A. Yes, sir.
18 Q. Okay.
19 A. Originally, that's correct.
20 Q. No other reason that you're aware
21 of?
22 A. Just -- just the sheriff's
23 recommendation that we -- that we coincide with
24 the -- you know, the city's policy.
25

Page 62

MIKE ROBERTS

2    Q.    Okay.  It allows here that the
3  board of supervisors and/or the sheriff can
4  waive the 30-day period.
5        Do you see that?
6    A.    I do see that.
7    Q.    What -- what would be the criteria
8  that the board would apply in determining
9  whether or not to waive the 30-day period?
10   A.    Here again, I'm going to speak from
11 what I -- you know, what -- how I interpreted
12 it.  I interpreted the conversations that I
13 briefly remember -- and I just don't remember
14 who said what -- but I know the -- there may be
15 circumstances that arise that being somebody
16 needed to demonstrate or protest or use a
17 facility that -- that their impact was under
18 a -- you know, a time constraint that, you
19 know, 14 days from now, they may have lost
20 their opportunity to accomplish what they were
21 trying to.
22        So that was kind of unforeseen --
23 leave that leeway there that if -- if somebody
24 needed to -- to use it and it was a time-
25 restrictive event, then we would have that

Page 63

MIKE ROBERTS

2  ability to allow that.
3    Q.    Okay.  Can you recall, while this
4  version of the policy, the one adopted on the
5  15th of June -- can you recall, while this
6  version of the policy was in place, ever being
7  asked, as a member of the board of supervisors,
8  to waive the 30-day requirement?
9    A.    I don't remember ever being asked.
10   Q.    Okay.  Before we broke, we were
11 talking about a potential appeal process if
12 somebody were denied a permit.  And I forgot to
13 ask you one question, which is:  During your 10
14 years on the board of supervisors, has anyone
15 ever appealed a denial of a permit to the board
16 of supervisors?
17   A.    Not to my knowledge that I can
18 remember while I've served.
19   Q.    Okay.  Permits have been denied,
20 though, during your tenure, correct?
21   A.    I'm sure they have.  The county
22 administrator, I'm sure, has, but I'm not --
23 I'm not aware of any specifics off the top of
24 my head.
25   Q.    Okay.  Well, I don't -- sir, how

Page 64

MIKE ROBERTS

2  familiar are you with the underlying facts
3  related to this lawsuit?
4    A.    I wasn't until I found out we had
5  been named in one.
6    Q.    Okay.  You know -- you know who
7  Mr. Rash is, the plaintiff in the case?
8    A.    I do not.
9    Q.    You've never met him?
10   A.    Not to my knowledge, I haven't.
11   Q.    Okay.  You understand he was
12 denied -- he was denied a permit in the summer
13 of 2020?
14   A.    Right.  I do now, but I wasn't -- I
15 wasn't at the time, until we got notified of
16 the lawsuit.  And I didn't know.
17   Q.    Do you know if he was apprised that
18 he had the ability to appeal the denial to the
19 board of supervisors?
20   A.    Say that again.
21   Q.    Do you know if anyone ever told
22 Mr. Rash that he could appeal the denial of his
23 permit to the board of supervisors?
24   A.    I don't know if they did or not.  I
25 really don't.

Page 65

MIKE ROBERTS

2    Q.    Okay.  And you're not aware of any
3  appeal to the board of supervisors that he
4  filed, correct?
5    A.    No, sir.  I don't know that we've
6  ever had an appeal.
7    Q.    Okay.  If -- if you had had an
8  appeal from Mr. Rash about the denial of his
9  permit, would you have overturned the county
10 administrator's decision to deny the permit?
11   A.    I have no idea.  I didn't see any
12 appeal or what it's -- what it's based on or --
13 I don't think I can answer that is what I'm
14 telling you.  I don't know, because I didn't
15 see -- see one.
16   Q.    Okay.  Let's go to the first --
17 we're still on Exhibit 12, the first part of
18 the first paragraph.  It refers to an amendment
19 to the facility use policy in order to allow
20 four people or less to use the historic
21 courthouse outside grounds, including the area
22 around the Confederate statue, without a
23 permit, although said individual or group may
24 obtain a permit in order to have exclusive use
25 of the area.  Five or more people gathering

Page 66

MIKE ROBERTS

1  require a permit for use.
2          Do you see that?
3      A.   I do.
4      Q.   And so prior to this, there was no
5  specific number of people that triggered the
6  need for a permit; is that right?
7      A.   Right.
8      Q.   Okay.  So why did you vote to
9  approve this change in the policy on the 15th
10  of June, 2020?
11      A.   Recommendation of the sheriff.
12      Q.   Okay.  Well, so you -- you approved
13  it simply because the sheriff recommended it or
14  because you agreed with the sheriff?
15      A.   The sheriff recommended it, and I'm
16  going -- I agree with trying to protect the
17  citizens' safety.  And that was his
18  recommendation in order to accomplish that
19  goal, so --
20      Q.   Okay.  Well --
21      A.   -- that's why the motion was made.
22      Q.   Okay.  So you thought making this
23  change would increase the safety of the
24  citizens of Lafayette County?

Page 67

MIKE ROBERTS

1      A.   The sheriff did, so we supported
2  him.  Yes, sir.
3      Q.   Okay.  What was the basis for the
4  sheriff's -- what did the sheriff tell you was
5  the basis for his belief that this change would
6  improve the safety of the citizens of Lafayette
7  County?
8      A.   Here again, this is my -- my
9  version of it.  But, basically, if you --
10  you've been to the square, you know, the
11  traffic flow and pedestrian crosswalks, it's
12  just -- man, it's just dangerous.  That's the
13  bottom line.  If you -- if you -- if you get
14  it -- folks standing there and blocking, you
15  know, the walkways or traffic or somebody steps
16  around them to get around them and steps out in
17  the street then, you know, the potential for an
18  accident could happen.
19      Q.   Okay.  But the courthouse grounds
20  include space that isn't on the sidewalk,
21  right?  There's -- there's that area within the
22  fence that we looked at, correct?
23      A.   That's right.
24      Q.   So somebody standing there isn't

Page 68

MIKE ROBERTS

1  going to be blocking traffic, right?
2      A.   Well, "a" somebody.  But, there
3  again, like we spoke about earlier, I mean,
4  you're -- you're it's still -- I mean, it's not
5  a museum.  I mean, it's a functioning
6  courthouse and circuit clerk's office.  And if
7  you get, you know, whatever that number is --
8  and we deemed it to be five -- that can
9  interfere with our duty to provide, you
10  know, an operable courthouse and clerk's
11  office.
12      Q.   Okay.
13      A.   One person, perhaps.  But, at the
14  end of the day, they've got -- the pictures
15  probably don't do it justice.  But if you -- if
16  you see the smallness of the open area you're
17  referring to, you would definitely restrict the
18  day-to-day business of our courthouse.
19      Q.   Okay.  So your concern related to
20  the hours -- strike that.
21          Your concern related to not
22  interfering with the day-to-day business of the
23  courthouse?
24      A.   I'm sorry, now?

Page 69

MIKE ROBERTS

1      Q.   The concern --
2      A.   My concern?
3      Q.   The concern you just listed related
4  to the not interfering with the day-to-day
5  business and flow of pedestrians in and out of
6  the courthouse.
7          Did I understand you correctly?
8      A.   Right.  It definitely was a
9  concern.  I mean, that's -- that's the -- you
10  know, the sheriff's recommendation to
11  protect -- protect the safety of those using
12  our courthouse facilities and grounds.
13  Specifically, the courthouse.
14      Q.   Okay.  So the courthouse is open,
15  absent holidays, Monday through Friday?
16      A.   Yes, sir.
17      Q.   What are its hours?
18      A.   8:00 to 5:00.
19      Q.   So --
20      A.   I don't know how many judges have
21  court at 8:00, but yes, it's open at 8:00.
22      Q.   Okay.  It -- it's not open at
23  7:00 p.m., for example?
24      A.   No, sir.

MIKE ROBERTS

2  Q.   And it's not open Saturday, Sunday,
3  right?
4  A.   No, sir.
5  Q.   I assume it's not open, for
6  example, next Monday, Martin Luther King Day,
7  correct?
8  A.   It will not be.
9  Q.   Okay.  So let's start with the
10 Saturdays and Sundays.  There is no courthouse
11 business, right?
12 A.   Correct.
13 Q.   So a gathering of five or more
14 people wouldn't interfere with courthouse
15 business on a Saturday, right?
16 A.   I'm sorry.  Do what, now?
17 Q.   Five people gathering on the
18 courthouse lawn would not interfere with
19 courthouse business if it were on a Saturday,
20 right?
21 A.   The courthouse would be closed.
22 Q.   So it would -- so by definition, it
23 wouldn't be interfering with courthouse
24 business on a Saturday, right?
25 A.   Well, I don't know that it would be

MIKE ROBERTS

2  any business there, so you're right.  Yeah.
3  Q.   Okay.  And -- and same thing, say,
4  for next Monday, Martin Luther King Day,
5  there's no courthouse business to interfere
6  with, right?
7  A.   Right.
8  Q.   Okay.  And any evening, say,
9  7:00 p.m., there'd be no courthouse business to
10 interfere with, right?
11 A.   They -- right.
12 Q.   Okay.  Did --
13 A.   Yeah.
14 Q.   Okay.  Did the sheriff offer any
15 safety concerns associated with the use of the
16 courthouse grounds on a weekend or a -- or a
17 holiday?
18 A.   Absolutely.
19 Q.   Sorry?
20 A.   Yes, sir.
21 Q.   What were those?
22 A.   There again, if -- if -- if you've
23 got the -- you know, a gathering, large
24 gathering there, or the manpower alone, he's
25 got 600-plus square miles to patrol, and -- and

MIKE ROBERTS

2  we don't -- you know, just don't necessarily
3  always have the manpower there.  So that --
4  that's restricting -- you know, restricting the
5  availability itself, just not to patrol it.
6  Q.   Okay.  But would you call five
7  people a large gathering?
8  A.   Well, I mean, you've still got the
9  sidewalks and, you know, the day-to-day
10 traffic.  So yes, five -- five could be
11 considered that.
12 Q.   Okay.  So if five people gathered
13 on the courthouse lawn on a Saturday to have
14 lunch together, would that be a violation of
15 your policy?
16         MR. O'DONNELL:  Object to the
17         form.
18         You can answer.
19 BY MR. YOUNGWOOD:
20 Q.   You can answer.  You can answer.
21 A.   Yeah.  I mean, I -- I'm not -- I'd
22 have to go back and ask somebody, to be honest.
23 Q.   Well, you -- you approved the
24 policy.  In your mind, would that be a
25 violation?

MIKE ROBERTS

2  A.   I'd have to go back and look at
3  specifics of -- of, you know, a casual use
4  versus something that would be obstructive to
5  pedestrian flow and safety.
6  Q.   Okay.  So casual use might be
7  treated differently, for example, than a
8  protest to support the continued location of
9  the statue?
10        MR. O'DONNELL:  Object to
11        form.
12        You can answer.
13 A.   I mean -- I mean, I think that it's
14 all -- all should be conducive with -- with the
15 safety and welfare and -- of those grounds,
16 regardless.  I mean, we -- we had protests
17 almost every day, it seemed like, for a year or
18 so.
19        And so, I mean, I -- I don't know
20 that dedicating one being casual and one not
21 casual -- for a while, it seemed normal to
22 have -- to have folks walking around
23 protesting, whether -- whether it was for or
24 against a relocation or for whatever purpose
25 they were protesting.

Page 74

MIKE ROBERTS

1
2      I mean, it just seemed like a
3 normal -- normal procedure for us for a long
4 time.  That's just -- I don't know if that's
5 considered casual or not, but it became normal.
6      Q.     Okay.  Well, it was those protests
7 for and against the statue and related issues
8 that gave rise to this amendment that we're
9 discussing, the June 20, '20, amendment,
10 correct?
11     A.     No, sir.  I wouldn't agree with
12 that.  I would think we'd been talking about
13 getting some kind of uniformity in our facility
14 use policy for a while.
15     Q.     Okay.  Well -- and the uniformity
16 you're referring to is the uniformity between
17 the city and the county, right?
18     A.     That's one, probably, aspect of it.
19 But, at the end of the day, we -- you know,
20 getting some kind of policy would allow our --
21 our sheriff's department to -- to, you know,
22 fulfill their obligation of security and
23 protecting courthouse property -- county
24 property.
25     Q.     Okay.  Well, sir, I'm correct, the

Page 75

MIKE ROBERTS

1
2 city doesn't have any five-or-more-person
3 restriction that ties to permit use, does it?
4      A.     I'm not -- I don't know.  I
5 couldn't answer that.  I haven't read theirs,
6 other than --
7      Q.     Okay.
8      A.     -- the sheriff brought up the
9 30-day issue to begin with.  We did that for
10 safety.
11     Q.     Okay.  Well, the -- the
12 five-or-more-person requirement implemented by
13 this amendment, that has nothing to do with the
14 city's policies, right?
15     A.     Not that I'm aware of.
16     Q.     Okay.
17     A.     I mean, we just basically -- you
18 know, the five- -- the five-person policy
19 came -- came to light trying to keep the
20 sidewalks from being blocked and crossing
21 crosswalks out into a courthouse traffic flow
22 and business to the courthouse, the
23 pedestrians.  That's where the five people
24 came -- came up, is what the number -- you
25 know, at the sheriff's recommendations to help,

Page 76

MIKE ROBERTS

1
2 you know, secure the --
3      Q.     You would agree with me that --
4             (Simultaneous speakers.)
5 BY MR. YOUNGWOOD:
6      Q.     -- that five people can fit on the
7 courthouse grounds without needing to walk onto
8 the sidewalk, right?
9      A.     In the -- you're talking about in
10 the grass area and the sidewalks going in
11 there?
12     Q.     Well, the grass area within the
13 gates -- with the -- not gates, but the fence.
14     A.     The fence?
15     Q.     Yes.
16     A.     Right.
17     Q.     I mean, quite easily, groups of
18 five could fit within there, right?
19     A.     You could.
20     Q.     Okay.  So what is the safety issue
21 associated with five people congregating on the
22 courthouse lawn?
23     A.     I think, at that point, you're --
24 you're more addressing the issue of the use of
25 the courthouse with county business.

Page 77

MIKE ROBERTS

1
2      Q.     Okay.  What -- what is the safety
3 issue associated with five people gathering on
4 the courthouse lawn on a weekend?
5      A.     There again, I think it's strictly
6 the number of our law enforcement being able
7 to -- you know, having to -- having to camp out
8 there, having to watch, having to patrol that,
9 for, you know, just their own safety, as well
10 as anybody's.  But, I mean, we just -- at the
11 end of the day, manpower, we don't have the
12 manpower to dictate to, you know, making sure
13 that -- that what goes on the courthouse is
14 kosher.
15     Q.     Okay.  What is the police manpower
16 need associated with five people having lunch
17 on the courthouse grass on a Saturday?
18     A.     That's -- that's strictly at the --
19 the recommendation of the sheriff, with his
20 knowledge of law enforcement for all the years
21 is what I -- I personally go by.
22     Q.     Okay.  But do you, as the president
23 of the board who supported this amendment --
24 did you see a safety issue associated with five
25 people having lunch on the courthouse grass on

Page 78

MIKE ROBERTS

1    a Saturday?

2        A.    I don't know that it's necessarily

3    a safety issue, more as it trying to be uniform

4    for the usage of the county property.

5        Q.    Okay.  If -- if five people were

6    gathering on a Saturday on the courthouse lawn

7    for lunch, do you understand that they would,

8    under your policy, be subject to citation or

9    arrest?

10       A.    I guess, under our policy, yeah.  I

11    mean, I'm assuming that that would -- that

12    would cover a Saturday lunching.

13       Q.    Okay.  You -- you keep mentioning

14    the sheriff, but who is it that's -- your

15    understanding, is charged with approving

16    permits once the amendment that's in Exhibit 12

17    was adopted?  Who -- who approved or didn't

18    approve the permits?

19       A.    My understanding, and the way it's

20    supposed to be, is county administrator does

21    that.  I'm sure she gets input from our

22    sheriff's department on what's going on or

23    contacts with the university or city.  But,

24    ultimately, yeah, she's -- she's -- our

Page 79

MIKE ROBERTS

1    administrator would be the one that approves or

2    denies.

3       Q.    Okay.  And what criteria would she

4    use to determine whether or not a gathering of

5    five or more people seeking to use the

6    courthouse grounds should be granted or denied?

7       A.    I think she would make it

8    applicable to the facility use policy.

9       Q.    Okay.  And based on your

10    understanding, following this amendment,

11    what -- what would those criteria be?

12       A.    In the -- in the -- by what's in

13    the document that we looked at earlier.  But

14    this amendment yourself is -- is the four or

15    five with the 30-day deal at this particular

16    time, if you're talking about now.

17       Q.    Okay.  Let's go back to Exhibit 3,

18    which is the old version of the policy.  And

19    can you tell me where in here the criteria are

20    that the administrator is supposed to use in

21    determining whether or not to grant a permit?

22       A.    I don't know that it mentions it or

23    not in here.

24       Q.    Okay.  Do you know --

Page 80

MIKE ROBERTS

1

2          I'm sorry.  I didn't mean to cut

3    you off, sir.

4       A.    No.  I didn't say nothing.

5       Q.    Do you know what the criteria are

6    that she uses in determining whether or not to

7    grant a permit?

8       A.    Outside of the facility use policy,

9    I'm not aware of any; that she would just make

10    it applicable to our policy that we adopted.

11       Q.    Okay.  Let's move on to tab 27 of

12    your binder, which will be Exhibit 27.

13          (Exhibit 27 was marked for

14            identification.)

15    BY MR. YOUNGWOOD:

16       Q.    Let me know if you recognize this

17    document.

18       A.    It looks like a copy of our agenda

19    from our July 6 meeting.

20       Q.    Okay.  And you referred to minutes.

21    Is this what you consider to be the minutes, or

22    are there minutes --

23       A.    Agenda.

24       Q.    This is the agenda, but is there a

25    separate set of minutes created, perhaps?  Or

Page 81

MIKE ROBERTS

1

2    is -- or is this it?

3       A.    Not in this -- not in this tab.

4       Q.    Right.  I'm asking you, in general,

5    are minutes created that look different than

6    this?

