# EXHIBIT 43

1                    BRENT ALLEN LARSON

2        IN THE UNITED STATES DISTRICT COURT

3      FOR THE NORTHERN DISTRICT OF MISSISSIPPI

4                    OXFORD DIVISION

5

6   JOHN RASH,

7

             Plaintiff,
8
    v.                          CIVIL ACTION NO.:
9                               3:20-cv-224-NBB-RP

10  LAFAYETTE COUNTY,
    MISSISSIPPI,
11
             Defendant.
12

13

14

15
         VIDEOTAPED REMOTE DEPOSITION OF
16
                  BRENT ALLEN LARSON
17
             Thursday, January 14, 2021
18
          9:13 a.m. Central Standard Time
19

20

21

22

23  Reported by:

24  GRETA H. DUCKETT, CCR, RPR, CRR, CVR-S, RVR-M-S

25  JOB NO.: 188442

Page 2

```
 1              BRENT ALLEN LARSON
 2
 3
 4
 5              January 14, 2021
 6          9:13 a.m. Central Standard Time
 7
 8          Videotaped remote deposition of
 9  BRENT ALLEN LARSON, before Greta H. Duckett,
10  CCR, RPR, CRR, CVR-S, RVR-M-S.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 3

```
 1              BRENT ALLEN LARSON
 2          A P P E A R A N C E S
 3
 4  FOR THE PLAINTIFF:
 5
 6          Isaac Rethy, Esq.
 7
 8          SIMPSON THACHER
 9          425 Lexington Avenue
10          New York, New York  10017
11
12
13          Landon Thames, Esq.
14
15          ACLU OF MISSISSIPPI
16          P.O. Box 2242
17          Jackson, Mississippi  39225
18
19
20
21
22
23
24
25
```

Page 4

```
 1              BRENT ALLEN LARSON
 2          A P P E A R A N C E S
 3          C O N T I N U E D
 4
 5  FOR LAFAYETTE COUNTY, MISSISSIPPI:
 6
 7          David O'Donnell, Esq.
 8
 9          CLAYTON O'DONNELL
10          1403 Van Buren Avenue
11          Oxford, Mississippi  38655
12
13
14  ALSO PRESENT:
15
16          Mike Pham, videographer
17
18
19
20
21
22
23
24
```

Page 5

```
 1              BRENT ALLEN LARSON
 2              I N D E X
 3          EXAMINATION INDEX
 4
 5  BRENT ALLEN LARSON
 6          BY MR. RETHY                10
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

BRENT ALLEN LARSON
EXHIBIT INDEX

EXHIBIT 1   3/4/2019 Facility Use          15
            Policy; Bates Lafayette
            County DOC000006 to
            Lafayette County DOC000010

EXHIBIT 2   Order: Amend Facility Use      23
            Policy Regarding Use of
            Courthouse Grounds; Bates
            Lafayette County DOC000052
EXHIBIT 3   Photographs                    27
EXHIBIT 4   Photograph                     42
EXHIBIT 5   Order:  Approve Revision       49
            of Facilities use Policy
            to Include a Requirement
            of Application to be Made
            14 Days Prior to Date of
            Proposed Use and Requiring
            Closure of Courthouse
            Grounds 30 Minutes Before
            Dusk; Bates Lafayette
            County DOC000001

EXHIBIT 6   6/1/2020 email from Janice     68
            Antonow; Bates Lafayette
            County Doc000709 to
            Lafayette County Doc000710
EXHIBIT 7   6/15/2020 email from           72
            Hughes; Bates Lafayette
            County Doc001111 to
            Lafayette County Doc001112

EXHIBIT 8   7/17/2020 email from           75
            Larson to Carwyle; Bates
            Lafayette County Doc001016

EXHIBIT 9   Photograph                     77

EXHIBIT 10  Photograph                     78

BRENT ALLEN LARSON

EXHIBIT INDEX

CONTINUED

EXHIBIT 11 9/3/2020 email to Larson        79
           from Rikard; Bates
           Lafayette County DOC000046
           to Lafayette County
           DOC000047

EXHIBIT 12 Letters; Bates Lafayette        79
           County DOC000364 to
           Lafayette County DOC000370

EXHIBIT 13 Facility Use Policy, July       90
           2020

EXHIBIT 14 2019 Facility Use Policy        90
           redline

1    BRENT ALLEN LARSON
2        THE VIDEOGRAPHER:  Good
3    morning, Counselors.  My name is
4    Michael Pham.  I am a legal
5    videographer in association with
6    TSG Reporting, Incorporated.
7        Due to the severity of
8    COVID-19 and following the practice
9    of social distancing, I will not be
10   in the same room with the witness.
11   Instead, I will record this
12   videotaped deposition remotely.
13   Our court reporter, Greta Duckett,
14   also will not be in the same room
15   and will swear the witness
16   remotely.
17       Do all parties stipulate to
18   the validity of this video
19   recording and remote swearing and
20   that it will be admissible in the
21   courtroom as if it had been taken
22   following Rule 30 of the Federal
23   Rules of Civil Procedure and the
24   state rules where this case is
25   pending?

1    BRENT ALLEN LARSON
2        MR. RETHY:  Yes.
3        MR. O'DONNELL:  Yes.  No
4    objection.
5        THE VIDEOGRAPHER:  Thank you.
6        This is the start of the
7    remote video-recorded deposition of
8    Brent Larson in the matter of John
9    Rash versus Lafayette County,
10   Mississippi, being heard in the
11   United States District Court,
12   Northern District of Mississippi,
13   Oxford Division, case number
14   3:20-cv-224-NBB-RP.  Today's date
15   is January 14th, 2021.  The time on
16   the record is approximately
17   9:13 a.m.
18       Counsel, will you please
19   introduce yourselves, plaintiffs
20   first.
21       MR. RETHY:  Good morning.  My
22   name is Isaac Rethy.  I'm an
23   attorney with Simpson Thacher &
24   Bartlett.  I represent plaintiff,
25   John Rash.

Page 10

BRENT ALLEN LARSON

1          BRENT ALLEN LARSON
2          MR. THAMES:  Good morning.
3     My name is Landon Thames.  I work
4     with the ACLU of Mississippi, and I
5     will be representing the plaintiff,
6     John Rash, as well.
7          MR. O'DONNELL:  This is David
8     O'Donnell on behalf of Lafayette
9     County, Mississippi.
10         THE VIDEOGRAPHER:  Would the
11    court reporter please swear in the
12    witness.
13         BRENT ALLEN LARSON,
14    the witness, having first been duly
15 sworn to speak the truth, the whole truth and
16 nothing but the truth, testified as follows:
17         EXAMINATION
18 BY MR. RETHY:
19    Q.    Good morning, Mr. Larson.
20    A.    Good morning.
21    Q.    Have you ever been deposed before?
22    A.    One other time.
23    Q.    And when was that?
24    A.    I don't know.  I'd have to
25 speculate on that.  Maybe 10 years ago.

Page 11

BRENT ALLEN LARSON

1          BRENT ALLEN LARSON
2    Q.    And what was the nature of that
3 deposition?
4    A.    I own a grocery store, and it was a
5 truck driver suing our company for having a
6 crushed foot from a dock plate dropped on it.
7    Q.    Other than that, have you ever
8 given testimony, either in court or out of
9 court?
10   A.    I have.
11   Q.    And could you describe those
12 circumstances?
13   A.    We own a grocery store, a family
14 business.  And, regularly, I go to city court
15 to testify on our business behalf for
16 shoplifter prosecution, and I've also testified
17 in federal court here in Oxford on a
18 counterfeit-money operation here in Oxford that
19 we were the ones that received the counterfeit
20 bill.
21   Q.    Okay.  Thanks.  Do you have a
22 binder of documents?
23   A.    I do.
24   Q.    Okay.  Great.  And could you just
25 state your full name and address for the

Page 12

BRENT ALLEN LARSON

1          BRENT ALLEN LARSON
2 record.
3    A.    My name is Brent Allen Larson.
4    Q.    And could you state your address,
5 as well?
6    A.    136 County Road 423, Oxford,
7 Mississippi 38655.
8    Q.    Are you currently a member of the
9 Lafayette County Board of Supervisors?
10   A.    Yes.
11   Q.    And which district do you
12 represent?
13   A.    One.
14   Q.    How long have you had that
15 position?
16   A.    12 months.
17   Q.    And who was the -- who held that
18 position before you did?
19   A.    Kevin Frye.
20   Q.    And did you run in a contested
21 election against Mr. Frye for that position?
22   A.    No, I did not.
23   Q.    Did you do anything to prepare for
24 today's deposition?
25   A.    I did.

Page 13

BRENT ALLEN LARSON

1          BRENT ALLEN LARSON
2    Q.    Could you describe what that was?
3    A.    I met with Mr. O'Donnell.
4    Q.    For approximately how long?
5    A.    An hour and a half.
6    Q.    Have you spoken to anyone other
7 than Mr. O'Donnell about the deposition?
8    A.    Yes.
9    Q.    Who else have you spoken to?
10   A.    Lisa Carwyle.  I just asked how it
11 went, just general questions.
12   Q.    And do you recall what she said?
13   A.    It was long.
14   Q.    And anything beyond that?
15   A.    No, no.  I just asked them how it
16 went.
17   Q.    Hopefully, this won't be too long
18 today.
19   A.    Okay.
20   Q.    I don't think we're going to go
21 through each one of the documents in the
22 binder.  So in terms of just deposition
23 procedure on Zoom, I'm going to be asking
24 questions.  If you can't hear me, either
25 because I'm just talking too quietly or not

Page 14

BRENT ALLEN LARSON

1
2  coherently or because there's a technical
3  issue, please let me know so that I can try to
4  fix the issue or restate my question.  Does
5  that make sense?
6        A.    Yes, sir.  It does.
7        Q.    And now, if there is a -- you know,
8  some kind of technical issue and someone drops
9  off, then we'll -- you know, we'll have to
10  adjourn and come back once that technical issue
11  is resolved.
12        A.    Okay.
13        Q.    The -- your counsel might make
14  objections, but unless he tells you not to
15  answer, you should proceed to answer, even
16  though he's objected to the question.  Does
17  that make sense?
18        A.    Yes, it does.
19        Q.    So could you explain why you
20  decided to join the board of supervisors?
21        A.    I enjoy serving the public.  I've
22  been in the business of selling groceries for
23  30 years, and I'm a lifelong Oxford resident,
24  and I just wanted to continue in a different
25  aspect to serve our public.  And I just enjoy

Page 15

BRENT ALLEN LARSON

1
2  doing it.
3        Q.    Have you held a public office
4  before this year or before the start of your
5  term on the board of supervisors?
6        A.    Yes.  I was on the Lafayette County
7  school board for three years.
8        Q.    I'm sorry.  You said "school
9  board"?
10        A.    Yes.  School board.
11        Q.    And what years was that?
12        A.    The three previous years of '16 --
13  '17, '18, and '19.
14        Q.    So we're going to look at a
15  document now.  And this will be Exhibit 1.
16  I'll drop it in the chat.  And it's tab 3 of
17  your binder.
18              (Exhibit 1 was marked for
19               identification.)
20  BY MR. RETHY:
21        Q.    Is this a document called, Facility
22  Use Policy?
23        A.    Yes.
24        Q.    And it says, Effective Date:
25  March 4, 2019?

Page 16

BRENT ALLEN LARSON

1
2        A.    Yes.
3        Q.    Have you ever seen this document
4  before?
5        A.    I saw it yesterday.
6        Q.    Was that in connection with your
7  preparation for this deposition?
8        A.    Yes.
9        Q.    But prior to yesterday, you've
10  never seen this document before?
11        A.    No.
12        Q.    So prior to yesterday, did you have
13  any awareness that a facility use policy was
14  maintained by Lafayette County?
15        A.    Yes.
16        Q.    And how did you come to -- when did
17  you come to learn that?
18        A.    I believe it was in June of 2020.
19  I'm speculating.  Around about June of 2020.
20        Q.    So prior to June 2020, you didn't
21  have any knowledge one way or the other as to
22  whether a facility use policy existed?
23        A.    I don't think so.  I mean, I might
24  have, but I'm just -- I'm guessing.
25        Q.    And so how did you come to learn of

Page 17

BRENT ALLEN LARSON

1
2  the existence of the facility use policy in
3  June 2020?
4        A.    Upon recommendations from our
5  sheriff.
6        Q.    And what was the nature of those
7  recommendations?
8        A.    He wanted to amend the facility use
9  policy.
10        Q.    And what was the nature of the
11  proposed amendment?
12        A.    I don't remember.
13        Q.    Do you recall whether any reasons
14  were given for the proposed amendment?
15        A.    I think it was safety concerns.
16        Q.    Were those safety concerns related
17  to increased protest activity following the
18  death of George Floyd?
19        A.    No.  Absolutely not.
20        Q.    What were those safety concerns
21  related to?
22        A.    What were the safety concerns?  I
23  don't remember.
24        Q.    So you say you don't remember what
25  they were, but you do remember that they were

Page 18

BRENT ALLEN LARSON

1
2 not related to increased protest activity?
3     A.    That's right.
4     Q.    Was there increased protest
5 activity in Oxford or Lafayette County
6 following the killing of George Floyd?
7     A.    Yes.
8     Q.    And did you believe that that gave
9 rise to any safety concerns?
10     A.    I don't know.
11     Q.    Did you discuss any safety concerns
12 related to protests over summer of 2020 with
13 anyone?
14     A.    Did I discuss -- I don't remember.
15     Q.    Do you remember having any
16 discussions of any kind related to protest
17 activities over the summer of 2020?
18     A.    Any protest activity?  I don't
19 remember.
20     Q.    Do you remember having any
21 discussions of any kind related to the
22 Confederate monument outside the Lafayette
23 County Courthouse at any point during the
24 summer of 2020?
25     A.    I don't remember.

Page 19

BRENT ALLEN LARSON

1
2     Q.    Do you have any recollection of the
3 board of supervisors having taken any votes
4 related to the Confederate monument over the
5 summer of 2020?
6     A.    Yes.
7     Q.    And what is that recollection?
8     A.    We voted not to move the statue, to
9 leave it where it's at.
10     Q.    And how did you vote on that?
11     A.    I voted to leave it where it is.
12     Q.    Why did you vote that way?
13     A.    Because that was my feelings.
14     Q.    I'm sorry.  Can you say that again?
15     A.    That was my -- my feelings.
16     Q.    Can you -- do you have any further
17 explanation as to why you felt that way?
18     A.    Listening to my constituents.
19     Q.    So you had conversations with
20 constituents related to the Confederate
21 monument over the summer of 2020?
22     A.    Yes.
23     Q.    But didn't you just testify that
24 you couldn't remember any discussions related
25 to the Confederate monument over the summer of

Page 20

BRENT ALLEN LARSON

1
2 2020?
3     A.    I just know I had discussions.  I
4 don't know the content.  I don't remember the
5 content of them.
6     Q.    So you don't know whether your
7 constituents wanted the statue to be kept or
8 wanted the statue to be moved?
9     A.    Yes, I do.
10     Q.    So you do remember the content to
11 some extent?
12     A.    To some extent, that's correct.
13     Q.    So how many -- can you provide a
14 rough sense of how many conversations you had
15 with constituents about the Confederate
16 monument?
17     A.    No.
18     Q.    Would it have been more like 10 or
19 more like a hundred?
20     A.    I don't know.
21     Q.    So you have no sense as to whether
22 you've talked to, say, only a single person or
23 whether you talked to a hundred or more people?
24     A.    The question was -- I mean, you
25 asked me did I talk to 10 or a hundred.  I

Page 21

BRENT ALLEN LARSON

1
2 don't know.  I know I talked to at least one.
3     Q.    Do you remember who that was?
4     A.    No.
5     Q.    And do you remember what that one
6 individual's perspective was on whether the
7 statue should be moved or kept?
8     A.    No.
9     Q.    So what's the basis for your belief
10 that your constituents wanted the statue to be
11 kept rather than moved?
12     A.    Because the majority of my
13 constituents wanted to keep it where it is.
14     Q.    How did you come to learn that that
15 was the opinion of the majority of your
16 constituents?
17     A.    From the ones I heard from.
18     Q.    But you're saying you can only
19 remember hearing from one person?
20     A.    No, I did not.  I said there was at
21 least one.
22     Q.    But beyond -- could you say whether
23 you heard from less than 10 or more than 10?
24     A.    I'd say more than 10.
25     Q.    More than 20?

                    BRENT ALLEN LARSON
1
2       A.    I don't know.
3       Q.    So it could have been less than 20?
4       A.    It could have been.
5       Q.    And was this a written
6 correspondence or telephone calls or in-person
7 discussions or what?
8       A.    A little bit of all of it.  There
9 wasn't -- written response as a text or email.
10 Conversations face to face.
11      Q.    You said there were no written
12 responses?
13      A.    I had text or email.  I don't know
14 what you're classifying "written."  But I had
15 text and email.
16      Q.    And your understanding is that the
17 majority of those communications were from
18 constituents who wanted to keep the statue at
19 its current location?
20      A.    Yes.
21      Q.    Did you keep any records reflecting
22 that, or was that just the sense that you got?
23      A.    The sense.
24      Q.    Did that reflect -- did the
25 decision to keep the statue also reflect your

                    BRENT ALLEN LARSON
1
2 personal views, or were you purely expressing
3 what you understood to be the position of the
4 majority of your constituents?
5       A.    I don't reflect my personal views
6 at all in decisions with the county.
7       Q.    I'm sorry.  Could you say the last
8 part of that again?
9       A.    I do not reflect any personal views
10 in my decisions.  I'm not here to represent
11 myself.
12      Q.    If you could turn to tab 10.
13      A.    Okay.
14      Q.    Exhibit 2.
15                  (Exhibit 2 was marked for
16                   identification.)
17 BY MR. RETHY:
18      Q.    You can ignore what I say about
19 which exhibit it will be.  Just look at the tab
20 numbers.
21      A.    Okay.
22      Q.    It's for the written transcript.
23            So this is a document titled,
24 Order: Amend Facility Use Policy Regarding Use
25 of Courthouse Grounds, correct?

                    BRENT ALLEN LARSON
1
2       A.    Correct.
3       Q.    Are you familiar with this
4 document?
5       A.    Yes, I am.
6       Q.    When did you first see this
7 document?
8       A.    Right now.  I mean, I saw it
9 looking at it right now.
10      Q.    So you have never seen this
11 document before?
12      A.    Before today?
13      Q.    Correct.
14      A.    Correct.
15      Q.    But you said you are familiar with
16 it?
17      A.    When I was at the meeting.  I'm
18 familiar with the content.
19      Q.    So this document says, Motion was
20 made by Larry Gillespie, duly seconded by Brent
21 Larson, to amend the facility use policy in
22 order to allow four people or less to use the
23 historic courthouse outside grounds, including
24 the area around the Confederate statue, without
25 a permit, although said individual or group may

                    BRENT ALLEN LARSON
1
2 obtain a permit in order to have exclusive use
3 of the area.  Five or more people gathering
4 require a permit for use.
5            And it goes on, but let's just
6 focus on that for the moment.  So this says
7 that you seconded this motion, correct?
8       A.    That's correct.
9       Q.    And could you explain why?
10      A.    Because I agreed with the motion
11 made by Mr. Gillespie to amend the policy.
12      Q.    And what's your understanding of
13 the nature of the change that was made to the
14 policy through this amendment?
15      A.    To allow four or less people to use
16 the courthouse grounds without a permit.  Four
17 or more must have a -- or five or more to have
18 a permit so they wouldn't block sidewalks and
19 interfere with courthouse business.
20      Q.    So what's your understanding of
21 what the -- so how was that a change from
22 before?  What was the policy in this regard
23 before --
24                  (Simultaneous speakers.)
25      A.    It was all just put together from

BRENT ALLEN LARSON

1   previous -- the previous policy.  It all just
2   came in together.
3
4           I'm not sure I understand any other
5   part of your question.  If you could repeat
6   that.  I'm not sure I actually answered the way
7   you were asking.
8       Q.   Sure.  So this says that five or
9   more people need a permit, basically.
10      A.   Right.
11      Q.   Four or less don't.  And is it your
12  understanding that that -- that the four --
13  five or more people could gather without a
14  permit, or is it your understanding that,
15  before this policy, even a single person needed
16  a permit?
17      A.   Before the policy, a single person
18  needed a permit.
19      Q.   So it's your understanding that
20  this -- that this amendment was relaxing the
21  requirements of the previous policy?
22      A.   Yes.  That's correct.
23      Q.   And so it's your understanding that
24  the presence of a single person on the county
25  courthouse grounds without a permit prior to

BRENT ALLEN LARSON

1
2   the adoption of this amendment would violate
3   the county ordinance?
4       A.   Correct.
5       Q.   So how did you come to have that
6   understanding?
7       A.   It was policy.
8       Q.   Sorry.  Could you repeat that?  You
9   got a little soft.
10      A.   It was policy.  I'm sorry.
11      Q.   But how did you come to understand
12  that that was the previous policy?
13      A.   It was mentioned.  That's why we
14  amended it.  We talked about it in a meeting.
15      Q.   So let's turn for a minute to
16  tab 44.  This exhibit, which will be
17  Exhibit 3 --
18           (Exhibit 3 was marked for
19             identification.)
20  BY MR. RETHY:
21      Q.   This is a series of photographs,
22  correct?
23      A.   Correct.
24      Q.   And do you recognize the location
25  depicted on the first page?

