IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI
Oxford Division

| | | |
|---|---|---|
| JOHN RASH, | ) | |
| | ) | |
| *Plaintiff,* | ) | Civil No. 3:20-cv-00224-NBB-RP |
| | ) | |
| v. | ) | |
| | ) | |
| LAFAYETTE COUNTY, MISSISSIPPI, | ) | **ORAL ARGUMENT REQUESTED** |
| | ) | |
| *Defendant.* | ) | |
| | ) | |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Page

INTRODUCTION ....................................................................................................................1

ARGUMENT............................................................................................................................2

I.     PLAINTIFF HAS STANDING TO SUE ....................................................................3

II.    THE COURTHOUSE GROUNDS ARE A TRADITIONAL PUBLIC FORUM .............6

       A.     The Courthouse Grounds Are Part Of A Historic Town Square And Serve
              As A Focal Point For Cultural And Political Expression .......................................7

       B.     The County's Legal Authorities Are Inapposite...................................................10

       C.     The Courthouse Grounds Were Open For Public Use Before 2015....................14

       D.     The Courthouse Grounds Are Not A "Limited Public Forum"............................18

III.   THE DUSK TO DAWN CLOSURE ORDER DOES NOT WITHSTAND
       SCRUTINY AS A TIME, PLACE, AND MANNER RESTRICTION..........................20

       A.     The Factual Record Does Not Support The County ............................................20

       B.     Disputed Issues Of Material Fact Exist As To The County's Motivation
              For Imposing The Closure Order........................................................................23

       C.     The County Lacks Legal Support For The Closure Order ...................................24

IV.    THE ONE- OR FIVE-PERSON PERMITTING REQUIREMENT DOES NOT
       WITHSTAND CONSTITUTIONAL SCRUTINY......................................................28

       A.     The One- Or Five-Person Rule Constitutes An Impermissible Prior
              Restraint...........................................................................................................29

       B.     The One- Or Five-Person Permitting Requirement Is Impermissibly Vague .......31

V.     THE COUNTY'S REMAINING ARGUMENTS FAIL...............................................33

CONCLUSION.......................................................................................................................35

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abramson v. Florida Gas Transmission Co.*,
909 F. Supp. 410 (E.D. La. 1995) .......................................................................18

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ...................................................................................2, 15

*Ashe v. Corley*,
992 F.2d 540 (5th Cir. 1993).................................................................................3

*Ass'n of Community Orgs. for Reform Now v. City of Frontenac*,
714 F. 2d 813 (8th Cir. 1983)...........................................................................27

*Beasley v. City of Atlanta*,
2012 WL 13012623 (N.D. Ga. Aug. 30, 2012)...................................................26

*Bell v. Keating*,
697 F.3d 445 (7th Cir. 2012).................................................................................5

*Bloedon v. Grube*,
631 F.3d 1218 (11th Cir. 2011).............................................................................6

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) .......................................................................................3, 18

*Center for Indiv. Freedom v. Carmouche*,
449 F.3d 655 (5th Cir. 2006)......................................................................5, 6, 29

*Chicago Acorn v. Metro. Pier & Expo. Auth.*,
150 F.3d 695 (7th Cir. 1998)...............................................................................19

*Chiu v. Plano Indep. School Dist.*,
260 F.3d 330 (5th Cir. 2001)..........................................................................19, 20

*Cinevision Corp. v. City of Burbank*,
745 F.2d 560 (9th Cir. 1984)............................................................................4, 5

*Clark v. City of Lakewood*,
259 F.3d 996 (9th Cir. 2001)...............................................................................24

*Club Retro, L.L.C. v. Hilton*,
568 F.3d 181 (5th Cir. 2009)..................................................................................5

*Comfort v. MacLaughlin*,
473 F. Supp. 2d 1026 (C.D. Cal. 2006) .............................................................13

*Community for Creative Non-Violence v. Turner*,
893 F.2d 1387 (D.C. Cir. 1990) ..........................................................................29

*Consol. Edison Co. of New York v. Public Service Comm'n of New York*,
447 U.S. 530 (1980) ............................................................................................25

*Cooper v. Meritor, Inc.*,
  2019 WL 545240 (N.D. Miss. Feb. 11, 2019) ...................................................17

*Courtemanche v. General Services Admin.*,
  172 F. Supp. 2d 251 (D. Mass. 2001)..............................................................35

*Cox v. City of Charleston*,
  416 F.3d 281 (4th Cir. 2005)..........................................................................30

*Douglas v. Brownell*,
  88 F.3d 1511 (8th Cir. 1996)...................................................................29, 33

*Dowd v. City of Los Angeles*,
  2013 WL 4039043 (C.D. Cal. Aug. 7, 2013)....................................................27

*Edwards v. South Carolina*,
  372 U.S. 229 (1963) ........................................................................................8

*Fairchild v. Liberty Indep. School Dist.*,
  597 F.3d 747 (5th Cir. 2010)..........................................................................20

*Forbes v. Arkansas Educ. Television Commc'n Network Found.*,
  22 F.3d 1423 (8th Cir. 1994)............................................................................8

*Forsyth Cnty. v. Nationalist Movement*,
  505 U.S. 123 (1992) .................................................................................29, 35

*Freedom From Religion Foundation v. Abbott*,
  955 F.3d 417 (5th Cir. 2020)..........................................................................20

*Garza v. Starr County*,
  309 F. Supp. 3d 454 (S.D. Tex. 2018) .............................................................31

*Gathright v. City of Portland*,
  439 F.3d 573 (9th Cir. 2006)............................................................................8

*Grossman v. City of Portland*,
  33 F.3d 1200 (9th Cir. 1994)....................................................................29, 33

*Hays Cnty. Guardian v. Supple*,
  969 F.2d 111 (5th Cir. 1992)..........................................................................19

*Hodge v. Talkin*,
  799 F.3d 1145 (D.C. Cir. 2015) ...............................................................10, 12

*Houston Chronicle Publishing Co. v. City of League City Tex.*,
  488 F.3d 613 (5th Cir. 2007)..........................................................................24

*Huminski v. Corsones*,
  396 F.3d 53 (2d Cir. 2005)............................................................................13

*Int'l Women's Day March Planning Committee v. City of San Antonio*,
  619 F.3d 346 (5th Cir. 2010)....................................................................34, 35

*ISKCON of Potomac, Inc. v. Kennedy*,
  61 F.3d 949 (D.C. Cir. 1995)..........................................................................18

*J&B Entertainment v. City of Jackson, Miss.*,
   2006 WL 1118130 (S.D. Miss. April 7, 2006).........................................................32

*Joseph Burstyn, Inc. v. Wilson*,
   343 U.S. 495 (1952) ...................................................................................................4

*Justice for All v. Faulkner*,
   410 F.3d 760 (5th Cir. 2005)....................................................................................20

*Keister v. Bell*,
   461 F. Supp. 3d 1152 (N.D. Ala. 2020)..............................................................33, 34

*Knowles v. City of Waco*,
   462 F.3d 430 (5th Cir. 2006).......................................................................................5

*Knowles v. City of Waco, Tex.*,
   462 F.3d 430 (5th Cir. 2006).....................................................................................29

*Kreimer v. Bureau of Police for Town of Morristown*,
   958 F.2d 1242 (3d Cir. 1992)....................................................................................19

*Lakewood v. Plain Dealer Publishing Co.*,
   468 U.S. 750 (1988) ....................................................................................................5

*Long Beach Area Peace Network v. City of Long Beach*,
   574 F.3d 1011 (9th Cir. 2009)...................................................................................35

*Magnolia Island Plantation, LLC v. Lucky Family, LLC*,
   2020 WL 5836558 (W.D. La. Sept. 30, 2020) ..........................................................11

*McCullen v. Coakley*,
   573 U.S. 464 (2014) .......................................................................................26, 28, 30

*McGlone v. Bell*,
   681 F.3d 718 (6th Cir. 2012).....................................................................................33

*Moore v. Brown*,
   868 F.3d 398 (5th Cir. 2017).......................................................................................6

*Multimedia Pub. Co. of S. Carolina, Inc. v. Greenville-Spartanburg Airport Dist.*,
   991 F.2d 154 (4th Cir. 1992).....................................................................................25

*N.A.A.C.P., W. Region v. City of Richmond*,
   743 F.2d 1346 (9th Cir. 1984)...................................................................................33

*Nat'l Ass'n for Adv. of Colored People v. Peterman*,
   479 F. Supp. 3d 231 (M.D.N.C. 2020) ...................................................................9, 30

*Nat'l Endowment for the Arts v. Finley*,
   524 U.S. 569 (1998) ....................................................................................................4

*Nat'l Screen Serv. Corp. v. Poster Exchange, Inc.*,
   305 F.2d 647 (5th Cir. 1962).......................................................................................3

*O'Connell v. Town of Burgaw*,
   262 F. Supp. 3d 316 (E.D.N.C. 2017) ......................................................................9, 26

*Occupy Eugene v. U.S. Gen. Servs. Admin.*,
    43 F. Supp. 3d 1143 (D. Or. 2014) ...................................................................9, 27

*Occupy Fresno v. County of Fresno*,
    835 F. Supp. 2d 849 (E.D. Cal. 2011) .....................................................................10

*Occupy Sacramento v. City of Sacramento*,
    878 F. Supp. 2d 1110 (E.D. Cal. 2012) ...................................................................26

*Pfeifer v. City of W. Allis*,
    91 F. Supp. 2d 1253 (E.D. Wis. 2000) ....................................................................19

*Pinette v. Capitol Sq. Review and Advisory Bd.*,
    844 F. Supp. 1182 (S.D. Ohio 1993), *aff'd*, 515 U.S. 753 (1995) ............................8

*Reed v. Town of Gilbert, Ariz.*,
    575 U.S. 155 (2015) ................................................................................................24

*Roberts v. Haragan*,
    346 F. Supp. 2d 853 (N.D. Tex. 2004) ....................................................................33

*Sammartano v. First Judicial District Court*,
    303 F.3d 959 (9th Cir. 2002) ...................................................................................13

*Sarre v. City of New Orleans*,
    420 F. App'x 371 (5th Cir. 2011) ...............................................................................4

*Satawa v. Macomb County Road Comm'n*,
    689 F.3d 506 (6th Cir. 2012) .....................................................................................8

*Smith v. County of Albemarle, Va.*,
    895 F.2d 953 (4th Cir. 1990) .....................................................................................9

*Sonnier v. Crain*,
    613 F.3d 436 (5th Cir. 2010) ...................................................................................33

*Southeastern Promotions, Ltd. v. Conrad*,
    420 U.S. 546 (1975) ...................................................................................................4

*Star Fin. Servs., Inc. v. Cardtronics USA, Inc.*,
    882 F.3d 176 (5th Cir. 2018) .................................................................................2, 3

*Stokes v. City of Madison*,
    930 F.2d 1163 (7th Cir. 1991) ...................................................................................5

