IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI
Oxford Division

JOHN RASH,                                    )
                                              )
            *Plaintiff*,                       )
                                              )   Civil No. 3:20-cv-00224-NBB-RP
      v.                                       )
                                              )
LAFAYETTE COUNTY, MISSISSIPPI,                )
                                              )   **ORAL ARGUMENT REQUESTED**
            *Defendant*.                       )
                                              )
                                              )
_____              )

**<u>REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
PLAINTIFF JOHN RASH'S PARTIAL MOTION FOR SUMMARY JUDGMENT</u>**

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ............................................................................................................... 1

ARGUMENT ..................................................................................................................... 2

I.  THE COURTHOUSE GROUNDS ARE A TRADITIONAL PUBLIC FORUM ............. 2

II.  THE DUSK TO DAWN CLOSURE ORDER DOES NOT WITHSTAND
    SCRUTINY AS A TIME, PLACE, AND MANNER RESTRICTION ........................... 6

III.  THE ONE- OR FIVE-PERSON PERMITTING REQUIREMENT IS INVALID ............ 8

CONCLUSION ................................................................................................................. 10

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bell v. Keating*,
  697 F.3d 445 (7th Cir. 2012) ........................................................................... 9

*Bloedon v. Grube*,
  631 F.3d 1218 (11th Cir. 2011) ....................................................................... 9

*Buehler v. City of Austin/Austin Police Dep't*,
  824 F.3d 548 (5th Cir. 2016) ........................................................................... 4

*Carroll v. President and Com'rs of Princess Anne*,
  393 U.S. 175 (1968) ......................................................................................... 8

*Center for Indiv. Freedom v. Carmouche*,
  449 F.3d 655 (5th Cir. 2006) ........................................................................... 9

*Chicago Acorn v. Metro. Pier & Expo. Auth.*,
  150 F.3d 695 (7th Cir. 1998) ........................................................................... 5

*City of Lakewood v. Plain Dealer Pub. Co.*,
  486 U.S. 750 (1988) ......................................................................................... 8

*Edwards v. South Carolina*,
  372 U.S. 229 (1963) ......................................................................................... 2

*Forbes v. Arkansas Educ. Television Commc'n Network Found.*,
  22 F.3d 1423 (8th Cir. 1994) ........................................................................... 3

*Forsyth County, Georgia v. Nationalist Movement*,
  505 U.S. 123 (1992) ......................................................................................... 8

*Garza v. Starr County*,
  309 F. Supp. 3d 454 (S.D. Tex. 2018) ........................................................... 10

*Gathright v. City of Portland*,
  439 F.3d 573 (9th Cir. 2006) ........................................................................... 3

*Hays Cnty. Guardian v. Supple*,
  969 F.2d 111 (5th Cir. 1992) ........................................................................... 5

*Higher Society of Indiana, Inc. v. Tippecanoe County, Indiana*,
  223 F. Supp. 3d 764 (N.D. Ind. 2016) ............................................................. 8

*Hodge v. Talkin*,
  799 F.3d 1145 (D.C. Cir. 2015) ....................................................................... 3

*ISKCON of Potomac, Inc. v. Kennedy*,
  61 F.3d 949 (D.C. Cir. 1995) ........................................................................... 4

*Knowles v. City of Waco, Tex.*,
  462 F.3d 430 (5th Cir. 2006) ...................................................................... 9, 10

*Lakewood v. Plain Dealer Publishing Co.*,
    468 U.S. 750 (1988) ............................................................................................ 9

*Lopez v. Town of Cave Creek*,
    559 F. Supp. 2d 1030 (D. Ariz. 2008) .......................................................... 7, 8

*Occupy Eugene v. U.S. Gen. Servs. Admin.*,
    43 F. Supp. 3d 1143 (D. Or. 2014) ................................................................. 7

*Pfeifer v. City of W. Allis*,
    91 F. Supp. 2d 1253 (E.D. Wis. 2000) ........................................................... 5

*Satawa v. Macomb County Road Comm'n*,
    689 F.3d 506 (6th Cir. 2012) .......................................................................... 2

*Stokes v. City of Madison*,
    930 F.2d 1163 (7th Cir. 1991) ........................................................................ 9

*United States v. Grace*,
    461 U.S. 171 (1983) .................................................................................... 2, 3

*United States v. Nat'l Treasury Emps.' Union*,
    513 U.S. 454 (1995) ........................................................................................ 6

*Verlo v. Martinez*,
    262 F. Supp. 3d 1113 (D. Colo. 2017) ........................................................... 3

Plaintiff John Rash respectfully submits this reply memorandum in further support of his motion for partial summary judgment.

