**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION**

**JOHN RASH**                                                                     **PLAINTIFF**

**VS.**                            **CIVIL ACTION NO.: 3:20-CV-224-NBB-RP**

**LAFAYETTE COUNTY, MISSISSIPPI**                            **DEFENDANT**

**DEFENDANT'S REBUTTAL IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

COMES NOW, Lafayette County, Mississippi, the Defendant in the above-styled and numbered cause, by and through counsel, and files its Rebuttal in Support of the Defendant's Motion for Summary Judgment, and would state as follows:

**I. Overview**

The plaintiff's initial complaint that the County's decision to deny his request for a permit based on the content neutral "dusk to dawn" closure of the Courthouse grounds which prohibited all nighttime uses has blossomed into a broader attack on other provisions contained in the County's facility use policy which were not applied to the plaintiff. Although, perhaps, Rash has standing to challenge the "dusk to dawn" closure policy, as applied, Rash has not met his summary judgment burden to prove his standing to challenge the policy's: (1) permitting scheme, (2) insurance/indemnification requirements and (3) enhanced security cost assessment, because these provisions were not applied to Rash and any threat of future enforcement as to Rash is too speculative to satisfy standing requirements. In any event, the summary judgment

record establishes the lack of a genuine issue of material fact in the County's favor as to the constitutionality of those provisions which are appropriately under review. As a matter of undisputed material fact and law, each of the provisions which Rash has standing to challenge are content neutral and satisfy intermediate scrutiny review. The Defendant provides the following in supplementation of the points and arguments presented in its initial brief and motion.

## II. Public Forum

As this court observed in its opinion denying Plaintiff's motion for preliminary injunction, regardless of whether the Courthouse grounds constitute either a traditional or designated public forum, the analysis is the same for purposes of evaluating the plaintiffs' First Amendment challenge to the provisions under review, including the "dusk to dawn" closure of the Courthouse grounds. The distinction between the two forums is significant for only one reason, that is, if the forum was created by the County's intentional formal "designation", that designation may be withdrawn at the County's discretion. In making his case that the Courthouse grounds are a "traditional" public forum, the plaintiff attempts to shift the focus away from the particular context under consideration (a functioning Courthouse) to the general characteristics of the Oxford "Square." It is the County's position that the defined physical and specific functional characteristics of the Courthouse and its grounds, and any record evidence of the sporadic, nongovernmental, First Amendment speech uses of the grounds prior to the adoption of the 2015 Facility Use Policy, do not support a finding that the Courthouse grounds constitute a traditional public forum because such evidence does not reflect the County's "intentional" opening of this area for "public discourse" in a First Amendment sense.

2

As pointed out in its initial brief and in its response to the Plaintiff's motion for partial summary judgment, the only evidence in the summary judgment record which reflects the nature of the "public speech" uses of the Courthouse grounds is limited to the time when the Courthouse grounds were governed by the County's facility use policy starting in 2015. Responding to the County's point that this evidence, by its very nature, cannot support a finding that the Courthouse grounds constitutes a "traditional" public forum, the plaintiff addresses this shortcoming by referring to an affidavit submitted by Kevin Frye, a former Lafayette County supervisor, and several "publications" which make reference to non-speech and unspecified uses of the Courthouse grounds during the years referenced in the publications. This evidence is not competent proof because it is either rank double hearsay (the publications) or it is patently conclusory and likewise refers to non-speech and social uses (with a generic and vague reference to "political" uses since 2007) of unspecified frequency in the case of the Frye affidavit ("the Courthouse grounds have been open to public and used as a community space including for social and political gatherings and other community assemblies."). In addition, the "publications" (Rash Exhibits 45 thru 48) describe life on the Oxford Square during the "old days" in such non-germane and literary terms they are irrelevant to the "public forum" issue.[1] Only those uses which bear upon the nature and extent of "expressive activities" (that is, the kinds of uses protected by the First Amendment) and which do not comprise governmental speech, are pertinent to the public forum analysis. See Students for Life USA v. Waldrop, 162 F Supp. 3d 1216 (S.D. Ala. 2016) (speech by the government itself, in the form of commemorative memorials and the like, and the government's own use of the area, are not the kind of uses relevant to a First Amendment forum analysis). Further, this limited evidence is not sufficient, as

---

[1] The Defendant objects to the inclusion of Exhibits 45 thru 48 in the summary judgment record because they were not produced during discovery.

