IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION

JOHN RASH                                                        PLAINTIFF

V.                                                    NO. 3:20-CV-224-DMB

LAFAYETTE COUNTY,
MISSISSIPPI                                                      DEFENDANT

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

After he was denied a permit to hold the PROJECT(ion) art event on the Lafayette County

courthouse grounds, John Rash sued the County under 42 U.S.C. § 1983 alleging a violation of his

right to free expression and assembly protected by the First and Fourteenth Amendments to the

United States Constitution, and seeking nominal damages, and injunctive and declaratory relief.

Following a three-day bench trial, the Court's findings of fact and conclusions of law are below.

## I
## Procedural History

On August 19, 2020, John Rash filed an amended complaint against Lafayette County,

Mississippi, in the United States District Court for the Northern District of Mississippi with the

intent "to vindicate his First Amendment right to engage in free speech on the grounds of the

Lafayette County Courthouse … owned by Lafayette County, in Oxford, Mississippi."[1] Doc. #29

at 1.  The amended complaint contains one claim for relief titled, "Violations of the First

Amendment of the United States Constitution applicable to the States through the Fourteenth

Amendment pursuant to 42 U.S.C. § 1983." *Id.* at 20.  In his amended complaint, Rash requests

permanent injunctive relief, a declaratory judgment, nominal damages in the amount of $100.00,

---

[1] Rash filed his original complaint against the County on July 31, 2020, along with a motion for a preliminary injunction.  Docs. #1, #3.  After a hearing on the preliminary injunction motion, Senior United States District Judge Neal B. Biggers denied injunctive relief.  Docs. #20, #25.

and an award of "reasonable costs and attorneys' fees pursuant to 42 U.S.C. § 1988."[2]  *Id.* at 22.

On February 2, 2021, Rash moved for summary judgment only on the issues of whether:

> (i) the grounds of the Lafayette County Circuit Court (the "Courthouse Grounds") are a traditional public forum; (ii) the County ordinance closing the Courthouse Grounds, without exception, as of thirty minutes before dusk violates the First Amendment; and (iii) the County ordinance requiring permits for gatherings of more than a handful of people on Courthouse Grounds violates the First Amendment.

Doc. #66.  The same day, the County moved for summary judgment on all Rash's claims.  Doc. #68.  On September 24, 2021, Senior United States District Judge Neal B. Biggers denied both parties' summary judgment motions.  Doc. #115.[3]  However, on October 21, 2022, Judge Biggers granted the parties' joint motion to file renewed motions for summary judgment.  Doc. #137.  Rash and the County each filed a renewed summary judgment motion on November 7, 2022.  Docs. #138, #140.

On August 15, 2023, this case was randomly reassigned to the undersigned district judge. Doc. #152; *see* Doc. #151.  On September 21, 2023, this Court denied the renewed motions for summary judgment without prejudice[4] and set this case for a non-jury trial.  Docs. #158, #181. The bench trial took place on February 29, March 1, and March 5, 2024.  Doc. #199.  Rash and the County each submitted proposed findings of fact and conclusions of law on April 23, 2024,

---

[2] An award of reasonable attorney's fees under § 1988 is discretionary.  42 U.S.C. § 1988(b).

[3] The order denying the motions also denied Rash's "supplemental submission" in further support of his summary judgment motion.  Doc. #104.

[4] The Court denied the motions "without prejudice to any party moving for judgment as a matter of law at the non-jury trial with respect to any issue properly raised in the renewed motions for summary judgment,"

> [b]ecause (1) the renewed motions for summary judgment violate the Local Rules in certain respects, (2) the [Court] concludes sufficient reason was not stated in the parties' joint motion requesting leave to file renewed motions for summary judgment, (3) some of the issues raised in the renewed motions for summary judgment rely on the statements of persons whose credibility should be assessed in person at the non-jury trial, (4) the [Court] can and will independently review the Article III standing issue raised by the defendant as to some of the plaintiff's claims, and (5) the  pretrial order entered reflects the existence of certain contested issues of fact ….

Doc. #158 at 1–2.

and responded to one another's proposed findings and conclusions on, respectively, May 7, 2024, and May 9, 2024.

## II
## Standard

"In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately." Fed. R Civ. P. 52(a)(1). This rule "exacts neither punctilious detail nor slavish tracing of the claims issue by issue and witness by witness." *Century Marine Inc. v. U.S.*, 153 F.3d 225, 231 (5th Cir. 1998). However, a court may not make a factual finding which is unsupported by substantial evidence, based on a misinterpretation of evidence, or clearly against the preponderance of credible testimony. *Meche v. Doucet*, 777 F.3d 237, 241–42 (5th Cir. 2015). Credibility determinations should be based on a witness' "demeanor and inflection," and whether "[d]ocuments or objective evidence may contradict the … story; or [whether] the story itself [is] … internally inconsistent or implausible on its face." *Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985).

## III
## Findings of Fact

Applying the Rule 52(a) standard above, the factual findings below considered (1) the testimony of the trial witnesses;[5] (2) the documentary exhibits admitted into evidence; and (3) the undisputed facts.

### A. The Parties

John Rash resides in Oxford, Mississippi, where he is an Assistant Professor of Film Production and Southern Studies at the University of Mississippi. Doc. #213 at 238–39. Before

---

[5] Joe York, Kevin Frye, Jeff McCutchen, John Rash, Joey East, David Rikard, Lisa Carwyle, Larry Gillespie, Brent Larson, and Jeff Busby testified at trial.

he was an Assistant Professor at the University, Rash served as a staff producer and director of the University's Southern Documentary Project starting in 2017, where he produced video, photo, and audio documentaries about the American South. *Id.* at 239.

Lafayette County, Mississippi, is a political subdivision of the State of Mississippi. Doc. #29 at 6; Doc. #32 at 2. The County acts through its Board of Supervisors, and the County Administrator exercises authority delegated by the Board. Doc. #198 at 5. The Board is comprised of five supervisors. Doc. #203-1 at PageID 3418, 3430; Doc. #206-1 at PageID 3560.

### B. The Courthouse Grounds and Oxford Town Square

The City of Oxford, Mississippi, is located within the County. Doc. #212 at 162. The County courthouse and its grounds constitute an enclave of County property within Oxford. Doc. #29 at 7; Doc. #32 at 3. Built in 1872, the County courthouse stands in the center of the Oxford town square. Doc. #198 at 4; Doc. #204-1 at PageID 3520. Immediately surrounding the courthouse are the courthouse grounds, which consist of pedestrian pathways, grass, trees, benches, and a Confederate statue that was erected in 1907. Doc. #204-1 at PageID 3522; Doc. #198 at 5.

The courthouse grounds are configured in the shape of an octagon and are surrounded by an approximately three-foot tall, intermittent fence and a perimeter sidewalk. Doc. #204-1 at PageID 3522. The confederate statue stands just outside the perimeter sidewalk on the southern edge of the courthouse grounds, and is surrounded by its own, slightly larger, perimeter sidewalk. *Id*. at PageID 3523. On all sides of the courthouse grounds, including the confederate statute, is a one-way road that separates the businesses on the Oxford town square from the courthouse grounds. *Id.* at PageID 3522.

The public may access the courthouse grounds from the Oxford town square through five

openings in the intermittent fence. *Id*. Three of these openings feed directly into crosswalks between the courthouse grounds and the town square, one leads to a triangular-shaped crosswalk on the opposite side of the confederate statue, and the fifth and final opening leads to the perimeter sidewalk that surrounds the courthouse grounds. *Id.* Pedestrians typically use these openings to navigate the Oxford town square by cutting across the courthouse grounds. Doc. #212 at 53, 106–07. People also sit on the benches on the courthouse grounds (to drink coffee, eat frozen yogurt, or wait for taxis at night), walk their dogs on the courthouse grounds' grassy area, take walks through the courthouse grounds, and allow their children to play on the courthouse grounds. *Id.* at 107; Doc. #213 at 298, 387; Doc. #214 at 455, 623. According to the City of Oxford's Chief of Police Jeff McCutchen and Lafayette County Sheriff Joey East, people are typically not on the courthouse grounds at night. *See* Doc. #213 at 386–87.