7       A.    They look similar to what -- the

8    one we were just looking at, the one with my

9    signature --

10       Q.    I see.

11       A.    -- on it that you showed me

12    earlier.

13       Q.    Okay.  12, that -- that's what you

14    consider to be -- that's the format of minutes?

15       A.    Yes, sir.  Right.  Right.  That

16    would be the format of the minutes that I

17    signed.

18       Q.    Okay.  Let's go to 27.

19       A.    Okay.

20       Q.    Whose handwriting is on this

21    document?  Do you recognize it?

22       A.    I do not.

23       Q.    Okay.  You attended the -- I

24    assume, the July 6th meeting?

25       A.    Yes, sir.

MIKE ROBERTS

1
2    Q.    And this is likely the meeting
3  immediately following the June 15 meeting, just
4  according to your normal schedule?
5    A.    As far as I know, that would be our
6  next regular-scheduled meeting.  Without a
7  calendar in front -- it looks like that'd be
8  our first meeting in July.
9    Q.    Yeah.  I'm -- I'm looking quickly
10  at a calendar.  That is a Monday -- first
11  Monday in July.  So that -- that's --
12    A.    Gotcha.
13    Q.    First, there's discussion about the
14  Confederate -- I'm looking at the third page.
15  I'm sorry.  For the record, I should say this
16  is Bates numbers doc11 to 13, and it's
17  Exhibit 27 to this deposition.  There is
18  discussion -- discuss Confederate statue.
19          Do you see that?
20    A.    I do.
21    Q.    And then there's references to
22  individuals making statements.
23          Do you see that?
24    A.    I do.
25    Q.    Okay.  And who are those

MIKE ROBERTS

1
2  individuals?  Do you know?
3    A.    Other board -- board of supervisors
4  members.
5    Q.    Okay.  You did not make a
6  statement?
7    A.    It says I did.
8    Q.    I'm sorry.  Which one is you?
9    A.    I'm Mike.
10    Q.    Oh, I see.  I didn't --
11    A.    On the bottom right.
12    Q.    I didn't see that as a --
13    A.    Yeah.
14    Q.    I didn't see that as a Mike.  I'm
15  sorry.  I couldn't -- I couldn't read that as a
16  Mike.  I think I -- I think I read it as a
17  Willie or something.  Okay.  That's you.
18          Do you remember what statement
19  you -- you made on this?
20    A.    I don't.  I really don't.
21    Q.    Okay.  And then it says -- but you
22  were in favor of not moving the statue or doing
23  anything to the statue, correct?
24    A.    That's correct.
25    Q.    Okay.  And what -- what was the

MIKE ROBERTS

1
2  actual motion or -- or item being considered?
3  It says here, Motion to decline to move the
4  statue from its current location.
5          Is that the question?
6    A.    To my knowledge, the best I
7  remember, perhaps there was a request from the
8  public to move it, and somebody made a motion
9  to -- to deny that request.
10    Q.    Okay.  And you agreed with the
11  denial of that request, correct?
12    A.    I did.
13    Q.    Why?
14    A.    I just -- personal convictions.
15    Q.    What -- what are those personal
16  convictions?
17    A.    I thought that perhaps the reason
18  for the request to move the statue wouldn't
19  satisfy the goal that they were trying to
20  achieve, and that was, you know, moving the
21  statue is not going to change people's hearts
22  or minds or -- or make one side right or the
23  other side wrong.  But at the end of the day,
24  for me personally, who comes from a military
25  family, that is a war monument.

MIKE ROBERTS

1
2          If you want me to elaborate, I
3  will.  You know, in conversations over the
4  course of periods with several folks on both
5  sides of this argument, I firmly believe this
6  board as a whole, if they thought moving that
7  statue would heal everyone's hearts, that it
8  would have been gone.
9          But for me, the reality is there's
10  no war ever been fought for one purpose.  I
11  won't sit here and try to tell you that -- that
12  slavery wasn't part of the Civil War, and which
13  that monument recognizes the -- the folks
14  who -- who gave their life for that.  But what
15  I will also sit here and tell you that it was
16  not a one-issue war.  That's -- that's --
17  that's proven.
18          So for me, whether you agree with
19  your neighbor on anything or not, the fact that
20  you're willing to die for that cause -- maybe
21  you were misled on the facts; maybe we disagree
22  on the facts.  But at the end of the day, you
23  sacrificed your life.  Maybe it was over
24  property rights; maybe it was over taxation;
25  maybe you were lied to and told that they're

MIKE ROBERTS

1
2 coming to take your land. I don't know. I
3 wasn't alive back then.
4        What I do know is moving the
5 monument wouldn't help the folks who have hate
6 in their heart on both sides. Sorry for the
7 elaborate answer.
8    Q.   No. I -- I appreciate it. If you
9 don't mind, sir, I'll ask a few follow-ups.
10        If I hear you correctly -- and I --
11 I don't mean to be putting words in your mouth
12 at all, so I know you'll correct me -- but you
13 see it as an honor to the fallen soldiers, not
14 as an honor to the -- whatever the cause the
15 war was about?
16    A.   I think -- I think it's a monument
17 there to the folks who sacrificed their lives,
18 not necessarily the -- a single-issue cause.
19 Whatever their issue was or whatever their
20 reason for going to fight, I don't know.
21    Q.   Okay. I -- I think I understand
22 what you're saying.
23        You -- you do engage in
24 correspondence with your constituents from time
25 to time on this subject; is that right?

MIKE ROBERTS

1
2    A.   I think I've gotten a ton of email
3 from them, but other than in the boardroom and
4 meetings, I try not to -- you know, there
5 again, I just don't think this is a -- yes.
6 The short answer is yes, I do correspond with
7 my constituents from time to time.
8    Q.   Okay. And -- and I just want to
9 show you one or two and ask you if there was
10 any follow-up from it. If you would go to tab
11 14.
12    A.   Did you say 14? I'm sorry.
13    Q.   Yeah. 14.
14    A.   Okay.
15        MR. YOUNGWOOD: It has a
16        Bates number on the bottom
17        Lafayette County document 1262.
18        We'll mark it as Exhibit 14.
19        (Exhibit 14 was marked for
20        identification.)
21 BY MR. YOUNGWOOD:
22    Q.   This is an email you -- you and
23 others received from Ms. McKinney.
24        Do you see this?
25    A.   I do. I do. I'm sorry.

MIKE ROBERTS

1
2    Q.   And I'm sorry. I -- sir, I should
3 know this, but I don't. Which district are you
4 representing or what --
5    A.   Five.
6    Q.   Five. Okay. So this is actually
7 one of -- somebody within your district. Is
8 this somebody you know or -- or just one of
9 your --
10    A.   I --
11    Q.   -- constituents?
12    A.   I don't. Off the top of my head, I
13 don't know that I know her.
14    Q.   Okay.
15    A.   Or him, for that matter.
16    Q.   Did you respond to Ms. McKinney at
17 all? I'm assuming --
18    A.   Not to my knowledge, I didn't.
19    Q.   Okay. And then if we could go to
20 tab 21. I'm sorry. That's wrong. Tab 20.
21        MR. YOUNGWOOD: This is, for
22        the record, Lafayette County
23        document 848. It's a one-page
24        email dated the 19th of June, 2020.
25        (Exhibit 20 was marked for

MIKE ROBERTS

1
2        identification.)
3 BY MR. YOUNGWOOD:
4    Q.   This is from somebody named Raymond
5 Settle. Do you know Mr. Settle?
6    A.   Not to my knowledge.
7    Q.   Okay. And he also writes about
8 this -- this issue. Did you respond at all to
9 this email?
10    A.   Not to my knowledge, I didn't.
11    Q.   Okay. Let's go back to the minutes
12 that we were looking at -- or minutes is
13 probably the wrong word. Let's go back to
14 Exhibit 27, the agenda with the handwritten
15 notes that we were looking at.
16        According to the notes on this page
17 13, following discussion of the movement of the
18 statue and the vote, it looks like there was an
19 executive session. Is that what the notes on
20 the bottom refer to, where it says exec?
21    A.   That's what it appears to be.
22    Q.   Okay. Well, do you recall there
23 being an executive session at this meeting
24 following the vote not to move the statue?
25    A.   I mean, specifically, I'm assuming,

MIKE ROBERTS

1    MIKE ROBERTS
2  just by the notes we did.  But yes, to answer
3  your question, I mean, we had so many I
4  couldn't -- I don't want to specifically tell
5  you yes, we made the motion to go to executive
6  or not.  But -- well, it's right there.
7       Q.    Okay.
8       A.    Yes.  I would -- I would agree that
9  this was executive session notes.
10      Q.    Okay.  And it says, Facility use
11 permit change.  And then it -- like, 30 days is
12 crossed out and -- and two weeks.
13      Do you see that?
14      A.    I do.
15      Q.    Do you remember a discussion of
16 that issue that -- I assume this is in relation
17 to the time required in advance to seek a
18 permit.  Do you remember discussion of that at
19 this meeting?
20      A.    Right.  That's what I was saying
21 earlier, that I kind of got ahead of your
22 question on the two -- '15 and '19 -- changes.
23 I do remember we ended up getting back to the
24 two weeks once the sheriff had recommended
25 that, you know, 30 days was perhaps too long,

1    MIKE ROBERTS
2  and he felt two weeks was adequate to, you
3  know, make a decision for safety.  You
4  know, he -- what he required to -- for safety
5  or, you know, patrol the event or if it needed
6  it at all.  The two weeks was adequate.  So
7  yes, I do remember a discussion about this.
8  That's why we took it back from 30 to two
9  weeks.
10      Q.    Okay.  So this is only a couple
11 weeks after the June 15 changes, your next
12 meeting.  Between June 15 and July 6, what
13 causes the change from -- from 30 days to two
14 weeks?
15      A.    I don't remember anything specific
16 other than maybe this -- you know, the sheriff
17 decided 30 days was -- you know, we could lax
18 that down to two weeks that -- you know, to try
19 to not limit folks from their permit requests.
20      Q.    Okay.  And then the next thing it
21 says, Safety.
22      Do you recall a discussion of
23 safety at this meeting?
24      A.    I remember several, several
25 discussions.  Specifics, I don't -- you know,

1    MIKE ROBERTS
2  I'm not sure, other than -- than on a -- you
3  know, when you try to make these documents
4  as -- as uniform and -- and serving as they
5  need to be, and there's always -- that's the
6  primary issue is the safety.  When you -- you
7  know, university, you've got kids.  The city's
8  got folks walking around the square.  We have
9  people doing business out at the courthouse.  I
10 mean -- so it's obviously -- we -- we want to
11 keep that primary focus, you know, first.
12      Q.    Okay.  But -- but there were no
13 specific prior safety incidents raised by the
14 sheriff at this meeting relating to the
15 courthouse grounds, right?
16      A.    I just don't -- I don't remember
17 anything specific to the courthouse grounds.
18      Q.    Okay.  There's a reference to
19 "after dark" underneath that.  Do you remember
20 any discussion of limitations on -- of possibly
21 putting limitations on the courthouse grounds
22 after dark?
23      A.    Right.  And those -- those have
24 been going on for a while.  Not a lot of -- I
25 don't know that we've ever had anybody use the

1    MIKE ROBERTS
2  courthouse at night.  I'm not -- I'm not -- off
3  the top of my head, I don't remember anybody.
4  But just strictly, again, I mean, from a
5  manpower issue, it -- it seemed the sensible
6  and common-sense thing to do was the courthouse
7  closes, you know, and nighttime, we didn't need
8  to have dedicated officers to staff there, you
9  know, to protect the -- the county property.
10      Q.    Let me ask you about courthouse use
11 at night.  You're -- you're saying you don't
12 recall any prior use of the courthouse grounds
13 at night?
14      A.    Not to my knowledge right now, I
15 don't.  I can't -- I just don't remember it --
16 I don't remember having it, you know, come up
17 before.
18      Q.    Well, do you remember from last
19 summer, sir, prior to this date, demonstrations
20 related to the statue itself at night?
21      A.    Not at nighttime, I don't.
22      Q.    Okay.  If you could turn to tab 47,
23 please.  You should find a picture behind that
24 tab.
25           MR. YOUNGWOOD:  We'll mark

Page 94

MIKE ROBERTS

1
2      this as Exhibit 47.
3               (Exhibit 47 was marked for
4               identification.)
5    BY MR. YOUNGWOOD:
6      Q.    Tell me when you're there, sir.
7      A.    I'm here.  I'm here.
8      Q.    Okay.  Do you -- you remember an
9    incident last summer, 2020, where individuals
10   projected the words "take it down" on the
11   statue in the evening?
12     A.    I don't.  I don't.
13     Q.    Okay.  You don't remember this at
14   all?
15     A.    I do not.
16     Q.    Okay.  And if you turn to tab 48.
17          MR. YOUNGWOOD:  We'll mark
18          this as Exhibit 48.  Tab 49 we'll
19          mark as Exhibit 49.  And tab 50
20          we'll mark as Exhibit 50.
21               (Exhibit 48 was marked for
22               identification.)
23               (Exhibit 49 was marked for
24               identification.)
25               (Exhibit 50 was marked for

Page 95

MIKE ROBERTS

1
2               identification.)
3    BY MR. YOUNGWOOD:
4      Q.    I'll represent to you, sir, these
5    are -- these are images from before 2020 of
6    films -- images being shown on the courthouse
7    wall.
8          Do you recall --
9          MR. O'DONNELL:  Object to
10         form.  Object to form.
11   BY MR. YOUNGWOOD:
12     Q.    Okay.  Do you recall, sir, in -- in
13   years past, the courthouse exterior wall being
14   used to display images and films?
15     A.    No, sir.
16     Q.    Okay.
17     A.    I sure don't.  It's the first time
18   I've seen that.
19     Q.    Okay.  All right.  Let's go back to
20   the tab 27, then, sir.  Is there anything
21   else -- the -- and we're looking at that third
22   page with the handwriting.  Anything else about
23   use of the courthouse after dark that you
24   recall being discussed at this July 6th, 2020,
25   meeting?

Page 96

MIKE ROBERTS

1
2      A.    Just that we needed to update -- I
3    just remember having the after-dark deal was a
4    safety issue that we needed to make sure was
5    clear in our facility use policy.
6      Q.    Okay.  And that was not something
7    that was discussed to -- to render the county
8    policy consistent with the city policy, right?
9      A.    I -- I don't know.  I don't -- I
10   haven't read the city's policy.  But no, we did
11   it basically for the -- the safety, to make
12   sure it was reflected in our facility use
13   policy.  Ours, not the city's.
14     Q.    Okay.  But in having this
15   discussion, the sheriff did not bring to your
16   attention any prior safety issues specifically
17   associated with the use of the courthouse
18   grounds after dark, right?
19     A.    I don't remember.  I don't remember
20   any.
21     Q.    Okay.  And was the words in the
22   subject covered at that July 6th meeting, was
23   it -- was it "after dark," or was it some other
24   measure of time?
25     A.    I think the general consensus

Page 97

MIKE ROBERTS

1
2    was -- was dark.  Later on, I think we
3    addressed it in the policy as dusk.  But the
4    ultimate goal was to try to keep from having to
5    patrol it or the safety of folks after -- after
6    it was dark outside.
7      Q.    Okay.  And -- and it gets dark at
8    different times different times of the year,
9    right?
10     A.    Right.
11     Q.    So in the summer, you could be on
12   the -- on the summer, dark comes -- state the
13   obvious -- comes later than it does in January?
14     A.    Correct.
15     Q.    So the -- the -- the time
16   limitation would change depending on the month
17   and day of the year, right?
18     A.    Right.
19     Q.    Why is that?
20     A.    The reasons you just stated,
21   basically, is that darkness comes at different
22   times, depending on what time of year you're
23   in.
24     Q.    So --
25     A.    I think -- I think if you go back

MIKE ROBERTS

1
2 to our original deal in 2015 or prior, we may
3 have had a 10:00 p.m. language in -- in the
4 document. Well, that doesn't necessarily apply
5 to this time of year when it's dark at 5:30.
6 So I think, in an effort to try to, you know,
7 maximize the opportunity to use the courthouse,
8 that, you know, we had to use a term that, you
9 know, meant dark at that particular time of the
10 year.
11      Q.   Okay. Well, let -- let's go to
12 that -- what do you think it was, 10:00 or
13 10:30? We can look back at it. It's
14 Exhibit --
15      A.   Yeah. I -- I think it was 10:00.
16      Q.   Why don't -- why don't we look and
17 we can get it -- we can get it right. See if I
18 can find it as well. It's Exhibit 3, tab 3.
19      A.   It says 10:00.
20      Q.   Okay. So, I mean, 10:00 p.m.,
21 anytime of year, it's dark, right?
22      A.   It'd be close.
23      Q.   And so under this -- this version
24 of the policy, the -- the one that's tab 3, it
25 would be uniform throughout the year,

MIKE ROBERTS

1
2 10:00 p.m., be it January or June, right?
3      A.   Right.
4      Q.   So what -- what's the need to
5 change that so that it changes?
6      A.   It was a safety concern brought up
7 by our sheriff. And so to make it uniform, I
8 mean, it -- you know, you don't want to say
9 everything is done at 5:00, because in the
10 summertime, it very well might be -- may not be
11 dark until 9:30. So you're -- you know, you're
12 limiting the, you know, opportunity to use
13 county property. So, therefore, you needed
14 more uniform language in it, which is what we
15 were trying to accomplish, to allow the maximum
16 opportunity of usage.
17      Q.   Well, if you had kept it at
18 10:00 p.m., you would have allowed the maximum
19 opportunity of usage, wouldn't you?
20      A.   Not -- not for safety concerns.
21      Q.   Okay. And what -- what are those
22 safety concerns? The same -- what we've
23 already discussed or any --
24      A.   Yeah.
25      Q.   -- that we haven't discussed?