BRENT ALLEN LARSON

1
2       A.   I do.
3       Q.   Could you identify that location?
4       A.   Courthouse square.
5       Q.   And if you turn to the third page,
6   do you recognize the location that's depicted
7   there?
8       A.   Are you talking about the third
9   picture?
10      Q.   Correct.  It says "B-3" on the
11  bottom.
12      A.   Yes.  That's the courthouse lawn.
13      Q.   And so you see that there's some
14  benches set up there, right?
15      A.   Correct.
16      Q.   And so is it your understanding
17  that prior to the permit change that we just
18  discussed, that an individual would need to
19  obtain a permit to sit on one of those benches?
20      A.   I don't know.
21      Q.   Well, you did say that before that
22  permit change, a single person needed to have a
23  permit to be on the courthouse grounds,
24  correct?
25      A.   Correct.  If they were protesting,

BRENT ALLEN LARSON

1
2   correct.  But sitting on a park bench and
3   getting up and leaving, it was -- we never
4   discussed that, but it -- technically, yes.
5   They would need to have one.
6       Q.   So if you turn back for a second to
7   the last one, to the document we just
8   discussed, tab 10.  So not the pictures
9   anymore, but the policy amendment.
10      A.   Okay.
11      Q.   So this says -- so this is phrased
12  in terms of allowing four people or less to use
13  the historic courthouse outside grounds,
14  correct?
15      A.   Correct.
16      Q.   And it doesn't say anything
17  specific about protesting, correct?
18      A.   Correct.
19      Q.   But that was -- the intent of the
20  policy was to apply it only to protesting?
21      A.   No.
22      Q.   So what was the intent of the
23  policy?
24      A.   Well, it's in the policy.  What it
25  says -- the intent of the policy was maintain

BRENT ALLEN LARSON
1
2  safety.
3      Q.    Where does it say that?
4      A.    The intent of the policy was -- are
5  you talking about the amended policy?  Is this
6  the one we're looking at?
7      Q.    Yeah.
8      A.    The intent of the policy was, like
9  you said before, to relax the policy of how
10 many people could gather, any individual group.
11 Just the intent of it was -- I mean, it's in
12 the policy, what it says there.
13     Q.    So if you could turn back to the
14 pictures, tab 44.
15     A.    Uh-huh.
16     Q.    And go back to page 3, the picture
17 with the benches.
18     A.    Uh-huh.
19     Q.    So under this amended policy, if a
20 group of five people walked, you know, from the
21 square onto the courthouse grounds and sat on
22 the benches, would they need to have a permit?
23     A.    We haven't discussed that.
24     Q.    When you say "we" --
25     A.    The board of supervisors.  That

BRENT ALLEN LARSON
1
2  hasn't come up yet.
3      Q.    So are you saying that you don't
4  know whether or not that use requires a permit?
5      A.    That's right.
6      Q.    If a group of five people came onto
7  the same space in order to promote a political
8  position, would they need a permit then?
9      A.    A group of how many?
10     Q.    Five.
11     A.    Yes, they would.
12     Q.    And how would you determine whether
13 or not something was a -- like, a political
14 gathering as opposed to a social gathering?
15     A.    That would be determined by the
16 county administrator in the application
17 process.
18     Q.    But so say a group of five people
19 comes onto the courthouse grounds, haven't
20 applied for a permit.  It seems like you're
21 saying that if it's a social gathering, that
22 might be okay; if it's a political gathering,
23 it wouldn't be.  Is that right?
24     A.    No.
25     Q.    Could you explain that?

BRENT ALLEN LARSON
1
2      A.    Well, a social gathering, somebody
3  coming and leaving isn't a -- people are
4  allowed to come and walk across the courthouse
5  grounds.  But -- and if they don't have a
6  permit and they're staying there, that's --
7  that would be different.
8      Q.    So explain what you mean by
9  "staying there."
10     A.    Well, if a group of five or more
11 wanted to express their political views and
12 they don't have a permit, they would have to go
13 get a permit or not be allowed to be there.
14     Q.    So say a group of five people walks
15 from the square, sits on these benches, and
16 they're having a conversation.  And then the
17 topic of the conversation turns to politics,
18 and they start arguing about politics.  Has
19 their use of the square turned into something
20 impermissible at that point because they don't
21 have a permit?
22     A.    No.
23     Q.    And why is that?
24     A.    Because that's a conversation
25 they're having, not a -- not an expression

BRENT ALLEN LARSON
1
2  of -- it's just a conversation they're having.
3  You don't have to have a permit for a
4  conversation.
5      Q.    So how do you distinguish between a
6  five-person permitted -- like, you know,
7  allowed conversation and a five-person
8  prohibited political expression or protest?
9      A.    Well, if they --
10            MR. O'DONNELL:  Object.
11            Object to form.  You can answer.
12     A.    If they -- repeat your question,
13 please.
14     Q.    So you can have -- five people --
15 you said, in substance, five people can come
16 onto the courthouse grounds and have a
17 political conversation but that five people
18 can't come onto the courthouse grounds to
19 engage in political expression or something of
20 that nature, drawing a distinction between a
21 conversation and some other form of expressive
22 conduct that --
23     A.    If they come and leave -- if
24 they're just having a conversation and they
25 come and leave, they would not need a permit.

BRENT ALLEN LARSON

1              BRENT ALLEN LARSON
2  If they stayed to express any political or any
3  particular subject, they would need a permit
4  staying on the courthouse grounds.  Walking
5  through or having a conversation, like I said,
6  does not require a permit.
7     Q.    So what does the -- what does
8  "staying" mean?
9     A.    You're asking me what "staying"
10  means?
11    Q.    Yeah.  It's the word you're using
12  to say, you know, what's the -- it's like the
13  dividing line between when you need a permit or
14  not.  If you're "staying" on the courthouse
15  grounds, you need a permit.
16    A.    If they continue to protest.
17    Q.    So there's some element of time in
18  that?
19    A.    Element of time is not in our
20  policy.
21    Q.    So who decides whether something is
22  just a conversation or whether something is a
23  protest?
24    A.    The county administrator decides on
25  the permit process.

1              BRENT ALLEN LARSON
2    Q.    Well, but I'm talking about no
3  permit has been applied for, just have five
4  people on the courthouse grounds.  Who decides
5  at that point?
6    A.    I don't know.
7    Q.    So you don't know how this facility
8  use policy would be enforced?
9    A.    The sheriff's department.
10    Q.    So the sheriff's department would
11  decide?
12    A.    Yes.  They would decide -- they
13  would enforce the facility use permit -- or
14  policy, I guess you would say.
15    Q.    So the sheriff's department
16  personnel would be tasked with deciding whether
17  a particular use of the courthouse grounds was
18  just a conversation or whether it amounted to a
19  political protest?
20    A.    No.
21    Q.    So, then, who would make that
22  decision?
23    A.    What decision?  If they're having a
24  conversation?
25    Q.    Right.

1              BRENT ALLEN LARSON
2    A.    There's no one that makes the
3  decision what's a conversation or not.  Just
4  enforce -- the facility use policy is enforced
5  by the sheriff's department, as I stated
6  before.
7    Q.    Right.  So what I'm getting at is,
8  that if you have -- going back to our example,
9  you have the five people on the courthouse
10  grounds.  Someone from the sheriff's department
11  shows up.  They know there's no permit.  And so
12  they have the authority at that point to
13  enforce the facility use policy in some
14  fashion; is that correct?
15    A.    Yes.
16    Q.    I'm sorry.  Could you repeat that?
17    A.    Yes.  Sorry.
18    Q.    And enforcing the facility use
19  policy in that circumstance would involve
20  making a determination whether something was
21  just a conversation or whether it amounted to a
22  political protest; is that correct?
23    A.    I don't know.  I don't know their
24  policies, how they determine who stays or who
25  goes.  That's something determined by the

1              BRENT ALLEN LARSON
2  sheriff's department.  We don't get involved in
3  that.
4    Q.    But the sheriff's department is
5  applying the board's policies, right?
6    A.    Right.  We don't get involved in
7  the enforcement of the policy.  We just set the
8  policy.
9    Q.    So you don't have any sense of what
10  criteria the sheriff's department might use to
11  determine whether something is a political
12  protest or just a conversation?
13    A.    Other than what's stated in the
14  policy, no.
15    Q.    And the policy itself doesn't
16  differentiate between political protests and
17  conversations, correct?
18    A.    No, it doesn't.
19    Q.    Have you ever been on the county
20  courthouse grounds, yourself?
21    A.    I have.
22    Q.    Are you regularly on the county
23  courthouse grounds or more infrequently?
24    A.    Infrequent.
25    Q.    When is the last time you were on

BRENT ALLEN LARSON

1  the county courthouse grounds?
2  A.   I don't know.
3  Q.   Would it have been in the last
4  month?
5  A.   I don't know.  I don't know when
6  the last time was.
7  Q.   Would it have been within the last
8  year?
9  A.   I said I didn't know.
10  Q.   If you would turn to the next page
11  of the pictures, B-4.  Do you recognize the
12  location depicted in this picture?
13  A.   Yes, I do.
14  Q.   What is that location?
15  A.   I believe you can classify that as
16  the west side of the courthouse.
17  Q.   So this is a picture taken from
18  within the county courthouse grounds looking
19  out onto the square; is that fair?
20  A.   Yes.  Yes.
21  Q.   And you see that there's a low
22  fence, but there's an opening, right?
23  A.   Correct.
24  Q.   And there's no gates that block
25

BRENT ALLEN LARSON

1  access to the county courthouse grounds,
2  correct?
3  A.   Do what?
4  Q.   There are no gates that block
5  access to the county courthouse grounds,
6  correct?
7  A.   That's correct.
8  Q.   So I believe that you testified
9  earlier that a reason behind the five-person
10  rule, you know, permitting policy rule -- one
11  reason, at least, related to avoiding blocking
12  pedestrian traffic; is that correct?
13  A.   The sidewalk.
14  Q.   And can you explain what sidewalk
15  you're referring to?
16  A.   The sidewalk on the outside of
17  those gates and around the courthouse.
18  Q.   So if you turn to the 11th page,
19  B-11, in this set of photographs.
20  A.   Okay.
21  Q.   Is this the sidewalk you're
22  referring to?
23  A.   The sidewalk I'm referring to, yes,
24  they cannot block those sidewalks.  The one I'm
25

BRENT ALLEN LARSON

1  referring to is in front of the statue on the
2  side and, as well, in the back.
3  Q.   So turn to B-20.  Do you recognize
4  the location that's depicted here?
5  A.   I do.
6  Q.   What is that location?
7  A.   In front of the courthouse.
8  Q.   So would a gathering of five people
9  in this area block any sidewalks?
10  MR. O'DONNELL:  Object to
11  form.  You can answer.
12  A.   I don't know.
13  Q.   Do you know the reason why the --
14  why five people was the threshold chosen for
15  requiring a permit?
16  A.   Re-ask your question, please.
17  Q.   So this policy amendment we've been
18  talking about it, it says a permit's required
19  for gatherings of five people or more, correct?
20  A.   Correct.
21  Q.   Do you know why the number five was
22  chosen as opposed to any other number?
23  A.   Because only four people can
24  actually stand around the statue or the
25

BRENT ALLEN LARSON

1  monument without blocking the sidewalk, and it
2  would become a safety issue because they would
3  have to stand out in the street or on the side.
4  Q.   So who made the decision that four
5  people was the maximum to stand around the
6  statue without a permit?
7  A.   The county administrator.
8  Q.   But the policy --
9  A.   Can we break so I can get a bottle
10  of water?
11  MR. RETHY:  Sure.  Do you
12  want to come back at 11:05 or
13  11:10?  Or, sorry, 10.  I forgot
14  we're in a different time zone.
15  A.   That's fine.
16  THE VIDEOGRAPHER:  The time
17  is 10:01 a.m.  Off the record.
18  (Recess from 10:01 a.m. to
19  10:12 a.m.)
20  THE VIDEOGRAPHER:  The time
21  is 10:12 a.m.  Back on the record.
22  BY MR. RETHY:
23  Q.   So the next thing we'll be looking
24  at, which will be Exhibit 4, this is your tab
25

Page 42

```
1              BRENT ALLEN LARSON
2  41.
3                  (Exhibit 4 was marked for
4                  identification.)
5  BY MR. RETHY:
6      Q.    So this is also a photograph,
7  correct?
8      A.    Do what?
9      Q.    This document, this is also a
10 photograph, correct?
11     A.    Yes.
12     Q.    And do you recognize the location?
13     A.    Yes, I do.
14     Q.    What is the location?
15     A.    The front of the courthouse.
16     Q.    And is that the Confederate
17 monument we've been referring to in the
18 foreground?
19     A.    It is.
20     Q.    And there's a sort of a sidewalk
21 area around the monument itself, correct?
22     A.    Correct.
23     Q.    Is that the sidewalk area that you
24 were referring to with regard to the
25 five-person rule?
```

Page 43

```
1              BRENT ALLEN LARSON
2      A.    It's part of it.  What I was
3  referring to is the sidewalk around the
4  courthouse.  That part, as well.
5      Q.    But you had said that the county
6  administrator had determined that five people
7  was the -- was the right number at which point
8  to require permits with reference to the
9  sidewalk, so in the immediately vicinity of the
10 Confederate monument.  Is that correct, or did
11 I misunderstand that testimony?
12     A.    No.  That's correct.  The county
13 administrator did determine that on her own
14 determination.
15     Q.    And so that was -- that
16 determination was made with respect
17 specifically to this sidewalk area in the
18 immediate vicinity of the Confederate monument?
19     A.    Well, it's the whole sidewalk
20 around the courthouse, the whole thing.  You
21 cannot block the sidewalk.
22     Q.    So if there were -- so the
23 courthouse has, I guess, four sides, correct?
24     A.    Yes.
25     Q.    And the sidewalk goes around all
```

Page 44

```
1              BRENT ALLEN LARSON
2  four?
3      A.    Correct.
4      Q.    And so if there is a group of
5  people protesting or, say, two people position
6  themselves on each side of the courthouse, so
7  for a total of eight people, that would be a
8  use that would require a permit, because the
9  two -- because that would block the sidewalk?
10     A.    Rephrase your question.  I didn't
11 understand that.
12     Q.    So you're saying that the
13 justification for the five-person rule is that
14 the presence of five people or more on any part
15 of the sidewalk surrounding the courthouse
16 blocks pedestrian traffic?
17              MR. O'DONNELL:  Object to the
18              form.  You can answer.
19     A.    You're asking me to speculate if
20 five or more blocks traffic; is that correct?
21     Q.    I'm asking you to explain whether
22 that's your understanding of the basis for this
23 policy.
24     A.    If what's my understanding?
25     Q.    That the --
```

Page 45

```
1              BRENT ALLEN LARSON
2      A.    Once again, I'm not understanding
3  your question.
4      Q.    So what I'm trying to get at is,
5  you said something -- and let me know if I
6  misunderstood this --
7      A.    Okay.
8      Q.    -- to the effect that the county
9  administrator made a decision that five people
10 or more needed a permit based on the space
11 immediately surrounding the Confederate
12 monument.  So that was my understanding of your
13 first testimony on this point.  Is that
14 correct?
15     A.    Well, you can't -- I mean, you
16 can't stand still with five or more on any part
17 of the courthouse grounds.
18     Q.    And so that's what I'm trying to
19 understand, then, is that if you were a group
20 of eight people who wanted to have a protest
21 where two people stood on each side of the
22 courthouse, would you need a permit for that?
23     A.    So you're saying two people on each
24 side?  Two, four, six, eight?
25     Q.    Yeah.
```

BRENT ALLEN LARSON

1
2    A.    Then -- I'm -- you're asking me to
3  speculate.  No.  If it's just two or more in
4  one spot.
5    Q.    So how would you -- how would you
6  define what's one spot?  Like, how spread out
7  does it have to be to to no longer constitute one
8  spot?
9    A.    Well, it's pretty easy.  One spot
10 where five or more gather, you've got to have a
11 permit.  The number one -- I mean, one spot --
12 if there are five or more -- if there are 20
13 people gathered, five on each side, then you've
14 got to have a permit.
15   Q.    So let's go back to tab 44.  It's
16 the series of photographs.  Go back to B-20 on
17 this.
18   A.    B what?
19   Q.    20.
20   A.    Okay.
21   Q.    And so this shows a series of
22 benches on one side of the county courthouse
23 grounds, right?
24   A.    Yes.
25   Q.    And you can see at least four

BRENT ALLEN LARSON

1
2  benches in the picture; is that fair?
3    A.    Yes.
4    Q.    And so if you organized a protest
5  that involved -- three people sit on each of
6  these four benches, would that be a protest in
7  one spot that would then require a permit?
8    A.    You're asking me to speculate on a
9  certain situation.  You know, the board of
10 supervisors don't enforce, so I don't know.
11 You're asking for speculation.  Each case is
12 different.  I don't know.  We haven't addressed
13 that part, anyway.
14   Q.    And that's -- so you're saying that
15 that's a decision for the sheriff to make?
16   A.    What?  What decision are you asking
17 about?
18   Q.    Whether -- whether a protest of the
19 type that I just described would be one that
20 would require a permit or not.
21   A.    No.  It's not up to the sheriff.
22 It's up to the county administrator.
23   Q.    Well, what if the protest is held
24 without a permit?  Then it's the -- for the
25 sheriff to decide whether the protest --

BRENT ALLEN LARSON

1
2               (Simultaneous speakers.)
3    A.    It's up to the sheriff's department
4  to enforce.
5    Q.    And you don't know the criteria
6  that they might use to make that decision
7  whether or not to enforce?
8    A.    I do not.
9    Q.    Are you aware of any instances in
10 which the -- in which the sheriff's department
11 has enforced the facility use policy?
12   A.    I don't know.
13   Q.    Are you aware of any instances in
14 which the county administrator has denied a
15 permit application?
16   A.    I don't know.
17   Q.    Do you have an understanding of
18 what this current lawsuit is about?
19   A.    Yes.
20   Q.    What's that understanding?
21   A.    I think Mr. Rash was wanting to
22 have an event, and he was -- he was denied on
23 that one, yes.
24   Q.    So you recall at least that permit
25 having been denied?

BRENT ALLEN LARSON

1
2    A.    That's right.  That is correct.
3    Q.    Were you involved in the decision
4  to deny that permit?
5    A.    No.
6    Q.    Does the board of supervisors ever
7  get involved in individual permit applications?
8    A.    No.  Unless there's an appeal.
9    Q.    Has there ever been an appeal?
10   A.    No.
11   Q.    Has the policy always provided for
12 an appeal?
13   A.    I don't know.
14   Q.    So let's look at tab 31.  This will
15 be Exhibit 5.
16              (Exhibit 5 was marked for
17              identification.)
18 BY MR. RETHY:
19   Q.    So this is a document titled,
20 Order: Approve Revision of Facilities Use
21 Policy to Include a Requirement of Application
22 To Be Made 14 Days Prior to Date of Proposed
23 Use and Requiring Closure of Courthouse Grounds
24 30 Minutes Before Dusk, correct?
25   A.    Right.