*Sullivan v. City of Augusta*,
    511 F.3d 16 (1st Cir. 2007) ...............................................................................34, 35

*Thayer v. City of Worcester*,
    144 F. Supp. 3d 218 (D. Mass. 2015) ......................................................................27

*United States v. Barnes*,
    481 F. Supp. 3d 15 (D.D.C. 2020) ...........................................................................14

*United States v. Frandsen*,
    212 F.3d 1231 (11th Cir. 2000) ...............................................................................29

*United States v. Gilbert,*
    130 F.3d 1458 (11th Cir. 1997) ("*Gilbert III*") ................................................. 13, 14

*United States v. Gilbert,*
    920 F.2d 878 (11th Cir. 1991) ............................................................................ 14

*United States v. Grace,*
    461 U.S. 171 (1983) ............................................................................................ 13

*United States v. Nat'l Treasury Emps.' Union,*
    513 U.S. 454 (1995) ............................................................................................ 25

*United States v. Salerno,*
    481 U.S. 739 (1987) ............................................................................................ 29

*Venice Justice Comm. v. City of Los Angeles,*
    205 F. Supp. 3d 1116 (C.D. Cal. 2016) ............................................................. 27

*Verlo v. City and County of Denver,*
    741 Fed. Appx. 534 (10th Cir. 2018) ................................................................. 12

*Verlo v. Martinez,*
    820 F.3d 1113 (10th Cir. 2016) .................................................................... 12, 13

*Walker v. Texas Div., Sons of Confederate Veterans, Inc.,*
    576 U.S. 200 (2015) ............................................................................................ 20

*Warren v. Fairfax County,*
    196 F.3d 186 (4th Cir. 1999) ................................................................................ 8

*Watters v. Otter,*
    955 F. Supp. 2d 1178 (D. Idaho 2013) ............................................................... 10

*Wisconsin Action Coalition v. City of Kenosha,*
    767 F.2d 1248 (7th Cir. 1985) ............................................................................ 27

*World Wide St. Preachers' Fellowship v. City of Grand Rapids,*
    2007 WL 1462130 (W.D. Mich. May 16, 2007) ................................................ 34

*Young v. Am. Mini Theatres, Inc.,*
    427 U.S. 50 (1976) ................................................................................................ 4

**Rules**

Fed. R. Civ. P. 56(a) ................................................................................................. 2

vi

Plaintiff John Rash respectfully submits this memorandum in opposition to the motion for summary judgment filed by Defendant Lafayette County, Mississippi.

## INTRODUCTION

Through this action, Plaintiff challenges a set of restrictions imposed by the County on use of the grounds of the historic Lafayette County courthouse (the "Courthouse Grounds"), which have historically been used for demonstrations, rallies, and community gatherings. Under the restrictions now in place, a curfew is now in effect on the Courthouse Grounds as of thirty minutes before dusk every day (the "Closure Order"). In addition, "use" of the Courthouse Grounds by even a single person during daylight hours now requires a permit, which must be applied for in writing two weeks in advance. As part of the application process, the applicant must agree to broadly release and indemnify the County and to pay the costs of "Sheriff Protection," if assessed. Each of these restrictions is unconstitutional on its own; combined, they work together to substantially burden Plaintiff's exercise of his First Amendment rights on the Courthouse Grounds.

The County's motion for summary judgment should be denied. First, Plaintiff clearly has standing to sue. He has applied for a permit to use the Courthouse Grounds and been denied. He has participated multiple times in First Amendment-protected conduct on the Courthouse Grounds that are now restricted by the County's policies, and intends to do so again in the future. The challenged policies plainly apply to Plaintiff and obstruct his exercise of First Amendment rights.

Second, the County's contention that the Courthouse Grounds are a nonpublic forum primarily restricted to government use is contrary to the factual record and the law. The Courthouse Grounds, located at the center of the Oxford town square, have for generations played a key role in the city's and County's political, social, and cultural life. Public space in a town square is a paradigmatic example of a traditional public forum in which First Amendment rights enjoy the highest level of protection. Summary judgment should be granted *for Plaintiff* on this

1

issue; at a bare minimum, the County has not established that all the evidence points in its favor.

Third, the Closure Order is not a reasonable time, place, and manner restriction. A traditional public forum cannot be closed to all First Amendment-protected activity thirty minutes before dusk each day, simply based on generalized public safety concerns. The evidence submitted by the County shows, at best, that the Oxford town square is a hub of nightlife activity on certain weekend and holiday nights. The County's solution of imposing a total curfew that purports to preclude any use of the Courthouse Grounds as of 30 minutes before dusk every night is not narrowly tailored and cannot withstand constitutional scrutiny.

Fourth, the imposition of a permitting requirement for use of the Courthouse Grounds by a single person, or groups of more than four, constitutes an impermissible prior restraint. As a matter of settled law, the public safety and competing use concerns that justify permitting requirements in certain cases clearly do not apply to uses by individuals or small groups. The County's contrary contentions misstate the law and are based on internally contradictory *ipse dixit* assertions, rather than any actual evidence demonstrating a need for these requirements.

Finally, the County's cursory arguments as to Plaintiff's remaining challenges do not seriously engage with the relevant facts or the law. As such, the County fails to carry its initial burden on summary judgment. For all these reasons, the County's motion should be denied.

## <u>ARGUMENT</u>

Summary judgment is proper only "where there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law." *Star Fin. Servs., Inc. v. Cardtronics USA, Inc.*, 882 F.3d 176, 179 (5th Cir. 2018); Fed. R. Civ. P. 56(a). A "genuine issue" of material fact arises if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[A] court must view the evidence in the light most favorable to the nonmovant and draw all reasonable inferences in the

nonmovant's favor." *Star Fin. Servs.*, 882 F.3d at 179.  Summary judgment is also improper where the court merely believes "that it unlikely that the non-moving party will prevail at trial."  *Nat'l Screen Serv. Corp. v. Poster Exchange, Inc.*, 305 F.2d 647, 651 (5th Cir. 1962).

The "party seeking summary judgment always bears the initial responsibility" of identifying the portions of the record which "demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  That initial burden cannot be satisfied by "conclusory statement[s] that the other side has no evidence." *Ashe v. Corley*, 992 F.2d 540, 544 (5th Cir. 1993).

## I.  PLAINTIFF HAS STANDING TO SUE

Plaintiff John Rash is an Oxford-based documentary filmmaker, photographer, visual artist, and educator.  Plaintiff brings this suit to vindicate his First Amendment rights to engage in political and artistic expression on the Courthouse Grounds.  In August 2020, Plaintiff was denied a permit to hold an annual public art event known as PROJECT(ion) on the Courthouse Grounds as a result of newly-enacted County policies.  *See* PX 1 (permit denial).  As Plaintiff's February 2, 2021 Declaration demonstrates, the harm to Plaintiff from the County policies challenged herein is ongoing, and Plaintiff has standing to pursue the claims asserted in this lawsuit: (i) Plaintiff intends to hold the PROJECT(ion) event again in 2021 and indefinitely thereafter (PX 2 at ¶ 2); (ii) Plaintiff intends to apply for permits to hold public events or gatherings on the Courthouse Grounds in the future, and would apply for such permits after dark absent the curfew (*id.* ¶ 4); (iii) Plaintiff has attended and documented political gatherings and other events in Lafayette County, including on the Courthouse Grounds, and intends to do so in the future (*id.* ¶ 5); (iv) the County's restrictions limit Plaintiff's opportunities to engage in First Amendment-protected activity on the Courthouse Grounds by purporting to require him to undergo the permitting process no matter the size of the event (*id.*); and (v) the County's new restrictions chill Plaintiff from otherwise engaging

3

in expressive activities due to the risk that being present on the Courthouse Grounds for political or artistic purposes would violate the challenged policies (*id.* ¶¶ 5–6).

The County raises two challenges to Plaintiff's standing to sue, both of which lack merit. First, the County argues that Plaintiff's standing to challenge the Closure Order is "dubious" because Plaintiff was "merely functioning as a 'curator' of the PROJECT(ion) event," rather than as the "artist or author of the content of the projection whose ideas or expressions were to be put on display." Br. at 17. This is plainly wrong. "It goes without saying that artistic expression lies within First Amendment protection." *Sarre v. City of New Orleans*, 420 F. App'x 371, 374 n.5 (5th Cir. 2011) (*quoting Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 602 (1998)). For each PROJECT(ion) event Rash solicits submissions from artists, handpicks which pieces to include and the backdrop on which to project, and designs the layout and juxtaposition of the chosen pieces.[1] Such curation and presentation of visual art is clearly protected expressive activity, just as a public reading of another author's poems or political works would be.

In any event, persons who promote and distribute the artistic expression of others also enjoy First Amendment protections. *See, e.g., Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501–02 (1952) (corporation engaged in business of distributing motion pictures was entitled to First Amendment protection); *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 552–53 (1975) (theater promoter entitled to First Amendment protection). Indeed, a "central concern of the First Amendment . . . is that there be a free flow from creator to audience of whatever message a film or book might convey," and "[i]n many instances, . . . it is only the theater owner or the bookseller who can protect this interest." *Cinevision Corp. v. City of Burbank*, 745 F.2d 560, 568 (9th Cir. 1984) (quoting *Young v. Am. Mini Theatres, Inc.*, 427 U.S. 50, 77 (1976) (Powell, J., concurring));

---

[1] *See* PX 3 (email discussing Black Lives Matter theme for PROJECT(ion) event); PX 4 (PROJECT(ion) artist proposal online application); PX 5 (email discussing selection of work); PX 6–9 (photos of event).

*see also Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 211 (5th Cir. 2009) (same, quoting *Cinevision*). Thus, even as a "mere[] . . . curator," Plaintiff has standing.[2]

Second, the County contends that Plaintiff lacks standing to challenge any aspect of County policy other than the Closure Order under which his permit application was denied. This also misstates the law. Plaintiff is injured by each of the County's new restrictions because they limit Plaintiff's opportunities to engage in First Amendment protected activity on the Courthouse Grounds. Moreover, Plaintiff does not have to first violate County policy in order to have standing to sue. *See Knowles v. City of Waco*, 462 F.3d 430, 433 (5th Cir. 2006) (invalidating permit requirement in suit brought by plaintiffs who "fear[ed] that they would be cited" under the ordinance). Courts recognize in the First Amendment context that "[c]hilled speech is, unquestionably, an injury supporting standing." *Bell v. Keating*, 697 F.3d 445, 453 (7th Cir. 2012); *see also Center for Indiv. Freedom v. Carmouche*, 449 F.3d 655, 660 (5th Cir. 2006) ("Controlling precedent thus establishes that a chilling of speech because of the mere existence of an allegedly vague or overbroad statute can be sufficient injury to support standing."). Where a claim challenges a permitting scheme, "[t]he class of plaintiffs eligible for standing includes all who are affected by its implementation," in other words, "all who must apply for a permit, since they suffer the vagaries of discretion—benevolent or otherwise." *Stokes v. City of Madison*, 930 F.2d 1163, 1168 (7th Cir. 1991); *see also Lakewood v. Plain Dealer Publishing Co.*, 468 U.S. 750 (1988) (publishing company had standing to challenge on its face a licensing scheme before applying).