## **INTRODUCTION**

The County fails to demonstrate the existence of any disputed issue of material fact that must be resolved at trial. Instead, the County's arguments only further confirm that summary judgment should be granted on the issues on which Plaintiff moved: the Lafayette County Circuit Courthouse grounds ("Courthouse Grounds") are a traditional public forum, and the County's ordinances closing the Courthouse Grounds as of thirty minutes before dusk each day (the "Closure Order") and requiring a permit for every "use" of the Courthouse Grounds, even where that "use" involves only a single individual, are unconstitutional.

As discussed further below, the County's contention that the Courthouse Grounds are a nonpublic forum primarily restricted to government use is contrary to the factual record and the law. The Courthouse Grounds, located at the center of the Oxford town square, have for generations played a key role in the city's and County's political, social, and cultural life. Public space in a town square, such as the Courthouse Grounds, is a paradigmatic example of a traditional public forum in which First Amendment rights enjoy the highest level of protection.

Plaintiff is also entitled to summary judgment on the constitutionality of the Closure Order and the County's one- or five-person permitting requirement. The Closure Order is not a reasonable time, place, and manner restriction. The County's imposition of a total curfew that purports to preclude any use of the Courthouse Grounds as of thirty minutes before dusk every night, based only on generalized public safety concerns untethered to the parameters of any specific proposed use, does not withstand constitutional scrutiny. Moreover, imposing a permitting requirement for use of the Courthouse Grounds by a single person, or groups of more than four, is an impermissible prior restraint under settled Fifth Circuit precedent.

1

## ARGUMENT

### I.   THE COURTHOUSE GROUNDS ARE A TRADITIONAL PUBLIC FORUM

In this Court's ruling denying Plaintiffs' motion for a preliminary injunction ("PI Ruling"), this Court found that the Courthouse Grounds "are open to the public and function as a public park with grass, benches, trees, and pedestrian pathways"; that the Courthouse Grounds "have long been a site of protests, rallies, and other community activities"; and that "[u]se of the grounds was largely unregulated until 2015 when the County established a permitting process for public gatherings and other uses." PI Ruling at 2. The evidentiary record developed in discovery firmly supports this Court's initial findings as to the physical character and historical use of the Courthouse Grounds. This record mandates the conclusion that the Courthouse Grounds are a traditional public forum. Nothing in the County's opposition brief suggests otherwise.

First, the County argues that the Courthouse Grounds have the "essential character" solely of "a place of court business," and that such places are categorically not traditional public forums. Opp. at 2. This unsupported *ipse dixit* assertion does not, however, raise a triable dispute of fact sufficient to defeat Plaintiff's motion for summary judgment. The fact that the interior of the *Courthouse building* is primarily reserved for official business does not mean that the *Courthouse Grounds* are as well. *See United States v. Grace*, 461 U.S. 171, 180 (1983) (that a forum "abuts government property that has been dedicated to a use other than as a forum for public expression" does not destroy its public character). To the contrary, courts have long recognized that public spaces "close to the seat of government" are traditional public forums. *Satawa v. Macomb County Road Comm'n*, 689 F.3d 506, 519 (6th Cir. 2012). As the Supreme Court made clear nearly sixty years ago, "assembl[ing] at the site of [government]" for political purposes constitutes "an exercise of . . . basic constitutional rights in their most pristine and classic form." *Edwards v. South Carolina*, 372 U.S. 229, 235 (1963). And, as the County has recognized, the Courthouse Grounds

are "located in the center of the City of Oxford Courthouse Square," which "functions as the cultural, economic and social center of the Lafayette County-Oxford community." County SJ Br. at 2–3. Public space within a town square clearly constitutes a traditional public forum. *See, e.g.*, *Forbes v. Arkansas Educ. Television Commc'n Network Found.*, 22 F.3d 1423, 1429 (8th Cir. 1994) ("The first is the traditional public forum, such as the town square . . ."); *Gathright v. City of Portland*, 439 F.3d 573, 575 (9th Cir. 2006) (discussing "the classic right of an individual to speak in the town square"). The Courthouse Grounds' status as a traditional public forum is thus intimately linked with its historical and cultural role in the Lafayette County-Oxford community, not merely or primarily derived from the judicial business conducted within the Courthouse.