3

a matter of law, to transform the Courthouse grounds into a "traditional" public forum**.** For example, in United States v. Barnes, 2020 U.S. Dist. LEXIS 152854 (D.C.D.C. 2020), the district court rejected the argument that the government had intentionally created a public forum by allowing "a variety of expressive activity" on the Supreme Court plaza, pointing to such uses as annual prayer meetings, the display of banners on the courthouse steps as a form of protest, and a photograph of Thurgood Marshall holding a press conference with members of the "Little Rock 9" on the Supreme Court steps. Noting that the government "does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse," the district court found, consistent with Hodge, that such proof was insufficient to show the Government's "intentional opening" of the Supreme Court plaza as a public forum.

The lack of proof of the intentional opening of the Courthouse grounds as a traditional public forum by allowing the indiscriminate use for expressive activity prior to 2015, when measured against the nature of the forum (functional Courthouse that is separated from the other areas of the Square by roads, sidewalks, curbs, retaining walls and fencing), establishes that the Courthouse grounds are not a traditional public forum. It bears emphasis in this case brought pursuant to 42 U.S.C. Section 1983, that the County may only be responsible the torts caused by the execution of its policies. By their very nature, the existence of a "policy" within the meaning of Section 1983 requires proof of intention, not inadvertence or negligence.

### III. The "Dusk to Dawn" Restriction Survives Intermediate Scrutiny

Rash's main attack on the County's Facility Use Policy centers on the "dusk to dawn" closure restriction as to the use of the Courthouse grounds. Rash does not contest the fact that the

4

policy is a content neutral time, place and manner restriction. Instead, employing intermediate scrutiny, Rash argues that the policy is not narrowly tailored to advance substantial governmental interests, but does not take issue with this court's preliminary injunction ruling and the Defendant's position that the policy does leave open "ample alternative avenues for expression."

The summary judgment record establishes beyond legitimate dispute that the policy is a narrowly drawn time, place and manner restriction which advances the compelling interests of traffic and public safety. First, there is no dispute that the interests of traffic and pedestrian safety are substantial and even compelling as a matter of law. <u>Houston Chronicle Pub. Co. v. City of League City</u>, 488 F. 3d 613, 622 (5th Cir. 2007). Ignoring the defendant's proof of the conditions surrounding the use of the Courthouse grounds as contributing to the County's decision to impose the "dusk to dawn" restriction (heavy pedestrian and traffic patterns around the Courthouse, poor lighting conditions, law enforcement experience in traffic and pedestrian control, and Sheriff's Department nighttime staffing issues), Rash contends that these real-life concerns are "too speculative" in nature and therefore cannot form the basis of the closure policy. Plainly, these interests are not conjectural or speculative The evidence of the governmental interests at stake is concrete, logical, a matter of common sense, and is supported by the testimony of Sheriff East and Oxford Police Chief Jeff Mccutchen. (See Defendant's Brief). The record also establishes that these interests in fact formed the basis of East's recommendation to the County to adopt the policy starting in the Spring of 2020. The record proves that the County Board approved East's recommendation for the evening closure at the July 2020 meeting based on "safety" concerns.