The County Administrator, Lisa Carwyle, has granted permits for people to use the courthouse grounds for political, commercial, religious, social, and memorial services. Doc. #214 at 526. Events that have occurred on the courthouse grounds include an annual prayer service on the south lawn of the grounds, an annual law enforcement and veteran appreciation event, a local arts commission event called "Makers Market" that allowed local vendors to sell art in booths on the courthouse grounds, a Christmas parade where attendees gather on the grounds, Easter celebrations, nighttime Halloween events, vigils, weddings, and a painting class. Doc. #198 at 6; Doc. #212 at 121, 167–68; Doc. #214 at 621–22, 631. There have also been protests at the courthouse grounds, both in favor of and against, the confederate statue. Doc. #198 at 6; Doc. #212 at 122. Between 2016 and 2020, ten to twelve events per year were held on the courthouse grounds, and two to three of them took place at night. Doc. #214 at 512–13.

At night, the Oxford town square is "festive," as there are approximately thirty bars within

a four-block radius of the town square that serve approximately 20,000 students from the University. Doc. #212 at 72; Doc. #213 at 432, 435. McCutchen testified that because many of the students out at night are consuming alcohol, a strong police presence is required. Doc. #212 at 204. According to McCutchen the "big nights" on the square are Thursday, Friday, and Saturday. *Id.* at 230. On these nights, McCutchen increases the number of officers in downtown Oxford. *Id.* at 173–74. Video footage dated May 14, 2016, August 26, 2013, September 16, 2012, and September 16, 2016, showed large crowds at bars on the square. When asked whether he would be concerned if crowds of the size depicted in the videos walked from the bars to the courthouse grounds, McCutchen responded in the affirmative. Doc. #212 at 216. McCutchen is aware of two alcohol-related car accidents in Oxford that have been fatal—one occurred behind City Hall, and the other occurred a quarter of a mile away from the town square. *Id.* at 227–28.

### C. The Facility Use Policy

#### 1. Policy enactment and amendments

##### a. *2015 Facility Use Policy*

Before 2015, the Board did not have a written policy governing the use of facilities owned by the County, including the courthouse and the courthouse grounds. Doc. #213 at 477. On April 20, 2015, the Board adopted a "Facility Use Policy" ("2015 Policy") that "govern[ed] the use of public areas of buildings or facilities owned, leased, or otherwise, occupied exclusively by Lafayette County Government that are used for the conduct of County operational business." Doc. #203-1 at PageID 3409. The 2015 Policy defined "public areas" to "include[] the grounds and lobbies of County buildings, the Board Room, and Chancery and Circuit Courtrooms" but not "offices, workstations, stairwells, corridors or halls," as "these areas are reserved for County business only." *Id.* at PageID 3410. The 2015 Policy required that potential users obtain an

6

approved "Facility Use Permit" to reserve any County facility, and that applications for a Facility Use Permit "be submitted to the County Administrator at least one (1) week in advance of the day needed." *Id.* at PageID 3411. Permitted uses were limited to Monday through Friday between 8:00 a.m. and 10:00 p.m. *Id.* at PageID 1410. Regarding use on the weekend or after 10:00 p.m., the 2015 Policy stated such use was "limited" and "must primarily be events coordinated and staffed by County employees and/or officials." *Id.* Because "[t]he primary use of the County facilities is for the conduct of County government business," the 2015 Policy gave "priority use of most facility space" to "groups that are a part of or associated with Lafayette County government;" however, those groups could "not pre-empt already scheduled events." *Id.* at PageID 3409.

Under its "Prohibitions" section, the 2015 Policy included a "Security" subsection stating that "[t]he user shall provide, at its own expense, any security that the user desires in addition to security normally provided by the County." *Id.* at PageID 3411. The "Prohibitions" section also contained a "Signs" subsection that prohibited "signs, emblems, banners, pennants, etc." from being "affixed to any building surface, steps, walls or light fixtures." *Id.* at PageID 3412. However, "[i]f requested and approved by the County Administrator," County personnel were permitted to "place banners on the exterior balcony of the Courthouse for a period not exceeding one (1) week." *Id.*

The 2015 Policy "appl[ied] to all groups and individuals that have requested use of County facilities and grounds," and provided that "[n]o group or individual shall be excluded from equal access to County facilities or grounds because of considerations of sex, race, religious or political persuasions or views." *Id.* at PageID 3410.

### b. *March 2019 Amendments*

"[M]otivated by knowledge … that outside groups … were wanting to come into Oxford

to protest the … moving of [the University of Mississippi's confederate] statute," Doc. #212 at 148, the Board amended the 2015 Policy on March 4, 2019, "to prevent things from getting out of hand." Doc. #203-1 at PageID 3413; Doc. #212 at 149. Before the enactment of the March 2019 amendments, Carwyle submitted a "draft of the proposed facility use policy" by e-mail dated February 26, 2019, to David O'Donnell,[6] John Hill, and "supervisors@lafayettecoms.com." Doc. #203-1 at PageID 3433, 3434. Carwyle's e-mail stated that she "took the City's ordinance and incorporated some restrictions [that the e-mail's recipients] wanted included." *Id.*

Ultimately, the March 2019 amendments (1) required permit applicants to pay the County a "non-refundable fee of $25.00 to cover administrative costs of processing the permit;" (2) extended the permit application deadline from one week to thirty days before the date of the permitted event; (3) added to the security subsection:

> The Sheriff shall determine whether and to what extent additional Sherriff Department deputies is reasonably necessary for the event for traffic control and public safety. The Sherriff shall base this decision on the size, location, duration, time and date of the event. If additional law enforcement protection for the event is deemed necessary by the Sherriff, he shall so inform the user. The total cost of Sherriff Protection must be paid in full 10 days prior to the event or the event will be canceled. The applicant may make a deposit of 25% of this amount in order to secure the date of the vent [sic], prior to making payment in full. If the event is canceled within 24 hours of the stated beginning time, no refund for law enforcement protection would be issued;

(4) added to the "Signs" subsection:

> No one at the event shall carry or possess any length of metal, lumber, wood, plastic, or PVS, or similar material for purposed [sic] of displaying a sign, poster, plaque, or notice, unless such object is one-fourth inch or less in thickness and two inches or less on width, or if not generally rectangular in shape, such object shall not exceed three-fourths inch in its thickest dimension;

and (5) added to the Prohibitions section a new "Other Items" subsection that states:

> - No person participating in the event shall carry or wear any glass bottles,

---

[6] O'Donnell is counsel of record for the County in this case.

8

balloons filled with anything other than helium or air, body armor, bricks, stones, water guns, operational gas masks, or slingshots or similar manual projectile-launching equipment[.]

- [N]o person participating in the event shall carry an open flame.
- No person may conceal their identity during the event by wearing a mask, hood, or other device that covers, hides, or conceals any portion of that individual's face:

   a) With the intent to intimidate, threaten, abuse or harass any other individual;

   b) With the intent to deprive any person or class or persons of the equal protection of the laws, privileges or immunities under the law, or for the purpose of hindering the authorities from giving or securing for all person's [sic] equal protections under the laws'

   c) With the intent, by force or threat of force to injure, intimidate, or interfere with any person because of his or her exercise of any right secured by local, state, or federal laws;

   d) For the purpose of evading or escaping discovery, recognition, or identification during the commission of a criminal offense.

- No animals are allowed.

*Id.* at PageID 3416–17.