MIKE ROBERTS

1
2      A.   Right. No. That -- that's it. I
3 mean, it's just the ability to patrol it,
4 manpower, and the, you know, pedestrian traffic
5 in and around the square and courthouse
6 grounds, specifically.
7      Q.   Okay. The square is lit at night,
8 right?
9      A.   To some degree.
10      Q.   The courthouse has lights on it at
11 night, right?
12      A.   Not on the building. I think
13 there's some outside ornamental lights. The
14 lamp -- you know, the streetlamps. But we
15 don't have flood lights or anything like that
16 on the building --
17      Q.   Let's --
18      A.   -- that I'm aware of.
19      Q.   Let's -- if we could turn to tab
20 46.
21      A.   Uh-huh.
22      Q.   These are the same pictures that
23 you looked at earlier under 39, but we'll mark
24 this as 46.
25           (Exhibit 46 was marked for

MIKE ROBERTS

1
2           identification.)
3 BY MR. YOUNGWOOD:
4      Q.   Yeah. Let's look to page B-20.
5      A.   Okay.
6      Q.   So if you look, sir, obviously,
7 this is daytime. Nothing is illuminated.
8 But --
9      A.   Right.
10      Q.   There's a street light with, it
11 looks like, four circular lights on it.
12           Do you see that?
13      A.   Right.
14      Q.   Those are --
15      A.   I do.
16      Q.   Those are illuminated at night,
17 right?
18      A.   Right.
19      Q.   And you see under them a kind of
20 strobe light pointed towards the courthouse?
21      A.   I do. Under the --
22      Q.   That's illuminated at night as
23 well, right?
24      A.   I would hope so, but I'm not -- I
25 don't know if they work or don't.

Page 102

MIKE ROBERTS

2   Q.   Okay.  And -- and there's also
3  ambient light in the square coming from the
4  retail establishments that -- that line the
5  square, right?
6      A.   Yeah.  I would assume so.
7      Q.   Okay.  The times of the year, at
8  least -- perhaps still today; I don't know --
9  there are holiday and other lights that are
10 strung around the square and proximate to the
11 courthouse, correct?
12     A.   Yes, sir.
13     Q.   Okay.  And there are -- there are
14 cameras around the square that are put in place
15 by the Oxford police; is that right?
16     A.   That's what I've been told.  I've
17 never -- I've never had the privy to view any,
18 but yes.
19     Q.   Okay.  And by the way, these
20 benches we're looking at in B-20, what are the
21 benches for?
22     A.   Not being ugly.  I guess, to sit
23 on.  I'm not trying to be ugly.  I just --
24 yeah.
25          You're just asking for who, for who

Page 103

MIKE ROBERTS

2  uses them?
3      Q.   Yeah.  Yeah.
4      A.   Maybe jury --
5      Q.   For who?
6      A.   Yeah.  Maybe jury trials or -- or
7  folks, you know, registering to vote, that
8  their loved one's inside or spouse.  I mean, I
9  guess they could be used for -- for numerous --
10 numerous deals.
11     Q.   Yeah.  And there's no posted
12 restriction on who can use them, correct?
13     A.   Not to my knowledge.
14     Q.   And -- and no posted notice on a
15 timing of -- of use, right?
16     A.   Not -- not to my knowledge, there's
17 not.
18     Q.   And -- and no posted restriction
19 that no more than four to five people can use
20 them as a group together at the same time,
21 right?
22     A.   Not that I'm aware of.
23     Q.   Okay.  And you're not aware of any
24 safety or security incidents that have ever
25 arisen from groups of people using these

Page 104

MIKE ROBERTS

2  benches, right?
3      A.   I -- not that I can currently spout
4  off the top of my head right now, no, sir.
5      Q.   Okay.  If we go back to tab 27,
6  Exhibit 27, that third page, there's notes on
7  the discussion of facility use permit change.
8          Do you know why, by the way,
9  this -- this discussion took place immediately
10 following the discussion of the removal of the
11 Confederate statue?
12     A.   I don't remember what sparked it
13 other than -- than, you know, I would -- I
14 would probably say that the sheriff wanted to
15 update us on safety and security of the county
16 property.
17     Q.   Okay.  And -- and these concerns --
18     A.   I don't remember specifically.
19     Q.   These concerns that are being
20 raised on July 6th, 2020, they're in the wake
21 of a number of pro and con Confederate statue
22 demonstrations or marches that took place in
23 the square in the summer of 2020, right?
24     A.   Yes, sir.
25     Q.   Okay.  And -- and that rise of

Page 105

MIKE ROBERTS

2  number of political gatherings related to the
3  statue, that, in part, gave rise to the need to
4  revisit the facility use policy, correct?
5      A.   I don't know that it would -- gave
6  rise to it.  I think this has been an
7  ongoing -- you know, ongoing conversation we've
8  had about the facility use policy.
9          Like we said earlier, I think -- I
10 think it's a -- it's a working document that,
11 you know, as issues arise, you -- you know,
12 depending on what the sheriff says and the
13 security of the people using the county
14 grounds, you know, it -- it's -- obviously,
15 we've proven it -- that we can -- you know, it
16 needs changing sometimes.  So, I mean, it just
17 depends on when.
18     Q.   Okay.  Well, the only issues that
19 had recently arisen in advance of the July 6th,
20 2020, discussion of facility use policy were
21 the protests related to -- protests and other
22 activity related to the statue, as well as the
23 nationwide reaction to the death of George
24 Floyd, correct?
25     A.   I think there was -- there was just

MIKE ROBERTS

1
2  several issues.  I mean, I think it's just back
3  to what I said.  It's just, you know, the
4  ongoing concern for safety, growing population.
5  We address it whether students are in town --
6  in college -- you know, in school, not in
7  school, what -- the ball game weekend, not a
8  ball game weekend.  What is -- what is the
9  pedestrian traffic versus, you know, vehicular
10 traffic.
11         I think, you know, the issues
12 countrywide and -- and the stuff you're
13 referring to, I mean, it was obviously in the
14 news headlines, but that's not the only factor
15 that drove us into updating our facility use
16 policy.
17    Q.    Would you agree with me that it was
18 a factor, if not the only factor?
19    A.    I -- I mean, I just don't remember
20 if that's -- I don't remember us saying, this
21 is why we're -- we're changing our policy.
22 That just didn't happen, to my knowledge, in
23 any conversation that I was in.
24    Q.    Well, can you identify for me
25 anything that had recently occurred related to

MIKE ROBERTS

1
2  the courthouse grounds or the statue, other
3  than the gatherings related to the statue
4  itself or local and nationwide reaction to the
5  death of Mr. Floyd?
6              MR. O'DONNELL:  Object to
7         form.
8              You can answer.
9    A.    Specifically, I don't -- I'd have
10 to -- I'd have to stop and think.  There was,
11 you know, just -- it's been a minute.  But, you
12 know, there again, I mean, just the safety --
13 the safety concerns brought up when we have,
14 you know, a substantial increase in population,
15 whether it's for ball game weekend, school, a
16 protest, a demonstration, a book signing,
17 whatever it may be.  That -- that always
18 exposes areas in our policies -- whether it be
19 ours, university's, or city's -- that may need
20 improvement.
21    Q.    You've had safety concerns
22 associated with book signings?
23    A.    Give you an example.
24    Q.    Okay.
25    A.    We've got some pretty big authors

MIKE ROBERTS

1
2  from Oxford, now.  We get -- we get -- we get
3  some high profiles in.
4    Q.    Okay.  Let's go on to tab 32.
5         I'm sorry.  Actually, one more
6  question -- one more set of questions on 27.
7  So let -- let's go to the last little starred
8  line here.  I think it says, Anti-stick
9  provision doesn't include flags.
10        Do you see that?
11   A.    I do see that.
12   Q.    Okay.  And I think you and I
13 started to discuss this earlier, and I think
14 maybe does this help you locate, in terms of
15 time, when the discussion came up about
16 clarifying the policy with respect to the use
17 of sticks at gatherings?
18   A.    I just see it written here.  I just
19 remember the conversations --
20   Q.    What -- what do you --
21   A.    -- in the past about it.
22   Q.    What do you remember, Mr. Roberts,
23 about the conversations?
24   A.    I just remember the -- the need to
25 clear up language in our facility use policy

MIKE ROBERTS

1
2  that would -- would help prevent, you know, any
3  kind of item or article being used as a weapon.
4    Q.    And were any changes ever made to
5  the facility use policy on this front?
6    A.    I think so.  I think they -- I
7  think this last document we have, I think we
8  put all our changes in there to address that.
9  I think we may have even mentioned -- I'd have
10 to go back and look at it, but I think we may
11 have mentioned sizes, rectangular versus round.
12 I just -- I don't -- my memory says we -- we
13 addressed specific sizes or uses, but I'd have
14 to go back and refresh myself with the
15 document.
16   Q.    I'm sorry.  Which document?
17   A.    The facility use policy.
18   Q.    Okay.  The one we've looked at is
19 tab 3, but that's dated 2019.
20   A.    Right.
21   Q.    So you're thinking of a different
22 version?
23   A.    I'm thinking of the one that's
24 posted on our website now with all of the
25 changes we've made over the course of '15 to

MIKE ROBERTS

1
2 now.
3       Q.    Okay.  And -- and, sir, because
4 we're -- we're having trouble identifying what
5 you're referring to.  Exactly which website are
6 you referring to?
7       A.    Our county -- Lafayette County
8 website.
9       Q.    What's the web -- can you be more
10 specific, what it's -- what it's called?  Just
11 Lafayette County website or --
12      A.    Lafayettecountyms.gov or .govms.  I
13 don't -- it's in my -- it's in my browser, so
14 I -- I don't type it in every time.  Try
15 lafayette -- lafayettecounty.gov, I guess,
16 maybe.
17      Q.    So there's a website
18 lafayettems.com.  Is that what you think it is?
19      A.    Yeah.  That -- that's probably it.
20 You're going to have MS on it, or -- or you'll
21 pull up somewhere else in the country.
22      Q.    There must be others.  Okay.
23 We'll -- we'll --
24      A.    There are.
25      Q.    We'll take another look during the

MIKE ROBERTS

1
2 break there.  But Mr. Duran has not been able
3 to locate what you're looking for.  We'll --
4 we'll see if we can -- if it's posted, we'll
5 pull it down and we can look at it together.
6       Let -- let's move on.  Tab 32.
7       A.    Okay.  I'm there.
8       Q.    Okay.  This is a one-page document,
9 Bates number Lafayette County doc1, and it's
10 dated the 20th of July, 2020.  And I -- I think
11 you've confirmed to me that that's your
12 signature on the bottom?
13      A.    I did.
14      Q.    Okay.
15            (Court reporter
16             clarification.)
17            MR. YOUNGWOOD:  This is
18      Exhibit 32.
19            (Exhibit 32 was marked for
20             identification.)
21 BY MR. YOUNGWOOD:
22      Q.    So this reflects action taken at
23 the July 20, 2020, meeting of the Lafayette
24 County board of supervisors, correct?
25      A.    Yes, sir.

MIKE ROBERTS

1
2       Q.    Okay.  And -- and you were present
3 at that meeting, correct?
4       A.    I was.
5       Q.    Okay.  And the action taken refers
6 to a further revision of the facility use
7 policy, right?
8       A.    Right.
9       Q.    And one of the changes being made
10 is to change the 30-day-in-advance requirement
11 to 14 days, right?
12      A.    Correct.
13      Q.    Okay.  If you could, sir, keep --
14 keep that document in mind or your finger on
15 it, perhaps, easy.  But also turn back to tab
16 12, which was marked as Exhibit 12.  And this
17 is the June 15th change to the policy where it
18 was changed to 30 days, but you'll see that
19 there was a provision there that the 30-day
20 period could be waived either by the board or
21 by the sheriff.
22            Do you see that?
23      A.    I do.
24      Q.    Okay.  In the -- now, going back to
25 32, which is Exhibit 32, there is -- there is

MIKE ROBERTS

1
2 no similar provision to allow for a waiver of
3 the time period, correct?
4       A.    I don't see it there, no, sir.
5       Q.    Okay.  Why -- why not?
6       A.    I think the 14 days kind of
7 eliminated that -- the need.  But, there again,
8 that's just my -- my remembrance of it.  The 14
9 days, the -- the sheriff had determined 30 days
10 was probably way more than he needed to give
11 his input to the county administrator on the
12 permitting process.
13      Q.    Okay.  Well, does -- does -- and
14 why do you say "the sheriff"?  I thought you
15 indicated that it was the county administrator
16 who had authority to grant or deny permits.
17      A.    Do what, now?
18      Q.    Let me ask a different question.
19      A.    Okay.
20      Q.    Why are 14 days needed to consider
21 permit application?
22      A.    That was the adequate time
23 recommended to us that law enforcement needed
24 to -- to review the event.
25      Q.    Why did they need 14 days?

MIKE ROBERTS

1
2    A.    To get -- you'd have to ask them.
3  That -- they started out at 30; they got down
4  to 14.  We wanted to try to lax the -- the
5  amount of time to, you know, offer folks more
6  opportunity to be permitted.  But, evidently,
7  they -- you know, that's what they recommended
8  they needed to -- to get with the other
9  entities that run this county.
10   Q.    Okay.  But, why --
11   A.    There again, I'd -- you'd have to
12 ask -- you'd have to ask him.  I'm not sure
13 where he came up with 14 days from.  But that's
14 what his recommendation was, and that's what we
15 moved it to.
16   Q.    Okay.  But why not 10 days?
17   A.    There again, because that's what he
18 recommended.
19   Q.    You -- you didn't probe him on the
20 basis for the recommendation?
21   A.    I -- to my -- what I remember is
22 that he said that 14 days was -- was time
23 enough for him to review the event and get with
24 the other people.
25   Q.    Okay.  Did you ask him if -- if

MIKE ROBERTS

1
2  less time might also be adequate?
3    A.    I don't remember.  But we still
4  had -- you know, we got the waiver -- waiver
5  process is still -- you know, still there.
6    Q.    Well, I'm sorry.  Where --
7    A.    I mean, he had --
8    Q.    I mean -- finish your answer, sir.
9  Sorry.
10   A.    I'm just saying, I mean, the -- I
11 didn't ask about the 10 days or why 30 days.
12 He gave the 14.  We still have the -- you know,
13 the waiver process is in place.  So, I mean, if
14 it needed to be ten and we saw that we could
15 waive that process and let them do it in 10,
16 then -- then I'm sure, you know, we'd do all we
17 could to -- to make that happen.
18   Q.    But, sir, we just looked.  The
19 waiver provision, which had been in the June
20 '15 version of the revisions to the policy,
21 were -- was removed from the July '20 version
22 of the policy, right?
23   A.    I don't think it's been removed; it
24 just wasn't in that minutes.  But I'd have
25 to -- I'd have to go back and -- and look.  But

MIKE ROBERTS

1
2  it's -- it's just not in that -- the minutes
3  you're referring to on tab 32.
4    Q.    What -- where else would I like to
5  find that you could waive the 14 days?
6    A.    In the published minutes online.
7  I'm trying to think where you may find
8  them.  I mean, but all of our minutes are
9  published on our website as well.
10   Q.    Okay.  Let -- let's go -- so it's
11 your understanding, sir, that that 14-day
12 period can be waived?
13   A.    It's my understanding, yes, sir.
14   Q.    And who has the power to waive it?
15   A.    The county administrator who's
16 reviewing the -- you know, the permit.
17   Q.    Okay.  How about the board of
18 supervisors?
19   A.    I think -- our only -- you know,
20 our only action would be if somebody appealed a
21 denial.
22   Q.    Okay.  We've -- we've discussed
23 that.
24   A.    Right.
25   Q.    Let's go to the other change here.

MIKE ROBERTS

1
2  There's reference to 30 minutes before dusk.
3          Do you see that?
4    A.    I do.
5    Q.    When's dusk?
6    A.    My interpretation, dusk is complete
7  darkness.
8    Q.    Okay.  So complete darkness would
9  be some amount of time after sunset; is that
10 fair to say?
11   A.    Whenever the complete darkness is.
12   Q.    Well --
13   A.    You know, it's different.
14   Q.    Is complete darkness before or
15 after sunset?
16   A.    After.
17   Q.    Okay.
18   A.    Yeah.
19   Q.    And is -- is the timing of dusk --
20 strike that.
21          How long after sunset, on a typical
22 day, is -- is complete darkness?
23   A.    I'm not sure what a typical day is.
24 For me, my -- my opinion of dusk is when
25 there's no more sunlight, whether it's ambient

MIKE ROBERTS

1
2 or visible.  It's got to be dark outside.
3      Q.    Okay.  And -- and if I were in
4 Oxford today, how would I figure out when it's
5 dusk?
6      A.    When it's completely dark outside
7 with no sunlight visible.  Or light from the
8 sun, whether it's setting or already set.
9      Q.    Okay.  And do you know what time
10 that is today?
11     A.    I do not.
12     Q.    Okay.  And the policy doesn't say
13 "at dusk," it says "before dusk," right?  30
14 minutes before dusk.
15           Do you see that?
16     A.    I do.
17     Q.    Why?
18     A.    I would think, you know, just for
19 the safety of everyone.  You don't want people
20 trying to, you know, leave their function or
21 whatever, after it's -- after it's dark.  There
22 again, if you've been to the square, you're
23 trying to get off the courthouse grounds at
24 nighttime -- it's hard enough during the day,
25 but you're trying to walk across the street,

MIKE ROBERTS

1
2 back to your cars or wherever you're going and
3 it's -- and it's black dark outside, the -- the
4 risk of accidents increases, no doubt.
5           So it's basically to give the --
6 you know, the permitted person or group an
7 opportunity to dismiss their activities in a
8 safe manner.
9      Q.    Okay.  Can the 30-minutes-before-
10 dusk requirement be waived by the board?
11     A.    I don't know.
12     Q.    Okay.
13     A.    I don't know.
14     Q.    Can it be waived by the county
15 administrator?
16     A.    I -- I don't know.  I wouldn't
17 think so.
18     Q.    Okay.  Can it be waived by the
19 sheriff?
20     A.    No.
21     Q.    Okay.  Are -- and did the sheriff
22 recommend that -- were these -- were these
23 words the sheriff's exact recommendation, 30
24 minutes before dusk?
25     A.    I don't remember who made the

MIKE ROBERTS

1
2 actual time frame, the 30 minutes before dusk.
3 I think the agreeance was that you need to be
4 out of there by dark, so you say 30 minutes
5 before dusk.
6      Q.    Okay.  Why was the word "dusk" used
7 instead of "dark"?
8      A.    Just -- I mean, just a technical
9 term that -- that -- you know, sunset -- sunset
10 may be interpreted different at different times
11 and places.  Dusk -- dusk is dusk whether we're
12 in New York or we're in Oxford.
13     Q.    Okay.  And did the sheriff
14 recommend that there be no exception to this
15 timing requirement, 30 minutes before dusk?
16     A.    I don't remember him asking for any
17 exceptions.
18     Q.    Okay.  Have you ever reviewed a
19 permit, sir?
20     A.    I have not.
21     Q.    Okay.  Have you even ever seen one?
22     A.    Not that I -- not that I'm aware
23 off the top of my head.  I don't remember ever
24 seeing one.
25     Q.    Okay.  Why don't we take a bit of a