BRENT ALLEN LARSON

1
2      Q.      And if you -- are you familiar with
3   this document?
4      A.      I've never seen it before until
5   now.
6      Q.      So this document reflects the board
7   of supervisors having voted on a motion,
8   correct?
9      A.      Right.
10     Q.      And this shows that you were
11  absent, correct?
12     A.      Right.
13     Q.      Do you recall why you were absent?
14     A.      I was on vacation.
15     Q.      Did you know prior to looking at
16  this document just now that there came to be an
17  amendment to the facilities use policy that
18  involved closure of courthouse grounds 30
19  minutes before dusk?
20     A.      Rephrase your question, please.
21     Q.      Were you -- are you familiar with
22  the requirement that the courthouse grounds be
23  closed 30 minutes before dusk?
24     A.      Am I familiar with it?  Yes.
25     Q.      And when did you first become aware

BRENT ALLEN LARSON

1
2   of that requirement?
3      A.      I don't know.
4      Q.      Was it over the summer?
5      A.      Yes.
6      Q.      Do you recall how you learned of
7   this requirement?
8      A.      I don't.
9      Q.      Do you support that requirement?
10     A.      I do.
11     Q.      And could you explain why?
12     A.      Because -- because it pulls it all
13  together, and with the 14 days prior, it gives
14  the sheriff and the county administrator time
15  to decide whether or not -- that it's not going
16  to involve safety issues and whether the
17  sheriff's department has enough personnel to
18  work a facilities use permit.
19     Q.      So what about, specifically, the
20  closure 30 minutes before dusk?  Do you support
21  that?
22     A.      I do.
23     Q.      And can you explain why?
24     A.      Because, as defined -- I believe
25  "dusk" defines when there's no more glow to the

BRENT ALLEN LARSON

1
2   sun and you start running into the possibility
3   of safety concerns.  The square is busy at
4   night.  There's a lot of traffic around the
5   courthouse, and there's also an issue whether
6   the sheriff's department has enough personnel
7   to police the situation.  With -- since there's
8   640 -- approximately 640 square miles to the
9   county, it makes it hard on the sheriff's
10  department, as well.
11     Q.      So the sheriff's department has
12  less resources starting at 30 minutes before
13  dusk?
14     A.      I don't know how many resources,
15  but it puts them thin.  I mean, it puts a
16  stress on their department.  I don't know how
17  many resources they have or don't have.
18     Q.      You're saying there's a particular
19  extra stress that starts 30 minutes before
20  dusk?
21     A.      Do what?  You're asking me?
22     Q.      Yeah.
23     A.      I just said it puts a stress on
24  the -- whether or not the sheriff's department
25  has enough personnel to cover -- cover whatever

BRENT ALLEN LARSON

1
2   it might be, whatever event that might be
3   taking place.
4      Q.      Right.  And I'm trying to
5   understand whether that stress is different
6   during the day versus starting 30 minutes
7   before dusk.
8      A.      Yeah.  There's a -- there's a lot
9   more people on the square, a lot more activity
10  going on, a lot more traffic.
11     Q.      There's a lot more of that during
12  the day or during the night?
13     A.      I would say -- I'm speculating --
14  during the night.
15     Q.      So the actual time that is 30
16  minutes before dusk, that varies based on the
17  time of the year, correct?
18     A.      Yeah.  That's correct.
19     Q.      And during the -- you know, during
20  the winter, 30 minutes before dusk could be
21  before 5:00 p.m., correct?
22     A.      No.
23     Q.      Why not?
24     A.      Why not what?
25     Q.      Well, I'm asking to you explain

Page 54

BRENT ALLEN LARSON

1
2 your denial that 30 minutes before dusk could
3 be before 5:00 p.m.
4        A.    Well, you're asking me to --
5 rephrase that question one more time, if you
6 would.
7        Q.    So do you know what time dusk is
8 today?
9        A.    No.
10       Q.    How would you go about learning
11 what time dusk is?
12       A.    When there's no more glow from the
13 sunlight, the sun.
14       Q.    So is that something that you
15 can -- is it possible to determine when dusk is
16 other than through observation at the
17 particular time?
18       A.    I don't know.  I don't know if you
19 can determine when dusk is by a particular
20 time.
21       Q.    Could -- when -- so if it's defined
22 in terms of glow, could it be earlier if it's
23 cloudy?
24       A.    I don't know.  I mean, you're
25 asking me to speculate on specific -- I don't

Page 55

BRENT ALLEN LARSON

1
2 know.  You'll have to ask me when it's cloudy
3 one night.  I don't know.
4        Q.    I'm trying to get a sense of how
5 this policy can be applied, given that it's
6 framed in terms of, you know, dusk, which is
7 a -- you know, it varies under a variety of
8 conditions and it's hard to determine.  You're
9 saying that you're unable to determine it
10 yourself.
11            MR. O'DONNELL:  Object to
12        form.  You can answer.
13       A.    As I said before, dusk is when
14 there's no more glow from the sun.
15       Q.    And so the policy -- so this policy
16 says that it requires closure of the courthouse
17 grounds 30 minutes before dusk, correct?
18       A.    That's correct.
19       Q.    What does "closure" mean?
20       A.    That the courthouse grounds will be
21 closed 30 minutes before dusk.
22       Q.    What does that mean in practice,
23 that they're closed?
24       A.    It's closed.  I mean, you know,
25 it's closed.  It's pretty simple.

Page 56

BRENT ALLEN LARSON

1
2        Q.    Well, does that manifest in the
3 physical world in any way?
4            MR. O'DONNELL:  I object to
5        the form.
6        A.    Rephrase your question.
7        Q.    So I'm trying to understand what
8 you mean by "closed."  It's not self-evident to
9 me what that means.  I mean, is there a gate
10 that closes?
11       A.    No.  No one is allowed on the
12 courthouse grounds.
13       Q.    So -- and how is -- how are -- how
14 is that conveyed to the public?
15       A.    In the policy.
16       Q.    So if someone walks onto the
17 courthouse grounds 30 minutes before dusk --
18 and so this is a time when it's still -- you
19 know, it's still somewhat light, right, because
20 dusk hasn't yet occurred, won't occur 30
21 minutes more, then they're in violation of the
22 policy?
23       A.    I would say so, but, I mean, we
24 haven't really -- yeah.
25       Q.    And that will be the case even if

Page 57

BRENT ALLEN LARSON

1
2 the court -- the court itself was still open
3 for business at that time?
4        A.    No.  The court -- no.  That's
5 not . . .
6        Q.    So it's your testimony that dusk
7 always is 30 minutes after 5:00 p.m., at
8 earliest?
9        A.    No.  You're asking "dusk," what the
10 meaning of "dusk" is; is that right?
11       Q.    Yeah.
12       A.    Okay.  The meaning of "dusk" is --
13 I guess this might be the fourth time -- when
14 there's no glow left in the sunlight -- in the
15 sun.
16       Q.    And you're saying that there's
17 always glow left in the sky from sunlight as of
18 5:30 p.m.?
19       A.    I told you before I didn't know.  I
20 mean, I don't know the time.  It's pretty
21 standard when -- 30 minutes before dusk.
22 Whenever dusk happens, 30 minutes before that.
23       Q.    What do you mean by "it's pretty
24 standard"?
25       A.    My answer.

BRENT ALLEN LARSON

1
2      Q.     Right.  But what do you mean by
3  that answer?
4      A.     That it's pretty obvious when
5  there's no more glow to the sun.
6      Q.     And you're saying that it's also --
7  it's, therefore, pretty obvious when 30 minutes
8  before that time is?
9      A.     No.  I'm saying when -- dusk is
10  when there's no more glow to the sun -- from
11  the sun.
12      Q.     You're saying that in order to
13  comply with this part of the policy, someone
14  has to predict when the glow will disappear
15  from the sky and then count back 30 minutes; is
16  that correct?
17      A.     You're speculating there.
18      Q.     I don't believe I am.
19      A.     Can I get you -- so rephrase your
20  question again.  I'll try to give you the same
21  answer.
22      Q.     So say it's winter; it's 5:15 p.m.
23      A.     And the days are shorter.
24      Q.     Right.
25      A.     Right.

BRENT ALLEN LARSON

1
2      Q.     So someone will come into being in
3  violation of this policy as of 30 minutes
4  before dusk, right?
5      A.     The policy -- it's in the policy
6  what -- the way it reads.  You know, you want
7  to check the policy.  It's in there.  It
8  explains it.
9      Q.     So I'm trying to understand how a
10  person of ordinary intelligence can comport
11  themselves in order to comply with this policy.
12  And that's what my questions are focused on.
13  And you might -- it seems like your position is
14  that it's perfectly clear when 30 minutes
15  before dusk is on any particular day.  But I
16  guess I don't share that belief or
17  understanding.  And so if you believe that
18  that's perfectly clear just from the policy
19  stating "30 minutes before dusk," I just would
20  appreciate understanding that position better.
21          MR. O'DONNELL:  Object to the
22          form.  It's also not in the form of
23          a question.
24      A.     Rephrase your question, if you
25  don't mind.

BRENT ALLEN LARSON

1
2      Q.     So can you -- do you know today
3  when 30 minutes before dusk is?
4      A.     No.
5      Q.     Will you know that 30 minutes
6  before dusk?
7      A.     If I was obtaining a permit, I
8  would find out.
9      Q.     And how would you do that?
10      A.     You would go check the sunset.  I
11  mean, I guess you would check when the sunset
12  is.  I don't know when you would find out.  I
13  guess that's why I'm not applying for a permit.
14      Q.     But this doesn't just apply to
15  permits, right?  This involves complete closure
16  of the grounds, right?
17      A.     Right.
18      Q.     So a single person who's on the
19  courthouse grounds could end up violating this
20  policy if they happen to miscalculate when 30
21  minutes before dusk is; is that right?
22      A.     A single person?
23      Q.     Yeah.
24      A.     No.
25      Q.     Why not?

BRENT ALLEN LARSON

1
2      A.     Because you just said "a single
3  person."
4      Q.     So this policy doesn't apply to a
5  single person?
6      A.     No, it does.  Let me backtrack.  I
7  was talking about the permit process.  Rephrase
8  your question one more time.  I got off track.
9  Please.
10      Q.     I wish I had ordered real time for
11  this one.
12          MR. O'DONNELL:  What?
13          MR. RETHY:  So, Court
14          Reporter, could you read back the
15          last question?
16          (The court reporter read the
17          requested portion.)
18      A.     The courthouse grounds are closed
19  30 minutes before dusk to anyone.
20      Q.     Right.  So an individual person
21  could come into the violation of this policy if
22  they miscalculated when 30 minutes before dusk
23  happened to be?
24      A.     Yes.
25      Q.     And the only way a person would

BRENT ALLEN LARSON

1
2 know that they needed to try to calculate 30
3 minutes before dusk is if they happened to look
4 at this particular document in the board of
5 supervisors' minutes; is that correct?
6     A.    Yes.  That's right.
7     Q.    Do you think that it's widely known
8 in the community that this policy exists?
9     A.    Yes.
10     Q.    And how did the community gain that
11 knowledge?
12     A.    Because anybody that's ever applied
13 for a permit has to follow the guidelines, and
14 people know we have guidelines.
15     Q.    But other than --
16     A.    Word of mouth.
17     Q.    Are you just speculating as to word
18 of mouth, or do you have actual knowledge of
19 specific conversations?
20     A.    I do not have specific knowledge of
21 a conversation.
22     Q.    Are you aware of this policy ever
23 having been enforced?
24     A.    Am I aware of what, now?
25     Q.    This 30-minutes-before-dusk closure

BRENT ALLEN LARSON

1
2 policy ever having been enforced.
3     A.    I don't know.
4     Q.    Does the sheriff's department have
5 discretion on whether or not to enforce it?
6     A.    No.
7     Q.    So the sheriff's department has to
8 enforce it under all circumstances?
9     A.    Yes.
10     Q.    So anytime any person is on the
11 courthouse grounds after 30 minutes before
12 dusk, it's your position that the sheriff's
13 department is obligated to take some sort of
14 enforcement action against that person?
15     A.    Yeah.  That's correct.
16     Q.    So this is courthouse grounds,
17 including the Confederate statue area, correct?
18     A.    Yes.
19     Q.    So let's turn back to the tab 41,
20 which is the photo of the statue.
21           So what is the Confederate statue
22 area?
23     A.    The area surrounding the statue.
24     Q.    And how far does that area extend?
25     A.    I don't know exactly.

BRENT ALLEN LARSON

1
2     Q.    So the sidewalk area that's around
3 the statue, is that part of the Confederate
4 statue area?
5     A.    It's part of the courthouse
6 grounds.
7     Q.    The policy specifically mentions
8 the Confederate statue area too, right?
9     A.    Repeat your question.
10     Q.    The policy mentions both the
11 courthouse grounds and the Confederate statue
12 area, right?
13     A.    Yes.
14     Q.    So is the -- is the sidewalk right
15 around the Confederate statue area part of the
16 Confederate statue area?
17     A.    I don't know.  I mean, it -- the
18 sidewalk beside it is part of the Confederate
19 monument.
20     Q.    Walking on that sidewalk after 30
21 minutes before dusk is a violation?
22     A.    Yes.  That's part of the courthouse
23 grounds.
24     Q.    And if you turn back to the
25 composite photographs at tab 44, if you go to

BRENT ALLEN LARSON

1
2 B-2.
3           Is walking on this sidewalk after
4 30 minutes before dusk a violation?
5     A.    That's part of the courthouse
6 grounds, yes.
7     Q.    So is walking on that part of the
8 sidewalk a violation 30 minutes before dusk?
9     A.    Walking?
10     Q.    Yes.
11     A.    I don't know.
12     Q.    So is walking potentially not a
13 violation, whereas standing is?
14     A.    No.
15     Q.    So is this sidewalk part of the
16 courthouse grounds?
17     A.    This sidewalk is part of the
18 courthouse grounds.
19     Q.    And so the policy provides that
20 this sidewalk is closed 30 minutes before dusk,
21 correct?
22     A.    I don't know.
23     Q.    So how would you -- how would you
24 go about figuring out whether the sidewalk was
25 closed or not?

Page 66

BRENT ALLEN LARSON

2   A.   That would -- that would be
3   enforced by the sheriff's department.
4        Q.   But by the literal terms of the
5   policy, the sidewalk would be closed?
6        A.   I don't know.
7        Q.   But it is part of the courthouse
8   grounds?
9        A.   Yes.
10       Q.   And the policy does say it requires
11  closure of the courthouse grounds, right?
12       A.   No.
13       Q.   And there's no exception for
14  sidewalks?
15       A.   I don't know about the sidewalk.  I
16  don't know.
17       Q.   You're saying there might be an
18  unwritten exception?
19       A.   No.  That's not what I'm saying.  I
20  just said I don't know.
21       Q.   So does the board of supervisors
22  have responsibility for the sheriff's
23  department's budget?
24       A.   For the budget, yes.
25       Q.   And has the sheriff ever asked for

Page 67

BRENT ALLEN LARSON

2   additional funding to deal with issues related
3   to the county courthouse grounds?
4        A.   Not that I'm aware of.
5        Q.   And is it your view that the
6   sheriff's department is underfunded?
7        A.   I don't know.  That's a question
8   for the sheriff, not me.
9        Q.   Well, what role do you play in
10  the -- in setting the sheriff's budget?
11       A.   Setting the budget.
12       Q.   But what do you consider when
13  determining how to set the budget?
14       A.   How do we set the budget?  We
15  approve it or not.  He comes to us with a
16  budget, and we either approve it or not.
17       Q.   And how do you determine whether to
18  approve it or not?
19       A.   We look at every line item and see
20  if it's needed.
21       Q.   And can you disapprove specific
22  line items?
23       A.   Yes.
24       Q.   And have you done that?
25       A.   No.  I've only been through one

Page 68

BRENT ALLEN LARSON

2   budget.
3        Q.   Has the sheriff, to your knowledge,
4   ever mentioned a need for additional funding?
5        A.   Yes.
6        Q.   Could you describe that?
7        A.   For repairs of the jail, for
8   expansion of the sheriff's office.
9        Q.   So I'm going to turn to tab 9.
10  This is now Exhibit 6.
11                 (Exhibit 6 was marked for
12                  identification.)
13  BY MR. RETHY:
14       Q.   So this is an email titled, Statue,
15  and sent by someone named Janice Antonow,
16  correct?
17       A.   Yes.
18       Q.   And did you receive this email?
19       A.   Yes.
20       Q.   Do you recall receiving this email?
21       A.   No.
22       Q.   Do you know who Janice Antonow is?
23       A.   I do.
24       Q.   Who is she?
25       A.   She is a alderman for the City of

Page 69

BRENT ALLEN LARSON

2   Oxford.
3        Q.   I'm sorry.  Could you repeat that?
4        A.   She is a alderman for the City of
5   Oxford.
6        Q.   Is she a constituent of yours?
7        A.   No.
8        Q.   Does your district cover the City
9   of Oxford?
10       A.   Part of it.
11       Q.   But you know that it's not the part
12  where this individual resides?
13       A.   I don't believe so.  I don't
14  believe it is, unless she's moved.
15       Q.   If you look at the second paragraph
16  of this email, it says, One of the issues that
17  citizens have brought to me involves the
18  Confederate statue in front of the courthouse.
19  When asked, I let them know that it's the
20  property of Lafayette County, not the City of
21  Oxford.  I also tell them that because it is
22  hurtful to so many of our citizens, black and
23  white, I would like it gone.
24            So when you received this email,
25  would you have read it?

                    BRENT ALLEN LARSON
1
2        A.      Yes.
3        Q.      And would you have taken this email
4    into consideration when deciding whether or not
5    to vote for moving the statue?
6        A.      I would have taken it into
7    consideration, yes.  But if a person is not in
8    my district -- I rely more on people that are
9    in my district than outside of my district,
10   because I represent the citizens of district 1.
11       Q.      So when you get an email from a
12   member of the public, would you be able to
13   determine from the -- you know, from the name
14   of the author whether they were a constituent
15   of yours or not?
16       A.      Most of the time.  I might look it
17   up.
18       Q.      Is that because you know most of
19   these people personally?
20       A.      Yeah, most -- are you talking about
21   in district 1?
22       Q.      But I'm talking about in general,
23   you know, to know whether or not someone is in
24   district 1?
25       A.      I know -- I know a lot of the

                    BRENT ALLEN LARSON
1
2    people here.
3        Q.      Do you agree that the Confederate
4    monument is hurtful to many of the citizens of
5    the county?
6        A.      They say it is.  I can only go by
7    what they say.
8        Q.      If you look at the next paragraph,
9    it says, Besides being offensive to many
10   citizens, the statue in its present location
11   will always serve as a magnet for protests, pro
12   or con, and will continue to strain our
13   resources that could be better used for more
14   positive events.
15               So do you agree that the statue is
16   a magnet for protests?
17       A.      That's -- no, not necessarily.  I
18   wouldn't call it a magnet.  It might be a place
19   for protest.
20       Q.      Do you agree that the statue being
21   kept in its present location strains resources?
22       A.      I don't know.  I'm sure -- I'm sure
23   it does, though, you know, when law enforcement
24   has to -- extra law enforcement might have to
25   be called in, you know.  I don't know if you

                    BRENT ALLEN LARSON
1
2    can call it a strain, but more resources, more
3    money, has to be spent during a protest.  More
4    personnel, more money.
5        Q.      Did you consider those impacts when
6    deciding how to vote on keeping or moving the
7    statue?
8        A.      Say that again.
9        Q.      Did you consider that resource
10   strain when deciding how to vote on keeping or
11   moving the statue?
12       A.      No.
13       Q.      Why not?
14       A.      I don't know.  I just didn't.
15       Q.      So if you could turn to tab 13,
16   Exhibit 7.
17               (Exhibit 7 was marked for
18               identification.)
19       MR. O'DONNELL:  Is there a
20           question, Isaac?
21       MR. RETHY:  Not yet.  I'm
22           just waiting for the document to
23           load.
24   BY MR. RETHY:
25       Q.      This is an email from Ann Conerly

                    BRENT ALLEN LARSON
1
2    titled, Confederate Statue, correct?
3        A.      Is it on the back, I'm assuming?
4        Q.      Yeah.
5        A.      No.
6               MR. O'DONNELL:  Tab 30?
7               MR. RETHY:  13.
8        A.      No.  That's from April Hughes?
9    Oh, Ann Conerly.
10       Q.      Sorry.  You're correct.  It's from
11   April Hughes.  The header says, Ann Conerly,
12   for whatever reason.
13               Do you know who Ann Conerly is?
14       A.      No.
15       Q.      Do you know who April Hughes is?
16       A.      No.
17       Q.      So do you know who Lindsey Hughes
18   is, which is the --
19       A.      No.
20               (Simultaneous speakers.)
21   BY MR. RETHY:
22       Q.      Lindsey Hughes?
23       A.      No.
24       Q.      And is Taylor, Mississippi, within
25   Lafayette County?