Here, Plaintiff has demonstrated that the challenged provisions of the County's permitting policies chill the exercise of his First Amendment rights to organize, participate in, and document

---

[2] The County's assertion that "Rash was uncertain as to the content of the display when inquiry was made prior to the permit decision" (Br. at 17) is irrelevant. *See, e.g.*, *Cinevision*, 745 F.2d at 568 (rejecting similar argument as "anomalous" and unsupported by precedent).

events on the Courthouse Grounds. Plaintiff has engaged in such activity previously, both by holding and seeking to hold the PROJECT(ion) event on the Courthouse Grounds (with an anticipated attendance of up to thirty people) and by participating in and documenting political activity on the Courthouse Grounds. *See* PX 2 (Feb. 2, 2021 Rash Decl.) ¶ 5; *see also* DX G (July 30, 2020 Rash Decl.) ¶ 4 (describing Plaintiff's experience documenting a July 4, 2020 pro-Confederate protest, and being told to "go to your side" by a Sheriff's deputy); *id.* ¶ 13 (describing Plaintiff's experience documenting a July 18, 2020 anti-Confederate protest). Plaintiff has also attested that the challenged policies impair his ability to engage in such conduct in the future. *See* PX 2 (Feb. 2, 2021 Rash Decl.) ¶ 6. This is sufficient. *See, e.g.*, *Center for Individual Freedom*, 449 F.3d at 661 ("[S]elf-censorship constitutes sufficient injury to confer standing to challenge the constitutionality of the [act] on its face."); *Bloedon v. Grube*, 631 F.3d 1218, 1229 (11th Cir. 2011) (standing established where "[plaintiff] has averred that he intends to return and proselytize on the GSU campus, but he has not done so because of his fear of re-arrest").[3]

## II. THE COURTHOUSE GROUNDS ARE A TRADITIONAL PUBLIC FORUM

In a traditional public forum, a time, place, manner restriction can be placed only if it is content neutral, narrowly tailored to achieve a significant government interest, and leaves open ample alternative channels of communication. *See Moore v. Brown*, 868 F.3d 398, 403–04 (5th Cir. 2017). In its ruling denying Plaintiffs' motion for a preliminary injunction ("PI Ruling"), this Court described the characteristics of the Lafayette County Courthouse and its grounds as follows:

> The Lafayette County Courthouse, built in 1872, stands in the center
> of the Oxford town square and is listed on the National Register of
> Historic Places. Its grounds are open to the public and function as a

---

[3] The County contends that "there is nothing in the summary judgment record or pleadings which would evince a 'serious interest' in acting in ways which would implicate these provisions in a concrete, not hypothetical manner." Br. at 17. But the Amended Complaint outlined these continuing harms. *See* Am. Compl. ¶¶ 3, 67. And, while the County chose not to take Mr. Rash's deposition, the declarations submitted by Plaintiff, cited herein, substantiate his standing to bring his claims.

> public park with grass, benches, trees, and pedestrian pathways. The courthouse grounds have long been a site of protests, rallies, and other community activities. Use of the grounds was largely unregulated until 2015 when the County established a permitting process for public gatherings and other uses.

PI Ruling at 2. From this, it naturally follows that the Courthouse Grounds are a traditional public forum. Summary judgment is thus warranted *for Plaintiff* on the forum analysis issue.

The County's motion presents two arguments to the contrary. First, the County argues that courthouse grounds categorically do not constitute traditional public forums, relying on a handful of out-of-circuit cases concerning other differently-situated court facilities. Second, the County asserts that prior to 2015, the Courthouse Grounds were "reserved for government functions" and "restricted to individuals who had court and related business within the Courthouse," and that therefore, the historical character and usage of the Courthouse Grounds is not that of a traditional public forum. Br. at 3. Both lack merit and should be rejected.

### A.    The Courthouse Grounds Are Part Of A Historic Town Square And Serve As A Focal Point For Cultural And Political Expression

The County's contention that "virtually every court which has considered the issue" has concluded that courthouse grounds are not traditional public forums (Br. at 19–20) is wrong for multiple reasons. As an initial matter, a categorical focus on "courthouses" is misguided. The forum analysis does not turn solely on the fact that the Courthouse Grounds are public property surrounding a court facility. Key to the analysis is that the Courthouse Grounds are "located in the center of the City of Oxford Courthouse Square," which "functions as the cultural, economic and social center of the Lafayette County-Oxford community." Br. at 2–3. The Courthouse Grounds are integrated into and form a part of the square, serve as an iconic visual and cultural reference point for Oxford, and have long been utilized for social and political gatherings.[4] Public

---

[4] *See, e.g.*, PX 10 (Carwyle Tr.) at 51:16-54:7; PX 11–12 (Maker's Market); PX 13 (Annual Service for

space within a town square is a paradigmatic example of a traditional public forum. *See, e.g.*, *Forbes v. Arkansas Educ. Television Commc'n Network Found.*, 22 F.3d 1423, 1429 (8th Cir. 1994) ("The first is the traditional public forum, such as the town square . . ."); *Gathright v. City of Portland*, 439 F.3d 573, 575 (9th Cir. 2006) (discussing "the classic right of an individual to speak in the town square").

As a result of its central location in the Oxford town square and its history as a seat of County government—the Courthouse has historically "housed various county government functions," including administrative and executive departments as well as the local judiciary (Br. at 2)—authorities concerning the forum status of public property surrounding seats of government such as statehouse grounds and capitol squares are instructive. Courts regularly find that such spaces constitute traditional public forums. *See, e.g.*, *Edwards v. South Carolina*, 372 U.S. 229, 235 (1963) ("assembl[ing] at the site of the State Government and there peaceably express[ing] . . . grievances 'to the citizens of [the state], along with the [government]" constitutes "an exercise of . . . basic constitutional rights in their most pristine and classic form."); *Satawa v. Macomb County Road Comm'n*, 689 F.3d 506, 519 (6th Cir. 2012) (walkways and grounds "quite close to the seat of government, and . . . covered by sidewalks" are clearly traditional public forums).[5] The

---

Jesus); PX 14 (East Tr.) at 146:14-148:7, PX 15–18 (2019 PROJECT(ion) event); PX 10 (Carwyle Tr.) at 63:20-76:6 (protests, marches, and assemblies during summer 2020); *id.* at 109:13-112:6; PX 19–20 (Love Your Neighbor events); PX 14 (East Tr.) at 123:2-25, PX 21 (July 4th Mississippi Stands 2.0 pro-Confederate events); PX 22 (2019 A. Hervey memorial); PX 23 (McCutchen Tr.) at 125:21-126:19, PX 14 (East Tr.) at 129:2-131:20, PX 24–26 (2020 A. Hervey vigil); PX 23 (McCutchen Tr.) at 32:22-33:21 (nighttime Halloween events); PX 27 (Busby Tr.) at 82:12-83:23 (Veterans Day commemorations); PX 28 (Frye Tr.) at 56:7-57:17; 59:2-60:5, PX 29 (McLarty Tr.) at 34:10-37:23 (Christmas and Easter events); PX 28 (Frye Tr.) at 60:2-61:4 (Fourth of July parade); *id.* at 61:5-23 (puppy walk); *id.* at 61:24-63:23 (Mardi Gras parade); *id.* at 63:24-65:5 (Dr. Martin Luther King, Jr. event); *id.* at 54:11-56:6 (Fringe Festival); PX 29 (McLarty Tr.) at 42:4-46:9; PX 23 (McCutchen Tr.) at 58:20-59:2, PX 28 (Frye Tr.) at 51:7-52:13 (Double Decker Festival); PX 10 (Carwyle Tr.) at 61:11-13; PX 30 (Bluff City Law TV filming).

[5] *See also Warren v. Fairfax County*, 196 F.3d 186 (4th Cir. 1999) ("large grassy mall" in front of government complex was a traditional public forum); *Pinette v. Capitol Sq. Review and Advisory Bd.*, 844 F. Supp. 1182 (S.D. Ohio 1993), *aff'd*, 515 U.S. 753 (1995) (statehouse grounds were traditional public

Courthouse Grounds have a social and cultural resonance that makes them a focus of political and other expressive activity in a manner distinct from government property in general. It is thus no surprise that, as the County notes, "a march from the University campus, which is less than a mile from the Square, along City streets, almost invariably ends at the Oxford Square in the vicinity of the Courthouse," for example. Br. at 5. Individuals and groups seeking to exercise First Amendment rights within the County naturally gravitate towards the Courthouse Grounds because it is the focal point of the County seat and a political and cultural touchstone for the County, not merely—or primarily—because of the Courthouse's judicial function.

Moreover, the County is incorrect that courthouse grounds are as a rule not traditional public forums. To the contrary, their forum status depends on the particular characteristics of the space at issue and its historical usage. Courts considering courthouse grounds similar in design and historical usage to those at issue here have not hesitated to find that they constitute traditional public forums. *See, e.g.*, *Nat'l Ass'n for Adv. of Colored People v. Peterman*, 479 F. Supp. 3d 231, 236 (M.D.N.C. 2020) ("The courthouse steps and grounds and the sidewalks immediately surrounding the courthouse are a traditional public forum."); *O'Connell v. Town of Burgaw*, 262 F. Supp. 3d 316, 320 (E.D.N.C. 2017) ("The Pender County Courthouse Square and its surrounding public streets and sidewalks are traditional public fora.")[6]; *Occupy Eugene v. U.S. Gen. Servs. Admin.*, 43 F. Supp. 3d 1143, 1152 (D. Or. 2014) ("Considering the long history of both protests and other gatherings at the federal plaza . . . the Plaza undoubtedly qualifies as [a

---

forum where they "have been made available for speeches or displays" by a variety of political, religious, and artistic groups); *Smith v. County of Albemarle, Va.*, 895 F.2d 953, 958–59 (4th Cir. 1990) (affirming district court's holding that courthouse lawn was a traditional public forum because it is "the lawn in front of a seat of government," which "is similar to other settings found to be a traditional public forum").

[6] Like the Lafayette County courthouse, the Alamance County and Pender County courthouses at issue in *Peterman* and *O'Connell*, respectively, are both historic courthouses located in town squares featuring Confederate monuments. Images and maps can be found at https://goo.gl/maps/QcHQGekZU5aibPMi6 (Alamance County) https://goo.gl/maps/pBXZfKg2bW7yFRyE7 (Pender County).

traditional public] forum."); *Watters v. Otter*, 955 F. Supp. 2d 1178, 1186 (D. Idaho 2013) (describing "the grounds surrounding the old Ada County Courthouse" as a traditional public forum); *Occupy Fresno v. County of Fresno*, 835 F. Supp. 2d 849, 855–56 (E.D. Cal. 2011) (same).