The County relies on *Verlo v. Martinez*, 262 F. Supp. 3d 1113 (D. Colo. 2017) as support for its argument that courthouse grounds can never be traditional public forums. Opp. at 2. There, however, the court declined to "decide the proper forum designation for courthouse grounds generally"; its ruling was limited to a "Restricted Area" which "was intended to be, and in fact functions as . . . an extension of the Courthouse lobby." 262 F. Supp. 3d at 1149. The County does nothing to show that a "Restricted Area" of the Denver, Colorado criminal courts building at (in *Verlo*), or the U.S. Supreme Court plaza (in *Hodge v. Talkin*, 799 F.3d 1145 (D.C. Cir. 2015)), are meaningfully analogous to the Courthouse Grounds or play any comparable historical or social roles. And, the County fails to distinguish the cases cited by Plaintiff in which other courthouse grounds *were* found to be traditional public forums on similar records (*See* Br. at 15–16 & n.35), noting only that in two of those cases, the government did not contest the issue. Opp. at 3–4.

Second, the County obliquely relies on *Grace* to suggest that the Courthouse Grounds are not a public forum because their physical characteristics evince "separat[ion]" from "the retail shops, restaurants, bars, other businesses, and parking areas which form the 'Oxford Town

3

Square.'"  Opp. at 3.  *Grace*, however, held that the lack of differentiation between the sidewalk in front of the Supreme Court and the surrounding sidewalk was evidence of its public character; it did not imply that public space that is distinguishable from its surroundings is for that reason *not* a public forum.  That is clearly not the case; traditional public forums, such as parks, are as a rule set off from their surroundings by roads, sidewalks, or the like.  *See, e.g.*, *ISKCON of Potomac, Inc. v. Kennedy*, 61 F.3d 949, 951–52 (D.C. Cir. 1995) (describing the physical characteristics of National Mall).  The issue in *Grace* was whether the space at issue had the characteristics of a "special type of enclave" reserved for official business.  *Grace*, 461 U.S. at 180.  In this case, far from being a special enclave that exists at a remove from the town square, the County concedes, for example, that the Courthouse Grounds "typically serves as a 'pass-through' for pedestrians walking to the area shops, restaurants and bars."  Opp. at 11.  The physical characteristics of the Courthouse Grounds thus do not raise any disputed issues of fact favoring the County.

Third, the County asserts, without any citation to the record, that public use of the Courthouse Grounds has only been "permitted since the adoption of the Facility Use Policy in 2015" and has "occurred only since 2018."  Opp. at 2, 4.  This is both plainly wrong as a factual matter and, in any event, insufficient to raise a factual dispute for trial.  *See Buehler v. City of Austin/Austin Police Dep't*, 824 F.3d 548, 556 n.7 (5th Cir. 2016) ("It is not [the court's] function to scour the record in search of evidence to defeat a motion for summary judgment; we rely on the nonmoving party to identify with reasonable particularity the evidence upon which he relies.").[1]

---

[1] The record is replete with evidence of pre-2015 public use of the Courthouse Grounds.  *See, e.g.*, Ex. 49 (East cross-examination) at 81:11-15 ("[T]he county courthouse grounds have been used for people to sit on the benches for people to gather, for people to enjoy themselves in the square both day and night for many years, right?  A. That's correct, yes, sir."); Ex. 5 (Frye Tr.) at 128:20-129:6 (testifying that the public had long made use of the area around the Confederate statue, referencing community members' experiences having "[sat] around the base of it . . . in elementary school" and "drank beer around it . . . in high school."); *id.* at 51:9-11 (discussing Double Decker festival having occurred "10 years ago"); Ex. 13 (McLarty Tr.) at 104:5-12 (discussing a man who "sat in front of the Confederate memorial for years and years, holding a

Finally, in response to Plaintiff's alternative argument that the Courthouse Grounds are, at a minimum, a designated public forum, the County asserts that because the permitting process restricts use of the Courthouse Grounds, the County has not opened the Courthouse Grounds for "unlimited" or "indiscriminate" use, and therefore they constitute a "limited public forum." Opp. at 4–8. As an initial matter, the record provides much stronger support for the conclusion that the Courthouse Grounds constitute a traditional public forum, as the evidence clearly shows that the permitting process was put in place in 2015 to regulate pre-existing public use of the Courthouse Grounds, rather than to open a previously-closed forum.[2]