Rash argues, however, that the County should wait for more "concrete proof" of accidents and injuries before adopting the "dusk to dawn" time restriction, but that is not what

the law requires, that is Rash's opinion. In Illusions – Dallas Private Club, Inc. v. Steen, 482 F. 3d 299, 313 (5th Cir. 2007), the Fifth Circuit acknowledged that "the evidentiary burden for a state attempting to justify a substantial governmental interest is "very light." Id. In our case, the County does not rest on a simple reference to the "compelling" interests at stake, it actually relied on the above proof when it adopted the "dusk to dawn" restriction. That proof, along with logic and common sense, are sufficient to establish the existence of a compelling governmental interest. See Porter v. Gore, 2021 U.S. Dist Lexis 23162 (S.D. Cal. 2021) (finding that history, consensus, common sense, and the declaration of a law enforcement officer regarding the presence of traffic safety issues were sufficient justification for time place manner restriction).

### Reasonable Fit

Moreover, the nature of the policy has a direct and clear link to the articulated governmental interest. As stated in its initial brief, the "narrow tailoring" required by intermediate scrutiny does not require the County to show that the "dusk to dawn" restriction is the "least restrictive or least intrusive means" of advancing the proffered governmental interest. Ward v. Rock Against Racism, 491 U.S. 781, 798 (1989). Thus, time, place, and manner restrictions are justified where "a substantial governmental interest would be achieved less effectively absent the regulation." United States v. Albertini, 472 U.S. 675, 689 (1985). A content neutral time place manner restriction does not survive the "narrow tailoring" inquiry if it "burden substantially more speech than is necessary to further the government's legitimate interests." Ward, 491 US at 799. Although East suggested that the closure should start at 5pm, the Board instead chose a more nuanced policy that was clearly a "tighter fit" with the concerns over the nighttime use of the grounds by adopting a "dusk to dawn" closure rule. A rule that

6

chose the more arbitrary time of 5 pm would have provided "less fit" by prohibiting uses during the daylight hours most of the year and would likely be susceptible to a First Amendment challenge under the narrow tailoring prong. See Beckerman v. City of Tupelo, 664 F.2d 502, 512 (5th Cir. 1981). In Beckerman, the Fifth Circuit considered whether the City of Tupelo's nighttime prohibition on parades unreasonably burdened more speech than necessary under the intermediate scrutiny analysis. While acknowledging that Tupelo had a legitimate interest in public safety and security especially at night time ("as the city explains, the number of policemen on duty at night is smaller than during the day time and the job is further complicated by the darkness"), the Fifth Circuit held that the 6:00 PM restriction was arbitrary because it was not related to Tupelo's concern for parade security during the evening hours because much of the year it was daylight in Tupelo until well past 6:00 PM. The Beckerman court further observed that "in striking down this provision, we do not mean to say that the daylight cut off must fluctuate daily to reflect actual time of the sunset, although regulations based on the time of sunset are common and are not difficult to administer." Id.

Quite obviously, the County's imposition of a "dusk to dawn" restriction on the use of the Courthouse grounds for all uses has a "reasonable fit" with the compelling interests of traffic and pedestrian safety which the restriction seeks to advance.

Rash insists, on the other hand, that the closure policy does not have the necessary "reasonable fit" with the interests it attempts to advance because the policy was adopted after the increased protest activity caused by the death of George Floyd and the related efforts to relocate the confederate monument from the Courthouse grounds. According to Rash, this post hac, ergo propter hac logical fallacy suffices to question whether the policy "actually furthers a significant governmental interest." (Rash Brief, p. 23-24). Certainly, as related above, there was