### c. June 2020 Amendments

After George Floyd was killed by a police officer in May 2020, protest activity at the confederate statue on the courthouse grounds increased. Doc. #214 at 595; *see* Doc. #213 at 327–29, 464. During this time, requests to use the courthouse grounds became "pretty frequent," Doc. #214 at 532, and the Board received many e-mails about the statue, Doc. #213 at 464–65. For several days in early June 2020, the Lafayette County Sherriff's Department set up temporary barricades around the confederate statue. Doc. #198 at 6.

On June 15, 2020, the Board issued an order amending the Facility Use Policy. Doc. #203-1 at PageID 3418. The June 15 order approved revisions to the Facility Use Policy to (1) "allow four (4) people or less to use the Historic Courthouse outside grounds, including the area around the Confederate Statue, without a permit, although said individual or group [could] obtain a permit in order to have exclusive use of the area;" (2) require "five (5) or more people gathering" to obtain

9

a permit "for use;" (3) provide an exception to the thirty-day application deadline where "unusual circumstances make it impossible to make application prior to the thirty (30) day period;" and (4) state that "the Board of Supervisors and/or the sheriff shall determine whether to waive the 30-day period." *Id.* The June 15 order amending the Facility Use Policy took immediate effect. *Id.*[7]

### d. July 2020 Amendments

Because of the increase in protests related to George Floyd's death, East began to look at the County's Facility Use Policy. Doc. #213 at 394–95, 400. On June 27, 2020, East forwarded to Carwyle an e-mail—originally sent to Chief Deputy Scott Mills and Major Alan Wilburn—that included an attachment containing his proposed changes to the March 4, 2019, Facility Use Policy and the permit application form. Doc. #203-1 at PageID 3420; Doc. #213 at 402. In reply to East's June 27 e-mail, Carwyle, East, and O'Donnell sent a series of e-mails dated June 29, 2020, in which they discussed meeting the following day. Doc. #203-1 at PageID 3419–20.

The attachment to East's June 27 e-mail contained four comments by him regarding the March 4, 2019, version of the Facility Use Policy and the permit application form. Specifically, (1) where the Policy states that "[u]se on weekends or after 10:00 p.m. is limited," East commented, "Need to address this time line. It should be no later that [sic] 5pm unless special request to and approved by BOS;" (2) regarding the Policy's provision that "use may be denied or terminated if there is a violation of the rules set forth in this policy/or if the use poses health or safety risks," East commented, "Safety risk;" (3) as to the Policy's exception to its prohibition on certain signs, East commented, "Never mentions flags, so therefore I believe they can carry a flag, state, American but maybe not a flag with a message on it;" and (4) where the permit application

---

[7] The Board posted a press release about the June 15, 2020, amendments to its social media account and on its website. Doc. #214 at 533–34.

states that "applications must be filed 30 days prior to the event, the Board of Supervisor or the Sheriff have the right to waive the 30 day requirement," East commented, "Should say something like, The BOS can waive the 30 day requirement. Or after checking with law enforcement to make sure no security issues." Doc. #203-1 at PageID 3421–26; Doc. #213 at 403–05. As to his suggestion that use be limited after 5:00 p.m. rather than 10:00 p.m., East testified that his department did not "have the manpower to keep anyone safe on the grounds" at night based on his "observations and experiences with nightlife around the square" and "the impact of nighttime use of the courthouse grounds on pedestrian traffic safety." Doc. #213 at 436–37.

On July 6, 2020, the Board held a meeting, the minutes of which indicate the Board's discussion of these topics: (1) the permit application period, (2) "safety," (3) "after dark," and (4) whether the anti-stick provision includes flags. Doc. #203-1 at PageID 3429. On July 20, 2020, the Board issued an order amending the Facility Use Policy. Doc. #203-1 at PageID 3430. The order approved a revision to the Facility Use Policy to reduce the permit application period from thirty days to fourteen days, and to "require closure of the Courthouse grounds, including the confederate statue area, thirty minutes before dusk." *Id.* The Board did not consider, as alternatives to the dusk to dawn closure, closing the courthouse grounds before the bars on the Oxford Town Square closed for the night, closing the courthouse grounds on only certain nights of the week, disallowing certain events after a certain time, or creating an exception to the dusk to dawn closure. Doc. #214 at 573, 574, 606.

### e. January 2021 Amendments

Approximately five months after Rash commenced this lawsuit, the Board issued an order adopting the current version of the Facility Use Policy on January 4, 2021. Doc. #206-1 at PageID 3560; Doc. #213 at 414–15. The substantive changes to the Facility Use Policy by the January 4,

2021, amendments (1) state that the County facilities not covered by the policy are also "not generally available for public use;" (2) prohibit use of any County facility under the policy "for private social functions such as weddings, birthdays and anniversary parties;" (3) in the section titled "Use of Facilities and Grounds," state that "permission to use Lafayette County facilities does not constitute an endorsement by Lafayette County or the Lafayette County Board of Supervisors," and "[u]se of the County Courthouse exterior grounds will not be permitted between 30 minutes before dusk thru and until dawn;" (4) add a new subsection titled "Courthouse Grounds," that (a) states "[t]he use of the Courthouse Exterior Grounds, defined to include the outside areas contiguous to the Circuit Courthouse and the area encompassing the confederate memorial, is limited given that it is primarily a place of court business," (b) requires a permit "for all uses except" "use of the area immediately surrounding the confederate memorial for groups of four or less, and (c) provides that "[n]o use of user(s) of the Courthouse Grounds permitted, or otherwise, may block or impede pedestrian use of the sidewalks leading to or from, or within, the Courthouse grounds;" (5) add to the "Liability" section that any group using the County facilities must indemnify the County from any liability; (6) change the section formerly titled "Denial of Usage" to "Denial of Proposed Usage," and add to this section that (a) the County "reserves the right to deny applications or impose reasonable time, place, and manner restrictions in granting a permit depending on the nature of the proposed use," (b) a permit may be denied if the use would "pose unreasonable health or safety risk," and (c) a permit applicant or permitted user may appeal a permit denial or restriction on use to the Board "by filing a written appeal with the County Administrator withing [sic] ten days of the denial or grant of the permit with restrictions;" (7) add to the "Application for Usage" section that (a) "[a] Deposit and Use Fee based on an hourly rate of $50.00 per hour of requested use must accompany the application" in addition to the potential

12

fees described in the "Security" subsection, and (b) the County Administrator, as opposed to the County Administrator and/or the Sheriff, may waive or shorten the fourteen-day application period for "proposed uses which demonstrate an urgent need for use of the County facility, such as the desire to demonstrate or engage in speech protected by the First Amendment motivated by events or issues suggesting a need for immediate demonstration or expression, subject to reasonable time, place and manner restrictions;" (8) add flags to the list of prohibited items in the "Signs" subsection; and (9) add a subsection titled "Grounds Use" stating that "[a]nchoring tents, canopies or other allowed structures must be accomplished with sandbags or other non-invasive methods which do not pose a potential hazard to underground facilities." Doc. #206-1 at PageID 3561–65. Though the order approving these amendments is dated January 4, 2021, the amended Policy attached to the order states that its "effective date" is "July 20, 2020." *Id.* at PageID 3561.

### 2. Policy enforcement

The County Administrator "implements all policies that are enacted by the [B]oard … in conjunction with consulting with the sheriff." Doc. #213 at 485. When Carwyle, as County Administrator, receives a permit application, she sends it to East to determine the extent of security needed. Doc. #213 at 408, 481–82. To make a security determination, East will consider what kind of event the permit is for and, if the event is a protest, whether there may be counter-protestors. *Id.* at 409–10.