MIKE ROBERTS

1
2 break, maybe five, 10 minutes, if that's okay?
3 We've been going for a bit.
4           MR. O'DONNELL:  That will be
5           fine.
6      A.    Whatever -- whatever's good with
7 you guys.
8           MR. YOUNGWOOD:  Okay.  That's
9           good.  And we're going to work
10          to -- to get you out of here within
11          the next hour.  Okay?
12          THE VIDEOGRAPHER:  We are
13          going off record.  The time is
14          11:36.
15          (Recess from 11:36 a.m. to
16          11:51 a.m.)
17          THE VIDEOGRAPHER:  Back on
18          record.  The time is 11:51.
19 BY MR. YOUNGWOOD:
20     Q.    Okay.  Mr. Roberts, I'd like to
21 direct your attention to tab 29 of your binder.
22     A.    You said 21?
23     Q.    29, sir.
24     A.    29.  Okay.  I'm there.
25          MR. YOUNGWOOD:  So we'll mark

Page 122

MIKE ROBERTS

1
2      this as Exhibit 29.  It's Bates
3      number Lafayette County doc30.
4              (Exhibit 29 was marked for
5              identification.)
6  BY MR. YOUNGWOOD:
7      Q.    Have you ever seen this before?
8              MR. YOUNGWOOD:  I'm not sure
9      if we're having a connectivity
10     problem.
11             (Technical discussion.)
12             THE VIDEOGRAPHER:  So we're
13     going to go off record.
14             MR. YOUNGWOOD:  Yeah.
15             THE VIDEOGRAPHER:
16     Okay.  We're going off record.  The
17     time is 11:52.
18             (Off-the-record discussion
19             from 11:52 a.m. to
20             11:53 a.m.)
21             THE VIDEOGRAPHER:  Back on
22     record at 11:53.
23  BY MR. YOUNGWOOD:
24     Q.    Okay.  Mr. Roberts, I'm not sure
25  where we lost each other, but we're going to

Page 123

MIKE ROBERTS

1  look at tab 29, which is Exhibit 29, Lafayette
2  County doc30.
3      A.    I'm there.
4      Q.    Okay.  And when we lost connection,
5  I was asking you to look at this document and
6  tell me if you've seen it before.
7      A.    Not to my knowledge, I haven't.
8      Q.    Okay.  It is the denied application
9  of Mr. -- Mr. Rash for a permit on August 8th,
10 2020.  Were you consulted at all with the
11 decision by the county administrator to deny
12 this request?
13     A.    No, sir.  I wasn't involved in
14 it -- in it.
15     Q.    Okay.  Do you have any information
16 whatsoever as to why the request was denied?
17     A.    No.  Not to my knowledge.
18     Q.    Okay.  And -- and we've discussed a
19 few times the appeal, the -- you know, whether
20 or not there's a possibility for an appeal.  Do
21 you see anything on this form that would
22 indicate to somebody that they could appeal to
23 the board of supervisors with respect to the
24 permit denial?
25

Page 124

MIKE ROBERTS

1
2      A.    I don't see any.  All I see is the
3  waiver option, but I don't see an appeals
4  notification.
5      Q.    I'm sorry.  By "waiver," what are
6  you referring to?
7      A.    I was just -- I was saying I see in
8  the -- in the language there, it says the
9  30-day --
10     Q.    Can be waived.  Okay.  I
11 understand.
12     A.    Right.  But I don't see the -- to
13 answer your question, I don't see the appeals
14 language.
15     Q.    Okay.  Do you know why this permit
16 was denied?
17     A.    Doesn't -- didn't conform with our
18 facility use project -- or --
19     Q.    Okay.
20     A.    -- policy.
21     Q.    And this is a permit for -- for
22 nighttime use, right?
23     A.    Yeah.  That's what -- it says on
24 here, 8:00 -- yeah, 8:00 p.m. to 11:00.
25     Q.    Okay.  And following July 20 of

Page 125

MIKE ROBERTS

1
2  2020, nighttime use of the courthouse grounds
3  was prohibited under your policy, right?
4      A.    Right.
5      Q.    And so had there been some appeal
6  to the board of supervisors, do you believe you
7  would have had discretion to waive that
8  nighttime use restriction?
9      A.    The board -- the way -- way I
10 understand the appeals process, the board could
11 have waived the -- granted the permit if they
12 had deemed it, you know, appropriate.
13     Q.    Okay.  Well, what criteria would
14 you have used to determine whether or not
15 Mr. Rash could have had an event on the
16 courthouse grounds on August 8, 2020, at night?
17     A.    I would -- I would have used our
18 facility use policy and, you know, obviously
19 gotten some input from law enforcement,
20 depending on what it was.  I'd just have -- I'd
21 have had to have seen this information or, you
22 know, heard from Mr. Rash or see what kind
23 of -- without the information, it'd be hard for
24 me to give you a would I have granted it or
25 wouldn't have been in favor of it.  I'd have

Page 126

MIKE ROBERTS

2 had to have known, you know, what it
3 entailed --
4      Q.    Okay.  And -- and you say you would
5 have consulted with the facility use policy.
6 The facility use policy would have -- would bar
7 any nighttime use whatsoever.  So would --
8 would that mean --
9      A.    Right.  (Indiscernible).
10      Q.    -- you would have denied his
11 permit?
12            (Simultaneous speakers.)
13      A.    Right.  So just looking at it on
14 the surface without, you know, knowing all the
15 details and information, I, you know -- more
16 than likely, the 8:00 p.m. to 11:00 p.m., it's
17 just safety concerns on that square at
18 nighttime are the primary reason we had it to
19 begin with, to bar it.  So I can't, you know --
20 I just -- without the -- more information of
21 his -- his request, my initial knee jerk is
22 8:00 p.m. to 11:00, that it would have not been
23 safe for spectators or -- or anybody else, for
24 that matter.  But --
25      Q.    Okay.  You'd agree with me that

Page 127

MIKE ROBERTS

2 if -- if Mr. Rash's goal was to display movies
3 or video on the courthouse exterior wall, the
4 only time he could have done that would be when
5 it was dark outside, right?
6      A.    I don't know, now.  I'm not privy
7 enough to know enough about projections and all
8 that.  I don't -- I don't know.  I wouldn't say
9 that was the only time he could do it, but --
10      Q.    You -- you think he could have
11 displayed movies on a white wall during the
12 daytime, and people would be able to see them?
13      A.    Never -- never tried it myself.  I
14 don't know.
15      Q.    Okay.  Let's go to the prior tab,
16 tab 28.
17      A.    28.
18      Q.    This is a set of emails exchanged
19 between Ms. Carwyle -- she's the county
20 administrator, right?
21      A.    Correct.
22      Q.    And -- and Mr. Rash.  You'll see
23 that.  And Mr. East, who's -- Sheriff East is
24 on at least one of them.
25            Do you see?

Page 128

MIKE ROBERTS

2      A.    I do.  I do.
3      Q.    If you look at the bottom -- have
4 you ever seen these -- this exchange before?
5      A.    I have not.  I don't remember it.
6            MR. YOUNGWOOD:  This is tab
7            28.  We'll mark it as Exhibit 28.
8            It's Lafayette County doc28.
9            (Exhibit 28 was marked for
10            identification.)
11 BY MR. YOUNGWOOD:
12      Q.    On the bottom email, Ms. Carwyle
13 says, Please see the attached permit.  I've
14 denied the permit due to a change in the
15 county's permit policy.  No permit shall be
16 issued after dusk due to security issues.
17            Do you -- you see that?
18      A.    I do.
19      Q.    And -- and do you believe that was
20 a -- that's a correct statement of the county's
21 policy after the July 20, 2020, amendments?
22      A.    In reference to the -- to the dusk?
23      Q.    Yes.
24      A.    Right.  I believe that's what our
25 policy is intended to reflect, that no permits

Page 129

MIKE ROBERTS

2 or usage of, you know, courthouse grounds
3 specifically will be issued for after dusk --
4      Q.    Okay.
5      A.    -- 30 minutes.
6      Q.    And -- and you'd agree with me that
7 her -- her conveying of this policy indicates
8 that there's no discretion here.  They'll --
9 they'll -- all such requests would be denied if
10 they were for the time period after dusk?
11            MR. O'DONNELL:  Object to
12            form.
13      A.    Reading the email at face value,
14 that's -- that's the way I would read it.
15      Q.    Okay.
16      A.    Now, there again, you know, to me,
17 whoever followed the permit application, it --
18 it gives him the right to waiver.
19      Q.    Okay.  And in the top email, she
20 elaborates.  She says, The Courthouse grounds,
21 including the statue area, are closed for any
22 gathering after dark, regardless of permit
23 requirements.  So you would not be allowed to
24 be on the grounds from 30 minutes prior to dusk
25 to sunrise.

Page 130

MIKE ROBERTS

2      Do you see that?
3      A.    I do.
4      Q.    And, again, she -- she does not
5  indicate that there's any discretion in
6  granting a permit for a time period after dusk,
7  correct?
8      A.    I don't know.  I mean, yeah, just
9  judging by the email.
10      Q.    Okay.  And she does not tell
11  Mr. Rash, for example, that he can appeal the
12  denial to the board of supervisors or anyone
13  else, correct?
14          MR. O'DONNELL:  Object.
15          Object to form.
16      A.    According to this email, I don't
17  see where she says that in there.  I don't know
18  what she -- you know, I'm not privy to their
19  conversation, if they had any.  But no, not by
20  this email.
21      Q.    Okay.  Since the end of July 2020,
22  has the county granted any permits for use of
23  the courthouse grounds after dusk?
24      A.    Not to my knowledge, no, sir.
25      Q.    Sir, can you think of occasions on

Page 131

MIKE ROBERTS

2  which Ms. Carwyle has informed you of permit
3  requests?
4      A.    Maybe after the fact, she would
5  send something to let us know who's -- who's
6  coming or not coming.  But as far as in the
7  process of approving or denying, no, I don't
8  have any communications with her that I'm aware
9  of.
10      Q.    Okay.
11      A.    Perhaps she's sent me something
12  letting us know -- you know, letting the board
13  know who was coming or who wasn't coming or
14  just a heads-up or --
15      Q.    Okay.  So --
16      A.    -- whatever.
17      Q.    And -- and so she -- she doesn't
18  consult with you on granting or denying
19  permits?
20      A.    No, sir.
21      Q.    Okay.  And I think I maybe have one
22  example of who you just referred.  If you could
23  turn to tab 18, which we'll mark as Exhibit 18,
24  Lafayette County 261 to 266.  When you're
25  there, I'm going to refer you within the

Page 132

MIKE ROBERTS

2  document.  So not -- not -- you're welcome to
3  look at anything, but not to the very top.
4          (Exhibit 18 was marked for
5              identification.)
6  BY MR. YOUNGWOOD:
7      Q.    So if you look at page 265.
8      A.    Okay.
9      Q.    She sends an email June 18, 2020.
10  In the "to" line, it says, Supervisor.  Is that
11  a group email list of some sort that includes
12  you and your fellow supervisors?
13      A.    I think that's how she has us
14  listed, yes.
15      Q.    Okay.  And she attaches this next
16  page, an approved permit.
17          Do you see that?
18      A.    I do.
19      Q.    Okay.  And this is for an
20  individual named Tim Warren who was granted a
21  permit?
22      A.    Right.
23      Q.    Do you see that?  Do you know who
24  Mr. Warren is?
25      A.    Yeah.  I know -- I know of him.

Page 133

MIKE ROBERTS

2      Q.    What do -- what do you know of him?
3      A.    He's probably not a big fan of
4  mine.  He doesn't -- doesn't really like me too
5  much.  But yeah, I know who he is.
6      Q.    Okay.  What -- what -- I'm not --
7  I'm not trying to get that much detail, but
8  what -- why do you think he's not a fan of
9  yours?
10      A.    Short version is when I first ran
11  for office, he's in my district, and I didn't
12  comply with one of his requests on a road that
13  he wanted done and, since then, has not ever
14  spoke to me politely again.
15      Q.    And -- and Mr. Warren has, are you
16  aware, somewhat extreme views on certain racial
17  issues?
18      A.    I really don't -- I don't.  I don't
19  know what -- what his views are.  We don't
20  really speak.
21      Q.    Okay.  If you could just turn
22  quickly to tab 17, which we'll mark as
23  Exhibit 17.  It doesn't have any Bates numbers,
24  but it's a collection of social media posts.
25          (Exhibit 17 was marked for

MIKE ROBERTS

1
2           identification.)
3  BY MR. YOUNGWOOD:
4       Q.    Do you see Mr. Warren's name in
5  this -- this picture?
6       A.    I do.  I do.
7       Q.    Had you -- were you aware of
8  Mr. Warren being associated with this picture
9  previously?
10      A.    No.
11      Q.    Okay.  Going back to tab 18, which
12  is Exhibit 18, and the page that we were
13  looking at, 265, do you know if Mr. Warren's
14  event ended up going forward?
15      A.    I don't think it did.  I'm trying
16  to remember the details, but I don't know -- I
17  don't know if -- or what happened.  But I don't
18  remember it being -- it ever happening.
19      Q.    Okay.
20      A.    I don't know that it -- I don't
21  know that it did happen.
22      Q.    Okay.  You'll see that the permit
23  is marked as "granted."
24            Do you see that?
25      A.    Right.

1                  MIKE ROBERTS
2       Q.    Okay.  Was it -- was it events like
3  the one Mr. Warren wanted to hold that played
4  some role in the change to the facility use
5  policy during the summer of 2020?
6       A.    No.  Nothing specific to that.
7            MR. YOUNGWOOD:  Okay.  We
8            were able to locate a different
9            version of the application that is
10           on the website.  I'm wondering,
11           Raul, if you could just email that
12           to the -- to the folks on -- on the
13           deposition.  Or you could give it
14           to me, and I could -- you could --
15           you could put it into the chat, and
16           I could maybe just share it, if you
17           could give me a .pdf of it.  I'm
18           just trying to not waste time doing
19           this.  I won't have many questions.
20              (Technical discussion.)
21           MR. YOUNGWOOD:  So I'm going
22           to -- we're going to mark what was
23           just put into the chat as
24           Exhibit 53, because there's no tab
25           53.

1                  MIKE ROBERTS
2              (Exhibit 53 was marked for
3                  identification.)
4  BY MR. YOUNGWOOD:
5       Q.    It's in the chat.  I'm going to
6  share my screen.  Can you see what I -- are you
7  able to see what I put up, Mr. Roberts?
8       A.    I can.  I can.
9       Q.    Okay.  So we -- we, during -- we
10  were able to pull this down.  Is it large
11  enough for you to read it, or do you want me to
12  enlarge it?
13      A.    I think so.  I gotcha.
14      Q.    Okay.  I'll just make it
15  slightly -- there.  Maybe that helps.
16      A.    There you go.
17      Q.    The -- the change that seems to be
18  made -- and I'm not representing there aren't
19  others, but the change is -- if you look, for
20  example, at -- sorry -- tab -- tab 29, which is
21  Exhibit 29 we just looked at.  That was
22  Mr. Rash's application that was made on the
23  14th of July, 2020, and there was the reference
24  to the 30 days.
25      A.    Right.

1                  MIKE ROBERTS
2       Q.    You'll see on what's now been
3  marked as Exhibit 53, which, again, we pulled
4  off your website just today, it refers to the
5  14 days.
6            Do you see that?
7       A.    I do.
8       Q.    And that -- that's the change from
9  30 to 14 that was done on July 20, 2020, right?
10      A.    Right.
11      Q.    Okay.  And you had said that that,
12  too, you thought could be waived, and this form
13  does indicate it can be waived.  You were
14  correct on that.
15      A.    Well, good.  Good.  I just didn't
16  remember us taking the -- the waiver ability
17  out, but --
18      Q.    Okay.
19      A.    -- I'm glad you found it.
20      Q.    Okay.  Well, yeah.  I'm -- I'm
21  often wrong, Mr. Roberts.  I try to check
22  before I -- before I say I'm right.
23            So my -- a couple questions,
24  though.  Any -- do you believe that this is the
25  current form that's available to individuals

MIKE ROBERTS

1
2  who want to seek a permit related to the
3  courthouse?
4      A.    I would assume so, but I don't know
5  a hundred percent.  But I would hope that this
6  is our most current form.
7      Q.    Okay.  And have you ever been asked
8  to waive the 14-day requirement?
9      A.    I haven't, no, sir.
10     Q.    Okay.  You're not aware of the
11 supervisors ever being asked to, are you?
12     A.    No.  This is the county
13 administrator would be who they would ask.  I
14 haven't -- I don't know that we --
15     Q.    Okay.
16     A.    I know I haven't.  The board's
17 never been asked --
18     Q.    If you --
19     A.    -- to waive it.
20     Q.    If you were asked, what criteria
21 would you use to determine whether or not the
22 time should be shortened to less than 14 days?
23     A.    Yeah.  I would -- you know, we'd
24 have to go back and make sure the sheriff
25 was -- was good with it, just to make sure for

MIKE ROBERTS

1
2  safety protocol that -- that he had time.  I
3  mean, you know, there -- there may be a time
4  that the -- I don't know -- Girl Scouts want to
5  sell cookies on there, and they don't --
6  they've got to do it this weekend.  And the
7  sheriff says, Yeah, that's fine; I can handle
8  it.  And it may be some time when 500 people
9  want to come into town, and he says, you know,
10 14 days, I've got to have to get my people in
11 place and -- and, you know, staff it.  So I
12 think depending on what he said.
13     Q.    Okay.  And you'd agree with me,
14 sir, other than saying that the board or the
15 sheriff have the ability to waive the 14-day
16 requirement, there's no indication on this form
17 that the board or the sheriff or anyone have
18 the ability to waive any other requirements
19 that are associated with the facility use
20 policy as it applies to the courthouse?
21     A.    I don't -- I don't see anything on
22 there that you have on that screen, but --
23     Q.    Okay.  And I'm happy to scroll
24 down.  There's not much --
25     A.    Yeah.  I'm with you.  I'm with you.