                    BRENT ALLEN LARSON
1
2      A.    Yes.
3      Q.    Is it in your district?
4      A.    No.
5      Q.    If you look at the third paragraph
6  of this email -- and I guess, just to start, if
7  you look at the header, you see this was sent
8  Monday, June 15, 2020?  And do you see that
9  you're included as a recipient here, correct?
10     A.    Right.
11     Q.    And if you look at the third
12 paragraph, it says, I'm disappointed in the
13 actions of our sheriff this past week by
14 barricading public property so that people
15 could not peacefully protest there.
16           Do you know what the author is
17 referring to?
18     A.    No.
19     Q.    But do you have any recollection of
20 the Confederate statue having been barricaded
21 or blockaded in any way over the summer?
22     A.    Yes.
23     Q.    And what's your recollection of
24 that?
25     A.    That it had been barricaded.

1                   BRENT ALLEN LARSON
2      Q.    Do you recall approximately when?
3      A.    I don't.
4      Q.    And do you recall why it was
5  barricaded?
6      A.    I believe it was to protect the
7  statue maybe.  Pure speculation.
8      Q.    So the sheriff made a decision to
9  barricade it?
10     A.    Yes.
11     Q.    Did the sheriff consult with the
12 board of supervisors on that?
13     A.    No.  We have no authority over the
14 sheriff except for setting the budget.
15     Q.    Let's look at tab 27, Exhibit 8.
16           (Exhibit 8 was marked for
17            identification.)
18 BY MR. RETHY:
19     Q.    So you see that this is an email
20 that you forwarded to Lisa Carwyle on
21 July 17th?
22     A.    Yes.
23     Q.    Do you recall why you forwarded
24 that email?
25     A.    It was requested.

1                   BRENT ALLEN LARSON
2      Q.    Do you know why it was requested?
3      A.    No.
4      Q.    The original email was sent by
5  someone named Catarina Passidomo, correct?
6      A.    Yes.
7      Q.    And is that person one of your
8  constituents?
9      A.    I don't know.
10     Q.    Do you know of this person at all?
11     A.    No.  I never heard of her.
12     Q.    So you have no idea why she wrote
13 directly to you?
14     A.    I don't know why, other than I'm a
15 supervisor.
16     Q.    Did you respond to this email?
17     A.    No.  It doesn't look like it.
18           MR. RETHY:  Can we take a
19           five-minute break?
20           MR. O'DONNELL:  Yeah.  That
21           would be fine.
22           THE VIDEOGRAPHER:  The time
23           is 11:11 a.m.  Off the record.
24           (Recess from 11:11 a.m. to
25            11:20 a.m.)

1                   BRENT ALLEN LARSON
2           THE VIDEOGRAPHER:  The time
3           is 11:20 a.m.  Back on the record.
4  BY MR. RETHY:
5      Q.    If you could turn to tab 42.  This
6  will be, I think, Exhibit 9.
7           (Exhibit 9 was marked for
8            identification.)
9  BY MR. RETHY:
10     Q.    So this is also a photograph.  And
11 it looks like it was taken from a Facebook post
12 or something of the sort; is that fair?
13     A.    Yes.
14     Q.    And could you describe what the
15 photograph is depicting?
16     A.    The monument.
17     Q.    And what else?
18     A.    People gathered around it.
19     Q.    And they have, like, a football
20 goalpost with them, correct?
21     A.    Correct.
22     Q.    Do you recall this gathering?
23     A.    I do not.
24     Q.    So do you have an understanding of
25 the circumstances of this gathering?

Page 78

BRENT ALLEN LARSON

1
2     A.     I'm just going to assume that we
3  won a football game.
4     Q.     Would this be authorized under the
5  current policy?
6     A.     No.
7     Q.     If you turn to tab 43, Exhibit 10.
8             (Exhibit 10 was marked for
9              identification.)
10 BY MR. RETHY:
11     Q.     And so this is another photograph,
12 correct?
13     A.     Correct.
14     Q.     And this shows the Confederate
15 monument with the projected words, "Take it
16 down" on it, correct?
17     A.     Correct.
18     Q.     And do you recall this projection
19 having been made at some point over the course
20 of the past year?
21     A.     No.
22     Q.     Do you have a view as to whether
23 this projection would violate the current
24 policy?
25     A.     I guess it just depends on what

Page 79

BRENT ALLEN LARSON

1
2  time of day it is.  It looks dark.  Pure
3  speculation.  It looks like it would be in
4  violation to me.
5     Q.     Would it depend on where the images
6  were being projected from?
7     A.     I don't know.
8     Q.     For instance, if it was being
9  projected from some distance away, you know,
10 from city property?
11     A.     I don't know.
12     Q.     If you could turn to tab 34.
13             (Exhibit 11 was marked for
14              identification.)
15             (Exhibit 12 was marked for
16              identification.)
17 BY MR. RETHY:
18     Q.     And this is a composite document.
19 I think there should be something like a blue
20 sheet separating an email and then some
21 letters; is that correct?
22     A.     Yes.  That's correct.
23     Q.     And so this will be Exhibits 11 and
24 12.
25             So you see the email or the email

Page 80

BRENT ALLEN LARSON

1
2  thread.  So this starts with an email from the
3  sheriff to the board of supervisors, correct?
4     A.     Correct.
5     Q.     And the subject of the email is
6  letters sent to various Oxford and University
7  of Mississippi officials regarding events that
8  took place on August 28th; is that fair?
9     A.     Yes, it is.
10     Q.     Now, the sheriff says that he would
11 imagine that each of you had your share of
12 phone calls concerning those events and have
13 your own concerns about what took place on the
14 courthouse grounds.
15             Do you see that?
16     A.     No.  Where is that?
17     Q.     It's in the sheriff's email,
18 just --
19     A.     I got it.  I'm with you.
20     Q.     So is that correct?  Did you have
21 phone calls regarding events on August 28,
22 2020?
23     A.     I didn't.
24     Q.     And what's your understanding of
25 what the sheriff is referring to in terms of

Page 81

BRENT ALLEN LARSON

1
2  those events?
3     A.     The Ole Miss football team march.
4     Q.     And did you have concerns about
5  that march?
6     A.     I did.
7     Q.     What was the nature of those
8  concerns?
9     A.     Number one, it was unannounced.
10 There wasn't proper time for law enforcement to
11 prepare for it.  There were people out in the
12 street once they got -- or, actually, they
13 marched from the university to the square and,
14 of course, took up road space, which is a
15 hazard in itself when it's unannounced.  And
16 then when they got to the square, the monument,
17 they were out in the street, as well.  So
18 there's a safety issue all the way through.
19     Q.     The streets of the Oxford town
20 square -- so the streets that surround the
21 courthouse grounds -- are those city or county
22 jurisdiction?
23     A.     City.
24     Q.     And so what role does the county
25 play with respect to traffic-safety issues

BRENT ALLEN LARSON

1                BRENT ALLEN LARSON
2  related to those streets?
3      A.    Technically, none, but the -- they
4  can assist on a unannounced venue like this.
5  Now, whether they did or not, I don't know.
6      Q.    But traffic-safety issues are
7  the -- on those streets are primarily the
8  responsibility of the City of Oxford, correct?
9      A.    Correct.
10     Q.    And so beyond -- so did you have
11 concerns regarding this march beyond traffic
12 safety concerns?
13     A.    Yes.
14     Q.    And what were those concerns,
15 specifically?
16     A.    There was a nonpermitted march in
17 violation of the permit -- of a permit, if it
18 was issued.  There was violations of our policy
19 and no permit was achieved.
20     Q.    So your concerns were that the
21 required procedures weren't followed?
22     A.    Correct.
23     Q.    And so you responded to the
24 sheriff's email, correct?
25     A.    Yes.

1                BRENT ALLEN LARSON
2      Q.    And you said, That's excellent,
3  Joey.  I appreciate you taking the facts
4  directly to all parties involved.  We stand
5  with you all the way.
6      And what did you mean saying,
7  taking the facts directly to all parties
8  involved?
9      A.    Taking the facts to the chancellor,
10 the athletic director, and the mayor of the
11 City of Oxford.
12     Q.    And what purpose did you believe
13 that served?
14     A.    What, now?
15     Q.    What purpose do you believe it
16 served to take those facts to those parties?
17     A.    Because of the violation that
18 occurred.
19     Q.    And so then David Rikard responds
20 and says, Thank you, Sheriff.  I know this is
21 taking a toll on all of us.
22     Do you agree with that statement?
23     A.    I don't know what he's referring to
24 there.
25     Q.    So as far as you were aware, there

1                BRENT ALLEN LARSON
2  was nothing taking a toll on you personally?
3      A.    Right.
4      Q.    So do you have a sense of what
5  Mr. Rikard meant when he wrote that?
6      A.    Do what, now?
7      Q.    Do you have a sense of what
8  Mr. Rikard meant in sending that email?
9      A.    No, I don't know.  I don't know
10 who -- other than taking a toll on the law
11 enforcement of having to take extra time to --
12 to do their job on the statue -- on the
13 monument.
14     Q.    So if you turn to the letters
15 behind the slip sheet.
16     A.    Do what, now?
17     Q.    So behind the email, there's some
18 letters, right -- just moving on to the
19 letters.  And first, there's a letter to Mayor
20 Tannehill, correct?
21     A.    Correct.
22     Q.    And did you review this letter
23 prior to today?
24     A.    Yeah.  I've scanned through it.
25     Q.    And so you reviewed it -- when the

1                BRENT ALLEN LARSON
2  sheriff sent this email, you also reviewed the
3  attachments to these?
4      A.    Yes.  Yeah.
5      Q.    And you see in the second
6  paragraph, the sheriff writes, It's very
7  concerning that the City of Oxford's mayor
8  would not notify anyone with the Oxford Police
9  Department, much less anyone at the Lafayette
10 County Sheriff's Department that approximately
11 120 emotionally charged grown men would be
12 marching and protesting upon City of Oxford
13 streets and on the Lafayette County Courthouse
14 grounds.
15     Do you see that?
16     A.    I do.
17     Q.    And do you agree that -- with the
18 sheriff that that's concerning?
19     A.    Absolutely.
20     Q.    And could you explain why?
21     A.    Well, the facts speak for
22 themselves, that 120 emotionally charged grown
23 men were marching without any notice or -- any
24 notice whatsoever so the city and the county
25 law enforcement could prepare for it -- prepare

Page 86

BRENT ALLEN LARSON

1
2 correctly for it.
3       Q.    And if you'll look at the next
4 page, this is a letter from Mayor Tannehill to
5 Sheriff East, correct?
6       A.    Yes.
7       Q.    Have you seen this letter before?
8       A.    No.
9       Q.    So do you have any sense of what
10 Mayor Tannehill might have meant in telling
11 Sheriff East that his information is simply not
12 correct?
13      A.    I don't know what you mean.
14      Q.    If you could turn to the next page.
15 And this is a letter from Sheriff East to the
16 University of Mississippi administrators,
17 correct?
18      A.    That's correct.
19      Q.    And have you seen this letter
20 before?
21      A.    Yes.
22      Q.    And you saw this letter before
23 because it was attached to Sheriff East's
24 email?
25      A.    Correct.

Page 87

BRENT ALLEN LARSON

1
2       Q.    And if you just go down to the --
3 this page 2 of this letter, second-to-last
4 paragraph, you see it says, The Lafayette
5 County Sheriff's Department is requesting that
6 the cost for all dedicated personnel hours for
7 both on-duty and off-duty (overtime) personnel
8 be paid by the University of Mississippi.  (See
9 attached for hours.)
10            Correct?
11      A.    Correct.
12      Q.    Do you know under what
13 circumstances the sheriff is entitled to charge
14 members of the public directly for law
15 enforcement time?
16      A.    I don't know.
17      Q.    Do you know whether -- if the
18 sheriff's department makes such a request --
19 whether a member of the public is legally
20 obligated to comply with it?
21      A.    I don't know.
22      Q.    When you read this, did the fact
23 that the sheriff was seeking to charge the
24 university for the officers' time, did that
25 present any concerns to you?

Page 88

BRENT ALLEN LARSON

1
2       A.    None.  Concerns about what?
3       Q.    Whether it's appropriate for law
4 enforcement to charge members of the public
5 directly for their time.
6       A.    I had no concerns whatsoever.
7       Q.    Are you aware of any other
8 instances in which the sheriff's department
9 charged members of the public directly for
10 officers' time?
11      A.    No.
12      Q.    Did this seem unusual to you?
13      A.    No.
14            MR. RETHY:  So, David, did
15       you see the email I sent you?
16            MR. O'DONNELL:  I did.  I
17       sent an email back.  I'd be happy
18       to print them off, Isaac.  Do you
19       want me to do that?
20            MR. RETHY:  Yeah.  If you
21       could, that would be great.
22            MR. O'DONNELL:  Okay.  Give
23       me a couple minutes.
24            MR. RETHY:  Let's go off the
25       record very briefly while he's

Page 89

BRENT ALLEN LARSON

1
2       printing that.
3            THE VIDEOGRAPHER:  The time
4       is 11:41 a.m.  Off the record.
5            (Recess from 11:41 a.m. to
6            11:49 a.m.)
7            THE VIDEOGRAPHER:  The time
8       is 11:49 a.m.  Back on the record.
9 BY MR. RETHY:
10      Q.    So I had two documents printed just
11 to get clarity as to what these are, you know,
12 because they're not, sort of, conventionally
13 produced documents.
14            The first document is titled,
15 Facility Use Policy Effective Date: July 20,
16 2020.  And this was a document that was
17 produced by counsel for defendant by email
18 yesterday.  It's in the form of a Word
19 document.  And counsel for the defendant
20 represented that this was a, sort of, revision
21 of the policy that was adopted by the board at
22 its January 4, 2021 meeting.
23            MR. RETHY:  David, do you
24       disagree with any of that?
25            MR. O'DONNELL:  Well, it was

Page 90

BRENT ALLEN LARSON

1
2       a document that was approved based
3            on prior revisions, yes.
4  BY MR. RETHY:
5       Q.     Okay.  And then the second document
6  is a -- which I'm adding now -- is a redline
7  comparison that I ran between the document sent
8  by Mr. O'Donnell yesterday and the 2019 version
9  of the policy.  And, you know, if there's
10 objections to using this document, let me know,
11 and we can just compare the -- you know, the
12 2019 and 2020 policies manually.  I just
13 thought that this -- you know, this redline
14 comparison made it easier.
15            MR. O'DONNELL:  That's fine.
16            I would have done that for you if I
17            had been asked.  That's fine.
18            (Exhibit 13 was marked for
19              identification.)
20            (Exhibit 14 was marked for
21              identification.)
22 BY MR. RETHY:
23      Q.     So back to you, Mr. Larson.  So
24 regarding the document titled, Facility Use
25 Policy Effective Date: July 20, 2020, are you

Page 91

BRENT ALLEN LARSON

1  familiar with this document?
2       A.     Yes.  Yes.
3       Q.     Sorry.  Could you repeat that?
4       A.     Yes.
5       Q.     And when did you first encounter
6  this document?
7       A.     I don't know.
8       Q.     And is it fair to say that this is
9  a version of the facility use policy that was
10 adopted at the board's January 4, 2021,
11 meeting?
12      A.     I don't remember.
13      Q.     Do you recall the board considering
14 or taking any action with respect to this
15 document?
16      A.     Yes.
17      Q.     And what's the nature of your
18 recollection?
19      A.     I just remember the content.  But
20 when, I don't know.
21      Q.     Was it recently?
22      A.     It was back in the summer sometime.
23 I don't have any problem believing it was the
24 dates on there.

Page 92

BRENT ALLEN LARSON

1            MR. O'DONNELL:  I think the
2  witness is confused.
3            THE WITNESS:  Do what?
4            MR. O'DONNELL:  It's okay.
5  That's my commentary.
6            But I think what Isaac is
7  asking is, although the document
8  relates to revisions in July -- I
9  think, in July -- when was that
10 particular document in front of
11 you -- when was that drafted and
12 approved by the board?
13           THE WITNESS:  July.
14           MR. O'DONNELL:  Okay.
15           THE WITNESS:  July the -- was
16 it July the 20th?  Effective date.
17           MR. O'DONNELL:  Isaac, I
18 don't want to interfere with your
19 exam.
20           MR. RETHY:  I mean, so far,
21 that's where I'm trying to go.
22 But --
23           THE WITNESS:  This one?
24           MR. O'DONNELL:  Yeah.  The --

Page 93

BRENT ALLEN LARSON

1            THE WITNESS:  The final?
2            MR. O'DONNELL:  I think I can
3  clarify, if you let me.  But it's
4  your exam, so --
5            (Simultaneous speakers.)
6            MR. RETHY:  Feel free to
7  clarify.
8            MR. O'DONNELL:  What was
9  that?  I didn't catch that.
10           MR. RETHY:  I said, please do
11 clarify if you feel you can.
12           MR. O'DONNELL:  Mr. Larson,
13 at the board's last meeting in
14 January of 2021, did the board
15 consider approving a document that
16 you have in front of you?
17           THE WITNESS:  Yes.
18           MR. O'DONNELL:  Okay.  And
19 what was the -- what was the
20 purpose of the board approving the
21 document that -- I think that we
22 have marked down as Exhibit 13.
23           THE WITNESS:  To culminate
24 everything into one document so

Page 94

BRENT ALLEN LARSON

1
2      that we would just have one
3      document from all the revisions.
4              MR. O'DONNELL:  Okay.
5              MR. RETHY:  Okay.  Got it.
6              MR. O'DONNELL:  Okay.  So you
7      can go from there.
8  BY MR. RETHY:
9      Q.    So were you involved in drafting
10 this particular document?
11     A.    No.
12     Q.    Do you know who was responsible for
13 drafting it?
14     A.    Lisa -- the county administrator.
15     Q.    And did you -- and when this was
16 adopted, did the board of supervisors consider
17 each of the changes that had been made?
18     A.    Yes.
19     Q.    So let's turn to the comparison
20 document, tab 14 -- not tab, but Exhibit 14,
21 the second printed document.
22             MR. O'DONNELL:  Is that the
23      redline?
24             MR. RETHY:  Yeah.
25 ///

Page 95

BRENT ALLEN LARSON

1
2  BY MR. RETHY:
3      Q.    And so you wouldn't have seen this
4  particular document before.  But did you, in
5  the course of approving this latest overall
6  policy document, did you review a similar
7  comparison between the 2020 and 2019 policies?
8      A.    Yes.
9      Q.    And so if you go down to the second
10 page in the definitions section, you'll see
11 that the word -- the phrase "arts
12 organizations" is struck, correct?
13     A.    Correct.
14     Q.    And do you understand why that was
15 struck?
16     A.    I don't.
17     Q.    So did the board discuss that
18 language having been struck when adopting
19 this --
20             (Simultaneous speakers.)
21     A.    I don't remember.
22     Q.    Could you repeat your answer?
23     A.    I'm sorry.  I don't remember.
24     Q.    Do you have a view as to whether an
25 arts organization should count as a nonprofit

Page 96

BRENT ALLEN LARSON

1
2  citizen group?
3      A.    I don't know.  I don't know.
4      Q.    And so this -- so the limitation
5  applicable, you know, where nonprofit citizen
6  groups -- where arts organizations no longer
7  count, that wasn't part of any policy until
8  this new policy was adopted, correct?
9      A.    Right.
10     Q.    And this -- you'll see towards the
11 bottom of this page, there's a section specific
12 to the courthouse grounds, correct?
13     A.    Right.
14     Q.    And do you know who drafted this
15 language?
16     A.    Mr. O'Donnell drafted it, with the
17 help of Lisa, our county administrator.
18             MR. O'DONNELL:  I'm going to
19      go stand next to Mr. Larson to look
20      at his redline version.
21             MR. RETHY:  Okay.
22             MR. O'DONNELL:  I'm just
23      going back to the definitions
24      section.  You've indicated --
25             (Court reporter

Page 97

BRENT ALLEN LARSON

1
2      clarification.)
3              MR. O'DONNELL:  I'm just
4  looking back on the prior -- the
5  2019 policy and definitions
6  section.  And I don't see that that
7  language is in the definition
8  section in the 2019 version of the
9  policy.  So I'm not sure where that
10 redline cross-out of "arts
11 organizations" is derived from.
12             MR. RETHY:  If that's a -- I
13 guess maybe we're seeing a danger
14 of informal redlines.  Let me see.
15             MR. O'DONNELL:  Yeah.  Okay.
16 Go ahead.
17             MR. RETHY:  Sorry.  Let me
18 take just a minute to get to the
19 bottom of what's going on with the
20 redline.  Apologies.
21      So I think I probably need
22 five minutes to get this straight.
23             MR. O'DONNELL:  Do you want
24 to go off the record?
25             MR. RETHY:  Yeah.