### B.  The County's Legal Authorities Are Inapposite

The County's primary contrary authority is *Hodge v. Talkin*, 799 F.3d 1145 (D.C. Cir. 2015).  Br. at 19–20.  *Hodge* held that the U.S. Supreme Court plaza—*i.e.*, the "elevated marble terrace running from the sidewalk to the staircase that ascends to the Court's main doors" (Br. at 19), depicted below (photograph from *Hodge*, 799 F.3d at 1151)—was not a public forum.



Careful consideration of *Hodge*, however, only further demonstrates that the one-size-fits-all rule the County seeks to apply is incorrect.  The County claims that *Hodge* rejected public forum status for the Supreme Court plaza despite "its 'park-like' features."  Br. at 19.  Yet the plaintiff in *Hodge* "ma[de] no argument that the Supreme Court plaza is defined as a 'park' for any reason under the law."  799 F.3d at 1161.  The *Hodge* court referenced "parks" only because parks are one key type of traditional public forum.  *See id.*  ("The plaza plainly is not a street or a sidewalk.  Nor is it a park.").  *Hodge* thus turned on an analysis of the specific history and

characteristics of the space at issue. And, the Supreme Court plaza is not at all analogous to the Courthouse Grounds, two views of which are pictured below. (PX 31, 32.)





Unlike the Courthouse Grounds, the U.S. Supreme Court plaza is not at the center of a town square surrounded by bars, restaurants, and stores. The U.S. Supreme Court plaza is not a public, park-like space with grass, trees, pedestrian pathways, and wooden park benches.[7] It has not been the

---

[7] The County states without evidentiary support or explanation that "the function and size of the Courthouse and its grounds do not offer a 'park-like' setting." Br. at 2. This and other unsupported assertions by the County should be disregarded. *See Magnolia Island Plantation, LLC v. Lucky Family, LLC*, 2020 WL

site of festivals, markets, political and religious events, or other community activities, as have the Courthouse Grounds. Nor is it an area that "typically serves as a 'pass-through' for pedestrians walking to the area shops, restaurants and bars." Br. at 25. Rather than lying at the center of a bustling town square, the U.S. Supreme Court plaza is set apart as a "special type of enclave" whose "appearance and design vividly manifest its architectural integration with the Supreme Court building," conceived as "an integrated 'processional route' culminating in the courtroom." *Hodge*, 799 F.3d at 1158–59. As the D.C. Circuit reasoned, persons visiting the Supreme Court plaza would recognize, as a result of its structure and function, that "they are not in a typical town square" but instead in "an integrated forecourt for contemplation of the Court's central purpose, the administration of justice to all who seek it." *Id.* at 1160 (quotations omitted). That reasoning is simply inapplicable to the Courthouse Grounds at issue here.

The other authorities relied on by the County also provide no support. *Verlo v. City and County of Denver*, 741 Fed. Appx. 534, 544 (10th Cir. 2018) ("*Verlo II*") addressed the propriety of a contempt finding; the relevant forum analysis is contained in a prior, published opinion, *Verlo v. Martinez*, 820 F.3d 1113, 1138–41 (10th Cir. 2016) ("*Verlo I*"). The forum at issue in *Verlo* was a walkway and patio immediately outside a Denver, Colorado criminal courts building, in which the plaintiffs sought to leaflet in support of jury nullification.[8] The Tenth Circuit identified specific factors the district court should consider on remand, including "the physical characteristics and the intended and actual use of any sidewalks included in the Restricted Areas" and whether the patio had "traditionally been a space open for expressive activities." *Id.* at 1140–41. In so stating, the court cautioned the Supreme Court had "rejected the idea that a traditional public forum

---

5836558, at *2 (W.D. La. Sept. 30, 2020) (disregarding "conclusory statements" on summary judgment).

[8] Images and maps of the Lindsey-Flanigan courthouse, the facility at issue in *Verlo*, can be found at https://goo.gl/maps/D8kLe3vzfsZk251u6. *See also Verlo I*, 820 F.3d at 1120 (highlighting restricted areas).

could be transformed into a nonpublic forum merely because of its physical proximity to government property." *Id.* at 1139–40, quoting *United States v. Grace*, 461 U.S. 171, 177 (1983); *see also id.* ("the fact that the arced walkway abuts the Courthouse here is not determinative").

*Huminski v. Corsones*, 396 F.3d 53 (2d Cir. 2005), concerned the exclusion of a "long-time critic of the Vermont justice system" from certain Vermont court facilities. In addition to courthouse interiors, the decision analyzed the forum status of adjacent parking lots. *Id.* at 91–92. The Second Circuit concluded that court parking lots were nonpublic forums; they were not "historically associated with the free exercise of expressive activities," as their intended and actual purpose was for parking and "there are various kinds of expressive activities that, if conducted in these lots, might well interfere with courts' attendance to their business." *Id.* Similarly, *Comfort v. MacLaughlin*, 473 F. Supp. 2d 1026, 1028 (C.D. Cal. 2006), concerned regulations governing a Los Angeles County court facility. The court rejected the argument that the existence of a "large grassy area" on the facility grounds established that the grounds were a traditional public forum, finding that it was not an "area[] that traditionally ha[d] been made available for public assembly and debate." *Id.* Nothing suggests the court facility at issue there had any meaningful similarities to the Courthouse Grounds or played a similar historic or cultural role in that community.[9]

*Sammartano v. First Judicial District Court*, 303 F.3d 959 (9th Cir. 2002), is wholly inapposite. All parties conceded that the space at issue—the interior of the Carson City Public Safety Complex—was a nonpublic forum; the case concerned whether the plaintiffs had the First Amendment right to wear clothing bearing motorcycle club symbols inside the building under the standards applicable to such forums. *Id.* at 966. So, too, is *United States v. Gilbert*, 130 F.3d 1458 (11th Cir. 1997) ("*Gilbert III*"). In *Gilbert III*, an area surrounding a federal building in Atlanta,

---

[9] Images and maps of this courthouse can be found at https://goo.gl/maps/kULkmpWSXejrfDrB9.

13

Georgia, had previously been determined to be a designated public forum. *See United States v. Gilbert*, 920 F.2d 878 (11th Cir. 1991). However, as a result of a security incident involving threats against the U.S. Attorney, the Government Services Administration erected a security barrier consisting of a row of planters and issued a policy stating that only the area outside the planters would be considered a public forum. *Gilbert III*, 130 F.3d at 1460 & n.1. The *Gilbert III* court subsequently concluded that the government could lawfully prohibit the defendant from protesting "at the top of the steps of the [building] (within the restricted area)." *Id.* at 1461. Nothing in *Gilbert III* sheds any light on proper forum analysis of the Courthouse Grounds.[10]

### C. The Courthouse Grounds Were Open For Public Use Before 2015

The County asserts that the Courthouse Grounds prior to 2015 were "reserved for government functions" and "restricted to individuals who had court and related business within the Courthouse," and that the only exception was that the County Administrator would "occasionally grant requests for use of the grounds by citizens" for certain community functions. Br. at 3. The County claims that due to "increasing and competing demands for the use of the County's facilities and growing concerns over the safety and damage risks to the historic Courthouse and grounds," the County adopted a Facility Use Policy to govern the use of public areas of County buildings or facilities. *Id.* at 3–4. The County also claims that the Facility Use Policy limited public use "to Monday through Friday between the hours of 8:00 AM and 10:00 PM" and provided that "use on weekends or after 10:00 PM is limited and must primarily be events coordinated and staffed by County employees and/or officials." *Id.* at 4. The County appears to contend that this version of history supports its position that the Courthouse Grounds are not a

---

[10] *United States v. Barnes*, 481 F. Supp. 3d 15 (D.D.C. 2020), also cited by the County (Br. at 20), simply applies *Hodge* as Circuit precedent governing First Amendment activities on the Supreme Court plaza. *See Barnes*, 481 F. Supp. 3d at 22 ("In other words, [plaintiffs] think the Circuit in *Hodge* got it wrong.").

traditional public forum. These contentions, however, lack evidentiary support.

In substance, the County asks the Court to draw inferences in its favor (*e.g.*, that the absence of a policy prior to 2015 implies that the Courthouse Grounds were essentially closed to the public until 2015), even where the opposing inference (*e.g.*, the absence of a policy prior to 2015 implies the absence of restrictions on public use prior to that date) is the sole permissible inference that can be drawn at on the County's motion. *See Anderson*, 477 U.S. at 255 ("[A]ll justifiable inferences are to be drawn in [the non-movant's] favor."). Not only that, this contrary inference is far more credible and supported by the evidence. As noted above, the documentary and testimonial record reflects substantial public use of the Courthouse Grounds. *See supra* note 4. This public use plainly did not begin in 2015. As former Supervisor Kevin Frye explains in his February 22, 2021 Declaration, submitted herewith, "the Courthouse grounds have been open to the public and used as a community space including for social and political gatherings, and other community assemblies . . . unrelated to County business" since well before 2015. PX 33 (Frye Decl.) ¶ 1. Mr. Frye also testified at his deposition that the public had long made use of the area around the Confederate statue, referencing community members' experiences having "[sat] around the base of it . . . in elementary school and "drank beer around it . . . in high school." PX 28 (Frye Tr.) at 128:20-129:6; *see also* PX 29 (McLarty Tr.) at 104:5-12 (discussing a man who "sat in front of the Confederate memorial for years and years, holding a Confederate flag").

Public records and news sources further confirm the public perception that "[t]hroughout the life of Oxford and Lafayette County, the courthouse square has been an anchor of the community."[11] For instance, in a 2013 article, local press recounted J.R. Cofield's recollections of the Courthouse Grounds:

---

[11] PX 45 (Castens, E., "Lafayette County Courthouse Remains Anchor of Community," Daily Journal, Nov. 26, 2012).

> Saturday was always the busiest day of the week. . . . "Some Saturday's the Courthouse lawn was circus like. Spring, summer, and fall, farmers set up rough stalls to sell their produce. . . . The Courthouse lawn also attracted some 'blaring' sermons from traveling evangelist. Through the years many things have change around the town, but the Courthouse lawn is still dead center for Oxford."[12]

Similarly, a 1984 *Washington Post* article titled "William Faulkner's Mississippi" narrated "the life of the town" as seen from the square: "the pickup trucks with rifles in their gun-racks; the country people, white and black, who came into town on Saturdays and stood on the corners of the square, socializing as they waited for their rides home; the old men who sat on benches outside the courthouse."[13] Another article in the local press discusses how "[s]everal generations of Oxonians have great stories from their time hanging out at the statue of the Confederate soldier in Oxford. It's been going on for 100 years among young and old alike."[14] And, Jack Lamar Mayfield's work, *Images of America: Oxford and Ole Miss*, illustrates that "[p]olitical speeches, 'Welcome Rebel' parties, truck farmers, mule traders, and even itinerant preachers were known to use the area next to the courthouse," and that "the east side of the courthouse . . . was used for political rallies and to listen to Ole Miss football games." *See* PX 34 (*Images of America* excerpts).