However, to the extent alternative forum analyses are relevant, all that is required of a designated public forum is that it be "open to the public for a range of expressive purposes." *Chicago Acorn v. Metro. Pier & Expo. Auth.*, 150 F.3d 695, 699 (7th Cir. 1998); *see also Pfeifer v. City of W. Allis*, 91 F. Supp. 2d 1253, 1261 n.2 (E.D. Wis. 2000) ("'Indiscriminate' does not mean that all First Amendment activities must be permitted in any designated public forum."). The County's argument that the permitting process itself destroys the public character of the forum is circular. *See Hays Cnty. Guardian v. Supple*, 969 F.2d 111, 117 (5th Cir. 1992) (rejecting argument where "[t]he restriction would disprove any intent to create a designated public forum, and the failure to create a public forum would justify the restriction of speech"). So, too, is the County's argument that any restriction on speech in a designated public forum can be justified as a "withdraw[al] [of] that designation at its discretion." Opp. at 5; *see also id.* at 6–7. If restrictions on speech automatically constituted permissible "withdrawals" of the forum's designation, the

---

Confederate flag"); *see also* Rash Summ. J. Br. (ECF No. 67) at 6 n.5 (cataloging uses both before and after 2015); Rash Summ. J. Opp. Br. (ECF No. 78) § II.C (discussing pre-2015 use of the Courthouse Grounds).

[2] *See, e.g.*, Ex. 4 (Busby Tr.) at 35:7-25 (testifying that the Courthouse grounds were used before the implementation of the Facility Use Policy in 2015 and the policy was created to regulate existing use rather than open to new uses); Ex. 5 (Frye Tr.) at 128:4-6 ("the idea has always been to make it more open and more accessible because it's the heartbeat of our community").

protections afforded to First Amendment rights in designated public forums would be illusory.

## II. THE DUSK TO DAWN CLOSURE ORDER DOES NOT WITHSTAND SCRUTINY AS A TIME, PLACE, AND MANNER RESTRICTION

Plaintiff's motion demonstrated that the County's Closure Order was not narrowly tailored to serve a significant government interest because there is no evidence in the record substantiating the County's asserted public safety and traffic safety concerns. As Plaintiff explained (Br. at 19), "when the Government defends a regulation on speech as a means to redress past harms or prevent anticipated harms, it must do more than simply 'posit the existence of the disease sought to be cured.' It must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *United States v. Nat'l Treasury Emps.' Union*, 513 U.S. 454, 475 (1995).

In response, the County, without citing specific evidence,[3] asserts that the Closure Order is necessary because (i) the Courthouse Grounds are "at the center of a very busy town Square" and are "poorly lit and typically serve[] as a pass-through" for pedestrians visiting the square; (ii) University students frequent bars and restaurants on the Square; and (iii) demonstrations in front of the Confederate monument purportedly have put a strain on law enforcement. Opp. at 10–11. However, as Plaintiff explained in detail in opposition to the County's motion, generalized public safety concerns associated with "late evening" nightlife on the Square on certain weekends and holidays (*id.* at 11) do not justify a blanket prohibition of First Amendment expressive activities on the Courthouse Grounds as of thirty minutes before dusk each day of the year. This is particularly true where there is no evidence of any arrests, citations, or other public safety incidents having taken place on the Courthouse Grounds, including as a result of (or even

---

[3] The County incorporates its summary judgment briefing by reference, but that briefing also fails to cite any specific evidence. *See* Def.s' Summ. J. Br. (ECF No. 69), at 25.

contemporaneously with) political or artistic expressive conduct on the Courthouse Grounds, prior to the enactment of the policy. *See* UF ¶¶ 5–7. On the County's own terms, its policy closes the Courthouse Grounds not because of any public or traffic safety concerns actually associated with use of the Courthouse Grounds, but instead because of unspecified second-order concerns resulting from commercial activity elsewhere on the Square that is not subject to comparable restrictions. This disparate treatment of First Amendment-protected activity cannot be justified as narrowly tailored to serve a significant government interest, and the County does not attempt to do so.