7

concern among the County officials regarding the frequency and size of the protests which caused the County to review its Facility Use Policy (there were other changes to the policy besides the "dusk to dawn" restriction) but that does not translate into proof which undermines the fit between policy and interest nor does it prove that the "dusk to dawn" restriction was intended to advance or oppose the political messages of those involved in the protests[2]. In fact, when looking at the overall nature of the changes to the Facility Use policy in June and July 2020, they were clearly more favorable to speech activities when compared to the 2015 version of the policy. For example, the County shortened the advance permit requirement from 30 days to 14 days, added a waiver of the 14 day period in cases where the permittee showed an impossibility to comply, as in spontaneous demonstrations spurred by salient events, eliminated use fees, and eliminated the permit requirement altogether for individual and groups of 4 or less desiring to use the area surrounding the confederate monument. The facially and as-applied content neutrality of the "dusk to dawn" restriction and its clear relation to traffic and pedestrian safety, when viewed with the "speech-favorable" nature of the other policy changes, contradicts any notion that the "dusk to dawn" restriction was motivated by an anti-message purpose. Certainly, if the County intended to enact greater restrictions on the use of the Courthouse grounds because of a disagreement with the messages underlying the George Floyd and confederate monument demonstrations, it failed miserably by enacting policies which actually made the use of the Courthouse grounds more accessible for all concerned.

---

[2] The Plaintiff refers to Frye's deposition testimony where he speculated that the County Board adopted the curfew policy in order to "limit criticism" concerning the confederate monument. (Plaintiff's Brief, p. 23). Frye's term as a Supervisor ended on December 31, 2019 and therefore his opinion about the Board's motivation for an action on July 20, 2020 is pure speculation which is not competent proof.

## IV. Plaintiff's Lack of Standing

Rash attempts to shoulder his burden to prove his standing by claiming that as a "documentary filmmaker, photographer, visual artist and educator" he has standing to "vindicate his First Amendment rights to engage in political and artistic expression on the Courthouse grounds." (Response Brief, p. 3). Although the County concedes, as Rash contends, that, as an artist or "distributor of artistic material," Rash enjoys "First Amendment protections," his standing to challenge the particular provisions at issue remains in question.

Beyond his standing to challenge the County's adoption of the "dusk to dawn" closure of the Courthouse grounds, Rash suggests that he has standing to challenge the County's "permitting scheme" because it "chills" his "exercise of his First Amendment rights to organize, participate in and document events on the Courthouse grounds." (Response Brief, p. 5-6). Rash's references to his past attempt to obtain a permit in August 2020 and his presence as an observer and documenter of the First Amendment activities of others are legally insufficient to support his standing as to the particular provisions under challenge.

According to the Fifth Circuit in <u>SEIU Local 5 v. City of Houston</u>, 595 F.3d 588 (5th Cir. 2010), "a lawsuit is not a general license for a federal court to examine all provisions of a municipal ordinance and decide if any are flawed." <u>Id</u>. at 597. Thus, in order to establish standing, Rash must show that (1) he suffered or imminently will suffer a concrete and particularized injury in fact, (2) the injury is fairly traceable to the defendant's conduct, and (3) a favorable judgment is likely to redress the injury. In determining whether the plaintiff has met his burden to establish standing in this case, the Supreme Court has emphasized that standing cannot be "inferred argumentatively from averments in the pleadings but rather must affirmatively appear in the record" in that it is the "burden of the party who seeks the exercise of

9

jurisdiction in his favor to clearly allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute." FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 233 (1990) (evaluating plaintiff's standing as to each challenged provision). This burden must be met "provision by provision." SEIU, 595 F.3d at 597 (citing FW/PBS, Inc); see also Reddy v. Foster, 2016 U.S. Dist. LEXIS 44965 (D.N.H. 2016). The plaintiff's failure to establish his standing as to each particular challenged provision (other than the "dusk to dawn" closure provision), and making vague allegations that he intends to engage in a "projection event" and other "documenting and observing" activities at some undetermined time in the future without tying it to the challenged provision, precludes this court's assumption of subject matter jurisdiction concerning the constitutionality of these provisions.