To enforce the Policy's prohibition against use of the "County Courthouse exterior grounds" from "30 minutes before dusk thru and until dawn," Carwyle consults Google's search engine to determine what time dusk is for the proposed date in each permit application. Doc. #213 at 486. For at least one permit application requesting to use the courthouse grounds for an event ending after dusk (as indicated by Carwyle's Google search), Carwyle called the applicant to

inform her that the event would need to end twenty-four minutes before dusk, and the applicant subsequently asked Carwyle to change the time on her permit application. Doc. #206-1 at PageID 3566; Doc. #214 at 548–49. To enforce the dusk to dawn closure beyond permit applications, in March of 2021, Carwyle instructed the building and grounds department to place signs on the courthouse grounds that state, "Attention Visitors: Lafayette County Courthouse Grounds are closed from 30 minutes before dusk until dawn." Doc. #198 at 5; Doc. #214 at 515.

As to the Policy's "urgent need" exception to the fourteen-day application period requirement, the Policy—as amended in January 2021—explicitly identifies "the desire to demonstrate or engage in speech protected by the First Amendment" as an "urgent need." Doc. #206-1 at PageID 3563. And Carwyle testified that before the January 2021 amendments, she considered whether an applicant "intend[ed] to engage in what [she] regarded as First Amendment speech" when exercising her discretion to waive the application period requirement. Doc. #214 at 532. Carwyle also uses her "discretion in consultation with the sheriff" to determine whether the "urgent need" exception applies. Doc. #214 at 510. If a permit application is submitted after the fourteen-day application period and East needs more time to "provide the ample security," Carwyle does not exercise her discretion to waive the application period requirement. Doc. #213 at 496.

Although the Policy does not define the type of use to which it applies,[8] it currently permits the County to deny or restrict a permit "depending on the nature of the proposed use." Doc. #206-1 at PageID 3563. And three of the five members of the Board testified that whether a permit is necessary for use of the courthouse grounds depends on what the use is.[9] Consequently, Carwyle

---

[8] Doc. #203-1 at PageID 3409–12, 3413–17; Doc. #206-1 at PageID 3560–65.

[9] Gillespie stated that permits would not be applied to "casual use" but would be required for "an organized demonstration." Doc. #214 at 580. Rikard testified that "there are two different types of uses, … someone … just walking through or sitting on a bench, or someone had intentions of drawing attention to themselves for a particular

does not apply the Policy to "casual use." Doc. #213 at 491–92, 494. During the permit application process, Carwyle uses her discretion to determine whether the requested use is "casual use." *Id.* at 494.

If a person uses the courthouse grounds without a permit, East exercises discretion to determine whether such use is "casual use," and whether the Policy should be enforced. *Id.* at 495–96. According to East, five people eating lunch on the courthouse grounds and debating politics loud enough for others to hear would not require permit but they "probably" need a permit to "start handing out signs and … occupying space." Doc. #213 at 414. Since signs were placed on the courthouse grounds in March 2021, East has never asked anyone to leave the courthouse grounds, given someone a citation for being on the courthouse grounds at night, or arrested anyone for being on the courthouse grounds at night. Doc. #213 at 388–89. East testified that he does not know the consequence of being cited for being on the courthouse grounds at night, including whether it would be a felony or a misdemeanor. Doc. #213 at 388.

During the December 2021 Christmas parade, one hundred to two hundred people stood on the courthouse grounds at night to watch the parade—some stood directly in front of the signs that were posted in March 2021—without interference from law enforcement. Doc. #212 at 61, 63, 64, 68, 88; Doc. #205-1 at PageID 3450.

### D. Rash's 2020 Permit Application

Starting in 2018, Rash, in partnership with the Yoknapatawpha Arts Council and Visit Oxford,[10] began holding an annual event called PROJECT(ion) as part of the Oxford Fringe

---

reason." Doc. #213 at 456. According to Rikard, whether someone using the courthouse grounds needs a permit "depends on what their intentions are. If they are trying to interact with the public or they are there for a specific purpose besides just enjoying someone's company." Doc. #213 at 457–58. Larson understands that a permit is not required for a "social gathering" or "casual event" such as "a group of five people sitting on the lawn praying together," but a permit is required "for a group of five people who wanted to express political views. Doc. #214 at 596–98.

[10] Visit Oxford is "an associative group within" Oxford. Doc. #212 at 190.

Festival.[11]  Doc. #213 at 241, 250, 253.  The Yoknapatawpha Arts Council's Fringe Festival creates cultural events during a four-week period "identified as being the least busy" for "tourism [in] Oxford."  *Id.* at 241.  PROJECT(ion) is a free public art event that occurs in August where artists project their work onto screens and other surfaces.  *Id.* at 348; Doc. #203-1 at PageID 3448; Doc. #203-1 at PageID 3438.[12]

Rash is both an organizer and participating artist of PROJECT(ion).  Doc. #213 at 250.  His role as an organizer includes collecting submissions from interested artists using a Google form, and helping the artists who ultimately participate in the event to set up their projectors and arrange their artwork.  *Id.* at 243, 250.  In 2018, PROJECT(ion) was held at "the atrium," a location between two businesses on the town square.  *Id.* at 257.  In 2019, it was held on the courthouse grounds.  *Id.*

In preparation for the August 2020 PROJECT(ion) event, Rash contacted Carwyle by e-mail dated July 7, 2020, to inquire about the process and cost for obtaining a permit "to set up an evening art installation on the courthouse property on … August 8th."  Doc. #203-1 at PageID 3447.  In his e-mail, Rash explained that he wanted "the opportunity to use the courthouse area this year due to COVID-19 so that it can be viewed by cars driving by or people parked in the adjacent spaces around the square."  Doc. #203-1 at PageID 3447.  At the time of Rash's e-mail to Carwyle, Carwyle was on vacation and returned to the office on July 14, 2020.  Doc. #214 at 540.

Rash followed up to his July 7 e-mail by submitting a permit application dated July 14, 2020, for PROJECT(ion).  Doc. #203-1 at PageID 3449.  The permit requested use of the

---

[11] The Oxford Fringe Festival has since been renamed "Ronzo Days."  Doc. #213 at 250.

[12] The Google form for submissions to the 2019 PROJECT(ion) event described it as "a one-night event for artists, video makers, photographers, and other creative freaks to transform an architectural space with light and imagination."  Doc. #203-1 at PageID 3438.

courthouse grounds on August 8, 2020, from 8:00 p.m. to 11:00 p.m., and estimated that thirty

people would attend. *Id.* In the section designated for "Explanation of Use," the permit application

stated, "Artists installations with light and projectors onto screens and courthouse objects." *Id.*

After reviewing the application, Carwyle called Rash "to get a little more information."

Doc. #214 at 541–43. The next day, Carwyle sent the application to East by e-mail explaining that

the event is "a projection show." Doc. #214 at 541–43; Doc. #203-1 at PageID 3450. East

responded to Carwyle's e-mail the same day, stating he would "check on this to see what exactly

they want to do." Doc. #203-1 at PageID 3450.

On July 16, 2020, Chief Deputy Scott Mills from the Sheriff's Department called Rash to

inquire about his permit application. Doc. #198 at 6. According to Rash, Mills asked whether

there would be content about the confederate statue at PROJECT(ion). Doc. #213 at 307, 340.

Rash responded that he could not guarantee that such content would not be part of the event. *Id.*

at 307. That same day, Visit Oxford applied on Rash's behalf for a permit from the City of Oxford

to hold PROJECT(ion) at City Hall on August 8, 2020, from 5:00 p.m. to 11:30 p.m. Doc. #213

at 319; Doc. #203-1 at PageID 3476–77.

On July 23, 2020, Carwyle sent an e-mail to Rash denying his permit application to use the

courthouse grounds for PROJECT(ion), stating that "due to a change in the County's permit

policy," "[n]o permits will be issued after dusk, due to security issues." Doc. #206-1 at PageID

3559. The next day, Rash called Carwyle to inquire whether the permit would be issued if he

limited the event's participants to two to three people. Doc. #214 at 546; Doc. #206-1 at PageID

3559. Carwyle responded to Rash's inquiry by e-mail dated July 27, 2020, stating that "the

Courthouse grounds, including the statue area, are closed for any gathering after dark, regardless

of permit requirements," and Rash "would not be allowed to be on the grounds from thirty minutes

17

prior to dusk to sunrise."  Doc. #206-1 at PageID 3559.