MIKE ROBERTS

1
2      Q.    Okay.  It says, Rules of courthouse
3  grounds.  The undersigned understands no one is
4  allowed to block the sidewalk walking up to and
5  around the statue.
6           What's the reason for that rule?
7      A.    Because we have the -- you know,
8  four people without the permit is pretty much
9  all that's going to be allowed, you know -- or
10 can be there without blocking it.  And so just
11 for the safety of -- of crosswalks, courthouse
12 grounds, just the use, I mean, you just don't
13 want that congestion there the way that the
14 sidewalks and stuff run around the grounds.
15     Q.    Okay.  And it says, No one is
16 allowed to stand or climb on the statue.
17          Do you understand what the purpose
18 of that rule is?
19     A.    It's protected by history and
20 archives.  It's safety.
21     Q.    Okay.  On -- on the bottom --
22     A.    It's numerous.
23     Q.    I'm sorry.  I didn't mean to cut
24 you off.
25          On the bottom under permit, there's

MIKE ROBERTS

1
2  a box for granted and a signature line for the
3  county administrator.  There's also a line for
4  denied, and it says, See attached.
5           Do you see that?
6      A.    Right.
7      Q.    What -- what do you understand the
8  reference to "see attached" to be for?
9      A.    Actually, I don't know.  I don't
10 know what -- what -- unless -- unless she puts
11 a -- you know, goes into depth or something, I
12 don't know what the attached would be.
13     Q.    Okay.  Would you think, perhaps,
14 it's -- it's a requirement that if anytime the
15 permit is denied, there be a written
16 explanation of such denial?
17     A.    I think it would -- you know, would
18 be in the best interest of public relations to
19 let them know why they're denied.
20          MR. YOUNGWOOD:  Okay.
21          Unless, Josh or Raul, you want to
22          talk, I don't -- and I'm missing
23          something, I don't -- we can go off
24          the record and do that, but I don't
25          have any other questions.  Josh,

Page 142

MIKE ROBERTS

1    MIKE ROBERTS
2  Raul, are you good?
3          MR. TOM:  Nothing from me.
4          MR. YOUNGWOOD:  Okay.
5          THE VIDEOGRAPHER:  Okay.
6  So --
7          MR. YOUNGWOOD:  Okay.
8  Mr. Roberts, unless -- unless your
9  attorney has questions for you, I
10 have no further questions, and I --
11 I thank you for your time.
12         Mr. O'Donnell, we're not able
13 to find the, you know, composite
14 policy on the website.  We'll email
15 you about that later.  I don't
16 think that would give rise to --
17         MR. O'DONNELL:  John -- John,
18 I'll send that to you this
19 afternoon.
20         MR. YOUNGWOOD:  Okay.  Is it
21 on the website?
22         MR. O'DONNELL:  It's -- it's
23 supposed to be.  I'll talk to our
24 county administrator.  She's been
25 out on sick leave.

Page 143

1    MIKE ROBERTS
2          MR. YOUNGWOOD:  Okay.  Okay.
3          MR. O'DONNELL:  I'll -- I'll
4  check with her to see where that --
5          THE VIDEOGRAPHER:  So are
6  we --
7          MR. O'DONNELL:  John, I'll
8  get that to you this afternoon.
9          MR. YOUNGWOOD:  Okay.  Okay.
10 Again, we'll reserve whatever
11 rights we have on that.  I
12 certainly don't want to bother
13 anyone unnecessarily.  We
14 appreciate you sending it to us.
15         THE VIDEOGRAPHER:  Are we
16 ready to go off record?
17         MR. O'DONNELL:  I have no
18 questions.
19         THE VIDEOGRAPHER:  We are
20 going off record.  The time is
21 12:17.
22         (The deposition of MIKE
23         ROBERTS concluded at
24         12:17 p.m. Central Standard
25         Time.)

Page 144

1          MIKE ROBERTS
2        REPORTER'S CERTIFICATE
3        I, Greta H. Duckett, Certified Court
4  Reporter, Registered Professional Reporter, and
5  Certified Realtime Reporter, hereby certify
6  that on Wednesday, January 13, 2021, I reported
7  the remote deposition of MIKE ROBERTS, who was
8  first duly sworn or affirmed to speak the truth
9  in the matter of the foregoing cause, and that
10 the pages herein contain a true and accurate
11 transcription of the examination of said
12 witness by counsel for the parties set out
13 herein.
14         I further certify that I am neither of
15 kin nor of counsel to any of the parties to
16 said cause, nor in any manner interested in the
17 results thereof.
18         This 26th day of January, 2021.
19
20         *Greta Duckett*
21
   GRETA H. DUCKETT, RPR, CRR, CVR-S, RVR-M-S
22 ACCR-12, GCCR-2891, MCCR-1945, TNLCR-671
23
24
25

Page 145

1                ERRATA SHEET
2  Case Name:
3  Deposition Date:
4  Deponent:
5  Pg.  No. Now Reads    Should Read   Reason
6  ___  ___  _____   _____   _____
7  ___  ___  _____   _____   _____
8  ___  ___  _____   _____   _____
9  ___  ___  _____   _____   _____
10 ___  ___  _____   _____   _____
11 ___  ___  _____   _____   _____
12 ___  ___  _____   _____   _____
13 ___  ___  _____   _____   _____
14 ___  ___  _____   _____   _____
15 ___  ___  _____   _____   _____
16 ___  ___  _____   _____   _____
17 ___  ___  _____   _____   _____
18 ___  ___  _____   _____   _____
19 ___  ___  _____   _____   _____
20
21                        _____
22                        Signature of Deponent
   SUBSCRIBED AND SWORN BEFORE ME
23 THIS ____ DAY OF _____, 2021.
24         _____
25 (Notary Public)   MY COMMISSION EXPIRES:_____

**$**

**$45,000** 12:5

**1**

**1** 32:16,18

**10** 29:22 30:12 31:21 37:18 51:13 63:13 114:16 115:11,15 121:2

**10:00** 98:3,12,15,19, 20 99:2,18

**10:08** 50:13,14

**10:22** 50:15,17

**10:30** 98:13

**11:00** 124:24 126:16, 22

**11:36** 121:14,15

**11:51** 121:16,18

**11:52** 122:17,19

**11:53** 122:20,22

**12** 53:18,19 54:4,5 65:17 78:17 81:13 112:16

**1262** 87:17

**12:17** 143:21,24

**13** 82:16 89:17

**13th** 9:12

**14** 42:17,22 60:19 62:19 87:11,12,13, 18,19 112:11 113:6, 8,20,25 114:4,13,22 115:12 116:5 137:5,9 138:22 139:10

**14-day** 116:11 138:8 139:15

**14th** 136:23

**15** 60:8,15 61:13 82:3 90:22 91:11,12 109:25 115:20

**15th** 56:22,24 60:21 63:5 66:10 112:17

**17** 133:22,23,25

**18** 12:17 131:23 132:4,9 134:11,12

**19** 60:8,16 61:13 90:22

**19th** 88:24

**2**

**2** 37:13,14 39:6,25 48:7 51:9

**20** 15:2 33:2 60:8,16 61:13 74:9 88:20,25 111:23 115:21 124:25 128:21 137:9

**2011** 14:13

**2015** 33:2,11,19,24 35:20 98:2

**2019** 37:19,22 38:13, 21 39:21 40:5 41:2 42:2,24 43:3,14 44:20 45:9 60:3 109:19

**2020** 42:24 51:17 53:9 55:3 58:7,17 60:22 64:13 66:11 88:24 94:9 95:5,24 104:20,23 105:20 111:10,23 123:11 125:2,16 128:21 130:21 132:9 135:5 136:23 137:9

**2021** 9:12

**20th** 111:10

**21** 88:20 121:22

**261** 131:24

**265** 132:7 134:13

**266** 131:24

**27** 80:11,12,13 81:18 82:17 89:14 95:20 104:5,6 108:6

**28** 127:16,17 128:7,9

**29** 121:21,23,24 122:2,4 123:2 136:20,21

**3**

**3** 44:4 50:23,24,25 51:3,4,11,18 79:18 98:18,24 109:19

**30** 8:22 42:16 43:12, 13 59:9,12,15 60:2 61:6 90:11,25 91:8, 13,17 112:18 113:9 114:3 115:11 117:2 118:13 119:23 120:2, 4,15 129:5,24 136:24 137:9

**30-day** 42:14 43:6 59:16,21 60:23 61:4, 7 62:4,9 63:8 75:9 79:16 112:19 124:9

**30-day-in-advance** 112:10

**30-minutes-before-** 119:9

**32** 108:4 111:6,18,19 112:25 116:3

**39** 19:25 20:5,9,10 28:9,12 100:23

**3:20-cv-224-nbb-rp** 9:20

**4**

**4** 44:5 45:9

**45** 12:5

**45-7** 11:24 12:3,4,7

**46** 100:20,24,25

**47** 93:22 94:2,3

**48** 94:16,18,21

**49** 94:18,19,23

**4th** 37:19 39:9 44:20

**5**

**5** 32:25

**50** 94:19,20,25

**500** 139:8

**53** 135:24,25 136:2 137:3

**5:00** 69:19 99:9

**5:30** 98:5

**6**

**6** 80:19 91:12

**600-plus** 71:25

**6th** 81:24 95:24 96:2 104:20 105:19

**7**

**7:00** 69:24 71:9

**8**

**8** 125:16

**848** 88:23

**8:00** 69:19,22 124:24 126:16,22

**8th** 123:10

**9**

**98** 13:17,18

**9:23** 9:12

**9:30** 99:11

**A**

**a.m.** 50:14,15 121:15, 16 122:19,20

**ability** 38:9 42:21 63:2 64:18 100:3 137:16 139:15,18

**absent** 69:16

**absolutely** 37:4 71:18

**access** 22:2,7

**accident** 67:19

**accidents** 119:4

**accomplish** 16:21 62:20 66:19 99:15

**accurate** 15:14

**achieve** 84:20

**ACLU** 10:10

**action** 111:22 112:5 116:20

**active** 20:19

**activities** 119:7

**activity** 105:22

**actual** 36:7 49:11,13 84:2 120:2

**addition** 20:20 60:22

**additional** 16:8 18:25

**address** 38:8 41:5 58:25 106:5 109:8

**addressed** 97:3 109:13

**addressing** 76:24

**adequate** 91:2,6 113:22 115:2

**adjustments** 53:16

**administrator** 18:19 35:12 36:4 45:3,13, 18 49:8 63:22 78:21 79:2,21 113:11,15 116:15 119:15 123:12 127:20 138:13 141:3 142:24

**administrator's** 65:10

**admissible** 8:20

**adopt** 36:4

**adopted** 37:9 43:7 51:15 52:4 63:4 78:18 80:10

**adopting** 33:19,24 34:2 47:8

**adoption** 39:5

**advance** 39:5 42:6 90:17 105:19

**affixed** 29:7

**afforded** 49:9

**after-dark** 96:3

**afternoon** 142:19 143:8

**agenda** 54:12 80:18, 23,24 89:14

**agent** 12:13,14

**agree** 66:17 74:11 76:3 85:18 90:8 106:17 126:25 129:6 139:13

**agreeance** 120:3

**agreed** 9:6 66:15 84:10

**ahead** 10:6,7 18:3 24:17 52:7,9,10 60:13 90:21

**alcohol** 25:7

**alignment** 41:25 43:5

**alive** 86:3

**allowed** 99:18 129:23 140:4,9,16

**ambient** 102:3 117:25

**amend** 54:13

**Amended** 53:22

**amendment** 54:19, 23 65:18 74:8,9 75:13 77:23 78:17 79:11,15

**amendments** 55:7 128:21

**amount** 11:22 41:6 114:5 117:9

**and/or** 59:20 62:3

**Anti-stick** 108:8

**anybody's** 77:10

**anytime** 98:21 141:14

**apologize** 61:11

**appeal** 46:2,5,13,25 47:18,21,24 49:6

63:11 64:18,22 65:3, 6,8,12 123:20,21,23 125:5 130:11

**appealed** 45:24 63:15 116:20

**appeals** 124:3,13 125:10

**appeared** 58:14

**appears** 33:12,16 51:18 89:21

**applicable** 60:25 79:9 80:10

**applicant** 46:13 49:15

**application** 59:11,15 113:21 123:9 129:17 135:9 136:22

**applications** 61:2

**applies** 35:3 139:20

**apply** 43:13 62:8 98:4

**apprised** 64:17

**approve** 18:15 36:21 66:10 78:19

**approved** 66:13 72:23 78:18 132:16

**approves** 79:2

**approving** 78:16 131:7

**April** 33:19,24

**archives** 140:20

**area** 13:21,24 17:2 23:15 24:11,25 65:21,25 67:22 68:17 76:10,12 129:21

**areas** 107:18

**argument** 85:5

**arise** 42:18 62:15 105:11

**arisen** 103:25 105:19

**arises** 19:5

**arrangement** 11:20

**arrest** 78:10

**article** 43:25 109:3

**arts** 35:16

**aspect** 74:18

**aspects** 25:17 40:21 41:24

**association** 8:5

**assume** 31:13,20 58:17 70:5 81:24 90:16 102:6 138:4

**assuming** 36:8 78:12 88:17 89:25

**astounding** 13:8

**attached** 128:13 141:4,8,12

**attaches** 132:15

**attended** 81:23

**attention** 40:4 41:2 96:16 121:21

**attorney** 142:9

**auditor** 12:21

**August** 33:2 123:10 125:16

**authority** 113:16

**authors** 107:25

**availability** 72:5

**aware** 22:3,10 24:3, 9,23 26:6,7 34:5 48:5 49:12 58:20 61:21 63:23 65:2 75:15 80:9 100:18 103:22, 23 120:22 131:8 133:16 134:7 138:10

---

**B**

**B-1** 20:10 28:14

**B-20** 101:4 102:20

**B-23** 20:10

**B-3** 21:17

**back** 13:5 16:14 40:23 42:17 45:4 48:10 50:16 60:3,6,

12,18 72:22 73:2 79:18 86:3 89:11,13 90:23 91:8 95:19 97:25 98:13 104:5 106:2 109:10,14 112:15,24 115:25 119:2 121:17 122:21 134:11 138:24

**ball** 27:20 106:7,8 107:15

**banner** 43:19

**bar** 126:6,19

**base** 28:24

**based** 18:16 38:24 44:19 46:17 47:2 55:9,13 58:10 60:9 65:12 79:10

**basically** 40:6 41:4 45:2 55:13 67:10 75:17 96:11 97:21 119:5

**basing** 56:18

**basis** 67:4,6 114:20

**Bates** 37:17 51:12 53:21 82:16 87:16 111:9 122:2 133:23

**Bates-numbered** 32:25

**begin** 75:9 126:19

**behalf** 10:12 22:18

**belief** 67:6

**benches** 102:20,21 104:2

**benefit** 12:14 47:15

**big** 107:25 133:3

**biggest** 38:6

**binder** 19:24 37:12 50:20 51:10 80:12 121:21

**bit** 14:5 16:15 42:23 43:9 50:4 51:17 120:25 121:3

**black** 119:3

**block** 140:4

**blocked** 75:20

**blocking** 67:15 68:2 140:10

**board** 11:8,21 14:4, 13,18,22 15:25 16:21,25 17:4 18:12, 18 24:5 26:21 28:4 33:20 39:20 45:21 46:6,14 49:6 51:15 52:23 53:3,4,7 56:22 57:15 59:19 62:3,8 63:7,14,15 64:19,23 65:3 77:23 83:3 85:6 111:24 112:20 116:17 119:10 123:24 125:6,9,10 130:12 131:12 139:14,17

**board's** 40:4 41:2 138:16

**boardroom** 87:3

**book** 107:16,22

**bother** 143:12

**bottom** 28:14 51:13 57:12 67:14 83:11 87:16 89:20 111:12 128:3,12 140:21,25

**box** 141:2

**break** 50:8 51:8 111:2 121:2

**briefly** 62:13

**bring** 41:22,25 43:4 96:15

**bringing** 55:11

**broad** 29:16

**broadened** 32:2

**broke** 63:10

**brought** 38:19,20 39:14,17,19 40:4,25 41:9 44:15 56:21 61:4 75:8 99:6 107:13

**browser** 110:13

**Buddy** 38:16

**budget** 18:14,21,24 19:2,4

**building** 46:22
100:12,16

**business** 13:19
22:17 23:6 41:12
56:5,9 57:7 68:19,23
69:6 70:11,15,19,24
71:2,5,9 75:22 76:25
92:9

**busy** 11:4

**C**

**calendar** 57:25 82:7,
10

**call** 27:21 45:19 72:6

**called** 110:10

**calls** 45:13

**cameras** 102:14

**camp** 77:7

**cannonballs** 27:19
28:23 30:23

**cars** 28:20 119:2

**Carwyle** 127:19
128:12 131:2

**case** 8:25 9:20 64:7

**cases** 26:24

**casual** 58:21 73:3,6,
20,21 74:5

**catered** 50:20

**causing** 56:7

**celebrations** 23:23

**center** 22:20,23 23:6

**Central** 143:24

**certified** 8:4

**change** 42:12,23
44:11 55:9 59:8 60:4
66:10,24 67:6 84:21
90:11 91:13 97:16
99:5 104:7 112:10,17
116:25 128:14 135:4
136:17,19 137:8

**changed** 15:3
112:18

**changing** 58:6,10
105:16 106:21

**charged** 78:16

**charger** 50:9

**chat** 135:15,23 136:5

**check** 137:21 143:4

**chief** 38:16

**circuit** 20:25 21:2
68:7

**circular** 101:11

**circumstances**
42:18 59:14 62:15

**citation** 78:9

**cite** 56:14

**citizen** 49:4

**citizens** 66:25 67:7

**citizens'** 66:18

**city** 17:5 19:8,12,13,
18 22:16 23:12 27:3
36:9 40:11,20 41:22
43:4 61:10,17 74:17
75:2 78:24 96:8

**city's** 22:18 61:8,25
75:14 92:7 96:10,13
107:19

**Civil** 8:23 85:12

**clarification** 33:15
111:16

**clarifying** 108:16

**cleaned** 43:9

**clear** 53:12 96:5
108:25

**clerk's** 21:2 68:7,11

**climb** 140:16

**close** 98:22

**closed** 70:21 129:21

**closes** 21:23 93:7

**co-supervisors**
15:22,24

**coincide** 61:8,24

**collection** 20:8

133:24

**college** 13:8,10
106:6

**commerce** 22:16,19
23:6,13

**commission** 46:24

**committee** 47:11

**common-sense**
93:6

**communications**
131:8

**Compared** 37:3

**complete** 117:6,8,
11,14,22

**completely** 118:6

**comply** 133:12

**composite** 142:13

**con** 104:21

**concern** 24:10,25
25:4,6,12 38:6 57:2
68:20,22 69:2,3,4,10
99:6 106:4

**concerned** 45:12

**concerns** 19:21
25:9,11,14 31:13,15
38:7,19,24 39:14,20,
22 40:3,25 41:17
56:7 71:15 99:20,22
104:17,19 107:13,21
126:17