Page 98

1    BRENT ALLEN LARSON
2         THE VIDEOGRAPHER:  The time
3    is 12:03 p.m.  Off the record.
4         (Off-the-record discussion
5         from 12:03 p.m. to
6         12:14 p.m.)
7         THE VIDEOGRAPHER:  The time
8    is 12:14 p.m.  Back on the record.
9         MR. RETHY:  So it appears
10   that there are multiple iterations
11   of the 2019 policy that exist.  The
12   arts organization language is
13   included in the version of the 2019
14   policy that's attached to the
15   county's opposition to our motion
16   for a preliminary injunction.  But
17   it's also correct that that
18   language does not, in fact, appear
19   in other produced versions.
20        It's unclear to me what the,
21   you know, what the sort of
22   official -- I believe the arts
23   organization language is on the
24   policy that's -- version that's
25   sort of like a redline itself or a

Page 99

1    BRENT ALLEN LARSON
2    track changes that's attached to
3    the order from 2019 that actually
4    adopts it.  It's not, I guess,
5    clear to me what the -- you know,
6    what the county views as the
7    authoritative -- you know, as the
8    authoritative version with respect
9    to those two words.  But it's maybe
10   not the biggest issue in the world.
11        MR. O'DONNELL:  I appreciate
12   that.  I would -- I would say this:
13   If that language is part of
14   approved policy -- that is, arts
15   organizations -- if that's included
16   in the definitions, its exclusion
17   in later version was not
18   intentional but probably a function
19   of the fact that you have, like you
20   say, more than one version floating
21   around.  That exclusion was never
22   discussed.  So . . .
23        MR. RETHY:  Okay.  So --
24        MR. O'DONNELL:  I'll try to
25   see if I can find out how all that

Page 100

1         BRENT ALLEN LARSON
2              occurred.
3    BY MR. RETHY:
4         Q.   So I guess at least that -- but I'm
5    going to -- but I think that the language we've
6    been discussing, the added language in
7    paragraphs specific to the courthouse grounds,
8    does reflect an actual change as between the
9    2019 and 2020 versions that is not just a
10   function of, kind of, like, version control
11   issues or anything.
12             MR. O'DONNELL:  Okay.  All
13        right.
14   BY MR. RETHY:
15        Q.   So turning back to this redline
16   document, Mr. Larson, I see in the new
17   paragraph concerning the courthouse grounds, it
18   states that, Permits are required for all uses
19   except no permit is required for use of the
20   area immediately surrounding the courthouse
21   (sic) memorial for groups of four or less.
22             Do you see that?
23        A.   Where are you?  Second page?
24             MR. O'DONNELL:  The redline
25        version.

Page 101

1         BRENT ALLEN LARSON
2    BY MR. RETHY:
3         Q.   Correct.  Second page in the
4    redline version.
5         A.   Yeah.  At the bottom.
6         Q.   Yeah.
7         A.   Okay.  I got you.
8         Q.   You see?  The sentence I read is
9    the sentence starting, Permits are required.
10             Do you see that?
11        A.   Permits are required.  Yes, I got
12   you.  Now I'm with you.
13        Q.   Okay, great.  So it says, Permits
14   are required for all uses except no permit is
15   required for use of the area immediately
16   surrounding the Confederate memorial for groups
17   of four or less.
18             Correct?
19        A.   Right.
20        Q.   So that's different from the
21   five-person rule as reflected in the order we
22   discussed earlier, correct?
23        A.   Right.
24        Q.   And could you explain how it's
25   different?

BRENT ALLEN LARSON

1
2     A.     No.  It seems to be the same, now
3  that I read it.  Permits are required for all
4  uses except no permit is required for use of
5  the area immediately -- the use of the area
6  immediately surrounding the Confederate
7  memorial.  I think we included the whole
8  courthouse grounds.
9     Q.     Correct.  That's what I was seeing
10  as the way that this was different from the
11  order.
12     A.     Right.
13     Q.     But now you need a permit to be,
14  even if you're one person, on the courthouse
15  grounds, so long as it's not the area
16  immediately surrounding the Confederate
17  memorial; is that correct?
18     A.     Yes, sir.
19     Q.     And what's the reason for that
20  change?
21     A.     Just to keep the safety of the --
22  because there's business going on in the
23  courthouse.  Not just around the statue, but
24  you've got business going on day to day inside
25  the courthouse.  So not to disrupt any business

BRENT ALLEN LARSON

1
2  that's happening.
3     Q.     So do you remember earlier we were
4  talking about the -- you know, the whole series
5  of potential circumstances involving, like, a
6  group of people sitting on the benches around
7  the courthouse, correct?
8     A.     Correct.
9     Q.     So is it the case now that,
10  effectively, they're not allowed to use those
11  benches at all?
12     A.     No.
13     Q.     Do you need to get a permit for
14  even one person to sit on one of those benches?
15     A.     No.
16     Q.     And why is that not the case?
17     A.     Because you've got somebody just
18  sitting and leaving, you know.  You don't have
19  to have a permit for that.
20     Q.     But one person sitting on a bench
21  and holding the poster that, you know, sets
22  forth a political opinion, that would be
23  prohibited without a permit?
24     A.     I mean, we haven't discussed that.
25  I mean, I don't know.

BRENT ALLEN LARSON

1
2     Q.     So do you recall who proposed this
3  change to the five-person rule?
4     A.     Do what, now?
5     Q.     Do you recall who proposed this
6  change in the language of the five-person rule?
7     A.     The county administrator, I
8  believe.
9     Q.     And do you recall what explanation
10  was given?
11     A.     No, I don't.
12     Q.     And did the board vote unanimously
13  to adopt this?
14     A.     Yes.
15     Q.     And did the board solicit any input
16  from the public regarding the policy before
17  adopting it?
18     A.     Not that I remember.
19     Q.     And do you have an understanding as
20  to why the policy is now more lenient with
21  respect to the Confederate statue area as
22  opposed to other parts of the courthouse
23  grounds?
24     A.     Because you can fit four people
25  around that statue, and it's just -- it doesn't

BRENT ALLEN LARSON

1
2  necessarily require -- one person required, you
3  know, to get a permit when you can have four up
4  there without impeding the sidewalk or traffic.
5     Q.     But you're saying that even one
6  person anywhere on the courthouse grounds
7  impedes pedestrian traffic?
8          MR. O'DONNELL:  Object to
9          form.  You can answer.
10     A.     Say again.
11     Q.     Are you saying that even one person
12  on another part of the courthouse grounds does
13  impede pedestrian traffic?
14     A.     Speculative.  It's -- I don't know,
15  I mean.
16     Q.     But you're saying that was the
17  basis for the board treating the Confederate
18  statue area and the rest of the courthouse
19  grounds differently; is that correct?
20     A.     I don't know.
21     Q.     So you don't know why the
22  Confederate statue area and the rest of the
23  county courthouse grounds are treated
24  differently in this regard?
25     A.     Talking as to what?

BRENT ALLEN LARSON

1
2      Q.      Excuse me?
3      A.      Treated differently in what way?
4      Q.      In that you don't need a permit for
5 four people or less right around the
6 Confederate statue, but you do need a permit
7 for four people or less anywhere else on the
8 courthouse grounds.
9      A.      And what is your question about
10 that?
11     Q.      Why is the Confederate statue area
12 and the rest of the county courthouse grounds
13 treated differently?
14     A.      I don't know.
15     Q.      So if you look at page 3 of the
16 redline, the paragraph called, Denial of
17 Proposed Usage.
18             Do you see that?
19     A.      I do.
20     Q.      And so this paragraph now, you
21 know, adds some language that wasn't previously
22 in the -- you know, in the 2019 policy, right?
23     A.      I don't know.  I wasn't there in
24 2019.
25     Q.      Then let's look at the 2019 policy.

BRENT ALLEN LARSON

1
2      A.      Where is the 2019?
3      Q.      I think it's tab 3.
4      A.      Page 3?
5      Q.      Tab 3.
6      A.      Okay.
7      Q.      So if you look at page 2 -- there
8 might be a blank page, but the page that is
9 page 2 of 4.
10     A.      Okay.
11     Q.      And you see at the bottom, there's
12 a paragraph called, Denial of Usage, correct?
13     A.      Correct.
14     Q.      And you see that this says, The
15 county reserves the right to deny applications
16 for use if the user has previously violated the
17 rules set forth in this policy or if the use
18 would pose health or safety risks.
19             Correct?
20     A.      That's right.
21     Q.      And that's the entirety of that
22 paragraph, correct?
23     A.      Correct.
24     Q.      And now if you look at the newly
25 adopted policy -- you can look at the clean

BRENT ALLEN LARSON

1
2 version.  Do you see on page 3 of the clean
3 version there's a paragraph called, Denial of
4 Proposed Usage?
5      A.      Yes.
6      Q.      And would you agree that that
7 paragraph corresponds to the paragraph in the
8 2019 policy?
9      A.      Yes.
10     Q.      And you would agree that there's
11 additional language that's been added to that
12 paragraph as of this -- this new policy that
13 was adopted by the board on January 4th,
14 correct?
15     A.      That's correct.
16     Q.      So who drafted this new language?
17     A.      Mr. O'Donnell drafted it, I
18 believe.  Between him and the county
19 administrator.
20     Q.      So in this paragraph, it says, The
21 county reserves the right to deny applications
22 or impose reasonable time, place, and manner
23 restrictions in granting a permit, depending on
24 the nature of the proposed use.
25             Do you see that?

BRENT ALLEN LARSON

1
2      A.      I do.
3      Q.      What's your understanding of a
4 time, place, and manner restriction?
5      A.      Just what it says, the time, the
6 place, and the manner they're going -- you
7 know, let's see.  The time and the manner
8 they're going to hold their event.  And make
9 sure there's not any competing events at the
10 same time.
11     Q.      So it says that the county reserves
12 this right to impose these restrictions.  Would
13 that be -- so who at the county would actually
14 determine those restrictions in the event the
15 county sought to exercise this right?
16     A.      The administrator.
17     Q.      And --
18     A.      And the sheriff.
19     Q.      And what factors would they
20 consider?
21     A.      Competing events.  I mean, that's
22 what I know of.  That's a question for them,
23 really, since I have no part of the decision
24 process whether to deny an application.
25 Competing events, holidays.

                     BRENT ALLEN LARSON
1
2        Q.      And so then later in the paragraph,
3   it says, In the event an applicant is denied a
4   permit or if a permittee objects to any use
5   restriction required by the county
6   administrator, the applicant or permittee may
7   appeal the denial or restriction to the
8   Lafayette County Board of Supervisors by filing
9   a written appeal with the county administrator
10  within 10 days of the denial or grant of the
11  permit with restrictions.
12               Correct?
13       A.      Right.
14       Q.      And this appeal process is new as
15  of the adoption of this policy, correct?
16       A.      Yes.
17       Q.      And what's your understanding of
18  how that appeal process will work?
19       A.      I've never done one, so I don't
20  know, other than what it says in the --
21       Q.      So who would decide the appeal?
22       A.      The board of supervisors.
23       Q.      And that includes yourself,
24  correct?
25       A.      Yes.

1                    BRENT ALLEN LARSON
2        Q.      And so what would you consider if
3   you received an appeal?
4        A.      Well, every situation is unique,
5   so, I mean, you really would -- it's hard to
6   say when you've got every different --
7   different -- make sure each -- each case is
8   unique and different.  I can't possibly say
9   what I would consider without knowing the
10  circumstance.
11       Q.      So you would consider it on a
12  case-by-case basis?
13       A.      That's right.
14       Q.      And you would just use your
15  judgment to make that determination?
16       A.      Right.
17       Q.      And do you have an understanding of
18  why the board decided to adopt this appeal
19  process?
20       A.      Just to give the applicant a fair
21  shot at letting the board hear it, hear their
22  case.
23       Q.      If there was an appeal, when would
24  the board consider it?
25       A.      10 days after the denial, I

1                    BRENT ALLEN LARSON
2   believe.
3        Q.      So it says it has to be filed
4   within 10 days, correct?
5        A.      Right.
6        Q.      And so are you saying the board
7   would consider it immediately upon filing?
8        A.      Yes.
9        Q.      And so you would expect the board
10  to make a decision the same day that the appeal
11  was filed?
12       A.      No.
13       Q.      When would the board make a
14  decision?
15       A.      I don't know.
16       Q.      There's no -- there's nothing in
17  the policy that defines the timing by which the
18  board has to make a decision, correct?
19       A.      Correct.
20       Q.      So in a -- if you go down to the
21  last page -- or the second-to-last page of the
22  redline document.
23       A.      Okay.
24       Q.      You'll see that the paragraph
25  called, Signs -- you know, with the header,

1                    BRENT ALLEN LARSON
2   Signs?
3        A.      Right.
4        Q.      And then you'll see that there's an
5   added word, where the word "flag" is added.
6        A.      Right.
7        Q.      And do you understand why that word
8   was added?
9        A.      No, I don't.
10       Q.      So was that addition discussed when
11  this policy was adopted?
12       A.      No, it was not discussed.
13       Q.      Do you agree with that policy
14  change, looking at it now?
15       A.      Yes, I do.
16       Q.      And can you explain why?
17       A.      Because it's a -- a flag.  It can
18  be -- obstruct someone's view or, you know,
19  it's just -- it's just not fair for one person
20  or 10 people -- however -- to have flags to
21  obstruct view -- in my opinion, to obstruct
22  someone's view.
23       Q.      So is it your understanding that
24  this policy now prohibits bringing flags onto
25  the courthouse grounds altogether?

BRENT ALLEN LARSON

1
2  A.    Yes.
3              (Court reporter
4              clarification.)
5  A.    Altogether?  No.
6  Q.    So in what way does it not?
7  A.    I don't know.
8  Q.    So why did you change your answer
9  from the first to the second time --
10  A.    I thought it was around the
11  monument, but I don't see something
12  identifying -- identifying that.  It's going to
13  be on a metal, lumber, wood or plastic -- okay.
14  It's going to be on a piece of wood or lumber.
15  The flag will be on a piece of lumber or wood.
16  And what was your question?  I've lost it
17  reading through this -- again?
18  Q.    I was asking whether it's your
19  understanding that this prohibits bringing
20  flags onto the county courthouse grounds.
21  A.    No.
22  Q.    Could you explain your
23  understanding of what it does prohibit?
24  A.    Poles or lumber, wood that go on --
25  that the flag goes on.  It prohibits lumber or

BRENT ALLEN LARSON

1
2  wood, plastic.
3  Q.    And then it says, unless such
4  object is one-fourth inch or less in thickness
5  and two inches or less in width, etcetera,
6  correct?
7  A.    Right.
8  Q.    So flags are -- flags are permitted
9  so long -- this just regulates the dimensions
10  of the flagpole, essentially?
11  A.    Right.
12  Q.    And you previously said that you
13  agreed with this because -- because flags can
14  obstruct view.  But that doesn't -- whether a
15  flag obstructs a view isn't a function of the
16  width or the dimensions of a flagpole, correct?
17  A.    Do what, now?  Say again.
18  Q.    Whether or not a flag obstructs the
19  view doesn't depend on how thick the flagpole
20  is, correct?
21  A.    Right.
22  Q.    So under this policy, you could
23  still have flags that obstruct view, correct?
24  A.    Right.
25  Q.    So I'm going to attempt to share my

BRENT ALLEN LARSON

1
2  screen to play a video.  I've never really done
3  this before, so it might not work, or you might
4  see, like, other weird stuff on my screen, but
5  hopefully not.
6              MR. O'DONNELL:
7              (Indiscernible.)
8  BY MR. RETHY:
9  Q.    But let me know if -- so can you
10  see -- do you see a video window?
11  A.    No, I don't.
12              MR. O'DONNELL:  Do you see
13              the courthouse?
14              THE WITNESS:  Yes.
15              MR. O'DONNELL:  He sees the
16              courthouse.
17  A.    I thought you meant -- yes, I see
18  it.  I'm sorry.
19  Q.    So, now, is the video playing?
20  A.    It is.
21              (Video played.)
22  BY MR. RETHY:
23  Q.    And do you recognize what this
24  video is showing?
25  A.    Yes, I do.

BRENT ALLEN LARSON

1
2  Q.    And could you describe it?
3  A.    It shows a picture of the
4  courthouse with some kind of festival, it looks
5  like, a festival in Oxford.  I can't recall it.
6  Q.    Is it -- is it fair to say this
7  might be the Double Decker Arts Festival?
8  A.    Double Decker, yeah.  That's what
9  it looks like.
10  Q.    And so this shows some people and
11  some booths and tents and so forth on the
12  courthouse grounds, correct?
13  A.    Right.
14  Q.    And is this a use that might be
15  permitted under the policies as they currently
16  stand, or is this contrary to the current
17  policies?
18  A.    I don't know.  I do not know how
19  they treat special events.  We haven't had one
20  since I've been in office.
21  Q.    I'm no longer sharing the screen,
22  correct?
23              MR. O'DONNELL:  Correct.
24  A.    Right.
25  Q.    You haven't had special events.  Is

BRENT ALLEN LARSON

1  
2  that because of COVID?
3      A.    Yes.  That's right.
4      Q.    But prior to COVID, there were
5  events that involved use of the county
6  courthouse grounds, right?
7      A.    Yes, like Double Decker did.  I
8  don't know what else you might be referring to.
9      Q.    Have you ever attended Double
10 Decker Arts Festival?
11     A.    I have.
12     Q.    And do you recall what year or
13 years you might have attended it?
14     A.    I don't.
15           MR. RETHY:  So let's go off
16           the record.  I might be done, but I
17           just want to check my notes.  So if
18           you give me five minutes.
19           THE WITNESS:  Okay.
20           THE VIDEOGRAPHER:  The time
21           is 12:46 p.m.  Off the record.
22           (Recess from 12:46 p.m. to
23           12:53 p.m.)
24           THE VIDEOGRAPHER:  The time
25           is 12:53 p.m.  Back on the record.