The only evidence cited by the County as support for its contrary position is the deposition testimony of former County supervisor Jeff Busby and the text of the Policy itself. *See* Br. at 3–5. However, Mr. Busby's testimony nowhere suggests that the Courthouse Grounds were "restricted" to government use prior to 2015. And, while Mr. Busby did testify that the Policy was enacted in 2015 due to increased demands for use of County facilities, this is hearsay—Mr. Busby is relaying statements made by former County Administrator Joseph Johnson, not testifying based

---

[12] PX 46 ("The Square," Hotty Toddy, May 21, 2013).

[13] PX 47 (Boyer, A., "William Faulkner's Mississippi," The Washington Post, June 3, 1984).

[14] PX 48 ("The Original Square Squatters," Hotty Toddy, May 13, 2013).

on personal knowledge.[15] "[H]earsay is not competent summary judgment evidence." *Cooper v. Meritor, Inc.*, 2019 WL 545240, at *2 (N.D. Miss. Feb. 11, 2019).

The County fares no better in relying on the terms of the Facility Use Policy, and the fact of the Policy's 2015 enactment, as evidence that the Courthouse Grounds have been historically "restricted" for government use. Br. at 4–5. The factual record establishes that the terms of the Policy have not been consistently applied, and thus even if inferences in the County's favor were permissible on this motion, any inferences as to the character or historical use of the Courthouse Grounds that could legitimately be drawn by the factfinder from the Policy itself would be extremely weak. For example, the Policy states that "[p]ermission to use the building shall be granted for events which are scheduled to begin and end between 8:00 a.m. and 10:00 p.m. Monday – Friday. Use on weekends or after 10:00 p.m. is limited and must primarily be events coordinated and staffed by County employees and/or officials." DX C (Policy). Yet there is no evidence that this was ever intended to apply to the Courthouse Grounds, as opposed to the use of interior County facilities (such as meeting rooms) also covered by the Policy. Both the Policy's express reference to "the building" and the County's consistent practice of authorizing use of the Courthouse Grounds on weekends (*see* PX 11, 19, 21, 24) establish, at a minimum, disputed issues of fact as to what these provisions mean and how they have been enforced in practice.

In addition, the County concedes that for years, the Oxford Maker's Market, a market for arts and crafts sales, was held on the Courthouse Grounds on the first Saturday of the month both before and after the 2015 enactment of the Policy. Br. at 3. The Maker's Market contravenes the

---

[15] *See* PX 27 (Busby Tr.) at 35:10-13 ("[Our county administrator, I'm assuming . . . said we had a lot more requests to use the building – use the grounds."); *id.* at 36:3-10 ("Q: So the impetus behind adopting this facility use policy in 2015 was county administrator Joseph Johnson? A: Yes, sir. I think he brought it to our attention that we – he felt like that we needed to have a facility use policy because of the requests that he was getting for use of the facilities at that time.").

Policy's restrictions on commercial or for-profit uses, but was nonetheless routinely issued permits for use of the Courthouse Grounds. *See* PX 35 (email from County Administrator Lisa Carwyle stating that "[M]aker['s] [M]arke[t] was allowed use before I ever came, so I just kept letting them, even though it did not comply with the language."); PX 28 (Frye Tr.) at 121:10-125:3 (discussing permitting for Maker's Market). And, to the extent the County suggests that the Policy's ostensible limitation to nonprofit and political uses is relevant (Br. at 4), restrictions on commercial activity are consistent with traditional public forum status. *See, e.g.*, *ISKCON of Potomac, Inc. v. Kennedy*, 61 F.3d 949, 958 (D.C. Cir. 1995) (the government "is at liberty to determine how much commercial activity may be permitted on the [National] Mall" even though "the constitutional rights of speech and peaceful assembly find their fullest expression" there).

Given this meager evidentiary showing as to the historical use of the Courthouse Grounds, the County has failed to even bear its "'initial responsibility of informing the district court' of the absence of a genuine issue of material fact." *Abramson v. Florida Gas Transmission Co.*, 909 F. Supp. 410, 418 (E.D. La. 1995), quoting *Celotex*, 477 U.S. at 323. The County cannot obtain summary judgment by making assertions without citation to competent evidence, or by asking the Court to draw unwarranted inferences in its favor.

### D.  The Courthouse Grounds Are Not A "Limited Public Forum"

The County contends that because a permitting scheme now governs use of the Courthouse Grounds, the County has not opened the Courthouse Grounds for "unlimited" or "indiscriminate" use, and therefore they constitute a "limited public forum" in which the County is afforded greater regulatory license. Br. at 20–21. As set forth above, the undisputed facts show that the Courthouse Grounds are a traditional public forum. However, to the extent an alternative forum analysis applies, it is that of a "designated public forum," not a "limited public forum." Designated public forums are "created by government designation of a place or channel of communication for use by

18

the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects." *Chiu v. Plano Indep. School Dist.*, 260 F.3d 330, 345 (5th Cir. 2001). In a designated public forum, "speech for which the forum is designated is afforded protection identical to the protection provided to speakers in a traditional public forum." *Id.* at 347.

All that is required for a space to constitute a designated public forum is that it must be "open to the public for a range of expressive purposes." *Chicago Acorn v. Metro. Pier & Expo. Auth.*, 150 F.3d 695, 699 (7th Cir. 1998). *See also Pfeifer v. City of W. Allis*, 91 F. Supp. 2d 1253, 1261 n.2 (E.D. Wis. 2000) ("'Indiscriminate' does not mean that all First Amendment activities must be permitted in any designated public forum. The Supreme Court's own decisions would undermine this construction . . ."); *Kreimer v. Bureau of Police for Town of Morristown*, 958 F.2d 1242, 1260 n.18 (3d Cir. 1992) (same). As the Fifth Circuit explained:

> Government property, however, does not automatically cease to be a designated public forum because the government restricts some speech on the property. Otherwise, the restriction of speech on government property would be self-justifying. The restriction would disprove any intent to create a designated public forum, and the failure to create a public forum would justify the restriction of speech.

*Hays Cnty. Guardian v. Supple*, 969 F.2d 111, 117 (5th Cir. 1992). Indeed, courts recognize that the subject matter of speech in a designated public forum "can be limited in accordance with the character of the forum," *Chicago Acorn*, 150 F.3d at 699–700, and "regulation of the time, place, and manner of speech" can be "relatively comprehensive" without changing the status of the forum. *Justice for All v. Faulkner*, 410 F.3d 760, 768 (5th Cir. 2005).

Here, the evidence demonstrates that the Courthouse Grounds have been open to public use for a "range of expressive purposes," and that the County authorized or ratified this use prior

to imposing the additional restrictions in the summer of 2020 that resulted in this action.[16]  Thus,

at a minimum, the County must be held to the standards applicable to designated public forums.[17]

## III.   THE DUSK TO DAWN CLOSURE ORDER DOES NOT WITHSTAND SCRUTINY AS A TIME, PLACE, AND MANNER RESTRICTION

### A.   The Factual Record Does Not Support The County

The County contends that the record establishes that "the after business hours use of the

grounds posed an undue pedestrian and traffic safety risk given the poor lighting conditions, heavy

pedestrian and traffic patterns around the courthouse, and the reduced manpower during the

evening shifts."  Br. at 7.  Yet the deposition testimony cited by the County provides it little if any

support, and there is otherwise no concrete evidence in the record of public safety or traffic safety

incidents related to use of the Courthouse Grounds.  The County failed to produce any such records

in discovery, and the records produced by the City of Oxford do not substantiate the County's

asserted public safety and traffic safety concerns.[18]  The County also failed to identify any specific

public safety or traffic safety incidents in its interrogatory responses.  *See* PX 36 (interrogatory

---

[16] *See, e.g.*, PX 27 (Busby Tr.) at 28:10-13 ("Q. The county courthouse grounds are used for assembly, protest, and other expressive activity, correct?  A. I would say yes."); PX 10 (Carwyle Tr.) at 25:21-26:2 ("Q. Are the courthouse grounds use for assembly, protests, and other expressive activity?  A. They - -  yes. They're used for protests, you know, through the permitting process.").

[17] The County's contention that the Courthouse Grounds constitute a "limited public forum" (Br. at 27) is also belied by the highly distinguishable nature of those spaces that have been found to constitute such forums.  *See, e.g.*, *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200 (2015) (specialty license plate designs); *Freedom From Religion Foundation v. Abbott*, 955 F.3d 417 (5th Cir. 2020) (displays in interior of Texas state capitol building); *Chiu*, 260 F.3d 330 (school mail delivery system); *Fairchild v. Liberty Indep. School Dist.*, 597 F.3d 747, 758–759 (5th Cir. 2010) (school board meeting).

[18] *See* PX 37–38 (Oxford police records); PX 23 (McCutchen Tr.) at 39:24-40:5; 49:2-13; 59:16-60:6 ("Q. Okay. Of these arrests that you list, were any made on the courthouse grounds or on the grounds that constitute the Confederate statue outside the courthouse?  A. No, sir. Q. Okay, Do you know if any of these arrests related to permitted activities?  A. Not to my knowledge. . . .  [Q.] . .. [T]here's a list of safety concerns. . . . I don't see anything specific in this list . . . that relates to the courthouse grounds.  A. No, sir. . . And nothing here that specifically refers to the statue, correct?  A. Correct."); PX 14 (East Tr.) at 184:3-10 ("During the time you've been sheriff, to your knowledge, has your office ever arrested or cited someone for being on courthouse grounds?  A. No, sir, that I can recall. Q. Okay. Whether you were sheriff or not, were you aware of anyone being arrested or cited for being on courthouse grounds?  A. No, sir . . .").

responses). Instead, the evidence shows the level of activity in the Oxford town square, particularly after dark, is a function of the square being a center for local nightlife, and fluctuates in accordance with weekends, holidays, and special events.[19] The town square is heavily policed at such times by the City of Oxford, and there is no evidence that the City is not capable of responding in the event of exigent circumstances on the Courthouse Grounds.[20]

The County does not present any contrary evidence, including any evidence showing that any political speech or other expressive conduct on the Courthouse Grounds poses a public or traffic safety threat. Indeed, the record shows that at the end of June 2020, when Sherriff East was asked to propose revisions to the policy, he did not see a full nighttime ban as necessary for public safety and did not recommend such an uncompromising ban. Instead, he suggested any nighttime restriction be subject to override upon "special request."[21] The Closure Order as adopted does not allow for this or any other exception.