The County's attempts to distinguish Plaintiff's authorities also fail. The County claims that *Occupy Eugene v. U.S. General Services Administration*, 43 F. Supp. 3d 1143 (D. Or. 2014) is distinguishable because the court noted in *dicta* that while the 8 a.m. to 5 p.m. restriction there at issue was "much too strict," *id.* at 1150, a 7 a.m. to 10 p.m. limitation might hypothetically pass muster. Opp. at 12. Yet *Occupy Eugene* in fact rejected an argument substantially similar to the County's, finding that while "public safety, aesthetics and public use are legitimate government interests, the hours regulations [at issue] . . . were so tightly restricted that they created an impermissible restriction of [plaintiff's] First Amendment rights." *Id.*[4]

Similarly, the County claims that *Lopez v. Town of Cave Creek*, 559 F. Supp. 2d 1030 (D. Ariz. 2008) is distinguishable because there "the defendant did not provide any evidence that traffic safety was endangered" by the activity subject to the regulation (Opp. at 12)—*i.e.*, "day laborers soliciting employment from vehicle occupants." 559 F. Supp. 2d at 1034. Yet here, the County has similarly presented no evidence that "pedestrian and traffic safety" (Opp. at 12) are endangered by use of the Courthouse Grounds for First Amendment-protected activities after thirty

---

[4] Notably, *Occupy Eugene* concerned "the plaza of the Eugene Federal Building . . . located on a highly-visible, busy street corner . . . adjacent to courthouses, federal, state, and municipal political offices," 43 F. Supp. 3d at 1146—not, as the County claims (Opp. at 12), "a park area."

minutes before dusk, and *Lopez* demonstrates that absent such evidence, "[m]erely invoking an interest in traffic safety . . . is insufficient." *Id.* Indeed, *Lopez* also held that even assuming the defendant had presented such evidence, the ordinance at issue would still not be narrowly tailored, because the asserted interests in traffic safety could be addressed through "enforcement of existing traffic, parking, and loitering laws." *Id.* at 1035. The same is true here.

Finally, the County vaguely contends, without citing any supporting evidence, that the County's denial of Plaintiff's permit for the PROJECT(ion) event may have been independently justified because "the 'speech at issue' . . . offers a significant distraction to passing motorists and risk to pedestrian safety and detracts from the dignity of the Courthouse." Opp. at 8. Yet the County does not contend that County personnel made an individualized assessment of the ostensible public safety risks associated with the PROJECT(ion) event and denied Plaintiff's permit on that basis, and the County's attempt to manufacture a post-hoc alternative rationale should be rejected. *See, e.g.*, *City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 758 (1988) (criticizing use of "post hoc rationalizations by the licensing official and the use of shifting or illegitimate criteria"). And, numerous court decisions have affirmed that constitutional protections for political and artistic conduct are not vitiated by concerns for courthouse dignity. *See, e.g.*, *Carroll v. President and Com'rs of Princess Anne*, 393 U.S. 175 (1968); *Forsyth County, Georgia v. Nationalist Movement*, 505 U.S. 123 (1992); *Higher Society of Indiana, Inc. v. Tippecanoe County, Indiana*, 223 F. Supp. 3d 764 (N.D. Ind. 2016), *aff'd*, 858 F.3d 1113 (7th Cir. 2017).

## III. THE ONE- OR FIVE-PERSON PERMITTING REQUIREMENT IS INVALID

Contrary to the County's contentions, Plaintiff has standing to challenge the constitutionality of the County's requirement that "all users of the Courthouse grounds (one person within the Courthouse grounds proper and groups of five or more individuals congregating around the confederate memorial) to first obtain a permit." Opp. at 13–14. In the First Amendment

context, "[c]hilled speech is, unquestionably, an injury supporting standing." *Bell v. Keating*, 697 F.3d 445, 453 (7th Cir. 2012); *see also Center for Indiv. Freedom v. Carmouche*, 449 F.3d 655, 660 (5th Cir. 2006) ("Controlling precedent thus establishes that a chilling of speech because of the mere existence of an allegedly vague or overbroad statute can be sufficient injury to support standing."). And, where a claim challenges a permitting scheme, "[t]he class of plaintiffs eligible for standing includes all who are affected by its implementation"— *i.e.*, "all who must apply for a permit." *Stokes v. City of Madison*, 930 F.2d 1163, 1168 (7th Cir. 1991); *see also Lakewood v. Plain Dealer Publishing Co.*, 468 U.S. 750 (1988) (publishing company had standing to challenge on its face a licensing scheme before applying).