The defendant acknowledges that, generally speaking, "chilling a plaintiff's speech is a constitutional harm adequate to satisfy the injury in fact requirement for purposes of establishing standing. Fairchild v. Liberty Indep. School Dist., 597 F.3d 747, 754 (5th Cir. 2010). However, allegations of a "subjective chill" are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." Laird v. Tatum, 408 U.S. 1, 13 – 14 (1972). It is insufficient for a plaintiff merely to allege that the defendant's conduct exercised "a chilling effect on the exercise of his First Amendment rights." Meese v. Keene, 481 U.S. 465, 473 (1987); see also Freedom Path, Inc. v. Lerner, 2015 U.S. Dist. LEXIS 22025 (N.D. Tex. 2015). Here, there is no proof of a pending application, threat of enforcement, or a permit denial based on any of the challenged provisions. Accordingly, Rash has not met his burden to prove his standing as to each of the following permitting provisions at issue.

## V. The Policy's Permitting Requirements

The remainder of the plaintiff's challenges do not concern the basis of the County's denial of his permit. They are, instead, a facial challenge to the County's permitting scheme which represents a type of pre-enforcement challenge to provisions which function as "prior restraints." In Forsyth County Ga v. Nationalist Movement, 505 U.S. 123 (1992), the Supreme Court found that an ordinance requiring a permit before authorizing public speaking, parades, or assemblies was a prior restraint on speech. The Court stated that "any permit scheme controlling the time, place, and manner of speech must not be based on the content of the message, must be narrowly tailored to serve a significant governmental interest, and must leave open ample alternatives for communication." Although there is a heavy presumption against the validity of a prior restraint, they are not unconstitutional per se. In that sense, the Court "has recognized that the government, in order to regulate competing uses of public forums, may impose a permit requirement on those wishing to hold a march, parade or rally." Cox v. New Hampshire, 312 U.S. 569, 574 (1941).

In Thomas v. Chicago Park Dist., 534 U.S. 316 (2002), the Supreme Court held that a content neutral licensing scheme must "contain adequate safeguards to guide the official's decision and render it subject to effective judicial review." Forsyth County, 505 U.S. at 130 (a permitting scheme "may not delegate overly broad licensing discretion to a government official"). Applying these standards, the Court in Thomas determined that an ordinance, which required a permit before conducting an event involving more than 50 people, passed constitutional muster because a permit could be denied only for reasons specified in the ordinance, the licensing body was required to process applications within 28 days and clearly

11

explain its reasons for any denial, and the grounds for denial were "reasonably specific and objective," such that the decision was not left to the whim of the licensing authority.

### Requirement that Individuals and Groups of Five or More Obtain a Permit

Rash asserts that the Facility Use Policy's requirement that individuals and groups of five or more who desire to use certain areas of the Courthouse grounds must first obtain a permit does not survive intermediate scrutiny. In support, he argues that the County has not provided proof of a substantial governmental interest justifying the need for permits for individuals and groups of five or more and that the terms of the permit requirement are unduly vague. (Plaintiff's Brief, p. 28-32). To the contrary, the County's proffered justification for the permit requirement, that is, the substantial interests in managing competing uses in a very confined area, minimizing disruption to and interference with court operations, and ensuring that the walkways to and from the courthouse remain unimpeded are substantial. Further, the permit requirement, made applicable to individual users of the Courthouse grounds within the fenced areas and groups of five or more for the area around the confederate monument, have a "reasonable fit" with the substantial interests the permitting scheme advances. As Carwyle testified, the Facility Use Policy allows groups of four or less to use the area around the confederate monument because County officials determined that this size would not impede pedestrian access to the courthouse. Finally, the summary judgment record also demonstrates that there are reasonable ample alternative means of expression given that the policy excepts the use of the sidewalks outside the perimeter fence from the permit requirement. In evaluating whether the County's permitting scheme survives intermediate scrutiny, context is all important. The plaintiff's challenge to the permit policy concerns the use of the Courthouse grounds - a narrowly confined area which primarily serves a fully functioning courthouse – and this overriding feature

distinguishes our case from Knowles v. City of Waco, 462 F. 3d 430 (5th Cir. 2006) (parade permit requirements not justified by traffic safety concerns because of policy's exceptions for certain groups which undermined legitimacy of interest).