Four days later, Rash commenced the present action by filing a "Complaint for Injunctive and Declaratory Relief" and a motion for preliminary injunction requiring the County to issue a permit to him or enjoin the County from interfering with, or taking adverse action against, him or other PROJECT(ion) participants.  Docs. #1, #3.  Rash's request for preliminary injunctive relief was denied on August 6, 2020.  Doc. #25.  Because Visit Oxford's permit application to use City Hall was approved, Rash held PROJECT(ion) there instead on August 8, 2020.  Doc. #213 at 308; Doc. #203-1 at PageID 3476–77.

Since August 2020, the Yoknapatawpha Arts Council has asked Rash to participate in the Fringe Festival every year, including this year.  Doc. #213 at 255, 326.  Each year, Rash told the council that "[he] was interested" but declined to participate since "[t]his case was still pending, and it would be contingent on the results of this case … [b]ecause without the ability to get a permit, [he] didn't see it as a viable event."  Doc. #213 at 255.  Rash also has not applied for a permit to use any County facilities since his application was denied in 2020.  *Id.* at 330.  According to Rash, the County's January 2021 Amendments "stat[e] clearly that [the courthouse] grounds aren't available for permit after dusk" and it would be "a waste of his time and money [to apply] because there is a fee to file a permit."  *Id.* at 255.  Although Rash has not applied for a permit to use County facilities or hosted PROJECT(ion) since August 2020, he testified that he intends to attend and document political events on the courthouse grounds.  *Id.* at 280.

IV
**Conclusions of Law**

**A.  Rash's Claim**

Rash proceeded to trial on his 42 U.S.C. § 1983 claim against the County alleging a violation of the right to free expression and assembly under the First and Fourteenth Amendments

18

to the United States Constitution. Doc. #198 at 2. Rash specifically challenges both facially and as applied[13] the following aspects of the County's Facility Use Policy: (1) dusk to dawn closure ("curfew"); (2) permit requirement for one or five persons ("group permit requirement"); (3) fourteen-day application period ("advance notice requirement"); (4) provision giving the sheriff the discretion to determine whether and how many sheriff department deputies are needed to maintain public safety at events and to require an applicant to pay the necessary fee ten days before the event ("sheriff protection fees"); (5) insurance and indemnity provisions; and (6) provision reserving the County's right to deny permit applications for use that would pose health or safety risks.[14] *Id.* at 6–7. Rash seeks declaratory and injunctive relief, and an award of nominal damages. *Id.* at 2.

## B. Standing

A plaintiff's standing to sue is "an essential and unchanging part of the case-or-controversy requirement of Article III [of the United States Constitution]." *Lujan v. Def. of Wildlife*, 504 U.S. 555, 560 (1992). The "irreducible constitutional minimum of standing" requires a plaintiff to "present an injury that is concrete, particularized, and actual or imminent; fairly traceable to the defendant's challenged behavior; and likely to be redressed by a favorable ruling." *Lujan*, 504 U.S. at 590; *Nat'l Fed'n of the Blind of Tex., Inc. v. Abbott*, 647 F.3d 202, 208–09 (5th Cir. 2011) (citing *Davis v. FEC*, 554 U.S. 724, 733 (2008)). Thus, a plaintiff has standing when he can establish (1) injury in fact, (2) causation, and (3) redressability. *Stringer v. Whitley*, 942 F.3d 715, 720 (5th Cir. 2019). The plaintiff's burden of establishing standing applies to each claim for relief

---

[13] Doc. #29 at 5.

[14] Rash's amended complaint also mentions the Policy's prohibition against amplified sound and its provision reserving the County's right to deny permit applications by users who previously have violated the rules or applications. Doc. #29 at 4, 19, 20. But the pleadings were amended to conform to the governing pretrial order and such provisions of the Policy were not included by the parties in the governing pretrial order as contested issues. Doc. #198 at 1, 6–7.

and each form of relief sought. *Perez v. McCreary*, 45 F.4th 816, 821 (5th Cir. 2022). The degree of evidence required to carry this burden "becomes gradually stricter as the parties proceed through the successive stages of litigation." *Ortiz v. Am. Airlines, Inc.*, 5 F.4th 622, 628 (5th Cir. 2021) (internal quotations omitted). "Therefore, in a case like this that proceeds to trial, the specific facts set forth by the plaintiff to support standing 'must be supported adequately by the evidence adduced at trial.'" *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) (quoting *Lujan*, 504 U.S. at 561).

### 1. Curfew

#### a. Injury in Fact

##### i. As-Applied

Rash challenges the curfew as applied based on claims that "the County's decision to adopt the curfew … was motivated, in whole or in part, by an intent to deny [his] permit application and prevent [him] from holding the PROJECT(ion) event," and "[a]s a result of the County's denial of [his] permit application and imposition of the curfew …, [he] was unable to hold the PROJECT(ion) event …, and was instead forced to make alternative arrangements to hold a substitute event on public property under the jurisdiction of the City of Oxford." Doc. #29 at 16–17.

Permit denials constitute injury in fact for purposes of Article III standing. *De Leon v. Perry*, 975 F. Supp. 2d 632, 646 (W.D. Tex. 2014). Here, Rash's as-applied challenge to the curfew provision presents an injury in fact because Carwyle denied his permit application based on the curfew provision of the County's Facility Use Policy. Doc. #206-1 at PageID 3559; *see Reeves v. McConn*, 631 F.2d 377, 381 (5th Cir. 1980) (finding injury for purposes of Article III standing where plaintiff was denied permit pursuant to local ordinance).

*ii. Facial*

Regarding his facial challenge to the curfew, Rash claims it is an "unreasonable restriction on speech" that is arbitrarily enforced against political speech, and vague and not narrowly tailored to the extent it "would chill the speech of others who want to engage in similar expression." Doc. #29 at 17, 21.[15] "[A] chilling of speech because of the mere existence of an allegedly vague or overbroad statute can be sufficient injury," *Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 660 (5th Cir. 2006), if a plaintiff demonstrates a "serious interest in acting contrary to a statute," *Nat'l Fed'n of the Blind of Tex., Inc.* 647 F.3d at 208–09.[16] But "[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18–19 (2010).

According to Rash, he "need[s] darkness, … a time after dark in order to produce … PROJECT(ion)" because the "event can't exist in the daylight." Doc. #213 at 244–45, 330. So the curfew, which closes the courthouse grounds thirty minutes before dusk, was not vague in its application to Rash's 2020 permit. Therefore, although chilled speech is a cognizable injury, Rash lacks standing to assert a facial challenge to the curfew based on vagueness. *See Holder*, 561 U.S. at 19. Accordingly, Rash's facial challenge to the curfew will be dismissed without prejudice.

---

[15] The County contends that Rash waived his claim against the curfew for vagueness because such claim was not identified in the amended pretrial order. The amended pretrial order identifies as a contested issue of law "[w]hether closing the Courthouse Grounds 30 minutes before dusk each day violates the First Amendment." Doc. #198 at 6. The Court considers this description inclusive of a First Amendment challenge to the curfew based on vagueness. *See Martin v. Lee*, 378 F. App'x 393, 395 (5th Cir. 2010) (Fifth Circuit "gives the trial court 'broad discretion to preserve the integrity and purpose of the pretrial order.'") (quoting *Geiserman v. MacDonald*, 893 F.2d 787, 790–91 (5th Cir. 1990)).