**concluded** 143:23

**conducive** 25:22
26:4 73:14

**conduct** 27:4 56:9
57:7

**conducted** 22:18

**conducting** 16:12
41:12

**Confederate** 65:22
82:14,18 104:11,21

**conferred** 31:10

**confident** 36:23

**confined** 24:12,25

**confirmed** 111:11

**conform** 124:17

**confused** 55:2

**congestion** 140:13

**congregating** 76:21

**conjunction** 40:11
53:7

**connection** 123:5

**connectivity** 122:9

**consensus** 96:25

**considered** 72:11
74:5 84:2

**consistent** 61:16
96:8

**constituents** 86:24
87:7 88:11

**constraint** 62:18

**consult** 131:18

**consulted** 36:8
123:11 126:5

**contacts** 78:24

**continued** 73:8

**controllers** 18:20

**conversation** 49:8
58:22 105:7 106:23
130:19

**conversations**
46:18 47:3 56:25
58:8 62:12 85:3
108:19,23

**conveying** 129:7

**convictions** 15:12
84:14,16

**cookies** 139:5

**copy** 39:23 80:18

**correct** 11:9 14:15
15:9 19:9,15,18,22
21:7,20,23 22:2,8,21
23:17 28:19 32:12
34:21 42:25 48:7
54:19,23 55:3 56:16
57:21 61:20 63:20
65:4 67:23 70:7,12

74:10,25 83:23,24
84:11 86:12 97:14
102:11 103:12 105:4,
24 111:24 112:3,12
113:3 127:21 128:20
130:7,13 137:14

**correctly** 14:14 69:8
86:10

**correlate** 17:18

**correspond** 87:6

**correspondence**
86:24

**cost** 30:14,15 44:9

**costing** 44:18

**costs** 44:5,9

**Counsel** 9:21

**country** 55:17
110:21

**countrywide** 106:12

**county** 9:16 10:13
11:9 13:24 18:17,19
19:7,8,12,17 20:15,
22 22:24 23:11 24:7
31:8,14,21 33:7
34:17 35:3,12 36:4
38:10 43:4 44:21
45:2,12,18 49:8,23
63:21 65:9 66:25
67:8 74:17,23 76:25
78:5,21 87:17 88:22
93:9 96:7 99:13
104:15 105:13 110:7,
11 111:9,24 113:11,
15 116:15 116:15
119:14 122:3 123:3,
12 127:19 128:8
130:22 131:24
138:12 141:3 142:24

**county's** 128:15,20

**countywide** 17:5,9
19:6 23:14

**couple** 91:10 137:23

**court** 9:7,18 10:16
21:2,4 33:14 69:22
111:15

**courthouse** 19:17
20:16,19,20,21 24:7
25:2 27:2,6 28:5

Index: courtroom..dusk

30:25 31:2,19 32:12
34:16,20,22 35:6,9,
13 38:10,25 41:13
44:23,24 53:23 54:14
56:5,8,15 57:8 65:21
67:20 68:7,11,19,24
69:7,13,14,15 70:10,
14,18,19,21,23 71:5,
9,16 72:13 74:23
75:21,22 76:7,22,25
77:4,13,17,25 78:7
79:7 92:9,15,17,21
93:2,6,10,12 95:6,13,
23 96:17 98:7 100:5,
10 101:20 102:11
107:2 118:23 125:2,
16 127:3 129:2,20
130:23 138:3 139:20
140:2,11

**courtroom** 8:21

**cover** 78:13

**covered** 96:22

**COVID-19** 8:8

**crafts** 35:16

**created** 80:25 81:5

**crime** 32:9

**criteria** 44:20,25
62:7 79:4,12,20 80:5
125:13 138:20

**crossed** 90:12

**crossing** 25:23 26:2
75:20

**crosswalks** 56:4
67:12 75:21 140:11

**current** 11:7 51:19
84:4 137:25 138:6

**cut** 52:9 80:2 140:23

**cuttings** 16:10

**D**

**daily** 21:3

**damage** 26:25 27:6

**danger** 25:9

**dangerous** 67:13

**dark** 92:19,22 95:23
96:18,23 97:2,6,7,12
98:5,9,21 99:11
118:2,6,21 119:3
120:4,7 127:5 129:22

**darkness** 97:21
117:7,8,11,14,22

**date** 33:2,25 37:19,24
39:8 51:24 52:12,22,
25 58:14 59:12 93:19

**dated** 33:18 88:24
109:19 111:10

**dates** 60:10

**David** 10:3,11

**day** 41:11 45:12,17
47:9 58:22 68:15
70:6 71:4 73:17
74:19 77:11 84:23
85:22 97:17 117:22,
23 118:24

**day-to-day** 68:19,23
69:5 72:9

**days** 42:5,6,16 43:12,
13 59:9,12 60:2,19
61:6 62:19 90:11,25
91:13,17 112:11,18
113:6,9,20,25
114:13,16,22 115:11
116:5 136:24 137:5
138:22 139:10

**daytime** 101:7
127:12

**deal** 40:14 42:20
60:14 79:16 96:3
98:2

**dealing** 56:20

**deals** 103:10

**death** 55:18 105:23
107:5

**decade** 28:3

**decide** 14:17 45:5

**decided** 34:11 91:17

**decides** 15:25

**decision** 46:2,24
47:21 65:10 91:3
123:12

**decline** 84:3

**dedicated** 93:8

**dedicating** 73:20

**deemed** 68:9 125:12

**deep** 12:24

**defendant** 9:5

**definition** 70:22

**degree** 100:9

**Democrat** 15:5,14

**demonstrate** 62:16

**demonstration**
107:16

**demonstrations**
23:19,20,22 93:19
104:22

**denial** 45:25 49:7,15
63:15 64:18,22 65:8
84:11 116:21 123:25
130:12 141:16

**denied** 46:13,20
47:23 49:5 63:12,19
64:12 79:7 123:9,17
124:16 126:10
128:14 129:9 141:4,
15,19

**denies** 79:3

**deny** 65:10 84:9
113:16 123:12

**denying** 46:10
131:7,18

**department** 18:6,9,
11,13,22 40:9 74:21
78:23

**departments** 18:17

**depending** 97:16,22
105:12 125:20
139:12

**depends** 105:17

**deposition** 8:12 9:13
32:17 37:13 82:17
135:13 143:22

**depth** 141:11

**deputy** 38:16

**desired** 41:22

**destruction** 26:17,
19

**detail** 133:7

**details** 32:4 126:15
134:16

**determination** 45:8

**determine** 16:3
44:21 59:21 79:5
125:14 138:21

**determined** 29:10
113:9

**determining** 62:8
79:22 80:6

**development** 46:23

**dictate** 77:12

**die** 85:20

**differently** 73:7

**dig** 12:24

**direct** 12:13 31:18
121:21

**directly** 26:8

**disagree** 85:21

**disagrees** 46:23

**discretion** 125:7
129:8 130:5

**discuss** 82:18
108:13

**discussed** 30:23
95:24 96:7 99:23,25
116:22 123:19

**discussing** 20:16
74:9

**discussion** 20:4
44:5,8,12 50:5 58:13,
18 82:13,18 89:17
90:15,18 91:7,22
92:20 96:15 104:7,9,
10 105:20 108:15
122:11,18 135:20

**discussions** 44:17
91:25

**dismiss** 119:7

**display** 95:14 127:2

**displayed** 127:11

**disputes** 32:7

**distancing** 8:9

**district** 9:18 16:19,
23 17:19 88:3,7
133:11

**Division** 9:19

**doc1** 111:9

**doc11** 82:16

**doc2** 32:25

**doc28** 128:8

**doc30** 122:3 123:3

**doc52** 53:21

**doc6** 37:17 51:13

**document** 20:11
32:24 35:5 37:19
38:5 44:4 48:2,6,12
51:7 52:15 53:11,16,
21 54:9 55:8 58:3
59:7 79:14 80:17
81:21 87:17 88:23
98:4 105:10 109:7,
15,16 111:8 112:14
123:6 132:2

**documented** 27:3,8
34:8

**documents** 53:4
92:3

**dollars** 17:11

**domestic** 32:7

**door-to-door** 25:25

**doubt** 119:4

**drafting** 36:13

**drove** 106:15

**Duckett** 8:13

**due** 8:7 128:14,16

**duly** 10:19

**Duran** 111:2

**dusk** 97:3 117:2,5,6,
19,24 118:5,13,14
119:10,24 120:2,5,6,

11,15 128:16,22
129:3,10,24 130:6,23

**duties** 16:15 17:14
59:3

**duty** 68:10

---

### E

**earlier** 37:23 58:17
60:2 68:4 79:14
81:12 90:21 100:23
105:9 108:13

**early** 38:23 39:21
40:5 41:2

**easily** 76:17

**East** 38:16,18,19
39:13 127:23

**easy** 112:15

**echo** 49:20

**economically** 17:8

**effective** 33:2 37:18
39:8

**Effectively** 22:20

**effectuated** 59:7

**efficient** 11:5 40:16

**effort** 98:6

**elaborate** 85:2 86:7

**elaborates** 129:20

**elect** 15:22 47:10

**elected** 14:12 15:20
29:17

**election** 15:8

**eliminated** 113:7

**email** 87:2,22 88:24
89:9 128:12 129:13,
19 130:9,16,20
132:9,11 135:11
142:14

**emails** 127:18

**employed** 14:6

**employee** 12:14

**employment** 12:10
14:9

**empowered** 45:7

**encouraged** 25:19

**end** 41:11 45:17 47:9
60:12 68:15 74:19
77:11 84:23 85:22
130:21

**ended** 90:23 134:14

**enforce** 40:16

**enforcement** 17:13,
15,23 18:7,10 36:9
41:9 55:22 77:6,20
113:23 125:19

**enforcement's**
38:25

**engage** 86:23

**engineering** 25:16

**enlarge** 136:12

**entailed** 126:3

**entertainment**
22:19 23:7,13

**entire** 22:14

**entities** 114:9

**equipped** 40:9

**establishments**
25:6 102:4

**evening** 71:8 94:11

**event** 62:25 91:5
113:24 114:23
125:15 134:14

**events** 55:16 135:2

**eventually** 60:18

**everyone's** 85:7

**evidentiary** 9:6

**evidently** 114:6

**evolves** 38:5

**exact** 51:2 119:23

**examination** 10:22
50:21

**exception** 120:14

**exceptions** 120:17

**exchange** 128:4

**exchanged** 127:18

**exclusive** 65:24

**exec** 89:20

**executive** 89:19,23
90:5,9

**exhibit** 20:5,10 28:9
32:16,18 37:13,14
39:6,25 48:7 51:3,4,
9,11,18 54:4,5 65:17
78:17 79:18 80:12,13
82:17 87:18,19 88:25
89:14 94:2,3,18,19,
20,21,23,25 98:14,18
100:25 104:6 111:18,
19 112:16,25 122:2,4
123:2 128:7,9 131:23
132:4 133:23,25
134:12 135:24 136:2,
21 137:3

**expenditures** 17:10

**expensive** 30:6

**experience** 55:22

**explanation** 141:16

**exposes** 107:18

**exterior** 95:13 127:3

**extra** 11:16,17 41:8

**extreme** 133:16

---

### F

**face** 129:13

**facilitated** 34:24

**facilities** 33:7 34:17
38:10 39:2 69:13

**facility** 33:4,6 34:3,
11 35:3 37:8 40:12
53:22 54:13 61:8
62:17 65:19 74:13
79:9 80:8 90:10 96:5,
12 104:7 105:4,8,20
106:15 108:25 109:5,
17 112:6 124:18
125:18 126:5,6 135:4
139:19

**fact** 85:19 131:4

**factor** 106:14,18

**facts** 64:2 85:21,22

**fair** 22:24 35:21
117:10

**fallen** 86:13

**familiar** 64:2

**family** 84:25

**fan** 133:3,8

**fashion** 17:17

**favor** 54:18 83:22
125:25

**February** 38:21 39:4

**Federal** 8:23

**fellow** 132:12

**felt** 91:2

**fence** 21:6,9,13,16
67:23 76:13,14

**field** 13:18

**fight** 86:20

**figure** 118:4

**figured** 42:15

**filed** 65:4

**films** 95:6,14

**find** 23:12 29:10
93:23 98:18 116:5,7
142:13

**fine** 121:5 139:7

**finger** 112:14

**finish** 24:17,18 115:8

**fire** 18:9

**firmly** 85:5

**fit** 76:6,18

**five-** 75:18

**five-minute** 50:8

**five-or-more-
person** 75:2,12

**five-person** 75:18

**flag** 43:19

**flagpole** 43:18

**flags** 108:9

**flood** 100:15

**flow** 67:12 69:6 73:5
75:21

**flows** 25:2 56:10

**Floyd** 55:18 105:24
107:5

**focus** 92:11

**folks** 16:22 56:2,7
67:15 73:22 85:4,13
86:5,17 91:19 92:8
97:5 103:7 114:5
135:12

**follow-up** 87:10

**follow-ups** 86:9

**foot** 25:24

**forgot** 63:12

**form** 49:11,13 72:17
73:11 95:10 107:7
123:22 129:12
130:15 137:12,25
138:6 139:16

**formal** 34:18

**format** 81:14,16

**Forty-** 12:2

**forward** 50:21
134:14

**fought** 85:10

**found** 64:4 137:19

**four-page** 48:12

**frame** 120:2

**Friday** 69:16

**front** 20:11 21:18
36:22 57:25 58:23
82:7 109:5

**fulfill** 74:22

**full** 49:6 51:18,19

**fully** 17:19

**function** 45:3 118:20

**functioning** 68:6

**functions** 21:3 22:12

**funds** 18:25

## G

**game** 60:13 106:7,8
107:15

**gate** 21:23

**gates** 76:13

**gathered** 72:12

**gathering** 65:25
70:13,17 71:23,24
72:7 77:3 78:7 79:5
129:22

**gatherings** 105:2
107:3 108:17

**gave** 34:13 41:17
74:8 85:14 105:3,5
115:12

**general** 16:18 25:3
31:3 34:6,15 35:11
38:11 47:4 81:4
96:25

**generalities** 34:6

**genuine** 57:2

**geographically**
23:2,5

**George** 55:18 105:23

**Girl** 139:4

**give** 20:2 107:23
113:10 119:5 125:24
135:13,17 142:16

**giving** 38:2

**glad** 137:19

**goal** 66:20 84:19 97:4
127:2

**good** 8:2 10:24
121:6,9 137:15
138:25 142:2

**gotcha** 82:12 136:13

**government** 14:6
22:17

**govms** 110:12

**graduated** 13:13,14

**grant** 44:22 45:8
79:22 80:7 113:16

**granted** 79:7 125:11,
24 130:22 132:20
134:23 141:2

**granting** 46:7,9
130:6 131:18

**grass** 76:10,12
77:17,25

**Great** 53:25

**Greta** 8:13

**grounds** 19:11,16,21
20:21,24 21:5 22:2,8
24:8 27:2,7 31:2
34:17,21 35:6,9,13
38:10 39:2 41:13
44:23,24 46:22 53:23
54:14 65:21 67:20
69:13 71:16 73:15
76:7 79:7 92:15,17,
21 93:12 96:18 100:6
105:14 107:2 118:23
125:2,16 129:2,20,24
130:23 140:3,12,14

**group** 65:23 103:20
119:6 132:11

**groups** 76:17 103:25

**grow** 13:20

**growing** 106:4

**growth** 17:7,9 22:16

**guess** 29:12 78:11
102:22 103:9 110:15

**guide** 41:10

**guideline** 35:2

**guidelines** 34:18
36:7 45:4

**guy** 16:18

**guys** 121:7

## H

**hall** 22:17

**handle** 139:7

**handwriting** 81:20
95:22

**handwritten** 89:14

**happen** 67:19 106:22
115:17 134:21

**happened** 29:3
30:12,13,20 134:17

**happening** 46:3
134:18

**happy** 47:10 139:23

**hard** 118:24 125:23

**hate** 29:16 86:5

**hazard** 56:12

**head** 12:8 24:15,19,
22 26:13 27:11,18
41:3 63:24 88:12
93:3 104:4 120:23

**headlines** 106:14

**heads-up** 131:14

**heal** 85:7

**hear** 86:10

**heard** 25:12 125:22

**heart** 86:6

**hearts** 84:21 85:7

**held** 14:9

**helps** 136:15

**high** 108:3

**historic** 65:20

**history** 16:3 140:19

**hold** 20:3 21:3 43:19
135:3

**holding** 16:6

**holiday** 71:17 102:9

**holidays** 23:23 69:16

**honest** 72:22

**honor** 86:13,14

**hope** 16:20 49:14
101:24 138:5

**hoping** 37:2

**hotel** 12:21

**hour** 121:11

**hours** 68:21 69:18

**hundred** 138:5

## I

**idea** 55:6 65:11

**identification** 20:6
32:19 37:15 51:5
54:6 80:14 87:20
89:2 94:4,22,24 95:2
101:2 111:20 122:5
128:10 132:5 134:2
136:3