BRENT ALLEN LARSON

1  
2  BY MR. RETHY:
3      Q.    So, Mr. Larson, we talked about
4  recently this latest version of the policy that
5  was adopted at the meeting on January 4th,
6  right?
7      A.    Right.
8      Q.    And we talked about this paragraph
9  concerning the courthouse grounds -- this new
10 paragraph concerning the courthouse grounds and
11 the added language in the
12 denial-of-proposed-use paragraph, correct?
13     A.    Right.
14     Q.    And you testified that those
15 paragraphs were written by Mr. O'Donnell and
16 Ms. Carwyle; is that correct?
17     A.    Yeah.  I'm under the assumption
18 that's correct.  I never have asked.
19     Q.    And do you know whether any of
20 those -- any of the language in those
21 paragraphs was -- was put into this policy in
22 response to this lawsuit?
23     A.    No, it was not.
24     Q.    And how do you know that?
25     A.    Because we looked over the changes

BRENT ALLEN LARSON

1  
2  to begin with and corresponded with
3  Mr. O'Donnell.
4      Q.    And how did that lead you to
5  conclude that this language was not added in
6  response to this lawsuit?
7           MR. O'DONNELL:  Object to
8           form.  You can answer.
9      A.    Because it was -- say it again,
10 now.  I lost you.
11     Q.    So what's the basis for your
12 assertion that this language wasn't added into
13 the policy in reaction to this lawsuit?
14     A.    I just know it wasn't.  I mean,
15 it's -- no one -- I think -- let me look and
16 see.
17           We did it on the advice of the
18 sheriff.  It was already done in June and July
19 before -- it was done in June and July upon the
20 advice of the sheriff.
21     Q.    Right.  But there's new language
22 that is new as of this document, which is
23 dated -- which came into existence later than
24 June and July, correct?
25     A.    Right.

BRENT ALLEN LARSON

1  
2      Q.    For instance, language regarding
3  reasonable time, place, and manner
4  restrictions.
5      A.    Right.
6      Q.    Was that language put in place by
7  the sheriff?
8           MR. O'DONNELL:  Object to
9           form.  You can answer.
10     A.    I'm going to say that's placed by
11 Mr. O'Donnell.
12     Q.    And you don't know the specific
13 reason why Mr. O'Donnell included that
14 language, correct?
15     A.    Correct.  Well, I mean, it's pretty
16 self-explanatory, time, place, and manner --
17 what time, the place, and the manner you're
18 doing it.  I mean, holiday or whatever was my
19 understanding.
20     Q.    Are you aware that the phrase,
21 "time, place, and manner restriction" has a
22 specific meaning in First Amendment law?
23     A.    Do what, now?
24     Q.    That the phrase "time, place, and
25 manner restriction" has a specific meaning in

Page 122

BRENT ALLEN LARSON

1  BRENT ALLEN LARSON
2  First Amendment law?
3      A.    No.
4      Q.    Going back to the previous page in
5  the courthouse grounds paragraph:  The use of
6  the courthouse exterior grounds, defined to
7  include the outside areas contiguous to the
8  circuit courthouse and the area encompassing
9  the Confederate memorial, is limited given that
10  it is primarily a place of court business.
11          Do you see that language?
12     A.    Uh-huh.
13     Q.    And do you know who wrote that?
14     A.    Do I know who wrote that?  It's
15  going to be -- no, I don't.  I was going to
16  say -- I don't know.
17     Q.    And so you don't know why that
18  language was inserted into here specifically,
19  correct?
20     A.    It was because of -- I lost my
21  place here.  Okay.  I got it.  Because the
22  court carries on court and everything else,
23  business with the county.  They have trials and
24  everything else, circuit clerk.
25     Q.    Well, you didn't write this

Page 123

BRENT ALLEN LARSON

1  language, right?
2      A.    Do what?
3      Q.    You did not write that language
4  yourself, right?
5      A.    No, I didn't.
6      Q.    And so that's just your
7  interpretation of why that language would have
8  been included, right?
9      A.    Right.
10         MR. RETHY:  I don't have any
11         further questions.
12         MR. O'DONNELL:  I don't have
13         any questions.
14         THE VIDEOGRAPHER:  This
15         concludes today's deposition.  The
16         time is 1:00 p.m.  Off the record.
17         (The deposition of BRENT
18         ALLEN LARSON concluded at
19         1:00 p.m. Central Standard
20         Time.)
21  *    *    *    *    *    *    *    *
22
23
24

Page 124

1  BRENT ALLEN LARSON
2  REPORTER'S CERTIFICATE
3      I, Greta H. Duckett, Certified Court
4  Reporter, Registered Professional Reporter, and
5  Certified Realtime Reporter, hereby certify
6  that on Thursday, January 14, 2021, I reported
7  the remote deposition of BRENT ALLEN LARSON,
8  who was first duly sworn or affirmed to speak
9  the truth in the matter of the foregoing cause,
10  and that the pages herein contain a true and
11  accurate transcription of the examination of
12  said witness by counsel for the parties set out
13  herein.
14      I further certify that I am neither of
15  kin nor of counsel to any of the parties to
16  said cause, nor in any manner interested in the
17  results thereof.
18      This 27th day of January, 2021.
19
20
21  _____
    GRETA H. DUCKETT, RPR, CRR, CVR-S, RVR-M-S
22  ACCR-12, GCCR-2891, MCCR-1945, TNLCR-671
23
24

**1**

**1** 15:15,18 70:10,21, 24

**10** 10:25 20:18,25 21:23,24 23:12 29:8 41:14 78:7,8 110:10 111:25 112:4 113:20

**10:01** 41:18,19

**10:12** 41:20,22

**11** 79:13,23

**11:05** 41:13

**11:10** 41:14

**11:11** 76:23,24

**11:20** 76:25 77:3

**11:41** 89:4,5

**11:49** 89:6,8

**11th** 39:19

**12** 12:16 79:15,24

**120** 85:11,22

**12:03** 98:3,5

**12:14** 98:6,8

**12:46** 118:21,22

**12:53** 118:23,25

**13** 72:15 73:7 90:18 93:23

**136** 12:6

**14** 49:22 51:13 90:20 94:20

**14th** 9:15

**15** 74:8

**16** 15:12

**17** 15:13

**17th** 75:21

**18** 15:13

**19** 15:13

**1:00** 123:17,20

**2**

**2** 23:14,15 87:3 107:7, 9

**20** 21:25 22:3 46:12, 19 89:15 90:25

**2019** 15:25 90:8,12 95:7 97:5,8 98:11,13 99:3 100:9 106:22, 24,25 107:2 108:8

**2020** 16:18,19,20 17:3 18:12,17,24 19:5,21 20:2 74:8 80:22 89:16 90:12,25 95:7 100:9

**2021** 9:15 89:22 91:11 93:15

**20th** 92:17

**27** 75:15

**28** 80:21

**28th** 80:8

**3**

**3** 15:16 27:17,18 30:16 106:15 107:3, 4,5 108:2

**30** 8:22 14:23 49:24 50:18,23 51:20 52:12,19 53:6,15,20 54:2 55:17,21 56:17, 20 57:7,21,22 58:7, 15 59:3,14,19 60:3,5, 20 61:19,22 62:2 63:11 64:20 65:4,8, 20 73:6

**30-minutes-before-dusk** 62:25

**31** 49:14

**34** 79:12

**38655** 12:7

**3:20-cv-224-nbb-rp** 9:14

**4**

**4** 15:25 41:25 42:3 89:22 91:11 107:9

**41** 42:2 63:19

**42** 77:5

**423** 12:6

**43** 78:7

**44** 27:16 30:14 46:15 64:25

**4th** 108:13 119:5

**5**

**5** 49:15,16

**5:00** 53:21 54:3 57:7

**5:15** 58:22

**5:30** 57:18

**6**

**6** 68:10,11

**640** 52:8

**7**

**7** 72:16,17

**8**

**8** 75:15,16

**9**

**9** 68:9 77:6,7

**9:13** 9:17

**A**

**a.m.** 9:17 41:18,19, 20,22 76:23,24,25 77:3 89:4,5,6,8

**absent** 50:11,13

**Absolutely** 17:19 85:19

**access** 39:2,6

**achieved** 82:19

**ACLU** 10:4

**action** 63:14 91:15

**actions** 74:13

**activities** 18:17

**activity** 17:17 18:2,5, 18 53:9

**actual** 53:15 62:18 100:8

**added** 100:6 108:11 113:5,8 119:11 120:5,12

**adding** 90:6

**addition** 113:10

**additional** 67:2 68:4 108:11

**address** 11:25 12:4

**addressed** 47:12

**adds** 106:21

**adjourn** 14:10

**administrator** 31:16 34:24 41:8 43:6,13 45:9 47:22 48:14 51:14 94:14 96:17 104:7 108:19 109:16 110:6,9

**administrators** 86:16

**admissible** 8:20

**adopt** 104:13 111:18

**adopted** 89:21 91:11 94:16 96:8 107:25 108:13 113:11 119:5

**adopting** 95:18 104:17

**adoption** 27:2 110:15

**adopts** 99:4

**advice** 120:17,20

**agree** 71:3,15,20 83:22 85:17 108:6,10 113:13

**agreed** 25:10 115:13

**ahead** 97:16

**alderman** 68:25 69:4

**Allen** 8:1 9:1 10:1,13 11:1 12:1,3 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1,19

**allowed** 32:4,13 33:7 56:11 103:10

**allowing** 29:12

**altogether** 113:25 114:5

**amend** 17:8 23:24 24:21 25:11

**amended** 27:14 30:5,19

**amendment** 17:11, 14 25:14 26:20 27:2 29:9 40:18 50:17 121:22 122:2

**amounted** 35:18 36:21

**Ann** 72:25 73:9,11,13

**Antonow** 68:15,22

**anymore** 29:9

**anytime** 63:10

**Apologies** 97:20

**appeal** 49:8,9,12 110:7,9,14,18,21 111:3,18,23 112:10

**appears** 98:9

**applicable** 96:5

**applicant** 110:3,6 111:20

**application** 31:16 48:15 49:21 109:24

**applications** 49:7 107:15 108:21

**applied** 31:20 35:3 55:5 62:12

**apply** 29:20 60:14 61:4

**applying** 37:5 60:13

**approve** 49:20 67:15,16,18

**approved** 90:2 92:13 99:14

**approving** 93:16,21 95:5

**approximately** 9:16 13:4 52:8 75:2 85:10

**April** 73:8,11,15

**area** 24:24 25:3 40:10 42:21,23 43:17 63:17,22,23,24 64:2, 4,8,12,16 100:20 101:15 102:5,15 104:21 105:18,22 106:11 122:8

**areas** 122:7

**arguing** 32:18

**arts** 95:11,25 96:6 97:10 98:12,22 99:14 117:7 118:10

**aspect** 14:25

**assertion** 120:12

**assist** 82:4

**association** 8:5

**assume** 78:2

**assuming** 73:3

**assumption** 119:17

**athletic** 83:10

**attached** 86:23 87:9 98:14 99:2

**attachments** 85:3

**attempt** 115:25

**attended** 118:9,13

**attorney** 9:23

**August** 80:8,21

**author** 70:14 74:16

**authoritative** 99:7,8

**authority** 36:12 75:13

**authorized** 78:4

**avoiding** 39:12

**aware** 48:9,13 50:25 62:22,24 67:4 83:25 88:7 121:20

**awareness** 16:13

**B**

**B-11** 39:20

**B-2** 65:2

**B-20** 40:4 46:16

**B-3** 28:10

**B-4** 38:12

**back** 14:10 29:6 30:13,16 36:8 40:3 41:13,22 46:15,16 58:15 61:14 63:19 64:24 73:3 77:3 88:17 89:8 90:23 91:23 96:23 97:4 98:8 100:15 118:25 122:4

**backtrack** 61:6

**barricade** 75:9

**barricaded** 74:20,25 75:5

**barricading** 74:14

**Bartlett** 9:24

**based** 45:10 53:16 90:2

**basically** 26:9

**basis** 21:9 44:22 105:17 111:12 120:11

**begin** 120:2

**behalf** 10:8 11:15

**belief** 21:9 59:16

**believing** 91:24

**bench** 29:2 103:20

**benches** 28:14,19 30:17,22 32:15 46:22 47:2,6 103:6,11,14

**biggest** 99:10

**bill** 11:20

**binder** 11:22 13:22 15:17

**bit** 22:8

**black** 69:22

**blank** 107:8

**block** 25:18 38:25 39:5,25 40:10 43:21 44:9

**blockaded** 74:21

**blocking** 39:12 41:2

**blocks** 44:16,20

**blue** 79:19

**board** 12:9 14:20 15:5,7,9,10 19:3 30:25 47:9 49:6 50:6 62:4 66:21 75:12 80:3 89:21 91:14 92:13 93:15,21 94:16 95:17 104:12,15 105:17 108:13 110:8, 22 111:18,21,24

**112**:6,9,13,18

**board's** 37:5 91:11 93:14

**booths** 117:11

**bottle** 41:10

**bottom** 28:11 96:11 97:19 101:5 107:11

**break** 41:10 76:19

**Brent** 8:1 9:1,8 10:1, 13 11:1 12:1,3 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1,20 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1,18

**briefly** 88:25

**bringing** 113:24 114:19

**brought** 69:17

**budget** 66:23,24 67:10,11,13,14,16 68:2 75:14

**business** 11:14,15 14:22 25:19 57:3 102:22,24,25 122:10,

112:6,9,13,18

23

**busy** 52:3

**C**

**calculate** 62:2

**call** 71:18 72:2

**called** 15:21 71:25 106:16 107:12 108:3 112:25

**calls** 22:6 80:12,21

**carries** 122:22

**Carwyle** 13:10 75:20 119:16

**case** 8:24 9:13 47:11 56:25 103:9,16 111:7,22

**case-by-case** 111:12

**Catarina** 76:5

**catch** 93:10

**Central** 123:20

**chancellor** 83:9

**change** 25:13,21 28:17,22 100:8 102:20 104:3,6 113:14 114:8

**charge** 87:13,23 88:4

**charged** 85:11,22 88:9

**chat** 15:16

**check** 59:7 60:10,11 118:17

**chosen** 40:15,23

**circuit** 122:8,24

**circumstance** 36:19 111:10

**circumstances** 11:12 63:8 77:25 87:13 103:5

**citizen** 96:2,5

**citizens** 69:17,22 70:10 71:4,10

**city** 11:14 68:25 69:4, 8,20 79:10 81:21,23 82:8 83:11 85:7,12, 24

**Civil** 8:23

**clarification** 97:2 114:4

**clarify** 93:4,8,12

**clarity** 89:11

**classify** 38:16

**classifying** 22:14

**clean** 107:25 108:2

**clear** 59:14,18 99:5

**clerk** 122:24

**closed** 50:23 55:21, 23,24,25 56:8 61:18 65:20,25 66:5

**closes** 56:10

**closure** 49:23 50:18 51:20 55:16,19 60:15 62:25 66:11

**cloudy** 54:23 55:2

**coherently** 14:2

**commentary** 92:6

**communications** 22:17

**community** 62:8,10

**company** 11:5

**compare** 90:11

**comparison** 90:7,14 94:19 95:7

**competing** 109:9,21, 25

**complete** 60:15

**comply** 58:13 59:11 87:20

**comport** 59:10

**composite** 64:25 79:18

**con** 71:12

**concerns** 17:15,16, 20,22 18:9,11 52:3

80:13 81:4,8 82:11, 12,14,20 87:25 88:2, 6

**conclude** 120:5

**concluded** 123:19

**concludes** 123:16

**conditions** 55:8

**conduct** 33:22

**Conerly** 72:25 73:9, 11,13

**Confederate** 18:22 19:4,20,25 20:15 24:24 42:16 43:10,18 45:11 63:17,21 64:3, 8,11,15,16,18 69:18 71:3 73:2 74:20 78:14 101:16 102:6, 16 104:21 105:17,22 106:6,11 122:9

**confused** 92:3

**connection** 16:6

**consideration** 70:4, 7

**constituent** 69:6 70:14

**constituents** 19:18, 20 20:7,15 21:10,13, 16 22:18 23:4 76:8

**constitute** 46:7

**consult** 75:11

**content** 20:4,5,10 24:18 91:20

**contested** 12:20

**contiguous** 122:7

**continue** 14:24 34:16 71:12

**contrary** 117:16

**control** 100:10

**conventionally** 89:12

**conversation** 32:16, 17,24 33:2,4,7,17,21, 24 34:5,22 35:18,24 36:3,21 37:12 62:21

**conversations** 19:19 20:14 22:10 37:17 62:19

**conveyed** 56:14

**correct** 20:12 23:25 24:2,13,14 25:7,8 26:22 27:4,22,23 28:10,15,24,25 29:2, 14,15,17,18 36:14,22 37:17 38:24 39:3,7,8, 13 40:20,21 42:7,10, 21,22 43:10,12,23 44:3,20 45:14 49:2, 24 50:8,11 53:17,18, 21 55:17,18 58:16 62:5 63:15,17 65:21 68:16 73:2,10 74:9 76:5 77:20,21 78:12, 13,16,17 79:21,22 80:3,4,20 82:8,9,22, 24 84:20,21 86:5,12, 17,18,25 87:10,11 95:12,13 96:8,12 98:17 101:3,18,22 102:9,17 103:7,8 105:19 107:12,13,19, 22,23 108:14,15 110:12,15,24 112:4, 18,19 115:6,16,20,23 117:12,22,23 119:12, 16,18 120:24 121:14, 15 122:19

**correctly** 86:2

**corresponded** 120:2

**correspondence** 22:6

**corresponds** 108:7

**cost** 87:6

**counsel** 9:18 14:13 89:17,19

**Counselors** 8:3

**count** 58:15 95:25 96:7

**counterfeit** 11:19

**counterfeit-money** 11:18

**county** 9:9 10:9 12:6, 9 15:6 16:14 18:5,23

23:6 26:24 27:3 31:16 34:24 37:19,22 38:2,19 39:2,6 41:8 43:5,12 45:8 46:22 47:22 48:14 51:14 52:9 67:3 69:20 71:5 73:25 81:21,24 85:10,13,24 87:5 94:14 96:17 99:6 104:7 105:23 106:12 107:15 108:18,21 109:11,13,15 110:5, 8,9 114:20 118:5 122:23

**county's** 98:15

**couple** 88:23

**court** 8:13 9:11 10:11 11:8,9,14,17 57:2,4 61:13,16 96:25 114:3 122:10,22

**courthouse** 18:23 23:25 24:23 25:16,19 26:25 28:4,12,23 29:13 30:21 31:19 32:4 33:16,18 34:4, 14 35:4,17 36:9 37:20,23 38:2,17,19 39:2,6,18 40:8 42:15 43:4,20,23 44:6,15 45:17,22 46:22 49:23 50:18,22 52:5 55:16, 20 56:12,17 60:19 61:18 63:11,16 64:5, 11,22 65:5,16,18 66:7,11 67:3 69:18 80:14 81:21 85:13 96:12 100:7,17,20 102:8,14,23,25 103:7 104:22 105:6,12,18, 23 106:8,12 113:25 114:20 116:13,16 117:4,12 118:6 119:9,10 122:5,6,8