For its position, the County relies on five videos, filed as Exhibit L to the County's motion. The provenance of these videos is unknown, and their evidentiary reliability is supported only by

---

[19] See PX 29 (McLarty Tr.) at 23:9-22 (activity level on the square "depends on what's going on, whether it's a football game weekend or baseball game weekend. I mean, there are a lot of different variables of what that square will look like at any given time."); PX 39 (Gillespie Tr.) at 58:20-59:3 ("Q. And is it fair to say that on certain nights, weekends, say when there's football games or other events, that there is a lot of night-life activity in the town square? A. That would be fair to say.").

[20] See PX 39 (East Tr.) at 102:4-19 ("Q. Okay. And then while you were chief, am I correct that there was a practice of having mounted officers patrol the square? A. Yes, sir. . . . I don't know the exact number, and it would vary depending on the events that were going on in town, whether there was an Ole Miss basketball game, football game, double-decker, those type things. It would all vary."); PX 23 (McCutchen Tr.) at 39:9-12; 56:19-57:20 ("Generally speaking, we probably have four to six [officers on patrol] on average" and "as many as 25 additional officers assigned to the downtown shift" for events around the square. "Q. Okay. And then from 2:00 a.m. to 4:00 p.m., not patrolled, or something lesser? A. It is generally patrolled by the patrol division. So they will make routine drives through or respond to calls of service."); PX 28 (Frye Tr.) at 70:4-8 ("So on particularly crowded nights, there are at least four officers on horseback. There's a dedicated square detail with officers who are on foot on the square.").

[21] See PX 44 (providing for nighttime restrictions "unless special request to and approved by [Board of Supervisors]); PX 14 (East Tr.) at 102:14-15 ("It should be something special is what I was meaning.").

Sheriff East's statement, in his February 2, 2021 declaration, that "the video" attached as Exhibit L "accurately shows a typical night time scene during a Thursday through Saturday evening around and within the Square and shows the typical flow of pedestrians and vehicular traffic." DX K (East Decl.) ¶ 3. These videos—which were produced at the close of discovery and well after Sheriff East's deposition—wholly fail to support the County's position.

Four of the five videos are 15-second surveillance videos taken between September 2012 and September 2016. Neither Defendant's motion papers nor Sheriff East's declaration explains how these videos were selected, or why the only purportedly representative footage of the Square available to the County is footage nearly five to ten years old, none of which shows the Courthouse Grounds. The first video is color footage from 10:09 p.m. on Friday, September 16, 2016 showing traffic moving through the Square and moderate pedestrian traffic off the Square. The second, third, and fourth videos are black and white videos that appear to show heavy pedestrian nightlife activity near the Square, dated, respectively, Saturday, May 16, 2016 at 11:51 p.m.; Monday, August 26, 2013 at 11:43 p.m.; and Sunday, September 16, 2012 at 12:54 a.m. *See* DX L.

To the extent these videos are at all relevant, they create rather than resolve factual disputes. The County presents no basis for the Court to conclude that these videos are actually representative of any conditions common to the Square, as opposed to having been selected by the County because they depict higher than usual levels of nightlife activity. The dates of these videos cluster around the beginning (late August to mid-September) and end (May) of the academic year. None of the videos postdates September 2016, nearly four and a half years ago. Moreover, the videos are time stamped hours after dusk; nothing in the record suggests that the same conditions obtain starting as of thirty minutes before dusk, and common sense dictates this is not the case.

**B.** **Disputed Issues Of Material Fact Exist As To The County's Motivation For Imposing The Closure Order**

The County claims that "the discussions which lead to the [Closure Order]" occurred "months prior" to July 2020. Br. at 24. But even assuming that discussions regarding the Closure Order began in Spring 2020 (*see* Br. at 6–7), the record also demonstrates that the Closure Order was actually *enacted* in July 2020 in response to increased Summer 2020 protest activity after the killing of George Floyd, including protest activity focused on the Confederate monument on the Courthouse Grounds. County officials repeatedly testified that changes to the permitting policy were responsive to such protests.[22] And, former Supervisor Frye testified as to his belief that the curfew policy was enacted to "limit criticism" from community members unhappy with the County's decision not to relocate the Confederate statue. PX 28 (Frye Tr.) at 126:8-128:4. Without impermissibly drawing inferences in the County's favor, the Court cannot disregard this testimony. This is particularly true given that these policy changes were enacted during a period when, on the one hand, the University of Mississippi was not in session and nightlife activity was generally diminished as a result of the COVID-19 pandemic,[23] but on the other, protest activity and public debate over the Confederate monument—which County officials privately communicated was "taking a toll on all of us"—was at its zenith.[24] This contrary evidence of the

---

[22] *See* PX 14 (East Tr.) at 60:19-64:5 ("Q. So it was after Mr. Floyd's death that you started to review this policy? A. it was right in that time frame, yes, sir."); PX 39 (Gillespie Tr.) at 22:16-24 ("Q. So was it put in place in response to protests around the courthouse or around the Confederate statute? A. This policy was put in place for increased activity around the courthouse. Q. And that increased activity was related to protests -- protest activity that increased after the killing of George Floyd; is that correct? A. Yes."); PX 29 (McLarty Tr.) at 64:9-67:11 ("Q. Was George Floyd's death one of the reasons -- A. Yes sir.").

[23] *See* PX 29 (McLarty Tr.) at 23:9-24:11 ("You have a Double Decker festival when there's not a COVID issue that brings in a lot of people."); PX 23 (McCutchen Tr.) at 49:14-51:23 (A. Mostly COVID restrictions, the attendance and the ability to bring people in, our ball game attendances, things - - things like that. Q. Okay. So less social activity, less arrests, effectively? A. Potentially, yes, sir."); PX 28 (Frye Tr.) at 15:19-16:18 ("[T]here's always a line. Maybe not during COVID."); *id.* at 42:14-43:8 ("[L]ater at night they become a music venue, at least when it's not COVID time.").

[24] PX 40; *see also* PX 41 (Rikard Tr.) at 51:4-55:2 ("Q. When you say … this was taking a toll, what

23

County's motivation is in and of itself sufficient to preclude summary judgment as to whether the Closure Order actually furthers a significant government interest. *See, e.g.*, *Clark v. City of Lakewood*, 259 F.3d 996, 1016 (9th Cir. 2001), *as amended* (Aug. 15, 2001) (reversing grant of summary judgment where "there is a genuine issue of material fact in dispute as to whether the Ordinance furthers a significant government interest").

The County also vaguely asserts, as support for the Closure Order, that "individuals desiring to demonstrate in front of the confederate statue demonstrated a real and ongoing pedestrian and traffic safety issue which posed a strain on the Sheriff's Department during the daylight hours." Br. at 25. Yet the only evidence of protest activity submitted by the County is approximately one minute of footage of a small demonstration around 6:00 p.m. on August 21, 2020. It shows approximately seven demonstrators holding signs in the area near the Confederate monument and subsequently dispersing of their own accord. Nothing in this video suggests that this protest posed "pedestrian and traffic safety" concerns. At a minimum, disputed factual issues remain as to whether and to what extent such concerns in fact precipitated the enactment of the Closure Order, or whether the County was in fact motivated by the desire to restrict the ability to protest and to express political views related to the Confederate monument. *See, e.g.*, *Reed v. Town of Gilbert, Ariz.*, 575 U.S. 155, 164 (2015) (laws adopted "because of disagreement with the message the speech conveys" are "considered content-based" even where "facially neutral).

C.      **The County Lacks Legal Support For The Closure Order**

The case law cited by the County also fails to demonstrate that the Closure Order is constitutional. While it is true that public safety is "a compelling interest at the heart of

---

specifically are you referring to …? A. … It was the protests and all of the stress that it's not only putting on ourselves, but our families."); PX 39 (Gillespie Tr.) at 62:23-63:10 ("taking a toll" referred to "all the overwhelming activity around – concerning the statue and all the things happening.").

government's function," *Houston Chronicle Publishing Co. v. City of League City Tex.*, 488 F.3d 613, 622 (5th Cir. 2007), it is also true that "when the Government defends a regulation on speech as a means to redress past harms or prevent anticipated harms, it must do more than simply 'posit the existence of the disease sought to be cured.'" *United States v. Nat'l Treasury Emps.' Union*, 513 U.S. 454, 475 (1995). Instead, the government "must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Id.*; *see also Consol. Edison Co. of New York v. Public Service Comm'n of New York*, 447 U.S. 530, 543 (1980) ("Mere speculation of harm does not constitute a compelling state interest."). Thus, simply invoking public safety and traffic safety concerns does not provide *carte blanche* to impose any and all restrictions on First Amendment expression. *See Multimedia Pub. Co. of S. Carolina, Inc. v. Greenville-Spartanburg Airport Dist.*, 991 F.2d 154, 160–61 (4th Cir. 1992) (while a government is "entitled to advance its interests by arguments based on appeals to common sense and logic . . . the interest's assertion, without more, isn't sufficient to carry the day and permit the restriction of protected expression.").

Here, appeals to "common sense and logic" do not vindicate the County. Essentially, the County seeks to prohibit First Amendment expressive activities on the Courthouse Grounds based on public safety concerns that arise from the contention that "the area is frequented by students enrolled at the University of Mississippi who are drawn by the bars and restaurants located in and around the town Square." Br. at 25. Yet the County's response to this alleged public safety issue is arbitrary and overbroad. The County's concerns could potentially justify restrictions on permits for large gatherings on certain weekend and holiday evenings, but those same concerns would not also justify complete closure of the Courthouse Grounds thirty minutes before dusk on a summer evening when the University is not in session, or as early as 4:30 p.m. on a winter weekday. The

evidence shows that the City of Oxford is equipped to, and does, address the public and traffic safety problems associated with University nightlife in and around the Square, and that nightlife on the Square does not conflict with First Amendment activity on the Courthouse Grounds. The County's appeals to public and traffic safety thus fail to establish that the restrictions the County has imposed further a significant and legitimate government interest.

The County also fails to show, as it must in order to prevail, that the Closure Order is narrowly tailored further its asserted interests. *See, e.g.*, *O'Connell*, 262 F. Supp. 3d 316 (enjoining ordinance because it was "not narrowly tailored to further" the asserted governmental interests of traffic safety and public safety). Indeed, the County barely addresses narrow tailoring, instead conflating this requirement with the distinct requirement that a proper, narrowly-tailored time, place, and manner restriction *also* leave ample alternative means of expression. *See* Br. at 25–26 (arguing that the Closure Order is narrowly tailored because "the plaintiff had, and has, ample alternatives to the proposed use."). A restriction on the exercise of First Amendment rights, however, must separately satisfy both criteria. *See, e.g.*, *McCullen v. Coakley*, 573 U.S. 464, 496 n.9 (2014) (where a challenged law "is not narrowly tailored," the Court need "not consider whether the Act leaves open ample alternative channels of communication.").