Here, the County's permitting policy plainly applies to Plaintiff and restricts the exercise of his First Amendment rights. Plaintiff has previously engaged in activity subject to the policy— both by holding and seeking to hold the PROJECT(ion) event on the Courthouse Grounds and by participating in and documenting political activity on the Courthouse Grounds—and has attested that the challenged policies impair his ability to engage in such conduct in the future.[5] This more than suffices to challenge a permitting requirement such as the one at issue here. *See Knowles v. City of Waco, Tex.*, 462 F.3d 430, 433 (5th Cir. 2006) (plaintiffs had standing to facially challenge permitting ordinance for gatherings of more than two people, based on "fear[ ] that they would be cited" for violating the ordinance); *Bloedon v. Grube*, 631 F.3d 1218, 1229 (11th Cir. 2011) (plaintiff had standing to challenge permitting requirement where he "averred that he intends to return and proselytize on the GSU campus, but he has not done so because of his fear of re-arrest").

On the merits, the County effectively concedes that *Knowles*' holding that "ordinances

---

[5] *See* Ex. 55 (Feb. 2, 2021 Rash Decl.) ¶ 5; *id.* at ¶ 6 (describing chilling effects of County's policies); *see also* ECF No. 3-4 (July 30, 2020 Rash Decl.) ¶ 6 (describing Plaintiff's experience documenting a July 4, 2020 pro-Confederate protest, and being told to "go to your side" by a Sheriff's deputy); *id.* ¶ 13 (describing Plaintiff's experience documenting a July 18, 2020 anti-Confederate protest).

requiring a permit for demonstrations by a handful of people are not narrowly tailored to serve a significant government interest," 462 F.3d at 436, is controlling in the traditional public forum context. Opp. at 16 ("Essential to the court's decision that the advance permit requirement could not be constitutionally justified" was its application to "'traditional' public forum areas."). Thus, should the Court grant summary judgment to Plaintiff on the forum analysis issue, summary judgment on the constitutionality of this permitting requirement must necessarily follow.

The County nonetheless attempts to argue that its one or more person permitting requirement is "fully justified and reasonable" because the Courthouse Grounds "are a place of business, are narrowly confined and subject to competing uses," and a permitting requirement "not only serves traffic and pedestrian safety interests but also the interest in maintaining an appropriate environment conducive to court operations." Opp. at 16. The County offers no evidence showing that the presence of five people—let alone a single person—on the Courthouse Grounds would somehow interfere with court operations, including during times when the court is closed such as nights and weekends. To the contrary, as the historical record demonstrates, the Courthouse Grounds are an open, public space in the middle of a town square that have been historically used by the public for a variety of purposes; indeed, County officials testified that social or recreational uses of the Courthouse Grounds would *not* be prohibited under the policy. *E.g.*, SUF ¶ 12. Given the absence of any evidence to the contrary, this Court cannot conclude that a "political" use of the Courthouse Grounds would cause any materially greater interference. *See, e.g.*, *Garza v. Starr County*, 309 F. Supp. 3d 454, 460 (S.D. Tex. 2018) (enjoining policy that did not define "use" and thus raised the concern that any "use," "even passive political speech," was "prohibited absent application for a permit").

## CONCLUSION

Plaintiff's partial motion for summary judgment should be granted.

Dated: March 3, 2021

|  |  |
|---|---|
|  | _____/s/ Joshua Tom_____ |
| SIMPSON THACHER & BARTLETT LLP | AMERICAN CIVIL LIBERTIES UNION OF |
| Jonathan K. Youngwood (*pro hac vice*) | MISSISSIPPI FOUNDATION, INC. |
| Isaac Rethy (*pro hac vice*) | Joshua Tom, MS Bar. No 105392 |
| 425 Lexington Avenue | Landon Thames, MS Bar No. 105127 |
| New York, NY 10017 | P.O. Box 2242 |
| (212) 455-2000 | Jackson, MS 39225 |
| jyoungwood@stblaw.com | Phone: (601) 354-3408 |
| irethy@stblaw.com | jtom@aclu-ms.org |
|  | lthames@aclu-ms.org |

C. Jackson Williams, MS Bar No. 7226
P.O. Box 69
Taylor, MS 38673
Phone: (662) 701-9447
cjxn@mac.com

## CERTIFICATE OF SERVICE

I, Joshua Tom, hereby certify that on March 3, 2021, I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to all parties on file with the Court.

/s/ Joshua Tom
Joshua Tom