Rash also contends that the permitting requirement is unconstitutionally vague, mainly because, he alleges, it is uncertain what constitutes a "use" that falls within the permit requirement. The Facility Use Policy applies "to all groups and individuals that have requested use of County facilities and grounds" and limits "use" to, inter alia, "individuals from any political group, or similar gathering of individuals, who are meeting for the purpose of engaging in political discussion." Thus, starting with the language of the policy at issue, it sufficiently and clearly defines "use" in a way that individuals of average intelligence can understand. The same provisions give adequate guidance to the County Administrator as to which individuals and groups, and the types of uses subject to the permit requirements. See United States v. Williams, 553 U.S. 285, 306 (2008). Mathematical precision and "perfect clarity and guidance" are not required. Ward v. Rock Against Racism, 491 U.S. 781, 794 (1989). In Magee v. City of South Padre Island, 463 Fed. Appx 377 (5th Cir. 2012), the Fifth Circuit recognized that "the requirement of reasonable certainty does not preclude the use of ordinary terms to express ideas which find adequate interpretation in common usage and understanding…. The use of common experience as a glossary is necessary to meet the practical demands of legislation."

### The 14 day Advance Notice Requirement

Assuming Rash has standing to challenge the requirement that potential users submit a permit application 14 days in advance of the date of the proposed use, the summary judgment record establishes that the Policy's 14 day rule, when considered in light of the right of applicants to seek its waiver when compliance is not possible, satisfies intermediate scrutiny.

The County's policy, clarifies the circumstances of when an individual or group may qualify for the waiver, stating "the County Administrator may shorten or waive the 14 day permit application requirement for proposed uses which demonstrate an urgent need for use of the County facility, such as the desire to demonstrate or engage in speech protected by the First Amendment motivated by events or issues suggesting a need for immediate demonstration or expression, subject to reasonable time, place and manner restrictions." (January 4, 2021 Policy, Exhibit X). Although Rash contends that the waiver provision's use of "may" implies that the County Administrator has impermissible "unfettered discretion," that contention is contrary to the Supreme Court's treatment of similar language in the use of permit waivers, which the Court found serve to further, rather than restrict, free speech. See Thomas v. Chicago Park Dist., 534 U.S. 316, 325 (2002). That construction is also contrary to the County Administrator's construction of the waiver which was interpreted to allow the waiver in every case involving a protest and demonstration. The availability of the waiver under these circumstances effectively neutralizes any facial challenge to the 14 day advance notice requirement.

### Assessment of Security Costs, Insurance and Indemnity

To reiterate, neither does Rash explain how he has standing to challenge these aspects of the County's Facility Use Policy. In any event, the County's proffered interests which support these requirements, and the objective and content-neutral standards which serve to guide the Sheriff's assessment of unusual security costs , satisfy intermediate scrutiny.

### IV.  Conclusion

Wherefore, premises considered, the Defendant respectfully requests that this Court grant the present motion. The Defendant also requests any other relief which the court may find warranted in the premises.

14

THIS, the 5th day of March, 2021.

Respectfully submitted,

CLAYTON O'DONNELL PLLC
1300 ACCESS ROAD, SUITE 200
P.O. Drawer 676
Oxford, MS 38655
Telephone: (662) 234-0900
Facsimile: (662) 234-3557


/s/ David D. O'Donnell
**DAVID D. O'DONNELL, MSB #3912**
*Attorney for Lafayette County, Ms.,*
*Defendant*
dodonnell@claytonodonnell.com


## CERTIFICATE OF SERVICE

I, David D. O'Donnell, hereby certify that I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record.

This the 5th day of March, 2021.

*/s/ David D. O'Donnell*
**DAVID D. O'DONNELL, MSB# 3912**
dodonnell@claytonodonnell.com