[16] *See Doe I v. Landry*, 909 F.3d 99, 115 (5th Cir. 2018) (chilled speech is injury in fact if plaintiff claimed she was "seriously interested in engaging in a course of conduct arguably affected with a constitutional interest, but proscribed by statute.") (internal quotations omitted); *Justice v. Hoseman*, 771 F.3d 285, 291 (5th Cir. 2014) ("[O]nce a plaintiff has shown more than a 'subjective chill'—that is, that he 'is seriously interested in disobeying, and the defendant seriously intent on enforcing, the challenged measure'—the case presents a viable 'case or controversy' under Article III.") (citation omitted).

*b. Causation*

Where a plaintiff claims an injury based on a policy, causation is established for Article III standing as to the entity that enacted the policy. *See Energy Mgmt. Corp. v. City of Shreveport*, 397 F.3d 297, 302 (5th Cir. 2005) (injury claimed by plaintiff as result of regulations in local ordinance is "fairly traceable" to defendant's actions in enacting and enforcing ordinance). Because (1) the County enacted the curfew by amending the Facility Use Policy, (2) Carwyle denied Rash's permit application to hold the PROJECT(ion) art event on August 8, 2020, based on the curfew, and (3) Rash claims the curfew prevented him from seeking a permit to hold PROJECT(ion) after 2020, the causation prong is satisfied for Rash's claim against the curfew. *See OCA-Greater Hous. v. Tex.*, 867 F.3d 604, 613 (5th Cir. 2017) (challenged statute is "without question, fairly traceable" to state that enacted statute for purposes of Article III standing); *De Leon*, 975 F. Supp. 2d at 646 (county clerk's denial of marriage license established causation for Article III standing because denial was directly related to Texas' law banning same-sex marriage).

*c. Redressability*

Rash requests that the Court (1) award "nominal damages in the amount of $100.00 to compensate [him] for [the County]'s violation of [his] constitutional rights in closing the County Courthouse ground and prohibiting [him] from holding the PROJECT(ion) event on August 8, 2020;" (2) "[p]ermanently enjoin [the County]'s policies and practices that restrict speech and assembly on the County Courthouse grounds;" (3) enter declaratory judgment stating that (a) the County's "policies and practices that restrict speech and assembly on the County Courthouse grounds violate [his] rights to free speech and assembly under the First Amendment to the United States Constitution," and (b) the County's "actions in closing the County Courthouse grounds and prohibiting [him] from holding the PROJECT(ion) event on August 8, 2020 violated [his] rights

22

to free speech and assembly under the First Amendment to the United States Constitution." Doc. #29 at 22.

### i.   Nominal Damages

"A request for nominal damages satisfies the redressability element of standing where a plaintiff's claim is based on a completed violation of a legal right." *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 802 (2021). Since the County denied Rash's permit application in 2020, it is a past, completed injury redressable by the nominal damages he seeks. *See Uzuegbunam*, 141 S. Ct. at 802 (nominal damages can redress injury petitioner suffered when respondents enforced their speech policies against him because such injury was completed violation); *Ostrewich v. Tatum*, 72 F.4th 94, 107 (5th Cir. 2023) ("Nominal damages go only to redressability and are unavailable where a plaintiff has failed to establish a past, completed injury.") (quoting *Uzuegbunam*, 141 S. Ct. at 802 n.*). So Rash has satisfied the redressability prong of his as-applied challenge to the curfew as to his request for nominal damages.

### ii.   Injunctive and Declaratory Relief

"Because injunctive and declaratory relief 'cannot conceivably remedy any past wrong,' plaintiffs seeking injunctive and declaratory relief can satisfy the redressability requirement only by demonstrating a continuing injury or threatened future injury." *Stringer*, 942 F.3d at 720 (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998)). For a threatened future injury to meet this standard, "there must be at least a 'substantial risk' that the injury will occur." *Id.* at 721 (quoting *Susan B. Anthony List v. Dreihaus*, 573 U.S. 149, 158 (2014)). "[P]ast incidents, though insufficient to confer standing, are still 'evidence bearing on whether there is a real and immediate threat of repeated injury.'" *Crawford v. Hinds Cnty. Bd. of Supervisors*, 1 F.4th 371, 375 (5th Cir. 2021) (quoting *City of L.A. v. Lyons*, 461 U.S. 95, 102 (1983)).

Rash testified that he has declined the Yoknapatawpha Arts Council's invitation to organize PROJECT(ion) every year since 2020 because the curfew prevents him from obtaining a permit for the event on the courthouse grounds. Where, as here, a challenged policy continues to be enforced, self-censorship is evidence of continuing injury. *Cf. Murthy v. Mo.*, 144 S. Ct. 1972, 1977, 1995 (2024) (no continuing injury of self-censorship where social media platforms were "free to enforce, or not to enforce, their policies"). And there is a substantial risk of future injury because Rash's 2020 permit was denied based on the curfew, and Carwyle testified that she has consulted Google to determine the time of dusk when deciding whether to grant each permit application, suggesting that a future application for PROJECT(ion)—an event that requires darkness—would be denied based on the curfew. *See Crawford*, 1 F.4th at 376 (past incidents are evidence of threat of future injury). Thus, Rash's permit denial is redressable by the injunctive and declaratory judgment.

### d. Summary

As to his as-applied challenge to the curfew, Rash has standing because he established an injury in fact traceable to the County's conduct and redressable by the relief sought. But because the curfew was not vague in its application to him, he lacks standing to challenge the curfew on its face for vagueness. So his facial challenge against the curfew will be dismissed without prejudice.

### 2. Other provisions

#### a. Injury in Fact

##### i. As-Applied Challenges

A party typically "cannot challenge a statute as-applied unless the statute has been applied to him." *Carmouche*, 449 F.3d at 659. An exception to this general rule exists in the First Amendment context for plaintiffs who make a pre-enforcement as-applied challenge and "clearly

illustrate the context in which the [challenged] statute will be applied." *Blankenship v. Buenger*, 653 F. App'x 330, 343–44 (5th Cir. 2016).

Except for the curfew provision, the other provisions Rash challenges have not been applied to him, and the evidence produced at trial did not "clearly illustrate the context in which" they would be applied. *Id.* at 344. Though Rash argues that he has standing to challenge these provisions as a potential applicant, the evidence at trial showed that application of the advance notice requirement and the group permit requirement is discretionary. And the Court was not presented with any evidence at trial demonstrating the context in which the indemnity and insurance provision, the provision reserving the County's right to deny applications it determines pose a health or safety risk, or the sheriff protection fees would be applied to Rash. While it is possible the County could enforce these provisions against Rash, this possibility does not transform Rash's claims "from speculative and abstract to concrete and imminent." *See id.* (potential future arrest insufficient to make an as-applied pre-enforcement challenge because such injury is not concrete and imminent).

Because the other provisions challenged by Rash have not been applied to him and because he has not clearly demonstrated the context in which they would apply to him, there is insufficient injury in fact for Article III standing for him to challenge these provisions as applied.

## ii. *Facial Challenges*

Where a plaintiff challenges a policy that has not been applied to him, the prudential consideration of third-party standing prevents him from making a facial challenge to such policy. *Serv. Emps. Int'l Union, Local 5 v. City of Hous.*, 595 F.3d 588, at 597–98 (5th Cir. 2010). "[T]he plaintiff must establish injury under a particular provision of a regulation that is validly applied to [his] conduct, then assert 'a facial challenge, under the overbreadth doctrine, to vindicate the rights

of others not before the court *under that provision*.'" *See id.* at 598 (emphasis original) (quoting *CAMP Legal Def. Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1271 (11th Cir. 2006)) (emphasis in original). So although Rash has standing to challenge the curfew provision as applied, because he has not established an injury in fact for his as applied challenge to the other provisions, he lacks standing to challenge them on their face.