**identify** 9:22 27:15
106:24

**identifying** 110:4

**illuminated** 101:7,
16,22

**images** 95:5,6,14

**immediately** 82:3
104:9

**immune** 32:8

**impact** 62:17

**imperative** 41:14

**implemented** 43:14
75:12

**importantly** 56:3

**imposed** 60:3

**impossible** 59:15

**improve** 67:7

**improvement**
107:20

**inadequate** 18:24

**inadvertent** 26:25

**incident** 94:9

**incidental** 27:6

**incidents** 24:6 26:18
41:17 56:15 92:13
103:24

**include** 67:21 108:9

**included** 19:7 52:13

**includes** 132:11

**including** 11:21
65:21 129:21

**increase** 35:8 66:24
107:14

**increased** 34:16

**increases** 119:4

**indication** 139:16

**indiscernible** 33:7
126:9

**individual** 22:6
47:23 65:23 132:20

**individuals** 82:22
83:2 94:9 137:25

**information** 30:8
123:16 125:21,23
126:15,20

**informed** 49:16
131:2

**inherent** 25:9

**initial** 60:15 61:7
126:21

**injuries** 26:8

**input** 45:16 55:12
78:22 113:11 125:19

**inside** 23:12 57:8
103:8

**instance** 29:23

**instances** 24:23
27:16 28:3 30:2,24
31:25 32:11

**insurance** 12:13,14,
20

**integrity** 41:15

**intended** 128:25

**interest** 14:19
141:18

**interesting** 28:9

**interfere** 68:10
70:14,18 71:5,10

**interfering** 68:23
69:5 70:23

**internally** 15:25

**interpretation** 117:6

**interpreted** 62:11,12
120:10

**involved** 46:9 123:14

**involving** 56:15

**issue** 75:9 76:20,24 77:3,24 78:4 86:19 89:8 90:16 92:6 93:5 96:4

**issued** 128:16 129:3

**issues** 24:6 38:7 74:7 96:16 105:11,18 106:2,11 128:16 133:17

**item** 54:13 84:2 109:3

**items** 18:21

---

**J**

**January** 9:12 15:2 97:13 99:2

**jerk** 126:21

**Joey** 38:18

**John** 9:15 142:17 143:7

**Jonathan** 9:24

**Josh** 141:21,25

**Joshua** 10:5,8,9

**judges** 69:21

**judging** 130:9

**July** 80:19 81:24 82:8,11 91:12 95:24 96:22 104:20 105:19 111:10,23 115:21 124:25 128:21 130:21 136:23 137:9

**June** 56:22 57:20,22, 24 58:14 60:22 63:5 66:11 74:9 82:3 88:24 91:11,12 99:2 112:17 115:19 132:9

**jury** 103:4,6

**justice** 68:16

---

**K**

**kids** 92:7

**kind** 16:17,19 21:18 34:18 36:10 38:4 40:19 62:22 74:13,20 90:21 101:19 109:3 113:6 125:22

**King** 70:6 71:4

**knee** 126:21

**knew** 30:19

**knowing** 15:20 126:14

**knowledge** 36:6 53:10 56:19 63:17 64:10 77:20 84:6 88:18 89:6,10 93:14 103:13,16 106:22 123:8,18 130:24

**kosher** 77:14

---

**L**

**lafayette** 9:16 10:12 11:9 20:22 66:25 67:7 87:17 88:22 110:7,11,15 111:9,23 122:3 123:2 128:8 131:24

**lafayettecounty. gov** 110:15

**Lafayettecountyms .gov** 110:12

**lafayettems.com.** 110:18

**lamp** 100:14

**land** 86:2

**language** 43:10 98:3 99:14 108:25 124:8, 14

**large** 71:23 72:7 136:10

**larger** 19:2

**latest** 29:24

**law** 17:13,14,22 18:7, 10 36:8 38:25 41:8 55:21 77:6,20 113:23 125:19

**lawn** 70:18 72:13

76:22 77:4 78:7

**lawsuit** 64:3,16

**lax** 91:17 114:4

**lead** 56:11

**leaned** 16:6

**learned** 43:21

**leave** 62:23 118:20 142:25

**led** 39:22

**leeway** 42:17 62:23

**left** 28:17 42:17

**legal** 8:4

**letting** 131:12

**lied** 85:25

**life** 13:25 20:23 85:14,23

**lifelong** 14:19 15:13

**light** 75:19 101:10,20 102:3 118:7

**lights** 100:10,13,15 101:11 102:9

**limit** 56:2 91:19

**limitation** 97:16

**limitations** 92:20,21

**limited** 22:2

**limiting** 99:12

**limits** 17:5 23:12

**list** 25:12 132:11

**listed** 23:8 25:12 26:9 69:4 132:14

**lit** 100:7

**litigation** 19:21

**live** 49:23

**lived** 13:23,24

**lives** 86:17

**local** 36:5 107:4

**locate** 108:14 111:3 135:8

**location** 73:8 84:4

**long** 12:15,25 21:10, 12,14,19 35:24,25 52:5 57:4 74:3 90:25 117:21

**looked** 22:25 36:5 48:9 67:23 79:14 100:23 109:18 115:18 136:21

**lost** 62:19 122:25 123:5

**lot** 16:10 25:24 58:21 92:24

**loved** 103:8

**low-rise** 21:6

**lunch** 72:14 77:16,25 78:8

**lunching** 78:13

**Luther** 70:6 71:4

---

**M**

**made** 45:13 50:4 52:3 53:6,8,12,16 55:9 58:13 60:16,17 66:22 83:19 84:8 90:5 109:4,25 112:9 119:25 136:18,22

**make** 17:6 45:7 48:24 55:7 59:15 79:8 80:9 83:5 84:22 91:3 92:3 96:4,11 99:7 115:17 136:14 138:24,25

**makes** 59:14

**making** 56:13 66:23 77:12 82:22

**man** 11:4 67:13

**manner** 22:5 40:16 119:8

**manpower** 71:24 72:3 77:11,12,15 93:5 100:4

**March** 37:19,22,23 38:21 39:4,9 41:25 44:20 45:9

**marches** 23:16 104:22

**mark** 20:9 32:16 37:12 51:3 87:18 93:25 94:17,19,20 100:23 121:25 128:7 131:23 133:22 135:22

**marked** 19:25 20:5 32:18 37:14 39:6,24 51:4,9,11 54:3,5 80:13 87:19 88:25 94:3,21,23,25 100:25 111:19 112:16 122:4 128:9 132:4 133:25 134:23 136:2 137:3

**market** 29:13

**Martin** 70:6 71:4

**matter** 9:15 88:15 126:24

**matters** 26:9

**maximize** 98:7

**maximum** 99:15,18

**Mckinney** 87:23 88:16

**meaningful** 26:19, 22

**means** 49:4

**meant** 98:9

**measure** 96:24

**media** 133:24

**meet** 57:16,17

**meeting** 36:20 52:23,24 53:7 58:2,4, 7 80:19 81:24 82:2,3, 6,8 89:23 90:19 91:12,23 92:14 95:25 96:22 111:23 112:3

**meetings** 16:12 35:15 53:3,5 58:12, 17 87:4

**member** 33:20 63:7

**members** 11:20 83:4

**memory** 109:12

**mental** 17:8

**mentioned** 31:12 34:20 41:21 109:9,11

**mentioning** 55:23 78:14

**mentions** 79:23

**met** 64:9

**middle** 19:17 59:10

**Mike** 8:1 9:1,14 10:1, 18 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1,9,14,16 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1 132:1 133:1 134:1 135:1 136:1 137:1 138:1 139:1 140:1 141:1 142:1 143:1,22

**miles** 71:25

**military** 84:24

**Mills** 38:16

**mind** 72:24 86:9 112:14

**minds** 84:22

**mine** 133:4

**minor** 27:5

**minute** 107:11

**minutes** 16:11,12 48:15 53:3,4 58:11, 16,23,24 59:4 80:20, 21,22,25 81:5,14,16 89:11,12 115:24 116:2,6,8 117:2 118:14 119:24 120:2, 4,15 121:2 129:5,24

**misled** 85:21

**missing** 141:22

**Mississippi** 9:16,19 10:10,13 13:12

**moment** 48:12

**Monday** 57:17,18,20, 22,23,24 69:16 70:6 71:4 82:10,11

**moneys** 17:6

**month** 57:17,18 58:4 97:16

**monument** 84:25 85:13 86:5,16

**morning** 8:3 10:24

**motion** 66:22 84:2,3, 8 90:5

**mouth** 86:11

**move** 80:11 84:3,8, 18 89:24 111:6

**moved** 42:17 114:15

**movement** 89:17

**movies** 127:2,11

**moving** 83:22 84:20 85:6 86:4

**municipalities** 36:11

**murders** 32:5

**museum** 68:6

---

**N**

**named** 64:5 89:4 132:20

**names** 47:5

**nation** 43:21

**nationwide** 105:23 107:4

**necessarily** 72:2 78:3 86:18 98:4

**needed** 34:11,18 38:8 40:13 41:5 42:19 43:9 53:11 62:16,24 91:5 96:2,4 99:13 113:10,20,23 114:8 115:14

**needing** 76:7

**neighbor** 85:19

**news** 106:14

**night** 12:20 93:2,11, 13,20 100:7,11 101:16,22 125:16

**nighttime** 93:7,21 118:24 124:22 125:2, 8 126:7,18

**normal** 73:21 74:3,5 82:4

**Northern** 9:18

**notes** 89:15,16,19 90:2,9 104:6

**notice** 103:14

**notification** 124:4

**notified** 64:15

**number** 9:20 21:7 37:17 42:5,6 53:21 61:7 66:6 68:8 75:24 77:6 87:16 104:21 105:2 111:9 122:3

**numbered** 20:10

**numbers** 51:13 82:16 133:23

**numerous** 103:9,10 140:22

---

**O**

**O'DONNELL** 9:4 10:3,4,7,11,12 72:16 73:10 95:9 107:6

121:4 129:11 130:14 142:12,17,22 143:3, 7,17

**Object** 72:16 73:10 95:9,10 107:6 129:11 130:14,15

**objections** 9:6

**objects** 28:24

**obligation** 74:22

**observe** 35:8

**obstructive** 73:4

**obtain** 65:24

**obtained** 50:19

**obvious** 97:13

**occasions** 130:25

**occurred** 31:25 106:25

**occurring** 29:15

**occurs** 31:8

**off-the-record** 122:18

**offer** 71:14 114:5

**office** 17:24 21:2 27:23 46:19 68:7,12 133:11

**officers** 93:8

**offices** 14:10

**one's** 29:8 103:8

**one-issue** 85:16

**one-page** 53:20 88:23 111:8

**ongoing** 105:7 106:4

**online** 116:6

**open** 68:17 69:15,22, 23 70:2,5

**opening** 21:18

**openings** 21:15

**operable** 68:11

**opinion** 117:24

**opportunity** 47:19 62:20 98:7 99:12,16,

19 114:6 119:7

**opposed** 19:13

**option** 49:9,10 124:3

**order** 53:22 65:19,24 66:19

**original** 98:2

**Originally** 61:20

**ornamental** 27:20 100:13

**overturned** 65:9

**Oxford** 9:19 12:21 13:21 19:8,12,18 22:14 23:9 24:12 25:18 36:9 55:17 102:15 108:2 118:4 120:12

---

**P**

**p.m.** 69:24 71:9 98:3, 20 99:2,18 124:24 126:16,22 143:24

**paid** 11:12

**parades** 23:24

**paragraph** 59:11 65:18

**part** 19:21 39:22 65:17 85:12 105:3

**parties** 8:17

**party** 15:4

**past** 23:16 27:22 29:4 95:13 108:21

**patrol** 40:9 71:25 72:5 77:8 91:5 97:5 100:3

**patterns** 26:10

**pay** 41:8

**payment** 11:20

**pdf** 135:17

**pedestrian** 25:18,22 57:3 67:12 73:5 100:4 106:9

**pedestrians** 26:9 56:4 69:6 75:23

**pending** 8:25

**people** 29:10 41:7 47:8 49:23 56:20 59:13 65:20,25 66:6 70:14,17 72:7,12 75:23 76:6,21 77:3, 16,25 78:6 79:6 92:9 103:19,25 105:13 114:24 118:19 127:12 139:8,10 140:8

**people's** 84:21

**percent** 138:5

**performed** 22:12

**period** 59:16,22 60:24,25 61:17 62:4, 9 112:20 113:3 116:12 129:10 130:6

**periods** 85:4

**permit** 42:6,7 44:10, 22 45:9 46:12,20 47:23 49:5,11,13,15 59:11 60:10,25 63:12,15 64:12,23 65:9,10,23,24 66:2,7 75:3 79:22 80:7 90:11,18 91:19 104:7 113:21 116:16 120:19 123:10,25 124:15,21 125:11 126:11 128:13,14,15 129:17,22 130:6 131:2 132:16,21 134:22 138:2 140:8, 25 141:15

**permits** 45:22 46:7, 10 63:19 78:17,19 113:16 128:25 130:22 131:19

**permitted** 114:6 119:6

**permitting** 41:6 42:3 43:6 48:4 113:12

**person** 68:14 119:6

**personal** 15:12 84:14,15

**personally** 17:16 77:21 84:24

**photographs** 20:9

**physical** 17:8

**physically** 23:5

**picture** 20:15 28:10, 18 93:23 134:5,8

**pictures** 21:7,17 68:15 100:22

**place** 21:10 22:16 32:11 36:24 42:24 44:19 51:23 55:17 60:21 63:6 102:14 104:9,22 115:13 139:11

**places** 31:7,14 120:11

**plaintiff** 9:3 10:2,10 64:7

**planning** 46:24

**play** 36:12,15 45:22

**played** 135:3

**point** 44:15,17 76:23

**pointed** 101:20

**police** 77:15 102:15

**policies** 40:18 41:24 43:4 46:20 75:14 107:18

**policy** 33:4,6,20 34:3,4,12,14,21 35:5 36:3 37:9,22 39:6,23 40:11,12,22 41:22,23 44:11,19 45:10 47:25 49:3,17,22,24 50:2 51:16,18,20 53:22 54:13 58:6,13,19 60:16 61:9,25 63:4,6 65:19 66:10 72:15,24 74:14,20 75:18 78:9, 11 79:9,19 80:8,10 96:5,8,10,13 97:3 98:24 105:4,8,20 106:16,21 108:16,25 109:5,17 112:7,17 115:20,22 118:12 124:20 125:3,18 126:5,6 128:15,21,25 129:7 135:5 139:20 142:14

**politely** 133:14

**political** 105:2

**politics** 14:19

**pops** 27:17

**population** 106:4 107:14

**position** 11:12 14:3 16:7 39:13

**possibility** 123:21

**possibly** 92:20

**posted** 22:10 51:25 52:15,17 103:11,14, 18 109:24 111:4

**posts** 133:24

**potential** 56:11 63:11 67:18

**power** 18:24 116:14

**power-wise** 19:3

**practice** 8:8

**preliminary** 10:25

**present** 18:18 112:2

**president** 11:8,18 15:17,21 16:3,9 54:22 55:3 59:3 77:22

**pretty** 23:10 36:23 41:14 107:25 140:8

**prevent** 43:25 109:2

**previous** 58:7 61:6

**previously** 37:3 58:6 134:9

**price** 30:6

**primarily** 20:25 22:18

**primary** 42:9 92:6,11 126:18

**prior** 12:18,20 13:6 15:14 34:4 51:12 55:2 56:15 58:12,14 59:12,15 66:5 92:13 93:12,19 96:16 98:2 127:15 129:24

**privy** 102:17 127:6 130:18

**pro** 104:21

**probe** 114:19

**problem** 122:10

**procedure** 74:3

**procedures** 8:23 46:21

**proceeding** 9:23

**process** 36:2 41:6 46:9,12 48:4 60:10 63:11 113:12 115:5, 13,15 125:10 131:7

**profiles** 108:3

**prohibited** 125:3

**project** 124:18

**projected** 94:10

**projections** 127:7

**property** 19:13 26:18,19 74:23,24 78:5 85:24 93:9 99:13 104:16

**proposed** 59:13

**protect** 38:9 41:14 56:3 66:17 69:12 93:9

**protected** 140:19

**protecting** 74:23

**protest** 62:16 73:8 107:16

**protesting** 73:23,25

**protests** 55:16 73:16 74:6 105:21

**protocol** 139:2

**proven** 85:17 105:15

**provide** 68:10

**provided** 19:24

**provision** 108:9 112:19 113:2 115:19

**proximate** 102:10

**public** 14:10,20 19:6 37:10 40:8 47:25

52:15 84:8 141:18

**public-relationships** 16:17

**published** 37:9 49:25 116:6,9

**pull** 27:10 110:21 111:5 136:10

**pulled** 137:3

**purpose** 73:24 85:10 140:17

**purposes** 36:25

**put** 39:23 51:25 102:14 109:8 135:15, 23 136:7

**puts** 141:10

**putting** 36:15 86:11 92:21

**Q**

**question** 49:2 58:15 60:8,14 63:13 84:5 90:3,22 108:6 113:18 124:13

**questions** 108:6 135:19 137:23 141:25 142:9,10 143:18

**quick** 27:11

**quickly** 82:9 133:22

**R**

**racial** 133:16

**raise** 18:25 19:4 41:16

**raised** 92:13 104:20

**ran** 133:10

**Rash** 9:15 64:7,22 65:8 123:10 125:15, 22 127:22 130:11

**Rash's** 127:2 136:22

**Raul** 135:11 141:21 142:2

**Raymond** 89:4

**reaction** 105:23 107:4

**read** 54:12 60:12 75:5 83:15,16 96:10 129:14 136:11

**Reading** 129:13

**ready** 143:16

**real** 11:24 27:11

**reality** 85:9

**realized** 34:17

**reason** 15:10 30:4 61:15,21 84:17 86:20 126:18 140:6

**reasoning** 61:14

**reasons** 97:20

**recall** 21:20 26:7 30:25 31:18 33:19,23 37:21 38:2 41:18 42:11 43:2 63:3,5 89:22 91:22 93:12 95:8,12,24

**receive** 18:16

**received** 87:23

**recently** 15:3 31:10 105:19 106:25

**recess** 50:14 121:15

**recognize** 11:3 20:14 32:21 33:5 54:8,11 80:16 81:21

**recognizes** 85:13

**recollection** 60:4

**recommend** 119:22 120:14

**recommendation** 55:10,14,15,21,24 56:6,14,24 61:24 66:12,19 69:11 77:19 114:14,20 119:23

**recommendations** 58:10 75:25

**recommended** 61:9 66:14,16 90:24 113:23 114:7,18

**record** 8:11 9:11 50:7,12,17 82:15 88:22 121:13,18 122:13,16,22 141:24 143:16,20

**recording** 8:19

**records** 36:20

**rectangular** 109:11

**reelected** 14:22

**refer** 18:10 89:20 131:25

**reference** 92:18 117:2 128:22 136:23 141:8

**references** 82:21

**referred** 43:16 80:20 131:22

**referring** 17:23,24 28:17,22 38:14 42:8 68:18 74:16 106:13 110:5,6 116:3 124:6

**refers** 65:18 112:5 137:4

**reflect** 52:2 53:11 128:25

**reflected** 55:7 96:12

**reflection** 58:12,18

**reflects** 111:22

**refresh** 44:6 109:14

**register** 57:8

**registering** 103:7

**registration** 15:4

**regular** 52:23

**regular-scheduled** 82:6

**related** 26:8 30:25 33:6 43:3 53:4 64:3 68:20,22 69:4 74:7 93:20 105:2,21,22 106:25 107:3 138:2

**relating** 92:14

**relation** 90:16

**relations** 141:18

**relevant** 26:23

**relocation** 73:24

**remember** 12:8 21:13 24:16,20 28:7 29:22 30:8 31:6 32:7 33:25 34:2 35:10 37:25 38:15,22 39:3, 4,16 41:4,24 44:8,13, 15 45:4 46:3 47:5 51:24 52:12,20,22,24 55:11,12,22 56:17 60:9,17 61:3,5,12,13 62:13 63:9,18 83:18 84:7 90:15,18,23 91:7,15,24 92:16,19 93:3,15,16,18 94:8, 13 96:3,19 104:12,18 106:19,20 108:19,22, 24 114:21 115:3 119:25 120:16,23 128:5 134:16,18 137:16