**courtroom** 8:21

**cover** 52:25 69:8

**COVID** 118:2,4

**COVID-19** 8:8

**criteria** 37:10 48:5

**cross-out** 97:10

**crushed** 11:6

**culminate** 93:24

**current** 22:19 48:18 78:5,23 117:16

---

**D**

**danger** 97:13

**dark** 79:2

**date** 9:14 15:24 49:22 89:15 90:25 92:17

**dated** 120:23

**dates** 91:25

**David** 10:7 83:19 88:14 89:23

**day** 53:6,12 59:15 79:2 102:24 112:10

**days** 49:22 51:13 58:23 110:10 111:25 112:4

**deal** 67:2

**death** 17:18

**decide** 35:11,12 47:25 51:15 110:21

**decided** 14:20 111:18

**decides** 34:21,24 35:4

**deciding** 35:16 70:4 72:6,10

**decision** 22:25 35:22,23 36:3 41:5 45:9 47:15,16 48:6 49:3 75:8 109:23 112:10,14,18

**decisions** 23:6,10

**Decker** 117:7,8 118:7,10

**dedicated** 87:6

**defendant** 89:17,19

**define** 46:6

**defined** 51:24 54:21 122:6

**defines** 51:25 112:17

**definition** 97:7

**definitions** 95:10 96:23 97:5 99:16

**denial** 54:2 106:16 107:12 108:3 110:7, 10 111:25

**denial-of-proposed-use** 119:12

**denied** 48:14,22,25 110:3

**deny** 49:4 107:15 108:21 109:24

**department** 35:9,10, 15 36:5,10 37:2,4,10 48:3,10 51:17 52:6, 10,11,16,24 63:4,7, 13 66:3 67:6 85:9,10 87:5,18 88:8

**department's** 66:23

**depend** 79:5 115:19

**depending** 108:23

**depends** 78:25

**depicted** 27:25 28:6 38:13 40:5

**depicting** 77:15

**deposed** 10:21

**deposition** 8:12 9:7 11:3 12:24 13:7,22 16:7 123:16,18

**derived** 97:11

**describe** 11:11 13:2 68:6 77:14 117:2

**determination** 36:20 43:14,16 111:15

**determine** 31:12 36:24 37:11 43:13 54:15,19 55:8,9 67:17 70:13 109:14

**determined** 31:15 36:25 43:6

**determining** 67:13

**differentiate** 37:16

**differently** 105:19, 24 106:3,13

**dimensions** 115:9, 16

**directly** 76:13 83:4,7 87:14 88:5,9

**director** 83:10

**disagree** 89:24

**disappear** 58:14

**disappointed** 74:12

**disapprove** 67:21

**discretion** 63:5

**discuss** 18:11,14 95:17

**discussed** 28:18 29:4,8 30:23 99:22 101:22 103:24 113:10,12

**discussing** 100:6

**discussion** 98:4

**discussions** 18:16, 21 19:24 20:3 22:7

**disrupt** 102:25

**distance** 79:9

**distancing** 8:9

**distinction** 33:20

**distinguish** 33:5

**district** 9:11,12 12:11 69:8 70:8,9,10, 21,24 74:3

**dividing** 34:13

**Division** 9:13

**dock** 11:6

**document** 15:15,21 16:3,10 23:23 24:4,7, 11,19 29:7 42:9 49:19 50:3,6,16 62:4 72:22 79:18 89:14, 16,19 90:2,5,7,10,24 91:2,7,16 92:8,11 93:16,22,25 94:3,10, 20,21 95:4,6 100:16 112:22 120:22

**documents** 11:22 13:21 89:10,13

**Double** 117:7,8 118:7,9

**drafted** 92:12 96:14, 16 108:16,17

**drafting** 94:9,13

**drawing** 33:20

**driver** 11:5

**drop** 15:16

**dropped** 11:6

**drops** 14:8

**Duckett** 8:13

**Due** 8:7

**duly** 10:14 24:20

**dusk** 49:24 50:19,23 51:20,25 52:13,20 53:7,16,20 54:2,7,11, 15,19 55:6,13,17,21 56:17,20 57:6,9,10, 12,21,22 58:9 59:4, 15,19 60:3,6,21 61:19,22 62:3 63:12 64:21 65:4,8,20

_____

### E

**earlier** 39:10 54:22 101:22 103:3

**earliest** 57:8

**easier** 90:14

**East** 86:5,11,15

**East's** 86:23

**easy** 46:9

**effect** 45:8

**Effective** 15:24 89:15 90:25 92:17

**effectively** 103:10

**election** 12:21

**element** 34:17,19

**email** 22:9,13,15 68:14,18,20 69:16,24 70:3,11 72:25 74:6

75:19,24 76:4,16 79:20,25 80:2,5,17 82:24 84:8,17 85:2 86:24 88:15,17 89:17

**emotionally** 85:11, 22

**encompassing** 122:8

**encounter** 91:6

**end** 60:19

**enforce** 35:13 36:4, 13 47:10 48:4,7 63:5, 8

**enforced** 35:8 36:4 48:11 62:23 63:2 66:3

**enforcement** 37:7 63:14 71:23,24 81:10 84:11 85:25 87:15 88:4

**enforcing** 36:18

**engage** 33:19

**enjoy** 14:21,25

**entirety** 107:21

**entitled** 87:13

**essentially** 115:10

**etcetera** 115:5

**event** 48:22 53:2 109:8,14 110:3

**events** 71:14 80:7, 12,21 81:2 109:9,21, 25 117:19,25 118:5

**exam** 92:20 93:5

**EXAMINATION** 10:17

**excellent** 83:2

**exception** 66:13,18

**exclusion** 99:16,21

**exclusive** 25:2

**Excuse** 106:2

**exercise** 109:15

**exhibit** 15:15,18 23:14,15,19 27:16,

17,18 41:25 42:3 49:15,16 68:10,11 72:16,17 75:15,16 77:6,7 78:7,8 79:13, 15 90:18,20 93:23 94:20

**Exhibits** 79:23

**exist** 98:11

**existed** 16:22

**existence** 17:2 120:23

**exists** 62:8

**expansion** 68:8

**expect** 112:9

**explain** 14:19 25:9 31:25 32:8 39:15 44:21 51:11,23 53:25 85:20 101:24 113:16 114:22

**explains** 59:8

**explanation** 19:17 104:9

**express** 32:11 34:2

**expressing** 23:2

**expression** 32:25 33:8,19

**expressive** 33:21

**extend** 63:24

**extent** 20:11,12

**exterior** 122:6

**extra** 52:19 71:24 84:11

_____

### F

**face** 22:10

**Facebook** 77:11

**facilities** 49:20 50:17 51:18

**facility** 15:21 16:13, 22 17:2,8 23:24 24:21 35:7,13 36:4, 13,18 48:11 89:15 90:24 91:10

**fact** 87:22 98:18 99:19

**factors** 109:19

**facts** 83:3,7,9,16 85:21

**fair** 38:20 47:2 77:12 80:8 91:9 111:20 113:19 117:6

**familiar** 24:3,15,18 50:2,21,24 91:2

**family** 11:13

**fashion** 36:14

**federal** 8:22 11:17

**feel** 93:7,12

**feelings** 19:13,15

**felt** 19:17

**fence** 38:23

**festival** 117:4,5,7 118:10

**figuring** 65:24

**filed** 112:3,11

**filing** 110:8 112:7

**final** 93:2

**find** 60:8,12 99:25

**fine** 41:16 76:21 90:15,17

**fit** 104:24

**five-minute** 76:19

**five-person** 33:6,7 39:10 42:25 44:13 101:21 104:3,6

**fix** 14:4

**flag** 113:5,17 114:15,25 115:15,18

**flagpole** 115:10,16,19

**flags** 113:20,24 114:20 115:8,13,23

**floating** 99:20

**Floyd** 17:18 18:6

**focus** 25:6

**focused** 59:12

**follow** 62:13

**foot** 11:6

**football** 77:19 78:3 81:3

**foreground** 42:18

**forgot** 41:14

**form** 33:11,21 40:12 44:18 55:12 56:5 59:22 89:18 105:9 120:8 121:9

**forwarded** 75:20,23

**fourth** 57:13

**framed** 55:6

**free** 93:7

**front** 40:2,8 42:15 69:18 92:11 93:17

**Frye** 12:19,21

**full** 11:25

**function** 99:18 100:10 115:15

**funding** 67:2 68:4

**G**

**gain** 62:10

**game** 78:3

**gate** 56:9

**gates** 38:25 39:5,18

**gather** 26:13 30:10 46:10

**gathered** 46:13 77:18

**gathering** 25:3 31:14,21,22 32:2 40:9 77:22,25

**gatherings** 40:20

**gave** 18:8

**general** 13:11 70:22

**George** 17:18 18:6

**Gillespie** 24:20 25:11

**give** 58:20 88:22 111:20 118:18

**glow** 51:25 54:12,22 55:14 57:14,17 58:5, 10,14

**goalpost** 77:20

**Good** 8:2 9:21 10:2, 19,20

**grant** 110:10

**granting** 108:23

**great** 11:24 88:21 101:13

**Greta** 8:13

**groceries** 14:22

**grocery** 11:4,13

**grounds** 23:25 24:23 25:16 26:25 28:23 29:13 30:21 31:19 32:5 33:16,18 34:4, 15 35:4,17 36:10 37:20,23 38:2,19 39:2,6 45:17 46:23 49:23 50:18,22 55:17,20 56:12,17 60:16,19 61:18 63:11,16 64:6,11,23 65:6,16,18 66:8,11 67:3 80:14 81:21 85:14 96:12 100:7,17 102:8,15 104:23 105:6,12,19,23 106:8,12 113:25 114:20 117:12 118:6 119:9,10 122:5,6

**group** 24:25 30:10, 20 31:6,9,18 32:10, 14 44:4 45:19 96:2 103:6

**groups** 96:6 100:21 101:16

**grown** 85:11,22

**guess** 35:14 43:23 57:13 59:16 60:11,13 74:6 78:25 97:13 99:4 100:4

**guessing** 16:24

**guidelines** 62:13,14

**H**

**half** 13:5

**happen** 60:20

**happened** 61:23 62:3

**happening** 103:2

**happy** 88:17

**hard** 52:9 55:8 111:5

**hazard** 81:15

**header** 73:11 74:7 112:25

**health** 107:18

**hear** 13:24 111:21

**heard** 9:10 21:17,23 76:11

**hearing** 21:19

**held** 12:17 15:3 47:23

**historic** 24:23 29:13

**hold** 109:8

**holding** 103:21

**holiday** 121:18

**holidays** 109:25

**hour** 13:5

**hours** 87:6,9

**Hughes** 73:8,11,15, 17,22

**hundred** 20:19,23,25

**hurtful** 69:22 71:4

**I**

**idea** 76:12

**identification** 15:19 23:16 27:19 42:4 49:17 68:12 72:18 75:17 77:8 78:9 79:14,16 90:19,21

**identify** 28:3

**identifying** 114:12

**ignore** 23:18

**images** 79:5

**imagine** 80:11

**immediately** 43:9 45:11 100:20 101:15 102:5,6,16 112:7

**impacts** 72:5

**impede** 105:13

**impedes** 105:7

**impeding** 105:4

**impermissible** 32:20

**impose** 108:22 109:12

**in-person** 32:6

**inch** 115:4

**inches** 115:5

**include** 49:21 122:7

**included** 74:9 98:13 99:15 102:7 121:13 123:9

**includes** 110:23

**including** 24:23 63:17

**Incorporated** 8:6

**increased** 17:17 18:2,4

**Indiscernible** 116:7

**individual** 24:25 28:18 30:10 49:7 61:20 69:12

**individual's** 21:6

**informal** 97:14

**information** 86:11

**Infrequent** 37:24

**infrequently** 37:23

**injunction** 98:16

**input** 104:15

**inserted** 122:18

**inside** 102:24

**instance** 79:8 121:2

**instances** 48:9,13 88:8

**intelligence** 59:10

**intent** 29:19,22,25 30:4,8,11

**intentional** 99:18

**interfere** 25:19 92:19

**interpretation** 123:8

**introduce** 9:19

**involve** 36:19 51:16

**involved** 37:2,6 47:5 49:3,7 50:18 83:4,8 94:9 118:5

**involves** 60:15 69:17

**involving** 103:5

**Isaac** 9:22 72:20 88:18 92:7,18

**issue** 14:3,4,8,10 41:3 52:5 81:18 99:10

**issued** 82:18

**issues** 51:16 67:2 69:16 81:25 82:6 100:11

**item** 67:19

**items** 67:22

**iterations** 98:10

### J

**jail** 68:7

**Janice** 68:15,22

**January** 9:15 89:22 91:11 93:15 108:13 119:5

**job** 84:12

**Joey** 83:3

**John** 9:8,25 10:6

**join** 14:20

**judgment** 111:15

**July** 75:21 89:15 90:25 92:9,10,14,16, 17 120:18,19,24

**June** 16:18,19,20 17:3 74:8 120:18,19, 24

**jurisdiction** 81:22

**justification** 44:13

### K

**keeping** 72:6,10

**Kevin** 12:19

**killing** 18:6

**kind** 14:8 18:16,21 100:10 117:4

**knowing** 111:9

**knowledge** 16:21 62:11,18,20 68:3

### L

**Lafayette** 9:9 10:8 12:9 15:6 16:14 18:5, 22 69:20 73:25 85:9, 13 87:4 110:8

**Landon** 10:3

**language** 95:18 96:15 97:7 98:12,18, 23 99:13 100:5,6 104:6 106:21 108:11, 16 119:11,20 120:5, 12,21 121:2,6,14 122:11,18 123:2,4,8

**Larry** 24:20

**Larson** 8:1 9:1,8 10:1,13,19 11:1 12:1, 3 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1, 21 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1

56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1,23 91:1 92:1 93:1,13 94:1 95:1 96:1,19 97:1 98:1 99:1 100:1, 16 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1,3 120:1 121:1 122:1 123:1,9

**latest** 95:5 119:4

**law** 71:23,24 81:10 84:10 85:25 87:14 88:3 121:22 122:2

**lawn** 28:12

**lawsuit** 48:18 119:22 120:6,13

**lead** 120:4

**learn** 16:17,25 21:14

**learned** 51:6

**learning** 54:10

**leave** 19:9,11 33:23, 25

**leaving** 29:3 32:3 103:18

**left** 57:14,17

**legal** 8:4

**legally** 87:19

**lenient** 104:20

**letter** 84:19,22 86:4, 7,15,19,22 87:3

**letters** 79:21 80:6 84:14,18,19

**letting** 111:21

**lifelong** 14:23

**light** 56:19

**limitation** 96:4

**limited** 122:9

**Lindsey** 73:17,22

**Lisa** 13:10 75:20 94:14 96:17

**Listening** 19:18

**literal** 66:4

**load** 72:23

**location** 22:19 27:24 28:3,6 38:13,15 40:5, 7 42:12,14 71:10,21

**long** 12:14 13:4,13, 17 102:15 115:9

**longer** 46:7 96:6 117:21

**looked** 119:25

**lost** 114:16 120:10 122:20

**lot** 52:4 53:8,9,10,11 70:25

**low** 38:22

**lumber** 114:13,14, 15,24,25

### M

**made** 24:20 25:11,13 41:5 43:16 45:9 49:22 75:8 78:19 90:14 94:17

**magnet** 71:11,16,18

**maintain** 29:25

**maintained** 16:14

**majority** 21:12,15 22:17 23:4

**make** 14:5,13,17 35:21 47:15 48:6 109:8 111:7,15 112:10,13,18

**makes** 36:2 52:9 87:18

**making** 36:20

**manifest** 56:2

**manner** 108:22 109:4,6,7 121:3,16, 17,21,25

**manually** 90:12

**march** 15:25 81:3,5 82:11,16

**marched** 81:13

**marching** 85:12,23

**marked** 15:18 23:15 27:18 42:3 49:16 68:11 72:17 75:16 77:7 78:8 79:13,15 90:18,20 93:23

**matter** 9:8

**maximum** 41:6

**mayor** 83:10 84:19 85:7 86:4,10

**meaning** 57:10,12 121:22,25

**means** 34:10 56:9

**meant** 84:5,8 86:10 116:17

**meeting** 24:17 27:14 89:22 91:12 93:14 119:5

**member** 12:8 70:12 87:19

**members** 87:14 88:4,9

**memorial** 100:21 101:16 102:7,17 122:9

**men** 85:11,23

**mentioned** 27:13 68:4

**mentions** 64:7,10

**met** 13:3

**metal** 114:13

**Michael** 8:4

**miles** 52:8

**mind** 59:25

**minute** 27:15 97:18

minutes 49:24
50:19,23 51:20
52:12,19 53:6,16,20
54:2 55:17,21 56:17,
21 57:7,21,22 58:7,
15 59:3,14,19 60:3,5,
21 61:19,22 62:3,5
63:11 64:21 65:4,8,
20 88:23 97:22
118:18

miscalculate 60:20

miscalculated
61:22

Mississippi 9:10,12
10:4,9 12:7 73:24
80:7 86:16 87:8

misunderstand
43:11

misunderstood
45:6

moment 25:6

Monday 74:8

money 72:3,4

month 38:5

months 12:16

monument 18:22
19:4,21,25 20:16
41:2 42:17,21 43:10,
18 45:12 64:19 71:4
77:16 78:15 81:16
84:13 114:11

morning 8:3 9:21
10:2,19,20

motion 24:19 25:7,
10 50:7 98:15

mouth 62:16,18

move 19:8

moved 20:8 21:7,11
69:14

moving 70:5 72:6,11
84:18

multiple 98:10

**N**

named 68:15 76:5

nature 11:2 17:6,10
25:13 33:20 81:7
91:18 108:24

necessarily 71:17
105:2

needed 26:15,18
28:22 45:10 62:2
67:20

newly 107:24

night 52:4 53:12,14
55:3

nonpermitted 82:16

nonprofit 95:25 96:5

Northern 9:12

notes 118:17

notice 85:23,24

notify 85:8

number 9:13 40:22,
23 43:7 46:11 81:9

numbers 23:20

**O**

O'DONNELL 9:3
10:7,8 13:3,7 33:10
40:11 44:17 55:11
56:4 59:21 61:12
72:19 73:6 76:20
88:16,22 89:25 90:8,
15 92:2,5,15,18,25
93:3,9,13,19 94:4,6,
22 96:16,18,22 97:3,
15,23 99:11,24
100:12,24 105:8
108:17 116:6,12,15
117:23 119:15 120:3,
7 121:8,11,13 123:13

object 33:10,11
40:11 44:17 55:11
56:4 59:21 105:8
115:4 120:7 121:8

objected 14:16

objection 9:4

objections 14:14
90:10

objects 110:4

obligated 63:13
87:20

observation 54:16

obstruct 113:18,21
115:14,23

obstructs 115:15,18

obtain 25:2 28:19

obtaining 60:7

obvious 58:4,7

occur 56:20

occurred 56:20
83:18 100:2

off-duty 87:7

off-the-record 98:4

offensive 71:9

office 15:3 68:8
117:20

officers' 87:24 88:10

official 98:22

officials 80:7

Ole 81:3

on-duty 87:7

one-fourth 115:4

open 57:2

opening 38:23

operation 11:18

opinion 21:15
103:22 113:21

opposed 31:14
40:23 104:22

opposition 98:15

order 23:24 24:22
25:2 31:7 49:20
58:12 59:11 99:3
101:21 102:11

ordered 61:10

ordinance 27:3

ordinary 59:10

organization 95:25
98:12,23

organizations 95:12
96:6 97:11 99:15

organized 47:4

original 76:4

overtime 87:7

Oxford 9:13 11:17,18
12:6 14:23 18:5 69:2,
5,9,21 80:6 81:19
82:8 83:11 85:8,12
117:5