Nor does the County's citation to cases upholding overnight park closures provide it any support for its position. *Occupy Sacramento v. City of Sacramento*, 878 F. Supp. 2d 1110, 1119 (E.D. Cal. 2012), upheld an ordinance that closed a park from 11:00 p.m. to 5:00 a.m., and *Beasley v. City of Atlanta*, 2012 WL 13012623, at *14 (N.D. Ga. Aug. 30, 2012), upheld a similar ordinance that applied from 11:00 p.m. to 6:00 a.m. The limited nature of the overnight closure was central to both decisions. *See id.* at *14 ("the Park Closure Law . . . only applies for seven hours, 11:00 a.m. to 6:00 p.m., leaving seventeen hours per day for Plaintiffs to engage in expressive activity);

*Occupy Sacramento*, 878 F. Supp. 2d at 1119 ("[T]he ordinance is . . . limited to five or six hours a day").[25] Here, by contrast, rather than closing the Courthouse Grounds during a limited period of time overnight, the Closure Order applies to a far more expansive period of time, as sunset in Oxford occurs between 4:47 p.m. (in December) and 8:14 p.m. (in June).[26] Courts faced with similarly expansive curfews and closure ordinances have found them not narrowly tailored. *See, e.g.*, *Occupy Eugene v. U.S. Gen. Servs. Admin.*, 43 F. Supp. 3d 1143, 1150–51 (D. Or. 2014) (8 a.m. to 5 p.m. restriction was "greater than necessary to further the interest of public safety").[27] Indeed, the County effectively concedes that the restriction is not narrowly tailored by asserting that what it aims to prevent is "*organized use* of the Courthouse grounds during the *late evening hours*." Br. at 25. As enacted, it sweeps far more broadly than that.

Finally, the County's legal analysis effectively disregards the narrow tailoring requirement and instead seeks to justify the restrictions at issue solely on the asserted basis that "ample

---

[25] While *Dowd v. City of Los Angeles*, 2013 WL 4039043 (C.D. Cal. Aug. 7, 2013), cited by the County (Br. at 23), ruled for the defendant when construing a similar sunset provision, *Dowd* is of limited value to the County as it turned on the *Dowd* plaintiffs' failure to present evidence, rather than on a substantive determination as to the provision's constitutionality. For this reason, when faced with the same claim in a later case, the judge who had presided over *Dowd* ruled that "*Dowd* does not control the outcome of this case." *Venice Justice Comm. v. City of Los Angeles*, 205 F. Supp. 3d 1116, 1123 (C.D. Cal. 2016).

[26] County officials presented divergent understandings of "dusk" in their testimony, stating that (i) dusk was the same as sunset (PX 14 (East Tr.) at 171:12-14 ("Q. Okay. So you're then interpreting dusk to be effectively sunset? A. Yes, sir.")); (ii) 30 minutes before sunset (PX 23 (McCutchen Tr.) at 105:13-14 ("Q. When is dusk? A. 30 minutes before sunset.")); (iii) complete darkness (PX 42 (Roberts Tr.) at 117:6-7 ("My interpretation, dusk is complete darkness.")); and (iv) variable daily (PX 41 (Rikard Tr. 24:22; 25:7-8 ("I don't know that dusk has an official time … it depends based on the weather or clouds or sunshine."))). The County misconstrues this as a distinct "vagueness" problem. Br. at 29. Instead, it is part of the County's failure to narrowly tailor the Closure Order. *See, e.g.*, Am. Compl. ¶ 52; *cf. Venice Justice Comm.*, 205 F. Supp. 3d at 1124 n.2 (taking "judicial notice of the fact that the sun sets in the Venice Beach area as early as 4:44 PM in December and as late as 8:09 PM in June, raising a question about why the city has elected a variable rather than fixed time . . .").

[27] *See also Ass'n of Community Orgs. for Reform Now v. City of Frontenac*, 714 F. 2d 813 (8th Cir. 1983) (striking down ordinance prohibiting door-to-door canvasing after 6 p.m.); *Wisconsin Action Coalition v. City of Kenosha*, 767 F.2d 1248 (7th Cir. 1985) (same); *Thayer v. City of Worcester*, 144 F. Supp. 3d 218, 235 (D. Mass. 2015) (striking down blanket prohibition on panhandling beginning at "one-half hour before sunset" because "the City has not cited to any evidence or provided any meaningful argument to establish that a blanket prohibition on panhandling at night is necessary to advance public safety.").

alternative means of expression" remain available.  Br. at 25–26.  "Ample alternative means," however, is a distinct legal requirement; it is not an alternative to the narrow tailoring requirement. *See McCullen*, 573 U.S. at 496 n.9 (where a policy "is not narrowly tailored," the Court need "not consider whether the Act leaves open ample alternative channels of communication.").

## IV.  THE ONE- OR FIVE-PERSON PERMITTING REQUIREMENT DOES NOT WITHSTAND CONSTITUTIONAL SCRUTINY

On June 15, 2020, the County enacted a policy providing that "five (5) or more people gathering require a permit for use" of the "Historic Courthouse outside grounds, including the area around the Confederate Statue."  DX M.  The County's January 4, 2021 revised policy now provides that "[p]ermits are required for all uses" of the Courthouse Grounds—defined as "the outside areas contiguous to the Circuit Courthouse and the area encompassing the confederate memorial"—subject to the exception that "no permit is required for use of the area immediately surrounding the confederate memorial for groups of four or less."  DX X.

The County is not entitled to summary judgment as to the constitutionality of this permitting requirement.  As set forth in Plaintiff's motion for partial summary judgment, requiring a permit for either one or more than four persons to engage in First Amendment-protected activity on the Courthouse Grounds constitutes an impermissible prior restraint such that summary judgment should be granted in Plaintiff's favor.  To the extent the County contends this permitting policy is somehow necessary as a pedestrian traffic control measure, the record contains no evidence substantiating this position.  At a bare minimum, disputed factual issues as to this asserted justification preclude summary judgment in the County's favor.

The County is also incorrect in asserting that to prevail on this challenge, Plaintiff must show that "no set of circumstances exists under which the challenged law would be valid."  Br. at 28.  While "[i]n general, to mount a successful facial attack, 'the challenger must establish that no

set of circumstances exists under which the Act would be valid,'" this "requirement is different in the First Amendment context." *Center for Individual Freedom*, 449 F.3d at 662, quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987). "With regard to facial First Amendment challenges, the challenger need only show that a statute or regulation 'might operate unconstitutionally under some conceivable set of circumstances.'" *Id.*, quoting *Salerno*, 481 U.S. at 745; *see also United States v. Frandsen*, 212 F.3d 1231, 1236 (11th Cir. 2000) ("[T]he Supreme Court and this Court consistently have permitted facial challenges to prior restraints on speech without requiring the plaintiff to show that there are no conceivable set of facts where the application of the particular government regulation might or would be constitutional.").

A.   **The One- Or Five-Person Rule Constitutes An Impermissible Prior Restraint**

An "ordinance requiring a permit and a fee before authorizing public speaking, parades, or assemblies … is a prior restraint on speech." *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 130 (1992). "[T]here is a 'heavy presumption' against the validity of a prior restraint." *Id.* Contrary to the County's *ipse dixit* assertion that "permit requirements are per se constitutional as reasonable and necessary for the sound management of public property" (Br. at 31), the Fifth Circuit has expressly recognized that "ordinances requiring a permit for demonstrations by a handful of people are not narrowly tailored to serve a significant government interest." *Knowles v. City of Waco, Tex.*, 462 F.3d 430, 436 (5th Cir. 2006).

In *Knowles*, the Fifth Circuit struck down an ordinance requiring a permit for gatherings of two people, and the court cited with approval cases from other circuits striking down ordinances requiring permits for gatherings of ten or six people.[28]  Like the permit requirement at issue in

---

[28] *See Douglas v. Brownell*, 88 F.3d 1511, 1524 (8th Cir. 1996) (noting concern about "application of the permit requirement to groups of ten or more persons"); *Grossman v. City of Portland*, 33 F.3d 1200, 1202–07 (9th Cir. 1994) (expressing disbelief that "six to eight people carrying signs in a public park constituted enough of a threat to the safety and convenience of park users . . . to justify the restrictions imposed on their

*Knowles*, the County's imposition of a permit requirement for gatherings of one person, or of more than four people, on the Courthouse Grounds cannot survive constitutional scrutiny. *Cox v. City of Charleston*, for instance, struck down a permitting ordinance that "applie[d] to gatherings of only a few people." 416 F.3d 281, 285 (4th Cir. 2005). The city argued this was justified because "[s]afety issues remain whether the parade or protest is large or small" and "'[s]mall towns with limited resources' need advance warning of even small protests to adequately police the events." *Id.* The court found that the city "fail[ed] to explain how a small demonstration that may become inflammatory would tax its police force any differently than, for example, a street fight between two individuals, so as to justify requiring advance warning of all small demonstrations." *Id.* To the extent the policy "succeeds in mitigating" safety risks, "it does so at too high a cost." *Id.*

The Middle District of North Carolina's recent decision in *Peterman* is also instructive. There, the defendants contended "that the need to prevent damage to the courthouse and to protect the public" justified restricting expressive activity on the Alamance County courthouse grounds. *Peterman*, 479 F. Supp. 3d at 239. The Court found, however, that "there [wa]s no evidence of any obstruction of the sidewalks or access to the courthouse," or any "evidence that protests have ever disrupted the ordinary functions at the courthouse." *Id.* The same is true here. There is no evidence that gatherings of small groups materially impede pedestrian or traffic safety or courthouse access. Indeed, the County's Exhibit L shows a group of approximately seven protesting without posing any such risks. As in *Peterman*, the County fails to "show that the proffered harms are 'real, not merely conjectural,' and that the policy 'alleviate[s] these harms in a direct and material way.'" *Id.*; *see also McCullen*, 573 U.S. at 486, 492 (public and traffic safety

---

speech here"); *Community for Creative Non-Violence v. Turner*, 893 F.2d 1387, 1392 (D.C. Cir. 1990) (permit requirement applicable to "two or more individuals speaking or otherwise proselytizing in the above-ground area of a Metro station" was not narrowly tailored, even though Washington Metro's asserted interests of protecting the safety and convenience of riders was significant).

risks can "readily be addressed through existing local ordinances" or "generic criminal statutes").

**B.    The One- Or Five-Person Permitting Requirement Is Impermissibly Vague**

The County asserts, without citation or other support, that "a person of ordinary intelligence would understand that the coordinated and planned use of County facilities by 5 or more individuals would fall within the ambit of the policy's permitting requirements," and thus that the policy is not unconstitutionally vague.  Br. at 32.  The evidentiary record demonstrates otherwise.