### b. Summary

Because Rash has not established injury in fact for his as applied and facial challenges to the group permit requirement, the advance notice requirement, the sheriff protection fees, the insurance and indemnity provisions, and the provision reserving the County's right to deny permit applications that would pose a health or safety risk, he lacks standing for these claims. *See William v. Morris*, 614 Fed. Appx. 773, 774 (5th Cir. 2015) (no standing without injury in fact). Accordingly, they will be dismissed without prejudice. *See id.* ("when a [claim] is dismissed for … lack of standing, it should be without prejudice").

## C. First Amendment Analysis

### 1. Content-Neutrality

"The first step in a First Amendment inquiry is to determine whether a challenged restriction on speech is either content based or content neutral." *Tex. Ent. Ass'n, Inc. v. Hegar*, 10 F.4th 495, 509 (5th Cir. 2021). "This determination dictates the level of scrutiny the challenged restriction must meet in order to pass muster." *Id.* A content-based restriction on First-Amendment protected speech is "presumptively unconstitutional and subject to strict scrutiny." *Id.* (citing *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)). Content neutral restrictions, however, are typically subject to intermediate scrutiny. *Id.* (citing *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 662 (1994)).

26

"Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed*, 576 U.S. at 163. To determine whether a restriction is content-based, courts "consider whether a regulation of speech 'on its face' draws distinctions based on the message a speaker conveys." *Id.* (quoting *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 564 (2011)). There is also "a separate and additional category of laws that, though facially content neutral, will be considered content-based regulations of speech" because they "cannot be 'justified without reference to the content of the regulated speech,' or … were adopted by the government 'because of disagreement with the message [the speech] conveys.'" *Id.* at 164 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). Consequently, "the First Amendment's hostility to content-based regulation extends not only to restrictions on particular viewpoints, but also to prohibition of public discussion of an entire topic." *Id.* at 169.

But a restriction on speech "may require some evaluation of the speech and nonetheless remain content neutral" if the speech's "substantive message … is irrelevant to the application of the [restriction]." *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 71–72 (2022). "[A] facially neutral law does not become content based simply because it may disproportionately affect speech on certain topics." *McCullen v. Coakley*, 573 U.S. 464, 480 (2014). "On the contrary, '[a] regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others.'" *Id.* (quoting *Ward*, 491 U.S. at 791).

The Policy's July 2020 amendments adopting the curfew—and the curfew provision in the current version of the Policy—do not distinguish between the types of use to which the curfew applies. So the curfew is neutral on its face. *See Nat'l Press Photographers Ass'n v. McCraw*, 90

F.4th 770, 791-92 (5th Cir. 2024) (surveillance provisions that do not distinguish among types of photographs is content neutral). However, testimony by several witnesses at trial established that while the Policy does not apply to "casual use," it applies to use that "express[es] political views," or "display[s] a message," and requires a permit for such use. Doc. #213 at 456; Doc. #214 at 597. Because the curfew is primarily enforced through Carwyle's review of permit applications, the curfew is largely enforced against use that "express[es] political views" or "display[s] a message." So whether the curfew is content-neutral turns on whether it could serve purposes unrelated to the type of use it restricts. *See McCullen*, 573 U.S. at 480.

The County's stated purpose for the curfew is that there is not enough manpower to keep people safe on the courthouse grounds at night because of the nightlife around the town square and the impact of nighttime use of the courthouse grounds on pedestrian traffic safety. Public safety is a purpose that can render a restriction content-neutral. *See id.* (ensuring safety and preventing obstruction of sidewalks is content neutral). Rash does not dispute that the County's interest in public safety is content-neutral as a general matter. But he contends the County's interest in public safety is pretextual because activities on the courthouse grounds have not created safety concerns or strained law enforcement since the County doubles the number of officers on patrol, uses surveillance cameras, and frequently coordinates with the City of Oxford's police department. Because the courthouse grounds are located in close proximity to the town square and the curfew's stated purpose includes safety concerns due to the nightlife around the town square, the Court declines to infer that the curfew cannot be justified without reference to the content it prohibits. Accordingly the curfew is a content-neutral restriction.

### 2. Forum analysis

#### a. *Forum Type*

The level of scrutiny applied to content-neutral restrictions on First Amendment speech varies depending on the type of forum the restriction governs. *See Chiu v. Plano Indep. Sch. Dist.*, 260 F.3d 330, 344 (5th Cir. 2001) ("For First Amendment purposes, 'the existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue.'") (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44 (1983)). "There are two broad categories of forums: (1) traditional and designated public forums and (2) limited public forums and nonpublic forums." *Freedom from Religion Found., Inc. v. Abbott*, 955 F.3d 417, 426 (5th Cir. 2020) (citations omitted).

Traditional public forms are places that have traditionally been devoted to assembly or debate. *Id.* (citing *Chiu*, 260 F.3d at 344). "This type of forum includes 'streets and parks which have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.'" *Chiu*, 260 F.3d at 344 (quoting *Perry*, 460 U.S. at 45). Designated public forums are places that the government "intentionally create[s] … for the same widespread use as traditional public forums." *Fairchild v. Liberty Indep. Sch. Dist.*, 597 F.3d 747, 758 (5th Cir. 2010). Limited public forums are places that the government has opened "for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects." *Chiu*, 260 F.3d at 346. Nonpublic forums are forums that are not open for public communication by tradition or designation. *Id.* at 347.

A content-neutral restriction on protected speech in a traditional or designated public form

is subject to intermediate scrutiny and must leave open ample alternative channels of communication. *Perry*, 460 U.S. at 45; *see Hays Cnty. Guardian v. Supple*, 969 F.2d 111, 118 (5th Cir. 1992) (content neutral regulation of speech in university outdoor premises—designated public forum—must survive intermediate scrutiny). Content-neutral restrictions on protected speech in a limited or nonpublic forum need only (1) be "reasonable in light of the purpose served by the forum," and (2) "not discriminate against speech on the basis of viewpoint." *Freedom from Religion Found., Inc.*, 955 F.3d at 427 (citing *Chiu*, 260 F.3d at 346–47).

In his proposed findings and conclusions, Rash contends that the courthouse grounds are a traditional public forum or, alternatively, a designated public forum. The County argues the courthouse grounds are a designated public forum. Because content neutral restrictions—whether in traditional public forums or designated public forums—must satisfy intermediate scrutiny and leave open ample alternative channels of communication, the Court need not address the issue of the courthouse grounds' forum type to determine whether the curfew is an unconstitutional restriction.

### b. *Intermediate Scrutiny*

To survive intermediate scrutiny for First Amendment purposes, a restriction on speech "must be narrowly tailored to serve a significant government interest." *Hays Cnty. Guardian*, 969 F.2d at 118; *accord NRA v. BATFE*, 714 F.3d 334, 346 (5th Cir. 2013) (Jones, E., dissenting) ("The First Amendment test for intermediate scrutiny allows a 'content-neutral regulation' of speech to be sustained if it 'advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests.'"). The government bears the burden of establishing both a significant interest and narrow tailoring. *J & B Ent. v. City of Jackson*, 152 F.3d 362, 370–71 (5th Cir. 1998) (quoting *Turner Broad. Sys.*

*Inc. v. FCC*, 520 U.S. 180, 189 (1997)).

### i. *Significant Interest*

The County asserts that the significant interest prong is satisfied because the curfew restricting use of the courthouse grounds serves to address public safety concerns caused by pedestrians and traffic in the town square at night. Rash does not dispute that public safety is a compelling interest but argues that the County's alleged interests are based on conjecture because the County did not show that permitted events on the courthouse grounds create safety issues or that the courthouse grounds' proximity to the town square has led intoxicated persons to enter the square and create safety issues.