**remembered** 30:5

**remembering** 30:12

**remembrance** 43:24 113:8

**remote** 8:19 47:15

**remotely** 8:12,16

**removal** 104:10

**removed** 115:21,23

**render** 96:7

**replace** 29:20 30:7, 19 60:23

**replaced** 29:23 30:9

**replacing** 30:17

**reporter** 8:13 9:7 10:16 33:14 111:15

**Reporting** 8:6

**represent** 16:19 95:4

**representing** 88:4 136:18

**Republican** 15:5

**request** 49:13 84:7, 9,11,18 123:13,17 126:21

**requested** 35:5

**requesters** 44:10

**requests** 34:16 35:9, 13 91:19 129:9 131:3 133:12

**require** 66:2

**required** 42:5 90:17 91:4

**requirement** 59:9 60:23 63:8 75:12 112:10 119:10 120:15 138:8 139:16 141:14

**requirements** 129:23 139:18

**resale** 29:13

**reserve** 143:10

**resident** 20:23

**respect** 17:12,14 35:19 51:16 108:16 123:24

**respond** 88:16 89:8

**responders** 18:8

**responsibilities** 16:9

**responsibility** 16:25 46:6

**responsible** 17:2

**rest** 11:14

**restrict** 68:18

**restricting** 72:4

**restriction** 22:7 75:3 103:12,18 125:8

**restrictive** 62:25

**results** 41:21

**retail** 102:4

**returning** 16:5

**revenues** 18:16

**review** 113:24 114:23

**reviewed** 58:16 120:18

**reviewing** 36:17 116:16

**revising** 37:21

**revision** 112:6

**revisions** 37:25 38:3 115:20

**revisit** 105:4

**ribbon** 16:10

**rights** 85:24 143:11

**rise** 34:13 38:2 41:17 74:8 104:25 105:3,6 142:16

**risk** 119:4

**road** 133:12

**Roberts** 8:1 9:1,14 10:1,18,24 11:1,6 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1,9,19 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1,22 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1,20 122:1,24 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1 132:1 133:1 134:1 135:1 136:1,7

137:1,21 138:1 139:1
140:1 141:1 142:1,8
143:1,23

**Roberts'** 32:17 37:13

**role** 17:17,21 18:12
36:12,15 45:20 135:4

**room** 8:10,14

**Roughly** 12:6,17

**round** 28:24 109:11

**rule** 8:22 140:6,18

**rules** 8:23,24 140:2

**run** 14:17 15:23
114:9 140:14

**S**

**sacrificed** 85:23
86:17

**safe** 119:8 126:23

**safety** 19:6 24:5,10,
13 25:9,15 26:4 38:7
40:7,24 41:17 56:3,7,
9,15 57:10 66:18,24
67:7 69:12 71:15
73:5,15 75:10 76:20
77:2,9,24 78:4 91:3,
4,21,23 92:6,13 96:4,
11,16 97:5 99:6,20,
22 103:24 104:15
106:4 107:12,13,21
118:19 126:17 139:2
140:11,20

**safety's** 24:24

**sales** 12:14

**satisfy** 84:19

**Saturday** 70:2,15,19,
24 72:13 77:17 78:2,
7,13

**Saturdays** 70:10

**scanning** 48:18

**schedule** 82:4

**scheduled** 16:13

**school** 106:6,7
107:15

**Scott** 38:15

**Scouts** 139:4

**screen** 136:6 139:22

**scroll** 139:23

**section** 44:4

**secure** 76:2

**security** 38:25 40:6
44:5 74:22 103:24
104:15 105:13
128:16

**seek** 16:3 90:17
138:2

**seeking** 79:6

**sell** 139:5

**send** 131:5 142:18

**sending** 143:14

**sends** 132:9

**sensitive** 42:20

**sentence** 24:18

**separate** 43:11
80:25

**serve** 25:7 36:25
37:2

**served** 63:18

**service** 14:20

**serving** 35:11 92:4

**session** 89:19,23
90:9

**set** 46:21 80:25 108:6
118:8 127:18

**setting** 17:22 118:8

**Settle** 89:5

**seven-day** 42:14

**severity** 8:7

**share** 16:20 32:9
135:16 136:6

**sheriff** 31:10 38:6,12,
13,19 39:13,17,19
40:25 41:16 42:15
45:14 55:10,13 59:20
61:5,9 62:3 66:12,14,
15,16 67:2,5 71:14

75:8 77:19 78:15
90:24 91:16 92:14
96:15 99:7 104:14
105:12 112:21 113:9,
14 119:19,21 120:13
127:23 138:24 139:7,
15,17

**sheriff's** 17:23 18:6,
11,13 40:9 55:14
61:23 67:5 69:11
74:21 75:25 78:23
119:23

**shopping** 25:25 57:6

**short** 87:6 133:10

**shortened** 138:22

**show** 53:2 87:9

**showed** 81:11

**shown** 95:6

**shows** 35:16

**sick** 142:25

**side** 28:18 84:22,23

**sides** 85:5 86:6

**sidewalk** 67:21 76:8
140:4

**sidewalks** 72:9
75:20 76:10 140:14

**sight** 25:21

**sight-seeing** 57:6

**signature** 57:12 81:9
111:12 141:2

**signed** 81:17

**signing** 16:11 59:4
107:16

**signings** 107:22

**signs** 21:25

**similar** 81:7 113:2

**simply** 61:16 66:14

**Simpson** 9:25

**simultaneous** 32:3
33:9 76:4 126:12

**single-issue** 86:18

**sir** 11:10 12:10 13:11

14:16 15:11,15
19:10,19,23 20:2,12,
13 21:14,21,24 22:22
29:2,24 31:16,23
32:13 33:5,16,22
36:23 45:15 48:12
51:21 52:19 53:18
54:2,10,24 57:14
61:18 63:25 65:5
67:3 69:17,25 70:4
71:20 74:11,25 80:3
81:15,25 86:9 88:2
93:19 94:6 95:4,12,
15,20 101:6 102:12
104:4,24 110:3
111:25 112:13 113:4
115:8,18 116:11,13
120:19 121:23
123:14 130:24,25
131:20 138:9 139:14

**sit** 85:11,15 102:22

**sitting** 27:13,15

**sizes** 109:11,13

**slavery** 85:12

**slightly** 136:15

**small** 26:24

**smallness** 68:17

**social** 8:9 133:24

**soldiers** 86:13

**sort** 23:24 132:11

**sought** 16:4 41:25
42:7 49:5

**sounds** 11:25

**space** 67:21

**sparked** 104:12

**speak** 10:20 18:4
47:9 62:10 133:20

**speakers** 32:3 33:9
76:4 126:12

**speaking** 49:19 60:7

**special-called** 58:2

**specific** 26:14 27:16,
17 31:25 33:23 34:22
35:10 38:22 40:24
41:16,18 47:5 52:12,
25 55:23 56:14 66:6

91:15 92:13,17
109:13 110:10 135:6

**specifically** 16:22
24:24 26:25 30:25
34:2 43:2 54:16
60:11 69:14 89:25
90:4 96:16 100:6
104:18 107:9 129:3

**specifics** 32:8 41:19
44:13 56:18 61:3
63:23 73:3 91:25

**spectators** 126:23

**speeches** 16:11

**spoke** 68:4 133:14

**spouse** 103:8

**spout** 104:3

**spreading** 44:9

**spurred** 35:4

**square** 19:18 22:6,
11,14 24:12 25:3,7,
15,20 26:20 28:6
31:2,19 32:12 40:7
56:5,10,16,20 67:11
71:25 92:8 100:5,7
102:3,5,10,14 104:23
118:22 126:17

**staff** 93:8 139:11

**stand** 140:16

**Standard** 143:24

**standing** 67:15,25

**starred** 108:7

**start** 14:25 15:18
20:14 23:20 24:4
56:7 58:15 70:9

**started** 14:23 47:8
55:5 60:15 108:13
114:3

**starting** 47:7

**state** 11:6 97:12

**state's** 8:24

**stated** 97:20

**statement** 83:6,18
128:20

**statements** 82:22

**States** 9:17

**statue** 21:19 27:18 28:2,11,16,17,25 65:22 73:9 74:7 82:18 83:22,23 84:4, 18,21 85:7 89:18,24 93:20 94:11 104:11, 21 105:3,22 107:2,3 129:21 140:5,16

**statutorily** 11:13

**steps** 67:16,17

**sticks** 43:7,17 108:17

**stipulate** 8:17

**stolen** 27:22

**stop** 107:10

**street** 67:18 101:10 118:25

**streetlamps** 100:14

**streets** 25:23 26:2

**strictly** 77:5,18 93:4

**strike** 24:2 40:22 68:21 117:20

**strobe** 101:20

**strung** 102:10

**student** 13:9

**students** 106:5

**study** 13:18

**stuff** 18:9 106:12 140:14

**subject** 9:5 58:5 78:9 86:25 96:22

**submitted** 59:12

**subsequent** 15:7 53:6

**subsequently** 14:21

**substantial** 107:14

**suggest** 21:25

**summer** 51:16 53:9 64:12 93:19 94:9 97:11,12 104:23

135:5

**summertime** 99:10

**sun** 118:8

**Sunday** 70:2

**Sundays** 70:10

**sunlight** 117:25 118:7

**sunrise** 129:25

**sunset** 117:9,15,21 120:9

**supervisor** 16:6,16, 18 26:11 29:18 31:19,22 35:12 132:10

**supervisors** 11:8,14 14:4 18:13 24:5 26:21 28:4 33:21 39:20 45:22 51:15 57:16 59:20 62:3 67:7,14,16 64:19,23 65:3 83:3 111:24 116:18 123:24 125:6 130:12 132:12 138:11

**support** 17:17,20 18:8 38:9 73:8

**supported** 67:2 77:23

**supposed** 78:21 79:21 142:23

**surface** 126:14

**surrounded** 21:6

**surrounding** 36:9 40:19

**swear** 8:15 10:17

**swearing** 8:19

**sworn** 10:20

**T**

**tab** 19:25 20:9 28:13 32:15 37:12 50:23,25 51:11 53:18 80:11 81:3 87:10 88:20 93:22,24 94:16,18,19 95:20 98:18,24

100:19 104:5 108:4 109:19 111:6 112:15 116:3 121:21 123:2 127:15,16 128:6 131:23 133:22 134:11 135:24 136:20

**taking** 16:11 32:11 137:16

**talk** 44:14 60:20 141:22 142:23

**talked** 26:5

**talking** 11:22 23:18 63:11 74:12 76:9 79:17

**tax** 17:10 18:16

**taxation** 85:24

**taxpayer** 17:6

**technical** 20:4 50:5 120:8 122:11 135:20

**telling** 65:14

**ten** 115:14

**tenure** 63:20

**term** 14:16,23,25 15:18 30:3 55:5 98:8 120:9

**terms** 19:6 47:7 60:4 108:14

**terrible** 11:25

**test** 48:24

**testified** 10:21 60:2

**testimony** 55:2

**Thacher** 9:25

**that'd** 82:7

**theft** 27:5

**there'd** 58:8 71:9

**thereabouts** 37:22

**thing** 23:24 71:3 91:20 93:6

**things** 23:7 26:10

**thinking** 32:11 109:21,23

**Thomas** 8:4

**thought** 18:23 26:12 27:14 31:4 40:13 41:20 60:2 66:23 84:17 85:6 113:14 137:12

**ties** 75:3

**Tim** 132:20

**time** 10:25 21:2 22:13 26:11 29:14 30:14 32:22 35:10 36:18 39:14,17,19,21 40:8 42:3 48:18 49:16 50:13,17 54:22 56:25 60:15,24,25 61:5,17 62:18 64:15 74:4 79:17 86:24,25 87:7 90:17 95:17 96:24 97:15,22 98:5,9 103:20 108:15 110:14 113:3,22 114:5,22 115:2 117:9 118:9 120:2 121:13, 18 122:17 127:4,9 129:10 130:6 135:18 138:22 139:2,3,8 142:11 143:20,25

**time-** 42:19 62:24

**time-wise** 61:11

**timeline** 42:4

**times** 14:22 38:23 97:8,22 102:7 120:10 123:20

**timing** 60:5 103:15 117:19 120:15

**Titled** 33:4

**today** 102:8 118:4,10 137:4

**told** 64:21 85:25 102:16

**Tom** 10:5,9 142:3

**ton** 87:2

**top** 12:8 24:15,19,22 26:13 33:2 41:3 53:22 63:23 88:12 93:3 104:4 120:23 129:19 132:3

**topic** 60:4

**town** 22:6,21 28:5 106:5 139:9

**traffic** 25:2,12,19,24 26:10 31:13,14 41:10 56:20 57:3 67:12,16 68:2 72:10 75:21 100:4 106:9,10

**traffic-** 56:10

**treated** 73:7

**trials** 103:6

**triggered** 66:6

**trouble** 110:4

**truth** 10:20,21

**TSG** 8:6

**turn** 19:23 37:11 50:22 93:22 94:16 100:19 112:15 131:23 133:21

**type** 23:13 26:8 27:3 43:25 110:14

**types** 35:18

**typical** 117:21,23

**U**

**ugly** 102:22,23

**Uh-huh** 100:21

**Uh-oh** 47:12

**ultimate** 97:4

**ultimately** 78:25

**underlying** 64:2

**underneath** 92:19

**undersigned** 140:3

**understand** 14:13 15:4 16:15,24 17:13 19:20 20:18 27:13 45:7 46:5 64:11 69:8 78:8 86:21 124:11 125:10 140:17 141:7

**understanding** 46:15,16 78:16,20 79:11 116:11,13

**understands** 140:3

**understood** 61:16

**undoubtedly** 11:4

**unforeseen** 62:22

**uniform** 40:13 78:4
92:4 98:25 99:7,14

**uniformity** 74:13,15,
16

**uniformly** 23:11

**United** 9:17

**university** 13:12
36:10 40:20 78:24
92:7

**university's** 107:19

**unnecessarily**
143:13

**unusual** 59:14

**update** 96:2 104:15

**updated** 51:19

**updates** 51:25 52:14

**updating** 58:9
106:15

**usage** 78:5 99:16,19
129:2

**V**

**validity** 8:18

**valued** 45:17

**vandalism** 26:24
27:4,16 28:3,23
30:20,24 31:8,11

**variety** 35:17 41:10

**vehicular** 106:9

**vendor** 30:9

**version** 33:18 45:9
51:10,20 63:4,6
67:10 79:19 98:23
109:22 115:20,21
133:10 135:9

**versus** 9:15 73:4
106:9 109:11

**video** 8:18 127:3

**view** 102:17

**viewing** 52:16

**views** 16:20 133:16,
19

**violation** 72:14,25

**violence** 24:6,10,20
26:6 31:18,21 32:9

**visibility** 26:3

**visible** 118:2,7

**visual** 25:21

**voice** 17:10

**vote** 36:18 47:19 57:8
66:9 89:18,24 103:7

**voted** 36:21 54:18

**W**

**waive** 59:21 62:4,9
63:8 115:15 116:5,14
125:7 138:8,19
139:15,18

**waived** 112:20
116:12 119:10,14,18
124:10 125:11
137:12,13

**waiver** 113:2 115:4,
13,19 124:3,5 129:18
137:16

**wake** 55:16 104:20

**walk** 76:7 118:25

**walking** 26:9 73:22
92:8 140:4

**walkways** 25:23
67:16

**wall** 95:7,13 127:3,11

**wanted** 104:14 114:4
133:13 135:3

**war** 84:25 85:10,12,
16 86:15

**Warren** 132:20,24
133:15 134:8 135:3

**Warren's** 134:4,13

**waste** 10:25 135:18

**watch** 77:8

**weapon** 43:8,22 44:2
109:3

**web** 49:25 110:9

**website** 52:2,18
109:24 110:5,8,11,17
116:9 135:10 137:4
142:14,21

**weddings** 35:15

**weekend** 71:16 77:4
106:7,8 107:15 139:6

**weeks** 90:12,24 91:2,
6,9,11,14,18

**welfare** 73:15

**well-being** 57:3

**whatever's** 121:6

**whatsoever** 123:17
126:7

**when's** 29:14 117:5

**white** 127:11

**wide** 35:16

**William** 8:3

**Willie** 83:17

**window** 25:25

**wise** 56:11

**wishes** 17:18

**wondering** 135:10

**word** 89:13 120:6

**words** 15:22 36:7
86:11 94:10 96:21
119:23

**work** 11:2 36:25
37:23 101:25 121:9

**working** 38:5 105:10

**writes** 89:7

**writing** 37:8

**written** 26:15 108:18
141:15

**wrong** 84:23 88:20
89:13 137:21

**Y**

**year** 13:16 34:10
38:23 50:4 73:17
97:8,17,22 98:5,10,
21,25 102:7

**years** 12:17,22 13:4
20:21 24:4 26:20
27:7 29:22 30:13
31:21 35:20 56:19
63:14 77:20 95:13

**York** 120:12

**Youngwood** 9:2,24,
25 10:23 20:7 32:14,
20 33:10 37:16
49:18,21 50:6,18
51:6 54:7 72:19 76:5
80:15 87:15,21 88:21
89:3 93:25 94:5,17
95:3,11 101:3
111:17,21 121:8,19,
25 122:6,8,14,23
128:6,11 132:6 134:3
135:7,21 136:4
141:20 142:4,7,20
143:2,9