Oxford's 85:7

**P**

p.m. 53:21 54:3 57:7,
18 58:22 98:3,5,6,8
118:21,22,23,25
123:17,20

paid 87:8

paragraph 69:15
71:8 74:5,12 85:6
87:4 100:17 106:16,
20 107:12,22 108:3,
7,12,20 110:2 112:24
119:8,10,12 122:5

paragraphs 100:7
119:15,21

park 29:2

part 23:8 26:5 43:2,4
44:14 45:16 47:13
58:13 64:3,5,15,18,
22 65:5,7,15,17 66:7
69:10,11 96:7 99:13
105:12 109:23

parties 8:17 83:4,7,
16

parts 104:22

Passidomo 76:5

past 74:13 78:20

peacefully 74:15

pedestrian 39:13
44:16 105:7,13

pending 8:25

people 20:23 24:22
25:3,15 26:9,13
29:12 30:10,20 31:6,

18 32:3,14 33:14,15,
17 35:4 36:9 40:9,15,
20,24 41:6 43:6 44:5,
7,14 45:9,20,21,23
46:13 47:5 53:9
62:14 70:8,19 71:2
74:14 77:18 81:11
103:6 104:24 106:5,7
113:20 117:10

perfectly 59:14,18

permit 24:25 25:2,4,
16,18 26:9,14,16,18,
25 28:17,19,22,23
30:22 31:4,8,20 32:6,
12,13,21 33:3,25
34:3,6,13,15,25 35:3,
13 36:11 40:16 41:7
44:8 45:10,22 46:11,
14 47:7,20,24 48:15,
24 49:4,7 51:18 60:7,
13 61:7 62:13 82:17,
19 100:19 101:14
102:4,13 103:13,19,
23 105:3 106:4,6
108:23 110:4,11

permit's 40:19

permits 43:8 60:15
100:18 101:9,11,13
102:3

permitted 33:6 115:8
117:15

permittee 110:4,6

permitting 39:11

person 20:22 21:19
26:15,17,24 28:22
59:10 60:18,22 61:3,
5,20,25 63:10,14
70:7 76:7,10 102:14
103:14,20 105:2,6,11
113:19

personal 23:2,5,9

personally 70:19
84:2

personnel 35:16
51:17 52:6,25 72:4
87:6,7

perspective 21:6

Pham 8:4

**phone** 80:12,21

**photo** 63:20

**photograph** 42:6,10 77:10,15 78:11

**photographs** 27:21 39:20 46:16 64:25

**phrase** 95:11 121:20, 24

**phrased** 29:11

**physical** 56:3

**picture** 28:9 30:16 38:13,18 47:2 117:3

**pictures** 29:8 30:14 38:12

**piece** 114:14,15

**place** 53:3 71:18 80:8,13 108:22 109:4,6 121:3,6,16, 17,21,24 122:10,21

**plaintiff** 9:24 10:5

**plaintiffs** 9:19

**plastic** 114:13 115:2

**plate** 11:6

**play** 67:9 81:25 116:2

**played** 116:21

**playing** 116:19

**point** 18:23 32:20 35:5 36:12 43:7 45:13 78:19

**Poles** 114:24

**police** 52:7 85:8

**policies** 36:24 37:5 90:12 95:7 117:15,17

**policy** 15:22 16:13, 22 17:2,9 23:24 24:21 25:11,14,22 26:2,15,17,21 27:7, 10,12 29:9,20,23,24, 25 30:4,5,8,9,12,19 34:20 35:8,14 36:4, 13,19 37:7,8,14,15 39:11 40:18 41:9 44:23 48:11 49:11,21 50:17 55:5,15 56:15,

22 58:13 59:3,5,7,11, 18 60:20 61:4,21 62:8,22 63:2 64:7,10 65:19 66:5,10 78:5, 24 82:18 89:15,21 90:9,25 91:10 95:6 96:7,8 97:5,9 98:11, 14,24 99:14 104:16, 20 106:22,25 107:17, 25 108:8,12 110:15 112:17 113:11,13,24 115:22 119:4,21 120:13

**political** 31:7,13,22 32:11 33:8,17,19 34:2 35:19 36:22 37:11,16 103:22

**politics** 32:17,18

**portion** 61:17

**pose** 107:18

**position** 12:15,18,21 23:3 31:8 44:5 59:13, 20 63:12

**positive** 71:14

**possibility** 52:2

**possibly** 111:8

**post** 77:11

**poster** 103:21

**potential** 103:5

**potentially** 65:12

**practice** 8:8 55:22

**predict** 58:14

**preliminary** 98:16

**preparation** 16:7

**prepare** 12:23 81:11 85:25

**presence** 26:24 44:14

**present** 71:10,21 87:25

**pretty** 46:9 55:25 57:20,23 58:4,7 121:15

**previous** 15:12 26:2, 21 27:12 122:4

**previously** 106:21 107:16 115:12

**primarily** 82:7 122:10

**print** 88:18

**printed** 89:10 94:21

**printing** 89:2

**prior** 16:9,12,20 26:25 28:17 49:22 50:15 51:13 84:23 90:3 97:4 118:4

**pro** 71:11

**problem** 91:24

**procedure** 8:23 13:23

**procedures** 82:21

**proceed** 14:15

**process** 31:17 34:25 61:7 109:24 110:14, 18 111:19

**produced** 89:13,17 98:19

**prohibit** 114:23

**prohibited** 33:8 103:23

**prohibits** 113:24 114:19,25

**projected** 78:15 79:6,9

**projection** 78:18,23

**promote** 31:7

**proper** 81:10

**property** 69:20 74:14 79:10

**proposed** 17:11,14 49:22 104:2,5 106:17 108:4,24

**prosecution** 11:16

**protect** 75:6

**protest** 17:17 18:2,4, 16,18 33:8 34:16,23 35:19 36:22 37:12 45:20 47:4,6,18,23,

25 71:19 72:3 74:15

**protesting** 28:25 29:17,20 44:5 85:12

**protests** 18:12 37:16 71:11,16

**provide** 20:13

**provided** 49:11

**public** 14:21,25 15:3 56:14 70:12 74:14 87:14,19 88:4,9 104:16

**pulls** 51:12

**Pure** 75:7 79:2

**purely** 23:2

**purpose** 83:12,15 93:21

**put** 25:25 119:21 121:6

**puts** 52:15,23

---

**Q**

**question** 14:4,16 20:24 26:5 33:12 40:17 44:10 45:3 50:20 54:5 56:6 58:20 59:23,24 61:8, 15 64:9 67:7 72:20 106:9 109:22 114:16

**questions** 13:11,24 59:12 123:12,14

**quietly** 13:25

---

**R**

**ran** 90:7

**Rash** 9:9,25 10:6 48:21

**Re-ask** 40:17

**reaction** 120:13

**read** 61:14,16 69:25 87:22 101:8 102:3

**reading** 114:17

**reads** 59:6

**real** 61:10

**reason** 39:10,12 40:14 73:12 102:19 121:13

**reasonable** 108:22 121:3

**reasons** 17:13

**recall** 13:12 17:13 48:24 50:13 51:6 68:20 75:2,4,23 77:22 78:18 91:14 104:2,5,9 117:5 118:12

**receive** 68:18

**received** 11:19 69:24 111:3

**receiving** 68:20

**recently** 91:22 119:4

**recess** 41:19 76:24 89:5 118:22

**recipient** 74:9

**recognize** 27:24 28:6 38:12 40:4 42:12 116:23

**recollection** 19:2,7 74:19,23 91:19

**recommendations** 17:4,7

**record** 8:11 9:16 12:2 41:18,22 76:23 77:3 88:25 89:4,8 97:24 98:3,8 118:16, 21,25 123:17

**recording** 8:19

**records** 22:21

**redline** 90:6,13 94:23 96:20 97:10,20 98:25 100:15,24 101:4 106:16 112:22

**redlines** 97:14

**reference** 43:8

**referring** 39:16,23, 24 40:2 42:17,24 43:3 74:17 80:25 83:23 118:8

**reflect** 22:24,25 23:5,
9 100:8

**reflected** 101:21

**reflecting** 22:21

**reflects** 50:6

**regard** 25:22 42:24
105:24

**regularly** 11:14
37:22

**regulates** 115:9

**related** 17:16,21
18:2,12,16,21 19:4,
20,24 39:12 67:2
82:2

**relates** 92:9

**relax** 30:9

**relaxing** 26:20

**rely** 70:8

**remember** 17:12,23,
24,25 18:14,15,19,
20,25 19:24 20:4,10
21:3,5,19 91:13,20
95:21,23 103:3
104:18

**remote** 8:19 9:7

**remotely** 8:12,16

**repairs** 68:7

**repeat** 26:5 27:8
33:12 36:16 64:9
69:3 91:4 95:22

**rephrase** 44:10
50:20 54:5 56:6
58:19 59:24 61:7

**reporter** 8:13 10:11
61:14,16 96:25 114:3

**Reporting** 8:6

**represent** 9:24 12:12
23:10 70:10

**represented** 89:20

**representing** 10:5

**request** 87:18

**requested** 61:17
75:25 76:2

**requesting** 87:5

**require** 25:4 34:6
43:8 44:8 47:7,20
105:2

**required** 40:19 82:21
100:18,19 101:9,11,
14,15 102:3,4 105:2
110:5

**requirement** 49:21
50:22 51:2,7,9

**requirements** 26:21

**requires** 31:4 55:16
66:10

**requiring** 40:16
49:23

**reserves** 107:15
108:21 109:11

**resident** 14:23

**resides** 69:12

**resolved** 14:11

**resource** 72:9

**resources** 52:12,14,
17 71:13,21 72:2

**respect** 43:16 81:25
91:15 99:8 104:21

**respond** 76:16

**responded** 82:23

**responds** 83:19

**response** 22:9
119:22 120:6

**responses** 22:12

**responsibility** 66:22
82:8

**responsible** 94:12

**rest** 105:18,22
106:12

**restate** 14:4

**restriction** 109:4
110:5,7 121:21,25

**restrictions** 108:23
109:12,14 110:11
121:4

**Rethy** 9:2,21,22
10:18 15:20 23:17
27:20 41:12,23 42:5
49:18 61:13 68:13
72:21,24 73:7,21
75:18 76:18 77:4,9
78:10 79:17 88:14,
20,24 89:9,23 90:4,
22 92:21 93:7,11
94:5,8,24 95:2 96:21
97:12,17,25 98:9
99:23 100:3,14 101:2
116:8,22 118:15
119:2 123:11

**review** 84:22 95:6

**reviewed** 84:25 85:2

**revision** 49:20 89:20

**revisions** 90:3 92:9
94:3

**Rikard** 83:19 84:5,8

**rise** 18:9

**risks** 107:18

**road** 12:6 81:14

**role** 67:9 81:24

**room** 8:10,14

**rough** 20:14

**rule** 8:22 39:11 42:25
44:13 101:21 104:3,6

**rules** 8:23,24 107:17

**run** 12:20

**running** 52:2

**S**

**safety** 17:15,16,20,
22 18:9,11 30:2 41:3
51:16 52:3 81:18
82:12 102:21 107:18

**sat** 30:21

**scanned** 84:24

**school** 15:7,8,10

**screen** 116:2,4
117:21

**second-to-last** 87:3
112:21

**seconded** 24:20
25:7

**section** 95:10 96:11,
24 97:6,8

**seeking** 87:23

**sees** 116:15

**self-evident** 56:8

**self-explanatory**
121:16

**selling** 14:22

**sending** 84:8

**sense** 14:5,17 20:14,
21 22:22,23 37:9
55:4 84:4,7 86:9

**sentence** 101:8,9

**separating** 79:20

**series** 27:21 46:16,
21 103:4

**serve** 14:25 71:11

**served** 83:13,16

**serving** 14:21

**set** 28:14 37:7 39:20
67:13,14 107:17

**sets** 103:21

**setting** 67:10,11
75:14

**severity** 8:7

**share** 59:16 80:11
115:25

**sharing** 117:21

**sheet** 79:20 84:15

**sheriff** 17:5 47:15,21,
25 51:14 66:25 67:8
68:3 74:13 75:8,11,
14 80:3,10,25 83:20
85:2,6,18 86:5,11,15,
23 87:13,23 109:18
120:18,20 121:7

**sheriff's** 35:9,10,15
36:5,10 37:2,4,10
48:3,10 51:17 52:6,9,
11,24 63:4,7,12 66:3,
22 67:6,10 68:8
80:17 82:24 85:10

**87**:5,18 **88**:8

**shoplifter** 11:16

**shorter** 58:23

**shot** 111:21

**showing** 116:24

**shows** 36:11 46:21
50:10 78:14 117:3,10

**sic** 100:21

**side** 38:17 40:3 41:4
44:6 45:21,24 46:13,
22

**sides** 43:23

**sidewalk** 39:14,15,
17,22,24 41:2 42:20,
23 43:3,9,17,19,21,
25 44:9,15 64:2,14,
18,20 65:3,8,15,17,
20,24 66:5,15 105:4

**sidewalks** 25:18
39:25 40:10 66:14

**Signs** 112:25 113:2

**similar** 95:6

**simple** 55:25

**simply** 86:11

**Simpson** 9:23

**simultaneous** 25:24
48:2 73:20 93:6
95:20

**single** 20:22 26:15,
17,24 28:22 60:18,22
61:2,5

**sir** 14:6 102:18

**sit** 28:19 47:5 103:14

**sits** 32:15

**sitting** 29:2 103:6,18,
20

**situation** 47:9 52:7
111:4

**sky** 57:17 58:15

**slip** 84:15

**social** 8:9 31:14,21
32:2

**soft** 27:9

**solicit** 104:15

**someone's** 113:18, 22

**sort** 42:20 63:13 77:12 89:12,20 98:21,25

**sought** 109:15

**space** 31:7 45:10 81:14

**speak** 10:15 85:21

**speakers** 25:24 48:2 73:20 93:6 95:20

**special** 117:19,25

**specific** 29:17 54:25 62:19,20 67:21 96:11 100:7 121:12,22,25

**specifically** 43:17 51:19 64:7 82:15 122:18

**speculate** 10:25 44:19 46:3 47:8 54:25

**speculating** 16:19 53:13 58:17 62:17

**speculation** 47:11 75:7 79:3

**Speculative** 105:14

**spent** 72:3

**spoken** 13:6,9

**spot** 46:4,6,8,9,11 47:7

**spread** 46:6

**square** 28:4 30:21 32:15,19 38:20 52:3, 8 53:9 81:13,16,20

**stand** 40:25 41:4,6 45:16 83:4 96:19 117:16

**standard** 57:21,24 123:20

**standing** 65:13

**start** 9:6 15:4 32:18 52:2 74:6

**starting** 52:12 53:6 101:9

**starts** 52:19 80:2

**state** 8:24 11:25 12:4

**stated** 36:5 37:13

**statement** 83:22

**states** 9:11 100:18

**stating** 59:19

**statue** 19:8 20:7,8 21:7,10 22:18,25 24:24 40:2,25 41:7 63:17,20,21,23 64:3, 4,8,11,15,16 68:14 69:18 70:5 71:10,15, 20 72:7,11 73:2 74:20 75:7 84:12 102:23 104:21,25 105:18,22 106:6,11

**stayed** 34:2

**staying** 32:6,9 34:4, 8,9,14

**stays** 36:24

**stipulate** 8:17

**stood** 45:21

**store** 11:4,13

**straight** 97:22

**strain** 71:12 72:2,10

**strains** 71:21

**street** 41:4 81:12,17

**streets** 81:19,20 82:2,7 85:13

**stress** 52:16,19,23 53:5

**struck** 95:12,15,18

**stuff** 116:4

**subject** 34:3 80:5

**substance** 33:15

**suing** 11:5

**summer** 18:12,17,24 19:5,21,25 51:4 74:21 91:23

**sun** 52:2 54:13 55:14

57:15 58:5,10,11

**sunlight** 54:13 57:14,17

**sunset** 60:10,11

**supervisor** 76:15

**supervisors** 12:9 14:20 15:5 19:3 30:25 47:10 49:6 50:7 66:21 75:12 80:3 94:16 110:8,22

**supervisors'** 62:5

**support** 51:9,20

**surround** 81:20

**surrounding** 44:15 45:11 63:23 100:20 101:16 102:6,16

**swear** 8:15 10:11

**swearing** 8:19

**sworn** 10:15

---

**T**

**tab** 15:16 23:12,19 27:16 29:8 30:14 41:25 46:15 49:14 63:19 64:25 68:9 72:15 73:6 75:15 77:5 78:7 79:12 94:20 107:3,5

**taking** 53:3 83:3,7,9, 21 84:2,10 91:15

**talk** 20:25

**talked** 20:22,23 21:2 27:14 119:3,8

**talking** 13:25 28:8 30:5 35:2 40:19 61:7 70:20,22 103:4 105:25

**Tannehill** 84:20 86:4,10

**tasked** 35:16

**Taylor** 73:24

**team** 81:3

**technical** 14:2,8,10

**technically** 29:4 82:3

**telephone** 22:6

**telling** 86:10

**tells** 14:14

**tents** 117:11

**term** 15:5

**terms** 13:22 29:12 54:22 55:6 66:4 80:25

**testified** 10:16 11:16 39:9 119:14

**testify** 11:15 19:23

**testimony** 11:8 43:11 45:13 57:6

**text** 22:9,13,15

**Thacher** 9:23

**Thames** 10:2,3

**thick** 115:19

**thickness** 115:4

**thin** 52:15

**thing** 41:24 43:20

**thought** 90:13 114:10 116:17

**thread** 80:2

**threshold** 40:15

**time** 9:15 10:22 34:17,19 37:25 38:7 41:15,17,21 51:14 53:15,17 54:5,7,11, 17,20 56:18 57:3,13, 20 58:8 61:8,10 70:16 76:22 77:2 79:2 81:10 84:11 87:15,24 88:5,10 89:3,7 98:2,7 108:22 109:4,5,7,10 114:9 118:20,24 121:3,16, 17,21,24 123:17,21

**timing** 112:17

**titled** 23:23 49:19 68:14 73:2 89:14 90:24

**today** 13:18 24:12 54:8 60:2 84:23

**today's** 9:14 12:24 123:16

**told** 57:19

**toll** 83:21 84:2,10

**topic** 32:17

**total** 44:7

**town** 81:19

**track** 61:8 99:2

**traffic** 39:13 44:16,20 52:4 53:10 82:11 105:4,7,13

**traffic-safety** 81:25 82:6

**transcript** 23:22

**treat** 117:19

**treated** 105:23 106:3,13

**treating** 105:17

**trials** 122:23

**truck** 11:5

**truth** 10:15,16

**TSG** 8:6

**turn** 23:12 27:15 28:5 29:6 30:13 38:11 39:19 40:4 63:19 64:24 68:9 72:15 77:5 78:7 79:12 84:14 86:14 94:19

**turned** 32:19

**turning** 100:15

**turns** 32:17

**type** 47:19

---

**U**

**Uh-huh** 30:15,18 122:12

**unable** 55:9

**unanimously** 104:12

**unannounced** 81:9, 15 82:4

**unclear** 98:20

**underfunded** 67:6

**understand** 26:4 27:11 44:11 45:19 53:5 56:7 59:9 95:14 113:7

**understanding** 22:16 25:12,20 26:12,14,19,23 27:6 28:16 44:22,24 45:2, 12 48:17,20 59:17,20 77:24 80:24 104:19 109:3 110:17 111:17 113:23 114:19,23 121:19

**understood** 23:3

**unique** 111:4,8

**United** 9:11

**university** 80:6 81:13 86:16 87:8,24

**unusual** 88:12

**unwritten** 66:18

**Usage** 106:17 107:12 108:4

**user** 107:16

———————

**V**

———————

**vacation** 50:14

**validity** 8:18

**varies** 53:16 55:7

**variety** 55:7

**venue** 82:4

**version** 90:8 91:10 96:20 97:8 98:13,24 99:8,17,20 100:10,25 101:4 108:2,3 119:4

**versions** 98:19 100:9

**versus** 9:9 53:6

**vicinity** 43:9,18

**video** 8:18 116:2,10, 19,21,24

**video-recorded** 9:7

**view** 67:5 78:22 95:24 113:18,21,22 115:14,15,19,23

**views** 23:2,5,9 32:11 99:6

**violate** 27:2 78:23

**violated** 107:16

**violating** 60:19

**violation** 56:21 59:3 61:21 64:21 65:4,8, 13 79:4 82:17 83:17

**violations** 82:18

**vote** 19:10,12 70:5 72:6,10 104:12

**voted** 19:8,11 50:7

**votes** 19:3

———————

**W**

———————

**waiting** 72:22

**walk** 32:4

**walked** 30:20

**walking** 34:4 64:20 65:3,7,9,12

**walks** 32:14 56:16

**wanted** 14:24 17:8 20:7,8 21:10,13 22:18 32:11 45:20

**wanting** 48:21

**water** 41:11

**week** 74:13

**weird** 116:4

**west** 38:17

**whatsoever** 85:24 88:6

**white** 69:23

**widely** 62:7

**width** 115:5,16

**window** 116:10

**winter** 53:20 58:22

**won** 78:3

**wood** 114:13,14,15, 24 115:2

**word** 34:11 62:16,17 89:18 95:11 113:5,7

**words** 78:15 99:9

**work** 10:3 51:18 110:18 116:3

**world** 56:3 99:10

**write** 122:25 123:4

**writes** 85:6

**written** 22:5,9,11,14 23:22 110:9 119:15

**wrote** 76:12 84:5 122:13,14

———————

**Y**

———————

**year** 15:4 38:9 53:17 78:20 118:12

**years** 10:25 14:23 15:7,11,12 118:13

**yesterday** 16:5,9,12 89:18 90:8

———————

**Z**

———————

**zone** 41:15

**Zoom** 13:23