The Courthouse Grounds is an open, public space in the middle of a town square that has been historically used by the public for a variety of reasons and purposes.  *See* Section II, *supra*. County officials testified that social or recreational uses of the Courthouse Grounds, such as sitting and talking on the park benches, would *not* be prohibited under the policy.[29]  Rather, only political speech, or certain types of political speech, would trigger its permitting requirement, as determined by the Sheriff's Department on an ad hoc basis.[30]

The County's explanation of the policy is incoherent.  The County asserts that "coordinated and planned use" of the Courthouse Grounds by "5 or more individuals" requires a permit.  Yet, the policy does not define "use," and nothing within the policy limits its application to uses that are "coordinated and planned."   And, the policy now appears to apply to even a single person "using" the Courthouse Grounds, but the County does not attempt to explain when one person's "use" could trigger the permit requirement.  *See, e.g.*, *Garza v. Starr County*, 309 F. Supp. 3d 454, 460 (S.D. Tex. 2018) (enjoining policy that did not define "use" and thus raised the concern that

---

[29] *See* PX 39 (Gillespie Tr.) at 76:13-77:23 ("Q.  But not for just a social gathering of five people?  A.  As to my knowledge, I would say that is not how it's applied.");  PX 43 (Larson Tr.) at 31:18-34:6 ("Q. So . . . five people can come onto the courthouse grounds and have a political conversation but that five people can't come onto the courthouse grounds to engage in political expression. . . . A. [I]f they're just having a conversation and they come and leave, they would not need a permit.").

[30] *See* PX 39 (Gillespie Tr.) at 76:13-77:23 ("Q. So who would make that determination?  Would it be the Sheriff?  A. Yes.");  PX 43 (Larson Tr.) at 31:18-34:6 ("Q. So the sheriff's department would decide?  A. Yes.  They would decide -- they would enforce the facility use permit.").

any "use," "even passive political speech," was "prohibited absent application for a permit").

The County Administrator's February 2, 2021 declaration further asserts that "individuals and groups used the Courthouse perimeter sidewalks and the area immediately in front of the confederate monument on an almost daily basis from early June to October, 2020," and "[t]hese uses, in the form of protests and demonstrations, did not, and do not, require a permit." DX O (Carwyle Decl.) ¶ 4. Yet the County at the same time takes the position that *any* "protests" on the Courthouse Grounds "do not comport with the policy," because the policy allows "discussion only." Br. at 22. And, the only evidence submitted by the County that is arguably relevant is the Exhibit L video showing a group demonstrating around the Confederate monument. The County produced no evidence that a permit was requested or obtained for this event; the policy as written would require one, but the County Administrator's declaration suggests otherwise.

The policy thus is unconstitutionally vague insofar as it (i) does not define the sort of "coordinated and planned" uses that trigger its permitting requirement, much less how that applies to use by a single person (such as Plaintiff's presence at political events on the Courthouse Grounds as a documentarian); (ii) contains no standards to guide County officials' determinations as to whether a particular use of the Courthouse Grounds is subject to the policy and thus unlawful absent a permit; and (iii) is subject to conflicting interpretations, including as to the necessity of permits for certain protests, whether the County contends that all protests are prohibited, and what distinguishes a use of the Courthouse Grounds that constitutes a "political discussion" from one that constitutes a "protest." The policy thus plainly fails to provide the sort of precise and objective criteria that would allow it to withstand constitutional scrutiny. *See, e.g.*, *J&B Entertainment v. City of Jackson, Miss.*, 2006 WL 1118130, at *9 (S.D. Miss. April 7, 2006) ("A scheme establishing a prior restraint, such as a licensing requirement, on protected speech which places

unbridled discretion in the decision maker by failing to impose either objective standards for a decision or adequate procedural safeguards creates an impermissible risk of suppression of that protected right with every application.").

## V. THE COUNTY'S REMAINING ARGUMENTS FAIL

**The 14-Day Advance Notice Requirement:** Courts regularly hold lengthy advance notice requirements unconstitutional, and conclude that generic justifications such as the "availability of law enforcement personnel" (Br. at 31) are insufficient. *See, e.g.*, *N.A.A.C.P., W. Region v. City of Richmond*, 743 F.2d 1346, 1357 (9th Cir. 1984) ("There is also no basis in logic for cities to demand notice far in advance of parades. Policemen and newsmen are frequently deployed on less than two days notice. . . . The only advance notice requirements to be upheld by courts have been dramatically shorter than 20 days.").[31] The County does not present any evidence of why this lengthy period is necessary, and the evidence in the record suggests it is not.[32]

While *Sonnier v. Crain* (Br. at 30) upheld an advance notice provision, that requirement was only seven days long. 613 F.3d 436, 441–42 (5th Cir. 2010), *on reh'g*, 634 F.3d 778 (2011). The court also "acknowledge[d]" that it was "longer than notice requirements considered by other circuits" and thus at the outer bounds of reasonableness, and ultimately found it justified in part based on special concerns applicable to universities. *Id.* at 445–46. Similarly, *Keister v. Bell* (Br. at 31), upheld a ten-day notice requirement in a limited public forum context. 461 F. Supp. 3d

---

[31] *See also McGlone v. Bell*, 681 F.3d 718, 734 (6th Cir. 2012) (invalidating "fourteen business day notice period" as "much longer than other notice periods that have been upheld."); *Douglas v. Brownell*, 88 F.3d 1511, 1523–24 (8th Cir. 1996) (invalidating a five-day advance notice requirement for processions of ten or more persons on streets, sidewalks, and public ways); *Grossman v. City of Portland*, 33 F.3d 1200, 1204–07 (9th Cir. 1994) (invalidating a seven-day advance notice requirement to demonstrate in a public park); *Roberts v. Haragan*, 346 F. Supp. 2d 853, 868–69 (N.D. Tex. 2004) (invalidating a two-day advance notice requirement for students to speak in designated campus areas).

[32] *See* PX 14 (East Tr.) at 78:5-16 (explaining that permit applications can usually be processed "within a couple of days").

1152, 1175 (N.D. Ala. 2020). Importantly, however, that ten-day notice period was viewed as an outer limit even in that context—the Eleventh Circuit had expressed "concerns" regarding its length, and the district court ultimately found it reasonable because in practice it only applied to larger events that required "multiple department approvals." *Keister*, 461 F. Supp. 3d at 1175.[33]

Nor does the County's newly-enacted waiver provision change the outcome. It provides that "the County Administrator *may* shorten or waive" the requirement if the applicant "demonstrate[s] an urgent need" to engage in First Amendment activity "motivated by events or issues suggesting a need for immediate demonstration or expression." Br. at 31 (emphasis added). Because waiver is discretionary, County officials have unfettered discretion. *See, e.g.*, *World Wide St. Preachers' Fellowship v. City of Grand Rapids*, 2007 WL 1462130, at *7 (W.D. Mich. May 16, 2007) (similar provision inadequate where it "merely permits such waiver, thereby leaving the discretion solely with the official."). This does not entitle the County to summary judgment.

**"Sheriff Protection" Fees:** County policy gives the Sheriff the discretion to charge applicants for "law enforcement protection," as determined to be "reasonably necessary" based on "the size, location, duration, time and date of the event." DX X (Policy). The County relies on *Int'l Women's Day March Planning Committee v. City of San Antonio*, but that case involved the assessment of "traffic control and cleanup fees" on parade organizers pursuant to a detailed multi-factor framework that cabined official discretion. 619 F.3d 346, 366 (5th Cir. 2010). *Sullivan v. City of Augusta*, 511 F.3d 16 (1st Cir. 2007), similarly concerned parade traffic control costs.

---

[33] Notably, in *Keister*, the fact that "but for the policy, [the plaintiff] would return to [the forum]" was enough for the court to "easily conclude[] that [plaintiff] has standing to pursue his claims," including as to the advance notice requirement. 461 F. Supp. 3d at 1165. Plaintiff has similarly made use of the Courthouse Grounds for First Amendment protected activity in the past both on a permitted and unpermitted basis, and has presented evidence that he intends to do so in the future. It is also not the case that Plaintiff must show there are no conceivable circumstances in which a 14-day requirement could be reasonable. To pursue a facial First Amendment challenge to County policy, Plaintiff need only show that "a substantial number of its applications are unconstitutional." *Serafine v. Branaman*, 810 F.3d 364 (5th Cir. 2010).

Importantly, the ordinance there at issue expressly excluded "the cost of police protection for public safety," an "item the Supreme Court [has] found to be improper[]." *Id.* at 36, citing *Forsyth County*, 505 U.S. at 134 (controversial speech cannot be burdened due to need for extra law enforcement). Because the policy at issue here gives the Sheriff discretion to assess fees for police protection, the County's authorities do not demonstrate that it is entitled to summary judgment.[34]

**Indemnity And Insurance:**[35] The County requires "[a]ny group using County facilities or grounds" to release and indemnify the County as to any liability, including to third parties, resulting from the actions of "any persons or groups to attend the event"; be liable to the County for damages caused by such persons; and obtain "a minimum of $1,000,000" in insurance for functions "that may involve 50 or more persons." DX X. Such provisions impermissibly shift liability "based on acts and omissions not only of the permittees but also of the [County] and third parties," including "hecklers, counter-protesters, or other persons not part of permittees' organization." *Long Beach Area Peace Network v. City of Long Beach*, 574 F.3d 1011, 1039 (9th Cir. 2009); *see also Courtemanche v. General Services Admin.*, 172 F. Supp. 2d 251, 268 (D. Mass. 2001) ("mandatory insurance provisions [are] unconstitutional prior restraints[.]"). The County is not entitled to summary judgment on these provisions either.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment should be denied.

Dated: February 22, 2021

|  |  |
|---|---|
|  | _____/s/ Joshua Tom_____ |
| SIMPSON THACHER & BARTLETT LLP | AMERICAN CIVIL LIBERTIES UNION OF |
| Jonathan K. Youngwood (*pro hac vice*) | MISSISSIPPI FOUNDATION, INC. |

---

[34] *Int'l Women's Day* found standing to pursue a facial challenge where it was clear that the plaintiff "engages in activity regulated by the ordinance." 619 F.3d at 357 n.13. That reasoning also applies here.

[35] The County also references Plaintiff's challenge to the Policy's amplified sound provisions (Br. at 34), but fails to actually discuss it. This, clearly, does not satisfy the County's initial summary judgment burden.

Isaac Rethy (*pro hac vice*)
425 Lexington Avenue
New York, NY 10017
(212) 455-2000
jyoungwood@stblaw.com
irethy@stblaw.com

C. Jackson Williams, MS Bar No. 7226
P.O. Box 69
Taylor, MS 38673
Phone: (662) 701-9447
cjxn@mac.com

Joshua Tom, MS Bar. No 105392
Landon Thames, MS Bar No. 105127
P.O. Box 2242
Jackson, MS 39225
Phone: (601) 354-3408
jtom@aclu-ms.org
lthames@aclu-ms.org

<u>**CERTIFICATE OF SERVICE**</u>

I, Joshua Tom, hereby certify that on February 22, 2021, I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to all parties on file with the Court.

/s/ Joshua Tom
Joshua Tom