The Fifth Circuit has held that public safety is "a compelling interest at the heart of government's function." *Hous. Chron. Publ. Co. v. City of League City*, 488 F.3d 613, 622 (5th Cir. 2007). But the government's burden to establish a significant interest "'is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on [protected] speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree.'" *Sarre v. City of New Orleans*, 420 F. App'x 371, 375 (5th Cir. 2011) (quoting *Edenfield v. Fane*, 507 U.S. 761, 770–71 (1993)).

The County presented considerable testimony that the public safety concerns caused by the nighttime activity on the town square are driven by the University's student population consuming alcohol at various bars around the square. However, there was no evidence that the public safety concerns posed by the nighttime activity on the square extended to the courthouse grounds, despite the proximity of the courthouse grounds to the square.[17] The evidence regarding public safety at

---

[17] There was evidence to the contrary. McCutchen testified that his officers have never stopped anyone from going onto the courthouse grounds at night because of intoxication, and that neither of the two alcohol-related fatalities he knew of that occurred in the City of Oxford in the last two years occurred on the courthouse grounds or even on the square. Doc. #212 at 196–97, 227–28. East testified that even during the summer of 2020, he never noticed people

night on the courthouse grounds focused on "what could happen,"[18] not real harms that the curfew would alleviate. Thus, the County has not met its burden to demonstrate that the curfew serves a significant interest in public safety. *Cf. Int'l Soc'y for Krishna Consciousness, Inc. v. Baton Rouge*, 876 F.2d 494, 498 (5th Cir. 1989) (government established significant interest in public safety served by ordinance prohibiting solicitation in all streets and roadways following fatal injury involving news vendor and where preamble to ordinance identified safety risks associated with solicitation in streets).

### ii. Narrowly Tailored

Even had the County met its burden of establishing a significant interest in public safety, the curfew is not narrowly tailored. "For a content-neutral time, place, or manner regulation to be narrowly tailored, it must not 'burden substantially more speech than is necessary to further the government's legitimate interests.'" *McCullen*, 134 S. Ct. at 2535 (quoting *Ward*, 491 U.S. at 799). Though such regulation "'need not be the least restrictive or least intrusive means of' serving the government's interests," the government "'may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals.'" *Id.* (quoting *Ward*, 491 U.S. at 799).

The County argues the curfew is narrowly tailored because the significant interest in public safety during nighttime activity on the town square is best served by a restriction imposed when darkness occurs as defined by "dusk" rather than at a certain time of day, and regulations based on the time of sunset are common and not difficult to administer. Rash contends that the curfew is

---

on the courthouse grounds at night, and that "[w]hen it was dark, the only time [he saw] people [in the courthouse grounds] were students … waiting for rides … [b]ut it was not used." Doc. #213 at 386–87.

[18] *Id.* at 223; *see id.* at 213 (McCutchen's testimony that he "would … be concerned" if a bar on the square were at its maximum capacity of "a littler over one thousand" and "a crowd of that size tried to walk over to an event on the courthouse grounds.").

not narrowly tailored because less restrictive options were available; the curfew is not limited to times when the town square is crowded; and though the extent of nighttime activity on the square varies, the County does not show how the level of activity on the square is related to dusk's onset.[19]

The curfew restricts use of the courthouse grounds every day starting thirty minutes before dusk, even though evidence at trial showed that nighttime activity on the town square varies and is most prominent on Thursday, Friday, and Saturday. By restricting use of the courthouse grounds seven days a week instead of the days during which the public safety concerns are implicated, the curfew restricts "substantially more speech than is necessary" to serve the County's stated interest. *McCullen*, 134 S. Ct. at 2535. Accordingly, the curfew is not narrowly tailored, and it fails to survive intermediate scrutiny for this additional reason.[20]

### 3. Summary

Although the curfew is content-neutral, it is an unconstitutional restriction on speech under the First Amendment because the County has not established a significant interest in public safety and, alternatively, it is not narrowly tailored to serve such interest.

### D. Nominal Damages, Declaratory Judgment, and Injunctive Relief

### 1. Permanent injunction

A party seeking a permanent injunction must show "(1) that it has succeeded on the merits;

---

[19] Rash also argues that the curfew is vague since it does not define the term "dusk." Courts have determined that a restriction on speech may fail to satisfy narrow tailoring for vagueness. *See, e.g.*, *Villejo v. City of San Antonio*, 485 F. Supp. 2d 777, 783 (W.D. Tex. 2007). Restrictions on speech are unconstitutionally vague when they fail to "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayne v. City of Rockford*, 408 U.S. 104, 108–09 (1972). However, because Rash lacks standing to assert a vagueness challenge to the curfew, the Court need not address whether the curfew fails narrow tailoring on that basis.

[20] Because the Court concludes that the curfew does not serve a significant interest and is not narrowly tailored to such interest, it need not address the issue of whether the curfew left open ample alternative channels of communication. *See McCullen*, 573 U.S. at 496 n.9 (court need not consider whether restriction leaves open ample alternative channels where it finds the restriction is not narrowly tailored).

(2) that a failure to grant the injunction will result in irreparable injury; (3) that said injury outweighs any damage that the injunction will cause the opposing party; and (4) that the injunction will not disserve the public interest." *Valentine v. Collier*, 993 F.3d 270, 280 (5th Cir. 2021).

For the reasons explained above, Rash has demonstrated actual success on the merits as to his as-applied challenge to the Policy's curfew. And the loss of First Amendment rights constitutes irreparable injury justifying the grant of a permanent injunction. *See Denton v. City of El Paso*, 861 F. App'x 836, 841 (5th Cir. 2021) ("the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury") (alteration omitted). The balancing of potential harms to the parties resulting from issuance of the injunction leans in Rash's favor as his ability to assert his First Amendment rights on the courthouse grounds outweighs the County's interest in maintaining public safety in the town square where the County has not shown that its public safety concerns extend to the courthouse grounds. *See N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013) ("[T]he Government does not have an interest in the enforcement of an unconstitutional law.") (internal quotation marks omitted; alteration in original); *accord Fund for Louisiana's Future v. La. Bd of Ethics*, 174 F. Supp. 3d 562, 576 (E.D. La. 2014) ("The State simply 'does not have an interest in the enforcement of an unconstitutional law.'") (quoting *ACLU v. Ashcroft*, 322 F.3d 240, 247 (3d Cir. 2003)). Finally, "injunctions protecting First Amendment freedoms are always in the public interest." *Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013) (internal quotation marks omitted). So the Court concludes that a permanent injunction would prevent irreparable injury to Rash, not unduly damage the County, and be in the best interest of the public.

### 2.  Nominal damages and declaratory judgment

Rash requests a declaratory judgment and a $100.00 nominal damages award as

34

compensation for the County's violation of his constitutional right. To the extent the Court determined above that the curfew unconstitutionally restricts Rash's First Amendment right as applied to Rash, a declaratory judgment will be issued and Rash award nominal damages in the amount of $100.00

**V**

**Conclusion**

In accordance with the findings of fact and conclusions of law above:

1.      To the extent Rash's claim against the County asserts an as-applied challenge to the Facility Use Policy's provisions regarding advance notice requirement, group permit requirement, sheriff protection fees, insurance and indemnity, and the County reserving the right to deny permit applications for use that would pose health or safety risks, such is **DISMISSED without prejudice** for lack of standing.

2.      To the extent Rash's claim against the County asserts a facial challenge to the Facility Use Policy's curfew provision, such is **DISMISSED without prejudice**.

3.      To the extent Rash's claim against the County asserts an as-applied challenge to the Facility Use Policy's curfew provision, the County is permanently enjoined from applying such provision to Rash.

4.      A judgment will be entered with declarations consistent with the rulings above.[21]

**SO ORDERED**, this 30th day of September, 2024.

/s/Debra M. Brown
**UNITED STATES DISTRICT JUDGE**

---

[21] The parties did not include in the governing pretrial order Rash's request for reasonable costs and attorneys' fees pursuant to 42 U.S.C. § 1988.